**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **STRATEGIC MATERIALS, INC.,** *et al.*, | § | **Case No. 23-90907 (CML)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |
| | § | |

## AFFIDAVIT OF SERVICE OF SOLICITATION MATERIALS

I, Alex Orchowski, depose and say that:

1.       I am a Director of Restructuring Administration at Kroll Restructuring Administration LLC ("***Kroll***"), the proposed claims and noticing agent for the Debtors in the above-captioned chapter 11 cases. At my direction and under my supervision, employees of Kroll caused the following materials to be served:

   a.   the Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization, a copy of which is attached hereto as **Exhibit A** (the "***Disclosure Statement***");

   b.   the Notice of Supplement to the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization, a copy of which is attached hereto **Exhibit B** (the "***Plan Supplement***");

   c.   the Notice of Amended Supplement to the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization, a copy of which is attached hereto **Exhibit C** (the "***Amended Plan Supplement***");

   d.   the Class 3 – First Lien Credit Facility Claims Ballot for Voting to Accept or Reject the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization, a form of which is attached hereto as **Exhibit D** (the "***Class 3 Ballot***");

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 17220 Katy Freeway, Ste. 150, Houston, TX 77094.

e.  the Class 4 – 1.5 Lien Credit Facility Claims Ballot for Voting to Accept or Reject the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization, a form of which is attached hereto as **Exhibit E** (the "*Class 4 Ballot*");

f.  the Class 5 – Second Lien Credit Facility Claims Ballot for Voting to Accept or Reject the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization, a form of which is attached hereto as **Exhibit F** (the "*Class 5 Ballot*"); and

g.  the Class 10 – SMI Topco Interests Ballot for Voting to Accept or Reject the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization, a form of which is attached hereto as **Exhibit G** (the "*Class 10 Ballot*").

2.      Unless otherwise stated, on November 15, 2023, at my direction and under my supervision, employees of Kroll caused electronic copies of the above materials to be served as follows:

a.  the Disclosure Statement, Plan Supplement and Class 3 Ballot were served via email on the parties identified on the service list attached hereto as **Exhibit H**;

b.  the Disclosure Statement, Plan Supplement and Class 4 Ballot were served via email on the parties identified on the service list attached hereto as **Exhibit I**;

c.  the Disclosure Statement, Plan Supplement and Class 5 Ballot were served via email on the parties identified on the service list attached hereto as **Exhibit J**; and

d.  the Disclosure Statement, Plan Supplement, Class 10 Ballot were served via email on SMI Topco L.P. at email addresses that have been redacted in the interest of privacy.

3.      In addition to the services detailed above, on November 20, 2023, at my direction and under my supervision, employees of Kroll caused electronic copies of the above material to be served as follows:

a.  the Amended Plan Supplement was served via email on the parties identified on the service list attached hereto as **Exhibit K.**

Dated: December 1, 2023

<div style="text-align:right">

_/s/ Alex Orchowski_
Alex Orchowski

</div>

State of New York
County of New York

Subscribed and sworn (or affirmed) to me on December 1, 2023, by Alex Orchowski, proved to me on the bases of satisfactory evidence to be the person who executed this affidavit.


_/s/ PAUL PULLO_
Notary Public, State of New York
No. 01PU6231078
Qualified in Nassau County
Commission Expires November 15, 2026

SRF 74481

**<u>Exhibit A</u>**

*Solicitation Version*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-[\_\_\_\_]** |
| | § | |
| **STRATEGIC MATERIALS, INC.**, *et al.*, | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |

## DISCLOSURE STATEMENT FOR THE DEBTORS'
## JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

> **THIS DISCLOSURE STATEMENT IS BEING PROVIDED TO YOU IN CONNECTION WITH YOUR VOTE ON THE PREPACKAGED CHAPTER 11 PLAN THAT IS BEING SOLICITED PREPETITION. THE DEBTORS HAVE NOT COMMENCED CHAPTER 11 CASES. THIS DISCLOSURE STATEMENT AND THE CHAPTER 11 PLAN WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' COMMENCEMENT OF THE CHAPTER 11 CASES.**

Joshua A. Feltman
Benjamin S. Arfa
Michael A. Chaia
Katherine Mateo
51 West 52nd Street
New York, NY 10019

**WACHTELL, LIPTON, ROSEN & KATZ**

**PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

Paul E. Heath (TX 09355050)
Matthew D. Struble (TX 24102544)
Trevor G. Spears (TX 24106681)
845 Texas Avenue, Suite 4700
Houston, TX 77002

- and -

David S. Meyer
Jessica C. Peet
Steven Zundell
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036

**VINSON & ELKINS LLP**

**PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

**Dated: November 15, 2023**

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  17220 Katy Freeway, Ste. 150, Houston, TX 77094.

*Solicitation Version*

## Important Information for You to Read[2]

| SUPPORT FOR THE PLAN |
|---|
| The boards of directors of SMI Topco Holdings, Inc., SMI Ultimate Group Holdings, Inc., SMI Group Holdings, LLC, SMI Group Acquisitions, Inc. ("*SMI*"), Strategic Materials Holding Corp., Strategic Materials, Inc., NexCycle, Inc., SMI Equipment, Inc., and American Specialty Glass, Inc. (each of the foregoing, together with each of their direct and indirect Debtor subsidiaries, collectively, the "*Debtors*"), have unanimously approved the transactions contemplated by the Plan and recommend that all creditors whose votes are being solicited submit Ballots to accept the Plan. |
| Holders of (i) approximately 90% of the aggregate principal amount of the First Lien Credit Facility Claims and more than one-half in number of the Holders thereof (the "*Consenting First Lien Creditors*"); (ii) 100% of the aggregate principal amount of the 1.5 Lien Credit Facility Claims (the "*Consenting 1.5 Lien Creditors*"); and (iii) approximately 68% of the aggregate principal amount of Second Lien Credit Facility Claims and more than one-half in number of the Holders thereof (the "*Consenting Second Lien Creditors*," and together with the Consenting Superpriority Creditors (as defined in the Restructuring Support Agreement), the Consenting First Lien Creditors, and the Consenting 1.5 Lien Creditors, the "*Consenting Creditors*") have agreed to vote to accept the Plan, subject to receipt of the solicitation materials (including this Disclosure Statement) in respect of the Plan and the commencement of solicitation of the Plan. |

| PLAN VOTING DEADLINE |
|---|
| The deadline to vote on the Plan is November 22, 2023, at 5:00 p.m. (Central Time) (the "*Voting Deadline*") unless extended by the Debtors, in consultation with the First Lien Lender Group.  For your vote to be counted, your Ballot must be actually received by Kroll Restructuring Administration LLC, the Debtors' proposed claims, noticing, and solicitation agent ("*Kroll*"), before the Voting Deadline in accordance with the instructions provided below. |
| The Debtors are providing you with the information in this disclosure statement (including any exhibits, appendices, or related documents, in each case, as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Restructuring Support Agreement, the "*Disclosure Statement*") for the Plan because you may be a creditor entitled to vote on the Plan.  Nothing in this Disclosure Statement may be relied upon or used by any Entity for any purpose other than determining whether to vote to accept or reject the Plan. |

| SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS |
|---|
| The Plan has not been approved (or disapproved) by the Securities and Exchange Commission ("*SEC*") or any state securities commission, and neither the SEC nor any state securities commission has passed upon the accuracy or adequacy of this Disclosure Statement or the merits of the Plan.  Any representation to the contrary is unlawful. |
| This Disclosure Statement contains forward-looking statements that involve substantial risks and uncertainties.  You can identify these or similar statements by forward-looking words such as "anticipate," "believe," "could," "estimate," "expect," "intend," "may," "plan," "potential," "should," "will," "would," or similar words.  You should read statements that contain these words carefully because they discuss the Debtors and their expectations concerning their businesses, financial condition, the Plan, and other similar matters.  While the Debtors believe these forward-looking statements are reasonable as and when made, there may be events in the future that the Debtors are not able to predict accurately or control, and there can be no assurance that future developments will be those that the Debtors anticipate.  The factors listed under "Risk Factors" as well as any cautionary language in this Disclosure Statement describe certain known material risks, uncertainties, and events that may cause actual events or results to differ materially and adversely from the expectations the Debtors describe in their forward-looking statements.  Additional factors or events that may |

---

[2]    Capitalized terms used but not immediately defined herein shall have the meanings ascribed to such terms later in this Disclosure Statement or in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "*Plan*"), as applicable; *provided*, that any capitalized term used but not defined herein or in the Plan that is defined in Chapter 11 of Title 11 of the United States Code (the "*Bankruptcy Code*") or the Federal Rules of Bankruptcy Procedure (the "*Bankruptcy Rules*") will have the meaning ascribed to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

emerge from time to time, or those the Debtors currently deem to be immaterial, could cause our actual events or results to differ, and it is not possible for the Debtors to predict all of them. You are cautioned not to place undue reliance on the forward-looking statements contained herein. The Debtors undertake no obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise, except as required by law.

The Financial Projections set forth in **Exhibit C** (the "*Financial Projections*"), the Liquidation Analysis set forth in **Exhibit D** (the "*Liquidation Analysis*"), and other information contained herein and attached hereto are only estimates, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot now be predicted. Any analyses, estimates, or recovery projections may not turn out to be accurate. Such analyses were not prepared with a view toward public disclosure or compliance with the published guidelines of the SEC or the guidelines established by the American Institute of Certified Public Accountants regarding projections or forecasts, and do not purport to present the Debtors' financial condition in accordance with accounting principles generally accepted in the United States. The Debtors' independent accountants have not examined, compiled or otherwise applied procedures to any financial information included herein and, accordingly, do not express an opinion or any other form of assurance with respect to such financial information.

Making investment decisions based on the information contained in this Disclosure Statement and/or the Plan is, therefore, highly speculative. The Debtors recommend that potential recipients of any securities issued pursuant to the Plan consult their own legal counsel concerning the securities laws governing the transferability of any such securities.

The Debtors cannot assure you that the Disclosure Statement, including any exhibits thereto, that is ultimately approved by the Court in the Chapter 11 Cases: (i) will contain any of the terms described in this Disclosure Statement; or (ii) will not contain different, additional, or material terms that do not appear in this Disclosure Statement. The Debtors urge each Holder of a Claim or Interest: (i) to read and carefully consider this entire Disclosure Statement (including the Plan and the matters described under "Risk Factors" below); and (ii) to consult with your own advisors with respect to reviewing this Disclosure Statement, the Plan, and each of the proposed transactions contemplated thereby prior to deciding whether to vote to accept or reject the Plan. You should not rely on this Disclosure Statement for any purpose other than to determine whether to vote to accept or reject the Plan.

No independent auditor or accountant has reviewed or approved the Liquidation Analysis or the Financial Projections herein. The Debtors have not authorized any person to give any information or advice, or to make any representation in connection with the Plan or this Disclosure Statement. This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver. The Debtors may seek to investigate, file, and prosecute Claims and Causes of Action and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies any such Causes of Action, Claims, or objections to Claims. Holders of Claims should not construe the contents of this Disclosure Statement as providing any legal, business, financial, securities, or tax advice and should consult with their own advisors before voting on the Plan.

Notwithstanding any right of approval pursuant to the Restructuring Support Agreement or otherwise as to the form or substance of this Disclosure Statement, the Plan, or any other document relating to the transactions contemplated thereunder, none of the Consenting Creditors or their respective representatives, members, financial or legal advisors, or agents has independently verified the information contained herein or takes any responsibility therefor, and none of the foregoing Entities or Persons makes any representations or warranties whatsoever concerning the information contained herein.

If the Plan is confirmed by the Court and the Effective Date occurs, all Holders of Claims against, and Holders of Interests in, the Debtors (including those Holders of Claims or Interests who do not submit Ballots to accept or reject the Plan or who are not entitled to vote on the Plan) will be bound by the terms of the Plan and the transactions contemplated thereby.

| QUESTIONS AND ADDITIONAL INFORMATION |
|---|

If you would like to obtain copies of this Disclosure Statement, the Plan, any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact Kroll, by either: (i) visiting its website at https://cases.ra.kroll.com/SMISolicitation; (ii) calling (844) 307-7493 (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll); or (iii) emailing at SMIBallots@ra.kroll.com with "SMI Solicitation" in the subject line.

**TABLE OF CONTENTS**

I.      EXECUTIVE SUMMARY ...................................................................................................1

   A.     Introduction...........................................................................................................1
   B.     Purpose of the Disclosure Statement....................................................................1
   C.     The Plan ................................................................................................................1
   D.     Voting on the Plan.................................................................................................5

II.     OVERVIEW OF THE DEBTORS' OPERATIONS .........................................................8

   A.     The Company's Business and History ...................................................................8
   B.     The Company's Organizational Structure..............................................................9
   C.     The Company's Operations.................................................................................10
   D.     The Debtors' Capital Structure...........................................................................14

III.    KEY EVENTS LEADING TO CHAPTER 11 CASES ..................................................17

   A.     High Interest Rates and Decreased Demand Across Glass Recycling Industry ............17
   B.     Liquidity Constraints and Near-Term Financial Obligations..............................18
   C.     Prepetition Liquidity Preservation Strategies and Hiring Advisors ....................18
   D.     Implementation of Key Employee Retention Program ........................................19
   E.     Execution of Restructuring Support Agreement .................................................19
   F.     Out-of-Court Marketing and Sale Process ..........................................................19
   G.     DIP Financing to Fund the Chapter 11 Cases .....................................................20
   H.     Milestones ...........................................................................................................21

IV.     ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES..................................21

   A.     First Day Pleadings .............................................................................................21
   B.     Schedules of Assets and Liabilities and Statements of Financial Affairs ............22

V.      TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS ......22

VI.     SUMMARY OF THE PLAN ...........................................................................................23

   A.     Administrative Expense Claims, Professional Fee Claims, and Priority Claims ............23
   B.     Classification and Treatment of Claims and Interests..........................................26
   C.     Means for Implementation of the Plan ................................................................31
   D.     Treatment of Executory Contracts and Unexpired Leases ..................................40
   E.     Provisions Governing Distributions ....................................................................43
   F.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ..................46
   G.     Settlement, Release, Injunction, And Related Provisions ....................................48
   H.     Conditions Precedent to Confirmation and Consummation of the Plan................52
   I.     Modification, Revocation, or Withdrawal of the Plan .........................................54
   J.     Retention of Jurisdiction .....................................................................................54

VII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...............56

   A.     Introduction.........................................................................................................56
   B.     Tax Treatment May Vary Depending on Structure of Plan .................................57
   C.     Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors ................58
   D.     Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Debt Claims ............60
   E.     U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Reorganized SMI Topco Interests.................................................64
   F.     Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Debt Claims, Second Out Exit Term Loans and/or Reorganized SMI Topco Interests....................................64
   G.     Back-Up Withholding and Information Reporting ...............................................67

VIII.   CERTAIN RISK FACTORS TO BE CONSIDERED ....................................................67

   A.     Certain Bankruptcy Considerations ....................................................................68
   B.     Additional Factors Affecting the Value of Claims..............................................71

i

| | | |
|---|---|---|
| **C.** | Risks Relating to the Debtors' Business and Financial Condition | 71 |
| **D.** | Factors Relating to Securities to Be Issued Under the Plan | 72 |
| **E.** | Additional Factors | 73 |

IX. CONFIRMATION OF THE PLAN ........................................................................................73

| | | |
|---|---|---|
| **A.** | Confirmation Hearing | 73 |
| **B.** | Objections to Confirmation | 73 |
| **C.** | Requirements for Confirmation of the Plan | 74 |
| **D.** | Best Interests Test/Liquidation Analysis | 75 |
| **E.** | Feasibility | 76 |
| **F.** | Acceptance by Impaired Classes | 76 |
| **G.** | Additional Requirements for Nonconsensual Confirmation | 77 |

X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............77

| | | |
|---|---|---|
| **A.** | Alternative Plan | 77 |
| **B.** | Sale of Some or All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code | 77 |
| **C.** | Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law | 78 |

XI. CONCLUSION AND RECOMMENDATION ........................................................................78

4876-2744-3839

*Solicitation Version*

## EXHIBITS

| | |
|---|---|
| **EXHIBIT A** | Plan |
| **EXHIBIT B** | Restructuring Support Agreement |
| **EXHIBIT C** | Financial Projections |
| **EXHIBIT D** | Liquidation Analysis |

4876-2744-3839

*Solicitation Version*

## I.   EXECUTIVE SUMMARY

This Executive Summary is only a general overview of the Disclosure Statement and the material terms of, and transactions proposed by, the Plan.  This Executive Summary is qualified in its entirety by reference to the more detailed discussions appearing elsewhere in this Disclosure Statement and the exhibits attached hereto, including the Plan.  The Debtors urge all parties to read this Executive Summary in conjunction with the entire Disclosure Statement and the Plan.

### A.   Introduction

The Debtors submit this Disclosure Statement pursuant to sections 1125 and 1126(b) of the Bankruptcy Code in connection with the solicitation of votes on the Plan, dated November 15, 2023, which is attached hereto as **Exhibit A**.  The Plan, although proposed jointly, constitutes a separate chapter 11 plan for each Debtor.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs.  The Debtors and the Consenting Creditors support the Plan and strongly urge Holders of Claims whose votes are being solicited to accept the Plan.

The Debtors are currently facing significant balance sheet and liquidity challenges stemming from a broad array of factors.  The Debtors' liquidity constraints are largely the result of macroeconomic forces, including significantly increased interest rates and inflation, as well as changes in the glass recycling market and other operational challenges.  In response to these challenges, the Debtors have taken certain measures to reduce operational costs and capital expenditures and preserve liquidity.  Despite these efforts and in recognition of the macroeconomic challenges, changing market trends, and their debt service obligations, the Debtors began evaluating strategic alternatives, including exploring potential asset sales and modifications to their capital structure.  The Debtors and the Consenting Creditors engaged in substantial, good faith negotiations over the terms of the Debtors' potential restructuring or a sale of all of their assets and property.  These efforts culminated in the Debtors and Consenting Creditors entering into the Restructuring Support Agreement on September 15, 2023, attached hereto as **Exhibit B**, which provides for a dual-track out-of-court sale and in-court restructuring process on an accelerated timeline.

Following a robust prepetition sale process, the Debtors and their advisors determined that the Chapter 11 Cases are the appropriate vehicle to implement the reorganization or sale contemplated in the Restructuring Support Agreement and the Plan with the support of the Consenting Creditors.  Consistent with the dual-track transactions contemplated in the Restructuring Support Agreement, the Plan will allow the Debtors to either implement the Equitization Transaction to right-size their balance sheet by converting a significant portion of their prepetition secured debt into equity or, alternatively, with the consent of the Required First Lien Lender Group, consummate a Sale Transaction whereby they would sell all or substantially all of their equity interests or assets and property to a third-party purchaser, and the proceeds from such sale would be distributed as set forth in the Plan, as further described in Section III hereof.

### B.   Purpose of the Disclosure Statement

The Debtors submit this Disclosure Statement pursuant to sections 1125 and 1126(b) of the Bankruptcy Code in connection with the solicitation of votes on the Plan prior to the commencement of the Chapter 11 Cases.  Section 1125 of the Bankruptcy Code requires that in connection with soliciting acceptances of a proposed chapter 11 plan, a debtor must prepare a disclosure statement that contains information of a kind, and in sufficient detail, to permit a hypothetical investor to make an informed judgment regarding acceptance of the plan.  The Debtors submit this Disclosure Statement pursuant to section 1125 and 1126(b) of the Bankruptcy Code to certain Holders of Claims against the Debtors because the Debtors are asking such Holders of Claims to vote to accept the Plan.

### C.   The Plan

#### 1.   Purpose and Effect of the Plan

A chapter 11 plan sets forth, among other things, how a debtor will treat claims and interests.  A bankruptcy court's confirmation of a plan binds the debtor, any entity or person acquiring assets or property under the plan, any creditor of or equity security holder in the debtor, and any other entities and persons to the extent ordered by such bankruptcy court pursuant to the terms of the confirmed plan, whether or not the claim or interest of such entity or person is impaired pursuant to the plan, and whether or not such entity or person has voted to accept the plan, or receives or retains any property under the plan.

Each of the Debtors is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.  The Plan does not contemplate the substantive consolidation of the Debtors' Estates.  Instead, the Plan, although proposed jointly, constitutes a separate plan for each of the Debtors in the Chapter 11 Cases.  Under the Plan, Claims and Interests are divided into Classes according to their relative priority and other criteria.  Holders of Allowed Claims

4876-2744-3839

against or Interests in a particular Debtor will receive the same recovery provided to other Holders of Allowed Claims against or Interests in such Debtor within the applicable Class under the Plan and will be entitled to their share of any property available for distribution to such Class. Among other things, subject to certain limited exceptions and except as otherwise provided in the Plan or an order of the Court approving this Disclosure Statement and confirming the Plan (the "***Confirmation Order***"), the Confirmation Order will discharge the Debtors from any debt arising before the Effective Date, terminate all of the rights and Interests of prepetition Holders of SMI Topco Interests, and substitute the obligations and Interests set forth in the Plan for those prepetition Claims and Interests.

    **2.**       **Feasibility of the Plan**

The feasibility of the Plan is premised upon, among other things, the Debtors' ability to make the distributions contemplated under the Plan, and payment of the Debtors' obligations in the ordinary course of business. As discussed below, the Plan provides for the payment in full of Administrative Expense Claims, Priority Tax Claims, and Other Priority Claims, and Other Secured Claims will either be paid in full or Reinstated (in any case, each of the foregoing Claims will be Unimpaired under the Plan). Thus, the Debtors believe that, following consummation of the Plan, no liquidation or further reorganization will be necessary unless otherwise contemplated by the Plan.

In developing the Plan, the Debtors gave due consideration to various other restructuring alternatives. After a careful review of their current operations, prospects as an ongoing business, estimated recoveries to creditors through out-of-court transactions, asset sales pursuant to section 363 of the Bankruptcy Code, or a forced sale or liquidation, and current market conditions, the Debtors concluded that the transactions contemplated under the Plan will maximize value for the Debtors' Estates. The Debtors believe, based on information learned through the extensive prepetition sale process, that any alternative to Confirmation of the Plan, such as an alternative plan, would result in significantly lower recoveries for stakeholders, undue delays, and greater costs. For these reasons and as discussed more fully in this Disclosure Statement, the Debtors believe the Plan provides the best recoveries possible for the Debtors' stakeholders under the circumstance and recommend that, if you are entitled to vote, you vote to accept the Plan.

> **THE DEBTORS AND THE CONSENTING CREDITORS BELIEVE THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES, AND PROVIDES THE BEST RECOVERY AVAILABLE TO CLAIM HOLDERS. FOR THESE AND THE OTHER REASONS DESCRIBED HEREIN, THE DEBTORS URGE ALL CREDITORS ENTITLED TO VOTE ON THE PLAN TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

    **3.**       **Treatment and Classification**

The Plan organizes the Debtors' creditors and equity holders into groups called "Classes." For each Class, the Plan describes: (a) the Claims or Interests comprising such Class; (b) whether the Class is "Impaired" under the Plan, meaning that the Holders in such Class will receive less than full value on account of their Claims or Interests, or that the legal or equitable rights of such Holders will be altered in some other form; (c) the form of recovery, if any, that such Holders will receive on account of their respective Claims or Interests; and (d) whether the Holders of Allowed Claims or Interests in such Class are entitled to vote on the Plan.

The table below summarizes the classification and treatment of Claims and Interests under the Plan. A more detailed description of the classification and treatment of Claims and Interests is set forth in Section VI of this Disclosure Statement.

| Class | Claim or Interest | Treatment |
|---|---|---|
| 1 | Other Priority Claims | If either an Equitization Transaction or a Sale Transaction occurs, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, (i) payment in full in Cash of its Allowed Other Priority Claim, or (ii) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or, in each case of (i) and (ii), as soon as reasonably practicable thereafter. |

4876-2744-3839

| Class | Claim or Interest | Treatment |
|---|---|---|
| 2 | Other Secured Claims | If either an Equitization Transaction or a Sale Transaction occurs, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, (i) payment in full in Cash of its Allowed Other Secured Claim, payable on the later of (1) the Effective Date and (2) the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or, in each case of (1) and (2), as soon as reasonably practicable thereafter, (ii) Reinstatement, or (iii) such other treatment so as to render such Holder's Allowed Other Secured Claim Unimpaired. |
| 3 | First Lien Credit Facility Claims | In exchange for the full and final satisfaction, settlement, release, and discharge of the First Lien Credit Facility Claims and any Adequate Protection Claims in respect thereof, each Holder of an Allowed First Lien Credit Facility Claim or its designated Affiliate shall receive its Pro Rata share of, as applicable: <br><br> (i) if the Equitization Transaction occurs: (A) the Second Out Exit Term Loans, and (B) 96.5% of the Reorganized SMI Topco Interests (subject to dilution on account of the MIP); or <br><br> (ii) if a Sale Transaction occurs: the Waterfall Recovery; *provided*, *however*, that in no event shall the Holders of First Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed First Lien Credit Facility Claims, including postpetition interest on any Allowed First Lien Credit Facility Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code. |
| 4 | 1.5 Lien Credit Facility Claims | In exchange for the full and final satisfaction, settlement, release, and discharge of the 1.5 Lien Credit Facility Claims and any Adequate Protection Claims in respect thereof, each Holder of an Allowed 1.5 Lien Credit Facility Claim or its designated Affiliate shall receive its Pro Rata share of, as applicable: <br><br> (i) if the Equitization Transaction occurs: 2.5% of the Reorganized SMI Topco Interests (subject to dilution on account of the MIP); or <br><br> (ii) if a Sale Transaction occurs: the Waterfall Recovery, *less* the amount necessary to satisfy the Class 3 treatment described above; *provided*, *however*, that in no event shall the Holders of 1.5 Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed 1.5 Lien Credit Facility Claims, including postpetition interest on any Allowed 1.5 Lien Credit Facility Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code. |
| 5 | Second Lien Credit Facility Claims | In exchange for the full and final satisfaction, settlement, release, and discharge of the Second Lien Credit Facility Claims and any Adequate Protection Claims in respect thereof, each Holder of an Allowed Second Lien Credit Facility Claim or its designated Affiliate shall receive its Pro Rata share of, as applicable: |

| Class | Claim or Interest | Treatment |
|---|---|---|
| | | (i) if the Equitization Transaction occurs: 1.0% of the Reorganized SMI Topco Interests (subject to dilution on account of the MIP); or |
| | | (ii) if a Sale Transaction occurs: the Waterfall Recovery, *less* the amount necessary to satisfy the Class 3 and Class 4, treatments described above; *provided*, *however*, that in no event shall the Holders of Second Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed Second Lien Credit Facility Claims, including postpetition interest on any Allowed Second Lien Credit Facility Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code. |
| 6 | General Unsecured Claims | In exchange for the full and final satisfaction, settlement, release, and discharge of the General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive:<br><br>(i) if the Equitization Transaction occurs: at the option of the applicable Debtor or Reorganized Debtor, either (1) Reinstatement of its Allowed General Unsecured Claim; or (2) payment in full in Cash of its Allowed General Unsecured Claim on the later of (a) the Effective Date or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Claim; or<br><br>(ii) if a Sale Transaction occurs: payment in full in Cash of its Allowed General Unsecured Claim on the later of (1) the Effective Date or (2) the date due in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Claim. |
| 7 | Trade Claims | In exchange for the full and final satisfaction, settlement, release, and discharge of the Trade Claims, each Holder of an Allowed Trade Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor:<br><br>(i) if the Equitization Transaction occurs, the applicable Debtor or Reorganized Debtor shall continue to pay each Allowed Trade Claim in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Allowed Trade Claim; or<br><br>(ii) if a Sale Transaction occurs: payment in full in Cash of its Allowed Trade Claim on the later of (1) the Effective Date or (2) the date due in the ordinary course of business in accordance with the terms and conditions of the agreements or transaction giving rise to such Claim. |
| 8 | Intercompany Claims | In the Debtors' discretion (with the reasonable consent of the Required First Lien Lender Group), all Intercompany Claims shall be Reinstated or discharged without any distribution on account of such Claims; *provided*, *however*, to the extent any Intercompany Claims constitute Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims held by SMI Topco, the distributions that would otherwise be made to SMI Topco on account of such Claims pursuant to the treatment set forth in Classes 3, 4, and 5, |

4876-2744-3839

| Class | Claim or Interest | Treatment |
|---|---|---|
| | | respectively, shall instead be made to the Holders of SMI Topco Interests pursuant to the treatment provided in Class 10. |
| 9 | Intercompany Interests | In the Debtors' discretion (with the reasonable consent of the Required First Lien Lender Group), all Intercompany Interests shall either be Reinstated or discharged without any distribution on account of such Interests. |
| 10 | SMI Topco Interests | All SMI Topco Interests shall be cancelled, released, discharged, and extinguished, and Holders of SMI Topco Interests shall receive: |
| | | (i) if the Equitization Transaction occurs: to the extent SMI Topco holds any Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims, the distributions that would otherwise be made to SMI Topco on account of it being a Holder of such Allowed Claims pursuant to the treatment set forth in Classes 3, 4, and 5, respectively shall instead be made to the Holders of SMI Topco Interests on account of their Class 10 Interests; or |
| | | (ii) if a Sale Transaction occurs: occurs: (1) the Waterfall Recovery, less the amount necessary to pay in full in Cash all Allowed Claims against the Debtors to the extent provided in Classes 3–5, and (2) all funds remaining in the Post-Sale Reserve after the wind down of the Post-Sale Estates, if any; *provided*, *however*, that to the extent SMI Topco holds any Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims, the distributions that would otherwise be made to SMI Topco on account of it being a Holder of such Allowed Claims pursuant to the treatment set forth in Classes 3, 4, and 5, respectively, shall instead be made to the Holders of SMI Topco Interests, in each case on account of their Class 10 Interests. |

**4.      Releases and Exculpations**

As set forth more fully in Section VI of this Disclosure Statement and Article VIII of the Plan, the Plan provides certain releases and exculpations in favor of the Released Parties and the Exculpated Parties, respectively. The Debtors intend to present evidence at the Confirmation Hearing to demonstrate the basis for and propriety of the releases and exculpations pursuant to section 1123(b) of the Bankruptcy Code and Bankruptcy Rule 9019. Specifically, as set forth in Section III of this Disclosure Statement, each of the Released Parties participated, *inter alia*, in months-long negotiations which culminated in the Restructuring Support Agreement and the Plan. Furthermore, as set forth more fully in Sections III and VI of this Disclosure Statement, the Consenting Creditors agreed to support the Plan in exchange for the treatment provided for their respective Classes of Claims thereunder. Class 3 (First Lien Credit Facility Claims), Class 4 (1.5 Lien Credit Facility Claims), Class 5 (Second Lien Credit Facility Claims), and Class 10 (SMI Topco Interests) are the only Classes entitled to vote on the Plan, and the Debtors cannot implement the transactions contemplated by the Restructuring Support Agreement and the Plan without the support of the Consenting Creditors. Accordingly, the Debtors believe the releases and exculpations are an integral part of the Plan, which will maximize the value of the Debtors and their respective Estates for the benefit of all stakeholders.

**D.      Voting on the Plan**

**1.      Parties Entitled to Vote**

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a

4876-2744-3839

plan unless (a) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (b) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.  If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  Similarly, if a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.  The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims in such class that cast ballots for acceptance or rejection of the plan.  Similarly, the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by at least two-thirds (2/3) in number of allowed interests in such class entitled to vote and that actually cast ballots for acceptance or rejection of the plan.

Only Holders of Claims in Class 3 (First Lien Credit Facility Claims), Class 4 (1.5 Lien Credit Facility Claims), Class 5 (Second Lien Credit Facility Claims), and Class 10 (SMI Topco Interests) (collectively, the "***Voting Classes***") are entitled to vote to accept or reject the Plan.  The Claims in the Voting Classes are Impaired under the Plan and will, in certain circumstances, receive a distribution under the Plan.  Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan.

The following table provides a summary of the status and voting rights of each Class (and each Holder within such Class) under the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | First Lien Credit Facility Claims | Impaired | Entitled to Vote |
| 4 | 1.5 Lien Credit Facility Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Credit Facility Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | Trade Claims | Unimpaired | Presumed to Accept |
| 8 | Intercompany Claims | Unimpaired/Impaired | Not Entitled to Vote |
| 9 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote |
| 10 | SMI Topco Interests | Impaired | Entitled to Vote |

**2.      The Solicitation Package**

Only record Holders of Claims in the Voting Classes as of November 13, 2023 (the "***Voting Record Date***") are entitled to vote on the Plan.  Holders of Claims in the Voting Classes as of the Voting Record Date will receive a solicitation package consisting of the following materials:

a)   this Disclosure Statement with all exhibits, including the Plan, the Restructuring Support Agreement, and any other supplements or amendments thereto;

b)   a form ballot (the "***Ballot***"), which will include the voting instructions; and

c)   a pre-addressed, return envelope.

3.     **Voting Procedures**

Ballots are being provided for Holders of Claims in the Voting Classes as of the Voting Record Date to vote to accept or reject the Plan.  Because all other Classes are either Unimpaired and deemed to accept the Plan or Impaired and deemed to reject the Plan, only the Voting Classes are entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, the applicable standards for tabulating Ballots, and instructions for how to opt out of the releases set forth in the Plan.

The Debtors have engaged Kroll as their claims, noticing, solicitation, and voting agent to assist in, among other things, the transmission of the Solicitation Materials and the tabulation of votes with respect to the Plan.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE ACTUALLY RECEIVED BY KROLL ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023, UNLESS EXTENDED BY THE DEBTORS, IN CONSULTATION WITH THE FIRST LIEN LENDER GROUP.**

**EACH BALLOT ADVISES THAT HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO ACCEPT OR REJECT THE PLAN OR WHO ABSTAIN FROM VOTING ON THE PLAN BUT DO NOT CHECK THE "OPT-OUT" BOX ON THE BALLOT AND TIMELY SUBMIT THE BALLOT SHALL, IN EACH CASE, BE DEEMED TO HAVE CONSENTED TO THE RELEASES OF THE RELEASED PARTIES SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

Holders of Claims or Interests in the Voting Classes as of the Voting Record Date may vote to accept or reject the Plan either by (a) submitting a Ballot electronically via the "E-Ballot" platform on Kroll's website or (b) completing, signing, and returning the Ballot by first class mail, overnight courier or hand delivery per mailing instructions provided below, in either case of (a) or (b), so that such Ballot is **actually received** by Kroll no later than the Voting Deadline of **5:00 p.m. Central Time on November 22, 2023** (unless such time is extended by the Debtors, in consultation with the First Lien Lender Group).

Ballots delivered by facsimile, e-mail, or any electronic means other than as described in the instructions for completing the Ballot will not be accepted.  Ballots returnable to Kroll must be returned by the Voting Deadline with an original signed copy to:

---

**Via First Class Mail, Overnight Courier, or Hand Delivery:**

**Strategic Materials, Inc. Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue, Suite 412**
**Brooklyn, NY 11232**

**To arrange hand delivery of your Ballot, please contact the Solicitation Agent via email at SMIBallots@ra.kroll.com (with "SMI Solicitation Ballot Submission" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.**

---

For questions regarding the Ballots or submission process, please contact Kroll at (844) 307-7493 (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll) and request to speak with a member of the solicitation team or email—with a reference to "Strategic Materials, Inc. Solicitation" in the subject line—to SMIBallots@ra.kroll.com.

**FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY KROLL NO LATER THAN THE VOTING DEADLINE OF 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023.**

The delivery of an accepting Ballot pursuant to the procedures set forth above will constitute the agreement of the Holder of Claims or Interests with respect to such Ballot to accept (a) all of the terms of, and conditions to, the solicitation of the Plan; and (b) the terms of the Plan, including the injunction, releases, and exculpations set forth therein; *provided* that Holders of Claims or Interests voting to accept the Plan may elect to opt-out of the releases in Article VIII.F of the Plan by indicating such election in their respective Ballots in accordance with the instructions provided with the Ballots.

*Solicitation Version*

####    4.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by Kroll and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve their respective rights to reject any and all Ballots submitted by any Holders of Claims against or Interests in the applicable Debtor that are not in proper form. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any Holder of Claims against or Interests in the applicable Debtor. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Court, will be final and binding on all parties.

Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors determine, unless otherwise ordered by the Court. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will the Debtors or any other person incur any liabilities for failure to provide such notification. Unless otherwise directed by the Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

##    II.    OVERVIEW OF THE DEBTORS' OPERATIONS

###    A.    The Company's Business and History

The Debtors and their non-Debtor affiliates (collectively, the "**Company**") are collectively a privately held company that is the industry leader in recovering and processing post-consumer and post-industrial glass in North America. The Company operates a network of 43 facilities across the United States (including 19 states), Canada, and Mexico. Through its network of facilities, the Company recycles over two million tons of glass per year and serves large and stable end markets, including those related to glass packaging, fiberglass insulation, flat glass, highway safety beads, air-blast abrasives, specialty glass, recycled plastic resin, and glass fillers.

The Company takes in various types of raw glass feedstock (approximately half of which has high levels of contamination) and reduces the contamination via high-tech quality and cleaning processes that result in a 99.9% nationwide acceptance rate from its customers. The Company's furnace-ready recycled glass product, or "cullet," results in energy savings and a reduction in carbon emissions by up to 30% when utilized in container glass and fiberglass insulation production. Headquartered in Houston, Texas, the Company employs over 700 individuals and utilizes over 200 temporary employees and/or contractors to successfully operate its U.S., Canadian, and Mexican businesses, many of whom have specialized industry knowledge and a longstanding relationship with the Company. The map below depicts the locations of the Company's network of facilities.



The Company traces its roots in glass recycling back to 1896, when it was first known as the Bassichis Company. Through various acquisitions and spin-offs, the Company's predecessor company became the first

nationwide glass recycler, and its modern-day form emerged in 1994. In November 2017, certain funds affiliated with Littlejohn & Co., LLC ("*Littlejohn*") acquired the Company from Willis Stein & Partners and Vision Capital. The Company conducts its operations primarily through the processes described below.

**B.      The Company's Organizational Structure**

The Company's organizational structure consists of 24 entities in the United States, Canada, and Mexico. Certain funds affiliated with Littlejohn are the ultimate owners of the Company. Only 16 of the Company entities are Debtors in the Chapter 11 Cases, which consist of the borrower, each United States-based entity that is a guarantor under the Prepetition Credit Agreements, and the three Topco Entities (as defined below), which are not obligors under the Prepetition Credit Agreements. The Company entities in Mexico and Canada are not Debtors. The following is a simplified organizational chart of the Company, with the Debtor entities highlighted in yellow.



SMI Topco Holdings, Inc. ("*SMI Topco*"), a Delaware corporation, is the Debtors' ultimate parent company.[3] SMI Topco is a holding company whose primary assets are composed of its direct and/or indirect ownership of the equity interests of each of the other Debtors and the Non-Debtor Affiliates. Additionally, SMI Topco is a lender under each of the First Lien Incremental Facilities (as defined below), the 1.5 Lien Credit Agreement (as defined below), and the Second Lien Credit Agreement (as defined below).

SMI Topco directly owns 100% of the equity of SMI Group Ultimate Holdings, Inc. ("*Ultimate Holdings*"), a Delaware corporation, which is in turn the direct owner of 100% of the equity interests of SMI Group Holdings, LLC ("*Group Holdings*," collectively with SMI Topco and Ultimate Holdings, the "*Topco Entities*"). Ultimate Holdings and Group Holdings are both holding companies and have no material investments or ownership interests

---

[3]     At least one Business Day prior to the Effective Date, SMI Topco will convert into a Delaware limited liability company and make an election to be treated as a corporation for U.S. federal income tax purposes. All references herein to SMI Topco will include SMI Topco Holdings, LLC, as context so requires.

other than their direct ownership of the equity interests of Group Holdings and SMI, respectively.  Group Holdings is the immediate parent of SMI.  None of the Topco Entities is a guarantor or borrower under the Prepetition Credit Agreements.

SMI, a Delaware corporation, is a holding company and has no material investments or ownership interests other than its direct ownership of the equity interests of Strategic Materials Holding Corp. ("***SMHC***") and indirect equity ownership interests in the downstream Debtors and Non-Debtor Affiliates (as defined below).  SMI is a guarantor under the Prepetition Credit Agreements.

SMHC is the borrower under the Prepetition Credit Agreements.  Other than the Topco Entities and SMHC, each Debtor is a guarantor under the Prepetition Credit Agreements.  SMHC has no material investments or ownership interests other than its direct ownership of the equity of Strategic Materials, Inc. and NexCycle, Inc. and its indirect ownership of the equity of the downstream Debtors and Non-Debtor Affiliates.

NexCycle, Inc., a Delaware corporation, is the U.S. parent of certain Canadian subsidiaries that are not Debtors in these Chapter 11 Cases (such non-Debtor entities, collectively, the "***Non-Debtor Canadian Affiliates***").  The Non-Debtor Canadian Affiliates operate the Company's Canadian business and are not guarantors under the Prepetition Credit Agreements.  NexCycle, Inc. is a guarantor under the Prepetition Credit Agreements.

Strategic Materials, Inc., a Delaware corporation, is the Company's primary operating entity and the direct owner of 99% of the equity interests of non-Debtor affiliate Strategic Materials Mexicana, S.A. de C.V. ("***SMM***," and together with the Non-Debtor Canadian Affiliates, the "***Non-Debtor Affiliates***"), a Mexican company that operates the Company's Latin American business, and 100% of the equity interests of each of American Specialty Glass, Inc. ("***ASG***"), a Delaware corporation that operates the Company's specialty colored-glass business, and Ripple Glass, LLC ("***Ripple***"), a Delaware limited liability company that operates the Company's drop-off container business.  Each of SMM, ASG, and Ripple are guarantors under the Prepetition Credit Agreements.

Strategic Materials, Inc. also owns 100% of the equity interests in the following Debtor entities:  SMI Reflective Industries HoldCo, LLC, a Delaware limited liability company; SMI Reflective Recycling NE HoldCo, LLC, a Delaware limited liability company; SMI Reflective Recycling HoldCo, LLC, a Delaware limited liability company; SMI Equipment, Inc., a Delaware corporation; Container Recycling Alliance, LLC, a Delaware limited liability company; SMI BevCon HoldCo, LLC, a Delaware limited liability company; and SMI Nutmeg HoldCo, LLC, a Delaware limited liability company (collectively, the "***Legacy Entities***").  The Legacy Entities are holding companies related to certain legacy acquisitions and do not have any activity in the Debtors' current business operations.  Each Legacy Entity is a guarantor under the Prepetition Credit Agreements.

## C.     The Company's Operations

### 1.     Supply of Raw Glass

As noted above, the Company recycles over two million tons of glass each year.  The Company accepts a variety of glass types:  bottle, plate, automotive, colored, pharmaceutical, soda lime, and borosilicate.  If a material is glass, the Company likely has the capability to process it and turn it into viable products.  Glass items the Company cannot accept are few, and include computer monitor or television glass, light bulbs, mirrors, and ceramic glass.  This is primarily due to the treated nature of the glass that prevents it from being melted and formed into new products.

The Company recycles a heterogenous mix of amber (brown), flint (clear), and emerald (green) container glass, commonly referred to as 3-Mix ("***3-Mix***"), stemming from traditional curbside recycling, redeemed deposit bottles, heldware from container manufacturers, all types of windows and windshields, heavy laminated glass, and borosilicate, and is flexible enough to handle different incoming streams from its suppliers.

*Solicitation Version*

 

**Delivery of various types of glass container supply**    **Close-up view of glass container supply**

The Company provides various convenient glass collection options for its suppliers, including roll-off containers located at hundreds of sites across the United States, that make it easy for suppliers to collect their scrap glass. These collection sites range from large industrial manufacturing plants and fabrication sites to bars and restaurants. The Company has also taken steps to proactively unlock incremental glass supply by making it convenient for individuals and businesses to recycle their glass products where they otherwise might not. For example, the Company acquired Ripple Glass, LLC in 2022 and, since that time, has rapidly adopted Ripple Glass, LLC's unique direct-collection model—which employs drop-off bins for customers to place glass for collection—across the United States.



**Ripple Glass Drop-Off Bin**

### 2.    Processing

Post-consumer glass product supply may come directly to the Company in the form of bottles, glass plate, or as a mix of post-consumer material, among other things. The 3-Mix collected at the curbside is usually commingled, meaning that different colors and types of glass (or even different materials) are collected together. Before 3-Mix supply gets to the Company, it will typically first go to a material recovery facility, or "MRF," which separates out recyclables by material type. Once separated, the raw glass supply (which still contains roughly 20–30% contaminated volume) is sent to the Company. The Company then, through a series of secondary sorting processes, removes contamination (*e.g.*, plastic, paper, metal, organics, etc.), while segregating and marketing any bi-products, such as aluminum, steel, and cardboard. The Company has historically recovered many tons of these byproducts, the sale of which resulted in approximately $500,000 in additional revenue in 2022.



**Post-consumer 3-Mix glass material prior to sorting**

The remaining supply is then further sorted to meet the needs of the Company's customers. Although all glass is made of silica and soda, the type and quantity vary with different types of glass. Different melting points and chemical incompatibility make it important to sort glass by type. The Company's finely tuned production processes use a series of different equipment to process the various types of inbound glass material to meet and exceed its customer specifications. Crushers and screens are used to size the material to either coarse 5/8-inch size, which is primarily used in the container industry, or to a fine-grind powder, which is used by fiberglass and specialty products customers. Fine-grind material also goes through a drying process to further remove organics and insure proper material flow through the screening and silo storage process. Optical sorters are used to separate the various glass colors from each other (flint from amber from emerald). Sorters are also used to separate ceramic, porcelain, and stone contamination from recyclable glass. Magnets and vacuum systems are used to further purify the glass stream by removing ferrous and non-ferrous metals and light material (*e.g.*, paper and organics) from heavier glass fragments.

 

**Machinery sorting post-consumer glass product**

 

**Glass cullet post-optical sorting**

*Solicitation Version*

Of its 43 facilities, the Company has 16 plants with color sorting capabilities to process 3-Mix, 16 plants with fine-grinding capabilities to produce product for the fiberglass market, and 8 plants that are capable of processing glass for abrasive blasting media product.

Once the post-consumer glass is separated from other contaminants, sorted by color and type, and sized, the cullet is sold to the Company's customers across various end markets.

3.      **The Company's Markets, Customers, and Supply**

The Company services clients in various longstanding, and mature end markets, including the glass container, fiberglass, highway bead, glass abrasive, glass filler, and plastic markets.  The Company's primary customers are manufacturers of glass containers or fiberglass, among others.  The Company maintains deep and long-standing relationships with most of its customers—87.0% of its revenue comes from customers that have done business with the Company for at least 20 years.

The Company provides glass container customers with furnace-ready cullet, which is used in combination with sand, soda ash, and limestone to create new glass containers, including glass bottles and jars.  The food and beverage industry is the primary end market for recycled glass containers.  Using recycled glass is particularly advantageous for the glass container industry because recycled glass can be substituted for up to 95% of raw materials, which is more cost efficient than using virgin materials, and is more energy efficient, as 25–30% less energy is required to melt cullet than virgin materials.

The fiberglass market also makes up a large portion of the Company's revenue.  Fiberglass customers purchase cullet in various forms, including "fine grind," which is the consistency of sand, and coarse plate glass, which is then placed in a furnace and spun into insulation to be used primarily in residential and commercial infrastructure. Using recycled glass is advantageous for fiberglass customers because when cullet is used, it requires less energy to manufacture fiberglass products and it is easier on equipment.

Cullet is further used in smaller markets, such as the highway bead market, glass abrasive market, and specialty glass market.  Highway beads are created by melting cullet into rounded glass pellets, which are sold for use in reflective paints for highway striping, as well as for use in peening and cleaning materials.  Glass abrasives are used to strip and clean various surfaces and are an alternative to silica-based abrasives.  The Company can size glass abrasives to meet the demands of various major blasting industries, including:  shipyards, tanks, pipelines, concrete restoration, wood/log homes, auto restoration, slurry/vapor blasting, and dustless and wet blasting.  The Company is further able to recycle glass into more than 35 standard colors and an unlimited amount of fade-proof custom colors for use in various applications, such as landscaping rocks, terrazzo floor tiles, countertop glass, aquarium chips, fire pit glass, and swimming pool accents.

The Company has a robust roster of suppliers from various well-known companies, including from various well-known waste disposal companies.  These suppliers provide the Company with 3-Mix, glass bottles, glass containers, or any combination thereof.  Although approximately 30% of the Company's supply comes from glass manufacturing customers, it also maintains long-term relationships with virtually every other type of supplier with consistent and reliable supply.  For example, certain suppliers provide the Company with supply that would otherwise be sent to a landfill.

4.      **The Company's Management and Employees**

The Company is led by an experienced management team comprised of the following members:

4876-2744-3839

| Name | Title |
|---|---|
| **Christopher Dods** | President and Chief Executive Officer |
| **Paul Garris** | SVP and Chief Financial Officer |
| **Curt Bucey** | Executive Vice President and Chief Commercial Officer |
| **Sherry Williams** | Chief Legal Officer, Chief Compliance Officer, and SVP of Human Resources |
| **Paul Faherty** | Executive Vice President, Chief Technology Officer |
| **Laura Hennemann** | Senior Vice President, Sustainability & Corporate Affairs |
| **Laurie Borg** | President, Canada |
| **Javier Lopez-Portillo** | President, Latin America |

As of the date hereof, the Company (including the Non-Debtor Affiliates) employs over 700 individuals on a full- or part-time basis and utilizes over 200 temporary employees and/or contractors across its U.S., Canadian, and Mexican businesses. Of those individuals, the Debtors employ approximately 600 full-time employees and approximately 90 temporary workers. The Debtors' employees perform a wide variety of functions critical to the Debtors' operations, the administration of the potential Chapter 11 Cases, and the Debtors' successful reorganization or sale. Their skills, knowledge, and understanding of the Debtors' operations are essential to preserving operational stability, safety, and efficiency. In many instances, the employees are highly trained personnel with specialized skills who are not easily replaced.

### D.    The Debtors' Capital Structure

As of the date hereof, the aggregate amount outstanding under the Debtors' funded debt obligations totals approximately $432 million, including approximately (1) $406 million of outstanding principal and letters of credit and (2) $25 million in accrued and unpaid interest.

#### 1.    Superpriority Credit Agreement

On September 15, 2023, the Debtors entered into a Superpriority Secured Credit Agreement by and among SMHC, as borrower, SMI as holdings, the lenders from time to time party thereto (the "***Superpriority Lenders***"), and Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (the "***Superpriority Agents***") (as amended, amended and restated, modified, or supplemented from time to time, the "***Superpriority Credit Agreement***"). The Superpriority Credit Agreement provides for a senior secured credit facility with an aggregate principal commitment amount of $27.5 million (the "***Superpriority Credit Facility***"). The Superpriority Credit Facility is secured by a superpriority lien on substantially all of the Debtors' (other than the Topco Entities) assets.

As of the date hereof, the Debtors' aggregate outstanding funded debt obligations under the Superpriority Credit Agreement total approximately $28 million.

#### 2.    First Lien Credit Agreement

The Debtors' primary long-term debt consists of that certain First Lien Credit Agreement, dated as of November 1, 2017, among SMHC, as borrower, SMI, as holdings, the lenders from time to time party thereto, and Acquiom Agency Services LLC and Seaport Loan Products LLC, in their respective capacities as co-administrative agent and co-collateral agent (as successors to Goldman Sachs Bank USA in such capacities) (the "***First Lien Credit Agreement***"), which provided SMHC with (a) a first-lien secured term loan facility (the "***First Lien Term Facility***") and (b) a first-lien secured revolving loan facility (the "***First Lien Revolving Facility***") with an aggregate maximum commitment of $275 million. Additionally, pursuant to the First Lien Credit Agreement, certain lenders provided SMHC with three incremental term loan facilities (collectively, the "***First Lien Incremental Facilities***"). Each of the First Lien Term Facility, First Lien Revolving Facility, and First Lien Incremental Facilities are secured by a first priority lien on substantially all of the Debtors' (other than the Topco Entities) assets, which is subordinated to the liens securing the obligations under the Superpriority Credit Agreement.

The First Lien Revolving Facility has a scheduled maturity date of August 2, 2024 and, as of the date hereof, the Debtors' aggregate outstanding funded debt obligations under the First Lien Revolving Facility total approximately $41.8 million, including $2.5 million of letters of credit.

*Solicitation Version*

The First Lien Term Facility has a scheduled maturity date of November 1, 2024 and, as of the date hereof, the Debtors' aggregate outstanding funded debt obligations under the First Lien Term Facility total approximately $235.9 million.

Each of the First Lien Incremental Facilities have a scheduled maturity date of November 1, 2024 and, as of the date hereof, the Debtors' outstanding principal and interest under the First Lien Incremental Facilities total approximately $27.7 million.  Additionally, if SMI prepays the loans outstanding under the First Lien Incremental Facilities in whole or in part before June 1, 2024, it must pay a prepayment premium equal to 3% of the loan amounts prepaid.

As of the date hereof, the Debtors' aggregate outstanding funded debt obligations under the First Lien Credit Agreement total approximately $305.4 million.

### 3.      1.5 Lien Credit Agreement

SHMC is also the borrower under that certain 1.5 Lien Credit Agreement, dated as of September 22, 2022, among SMHC, as borrower, SMI, as holdings, the lenders from time to time party thereto, and Alter Domus (US) LLC, as administrative agent (the "***1.5 Lien Credit Agreement***"), which provides a maximum commitment of $10 million and is secured by a one and one-half priority lien on substantially all of the Debtors' (other than the Topco Entities) assets, which is subordinated to the liens securing the obligations under the First Lien Credit Agreement and the Superpriority Credit Agreement.  The lenders under the 1.5 Lien Credit Agreement are certain funds affiliated with Littlejohn and SMI Topco Holdings, Inc. (which is owned by certain funds affiliated with Littlejohn).

The 1.5 Lien Credit Agreement has a scheduled maturity date of January 31, 2025.  As of the date hereof, the Debtors' aggregate outstanding funded debt obligations under the 1.5 Lien Credit Agreement total approximately $11.7 million.  The obligations under the 1.5 Lien Credit Agreement are secured by liens on substantially all of the Debtors' assets on a junior basis to the liens securing the Superpriority Credit Facility and all of the obligations under the First Lien Credit Agreement.

### 4.      Second Lien Credit Agreement

SHMC is also the borrower under that certain Second Lien Credit Agreement, dated as of November 1, 2017, among SMHC, as borrower, SMI, as holdings, the lenders from time to time party thereto, and Acquiom Agency Services LLC and Seaport Loan Products LLC, in their respective capacities as co-administrative agent and co-collateral agent (as successors to Goldman Sachs Bank USA in such capacities) (the "***Second Lien Credit Agreement***," and together with the Superpriority Credit Agreement, the First Lien Credit Agreement, the 1.5 Lien Credit Agreement, and the Second Lien Credit Agreement, the "***Prepetition Credit Agreements***"), which provides a maximum commitment of $80 million and is secured by a second priority lien on substantially all of the Debtors' (other than the Topco Entities) assets, which is subordinated to the liens securing the obligations under the 1.5 Lien Credit Agreement, the First Lien Credit Agreement, and the Superpriority Credit Agreement.

The Second Lien Credit Agreement has a scheduled maturity date of November 1, 2025.  As of the date hereof, the Debtors' aggregate outstanding funded debt obligations under the Second Lien Credit Agreement total approximately $86.2 million.  The obligations under the Second Lien Credit Agreement are secured by liens on substantially all of the Debtors' assets on a junior basis to the liens securing the other Prepetition Credit Agreements.

### 5.      Trade Claims and Other Unsecured Claims

The Debtors rely on numerous trade vendors, including certain providers of essential goods (*e.g.*, post-industrial raw glass stock) and services (*e.g.*, glass haulers) to operate their businesses.  These vendors are critical to the Debtors' businesses because they (a) possess unique technical knowledge regarding, and have familiarity with, the Debtors' recycling products and services, (b) provide specialized materials and/or services to the Debtors that are vital to the Debtors' operations going forward, (c) are located near the Debtors' operations, or (d) provide some combination of the foregoing.

Specifically, the Debtors rely on critical vendors who supply certain raw materials and specialized equipment (*e.g.*, hydraulic back-end dumpers) necessary for the Debtors' operations.  Many of the critical vendors are, by and large, sole-source or limited-source suppliers or vendors who provide a material economic or operational advantage when compared to other available suppliers and vendors.

Raw glass providers are among those critical vendors because many are large waste management companies with in-house recycling units, industrial producers, or municipal waste-management departments.  Many other parties,

such as brokers, other glass recyclers, or even the Debtors' customers, would be interested in purchasing this raw glass product. Without raw glass supply, the Debtors' operations would halt causing immediate and irreparable harm to the Debtors' businesses. Likewise, trucking and hauling providers are critical because they deliver the raw glass stock to the Debtors and deliver the Debtors' glass cullet to various customers, along with hauling away waste, as described below. Because the types of trucks that can haul these glass materials are specialized and limited, the Debtors have few alternatives to ship the necessary volume of supply and product. Without the ability to ship, the Debtors' business activities would be severely limited, which would cause immediate and irreparable harm to the Debtors.

Landfill operators are also critical to the Debtors' continued business operations. The Debtors engage landfill operators to dispose of waste that cannot be recycled and, without these vendors, the Debtors' business operations would be interrupted by accumulating landfill waste. These landfill operators are also difficult to replace, as the landfill vendors are located near the Debtors' facilities and traveling farther to dispose of waste would increase hauling costs. The disruption caused by the inability to haul away and dispose of landfill waste in an economical fashion would cause immediate and irreparable harm to the Debtors' businesses.

Finally, vendors of information technology services, equipment repair, brokers, and management services for essential goods such as utilities and health and safety equipment, are critical because they are a necessary part of the Debtors' day-to-day operations. Without them, the Debtors would not be able to carry on their normal business operations.

The Debtors anticipate that, as of the Petition Date, approximately $34 million in Trade Claims will likely exist against the Debtors. The Debtors expect to seek authority to pay approximately $31 million in Trade Claims (subject to approval by the Court) immediately upon commencing the Chapter 11 Cases. In addition to the Trade Claims, the Debtors have additional General Unsecured Claims, most of which the Debtors believe are contingent and unliquidated and/or disputed.

### 6. Factoring Agreements

As part of its normal business operations, Strategic Materials, Inc. utilizes certain factoring agreements (the "***Factoring Agreements***") with Citibank, N.A. and PrimeRevenue, Inc. (collectively, the "***Factors***") to finance accounts receivable and improve cash flow. As described below, the Factoring Agreements provide a valuable source of working capital and liquidity for the Debtors' businesses and are in the best interests of the Debtors and their estates.

Pursuant to its factoring arrangements with the Factors (the "***Factoring Arrangements***"), Strategic Materials, Inc. sells the receivables generated from its sale and delivery of goods to two of its major customers (such receivables, the "***Receivables***") to the Factors. Although Strategic Materials, Inc. sells the Receivables at a discounted rate and/or pays certain fees to the Factors, the Factoring Arrangements allow the Debtors to address certain of their near-term liquidity needs by monetizing the Receivables. Without the Factoring Arrangements, Strategic Materials, Inc. would not receive payment for cullet sold to two of its major customers for approximately 110 to 140 days after supplying such cullet. By utilizing the Factoring Arrangements, Strategic Materials, Inc. is able to promptly receive cash on account of the sold Receivables, significantly shortening the collection period with respect to those Receivables. Accordingly, the Factoring Arrangements provide an important source of liquidity and operational flexibility for the Debtors.

In the 12-month period prior to the date hereof, Strategic Materials, Inc.'s average monthly revenue from the Factors on account of the Factoring Arrangements was approximately $9 million, and it has paid the Factors approximately $200,000 in monthly fees on account thereof.

### 7. Litigation Matters

In the ordinary course of business, the Debtors are parties to certain lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations. The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases. In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases generally is subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions. Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### III.   KEY EVENTS LEADING TO CHAPTER 11 CASES

In recent years, the Debtors have faced macroeconomic headwinds, including significantly increased interest rates and inflation, the effects of which have been exacerbated by increasing competition in the Company's most profitable regions, while simultaneously experiencing shifting market demands in the glass recycling industry. The Debtors proactively worked with their secured lenders to address their balance sheet and liquidity challenges, including by entering into a forbearance agreement on August 1, 2023, negotiating a Restructuring Support Agreement, and obtaining interim financing under the Superpriority Credit Agreement that has allowed the Company to run a robust, out-of-court sale process.

The sale process has been robust, extensive, and conducted in a value-maximizing manner. In connection with the sale process, the Company's investment banker Moelis & Company ("***Moelis***") contacted and held partner-level conversations with over seventy (70) potential buyers while diligently working to both market the Debtors' assets and resolve any questions and concerns from potential buyers. Moelis facilitated a diligence process that included executing non-disclosure agreements and providing initial diligence materials to over forty (40) parties and holding nearly as many buyer "deep dive" conversations, including approximately ten (10) introductory meetings with a portion of the Debtors' management team. These efforts resulted in the Debtors receiving multiple indications of interest that could represent a Qualifying Sale Transaction (as defined in the Restructuring Support Agreement). The sale process is discussed in greater detail in Section III.C hereof.

### A.   High Interest Rates and Decreased Demand Across Glass Recycling Industry

The Company is North America's leading glass recycler and supplier of glass cullet. With its over 125 years of history, the Company has established a deep customer base and its products touch on nearly every form of recycled glass in circulation. The Company provides industry-leading environmental services to a broad range of end markets, such as producers of glass packaging (*e.g.*, glass bottles), fiberglass used for, among other things, insulation and industrial end markets. The Debtors employ approximately 568 employees on a full-time basis and utilize approximately 90 additional temporary workers to operate its 43 recycling plants across 19 states in the United States, Canada, and Mexico.

Despite its storied history, the Company is currently facing significant balance sheet and liquidity challenges, caused by a range of factors, including a rising interest rate environment, changes in the glass recycling market, and various operational challenges. Most significantly, the Company has faced headwinds from current macroeconomic forces, as the Federal Reserve has significantly increased interest rates over the past two years – indeed, raising the federal funds rate more than five percentage points over the past 18 plus months – in its effort to fight inflation. Accordingly, the Company's funded debt, which carries variable interest rates, has become significantly more expensive and has squeezed the Company's liquidity.

The Company has also been impacted by a changing landscape in the glass recycling market, including both increased competition and stricter requirements for cullet specifications. Over the past few years, there have been several new entrants into the glass recycling industry. In 2019, one of the Company's largest suppliers in California constructed its own glass recycling plant, which eliminated approximately 100,000 tons of glass supply that would have otherwise been available to the Company. Another one of the Company's customers in Northern California has also entered the glass recycling market, causing further potential feedstock supply to be diverted away from the Company totaling approximately 120,000 tons. Both cases resulted in a "price war" that increased glass supply costs to maintain capacity.

Changes in container manufacturing and consumer habits have put further pressure on the glass recycling market, as there has been a general reduction in the use of, and demand for, glass products in the first instance, and consumers are recycling glass products at a lower rate than in the past. This trend appears poised to continue as glass products are increasingly being replaced by plastic counterparts and/or aluminum cans. For instance, one of the largest glass bottle manufacturers has shuttered multiple plants across the country due to reduced demand, reducing the amount of glass product in circulation that would otherwise eventually make its way to the Company's plants to be recycled. In addition to the overall shift away from glass container production capacity, the Covid-19 pandemic resulted in fewer people frequenting restaurants and bars which are historically bulk recyclers, resulting in more glass being sent to landfills or otherwise being removed from the recycling chain. The trend has not fully reversed in 2022 or 2023, and it is uncertain whether it will reverse to pre-pandemic levels in the future.

The Company has faced certain operational challenges that have increased operating costs or decreased the amount of revenue generated by the Company. First and foremost, the feedstock supply that is available to the

4876-2744-3839

Company has generally been more contaminated than it has historically been, which increases the time and cost to sort out usable glass. This is, in large part, due to the above-mentioned changes in consumer behavior, which has resulted in less recycling than during the pre-Covid era, and also due to glass redemption centers closing in certain locations, particularly in California. When the Company is able to obtain so-called "clean stream" supply (*i.e.*, glass that is largely free of other waste), it is much simpler to process. On the other hand, the Company requires different types of equipment to process supply that includes a significant amount of landfill waste, and then the Company has to pay to have that waste transported to a landfill after the glass is sorted out. Other operational challenges include increased costs for shipping finished product and delays in receiving necessary parts and equipment due to supply chain issues. In addition, due to the various aforementioned increased costs, the Company has had to defer certain capital projects, including plant maintenance and upgrades, which has caused business interruptions in several instances when plant machinery has broken down.

## B.       Liquidity Constraints and Near-Term Financial Obligations

Prior to the Petition Date, the Company primarily depended on cash flow from operations and borrowings under its Prepetition Credit Agreements as its sources of cash and liquidity. The principal factors influencing revenues are, among other things: the demand for glass cullet and other products the Company produces and the generation of demand for new products manufactured from its glass cullet. The principal factors impacting costs include changes in interest rates, competition and inflation, which have increased the cost of supply; the prices and quality of the 3-Mix the Company receives for glass recycling; the transportation costs associated with delivering its glass cullet to end users; as well as transportation of goods, parts and equipment, repair services, and other goods and services the Company consumes. As a result of the nationwide sustained increase in interest rates across its floating rate debt facilities, the Company continues to face increasing debt service obligations and declining cash flows and liquidity prior to the Petition Date.

These factors have combined to result in the Company's net EBITDA decreasing by approximately 30% for the three-month period ended August 2023 as compared with the same period of 2022. As discussed above, the Debtors face upcoming maturities on their debt, and the Company may not have sufficient liquidity to sustain operations and to continue as a going concern. Accordingly, absent a comprehensive financial restructuring or sale, it is highly unlikely that the Debtors will be able to meet their funded debt obligations as they become due.

## C.       Prepetition Liquidity Preservation Strategies and Hiring Advisors

The challenging market conditions described above adversely impacted the Company's liquidity position in the months leading up to the Petition Date. In an effort to maintain liquidity levels sufficient to meet the Company's debt and other financial commitments and address its near-term financial obligations, the Company has pursued a number of steps prior to filing the Chapter 11 Cases, including (1) minimizing capital expenditures, (2) aggressively managing working capital, (3) further reducing recurring operating expenses, and (4) exploring potential business transactions.

However, despite these efforts, in the Summer of 2023, forecasts maintained by management began to suggest that, under certain downside scenarios, liquidity could begin to reach critical levels in the Fall of 2023. Ultimately, when the above-described liquidity preservation efforts and exploration of potential transactions did not yield a viable solution, the Company engaged advisors to explore potential deleveraging transactions. In August 2023, the Company retained Moelis & Company ("*Moelis*"), as investment banker, to explore strategic alternatives and solutions for the Company's balance sheet and liquidity challenges, and to consider other potential liability management transactions.

In August 2023, the Company also engaged Vinson & Elkins LLP ("*V&E*"), as restructuring counsel (in addition to its existing finance and restructuring counsel, Wachtell, Lipton, Rosen & Katz ("*Wachtell*")), and Alvarez & Marsal ("*A&M*," and collectively with Wachtell, Moelis, and V&E, the "*Advisors*"), as financial advisor, to work with the Company on forecasting cash flow, analyzing and preserving liquidity, and implementing contingency planning for a potential in-court process in the event the Company was unsuccessful in consummating a comprehensive out-of-court solution. During this time, the Company and the Advisors explored a number of potential out-of-court and in-court alternatives.

Certain Holders of First Lien Credit Facility Claims, some of whom are also Holders of Second Lien Credit Facility Claims, (the "*First Lien Lender Group*") retained Arnold & Porter Kaye Scholer LLP ("*A&P*"), as counsel, and Ankura Consulting, LLC ("*Ankura*," and together with A&P, the "*Consenting Creditor Representatives*"), as financial advisor. The Company and its Advisors began engaging in extensive, arms'-length negotiations in parallel

with the First Lien Lender Group and the Consenting Creditor Representatives regarding a potential out-of-court sale and/or in-court restructuring to comprehensively address the Company's funded debt and liquidity constraints, culminating in the execution of the Restructuring Support Agreement, which provides for a dual-track out-of-court sale process and alternative in-court restructuring process.

**D.       Implementation of Key Employee Retention Program**

On November 13, 2023, the Debtors, in consultation with the Required First Lien Lender Group, recommended and the board of directors of Strategic Materials, Inc. approved a retention program (the "***Retention Program***") that will provide $2,562,131 to certain key employees, paid out in four equal installments, in an effort to retain such employees to assist the Debtors through their exploration, implementation, and success of potential transactions to address the Company's balance sheet and liquidity challenges.  The first installment will be funded prior to the anticipated Petition Date and the remaining three (3) installments will be funded after the Effective Date (the timing of which is dependent on the employee's title).  It is not anticipated that any awards pursuant to the Retention Program will be paid during the Chapter 11 Cases.

**E.       Execution of Restructuring Support Agreement**

The Company and the Advisors engaged in conversations with the First Lien Lender Group and the Consenting Creditor Representatives regarding potential consensual transactions to address the Debtors' balance sheet and liquidity challenges, including a potential sale of the Company or a restructuring of the Debtors' funded debt obligations.  After months of good faith and arms'-length negotiations, it became clear that a dual-track out-of-court marketing and sale process and alternative in-court debt-to-equity-conversion restructuring transaction with the First Lien Lender Group presented the best opportunity to maximize the Company's value for all stakeholders.  Accordingly, on September 15, 2023, the Debtors, the members of the First Lien Lender Group, in their capacity as Consenting Creditors, and Littlejohn, in its capacity as the indirect holder of equity interests in Group Holdings, entered into the Restructuring Support Agreement attached hereto as **Exhibit B** (the "***Restructuring Support Agreement***").  The Consenting Creditors hold (1) 100.00% of the aggregate principal amount of the Superpriority Credit Facility Claims (2) at least 66.67% of the aggregate principal amount of the First Lien Credit Facility Claims and more than one-half in number of the Holders thereof; (3) 100.00% of the aggregate principal amount of the 1.5 Lien Credit Facility Claims; and (4) at least 66.67% of the aggregate principal amount of Second Lien Credit Facility Claims and more than one-half in number of the Holders thereof.

The Restructuring Support Agreement documents the parties' commitment to the restructuring transactions described above.  As such, it is an essential part of the Debtors' restructuring efforts and provides the Debtors with significant assurances regarding the ultimate success of the Chapter 11 Cases.  In particular, by signing the Restructuring Support Agreement, the Consenting Creditors have agreed to support the restructuring process on the terms set forth in the Restructuring Support Agreement.  This includes an agreement by the Consenting Creditors to take any steps and actions that are reasonably necessary to implement the Restructuring Transactions (as defined in the Restructuring Support Agreement), including voting in favor of the Plan subject to receipt of appropriate solicitation materials, including the Debtors' Plan and Disclosure Statement.  In exchange, the Debtors have agreed, among other things, that the key documents necessary to implement the Restructuring Transactions must be in form and substance acceptable to the Debtors and the Required First Lien Lender Group.

The Restructuring Support Agreement does not contemplate that the Topco Entities would be Debtors in the Chapter 11 Cases.[4]  However, following execution of the Restructuring Support Agreement, the Debtors, in consultation with the First Lien Lender Group, determined that filing chapter 11 petitions for the Topco Entities would be necessary to preserve the value of the Debtors' estates and maximize value for stakeholders, and to the extent that Chapter 11 Cases are commenced, the Topco Entities will be Debtors in such Chapter 11 Cases.

**F.       Out-of-Court Marketing and Sale Process**

The Company and Moelis began formally marketing substantially all of the Company's equity interests or assets for sale on September 12, 2023.  Moelis identified over 70 potential financial and strategic buyers that it believed, based on its experience in the industry and discussions with the Company, may have the requisite interest and financial wherewithal to purchase all or a portion of the Company's assets or equity.

---

[4]     Group Holdings was a party to the Restructuring Support Agreement in its capacity as the consenting sponsor.

Initially, Moelis engaged with these potential buyers and others that proactively reached out to the Debtors or Moelis and held partner-level conversations to discuss such parties' potential interest in acquiring all or a substantial portion of the Company's assets or equity through an out-of-court sale transaction. Of those parties, over 40 signed NDAs and received access to the Debtors' confidential information in a digital data room. Subsequently, 38 parties held "deep dive" conversations with Moelis, 10 participated in introductory meetings with the Company's senior management team, and some participated in site visits. All prospective buyers were given adequate time to conduct due diligence and provide initial indications of interest ("***IOIs***"). Throughout the marketing process, Moelis worked with each of the interested potential buyers to respond to their information requests and encourage them to submit competitive IOIs.

The Company has received multiple IOIs from both strategic and financial bidders. Moelis and the Company's management team intend to continue working with certain of the parties who submitted IOIs to assist with any further diligence and encourage them to improve or refine their offers to be more competitive and to provide more potential value for the Debtors. Further, Moelis and the management team will work with such parties to negotiate letters of intent in advance of the November 22, 2023 milestone for receiving letters of intent under the Restructuring Support Agreement. If the November 22 milestone is satisfied, the Debtors will then, in consultation with the Required First Lien Lender Group, select the letter of intent that constitutes the most value maximizing transaction available to the Company and work expeditiously to negotiate definitive sale documentation and potentially consummate the transaction contemplated thereby, which may include consummating such transaction pursuant to the Plan if the Debtors receive a Sale Toggle Notice. In the event the Debtors receive a Sale Toggle Notice and are seeking to consummate a Sale Transaction pursuant to the Plan, the Debtors will file a notice indicating the same on the docket in the Chapter 11 Cases prior to the Confirmation Hearing. In the event the Debtors are unable to satisfy any of the sale process milestones under the Restructuring Support Agreement or are otherwise unable to reach agreement with a potential purchaser with respect to a Sale Transaction, the Debtors expect to pursue consummation of the Equitization Transaction as set forth in the Plan.

**G.      DIP Financing to Fund the Chapter 11 Cases**

As contemplated by the Restructuring Support Agreement, the Debtors will, to the extent necessary to bridge the Debtors through the bankruptcy process and consummate the Plan, enter into a Superpriority Secured Priming Debtor-In-Possession Credit Agreement (the "***DIP Credit Agreement***"), by and among SMHC, as borrower, SMI, as holdings, the lenders and guarantors party thereto (any such lenders, the "***DIP Lenders***"), and Acquiom Agency Services LLC and Seaport Loan Products LLC, in their respective capacities as co-administrative agent, providing for senior secured superpriority term loan facilities in the form of new money term loans in an aggregate principal amount estimated to be $23 million and in the form of roll-up loans in an aggregate principal amount of approximately $27.5 million and accrued interest of approximately $900,000 in respect of the loans outstanding under the Superpriority Credit Facility (the "***DIP Facility***").

Moelis and the Debtors' management team are conducting a marketing process seeking third-party financing. To date, no third party has been willing to provide postpetition financing on an unsecured basis, secured only by unencumbered property, or secured only by liens junior to or *pari passu* with the Claims arising under the Prepetition Credit Agreements. Accordingly, the Debtors believe the DIP Facility is the best possible financing available to them. Moreover, in the absence of the Consenting Creditors' consent to the Debtors' use of  Cash Collateral and, if applicable, provision of the DIP Facility, the Debtors would not be able to fund the Chapter 11 Cases or pursue the value-maximizing restructuring transactions set forth in the Restructuring Support Agreement and the Plan.

An integral component of the DIP Facility is the "roll-up" of prepetition indebtedness under the Superpriority Credit Agreement. The negotiation of the roll-up was a critical component of the overall DIP Facility and was required as a condition for the DIP Lenders to provide the liquidity necessary to continue the Debtors' operations and implement the restructuring pursuant to the Restructuring Support Agreement. The Debtors agreed to the roll-up and believe it is fair, as the lenders under the Superpriority Credit Agreement, all of whom were existing holders of loans under one or more of the other Prepetition Credit Agreements, agreed to fund the Superpriority Credit Facility outside of bankruptcy notwithstanding the existence of multiple defaults under the Prepetition Credit Agreements, including a default arising from the Debtors' inability to pay interest when due. Moreover, the Debtors believe the roll-up is fair and a sound exercise of their business judgment because, without the roll-up obligations, the Consenting Creditors would not consent to key features of the DIP Facility, including their consent to the Debtors' use of Cash Collateral and the priming of the liens securing the Prepetition Credit Agreements (other than the Superpriority Credit Agreement, which obligations are being rolled up). These concessions have permitted the Debtors to conduct an

out-of-court sale process in a manner designed to test the true market value of their businesses and assets and maximize potential sale proceeds for the benefit of all creditors otherwise Impaired under the Plan.

**H.      Milestones**

To minimize costs and potential disruptions to the business that could result from the chapter 11 filings, the Debtors, and the Consenting Creditors seek to minimize the duration of the Chapter 11 Cases.  As a result, the Restructuring Support Agreement obligates the parties to work expeditiously to consummate the restructuring described in the Restructuring Term Sheet and, through the Restructuring Term Sheet and the DIP Term Sheet, establishes a number of milestones (the "***Milestones***") to govern that process, including the following:

a)   filing the Plan and this Disclosure Statement, as well as a motion seeking approval of the Disclosure Statement, on the Petition Date;

b)   obtaining the Court's entry of the Interim DIP Order within three (3) Business Days of the Petition Date; and

c)   obtaining the Court's entry of (i) the Final DIP Order and (ii) confirmation of the Plan and approval of this Disclosure Statement within 35 days of the Petition Date.

Accordingly, the Debtors intend to seek authority to schedule a combined hearing to (a) approve the Disclosure Statement and (b) consider confirmation of the Plan on or around a date that is consistent with the confirmation milestone above.  To abide by this schedule, the Debtors have spent and will spend considerable time and effort in the period leading up to the Petition Date drafting and negotiating many of the material documents necessary to implement the agreed restructuring.  This includes, among many other documents, the Plan, which was delivered as part of the Solicitation Materials, and various related documents, including this Disclosure Statement and various exhibits hereto—which were finalized or substantially finalized prior to the Petition Date.

**IV.      ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES**

Pursuant to the Restructuring Support Agreement, the Debtors agreed to commence the Chapter 11 Cases upon the occurrence of a Restructuring Trigger (as defined in the Restructuring Support Agreement) or if a Qualifying Sale Transaction (as defined in the Restructuring Support Agreement) is not consummated pursuant to the Company's prepetition out-of-court sale process.  If the Chapter 11 Cases are commenced, the Debtors expect the Chapter 11 Cases to proceed quickly.  Should the Debtors' projected timelines prove accurate, the Debtors could emerge from chapter 11 by early January, 2024.  ***No assurances can be made, however, that the Court will enter various orders on the timetable anticipated by the Debtors. As a result, the Debtors' emergence could be substantially longer than the anticipated emergence date.***

**A.      First Day Pleadings**

If the Chapter 11 Cases are commenced, on the Petition Date, the Debtors will file several motions (collectively, the "***First Day Pleadings***") designed to facilitate the administration of these Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees, vendors, insurers, and taxing authorities, among others, following the commencement of the Chapter 11 Cases.  If the Chapter 11 Cases are commenced, on the Petition Date, the Debtors expect to file the following First Day Pleadings on an emergency basis:

- *Emergency Ex Parte Application for Entry of an Order Authorizing the Employment and Retention of Kroll Restructuring Administration LLC as Claims, Noticing, and Solicitation Agent;*

- *Emergency Motion for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases;*

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Program; and (II) Granting Related Relief;*

- *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue Using*

4876-2744-3839

*Existing Checks and Business Forms, (C) Maintain Their Corporate Card Program, and (D) Continue Intercompany Transactions; and (II) Granting Related Relief;*

- *Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition Taxes and Fees; and (II) Granting Related Relief;*

- *Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance Payments for Future Utility Services; (II) Prohibiting Utility Companies from Altering, Discontinuing, or Refusing Services; (III) Approving the Debtors' Proposed Procedures for Resolving Additional Adequate Assurance Requests; and (IV) Granting Related Relief;*

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage and Satisfy Prepetition Obligations Related Thereto; (B) Renew, Amend, Supplement, Extend, or Purchase Insurance Coverage on a Postpetition Basis in the Ordinary Course; and (C) Continue Their Prepetition Surety Bond Program and Satisfy Prepetition Obligations Related Thereto; (II) Modifying the Automatic Stay Solely With Respect to Workers' Compensation Claims; and (III) Granting Related Relief;*

- *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors' Continuation of Certain Factoring Arrangements and (II) Granting Related Relief;*

- *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay (A) Critical Vendors, (B) Lien Claimants, and (C) 503(B)(9) Claimants; (II) Confirming Administrative Expense Priority of Outstanding Orders; and (III) Granting Related Relief;*

- *Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) File a Consolidated Creditor Matrix; (B) File a Consolidated List of the 30 Largest Unsecured Creditors; and (C) Redact Certain Personal Identification Information; and (II) Granting Related Relief;*

- *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Use Cash Collateral, (II) Grant Liens and Superpriority Administrative Expense Claims, (III) Grant Adequate Protection to the Prepetition Secured Parties; (IV) Modify the Automatic Stay; (V) Schedule a Final Hearing; and (VI) Grant Related Relief;* and

- *Emergency Motion for Entry of an Order (I) Scheduling a Combined Hearing, (II) Establishing Objection Deadlines, (III) Approving the Solicitation Materials and Tabulation Procedures, and (IV) Waiving the Requirements that the U.S. Trustee Convene A Meeting of Creditors and the Debtors File Schedules and Statements of Financial Affairs* (the "**Disclosure Statement Motion**").

After the Petition Date, the Debtors intend to file several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, along with applications to retain various professionals, including Moelis as investment banker, A&M as restructuring advisor, and Wachtell and V&E as co-counsel to the Debtors, to assist them in the Chapter 11 Cases.

The First Day Pleadings and all orders for relief granted in the Chapter 11 Cases will be available to view free of charge on the Debtors' case website at https://cases.ra.kroll.com/SMI.

**B.      Schedules of Assets and Liabilities and Statements of Financial Affairs**

The Debtors intend to seek a conditional waiver of the requirement to prepare and File their Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs (collectively, the "**Schedules and Statements**") in connection with the Disclosure Statement Motion.   The Debtors' requested relief will be conditioned on having the Plan Confirmed within forty-five (45) days following the Petition Date.  If the Plan is not Confirmed in such timeframe, the Debtors will seek relief from the Court to allow an extension of time to file the Schedules and Statements.

**V.      TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS**

The Plan provides for, among other things, the issuance of Reorganized SMI Topco Interests.  The issuance and the distribution under the Plan of Reorganized SMI Topco Interests will be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code or, alternatively, Section 4(a)(2) of the Securities Act.  The Reorganized SMI Topco Interests issued pursuant

to Section 1145 may be resold without registration under the Securities Act unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code: *provided*, *however*, such Reorganized SMI Topco Interests may not be freely resold under the Securities Act if, at the time of transfer, the holder is an "affiliate," as defined in Rule 144(a)(1) under the Securities Act, of the Reorganized Debtors, or has been such an "affiliate" within 90 days of such transfer.  In addition, section 1145 of the Bankruptcy Code generally permits Reorganized SMI Topco Interests to be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash or property.  Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions of an entity that is not an issuer, (a) purchases a claim or interest with a view to distribution of any security to be received in exchange for the claim or interest, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

If section 1145 of the Bankruptcy Code is deemed not to apply, such offering, issuance, and distribution of the Reorganized SMI Topco Interests is nonetheless exempt from registration under the Securities Act pursuant to Section 4(a)(2) thereof and the Reorganized SMI Topco Interests will be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, and in compliance with any applicable state or foreign securities laws.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, publicly available information, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144 under the Securities Act.

***In any case, recipients of new securities issued or transferred under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.***

**BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE, SECTION 4(A)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER, AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.**

## VI.     SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.

### A.     Administrative Expense Claims, Professional Fee Claims, and Priority Claims

#### 1.     Administrative Expense Claims

Except with respect to Administrative Expense Claims that are Professional Fee Claims, and except to the extent that an Administrative Expense Claim is satisfied pursuant to the treatment provided in Article III.B of the Plan

4876-2744-3839

(including with respect to any Adequate Protection Claims) or has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall receive, at the option of the Debtors (with the reasonable consent of the Required First Lien Lender Group), (a) payment in full in Cash; (b) Reinstatement; (c) delivery of the collateral securing any such secured claim and payment of any interests required under section 506(b) of the Bankruptcy Code; or (d) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code rendering such Claim unimpaired, in each case on the latest of:  (i) on or as soon as reasonably practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (ii) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (iii) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided*, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' businesses may be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in Article II.A of the Plan and except with respect to Administrative Expense Claims that are Professional Fee Claims, requests for allowance and payment of Administrative Expense Claims must be Filed and served on the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than the Administrative Expense Claims Bar Date.  Holders of Administrative Expense Claims that are required to, but do not, File and serve on the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, a request for allowance and payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, the Post-Sale Estates, or their respective assets or property and such Administrative Expense Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the requesting party no later than forty-five (45) days after the Effective Date or such other date fixed by the Court.  Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed.

<h4>2.     Professional Compensation</h4>

<h4>a.     Final Fee Applications</h4>

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Reorganized Debtors or the Post-Sale Estates, as applicable, no later than forty-five (45) days after the Effective Date. Each such final request will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, and once approved by the Court, such Allowed Professional Fee Claims shall be promptly paid in Cash from the Professional Fee Escrow Account up to its full Allowed amount.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims shall be promptly paid by the Reorganized Debtors or the Post-Sale Estates, as applicable, without any further action or order of the Court.  The Reorganized Debtors' or the Post-Sale Estates', as applicable, obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors or the Post-Sale Estates, as applicable, and the requesting party no later than twenty (20) days after such Professional Fee Claim is Filed with the Court.

<h4>b.     Professional Fee Escrow Account</h4>

As soon as practicable after Confirmation, and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall not be subject to any Lien and shall be maintained in trust solely for the benefit of the Professionals.  The funds in the Professional Fee Escrow Account shall not be considered property of the Estates or of the Reorganized Debtors or the Post-Sale Estates, as applicable.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals on account of Professional Fee Claims have been irrevocably paid in full, any

remaining amount in the Professional Fee Escrow Account shall promptly be turned over to the Reorganized Debtors or the Post-Sale Estates, as applicable, without any further action or order of the Court.

   **c.**   Professional Fee Reserve Amount

   No later than five (5) Business Days prior to the Effective Date, the Debtors shall solicit Professionals for good-faith estimates of their unpaid Professional Fee Claims before and as of the Effective Date, and such Professionals shall deliver such estimate to the Debtors in writing via email two (2) Business Days prior to the Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Professional Fee Claims and shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not timely provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

   **d.**   Post-Effective Date Fees and Expenses

   Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals (including any fees related to the preparation of Professional fee applications). If the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, dispute the reasonableness of any such invoice, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, or the affected Professional may submit such dispute to the Court for a determination of reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

   Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Court.

   **3.**   **DIP Claims**

   Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall, (a) in the event the Equitization Transaction occurs, receive its Pro Rata share of the First Out Roll-Up Loans and (b) in the event a Sale Transaction occurs, be indefeasibly paid in full in Cash by the Debtors on or prior to the Effective Date (as the case may be as required by the DIP Documents).

   **4.**   **Restructuring Expenses**

   During the period commencing on the Petition Date through the Effective Date, the Debtors will promptly pay and reimburse in full in Cash in immediately available funds all accrued and unpaid Restructuring Expenses incurred in connection with the Chapter 11 Cases and the Confirmation and Consummation of the Plan in accordance with the Restructuring Support Agreement, any DIP Order, the Confirmation Order, or any other applicable order of the Court, and without any requirement to File a fee application with the Court or for Court review or approval.

   **5.**   **Priority Tax Claims**

   Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors (with the reasonable consent of the Required First Lien Lender Group), (a) payment in full in Cash; (b) Reinstatement; (c) delivery of the collateral securing any Secured Tax Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (d) such other treatment rendering such Claim Unimpaired.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

6.      **Statutory Fees**

All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors on the Effective Date. After the Effective Date, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall pay any and all such fees for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first. The Debtors shall File all quarterly reports due prior to the Effective Date when they become due and after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, shall continue to file quarterly, post-confirmation operating reports, in each case in accordance with the U.S. Trustee's Region 7 Guidelines for Debtors-in-Possession.

**B.      Classification and Treatment of Claims and Interests**

1.      **Summary of Classification**

Claims and Interests, except for Administrative Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims, are classified in the Classes set forth in Article III of the Plan. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es). A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date. The Plan constitutes a separate chapter 11 plan for each Debtor, and the classifications set forth in Article III of the Plan shall be deemed to apply to each Debtor. For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be ten Classes for each Debtor); *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.D of the Plan.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | First Lien Credit Facility Claims | Impaired | Entitled to Vote |
| 4 | 1.5 Lien Credit Facility Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Credit Facility Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | Trade Claims | Unimpaired | Presumed to Accept |
| 8 | Intercompany Claims | Unimpaired / Impaired | Not Entitled to Vote |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote |
| 10 | SMI Topco Interests | Impaired | Entitled to Vote |

2.      **Treatment of Claims and Interests**

a.      Class 1 – Other Priority Claims

*Classification*: Class 1 consists of all Other Priority Claims.

*Treatment*: If either an Equitization Transaction or a Sale Transaction occurs, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, (i) payment in full in Cash of its Allowed Other Priority Claim, or (ii) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or, in each case of (i) and (ii), as soon as reasonably practicable thereafter.

*Voting*: Class 1 is Unimpaired under the Plan. Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

b.      <u>Class 2 – Other Secured Claims</u>

*Classification*: Class 2 consists of all Other Secured Claims.

*Treatment*: If either an Equitization Transaction or a Sale Transaction occurs, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, (i) payment in full in Cash of its Allowed Other Secured Claim, payable on the later of (1) the Effective Date and (2) the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or, in each case of (1) and (2), as soon as reasonably practicable thereafter, (ii) Reinstatement, or (iii) such other treatment so as to render such Holder's Allowed Other Secured Claim Unimpaired.

*Voting*: Class 2 is Unimpaired under the Plan. Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

c.      <u>Class 3 – First Lien Credit Facility Claims</u>

*Classification*: Class 3 consists of all First Lien Credit Facility Claims.

*Allowance*: On the Effective Date, the First Lien Credit Facility Claims shall be Allowed, without setoff, subordination, defense, or counterclaim, in the aggregate principal amount equal to $285,480,985, plus (i) any accrued but unpaid interest payable thereon, and (ii) any and all accrued and unpaid fees, expenses, and indemnification or other obligations of any kind payable under the First Lien Credit Facility.

*Treatment*: On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the First Lien Credit Facility Claims and any Adequate Protection Claims in respect thereof, each Holder of an Allowed First Lien Credit Facility Claim or its designated Affiliate shall receive its Pro Rata share of, as applicable:

      i.      If the Equitization Transaction occurs:  (1) the Second Out Exit Term Loans, and (2) 96.5% of the Reorganized SMI Topco Interests (subject to dilution on account of the MIP); or

      ii.      If a Sale Transaction occurs:  the Waterfall Recovery; *provided*, *however*, that in no event shall the Holders of First Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed First Lien Credit Facility Claims, including postpetition interest on any Allowed First Lien Credit Facility Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code.

*provided*, *further*, that any such distribution on account of any First Lien Credit Facility Claim held by SMI Topco shall be distributed as set forth in Class 10 below.

*Voting*: Class 3 is Impaired under the Plan. Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

d.      <u>Class 4 – 1.5 Lien Credit Facility Claims</u>

*Classification*: Class 4 consists of all 1.5 Lien Credit Facility Claims.

*Allowance*: On the Effective Date, the 1.5 Lien Credit Facility Claims shall be Allowed, without setoff, subordination, defense, or counterclaim, in the aggregate principal amount equal to $11,053,092, plus (i) any accrued but unpaid interest payable thereon, and (ii) any and all accrued and unpaid fees, expenses, and indemnification or other obligations of any kind payable under the 1.5 Lien Credit Facility.

Treatment:  On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the 1.5 Lien Credit Facility Claims and any Adequate Protection Claims in respect thereof, each Holder of an Allowed 1.5 Lien Credit Facility Claim or its designated Affiliate shall receive its Pro Rata share of:

    i.   If the Equitization Transaction occurs:  2.5% of the Reorganized SMI Topco Interests (subject to dilution on account of the MIP); or

    ii.   If a Sale Transaction occurs:  the Waterfall Recovery, *less* the amount necessary to satisfy the Class 3 treatment described above; *provided*, *however*, that in no event shall the Holders of 1.5 Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed 1.5 Lien Credit Facility Claims, including postpetition interest on any Allowed 1.5 Lien Credit Facility Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code.

    *provided, further*, that any such distribution on account of any 1.5 Lien Credit Facility Claim held by SMI Topco shall be distributed as set forth in Class 10 below.

*Voting*: Class 4 is Impaired under the Plan.  Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

**e.**    <u>Class 5 – Second Lien Credit Facility Claims</u>

*Classification*:  Class 5 consists of all Second Lien Credit Facility Claims.

*Allowance*:  On the Effective Date, the Second Lien Credit Facility Claims shall be Allowed, without setoff, subordination, defense, or counterclaim, in the aggregate principal amount equal to $80,000,000, plus (i) any accrued but unpaid payable interest thereon, and (ii) any and all accrued and unpaid fees, expenses, and indemnification or other obligations of any kind payable under the Second Lien Credit Facility.

*Treatment*: On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the Second Lien Credit Facility Claims and any Adequate Protection Claims in respect thereof, each Holder of an Allowed Second Lien Credit Facility Claim or its designated Affiliate shall receive its Pro Rata share of:

    i.   If the Equitization Transaction occurs:  1.0% of the Reorganized SMI Topco Interests (subject to dilution on account of the MIP); or

    ii.   If a Sale Transaction occurs:  the Waterfall Recovery, *less* the amount necessary to satisfy the Class 3 and Class 4 treatments described above; *provided*, *however*, that in no event shall the Holders of Second Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed Second Lien Credit Facility Claims, including postpetition interest on any Allowed Second Lien Credit Facility Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code.

    *provided, further*, that any such distribution on account of any Second Lien Credit Facility Claim held by SMI Topco shall be distributed as set forth in Class 10 below.

*Voting*: Class 5 is Impaired under the Plan.  Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

**f.**    <u>Class 6 – General Unsecured Claims</u>

*Classification*: Class 6 consists of all General Unsecured Claims.

*Treatment*: On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive:

28

i.    If the Equitization Transaction occurs:  at the option of the applicable Debtor or Reorganized Debtor, either (1) Reinstatement of its Allowed General Unsecured Claim; or (2) payment in full in Cash of its Allowed General Unsecured Claim on the later of (a) the Effective Date or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Claim; or

ii.   If a Sale Transaction occurs:  payment in full in Cash of its Allowed General Unsecured Claim on the later of (1) the Effective Date or (2) the date due in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Claim.

*Voting*: Class 6 is Unimpaired under the Plan.  Holders of Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

g.    Class 7 – Trade Claims

*Classification*: Class 7 consists of all Trade Claims.

*Treatment*: On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the Trade Claims, each Holder of an Allowed Trade Claim shall receive:

i.    If the Equitization Transaction occurs, the applicable Debtor or Reorganized Debtor shall continue to pay each Allowed Trade Claim in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Allowed Trade Claim; or

ii.   If a Sale Transaction occurs:  payment in full in Cash of its Allowed Trade Claim on the later of (1) the Effective Date or (2) the date due in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Claim.

*Voting*: Class 7 is Unimpaired under the Plan.  Holders of Claims in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

h.    Class 8 – Intercompany Claims

*Classification*: Class 8 consists of all Intercompany Claims.

*Treatment*:  On the Effective Date, in the Debtors' discretion (with the reasonable consent of the Required First Lien Lender Group), all Intercompany Claims shall either be Reinstated or discharged without any distribution on account of such Claims; *provided*, *however*, to the extent any Intercompany Claims constitute Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims held by SMI Topco, the distributions that would otherwise be made to SMI Topco on account of such Claims pursuant to the treatment set forth in Classes 3, 4, and 5, respectively, shall instead be made to the Holders of SMI Topco Interests pursuant to the treatment provided in Class 10.

*Voting*:  Class 8 is either Unimpaired, in which case the Holders of such Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

i.    Class 9 – Intercompany Interests

*Classification*: Class 9 consists of all Intercompany Interests.

*Treatment*: On the Effective Date, in the Debtors' discretion (with the reasonable consent of the Required First Lien Lender Group), all Intercompany Interests shall either be Reinstated or discharged without any distribution on account of such Interests.

*Voting*: Class 9 is either Unimpaired, in which case the Holders of such Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

**j.**    Class 10 – SMI Topco Interests

*Classification*: Class 10 consists of all SMI Topco Interests.

*Treatment*: On the Effective Date, all SMI Topco Interests shall be cancelled, released, discharged, and extinguished, and Holders of SMI Topco Interests shall receive:

  i.    If the Equitization Transaction occurs: to the extent SMI Topco holds any Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims, the distributions that would otherwise be made to SMI Topco on account of it being a Holder of such Allowed Claims pursuant to the treatment set forth in Classes 3, 4, and 5, respectively shall instead be made to the Holders of SMI Topco Interests on account of their Class 10 Interests; or

  ii.    If a Sale Transaction occurs: (1) the Waterfall Recovery, less the amount necessary to pay in full in Cash all Allowed Claims against the Debtors to the extent provided in Classes 3–5, and (2) all funds remaining in the Post-Sale Reserve after the wind down of the Post-Sale Estates, if any; *provided*, *however*, that to the extent SMI Topco holds any Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims, the distributions that would otherwise be made to SMI Topco on account of it being a Holder of such Allowed Claims pursuant to the treatment set forth in Classes 3, 4, and 5, respectively, shall instead be made to the Holders of SMI Topco Interests, in each case on account of their Class 10 Interests.

*Voting*: Class 10 is Impaired under the Plan. Holders of Interests in Class 10 are entitled to vote to accept or reject the Plan.

**3.    Special Provision Governing Unimpaired or Reinstated Claims**

Without limiting or otherwise modifying any order of the Court, nothing under the Plan shall affect or waive the Debtors', the Reorganized Debtors', or the Post-Sale Estates', as applicable, claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

**4.    Elimination of Vacant Classes**

Any Class of Claims or Interests that does not contain an Allowed Claim or Interest or a Claim temporarily Allowed by the Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**5.    Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

6.     **Intercompany Claims and Interests**

To the extent Reinstated under the Plan, distributions on account of Intercompany Claims and Intercompany Interests are not being received by Holders of such Intercompany Claims and Intercompany Interests on account of their Intercompany Claims and Intercompany Interests but for the purposes of administrative convenience, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

7.     **Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan.  The Debtors reserve the right to modify the Plan subject to and in accordance with Article X of the Plan and the Consenting Parties' respective consent rights set forth in the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests, and the filing of the Plan shall constitute a motion for such relief.

8.     **Controversy Concerning Impairment**

If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, are Impaired, the Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

9.     **Subordinated Claims**

Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, reserve the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**C.     Means for Implementation of the Plan**

1.     **Equitization Transaction**

**If no Sale Toggle Notice has been delivered, the provisions in Article IV.A of the Plan shall govern the implementation of the Plan.  For the avoidance of doubt, all provisions in Article IV.A of the Plan shall apply only if a Sale Toggle Notice has <u>not</u> been delivered.**

a.     <u>Restructuring Transactions</u>

On the Conversion Date (as defined in the Plan), the Debtors shall effectuate the Conversion as set forth in the Plan and the Restructuring Transactions Exhibit.  On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall undertake the Restructuring as set forth in the Plan and the Restructuring Transactions Exhibit, including:  (i) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, sale, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Restructuring Transactions Exhibit, and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Restructuring Transactions Exhibit, and the Restructuring Support Agreement and having other terms for which the applicable Entities agree; (iii) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (iv) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (v) the issuance of securities, including the Reorganized SMI Topco Interests, which shall be authorized and approved in all respects in

each case without further action being required under applicable law, regulation, order, or rule; (vi) the execution and delivery of the Exit Term Loan Facilities Documents; (vii) the execution and delivery of Definitive Documents not otherwise included in the foregoing, if any; and (viii) all other actions that the Debtors or the Reorganized Debtors determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law, but in all cases subject to the terms of the Plan, the Restructuring Transactions Exhibit, and the Restructuring Support Agreement.  The Confirmation Order shall and shall be deemed, pursuant to sections 363, 365, 1123, and 1145(a) of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring.

      **b.**    <u>Sources of Consideration for Plan Distributions</u>

      The Debtors, the Reorganized Debtors, and/or the Disbursing Agent, as applicable, shall fund distributions under the Plan as follows:

      i.    <u>Cash on Hand / DIP Facility Borrowings</u>

      On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall make all distributions required to be made under the Plan using Cash on hand as of the Effective Date, including Cash from operations and the proceeds of borrowings under the DIP Facility and/or Exit Term Loan Facilities.  All remaining Cash on hand as of the Effective Date, after payment or funding of all distributions required to be made on the Effective Date, including Cash from operations and the proceeds of borrowings under the DIP Facility, but excluding the Cash funded into the Professional Fee Escrow Account, shall be retained by or transferred to, as applicable, the Reorganized Debtors.  Cash payments to be made pursuant to the Plan will be made by the Debtors or the Reorganized Debtors, as applicable.  The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

      ii.    <u>Exit Term Loan Facilities</u>

      On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit Term Loan Facilities.  The Reorganized Debtors shall use the loans under and proceeds of the Exit Term Loan Facilities for the purposes permitted by the Exit Term Loan Facilities Documents, including the funding of distributions under the Plan and satisfaction of ongoing working capital needs, as well as the repayment in full of the Canadian Credit Agreement and the issuance of the First Out Roll-Up Loans to the Holders of DIP Claims.

      The Confirmation Order shall constitute approval of the Exit Term Loan Facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Term Loan Facilities Documents and such other documents as may be required or appropriate.

      The Exit Term Loan Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.  The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, whether under the Bankruptcy Code or other applicable non-bankruptcy law, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Term Loan Facilities Documents (i) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Term Loan Facilities Documents, (ii) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Term Loan Facilities Documents, and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all

governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

On and as of the Effective Date, all Persons or Entities entitled to Plan consideration in the form of Exit Term Loans (as defined in the Exit Term Loan Facilities Term Sheet) in accordance with the Plan shall be deemed to be parties to, and bound by, the Exit Term Loan Facilities Credit Agreement (as defined in the Exit Term Loan Facilities Term Sheet), without the need for execution thereof by any such Person or Entity.

        iii.        Issuance and Distribution of Reorganized SMI Topco Interests

On the Effective Date, Reorganized SMI Topco shall be authorized to and shall issue the Reorganized SMI Topco Interests in accordance with the terms of the Plan and the Restructuring Transactions Exhibit without the need for any further corporate or limited liability company action or without any further action by Holders of Claims or Interests. All of the Reorganized SMI Topco Interests, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable (as applicable). Each distribution and issuance of the Reorganized SMI Topco Interests under the Plan shall be governed by the terms and conditions set forth in the Plan and the Restructuring Transactions Exhibit applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The Reorganized SMI Topco Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date.

The Holders of Reorganized SMI Topco Interests shall be deemed as a result of having received distributions of Reorganized SMI Topco Interests pursuant to the Plan and the Restructuring Transactions Exhibit to have accepted the terms of the Reorganized SMI Topco Interests Documents (solely in their capacity as holders of Reorganized SMI Topco Interests) and to be parties thereto without further action or signature. The Reorganized SMI Topco Interests Documents shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of Reorganized SMI Topco Interests shall be bound thereby (without any further action or signature) in all respects, whether or not such Holder has executed the Reorganized SMI Topco Interests Documents.

        c.        New Governance Documents

On the Effective Date, the New Governance Documents, including the Reorganized SMI Topco Interests Documents, shall be adopted automatically by the applicable Reorganized Debtors in a form consistent with the provisions of the Plan, the Restructuring Transactions Exhibit, and the Restructuring Support Agreement, and shall be deemed to be valid, binding, and enforceable obligations. To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtors, as applicable, will, on or as soon as practicable after the Effective Date, file their respective New Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.

Pursuant to section 1123(a)(6) of the Bankruptcy Code, the applicable New Governance Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities and will comply with all other applicable provisions of section 1123(a)(6) of the Bankruptcy Code regarding the distribution of power among, and dividends to be paid to, different classes of voting securities. After the Effective Date, the Reorganized Debtors, as applicable, may amend and restate their respective New Governance Documents and other constituent documents in accordance with the terms thereof, as permitted by the laws of their respective states, provinces, or countries of organization and their respective New Governance Documents.

        d.        New Company Agreement

On the Effective Date, Reorganized SMI Topco shall enter into and adopt the New Company Agreement, substantially in the form set forth in the Plan Supplement. Reorganized SMI Topco or the Disbursing Agent shall deliver the New Company Agreement to each Holder of Reorganized SMI Topco Interests and, to the extent that the New Company Agreement purports to bind any such parties, such parties shall be bound thereby, in each case, without the need for execution by any party thereto other than Reorganized SMI Topco. On the Effective Date, the New

4876-2744-3839

Company Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms and provisions.

### e. Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the boards of directors of each of the Debtors shall expire automatically, and each person serving as a director thereof shall be automatically removed and shall be deemed to have resigned and cease to serve, and the New Board and the officers of each of the Reorganized Debtors, respectively, shall be appointed in accordance with the Plan, the New Governance Documents, and any other constituent documents of each Reorganized Debtor.

The size of the New Board of Reorganized SMI Topco and the identity of the members will be disclosed in the Plan Supplement. The directors, managers, and officers for the subsidiaries of Reorganized SMI Topco, as applicable, shall be identified and selected by the New Board of Reorganized SMI Topco in accordance with the terms of the New Governance Documents.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve as a director, officer, or manager of Reorganized SMI Topco or any of the other Reorganized Debtors. To the extent any such director, officer, or manager is an "Insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director, officer, or manager will also be disclosed. Each such director, officer, and manager shall serve from and after the Effective Date pursuant to the terms of the New Governance Documents and other constituent documents of the Reorganized Debtors and applicable laws of the respective Reorganized Debtors' jurisdiction of formation.

### f. Exemption from Registration Requirements

The offering, issuance, and distribution of the Reorganized SMI Topco Interests shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without any further act or action by any Entity, from registration under (i) the Securities Act and all rules and regulations promulgated thereunder and (ii) any applicable U.S. state or local law requiring registration for the offer, issuance, or distribution of securities or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption under the Securities Act.

Pursuant to section 1145 of the Bankruptcy Code, the Reorganized SMI Topco Interests issued under the Plan in reliance upon section 1145 of the Bankruptcy Code will be freely transferable by the recipients thereof, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (ii) the restrictions, if any, on the transferability of such securities or instruments, including, any restrictions on the transferability under the terms of the New Governance Documents; and (iii) any other applicable regulatory approval.

To the extent issuance under section 1145 of the Bankruptcy Code is unavailable, such Reorganized SMI Topco Interests (including on account of the MIP) will be issued without registration under the Securities Act in reliance on section 4(a)(2) of the Securities Act and shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, and in compliance with any applicable state or foreign securities laws.

### g. Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, the Reorganized Debtors' officers, and the members of the New Board(s), as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the Reorganized SMI Topco Interests, in the name of and on behalf

4876-2744-3839

of the Reorganized Debtors, as applicable, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

### h. Management Incentive Plan

The Required First Lien Lender Group will negotiate in good faith with the Debtors to finalize the material terms of the MIP prior to the Effective Date.  For the avoidance of doubt, the MIP shall contain customary terms with up to 10% of the Reorganized SMI Topco Interests, on a fully diluted basis, reserved for the MIP.  The Confirmation Order shall authorize the Reorganized Debtors to adopt and enter into the MIP, on the terms set forth in Article IV.A.7 of the Plan.

### i. Employment Agreements

Prior to the Effective Date, the Required First Lien Lender Group will negotiate in good faith with the Debtors and the applicable employees of the Debtors to finalize the New Employment Agreements.

### 2. Sale Transaction

**If a Sale Toggle Notice has been delivered, the provisions in Article IV.B of the Plan shall govern the implementation of the Plan.  For the avoidance of doubt, all provisions in Article IV.B of the Plan shall apply only if a Sale Toggle Notice <u>has</u> been delivered.**

### a. Closing of Sale Transaction

The Sale Transaction shall be governed by, and shall be subject to the terms and conditions of, the Sale Agreement and the Restructuring Support Agreement in all respects except as may be modified by the provisions of the Plan or the Confirmation Order, in accordance with the Restructuring Support Agreement.  On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction with the Third-Party Purchaser and any other applicable party and, among other things and as applicable, the Debtors' assets (including Executory Contracts and Unexpired Leases assumed and assigned to the Third-Party Purchaser pursuant to Article V of the Plan) shall be transferred to and vest in the applicable Third-Party Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the applicable Sale Agreement and the Confirmation Order.

### b. Waterfall of Sale Distributable Proceeds

Solely in the event of a Sale Transaction, the Sale Distributable Proceeds shall be distributed pursuant to the Waterfall Recovery and the treatment set forth in Article III.B of the Plan.

For the avoidance of doubt, after accounting or reserving for the amounts necessary to pay or fund in full in Cash the DIP Claims, Professional Fee Claims (including funding the Professional Fee Reserve Amount into the Professional Fee Escrow Account), Allowed Administrative Expense Claims, Restructuring Expenses, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed General Unsecured Claims, Allowed Trade Claims, and the Post-Sale Reserve, the Sale Distributable Proceeds shall be allocated and distributed in accordance with the following priority (in each case on a Pro Rata basis): *first*, to Holders of Allowed First Lien Credit Facility Claims until all Allowed First Lien Credit Facility Claims are paid in full in Cash; *second*, after accounting for the amount necessary to satisfy the Allowed First Lien Credit Facility Claims in full in Cash, to Holders of Allowed 1.5 Lien Credit Facility Claims until all Allowed 1.5 Lien Credit Facility Claims are paid in full in Cash; *third*, after accounting for the amount necessary to satisfy the Allowed First Lien Credit Facility Claims and Allowed 1.5 Lien Credit Facility Claims in full in Cash, to Holders of Allowed Second Lien Credit Facility Claims until all Allowed Second Lien Credit Facility Claims are paid in full in Cash; and *fourth*, after accounting for the amount necessary to satisfy the Allowed First Lien Credit Facility Claims, the Allowed 1.5 Lien Credit Facility Claims, and the Allowed Second Lien Credit Facility Claims in full in Cash, to Holders of Allowed SMI Topco Interests; *provided*, *however*, that in no event shall the Holders of Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed amount of such Claims, including postpetition interest on any such

Allowed Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code.

### c.     Wind Down and Dissolution of Debtors

Solely in the event of a Sale Transaction, the Plan Administrator shall manage the wind down of the Post-Sale Estates and manage certain distributions in accordance with the Plan. As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically.  The Plan Administrator shall serve as the sole officer and manager or director, as applicable, of the Post-Sale Estates and may also elect such additional manager(s), director(s), and officer(s), as applicable, as the Plan Administrator deems necessary to implement the Plan and the actions contemplated herein. The applicable governance documents for the Post-Sale Estates shall be amended in accordance with section 1123(a)(6) of the Bankruptcy Code.

The Plan Administrator shall have the authority and right on behalf of each of the Post-Sale Estates, without the need for Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including to:  (i) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (ii) make distributions to Holders of Allowed Claims and, if applicable, Interests, in accordance with the Plan; (iii) subject in all respects to Article VIII of the Plan, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any such Causes of Action that are not Sale Assets, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Post-Sale Estates; (iv) retain professionals to assist in performing its duties under the Plan; (v) maintain the books, records, and accounts of the Post-Sale Estates; (vi) complete and file, as necessary, all final or otherwise required federal, state, local and non-U.S. tax returns for the Post-Sale Estates; and (vii) perform other duties and functions that are consistent with the implementation of the Plan.

After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind down, sell, liquidate, and may operate, use, acquire, or dispose of any property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Post-Sale Estates after consummation of the Sale Transaction without approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  The Plan Administrator shall effectuate the process to wind down, dissolve, and liquidate the Post-Sale Estates and distribute any remaining assets with the amounts reserved in the Post-Sale Reserve.

Each of the Post-Sale Estates shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

The Plan Administrator shall be authorized to file on behalf of the Debtors, certificates of dissolution and any and all other corporate, limited liability company, and partnership documents and other instruments necessary to effectuate the Sale Transaction without further approval of the Court or other action under applicable law, regulation, order, or rule, including any action by the stockholders, officers, members, the board of directors, board of managers or similar governing body of the Debtors.

### d.     Corporate Existence

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents and agreements) in effect prior to the Effective Date, except to the extent that such certificate of incorporation and bylaws (or other formation documents and agreements) are amended under the Plan, including, with respect to Reorganized SMI Topco, pursuant to the New Governance Documents and giving effect to the Conversion, or otherwise, and to the extent such documents are amended, such documents are deemed amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial or federal law).  After the Effective Date, the respective certificate of incorporation and bylaws (or other

formation documents or agreements) of one or more of the Reorganized Debtors or the Post-Sale Estates, as applicable, may be amended or modified without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  After the Effective Date, one or more of the Reorganized Debtors or the Post-Sale Estates, as applicable, may be disposed of, dissolved, wound down, merged, converted, or liquidated without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

> **e.**     Vesting of Assets

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein (including any applicable Sale Agreement), on the Effective Date, all property in each Estate, including all Causes of Action, and any property acquired by any of the Debtors shall vest in each applicable Reorganized Debtor, Post-Sale Estate, and/or any Third-Party Purchaser, as applicable, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Except with respect to Liens securing the Exit Term Loan Facilities or as otherwise provided for in the Plan, to the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the applicable Reorganized Debtors, any administrative agent under the Exit Term Loan Facilities Documents, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, that are necessary to cancel and/or extinguish such Liens and/or security interests.

After the Effective Date, the applicable Reorganized Debtors, the Plan Administrator on behalf of the Post-Sale Estates, or any Third-Party Purchaser, as applicable, may present Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the applicable Reorganized Debtors, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, free and clear of all Liens, Claims, encumbrances, or other interests which appear of record, other than as specified above.  The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by the Plan, shall be given prior to the presentation of such Court order(s) or assignment(s).  Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the applicable Reorganized Debtors, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

> **f.**     Cancellation of Existing Securities, Agreements, and Indebtedness

On the Effective Date, only in the event the Equitization Transaction occurs, the Reorganized SMI Topco Interests shall be issued pursuant to the Plan and the Restructuring Transactions Exhibit.

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Support Agreement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtors under the Prepetition Credit Agreements and each certificate, share, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors, the Reorganized Debtors, and the Post-Sale Estates, as applicable, shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released and discharged, (except with respect to any Indemnification Obligations, which obligations, shall be assumed and assigned as set forth in Article V.E of the Plan); *provided*, that notwithstanding the releases set forth in Article VIII.F of the Plan, upon Confirmation or the occurrence of the Effective Date (i) any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under

the Plan as provided herein; and (ii) the DIP Documents and the Prepetition Credit Agreements shall continue in effect (other than, for the avoidance of doubt, any Liens or security interest terminated pursuant to Article VIII.D of the Plan) after the Effective Date solely with respect to any rights of the Agents and the co-administrative agents under the DIP Credit Agreement to (A) maintain, exercise, and enforce any of their respective rights to indemnification, reimbursement, or similar obligations and (B) perform any functions that are necessary to effectuate the foregoing, including appearing and raising issues in the Chapter 11 Cases in any proceeding in the Court or any other court.

Notwithstanding anything to the contrary in Article IV.D of the Plan any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in Article IV.D of the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by such Debtor or Reorganized Debtor, as applicable, pursuant to the Plan or a Final Order of the Court.

### g.    Corporate Action

Upon and after the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Court in all respects without any further corporate or equity holder action, including, as applicable to the Equitization Transaction or a Sale Transaction: (1) the Conversion; (2) entry into the Exit Term Loan Facilities; (3) execution, delivery, and performance of the Exit Term Loan Facilities Documents and the New Governance Documents; (4) the issuance and distribution of the Reorganized SMI Topco Interests; (5) appointment of the New Board and other directors and officers for Reorganized SMI Topco and the Reorganized Debtors; (6) the adoption of the MIP on terms and conditions set forth in Article IV.A.7 of the Plan; (7) entry into a Sale Agreement; (8) implementation of the Restructuring; and (9) all other actions contemplated by or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan and, if applicable, the Restructuring Transactions Exhibit.

Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, in connection with the Plan (including any items listed in the immediately preceding paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further corporate or other action by any security holders, directors, managers, or officers of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, or by any Holders of any Claims or Interests, as applicable.  On or (as applicable) before the Effective Date, the appropriate directors, managers, officers, or other authorized persons of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, shall be (or shall be deemed to have been) authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors or the Post-Sale Estates, as applicable, including the Exit Term Loan Facilities Documents, the New Governance Documents, any Sale Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court.  The authorizations and approvals contemplated by Article IV.F of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### h.    Exemption from Certain Taxes and Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (1) any issuance, transfer, or exchange of a Security (including of the Reorganized SMI Topco Interests), (2) any grant of collateral under the Exit Term Loan Facilities, (3) any creation of any Lien, mortgage, deed of trust, or other security interest, or (4) any transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

*Solicitation Version*

i.      Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors or the Post-Sale Estates, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the List of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Post-Sale Estates, as applicable.

No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Confirmation Order, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, will not pursue any and all available Causes of Action against it.  The Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order (including the Confirmation Order), including pursuant to Article VIII of the Plan, the Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor or Post-Sale Estate, as applicable.  The applicable Reorganized Debtors or the Post-Sale Estates, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

j.      Payment of the Restructuring Expenses

On the Effective Date, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, will pay all Restructuring Expenses, including fees and expenses estimated to be incurred through the Effective Date by the Consenting Creditor Representatives and the Consenting Sponsor Representatives without the need for any such Person to file a fee or retention application in the Chapter 11 Cases.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered in writing via email to the Debtors at least three (3) Business Days before the Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses (it being understood that any difference in (a) estimated Restructuring Expenses on and including the Effective Date as compared to (b) Restructuring Expenses actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the relevant Entity within thirty (30) days of the Effective Date).  If the Debtors, Reorganized Debtors, or Plan Administrator on behalf of the Post-Sale Estates, as applicable, dispute the reasonableness of any such estimate, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, or the affected professional, may submit such dispute to the Court for a determination of the reasonableness of such estimate, and the disputed portion of such estimated Restructuring Expenses shall not be paid until such dispute is resolved.  The undisputed portion of such estimated Restructuring Expenses shall be paid as provided herein.  For the avoidance of doubt, following the Effective Date, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall continue to pay all Restructuring Expenses of the Consenting Creditor Representatives and the Consenting Sponsor Representatives related to the Restructuring or any other transactions contemplated by the Plan.

4876-2744-3839

### k. Employee and Retiree Benefits

All compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, incentive and/or retention plans, severance agreements and plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed by, if the Equitization Transaction occurs, the Reorganized Debtors or, if a Sale Transaction occurs, the Third-Party Purchaser, pursuant to sections 365 and 1123 of the Bankruptcy Code.

## D. Treatment of Executory Contracts and Unexpired Leases

### 1. Assumption and Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be assumed by and assigned to the applicable Reorganized Debtors, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, or any of their respective designated assignees in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Court, other than those Executory Contracts or Unexpired Leases that: (a) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (b) have been previously rejected or assumed by a Final Order; (c) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; (d) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; or (e) have previously expired or terminated pursuant to its own terms or by agreement of the parties thereto.

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor or Post-Sale Estate, as applicable, in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors, with the reasonable consent of the Required First Lien Lender Group, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than three (3) days' notice to the applicable non-Debtor counterparties.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision) then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

### 2. Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order of the Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Court within the earliest to occur of (a) twenty-one (21) days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection or (b) thirty (30) days after notice of any rejection that occurs after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, the Post-Sale Estates, or any assets or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, or further notice to, or**

**action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in any Proof of Claim (if any) to the contrary**.

Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be considered General Unsecured Claims and shall be treated in accordance with Article III.B.6 of the Plan.

> **3.**      **Cure of Defaults for Assumed Executory Contracts and Unexpired Leases**

The Debtors, the Reorganized Debtors, the Plan Administrator on behalf of the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors, the Reorganized Debtors, the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, to a counterparty must be filed and served on the Reorganized Debtors, the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, on or before thirty (30) days after the Effective Date.  If such Cure Claim dispute is not resolved within seven (7) days of the Reorganized Debtors', the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, receiving such Cure Claim dispute, the counterparty to the applicable assumed Executory Contract or Unexpired Lease shall timely file an objection with the Court within seven (7) days.  **Any such request and/or objection that is not timely Filed shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, without the need for any objection by the Reorganized Debtors, the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Court.**

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors, the Reorganized Debtors, the Plan Administrator on behalf of the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, of the Cure Claim; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim.  The Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, also may settle any Cure Claim without any further notice to or action, order, or approval of the Court.  In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Court on or before thirty (30) days after the Effective Date.  Any such objection will be scheduled to be heard by the Court at the Debtors', the Reorganized Debtors', or the Post-Sale Estates', as applicable, first scheduled omnibus hearing for which such objection is timely Filed.  **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or the Post-Sale Estates, as applicable, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may assume the Executory Contract or Unexpired Lease, subject to the reasonable consent of the Required First Lien Lender Group, prior to the resolution of any such dispute; *provided*, *however*, that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Claim by the contract counterparty; *provided further*, *however*, that following entry of a Final Order resolving any such dispute, the Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution, subject to the reasonable consent of the Required First Lien Lender Group.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an

Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

### 4.    Insurance Policies

The Debtors do not believe any of their insurance policies (including all D&O Liability Insurance Policies and tail coverage liability insurance) are Executory Contracts.  All of the Debtors' insurance policies which are not Executory Contracts shall vest in the Reorganized Debtors or the Post-Sale Estates, as applicable.  To the extent such insurance policies are determined to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors or the Post-Sale Estates, as applicable, shall be deemed to have assumed all such insurance policies held by such entities as of the Petition Date (including all D&O Liability Insurance Policies and all tail coverage related thereto), and any agreements, documents, or instruments relating thereto, pursuant to section 365(a) of the Bankruptcy Code.  Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' or the Post-Sale Estates', as applicable, assumption of such D&O Liability Insurance Policies or other insurance policies, as applicable, and any agreements, documents, or instruments relating thereto, to the extent they are Executory Contracts.  Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and to the extent treated as an Executory Contract, each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, under the Plan, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, general partners, directors, and officers of the Debtors or their Affiliates who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, general partners, directors, and officers remain in such positions after the Effective Date.

### 5.    Indemnification Obligations

All Indemnification Obligations shall not be discharged or impaired by Confirmation of the Plan  or entry of the Confirmation Order and shall be assumed by the Reorganized Debtors or the Post-Sale Estates, as applicable, and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring (and, for the avoidance of doubt, the Plan and the Confirmation Order) on terms no less favorable to such current and former directors, officers, managers, equity holders, employees, attorneys, accountants, investment bankers, and other professionals of any of the Debtors and such current and former directors', officers', and managers' respective Affiliates than the Indemnification Obligations in place prior to the Petition Date, and to the extent any such Indemnification Obligations are obligations of a non-Debtor Affiliate of any of the Debtors, such Indemnification Obligations shall be assigned on the Effective Date to, (a) if the Equitization Transaction occurs, the Reorganized Debtors on a joint and several basis, or (b) if a Sale Transaction occurs, the Post-Sale Estates on a joint and several basis.

### 6.    Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### 7.    Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any

4876-2744-3839

Reorganized Debtor or Post-Sale Estate, as applicable, has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors or the Post-Sale Estates, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### 8. Nonoccurrence of Effective Date

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

### 9. Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases that have not expired or otherwise been terminated, cancelled, or rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

### E. Provisions Governing Distributions

### 1. Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

### 2. Delivery of Distributions and Undeliverable or Unclaimed Property

#### a. Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests.  The Debtors, the Reorganized Debtors, the Plan Administrator, and the Disbursing Agent, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

#### b. Delivery of Distributions in General

Except as otherwise provided herein or in the Restructuring Transactions Exhibit, distributions to Holders of Allowed Claims shall be made to the Holders of record as of the Distribution Record Date by the Debtors, the Reorganized Debtors, the Plan Administrator on behalf of the Post-Sale Estates, or the Disbursing Agent, as applicable, as follows:  (i) at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; (ii) at the address set forth in any written notice of address changes delivered to the Reorganized Debtors, or the Plan Administrator, as applicable, after the Effective Date; (iii) to any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; and/or (iv) in the case of Cash distributions on account of Allowed Claims in respect of the Prepetition Credit Agreements, through customary procedures with the applicable Agent.  Subject to Article VI of the Plan, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, the Plan Administrator, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

### c. Minimum Distributions

No fractional units of Reorganized SMI Topco Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts of units. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of units of Reorganized SMI Topco Interests that is not a whole number, the actual distribution of units of Reorganized SMI Topco Interests shall be rounded to the next higher whole number. The total number of units of Reorganized SMI Topco Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

### d. Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, shall have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date. After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors, or the Post-Sale Estates, as applicable, automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

### 3. Registration or Private Placement Exemption

Except as otherwise set forth in the Plan, if the Equitization Transaction occurs, all Reorganized SMI Topco Interests (including on account of the MIP) issued under Article III of the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code (or pursuant to another available exemption from registration under the Securities Act). The Reorganized SMI Topco Interests issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities. Such Reorganized SMI Topco Interests issued under the Plan in reliance upon section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any holder thereof at the time of transfer that (i) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the Reorganized SMI Topco Interests from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code. To the extent issuance under section 1145 of the Bankruptcy Code is unavailable, such Reorganized SMI Topco Interests (including on account of the MIP) will be issued without registration under the Securities Act in reliance on section 4(a)(2) of the Securities Act and shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, and in compliance with any applicable state or foreign securities laws.

None of the Debtors, the Reorganized Debtors, or any other person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the Reorganized SMI Topco Interests.

Notwithstanding anything to the contrary in the Plan or the Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the Reorganized SMI Topco Interests are exempt from registration.

### 4. Compliance with Tax Requirements

The Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit in connection with the Plan, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any

other mechanisms they believe are reasonable and appropriate.  The Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  The distributing party may require a Holder of an Allowed Claim or Interest to complete and return an appropriate Internal Revenue Service Form W-8 or Internal Revenue Service Form W-9, as applicable to each such Holder, and any other applicable tax forms.

### 5.      Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to Article IV.F of the Plan, except to the extent otherwise provided in the Plan without need for further action by any Agent.

### 6.      Allocations

The aggregate consideration to be distributed to each Holder of an Allowed Claim will be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes), with any excess allocated to unpaid interest that accrued on such Allowed Claim, if any.

### 7.      No Postpetition Interest on Claims

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if any, if and when such Disputed Claim becomes an Allowed Claim.

### 8.      Setoffs and Recoupment

Except as otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim against a Debtor of any nature whatsoever that the applicable Debtor, Reorganized Debtor, or Post-Sale Estate, as applicable, may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor, Reorganized Debtor, or Post-Sale Estate, as applicable, of any such Claim it may have against the Holder of such Allowed Claim.

In no event shall any Holder of an Allowed Claim be entitled to set off or recoup against any such Claim, right, or Cause of Action of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, unless (a) the Debtors have consented, and (b) such Holder has Filed a motion with the Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim (if any) or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise.  Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence prior to the Effective Date.

### 9.      Claims Paid or Payable by Third Parties

#### a.      Claims Paid by Third Parties

The Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or Post-Sale Estate; *provided*, that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall provide twenty-one (21) days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from

a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors or the Post-Sale Estates, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

> **b.** <u>Claims Payable by Insurers</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided*, that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall provide twenty-one (21) days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

> **c.** <u>Applicability of Insurance Policies</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**F.      Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

> **1.      Disputed Claims Process**

There is no requirement to file a Proof of Claim (or move the Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B of the Plan. On and after the Effective Date, except as otherwise provided in the Plan, all Allowed Claims shall be satisfied in the ordinary course of business of the applicable Reorganized Debtors or the Post-Sale Estates, as applicable. The Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall have the exclusive authority to (a) determine, without the need for notice to or action, order, or approval of the Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (b) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. If the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the same manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided* that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by the Plan) and to have the validity or amount of any Claim adjudicated by the Court; *provided further* that Holders of Claims may elect to resolve the validity or amount of any Claim in the Court. If a Holder makes such an election, the Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed. For the avoidance of doubt, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall retain all rights, claims, defenses, counterclaims, crossclaims, or rights of setoff or recoupment with respect to any Claims, including General Unsecured Claims and Trade Claims, that are Reinstated or otherwise Unimpaired pursuant to the Plan in the ordinary course of business after the Effective Date. Notwithstanding any other provision of the Plan, the fact that a Claim, including a General Unsecured Claim or a Trade Claim, is Unimpaired under the Plan shall in no way effect whether such Claim is Allowed. All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors. **Except as otherwise provided in the Plan, all Proofs of Claim Filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, or any further notice to or action, order, or approval of the Court.**

### 2. Allowance of Claims

On or after the Effective Date, each of the Reorganized Debtors or the Post-Sale Estates, as applicable, shall have and retain any and all rights and defenses its predecessor Debtor had with respect to any Claim immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  All settlements of Claims approved prior to the Effective Date pursuant to a Final Order of the Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

### 3. Claims and Interests Administration Responsibilities

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, by order of the Court, shall together have the sole authority to:  (a) File, withdraw, or litigate to judgment objections to Claims or Interests; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court.  In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim or Trade Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim or Trade Claim are preserved as if the Chapter 11 Cases had not been commenced.

### 4. Estimation of Claims

Before or after the Effective Date, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may (but are not required to) at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection.  In the event that the Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.  All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

### 5. Adjustment to Claims Without Objection

Any duplicate Claim or any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register without the Reorganized Debtors or the Plan Administrator, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Court.

### 6. No Distributions Pending Allowance

No payment or distribution provided under the Plan shall be made to the extent that any Claim is a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

### 7. Single Satisfaction of Claims

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim plus interest, if applicable.

G.  **Settlement, Release, Injunction, And Related Provisions**

1.  **Compromise and Settlement of Claims, Interests, and Controversies**

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval, as of the Effective Date, of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and are fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.  **Discharge of Claims and Termination of Interests**

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in any contract, instrument, or other agreement or document created pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever (including any interest accrued from and after the Petition Date) against or in, liabilities of, Liens on, obligations of, or rights against, the Debtors or any of their respective assets or properties, whether known or unknown, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account thereof, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims, Interests, and Causes of Action subject to the Effective Date occurring.

3.  **Term of Injunctions or Stays**

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

4.  **Release of Liens**

**Except with respect to the Liens securing the Exit Term Loan Facilities or as otherwise specifically provided in the Plan, the Exit Term Loan Facilities Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Term Loan Facilities Documents), or in any other contract, instrument, agreement or document created pursuant to the Plan or Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Post-Sale Estates, as applicable, and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required from the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable.**

To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Plan Administrator, as applicable, or the Exit Term Loan Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the Reorganized Debtors or the Plan Administrator, as applicable, shall be entitled to make any such filings or recordings on such Holder's behalf.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

5.        Releases by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, including the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their respective Estates or Post-Sale Estates, as applicable, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their respective Estates, Post-Sale Estates, or Affiliates, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership, or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Definitive Documents, the Plan, or any Restructuring (including any transaction in connection therewith), contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the Debtors' Restructuring efforts (including those contemplated by the Restructuring Support Agreement) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, any Restructuring transaction, any assumed Executory Contract or Unexpired Lease, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors and their respective Estates set forth in Article VIII.E of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall

constitute the Court's finding that such releases are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (c) in the best interests of the Debtors and their respective Estates; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors, their Estates, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, asserting any Claim or Cause of Action released pursuant to such releases.

6.      **Releases by Holders of Claims and Interests**

As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, whether known or unknown, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Definitive Documents, the Plan, or any Restructuring (including any transaction in connection therewith), contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the Debtors' Restructuring efforts (including those contemplated by the Restructuring Support Agreement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, any Restructuring transaction, any assumed contract, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in Article VIII.F of the Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (c) in the best interests of the Debtors and their Estates; (d) fair, equitable and reasonable; (e) given and made after due notice and opportunity for hearing; (f) an essential component of the Plan and the Restructuring; and (g) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.

7.      **Exculpation**

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from, any Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, any other Definitive Document or any Restructuring, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan.**

**The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

8.      **Injunction**

**Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released pursuant to Articles VIII.E or VIII.F of the Plan, discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Post-Sale Estates, the Exculpated Parties, the Released Parties and their respective assets and property: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.**

**Subject in all respects to Article XI of the Plan, no Entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, the Chapter 11 Cases, the Debtors (including the governance, management, ownership, or**

operation thereof), the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Exit Term Loan Facilities, the Reorganized SMI Topco Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Chapter 11 Cases, the Reorganized SMI Topco Interests, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, the execution of the Exit Term Loan Facilities, the issuance of the Reorganized SMI Topco Interests, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing without the Court: (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim or Cause of Action of any kind, including negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Released Party or Exculpated Party and (b) specifically authorizing such entity or person to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

### 9. Protection Against Discriminatory Treatment

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or the Post-Sale Estates, as applicable, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, the Post-Sale Estates, as applicable, or another Entity with whom the Reorganized Debtors or the Post-Sale Estates, as applicable, have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### 10. Subordination Rights

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights.  Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

### 11. Reimbursement or Contribution

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent.

## H. Conditions Precedent to Confirmation and Consummation of the Plan

### 1. Conditions Precedent to Confirmation

a.  The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan.

b.  The Restructuring Support Agreement shall not have been terminated as to all parties thereto and shall remain in full force and effect.

c.  The Plan shall not have been amended, altered, or modified from the Plan as of the commencement of solicitation unless such amendment, alteration, or modification has been made in accordance with Article X of the Plan and the Restructuring Support Agreement.

4876-2744-3839

### 2.    Conditions Precedent to the Effective Date

It shall be a condition to the occurrence of the Effective Date that each condition listed below shall have been satisfied (or waived pursuant to the provisions of Article IX.C of the Plan):

 a. the Court shall have entered the Confirmation Order, which shall be in form and substance consistent in all material respects with the Restructuring Support Agreement;

 b. the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date;

 c. if the Equitization Transaction occurs, the New Governance Documents shall be in full force and effect, in form and substance consistent in all respects with the Restructuring Support Agreement;

 d. if the Equitization Transaction occurs, the Debtors shall not be in default under the DIP Facility or any DIP Order;

 e. if the Equitization Transaction occurs, the final DIP Order shall remain in full force and effect;

 f. the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all waiting periods imposed by any governmental entity shall have terminated or expired;

 g. the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan;

 h. the Restructuring Support Agreement shall not have been terminated as to all parties thereto and shall remain in full force and effect;

 i. the applicable Definitive Documents shall be in full force and effect and in form and substance consistent in all respects with the Restructuring Support Agreement;

 j. if a Sale Transaction occurs, the Sale Agreement and the Plan Administrator Agreement shall be in full force and effect and in form and substance consistent in all respects with the Restructuring Support Agreement;

 k. all Professional Fee Claims that require the approval of the Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the approval of such fees and expenses by the Court;

 l. all fees and expenses of the Consenting Creditor Representatives shall have been paid in accordance with the Restructuring Support Agreement, the Final DIP Order, the Plan, or otherwise;

 m. the Debtors shall have implemented the Restructuring and all transactions contemplated in the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement and the Plan; and

 n. no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Restructuring, the Restructuring Support Agreement, or any of the Definitive Documents contemplated thereby.

### 3.    Waiver of Conditions

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IX of the Plan may be waived by the Debtors with the prior written consent of the Required First Lien Lender Group (not to be withheld unreasonably) without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan.

### 4.    Substantial Consummation

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

5.     **Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date**

If the Confirmation Date and/or the Effective Date do(es) not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Support Agreement shall: (a) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the Debtors or any other Entity; (c) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity in any respect; or (d) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

I.     **Modification, Revocation, or Withdrawal of the Plan**

1.     **Modification and Amendments**

Subject to the limitations contained herein, and only in accordance with the terms of the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the restrictions on modifications set forth in the Plan, and the terms of the Restructuring Support Agreement, the Debtors expressly reserve their rights, subject to and in accordance with the terms of the Restructuring Support Agreement, to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

2.     **Effect of Confirmation on Modifications**

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

3.     **Revocation or Withdrawal of the Plan**

The Debtors reserve the right, subject to and in accordance with the terms of the Restructuring Support Agreement, to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then:  (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (c) nothing contained in the Plan shall: (w) constitute a waiver or release of any Claims or Interests; (x) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or Interests; (y) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (z) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

J.     **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

a.     allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections relating to any of the foregoing;

b.     decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

c.     resolve any matters related to:  (i) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising

therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, any Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (ii) the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, amending, modifying, or supplementing, pursuant to Article V of the Plan, the Schedule of Rejected Executory Contracts and Unexpired Leases; and (iii) any dispute regarding whether a contract or lease is or was executory or unexpired;

d.   ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

e.   modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

f.   adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

g.   adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

h.   adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

i.   enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and the Restructuring Support Agreement, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Restructuring Support Agreement;

j.   resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan or the Restructuring Support Agreement;

k.   issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

l.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

m.   resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.I.1 of the Plan;

n.   enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

o.   determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement, any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Restructuring Support Agreement;

p.   adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein, including any Restructuring;

q.   hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

r.   consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

s.   determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

t.   hear and determine matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

u.   hear and determine matters concerning section 1145 of the Bankruptcy Code;

v.   hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

w.   enforce all orders previously entered by the Court;

x.   hear any other matter not inconsistent with the Bankruptcy Code;

y.   enter an order concluding or closing the Chapter 11 Cases; and

z.   enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan.

As of the Effective Date, notwithstanding anything in Article XI of the Plan to the contrary, the New Governance Documents, the Exit Term Loan Facilities, and any documents related thereto shall be governed by the jurisdictional provisions therein and the Court shall not retain jurisdiction with respect thereto.

## VII.   CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.   Introduction

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtors and to the holders of (i) the Allowed First Lien Credit Facility Claims and (ii) the Allowed Second Lien Credit Facility Claims (together with the Allowed First Lien Credit Facility Claims, the "***Debt Claims***"). This discussion is provided for informational purposes only and is based on the U.S. Internal Revenue Code of 1986, as amended (the "***Tax Code***"), the U.S. Department of the Treasury regulations promulgated thereunder (the "***Treasury Regulations***"), judicial authority and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect. Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, court decisions or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder. No representations are being made regarding the particular tax consequences of the Plan to any specific holder of a Claim or Interest. The Debtors will not seek a ruling from the U.S. Internal Revenue Service (the "***IRS***") and have not obtained an opinion of counsel regarding any tax consequences of the Plan to the Debtors or any holder of a Claim or Interest. No assurances can be given that the IRS would not assert, or that a court would not sustain, a different position from any discussed herein. This discussion only addresses U.S. federal income tax consequences and does not address any other U.S. federal tax consequences (such as estate and gift tax consequences), or the tax consequences arising under the laws of any non-U.S., state, local or other jurisdiction or any income tax treaty. The Debtors intend to treat, and this discussion assumes that, the Debt Claims and the Second Out Exit Term Loans are and/or will be treated as indebtedness for U.S. federal income tax purposes. This discussion assumes that the Reorganized SMI Topco Interests will be held as "capital assets" (as defined in section 1221 of the Tax Code). In addition, this discussion assumes that the Conversion (as defined in the Plan) will be treated as a reorganization within the meaning of section 368(a)(1)(F) of the Tax Code.

This discussion does not describe all of the tax consequences that may be relevant in light of a holder's particular circumstances, including, but not limited to, the potential application of provisions of the Tax Code known as the unearned income Medicare contribution tax, or tax consequences applicable to holders of Debt Claims that are otherwise subject to special treatment under the Tax Code, such as: financial institutions; banks; broker-dealers; insurance companies; tax-exempt organizations; retirement plans or other tax-deferred accounts; mutual funds; real estate investment trusts; traders in securities that elect mark-to-market treatment; persons subject to the alternative minimum tax; persons who hold or will hold Debt Claims, Second Out Exit Term Loans and/or Reorganized SMI Topco Interests as part of a hedge, straddle, constructive sale, conversion or other integrated transaction; persons that

*Solicitation Version*

have a functional currency other than the U.S. dollar; persons who hold or will hold Debt Claims, Second Out Exit Term Loans and/or Reorganized SMI Topco Interests through non-U.S. brokers or other non-U.S. intermediaries; governments or governmental organizations; partnerships or other pass-through entities or holders of interests therein; persons required to accelerate the recognition of any item of gross income with respect to the Debt Claims or Second Out Exit Term Loans as a result of such income being recognized on an "applicable financial statement" (within the meaning of section 451(b) of the Tax Code). This discussion does not address the tax consequences of the Plan to any holders of 1.5 Lien Credit Facility Claims, holders of the SMI Topco Interests and holders not entitled to vote on the Plan. This discussion does not address the tax consequences applicable to any holder of Debt Claims, Second Out Exit Term Loans and/or Reorganized SMI Topco Interests that is a Debtor, a member of the Tax Group (as defined herein), Littlejohn or an entity otherwise related to a Debtor or related to or otherwise affiliated with Littlejohn for U.S. federal income tax purposes. In addition, this discussion does not address the tax consequences applicable to the Tax Group as a result of the satisfaction, settlement, release or discharge under the Plan of any Claims held by another member of the Tax Group. If an entity that is classified as a partnership for U.S. federal income tax purposes holds or will hold Debt Claims, Second Out Exit Term Loans and/or Reorganized SMI Topco Interests, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and the activities of the partnership. Partnerships holding or that will hold Debt Claims, Second Out Exit Term Loans and/or Reorganized SMI Topco Interests and partners in such partnerships should consult their tax advisors as to the particular U.S. federal income tax consequences of owning and disposing of the Debt Claims, Second Out Exit Term Loans and/or Reorganized SMI Topco Interests.

For purposes of this discussion, a "U.S. holder" is a beneficial owner of a Debt Claim, a Second Out Exit Term Loan and/or Reorganized SMI Topco Interests, that is, for U.S. federal income tax purposes:

- an individual who is a U.S. citizen or U.S. resident alien;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, that was created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust (a) the administration of which is subject to the primary supervision of a U.S. court and that has one or more United States persons that have the authority to control all substantial decisions of the trust or (b) that has made a valid election under applicable Treasury Regulations to be treated as a United States person.

For purposes of this discussion, a "Non-U.S. holder" is a beneficial owner of a Debt Claim, a Second Out Exit Term Loan and/or Reorganized SMI Topco Interests that is an individual, corporation, estate or trust that is not a U.S. holder. In addition, for purposes of this discussion, a "holder" means a U.S. holder or a non-U.S. holder, as applicable.

**THE FOLLOWING DISCUSSION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER. ALL HOLDERS OF DEBT CLAIMS, SECOND OUT EXIT TERM LOANS AND/OR REORGANIZED SMI TOPCO INTERESTS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**B.        Tax Treatment May Vary Depending on Structure of Plan**

The Plan provides for a Restructuring pursuant to either (i) an Equitization Transaction or (ii) if a Sale Toggle Notice has been delivered, a Sale Transaction. The structure that will be utilized to implement a Sale Transaction is currently uncertain.

In an Equitization Transaction, the Reorganized SMI Topco Interests would be issued pursuant to the Plan and the Restructuring Transactions Exhibit, whereby the Reorganized SMI Topco Interests would be contributed by SMI Topco (and this discussion herein so assumes) indirectly to SMHC for distribution pursuant to the Plan. Reorganized SMI Topco is the entity that indirectly owns 100% of the stock of SMHC and is the common parent of the U.S. federal consolidated tax group of which SMHC is a member (the "*Tax Group*").

Alternatively, a Sale Transaction may be structured in a manner that is similar or equivalent in tax result to an Equitization Transaction, in that a buyer could acquire new equity in SMI Topco and, depending on the successful bid, the consideration to be received by a particular holder of a Debt Claim may be Cash or other consideration

4876-2744-3839

(possibly including new debt or equity). Because the contours of any Sale Transaction are not known at this time, the following discussion focuses on certain U.S. federal income tax consequences of an Equitization Transaction.

The U.S. federal income tax consequences of the Plan to the Debtors and to certain Holders of Claims may differ materially depending on which structure is ultimately implemented.

## C.   Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

### 1.   Cancellation of Debt and Reduction of Tax Attributes

It is anticipated that the Debtors will recognize cancellation of indebtedness income ("***CODI***") upon implementation of the Plan. Absent an exception, the Debtors would generally recognize CODI upon satisfaction of their outstanding indebtedness for total consideration less than the amount of such indebtedness. In general, the amount of CODI is the excess of (i) the adjusted issue price of the indebtedness satisfied, over (ii) the sum of (A) the amount of Cash paid, (B) the issue price of any new indebtedness of a Debtor issued, and (C) the fair market value of any other consideration (including stock of a Debtor or another entity) given in satisfaction of such indebtedness at the time of the exchange.

The Debtors expect that they will be required to reduce their tax attributes by the amount of any CODI that is excluded from gross income (the "***Tax Attribute Reduction Rules***"). Generally, tax attributes are reduced in the following order: (a) net operating losses and net operating loss carryforwards; (b) certain tax credit carryovers; (c) net capital losses and capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the Debtors remain subject); (e) passive activity loss and credit carryovers; and (f) foreign tax credit carryovers. However, the Debtors may elect to first reduce the basis of their remaining depreciable assets, in which case the limitation on reduction in tax basis in assets described above in (d) will not apply. The Debtors will apply the Tax Attribute Reduction Rules under a methodology set forth in the Treasury Regulations addressing such reduction for consolidated groups, including (i) first, tax attributes attributable to the debtor member are reduced, (ii) second, to the extent one of the tax attributes so reduced is stock of the debtor member's lower-tier subsidiary, the look-through rules will cause tax attribute reductions by the lower-tier member in that same amount; and (iii) third, certain tax attributes attributable to other members are reduced. Any excess CODI over the amount of available tax attributes will generally not give rise to U.S. federal income tax under the Chapter 11 exception under section 108 of the Tax Code and will generally have no other U.S. federal income tax impact unless there is a so-called "excess loss account" ("***ELA***") in the stock of the Debtors. In that case, the Tax Group will recognize taxable income equal to the lesser of the amount of such ELA and the amount of any CODI in excess of reduced tax attributes.

As of December 31, 2022, the Debtors have a U.S. federal net operating loss carryforward of approximately $229,280,329 (the "***NOL Carryforwards***") and a U.S. federal business interest deduction carryforward of approximately $99,530,892 (the "***Interest Deduction Carryforward***"). The Debtors may generate additional net operating losses (together with the NOL Carryforward, the "***NOLs***") and business interest not allowed as a deduction (together with the NOLs and the Interest Deduction Carryforward and certain other tax attributes, the "***Tax Attributes***") in 2023. Certain of the Debtors experienced an Ownership Change (as defined herein) on November 1, 2017 and, therefore, certain of the Debtors' NOL Carryforwards and other Tax Attributes allocable to the period ending on November 1, 2017 are subject to limitations under sections 382 and 383 of the Tax Code. The Debtors expect that the NOLs and other Tax Attributes may be reduced under the Tax Attribute Reduction Rules as a result of any CODI generated upon implementation of the Plan. Any reduction in Tax Attributes in respect of CODI generally does not occur until after the determination of the Debtors' net income or loss for the taxable year in which the CODI is incurred. In addition, as described below, any remaining NOLs and certain other Tax Attributes may be subject to limitations on their use.

### 2.   Limitation of NOL Carryforwards and Other Tax Attributes

The Debtors' ability to use Tax Attributes post-emergence may be subject to certain limitations under sections 382 and 383 of the Tax Code or other rules or tax principles. Any such limitation would apply in addition to, and not in lieu of, the reduction of the Tax Attributes that results from CODI arising in connection with the Plan and the 80% taxable income limitation on the use of NOL Carryforwards arising in taxable years beginning after December 31, 2017.

Under sections 382 and 383 of the Tax Code, if the Debtors undergo an "ownership change" (an "***Ownership Change***"), the amount of their pre-Ownership Change NOLs, tax credit carryforwards (if any), net unrealized built-in losses (if any), and possibly certain other Tax Attributes allocable to periods (or portions thereof) ending on the

4876-2744-3839

Effective Date (collectively, "***Pre-Change Tax Attributes***") that may be utilized to offset future taxable income generally is subject to an annual limitation (the "***Annual Limitation***").

  **a.**  General Annual Limitation

   The amount of the Annual Limitation on a corporation's (or consolidated group's or subgroup's) Pre-Change Tax Attributes is generally equal to the product of (a) the fair market value of the stock of the corporation (or consolidated group or subgroup) immediately before the Ownership Change (with certain adjustments), and (b) the "long-term tax-exempt rate" (which is the highest of the adjusted federal long-term rates in effect for any month in the three-calendar month period ending with the calendar month in which the Ownership Change occurs, or 3.65 percent for an Ownership Change that occurs in November 2023). If a loss corporation (or consolidated group or subgroup) has a net unrealized built-in gain immediately prior to an Ownership Change, the Annual Limitation generally may be increased by certain built-in gains recognized (or according to a currently effective IRS notice treated as recognized) during the subsequent five-year period (the "***Recognition Period***"). Alternatively, if a loss corporation (or consolidated group or subgroup) has a net-unrealized built-in loss immediately prior to an Ownership Change, certain losses or deductions recognized during the Recognition Period also would be subject to the Annual Limitation and thus would reduce the amount of Pre-Change Tax Attributes that could be used by a corporation during the Recognition Period. In general, a loss corporation's (or consolidated group's or subgroup's) net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (1) $10 million or (2) fifteen percent of the fair market value of its assets (with certain adjustments) before the Ownership Change. In 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses and that generally would be effective prospectively from 30 days after the time they become final, but such proposed regulations would not apply with respect to an Ownership Change pursuant to a chapter 11 case filed prior to the regulations becoming effective. Thus, even if finalized prior to the Effective Date, such regulations should not apply to an Ownership Change of the Debtors. Any unused limitation may be carried forward, thereby increasing the Annual Limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation that experiences an Ownership Change as the result of an order by the court or a plan approved by the court in a chapter 11 bankruptcy proceeding.

  **b.**  Special Bankruptcy Exceptions

   An exception to the foregoing Annual Limitation rules generally applies when existing shareholders and "qualified creditors" of a debtor corporation in chapter 11 receive, in respect of their equity interests or claims (as applicable), at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan (the "***382(l)(5) Exception***"). A qualified creditor generally is any creditor who (a) has been the beneficial owner of the debt of a debtor corporation continuously during the period beginning at least eighteen months prior to the date of filing of the chapter 11 bankruptcy proceeding, (b) has been the beneficial owner of "ordinary course indebtedness" at all times since it has been outstanding or (c) in certain cases, does not become a five percent (5%) shareholder of the reorganized corporation. Ordinary course indebtedness generally is any indebtedness that has been incurred by the debtor corporation in connection with the normal, usual or customary conduct of business, determined without regard to whether the indebtedness funds ordinary or capital expenditures of the debtor corporation (e.g., trade debt or a liability arising from a past or present business relationship with a supplier, customer or competitor of the debt corporation).

   Under the 382(l)(5) Exception, a debtor corporation's Pre-Change Tax Attributes are not subject to the Annual Limitation. However, if the 382(l)(5) Exception applies, the debtor corporation's NOL carryforwards will be reduced by the amount of any interest deductions claimed with respect to debt converted into stock in the plan of reorganization during the three taxable years preceding the taxable year that includes the effective date of the plan of reorganization and during the part of the taxable year prior to and including the effective date of the plan of reorganization. If there is a further ownership change of the debtor corporation within a two-year period after the effective date of a confirmed chapter 11 plan, the Annual Limitation with respect to the second Ownership Change for any post-change year ending after the change date of the second Ownership Change will be zero.

   Where the 382(l)(5) Exception is not applicable to a debtor corporation in bankruptcy (either because the debtor corporation does not qualify for it or the debtor corporation otherwise elects not to utilize the 382(l)(5) Exception), another exception will generally apply (the "***382(l)(6) Exception***"). Under the 382(l)(6) Exception, the Annual Limitation will be calculated by reference to the lesser of (a) the value of the equity interests in the debtor corporation (with certain adjustments) immediately after the Ownership Change or (b) the value of the debtor corporation's assets (determined without regard to liabilities surrendered or cancelled pursuant to the Plan)

immediately before the Ownership Change. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an Ownership Change to be determined before the events giving rise to such Ownership Change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that, under it, a debtor corporation is not required to reduce its NOL carryforwards by the amount of interest deductions claimed within the prior three-year period, and a debtor corporation may undergo an Ownership Change within two years without automatically triggering a zero Annual Limitation on its Pre-Change Tax Attributes. The resulting limitation would be determined under the regular rules for an Ownership Change.

The Debtors have until the time for filing the U.S. federal income tax return (including any extensions) for the taxable year in which the Ownership Change occurs to decide whether to make such an election. However, the Debtor's ability to qualify for the 382(l)(5) Exception is subject to further analysis and depends on whether the exchanges of the Debt Claims for Reorganized SMI Topco Interests satisfy the requirements of the 382(l)(5) Exception, including the extent to which the holders of the Debt Claims may be treated as qualified creditors for purposes of section 382(l)(5) of the Tax Code.

**3.      Potential Triggering of Excess Loss Account**

Within a consolidated group, a corporation's basis in the stock of a subsidiary corporation generally is (i) increased by the income of such subsidiary and any contributions to such subsidiary and (ii) decreased by any losses of such subsidiary which are used by the group and by any distributions from such subsidiary. If total net reductions exceed the parent's initial basis in the subsidiary stock, the excess is called an ELA and is treated as negative basis. The consolidated group must include the ELA in income upon the occurrence of certain events, including to the extent the subsidiary has CODI in excess of reduced tax attributes. In general, the subsidiary's tax attributes cannot be used to offset such income.

**D.      Certain U.S. Federal Income Tax Consequences to Certain U.S. Holders of Debt Claims**

**1.      U.S. Federal Income Tax Consequences to U.S. Holders of Debt Claims in the Debt Exchanges**

Pursuant to the Plan, a U.S. holder of (a) an Allowed First Lien Credit Facility Claim will be treated as exchanging such Claim on the Effective Date for its *pro rata* share of (i) the Second Out Exit Term Loan and (ii) the Reorganized SMI Topco Interests (such exchange, the "***First Lien Claims Exchange***") and (b) an Allowed Second Lien Credit Facility Claim will be treated as exchanging such Claim on the Effective Date for its *pro rata* share of the Reorganized SMI Topco Interests (such exchange, the "***Second Lien Claims Exchange***" and, together with the First Lien Claims Exchange, the "***Debt Exchanges***").

The U.S. federal income tax treatment of the First Lien Claims Exchange is uncertain. The discussion below describes the U.S. federal income tax consequences associated with the potential characterization of the First Lien Claims Exchange as either a taxable exchange or a recapitalization for U.S. federal income tax purposes.

**a.      Taxable Exchange**

The discussion below assumes that each of the Debt Exchanges is treated as a taxable exchange for U.S. federal income tax purposes. If each of the Debt Exchanges is treated as a taxable exchange, each U.S. holder of a Debt Claim should recognize gain or loss equal to the difference between (x) the amount realized on a Debt Exchange and (y) such U.S. holder's adjusted basis in such Debt Claim with respect to such Debt Exchange. The amount realized will include  (1) in the case of an Allowed First Lien Credit Facility Claim, the sum of the issue price of any Second Out Exit Term Loans (as discussed below) and the fair market value of the Reorganized SMI Topco Interests received in the First Lien Claims Exchange and (2) in the case of an Allowed Second Lien Credit Facility Claim, the fair market value of the Reorganized SMI Topco Interests received in the Second Lien Claims Exchange.  To the extent that any portion of the amount realized on a Debt Exchange is attributable to accrued but unpaid interest on such Debt Claim, this amount generally will not be included in the amount realized but will instead be treated in the same manner as described below.  Whether such gain or loss is capital or ordinary in character will be determined by a number of factors, including the tax status of the U.S. holder, the nature of the Debt Claim in such U.S. holder's hands and whether and to what extent the U.S. holder previously has claimed a bad debt deduction with respect to such Claim. See Sections D.2 and D.3 of this Disclosure Statement entitled "Accrued Interest" and "Market Discount."

**b.      Recapitalization**

Whether and to the extent that all or a portion of the First Lien Claims Exchange qualifies as a recapitalization depends on whether any of the loans under the First Lien Credit Facility and Second Out Exit Term Loans qualify as

*Solicitation Version*

"securities" for U.S. federal income tax purposes. Neither the Tax Code nor the Treasury Regulations define the term "security" for this purpose, and the term has not been clearly defined by judicial decisions. Rather, whether a debt instrument is a security is based on all of the facts and circumstances, including the degree of participation and continuing interest in the affairs of the business and the extent of the proprietary interest of the debt instrument in the corporate assets. Most authorities have held that the term to maturity of the debt instrument is one of the most significant factors in determining whether a debt instrument is a security. In this regard, debt instruments with a term of ten years or more generally qualify as securities, debt instruments with a term between five and ten years may qualify as securities, and debt instruments with a term of less than five years generally do not qualify as securities.

It is unclear whether all or a portion of the loans under the First Lien Credit Facility will be treated as securities for U.S. federal income tax purposes. The term of the initial term loans under the First Lien Credit Facility was seven years. The term of the revolver loans under the First Lien Credit Facility was originally five years but was extended to have an overall term of approximately 6.8 years. The incremental term loans under the First Lien Credit Facility were issued after the initial term loans and have the same maturity date as the initial term loans. Whether the Second Out Exit Term Loans will qualify as securities for U.S. federal income tax purposes is uncertain, as the term of the Second Out Exit Term Loans is exactly five years. To the extent any of the loans under the First Lien Credit Facility and the Second Out Exit Term Loans constitute securities for U.S. federal income tax purposes, any such loans under the First Lien Credit Facility exchanged for such Second Out Exit Term Loans in the First Lien Claims Exchange may be treated as a recapitalization.

If the exchange of any loan under the First Lien Credit Facility in a First Lien Claims Exchange is treated as a recapitalization, a U.S. holder of such loan under the First Lien Credit Facility in such First Lien Claims Exchange should not recognize gain or loss with respect to such First Lien Claims Exchange (subject to "Accrued Interest," as discussed in Section D.2) except a U.S. holder may recognize gain as a result of the Reorganized SMI Topco Interests being treated as "boot" in such recapitalization. In this case, a U.S. holder should recognize gain, if any, but not loss, in respect of any loans under the First Lien Claims Facility in a First Lien Claims Exchange treated as a recapitalization, but not in excess of the fair market value of the Reorganized SMI Topco Interests received in exchange therefor. As described below in Section D.3, any gain attributable to accrued but unrecognized market discount would be subject to tax as ordinary income. A U.S. holder's tax basis in the Second Out Exit Term Loan received in a First Lien Claims Exchange treated as a recapitalization should equal its tax basis in the Allowed First Lien Credit Facility Claim exchanged therefor, decreased by the amount of "boot" received and increased by the amount of gain recognized. A U.S. holder's initial tax basis in the Reorganized SMI Topco Interests will be equal to the fair market value of such Reorganized SMI Topco Interests and its holding period would begin the day after the First Liens Claims Exchange. The holding period for the Second Out Exit Term Loans received in the First Lien Claims Exchange treated as a recapitalization should include the holding period for loans under the First Lien Credit Facility exchanged therefor (except to the extent any of the Second Out Exit Term Loan is allocable to accrued but unpaid interest, in which case its holding period would begin on the day following the Effective Date). See Section D.2 of this Disclosure Statement entitled "Accrued Interest."

**U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM OF THE DEBT EXCHANGES, INCLUDING WHETHER THE FIRST LIEN CLAIMS EXCHANGE QUALIFIES AS (I) A TAXABLE TRANSACTION OR (II) A RECAPITALIZATION FOR U.S. FEDERAL INCOME TAX PURPOSES AND THE ASSOCIATED TAX CONSEQUENCES TO THEM RELATED THERETO.**

**2.      Accrued Interest**

Regardless of whether the First Lien Claims Exchange qualifies as a recapitalization or is treated as a taxable exchange, to the extent that any amount received by a U.S. holder of a Debt Claim is attributable to accrued but unpaid interest on such Debt Claim, the receipt of such amount should be taxable to the U.S. holder as ordinary interest income (to the extent not already taken into income by the U.S. holder). Conversely, a U.S. holder of a Debt Claim may be able to recognize a deductible loss (or, possibly, a write off against a reserve for worthless debts) to the extent that any accrued interest was previously included in the U.S. holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

If the fair market value of the consideration is not sufficient to fully satisfy all principal and interest on Debt Claims, the extent to which such consideration will be attributable to accrued but unpaid interest is unclear. Under the Plan, the aggregate consideration to be distributed to holders of Debt Claims will be allocated first to the principal amount of such Debt Claims, with any excess allocated to unpaid interest that accrued on such Debt Claims, if any.

Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan of reorganization is binding for U.S. federal income tax purposes, and certain case law generally indicates that a final payment on a distressed debt instrument that is insufficient to repay outstanding principal and interest will be allocated to principal, rather than interest, while certain Treasury Regulations treat payments as allocated first to any accrued but unpaid interest. The IRS could take the position that the consideration received by a holder should be allocated in a manner other than as provided in the Plan, which could include allocating consideration first to any accrued but unpaid interest under the aforementioned Treasury Regulations.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR DEBT CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

**3.      Market Discount**

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its holder's adjusted tax basis in the debt instrument is less than the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest (as defined herein), by at least a specified de minimis amount. To the extent that a loan under the First Lien Credit Facility or a Second Out Exit Term Loan is considered to have been acquired with market discount, any gain recognized by a U.S. holder in respect of such loan under the First Lien Credit Facility in a First Lien Claims Exchange or a taxable disposition of a Second Out Exit Term Loan  should be treated as ordinary income to the extent of the market discount that accrued thereon while such loan under the First Lien Credit Facility or Second Out Exit Term Loan was considered to be held by the U.S. holder (unless the U.S. holder elected to include market discount in income as it accrued).

To the extent that a loan under the First Lien Credit Facility was acquired with market discount and is exchanged in a First Lien Claims Exchange treated as a recapitalization, any market discount that accrued on such loan (i.e., up to the time of the First Lien Claims Exchange) but was not recognized in connection with the recapitalization by the U.S. holder is carried over to the Second Out Exit Term Loans received therefor and any gain recognized on the subsequent sale, exchange, redemption, or other disposition of the Second Out Exit Term Loans  is treated as ordinary income to the extent of the accrued, but not recognized, market discount.

**U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS CONCERNING THE APPLICATION OF THE MARKET DISCOUNT RULES TO THEIR DEBT CLAIMS.**

**4.      Second Out Exit Term Loans**

**a.      Issue Price**

The issue price of the Second Out Exit Term Loans would depend on (i) whether the Second Out Exit Term Loans or loans under the First Lien Credit Facility are treated as publicly traded under the applicable provisions of the Tax Code and Treasury Regulations ("***publicly traded***") and (ii) whether the Second Out Exit Term Loans are issued as part of an investment unit for U.S. federal income tax purposes. A debt instrument is not treated as publicly traded if the stated principal amount of an issue that includes the debt instrument does not exceed $100 million (the "***Small Issue Exception***").

Under the Plan, the revolver and term loans under the First Lien Credit Facility will be exchanged for Second Out Exit Term Loans and Reorganized SMI Topco Interests. The following discussion assumes that the Second Out Exit Term Loans and Reorganized SMI Topco Interests are treated as an investment unit for U.S. federal income tax purposes. Although not free from doubt, an investment unit itself should be treated as publicly traded only if each property right (e.g., in this case, the Second Out Exit Term Loans and the Reorganized SMI Topco Interests) in the investment unit is publicly traded for U.S. federal income tax purposes. If the investment unit itself is treated as publicly traded for U.S. federal income tax purposes (i.e., because each of the Second Out Exit Term Loans and the Reorganized SMI Topco Interests is treated as publicly traded for U.S. federal income tax purposes), then (i) the issue price of the investment unit allocated to the Second Out Exit Term Loans (and therefore the issue price of the Second Out Exit Term Loans) should be the fair market value of the Second Out Exit Term Loans and (ii) the issue price of the investment unit allocated to the Reorganized SMI Topco Interests should be the fair market value of the Reorganized SMI Topco Interests. If a substantial amount of the investment unit is issued for property that is publicly traded for U.S. federal income tax purposes but the investment unit itself is not treated as publicly traded for U.S. federal income tax purposes, then the issue price of the investment unit should be determined based on the fair market

value of such property  exchanged therefor, and such issue price should be allocated between the Second Out Exit Term Loans and the Reorganized SMI Topco Interests based on their relative fair market values.  The investment unit is issued in exchange for property consisting of the revolver and term loans under the First Lien Credit Facility.  The revolver loans under the First Lien Credit Facility do not exceed $100 million and, therefore, should not be treated as publicly traded for U.S. federal income tax purposes under the Small Issue Exception. However, the term loans under the First Lien Credit Facility may be treated as publicly traded for U.S. federal income tax purposes.

If the investment unit itself is not treated as publicly traded for U.S. federal income tax purposes and a substantial amount of the investment unit is not issued for property that is publicly traded for U.S. federal income tax purposes, then the issue price of the Second Out Exit Term Loans should be the stated principal amount of the Second Out Exit Term Loans.

Reorganized SMI Topco will make its determination of the issue price of the Second Out Exit Term Loans and provide holders with such information in a manner consistent with applicable Treasury Regulations. The rules regarding the issue price determination are complex and highly detailed, and no assurances can be given that the IRS would not assert, or that a court would not sustain, a different position. U.S. holders of the Second Out Exit Term Loans should consult their tax advisors regarding (i) the determination of the issue price of the Second Out Exit Term Loans and (ii) the application of the investment unit rules.

  **b.**  <u>Ownership and Disposition</u>

  **i.** **Qualified Stated Interest and OID on the Second Out Exit Term Loans**

Qualified stated interest on the Second Out Exit Term Loans will be taxed as ordinary interest income at the time it is received or accrued in accordance with a U.S. holder's regular method of accounting for U.S. federal income tax purposes.  Qualified stated interest is generally stated interest that is unconditionally payable in cash or property (other than a debt instrument of the issuer) at least annually at a single fixed rate or a single qualified floating rate.

The Second Out Exit Term Loans will be treated as issued with original issue discount ("**OID**") if the issue price of such Second Out Exit Term Loans is less than its stated redemption price at maturity by at least a specified de minimis amount (an amount equal to 0.25% of the stated principal amount of the Second Out Exit Term Loans multiplied by the weighted average maturity of the Second Out Exit Term Loans).  The stated redemption price at maturity of the Second Out Exit Term Loans is the total of all payments to be made under such Second Out Exit Term Loans other than qualified stated interest, and thus may include a portion of the stated interest to the extent not all interest is required to be paid at a fixed (or qualified floating) annual rate in cash.

If the Second Out Exit Term Loans are issued with OID, a U.S. holder of such Second Out Exit Term Loans would be required to include the OID in such U.S. holder's gross income as ordinary income for U.S. federal income tax purposes as the OID accrues on a constant yield method (regardless of the U.S. holder's regular method of U.S. federal income tax accounting), which generally would be in advance of the receipt of the Cash attributable to such OID, and generally would be required to include in income increasingly greater amounts of OID in successive accrual periods.

The rules regarding OID are complex.  U.S. holders should consult their own tax advisors regarding the application of these rules to their particular situations.

  **ii.** **Sale, Exchange or Other Taxable Disposition**

Upon the sale, exchange, redemption, retirement or other taxable disposition of the Second Out Exit Term Loans, a U.S. holder will recognize taxable gain or loss equal to the difference between (x) the amount realized on such disposition (except to the extent any amount realized is attributable to accrued but unpaid interest (including any OID), which amount will be taxed as ordinary income to the extent not previously included in income) and (y) the U.S. holder's adjusted tax basis in the Second Out Exit Term Loans. A U.S. holder's adjusted tax basis in the Second Out Exit Term Loans will be equal to the issue price of such Second Out Exit Term Loans, increased by any OID previously included in income and reduced by any prior payments on the Second Out Exit Term Loans (other than qualified stated interest). Whether such gain or loss is capital or ordinary in character will be determined by a number of factors, including the tax status of the U.S. holder and the nature of the Second Out Exit Term Loan in such U.S. holder's hands.

  **THE PRECEDING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT LEGAL OR TAX ADVICE. ACCORDINGLY,**

U.S. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSIDERATIONS RELATING TO THE OWNERSHIP AND DISPOSITION OF ANY OF THE SECOND OUT EXIT TERM LOANS ACQUIRED PURSUANT TO THE DEBT EXCHANGES.

**E.      U.S. Federal Income Tax Consequences to U.S. Holders of Ownership and Disposition of the Reorganized SMI Topco Interests**

**1.      Distributions on Reorganized SMI Topco Interests**

Any distributions of Cash or property made to a U.S. holder with respect to the Reorganized SMI Topco Interests generally will be includible in gross income by a U.S. holder as dividend income to the extent such distribution is paid out of current or accumulated earnings and profits, as determined under U.S. federal income tax principles. To the extent those distributions exceed Reorganized SMI Topco's current and accumulated earnings and profits, the distribution (i) will be treated as a non-taxable return of the U.S. holder's adjusted basis in the Reorganized SMI Topco Interests and (ii) thereafter as capital gain. A distribution which is treated as a dividend and paid to a corporate U.S. holder of the Reorganized SMI Topco Interests may be eligible for the dividends-received deduction, and a distribution which is treated as a dividend and paid to a non-corporate U.S. holder of the Reorganized SMI Topco Interests may be subject to tax at the preferential tax rates applicable to "qualified dividend income."

**2.      Sale, Exchange, or Other Taxable Disposition of Reorganized SMI Topco Interests**

For U.S. federal income tax purposes, a U.S. holder generally will recognize gain or loss on the sale, exchange or other taxable disposition of any of its Reorganized SMI Topco Interests in an amount equal to the difference, if any, between (x) the amount realized for the Reorganized SMI Topco Interests and (y) the U.S. holder's adjusted tax basis in the Reorganized SMI Topco Interests.  The amount realized will include the amount of any Cash and the fair market value of any other property received for the Reorganized SMI Topco Interests.  Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the holder has a holding period in the Reorganized SMI Topco Interests of more than one year as of the date of disposition. Non-corporate U.S. holders may be eligible for reduced rates of taxation on long-term capital gains.

THE PRECEDING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION ONLY AND IS NOT LEGAL OR TAX ADVICE. ACCORDINGLY, U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISORS REGARDING THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSIDERATIONS RELATING TO THE DEBT EXCHANGES AND THE OWNERSHIP AND DISPOSITION OF ANY REORGANIZED SMI TOPCO INTERESTS ACQUIRED PURSUANT TO THE DEBT EXCHANGES.

**F.      Certain U.S. Federal Income Tax Consequences to Certain Non-U.S. Holders of Debt Claims, Second Out Exit Term Loans and/or Reorganized SMI Topco Interests**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. holders of Debt Claims, Second Out Exit Term Loans and/or Reorganized SMI Topco Interests. The rules governing the U.S. federal income tax consequences to Non-U.S. holders are complex. Each Non-U.S. holder should consult its own independent tax advisor regarding the U.S. federal, state and local and the non-U.S. tax consequences of the Debt Exchanges to such Non-U.S. holders and the ownership and disposition of the Second Out Exit Term Loans and/or Reorganized SMI Topco Interests, as applicable.

**1.      Gain Recognition**

Whether a Non-U.S. holder recognizes gain or loss on a Debt Exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. holders. Subject to the rules discussed below under Section G entitled "Back-Up Withholding and Information Reporting," any gain recognized by a Non-U.S. holder on the exchange of its Debt Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. holder is a non-resident alien individual who was present in the United States for 183 days or more during the taxable year in which the Debt Exchanges occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States).

If the first exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or lower applicable income tax treaty rate) on any gain recognized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax in the manner described in Section F.3, entitled "Income or Gain Effectively Connected with a U.S. Trade or Business."

### 2.      Accrued Interest

Subject to the rules discussed below under Sections F.6 and G, entitled "FATCA" and "Back-Up Withholding and Information Reporting," payments attributable to accrued but unpaid interest (including any OID) on a Debt Claim or a Second Out Exit Term Loan to a Non-U.S. holder generally will not be subject to U.S. federal income tax and will be exempt from withholding under the "portfolio interest" exemption if the Non-U.S. holder properly certifies to its non-U.S. status (generally, by providing the withholding agent a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, prior to payment), and:

(i)      the Non-U.S. holder does not own, actually or constructively, 10% or more of the total combined voting power of all classes of SMHC stock entitled to vote;

(ii)     the Non-U.S. holder is not a "controlled foreign corporation" that is a "related person" with respect to SMHC;

(iii)    the Non-U.S. holder is not a bank whose receipt of interest on the Debt Claim or a Second Out Exit Term Loan is in connection with an extension of credit made pursuant to a loan agreement entered into in the ordinary course of the Non-U.S. holder's trade or business; and

(iv)    such interest is not effectively connected with the Non-U.S. holder's conduct of a U.S. trade or business.

A Non-U.S. holder that does not qualify for exemption from withholding tax with respect to accrued but unpaid interest (including any OID) that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or lower applicable income tax treaty rate) on payments that are attributable to accrued but unpaid interest (including any OID). For purposes of providing a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

If any accrued but unpaid interest (including any OID) is effectively connected income, the Non-U.S. holder generally will be subject to U.S. federal income tax in the manner described in Section F.3, entitled "Income or Gain Effectively Connected with a U.S. Trade or Business."

### 3.      Income or Gain Effectively Connected with a U.S. Trade or Business

If any interest or gain realized by a Non-U.S. holder on the exchange of its Debt Claim is effectively connected with such Non-U.S. holder's conduct of a trade or business in the United States (and, if required by an applicable income tax treaty, the Non-U.S. holder maintains a permanent establishment in the United States to which such interest (including any OID), gain or dividends is attributable) then the interest income (including any OID), gain or dividends will be subject to U.S. federal income tax at regular graduated income tax rates generally in the same manner as if such non-U.S. holder were a U.S. holder. Effectively connected income will not be subject to U.S. federal withholding tax if the non-U.S. holder satisfies certain certification requirements by providing to the applicable withholding agent a properly executed IRS Form W-8ECI (or successor form), In addition, if such a Non-U.S. holder is a corporation, it may be subject to a branch profits tax equal to 30% (or lower applicable income tax treaty rate) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 4.      Owning and Disposing of Reorganized SMI Topco Interests

#### a.      <u>Dividends on Reorganized SMI Topco Interests</u>

Any distributions made with respect to Reorganized SMI Topco Interests will constitute dividends for U.S. federal income tax purposes to the extent of Reorganized SMI Topco's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  To the extent those distributions exceed Reorganized SMI Topco's current and accumulated earnings and profits, the distributions will be treated as a non-taxable return of capital to the extent of the Non-U.S. holder's tax basis in the Reorganized SMI Topco Interests and thereafter as capital

gain from the sale or exchange of such Reorganized SMI Topco Interests. Subject to the rules discussed above under Section F.3, entitled "Income or Gain Effectively Connected with a U.S. Trade or Business," and below under Sections F.5 and F.6, entitled "FIRPTA" and "FATCA," any distribution made to a Non-U.S. holder on the Reorganized SMI Topco Interests generally will be subject to U.S. federal withholding tax at a rate of 30% of the gross amount of the distribution unless an applicable income tax treaty provides for a lower rate. To receive the benefit of a reduced treaty rate, a Non-U.S. holder must provide the applicable withholding agent with a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E (or other applicable or successor form) certifying qualification for the reduced rate.

      **b.**     <u>Sale, Redemption, or Repurchase of Reorganized SMI Topco Interests</u>

Subject to the rules discussed below under Section G entitled "Back-Up Withholding and Information Reporting," a Non-U.S. holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition of any of its Reorganized SMI Topco Interests, including any gain resulting from a non-dividend distribution in excess of the holder's tax basis in their Reorganized SMI Topco Interests, unless (i) the Non-U.S. holder is a non-resident alien individual who was present in the United States for 183 days or more during the taxable year in which the disposition occurs and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such Non-U.S. holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. holder in the United States), or (iii) Reorganized SMI Topco is or has been a USRPHC during the shorter of the Non-U.S. holder's holding period in the Reorganized SMI Topco Interests or the five-year period ending on the date of the disposition of the Reorganized SMI Topco Interests. If the first exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax at a rate of 30% (or lower applicable income tax treaty rate) on any gain realized, which may be offset by certain U.S. source capital losses. If the second exception applies, the Non-U.S. holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. holder, and a Non-U.S. holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains at a rate of 30% (or lower applicable income tax treaty rate). If the third exception applies, the Non-U.S. holder will be subject to U.S. federal income tax and U.S. federal withholding tax as discussed in Section F.5 entitled "FIRPTA."

     **5.**     **FIRPTA**

Under the Foreign Investment in Real Property Tax Act of 1980 ("***FIRPTA***"), gain or loss of a non-U.S. person on a disposition of a United States real property interest ("***USRPI***") is deemed to be effectively connected with a trade or business carried on in the United States and subject to U.S. federal income tax. A USRPI includes any interest (other than solely as a creditor) in a domestic corporation if the domestic corporation is a United States real property holding corporation ("***USRPHC***"). An equity interest in a USRPHC that is "regularly traded on an established securities market" (within the meaning of the Treasury Regulations) is, however, excepted from FIRPTA treatment if such non-U.S. person of such equity interest does not, at any time during an applicable measuring period, actually or constructively own more than 5% of that class of equity interest (the "***5% Public Shareholder Exception***").

If Reorganized SMI Topco is or were to become a USRPHC, and the Reorganized SMI Topco Interests are not considered to be regularly traded on an established securities market, each Non-U.S. holder (regardless of the percentage of Reorganized SMI Topco Interests) would be subject to U.S. federal income tax on a taxable disposition of the Reorganized SMI Topco Interests, and a 15% withholding tax generally would apply to the gross proceeds from such disposition. Reorganized SMI Topco has not determined whether it is a USRPHC, and there is no current plan for Reorganized SMI Topco to create a market for the Reorganized SMI Topco Interests. Therefore, no assurance can be given that the 5% Public Shareholder Exception would be available to a non-U.S. holder of Reorganized SMI Topco Interests if Reorganized SMI Topco is or were to become a USRPHC.

    **NON-U.S. HOLDERS SHOULD CONSULT THEIR INDEPENDENT TAX ADVISORS TO DETERMINE THE APPLICATION OF THE FIRPTA RULES TO THE OWNERSHIP AND DISPOSITION OF ANY REORGANIZED SMI TOPCO INTERESTS.**

     **6.**     **FATCA**

Sections 1471 through 1474 of the Tax Code and the Treasury Regulations and administrative guidance issued thereunder ("***FATCA***") imposes a 30% withholding tax on "withholdable payments" (as defined in the Tax Code, including payments of interest (including OID) on a Debt Claim and the Second Out Exit Term Loans and dividends on Reorganized SMI Topco Interests) if paid to a "foreign financial institution" or a "non-financial entity" (each as defined in the Tax Code) (including in some cases, when such foreign financial institution or non-financial

foreign entity is acting as an intermediary), unless (i) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments, and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are non-U.S. entities with U.S. owners), (ii) in the case of a non-financial foreign entity, such entity certifies that it does not have any "substantial United States owners" (as defined in the Tax Code) or provides the applicable withholding agent with a certification identifying the direct and indirect substantial United States owners of the entity (in either case, generally on a properly executed IRS Form W-8BEN-E), or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules and provides appropriate documentation (such as a properly executed IRS Form W-8BEN-E).  Although withholdable payments originally would have included payments of gross proceeds from the sale or other disposition of a note or stock which can produce U.S. source interest or dividends, proposed Treasury Regulations provide that such payments of gross proceeds (other than amounts treated as interest) do not constitute withholdable payments. Taxpayers may rely generally on these proposed Treasury Regulations until they are revoked or final Treasury Regulations are issued. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing these rules may be subject to different rules. Under certain circumstances, a holder might be eligible for refunds or credits of such taxes.  Non-U.S. Holders should consult their own tax advisors regarding the possible application of FATCA to the Plan.

**NON-U.S. HOLDERS SHOULD CONSULT THEIR OWN INDEPENDENT TAX ADVISOR REGARDING THE POSSIBLE IMPACT OF THESE RULES ON SUCH NON-U.S. HOLDER'S U.S. FEDERAL INCOME TAX CONSEQUENCES PURSUANT TO THE PLAN.**

**G.       Back-Up Withholding and Information Reporting**

        Under the Tax Code, interest, dividends and other reportable payments may, under certain circumstances, be subject to backup withholding.  Backup withholding may apply to payments made pursuant to the Plan, unless the holder provides to the applicable withholding agent its taxpayer identification number, certified under penalties of perjury, as well as certain other information or otherwise establish an exemption from backup withholding.  Backup withholding is not an additional tax.  Amounts withheld under the backup withholding rules may be credited against a holder's U.S. federal income tax liability, and a holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS.

        In addition, information reporting may apply to (i) distributions or payments made to a holder of a Debt Claim, (ii) future payments made with respect to a Second Out Exit Term Loan or Reorganized SMI Topco Interests, and (iii) certain transactions under the Plan that result in a holder claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding the Treasury Regulations with respect to reportable "loss transactions" and whether the transactions contemplated by the Plan would be subject to the Treasury Regulations and require disclosure on the holders' tax returns.

        **THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR INDEPENDENT TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## VIII.     CERTAIN RISK FACTORS TO BE CONSIDERED

        Prior to voting to accept or reject the Plan, Holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with the attachments, exhibits, or documents incorporated by reference hereto.  The risk factors below should not be regarded as the only risks associated with the Debtors' businesses or the Plan and its implementation.

A.      **Certain Bankruptcy Considerations**

    1.      **General**

While the Debtors believe the Chapter 11 Cases will be efficient and not materially harmful to the value of their assets and property, the Debtors cannot be certain this will be the case.  Further, it is impossible to predict with certainty the amount of time one or more of the Debtors may spend in bankruptcy or to assure the parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on subsequent ownership of the Debtors' assets and property or on the amount of distributable value available to the Holders of Allowed Claims or Interests.

    2.      **The Debtors May Not Commence Chapter 11 Cases**

Pursuant to the Restructuring Support Agreement, the Debtors are soliciting acceptances of the Plan prior to commencement of the Chapter 11 Cases.  The Debtors have not commenced the Chapter 11 Cases, and they may not commence the Chapter 11 Cases in the future.  The Debtors may, with the consent of the Required First Lien Lender Group, consummate an out-of-court transaction to implement the sale of all or substantially all of the Debtors' assets and property.  Accordingly, the prepetition solicitation of the Plan involves significant risks and uncertainties, and Holders of Claims and Interests should carefully consider the Plan and this Disclosure Statement before voting on the Plan or taking any other action in reliance on the Debtors' commencement of the Chapter 11 Cases.

    3.      **The Debtors May Not Be Able to Effectuate a Sale of Substantially All of Their Assets**

In the event that the Chapter 11 Cases are commenced and the Debtors seek to pursue a Sale Transaction, the Debtors may be unable to effectuate a sale of substantially all of their equity interests or assets and property.  There can be no assurance that any of the indications of interest received by the Debtors as part of the sale process will not be modified in a material manner, nor that any such indications of interest will ultimately result in an actionable transaction.

    4.      **The Debtors May Exercise their "Fiduciary Out" Under the Restructuring Support Agreement**

Pursuant to section 7.01 of the Restructuring Support Agreement, the board of directors, board of managers, members, or any similar governing body of a Debtor, may determine that taking any action or refraining from taking any action with respect to the transactions contemplated by the Restructuring Support Agreement (including a Sale Transaction) would be inconsistent with applicable law or its fiduciary obligations under applicable law.  In the event that such transactions (including a Sale Transaction) are determined to be inconsistent with applicable law or such directors', managers', members', or similar governing body's fiduciary obligations under applicable law, the Debtors may terminate the Restructuring Support Agreement and pursue one or more alternative transactions, and the transactions contemplated by the Plan may not be consummated.

    5.      **Parties in Interest May Object to the Plan's Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a Claim or an Interest in a particular class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class.  The Debtors believe the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class.  Nevertheless, there can be no assurance the Court will reach the same conclusion.

    6.      **The Conditions Precedent to the Confirmation Date and/or Effective Date of the Plan May Not Occur**

As more fully set forth in Article IX of the Plan, the Confirmation Date and the Effective Date of the Plan are subject to a number of conditions precedent.  If such conditions precedent are not met or waived, the Confirmation Date or the Effective Date will not take place.

    7.      **The Debtors May Fail to Satisfy Voting Requirements**

If votes are received in number and amount sufficient to enable the Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or proceed with a sale of all or substantially all of the Debtors' operating assets pursuant to section 363 of the Bankruptcy Code.  There can be no assurance that

the terms of any such alternative chapter 11 plan or sale pursuant to section 363 of the Bankruptcy Code would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 8.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of re-vote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 9.      Releases, Injunctions, and Exculpations May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors or other Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

### 10.      The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, findings by the Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting class; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to nonaccepting Holders of Claims and Interests within a particular class under such plan will not be less than the value of distributions such Holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  Confirmation of the Plan is also subject to certain conditions as described in Article IX of the Plan.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive on account of such Allowed Claims.

The Debtors, subject to the terms and conditions of the Plan and the Restructuring Support Agreement, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class, as well as any Class junior to such non-accepting Class, than the treatment currently specified in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently enumerated in the Plan or no distribution whatsoever under the Plan.

### 11.      Nonconsensual Confirmation

In the event any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance

the Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 12. Risk of Termination of the Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the Consenting Creditors the ability to terminate the Restructuring Support Agreement under certain circumstances, such as the failure to meet the milestones and other obligations under the DIP Facility or the occurrence of an Event of Default under the DIP Credit Agreement. Should a termination event occur, all obligations of the Parties under the Restructuring Support Agreement may terminate. Termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the distributable value available to the Holders of Allowed Claims or Interests.

### 13. The Court May Find the Solicitation of Acceptances Inadequate

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) of the Bankruptcy Code require that:

    a.    solicitation comply with applicable nonbankruptcy law;

    b.    the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

    c.    the time prescribed for voting is not unreasonably short.

In addition, Bankruptcy Rule 3018(b) provides that a holder of a claim or interest who has accepted or rejected a plan before the commencement of the case under the Bankruptcy Code will not be deemed to have accepted or rejected the plan if the Court finds after notice and a hearing that the plan was not transmitted in accordance with reasonable solicitation procedures. Section 1126(b) of the Bankruptcy Code provides that a holder of a claim or interest that has accepted or rejected a plan before the commencement of a case under the Bankruptcy Code is deemed to have accepted or rejected the plan if (a) the solicitation of such acceptance or rejection was in compliance with applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation or (b) there is no such law, rule, or regulation, and such acceptance or rejection was solicited after disclosure to such holder of adequate information (as defined in section 1125(a) of the Bankruptcy Code). While the Debtors believe the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance the Court will reach the same conclusion.

### 14. Conversion to Cases under Chapter 7 of the Bankruptcy Code

If no plan can be confirmed, or if the Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.

The Debtors believe liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan or another chapter 11 plan because of, *inter alia*, (a) the current economic conditions and the currently depressed market for assets of the type owned by the Debtors, (b) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than selling in a controlled manner, (c) additional administrative expenses involved in the appointment of a trustee, (d) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and Executory Contracts in connection with the cessation of operations, and (e) a trustee's inability to potentially realize certain value or recover on assets that are otherwise available under the Plan. See the Liquidation Analysis attached hereto as **Exhibit D** for further discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Allowed Claims and Interests.

B.      **Additional Factors Affecting the Value of Claims**

1.      **Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary**

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (a) estimates and assumptions which might ultimately prove to be incorrect and (b) projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

2.      **The Reorganized Debtors May Not Be Able to Achieve Their Projected Financial Results**

The Reorganized Debtors may not be able to achieve their projected financial results.  The Financial Projections set forth in this Disclosure Statement represent the best estimate of the Debtors' management team of the Debtors' future financial performance, which is necessarily based on certain assumptions regarding the anticipated future performance of the Reorganized Debtors' operations, as well as the North American and world economies in general, and the industry segments in which the Debtors operate in particular.  While the Debtors believe the Financial Projections contained in this Disclosure Statement are reasonable, there can be no assurance they will be realized.  If the Debtors do not achieve their projected financial results, the value of the Reorganized SMI Topco Interests may be negatively affected and the Debtors may lack sufficient liquidity to continue operating as planned after the Effective Date.  Moreover, the financial condition and results of operations of the Reorganized Debtors from and after the Effective Date may not be comparable to the Debtors' historical financial condition or results of operations.

C.      **Risks Relating to the Debtors' Business and Financial Condition**

1.      **Risks Associated with the Debtors' Business and Industry**

The risks associated with the Debtors' business and industry and additional risk factors relating to the Chapter 11 Cases include, but are not limited to, the following:

- changes in the cost of raw materials used in manufacturing the Debtors' products, such as, among other things, 3-Mix and other clean stream supply which are subject to market fluctuations;

- changes in the cost of alternative means of glass disposal, such as, among other things, landfill disposal, which may decrease supply and/or increase supply costs;

- fuel shortages or increases in fuel prices, which may substantially increase operating expenses which the Debtors may not be able to pass through to customers;

- changes in the cost and access to the Company's network of specialized freight carriers;

- changes to consumer behaviors, both reducing their consumption from glass as well as reduction of efforts to recycle;

- changes in MRF (materials recovery facilities) behavior to utilize 3-Mix as ADC (alternative daily cover) at landfills;

- operational and safety risks (despite close monitoring, management, and mitigation of such risks) including, among other things, the risk of personal injury to employees and third parties as a result of transportation accidents, equipment malfunctions or failures, improper operation of equipment, disregard of safety standards and procedures, instability of supply or product masses, inhalation of hazardous material or fumes, and/or other work-related hazards;

- risks related to non-compliance with federal and state health and safety regulations (despite close monitoring, management, and mitigation of such risks) and enforcement thereof, including inspections and citations;

- risks related to labor unrest;

- risks related to the Debtors' ability to access needed cash and capital;

- risks related to the Debtors' inability to maintain necessary permits, resulting in decreased revenue and increased costs;

4876-2744-3839

- the possibility that the Debtors are not able to continue as a going concern;

- the Debtors' ability to meet their current and future debt service obligations, including the ability to maintain compliance with debt covenants;

- the Debtors' ability to manage distribution costs effectively;

- the Debtors' ability to successfully implement strategic changes in their business;

- changes in demand and prices charged for the Debtors' products;

- technological, manufacturing and product development risks, including, among other things, capital expenditure needs that outpace expectations;

- the Debtors' dependence on and loss of key customers and end users;

- an increase in competition in the recycling market, including, without limitation, new market entrants;

- changes in foreign and domestic governmental regulations, including environmental restrictions on operations and regulation of recycling;

- the development and utilization of alternatives to glass (*e.g.*, increased use of plastics and/or aluminum cans) and shifting end-user preferences;

- general global macroeconomic and business conditions, including, among other things, market disruption and supply chain constraints;

- acute and chronic weather-related risks, climatic or other natural conditions, natural disasters, pandemics and other risks and uncertainties (such as the Covid-19 virus) that may limit operating capacity and/or increase the costs of supply;

- changes in foreign and domestic political and legislative risks;

- risks of war and international and domestic terrorism;

- risks associated with foreign operations and foreign currency exchange rates and controls;

- changes to state recycling initiatives;

- changes to federal initiatives;

- changes to state and federal ESG initiatives;

- future compliance with covenants under the Debtors' debt arrangements; and

- other risks and uncertainties.

### 2. Liquidity During the Chapter 11 Cases

In addition to the cash requirements necessary to fund ongoing operations, the Debtors have incurred significant professional fees and other costs in connection with the Chapter 11 Cases and expect to continue to incur significant professional fees and costs throughout the Chapter 11 Cases.

The Debtors' current liquidity may not be sufficient to allow the Debtors to satisfy their obligations related to the Chapter 11 Cases and proceed with Confirmation of the Plan.

### D. Factors Relating to Securities to Be Issued Under the Plan

### 1. Market for Securities

The Reorganized SMI Topco Interests will be newly issued securities for which there is no established trading market, and the Debtors do not expect any market will develop for resales of such securities. Further, the Debtors and the Reorganized Debtors have no obligation to list any securities on any national securities exchange and no duty under the Plan and do not intend to register the resales of such securities under the Securities Act of 1933, as amended or the classes of such securities under the Securities Exchange Act of 1934, as amended. In addition, affiliates of the

Reorganized Debtors will be subject to restrictions on resales of their securities pursuant to Rule 144 under the Securities Act. *See* "Transfer Restrictions and Consequences Under Federal Securities Laws" above.

**E.      Additional Factors**

**1.      The Debtors Could Withdraw the Plan**

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

**2.      The Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Court.

**3.      No Representations Outside this Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

**4.      No Legal, Business, or Tax Advice Is Provided by this Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of Claims or Interests should consult its own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

**5.      No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or Holders of Claims or Interests.

**6.      Certain U.S. Federal Income Tax Consequences**

For a discussion of certain U.S. federal income tax considerations to the Debtors and certain Holders of Claims in connection with the implementation of the Plan, *see* Section VII hereof.

**IX.      CONFIRMATION OF THE PLAN**

**A.      Confirmation Hearing**

Following commencement of the Chapter 11 Cases, the Debtors will request that the Court schedule a hearing to consider, among other things, (1) approval of the Solicitation Materials, which shall include the procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, (2) approval of the Disclosure Statement, and (3) confirmation of the Plan (the "***Confirmation Hearing***"). The Debtors will provide notice of the Confirmation Hearing to all necessary parties in accordance with applicable law. The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Court and served on any master service list ordered by the Court and any entities which filed objections to the Plan, without further notice to parties in interest. The Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. The Plan may be modified, in accordance with the Plan and the Restructuring Support Agreement, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

**B.      Objections to Confirmation**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan. The Court will set a deadline by which objections to confirmation of the Plan must be filed and served (the "***Objection Deadline***"). This means that any objections or responses to the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims

held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to these Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Court may order:

1)   **The Debtors and Attorneys for the Debtors:**

**Strategic Materials, Inc.**
17220 Katy Freeway, Suite 150
Houston, Texas, 77094
Attn: Sherry Williams
Email: swilliams@smi.com

*- and -*

**Wachtell, Lipton, Rosen & Katz**
51 West 52nd Street
New York, NY 10019
Attn: Joshua A. Feltman and Benjamin S. Arfa
Email: jafeltman@wlrk.com
     bsarfa@wlrk.com

*- and -*

**Vinson & Elkins LLP**
845 Texas Avenue, Suite 4700
Houston, TX 77002
Attn: Paul E. Heath and Matthew D. Struble
Email: pheath@velaw.com
     mstruble@velaw.com

*- and -*

**Vinson & Elkins LLP**
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Attn: David S. Meyer and Jessica C. Peet
Email: dmeyer@velaw.com
     jpeet@velaw.com

2)   **Attorneys for the First Lien Lender Group:**

**Arnold & Porter Kaye Scholer LLP**
70 West Madison Street, Suite 4200
Chicago, IL 60602
Attn: Michael D. Messersmith and Sarah Gryll
Email: michael.messersmith@arnoldporter.com
     sarah.gryll@arnoldporter.com

**C.     Requirements for Confirmation of the Plan**

The requirements for Confirmation of the Plan pursuant section 1129(a) of the Bankruptcy Code include whether:

a.   the Plan complies with the applicable provisions of the Bankruptcy Code;

b.   the Debtors have complied with the applicable provisions of the Bankruptcy Code;

c.   the Plan has been proposed in good faith and not by any means forbidden by law;

d.   any payment made or to be made by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter

> 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Court as reasonable;

> e.  the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Reorganized Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the Holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained and the nature of any compensation for such insider;

> f.  with respect to each Class of Claims or Interests, each Holder of an Impaired Claim or Interest has either accepted the Plan or will receive or retain under the Plan, on account of such Holder's Claim or Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

> g.  except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not Impaired under the Plan;

> h.  except to the extent that the Holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred Cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

> i.  at least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

> j.  confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

> k.  all fees payable under section 1930 of title 28, as determined by the Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

At the Confirmation Hearing, the Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code. The Debtors believe: (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11; (2) they have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

**D.      Best Interests Test/Liquidation Analysis**

Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

Attached hereto as **Exhibit D** and incorporated herein by reference is the Liquidation Analysis prepared by the Debtors with the assistance of A&M. The Liquidation Analysis provides the Debtors' analysis with respect to

liquidations of SMI Topco and its subsidiaries and affiliates. As reflected in the Liquidation Analysis, the Debtors believe liquidation of the Debtors' businesses under chapter 7 of the Bankruptcy Code would result in substantial reduction in the value to be realized by Holders of Allowed Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Allowed Claims than such Holders would receive in a liquidation under chapter 7 of the Bankruptcy Code.

Any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis is solely for the purpose of disclosing to Holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

**E.     Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors, with the assistance of their advisors, have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections, which are comprised of their projected consolidated balance sheet, income statement, and statement of cash flows. Creditors and other interested parties should review Section VIII of this Disclosure Statement, entitled "Risk Factors," for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The Financial Projections are attached hereto as **Exhibit C** and incorporated herein by reference. Based upon the Financial Projections, the Debtors believe there will be a viable operation following the Chapter 11 Cases and that the Plan satisfies the feasibility requirements of the Bankruptcy Code. The Debtors and the First Lien Lender Group are in the process of finalizing the amount of exit financing that the Debtors will need in the event of an Equitization Transaction to support their efforts to effectuate the transactions contemplated by the Plan and to transition out of the chapter 11 process in a manner that provides a reasonable assurance of success in accordance with the Bankruptcy Code. The Debtors believe that securing exit financing will help support a conclusion that the Plan is feasible.

Additionally, as discussed above, the Plan provides for the payment in full of Allowed Administrative Claims, Cure Claims, Priority Tax Claims, and Other Priority Claims, and Other Secured Claims will either be paid in full or Reinstated. Thus, the Debtors believe, following consummation of the Plan, no liquidation or further reorganization will be necessary unless otherwise contemplated by the Plan.

**F.     Acceptance by Impaired Classes**

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[5]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

---

[5]     A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

### G.     Additional Requirements for Nonconsensual Confirmation

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; *provided*, that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right, subject to the terms of the Plan and the Restructuring Support Agreement, to alter, amend, modify, revoke, or withdraw the Plan or any Plan Supplement document, including the right to amend or modify the Plan or any Plan Supplement document to satisfy the requirements of section 1129(b) of the Bankruptcy Code.

#### 1.     No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (*e.g.*, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.

#### 2.     Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receives more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  With respect to the fair and equitable requirement, no Class under the Plan will receive more than 100% of the amount of Allowed Claims in that Class.  The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

### X.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming Confirmation and Consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (a) the preparation and presentation of an alternative plan of reorganization, (b) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (c) a liquidation under chapter 7 of the Bankruptcy Code.

### A.     Alternative Plan

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a chapter 11 plan has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets.  The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.     Sale of Some or All of the Debtors' Assets Pursuant to Section 363 of the Bankruptcy Code

Alternatively, if the Plan is not confirmed, the Debtors could seek to consummate a sale or some or all of their assets pursuant to section 363 of the Bankruptcy Code, which could result in Holders of Allowed Claims receiving substantially lower recoveries, if any, than they would receive under the Plan.

**C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D**.

As discussed herein, the Debtors believe liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, *inter alia,* (1) delay resulting from the conversion of the Chapter 11 Cases, (2) additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases, (3) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with the cessation of operations, and (4) a trustee's inability to potentially realize certain value or recover on assets that are otherwise available under the Plan.

<h2 style="text-align:center">XI.      CONCLUSION AND RECOMMENDATION</h2>

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

<p style="text-align:center">[<em>Remainder of page intentionally left blank.</em>]</p>

Respectfully submitted, as of the date first set forth below,

Dated:        November 15, 2023
              Houston, Texas

                                          **STRATEGIC MATERIALS, INC.**
                                          **on behalf of itself and all other Debtors other than**
                                          **the Topco Entities**

                                          /s/
                                          Christopher Dods
                                          President and Chief Executive Officer


                                          **SMI TOPCO HOLDINGS, INC.**
                                          **on behalf of itself and the other Topco Entities**

                                          /s/
                                          Brian Michaud
                                          Authorized Signatory

[*Signature Page for Disclosure Statement for the
Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*]

Respectfully submitted, as of the date first set forth below,

Dated:     November 15, 2023
           Houston, Texas

**STRATEGIC MATERIALS, INC.**
**on behalf of itself and all other Debtors other than**
**the Topco Entities**

/s/ _____
Christopher Dods
President and Chief Executive Officer

**SMI TOPCO HOLDINGS, INC.**
**on behalf of itself and the other Topco Entities**

/s/ _____
Brian Michaud
Authorized Signatory

[*Signature Page for Disclosure Statement for the*
*Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*]

*Solicitation Version*

# <u>EXHIBIT A</u>

## Plan

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 23-[_____] |
| | § | |
| **STRATEGIC MATERIALS, INC.**, *et al.*, | § | (Chapter 11) |
| | § | |
| Debtors.[1] | § | (Joint Administration Requested) |

## DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

Joshua A. Feltman
Benjamin S. Arfa
Michael A. Chaia
Katherine Mateo
51 West 52nd Street
New York, NY 10019

**WACHTELL, LIPTON, ROSEN & KATZ**

**PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

Paul E. Heath (TX 09355050)
Matthew D. Struble (TX 24102544)
Trevor G. Spears (TX 24106681)
845 Texas Avenue, Suite 4700
Houston, TX 77002

- and -

David S. Meyer
Jessica C. Peet
Steven Zundell
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036

**VINSON & ELKINS LLP**

**PROPOSED ATTORNEYS FOR THE DEBTORS
AND DEBTORS IN POSSESSION**

**Dated:  November 15, 2023**

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  17220 Katy Freeway, Ste. 150, Houston, TX 77094.

# TABLE OF CONTENTS

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.   Defined Terms .................................................................................................. 1
B.   Rules of Interpretation ................................................................................... 15
C.   Computation of Time ...................................................................................... 16
D.   Governing Law ................................................................................................ 16
E.   Reference to Monetary Figures ...................................................................... 16
F.   Reference to the Debtors or the Reorganized Debtors .................................... 16
G.   Controlling Document ..................................................................................... 17
H.   Consent Rights of Parties to Restructuring Support Agreement ..................... 17

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL
## FEE CLAIMS, AND PRIORITY CLAIMS

A.   Administrative Expense Claims ...................................................................... 17
B.   Professional Compensation ............................................................................ 18
C.   DIP Claims ...................................................................................................... 20
D.   Restructuring Expenses ................................................................................... 20
E.   Priority Tax Claims ......................................................................................... 20
F.   Statutory Fees .................................................................................................. 20

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.   Summary of Classification .............................................................................. 21
B.   Treatment of Claims and Interests .................................................................. 22
C.   Special Provision Governing Unimpaired or Reinstated Claims ................... 28
D.   Elimination of Vacant Classes ........................................................................ 28
E.   Voting Classes; Presumed Acceptance by Non-Voting Classes ....................... 28
F.   Intercompany Claims and Interests ................................................................ 28
G.   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
     Code ................................................................................................................. 28
H.   Controversy Concerning Impairment .............................................................. 28
I.   Subordinated Claims ....................................................................................... 29

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.   Equitization Transaction ................................................................................. 29
B.   Sale Transaction .............................................................................................. 34
C.   Corporate Existence ........................................................................................ 36
D.   Vesting of Assets .............................................................................................. 37
E.   Cancellation of Existing Securities, Agreements, and Indebtedness .............. 38
F.   Corporate Action ............................................................................................. 38
G.   Exemption from Certain Taxes and Fees ......................................................... 39

H.    *Preservation of Causes of Action* ........................................................................ 39
I.    *Payment of the Restructuring Expenses* .............................................................. 40
J.    *Employee and Retiree Benefits* ............................................................................ 41

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases* ..................... 41
B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases* ..................... 42
C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* ................... 43
D.    *Insurance Policies* ................................................................................................ 44
E.    *Indemnification Obligations* ................................................................................ 45
F.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements* ............. 45
G.    *Reservation of Rights* .......................................................................................... 45
H.    *Nonoccurrence of Effective Date* ........................................................................ 46
I.    *Contracts and Leases Entered into After the Petition Date* .............................. 46

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed* ....................................... 46
B.    *Delivery of Distributions and Undeliverable or Unclaimed Property* ............... 46
C.    *Registration or Private Placement Exemption* ................................................... 47
D.    *Compliance with Tax Requirements* .................................................................... 48
E.    *Surrender of Cancelled Instruments or Securities* ............................................. 49
F.    *Allocations* ........................................................................................................... 49
G.    *No Postpetition Interest on Claims* ..................................................................... 49
H.    *Setoffs and Recoupment* ..................................................................................... 49
I.    *Claims Paid or Payable by Third Parties* ........................................................... 50

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Disputed Claims Process* ..................................................................................... 51
B.    *Allowance of Claims* ............................................................................................ 51
C.    *Claims and Interests Administration Responsibilities* ...................................... 52
D.    *Estimation of Claims* ........................................................................................... 52
E.    *Adjustment to Claims Without Objection* ........................................................... 52
F.    *No Distributions Pending Allowance* .................................................................. 53
G.    *Single Satisfaction of Claims* ............................................................................. 53

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies* .............. 53
B.    *Discharge of Claims and Termination of Interests* ............................................ 53
C.    *Term of Injunctions or Stays* .............................................................................. 54
D.    *Release of Liens* ................................................................................................... 54
E.    *Releases by the Debtors* ...................................................................................... 55

| F. | Releases by Holders of Claims and Interests | 56 |
| G. | Exculpation | 57 |
| H. | Injunction | 58 |
| I. | Protection Against Discriminatory Treatment | 59 |
| J. | Subordination Rights | 59 |
| K. | Reimbursement or Contribution | 60 |

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

| A. | Conditions Precedent to Confirmation | 60 |
| B. | Conditions Precedent to the Effective Date | 60 |
| C. | Waiver of Conditions | 61 |
| D. | Substantial Consummation | 61 |
| E. | Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date | 62 |

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

| A. | Modification and Amendments | 62 |
| B. | Effect of Confirmation on Modifications | 62 |
| C. | Revocation or Withdrawal of the Plan | 62 |

## ARTICLE XI.
## RETENTION OF JURISDICTION

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

| A. | Immediate Binding Effect | 65 |
| B. | Additional Documents | 65 |
| C. | Reservation of Rights | 66 |
| D. | Successors and Assigns | 66 |
| E. | Service of Documents | 66 |
| F. | Term of Injunctions or Stays | 67 |
| G. | Entire Agreement | 67 |
| H. | Exhibits | 67 |
| I. | Nonseverability of Plan Provisions | 67 |
| J. | Votes Solicited in Good Faith | 68 |
| K. | Request for Expedited Determination of Taxes | 68 |
| L. | Statutory Committee and Cessation of Fee and Expense Payment. | 68 |
| M. | Closing of Chapter 11 Cases | 68 |
| N. | No Stay of Confirmation Order | 68 |
| O. | Waiver or Estoppel | 69 |

*Solicitation Version*

## INTRODUCTION

Strategic Materials, Inc. and its affiliated Debtors, as debtors and debtors in possession in the above-captioned chapter 11 cases, jointly propose this prepackaged chapter 11 plan of reorganization for the resolution of outstanding Claims against, and Interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against, and Interests in, such Debtor. Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in Article I.A hereof, the Bankruptcy Code, or the Bankruptcy Rules.  Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.  The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

> **ALL HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "***1.5 Lien Credit Agreement***" means that certain 1.5 Lien Credit Agreement, dated as of September 22, 2022, among Strategic Materials Holding Corp., as Borrower, SMI Group Acquisitions, Inc., as Holdings, the lenders from time to time party thereto, and Alter Domus (US) LLC, as administrative agent.

2.    "***1.5 Lien Credit Facility***" means the credit facility under the 1.5 Lien Credit Agreement.

3.    "***1.5 Lien Credit Facility Claim***" means any Claim arising under, derived from, secured by, based on, or related to the 1.5 Lien Credit Facility or any other agreement, instrument or document executed at any time in connection therewith and any guaranty thereof.

4.    "***Acceptable IOI***" means any bona fide indication of interest received by the Debtors that (a) provides for a purchase price satisfying the requirements set forth in the definition of Qualifying Sale Transaction and includes reasonable evidence of the proposed Third-Party Purchaser's financial wherewithal or financing (*e.g.*, a highly confident letter); or (b) is otherwise acceptable to the Required First Lien Lender Group.

5.    "***Adequate Protection Claim***" means any Claim for adequate protection within the meaning of section 361 of the Bankruptcy Code arising under applicable law or pursuant to Final Order of the Court.

6.    "***Administrative Expense Claim***" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 327, 328, 330, 365, 503(b), 507(a)(2),

507(b), 1103, or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) Allowed Professional Fee Claims; (c) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; (d) Restructuring Expenses; and (e) Adequate Protection Claims.

7.     "***Administrative Expense Claims Bar Date***" means the deadline for Filing requests for payment of Administrative Expense Claims, which:  (a) with respect to Administrative Expense Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (b) with respect to Professional Fee Claims, shall be forty-five (45) days after the Effective Date.

8.     "***Affiliate***" means, with respect to any Person, any other Person that, directly or indirectly, Controls or is Controlled by, or is under common Control with, such Person, and shall include the meaning of "affiliate" set forth in section 101(2) of the Bankruptcy Code as if such Person were a debtor in a case under the Bankruptcy Code.

9.     "***Agent***" means any administrative agent or collateral agent under the Superpriority Credit Facility, the First Lien Credit Facility, the 1.5 Lien Credit Facility, or the Second Lien Credit Facility, including any successors thereto.

10.     "***Allowed***" means, as to a Claim or Interest, a Claim or Interest allowed under the Plan, under the Bankruptcy Code, or by a Final Order, as applicable.  Except as otherwise provided in the Plan, an order of the Court, or with respect to Priority Tax Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For the avoidance of doubt, (a) a request for allowance and payment of an Administrative Expense Claim after the Administrative Expense Claims Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-filed Administrative Expense Claim and (b) the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, will retain all Claims and defenses with respect to Claims that are Reinstated or otherwise Unimpaired pursuant to this Plan.  "Allow" and "Allowing" shall have correlative meanings.

11.     "***Avoidance Actions***" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer and preference laws.

12.     "***Bankruptcy Code***" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

13.     "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Court other than the Local Rules.

14.     "***Business Day***" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

15.     "***Canadian Credit Agreement***" means that certain Term Loan Credit Agreement, dated as of December 31, 2019, as amended, supplemented, or otherwise modified, by and among NexCycle Canada Ltd., an Ontario corporation, NexCycle Industries Ltd., an Ontario corporation,

Piney Lake Opportunities ECI Master Fund LP, as administrative agent and collateral agent, and the lenders party thereto from time to time.

16.      "***Cash***" means the legal tender of the United States of America or the equivalent thereof.

17.      "***Cause of Action***" means any action, Claim, Avoidance Actions, cross-claim, cause of action, third-party claim, controversy, demand, right, Lien, indemnity, Interest, guaranty, sum of money, trespass, suit, obligation, liability, damage, judgment, cost, expense, account, defense, offset, reckoning, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law, and whether representing a past, present, or future obligation that a party ever had, now has, or hereafter can, shall, or may have. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar avoidance claim.

18.      "***Chapter 11 Cases***" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Court, and (b) when used with reference to all of the Debtors, the jointly administered chapter 11 cases pending for the Debtors in the Court.

19.      "***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code, against any Debtor.

20.      "***Claims Register***" means the official register of Claims against and Interests in the Debtors maintained by the Noticing and Claims Agent.

21.      "***Class***" means a category of Claims against or Interests in the Debtors as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

22.      "***Confirmation***" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A hereof having been (a) satisfied or (b) waived pursuant to Article IX.C hereof.

23.      "***Confirmation Date***" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

24.      "***Confirmation Hearing***" means the hearing held by the Court to consider (a) approval of the Disclosure Statement and (b) Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

25.      "***Confirmation Order***" means the Order of the Court (a) approving the Disclosure Statement and (b) confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance reasonably acceptable to the Debtors and the Required First

Lien Lender Group and consistent in all material respects with the Restructuring Support Agreement.

26.     "***Consenting Creditor Representatives***" means, collectively, Arnold & Porter Kaye Scholer LLP and Ankura Consulting Group, LLC, as advisors to the First Lien Lender Group.

27.     "***Consenting Party***" has the meaning ascribed to it in the Restructuring Support Agreement.

28.     "***Consenting Sponsor Representatives***" has the meaning set forth in the Restructuring Support Agreement.

29.     "***Consummation***" means the occurrence of the Effective Date.

30.     "***Control***" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract, or otherwise, and "***Controlling***" and "***Controlled***" have meanings correlative thereto.

31.     "***Conversion***" means, if the Equitization Transaction occurs, (a) the conversion of SMI Topco from a Delaware corporation to a Delaware limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act and (b) the filing of a U.S. Internal Revenue Service Form 8832 (Entity Classification Election) by SMI Topco to be treated as a corporation for U.S. federal income tax purposes, as further described in the Restructuring Transactions Exhibit.

32.     "***Conversion Date***" means the date on which the Conversion occurs, which shall be a date determined by the board of directors of SMI Topco that is at least one (1) Business Day prior to the Effective Date.

33.     "***Court***" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of reference under 28 U.S.C. § 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

34.     "***Cure Claim***" means a monetary Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

35.     "***D&O Liability Insurance Policies***" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") maintained by any of the Debtors with respect to directors, managers, officers, and employees of any of the Debtors or their Affiliates, including employee practices liability insurance (and related policies).

36.     "***Debtors***" means, collectively, SMI Topco Holdings, Inc.; SMI Group Ultimate Holdings, Inc.; SMI Group Holdings LLC; SMI Group Acquisitions, Inc.; Strategic Materials Holding Corp.; Strategic Materials, Inc.; American Specialty Glass, Inc.; SMI Reflective Recycling NE HoldCo, LLC; SMI Reflective Industries HoldCo, LLC; SMI BevCon HoldCo, LLC; SMI Equipment, Inc.; Container Recycling Alliance, LLC; SMI Reflective Recycling HoldCo, LLC; SMI Nutmeg HoldCo, LLC; Ripple Glass, LLC; and NexCycle, Inc.

37.     "***Definitive Documents***" means, collectively, the (a) the Restructuring Support Agreement; (b) the Restructuring Term Sheet; (c) the Exit Term Loan Documents; (d) the Exit Term Loan Facilities Term Sheet; (e) the New Governance Documents; (f) the New Employment Agreements; (g) the Plan; (h) the Confirmation Order; (i) the Disclosure Statement; (j) the Solicitation Materials; (k) the First Day Pleadings (as defined in the Restructuring Support Agreement) and all orders sought and entered pursuant thereto; (l) the DIP Documents; (m) the DIP Facility Term Sheet any other document necessary to implement or consummate the Restructuring; (n) the Restructuring Transactions Exhibit; and (o) any other material agreements, motions, pleadings, briefs, applications, orders, and other filings with the Court related to the Restructuring, if applicable.

38.     "***DIP Claim***" means any Claim arising under, derived from, secured by, based on, or related to the DIP Facility or any other agreement, instrument or document executed at any time in connection therewith and any guaranty thereof.

39.     "***DIP Credit Agreement***" means that certain Superpriority Secured Debtor-In-Possession Credit Agreement, dated as of November __, 2023, by and among Strategic Materials Holding Corp., as borrower, SMI Group Acquisitions, Inc., as holdings, Acquiom Agency Services LLC and Seaport Loan Products LLC, in their respective capacities as co-administrative agent and co-collateral agent, and the lenders party thereto and any principal loan or other agreement governing the provision to the Debtors of postpetition financing, to the extent approved by the Court.

40.     "***DIP Documents***" means the DIP Credit Agreement, the other documentation in respect of the DIP Facility, and all pleadings in support of approval thereof, and all orders relating thereto (including any exhibits, schedules, amendments, modifications, or supplements thereto), including the DIP Order, each of which shall be consistent with the DIP Facility Term Sheet.

41.     "***DIP Facility***" means that certain superpriority debtor-in-possession financing facility provided for in accordance with the terms and conditions set forth in the DIP Credit Agreement.

42.     "***DIP Facility Term Sheet***" means the term sheet attached as **Exhibit B** to the Restructuring Support Agreement (as such term sheet may be amended, modified or supplemented pursuant to Section 14 of the Restructuring Support Agreement).

43.     "***DIP Order***" means any order entered in the Chapter 11 Cases approving the DIP Facility (whether interim or final) consistent with the DIP Facility Term Sheet.

44.     "***Disallowed***" means, with respect to any Claim, or any portion thereof, that such Claim, or such portion thereof, is not Allowed; *provided*, *however*, that a Disputed Claim shall not be considered Disallowed until so determined by entry of a Final Order.

45.     "***Disbursing Agent***" means, on the Effective Date, (a) in the case of the Equitization Transaction, the Debtors or the Reorganized Debtors, as applicable, their respective agent(s), or any Entity or Entities that consent to and are designated by the Debtors or the Reorganized Debtors, as applicable, to make or facilitate distributions that are to be made pursuant to the Plan or (b) in the case of a Sale Transaction, the Plan Administrator.

46.     "***Disclosure Statement***" means a disclosure statement, including any exhibits, appendices, or related documents, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms of the Restructuring Support Agreement, and that

is prepared and distributed in accordance with, among other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018, and other applicable law.

47.     "*Disputed*" means, with respect to any Claim or Interest, any Claim or Interest (a) that is not Allowed; (b) that is not Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable; (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law; (d) that is Filed in the Court and not withdrawn, as to which a timely objection or request for estimation has been Filed; and (e) with respect to which a party in interest has filed a Proof of Claim (if applicable) or otherwise made a written request to a Debtor for payment, without any further notice to or action, order, or approval of the Court.

48.     "*Distribution Record Date*" means November 13, 2023, the record date for purposes of making distributions under the Plan on account of Allowed Claims and, if applicable, Interests.

49.     "*Effective Date*" means the date selected by the Debtors, in consultation with the First Lien Lender Group, on which:  (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.C); and (c) the Plan becomes effective; *provided*, *however*, that if such date does not occur on a Business Day, the Effective Date shall be deemed to occur on the first Business Day after such date.

50.     "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

51.     "*Equitization Transaction*" means the transactions and reorganization contemplated by, and pursuant to, this Plan in accordance with Article IV.A of the Plan and the Restructuring Transactions Exhibit, which shall occur on the Effective Date unless a Sale Toggle Notice has been delivered.

52.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

53.     "*Exculpated Party*" means each of the following, solely in its capacity as such and, in each case, to the maximum extent permitted by law: (a) the Debtors; (b) Tim Pohl, in his capacity as an independent director of SMI Group Acquisitions, Inc., (c) L. Richard Crawford, in his capacity as an independent director of SMI Group Ultimate Holdings, Inc. and SMI Group Holdings, Inc., and (d) the members of any statutory committee appointed in the Chapter 11 Cases.

54.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

55.     "*Exit Term Loan Facilities*" has the meaning set forth in the Exit Term Loan Facilities Term Sheet.

56.     "*Exit Term Loan Facilities Agent*" means, collectively, Acquiom Agency Services LLC and Seaport Loan Products LLC, solely in their respective capacities as co-administrative agent and co-collateral agent under the Exit Term Loan Facilities.

57.     "*Exit Term Loan Facilities Documents*" means all documentation governing the Exit Term Loan Facilities, which will be consistent with the Exit Term Loan Facilities Term Sheet.

58.    "***Exit Term Loan Facilities Term Sheet***" means the term sheet attached as **Exhibit C** to the Restructuring Support Agreement, as such term sheet may be amended, modified or supplemented pursuant to Section 14 of the Restructuring Support Agreement.

59.    "***Federal Judgment Rate***" means the federal judgment rate in effect as of the Petition Date, compounded annually.

60.    "***File***," "***Filed***," or "***Filing***" means file, filed, or filing in the Chapter 11 Cases with the Court in the Chapter 11 Cases.

61.    "***Final Order***" means (a) an order or judgment of the Court, as entered on the docket in any Chapter 11 Case (or any related adversary proceeding or contested matter) or the docket of any other court of competent jurisdiction; or (b) an order or judgment of any other court having jurisdiction over any appeal from (or petition seeking certiorari or other review of) any order or judgment entered by the Court (or any other court of competent jurisdiction, including in an appeal taken) in the Chapter 11 Cases (or in any related adversary proceeding or contested matter), in each case that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired according to applicable law and no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely Filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice; *provided, however,* that the possibility a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Rules, may be Filed relating to such order shall not prevent such order from being a Final Order.

62.    "***First Lien Credit Agreement***" means that certain First Lien Credit Agreement, dated as of November 1, 2017, among Strategic Materials Holding Corp., as borrower, SMI Group Acquisitions, Inc., as holdings, the lenders from time to time party thereto, and Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (as successor to Goldman Sachs Bank USA in such capacity).

63.    "***First Lien Credit Facility***" means the credit facility under the First Lien Credit Agreement.

64.    "***First Lien Credit Facility Claim***" means any Claim arising under, derived from, secured by, based on, or related to the First Lien Credit Facility or any other agreement, instrument or document executed at any time in connection therewith and any guaranty thereof.

65.    "***First Lien Lender Group***" means the members of the ad hoc group of Holders of First Lien Credit Facility Claims represented by the Consenting Creditor Representatives.

66.    "***First Out New Money Exit Term Loans***" means the first lien, first out new money exit term loans to be borrowed by Strategic Materials Holding Corp. under the Exit Term Loan Facilities Credit Agreement.

67.    "***First Out Roll-Up Loans***" means the first lien, first out exit term loans to be issued by Strategic Materials Holding Corp. under the Exit Term Loan Facilities Credit Agreement in an aggregate principal amount equal to the sum of (a) the outstanding amount on the Effective Date

of all principal and accrued interest on the loans outstanding under the DIP Credit Agreement and (b) the Exit Fee (as defined in the DIP Credit Agreement).

68.     "***General Unsecured Claim***" means any unsecured Claim against any of the Debtors, other than: (a) an Administrative Expense Claim, (b) a Priority Tax Claim, (c) an Other Priority Claim, (d) an Other Secured Claim, (e) a Claim arising under section 510(b) of the Bankruptcy Code; (f) an Intercompany Claim; (g) a Trade Claim; (h) a First Lien Credit Facility Claim; (i) a 1.5 Lien Credit Facility Claim; or (j) a Second Lien Credit Facility Claim.

69.     "***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

70.     "***Holder***" means a Person or Entity holding a Claim against or Interest in a Debtor, as applicable.

71.     "***Impaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

72.     "***Indemnification Obligations***" means each of the Debtors' or their non-Debtor Affiliates' indemnification obligations as of the Petition Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, equity holders, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors and such current and former directors, officers, and managers' respective Affiliates, as applicable, which shall be reinstated and remain intact, irrevocable, and shall continue during the Chapter 11 Cases on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Petition Date.  The treatment of the Indemnification Obligations are set forth in Article V.E herein.

73.     "***Insider***" has the meaning set forth in section 101(31) of the Bankruptcy Code.

74.     "***Intercompany Claim***" means any Claim held by one Debtor against another Debtor.

75.     "***Intercompany Interest***" means an Interest in one Debtor held by another Debtor.

76.     "***Interest***" means collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of any of the Debtors, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity ownership, or profits interests of any of the Debtors (in each case whether or not arising under or in connection with any employment agreement) and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

77.     "***Judicial Code***" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

78.     "***Lien***" has the meaning set forth in section 101(37) of the Bankruptcy Code.

79.     "***List of Retained Causes of Action***" means the schedule of certain Causes of Action of the Debtors or the Post-Sale Estates, as applicable, that are not released, waived, or transferred pursuant to the Plan, which shall be included in the Plan Supplement.  For the avoidance of doubt, the List of Retained Causes of Action shall not include any Causes of Action against any Released Parties.

80.     "***Local Rules***" means, collectively, the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas and the Procedures for Complex Cases in the Southern District of Texas.

81.     "***MIP***" means a post-Effective Date key management incentive plan, the terms of which shall be consistent in all respects with Article IV.A.7 and otherwise be on terms reasonably acceptable to the Debtors and the Required First Lien Lender Group.

82.     "***New Board***" means the initial board of directors, board of managers, or other governing body of each Reorganized Debtor, in each case as determined pursuant to Article IV.A.4 of the Plan and the Plan Supplement.

83.     "***New Company Agreement***" means that certain limited liability company agreement of Reorganized SMI Topco, effective as of the Effective Date, to which all parties receiving Reorganized SMI Topco Interests (and all persons to whom such parties may sell or transfer their Reorganized SMI Topco Interests in the future and all persons who purchase or acquire the Reorganized SMI Topco Interests in future transactions) shall be required to become or shall be deemed parties.

84.     "***New Employment Agreements***" means the new employment agreements to be entered among certain of the Reorganized Debtors and certain of the Debtors' employees.

85.     "***New Governance Documents***" means the organizational and corporate governance documents of Reorganized SMI Topco and its subsidiaries, including certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, shareholders' agreements (or equivalent governing documents), including the Reorganized SMI Topco Interest Documents and the identity of proposed members of Reorganized SMI Topco's board of directors or managers, as applicable.  Substantially final forms of the material New Governance Documents will be included in the Plan Supplement and shall be consistent with the Restructuring Support Agreement.

86.     "***Noticing and Claims Agent***" means Kroll Restructuring Administration LLC, the noticing, claims, and solicitation agent to be retained by the Debtors in the Chapter 11 Cases.

87.     "***Other Priority Claim***" means any Claim against a Debtor other than an Administrative Expense Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, to the extent such Claim has not already been paid during the Chapter 11 Cases.

88.     "***Other Secured Claim***" means any Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the Holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code, other than a Priority Tax Claim, a First Lien

Credit Facility Claim, a 1.5 Lien Credit Facility Claim, a Second Lien Credit Facility Claim, or a Trade Claim.

89. "***Person***" has the meaning set forth in section 101(41) of the Bankruptcy Code.

90. "***Petition Date***" means the date on which each Debtor Filed its voluntary petition for relief commencing the Chapter 11 Cases.

91. "***Plan***" means this prepackaged chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Restructuring Support Agreement, and the terms hereof, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan.

92. "***Plan Administrator***" means, solely in the event of a Sale Transaction, a Person selected by the Debtors to serve as plan administrator for each of the Debtors and their Post-Sale Estates pursuant to the Plan and the Plan Administrator Agreement.

93. "***Plan Administrator Agreement***" means, solely in the event of a Sale Transaction, the agreement between the Debtors and the Plan Administrator identifying the Plan Administrator and governing the rights, duties, and obligations of the Plan Administrator.

94. "***Plan Supplement***" means the compilation of documents and forms of documents, and all schedules, exhibits, attachments, agreements, and instruments referred to therein, ancillary or otherwise, or the material terms thereof, including, as applicable to the Equitization Transaction or a Sale Transaction: (a) the material New Governance Documents; (b) the Schedule of Rejected Executory Contracts and Unexpired Leases; (c) the identity of the members of the New Board and the officers of Reorganized SMI Topco as of the Effective Date; (d) the List of Retained Causes of Action; (e) the material Exit Term Loan Facilities Documents; (f) the Sale Agreement (if applicable); (g) the Plan Administrator Agreement (if applicable); (h) the Restructuring Transactions Exhibit; and (i) any other documentation necessary to effectuate the Restructuring or that is contemplated by the Plan, all of which shall be incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced and/or supplemented from time to time, consistent with the Plan and the Restructuring Support Agreement, as applicable, which shall be Filed by the Debtors on the Petition Date.

95. "***Post-Sale Estates***" means, solely with respect to a Sale Transaction, the Estates to be wound down, dissolved, and liquidated, as applicable, following the closing of any Sale Transaction, pursuant to and under the Plan on or after the Effective Date.

96. "***Post-Sale Reserve***" means, solely with respect to a Sale Transaction, a Cash reserve to fund the reasonably anticipated costs necessary for the wind down of the Post-Sale Estates, including an estimated amount of reasonable fees and expenses that may be incurred by professionals for services rendered after the Effective Date and statutory fees, which shall be funded into a segregated account on the Effective Date and shall be reasonably acceptable to the Debtors and the Required First Lien Lender Group.

97. "***Prepetition Credit Agreements***" refers, collectively, to each of the following agreements, as each may have been or may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof: (a) the Superpriority Credit Agreement, (b) the First Lien Credit Agreement, (c) the 1.5 Lien Credit Agreement, and (d) the Second Lien Credit Agreement.

98. "***Priority Tax Claim***" means (a) any Claim entitled to priority against a Debtor of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code and (b) any Secured Tax Claim.

99. "***Pro Rata***" means, unless indicated otherwise, the proportion that an Allowed Claim or an Allowed Interest bears to the aggregate amount of Allowed Claims of the applicable Class, Allowed Interests of the applicable Class, or other matter so referenced, as the context requires.

100. "***Professional***" means an Entity employed pursuant to a Final Order of the Court in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

101. "***Professional Fee Claims***" means all Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been previously paid. To the extent the Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Allowed Professional Fee Claim.

102. "***Professional Fee Escrow Account***" means an interest-bearing account funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Reserve Amount, pursuant to Article II.B.

103. "***Professional Fee Reserve Amount***" means the total amount of unpaid Professional Fee Claims estimated in accordance with Article II.B.3.

104. "***Proof of Claim***" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

105. "***Qualifying Sale Transaction***" means a sale of all or a portion of the business or assets of the Debtors (or of the equity of Strategic Materials Holding Corp. or any direct or indirect parent thereof) that, unless otherwise acceptable to the Required First Lien Lender Group, results in net Cash proceeds being received, at the time of consummation of such Sale Transaction, in an amount sufficient to pay in full in Cash:

(a) all loans and other obligations (including, without limitation, all principal, interest, fees, expenses, and outstanding indemnification claims) under the First Lien Credit Agreement;

(b) all loans and other obligations (including, without limitation, all principal, interest, fees, expenses, and outstanding indemnifications claims) under the Superpriority Credit Agreement;

(c) all loans and other obligations (including, without limitation, all principal, interest, fees, expenses, and outstanding indemnifications claims) under the DIP Credit Agreement;

(d) all Restructuring Expenses; and

(e) all other fees and expenses incurred in connection with the Restructuring Transactions (as defined in the Restructuring Support Agreement).

106. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall not be discharged under the Plan and the holder's legal, equitable, and contractual rights on account of such Claim or Interest shall remain unaltered by consummation of the Plan in accordance with section 1124(1) of the Bankruptcy Code.

107. "*Registration Rights Agreement*" means the agreement covering registration of the Reorganized SMI Topco Interests.

108. "*Related Party*" means, with respect to any Entity, such Entity's predecessors, successors, assigns, and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries, and each of their respective managed accounts or funds or investment vehicles, and each of their respective current and former direct and indirect equity holders, officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case acting in such capacity.

109. "*Released Party*" means each of the following solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors or the Post-Sale Estates (as applicable); (c) each Consenting Party; (d) the Third-Party Purchaser (if applicable), (e) each Holder of a Claim or Interest who votes in favor of the Plan; (f) each Related Party of each Entity in clause (a) through this clause (f); *provided*, that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases set forth in Article VIII.F of the Plan; or (y) timely objects to the releases set forth in Article VIII.F of the Plan and such objection is not resolved before Confirmation.

110. "*Releasing Party*" means each of the following solely in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors or the Post-Sale Estates (as applicable); (c) each Consenting Party; (d) each of the Agents; (e) all Holders of Claims and Interests that vote to accept the Plan but do not opt out of granting the releases set forth herein; (f) all Holders of Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth herein; (g) all Holders of Claims or Interests that vote, or are deemed, to reject the Plan or that are presumed to accept the Plan but do not opt out of granting the releases set forth herein; (h) all Holders of Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in Article VIII.F herein but did not opt out; and (i) each Related Party of each Entity in clause (a) through this clause (i) for which such Entity is legally entitled to bind such Related Party to the releases set forth in Article VIII.F of the Plan under applicable law.

111. "*Reorganized*" means, in relation to a Debtor, such Debtor (or any successor thereto, by merger, consolidation, or otherwise), as reorganized on and after the Effective Date.

112. "*Reorganized Debtors*" means, collectively, the Debtors (or any successors thereto, by merger, consolidation, or otherwise), as reorganized on and after the Effective Date.

113. "*Reorganized SMI Topco Interest Documents*" means the documentation governing the Reorganized SMI Topco Interests and the issuance thereof, which shall include the New Company Agreement and the Registration Rights Agreement.

114. "***Reorganized SMI Topco Interests***" means the Interests of Reorganized SMI Topco to be issued on the Effective Date.

115. "***Required First Lien Lender Group***" means, as of the relevant date, Holders of First Lien Credit Facility Claims in the First Lien Lender Group equal to at least 50.1% of the aggregate outstanding First Lien Credit Facility Claims that are held by the members of the First Lien Lender Group at such time.

116. "***Restructuring***" means all actions that may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate, the Restructuring Support Agreement and the Plan.

117. "***Restructuring Expenses***" has the meaning ascribed to it in the Restructuring Support Agreement; *provided* that, solely as it pertains to the Plan, Restructuring Expenses shall not include Professional Fee Claims.

118. "***Restructuring Support Agreement***" means that certain *Restructuring Support Agreement*, dated September 15, 2023, by and among the Debtors, the Consenting Superpriority Creditors, the Consenting First Lien Creditors, the Consenting 1.5 Lien Creditors, the Consenting Second Lien Creditors, and the Consenting Sponsors (each as defined therein), as may be amended, restated, modified, supplemented, or replaced from time to time in accordance with the terms thereof, and including all exhibits thereto.

119. "***Restructuring Term Sheet***" means that certain term sheet for the Restructuring attached as **Exhibit A** to the Restructuring Support Agreement.

120. "***Restructuring Transactions Exhibit***" means the summary of transaction steps to complete the Equitization Transaction, if applicable, to be included in the Plan Supplement, which shall be in form and substance reasonably acceptable to the Debtors and the Required First Lien Lender Group and consistent in all material respects with the Restructuring Support Agreement.

121. "***Sale Agreement***" means, solely in the case of a Sale Transaction, a purchase and sale or other executed agreement governing a Sale Transaction with a Third-Party Purchaser.

122. "***Sale Assets***" means, solely in the case of a Sale Transaction, the assets of the Debtors, including any Interests held by the Debtors, acquired pursuant to the Sale Transaction.

123. "***Sale Distributable Proceeds***" means, solely in the case of the Sale Transaction, the Cash proceeds and any other non-Cash consideration to be distributed pursuant to the Sale Transaction.

124. "***Sale Toggle Notice***" means, solely in the event the Debtors receive one or more Acceptable IOI's and are pursuing consummation of a Sale Transaction, a notice sent to the Debtors by the Consenting Creditor Representatives stating that the Required First Lien Lender Group is (a) electing to have the Debtors pursue such Sale Transaction pursuant to this Plan in lieu of an Equitization Transaction or (b) consenting to have the Debtors pursue such Sale Transaction pursuant to this Plan in lieu of an Equitization Transaction.

125. "***Sale Transaction***" means one or more transactions proposed by a Third-Party Purchaser to consummate a Qualifying Sale Transaction.

126. "***Schedule of Rejected Executory Contracts and Unexpired Leases***" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to

the Plan, as set forth in the Plan Supplement, as may be amended from time to time prior to the Effective Date.

127.    "*Second Lien Credit Agreement*" means that certain Second Lien Credit Agreement, dated as of November 1, 2017, among Strategic Materials Holding Corp., as borrower, SMI Group Acquisitions, Inc., as holdings, the lenders from time to time party thereto, and Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (as successor to Goldman Sachs Bank USA in such capacity).

128.    "*Second Lien Credit Facility*" mean the credit facility under the Second Lien Credit Agreement.

129.    "*Second Lien Credit Facility Claim*" means any Claim arising under, derived from, secured by, based on, or related to the Second Lien Credit Facility or any other agreement, instrument or document executed at any time in connection therewith and any guaranty thereof.

130.    "*Second Out Exit Term Loans*" has the meaning set forth in the Exit Term Loan Facilities Term Sheet; the Second Out Exit Term Loans shall be issued in an aggregate principal amount equal to $150,000,000 *less* the principal amount of the First Out New Money Exit Term Loans and the First Out Roll-Up Loans.

131.    "*Secured*" means a Claim:  (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

132.    "*Secured Tax Claim*" means any Secured Claim against a Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

133.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, or any similar federal, state or local law.

134.    "*Security*" has the meaning set forth in section 101(49) of the Bankruptcy Code.

135.    "*SMI Topco*" means SMI Topco Holdings, Inc. and, following the Conversion, SMI Topco Holdings, LLC.

136.    "*SMI Topco Interest*" means an Interest in SMI Topco that was issued prior to the Petition Date.

137.    "*Solicitation Materials*" means all ballots, notices, and other materials used by the Debtors in respect of the solicitation of votes to accept or reject the Plan.

138.    "*Superpriority Credit Agreement*" means that certain Superpriority Secured Credit Agreement, dated as of September 15, 2023, among Strategic Materials Holding Corp., as borrower, SMI Group Acquisitions, Inc., as holdings, the lenders from time to time party thereto, and Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents.

139.    "***Superpriority Credit Facility***" means the credit facility under the Superpriority Credit Agreement.

140.    "***Superpriority Credit Facility Claim***" means any Claim arising under, derived from, secured by, based on, or related to the Superpriority Credit Facility or any other agreement, instrument or document executed at any time in connection therewith and any guaranty thereof.

141.    "***Third-Party Purchaser***" means, solely in the case of a Sale Transaction, the proposed purchaser of the Sale Assets pursuant to a Sale Agreement.

142.    "***Topco Entities***" means, collectively, SMI Topco, SMI Group Ultimate Holdings, Inc., and SMI Group Holdings, LLC.

143.    "***Trade Claim***" means any Claim for the provision of goods and services to any of the Debtors held by a trade creditor, service provider, or other vendor or such Entity's successor in interest (through sale of such Claim or otherwise).

144.    "***U.S. Trustee***" means the Office of the United States Trustee for the Southern District of Texas.

145.    "***Unclaimed Property***" means any distribution under the Plan on account of an Allowed Claim whose Holder has not:  (a) accepted such distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors or the Plan Administrator, as applicable, of an intent to accept such distribution; (c) responded to the Debtors', Reorganized Debtors', or Plan Administrator's, as applicable, requests for information necessary to facilitate such distribution; or (d) taken any other action necessary to facilitate such distribution.

146.    "***Unexpired Lease***" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

147.    "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not "impaired" within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash or Reinstatement.

148.    "***Waterfall Recovery***" means, solely in the case of a Sale Transaction, the Sale Distributable Proceeds *less* amounts necessary to pay or fund in full in Cash the DIP Claims, Professional Fee Claims (including funding the Professional Fee Reserve Amount into the Professional Fee Escrow Account), Allowed Administrative Expense Claims, Restructuring Expenses, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed General Unsecured Claims, Allowed Trade Claims, and the Post-Sale Reserve.

B.    *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing

document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan, the Confirmation Order, and the Restructuring Support Agreement, as applicable; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (5) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules has the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Court in the Chapter 11 Cases.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction, action, or event shall or may occur pursuant to the Plan is a day that is not a Business Day, then such transaction, action, or event shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided*, that the corporate or limited liability company governance matters relating to the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor, Reorganized Debtor, or Post-Sale Estate.

E.      *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.      *Reference to the Debtors or the Reorganized Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

G.      *Controlling Document*

In the event of an inconsistency between the Plan, the Restructuring Support Agreement, and the Disclosure Statement or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing, other than the Plan Supplement), the terms of the Plan shall control in all respects, except as set forth in the last sentence of Article I.H hereof.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order).  In the event of an inconsistency between the Confirmation Order and any of the Plan, the Disclosure Statement, or the Plan Supplement, the Confirmation Order shall control.  For the avoidance of doubt, the Definitive Documents in effect from and after the Effective Date shall control the matters set forth therein in the event of a conflict between any such Definitive Documents and any other document.

H.      *Consent Rights of Parties to Restructuring Support Agreement*

Notwithstanding anything to the contrary, any and all consent rights of the parties to the Restructuring Support Agreement set forth therein with respect to the form and substance of this Plan and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein. Failure to reference in this Plan the rights referred to in the immediately preceding sentence as such rights relate to the Restructuring Support Agreements or any Definitive Document shall not impair such rights and obligations. In case of a conflict between the consent rights of the parties to the Restructuring Support Agreement that are set forth in the Restructuring Support Agreement with those parties' consent rights that are set forth in the Plan or the Plan Supplement, the consent rights in the Restructuring Support Agreement shall control.

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL
## FEE CLAIMS, AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.      *Administrative Expense Claims*

Except with respect to Administrative Expense Claims that are Professional Fee Claims, and except to the extent that an Administrative Expense Claim is satisfied pursuant to the treatment provided in Article III.B (including with respect to any Adequate Protection Claims) or has already been paid during the Chapter 11 Cases, or a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall receive, at the option of the Debtors (with the reasonable consent of the Required First Lien Lender Group), (1) payment in full in Cash; (2) Reinstatement; (3) delivery of the collateral securing any such secured claim and payment of any interests required

under section 506(b) of the Bankruptcy Code; or (4) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code rendering such Claim unimpaired, in each case on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed; and (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided*, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' businesses may be paid in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

Except as otherwise provided in this Article II.A of the Plan and except with respect to Administrative Expense Claims that are Professional Fee Claims, requests for allowance and payment of Administrative Expense Claims must be Filed and served on the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order, no later than the Administrative Expense Claims Bar Date.  Holders of Administrative Expense Claims that are required to, but do not, File and serve on the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, a request for allowance and payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, the Post-Sale Estates, or their respective assets or property and such Administrative Expense Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the requesting party no later than forty-five (45) days after the Effective Date or such other date fixed by the Court.  Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim previously Allowed.

B.    *Professional Compensation*

1.    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Reorganized Debtors or the Post-Sale Estates, as applicable, no later than forty-five (45) days after the Effective Date.  Each such final request will be subject to approval by the Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Court in the Chapter 11 Cases, and once approved by the Court, such Allowed Professional Fee Claims shall be promptly paid in Cash from the Professional Fee Escrow Account up to its full Allowed amount.  If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims shall be promptly paid by the Reorganized Debtors or the Post-Sale Estates, as applicable, without any further action or order of the Court.  The Reorganized Debtors' or the Post-Sale Estates', as applicable, obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

Objections to any Professional Fee Claim must be Filed and served on the Reorganized Debtors or the Post-Sale Estates, as applicable, and the requesting party no later than twenty (20) days after such Professional Fee Claim is Filed with the Court.

2.      Professional Fee Escrow Account

As soon as practicable after Confirmation, and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Reserve Amount.  The Professional Fee Escrow Account shall not be subject to any Lien and shall be maintained in trust solely for the benefit of the Professionals.  The funds in the Professional Fee Escrow Account shall not be considered property of the Estates or of the Reorganized Debtors or the Post-Sale Estates, as applicable.  The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed by a Final Order.  When all such Allowed amounts owing to Professionals on account of Professional Fee Claims have been irrevocably paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be turned over to the Reorganized Debtors or the Post-Sale Estates, as applicable, without any further action or order of the Court.

3.      Professional Fee Reserve Amount

No later than five (5) Business Days prior to the Effective Date, the Debtors shall solicit Professionals for good-faith estimates of their unpaid Professional Fee Claims before and as of the Effective Date, and such Professionals shall deliver such estimate to the Debtors in writing via email two (2) Business Days prior to the Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Professional Fee Claims and shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims.  If a Professional does not timely provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals (including any fees related to the preparation of Professional fee applications). If the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, dispute the reasonableness of any such invoice, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, or the affected Professional may submit such dispute to the Court for a determination of reasonableness of any such invoice, and the disputed portion of such invoice shall not be paid until the dispute is resolved.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Court.

C.      *DIP Claims*

Except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each such Allowed DIP Claim shall, (1) in the event the Equitization Transaction occurs, receive its Pro Rata share of the First Out Roll-Up Loans and (2) in the event a Sale Transaction occurs, be indefeasibly paid in full in Cash by the Debtors on or prior to the Effective Date (as the case may be as required by the DIP Documents).

D.      *Restructuring Expenses*

During the period commencing on the Petition Date through the Effective Date, the Debtors will promptly pay and reimburse in full in Cash in immediately available funds all accrued and unpaid Restructuring Expenses incurred in connection with the Chapter 11 Cases and the Confirmation and Consummation of the Plan in accordance with the Restructuring Support Agreement, any DIP Order, the Confirmation Order, or any other applicable order of the Court, and without any requirement to File a fee application with the Court or for Court review or approval.

E.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, on the Effective Date or as soon as reasonably practicable thereafter, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive, at the option of the Debtors (with the reasonable consent of the Required First Lien Lender Group), (1) payment in full in Cash; (2) Reinstatement; (3) delivery of the collateral securing any Secured Tax Claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (4) such other treatment rendering such Claim Unimpaired.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full.

F.      *Statutory Fees*

All fees due and payable pursuant to 28 U.S.C. § 1930(a) prior to the Effective Date shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall pay any and all such fees for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.  The Debtors shall File all quarterly reports due prior to the Effective Date when they become due and after the Effective Date, the Reorganized Debtors

or the Plan Administrator, as applicable, shall continue to file quarterly, post-confirmation operating reports, in each case in accordance with the U.S. Trustee's Region 7 Guidelines for Debtors-in-Possession.

# ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Summary of Classification*

Except for the Claims addressed in Article II hereof, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es).  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.  The Plan constitutes a separate chapter 11 plan for each Debtor, and the classifications set forth in this Article III shall be deemed to apply to each Debtor.  For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors (*i.e.*, there will be ten Classes for each Debtor); *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article III.D below.

The classification of Claims against and Interests in the Debtors pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | First Lien Credit Facility Claims | Impaired | Entitled to Vote |
| 4 | 1.5 Lien Credit Facility Claims | Impaired | Entitled to Vote |
| 5 | Second Lien Credit Facility Claims | Impaired | Entitled to Vote |
| 6 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 7 | Trade Claims | Unimpaired | Presumed to Accept |
| 8 | Intercompany Claims | Unimpaired/ Impaired | Not Entitled to Vote |
| 9 | Intercompany Interests | Unimpaired/ Impaired | Not Entitled to Vote |
| 10 | SMI Topco Interests | Impaired | Entitled to Vote |

**B.**      *Treatment of Claims and Interests*

Each Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors or the Reorganized Debtors and the Holder of such Allowed Claim or Allowed Interest, as applicable, subject to the reasonable consent of the Required First Lien Lender Group.  Unless otherwise indicated, the Holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the Effective Date or as soon as reasonably practicable thereafter.

1.      <u>Class 1 – Other Priority Claims</u>

   a.      *Classification*: Class 1 consists of all Other Priority Claims.

   b.      *Treatment*: If either an Equitization Transaction or a Sale Transaction occurs, each Holder of an Allowed Other Priority Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, (i) payment in full in Cash of its Allowed Other Priority Claim, or (ii) treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or, in each case of (i) and (ii), as soon as reasonably practicable thereafter.

   c.      *Voting*: Class 1 is Unimpaired under the Plan.  Holders of Claims in Class 1 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 – Other Secured Claims</u>

   a.      *Classification*: Class 2 consists of all Other Secured Claims.

   b.      *Treatment*: If either an Equitization Transaction or a Sale Transaction occurs, each Holder of an Allowed Other Secured Claim shall receive, at the option of the applicable Debtor or Reorganized Debtor, (i) payment in full in Cash of its Allowed Other Secured Claim, payable on the later of (A) the Effective Date and (B) the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, or, in each case of (A) and (B), as soon as reasonably practicable thereafter, (ii) Reinstatement, or (iii) such other treatment so as to render such Holder's Allowed Other Secured Claim Unimpaired.

   c.      *Voting*: Class 2 is Unimpaired under the Plan.  Holders of Claims in Class 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – First Lien Credit Facility Claims</u>

    a.    *Classification*: Class 3 consists of all First Lien Credit Facility Claims.

    b.    *Allowance*:  On the Effective Date, the First Lien Credit Facility Claims shall be Allowed, without setoff, subordination, defense, or counterclaim, in the aggregate principal amount equal to $285,480,985, plus (i) any accrued but unpaid interest payable thereon, and (ii) any and all accrued and unpaid fees, expenses, and indemnification or other obligations of any kind payable under the First Lien Credit Facility.

    c.    *Treatment*:  On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the First Lien Credit Facility Claims and any Adequate Protection Claims in respect thereof, each Holder of an Allowed First Lien Credit Facility Claim or its designated Affiliate shall receive its Pro Rata share of, as applicable:

        (i)    If the Equitization Transaction occurs:  (A) the Second Out Exit Term Loans, and (B) 96.5% of the Reorganized SMI Topco Interests (subject to dilution on account of the MIP); or

        (ii)    If a Sale Transaction occurs:  the Waterfall Recovery; *provided*, *however*, that in no event shall the Holders of First Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed First Lien Credit Facility Claims, including postpetition interest on any Allowed First Lien Credit Facility Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code.

    *provided*, *further*, that any such distribution on account of any First Lien Credit Facility Claim held by SMI Topco shall be distributed as set forth in Class 10 below.

    d.    *Voting*:  Class 3 is Impaired under the Plan.  Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – 1.5 Lien Credit Facility Claims</u>

    a.    *Classification*:  Class 4 consists of all 1.5 Lien Credit Facility Claims.

    b.    *Allowance*:  On the Effective Date, the 1.5 Lien Credit Facility Claims shall be Allowed, without setoff, subordination, defense, or counterclaim, in the aggregate principal amount equal to $11,053,092, plus (i) any accrued but unpaid interest payable thereon, and (ii) any and all accrued and unpaid fees, expenses, and indemnification or other obligations of any kind payable under the 1.5 Lien Credit Facility.

c.    Treatment:  On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the 1.5 Lien Credit Facility Claims and any Adequate Protection Claims in respect thereof, each Holder of an Allowed 1.5 Lien Credit Facility Claim or its designated Affiliate shall receive its Pro Rata share of:

   (i)    If the Equitization Transaction occurs:  2.5% of the Reorganized SMI Topco Interests (subject to dilution on account of the MIP); or

   (ii)   If a Sale Transaction occurs:  the Waterfall Recovery, *less* the amount necessary to satisfy the Class 3 treatment described above; *provided*, *however*, that in no event shall the Holders of 1.5 Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed 1.5 Lien Credit Facility Claims, including postpetition interest on any Allowed 1.5 Lien Credit Facility Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code.

provided, *further*, that any such distribution on account of any 1.5 Lien Credit Facility Claim held by SMI Topco shall be distributed as set forth in Class 10 below.

d.    *Voting*: Class 4 is Impaired under the Plan.  Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – Second Lien Credit Facility Claims</u>

a.    *Classification*:  Class 5 consists of all Second Lien Credit Facility Claims.

b.    *Allowance*:  On the Effective Date, the Second Lien Credit Facility Claims shall be Allowed, without setoff, subordination, defense, or counterclaim, in the aggregate principal amount equal to $80,000,000, plus (i) any accrued but unpaid payable interest thereon, and (ii) any and all accrued and unpaid fees, expenses, and indemnification or other obligations of any kind payable under the Second Lien Credit Facility.

c.    *Treatment*:  On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the Second Lien Credit Facility Claims and any Adequate Protection Claims in respect thereof, each Holder of an Allowed Second Lien Credit Facility Claim or its designated Affiliate shall receive its Pro Rata share of:

   (i)    If the Equitization Transaction occurs:  1.0% of the Reorganized SMI Topco Interests (subject to dilution on account of the MIP); or

(ii)   If a Sale Transaction occurs:  the Waterfall Recovery, *less* the amount necessary to satisfy the Class 3 and Class 4 treatments described above; *provided*, *however*, that in no event shall the Holders of Second Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed Second Lien Credit Facility Claims, including postpetition interest on any Allowed Second Lien Credit Facility Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code.

*provided*, *further*, that any such distribution on account of any Second Lien Credit Facility Claim held by SMI Topco shall be distributed as set forth in Class 10 below.

d.   *Voting*: Class 5 is Impaired under the Plan.  Holders of Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.   Class 6 – General Unsecured Claims

a.   *Classification*: Class 6 consists of all General Unsecured Claims.

b.   *Treatment*: On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the General Unsecured Claims, each Holder of an Allowed General Unsecured Claim shall receive:

(i)   If the Equitization Transaction occurs:  at the option of the applicable Debtor or Reorganized Debtor, either (A) Reinstatement of its Allowed General Unsecured Claim; or (B) payment in full in Cash of its Allowed General Unsecured Claim on the later of (1) the Effective Date or (2) the date due in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Claim; or

(ii)   If a Sale Transaction occurs:  payment in full in Cash of its Allowed General Unsecured Claim on the later of (A) the Effective Date or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Claim.

c.   *Voting*: Class 6 is Unimpaired under the Plan.  Holders of Claims in Class 6 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

7.      Class 7 – Trade Claims

   a.      *Classification*: Class 7 consists of all Trade Claims.

   b.      *Treatment*: On the Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the Trade Claims, each Holder of an Allowed Trade Claim shall receive:

      (i)      If the Equitization Transaction occurs:  the applicable Debtor or Reorganized Debtor shall continue to pay each Allowed Trade Claim in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Allowed Trade Claim; or

      (ii)      If a Sale Transaction occurs:  payment in full in Cash of its Allowed Trade Claim on the later of (A) the Effective Date or (B) the date due in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such Claim.

   c.      *Voting*: Class 7 is Unimpaired under the Plan.  Holders of Claims in Class 7 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

8.      Class 8 – Intercompany Claims

   a.      *Classification*: Class 8 consists of all Intercompany Claims.

   b.      *Treatment*:  On the Effective Date, in the Debtors' discretion (with the reasonable consent of the Required First Lien Lender Group), all Intercompany Claims shall either be Reinstated or discharged without any distribution on account of such Claims; *provided*, *however*, to the extent any Intercompany Claims constitute Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims held by SMI Topco, the distributions that would otherwise be made to SMI Topco on account of such Claims pursuant to the treatment set forth in Classes 3, 4, and 5, respectively, shall instead be made to the Holders of SMI Topco Interests pursuant to the treatment provided in Class 10.

   c.      *Voting*:  Class 8 is either Unimpaired, in which case the Holders of such Claims conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

9.     <u>Class 9 – Intercompany Interests</u>

    a.     *Classification*: Class 9 consists of all Intercompany Interests.

    b.     *Treatment*: On the Effective Date, in the Debtors' discretion (with the reasonable consent of the Required First Lien Lender Group), all Intercompany Interests shall either be Reinstated or discharged without any distribution on account of such Interests.

    c.     *Voting*: Class 9 is either Unimpaired, in which case the Holders of such Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired and not receiving any distribution under the Plan, in which case the Holders of such Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

10.     <u>Class 10 – SMI Topco Interests</u>

    a.     *Classification*: Class 10 consists of all SMI Topco Interests.

    b.     *Treatment*: On the Effective Date, all SMI Topco Interests shall be cancelled, released, discharged, and extinguished, and Holders of SMI Topco Interests shall receive:

        (i)     If the Equitization Transaction occurs: to the extent SMI Topco holds any Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims, the distributions that would otherwise be made to SMI Topco on account of it being a Holder of such Allowed Claims pursuant to the treatment set forth in Classes 3, 4, and 5, respectively shall instead be made to the Holders of SMI Topco Interests on account of their Class 10 Interests; or

        (ii)     If a Sale Transaction occurs: (A) the Waterfall Recovery, *less* the amount necessary to pay in full in Cash all Allowed Claims against the Debtors to the extent provided in Classes 3-5, and (B) all funds remaining in the Post-Sale Reserve after the wind down of the Post-Sale Estates, if any; *provided*, *however*, that to the extent SMI Topco holds any Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims, the distributions that would otherwise be made to SMI Topco on account of it being a Holder of such Allowed Claims pursuant to the treatment set forth in Classes 3, 4, and 5, respectively, shall instead be made to the Holders of SMI Topco Interests, in each case on account of their Class 10 Interests.

    c.    *Voting*: Class 10 is Impaired under the Plan. Holders of Interests in Class 10 are entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired or Reinstated Claims*

Without limiting or otherwise modifying any order of the Court, nothing under the Plan shall affect or waive the Debtors', the Reorganized Debtors', or the Post-Sale Estates', as applicable, claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

D.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not contain an Allowed Claim or Interest or a Claim temporarily Allowed by the Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.     *Voting Classes*; *Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be deemed accepted by such Class.

F.     *Intercompany Claims and Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Claims and Intercompany Interests are not being received by Holders of such Intercompany Claims and Intercompany Interests on account of their Intercompany Claims and Intercompany Interests but for the purposes of administrative convenience, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.

G.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right to modify the Plan subject to and in accordance with Article X hereof and the Consenting Parties' respective consent rights set forth in the Restructuring Support Agreement to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests, and the filing of the Plan shall constitute a motion for such relief.

H.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claim or Interest, or any Class of Claims or Interests, are Impaired, the Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

I.     *Subordinated Claims*

Except as may be the result of the settlement described in Article VIII.A of the Plan, the allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, reserve the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.     *Equitization Transaction*

**If no Sale Toggle Notice has been delivered, the following provisions in this Article IV.A shall govern the implementation of the Plan.  For the avoidance of doubt, all provisions in this Article IV.A of the Plan shall apply only if a Sale Toggle Notice has <u>not</u> been delivered.**

1.     <u>Restructuring Transactions</u>

On the Conversion Date, the Debtors shall effectuate the Conversion as set forth in the Plan and the Restructuring Transactions Exhibit.  On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall undertake the Restructuring as set forth in the Plan and the Restructuring Transactions Exhibit, including:  (a) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, sale, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, the Restructuring Transactions Exhibit, and the Restructuring Support Agreement, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan, the Restructuring Transactions Exhibit, and the Restructuring Support Agreement and having other terms for which the applicable Entities agree; (c) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (d) the filing of appropriate certificates or articles of incorporation, formation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (e) the issuance of securities, including the Reorganized SMI Topco Interests, which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (f) the execution and delivery of the Exit Term Loan Facilities Documents; (g) the execution and delivery of Definitive

Documents not otherwise included in the foregoing, if any; and (h) all other actions that the Debtors or the Reorganized Debtors determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law, but in all cases subject to the terms of the Plan, the Restructuring Transactions Exhibit, and the Restructuring Support Agreement. The Confirmation Order shall and shall be deemed, pursuant to sections 363, 365, 1123, and 1145(a) of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring.

2.     Sources of Consideration for Plan Distributions

The Debtors, the Reorganized Debtors, and/or the Disbursing Agent, as applicable, shall fund distributions under the Plan as follows:

a.     Cash on Hand / DIP Facility Borrowings

On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall make all distributions required to be made under the Plan using Cash on hand as of the Effective Date, including Cash from operations and the proceeds of borrowings under the DIP Facility and/or Exit Term Loan Facilities. All remaining Cash on hand as of the Effective Date, after payment or funding of all distributions required to be made on the Effective Date, including Cash from operations and the proceeds of borrowings under the DIP Facility, but excluding the Cash funded into the Professional Fee Escrow Account, shall be retained by or transferred to, as applicable, the Reorganized Debtors. Cash payments to be made pursuant to the Plan will be made by the Debtors or the Reorganized Debtors, as applicable. The Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

b.     Exit Term Loan Facilities

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Exit Term Loan Facilities. The Reorganized Debtors shall use the loans under and proceeds of the Exit Term Loan Facilities for the purposes permitted by the Exit Term Loan Facilities Documents, including the funding of distributions under the Plan and satisfaction of ongoing working capital needs, as well as the repayment in full of the Canadian Credit Agreement and the issuance of the First Out Roll-Up Loans to the Holders of DIP Claims.

The Confirmation Order shall constitute approval of the Exit Term Loan Facilities (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Term Loan Facilities Documents and such other documents as may be required or appropriate.

The Exit Term Loan Facilities Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors, enforceable in accordance with their terms.

The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, whether under the Bankruptcy Code or other applicable non-bankruptcy law, and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Term Loan Facilities Documents (i) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Term Loan Facilities Documents, (ii) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Term Loan Facilities Documents, and (iii) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent transfers, obligations, or conveyances, or other voidable transfers or obligations under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

On and as of the Effective Date, all Persons or Entities entitled to Plan consideration in the form of Exit Term Loans (as defined in the Exit Term Loan Facilities Term Sheet) in accordance with this Plan shall be deemed to be parties to, and bound by, the Exit Term Loan Facilities Credit Agreement (as defined in the Exit Term Loan Facilities Term Sheet), without the need for execution thereof by any such Person or Entity.

c.      Issuance and Distribution of Reorganized SMI Topco Interests

On the Effective Date, Reorganized SMI Topco shall be authorized to and shall issue the Reorganized SMI Topco Interests in accordance with the terms of the Plan and the Restructuring Transactions Exhibit without the need for any further corporate or limited liability company action or without any further action by Holders of Claims or Interests.  All of the Reorganized SMI Topco Interests, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable (as applicable).  Each distribution and issuance of the Reorganized SMI Topco Interests under the Plan shall be governed by the terms and conditions set forth in the Plan and the Restructuring Transactions Exhibit applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance. The Reorganized SMI Topco Interests will not be registered under the Securities Act or listed on any exchange as of the Effective Date.

The Holders of Reorganized SMI Topco Interests shall be deemed as a result of having received distributions of Reorganized SMI Topco Interests pursuant to the Plan and the Restructuring Transactions Exhibit to have accepted the terms of the Reorganized SMI Topco Interest Documents (solely in their capacity as holders of Reorganized SMI Topco Interests) and to be parties thereto without further action or signature.  The Reorganized SMI Topco Interest Documents shall be effective as of the Effective Date and, as of such date, shall be deemed to be valid, binding, and enforceable in accordance with their terms, and each Holder of Reorganized SMI Topco Interests shall be bound thereby (without any further action or signature) in all respects, whether or not such Holder has executed the Reorganized SMI Topco Interest Documents.

3.      New Governance Documents

On the Effective Date, the New Governance Documents, including the Reorganized SMI Topco Interest Documents, shall be adopted automatically by the applicable Reorganized Debtors in a form consistent with the provisions of the Plan, the Restructuring Transactions Exhibit, and the Restructuring Support Agreement, and shall be deemed to be valid, binding, and enforceable obligations.  To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtors, as applicable, will, on or as soon as practicable after the Effective Date, file their respective New Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.

Pursuant to section 1123(a)(6) of the Bankruptcy Code, the applicable New Governance Documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities and will comply with all other applicable provisions of section 1123(a)(6) of the Bankruptcy Code regarding the distribution of power among, and dividends to be paid to, different classes of voting securities.  After the Effective Date, the Reorganized Debtors, as applicable, may amend and restate their respective New Governance Documents and other constituent documents in accordance with the terms thereof, as permitted by the laws of their respective states, provinces, or countries of organization and their respective New Governance Documents.

4.      New Company Agreement

On the Effective Date, Reorganized SMI Topco shall enter into and adopt the New Company Agreement, substantially in the form set forth in the Plan Supplement.  Reorganized SMI Topco or the Disbursing Agent shall deliver the New Company Agreement to each Holder of Reorganized SMI Topco Interests and, to the extent that the New Company Agreement purports to bind any such parties, such parties shall be bound thereby, in each case, without the need for execution by any party thereto other than Reorganized SMI Topco.  On the Effective Date, the New Company Agreement shall be deemed to be valid, binding, and enforceable in accordance with its terms and provisions.

5.      Directors and Officers of the Reorganized Debtors

As of the Effective Date, the term of the current members of the boards of directors of each of the Debtors shall expire automatically, and each person serving as a director thereof shall be

automatically removed and shall be deemed to have resigned and cease to serve, and the New Board and the officers of each of the Reorganized Debtors, respectively, shall be appointed in accordance with the Plan, the New Governance Documents, and any other constituent documents of each Reorganized Debtor.

The size of the New Board of Reorganized SMI Topco and the identity of the members thereof will be disclosed in the Plan Supplement. The directors, managers, and officers for the subsidiaries of Reorganized SMI Topco, as applicable, shall be identified and selected by the New Board of Reorganized SMI Topco in accordance with the terms of the New Governance Documents.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve as a director, officer, or manager of Reorganized SMI Topco or any of the other Reorganized Debtors. To the extent any such director, officer, or manager is an "Insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director, officer, or manager will also be disclosed. Each such director, officer, and manager shall serve from and after the Effective Date pursuant to the terms of the New Governance Documents and other constituent documents of the Reorganized Debtors and applicable laws of the respective Reorganized Debtors' jurisdiction of formation.

6.    Exemption from Registration Requirements

The offering, issuance, and distribution of the Reorganized SMI Topco Interests shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without any further act or action by any Entity, from registration under (a) the Securities Act and all rules and regulations promulgated thereunder and (b) any applicable U.S. state or local law requiring registration for the offer, issuance, or distribution of securities or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption under the Securities Act.

Pursuant to section 1145 of the Bankruptcy Code, the Reorganized SMI Topco Interests issued under the Plan in reliance upon section 1145 of the Bankruptcy Code will be freely transferable by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act, and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (b) the restrictions, if any, on the transferability of such securities or instruments, including, any restrictions on the transferability under the terms of the New Governance Documents; and (c) any other applicable regulatory approval.

To the extent issuance under section 1145 of the Bankruptcy Code is unavailable, such Reorganized SMI Topco Interests (including on account of the MIP) will be issued without registration under the Securities Act in reliance on section 4(a)(2) of the Securities Act and shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration

under the Securities Act is available, and in compliance with any applicable state or foreign securities laws.

7.     Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtors, the Reorganized Debtors' officers, and the members of the New Board(s), as applicable, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the Reorganized SMI Topco Interests, in the name of and on behalf of the Reorganized Debtors, as applicable, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

8.     Management Incentive Plan

The Required First Lien Lender Group will negotiate in good faith with the Debtors to finalize the material terms of the MIP prior to the Effective Date.  For the avoidance of doubt, the MIP shall contain customary terms with up to 10.0% of the Reorganized SMI Topco Interests, on a fully diluted basis, reserved for the MIP.  The Confirmation Order shall authorize the Reorganized Debtors to adopt and enter into the MIP, on the terms set forth in this Article IV.A.7.

9.     Employment Agreements

Prior to the Effective Date, the Required First Lien Lender Group will negotiate in good faith with the Debtors and the applicable employees of the Debtors to finalize the New Employment Agreements.

B.     *Sale Transaction*

**If a Sale Toggle Notice has been delivered, the following provisions in this Article IV.B shall govern the implementation of the Plan.  For the avoidance of doubt, all provisions in this Article IV.B of the Plan shall apply only if a Sale Toggle Notice has been delivered.**

1.     Closing of Sale Transaction

The Sale Transaction shall be governed by, and shall be subject to the terms and conditions of, the Sale Agreement and the Restructuring Support Agreement in all respects except as may be modified by the provisions of the Plan or the Confirmation Order, in accordance with the Restructuring Support Agreement.  On the Effective Date, the Debtors shall be authorized to consummate the Sale Transaction with the Third-Party Purchaser and any other applicable party and, among other things and as applicable, the Debtors' assets (including Executory Contracts and Unexpired Leases assumed and assigned to the Third-Party Purchaser pursuant to Article V) shall be transferred to and vest in the applicable Third-Party Purchaser free and clear of all Liens, Claims, charges, or other encumbrances pursuant to the terms of the applicable Sale Agreement and the Confirmation Order.

2.        Waterfall of Sale Distributable Proceeds

Solely in the event of a Sale Transaction, the Sale Distributable Proceeds shall be distributed pursuant to the Waterfall Recovery and the treatment set forth in Article III.B.  For the avoidance of doubt, after accounting or reserving for the amounts necessary to pay or fund in full in Cash the DIP Claims, Professional Fee Claims (including funding the Professional Fee Reserve Amount into the Professional Fee Escrow Account), Allowed Administrative Expense Claims, Restructuring Expenses, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed General Unsecured Claims, Allowed Trade Claims, and the Post-Sale Reserve, the Sale Distributable Proceeds shall be allocated and distributed in accordance with the following priority (in each case on a Pro Rata basis): *first*, to Holders of Allowed First Lien Credit Facility Claims until all Allowed First Lien Credit Facility Claims are paid in full in Cash; *second*, after accounting for the amount necessary to satisfy the Allowed First Lien Credit Facility Claims in full in Cash, to Holders of Allowed 1.5 Lien Credit Facility Claims until all Allowed 1.5 Lien Credit Facility Claims are paid in full in Cash; *third*, after accounting for the amount necessary to satisfy the Allowed First Lien Credit Facility Claims and Allowed 1.5 Lien Credit Facility Claims in full in Cash, to Holders of Allowed Second Lien Credit Facility Claims until all Allowed Second Lien Credit Facility Claims are paid in full in Cash; and *fourth*, after accounting for the amount necessary to satisfy the Allowed First Lien Credit Facility Claims, the Allowed 1.5 Lien Credit Facility Claims, and the Allowed Second Lien Credit Facility Claims in full in Cash, to Holders of Allowed SMI Topco Interests; *provided*, *however*, that in no event shall the Holders of Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, or Allowed Second Lien Credit Facility Claims receive, on account of such Claims, a recovery greater than 100% of the Allowed amount of such Claims, including postpetition interest on any such Allowed Claims from the Petition Date through the date of payment of such Claims, to the maximum extent permitted by law, including under the Bankruptcy Code.

3.        Wind Down and Dissolution of Debtors

Solely in the event of a Sale Transaction, the Plan Administrator shall manage the wind down of the Post-Sale Estates and manage certain distributions in accordance with the Plan. As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically.  The Plan Administrator shall serve as the sole officer and manager or director, as applicable, of the Post-Sale Estates and may also elect such additional manager(s), director(s), and officer(s), as applicable, as the Plan Administrator deems necessary to implement the Plan and the actions contemplated herein. The applicable governance documents for the Post-Sale Estates shall be amended in accordance with section 1123(a)(6) of the Bankruptcy Code.

The Plan Administrator shall have the authority and right on behalf of each of the Post-Sale Estates, without the need for Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including to:  (a) except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors; (b) make distributions to Holders of Allowed Claims and, if applicable, Interests, in accordance with the Plan; (c) subject in all respects to Article VIII, prosecute all Causes of Action on behalf of the

Debtors, elect not to pursue any such Causes of Action that are not Sale Assets, and determine whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Post-Sale Estates; (d) retain professionals to assist in performing its duties under the Plan; (e) maintain the books, records, and accounts of the Post-Sale Estates; (f) complete and file, as necessary, all final or otherwise required federal, state, local, and non-U.S. tax returns for the Post-Sale Estates; and (g) perform other duties and functions that are consistent with the implementation of the Plan.

After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind down, sell, liquidate, and may operate, use, acquire, or dispose of any property and compromise or settle any Claims, Interests, or Causes of Action remaining with the Post-Sale Estates after consummation of the Sale Transaction without approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Plan Administrator shall effectuate the process to wind down, dissolve, and liquidate the Post-Sale Estates and distribute any remaining assets with the amounts reserved in the Post-Sale Reserve.

Each of the Post-Sale Estates shall indemnify and hold harmless the Plan Administrator solely in its capacity as such for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

The Plan Administrator shall be authorized to file on behalf of the Debtors, certificates of dissolution and any and all other corporate, limited liability company, and partnership documents and other instruments necessary to effectuate the Sale Transaction without further approval of the Court or other action under applicable law, regulation, order, or rule, including any action by the stockholders, officers, members, the board of directors, board of managers or similar governing body of the Debtors.

*C.*     *Corporate Existence*

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents and agreements) in effect prior to the Effective Date, except to the extent that such certificate of incorporation and bylaws (or other formation documents and agreements) are amended under the Plan, including, with respect to Reorganized SMI Topco, pursuant to the New Governance Documents and giving effect to the Conversion, or otherwise, and to the extent such documents are amended, such documents are deemed amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial or federal law). After the Effective Date, the respective certificate of incorporation and bylaws (or other formation documents or agreements) of one or more of the Reorganized Debtors or the Post-Sale Estates, as applicable, may be amended or modified without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or

Bankruptcy Rules. After the Effective Date, one or more of the Reorganized Debtors or the Post-Sale Estates, as applicable, may be disposed of, dissolved, wound down, merged, converted, or liquidated without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

D.     *Vesting of Assets*

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, or any agreement, instrument, or other document incorporated herein or therein (including any applicable Sale Agreement), on the Effective Date, all property in each Estate, including all Causes of Action, and any property acquired by any of the Debtors shall vest in each applicable Reorganized Debtor, Post-Sale Estate, and/or any Third-Party Purchaser, as applicable, free and clear of all Liens, Claims, charges, or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, may operate its business and may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Except with respect to Liens securing the Exit Term Loan Facilities or as otherwise provided for in the Plan, to the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the applicable Reorganized Debtors, any administrative agent under the Exit Term Loan Facilities Documents, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, that are necessary to cancel and/or extinguish such Liens and/or security interests.

After the Effective Date, the applicable Reorganized Debtors, the Plan Administrator on behalf of the Post-Sale Estates, or any Third-Party Purchaser, as applicable, may present Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the applicable Reorganized Debtors, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, free and clear of all Liens, Claims, encumbrances, or other interests which appear of record, other than as specified above. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by the Plan, shall be given prior to the presentation of such Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the applicable Reorganized Debtors, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

E.      *Cancellation of Existing Securities, Agreements, and Indebtedness*

On the Effective Date, only in the event the Equitization Transaction occurs, the Reorganized SMI Topco Interests shall be issued pursuant to the Plan and the Restructuring Transactions Exhibit.

Except as otherwise provided in the Plan, the Plan Supplement, the Confirmation Order, the Restructuring Support Agreement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date:  (1) the obligations of the Debtors under the Prepetition Credit Agreements and each certificate, share, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors, the Reorganized Debtors, and the Post-Sale Estates, as applicable, shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released and discharged, (except with respect to any Indemnification Obligations, which obligations, shall be assumed and assigned as set forth in Article V.E of the Plan); *provided*, that notwithstanding the releases set forth in Article VIII.F of the Plan, upon Confirmation or the occurrence of the Effective Date (i) any such agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; and (ii) the DIP Documents and the Prepetition Credit Agreements shall continue in effect (other than, for the avoidance of doubt, any Liens or security interest terminated pursuant to Article VIII.D) after the Effective Date solely with respect to any rights of the Agents and the co-administrative agents under the DIP Credit Agreement to (A) maintain, exercise, and enforce any of their respective rights to indemnification, reimbursement, or similar obligations and (B) perform any functions that are necessary to effectuate the foregoing, including appearing and raising issues in the Chapter 11 Cases in any proceeding in the Court or any other court.

Notwithstanding anything to the contrary in this Article IV.D any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfactions, releases, or discharges provided for in this Article IV.D shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by such Debtor or Reorganized Debtor, as applicable, pursuant to the Plan or a Final Order of the Court.

F.      *Corporate Action*

Upon and after the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Court in all respects without any further corporate or equity holder action, including, as applicable to the Equitization Transaction or a Sale Transaction:  (1) the Conversion; (2) entry into the Exit Term

Loan Facilities; (3) execution, delivery, and performance of the Exit Term Loan Facilities Documents and the New Governance Documents; (4) the issuance and distribution of the Reorganized SMI Topco Interests; (5) appointment of the New Board and other directors, managers, and officers for Reorganized SMI Topco and the Reorganized Debtors; (6) the adoption of the MIP on terms and conditions set forth in Article IV.A.7 of the Plan; (7) entry into a Sale Agreement; (8) implementation of the Restructuring; and (9) all other actions contemplated by or reasonably necessary or appropriate to promptly consummate the transactions contemplated by the Plan and, if applicable, the Restructuring Transactions Exhibit.

Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtors, and any corporate, partnership, limited liability company, or other governance action required by the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, in connection with the Plan (including any items listed in the immediately preceding paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further corporate or other action by any security holders, directors, managers, or officers of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, or by any Holders of any Claims or Interests, as applicable.  On or (as applicable) before the Effective Date, the appropriate directors, managers, officers, or other authorized persons of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, shall be (or shall be deemed to have been) authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors or the Post-Sale Estates, as applicable, including the Exit Term Loan Facilities Documents, the New Governance Documents, any Sale Agreement, and any and all other agreements, documents, securities, and instruments relating to the foregoing, to the extent not previously authorized by the Court.  The authorizations and approvals contemplated by this Article IV.F of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

G.    *Exemption from Certain Taxes and Fees*

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (1) any issuance, transfer, or exchange of a Security (including of the Reorganized SMI Topco Interests), (2) any grant of collateral under the Exit Term Loan Facilities, (3) any creation of any Lien, mortgage, deed of trust, or other security interest, or (4) any transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

H.    *Preservation of Causes of Action*

In accordance with section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors or the Post-Sale Estates, as applicable, shall retain and

may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the List of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Post-Sale Estates, as applicable.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Confirmation Order, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, will not pursue any and all available Causes of Action against it. The Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order (including the Confirmation Order), including pursuant to Article VIII hereof, the Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor or Post-Sale Estate, as applicable. The applicable Reorganized Debtors or the Post-Sale Estates, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

I.     *Payment of the Restructuring Expenses*

On the Effective Date, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, will pay all Restructuring Expenses, including fees and expenses estimated to be incurred through the Effective Date by the Consenting Creditor Representatives and the Consenting Sponsor Representatives without the need for any such Person to file a fee or retention application in the Chapter 11 Cases. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered in writing via email to the Debtors at least three (3) Business Days before the Effective Date; *provided* that such estimates shall not be considered an admission or

limitation with respect to such Restructuring Expenses (it being understood that any difference in (a) estimated Restructuring Expenses on and including the Effective Date as compared to (b) Restructuring Expenses actually incurred on and including the Effective Date shall be reconciled following the submission of a final invoice by the relevant Entity within thirty (30) days of the Effective Date). If the Debtors, Reorganized Debtors, or Plan Administrator on behalf of the Post-Sale Estates, as applicable, dispute the reasonableness of any such estimate, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, or the affected professional, may submit such dispute to the Court for a determination of the reasonableness of such estimate, and the disputed portion of such estimated Restructuring Expenses shall not be paid until such dispute is resolved. The undisputed portion of such estimated Restructuring Expenses shall be paid as provided herein. For the avoidance of doubt, following the Effective Date, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall continue to pay all Restructuring Expenses of the Consenting Creditor Representatives and the Consenting Sponsor Representatives related to the Restructuring or any other transactions contemplated by this Plan.

*J.*     *Employee and Retiree Benefits*

All compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, incentive and/or retention plans, severance agreements and plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed by, if the Equitization Transaction occurs, the Reorganized Debtors or, if a Sale Transaction occurs, the Third-Party Purchaser, pursuant to sections 365 and 1123 of the Bankruptcy Code.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

*A.*     *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be assumed by and assigned to the applicable Reorganized Debtors, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, or any of their respective designated assignees in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Court, other than those Executory Contracts or Unexpired Leases that: (1) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) have been previously rejected or assumed by a Final Order; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; or (5) have previously expired or terminated pursuant to its own terms or by agreement of the parties thereto.

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or the Schedule of Rejected Executory Contracts and Unexpired Leases, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor or Post-Sale Estate, as applicable, in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors, with the reasonable consent of the Required First Lien Lender Group, reserve the right to alter, amend, modify, or supplement the Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than three (3) days' notice to the applicable non-Debtor counterparties.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision) then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Court within the earliest to occur of (1) twenty-one (21) days after the date of entry of an order of the Court (including the Confirmation Order) approving such rejection or (2) thirty (30) days after notice of any rejection that occurs after the Effective Date.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease that are not Filed within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, the Post-Sale Estates, or any assets or property of the foregoing parties, without the need for any objection by the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, or further notice to, or action, order, or approval of the Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in any Proof of Claim (if any) to the contrary**.

Claims arising from the rejection of any Executory Contract or Unexpired Lease shall be considered General Unsecured Claims and shall be treated in accordance with Article III.B.6 of the Plan.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors, the Reorganized Debtors, the Plan Administrator on behalf of the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, shall pay Cure Claims, if any, on the Effective Date or as soon as reasonably practicable thereafter. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, all requests for payment of Cure Claims that differ from the amounts paid or proposed to be paid by the Debtors, the Reorganized Debtors, the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, to a counterparty must be filed and served on the Reorganized Debtors, the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, on or before thirty (30) days after the Effective Date. If such Cure Claim dispute is not resolved within seven (7) days of the Reorganized Debtors', the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, receiving such Cure Claim dispute, the counterparty to the applicable assumed Executory Contract or Unexpired Lease shall timely file an objection with the Court within seven (7) days. **Any such request and/or objection that is not timely Filed shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, without the need for any objection by the Reorganized Debtors, the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, or any other party in interest or any further notice to or action, order, or approval of the Court.**

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors, the Reorganized Debtors, the Plan Administrator on behalf of the Post-Sale Estates, and/or a Third-Party Purchaser, as applicable, of the Cure Claim; *provided*, *however*, that nothing herein shall prevent the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, also may settle any Cure Claim without any further notice to or action, order, or approval of the Court. In addition, any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan must be Filed with the Court on or before thirty (30) days after the Effective Date. Any such objection will be scheduled to be heard by the Court at the Debtors', the Reorganized Debtors', or the Post-Sale Estates', as applicable, first scheduled omnibus hearing for which such objection is timely Filed. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.**

If there is any dispute regarding any Cure Claim, the ability of the Reorganized Debtors or the Post-Sale Estates, as applicable, or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors, the Reorganized Debtors, or

the Plan Administrator on behalf of the Post-Sale Estates, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may assume the Executory Contract or Unexpired Lease, subject to the reasonable consent of the Required First Lien Lender Group, prior to the resolution of any such dispute; *provided*, *however*, that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Claim by the contract counterparty; *provided further*, *however*, that following entry of a Final Order resolving any such dispute, the Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution, subject to the reasonable consent of the Required First Lien Lender Group.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Court.

D.      *Insurance Policies*

The Debtors do not believe any of their insurance policies (including all D&O Liability Insurance Policies and tail coverage liability insurance) are Executory Contracts. All of the Debtors' insurance policies which are not Executory Contracts shall vest in the Reorganized Debtors or the Post-Sale Estates, as applicable. To the extent such insurance policies are determined to be Executory Contracts, notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Reorganized Debtors or the Post-Sale Estates, as applicable, shall be deemed to have assumed all such insurance policies held by such entities as of the Petition Date (including all D&O Liability Insurance Policies and all tail coverage related thereto), and any agreements, documents, or instruments relating thereto, pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Court's approval of the Reorganized Debtors' or the Post-Sale Estates', as applicable, assumption of such D&O Liability Insurance Policies or other insurance policies, as applicable, and any agreements, documents, or instruments relating thereto, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of insurance policies, including the D&O Liability Insurance Policies, and to the extent treated as an Executory Contract, each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, under the Plan, and shall survive the Effective Date.

After the Effective Date, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall not terminate or otherwise reduce, modify or restrict in any way, the coverage under any D&O Liability Insurance Policy (including such tail coverage liability insurance) in effect as of the Effective Date, and all members, managers, general partners,

directors, and officers of the Debtors or their Affiliates who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy (and all tail coverage related thereto) regardless of whether such members, managers, general partners, directors, and officers remain in such positions after the Effective Date.

E.     *Indemnification Obligations*

All Indemnification Obligations shall not be discharged or impaired by Confirmation of the Plan  or entry of the Confirmation Order and shall be assumed by the Reorganized Debtors or the Post-Sale Estates, as applicable, and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring (and, for the avoidance of doubt, the Plan and the Confirmation Order) on terms no less favorable to such current and former directors, officers, managers, equity holders, employees, attorneys, accountants, investment bankers, and other professionals of any of the Debtors and such current and former directors', officers', and managers' respective Affiliates than the Indemnification Obligations in place prior to the Petition Date, and to the extent any such Indemnification Obligations are obligations of a non-Debtor Affiliate of any of the Debtors, such Indemnification Obligations shall be assigned on the Effective Date to, (a) if the Equitization Transaction occurs, the Reorganized Debtors on a joint and several basis, or (b) if a Sale Transaction occurs, the Post-Sale Estates on a joint and several basis.

F.     *Modifications*, *Amendments*, *Supplements*, *Restatements*, *or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.  Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.     *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor or Post-Sale Estate, as applicable, has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors or the Post-Sale Estates, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.     *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

I.     *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor will be performed by the applicable Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.   Accordingly, such contracts and leases that have not expired or otherwise been terminated, cancelled, or rejected as of the date of Confirmation will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.     *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.   In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.   If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.   Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.     *Delivery of Distributions and Undeliverable or Unclaimed Property*

1.     <u>Distribution Record Date</u>

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests.   The Debtors, the Reorganized Debtors, the Plan Administrator, and the Disbursing Agent, as applicable, shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

2.     <u>Delivery of Distributions in General</u>

Except as otherwise provided herein or in the Restructuring Transactions Exhibit, distributions to Holders of Allowed Claims shall be made to the Holders of record as of the

Distribution Record Date by the Debtors, the Reorganized Debtors, the Plan Administrator on behalf of the Post-Sale Estates, or the Disbursing Agent, as applicable, as follows:  (a) at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; (b) at the address set forth in any written notice of address changes delivered to the Reorganized Debtors, or the Plan Administrator, as applicable, after the Effective Date; (c) to any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf; and/or (d) in the case of Cash distributions on account of Allowed Claims in respect of the Prepetition Credit Agreements, through customary procedures with the applicable Agent.  Subject to this Article VI, distributions under the Plan on account of Allowed Claims shall not be subject to levy, garnishment, attachment, or like legal process, so that each Holder of an Allowed Claim shall have and receive the benefit of the distributions in the manner set forth in the Plan.  The Debtors, the Reorganized Debtors, the Plan Administrator, and the Disbursing Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

### 3.  Minimum Distributions

No fractional units of Reorganized SMI Topco Interests shall be distributed, and no Cash shall be distributed in lieu of such fractional amounts of units.  When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of units of Reorganized SMI Topco Interests that is not a whole number, the actual distribution of units of Reorganized SMI Topco Interests shall be rounded to the next higher whole number.  The total number of units of Reorganized SMI Topco Interests to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

### 4.  Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, shall have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors, or the Post-Sale Estates, as applicable, automatically and without need for a further order by the Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred.

### C.  *Registration or Private Placement Exemption*

Except as otherwise set forth in the Plan, if the Equitization Transaction occurs, all Reorganized SMI Topco Interests (including on account of the MIP) issued under Article III of the Plan will be issued without registration under the Securities Act or any similar federal, state, or local law in reliance upon section 1145 of the Bankruptcy Code (or pursuant to another available exemption from registration under the Securities Act).  The Reorganized SMI Topco Interests issued under the Plan in reliance upon section 1145 of the Bankruptcy Code are exempt from,

among other things, the registration requirements of Section 5 of the Securities Act and any other applicable U.S. state or local law requiring registration prior to the offering, issuance, distribution, or sale of Securities.  Such Reorganized SMI Topco Interests issued under the Plan in reliance upon section 1145 of the Bankruptcy Code (1) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (2) are freely tradable and transferable by any holder thereof at the time of transfer that (a) is not an "affiliate" of the Reorganized Debtors as defined in Rule 144(a)(1) under the Securities Act, (b) has not been such an "affiliate" within 90 days of such transfer, (c) has not acquired the Reorganized SMI Topco Interests from an "affiliate" within one year of such transfer, and (d) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code.  To the extent issuance under section 1145 of the Bankruptcy Code is unavailable, such Reorganized SMI Topco Interests (including on account of the MIP) will be issued without registration under the Securities Act in reliance on section 4(a)(2) of the Securities Act and shall be deemed "restricted securities" that may not be offered, sold, exchanged, assigned, or otherwise transferred unless they are registered under the Securities Act, or an exemption from registration under the Securities Act is available, and in compliance with any applicable state or foreign securities laws.

None of the Debtors, the Reorganized Debtors, or any other person shall be required to provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the Reorganized SMI Topco Interests.

Notwithstanding anything to the contrary in the Plan or the Disclosure Statement, no Entity shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by this Plan, including whether the Reorganized SMI Topco Interests are exempt from registration.

D.    *Compliance with Tax Requirements*

The Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit in connection with the Plan, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  The distributing party may require a Holder of an Allowed Claim or Interest to complete and return an appropriate Internal Revenue Service Form W-8 or Internal Revenue Service Form W-9, as applicable to each such Holder, and any other applicable tax forms.

E.      *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to Article IV.F of the Plan, except to the extent otherwise provided in the Plan without need for further action by any Agent.

F.      *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim will be allocated first to the principal amount of such Allowed Claim (as determined for U.S. federal income tax purposes), with any excess allocated to unpaid interest that accrued on such Allowed Claim, if any.

G.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if any, if and when such Disputed Claim becomes an Allowed Claim.

H.      *Setoffs and Recoupment*

Except as otherwise provided in the Plan, the Plan Supplement, or the Confirmation Order, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may, but shall not be required to, set off against, or recoup from, any Claim against a Debtor of any nature whatsoever that the applicable Debtor, Reorganized Debtor, or Post-Sale Estate, as applicable, may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor, Reorganized Debtor, or Post-Sale Estate, as applicable, of any such Claim it may have against the Holder of such Allowed Claim.

In no event shall any Holder of an Allowed Claim be entitled to set off or recoup against any such Claim against any Claim, right, or Cause of Action of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, unless (1) the Debtors have consented, and (2) such Holder has Filed a motion with the Court requesting the authority to perform such setoff or recoupment on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim (if any) or otherwise that such Holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence prior to the Effective Date.

I.      *Claims Paid or Payable by Third Parties*

    1.      Claims Paid by Third Parties

The Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Reorganized Debtor, or Post-Sale Estate; *provided*, that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall provide twenty-one (21) days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Reorganized Debtors or the Post-Sale Estates, as applicable, annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the fourteen (14) day grace period specified above until the amount is repaid.

    2.      Claims Payable by Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Court; *provided*, that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall provide twenty-one (21) days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Court.

    3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Disputed Claims Process*

There is no requirement to file a Proof of Claim (or move the Court for allowance) to have a Claim Allowed for the purposes of the Plan, except as provided in Article V.B.  On and after the Effective Date, except as otherwise provided in this Plan, all Allowed Claims shall be satisfied in the ordinary course of business of the applicable Reorganized Debtors or the Post-Sale Estates, as applicable.  The Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall have the exclusive authority to (1) determine, without the need for notice to or action, order, or approval of the Court, that a claim subject to any Proof of Claim that is Filed is Allowed and (2) File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan.  If the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, dispute any Claim, such dispute shall be determined, resolved, or adjudicated, as the case may be, in the same manner as if the Chapter 11 Cases had not been commenced and shall survive the Effective Date as if the Chapter 11 Cases had not been commenced; *provided*, that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may elect, at their sole option, to object to any Claim (other than Claims expressly Allowed by the Plan) and to have the validity or amount of any Claim adjudicated by the Court; *provided, further*, that Holders of Claims may elect to resolve the validity or amount of any Claim in the Court.  If a Holder makes such an election, the Court shall apply the law that would have governed the dispute if the Chapter 11 Cases had not been filed.  For the avoidance of doubt, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall retain all rights, claims, defenses, counterclaims, crossclaims, or rights of setoff or recoupment with respect to any Claims, including General Unsecured Claims and Trade Claims, that are Reinstated or otherwise Unimpaired pursuant to the Plan in the ordinary course of business after the Effective Date.  Notwithstanding any other provision of this Plan, the fact that a Claim, including a General Unsecured Claim or a Trade Claim, is Unimpaired under this Plan shall in no way effect whether such Claim is Allowed.  All Proofs of Claim Filed in the Chapter 11 Cases shall be considered objected to and Disputed without further action by the Debtors.  **Except as otherwise provided herein, all Proofs of Claim Filed after the Effective Date shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, or any further notice to or action, order, or approval of the Court.**

B.      *Allowance of Claims*

On or after the Effective Date, each of the Reorganized Debtors or the Post-Sale Estates, as applicable, shall have and retain any and all rights and defenses its predecessor Debtor had with respect to any Claim immediately prior to the Effective Date.  The Debtors may affirmatively determine to deem Unimpaired Claims Allowed to the same extent such Claims would be allowed under applicable non-bankruptcy law.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no

Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim. All settlements of Claims approved prior to the Effective Date pursuant to a Final Order of the Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

C.    *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, by order of the Court, shall together have the sole authority to: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Court. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim or Trade Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim or Trade Claim are preserved as if the Chapter 11 Cases had not been commenced.

D.    *Estimation of Claims*

Before or after the Effective Date, the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may (but are not required to) at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Court has ruled on any such objection, and the Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection. In the event that the Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Court.

E.    *Adjustment to Claims Without Objection*

Any duplicate Claim or any Claim that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register without the Reorganized Debtors or the Plan Administrator, as applicable, having to File an application,

motion, complaint, objection, or any other legal proceeding seeking to object to such Claim and without any further notice to or action, order, or approval of the Court.

F.      *No Distributions Pending Allowance*

No payment or distribution provided under the Plan shall be made to the extent that any Claim is a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

G.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim plus interest, if applicable.

# ARTICLE VIII.
# SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies, pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Court's approval, as of the Effective Date, of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and are fair, equitable, and reasonable.  In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Court, after the Effective Date, the Reorganized Debtors or the Plan Administrator, as applicable, may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.      *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in any contract, instrument, or other agreement or document created pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever (including any interest accrued from and after the Petition Date) against or in, liabilities

of, Liens on, obligations of, or rights against, the Debtors or any of their respective assets or properties, whether known or unknown, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account thereof, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims, Interests, and Causes of Action subject to the Effective Date occurring.

C.      *Term of Injunctions or Stays*

Unless otherwise provided herein or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

D.      *Release of Liens*

**Except with respect to the Liens securing the Exit Term Loan Facilities or as otherwise specifically provided in the Plan, the Exit Term Loan Facilities Documents (including in connection with any express written amendment of any mortgage, deed of trust, Lien, pledge, or other security interest under the Exit Term Loan Facilities Documents), or in any other contract, instrument, agreement or document created pursuant to the Plan or Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors or the Post-Sale Estates, as applicable, and their successors and assigns, in each case, without any further approval or order of the Court and without any action or Filing being required from the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable.**

**To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Reorganized Debtors, the Plan Administrator, as applicable, or the Exit Term Loan Facilities Agent that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests, including the making of any applicable filings or recordings, and the**

Reorganized Debtors or the Plan Administrator, as applicable, shall be entitled to make any such filings or recordings on such Holder's behalf. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such mortgages, deeds of trust, Liens, pledges, and other security interests.

E.      *Releases by the Debtors*

Pursuant to section 1123(b) of the Bankruptcy Code, on and after the Effective Date, in exchange for good and valuable consideration, including the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Released Party will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their respective Estates or Post-Sale Estates, as applicable, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their respective Estates, Post-Sale Estates, or Affiliates, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership, or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Definitive Documents, the Plan, or any Restructuring (including any transaction in connection therewith), contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the Debtors' Restructuring efforts (including those contemplated by the Restructuring Support Agreement) the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or

the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, any Restructuring transaction, any assumed Executory Contract or Unexpired Lease, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors and their respective Estates set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their respective Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, their Estates, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, asserting any Claim or Cause of Action released pursuant to such releases.

F.      *Releases by Holders of Claims and Interests*

As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, whether known or unknown, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Definitive Documents, the Plan, or any Restructuring (including any transaction in connection therewith), contract,

instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the Debtors' Restructuring efforts (including those contemplated by the Restructuring Support Agreement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, any Restructuring transaction, any assumed contract, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Obligations as set forth in the Plan.

Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.

G.    *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is released and exculpated from, any Cause of Action related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Restructuring Support Agreement and related prepetition transactions, the Disclosure Statement, the Plan, any other Definitive Document or any Restructuring, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the

**advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan.**

**The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

H.  *Injunction*

**Except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released pursuant to Article VIII.E or Article VIII.F, discharged pursuant to Article VIII.B, or are subject to exculpation pursuant to Article VIII.G, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Post-Sale Estates, the Exculpated Parties, or the Released Parties and their respective assets and property: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action released or settled pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.**

**Subject in all respects to Article XI, no Entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, the Chapter 11 Cases, the Debtors (including the governance, management, ownership, or operation thereof), the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Exit Term Loan Facilities, the Reorganized SMI Topco Interests, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the Plan, the Disclosure Statement, the Chapter 11 Cases, the Reorganized SMI Topco Interests, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, the execution of the Exit Term Loan Facilities, the issuance of the Reorganized SMI Topco Interests, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing without the Court: (a) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim or Cause of Action of any kind, including negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Released Party or Exculpated Party and (b) specifically authorizing such entity or person to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.**

I.   *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Reorganized Debtors or the Post-Sale Estates, as applicable, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, the Post-Sale Estates, as applicable, or another Entity with whom the Reorganized Debtors or the Post-Sale Estates, as applicable, have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.   *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

*K.*     *Reimbursement or Contribution*

If the Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date such Claim has been adjudicated as non-contingent.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

*A.*     *Conditions Precedent to Confirmation*

1.     The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan.

2.     The Restructuring Support Agreement shall not have been terminated as to all parties thereto and shall remain in full force and effect.

3.     The Plan shall not have been amended, altered, or modified from the Plan as of the commencement of solicitation unless such amendment, alteration, or modification has been made in accordance with Article X of the Plan and the Restructuring Support Agreement.

*B.*     *Conditions Precedent to the Effective Date*

It shall be a condition to the occurrence of the Effective Date that each condition listed below shall have been satisfied (or waived pursuant to the provisions of Article IX.C hereof):

1.     the Court shall have entered the Confirmation Order, which shall be in form and substance consistent in all material respects with the Restructuring Support Agreement;

2.     the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date;

3.     if the Equitization Transaction occurs, the New Governance Documents shall be in full force and effect, in form and substance consistent in all respects with the Restructuring Support Agreement;

4.     if the Equitization Transaction occurs, the Debtors shall not be in default under the DIP Facility or any DIP Order;

5.     if the Equitization Transaction occurs, the final DIP Order shall remain in full force and effect;

6.      the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all waiting periods imposed by any governmental entity shall have terminated or expired;

7.      the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Restructuring Support Agreement and the Plan;

8.      the Restructuring Support Agreement shall not have been terminated as to all parties thereto and shall remain in full force and effect;

9.      the applicable Definitive Documents shall be in full force and effect and in form and substance consistent in all respects with the Restructuring Support Agreement;

10.      if a Sale Transaction occurs, the Sale Agreement and the Plan Administrator Agreement shall be in full force and effect and in form and substance consistent in all respects with the Restructuring Support Agreement;

11.      all Professional Fee Claims that require the approval of the Court shall have been paid in full, or amounts sufficient to pay such fees and expenses after the Effective Date shall have been placed in the Professional Fee Escrow Account pending the approval of such fees and expenses by the Court;

12.      all fees and expenses of the Consenting Creditor Representatives shall have been paid in accordance with the Restructuring Support Agreement, the Final DIP Order, the Plan, or otherwise;

13.      the Debtors shall have implemented the Restructuring and all transactions contemplated in the Restructuring Term Sheet in a manner consistent with the Restructuring Support Agreement and the Plan; and

14.      no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Restructuring, the Restructuring Support Agreement, or any of the Definitive Documents contemplated thereby.

C.      *Waiver of Conditions*

The conditions precedent to Confirmation of the Plan and to the Effective Date of the Plan set forth in this Article IX may be waived by the Debtors with the prior written consent of the Required First Lien Lender Group (not to be withheld unreasonably) without notice, leave, or order of the Court or any formal action other than proceedings to confirm or consummate the Plan.

D.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

*E.     Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Confirmation Date and/or the Effective Date do(es) not occur, the Plan shall be null and void in all respects and nothing contained in the Plan, the Disclosure Statement, the Confirmation Order, or the Restructuring Support Agreement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments or claims.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

*A.     Modification and Amendments*

Subject to the limitations contained herein, and only in accordance with the terms of the Restructuring Support Agreement, the Debtors reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the restrictions on modifications set forth in the Plan, and the terms of the Restructuring Support Agreement, the Debtors expressly reserve their rights, subject to and in accordance with the terms of the Restructuring Support Agreement, to alter, amend, or modify the Plan, one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

*B.     Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

*C.     Revocation or Withdrawal of the Plan*

The Debtors reserve the right, subject to and in accordance with the terms of the Restructuring Support Agreement, to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any

Claims or Interests; (b) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims or Interests; (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (d) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections relating to any of the foregoing;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.      resolve any matters related to:  (a) the assumption, assignment, or rejection of any Executory Contract or Unexpired Lease and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, any Cure Claims, or any other matter related to such Executory Contract or Unexpired Lease; (b) the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, amending, modifying, or supplementing, pursuant to Article V hereof, the Schedule of Rejected Executory Contracts and Unexpired Leases; and (c) any dispute regarding whether a contract or lease is or was executory or unexpired;

4.      ensure that distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

6.      adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.    adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

8.    adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

9.    enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and the Restructuring Support Agreement, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Restructuring Support Agreement;

10.    resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan or the Restructuring Support Agreement;

11.    issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, discharges, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.    resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.I.1 hereof;

14.    enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.    determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement, any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Restructuring Support Agreement;

16.    adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein, including any Restructuring;

17.    hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

18.    consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Court order, including the Confirmation Order;

19.    determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

20. hear and determine matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine matters concerning section 1145 of the Bankruptcy Code;

22. hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23. enforce all orders previously entered by the Court;

24. hear any other matter not inconsistent with the Bankruptcy Code;

25. enter an order concluding or closing the Chapter 11 Cases; and

26. enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof.

As of the Effective Date, notwithstanding anything in this Article XI to the contrary, the New Governance Documents, the Exit Term Loan Facilities, and any documents related thereto shall be governed by the jurisdictional provisions therein and the Court shall not retain jurisdiction with respect thereto.

# ARTICLE XII.
## MISCELLANEOUS PROVISIONS

### A. *Immediate Binding Effect*

Subject to Article IX.A hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases.  All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

### B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and the Restructuring Support Agreement.  The Debtors and all Holders of Claims receiving distributions pursuant to the Plan and all other parties in interest shall, from

time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect unless the Effective Date occurs.  Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests.

D.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiary, or guardian, if any, of each Entity.

E.      *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or Reorganized Debtors shall be served on:

| | |
|---|---|
| **Debtors or the Reorganized Debtors** | **Strategic Materials, Inc.** 17220 Katy Freeway, Suite 150 Houston, Texas, 77094 Attention:  Sherry Williams |
| **Attorneys for the Debtors** | **Wachtell, Lipton, Rosen & Katz** 51 West 52nd Street New York, NY 10019 Attention:  Joshua A. Feltman and Benjamin S. Arfa Email:  jafeltman@wlrk.com          bsarfa@wlrk.com |
| | - and - |
| | **Vinson & Elkins LLP** 845 Texas Avenue, Suite 4700 Houston, TX 77002 Attention:  Paul E. Heath and Matthew D. Struble Email:  pheath@velaw.com          mstruble@velaw.com |
| | - and - |

*Solicitation Version*

<div align="right">

**Vinson & Elkins LLP**
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Attention:  David S. Meyer and Jessica C. Peet
Email:  dmeyer@velaw.com
          jpeet@velaw.com

</div>

**Attorneys for the First Lien Lender Group**          **Arnold & Porter Kaye Scholer LLP**
70 West Madison Street, Suite 4200
Chicago, IL 60602
Attention: Michael D. Messersmith and Sarah Gryll
Email:  michael.messersmith@arnoldporter.com
          sarah.gryll@arnoldporter.com

## F.     Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## G.     Entire Agreement

Except as otherwise indicated, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

## H.     Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://cases.ra.kroll.com/SMI or the Court's website at www.deb.uscourts.gov.  To the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the Plan Supplement exhibit or document shall control (unless stated otherwise in such Plan Supplement document or exhibit or in the Confirmation Order).

## I.     Nonseverability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Court to be invalid, void, or unenforceable, the Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it

<div align="center">67</div>

may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent, in consultation with the Required First Lien Lender Group; and (3) nonseverable and mutually dependent.

### J.    *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Reorganized Debtors or the Post-Sale Estates, as applicable, will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

### K.    *Request for Expedited Determination of Taxes*

The Debtors, the Reorganized Debtors, or the Post-Sale Estates, as the case may be, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### L.    *Statutory Committee and Cessation of Fee and Expense Payment.*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases. The Reorganized Debtors or the Post-Sale Estates, as applicable, shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to any statutory committees after the Effective Date.

### M.    *Closing of Chapter 11 Cases*

The Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall, promptly after the full administration of the Chapter 11 Cases, File with the Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Court to close the Chapter 11 Cases.

### N.    *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

O.      *Waiver or Estoppel*

Except with respect to the Restructuring Support Agreement and the parties thereto, each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors', the Reorganized Debtors', or the Post-Sale Estates', as applicable, right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Court or the Noticing and Claims Agent prior to the Confirmation Date.

* * * *

Respectfully submitted, as of the date first set forth below,

Dated:      November 15, 2023
            Houston, Texas

**STRATEGIC MATERIALS, INC.**
on behalf of itself and all other Debtors other than
the Topco Entities

/s/
Christopher Dods
President and Chief Executive Officer

**SMI TOPCO HOLDINGS, INC.**
on behalf of itself and the other Topco Entities

/s/
Brian Michaud
Authorized Signatory

[*Signature Page for Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*]

DocuSign Envelope ID: 63B0638D-5791-4C24-93F5-988885A39E3B

Respectfully submitted, as of the date first set forth below,

Dated:        November 15, 2023
              Houston, Texas

**STRATEGIC MATERIALS, INC.**
on behalf of itself and all other Debtors other than
the Topco Entities


/s/ _____
Christopher Dods
President and Chief Executive Officer



**SMI TOPCO HOLDINGS, INC.**
on behalf of itself and the other Topco Entities


/s/ _____
Brian Michaud
Authorized Signatory

[*Signature Page for Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*]

*Solicitation Version*

## __EXHIBIT B__

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT AND THE DOCUMENTS ATTACHED HERETO COLLECTIVELY DESCRIBE A PROPOSED RESTRUCTURING OF THE COMPANY PARTIES THAT, IF A QUALIFYING SALE TRANSACTION IS NOT CONSUMMATED, WILL BE EFFECTUATED THROUGH PREPACKAGED CHAPTER 11 CASES IN THE BANKRUPTCY COURT ON THE TERMS DESCRIBED HEREIN.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 OR 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE U.S. SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS THE PRODUCT OF SETTLEMENT DISCUSSIONS AMONG THE PARTIES HERETO. ACCORDINGLY, THIS RESTRUCTURING SUPPORT AGREEMENT IS PROTECTED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER APPLICABLE STATUTES OR DOCTRINES PROTECTING THE USE OR DISCLOSURE OF CONFIDENTIAL SETTLEMENT DISCUSSIONS.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE RESTRUCTURING TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTS.**

### RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto, in accordance with Section 16.02 and as may be amended, modified or supplemented from time to time in accordance with Section 14, this "***Agreement***") is made and entered into as of September 15, 2023 (the "***Execution Date***"), by and among the following parties, each in the capacity set forth on its signature page to this Agreement (each of the following

described in sub-clauses (i) through (vi) of this preamble, collectively, the "***Parties***" and each a "***Party***"):[1]

    i.    SMI Group Acquisitions, Inc., a corporation incorporated under the Laws of Delaware ("***Holdings***") and each of its respective direct and indirect subsidiaries listed on <u>Schedule A</u> hereto (the entities in this clause (i), collectively, the "***Company Parties***" and each a "***Company Party***");

    ii.    the undersigned holders of, or nominees, investment advisors, sub-advisors or managers of funds or accounts that hold Superpriority Credit Facility Claims that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties, the Consenting Creditor Representatives, and counsel to the Consenting Sponsor (the entities in this clause (ii), collectively, the "***Consenting Superpriority Creditors***");

    iii.    the undersigned holders of, or nominees, investment advisors, sub-advisors or managers of funds or accounts that hold First Lien Credit Facility Claims that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties, the Consenting Creditor Representatives, and counsel to the Consenting Sponsor (the entities in this clause (iii), collectively, the "***Consenting First Lien Creditors***");

    iv.    the undersigned holders of, or nominees, investment advisors, sub-advisors or managers of funds or accounts that hold 1.5L Credit Facility Claims that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties, the Consenting Creditor Representatives, and counsel to the Consenting Sponsor (the entities in this clause (iv), collectively, the "***Consenting 1.5 Lien Creditors***");

    v.    the undersigned holders of, or nominees, investment advisors, sub-advisors or managers of funds or accounts that hold Second Lien Credit Facility Claims that have executed and delivered counterpart signature pages to this Agreement to counsel to the Company Parties, the Consenting Creditor Representatives, and counsel to the Consenting Sponsor (the entities in this clause (v), collectively, the "***Consenting Second Lien Creditors***" and together with the Consenting Superpriority Creditors, Consenting First Lien Creditors and Consenting 1.5 Lien Creditors, the "***Consenting Creditors***" and each a "***Consenting Creditor***"); and

    vi.    the undersigned holders of, or nominees, investment advisors, sub-advisors or managers of funds or accounts that hold, directly or indirectly, Equity Interests in Holdings that have executed and delivered counterparty signature pages to this Agreement to counsel to the Company Parties and to counsel to the Consenting Creditors (the entities in this clause (vi), collectively the "***Consenting Sponsor***"

---

[1]   Capitalized terms used but not defined in the preamble and recitals to this Agreement have the meanings ascribed to them in Section 1.

and together with the Consenting Creditors, the "**Consenting Parties**" and each a "**Consenting Party**").

<div align="center">

*RECITALS*

</div>

**WHEREAS**, the Company Parties and the Consenting Parties have in good faith and at arms' length negotiated or been apprised of certain procedures for the marketing and potential sale of the Company Parties and/or their respective assets and property;

**WHEREAS**, the Company Parties and the Consenting Parties have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties and their capital structure on the terms set forth in this Agreement and as specified in the term sheet attached as **Exhibit A** hereto (as such term sheet may be amended, modified or supplemented in accordance with Section 14, the "**Restructuring Term Sheet**" and, such transactions as described in this Agreement and the Restructuring Term Sheet, including the Sale Process, a Qualifying Sale Transaction, an In-Court Restructuring and a 363 Sale Proceeding, as applicable, the "**Restructuring Transactions**");

**WHEREAS**, the Restructuring Transactions set forth in the Restructuring Term Sheet contemplate a restructuring through either (i) a Qualifying Sale Transaction of all or a portion of the Company's business enterprise; or (ii) if a Qualifying Sale Transaction is not consummated or any Restructuring Trigger occurs, a prepackaged plan of reorganization of the Company on the terms and conditions set forth in the Restructuring Term Sheet (the "**In-Court Restructuring**") implemented through cases (the "**Chapter 11 Cases**") commenced under the Bankruptcy Code in the Bankruptcy Court; and

**WHEREAS**, the Parties have agreed to take certain actions in support of the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

<div align="center">

*AGREEMENT*

</div>

**Section 1.**      *Definitions and Interpretation.*

1.01.   <u>Definitions</u>.  The following terms shall have the following definitions:

"*1.5 Lien Credit Agreement*" has the meaning specified in the definition of Prepetition Credit Agreements.

"*1.5L Credit Facility Claims*" means any Claim arising under, derived from, secured by, based on, or related to the 1.5L Credit Facility or any other agreement, instrument or document executed at any time in connection therewith and any guaranty thereof.

<div align="center">3</div>

"**1.5L Credit Facility**" means the credit facility under the 1.5 Lien Credit Agreement.

"**363 Sale Proceeding**" has the meaning set forth in the Restructuring Term Sheet.

"**Affiliate**" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"**Agent**" means any administrative agent or collateral agent under the Superpriority Credit Facility, the First Lien Credit Facility, the 1.5L Credit Facility or the Second Lien Credit Facility, including any successors thereto.

"**Agents**" means, collectively, all of the Agents.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Agreement Effective Date**" means the date on which the conditions set forth in Section 2 have been satisfied or waived by the appropriate Party or Parties in accordance with this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date to the Termination Date applicable to that Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, or term sheet, or discussion with respect to a new money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, sale, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions identified in the Restructuring Term Sheet.

"**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Causes of Action**" means any action, Claim, cross-claim, cause of action, third-party claim, controversy, demand, right, Lien, indemnity, Equity Interest, guaranty, sum of money, trespass, suit, obligation, liability, damage, judgment, cost, expense, account, defense, offset, reckoning, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law, and whether representing a past, present, or future obligation that a party ever had, now has, or hereafter

can, shall, or may have.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Equity Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar avoidance claim.

"*Chapter 11 Cases*" has the meaning set forth in the recitals to this Agreement.

"*Claim*" means (i) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured and calculated together with all applicable accrued interest, fees and commission due, owing or incurred from time to time by any Company Party or an applicable obligor or security provider or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured. For the avoidance of doubt, the definition of claim as defined in this Agreement is no less broad than the definition of claim as defined in section 101(5) of the Bankruptcy Code.

"*Company Claims/Interests*" means, collectively, all Claims against, and Equity Interests in, a Company Party, including the Superpriority Credit Facility Claims, First Lien Credit Facility Claims, 1.5L Credit Facility Claims and Second Lien Credit Facility Claims.

"*Company Parties*" has the meaning set forth in the preamble to this Agreement.

"*Company Releasing Parties*" means each of the Company Parties and, to the maximum extent permitted by Law, each of the Company Parties on behalf of its Related Parties.

"*Company Representatives*" means Wachtell, Lipton, Rosen & Katz, Vinson & Elkins LLP, Alvarez & Marsal and Moelis & Company, as advisors to the Company.

"*Confidentiality Agreement*" means an executed confidentiality agreement between any Company Party and any Consenting Creditor, including with respect to the issuance of a "cleansing letter" or other agreement to publicly disclose material non-public information in connection with any proposed Restructuring Transaction.

"*Confirmation Order*" means an order by the Bankruptcy Court confirming the Plan.

"*Consenting Creditor Representatives*" means Arnold & Porter Kaye Scholer LLP and Ankura Consulting Group, LLC, as advisors to the Consenting Superpriority Creditors and the ad hoc group of lenders under the First Lien Credit Agreement.

"*Consenting Creditors*" has the meaning set forth in the preamble to this Agreement.

"*Consenting Parties*" has the meaning set forth in the preamble to this Agreement.

"*Consenting Party Releasing Parties*" means each of the Consenting Parties and, to the maximum extent permitted by Law, each of the Consenting Parties on behalf of its Related Parties.

"*Consenting Sponsor*" has the meaning set forth in the preamble to this Agreement.

"*Consenting Sponsor Representatives*" means legal counsel to the Consenting Sponsor, if any.

"*Corporate Governance Documents*" means the New Common Stock Documents and any documents providing for the corporate governance of the Reorganized Company Parties, including charters, bylaws, operating agreements, or other organizational documents or shareholders' agreements, as applicable, each of which shall be consistent with the Governance Term Sheet.

"*Chosen Court*" means the United States District Court for the Southern District of New York, or, to the extent such court lacks the requisite jurisdiction or is otherwise not permitted by law, the courts of the State of New York; provided, that if any of the Company Parties commence Chapter 11 Cases, then the Bankruptcy Court (or court of proper appellate jurisdiction) shall be the exclusive Chosen Court.

"*Debtors*" means the Company Parties that commence Chapter 11 Cases.

"*Definitive Documents*" means the documents set forth in Section 3.01.

"*DIP Documents*" means the DIP Credit Agreement, the other documentation in respect of the DIP Facility and all pleadings in support of approval thereof and all orders relating thereto (including any exhibits, schedules, amendments, modifications, or supplements thereto), including the DIP Order, each of which shall be consistent with the DIP Facility Term Sheet.

"*DIP Credit Agreement*" has the meaning assigned thereto in the DIP Facility Term Sheet.

"*DIP Facility*" means that certain superpriority debtor-in-possession financing facility in accordance with the terms and conditions set forth in the DIP Credit Agreement.

"*DIP Facility Term Sheet*" means the term sheet attached  as **Exhibit B** hereto, as such term sheet may be amended, modified or supplemented only in accordance with Section 14.

"*DIP Lenders*" means the lenders party to the DIP Credit Agreement with respect to the DIP Facility.

"*DIP Order*" means any order entered in the Chapter 11 Cases approving the DIP Facility (whether interim or final) consistent with the DIP Facility Term Sheet.

"*Disclosure Statement*" means a disclosure statement, including any exhibits, appendices, related documents, ballots, and procedures related to the solicitation of votes to accept or reject the Plan, in each case, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, and that is prepared and distributed in accordance with, among

6

other things, sections 1125, 1126(b), and 1145 of the Bankruptcy Code, Rule 3018 of the Federal Rules of Bankruptcy Procedure, and other applicable law.

"***Disclosure Statement Motion***" means the motion seeking, among other things, (i) approval of the Disclosure Statement, (ii) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, and (iii) to schedule the confirmation hearing.

"***Disclosure Statement Order***" means the order (and all exhibits thereto) entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials and the solicitation of votes on the Plan, which order may be the Confirmation Order.

"***Entity***" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"***Equity Interests***" means, collectively, the shares (or any class thereof), common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of each of the Company Parties, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of each of the Company Parties (in each case whether or not arising under or in connection with any employment agreement).

"***Execution Date***" has the meaning set forth in the preamble to this Agreement.

"***Exit Term Loan Facilities***" has the meaning set forth in the Exit Term Loan Facilities Term Sheet.

"***Exit Term Loan Facilities Documents***" means all documentation governing the Exit Term Loan Facilities, which will be consistent with the Exit Term Loan Facilities Term Sheet.

"***Exit Term Loan Facilities Term Sheet***" means the term sheet attached  as **Exhibit C** hereto, as such term sheet may be amended, modified or supplemented only in accordance with Section 14.

"***First Day Pleadings***" means the first-day and second-day pleadings that the Company Parties determine are necessary or desirable to file.

"***First Lien Credit Agreement***" has the meaning specified in the definition of Prepetition Credit Agreements.

"***First Lien Credit Facility***" means the credit facility under the First Lien Credit Agreement.

"***First Lien Credit Facility Claims***" means any Claim arising under, derived from, secured by, based on, or related to the First Lien Credit Facility or any other agreement, instrument or document executed at any time in connection therewith and any guaranty thereof.

7

"*First Lien Forbearance Agreement*" means the Forbearance Agreement, dated as of August 1, 2023, by and among the Company Parties party thereto and the Consenting First Lien Creditors party thereto.

"*Forbearance Period*" means the period from the Forbearance Agreement Effective Date (as defined in the First Lien Forbearance Agreement) to the Termination Date on which, after giving effect thereto, the remaining parties hereto do not satisfy the thresholds set forth in Section 2.01(b).

"*General Unsecured Claim*" means any unsecured Claim against any of the Debtors, other than: (i) an Administrative Claim (as described in the Restructuring Term Sheet); (ii) a Priority Tax Claim (as described in the Restructuring Term Sheet); (iii) an Other Priority Claim (as described in the Restructuring Term Sheet); (iv) a Claim arising under Section 510(b) of the Bankruptcy Code; (v) an Intercompany Claim (as described in the Restructuring Term Sheet); (vi) the Equity Interests; or (vii) an Intercompany Interest (as described in the Restructuring Term Sheet). For the avoidance of doubt, General Unsecured Claims do not include Trade Claims.

"*Governance Term Sheet*" means the term sheet to be included in the Plan Supplement, which term sheet shall be in form and substance reasonably satisfactory to the Required First Lien Lender  Group (as defined in the Restructuring Term Sheet) and the Company Parties and in any event include customary minority protections, including customary preemptive rights, governors over affiliate transactions and drag/tag and information rights.

"*Insolvency Proceeding*" means any corporate action, legal proceedings, or other procedure or step taken in any jurisdiction in relation to:

(a)     the suspension of payments, a moratorium of any indebtedness, winding-up, bankruptcy, liquidation, dissolution, administration, receivership, administrative receivership, judicial composition or reorganization (by way of voluntary arrangement, scheme or otherwise) of any of the Company Parties, including under the Bankruptcy Code;

(b)     a composition, conciliation, compromise or arrangement with the creditors generally of any of the Company Parties or an assignment by any of the Company Parties of its assets for the benefit of its creditors generally or any of the Company Parties becoming subject to a distribution of its assets;

(c)     the appointment of a liquidator, receiver, administrator, administrative receiver, compulsory manager or other similar officer in respect of any of the Company Parties or any of its assets;

(d)     enforcement of any security over any assets of any of the Company Parties; or

(e)     any procedure or step in any jurisdiction analogous to those set out in paragraphs (a) to (d) above.

"*Junior Lien Forbearance*" shall have the meaning set forth in Section 15.02.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, or regulation, in each case, that is validly adopted, promulgated, or issued by a governmental authority of competent jurisdiction.

"**Lien**" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

"**New Common Stock**" has the meaning set forth in the Restructuring Term Sheet.

"**New Common Stock Documents**" means the documentation governing the New Common Stock and the issuance thereof.

"**New Organizational Documents**" means the form of the certificates or articles of incorporation, bylaws, shareholders' agreement or such other applicable formation documents, of each of the Reorganized Company Parties.

"**Outside Date**" means the date that is 60 days from the Petition Date.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Transferee**" means each transferee who meets the requirements of Section 8.01.

"**Petition Date**" means the first date any of the Company Parties commences a Chapter 11 Case.

"**Plan**" means a prepackaged chapter 11 plan of reorganization for the Company Parties through which the In-Court Restructuring will be effectuated, which plan shall be consistent with the Restructuring Term Sheet and the other applicable provisions of this Agreement.

"**Plan Supplement**" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Company Parties with the Bankruptcy Court.

"**Prepetition Credit Agreements**" refers, collectively, to each of the following agreements, as each may have been or may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof:

(a)     that certain Superpriority Secured Credit Agreement, dated as of the date hereof, among Strategic Materials Holding Corp., as Borrower, SMI Group Acquisitions, Inc., as Holdings, the lenders from time to time party thereto, and Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (the "**Superpriority Credit Agreement**");

(b)     that certain First Lien Credit Agreement, dated as of November 1, 2017, among SMI Acquisition, Inc., as Initial Borrower, Strategic Materials Holding Corp., as Successor Borrower, SMI Group Acquisitions, Inc., as Holdings, the lenders from time to time party thereto, and Goldman Sachs Bank USA, as administrative agent (the "**First Lien Credit Agreement**");

(c)     that certain 1.5 Lien Credit Agreement, dated as of September 22, 2022, among Strategic Materials Holding Corp., as Borrower, SMI Group Acquisitions, Inc., as Holdings, the lenders from time to time party thereto, and Alter Domus (US) LLC, as administrative agent (the "*1.5 Lien Credit Agreement*"); and

(d)     that certain Second Lien Credit Agreement, dated as of November 1, 2017, among SMI Acquisition, Inc., as Initial Borrower, Strategic Materials Holding Corp., as Successor Borrower, SMI Group Acquisitions, Inc., as Holdings, the lenders from time to time party thereto, and Goldman Sachs Bank USA, as administrative agent (the "*Second Lien Credit Agreement*").

"*Qualified Marketmaker*" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"*Qualifying Sale Transaction*" has the meaning set forth in the Restructuring Term Sheet.

"*Related Parties*" means, with respect to any Entity, such Entity's predecessors, successors, assigns, and present and former Affiliates (whether by operation of law or otherwise) and subsidiaries (excluding Excluded Subsidiaries (as defined in the Superpriority Credit Agreement)), and each of their respective managed accounts or funds or investment vehicles, and each of their respective current and former direct and indirect equity holders, officers, directors, managers principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case acting in such capacity.

"*Release*" means the releases given by the Releasing Parties to the Released Parties under Section 13 of this Agreement.

"*Released Claim*" means, with respect to any Releasing Party, any Claim, Cause of Action, or any other debt, obligation, right, suit, damage, judgment, action, remedy, or liability which is released by such Releasing Party under Section 13 of this Agreement.

"*Released Party*" means, collectively, (a) each of the Company Parties; (b) each of the Consenting Parties; (c) each Agent; (d) each current and former Affiliate of each Entity in clauses (a) through this clause (d); and (e) each Related Party of each Entity in clause (a) through this clause (e) with respect to the Release under Section 13 of this Agreement.

"*Releasing Party*" means,  with respect to the Release under Section 13 of this Agreement, collectively, (a) each of the Company Releasing Parties; (b) each Consenting Party Releasing Party; (c) each of the Agents; (d) [reserved]; (e) each current and former Affiliate of each Entity in clauses (a) through clause (d); and (f) each Related Party of each of Entity in clause (a) through clause (e).  For the avoidance of doubt, each of the Releasing Parties hereby grants the Release in all of its capacities, including with respect to the Consenting Parties, in their capacity as holders

of each Company Claim/Interest that they hold, and with respect to the Company Releasing Parties, including on behalf of each of their Affiliates, in each case, in accordance with the terms and conditions set forth in this Agreement.

"**_Reorganized Company_**" means Holdings, or any successors or assigns thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Restructuring Effective Date.

"**_Reorganized Company Parties_**" means the Company Parties, or any successors or assigns thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Restructuring Effective Date.

"**_Required Consenting 1.5 Lien Creditors_**" means as of the relevant date, holders of 1.5L Credit Facility Claims equal to at least 50.01% of the aggregate outstanding 1.5L Credit Facility Claims that are held by the Consenting Creditors at such time.

"**_Required Consenting First Lien Creditors_**" means as of the relevant date, holders of First Lien Credit Facility Claims equal to at least 50.01% of the aggregate outstanding First Lien Credit Facility Claims that are held by the Consenting Creditors at such time.

"**_Required Consenting Second Lien Creditors_**" means as of the relevant date, holders of Second Lien Credit Facility Claims equal to at least 50.01% of the aggregate outstanding Second Lien Credit Facility Claims that are held by the Consenting Creditors at such time.

"**_Required Consenting Superpriority Creditors_**" means as of the relevant date, holders of Superpriority Credit Facility Claims equal to at least 50.01% of the aggregate outstanding Superpriority Credit Facility Claims that are held by the Consenting Creditors at such time.

"**_Restructuring Effective Date_**" means the date on which the Plan becomes effective in accordance with its terms.

"**_Restructuring Expenses_**" means the reasonable and documented fees and expenses of the Consenting Creditor Representatives and the Consenting Sponsor Representatives and Company Representatives accrued since the inception of their respective engagements related to the Company Parties or the Restructuring Transactions and not previously paid by, or on behalf of, the Company Parties, including, without limitation, any success fees contemplated in any applicable engagement letters.

"**_Restructuring Milestones_**" has the meaning set forth in the Restructuring Term Sheet.

"**_Restructuring Term Sheet_**" has the meaning set forth in the recitals to this Agreement.

"**_Restructuring Transactions_**" has the meaning set forth in the recitals to this Agreement.

"**_Restructuring Trigger_**" has the meaning set forth in the Restructuring Term Sheet.

"***Rules***" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"***Sale Process***" has the meaning set forth in the Restructuring Term Sheet.

"***Sale Process Milestones***" has the meaning set forth in the Restructuring Term Sheet.

"***Second Lien Credit Agreement***" has the meaning specified in the definition of Prepetition Credit Agreements.

"***Second Lien Credit Facility***" mean the credit facility under the Second Lien Credit Agreement.

"***Second Lien Credit Facility Claims***" means any Claim arising under, derived from, secured by, based on, or related to the Second Lien Credit Facility or any other agreement, instrument or document executed at any time in connection therewith and any guaranty thereof.

"***Securities Act***" means the Securities Act of 1933, as amended.

"***Solicitation Materials***" means all solicitation materials in respect of the Plan.

"***Specified Defaults***" has the meaning set forth in Section 15.02.

"***Specified Mexico Forbearance Period***" means the period commencing on the date the Chapter 11 Cases are consummated in connection with the In-Court Restructuring or the 363 Sale Proceeding, in accordance with the Restructuring Term Sheet, and ending on the date on which an "Event of Default" (as defined in the DIP Facility) occurs.

"***Superpriority Credit Agreement***" has the meaning specified in the definition of Prepetition Credit Agreements.

"***Superpriority Credit Facility***" means the credit facility under the Superpriority Credit Agreement.

"***Superpriority Credit Facility Claims***" means any Claim arising under, derived from, secured by, based on, or related to the Superpriority Credit Facility or any other agreement, instrument or document executed at any time in connection therewith and any guaranty thereof.

"***Termination Date***" means the date on which termination of this Agreement as to a Party is effective in accordance with Sections 12.01, 12.02, 12.03, or 12.04.

"***Trade Claim***" means any Claim for the provision of goods and services to the Debtors held by a trade creditor, service provider, or other vendor or such Entity's successor in interest (through sale of such Claim or otherwise).

"***Transfer***" means to (i) sell, resell, contract to sell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, give, offer, sell any option or contract to purchase, grant a participation interest in, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions); <u>provided</u>,

however, that holding securities attesting ownership of Company Claims/Interests in an account with a broker-dealer where the broker-dealer holds a security interest or other encumbrance over property in the account generally, which security interest or other encumbrance is released upon transfer of such securities, shall not constitute a "Transfer" for purposes hereof and solely to the extent that the right to vote such loan interest remains with the Consenting Creditor and not the lender, or (ii) grant any proxies, deposit of any Claims against the Company Parties into a voting trust, or enter into a voting agreement with respect to any such Claims.

"***Transfer Agreement***" means an executed form of the transfer agreement providing, among other things, that a transferee is bound by the terms of this Agreement and substantially in the form attached hereto as **Exhibit D**.

1.02.   Interpretation.  For purposes of this Agreement:

(a)      in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)      capitalized terms defined only in the plural or singular form shall nonetheless have their defined meanings when used in the opposite form;

(c)      unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(d)      unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided, that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(e)      unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(f)      the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety, including all exhibits, annexes, and schedules attached hereto, subject to Section 16.02, rather than to any particular portion of this Agreement;

(g)      captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(h)      references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(i)       the use of "include" or "including" is without limitation, whether stated or not;

(j)       the phrase "counsel to the Consenting Creditors" refers in this Agreement to each counsel specified in Section 16.10 other than counsel to the Company Parties and counsel to the Consenting Sponsor; and

(k)       the phrase "counsel to the Consenting Sponsor" refers in this Agreement to each counsel specified in Section 16.10 other than counsel to the Company Parties and counsel to the Consenting Creditors.

**Section 2.**       ***Effectiveness of this Agreement.***

2.01.    This Agreement shall become effective and binding upon each of the Parties upon the occurrence of the Agreement Effective Date, which is the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement:

(a)       each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Consenting Parties;

(b)       Consenting Creditors holding (i) 100.00% of the aggregate principal amount of the Superpriority Credit Facility Claims; (ii) at least 66.67% of the aggregate principal amount of the First Lien Credit Facility Claims and one-half in number of the holders thereof; (iii) 100.00% of the aggregate principal amount of the 1.5L Credit Facility Claims; and (iv) at least 66.67% of the aggregate principal amount of Second Lien Credit Facility Claims and one-half in number of the holders thereof shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Company Parties and counsel to each of the Consenting Parties;

(c)       the Consenting Sponsor shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and counsel to the Consenting Creditors; and

(d)       counsel to the Company Parties shall have given notice to counsel to the Consenting Creditors and counsel to the Consenting Sponsor in the manner set forth in Section 16.10 hereof that the other conditions to the Agreement Effective Date set forth in this Section 2.01 have occurred.

**Section 3.**       ***Definitive Documents.***

3.01.    The Definitive Documents governing the Restructuring Transactions shall consist of: (i) this Agreement; (ii) the Restructuring Term Sheet; (iii) the Exit Term Loan Documents; (iv) the New Organizational Documents; (v) the Corporate Governance Documents; (vi) the Plan; (vii) the Confirmation Order; (viii) the Disclosure Statement; (ix) the Disclosure Statement Order and the other Solicitation Materials; (x) the First Day Pleadings and all orders sought and entered pursuant thereto; (xi) the DIP Documents; (xii) any other document necessary to implement or consummate the Restructuring Transactions; and (xiii) any other material agreements, motions, pleadings, briefs, applications, orders, and other filings with the Bankruptcy Court related to the Restructuring Transactions, if applicable.

3.02.    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date remain subject to negotiation and completion.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, including the Restructuring Term Sheet, as they may be modified, amended, or supplemented in accordance with Section 14. Further, the Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date shall otherwise be in form and substance reasonably acceptable to the Company Parties, the Required Consenting First Lien Creditors, and the Required Consenting Superpriority Creditors.

3.03.    The Required Consenting 1.5 Lien Creditors and the Required Consenting Second Lien Creditors shall have the right to consent to or approve any of the Definitive Documents (or any amendments, modifications or supplements to the Definitive Documents) and require that such documents be in form and substance acceptable to the Required Consenting 1.5 Lien Creditors and the Required Consenting Second Lien Creditors solely to the extent any Definitive Document adversely affects the express rights or obligations of the Consenting 1.5 Lien Creditors or the Consenting Second Lien Creditors in respect of the terms of the New Common Stock and the Consenting 1.5 Lien Creditors or the Consenting Second Lien Creditors receipt thereof.

**Section 4.**    *Commitments of the Consenting Parties.*

4.01.    <u>General Commitments</u>.

(a)    During the Agreement Effective Period, each Consenting Party (severally and not jointly) agrees in respect of all of its Company Claims/Interests to:

(i)    support the Restructuring Transactions and timely vote and exercise any powers or rights available to it (including in any board, shareholders', or creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in each case in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions, and not to change or withdraw such vote or exercise of any power or right;

(ii)    use commercially reasonable efforts to cooperate with and assist the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(iii)    exercise any and all necessary and appropriate rights, and execute and deliver any and all necessary and appropriate documentation, in furtherance of the Restructuring Transactions and the Definitive Documents, to the extent such actions are otherwise contemplated or required by this Agreement;

(iv)    negotiate in good faith and use commercially reasonable efforts to execute and implement the Definitive Documents that are consistent with this Agreement to which it is required to be a party;

(v)      use commercially reasonable efforts to oppose any party or Person from taking any actions contemplated in Section 4.01(b); and

(vi)      use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions giving due regard to the Sale Process Milestones and the Restructuring Milestones.

(b)      During the Agreement Effective Period, each Consenting Party (severally and not jointly) agrees in respect of all of its Company Claims/Interests that it shall not directly or indirectly:

(i)      object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions;

(ii)      either itself or through any representatives or agents, except with the prior consent of the Company Parties, (i) solicit, initiate, encourage (including by furnishing information), induce, negotiate, facilitate, continue, or respond to any Alternative Restructuring Proposal from or with any Entity; or (ii) propose, file, support, consent to, seek formal or informal credit committee approval of, or vote for any Alternative Restructuring Proposal (and shall immediately inform the Company Parties and the other Consenting Party of any notification of an Alternative Restructuring Proposal); and

(iii)      initiate, or have initiated on its behalf, any litigation or proceeding that is inconsistent with this Agreement against the Company Parties or the other Parties.

4.02.    <u>Commitments with Respect to Chapter 11 Cases</u>.

(a)      In addition to the affirmative and negative commitments set forth in Section 4.01, during the Agreement Effective Period, each Consenting Party agrees in respect of all of its Company Claims/Interests, severally, and not jointly, that it shall, subject to receipt by such Consenting Parties, whether before or after the commencement of the Chapter 11 Cases, of the Solicitation Materials and the commencement of the solicitation of the Plan:

(i)      vote each of its Company Claims/Interests that it is entitled to vote to accept the Plan by delivering its duly executed and completed ballot(s) accepting the Plan on a timely basis; and

(ii)      not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any vote referred to in clause 4.02(a)(i) above; <u>provided</u>, <u>however</u>, that nothing in this Agreement shall prevent any Party from changing, withholding, amending, or revoking (or causing the same) its timely consent or vote with respect to the Plan if this Agreement has been terminated with respect to such Party.

(b)      During the Agreement Effective Period, each Consenting Party, in respect of each of its Company Claims/Interests, will support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by a Company Party in the Bankruptcy Court that is consistent with this Agreement.

16

(c)     During the Agreement Effective Period, each Consenting Party agrees that it will not file, will oppose, and will not support any motion to appoint a trustee in one or more of the Chapter 11 Cases of any Company Party or appoint an examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code.

**Section 5.**     *Additional Provisions Regarding the Consenting Parties' Commitments.*

5.01.     Notwithstanding anything contained in this Agreement, and notwithstanding any delivery of a consent or vote to accept the Plan by any Consenting Party, or any acceptance of the Plan by any class of creditors, nothing in this Agreement shall:

(a)     be construed to prohibit any Consenting Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement;

(b)     be construed to prohibit any Consenting Party from appearing as a party in interest in any matter to be adjudicated in the Chapter 11 Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of delaying, interfering with, or impeding, and would not reasonably be expected to delay, interfere with or impede, directly or indirectly, the Restructuring Transactions;

(c)     except as set forth in this Agreement, including Section 4 and Section 15, and, if applicable, the stay under section 362 of the Bankruptcy Code, prevent any Consenting Creditor from exercising any right under the Prepetition Credit Agreements (consistent with such agreements and any applicable intercreditor agreements), nor shall anything contained in this Agreement be deemed to constitute a waiver or amendment of any provision of the Prepetition Credit Agreements, other than as expressly set forth herein;

(d)     except as set forth in this Agreement, including Section 4 and, if applicable, the stay imposed by section 362 of the Bankruptcy Code, prevent any Consenting Creditor from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, or priority of its Company Claims/Interests in accordance with the terms of the Prepetition Credit Agreements  (consistent with such agreements and any applicable intercreditor agreements) (including the filing of a proof of claim against any Debtor);

(e)     subject to the terms of Section 4.01(b)(ii), affect the ability of any Consenting Party to consult with any other Consenting Party, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee);

(f)     impair or waive the rights of any Consenting Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions;

(g)     prevent any Consenting Party from enforcing this Agreement;

(h)     obligate a Consenting Party to deliver a vote to support the Plan or prohibit a Consenting Party from withdrawing such vote, in each case after the occurrence of the Termination Date (other than as a result of the occurrence of the Restructuring Effective Date) with respect to such Consenting Party; <u>provided</u>, that upon the withdrawal of any such vote after the occurrence

17

of the Termination Date (other than as a result of the occurrence of the Restructuring Effective Date), such vote shall be deemed void *ab initio* and such Consenting Party shall have the opportunity to change its vote;

(i)      require any Consenting Party to take any action that is prohibited by applicable Law or to waive or forego the benefit of any applicable legal professional privilege;

(j)      prevent any Consenting Party from taking any action that is required by applicable Law;

(k)      prevent any Consenting Party by reason of this Agreement or the Restructuring Transactions from making, seeking, or receiving any regulatory filings, notifications, consents, determinations, authorizations, permits, approvals, licenses, or the like;

(l)      require any Consenting Party to incur any liability or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that would reasonably be expected to result in liabilities or other obligations to any Consenting Party other than as expressly described in this Agreement;

(m)      require any Consenting Party to make any equity, debt, or other financing available to any Company Party other than as contemplated in this Agreement;

(n)      require any Consenting Party to incur any material out-of-pocket costs or expenses (unless a Company Party has agreed to reimburse those costs and expenses on terms satisfactory to that Consenting Party);

(o)      prevent, limit, or otherwise impair any Consenting Creditor's ability to exercise any rights or remedies under the DIP Documents; and

(p)      prohibit any Consenting Party from taking any action that is not inconsistent with this Agreement.

**Section 6.**      *Commitments of the Company Parties.*

6.01.   <u>Affirmative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, the Company Parties agree to:

(a)      support and take all steps reasonably necessary and desirable to confirm the Plan and consummate the Restructuring Transactions in accordance with this Agreement giving due regard to the Sale Process Milestones and the Restructuring Milestones, including by complying with Section 4 and Section 5 to the extent they hold or otherwise control any Company Claims/Interests and by electing to seek and prosecute confirmation of the Plan over any non-accepting class;

(b)      to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated herein, use

commercially reasonable efforts to support and take all steps reasonably necessary and desirable to address any such impediment;

(c)      use commercially reasonable efforts to obtain any and all required regulatory and/or third-party approvals for the Restructuring Transactions giving due regard to the Sale Process Milestones and the Restructuring Milestones;

(d)      use commercially reasonable efforts to actively oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the timely filing of objections or written responses in a Chapter 11 Case) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(e)      negotiate in good faith and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(f)      use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent;

(g)      consult with the advisors to the Consenting Parties regarding the implementation of the In-Court Restructuring, including, if applicable, with respect to (i) the steps for the filing of the Chapter 11 Cases, (ii) the identity of the Debtors in any Chapter 11 Cases, and (iii) whether it is necessary or desirable for the Company to commence any ancillary proceedings;

(h)      upon reasonable request of the Consenting Parties, inform the advisors to the Consenting Parties as to:  (i) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Definitive Documents; and (ii) the status of obtaining any necessary or desirable authorizations (including any consents) from any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(i)      inform counsel to the Consenting Creditors and counsel to the Consenting Sponsor as soon as reasonably practicable after becoming aware of:  (i) any event or circumstance that has occurred, or that is reasonably likely to occur (and if it did so occur), that would permit any Party to terminate, or would result in the termination, of this Agreement; (ii) any matter or circumstance which they know, or expect is likely, to be a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) any notice of any commencement of any material involuntary Insolvency Proceedings, legal suit for payment of debt, or securement of security from or by any person in respect of any Company Party; (iv) a breach of this Agreement (including a breach by any Company Party); and (v) any representation or statement made or deemed to be made by them under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made;

(j)      pay and reimburse in full in cash in immediately available funds (i) on or within one (1) Business Day of the Agreement Effective Date, all Restructuring Expenses incurred prior

to (to the extent not previously paid) the Agreement Effective Date; (ii) on the Termination Date, all Restructuring Expenses incurred and outstanding in connection with the Restructuring Transactions (including any estimated fees and expenses reasonably estimated to be incurred through the Termination Date) (to the extent not previously paid); (iii) on or within ten (10) business days following receipt of an invoice therefor, all Restructuring Expenses incurred on or following the Agreement Effective Date and prior to the Termination Date or the Petition Date, as applicable (to the extent not previously paid); *provided,* that upon the closing of a Qualifying Sale Transaction all Restructuring Expenses incurred and outstanding shall be paid in full; and (iv) if the Chapter 11 Cases are commenced, after the Petition Date, all accrued and unpaid Restructuring Expenses incurred in connection with the implementation and consummation of the Plan on a regular and continuing basis promptly in accordance with any DIP Order, the Confirmation Order or any other applicable order of the Bankruptcy Court;

(k)     use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(l)     use commercially reasonable efforts to operate their business in the ordinary course, taking into account the Restructuring Transactions;

(m)     provide counsel to the Consenting Creditors and counsel to the Consenting Sponsor with (i) draft copies of the Definitive Documents as soon as reasonably practicable, but no later than two (2) Business Days before filing such Definitive Document with the Bankruptcy Court; and (ii) draft copies of any material motion, document, or other pleading prior to it being filed by the Company Parties with the Bankruptcy Court, other than the Definitive Documents, reasonably in advance of (and in any event no later than one (1) Business Day before) such motion, document, or other pleading is filed; and

(n)     provide counsel to the Consenting Creditors and Consenting Sponsor draft copies of any press releases or other public communications materials or public disclosure documents pertaining to the Restructuring Transactions reasonably in advance of (and in any event no later than two (2) days before) publication or dissemination thereof.

6.02.   <u>Negative Commitments</u>.  Except as set forth in Section 7, during the Agreement Effective Period, each of the Company Parties shall not directly or indirectly:

(a) (i) object to or otherwise commence any proceeding opposing any of the terms of this Agreement (including the Restructuring Term Sheet); or (ii) commence any proceeding or prosecute, join in, or otherwise support any action to oppose, object to, or delay entry of the Confirmation Order, if applicable;

(b) take any action, or encourage any other person or Entity to take any action, that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions described in, this Agreement (including the Restructuring Term Sheet) or the Plan, if applicable;

(c) modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement (including the Restructuring Term Sheet) in all material respects;

(d) file any motion, pleading, or Definitive Documents with the Bankruptcy Court, if applicable, or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement (including the Restructuring Term Sheet) or, if applicable, the Plan;

(e) initiate any proceeding that does not comply with this Agreement;

(f) engage in any transaction outside the ordinary course of its business without the prior consent of the Required Consenting First Lien Creditors, other than transactions contemplated by this Agreement; and

(g) except as otherwise contemplated by this Agreement (including the Restructuring Term Sheet), directly or indirectly, incur or suffer to exist any material indebtedness, except indebtedness existing and outstanding immediately prior to the date hereof, trade payables, liabilities arising in the ordinary course of business, and as otherwise contemplated by this Agreement, or grant any Liens or encumbrances in favor of any Entity, except as arising in the ordinary course of business, and as otherwise contemplated by this Agreement.

**Section 7.** *Additional Provisions Regarding Company Parties' Commitments.*

7.01.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party or the board of directors, board of managers, members, or any similar governing body of a Company Party, after consulting with counsel, to take any action or to refrain from taking any action with respect to the Restructuring Transactions to the extent taking or failing to take such action would be inconsistent with applicable Law or its fiduciary obligations under applicable Law, and any such action or inaction pursuant to such exercise of fiduciary duties shall not be deemed to constitute a breach of this Agreement.

7.02.   Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 7.01, each Company Party and their respective directors, officers, managers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (i) consider, respond to, and facilitate Alternative Restructuring Proposals; (ii) provide access to non-public information concerning any Company Party to any Entity or enter into confidentiality agreements or nondisclosure agreements with any Entity with respect to Alternative Restructuring Proposals; (iii) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; (iv) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternative Restructuring Proposals; and (v) enter into or continue discussions or negotiations with holders of Claims against or Equity Interests in a Company Party regarding Alternative Restructuring Proposals. The Company Parties shall provide notice of all Alternative Restructuring Proposals, with a copy of each written proposal or a summary of each oral proposal, to counsel to the Consenting Creditors and counsel to the Consenting Sponsor as soon as reasonably practicable and no later than two (2) Business Days from the receipt of such Alternative Restructuring Proposal; provided, that, to the extent any Company Party is prohibited from doing so due to a confidentiality restriction or condition upon which such proposal was submitted, such Company Party shall (x) promptly notify counsel to the Consenting Creditors and counsel to the Consenting Sponsor upon receipt of any confidential proposal of the existence of such confidential proposal and (y) use commercially

reasonable efforts to obtain relief from such restriction or condition as promptly as practicable in order to comply with its obligations under this Section 7.02.

7.03.   Nothing in this Agreement shall: (i) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (ii) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

7.04.   Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall be construed to in any way prevent, impede or limit the Consenting Sponsor or the Company Parties from conducting the Sale Process on and subject to the other terms and conditions set forth herein and consistent with the Restructuring Term Sheet.

7.05.   Notwithstanding anything to the contrary in this Agreement, but without limiting the Company Parties' other obligations expressly set forth herein, nothing in this Agreement shall require any Company Party to (or require any Consenting Sponsor to cause any Company Party to) commence the In-Court Restructuring prior to the occurrence of a Restructuring Trigger.

**Section 8.**     *Transfer of Interests and Securities.*

8.01.   During the Agreement Effective Period, no Consenting Party shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in any Company Claims/Interests to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless:

(a)      the transferee is either: (i) a qualified institutional buyer as defined in Rule 144A of the Securities Act; (ii) a non-U.S. person in an offshore transaction as defined under Regulation S under the Securities Act; (iii) an institutional accredited investor (as defined in the Rules); or (iv) a Consenting Party;

(b)      either (i) the transferee executes and delivers to counsel to the Company Parties, at or before the time of the proposed Transfer, a Transfer Agreement; or (ii) the transferee is a Consenting Party; and

(c)      the intended transferee, the intended transferee's affiliates, and/or any unaffiliated third-party in which the intended transferee has beneficial ownership,[2] or any group of persons acting pursuant to a plan or arrangement as described in Treasury Regulation Section 1.355-6(c)(4) (provided, however, that for purposes of this Section 8.01(c), none of the Consenting Parties will be treated as acting pursuant to a plan or arrangement as a result of participating in the Plan and Restructuring Transactions), will not, after giving effect to such Transfer: (i) have beneficial ownership of, in the aggregate, fifty percent (50.0%) or more of the First Lien Credit Facility Claims; or (ii) have, assuming the Restructuring Transactions were to be consummated

---

[2]   As used herein, the term "beneficial ownership" means the direct or indirect economic ownership of, and/or the power, whether by contract or otherwise, to direct the exercise of the voting rights and the disposition of, the Company Claims/Interests or the right to acquire such Claims or Equity Interests.

immediately upon such Transfer, beneficial ownership of, in the aggregate, fifty percent (50.0%) or more of the Equity Interests in the Reorganized Company Parties.

8.02.   Upon compliance with the requirements of Section 8.01, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Company Claims/Interests.  Any Transfer in violation of Section 8.01 shall be void *ab initio* and of no force or effect without further action by any party or the intended transferee, regardless of any prior notice provided to counsel to the Company Parties.  A Consenting Party that makes a Transfer pursuant to Section 8.01(b)(ii) shall provide notice of such Transfer to the Company Parties as soon as reasonably practicable after such Transfer.

8.03.   This Agreement shall in no way be construed to preclude the Consenting Parties from acquiring additional Company Claims/Interests (subject to Section 8.01(c)); provided, however, that (i) any Consenting Party that acquires additional Company Claims/Interests during the term of this Agreement shall promptly notify the Company Representatives, the Consenting Creditor Representatives, and the Consenting Sponsor Representatives of such acquisition, including the amount of such acquisition; and (ii) such additional Company Claims/Interests shall automatically and immediately upon acquisition by a Consenting Party be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to the Company Representatives, the Consenting Creditor Representatives, and the Consenting Sponsor Representatives).

8.04.   Notwithstanding anything herein to the contrary, to the extent that a Consenting Party effects the Transfer of all of its Company Claims/Interests in accordance with this Agreement, such Consenting Party shall cease to be a Party to this Agreement in all respects and shall have no further obligations hereunder, other than as set forth in Section 16.18; provided, however, that if such Consenting Party acquires a Company Claim/Interest at any point thereafter, it shall be deemed to be a Party to this Agreement on the same terms as if it had not effected a Transfer of all of its Company Claims/Interests.

8.05.   This Section 8 shall not impose any obligation on any Company Party to issue any "cleansing letter" or otherwise publicly disclose information for the purpose of enabling a Consenting Party to Transfer any of its Company Claims/Interests.  Notwithstanding anything to the contrary herein, to the extent a Company Party and another Party have entered into a Confidentiality Agreement, the terms of such Confidentiality Agreement shall continue to apply and remain in full force and effect according to its terms, and this Agreement does not supersede any rights or obligations otherwise arising under such Confidentiality Agreement.

8.06.   Notwithstanding Section 8.01, a Qualified Marketmaker that acquires any Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker for such Company Claims/Interests shall not be required to execute and deliver a Transfer Agreement in respect of such Company Claims/Interests if (i) such Qualified Marketmaker subsequently transfers such Company Claims/Interests (by purchase, sale assignment, participation, or otherwise) within ten (10) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (ii) the

transferee otherwise is a Permitted Transferee under Section 8.01; and (iii) the transfer otherwise is a permitted transfer under Section 8.01.  To the extent that a Consenting Party is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims/Interests that the Qualified Marketmaker acquires from a holder of such Company Claims/Interests who is not a Consenting Party without the requirement that the transferee be a Permitted Transferee.

8.07.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

8.08.   Notwithstanding anything to the contrary in this Section 8, the restrictions on Transfer set forth in this Section 8 shall not apply to any Consenting Sponsor's agreement to Transfer, directly or indirectly, any Equity Interests pursuant to a transaction that if consummated would constitute a Qualifying Sale Transaction.

**Section 9.** *Representations and Warranties of Consenting Parties.* Each Consenting Party severally, and not jointly, represents and warrants that, as of the date such Consenting Party executes and delivers this Agreement (or a Transfer Agreement, as applicable):

(a)   it is the beneficial or record owner of the face amount of the Company Claims/Interests or is the nominee, investment manager, or advisor for beneficial holders of the Company Claims/Interests reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Company Claims/Interests other than those reflected in, such Consenting Party's signature page to this Agreement or a Transfer Agreement, as applicable (as may be updated pursuant to Section 8);

(b)   it has the sole and full power and authority to vote, and to bind to this Agreement, such Company Claims/Interests;

(c)   such Company Claims/Interests are free and clear of any pledge, Lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would prohibit such Consenting Party from performing any of its obligations under this Agreement at the time such obligations are required to be performed;

(d)   it has the full power to vote, approve changes to, and transfer all of its Company Claims/Interests, subject to applicable Law;

(e)   (i) it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act, (B) not a U.S. person (as defined in Regulation S of the Securities Act) and is outside the United States within the meaning of Regulation S, or (C) an institutional accredited investor (as defined in Rule 501(a)(1), (2), (3), or (7) under the Securities Act); and (ii) any securities acquired by the Consenting Party in connection with the Restructuring Transactions will

have been acquired for investment and not with a view to distribution or resale in violation of the Securities Act; and

(f)     is has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems necessary and appropriate for such Consenting Party to evaluate the financial and other risks inherent in the transactions contemplated by this Agreement.

**Section 10.** *Representations and Warranties of Company Parties*.  Each Company Party severally, and not jointly, represents and warrants that, as of the date such Company Party executes and delivers this Agreement:

(a)     to the best of its knowledge having made all reasonable inquiries, no order has been made, petition presented or resolution passed for the winding up of or appointment of a liquidator, receiver, administrative receiver, administrator, compulsory manager or other similar officer in respect of it or any other Company Party, and no analogous procedure has been commenced in any jurisdiction; and

(b)     it has not entered into any arrangement in respect or in lieu of the transactions contemplated by this Agreement (including with any individual creditor thereunder, irrespective of whether it is or is to become a Consenting Party) having terms that are not reflected in the Restructuring Term Sheet.

**Section 11.** *Mutual Representations and Warranties*.  Each of the Parties represents and warrants to each other Party, as of the date such Party executes and delivers this Agreement:

(a)     it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)     except as expressly provided in this Agreement and the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)     the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association or other constitutional documents;

(d)     it has all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(e)      the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary action on its part; and

(f)      it is not party to any restructuring or similar agreements or arrangements with the other Parties to this Agreement that have not been disclosed to all Parties to this Agreement.

**Section 12.      *Termination Events*.**

12.01.   <u>Consenting Party Termination Events</u>.  This Agreement may be terminated (i) with respect to all Parties by the Required Consenting First Lien Creditors by the delivery to the other Parties of a written notice in accordance with Section 16.10 hereof upon the occurrence and continuation of any of the following events; (ii) with respect to the Consenting 1.5 Lien Creditors by the Required Consenting 1.5 Lien Creditors by the delivery to the other Parties of a written notice in accordance with Section 16.10 hereof upon the occurrence and continuation of any of the events described in the following clauses (f), (g), (h), (i) or (l); and (iii) with respect to the Consenting Sponsor by the Consenting Sponsor by the delivery to the other Parties of a written notice in accordance with Section 16.10 hereof upon the occurrence and continuation of any of the events described in the following clauses (c)(ii), (c)(iii), (d), (f), (g), (h), or (i):

(a)      the breach in any material respect by a Company Party of any of the representations, warranties, or covenants of the Company Parties set forth in this Agreement that (i) would have a material adverse impact on the Company Parties or their ability to consummate the Restructuring Transactions; and (ii) remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Parties transmit a written notice in accordance with Section 16.10 hereof detailing any such breach;

(b)      the economic substance or legal rights, remedies or benefits of the Restructuring Transactions are adversely affected (i) as a result of fraud, bad faith, or willful misconduct by the Company Parties or their applicable boards of directors or officers; and (ii) remains uncured (to the extent curable) for five (5) Business Days after such terminating Consenting Parties transmit a written notice in accordance with Section 16.10 hereof detailing such occurrence;;

(c)      the Company Parties (i) withdraw the Plan, if applicable; (ii) publicly announce their intention not to support the Restructuring Transactions or to accept an Alternative Restructuring Proposal; <u>provided</u>, that this termination right shall not apply to or be exercisable as a result of actions reasonably taken by the Company Parties in the good faith pursuit of a Qualifying Sale Transaction in accordance with the terms and conditions set forth in this Agreement; or (iii) execute a definitive written agreement for an Alternative Restructuring Proposal;

(d)      any Company Party determines, pursuant to Section 7.01, that a Company Party or the board of directors, board of managers, members, or any similar governing body of a Company Party pursuing or consummating the Restructuring Transactions would be inconsistent with applicable Law or its fiduciary obligations under applicable Law;

(e)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the

consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for ten (10) Business Days after such terminating Consenting Parties transmit a written notice in accordance with Section 16.10 hereof detailing any such issuance; provided, that this termination right may not be exercised by any Party that sought or requested such ruling or order in contravention of any obligation set out in this Agreement;

(f)      the Bankruptcy Court enters an order denying confirmation of the Plan or any Confirmation Order is reversed, stayed, dismissed, or vacated, or is modified or amended (i) in a manner that is materially inconsistent with this Agreement and adverse to the applicable Consenting Creditors or the Consenting Sponsor, as applicable, and (ii) the Bankruptcy Court does not within ten (10) Business Days enter a revised order confirming the Plan reasonably acceptable to the applicable Consenting Parties;

(g)      the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (i) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code; (ii) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party; (iii) rejecting this Agreement; (iv) dismissing one or more of the Chapter 11 Cases of a Company Party; or (v) invalidating, disallowing, subordinating, or limiting the enforceability, priority, or validity of any of the Company Claims/Interests held by any of the Consenting Creditors or the Consenting Sponsor, without the prior consent of the Required Consenting Superpriority Creditors, the Required Consenting First Lien Creditors, the Required Consenting 1.5 Lien Creditors, the Required Consenting Second Lien Creditors, or the Consenting Sponsor, with respect to each Consenting Creditors' or the Consenting Sponsor's respective Company Claims/Interests;

(h)      any Company Party files, waives, amends, withdraws, or modifies a pleading seeking approval of any Definitive Document or any documents related thereto (including any waiver of any term or condition therein) in a manner that is materially inconsistent with, or constitutes a material breach of, this Agreement (including with respect to any consent rights set forth herein), without the prior consent of the Required Consenting First Lien Creditors, the Required Consenting Superpriority Creditors, the Consenting Sponsor and, solely to the extent any such Definitive Document adversely affects the express rights or obligations of the Consenting 1.5 Lien Creditors or the Consenting Second Lien Creditors in respect of the terms of the New Common Stock and the Consenting 1.5 Lien Creditors or the Consenting Second Lien Creditors receipt thereof, the Required Consenting 1.5 Lien Creditors and/or the Required Consenting Second Lien Creditors, and which remains uncured for three (3) Business Days after the terminating Consenting Parties transmit a written notice in accordance with Section 16.10 hereof;

(i)      any Definitive Document is executed or filed by a Company Party or entered by the Bankruptcy Court that includes terms (by amendment or otherwise) that are materially inconsistent with this Agreement, without the prior consent of the Required Consenting First Lien Creditors, the Required Consenting Superpriority Creditors, the Consenting Sponsor and, solely to the extent any such Definitive Document adversely affects the express rights or obligations of the Consenting 1.5 Lien Creditors or the Consenting Second Lien Creditors in respect of the terms of the New Common Stock and the Consenting 1.5 Lien Creditors or the Consenting Second Lien Creditors

receipt thereof, the Required Consenting 1.5 Lien Creditors and/or the Required Consenting Second Lien Creditors;

(j)     the Debtors take any action or inaction to receive or obtain debtor-in-possession financing, cash collateral usage, exit financing, and/or financing arrangements, other than as expressly contemplated in this Agreement, the final DIP Order, or with the prior consent of the First Lien Lender Group;

(k)     [reserved];

(l)     the entry of an order by any court of competent jurisdiction invalidating, disallowing, subordinating, or limiting, in any respect, as applicable, the enforceability, priority, or validity of the claims and liens of the Consenting Creditors under the DIP Facility, if applicable, or the Superpriority Credit Facility, the First Lien Credit Facility, the 1.5L Credit Facility or the Second Lien Credit Facility without the prior consent of the DIP Lenders, the Required Consenting Superpriority Creditors, the Required Consenting First Lien Creditors, the Required Consenting 1.5 Lien Creditors, or the Required Consenting Second Lien Creditors, with respect to the DIP Lenders, the Consenting Creditors', or the Consenting Sponsor's respective claims and liens under the Prepetition Credit Agreements or the DIP Facility, as applicable;

(m)     the occurrence and continuation of an event of default under, or the termination of, the Superpriority Credit Agreement or the DIP Credit Agreement that has not been cured or waived in accordance with the terms of the Superpriority Credit Agreement or the DIP Credit Agreement;

(n)     other than for the purpose of implementing the Restructuring Transactions in accordance with the terms of this Agreement, one or more Insolvency Proceedings are commenced in respect of any Company Party that is obligated under the Prepetition Credit Agreements that has not been dismissed within twenty-five (25) days of the commencement thereof; provided, that this termination right shall not apply to or be exercised by any Party that initiated or supported the initiation of the Insolvency Proceedings in question in contravention of any contrary obligation set out in this Agreement;

(o)     the failure of any Restructuring Milestone to occur as and when specified in the Restructuring Term Sheet unless extended or waived in accordance with the terms hereof;

(p)     the repudiation or disavowal in writing by one or more of the Company Parties of this Agreement; or

(q)     a Company Party terminates this Agreement pursuant to Section 12.02(b) of this Agreement.

12.02.  Company Party Termination Events.  Any Company Party may terminate this Agreement as to all Parties upon prior written notice to all Parties in accordance with Section 16.10 hereof upon the occurrence of any of the following events:

(a)     the breach in any material respect by one or more of the Consenting Parties of any provision set forth in this Agreement that remains uncured for a period of five (5) Business Days

after the receipt by the Consenting Parties of notice of such breach; <u>provided</u>, that termination of this Agreement shall only be with respect to such breaching Party;

(b)        the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law; or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(c)        the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions; and (ii) remains in effect for ten (10) Business Days after such terminating Company Party transmits a written notice in accordance with Section 16.10 hereof detailing any such issuance; <u>provided</u>, that this termination right shall not apply to or be exercised by any Company Party that sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement; or

(d)        the Bankruptcy Court enters an order denying confirmation of the Plan and the Bankruptcy Court does not within ten (10) Business Days enter a revised order confirming the Plan reasonably acceptable to the Required Consenting First Lien Creditors, the Required Consenting Superpriority Creditors, the Required Consenting 1.5 Lien Creditors, and the Consenting Sponsor.

12.03.  <u>Mutual Termination</u>.  This Agreement, and the obligations of all Parties hereunder, may be terminated by mutual written agreement among the (i) the Required Consenting First Lien Creditors; (ii) the Required Consenting Superpriority Creditors; (iii) the Required Consenting 1.5 Lien Creditors; (iv) the Consenting Sponsor; and (v) each Company Party.

12.04.  <u>Automatic Termination</u>.  This Agreement shall terminate automatically without any further required action or notice on the earlier of (i) the Outside Date; (ii) the Restructuring Effective Date; and (iii) the consummation of a Qualifying Sale Transaction.

12.05.  <u>Effect of Termination</u>.  Except as set forth in Section 16.18, upon the occurrence of a Termination Date as to a Party, this Agreement shall be of no further force and effect as to such Party and each Party subject to such termination shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action.  Upon the occurrence of a Termination Date prior to the Confirmation Order being entered by a Bankruptcy Court, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Date shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring Transactions and this Agreement or otherwise; <u>provided</u>, <u>however</u>, any Consenting Party withdrawing or changing its vote pursuant to 5.01(h) shall promptly provide written notice of such withdrawal or change to each other Party to this Agreement and, if such withdrawal or change occurs on or after the Petition Date, file notice

of such withdrawal or change with the Bankruptcy Court.  Nothing in this Agreement shall be construed as prohibiting a Company Party or any of the Consenting Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict (i) any right of any Company Party or the ability of any Company Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Consenting Party; and (ii) any right of any Consenting Party, or the ability of any Consenting Party, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any Company Party or other Consenting Party. No purported termination of this Agreement shall be effective under this Section 12 or otherwise if the Party seeking to terminate this Agreement is in material breach of this Agreement, except a termination pursuant to Section 12.02(b).  Nothing in this Section 12.05 shall restrict any Company Party's right to terminate this Agreement in accordance with Section 12.02(b).

**Section 13.**      *Mutual Releases; Release Support.*

13.01.  <u>Releases by the Company Releasing Parties</u>.  Except as expressly set forth in this Agreement, effective as of, and subject to the occurrence of, the consummation of a Qualifying Sale Transaction, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which are hereby confirmed, each Company Releasing Party, severally and not jointly, hereby conclusively, absolutely, unconditionally, irrevocably, and forever fully releases, remises, and discharges each of the Released Parties (and each such Released Party shall be deemed forever released, remised, and discharged by the Company Releasing Parties) and their respective assets and properties from any and all Claims and Causes of Action, including any derivative claims asserted on behalf of any of the Company Releasing Parties, that any of the Company Releasing Parties would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Company Releasing Party or other Entity, based on or relating to, or in any manner arising from, in whole or in part, (i) the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, any Restructuring Transaction, or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to this Agreement, or the Definitive Documents; or (ii) the pursuit of consummation, the administration or implementation of any of the Restructuring Transactions. Nothing in this Agreement shall or shall be deemed to result in the waiving or limiting by the Consenting Sponsor or any officer, director, manager, or employee of any Company Party of (a) any indemnification against, or expense reimbursement or advance by, any Company Party or any Company Party's insurance carriers; (b) any rights as beneficiaries of any insurance policies; or (c) wages, salaries, compensation, or benefits.  Each of the Company Releasing Parties hereby further agrees and covenants not to, and shall not, commence or prosecute, or assist or otherwise aid any other Entity in the commencement or prosecution of, whether directly, derivatively or otherwise, any Released Claims.  Notwithstanding anything to the contrary in this Section 13.01 or otherwise in this Agreement, nothing in this Agreement shall or be deemed to (or is intended to) limit any of the Company Releasing Parties' rights to assert or prosecute any affirmative defenses or otherwise raise any defense or take any action to defend itself or themselves in

connection with any Claim or Cause of Action (whether direct or indirect) brought by any Entity relating to any of the above-referenced Claims or Causes of Action.

13.02.  <u>Releases by the Consenting Party Releasing Parties</u>.  Except as expressly set forth in this Agreement, effective as of, and subject to the occurrence of, the consummation of a Qualifying Sale Transaction, for good and valuable consideration provided by each of the Released Parties, the adequacy and sufficiency of which are hereby confirmed, each Consenting Party Releasing Party, severally and not jointly, hereby conclusively, absolutely, unconditionally, irrevocably, and forever fully releases, remises, and discharges each of the Released Parties (and each such Released Party shall be deemed forever released, remised, and discharged by the Consenting Party Releasing Parties) and their respective assets and properties from any and all Claims and Causes of Action, including any derivative claims asserted on behalf of any of the Company Releasing Parties or the Consenting Party Releasing Parties, that any of the Consenting Party Releasing Parties would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Company Releasing Party or other Entity, based on or relating to, or in any manner arising from, in whole or in part, (i) the formulation, preparation, dissemination, negotiation, or filing of this Agreement, the Definitive Documents, any Restructuring Transaction or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to this Agreement or the Definitive Documents; or (ii) the pursuit of consummation or the administration or implementation of any of the Restructuring Transactions.  Nothing in this Agreement shall or shall be deemed to result in the waiving or limiting by the Consenting Sponsor or any officer, director, manager, or employee of any Company Party or (a) any indemnification against, or expense reimbursement or advance by, any Company Party or any Company Party's insurance carriers; (b) any rights as beneficiaries of any insurance policies; or (c) wages, salaries, compensation, or benefits.  Each of the Consenting Party Releasing Parties hereby further agrees and covenants not to, and shall not, commence or prosecute, or assist or otherwise aid any other Entity in the commencement or prosecution of, whether directly, derivatively or otherwise, any Released Claims.  Notwithstanding anything to the contrary in this Section 13.02 or otherwise in this Agreement, nothing in this Agreement shall or be deemed to (or is intended to) limit any of the Consenting Party Releasing Parties' rights to assert or prosecute any affirmative defenses or otherwise raise any defense or take any action to defend itself or themselves in connection with any Claim or Cause of Action (whether direct or indirect) brought by any Entity relating to any of the above-referenced Claims or Causes of Action.

13.03.  <u>Plan Releases</u>.  Subject to the other provisions of this Agreement, each Consenting Party shall (i) support, and shall not directly or indirectly object to or commence, join, or otherwise support any proceeding or action opposing, the releases set forth in the Plan; (ii) to the extent it is permitted to elect whether to opt out of the releases set forth in the Plan, elect not to opt out of the releases set forth in the Plan by timely delivering its duly executed and completed ballot(s) indicating such election; and (iii) not change, withdraw, amend, or revoke (or cause to be changed, withdrawn, amended, or revoked) any election referred to in the immediately preceding clause (ii).

**Section 14.**     *Amendments and Waivers*.

(a)     This Agreement, including any exhibits or schedules hereto, may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 14.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by:  (i) each Company Party, (ii) the Required Consenting First Lien Creditors, (iii) the Required Consenting 1.5 Lien Creditors and (iv) the Consenting Sponsor; provided, however, (i) that if the proposed modification, amendment, waiver, or supplement has a material, disproportionate and adverse effect on any of the Company Claims/Interests held by a Consenting Party, then the consent of each such affected Consenting Party shall also be required to effectuate such modification, amendment, waiver, or supplement; and (ii) any amendments to this Section 14, Section 5.01(l), Section 5.01(m), or Section 5.01(n), any voting or consent threshold (or any related definition), or the definition of "Definitive Documents," shall require the prior consent of each Consenting Creditor, the Consenting Sponsor, and each Company Party.

(c)     Any proposed modification, amendment, waiver or supplement that does not comply with this Section 14 shall be ineffective and void *ab initio*.

(d)     The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy.  All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.**     *Forbearance; Consents to Superpriority Facility.*

15.01. The Consenting First Lien Creditors and the Company Parties hereby agree that First Lien Forbearance Agreement is hereby amended as follows:

(a)     the definition of "Forbearance Termination Date" in the First Lien Forbearance Agreement is hereby amended and restated to read as follows:

"**Forbearance Termination Date**" shall mean the sooner to occur of (a) the Termination Date (as defined in the Restructuring Support Agreement, dated as of September 15, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "**RSA**"), among Holdings, the subsidiaries of Holdings party thereto, the Lenders party thereto and other parties thereto) with respect to any party to the RSA, if, immediately after giving effect to such termination the remaining parties thereto would not satisfy the thresholds set forth in Section 2.01(b) of the RSA and (b) any Forbearance Default.

(b)     references in the First Lien Forbearance Agreement to "Specified Defaults" shall be deemed references to Specified Defaults, as defined herein.

(c)     clause (a) of the definition of "Forbearance Default" in the First Lien Forbearance Agreement is hereby amended and restated as follows:

"(a) the occurrence of (i) an Event of Default other than the Specified Defaults or (ii) any Event of Default (as defined in the Superpriority Credit Agreement (as defined in the RSA))"

(d)     clause (g) of the definition of "Forbearance Default" in the First Lien Forbearance Agreement is hereby replaced with the following:

"(g) (i) the termination or expiration of the Forbearance Period (as defined in the RSA) or (ii) a termination of the applicable obligations of the Consenting 1.5 Lien Lenders (as defined in the RSA) or the Consenting Second Lien Lenders (as defined in the RSA) under the Junior Lien Forbearance (as defined in the RSA)."

(e)     each of Sections 5(d), 6(a), (b), (c), (e), (f), (h), and (i) in the First Lien Forbearance Agreement are hereby replaced with the following: "[reserved]."

(f)     references in the First Lien Forbearance Agreement to the "Administrative Agent" shall be deemed references to Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents under the First Lien Credit Agreement.

(g)     for the avoidance of doubt, no action, inaction or omission by the Company Parties on or after August 16, 2023 and prior to the Agreement Effective Date shall be deemed a violation or breach of the First Lien Forbearance Agreement or result in a "Forbearance Default" thereunder, except, in the case of any action, inaction or omission by the Company Parties constituting (or that results or has resulted in) an Event of Default (as defined in the First Lien Credit Agreement, and determined without giving effect to any modifications to the First Lien Credit Agreement set forth in the First Lien Forbearance Agreement) that does not constitute a Specified Default.

The Consenting First Lien Creditors and the Company Parties hereby agree that the First Lien Forbearance Agreement, as amended and modified pursuant to Section 15.01, is in full force and effect on the Agreement Effective Date and constitutes valid and binding obligations of the parties thereto.

15.02.

(a)     During the Forbearance Period, the Consenting 1.5 Lien Creditors and Consenting Second Lien Creditors agree to (i) not instruct the applicable Agent to exercise any rights or remedies it may have under the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement, as applicable, or any of the Loan Documents (as defined in the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement, as applicable) or under applicable United States or foreign law or otherwise with respect to any of the alleged, existing or anticipated Defaults or Events of Default (as such terms are defined in the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement,

as applicable) listed on Schedule B hereto (the "**Specified Defaults**"); and (ii) waive or forbear from the exercise of any rights or remedies it may have under the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement, as applicable, or any of the Loan Documents (as defined in the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement, as applicable) or under applicable United States or foreign law or otherwise with respect to the Specified Defaults or any acceleration that may occur automatically without action of any party as a result of the operation of the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement, as applicable, solely due to the Specified Defaults (collectively, the "**Junior Lien Forbearance**").

(b)        During the Specified Mexico Forbearance Period, the Consenting Superpriority Creditors, the Consenting First Lien Creditors, the Consenting 1.5 Lien Creditors, and the Consenting Second Lien Creditors agree, solely with respect to Strategic Materials Mexicana S.A. de C.V. (the "**Mexican Guarantor**"), to not, and to not instruct the applicable Agent to, exercise any rights or remedies it may have against the Mexican Guarantor under the Superpriority Credit Agreement, the First Lien Credit Agreement, the 1.5 Lien Credit Agreement, or the Second Lien Credit Agreement, as applicable, or any of the Loan Documents (as defined in the Superpriority Credit Agreement, the First Lien Credit Agreement, the 1.5 Lien Credit Agreement, or the Second Lien Credit Agreement as applicable) or under applicable United States or foreign law or otherwise with respect to any of the Specified Defaults or any "Event of Default" under such Prepetition Credit Agreements arising as a result of the commencement of the Chapter 11 Cases.

15.03. As consideration for the forbearance provided by the Consenting First Lien Creditors under the First Lien Forbearance Agreement, as amended and modified pursuant to Section 15.01, the Company Parties agree (with terms used in this Section 15.03 and not defined herein having the meaning assigned thereto in the First Lien Credit Agreement):

(a)        that, on a retroactive basis commencing on June 30, 2023, interest on the outstanding principal amount of the Loans and on all other outstanding Obligations shall at all times on and after June 30, 2023 accrue at a rate per annum equal to two percent (2.00%) per annum plus the interest rate which would otherwise be applicable to such Loans or other Obligations (or if no interest rate is applicable, then the highest rate applicable to Base Rate Loans that are Revolving Credit Loans plus two percent (2.00%) per annum); and

(b)        to pay to each Consenting First Lien Creditor party hereto as of the Agreement Effective Date (in such capacity, a "**Forbearing First Lien Lender**") a fee equal to 4.00% of the sum of the (x) Term Loans held by such Forbearing First Lien Lender on the Agreement Effective Date (as of immediately prior to giving effect to this Agreement) and (y) Revolving Credit Commitments held by such Forbearing First Lien Lender as of the Agreement Effective Date (the "**Forbearance Fee**"), which Forbearance Fee shall be paid in-kind by increasing the aggregate principal amount of the Term Loans (in the case of the portion of the Forbearance Fee under clause (x)) and the Revolving Credit Loans (in the case of the portion of the Forbearance Fee under clause (y))  held by such Forbearing First Lien Lender by the amount of the Forbearance Fee payable thereto (it being understood and agreed that any portion of the Forbearance Fee added to the Revolving Credit Loans of a Forbearing First Lien Lender shall not constitute utilization of, or an amount funded (or deemed funded) under, the Revolving Credit Commitment of such Forbearance

First Lien Lender, but shall for all other purposes constitute principal of the Revolving Credit Loans of such Forbearing First Lien Lender).

15.04.  The applicable obligations of the Consenting 1.5 Lien Creditors and Consenting Second Lien Creditors under the Junior Lien Forbearance shall terminate one (1) Business Day following the occurrence of any Event of Default under and as defined in the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement, as applicable, other than the Specified Defaults, unless waived pursuant to the terms of the applicable Prepetition Credit Agreement.

15.05.  Each Consenting Creditor hereby (i) consents (and waives any condition) to the Company Parties' (and any applicable subsidiary's) entry into and performance (including the incurrence of indebtedness and guarantees and grant of liens to secure its obligations) under the Superpriority Credit Agreement and any related Loan Documents (as defined therein), in each case in accordance with the terms thereof; and (ii) authorizes and instructs each applicable Agent to enter into each Intercreditor Agreement (as defined in the Superpriority Credit Agreement). Each Consenting Second Lien Creditor hereby consents to the resignation of Goldman Sachs Bank USA as administrative agent and to the appointment of Acquiom Agency Services LLC and Seaport Loan Products LLC as co-administrative agents under the Second Lien Credit Agreement and agrees to be bound by the Successor Second Lien Agent Agreement dated the date hereof as if it were party thereto.

15.06.  Execution of this Agreement by Consenting Creditors constituting the Required Lenders and/or Supermajority Revolving Lenders, as applicable, under and as defined in each applicable Prepetition Credit Agreement constitutes a direction by such Consenting Creditors that the applicable Agent, in accordance with this Agreement (or, in the case of the Agent under the First Lien Credit Agreement, in accordance with the First Lien Forbearance Agreement as modified hereby), act or refrain from acting. The Parties hereto hereby agree to cooperate in good faith to take all steps reasonably necessary to give effect to this Section 15, including providing any documents or instruments and/or delivering any direction to the applicable Agents reasonably necessary to implement the foregoing. From and after the Agreement Effective Date, this Agreement shall constitute a Loan Document under and for purposes of each Prepetition Credit Agreement (other than the Superpriority Credit Agreement).

**Section 16.**     *Miscellaneous.*

16.01.  <u>Acknowledgement</u>.  Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, and/or other applicable Law.

16.02.  <u>Exhibits Incorporated by Reference; Conflicts</u>.  Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the

exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern.

16.03.  <u>Further Assurances</u>.  Subject to the other terms of this Agreement, the Parties agree to use commercially reasonable efforts to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

16.04.  <u>Complete Agreement</u>.  Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the Parties with respect to the subject matter hereof and supersedes all prior negotiations, understandings, and agreements, whether oral or written, among the Parties with respect thereto, other than any Confidentiality Agreement.

16.05.  <u>GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM</u>.  THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES THEREOF.  Each Party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Chosen Court, and solely in connection with claims arising under this Agreement:  (i) irrevocably submits to the exclusive jurisdiction of the Chosen Court; (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Court; and (iii) waives any objection that the Chosen Court is an inconvenient forum or does not have jurisdiction over any Party hereto.

16.06.  <u>TRIAL BY JURY WAIVER</u>.  EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.07.  <u>Execution of Agreement</u>.  This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement.  Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

16.08.  <u>Rules of Construction</u>.  This Agreement is the product of negotiations among the Company Parties and the Consenting Parties, and in the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion hereof, shall not be effective in regard to the interpretation hereof.  The Company Parties and the Consenting Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.09.  <u>Successors and Assigns; Third Parties</u>.  This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns, as applicable.  There are no third party beneficiaries under this Agreement, and the rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other person or entity.

16.10.  <u>Notices</u>.  All notices hereunder shall be deemed given if in writing and delivered, if sent by electronic mail, courier, or registered or certified mail (return receipt requested) to the following addresses (or at such other addresses as shall be specified by like notice):

(a)     if to a Company Party, to:

Strategic Materials, Inc.
17220 Katy Freeway, Suite 150
Houston, Texas, 77094
Attention:  Paul Garris
Email:  pgarris@smi.com

with copies for information only (which shall not constitute notice) to:
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY 10019
Attention:  Joshua A. Feltman and Benjamin S. Arfa
Email: jafeltman@wlrk.com and bsarfa@wlrk.com

and

Vinson & Elkins LLP
845 Texas Avenue, Suite 4700
Houston, TX 77002
Attention:  Paul E. Heath and Matthew D. Struble
Email:  pheath@velaw.com
        mstruble@velaw.com

-and-

Vinson & Elkins LLP
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Attention:  David S. Meyer and Jessica C. Peet
Email:  dmeyer@velaw.com
        jpeet@velaw.com

(b)      if to a Consenting Creditor, to the notice details identified on that Consenting Creditor's signature page to this Agreement or its Transfer Agreement, with a copy (which shall not constitute notice unless otherwise specified herein) to:

> Arnold & Porter Kaye Scholer LLP
> 70 West Madison Street, Suite 4200
> Chicago, IL 60602
> Attention: Michael D. Messersmith and Sarah Gryll
> Email:  michael.messersmith@arnoldporter.com
>             sarah.gryll@arnoldporter.com

(c)      if to a Consenting Sponsor, to the notice details identified on that Consenting Sponsor's signature page to this Agreement or its Transfer Agreement.

Any notice given by delivery, mail, or courier shall be effective when received.

16.11.  <u>Independent Due Diligence and Decision Making</u>.  Each Consenting Party hereby confirms that its decision to execute this Agreement has been based upon its independent investigation of the operations, businesses, financial and other conditions, and prospects of the Company Parties.

16.12.  <u>Enforceability of Agreement</u>.  Each of the Parties to the extent enforceable waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

16.13.  <u>Waiver</u>.   If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the Parties fully reserve any and all of their rights, remedies, claims, and defenses.  This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties hereto.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.14.  <u>Specific Performance</u>.   It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party, and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy of any such breach, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.

16.15.  <u>Relationship Among Parties</u>.  Except where otherwise specified, the agreements, representations, warranties, and obligations of the Parties under this Agreement are, in all respects, several and not joint.  No Party shall, as a result of its entering into and performing its obligations under this Agreement, be deemed to be part of a "group" (as that term is used in section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder) with any of the other Parties. It is understood and agreed that no Consenting Party has any duty of trust or confidence in any kind or form with any other Consenting Party, and, except as expressly provided in this Agreement, there are no commitments among or between them.

16.16.  <u>Severability and Construction</u>.  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.17.  <u>Remedies Cumulative</u>.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.18.  <u>Survival</u>.  Notwithstanding (i) any Transfer of any Company Claims/Interests in accordance with Section 8 or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 6.01(j), Section 13.01, Section 13.02, Section 15.03, Section 15.04, Section 15.05, Section 15.06, 15.01 and the Confidentiality Agreements shall survive such Transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof and thereof.

16.19.  <u>Capacities of Consenting Parties</u>.  Each Consenting Party has entered into this agreement on account of all Company Claims/Interests that it holds as beneficial or record owner (directly or through discretionary accounts that it manages or advises) or that is held by a person in respect of which it is the nominee, investment manager, or advisor and, except where otherwise specified in this Agreement, shall take or refrain from taking all actions that it is obligated to take or refrain from taking under this Agreement with respect to all such Company Claims/Interests.

16.20.  <u>Consents and Acceptances</u>.  Where a written consent, acceptance, or approval is required pursuant to or contemplated by this Agreement, pursuant to Section 3.02, Section 14, or otherwise, including a written approval by the Company Parties, the Consenting First Lien Creditors, the Required Consenting First Lien Creditors, the Consenting 1.5 Lien Creditors, the Required Consenting 1.5 Lien Creditors, the Consenting Second Lien Creditors, the Required Consenting Second Lien Creditors, the Consenting Creditors, or the Consenting Sponsor such written consent, acceptance, or approval shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, or approval, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement on the day and year first above written.

**Company Parties' Signature Page to
the Restructuring Support Agreement**

**SMI GROUP ACQUISITIONS, INC.**

By: _____

Name: Paul Garris

Senior Vice President and Chief Financial Officer

*[Signature Pages Redacted]*

## **SCHEDULE A**

### **Company Parties**

1. Strategic Materials Holding Corp.
2. Strategic Materials, Inc. (Delaware)
3. SMI Equipment, Inc. (Delaware)
4. American Specialty Glass, Inc. (Delaware)
5. Container Recycling Alliance, LLC (Delaware)
6. SMI Reflective Recycling NE HoldCo, LLC (Delaware)
7. SMI Reflective Industries HoldCo, LLC (Delaware)
8. SMI Reflective Recycling HoldCo, LLC (Delaware)
9. SMI BevCon HoldCo, LLC (Delaware)
10. SMI Nutmeg HoldCo, LLC (Delaware)
11. Ripple Glass, LLC (Delaware)
12. NexCycle, Inc. (Delaware)

## SCHEDULE B

### Specified Defaults[1]

Events of Default have occurred and are continuing, or are expected to or may occur, under the First Lien Credit Agreement, the 1.5 Lien Credit Agreement and/or the Second Lien Credit Agreement, as applicable, as a result of the following:

1. Failure to comply with Section 6.18(a) of the First Lien Credit Agreement

2. Failure to comply with Section 7.10 of the First Lien Credit Agreement

3. Failure to pay interest under the First Lien Credit Agreement, the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement

4. Failure to make any amortization payment under the First Lien Credit Agreement

5. Failure to make any other payment in respect of the First Lien Credit Agreement, the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement that is prohibited from being made by the Superpriority Credit Agreement or the Loan Documents (as defined in the Superpriority Credit Agreement)

6. Failure to provide notice of any of the foregoing

7. Any cross-default under the First Lien Credit Agreement, the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement arising as a result of any other Specified Default described on this schedule

8. Any cross-default under the First Lien Credit Agreement, the 1.5 Lien Credit Agreement or the Second Lien Credit Agreement arising as a result of any cross-default under the Term Loan Credit Agreement, dated as of December 31, 2019 (as amended, supplemented or otherwise modified from time to time), by and among NexCycle Canada Ltd., an Ontario corporation, NexCycle Industries Ltd., an Ontario corporation, Piney Lake Opportunities ECI Master Fund LP, as administrative agent and collateral agent, and the lenders party thereto from time to time, arising as a result of any Specified Default described on this schedule

---

[1] Capitalized terms used in this Schedule B and not otherwise defined in this Agreement shall have the meaning given to such terms in the First Lien Credit Agreement, the 1.5 Lien Credit Agreement and/or the Second Lien Credit Agreement, as applicable.

## EXHIBIT A

**Restructuring Term Sheet**

**THIS RESTRUCTURING TERM SHEET IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 OR 1126 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE U.S. SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.  NOTHING CONTAINED IN THIS RESTRUCTURING TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE OF THE RESTRUCTURING SUPPORT AGREEMENT ON THE TERMS DESCRIBED HEREIN AND IN THE RESTRUCTURING SUPPORT AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

*Restructuring Term Sheet*

**INTRODUCTION**

This term sheet (as may be amended, modified or supplemented from time to time in accordance with Section 14 of the Agreement, the "***Restructuring Term Sheet***[1]) describes the principal terms of the Restructuring and the Restructuring Transactions of SMI Group Acquisitions, Inc. ("***SMI***") and SMI's direct and indirect subsidiaries (collectively, the "***Company***" or the "***Debtors***," as applicable) that, if a Qualifying Sale Transaction is not consummated or any Restructuring Trigger occurs, will be effectuated pursuant to a prepackaged chapter 11 plan of reorganization on the terms set forth in this Restructuring Term Sheet and the Restructuring Support Agreement (the "***Agreement***") to which this Restructuring Term Sheet is attached as **Exhibit A**.[2]  The statements contained in this Restructuring Term Sheet and the discussions between and among the Parties to the Agreement in connection therewith constitute privileged settlement discussions.  Accordingly, this Restructuring Term Sheet and the statements and information contained herein are entitled to protection from any use or disclosure to any party or person pursuant to Rule 408 of the Federal Rules of Evidence and any other applicable rule, statute, or doctrine of similar import protecting the use or disclosure of confidential settlement discussions.

This Restructuring Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the Definitive Documents governing the Restructuring, which remain subject to negotiation and completion in accordance with and consistent with the Agreement, this Restructuring Term Sheet, and applicable bankruptcy and securities laws.  The Restructuring will not contain any material terms or conditions that are inconsistent in any material respect with this Restructuring Term Sheet or the Agreement.  This Restructuring Term Sheet incorporates the rules of construction as set forth in the Agreement and section 102 of the Bankruptcy Code.

---

[1]  Capitalized terms used but not defined in this Restructuring Term Sheet have the meanings given to such terms in the Agreement.

[2]  The Debtors in any chapter 11 cases are contemplated to be (i) Strategic Materials Holding Corp., (ii) SMI Group Acquisitions, Inc., (iii) NexCycle, Inc., (iv) Strategic Materials, Inc., (v) American Specialty Glass Inc., (vi) SMI Reflective Recycling NE HoldCo, LLC, (vii) SMI Reflective Industries HoldCo, LLC, (viii) SMI BevCon HoldCo, LLC, (ix) SMI Equipment, Inc., (x) Container Recycling Alliance, LLC, (xi) SMI Reflective Recycling HoldCo, LLC, (xii) SMI Nutmeg HoldCo, LLC  and (xiii) Ripple Glass, LLC.

| OVERVIEW | |
|---|---|
| ***Restructuring Summary*** | The Restructuring Transactions will be accomplished through either (i) a Qualifying Sale Transaction of all or a portion of the Company's business enterprise or (ii) if a Qualifying Sale Transaction is not consummated or any Restructuring Trigger occurs, a prepackaged plan of reorganization (the "***Plan***") of the Company on the terms and conditions set forth in this Restructuring Term Sheet (the "***In-Court Restructuring***") implemented  through cases (the "***Chapter 11 Cases***") commenced under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the Bankruptcy Court pursuant to the Agreement. |
| | **Sale Process.** The Company and its investment banker, Moelis & Company ("***Moelis***"), will conduct an out-of-court sale process in pursuit of a Qualifying Sale Transaction (the "***Sale Process***"), which Sale Process will be subject to the Sale Process Milestones (as defined below). Any Qualifying Sale Transaction will be (1) consummated out-of-court or, (2) to the extent unable to be consummated out-of-court but (i) consistent with any "toggle" option provided for in the Plan with the consent of the Required First Lien Lender Group[3] in its sole discretion, and (ii) acceptable to the prospective buyer, consummated pursuant to the Plan,  or (3) consummated pursuant to Section 363 of the Bankruptcy Code in Chapter 11 Cases commenced by the Company (a "***363 Sale Proceeding***") if (i) it cannot be consummated out-of-court because it lacks the requisite consent of creditors, (ii) it is required by the buyer or the Required First Lien Lender Group, in its reasonable discretion, or (iii) it is consented to by the Required First Lien Lender Group, in each case under this clause (3) with the agreement of the prospective buyer. In the event a Qualifying Sale Transaction is consummated, proceeds of the Qualifying Sale Transaction shall, subject to the last sentence under the heading "Sale Process" below, be applied as follows: ***first***, if applicable, to holders of  DIP Claims, *pro rata* until all DIP Claims are paid in full; ***second***, to holders to holders of Superpriority Facility Claims, *pro rata* until all Superpriority Credit Facility Claims are paid in full; ***third***, to holders of First Lien Credit Facility Claims, *pro rata* until all First Lien Credit Facility Claims are paid in full; ***fourth***, to holders of 1.5L Credit Facility Claims, *pro rata* until all 1.5L Credit Facility Claims are paid in full; and ***fifth***, to holders of Second Lien Credit Facility Claims, *pro rata* until all Second Lien Credit Facility Claims are paid in full. For the avoidance of doubt, the foregoing waterfall shall not apply to any proceeds from the sale or disposition of assets or properties of NexCycle Canada, Ltd. or its subsidiaries unless the Obligations (as defined in the Canadian Credit Agreement referred to in the DIP Facility Term Sheet) have been paid in full in cash  (other than contingent reimbursement or indemnification obligations for which no claim has been made in writing). |
| | **In-Court Restructuring.** In the event one or more Restructuring Triggers occurs, the Company shall immediately terminate the Sale Process (unless otherwise agreed to by the Required First Lien Lender Group) and, within three |

---

[3]   "***Required First Lien Lender Group***" means, as of the relevant date, holders of First Lien Credit Facility Claims in the First Lien Lender Group equal to at least 50.1% of the aggregate outstanding First Lien Credit Facility Claims that are held by the members of the First Lien Lender Group at such time.

"***First Lien Lender Group***" means the members of the ad hoc group of First Lien Credit Facility Claims represented by Arnold & Porter Kaye Scholer LLP.

| | |
|---|---|
| | (3) Business Days (or, if later, one (1) Business Day following commencement of solicitation of the Plan), commence the Chapter 11 Cases to implement the Restructuring Transactions through the Plan and, as further set forth in this Restructuring Term Sheet, the Agreement, and the other Definitive Documents. |
| **GENERAL TRANSACTION TERMS**<br>**(Applicable to the Sale Process and the In-Court Restructuring)** | |
| *Governance* | Upon the Agreement Effective Date, the boards of directors of SMI and Strategic Materials Holding Corp. ("*SMHC*") shall be reconstituted to include one (1) independent director (the "*Independent Director*") the identity, duties, and authority of which shall be reasonably acceptable to the Required First Lien Lender Group. |
| *Key Employee Retention Program* | The Required First Lien Lender Group shall agree to negotiate and support a Key Employee Retention Program on customary terms to be agreed with the Company Parties and acceptable to the Required First Lien Lender Group. |
| **SALE PROCESS** | |
| *Sale Process* | The Company, with the assistance of Moelis, shall conduct the Sale Process in compliance with, and subject to, the Sale Process Milestones and commitments set forth in the Agreement.<br><br>A "*Qualifying Sale Transaction*" is a sale of all or a portion of the business or assets of the Company (or of the equity of SMHC or any direct or indirect parent thereof) that, unless otherwise acceptable to the Required First Lien Lender Group, results in net cash proceeds being received, at the time of consummation of such sale, in an amount sufficient to pay in full in cash:<br><br>• all loans and other obligations (including, without limitation, all principal, interest, fees, expenses and outstanding indemnification claims) under the First Lien Credit Agreement;<br>• all loans and other obligations (including, without limitation, all principal, interest, fees, expenses and outstanding indemnifications claims) under the Superpriority Credit Agreement;<br>• all Restructuring Expenses; and<br>• all other fees and expenses incurred in connection with the Restructuring Transactions.<br><br>The Company shall, promptly upon its receipt thereof, provide to the Consenting Creditor Representatives a copy of any indication of interest that it receives in connection with the Sale Process (each, an "*IOI*"), which shall, subject to any Company confidentiality obligations, be shared with the First Lien Lender Group and to the extent the Company is prohibited from doing so, the Company shall use commercially reasonable efforts to obtain relief from such restriction or condition as promptly as practicable in order to share such IOI with the First Lien Lender Group. Any bona fide IOI that (i) provides for a purchase price satisfying the requirements set forth in the definition of Qualifying Sale Transaction above and includes reasonable evidence of the proposed buyer's financial wherewithal or financing (e.g. a highly confident letter); or (ii) is otherwise acceptable to the Required First Lien Lender Group, is referred to herein as an "*Acceptable IOI*." For the avoidance of doubt, in the event an IOI includes a purchase price expressed as a range, the low number of such range must provide for a purchase |

price satisfying the requirements set forth in the definition of Qualifying Sale Transaction.

In the event the Company receives a single Acceptable IOI, the Company shall work expeditiously to consummate a transaction contemplated thereby (including by negotiating a letter of intent (a "*LOI*") and definitive sale documentation, and, if applicable, consummating the sale transaction pursuant to a 363 Sale Proceeding).

In the event the Company receives multiple Acceptable IOI's, the Company shall, in consultation with the Required First Lien Lender Group, work with the parties submitting such Acceptable IOIs towards the submission of LOIs. The Company shall, in the business judgment of SMI's board of directors and consistent with its fiduciary duties, and in consultation with the Required First Lien Lender Group, select the LOI that constitutes the most value maximizing transaction available to the Company and work expeditiously to consummate the transaction contemplated thereby, including, if applicable, to consummate the sale transaction pursuant to a 363 Sale Proceeding.

Any LOI submitted to the Company shall be accompanied by a customary draft financing commitment letter that is in form and substance reasonably acceptable to the Company Parties and the Required First Lien Lender Group.

In the event that the Company receives an Acceptable IOI or enters into an LOI or a binding definitive agreement for a Qualifying Sale Transaction, in any such case that (i) cannot be consummated out-of-court because it lacks the requisite consent of creditors or pursuant to a "toggle" option set forth in the Plan (with the consent of the Required First Lien Lender Group as contemplated above under "Restructuring Summary"), or  (ii) the buyer or the Required First Lien Lender Group requires, in its reasonable discretion, to be consummated pursuant to a 363 Sale Proceeding; or (iii) the Required First Lien Lender Group consents to being consummated pursuant to a 363 Sale Proceeding, in each case of this sentence with the agreement of the prospective buyer, the Company shall commence a 363 Sale Proceeding by the later of (x) November 1, 2023, and (y) three (3) Business Days after the Required First Lien Lender Group provides notice to the Company Parties of (i) the requirement to commence a 363 Sale Proceeding or (ii) their consent to the consummation of a 363 Sale Proceeding.

The 363 Sale Proceeding will include reasonable milestones to be agreed to among the Company Parties and the Required First Lien Lender Group and provided for in the DIP Facility (as defined below), and, if agreed by the Required First Lien Lender Group and the prospective buyer, such Acceptable IOI, LOI, or binding definitive agreement shall serve as the stalking horse bid. The Company Parties and the Required First Lien Lender Group and any other applicable party, including the buyer, shall mutually agree on appropriate funding and administration of the 363 Sale Proceeding.

| | |
|---|---|
| ***Sale Process Milestones*** | The Company shall implement the Qualifying Sale Transaction on the following timeline (each action and event set forth below and the corresponding deadline, a "***Sale Process Milestone***"), unless any such Sale Process Milestone is extended or waived in writing by the Required First Lien Lender Group: |

|  |  |
|---|---|
|  | a. no later than September 15, 2023, the Company and Moelis shall finalize the necessary marketing materials for the Sale Process, which shall be in form and substance reasonably acceptable to the Required First Lien Lender Group, and populate the virtual data room;<br><br>b. no later than September 18, 2023, the Company and Moelis shall begin to contact prospective bidders;<br><br>c. no later than October 18, 2023, the Company shall receive an Acceptable IOI;<br><br>d. no later than November 22, 2023, the Company and a prospective buyer shall execute an LOI which shall be in form and substance reasonably acceptable to the Required First Lien Lender Group, in respect of an Acceptable IOI, and thereafter the Company shall seek any and all required regulatory approvals for the Qualifying Sale Transaction (subject to the agreement of, and payment of applicable filing fees by, the prospective buyer);<br><br>e. no later than December 6, 2023, the buyer shall execute a binding definitive agreement for a Qualifying Sale Transaction in a form agreed by the buyer and the Company, in consultation with the Required First Lien Lender Group; and<br><br>f. no later than January 5, 2024 (or, if later, the "outside date" set forth in the applicable definitive agreement), a Qualifying Sale Transaction shall be consummated (the "***Sale Process Outside Date***"). |
| ***Priming Loan Facility*** | On the Agreement Effective Date, the First Lien Lender Group (or their respective affiliate designees) (in such capacity, the "***Superpriority Lenders***") shall provide to Strategic Materials Holding Corp. a superpriority lien term loan facility (the "***Superpriority Loan***") in an aggregate principal amount of $27,500,000 to facilitate the Sale Process on the terms and conditions set forth in the Superpriority Credit Agreement. |
| <div align="center">**IN-COURT RESTRUCTURING**</div> ||
| ***General*** | The Company shall immediately abandon the Sale Process, commence the Chapter 11 Cases and implement the In-Court Restructuring upon the occurrence of any of the following (each, a "***Restructuring Trigger***"), unless otherwise agreed to by the Required First Lien Lender Group:<br><br>a. any Sale Process Milestone is not satisfied within the time period specified for such Sale Process Milestone and such Sale Process Milestone has not been extended or waived in writing by the Required First Lien Lender Group; or<br><br>b. the Required First Lien Lender Group consent in writing, at the Company's request, to the Sale Process being abandoned.<br><br>Notwithstanding anything to contrary herein or in the Agreement, unless otherwise agreed to by the Required First Lien Lender Group, the Company shall file the Chapter 11 Cases and pursue the In-Court Restructuring within three (3) Business Days following the occurrence of a Restructuring Trigger (or, if later, one Business Day following commencement of solicitation of the Plan). |
| ***Management Incentive Plan*** | Prior to the commencement of solicitation for the Plan, the Required First Lien Lender Group shall agree to support a key management incentive plan (the "***MIP***") on customary terms to be agreed with the Company Parties. |

| | |
|---|---|
| ***DIP Facility*** | If the In-Court Restructuring or a 363 Sale Proceeding is commenced in accordance with the terms hereof, the members of the First Lien Lender Group (in such capacity, the "***DIP Lenders***") shall provide a postpetition multi-draw super-priority senior secured priming debtor-in-possession facility (the "***DIP Facility***") consisting of (i) new money delayed-draw term loans and (ii) loans representing a "roll up" of the Prepetition Superpriority Obligations (as defined in the DIP Term Sheet), in each case on the terms and conditions set forth in the DIP Term Sheet attached as **Exhibit B** to the Agreement. |
| ***Exit Term Loan Facilities*** | If the In-Court Restructuring is consummated, on the Restructuring Effective Date, the Reorganized Company Parties shall enter into the exit term loan facilities on the terms and conditions set forth in the Exit Term Loan Facilities Term Sheet attached as **Exhibit C** to the Agreement and issue the Exit Term Loans (as defined in the Exit Term Loan Facilities Term Sheet) on the terms and conditions set forth therein (the "***Exit Term Loan Facilities***"). |
| ***New Common Stock*** | If the In-Court Restructuring is consummated, on the Restructuring Effective Date, the Reorganized Company will issue a single class of common Equity Interests (the "***New Common Stock***"). The New Common Stock will be distributed in accordance with this Restructuring Term Sheet and the Governance Term Sheet.<br><br>On the Restructuring Effective Date, 96.5% of the New Common Stock will be distributed to holders of allowed First Lien Credit Facility Claims (subject to dilution on account of the MIP).<br>On the Restructuring Effective Date, 2.5% of the New Common Stock will be distributed to holders of allowed 1.5L Credit Facility Claims (subject to dilution on account of the MIP).<br><br>On the Restructuring Effective Date, 1.0% of the New Common Stock will be distributed to holders of allowed Second Lien Credit Facility Claims (subject to dilution on account of the MIP).<br><br>The consideration provided to the 1.5L Credit Facility Claims and Second Lien Credit Facility Claims, respectively, in the In-Court Restructuring shall be contingent upon the applicable class voting to accept the Plan. |
| ***Restructuring Milestones*** | The Company shall implement the In-Court Restructuring on the following timeline (each action and event set forth below and the corresponding deadline, a "***Restructuring Milestone***") unless any such Restructuring Milestone is extended or waived in writing by the Required First Lien Lender Group:<br><br>    a. no later than September 15, 2023, the Company and the Consenting Creditors shall execute the Agreement and the Superpriority Credit Agreement;<br>    b. no later than September 18, 2023, the Company shall retain a claims and noticing agent and deliver a draft of the Plan to the Consenting Creditor Representatives;<br>    c. no later than September 25, 2023, the Company shall deliver drafts of the Disclosure Statement, the Disclosure Statement Motion, and the Solicitation Materials to the Consenting Creditor Representatives;<br>    d. no later than October 2, 2023, the Company shall deliver draft First Day Pleadings to the Consenting Creditor Representatives; |

| | |
|---|---|
| | e.   no later than October 9, 2023, the Company shall deliver drafts of any exhibits to the Disclosure Statement and the Plan Supplement to the Consenting Creditor Representatives; |
| | f.   no later than October 13, 2023, the Company shall deliver solicitation versions of the Plan, the Disclosure Statement and the Solicitation Materials and final versions of the motion to approve debtor-in-possession financing (the "**DIP Motion**"), the Disclosure Statement Motion, and all other First Day Pleadings to the Consenting Creditor Representatives; |
| | g.   no later than October 17, 2023, the Company shall deliver final versions of any exhibits to the Disclosure Statement and the Plan Supplement to the Consenting Creditor Representatives; |
| | h.   no later than October 19, 2023, the Company shall commence solicitation of the Plan; |
| | i.   no later than three (3) Business Days after the occurrence of a Restructuring Trigger, the Company shall file the Chapter 11 Cases and pursue the In-Court Restructuring; |
| | j.   no later than three (3) Business Days after the Petition Date the Company shall deliver a notice of hearing at which the Bankruptcy Court will consider confirmation of the Plan and final approval of the Disclosure Statement to the Consenting Creditor Representatives; |
| | k.   no later than the Petition Date, the Debtors shall have filed the Plan, the Disclosure Statement, the Disclosure Statement Motion, the Plan Supplement, and the DIP Motion with the Bankruptcy Court; |
| | l.   no later than three (3) Business Days following the Petition Date (subject to the availability of the Bankruptcy Court), the Bankruptcy Court shall have entered the interim DIP Order; |
| | m.   no later than thirty-five (35) days following the Petition Date (subject to the availability of the Bankruptcy Court), the Bankruptcy Court shall have entered the final DIP Order and the Confirmation Order; and |
| | n.   no later than forty (40) days following the Petition Date, the Restructuring Transactions shall have been consummated and the Restructuring Effective Date shall have occurred. |
| ***Definitive Documents*** | Any documents, including any Definitive Documents, that remain the subject of negotiation and completion as of the Agreement Effective Date shall be subject to the rights and obligations set forth in Section 3 of the Agreement.  Failure to reference such rights and obligations as it relates to any document referenced in this Restructuring Term Sheet shall not impair such rights and obligations. |
| ***Tax Matters*** | The Parties will work together in good faith and will use commercially reasonable efforts to structure and implement the Restructuring in a tax efficient and cost-effective manner for the Debtors and the Consenting Sponsor. |
| ***363 Sale*** | In the event that the Qualifying Sale Transaction is required to be implemented pursuant to a 363 Sale Proceeding as provided in this Restructuring Term Sheet, the Company Parties and the Consenting Creditors agree to negotiate, in good faith, any necessary and conforming changes to the Agreement, the Definitive Documents and terms herein and therein, including to the Restructuring Milestones to require filing of the Chapter 11 Cases with a binding acquisition agreement and consummation of such Qualifying Sale Transaction as expeditiously as practicable (giving due consideration to the pre-bankruptcy petition marketing process), and the Company Parties and the Consenting Parties |

| | shall support and take all actions reasonably requested by the First Lien Lender Group to consummate the Qualifying Sale Transaction pursuant to any such 363 Sale Proceeding. | |
|---|---|---|
| **CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS PURSUANT TO THE IN-COURT RESTRUCTURING** | | |
| **Type of Claim** | **Treatment** | **Impairment/Voting** |
| **Unclassified Non-Voting Claims** | | |
| *DIP Claims* | On the Restructuring Effective Date, each holder of an allowed DIP Claim shall receive its *pro rata* share of the First Out Roll-Up Loans (as defined in the Exit Term Loan Facilities Term Sheet). | N/A |
| *Administrative Claims* | Unless a holder of an allowed administrative claim agrees to a lesser treatment, on the Restructuring Effective Date or as soon as reasonably practicable thereafter, each holder of such an administrative claim will receive, at the option of the Company (with the reasonable consent of the Required First Lien Lender Group), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim: (i) payment in full in cash; (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code; (iii) delivery of the collateral securing any such secured claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (iv) such other treatment rendering such claim unimpaired. | N/A |
| *Priority Tax Claims* | Unless a holder of an allowed priority tax claim agrees to a lesser treatment, on the Restructuring Effective Date or as soon as reasonably practicable thereafter, each holder of such a priority tax claim will receive, at the option of the Company (with the reasonable consent of the Required First Lien Lender Group), in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such claim: (i) payment in full in cash; (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code; (iii) delivery of the collateral securing any such secured claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (iv) such other treatment rendering such claim unimpaired. | N/A |
| **Classified Claims and Equity Interests** | | |
| *Other Priority Claims* | On the Restructuring Effective Date, each holder of an allowed Other Priority Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the Bankruptcy Code. | Unimpaired / Not Entitled to Vote / Deemed to Accept |
| *Other Secured Claims* | On the Restructuring Effective Date, each holder of an allowed Other Secured Claim shall receive treatment in a manner consistent with section 1129(a)(9) of the | Unimpaired / Not Entitled to Vote / Deemed to Accept |

| | | |
|---|---|---|
| | Bankruptcy Code. | |
| *First Lien Credit Facility Claims* | On the Restructuring Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the First Lien Credit Facility Claims, each holder of an allowed First Lien Credit Facility Claim shall receive its *pro rata* share of (i) the Second Out Exit Term Loans  (as defined in the Exit Term Loan Facilities Term Sheet), and (ii) 96.5% of the New Common Stock (subject to dilution on account of the MIP). | Impaired / Entitled to Vote |
| *1.5L Credit Facility Claims* | On the Restructuring Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the 1.5L Credit Facility Claims, each holder of an allowed 1.5L Credit Facility Claim shall receive its *pro rata* share of 2.5% of the New Common Stock (subject to dilution on account of the MIP). | Impaired / Entitled to Vote |
| *Second Lien Credit Facility Claims* | On the Restructuring Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the Second Lien Credit Facility Claims, each holder of an allowed Second Lien Credit Facility Claim shall receive its *pro rata* share of 1.0% of the New Common Stock (subject to dilution on account of the MIP). | Impaired / Entitled to Vote |
| *General Unsecured Claims* | On the Restructuring Effective Date, in exchange for the full and final satisfaction, settlement, release, and discharge of the General Unsecured Claims, each holder of an allowed General Unsecured Claim shall: <br><br> (i) be reinstated pursuant to section 1124 of the Bankruptcy Code; or <br><br> (ii) receive payment in full in cash on (a) the Restructuring Effective Date, or (b) the date due in the ordinary course of business in accordance with the terms and conditions of the agreement or transaction giving rise to such claim. | Unimpaired / Not Entitled to Vote / Deemed to Accept |
| *Trade Claims* | The Company Parties or the Reorganized Company Parties, as applicable, shall continue to pay each Trade Claim in the ordinary course of business as if the Chapter 11 Cases had not been commenced. | Unimpaired / Not Entitled to Vote / Deemed to Accept |
| *Equity Interests* | On the Restructuring Effective Date, each holder of an allowed Equity Interest in Holdings shall receive no distribution on account thereof and each such Equity Interest shall be cancelled. | Impaired / Not Entitled to Vote / Deemed to Reject |
| *Intercompany Claims* | All claims held by one Company Party against any other Company Party will be, at the option of the Company (with the reasonable consent of the Required First Lien Lender Group), either (a) reinstated, or (b) discharged without any distribution on account of such claims. | Impaired / Not Entitled to Vote / Deemed to Reject |

| | | |
|---|---|---|
| *Intercompany Interests* | All interests held by one Company Party in any other Company Party will be, at the option of the Company (with the reasonable consent of the Required First Lien Lender Group), either (a) reinstated or (b) cancelled without any distribution on account of such interests. | Impaired / Not Entitled to Vote / Deemed to Reject |
| **OTHER TERMS OF THE PLAN** | | |
| *Subordination* | The classification and treatment of Claims under the Plan, if applicable, shall conform to the respective contractual, legal, and equitable subordination rights of such Claims, and any such rights shall be settled, compromised, and released pursuant to the Plan. | |
| *Restructuring Transactions* | The Confirmation Order shall authorize, among other things, all actions as may be reasonably necessary or appropriate to effectuate any transaction described in, approved by, contemplated by, or necessary to consummate the Plan, as well as the Restructuring Transactions therein.  On the Restructuring Effective Date, the Debtors, as applicable, shall issue all securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Restructuring. | |
| *Cancellation of Notes, Instruments, Certificates, and Other Documents* | On the Restructuring Effective Date, except to the extent otherwise provided in this Restructuring Term Sheet or the Plan, as applicable, all notes, instruments, certificates, and other documents evidencing Claims or Equity Interests, including credit agreements and indentures, shall be canceled, and the Debtors' obligations thereunder or in any way related thereto shall be deemed satisfied in full and discharged.  Notwithstanding such cancellation and discharge, if any, the Prepetition Credit Agreements shall continue in effect to the extent necessary (i) to allow the holders of the applicable Claims to receive distributions under the Plan, and (ii) to allow the Agents to make distributions pursuant to the Plan and to preserve and exercise against such distributions their respective charging liens with respect to any unpaid fees, expenses, and indemnification obligations, as applicable.  Except for the foregoing, subsequent to the performance by the Agents of their obligations pursuant to the Plan, the Agents shall be relieved of all further duties and responsibilities related to the applicable agreements. | |
| *Executory Contracts and Unexpired Leases* | If the Company pursues the In-Court Restructuring, the Plan will provide that the executory contracts and unexpired leases that are not rejected as of the Restructuring Effective Date (either pursuant to the Plan or a separate motion) will be deemed assumed pursuant to section 365 of the Bankruptcy Code. The assumption or rejection of any executory contract or unexpired lease by the Debtors shall be subject to the reasonable consent of the Required First Lien Lender Group. | |
| *Retention of Jurisdiction* | If the Company pursues the In-Court Restructuring, the Plan will provide that the Bankruptcy Court shall retain jurisdiction for usual and customary matters to the extent consistent with applicable law. | |
| *Discharge of Claims and Termination of Equity Interests* | If the Company pursues the In-Court Restructuring, pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to or assumed by the Plan, the distributions, rights, and treatment that are provided in the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Restructuring Effective Date, of Claims (including any intercompany claims that the Debtors resolve or compromise after the Restructuring Effective Date), Equity Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Equity Interests from and after the Petition Date, whether known or unknown, against, liabilities | |

| | |
|---|---|
| | of, liens on, obligations of, rights against, and Equity Interests in the Debtors or any of their respective assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Equity Interests, including demands, liabilities, and Causes of Action that arose before the Restructuring Effective Date, any liability (including withdrawal liability) to the extent such Claims or Equity Interests relate to services that employees of the Debtors have performed prior to the Restructuring Effective Date, and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Restructuring Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (ii) a Claim or Equity Interest based upon such debt, right, or Equity Interest is allowed pursuant to section 502 of the Bankruptcy Code, or (iii) the holder of such a Claim or Equity Interest has accepted the Plan.  The Confirmation Order, if applicable, shall be a judicial determination of the discharge of all Claims and Equity Interests subject to the occurrence of the Restructuring Effective Date. |
| ***Releases by the Debtors*** | If the Company pursues the In-Court Restructuring, on and after the Restructuring Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Restructuring Effective Date, each Released Party will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by each and all of the Debtors, the Reorganized Debtors, and their estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Causes of Action, whether known or unknown, including any derivative claims asserted or assertable on behalf of any of the Debtors, that the Debtors, the Reorganized Debtors, or their estates or Affiliates, as applicable, would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Agreement, the Definitive Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the |

| | |
|---|---|
| | Debtors' in- or out-of-court restructuring efforts (including those contemplated by this Agreement), the filing of the Chapter 11 Cases, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Restructuring Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Restructuring Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, any assumed contract, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the  Plan. |
| ***Releases by Holders of Claims and Equity Interests*** | If the Company Parties pursue the In-Court Restructuring, on and after the Restructuring Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Restructuring Effective Date, each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, whether known or unknown, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Equity Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Equity Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Agreement, the Definitive Documents, the Plan, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the Debtors' in- or out-of-court restructuring efforts (including those contemplated by this Agreement), the filing of the Chapter 11 Cases, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, |

| | including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Restructuring Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising after the Restructuring Effective Date under the Plan, the Confirmation Order, any Restructuring Transaction, any assumed contract, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Provisions as set forth in the Plan. |
|---|---|
| ***Exculpation*** | If the Company pursues the In-Court Restructuring, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Agreement and related prepetition transactions, the Disclosure Statement, the Plan, any other Definitive Document or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation, the pursuit of consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan, or such distributions made pursuant to the Plan. |
| ***Injunction*** | If the Company pursues the In-Court Restructuring, except as otherwise expressly provided in the Plan, or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Equity Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Restructuring Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; |

|  | (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Equity Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Restructuring Effective Date, and notwithstanding an indication of a Claim or Equity Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Equity Interests released or settled pursuant to the Plan. |
|---|---|
| ***Certain Definitions*** | The following definitions shall be applicable to the foregoing release and exculpation provisions:<br><br>"***Released Parties***" means collectively, and in each case in its capacity as such: (i) each of the Debtors; (ii) each of the Reorganized Debtors; (iii) each Consenting Party; (iv) each holder of a Claim who votes in favor the Plan and does not opt out of the releases contained in the Plan; (v) each current and former Affiliate of each Entity in clause (i) through the following clause (vi); and (vi) each Related Party of each Entity in clause (i) through this clause (vi); provided, that in each case, an Entity shall not be a Released Party if it: (i) elects to opt out of the release contained in the Plan; or (ii) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation.<br><br>"***Releasing Parties***" means, collectively, and in each case in its capacity as such: (i) each of the Debtors; (ii) each of the Reorganized Debtors; (iii) each Consenting Party; (iv) each of the Agents; (v) all Holders of Claims; (vi) each current and former Affiliate of each Entity in clause (i) through the following clause (vii); and (vii) each Related Party of each Entity in clause (i) through this clause (vii) for which such Entity is legally entitled to bind such Related Party to the releases contained in the Plan under applicable law; provided, that, in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases contained in the Plan; or (y) timely objects to the releases contained in the Plan and such objection is not resolved before Confirmation.<br><br>"***Exculpated Parties***" means, collectively, and in each case in its capacity as such: (i) each of the Debtors; (ii) each of the Reorganized Debtors; (iii) each current and former Affiliate of each Entity in clause (i) through the following clause (iv); and (iv) the directors, officers, restructuring professionals and other Related Parties of each Entity in clauses (i) through this clause (iv). |
| ***Governance*** | Corporate governance for Reorganized Company Parties, including charters, bylaws, operating agreements, or other organizational documents, as applicable (the "***New Organizational Documents***"), shall be consistent with this Restructuring Term Sheet, the Governance Term Sheet, and section 1123(a)(6) of the Bankruptcy Code, if applicable. |
| ***Exemption from SEC Registration*** | If the Company pursues the In-Court Restructuring, the Plan and Confirmation Order shall provide that the issuance of any securities under the Plan, including the New Common Stock, will be exempt from securities laws in accordance with section 1145 of the Bankruptcy Code to the greatest extent possible and, to the |

| | |
|---|---|
| | extent the section 1145 exemption is unavailable, will be issued in reliance on the exemption provided by section 4(a)(2) under the Securities Act or another applicable exemption. For the avoidance of doubt, the New Common Stock issued under the MIP shall be issued in accordance with applicable exemptions under federal and state securities laws. |
| ***Employment Obligations*** | Pursuant to the Agreement and this Restructuring Term Sheet, the Parties consent to the continuation of the Debtors' wages, compensation, and benefits programs according to existing terms and practices, including executive compensation programs and any motions in the Bankruptcy Court for approval thereof. If the Company pursues the In-Court Restructuring, on the Restructuring Effective Date, the Debtors shall (i) assume all employment agreements, indemnification agreements, or other agreements entered into with current employees or (ii) enter into new agreements with such employees on terms and conditions acceptable to the Debtor, such employee, and the Required First Lien Lender Group. |
| ***Indemnification Obligations*** | All indemnification provisions in place as of immediately prior to the Restructuring Effective Date (whether in the by-laws, certificates of incorporation or formation, limited liability company agreements, other organizational documents, board resolutions, indemnification agreements, employment contracts, or otherwise) for current and former directors, officers, managers, equity holders, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors and such current and former directors, officers, and managers' respective Affiliates (collectively, the "***Indemnification Provisions***"), as applicable, will not be discharged or impaired by confirmation of the Plan and shall be reinstated and remain intact, irrevocable, and shall survive the effectiveness of the Restructuring on terms no less favorable to such current and former directors, officers, managers, employees, attorneys, accountants, investment bankers, and other professionals of the Debtors than the indemnification provisions in place prior to the Restructuring.<br><br>Director and officer insurance will continue in place for the directors and officers of all of the Debtors during the Chapter 11 Cases on existing or comparable terms.<br>To the extent not previously obtained, on or prior to the Restructuring Effective Date, the Debtors shall acquire a standard tail policy covering any director and officer at any time prior to the Restructuring Effective Date in at least the scope and amount as currently maintained by the Debtors for six years after the Plan Effective Date. Any such tail policy shall not be impaired or terminated by the Plan. |
| ***Retained Causes of Action*** | The Reorganized Debtors shall retain all rights to commence and pursue any Causes of Action, other than any Causes of Action that the Debtors or Reorganized Debtors have released pursuant to the release and exculpation provisions outlined in this Restructuring Term Sheet and implemented pursuant to the Plan. |
| ***Conditions Precedent to Restructuring*** | The following shall be conditions to the Restructuring Effective Date (the "***Conditions Precedent***"):<br><br>(a)    if the Company pursues the In-Court Restructuring, the Bankruptcy Court shall have entered the Confirmation Order, which shall be in form and substance consistent in all material respects with this Restructuring Term Sheet and the Agreement and shall: |

(i)    authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)    decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

(iii)    authorize the Debtors to: (i) implement the Restructuring Transactions; (ii) distribute the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or another exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions and issuances as required under the Plan; and (iv) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, including the MIP;

(iv)    authorize the implementation of the Plan in accordance with its terms; and

(v)    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

(b)    the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Restructuring Effective Date;

(c)    if the Company pursues the In-Court Restructuring, the Debtors shall not be in default under the DIP Facility or any DIP Order;

(d)    the Corporate Governance Documents shall be in full force and effect, in form and substance consistent in all respects with this Restructuring Term Sheet, the Governance Term Sheet, and the Agreement;

(e)    the Debtors shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, and all waiting periods imposed by any governmental entity shall have terminated or expired;

(f)    if the Company pursues the In-Court Restructuring, the final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in a manner consistent in all material respects with the Agreement, this Restructuring Term Sheet, the Governance Term Sheet, and the Plan;

(g)    the Agreement shall not have been terminated as to all parties thereto and shall remain in full force and effect, and there shall be no active termination event thereunder as to all parties thereto that has not been waived;

(h)    the applicable Definitive Documents shall be in full force and effect and in form and substance consistent in all respects with this Restructuring Term Sheet, the Governance Term Sheet, and the Agreement;

(i)    if the Company pursues the In-Court Restructuring, the final DIP Order shall remain in full force and effect;

(j)    if the Company pursues the In-Court Restructuring, all professional fees and expenses of retained professionals that require the approval of the

| | |
|---|---|
| | Bankruptcy Court shall have been paid in full or amounts sufficient to pay such fees and expenses after the Restructuring Effective Date shall have been placed in a professional fee escrow account pending the approval of such fees and expenses by the Bankruptcy Court;<br><br>(k) all fees and expenses of the Consenting Creditor Representatives shall have been paid in accordance with the Agreement, the final DIP Order, the Plan, or otherwise;<br><br>(l) the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated in this Restructuring Term Sheet in a manner consistent with the Agreement, this Restructuring Term Sheet, the Governance Term Sheet, and the Plan; and<br><br>(m) no court of competent jurisdiction or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, preventing or prohibiting the consummation of the Restructuring Transactions, the Agreement, or any of the definitive documentation contemplated thereby. |
| ***Waiver of Conditions Precedent*** | The Debtors, with the prior written consent of the Required First Lien Lender Group (not to be withheld unreasonably), may waive any one or more of the Conditions Precedent. |

**<u>EXHIBIT B</u>**

**DIP Facility Term Sheet**

**SUMMARY OF TERMS AND CONDITIONS**

**SENIOR SECURED SUPERPRIORITY PRIMING
DEBTOR-IN-POSSESSION CREDIT FACILITY**

This term sheet (including all exhibits, annexes, and schedules hereto, and as may be amended, modified or supplemented from time to time in accordance with Section 14 of the Agreement, this "***DIP Term Sheet***") is a summary of the terms and conditions for a proposed senior secured, superpriority debtor-in-possession credit facility (the "***DIP Facility***"; the credit agreement evidencing the DIP Facility, the "***DIP Credit Agreement***" and, together with the other definitive documents governing the DIP Facility, the "***DIP Documents***") to be provided to the Borrower (as defined below) and certain of its affiliates (including certain subsidiaries of the Borrower), as debtors and debtors-in-possession (collectively, the "***Debtors***") in their respective Chapter 11 Cases to be commenced on the terms set forth in the Restructuring Support Agreement to which this DIP Term Sheet is attached as **Exhibit B** (the "***Agreement***").

This DIP Term Sheet does not include a description of all of the terms, conditions, and other provisions that will be contained in the DIP Documents, which remain subject to negotiation and completion in accordance with and consistent with the Agreement, this DIP Term Sheet, and applicable bankruptcy law. This DIP Term Sheet incorporates the rules of construction as set forth in the Agreement and section 102 of the Bankruptcy Code.

| | |
|---|---|
| ***Borrower:*** | Strategic Materials Holding Corp., a Delaware corporation, as a debtor and debtor-in-possession (the "***Borrower***"). |
| ***Guarantors:*** | All obligations under the DIP Facility will be fully and unconditionally guaranteed by (i) SMI Group Acquisitions, Inc., a Delaware corporation ("***Holdings***"), (ii) each of the Borrower's domestic subsidiaries, including its subsidiaries that are Debtors, each as a debtor and debtor-in-possession, and (iii) each of the Borrower's subsidiaries organized under the laws of Mexico (the "***Foreign Subsidiary Guarantors***"; and collectively with Holdings and the subsidiaries of the Borrower referred to in clause (ii), the "***Guarantors***"). The Borrower and the Guarantors are referred to herein collectively as the "***Loan Parties***"). |
| | For the avoidance of doubt and notwithstanding any provision to the contrary herein or in any DIP Document, in no event shall NexCycle Canada, Ltd., an Ontario corporation, or any of its subsidiaries be required to become a Loan Party or a Guarantor or to grant a security interest over any of their respective assets in connection with the DIP Facility or under any DIP Document unless all Obligations (as defined in the Canadian Credit Agreement referred to below) have been paid in full in cash (other than contingent reimbursement or indemnification obligations for which no claim has been made in writing). |
| ***DIP Lenders:*** | The Prepetition 1L Lenders (as defined below) and Prepetition Superpriority Lenders (as defined below) in the ad hoc group of Prepetition 1L Lenders and Prepetition Superpriority Lenders represented by Arnold & Porter Kaye |

<table>
<tr>
<td></td>
<td>Scholer LLP (the "***Ad Hoc Group***") will provide the New Money DIP Commitments (as defined below).

Notwithstanding anything herein to the contrary, each member of the Ad Hoc Group shall be permitted to allocate its respective funding obligation with respect to its New Money DIP Commitment to any of its affiliate designees; provided such assignor shall not be released from its funding obligation until immediately after the initial funding of the New Money DIP Loans.

Each member of the Ad Hoc Group (or affiliated designee thereof) that provides a portion of the New Money DIP Commitments (and/or holds DIP Roll-Up Loans (as defined below)), in its capacity as a lender under the DIP Facilities, together with its successors and permitted assigns in such capacity, is referred to herein as a "***DIP Lender,***" and collectively, as the "***DIP Lenders***."</td>
</tr>
<tr>
<td>***DIP Agent:***</td>
<td>Acquiom Agency Services LLC and Seaport Loan Products LLC will act as co-administrative agents and collateral agent for the DIP Lenders with respect to the DIP Facility (in such capacities, collectively, the "***DIP Agent***").</td>
</tr>
<tr>
<td>***Prepetition Credit Facilities:***</td>
<td>**Prepetition Superpriority Facility**: That certain Superpriority Secured Credit Agreement, dated as of September 15, 2023 (as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition Superpriority Credit Agreement***"), by and among the Borrower, Holdings, Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (in such capacities as co-administrative agents under the Prepetition Superpriority Credit Agreement and related loan documents, the "***Prepetition Superpriority Agent***"), and the lenders (the "***Prepetition Superpriority Lenders***") party thereto from time to time (including all exhibits and guarantee, security and other ancillary documentation in respect thereof, in each case as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition Superpriority Facility***"; all obligations of the Debtors under or related to the Prepetition Superpriority Facility, the "***Prepetition Superpriority Obligations***").

**Prepetition 1L Facility**: That certain First Lien Credit Agreement, dated as of November 1, 2017 (as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition 1L Credit Agreement***"), by and among the Borrower, Holdings, Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents and collateral agent (as successor to Goldman Sachs Bank USA in such capacities) (in such capacities as co-administrative agents and collateral agent under the Prepetition 1L Credit Agreement and related loan documents, the "***Prepetition 1L Agent***"), and the lenders (the "***Prepetition 1L Lenders***") party thereto from time to time (including all exhibits and guarantee, security and other ancillary documentation in respect thereof, in each case as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition 1L Facility***"; all obligations of the Debtors under or related to the Prepetition 1L Facility, the "***Prepetition 1L Obligations***").</td>
</tr>
</table>

|  | **Prepetition 1.5L Facility**: That certain 1.5 Lien Credit Agreement, dated as of September 22, 2022 (as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition 1.5L Credit Agreement***"), by and among the Borrower, Holdings, Alter Domus (US) LLC, as administrative agent and collateral agent (in such capacities as administrative agent and collateral agent under the Prepetition 1.5L Credit Agreement and related loan documents, the "***Prepetition 1.5L Agent***"), and the lenders (the "***Prepetition 1.5L Lenders***") party thereto from time to time (including all exhibits and guarantee, security and other ancillary documentation in respect thereof, in each case as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition 1.5L Facility***"; all obligations of the Debtors under or related to the Prepetition 1.5L Facility, the "***Prepetition 1.5L Obligations***"). |
|  | **Prepetition 2L Facility**: That certain Second Lien Credit Agreement, dated as of November 1, 2017 (as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition 2L Credit Agreement***"), by and among the Borrower, Holdings, Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents and collateral agent (as successor to Goldman Sachs Bank USA in such capacities) (in such capacities as co-administrative agents and collateral agent under the Prepetition 2L Credit Agreement and related loan documents, the "***Prepetition 2L Agent***"; and together with the Prepetition 1L Agent and the Prepetition 1.5L Agent, the "***Prepetition Agents***"), and the lenders (the "***Prepetition 2L Lenders***"; and together with the Prepetition 1L Lenders and the Prepetition 1.5L Lenders, the "***Prepetition Lenders***") party thereto from time to time (including all exhibits and guarantee, security and other ancillary documentation in respect thereof, in each case as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition 2L Facility***"; all obligations of the Debtor under or related to the Prepetition 2L Facility, the "***Prepetition 2L Obligations***"). |
|  | **Canadian Credit Facility**: That certain Term Loan Credit Agreement, dated as of December 31, 2019 (as amended, supplemented or otherwise modified prior to the date hereof, the "***Canadian Credit Agreement***"), by and among NexCycle Canada Ltd., an Ontario corporation, NexCycle Industries Ltd., an Ontario corporation (the "***Canadian Borrower***"), Piney Lake Opportunities ECI Master Fund LP, as administrative agent and collateral agent, and the lenders party thereto from time to time (including all exhibits and guarantee, security and other ancillary documentation in respect thereof, in each case as amended, supplemented or otherwise modified prior to the date hereof, the "***Canadian Credit Facility***"; all obligations of the Canadian Borrower and the Loan Parties (as defined in the Canadian Credit Agreement) under the Canadian Credit Facility, the "***Canadian Credit Facility Obligations***"). |
| ***DIP Facility:*** | A multi-draw superpriority senior secured priming debtor-in-possession term loan facility (the "***DIP Facility***") consisting of (i) new money delayed-draw term loans in an aggregate principal amount not to exceed an amount to be agreed in accordance with the DIP Amount Procedures (as defined below) (the commitments to provide such new money delayed-draw term loans under the DIP Facility, the "***New Money DIP Commitments***," and such new money |

delayed-draw term loans under the DIP Facility, the "***New Money DIP Loans***") and (ii) loans representing a "roll up" of the Prepetition Superpriority Obligations (such loans, the "***DIP Roll-Up Loans***" and, together with the New Money DIP Loans, the "***DIP Loans***").  Once repaid or prepaid, no portion of the DIP Loans may be reborrowed.  The New Money DIP Commitments will be permanently reduced upon each funding of New Money DIP Loans by an amount equal to such funding.

The Borrower and the DIP Lenders shall, reasonably in advance of the Petition Date, negotiate in good faith the relative sizes of the Initial Draw (as defined below) and the remaining amount and maturity of the DIP Facility in light of the budget most recently delivered to the DIP Lenders (to the extent such budget is reasonably satisfactory to the Required Lenders (as defined in the Prepetition Superpriority Credit Agreement)), the expected duration of the Bankruptcy Cases and the status of the Plan as of the Petition Date (the "***DIP Amount Procedures***").

| | |
|---|---|
| ***Interim Availability:*** | On the first date upon which an order by the Bankruptcy Court granting interim approval of the DIP Facility (which shall be in form and substance consistent with this DIP Term Sheet and otherwise reasonably satisfactory to the DIP Lenders and the DIP Agent, the "***Interim Order***") shall have been entered and all other conditions precedent to funding shall have been satisfied or waived (the "***Closing Date***"), the Borrower shall make a single draw of New Money DIP Loans under the New Money DIP Commitments in an amount to be agreed in accordance with the DIP Amount Procedures (the "***Initial Draw***"), which Initial Draw shall be funded into and credited to the Funding Account (as defined below); <u>provided</u>, that, notwithstanding the foregoing, a portion of the Initial Draw not to exceed an amount to be agreed may be disbursed to account(s) other than the Funding Account (as defined below) or directly to one or more payees in the manner to be agreed in the DIP Documents. The DIP Roll-Up Loans shall be deemed to have been advanced on the Closing Date concurrently with the Initial Draw. |
| ***Full Availability:*** | On the first date upon which an order by the Bankruptcy Court granting final approval of the DIP Facility (which shall be in form and substance consistent with this DIP Term Sheet and otherwise reasonably satisfactory to the DIP Lenders and the DIP Agent, the "***Final Order***" and together with the Interim Order, the "***Orders***") shall have been entered and all other conditions precedent to funding shall have been satisfied or waived, the full remaining amount of the New Money DIP Commitments shall be available to the Borrower, subject to compliance with the terms, conditions and covenants described in the DIP Documents. |
| ***Funding Account:*** | Except as otherwise specified herein, the proceeds of the New Money DIP Loans when made shall be funded or credited to a non-interest bearing account in the name of the DIP Agent and subject to the sole control of the DIP Agent (the "***Funding Account***").   The Borrower may, subject to conditions precedent for withdrawals substantially consistent with those set forth in the |

| | |
|---|---|
| | Prepetition Superpriority Credit Agreement, withdraw or apply funds from the Funding Account solely for the purposes set forth under the heading "Use of Proceeds" below.  For the avoidance of doubt, the New Money DIP Loans shall be outstanding and accrue interest at the rate set forth herein notwithstanding that the proceeds thereof may be held in the Funding Account. |
| ***DIP Obligations:*** | "***DIP Obligations***" means (a) the due and punctual payment by the Loan Parties of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after the Petition Date) the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to be due, now existing or hereafter arising, fixed or otherwise, of the Loan Parties to the DIP Agent and the DIP Lenders under the DIP Documents and the Orders (including the costs and expenses of the advisors to the DIP Agent and the DIP Lenders payable pursuant to the terms of the DIP Documents), and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the Loan Parties to the DIP Agent and the DIP Lenders under or pursuant to the DIP Documents and the Orders. |
| ***Use of Proceeds:*** | The proceeds of the New Money DIP Loans and Cash Collateral (as defined in section 363 of the Bankruptcy Code) will be available to finance, in each case consistent (subject to Permitted Variances) with the Approved Budget: |
| | (i)  interest, fees and expenses owed to the DIP Lenders and the DIP Agent; |
| | (ii)  working capital of the Debtors during the pendency of the Chapter 11 Cases; |
| | (iii)  administrative costs of the Chapter 11 Cases; and |
| | (iv)  payments in respect of the adequate protection provided to the Prepetition 1L Secured Parties (as defined below). |
| | No proceeds of the DIP Facility, any DIP Collateral (as defined below) or any cash collateral may be used (i) for any fees or expenses incurred in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the DIP Agent, the DIP Lenders, the Prepetition 1L Agent or the Prepetition 1L Lenders (the Prepetition 1L Lenders, together with the Prepetition 1L Agent and any other holder of Prepetition 1L Obligations, the "***Prepetition 1L Secured Parties***"), (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and adequate protection of the DIP Agent and the DIP Lenders or the Prepetition 1L Secured Parties, as applicable, including for the avoidance of doubt, (a) objecting to or contesting the validity, extent, amount, |

| | |
|---|---|
| | perfection, priority, or enforceability of the obligations under the DIP Facility or the DIP Liens (as defined below), or (b) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations and liens under the Prepetition 1L Credit Agreement, (iii) for any purpose that is prohibited under the Bankruptcy Code or the Orders, or (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body, or to pay any costs or expenses incurred in connection with any such claim, action or proceeding, in each case which payment, cost or expense is not provided for in the Approved Budget, without the prior written consent of the DIP Lenders holding, managing or controlling in the aggregate, DIP Loans and unused New Money DIP Commitments comprising 50.1% of principal amount of all DIP Loans and unused New Money DIP Commitments (the "***Required DIP Lenders***"). |
| ***Maturity Date:*** | The "***Maturity Date***" of the DIP Facility shall be the earliest of (i) the effective date of any Chapter 11 plan for the reorganization of the Borrower or any other Debtor; (ii) the date that all DIP Loans shall become due and payable in full in accordance with the terms of the DIP Facility, including due to acceleration of the DIP Loans pursuant to the DIP Documents; (iii) 35 days after the Petition Date if the Final Order has not been entered on or prior to the expiration of such period, and (iv) a specified number of days from the Petition Date to be agreed in the DIP Credit Agreement (determined in accordance with the DIP Amount Procedures) (the "***Scheduled Maturity Date***"). <br><br> The DIP Facilities, together with all accrued and unpaid interest thereon, will be due and payable on the Scheduled Maturity Date. |
| ***Amortization:*** | None. |
| ***Interest:*** | The DIP Loans will bear interest at a per annum rate equal to one-month Adjusted Term SOFR (with a SOFR adjustment of 0.11448% (11.448 basis points) and with a 1.00% floor), plus 10.00%. A customary alternate base rate option will be available as an alternative to Adjusted Term SOFR. <br><br> Upon the occurrence and during the continuance of an Event of Default (as defined below), the DIP Obligations (including, without limitation, the DIP Loans) will bear interest at a rate per annum equal to 2.00% above the otherwise applicable rate (or, if there is no applicable rate, the rate applicable to DIP Loans accruing interest at the base rate, plus 2.00%), payable upon demand. <br><br> Interest shall be payable in cash in arrears on the last day of each one-month SOFR interest period, and upon prepayment on the amount of DIP Loans prepaid. <br><br> For the avoidance of doubt, all outstanding DIP Loans shall bear interest, including any DIP Loans the proceeds of which are on deposit in the Funding |

| | |
|---|---|
| | Account and are then unavailable for withdrawal or other utilization in accordance with the DIP Documents. |
| *Commitment Fee:* | A commitment fee (the "***Commitment Fee***") equal to (i) 4.00% of the aggregate principal amount of the New Money DIP Commitments on the Closing Date (immediately prior to the funding thereof on the Closing Date) will be payable on the Closing Date to the DIP Lenders on a *pro rata* basis based on their respective New Money DIP Commitments (immediately prior to the funding thereof) on the Closing Date and (ii) 2.00% of the aggregate principal amount of the DIP Roll-Up Loans on the Closing Date (immediately after giving effect to the deemed funding thereof on the Closing Date) will be payable on the Closing Date to the DIP Lenders on a *pro rata* basis based on their respective DIP Roll-Up Loans on the Closing Date. The Commitment Fee in respect of the New Money DIP Commitments may be structured as original issue discount. |
| *Exit Fee:* | An exit fee (the "***Exit Fee***") equal to 4.00% of the aggregate principal amount of the New Money DIP Commitments on the Closing Date (immediately prior to the funding thereof on the Closing Date) and DIP Roll-Up Loans on the Closing Date (immediately after giving effect to the deemed funding thereof on the Closing Date) will be payable on the Maturity Date, or on the date of any earlier voluntary or mandatory prepayment of the DIP Loans, to the DIP Lenders on a *pro rata* basis based on their respective DIP Loan amounts immediately prior to the Maturity Date. |
| *Agency Fees:* | To be set forth in a separate fee letter to be entered into by the Borrower and the DIP Agent on the Closing Date (the "***Agent Fee Letter***"). All fees payable under the Agent Fee Letter shall be paid on the dates due, in U.S. dollars and immediately available funds. Once paid, the fees payable under the Agent Fee Letter shall not be refundable under any circumstances. |
| *Milestones:* | The DIP Documents will contain certain milestones (the "***Milestones***"), including, without limitation: |
| | (i) no later than October 19, 2023, the Company shall commence solicitation of the Plan; |
| | (ii) no later than the Petition Date, the Company shall have filed the Plan, the Disclosure Statement, the Disclosure Statement Motion, the Plan Supplement, and the DIP Motion with the Bankruptcy Court; |
| | (iii) no later than three (3) Business Days after the Petition Date the Company shall deliver a notice of hearing at which the Bankruptcy Court will consider confirmation of the Plan and final approval of the Disclosure Statement to the Consenting Creditor Representatives; |
| | (iv) no later than three (3) Business Days following the Petition Date (subject to the availability of the Bankruptcy Court), the Bankruptcy Court shall have entered the Interim Order; |

<table>
<tr>
<td></td>
<td>

(v) no later than thirty-five (35) days following the Petition Date (subject to the availability of the Bankruptcy Court), the Bankruptcy Court shall have entered the final DIP Order and the Confirmation Order; and

(vi) no later than forty (40) days following the Petition Date, the Restructuring Transactions shall have been consummated and the Restructuring Effective date shall have occurred.

</td>
</tr>
<tr>
<td>

***Mandatory Prepayments:***

</td>
<td>

The DIP Documents will contain mandatory prepayments that are customary for debtor-in-possession financing of this type, including, without limitation, 100% of the net cash proceeds of (i) non-ordinary course asset sales, (ii) insurance/condemnation events and other extraordinary receipts, and (iii) any incurrence of indebtedness not otherwise permitted under the DIP Documents.

</td>
</tr>
<tr>
<td>

***Voluntary Prepayments:***

</td>
<td>

The Debtors may, at any time prior to maturity, voluntarily repay the DIP Loans in full or in part; <u>provided</u>, that any such prepayment shall be made with all accrued interest, fees (including the Exit Fee) and other amounts (including any SOFR breakage costs) outstanding in respect of such prepaid DIP Loans.

</td>
</tr>
<tr>
<td>

***Collateral and Liens:***

</td>
<td>

All DIP Loans and other DIP Obligations of the Loan Parties owed to the DIP Agent and the DIP Lenders under the DIP Facility shall be secured by perfected, first priority, senior priming liens (collectively, the "***DIP Liens***") on and security interests in all prepetition and postpetition property of the Loan Parties, whether existing on the Petition Date or thereafter acquired, including, without limitation, all inventory, equipment, accounts, cash and cash equivalents, general intangibles, intercompany receivables, contract rights, supporting obligations and letter-of-credit rights, instruments (including, but not limited to, intercompany notes), deposit accounts, investment property, intellectual property, books and records, investments, proceeds of causes of action (including those arising under sections 544, 547, 548 and 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code), and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (all such assets, collectively, the "***DIP Collateral***"). For the avoidance of doubt, the DIP Collateral shall include, subject to entry of the Final Order, the proceeds of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code).

All liens authorized and granted pursuant to the Orders on DIP Collateral of the Debtors shall be deemed valid, binding, enforceable, effective and automatically perfected and non-avoidable as of the Petition Date, and no further filing, notice, or act under applicable law or otherwise will be required to effect such perfection. The DIP Lenders, or the DIP Agent on behalf of the DIP Lenders, shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be necessary under state law or other applicable law in order to enforce

</td>
</tr>
</table>

| | |
|---|---|
| | the security, perfection or priority of the DIP Lenders' claims described herein. The Foreign Subsidiary Guarantors will be required to take all actions reasonably requested by the DIP Agent or Required DIP Lenders to grant, create and maintain the perfection of the liens and security interests granted on the DIP Collateral of such Foreign Subsidiary Guarantors. |
| ***Carve-Out:*** | The liens securing the DIP Obligations, the DIP Obligations' status as "super-priority" claims, the "super-priority" claims and liens constituting the 1L Adequate Protection Claims (as defined below), 1.5L Adequate Protection Claims (as defined below), and 2L Adequate Protection Claims (as defined below), and the liens securing the Prepetition Obligations shall be subject to a "carve-out" on customary terms for a transaction of this type (the "***Carve-Out***"). |
| ***Debtors' Stipulations:*** | Customary debtor stipulations regarding validity of claims, liens and causes of action. |
| ***Credit Bidding:*** | The DIP Agent will have the right to credit bid, in accordance with the DIP Documents, up to the full amount of the DIP Obligations in any sale of the DIP Collateral without the need for further court order authorizing the same and whether any such sale is effectuated through section 363(k) or 1129(b) of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise. |
| ***Priority:*** | The DIP Facility and all other DIP Obligations shall, subject to the Carve-Out, at all times: |
| | (i)  pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense status (the "***DIP Superpriority Claims***"), with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code; |
| | (ii)  pursuant to section 364(c)(2) of the Bankruptcy Code, have a first priority lien on and security interest in all DIP Collateral that is not subject to a valid, enforceable, non-avoidable and perfected lien existing on the Petition Date; |
| | (iii)  pursuant to section 364(c)(3) of the Bankruptcy Code, have a lien on and security interest in all DIP Collateral that is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the liens of the Prepetition Lenders and Prepetition Agents, which prepetition liens will be primed by the liens |

|  | described in the next clause) ("**Permitted Third Party Liens**"); and |
|  | (iv) pursuant to section 364(d)(1) of the Bankruptcy Code, have a first priority, senior priming lien on and security interest in all DIP Collateral, subject and junior to Permitted Third Party Liens. |
| **Adequate Protection:** | The Prepetition 1L Secured Parties shall be entitled to adequate protection of their interests in the Collateral (as defined in the Prepetition 1L Credit Agreement, the "**Prepetition Collateral**") in an amount equal to the aggregate diminution in the value of their interests therein from and after the Petition Date (the "**1L Adequate Protection Claims**") in the form of: (i) a senior perfected replacement lien on all the Prepetition Collateral, including any such assets of the Debtors' estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof, to secure the Adequate Protection Claims (the "**1L Adequate Protection Liens**"), senior to all other liens on such Prepetition Collateral (other than the liens thereon securing the DIP Facility and any Permitted Third Party Liens on Prepetition Collateral that are (and are permitted under the Prepetition 1L Credit Agreement to be) senior to the liens on such Prepetition Collateral securing the Prepetition 1L Obligations), subject to the Carve-Out, (ii) superpriority claims as provided in section 507(b) of the Bankruptcy Code in the amount of any 1L Adequate Protection Claims, with priority over all other superpriority and administrative expense claims except the Carve-Out and the DIP Obligations, (iii) on or before the Closing Date, payment in cash of all accrued and unpaid reasonable prepetition fees and expenses of the Prepetition Secured Parties (including all reasonable fees and expenses of Arnold & Porter Kaye Scholer LLP, Ankura Consulting Group, LLC, and any local counsel retained by any of the Prepetition Secured Parties), (iv) after entry of the Interim Order, monthly payments in cash of the reasonable and documented costs, fees and expenses of the Prepetition 1L Secured Parties (including fees and expenses of (x) one primary counsel (which shall be Arnold & Porter Kaye Scholer LLP) and one local counsel in each applicable jurisdiction to the Prepetition 1L Lenders, (y) one primary counsel and one local counsel in each applicable jurisdiction to the Prepetition 1L Agent, and (z) any other advisor retained by the Prepetition 1L Secured Parties (including Ankura Consulting Group, LLC), (v) all required written financial reporting and other periodic reporting that is provided to the DIP Agent and the DIP Lenders, and (vi) other customary legal protections including the benefit of the Milestones. All interest on the loans under the Prepetition 1L Facility, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall accrue interest at the default rate under the Prepetition 1L Credit Agreement and be paid in kind by adding such accrued interest to the unpaid principal amount of the loans under the Prepetition 1L Credit Agreement on the date such interest is due and, to the extent permitted under the Bankruptcy Code and by the Bankruptcy Court, be deemed part of the Prepetition 1L Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code. |
|  | The Prepetition 1.5L Lenders and other holders of Prepetition 1.5L Obligations (collectively, the "**Prepetition 1.5L Secured Parties**") shall be |

10

entitled to adequate protection of their interests in the Prepetition Collateral in an amount equal to the aggregate diminution in the value of their interests therein from and after the Petition Date (the "*1.5L Adequate Protection Claims*") in the form of: (i) a perfected replacement lien on all the Prepetition Collateral, including any such assets of the Debtors' estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof, to secure the 1.5L Adequate Protection Claims, senior to all other liens on such Prepetition Collateral (other than (w) the liens thereon securing the DIP Facility, (x) the liens thereon securing the Prepetition 1L Obligations, (y) the 1L Adequate Protection Liens and (z) liens securing the Prepetition 1L Obligations and any Permitted Third Party Liens on Prepetition Collateral that are (and are permitted under the Prepetition 1.5L Credit Agreement to be) senior to the liens of the Prepetition 1.5L Secured Parties on such Prepetition Collateral), subject to the Carve-Out and (ii) superpriority claims as provided in section 507(b) of the Bankruptcy Code in the amount of any 1.5L Adequate Protection Claims, with priority over all other superpriority and administrative expense claims except the Carve-Out, 1L Adequate Protection Claims, the Prepetition 1L Obligations and the DIP Obligations.  All interest on the loans under the Prepetition 1.5L Facility, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall accrue interest at the default rate under the Prepetition 1.5L Credit Agreement and be paid in kind by adding such accrued interest to the unpaid principal amount of the loans under the Prepetition 1.5L Credit Agreement on the date such interest is due and, to the extent permitted under the Bankruptcy Code and by the Bankruptcy Court, be deemed part of the Prepetition 1.5L Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

The Prepetition 2L Lenders and other holders of Prepetition 2L Obligations (collectively, the "*Prepetition 2L Secured Parties*") shall be entitled to adequate protection of their interests in the Prepetition Collateral in an amount equal to the aggregate diminution in the value of their interests therein from and after the Petition Date (the "*2L Adequate Protection Claims*") in the form of: (i) a perfected replacement lien on all the Prepetition Collateral, including any such assets of the Debtors' estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof, to secure the 2L Adequate Protection Claims, senior to all other liens on such Prepetition Collateral (other than (u) the liens thereon securing the DIP Facility, (v) the liens thereon securing the Prepetition 1L Obligations, (w) the liens thereon securing the Prepetition 1.5L Obligations, (x) the 1L Adequate Protection Liens, (y) the 1.5L Adequate Protection Liens and (z) any Permitted Third Party Liens on Prepetition Collateral that are (and are permitted under the Prepetition 2L Credit Agreement to be) senior to the liens of the Prepetition 2L Secured Parties on such Prepetition Collateral), subject to the Carve-Out and (ii) superpriority claims as provided in section 507(b) of the Bankruptcy Code in the amount of any 2L Adequate Protection Claims, with priority over all other superpriority and administrative expense claims except the Carve-Out, 1L Adequate Protection Claims, the 1.5L Adequate Protection Claims, the Prepetition 1L Obligations, the Prepetition 1.5L Obligations, and the DIP Obligations.  All interest on the loans under the Prepetition 2L Facility,

| | |
|---|---|
| | including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall accrue interest at the default rate under the Prepetition 2L Credit Agreement and be paid in kind by adding such accrued interest to the unpaid principal amount of the loans under the Prepetition 2L Credit Agreement on the date such interest is due and, to the extent permitted under the Bankruptcy Code and by the Bankruptcy Court, be deemed part of the Prepetition 2L Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code. |
| ***Representations and Warranties:*** | The DIP Documents will contain representations and warranties usual and customary for debtor-in-possession financings of this type, together with any other representations and warranties determined by the DIP Lenders to be necessary or appropriate for this transaction. |
| ***Affirmative and Negative Covenants:*** | The DIP Documents shall contain such negative and affirmative covenants as are usual and customary for transactions of this type, and any other covenants determined by the DIP Lenders to be necessary or appropriate for this transaction. |
| ***Budget:*** | The DIP Documents shall contain provisions requiring the delivery of a rolling 13-week cash flow forecast and variance reports on a bi-weekly basis substantially consistent with the Prepetition Superpriority Credit Agreement. |
| ***Financial and Other Reporting Requirements:*** | The DIP Documents shall contain reporting covenants substantially consistent with the Prepetition Superpriority Credit Agreement. |
| ***Financial Covenants:*** | The DIP Documents shall contain budget variance and minimum liquidity covenants substantially consistent with the Prepetition Superpriority Credit Agreement. |
| ***Independent Director*** | Holdings will be required to at all times have on its board of directors at least one independent director acceptable to the Required DIP Lenders. |
| ***Conditions Precedent to Closing of the DIP Loans:*** | Usual and customary for financings of this type, including, without limitation: (i) execution and delivery of the DIP Credit Agreement and the other DIP Documents evidencing the DIP Facility, including a guarantee and collateral agreement; (ii) no default or event of default; (iii) accuracy of representations and warranties in all material respects; (iv) delivery of a customary notice of borrowing at least an agreed number of business days in advance of the date of the making of the DIP Loans; (v) [reserved]; (vi) entry of the Interim Order, which shall be in full force and effect and shall not have been reversed, amended, stayed, vacated, terminated or otherwise |

| | |
|---|---|
| | materially modified; (vii) delivery of a Budget reasonably acceptable to the Debtors and the Required DIP Lenders; (viii) no material adverse effect since the date of the Agreement (subject to customary carve-outs for the Chapter 11 Cases); (ix) payment of all fees and expenses (including, without limitation, legal and financial advisory fees and expenses) and other compensation contemplated herein and in the DIP Documents, payable to the DIP Agent and the DIP Lenders; (x) receipt by each of the DIP Lenders and the DIP Agent of all requested documentation and information required under applicable "know your customer" and anti-money laundering rules and regulations; (xi) all "first day orders" shall be in in form and substance reasonably acceptable to the DIP Lenders; (xii) [reserved]; and (xiii) delivery of customary closing documentation. |
| ***Events of Default:*** | The DIP Documents will contain events of default customarily found in loan agreements for similar debtor-in-possession financings (the "***Events of Default***"), including, without limitation, non-payment of obligations, defaults under covenants (including, for the avoidance of doubt and without limitation, any variance beyond the Permitted Variances under the then-applicable Budget or failure to meet any of the Milestones), the making of representations and warranties that are incorrect in a material respect when made or deemed made, judgment defaults, failure to comply with ERISA rules and regulations, appointment of a bankruptcy trustee, examiner or receiver, invalidity of collateral documents, dismissal or conversion of the Chapter 11 Cases, certain other bankruptcy matters, failure to comply with the Orders, entry of an order amending, modifying, staying, revoking or reversing the Orders without the consent of the DIP Lenders, termination of the Interim Order or the Final Order, as applicable, allowance of a claim under section 506(c) of the Bankruptcy Code, filing of a plan or disclosure statement that does not satisfy certain agreed criteria, payment of prepetition claims other than as permitted under the Orders or the DIP Documents, entry of an order granting stay relief in respect of any DIP Collateral, and granting any superpriority claim that is *pari passu* with or senior to those of the DIP Lenders. |
| ***Remedies:*** | The DIP Agent (acting at the direction of the Required DIP Lenders) and the DIP Lenders shall have customary remedies, including, without limitation, the right (after a notice period to be agreed) (which notice period will run concurrently with any notice required to be provided under the DIP Documents) (the "***Default Notice Period***"), to realize on all DIP Collateral, including Cash Collateral. |
| | Upon expiration of the Default Notice Period (and subject to any requirements of the Bankruptcy Court), the automatic stay pursuant to section 362 of the Bankruptcy Code will be automatically vacated and modified to the extent necessary to permit the DIP Agent (at the direction of the Required DIP Lenders) to exercise all rights and remedies, including with respect to the DIP Collateral, set forth in the Interim Order or the Final Order, as applicable, and the other DIP Documents, and as otherwise available at law without further |

| | |
|---|---|
| | order or application or motion to the Bankruptcy Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code or otherwise. |
| ***Amendments and Waivers:*** | Amendments and waivers of the DIP Facility will require the approval of the Required DIP Lenders, subject to customary exceptions for certain provisions that require the consent of each affected DIP Lender or all DIP Lenders and customary protections for the DIP Agent. |
| ***Assignments and Participations:*** | The DIP Documents will contain customary provisions for debtor-in-possession credit agreements of this type regarding the ability of DIP Lenders to assign, or sell participations in, the DIP Loans. |
| ***Taxes, Yield Protection and Increased Costs:*** | The DIP Documents will contain customary provisions for debtor-in-possession financings of this type, including, without limitation, in respect of tax gross-ups, breakage and redeployment costs, increased costs (but not including taxes), funding losses, capital adequacy, and illegality. |
| ***Expenses and Indemnity:*** | The Loan Parties will pay all reasonable out-of-pocket fees, costs and expenses incurred or accrued by the DIP Agent and the DIP Lenders in connection with any and all aspects of the DIP Facility and the DIP Documents, including, without limitation, the reasonable fees and expenses of legal counsel and financial advisors (including all reasonable fees and expenses of Arnold & Porter Kaye Scholer LLP and Ankura Consulting Group, LLC, as advisors to the DIP Lenders, any primary counsel to the DIP Agent, and any local counsel retained by the DIP Lenders or the DIP Agent). |
| | The Loan Parties will, jointly and severally, be obligated to indemnify and hold harmless the DIP Agent (and any sub-agent thereof), the DIP Lenders, and each of its or their respective affiliates, equity holders, partners, managers, investors, officers, directors, fiduciaries, employees, agents, trustees, advisors, attorneys and representatives (each in their respective capacities as such, an "***Indemnified Person***") from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, as to the DIP Agent and as to the DIP Lenders (taken as a whole), in each case the reasonable and documented out-of-pocket fees and disbursements of one primary counsel and one local counsel in each applicable jurisdiction to each of the DIP Agent and the DIP Lenders (taken as a whole) and, if necessary, a single special counsel for each relevant specialty and any conflicts counsel) in connection with any investigation, litigation or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or any other transactions contemplated in this DIP Term Sheet; provided, that no Indemnified Person will be indemnified for any cost, expense or liability to the extent determined in the final, non-appealable judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Person. |

| *Governing Law:* | New York, except as governed by the Bankruptcy Code. |

# EXHIBIT C

**Exit Term Loan Facilities Term Sheet**

*STRATEGIC MATERIALS, INC., ET AL.*

**EXIT FIRST LIEN TERM LOAN FACILITY TERM SHEET**

**September 15, 2023**

This term sheet (this "***Term Sheet***") describes the principal terms of (i) the new money first lien, first out term loan facility to be provided to the Borrower (as defined below) by the Exit First Out New Money Term Lenders (as defined below), (ii) the first lien, first out roll-up DIP loans to be issued by the Borrower to the Exit First Out Roll-Up Lenders (as defined below) and (iii) the first lien, second out take-back term loans to be issued by the Borrower to the Exit Second Out Term Lenders (as defined below) (all of the foregoing, collectively, the "***Exit Term Loan Facilities***") in connection with the Reorganized Debtors' emergence from the Chapter 11 Cases in accordance with the terms of the Plan.  This Term Sheet does not purport to summarize all of the terms, conditions and other provisions that will be required in connection with the Exit Term Loan Facilities or that will be contained in the Exit Term Loan Facilities Documents (as defined below).

Capitalized terms used and not defined in this Term Sheet shall have the respective meanings ascribed to such terms in the restructuring support agreement to which this Term Sheet is attached (together with the exhibits and schedules attached to such agreement, including this Term Sheet, as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, the "***RSA***").

THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES, LOANS, OR OTHER INSTRUMENTS OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN, IT BEING UNDERSTOOD THAT SUCH AN OFFER OR SOLICITATION, IF ANY, WILL BE MADE ONLY IN COMPLIANCE WITH APPLICABLE LAW.  NOTHING IN THIS TERM SHEET SHALL CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION OR A WAIVER, AND EACH STATEMENT CONTAINED HEREIN IS MADE WITHOUT PREJUDICE AND WITH A FULL RESERVATION OF ALL RIGHTS, REMEDIES, CLAIMS, AND DEFENSES OF EACH PARTY HERETO.

**SUMMARY OF PRINCIPAL TERMS OF THE EXIT TERM LOAN FACILITIES**

| | |
|---|---|
| **Borrower** | Strategic Materials Holding Corp., a Delaware corporation, as reorganized pursuant to the Plan (the "***Borrower***"). |
| **Guarantors** | (a) SMI Group Acquisitions, Inc., a Delaware corporation, as reorganized pursuant to the Plan ("***Holdings***"), (b) each of the other Reorganized Debtors (other than the Borrower), and (c) all other direct and indirect subsidiaries of Holdings, subject to exceptions to be agreed (collectively, the "***Guarantors***," and, together with the Borrower, the "***Loan Parties***"). |
| | For the avoidance of doubt and notwithstanding any provision to the contrary herein or in any definitive document related to the Exit Term Loan Facilities, in no event shall NexCycle Canada, Ltd., an Ontario corporation, or any of its subsidiaries be required to become a Loan Party or a Guarantor or to grant a security interest over any of their respective assets in connection with the Exit Term Loan Facilities or any definitive |

| | |
|---|---|
| | document in connection therewith unless all Obligations (as defined in the Canadian Credit Agreement referred to below) have been paid in full in cash (other than contingent reimbursement or indemnification obligations for which no claim has been made in writing). |
| **Administrative Agent and Collateral Agent** | Acquiom Agency Services LLC and Seaport Loan Products LLC will act as co-agents under the Exit Term Loan Facilities (the "***Exit Term Loan Facilities Agent***"). |
| **Lenders** | The lenders under the prepetition First Lien Credit Agreement (the "***Prepetition 1L Lenders***") in the ad hoc group of Prepetition 1L Lenders represented by Arnold & Porter Kaye Scholer LLP (the "***Ad Hoc Group***") will provide the First Out New Money Exit Term Loans (as defined below) under the Exit Term Loan Facilities Credit Agreement (as defined below) (the Ad Hoc Group, in such capacity, the "***Exit First Out New Money Term Lenders***"). |
| | The DIP Lenders will be issued the First Out Roll-Up Loans (as defined below) under the Exit Term Loan Facilities Credit Agreement in accordance with the Plan (the DIP Lenders, in such capacity, the "***Exit First Out Roll-Up Lenders***"; and together with the Exit First Out New Money Term Lenders, "***Exit First Out Term Lenders***"). |
| | The Prepetition 1L Lenders will be issued the Second Out Exit Term Loans (as defined below) under the Exit Term Loan Facilities Credit Agreement in accordance with the Plan (the Prepetition 1L Lenders, in such capacity, the "***Exit Second Out Term Lenders***"; and together with the Exit First Out Term Lenders, the "***Exit Term Lenders***"). |
| | Notwithstanding anything herein to the contrary, (i) each member of the Ad Hoc Group shall be permitted to allocate its respective funding obligation with respect to its First Out New Money Exit Term Loans to any of its affiliate designees, (ii) each DIP Lender shall be permitted to allocate its respective portion of the First Out Roll-Up Loans to any of its affiliate designees and (iii) each Prepetition 1L Lender shall be permitted to allocate its respective portion of the Second Out Exit Term Loans to any of its affiliate designees. |
| **Exit Term Loan Facilities** | The Exit First Out New Money Term Lenders will provide first lien, first out new money exit term loans to the Borrower in an aggregate principal amount to be reasonably determined between the Borrower and the Exit First Out New Money Term Lenders (such facility, the "***First Out New Money Exit Term Loans***"), which will be borrowed by the Borrower in a single drawing on the Restructuring Effective Date.  Once borrowed and repaid, the First Out New Money Exit Term Loans may not be reborrowed. |
| | The Exit First Out Roll-Up Lenders will be issued first lien, first out exit term loans by the Borrower in an aggregate principal amount equal to the sum of (x) the outstanding amount on the Restructuring Effective Date of all principal and accrued interest on the loans outstanding under the DIP Credit Agreement and (y) the Exit Fee (as defined in the DIP Facility Term Sheet) (such facility, the "***First Out Roll-Up Loans***"; and together |

|  | with the First Out New Money Exit Term Loans, the "***First Out Term Loans***"), which will be issued by the Borrower ratably to the Exit First Out Roll-Up Lenders on the Restructuring Effective Date. Once issued and repaid, the First Out Roll-Up Loans may not be reborrowed. |
|  | The Exit Second Out Term Lenders will be issued first lien, second out exit term loans by the Borrower in an aggregate principal amount equal to $150,000,000 *less* the aggregate principal amount of the First Out Exit Term Loans (such facility, the "***Second Out Exit Term Loans***"; and together with the First Out Exit Term Loans, the "***Exit Term Loans***"), which will be issued by the Borrower ratably to the Exit Second Out Term Lenders on the Restructuring Effective Date. Once issued and repaid, the Second Out Exit Term Loans may not be reborrowed. |
|  | The First Out New Money Exit Term Loans and the First Out Roll-Up Loans will be pari passu in right of payment and lien status. The First Out Exit Term Loans and the Second Out Exit Term Loans will be pari passu in lien status. The Second Out Exit Term Loans will be subordinated in right of payment to the First Out Exit Term Loans (including with respect to voluntary and mandatory prepayments prior to the satisfaction in full of the First Out Exit Term Loans). |
| **Use of Proceeds** | The proceeds of the First Out New Money Exit Term Loans will be used (a) to pay fees, cure costs, and other costs and expenses related to the Restructuring Transactions, (b) to repay in full on the Restructuring Effective Date the Obligations (as defined in the Term Loan Credit Agreement, dated as of December 31, 2019 (as amended, supplemented or otherwise modified from time to time, the "***Canadian Credit Agreement***"), by and among NexCycle Canada Ltd., an Ontario corporation, NexCycle Industries Ltd., an Ontario corporation, Piney Lake Opportunities ECI Master Fund LP, as administrative agent and collateral agent, and the lenders party thereto from time to time) and (c) for working capital and general corporate purposes of the Reorganized Debtors and their subsidiaries. |
| **Maturity Date** | The First Out Exit Term Loans will mature on the date occurring four years and six months after the Restructuring Effective Date (the "***First Out Maturity Date***"). |
|  | The Second Out Exit Term Loans will mature on the fifth anniversary of the Restructuring Effective Date (the "***Second Out Maturity Date***"). |
| **Interest Rate** | Interest will accrue on the First Out Exit Term Loans at a per annum rate equal to Term SOFR (subject to a 1.00% floor) *plus* the SOFR Adjustment (which SOFR Adjustment shall be: (a) 0.11448% (11.448 basis points) for one-month SOFR; (b) 0.26161% (26.161 basis points) for three-month SOFR; and (c) 0.42826% (42.826 basis points) for six-month SOFR) ("***Adjusted Term SOFR***") *plus* 6.50% payable in cash. |
|  | Interest shall accrue on the Second Out Exit Term Loans at a per annum rate equal to Adjusted Term SOFR *plus* 7.50%, payable in cash; |

|  | *provided* that the Borrower may elect, pursuant to procedures to be set forth in the Exit Term Loan Facilities Credit Agreement, to pay a portion of the interest that accrues on the Second Out Exit Term Loans at a rate of up to 6.50% per annum during the interest period ending on any interest payment date in-kind in lieu of cash payment (the "***PIK Option***"), but if the PIK Option is elected for an interest period, the interest rate in respect of the Second Out Exit Term Loans for such interest period shall be Adjusted Term SOFR *plus* 8.50%. |
|  | Upon the occurrence and during the continuance of a payment or bankruptcy event of default, or at the election of the Exit Term Lenders holding a majority of the Exit Term Loans and unused commitments under the Exit Term Loan Facilities Credit Agreement (the "***Required Lenders***") in the case of any other event of default, the Exit Term Loans and other obligations under the Exit Term Loan Facilities Documents shall bear interest at the otherwise applicable interest rate, plus 2% per annum (or, in the case of obligations that are not Exit Term Loans, at the base rate plus 2% per annum), payable in cash upon demand. |
| **Amortization** | 1% per annum, payable quarterly, in respect of the First Out Exit Term Loans and the Second Out Exit Term Loans. |
| **Voluntary Prepayments** | The Borrower may voluntarily prepay the Exit Term Loans, without premium or penalty, except for the Prepayment Premium (as defined below) (to the extent applicable) and subject to reimbursement of the Exit Term Lenders' breakage and redeployment costs in the case of prepayment of SOFR loans; <u>provided</u> that no optional prepayments of Second Out Exit Term Loans will be permitted prior to the satisfaction in full of the First Out Exit Term Loans. |
| **Mandatory Prepayments** | Usual and customary for facilities of this type, including prepayments with (a) 50% of Excess Cash Flow (to be defined in the Exit Term Loan Facilities Credit Agreement), with step downs to be agreed, commencing with the fiscal year ending December 31, 2024, (b) 100% of the net cash proceeds of all non-ordinary course asset sales or other dispositions of property by the Borrower and its subsidiaries (including casualty insurance and condemnation proceeds and with exceptions to be agreed in the Exit Term Loan Facilities Credit Agreement), subject to customary reinvestment rights and exceptions to be agreed, and (c) 100% of the net cash proceeds of issuances of debt obligations (other than debt issuances permitted under the Exit Term Loan Facilities Credit Agreement); <u>provided</u> that all mandatory prepayments will be applied to the First Out Exit Term Loans until satisfaction thereof in full prior to application to the Second Out Exit Term Loans. |
| **Prepayment Premium** | In the event that all or any portion of the principal of the First Out Exit Term Loans is (x) prepaid (other than as a result of a mandatory prepayment resulting from a casualty or condemnation event or an Excess Cash Flow mandatory prepayment) or (y) accelerated for any reason (including, without limitation, as a result of a bankruptcy or insolvency Event of Default), in each case, other than in connection with a "Change of Control" (to be defined in the Exit Term Loan Facilities |

| | |
|---|---|
| | Credit Agreement) (other than any Change of Control that occurs during or as part of a bankruptcy or insolvency proceeding) (i) on or prior to the first anniversary of the Restructuring Effective Date, the Borrower shall pay a premium (the "Prepayment Premium") ratably to the Exit First Out Term Lenders in an amount equal to a T+50 make-whole on the amount of the First Out Exit Term Loans prepaid or accelerated, (ii) after the first anniversary of the Restructuring Effective Date but on or prior to the second anniversary of the Restructuring Effective Date, the Borrower shall pay a premium ratably to the Exit First Out Term Lenders in an amount equal to 2.0% of the amount of the First Out Exit Term Loans prepaid or accelerated or (iii) after the second anniversary of the Restructuring Effective Date but on or prior to the third anniversary of the Restructuring Effective Date, the Borrower shall pay a premium ratably to the Exit First Out Term Lenders in an amount equal to 1.0% of the amount of the First Out Exit Term Loans prepaid or accelerated. |
| **OID** | The First Out New Money Exit Term Loans will be issued with original issue discount of 2.00% |
| **Agent Fees** | To be set forth in a separate fee letter between the Exit Term Loan Facilities Agent and the Borrower. |
| **Definitive Documentation** | The Exit Term Loan Facilities will be evidenced by a credit agreement (the "***Exit Term Loan Facilities Credit Agreement***") and other guarantee, security and other relevant documentation (together with the Exit Term Loan Facilities Credit Agreement, the "***Exit Term Loan Facilities Documents***") reflecting the terms and provisions set forth in this Term Sheet and otherwise in form and substance consistent with the RSA and satisfactory to the Company and the Required Lenders. |
| **Collateral** | The obligations of the Loan Parties with respect to the Exit Term Loan Facilities (including the guarantee obligations of the Guarantors) shall be secured by a perfected first priority security interest (subject to permitted liens) in substantially all of the present and after-acquired assets and property (whether tangible, intangible, real, personal, or mixed) of the Loan Parties, wherever located, including (without limitation) all accounts receivable, deposit accounts, securities accounts, commodities accounts, inventory, equipment, intellectual property, investment property, intercompany notes, instruments, chattel paper, fee-owned real estate with a value in excess of an amount to be agreed, contracts, licenses, permits, capital stock of subsidiaries, tax refunds, general intangibles, and all products and proceeds thereof (subject to customary exceptions and, in the case of assets subject to the Laws of foreign jurisdictions, subject to limitations of such foreign Laws) (collectively, the "***Collateral***"). |
| **Conditions Precedent** | The closing of the Exit Term Loan Facilities will be subject to satisfaction or waiver of conditions precedent customary for facilities of this type and acceptable to Required Lenders, including the following: |

| | |
|---|---|
| | (a) all of the representations and warranties in the Exit Term Loan Facilities Documents shall be true and correct in all material respects (or, if qualified by materiality or material adverse effect, in all respects) as of the Restructuring Effective Date, or if such representation speaks as of an earlier date, as of such earlier date; |
| | (b) no default or event of default under the Exit Term Loan Facilities Documents shall have occurred and be continuing or would result from such extension of credit; |
| | (c) delivery of a customary borrowing notice; |
| | (d) all conditions to the Restructuring Effective Date shall have been satisfied in accordance with the Plan or shall have been waived with the consent of the Required Lenders; and |
| | (e) satisfaction of those conditions listed on **Annex I** attached hereto. |
| **Representations and Warranties** | Customary and appropriate for facilities of this type. |
| **Affirmative Covenants** | Customary and appropriate for facilities of this type, including (without limitation):   (a) information and reporting requirements, including delivery of audited annual financials and quarterly financials, in each case to be delivered within a time period to be agreed upon; (b) certificates and other information; (c) payment of taxes; (d) compliance with laws; (e) compliance with environmental Laws; (f) maintenance of existence; (g) maintenance of properties; (h) maintenance of insurance; (i) inspection rights; (j) books and records; (k) notices of certain material events; (l) additional collateral and additional guarantors; (m) use of proceeds; (n) further assurances and post-closing conditions; (o) line of business; (p) sanctions and anti-money laundering Laws; and (q) changes in jurisdiction of organization and name. |
| **Negative Covenants** | Customary and appropriate for facilities of this type (with exceptions and basket amounts to be agreed), including (without limitation) restrictions on:   (a) indebtedness; (b) liens; (c) fundamental changes; (d) dispositions; (e) restricted payments, including prepayments of subordinated indebtedness; (f) investments; (g) transactions with Affiliates; (h) changes in nature of business; (i) changes in fiscal periods; (j) negative pledge clauses; (k) clauses restricting subsidiary distributions; (l) modifications of debt agreements and constituent documents; (m) designation of senior debt; and (n) holding company covenants.<br><br>Notwithstanding the foregoing, the Exit Term Loan Documents shall include a basket for a revolving credit facility (a "<u>Permitted Revolver</u>") in the form of either (x) a first-out cash flow revolving credit facility or (y) an asset-based revolving credit facility, in either case, in an amount and on terms to be agreed by the Required Lenders. |
| **Financial Covenants** | None. |

| | |
|---|---|
| **Events of Default** | Customary and appropriate for facilities of this type (with materiality thresholds, exceptions, and grace periods to be agreed). |
| **Voting** | Customary and appropriate for facilities of this type, which shall include provisions to be agreed providing for, in the case of an uptiering transaction of the Second Out Exit Term Loans (including an uptiering in the form of a buyback or exchange transaction involving the Second Out Exit Term Loans), the opportunity for all Exit Second Out Term Lenders to participate ratably in such uptiering transaction on the same terms, subject to exceptions to be agreed in the Exit Term Loan Facilities Credit Agreement. |
| **Expenses and Indemnification** | Customary and appropriate for facilities of this type. |
| **Assignments and Participations** | Customary and appropriate for facilities of this type |
| **Other Provisions** | The Exit Term Loan Facilities Documents shall include customary provisions regarding increased costs, illegality, tax indemnities, waiver of trial by jury, and other similar provisions. |
| **Governing Law** | New York. |

*Annex I*

### ADDITIONAL CONDITIONS TO CLOSING

The borrowing (or deemed borrowing) under the Exit Term Loan Facilities shall be subject to the following additional conditions precedent, unless waived by the Required Lenders:

1. All Exit Term Loan Facilities Documents shall have been (or shall, contemporaneously with the occurrence of the Restructuring Effective Date, be) executed and delivered (or deemed executed and delivered pursuant to the Confirmation Order) and shall be in full force and effect, and shall be in form and substance acceptable to the Required Lenders.

2. All documents required to be delivered under the Exit Term Loan Facilities Documents, including customary legal opinions, corporate records, good standing certificates, a customary solvency certificate and other documents from public officials and officers' certificates, shall have been delivered.

3. All necessary governmental and third-party approvals, consents, licenses, and permits in connection with the Exit Term Loan Facilities shall have been obtained and remain in full force and effect.

4. Valid and perfected liens on and security interests in the Collateral described in this Term Sheet shall have been created, subject to post-closing matters to be reasonably agreed.

5. All fees and expenses required to be paid to the Exit Term Loan Facilities Agent and the Exit Term Lenders on the Restructuring Effective Date shall have been paid.

6. The Exit Term Loan Facilities Agent shall have received, at least five Business Days prior to the Restructuring Effective Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, that has been requested in writing by the Exit Term Loan Facilities Agent or Exit Term Lenders at least ten Business Days prior to the Restructuring Effective Date.

7. As of the Restructuring Effective Date, there shall not be any litigation pending or known by Loan Parties to be threatened against any Loan Party drawing into question any credit transaction contemplated by Exit Term Loan Facilities, or that could reasonably be expected to have a material adverse effect.

8. A final non-appealable order of the Bankruptcy Court (a) confirming the Plan consistent with the RSA, which shall not have been reversed, vacated, amended, supplemented, or otherwise modified (other than in a manner permitted by the RSA) and (b) authorizing the Loan Parties to execute, deliver, and perform under all documents contemplated under the Exit Term Loan Facilities Documents shall have been entered and shall have become a final order of the Bankruptcy Court.

**EXHIBIT D**

**Transfer Agreement**

**PROVISION FOR TRANSFER AGREEMENT**

The undersigned ("***Transferee***") (a) hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of _____ (including all exhibits, annexes, and schedules hereto, subject to in accordance with Section 16.02 thereof, in each case, as may be amended, modified or supplemented from time to time only in accordance with Section 14 thereof, the "***Agreement***"),[4] by and among the Company Parties and each of the Consenting Parties party thereto, (b) desires to acquire the Claims described below (the "***Transferred Claims***") from one of the Consenting Creditors (the "***Transferor***"), (c) hereby irrevocably agrees to be bound by the terms and conditions of the Agreement to the same extent the Transferor was thereby bound with respect to the Transferred Claims, and shall be deemed a "Consenting Creditor" and a "Consenting Party" under the terms of the Agreement and (d) hereby makes as of the date hereof all representations and warranties made therein by all other Consenting Creditors.

The Transferee hereby specifically and irrevocably agrees (i) to be bound by the terms and conditions of the Agreement, to the same extent applicable to the Transferred Claims, (ii) to be bound by the vote of the Transferor if cast prior to the effectiveness of the transfer of the Transferred Claims, except as otherwise provided in the Agreement, and (iii) that each of the Parties shall be an express third-party beneficiary of this Provision for Transfer Agreement and shall have the same recourse against the Transferee under the Agreement as such Party would have had against the Transferor with respect to the Transferred Claims.

Date Executed: _____,

_____
Print name of Transferee

_____
Name:
Title:
Address:     _____

_____
Attention:     _____
Telephone:     _____
Facsimile:     _____

---

[4]     Capitalized terms used but not defined herein shall have the meanings given to such terms elsewhere in the Agreement.

| Principal Amount Transferred | |
|---|---|
| Claim Type | Amount |
| | |
| | |
| | |
| | |
| | |

*Solicitation Version*

# **EXHIBIT C**

**Financial Projections**

**Exhibit C**

**FINANCIAL INFORMATION AND PROJECTIONS**[1]

*The prospective financial information included in this Disclosure Statement has been prepared by, and is the responsibility of, the Debtors. No independent auditors have examined, compiled, or performed any procedures with respect to the accompanying prospective financial information.*

*The Debtors do not, as a matter of course, publish their business plans, budgets, or strategies or disclose projections or forecasts of their anticipated financial positions, results of operations or cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans, budgets, strategies, projections, or forecasts of their anticipated financial position, results of operations, or cash flows to creditors or equity interest holders prior to the Effective Date of the Plan or to include such information in any documents required to be filed with the SEC or otherwise make such information publicly available.*

*The assumptions, projections, and other financial information contained in this section constitute and contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.*

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization). The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, and that Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successors under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed the ability of the Reorganized Debtors to satisfy their financial obligations while maintaining sufficient liquidity and capital resources following emergence from the Chapter 11 Cases.

For purposes of demonstrating that that the Plan meets this requirement, the Debtors have prepared the forecasted, post-reorganized income statement for annual periods ending December, 31 2024 through December 31, 2028 (the "***Projections***") for the Reorganized Debtors and their non-Debtor Affiliates. The Projections were prepared by the Debtors' management team ("***Management***") and are based on a number of assumptions made by Management with respect to the potential future performance of the Reorganized Debtors' and their non-Debtor Affiliates' operations assuming the Plan is consummated. The Projections are presented on a consolidated basis, including estimates of operating results for all Reorganized Debtor entities and non-Debtor Affiliate entities. As illustrated by the Projections, the reduction of debt will substantially reduce annual interest expense and improve future cash flows. As demonstrated by the Projections, the Reorganized Debtors and their non-Debtor Affiliates should have sufficient cash flow to pay and service their post-emergence debt obligations as they come due and to operate their businesses. The Debtors believe that the Confirmation Date and the Effective Date of the Plan are not likely to be followed by the liquidation or the need for further financial reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED FINANCIAL STATEMENTS DO NOT REFLECT THE IMPACT OF FRESH START ACCOUNTING, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED RESULTS.

---

[1] Capitalized terms used but not otherwise defined in these Projections have the meanings ascribed to such terms in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (the "***Plan***") or the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (the "***Disclosure Statement***"), as applicable.

ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, NEITHER THE DEBTORS NOR THE REORGANIZED DEBTORS CAN PROVIDE ANY ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED.  AS DESCRIBED BELOW, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED.   ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN SECTION VIII OF THE DISCLOSURE STATEMENT AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES, AND ANY RESULTING CHANGES TO THE PROJECTIONS COULD BE MATERIAL.

[*Remainder of page intentionally left blank*]

**Notes to Financial Projections**

*Accounting Policies*

The Financial Projections have not been audited or reviewed by a registered independent accounting firm, and were not prepared with a view toward compliance with the guidelines of the SEC, the American Institute of Certified Public Accountants, or the Financial Accounting Standards Board ("*FASB*").

The Financial Projections do not consider the potential impact of the application of "fresh start" accounting under Accounting Standards Codification 852, "Reorganizations" ("*ASC 852*") that may apply upon the Effective Date. If the Debtors implement fresh start accounting, material differences from the amounts presented are anticipated. Upon emergence, the Debtors will be required to determine the amount by which the reorganization value as of the Effective Date exceeds, or is less than, the fair value at the time. Valuation may be based on the fair value of the Debtors' assets and liabilities as of the Effective Date. The difference between the amounts presented in the Financial Projections and the actual amounts thereof as of the Effective Date may be material. Overall, the implementation of ASC 852 is not anticipated to have a material impact on the underlying feasibility of the Plan.

*General Assumptions*

The Debtors and their non-Debtor Affiliates (collectively, the "*Company*") are a North American recycling company with facilities distributed across the U.S., Canada and Mexico. The Company's primary activities include recycling, processing, and marketing for sale cullet (scrap glass) and plastic resins (post-industrial scrap plastic). These scrap materials are principally collected from curbsides and materials recovery facilities. The customer base consists of manufacturers of glass containers, fiberglass, and other producers or users of glass input products.

The Company operates on a calendar year and the Projections assume that the Effective Date will be December 31, 2023 and that the Company will continue to conduct its post-emergence operations substantially similar to its current businesses.  In addition, the Projections take into account the current market environment in which the Company competes, including many economic and financial forces that are beyond the control of the Company and Management.

The Company's regular budget process is led by Management, with input from the corporate Financial Planning & Analysis ("*FP&A*") team.  The FP&A team collaborates with relevant operational leadership to develop the operational and financial projections for each of the key drivers of the business.  Key drivers include forecast cullet and waste prices, forecast demand and processing capacity, capital investments, operational initiatives, and historical trends.  These inputs are projected by plant and summarized into a consolidated financial view that is further reviewed by the senior leadership team.

[*Remainder of page intentionally left blank*]

### Risk Factors

The Projections are subject to inherent risks and uncertainties, most of which are difficult to predict and many of which are beyond the Company's control. Many factors could cause actual results, performance, or achievements to differ materially from any future results, performance, or achievements expressed or implied by these forward-looking statements. Accordingly, the Projections should be reviewed in conjunction with a review of the risk factors set forth in Section VIII of the Disclosure Statement and the assumptions described herein.

### Projected Income Statement

"Adjusted EBITDA" is defined as earnings before interest, tax, depreciation, amortization and impairment, adjusted to exclude restructuring charges and certain other non-recurring expenses. Adjusted EBITDA is a key measure of the Company's operational performance, and Management uses Adjusted EBITDA for a myriad of purposes, including internal reporting and the evaluation of business objectives, opportunities, and performance. Adjusted EBITDA is not a measure of financial performance under Generally Accepted Accounting Principles ("**GAAP**") and should not be considered as a substitute for measures of financial performance prepared in accordance with GAAP.

[*Remainder of page intentionally left blank*]

**Financial Projections**

**SMI Post-Emergence Pro Forma Financial Summary**

**($ in 000s, unless stated otherwise)**

| Income Statement | | 2024F | 2025F | 2026F | 2027F | 2028F |
|---|---|---|---|---|---|---|
| Revenue | (1) | $322,995 | $346,754 | $370,359 | $396,368 | $427,330 |
| Less: Freight Out | (2) | (30,184) | (31,323) | (32,168) | (33,263) | (34,715) |
| **Total Net Revenue** | | **$292,811** | **$315,431** | **$338,191** | **$363,105** | **$392,615** |
| Cost of Sales | (3) | ($223,655) | ($241,246) | ($258,809) | ($278,269) | ($300,831) |
| **Gross Profit** | | **$69,156** | **$74,186** | **$79,382** | **$84,836** | **$91,784** |
| Selling, General, and Administrative Expenses | (4) | ($27,717) | ($29,228) | ($30,660) | ($32,556) | ($35,201) |
| Depreciation & Amortization | (5) | (21,201) | (20,859) | (20,570) | (20,348) | (20,372) |
| **Income/(Loss) from Operations** | | **$20,238** | **$24,100** | **$28,152** | **$31,932** | **$36,210** |
| Interest Expense | (6) | ($18,006) | ($16,531) | ($15,937) | ($15,739) | ($15,673) |
| **Income/(Loss) before Tax Provision** | | **$2,232** | **$7,569** | **$12,215** | **$16,193** | **$20,538** |
| Income Tax Provision | (7) | ($558) | ($1,892) | ($3,054) | ($4,048) | ($5,134) |
| **Net Income** | | **$1,674** | **$5,677** | **$9,161** | **$12,145** | **$15,403** |

*Notes to Projected Income Statement*

### 1. Revenue

Revenues are generated from the sale of glass cullet and plastic products along with glass and plastics recycling services.

### 2. Freight Out (Shipping and Handling Costs)

The Company incurs outbound shipping and handling costs ("*Freight Out*") for delivering glass cullet and other products to customers. The Company incurs inbound shipping and handling costs as either a component of the value of inventory items or in the case of fuel surcharges, as a component of cost of sales.

### 3. Cost of Sales

Cost of sales includes materials, direct labor, and other operating costs.

### 4. Selling, General, & Administrative

Selling, general and administrative ("*SG&A*") expenses are primarily comprised of payroll and benefits, employee expenses, and other corporate overhead costs not directly related to recycling facilities.

**5. Depreciation & Amortization**

Represents forecasted depreciation and amortization on existing property, plant and equipment based on current net book values.

**6. Interest Expense**

Interest expense post-emergence is forecast based on the Company's proposed capital structure, as more fully described in the Plan and the Plan Supplement.

**7. Income Tax Provision**

Provision for federal and state income tax; actual cash taxes will differ.

[*Remainder of page intentionally left blank*]

**SMI Post-Emergence Pro Forma Financial Summary**
**($ in 000s, unless stated otherwise)**

| Adjusted EBITDA / Free Cash Flow | | 2024F | 2025F | 2026F | 2027F | 2028F |
|---|---|---|---|---|---|---|
| **Adjusted EBITDA** | | **$41,439** | **$44,958** | **$48,722** | **$52,281** | **$56,582** |
| Capital Expenditures | (1) | (17,593) | (18,113) | (17,370) | (18,271) | (19,349) |
| Cash Interest + Amortization | (2) | (19,290) | (17,814) | (17,221) | (17,023) | (16,956) |
| Net Change in Working Capital | (3) | (1,100) | (1,046) | (1,019) | (1,074) | (1,359) |
| **Free Cash Flow** | | **$3,457** | **$7,985** | **$13,112** | **$15,913** | **$18,918** |

*Notes to Adjusted EBITDA / Free Cash Flow*

### 1. Capital Expenditures

Capital expenditures ("***Capex***") are forecast with consideration of in progress and upcoming capital investment requirements for the Company's plants and other property and equipment assets. Capex primarily relates to sustaining plant and processing assets to requisite standards. Capex also includes capitalized corporate costs, including certain information technology expenditures required to maintain systems, equipment, software, and processes.

### 2. Cash interest and amortization

Represents forecasted cash interest payments on Exit Term Loan Facilities and scheduled principal amortization. Amounts shown do not include the impact of mandatory principal prepayments that may occur and will be calculated based on a percentage of excess cash flow.

### 3. Net Change in Working Capital

The Projections assume the Company's post-emergence working capital accounts, including accounts receivables, inventory, other current assets, accounts payable and accrued liabilities, continue to perform according to the historical relationships with respect to revenue and expense activity.

*Solicitation Version*

## **EXHIBIT D**

**Liquidation Analysis**

**Exhibit D**

**LIQUIDATION ANALYSIS**

Strategic Materials, Inc., et al.,

## I.     INTRODUCTION

Section 1129(a)(7) of the Bankruptcy Code, often called the "best interests test," requires that a bankruptcy court find, as a condition of confirmation, that the chapter 11 plan provides, with respect to each class, that each holder in such class either (i) has accepted the plan of reorganization, or (ii) will receive or retain under the plan property of a value, as of the plan's effective date, that is not less than the value such holder would receive or retain if the debtor were to be liquidated under chapter 7 of the Bankruptcy Code on such date.

Accordingly, to demonstrate that the proposed Plan satisfies the "best interest" of creditors test, the Debtors, with assistance from their restructuring advisors, have prepared the following hypothetical liquidation analysis ("***Liquidation Analysis***") in connection with the Plan and the Disclosure Statement.[1] The Liquidation Analysis indicates the estimated recoveries that may be obtained by Holders of Claims or Interests assuming a hypothetical liquidation under chapter 7 of the Bankruptcy Code upon disposition of the Debtors' assets as an alternative to the Plan. Accordingly, the values discussed in the Liquidation Analysis may be different from amounts referred to in the Plan. The Liquidation Analysis is based on certain assumptions in the Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

## II.     STATEMENT OF LIMITATIONS

The determination of the costs of, and proceeds from, the hypothetical liquidation of the Debtors' assets in a chapter 7 case is an uncertain process involving the extensive use of significant estimates and assumptions that, although considered reasonable by the Debtors based upon their business judgment and input from certain of their advisors, are inherently subject to significant business, economic, and competitive uncertainties and contingencies beyond the control of the Debtors, their management, and their advisors. Inevitably, some assumptions in the Liquidation Analysis would not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation. The Liquidation Analysis was prepared for the sole purpose of generating a reasonable good faith estimate of the proceeds that would be generated if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose. The underlying financial information in the Liquidation Analysis was not compiled or examined by independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants.

NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS WOULD OR WOULD NOT APPROXIMATE THE ESTIMATES AND ASSUMPTIONS REPRESENTED IN THE LIQUIDATION ANALYSIS. ACTUAL RESULTS COULD VARY MATERIALLY. NOTHING CONTAINED IN THIS LIQUIDATION ANALYSIS IS INTENDED TO BE, OR CONSTITUTES, A CONCESSION, ADMISSION, OR ALLOWANCE OF ANY CLAIM. THE ACTUAL AMOUNT OR PRIORITY OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in (a) the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (the "***Plan***") or (b) the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (the "***Disclosure Statement***"), as applicable.

SET FORTH AND USED IN THIS LIQUIDATION ANALYSIS. THE DEBTORS RESERVE ALL RIGHTS TO SUPPLEMENT, MODIFY, OR AMEND THE ANALYSIS SET FORTH HEREIN.

## III.      OVERVIEW AND GENERAL ASSUMPTIONS

The hypothetical chapter 7 recoveries set forth in this Liquidation Analysis were determined through multiple steps, as set forth below. The basis of the Liquidation Analysis is the Debtors' projected cash balance and assets as of December 31, 2023 (the "***Conversion Date***") and the net costs to execute the administration of the wind-down of the Estates. The Liquidation Analysis assumes that the Debtors would commence a chapter 7 liquidation on or about the Conversion Date under the supervision of a single court-appointed chapter 7 trustee (the "***Chapter 7 Trustee***"). The selection of a separate chapter 7 trustee for one or more of the Estates likely would result in substantially higher administrative expenses associated with the chapter 7 cases from a large duplication of effort by each trustee and his or her professionals. The Liquidation Analysis reflects the wind-down and liquidation of substantially all the Debtors' remaining assets and the distribution of available proceeds to Holders of Allowed Claims during the period after the Conversion Date.

### Summary Notes to Liquidation Analysis

1. **Dependence on Assumptions**. The Liquidation Analysis depends on a number of estimates and assumptions. Although developed and considered reasonable by the management and the restructuring advisors of the Debtors, the assumptions are inherently subject to significant economic, business, regulatory, and competitive uncertainties, and contingencies beyond the control of the Debtors or their management. The Liquidation Analysis is also based on the Debtors' best judgment of how numerous decisions in the liquidation process would be resolved. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and actual results could vary materially and adversely from those contained herein.

2. **Dependence on Forecasted / Estimated Financial information**. This Liquidation Analysis contains numerous estimates and forecasts that are still under review, and it remains subject to further legal and accounting analysis.

3. **No Incremental DIP facility assumed.** The Liquidation Analysis assumes no incremental DIP facility is available beyond borrowings as of December 31, 2023. The hypothetical chapter 7 case is assumed to be funded by cash on hand and liquidation of assets.

4. **Chapter 7 liquidation process**. The liquidation of the Debtors' assets is assumed to be completed over a nine (9) month period inside of a chapter 7 case managed by the Chapter 7 Trustee. The Chapter 7 Trustee would manage the Estates to maximize recovery to creditors as expeditiously as possible and would appoint professionals (*e.g.*, attorneys, financial advisors, liquidators, accountants, consultants, appraisers, experts, etc.) to assist in the liquidation and wind-down of the Estates. The Chapter 7 Trustee would oversee the Debtors' inventory liquidation and collection of outstanding accounts receivable in addition to attempting to sell or otherwise monetize other assets owned by the Debtors to one or multiple buyers. During the first two (2) months, the Debtors would process all remaining inventory and commence the operational wind-down of all plant facilities in the U.S., Canada, and Mexico. At the end of this two (2) month period, the Debtors would reject all operating leases as soon as practicable, and return the spaces to the landlords in current conditions. During the remaining seven (7) month period, the Debtors would primarily focus on monetizing other assets such as owned real estate, intellectual property and other remaining personal property and equipment, as well as administrative activities such as Claims

reconciliation, distributions to Holders of various Allowed Claims, and other activities necessary to wind down the Estates.

5. **Claims Estimates**. In preparing this Liquidation Analysis, the Debtors have preliminarily estimated an amount of Allowed Claims for each Class based upon a review of the Debtors' estimated balance sheet. Administrative Expense Claims were estimated based on the Debtors' financial projections as of the Conversion Date. Additional Claims were estimated to include certain chapter 7 administrative obligations incurred after the Conversion Date. The estimate of all Allowed Claims in this Liquidation Analysis is based on the estimated book value of those Claims, where applicable. No order or finding has been entered or made by the Court estimating or otherwise fixing the amount of Claims at the estimated amounts of Allowed Claims set forth in this Liquidation Analysis. The estimate of the amount of Allowed Claims set forth in this Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of Allowed Claims under the Plan. The actual amount of Allowed Claims could be materially different from the amount of Claims estimated in this Liquidation Analysis.

## IV.   CONCLUSION

> THE DEBTORS HAVE DETERMINED, AS SUMMARIZED IN THE FOLLOWING ANALYSIS, THAT CONFIRMATION OF THE PLAN WILL PROVIDE CREDITORS WITH A RECOVERY THAT IS NOT LESS THAN WHAT THEY WOULD OTHERWISE RECEIVE IN CONNECTION WITH A LIQUIDATION OF THE DEBTORS UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

## V.    LIQUIDATION ANALYSIS RESULTS

Presented below is a summary of asset recoveries and distributions to various Classes of Claims resulting from the hypothetical Liquidation Analysis.[2]

---

[2]    The estimated Claim amounts reflected above may differ from the estimated Claims included elsewhere in the Disclosure Statement because of differing assumptions between the Plan and this hypothetical chapter 7 liquidation.

*Solicitation Version*

| ESTIMATED PROCEEDS | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *$ in Thousands* | | | | | | | | | |
| | | AUG 31, 2023 | TOTAL | DEC 31, 2023 | RECOVERY ESTIMATE (%) | | | RECOVERY ESTIMATE ($) | | |
| ASSETS | NOTES | BOOK VALUE | ADJ. | BOOK VALUE | LOW | MID | HIGH | LOW | MID | HIGH |
| **Gross Liquidation Proceeds** | | | | | | | | | | |
| Cash and cash equivalents | [1] | $12,097 | $14,408 | $26,505 | 100% | 100% | 100% | $26,505 | $26,505 | $26,505 |
| Restricted cash | [2] | 800 | -- | 800 | 69% | 69% | 69% | 550 | 550 | 550 |
| Trade and other current receivables, net | [3] | 41,610 | (3,771) | 37,840 | 61% | 71% | 81% | 23,050 | 26,795 | 30,539 |
| Inventory | [4] | 12,639 | -- | 12,639 | 42% | 62% | 83% | 5,255 | 7,883 | 10,510 |
| Prepaid expenses and other current assets | [5] | 11,325 | -- | 11,325 | 2% | 5% | 8% | 174 | 529 | 884 |
| **Total Current Assets** | | **$78,472** | **$10,637** | **$89,109** | **62%** | **70%** | **77%** | **$55,534** | **$62,260** | **$68,987** |
| Property, plant and equipment, net | [6] | 89,449 | -- | 89,449 | 30% | 35% | 41% | 26,527 | 31,460 | 36,393 |
| Intangible assets, net | [7] | 13,278 | -- | 13,278 | 3% | 4% | 7% | 456 | 593 | 911 |
| Goodwill, net | [8] | 127,132 | -- | 127,132 | -- | -- | -- | -- | -- | -- |
| ROU assets, net | [9] | 69,633 | -- | 69,633 | -- | -- | -- | -- | -- | -- |
| Other assets | [10] | 3,470 | -- | 3,470 | 26% | 31% | 35% | 914 | 1,068 | 1,223 |
| **Total Assets and Estimated Gross Proceeds** | | **$381,434** | **$10,637** | **$392,071** | **21%** | **24%** | **27%** | **$83,430** | **$95,382** | **$107,515** |
| **Less: Winddown Costs** | | | | | | | | | | |
| Operating Expenses - Inventory | [11] | | | | | | | ($22,327) | ($24,556) | ($26,785) |
| Operating Expenses - Corporate Overhead | [12] | | | | | | | (8,648) | (8,648) | (8,648) |
| Chapter 7 - Professional Fees | [13] | | | | | | | (10,800) | (8,100) | (5,400) |
| Chapter 7 - Trustee Fee | [14] | | | | | | | (2,503) | (2,861) | (3,225) |
| Accrued Payroll & Payroll Taxes | [15] | | | | | | | (2,151) | (2,151) | (2,151) |
| Asset Realization Fees | [16] | | | | | | | (239) | (798) | (1,356) |
| **Total Winddown Costs** | | | | | | | | **($46,667)** | **($47,113)** | **($47,565)** |
| **Net Proceeds Available** | | | | | | | | **$36,763** | **$48,269** | **$59,949** |

| DISTRIBUTION OF NET LIQUIDATION PROCEEDS TO CREDITORS | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | ESTIMATED CLAIMS | | | RECOVERY ESTIMATE (%) | | | RECOVERY ESTIMATE ($) | | |
| LIQUIDATION CLAIMS | NOTES | LOW | MID | HIGH | LOW | MID | HIGH | LOW | MID | HIGH |
| Carve Out Claims | [18] | $2,500 | $2,500 | $2,500 | 100% | 100% | 100% | $2,500 | $2,500 | $2,500 |
| *Remaining Amount for Distribution* | | | | | | | | *$34,263* | *$45,769* | *$57,449* |
| Other Secured Claims | [17] | $36,019 | $36,019 | $36,019 | 43% | 47% | 51% | $15,664 | $17,047 | $18,428 |
| *Remaining Amount for Distribution* | | | | | | | | *$18,598* | *$28,722* | *$39,021* |
| DIP Claims | [18] | $52,011 | $52,011 | $52,011 | 36% | 55% | 75% | $18,598 | $28,722 | $39,021 |
| *Remaining Amount for Distribution* | | | | | | | | *--* | *--* | *--* |
| First Lien Credit Facility Claims | [19] | $308,715 | $308,715 | $308,715 | -- | -- | -- | -- | -- | -- |
| *Remaining Amount for Distribution* | | | | | | | | *--* | *--* | *--* |
| 1.5L Credit Facility Claims | [20] | $11,899 | $11,899 | $11,899 | -- | -- | -- | -- | -- | -- |
| *Remaining Amount for Distribution* | | | | | | | | *--* | *--* | *--* |
| Second Lien Credit Facility Claims | [21] | $87,220 | $87,220 | $87,220 | -- | -- | -- | -- | -- | -- |
| *Remaining Amount for Distribution* | | | | | | | | *--* | *--* | *--* |
| Chapter 11 Admin Claims & Other Priority Claims | [22] | $34,213 | $34,213 | $34,213 | -- | -- | -- | -- | -- | -- |
| *Remaining Amount for Distribution* | | | | | | | | *--* | *--* | *--* |
| General Unsecured Claims | [23] | $528,777 | $517,271 | $505,590 | -- | -- | -- | -- | -- | -- |
| *Remaining Amount for Distribution* | | | | | | | | *--* | *--* | *--* |

# VI.    NOTES FOR PROCEEDS AVAILABLE FOR DISTRIBUTION

## Note [1] – Cash and Cash Equivalents

The Liquidation Analysis assumes 100.0% recovery for all cash and cash equivalents.

## Note [2] – Restricted Cash

Restricted cash consists of deposits held by Comerica and PNC banks for the Debtors' corporate credit card programs. The Liquidation Analysis assumes the balance of restricted cash net of credit card obligations ($0.25 million) is 100% recoverable.

## Note [3] – Trade and Other Current Receivables, Net

The Liquidation Analysis includes trade accounts receivable and other accounts receivable in U.S., Mexico, and Canada. The assumed recovery on trade receivables is based on the aging of respective AR balances and recoverable proceeds net of existing credits on the balance sheet. The blended recovery range for all accounts receivable is 61.0% to 81.0% of estimated book value.

## Note [4] – Inventory

The Liquidation Analysis assumes inventory of approximately $13 million as of the Conversion Date. Raw and WIP inventory is assumed to be processed into finished goods and then sold through orderly going-out-of-business sales using all existing facilities and customer channels. Estimated recovery is based on the gross liquidation value, which does not account for costs related to selling the inventory such as occupancy, payroll, freight, and other general selling expenses. These costs are included elsewhere in the Liquidation Analysis and described further in Note [11]. The blended recovery range on inventory is 42.0% to 83.0% of estimated book value.

## Note [5] – Prepaid Expenses and Other Current Assets

The Liquidation Analysis assumes prepaid expenses and other current assets of approximately $11 million as of the Conversion Date and consists of (i) prepaid expenses, (ii) VAT receivables, and (iii) other miscellaneous assets. Prepaid expenses related to insurance, taxes, utilities, real estate leases, and vendor prepayments are assumed to have a blended recovery range of 4.0% to 20.0% of estimated book value. IVA receivables are presumed to be offset against related IVA payables and have no recoverable value. Other miscellaneous assets are de minimis and are assumed to have no recoverable value. The blended recovery range on prepaid expenses and other current assets is 2.0% and 8.0% of book value.

## Note [6] – Property and Equipment, Net

Property, machinery, and equipment assets primarily consist of real estate (buildings, land, leases), plant machinery and equipment, rolling stock, and information technology ("*IT*") equipment and software assets.

Real estate assets consist of company owned properties as well as traditional commercial leases. The Liquidation Analysis assumes that the Chapter 7 Trustee would reject the traditional leases at the conclusion of the two (2) month operational wind-down period in order to minimize the carrying costs of such leases and attempt to sell or otherwise monetize the remaining owned property during the remaining seven (7) month period. The assumed recovery range is based on the "dark" values presented in a recent comparable analysis, and range between 60.0% to 100.0% of such dark value.

For plant machinery, equipment, and rolling stock, recoveries are based on a third-party appraisal and are estimated to be 36.0% to 49.0% of book value. Computer hardware and software assets are assumed to have estimated recoveries of 5.0% to 10.0% of book value. The blended recovery range on property, plant, and equipment is 30.0% to 41.0% of book value.

**Note [7] – Intangible Assets**

Intangible assets primarily consist of customer relationships, certain trade names, patents, and other intangible assets related to the Company's ERP (accounting system) technology. Value for trademarks of 5.0% to 10.0% of estimated book value and patents of 10.0% to 20.0% of estimated book value has been assumed to reflect the Company's market leading position offset by the limited value of trademarks and patents to the industry as a whole. No recovery has been assigned to customer relationships or the book value related to ERP technology. The blended recovery range on intangible assets is 3.0% to 7.0% of estimated book value.

**Note [8] – Goodwill, Net**

The Liquidation Analysis assumes no recoverable value.

**Note [9] – Right of Use ("*ROU*") Assets, Net**

The Liquidation Analysis assumes no recoverable value.

**Note [10] – Other Assets**

The Liquidation Analysis includes deposits held in the U.S., Mexico, and Canada consisting of professional fee retainers, real estate lease security deposits, environmental deposits, customs deposits, and other miscellaneous deposits. Assumed recovery on professional fee retainers of 100.0%, environmental deposits of 50.0% to 100.0%, and other miscellaneous deposits of 0.0% to 50.0%. The blended recovery range for other assets is 26.0% to 35.0% of estimated book value.

**VII.   WIND-DOWN COSTS**

**Note [11] – Operating Expenses - Inventory**

Includes plant costs across U.S., Canada, and Mexico to process remaining raw and WIP inventory into finished goods and wind-down respective facilities. Costs include labor (*e.g.*, payroll, benefits, and severance), facility maintenance expenses, utilities, site costs (insurance, telephone, property leases, etc.), and other miscellaneous expenses. Operational wind-down of all plant facilities expected to occur over two (2) months with an additional three (3) to six (6) months to liquidate and monetize all remaining assets.

**Note [12] – Operating Expenses – Corporate Overhead**

Includes all corporate overhead (*e.g.*, salaries, wages, benefits, corporate occupancy, IT and other support) during the nine (9) month period. Higher costs will be incurred during the first two (2) months as additional support will be needed to complete the operational wind-down and plant closures. After this period, costs will be reduced to include basic functions such as monetizing remaining assets, reconciling creditor claims, completing the wind-down of the estate, and facilitating distributions to creditors.

**Note [13] – Chapter 7 - Professional Fees**

Chapter 7 professional fees include costs for restructuring counsel, local counsel, financial advisor, and other professionals.

**Note [14] – Chapter 7 - Trustee Fee**

Consistent with statutory guidelines, the Chapter 7 Trustee fee is estimated at 3.0% of total distributions to interested parties.

**Note [15] – Accrued Payroll and Payroll Tax**

Accrued payroll and associated taxes are estimates as of the Conversion Date and are assumed to be paid in the normal course as part of the wind-down process, as failure to pay these expenses would likely have a destabilizing effect on the orderly wind-down of the Debtors' Estates.

**Note [16] – Asset Realization Fees**

Asset realization fees are assumed to be 1.0% to 4.0% of gross recoveries on all real estate, equipment, and intangible assets. The Liquidation Analysis assumes the Chapter 7 Trustee will retain brokers and auctioneers to assist in the marketing and liquidation of these assets.

## VIII.   SECURED CLAIMS

**Note [17] – Other Secured Claims**

Other Secured Claims are estimated to be $36 million on Conversion Date and are related to (i) the Canadian Credit Agreement, (ii) lienholder claims on post-petition accounts payable trade, and (iii) capital leases and other miscellaneous secured claims. It is assumed that all recoveries from these specific assets will be distributed only to holders of such Other Secured Claims.

**Note [18] – DIP Claims**

The DIP Claims, including Superpriority Credit Facility Claims are estimated to be $56 million, including an estimated $23 million of incremental DIP Facility borrowings (including accrued and unpaid interest). Recoveries from all U.S. assets collateralized by first priority liens are used to fund the professional fee carve out of $2.5 million and then satisfy DIP Claims. The Liquidation Analysis estimates a partial recovery for Holders of DIP Claims.

**Note [19] - First Lien Credit Facility Claims**

The First Lien Credit Facility has an estimated balance of $309 million (including accrued and unpaid interest) as of the Conversion Date, consisting of (i) revolver, (ii) term loans, and (iii) accrued and unpaid interest and fees. The Liquidation Analysis assumes First Lien Credit Facility Claims are asserted in full against each guarantor of the debt. These claims are paid from any excess proceeds after payment of the DIP Claims in full. The Liquidation Analysis estimates no recovery for Holders of First Lien Credit Facility Claims.

**Note [20] – 1.5 Lien Credit Facility Claims**

The 1.5 Lien Credit Facility has an estimated balance of $12 million (including accrued and unpaid interest) as of the Conversion Date. The Liquidation Analysis assumes 1.5 Lien Credit Facility Claims are asserted in full against each guarantor of the debt. These claims are paid from any excess proceeds after payment in full of the DIP Claims and First Lien Credit Facility Claims. The Liquidation Analysis estimates no recovery to Holders of the 1.5 Lien Credit Facility Claims.

**Note [21] – Second Lien Credit Facility Claims**

The Second Lien Credit Facility has an estimated balance of $87 million (including accrued and unpaid interest) as of the Conversion Date. The Liquidation Analysis assumes Second Lien Credit Facility Claims are asserted in full against each guarantor of the debt. These claims are paid from any excess proceeds after payment in full of the DIP Claims, Superpriority Credit Facility Claims, First Lien Credit Facility Claims, and 1.5 Lien Credit Facility Claims. The Liquidation Analysis estimates no recovery to Holders of the Second Lien Credit Facility Claims.

## IX.     ADMINISTRATIVE AND PRIORITY CLAIMS

**Note [20] – Administrative and Priority Tax Claims**

Administrative and Priority Claims estimates include but are not limited to chapter 11 Professional Fee Claims in excess of the carve out, 503(b)(9) Claims, Priority Tax Claims, post-petition accounts payable, accrued expenses, and other administrative claims as of the Conversion Date. Additionally, it is assumed that accrued and unpaid VAT taxes owed to Mexican taxing authorities would become a Priority Tax Claim. To the extent that the Company holds cash related to these obligations, such amounts would be transferred to the applicable taxing authorities, reducing cash and Priority Tax claims, respectively.

## X.     UNSECURED CLAIMS

**Note [21] – General Unsecured Claims and Trade Claims**

General Unsecured Claims and Trade Claims include estimated trade payables and other accrued expenses, intercompany claims, lease rejection damage claims, deficiency claims from holders of Other Secured Claims, DIP Claims, Superpriority Credit Facility Claims, First Lien Credit Facility Claims, 1.5 Lien Credit Facility Claims, Second Lien Credit Facility Claims, and various other general unsecured claims. The Liquidation Analysis estimates no recovery to holders of General Unsecured Claims and Trade Claims.

- **Accounts Payable, Accrued Expenses and Other Current Liabilities** represent estimates as of the Conversion Date.

- **Lease rejection and related real property damage claims** were calculated as the greater of (a) one year's rent; or (b) 15.0% of the remaining lease term, not to exceed 3 (three) years rent. Additionally, it is assumed that remaining non-saleable machinery, equipment, and inventory would be disposed of by landlords, resulting in incremental claims against the estate.

- **Deficiency claims** were estimated based on assumed recoveries for Other Secured Claims, DIP Claims, Superpriority Credit Facility Claims, First Lien Credit Facility Claims, 1.5 Lien Credit Facility Claims, and Second Facility Claims (deficiency claims range between $438 million and $462 million).

*Solicitation Version*

IT SHOULD BE NOTED THAT NO ORDER OR FINDING HAS BEEN ENTERED OR MADE BY THE COURT ESTIMATING OR OTHERWISE FIXING THE AMOUNT OF CLAIMS AT THE ESTIMATED AMOUNTS OF ALLOWED CLAIMS SET FORTH IN THE LIQUIDATION ANALYSIS. THE ESTIMATE OF THE AMOUNT OF ALLOWED CLAIMS SET FORTH IN THIS LIQUIDATION ANALYSIS SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING, WITHOUT LIMITATION, ANY DETERMINATION OF THE VALUE OF ANY DISTRIBUTION TO BE MADE ON ACCOUNT OF ALLOWED CLAIMS UNDER THE PLAN. THE ACTUAL AMOUNT OF ALLOWED CLAIMS COULD BE MATERIALLY DIFFERENT FROM THE AMOUNT OF CLAIMS ESTIMATED IN THIS LIQUIDATION ANALYSIS.

**<u>Exhibit B</u>**

*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-[_____]** |
| | § | |
| **STRATEGIC MATERIALS, INC.**, *et al.*, | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |

## NOTICE OF SUPPLEMENT TO THE
## DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

**PLEASE TAKE NOTICE** that, on November 15, 2023, the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") commenced solicitation of the *Debtors' Joint Prepackaged Plan of Reorganization* (together with all exhibits and amendments thereto, the "***Plan***")[2] by sending copies of the Plan, the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (together with all exhibits and amendments thereto, the "***Disclosure Statement***"), and the ballots for voting to accept or reject the Plan (the "***Ballots***"), substantially contemporaneously with this supplement to the Plan (together with all exhibits and amendments thereto, the "***Plan Supplement***," and together with the Plan, the Disclosure Statement, and the Ballots, the "***Solicitation Materials***"), to parties entitled to vote to accept or reject the Plan, which includes Holders of Claims in Classes 3, 4, and 5, and Holders of Interests in Class 10.

**PLEASE TAKE FURTHER NOTICE** that the Debtors anticipate they may commence chapter 11 cases and, if they do, they will subsequently file each of the Solicitation Materials on the docket in such chapter 11 cases.

**PLEASE TAKE FURTHER NOTICE** that this Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time in accordance with the Plan and the Restructuring Support Agreement:[3]

---

[1] The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are: Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 17220 Katy Freeway, Ste. 150, Houston, TX 77094.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[3] To the extent a document is identified in the Plan as a document to be included in the Plan Supplement and is not included in this Plan Supplement, the Debtors will provide such document as soon as practicable as part of an amended Plan Supplement and will file such document with the Court if the Debtors commence chapter 11 cases.

- **Exhibit A** — Material New Governance Documents
- **Exhibit B** — Schedule of Rejected Executory Contracts and Unexpired Leases
- **Exhibit C** — Identities of Members of the New Board and Officers of Reorganized SMI Topco
- **Exhibit D** — List of Retained Causes of Action
- **Exhibit E** — Material Exit Term Loan Facilities Documents
- **Exhibit F** — Restructuring Transactions Exhibit

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement and any exhibits, appendices, supplements, or annexes to the Plan Supplement documents are incorporated into the Plan by reference and are a part of the Plan as if set forth therein.  If the Plan is confirmed by the Court, the Plan Supplement will be approved as well.  The Debtors reserve the right, subject to any applicable consent rights contained in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement any document or exhibit in the Plan Supplement until the Effective Date or as otherwise provided in the Plan, in each case in accordance with the Plan and the Restructuring Support Agreement, as applicable; *provided*, that if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect, the Debtors will file a revised version of such document with the Court.

**PLEASE TAKE FURTHER NOTICE** that the Solicitation Materials, including this Plan Supplement, may be obtained upon request made to the Debtors' counsel at the address specified below, and the Solicitation Materials (excluding the Ballots) are also available for inspection free of charge on the Debtors' solicitation website at https://cases.ra.kroll.com/SMISolicitation.  If the Debtors file chapter 11 cases, copies of all pleadings, including the Solicitation Materials, will be on file with the Clerk of the Court, 515 Rusk Street, Houston, Texas 77002 and available for review during the normal operating hours, and they will also be available for inspection on the Court's website at www.txs.uscourts.gov or free of charge on the Debtors' restructuring website at https://cases.ra.kroll.com/SMI.

4890-4691-1632v.7

Dated:  November 15, 2023
Houston, Texas

**VINSON & ELKINS LLP**
Paul E. Heath (TX 09355050)
Matthew D. Struble (TX 24102544)
Trevor G. Spears (TX 24106681)
845 Texas Avenue, Suite 4700
Houston, TX 77002
Tel: 713.758.2222
Fax: 713.758.2346
Email: pheath@velaw.com
mstruble@velaw.com
tspears@velaw.com

-and-

David S. Meyer (*pro hac vice* pending)
Jessica C. Peet (*pro hac vice* pending)
Steven Zundell (*pro hac vice* pending)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel:  212.237.0000
Fax:  212.237.0100
Email: dmeyer@velaw.com
jpeet@velaw.com
szundell@velaw.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**WACHTELL, LIPTON, ROSEN & KATZ**
Joshua A. Feltman (*pro hac vice* pending)
Benjamin S. Arfa (*pro hac vice* pending)
Michael A. Chaia (*pro hac vice* pending)
Katherine Mateo (*pro hac vice* pending)
51 West 52nd Street
New York, NY 10019
Tel: 212.403.1000
Fax: 212.403.2000
Email: JAFeltman@wlrk.com
BSArfa@wlrk.com
MAChaia@wlrk.com
KMateo@wlrk.com

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

3

## Exhibit A

**Material New Governance Documents**

**Exhibit A**

## <u>Exhibit A-1</u>

**New Company Agreement**

- To be supplemented.

**Exhibit A-1**

4890-4691-1632v.7

**<u>Exhibit A-2</u>**

**Registration Rights Agreement**

**Exhibit A-2**

*Solicitation Version*

**REGISTRATION RIGHTS AGREEMENT**

**BY AND AMONG**

**SMI TOPCO HOLDINGS, LLC**

**AND**

**THE INVESTORS (AS DEFINED HEREIN)**

**DATED AS OF [●], 2023**

1.      Definitions and Interpretations ................................................................. 1

(a)     Definitions ................................................................................................ 1

(b)     Interpretations ......................................................................................... 6

2.      Incidental Registrations ......................................................................... 6

     (a)     Right to Include Registrable Securities ............................................. 6

     (b)     Priority in Incidental Registrations ................................................... 7

3.      Registration on Request ......................................................................... 8

     (a)     Request by the Demand Party ............................................................ 8

     (b)     Priority on Demand Registration ....................................................... 9

     (c)     Cancellation of a Demand Registration ............................................ 9

     (d)     Limitations on Demand Registrations ............................................. 10

     (e)     Postponements in Requested Registrations .................................... 10

     (f)     Short-Form Registrations .................................................................. 10

     (g)     Shelf Take-Downs .............................................................................. 12

     (h)     Registration Statement Form ........................................................... 12

     (i)     Selection of Underwriters ................................................................. 13

4.      Registration Procedures ....................................................................... 13

5.      Hedging Transactions. .......................................................................... 20

6.      Indemnification. .................................................................................... 20

     (a)     Indemnification by the Issuer ........................................................... 20

     (b)     Indemnification by Holder of Registrable Securities .................... 21

     (c)     Conduct of Indemnification Proceedings ........................................ 22

     (d)     Contribution ....................................................................................... 23

     (e)     Deemed Underwriter ......................................................................... 23

     (f)     Other Indemnification ....................................................................... 24

| | (g) | Non-Exclusivity | 24 |
|---|---|---|---|
| | (h) | Primacy of Indemnification | 24 |
| 7. | | Conversion to Corporation | 24 |
| 8. | | Registration Expenses | 25 |
| 9. | | Rule 144; Other Exemptions | 26 |
| 10. | | Certain Additional Agreements | 26 |
| 11. | | Miscellaneous | 26 |
| | (a) | Termination | 26 |
| | (b) | Holdback Agreement | 27 |
| | (c) | Amendments and Waivers | 27 |
| | (d) | Issuer Party; Non-U.S. IPO | 28 |
| | (e) | Successors, Assigns and Transferees | 28 |
| | (f) | Notices | 28 |
| | (g) | Further Assurances | 29 |
| | (h) | Preservation of Rights | 29 |
| | (i) | Entire Agreement; No Third Party Beneficiaries | 29 |
| | (j) | Governing Law; Jurisdiction and Forum; Waiver of Jury Trial | 29 |
| | (k) | Severability | 30 |
| | (l) | Enforcement | 30 |
| | (m) | Titles and Subtitles | 30 |
| | (n) | No Recourse | 30 |
| | (o) | Counterparts; Facsimile Signatures | 30 |

Exhibit A — Investors
Exhibit B — Joinder Agreement

This REGISTRATION RIGHTS AGREEMENT (this "<u>Agreement</u>") is entered into as of [●], 2023, by and among SMI Topco Holdings, LLC, a Delaware limited liability company (the "<u>Company</u>") and the Persons identified on <u>Exhibit A</u> hereto (collectively, the "<u>Investors</u>" and, each individually, an "<u>Investor</u>").

WHEREAS, the Parties desire to provide the Holders with rights to registration under the Securities Act of Registrable Securities, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual promises hereinafter set forth, the Parties agree as follows:

<u>AGREEMENT</u>

1.    <u>Definitions and Interpretations</u>

(a)    <u>Definitions</u>. As used in this Agreement, the following capitalized terms shall have the following respective meanings:

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment advisor to which is such Person or an Affiliate thereof); <u>provided</u>, that for purposes of this Agreement, no Holder shall be deemed an Affiliate of the Issuer or any of its Subsidiaries.

"<u>Agreement</u>" has the meaning given to such term in the preamble, as the same may be amended, supplemented or restated from time to time.

"<u>Automatic Shelf Registration Statement</u>" has the meaning given to such term in <u>Section 3.(f)(iii)</u>.

"<u>Board</u>" means the Board of Managers or Directors of the Issuer, as applicable.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or date on which commercial banks in the State of New York are authorized or required by law to close for business.

"<u>Common Units</u>" means the Units designated as "Common Units" pursuant to the LLC Agreement.

"<u>Company</u>" has the meaning given to such term in the preamble.

"<u>control</u>" (including the terms "<u>controlling</u>", "<u>controlled by</u>" and "<u>under common control with</u>"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise.

1

"Covered Person" has the meaning given to such term in Section 6.(a).

"Demand Follow-Up Notice" has the meaning given to such term in Section 3.(a).

"Demand Including Holders" has the meaning given to such term in Section 3.(a).

"Demand Notice" has the meaning given to such term in Section 3.(a).

"Demand Registration" has the meaning given to such term in Section 3.(a).

"Demanding Holders" has the meaning given to such term in Section 3.(a).

"Equity Securities" means any and all Common Units or shares of Common Stock, of the Issuer.

"Estimated Pricing Information" means, with respect to any offering of securities in which a Holder is including its Registrable Securities, a good faith estimate (which may take the form of a customary "price range") of the price per share at which the Registrable Securities will be sold. Any Estimated Pricing Information shall be given based on the advice of the lead managing underwriter(s), in the case of an underwritten offering.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"FINRA" means the Financial Industry Regulatory Authority.

"Free Writing Prospectus" has the meaning given to such term in Section 4.(a)(i)(a).

"Holdback Agreement" has the meaning given to such term in Section 11.(b).

"Holdback Period" means, (i) with respect to an IPO, one hundred eighty (180) days after, and during the ten (10) days before, the effective date of the related Registration Statement and (ii) with respect to any registered offering other than an IPO covered by this Agreement, ninety (90) days after, and during the ten (10) days before, the effective date of the related Registration Statement or, in the case of a takedown from a Shelf Registration Statement, sixty (60) days after the date of the Prospectus supplement filed with the SEC in connection with such takedown and during such prior period (not to exceed seven (7) days) as the Issuer has given reasonable written notice to the Holder of Registrable Securities, in each case of clauses (i) and (ii), as such periods may be shortened by the agreement of the lead managing underwriter(s) with respect to such offering.

"Holder" means any of (i) the Investors, (ii) any other Person entitled to incidental or piggyback registration rights hereunder upon entering into a Joinder Agreement substantially in the form of Exhibit B hereto and (iii) any direct or indirect transferee of a Holder who has acquired Registrable Securities from a Holder and who has entered into a

Joinder Agreement substantially in the form of <u>Exhibit B</u> hereto, in each case of clauses (i), (ii) and (iii), for so long as such Person holds Registrable Securities.

"<u>Including Holder</u>" has the meaning given to such term in <u>Section 2.(a)</u>.

"<u>Indemnified Party</u>" has the meaning given to such term in <u>Section 6.(c)</u>.

"<u>Indemnifying Party</u>" has the meaning given to such term in <u>Section 6.(c)</u>.

"<u>Indemnitors</u>" has the meaning given to such term in <u>Section 6.(h)</u>.

"<u>Inspectors</u>" has the meaning given to such term in <u>Section 4.(a)(i)(o)</u>.

"<u>IPO</u>" means the initial public offering of Equity Securities of the Issuer pursuant to an effective Registration Statement under the Securities Act, including a direct listing without conducting a concurrent underwritten Public Offering or any other transaction that results in the listing of Equity Securities of the Issuer on a national securities exchange.

"<u>Issuer</u>" means the Company, any Subsidiary of the Company or any Successor Corporation.

"<u>LLC Agreement</u>" means that certain Limited Liability Company Agreement of the Company, dated as of the date hereof, by and among the Investors party thereto and the Company.

"<u>Losses</u>" has the meaning given to such term in <u>Section 6.(a)</u>.

"<u>Majority-in-Interest of the Demanding Holders</u>" means Demanding Holders that requested registration of a majority of the Registrable Securities requested to be registered by all Demanding Holders in a Demand Registration.

"<u>Investor</u>" has the meaning given to such term in the preamble.

"<u>Parties</u>" means the parties to this Agreement.

"<u>Permitted Transferee</u>" means with respect to any Holder, (i) an Affiliate (other than any "portfolio company" described below) of such Holder, (ii) in the case of a Holder that is a partnership, limited liability company or any foreign equivalent thereof, any partner, member or foreign equivalent thereof of such Holder (<u>provided</u>, that such Transfer is made in a *pro rata* distribution in accordance with the applicable partnership agreement, limited liability company agreement or foreign equivalent thereof, as the case may be) and (iii) any transferee of Registrable Securities that is not an Affiliate of such Holder that holds (after giving effect to such Transfer), together with its Affiliates, in excess of five percent (5%) of the then-outstanding Equity Securities; <u>provided</u>, <u>however</u>, that any such transferee shall agree in a writing in substantially the form attached as <u>Exhibit B</u> hereto to be bound by and to comply with all applicable provisions of this Agreement; <u>provided</u>, <u>further</u>, <u>however</u>, that in no event shall (A) the Company or any of

3

its Subsidiaries or (B) any "portfolio company" (as such term is customarily used among institutional investors) of any Holder or any entity controlled by an portfolio company of any Holder constitute a "Permitted Transferee".

"Person" means any individual, partnership, joint venture, corporation, limited liability company, trust, unincorporated organization, government or any department or agency thereof or any other entity.

"Prospectus" means the prospectus included in any Registration Statement (including, without limitation, a prospectus that discloses information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, relating to Registrable Securities, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus.

"Public Offering" means a public offering of Equity Securities of the Issuer pursuant to an effective Registration Statement under the Securities Act.

"Records" has the meaning given to such term in Section 4.(a)(i)(o).

"Registrable Securities" means (i) any Equity Securities held by a Holder,  (ii) any Equity Securities which may be obtained upon the conversion, exchange or exercise of other securities held by a Holder and (iii) any other equity securities or equity interests issued or issuable, directly or indirectly, with respect to the securities described in clause (i) or (ii) by way of conversion or exchange thereof or stock dividends, stock splits or in connection with a combination of shares, reclassification, recapitalization, merger, consolidation or other reorganization.  As to any particular Registrable Securities, once issued such securities shall cease to be Registrable Securities on the date when (A) they are disposed of pursuant to an effective Registration Statement under the Securities Act, (B) they are sold to the public pursuant to Rule 144 (or another applicable exemption from registration under the Securities Act), (C) they are able to be sold by their Holder without restriction as to volume or manner of sale pursuant to Rule 144 or (D) they shall have ceased to be outstanding.

"Registration Statement" means any registration statement of the Issuer filed with the SEC under the Securities Act which covers any of the Registrable Securities pursuant to the provisions of this Agreement, including any Prospectus, Free Writing Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"Rule 144" means Rule 144 under the Securities Act.

"Rule 145" means Rule 145 under the Securities Act.

"Rule 405" means Rule 405 under the Securities Act.

4

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Shelf Registration Statement" has the meaning given to such term in Section 3.(f)(i).

"Shelf Underwritten Offering" has the meaning given to such term in Section 3.(g).

"Short-Form Registration" has the meaning given to such term in Section 3.(f)(i)

"Stock" has the meaning given to such term in Section 7.(a).

"Subsidiary" means (i) any corporation of which a majority of the securities entitled to vote generally in the election of directors thereof, at the time as of which any determination is being made, are owned by another entity, either directly or indirectly and (ii) any joint venture, general or limited partnership, limited liability company or other legal entity in which an entity is the record or beneficial owner, directly or indirectly, of a majority of the voting interests or the general partner.

"Successor Corporation" has the meaning given to such term in Section 7.(a).

"Suspension Event" has the meaning given to such term in Section 3.(e).

"Take-Down Notice" has the meaning given to such term in Section 3.(g).

"Transfer" means, directly or indirectly, to sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Equity Securities beneficially owned by a Person, or any interest in any Equity Securities (including through ownership of any other securities convertible into or exchangeable or exercisable for Equity Securities) beneficially owned by a Person. In the event that any Holder that is a corporation, partnership, limited liability company or other legal entity (other than an individual, trust or estate) ceases to be, directly or indirectly, controlled by the Person controlling such Holder as of the date hereof or a Permitted Transferee thereof, such event shall be deemed to constitute a "Transfer" subject to the restrictions on Transfer contained or referenced herein; provided, however, that, with respect to any Investor or Affiliate thereof that is an investment fund, a change of control of the direct or indirect general partner or investment advisor of such investment fund shall not constitute a Transfer.

"Unit" means a unit representing a fractional part of the ownership interest of the Company and shall include all types and classes of Units; provided that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations, and rights set forth in the LLC Agreement and the ownership interest represented by such type or class

or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations, and rights.

"Unit Equivalents" means any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable, or exercisable for Units, and any option, warrant, or other right to subscribe for, purchase, or acquire Units.

"WKSI" has the meaning given to such term in Section 3.(f)(iii).

(b)    Interpretations.  For purposes of this Agreement, unless otherwise noted:

(i)    All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor laws, rules, regulations and forms thereto in effect at the time.

(ii)    All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successor thereto.

(iii)    All references to agreements and other contractual instruments shall be deemed to be references to such agreements or other instruments as they may be amended, waived, supplemented or modified from time to time.

(iv)    All references to any amount of securities (including Registrable Securities) shall be deemed to be a reference to such amount measured on an as-converted or as-exercised basis.

2.    Incidental Registrations.

(a)    Right to Include Registrable Securities. If, at any time following the consummation of an IPO, the Issuer determines to register its Equity Securities under the Securities Act (other than pursuant to a Demand Registration in accordance with Section 3.(a) or a Registration Statement filed by the Issuer on Form S-4 or S-8 or any successor forms promulgated for similar purposes, or filed solely in connection with an exchange offer or any employee benefit or dividend reinvestment plan), whether or not for sale for its own account, in a manner which would permit registration of Registrable Securities for sale to the public under the Securities Act, it will, at each such time, give prompt written notice to all Holders of Registrable Securities of its intention to do so and of such Holders' rights under this Section 2. Upon the written request of any such Holder (each, an "Including Holder") made within seven (7) Business Days after the receipt of any such notice (which request shall specify the Registrable Securities intended to be disposed of by such Holder and the intended method or methods of disposition thereof), the Issuer will use its reasonable best efforts to effect the registration under the Securities Act of all Registrable Securities which the Issuer has been so requested to register by the Including Holders, to the extent required to permit the disposition of the Registrable Securities so to be registered; provided, that (i) if, at any time after giving written notice of its intention to register any securities to be sold by it and prior to the effective date of the Registration Statement filed in connection with such registration, the Issuer shall determine for

any reason not to proceed with the proposed registration of the securities to be sold by it, the Issuer may, at its election, give written notice of such determination to each Holder of Registrable Securities and, thereupon, shall be relieved of its obligation to register any Registrable Securities in connection with such registration (but not from its obligation to pay the expenses in connection therewith) without prejudice to the rights of the Holders to request that such registration be effected as a registration under Section 3 and (ii) if such registration involves an underwritten offering, all Including Holders must sell their Registrable Securities to the underwriters selected by the Issuer on the same terms and conditions as applied to the Issuer, with such differences, including any with respect to indemnification and liability insurance, as may be customary or appropriate in combined primary and secondary offerings. The Issuer shall provide each Including Holder with written notice of the Estimated Pricing Information as soon as practicable after such Estimated Pricing Information is available and shall provide each Including Holder with written notice of any updated Estimated Pricing Information as soon as practicable after such updated Estimated Pricing Information is available. Other than with respect to a Shelf Registration Statement in accordance with Section 3(f), the Issuer shall not be required to maintain the effectiveness of the Registration Statement for a registration requested pursuant to this Section 2.(a) beyond the earlier to occur of (i) one hundred eighty (180) days after the effective date thereof and (ii) consummation of the distribution by the Holders of the Registrable Securities included in such Registration Statement. Any Including Holder shall be permitted to withdraw from such registration and offering by written notice to the Issuer (x) in the case of an underwritten offering, at least two (2) Business Days prior to the earlier of the anticipated filing date of the "red herring" prospectus, if applicable, and the anticipated pricing date, or (y) in the case of any other offering, at least two (2) Business Days prior to the effective date of the Registration Statement filed in connection with such registration; provided, that, in the case of either (x) or (y), an Including Holder may withdraw from such registration and offering all or a portion of its Registrable Securities at any time prior to two (2) Business Days after the date on which the Estimated Pricing Information is provided by the Issuer with respect to such offering and within two (2) Business Days after the date on which any updated Estimated Pricing Information is provided by the Issuer with respect to such offering.

(b)     Priority in Incidental Registrations. In the event of any registration pursuant to this Section 2, the Issuer shall, and shall cause the managing underwriter(s) of a proposed underwritten offering to, permit Holders of Registrable Securities who have requested to include Registrable Securities in such offering to include in such offering all Registrable Securities so requested to be included on the same terms and conditions as any other shares or units of Equity Securities, if any, of the Issuer included in the offering. Notwithstanding the foregoing, if the managing underwriter(s) of such underwritten offering have informed the Issuer that in its or their good faith opinion the total number or dollar amount of securities that such Holders and the Issuer intend to include in such offering is such as to adversely affect the per share offering price, then there shall be included in such underwritten offering the number or dollar amount of Registrable Securities that in the good faith opinion of such managing underwriter(s) can be sold without such adverse effect, and such number of Registrable Securities shall be allocated as follows: first, all securities of the Issuer requested to be included by the Issuer in such registration for its own account (if any); and second, all securities of the Issuer requested to be included by the Holders of Registrable Securities requesting such registration *pro rata* among such Holders on the basis of the percentage of the Registrable Securities owned by each such Holder.

7

3.      <u>Registration on Request</u>.

(a)      <u>Request by the Demand Party</u>. Subject to <u>Section 3.(d)</u>, following an IPO, Holders of at least fifteen percent (15%) of the then outstanding Registrable Securities (the "<u>Demanding Holders</u>") shall have the right to require the Issuer to register, pursuant to the terms of this Agreement, pursuant to a Registration Statement on an appropriate form and under and in accordance with the provisions of the Securities Act, the number of Registrable Securities of such Holders requested to be so registered pursuant to this Agreement, in each case by delivering written notice to the Issuer (any such written notice, a "<u>Demand Notice</u>" and any such registration, a "<u>Demand Registration</u>"). Subject to <u>Section 3.(d)</u>, following receipt of a Demand Notice for a Demand Registration in accordance with this <u>Section 3.(a)</u>, the Issuer shall use its reasonable best efforts to file a Registration Statement as promptly as practicable, but no later than thirty (30) days following receipt of any Demand Notice, and to cause such Registration Statement to be declared effective under the Securities Act as promptly as practicable after the filing thereof.

No Demand Registration shall be deemed to have occurred for purposes of the first sentence of the preceding paragraph if (i) the Registration Statement relating thereto (x) does not become effective, (y) is not maintained effective for the period required pursuant to this <u>Section 3</u>, or (z) is subject to a stop order, injunction, or similar order or requirement of the SEC during such period, (ii) more than ninety percent (90%) of the Registrable Securities requested by the Demanding Holders to be included in such registration are not so included pursuant to <u>Section 3.(b)</u> or (iii) the conditions to closing specified in any underwriting agreement, purchase agreement or similar agreement entered into in connection with the registration relating to such request are not satisfied (other than as a result of a material default or breach thereunder by a Demanding Holder or its Affiliates) or otherwise waived by a Majority-in-Interest of the Demanding Holders.

Within two (2) Business Days after receipt by the Issuer of a Demand Notice in accordance with this <u>Section 3.(a)</u>, the Issuer shall give written notice (the "<u>Demand Follow-Up Notice</u>") of such Demand Notice to all other Holders of Registrable Securities and shall, subject to the provisions of <u>Section 3.(b)</u> hereof, include in such registration all Registrable Securities with respect to which the Issuer receives written requests for inclusion therein (the Holders making such requests, the "<u>Demand Including Holders</u>") within seven (7) Business Days after such Demand Follow-Up Notice is given by the Issuer to such Holders. For the avoidance of doubt, any such requests for inclusion in such registration of Registrable Securities by Demand Including Holders shall not count as a Demand Registration for the purposes of the limitations set forth in <u>Section 3.(d)</u>. The Issuer shall provide each Demand Including Holder with written notice of the Estimated Pricing Information as soon as practicable after such Estimated Pricing Information is available and shall provide each Demand Including Holder with written notice of any updated Estimated Pricing Information as soon as practicable after such updated Estimated Pricing Information is available.

All requests made pursuant to this <u>Section 3</u> will specify the number of Registrable Securities to be registered and the intended method or methods of disposition thereof.

The Issuer shall be required to maintain the effectiveness of the Registration Statement with respect to any Demand Registration for a period of at least one hundred eighty (180) days after the effective date thereof or such shorter period during which all Registrable Securities included in such Registration Statement have actually been sold; provided, however, that such period shall be extended for a period of time equal to the period the Holder of Registrable Securities refrains from selling any securities included in such Registration Statement at the request of the Issuer or an underwriter of the Issuer pursuant to the provisions of this Agreement.

(b)    Priority on Demand Registration. If any of the Registrable Securities registered pursuant to a Demand Registration are to be sold in an underwritten offering, and the managing underwriter(s) advise the Holders of such securities that in its or their good faith opinion the total number or dollar amount of Registrable Securities proposed to be sold in such offering (including, without limitation, securities proposed to be included by other Holders of securities entitled to include securities in such Registration Statement pursuant to Section 2 or Section 3.(a)) is such as to adversely affect the per share offering price, then there shall be included in such underwritten offering the number or dollar amount of Registrable Securities that in the good faith opinion of such managing underwriter(s) can be sold without such adverse effect, and such number of Registrable Securities shall be allocated as follows, unless the underwriters require a different allocation:

(i)    first, to the Holders requesting such registration (whether pursuant to a Demand Notice or pursuant to incidental or piggyback registration rights) *pro rata* on the basis of the percentage of Registrable Securities owned by each such Holder, until with respect to each such Holder, all Registrable Securities requested for registration by such Holder have been included in such registration; and

(ii)    second, the securities for which inclusion in such Demand Registration was requested by the Issuer.

(c)    Cancellation of a Demand Registration. A Majority-in-Interest of the Demanding Holders shall have the right, prior to the effectiveness of the Registration Statement, to notify the Issuer that it or they, as the case may be, have determined that the Registration Statement be abandoned or withdrawn, in which event the Issuer shall abandon or withdraw such Registration Statement. Any Holder of Registrable Securities who has elected to sell Registrable Securities in an underwritten offering pursuant to this Section 3 (including any Demanding Holder) shall be permitted to withdraw from such registration and offering by written notice to the Issuer at least two (2) Business Days prior to the effective date of the Registration Statement filed in connection with such registration, or, in the case of an underwritten offering, at least two (2) Business Days prior to the earlier of the anticipated filing of the "red herring" prospectus, if applicable, and the anticipated pricing date; provided, that a Demand Including Holder may withdraw from such registration and offering all or a portion of its Registrable Securities at any time prior to two (2) Business Days after the date on which the Estimated Pricing Information is provided by the Issuer with respect to such offering and within two (2) Business Days after the date on which any updated Estimated Pricing Information is provided by the Issuer with respect to such offering.

(d)     Limitations on Demand Registrations. Following an IPO, the Holders as a group shall be entitled to initiate no more than two (2) Demand Registrations in any twelve (12) month period (other than Short-Form Registrations and shelf take-downs to effect a Shelf Underwritten Offering).

(e)     Postponements in Requested Registrations. If the filing, initial effectiveness or continued use of a Registration Statement, including a Shelf Registration Statement, with respect to a Demand Registration would require the Issuer to make a public disclosure of material nonpublic information that the Issuer has a bona fide business purpose for preserving as confidential, which disclosure in the good faith judgment of the Board (after consultation with external legal counsel) (i) would be required to be made in any Registration Statement so that such Registration Statement would not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made therein not misleading, (ii) would not be required to be made at such time but for the filing, effectiveness or continued use of such Registration Statement and (iii) would reasonably be expected to have a material adverse effect on the Issuer or its business or on the Issuer's ability to effect a bona fide material proposed acquisition, disposition, financing, reorganization, recapitalization or similar transaction involving the Issuer (collectively, a "Suspension Event"), and the Issuer furnishes to the Holders a certificate signed by the Chief Executive Officer or any other senior executive officer of the Issuer stating that such disclosure would in the good faith judgment of the Chief Executive Officer or such other senior executive officer result in any such Suspension Event, then the Issuer may, upon giving prompt written notice of such action to the Holders participating in such registration, delay the filing or initial effectiveness (but not the preparation) of, or suspend the use of, such Registration Statement; provided, that the Issuer shall be permitted to take any such action no more than once in any six (6)-month period for a period not to exceed forty-five (45) days following notice of any such Suspension Event, which period shall end upon the termination of the Suspension Event, if earlier; provided further, that the Issuer may not postpone or suspend for periods exceeding, in the aggregate, sixty (60) days during any twelve (12)-month period. In the event that the Issuer exercises its rights under the preceding sentence, such Holders agree to suspend, promptly upon receipt of the notice referred to above, the use of any Prospectus relating to such registration in connection with any sale or offer to sell Registrable Securities. The Issuer covenants and agrees that it shall not deliver a suspension notice with respect to a Suspension Event unless all of the Issuer's employees, officers, directors and managers who are subject to the Issuer's Insider Trading Compliance Policy, and who are prohibited by the terms thereof from effecting any public sales of securities of the Issuer beneficially owned by them, are so prohibited for the duration of such suspension period. If the Issuer so postpones the filing of a Prospectus or the effectiveness of a Registration Statement, a Majority-in-Interest of the Demanding Holders shall be entitled to withdraw such request and, if such request is withdrawn, such registration request shall not count for the purposes of the limitations set forth in Section 3.(d). The Issuer shall promptly give the Holders requesting registration thereof pursuant to this Section 3 written notice of any postponement made in accordance with this Section 3.(e).

(f)     Short-Form Registrations.

(i)     Following an IPO, the Issuer shall use its reasonable best efforts to qualify for registration on Form S-3 or any comparable or successor form or forms or any similar

short-form registration (a "Short-Form Registration"). At any time and from time to time following an IPO when the Issuer has qualified for Short-Form Registration, Holders of Registrable Securities shall be entitled to submit a Demand Notice to request an unlimited number of Short-Form Registrations with respect to the Registrable Securities held by such requesting Holder and its Affiliates in addition to the other registration rights provided in Section 2 and this Section 3 and, if requested by the Holders of Registrable Securities and available to the Issuer, such Short-Form Registration shall be a "shelf" registration statement providing for the registration of, and the sale on a continuous or delayed basis of, the Registrable Securities, pursuant to Rule 415 or otherwise (a "Shelf Registration Statement").

(ii)     Upon filing any Short-Form Registration, the Issuer shall use its reasonable best efforts to keep such Short-Form Registration effective with the SEC at all times and to re-file such Short-Form Registration upon its expiration, and to cooperate in any shelf take-down, whether or not underwritten, by amending or supplementing any Prospectus related to such Short-Form Registration as may be reasonably requested by Holders of Registrable Securities or as otherwise required, until such time as all Registrable Securities that could be sold in such Short-Form Registration have been sold or are no longer outstanding. To the extent that the Issuer becomes ineligible to use Form S-3, the Issuer shall file a "shelf" registration statement on Form S-1 not later than thirty (30) days after the date of such ineligibility and use its reasonable best efforts to have such Registration Statement declared effective as promptly as practicable.

(iii)     To the extent the Issuer is a well-known seasoned issuer (as defined in Rule 405) (a "WKSI") at the time any Demand Notice for a Short-Form Registration is submitted to the Issuer and such Demand Notice requests that the Issuer file a Shelf Registration Statement, the Issuer shall file an automatic shelf registration statement (as defined in Rule 405) on Form S-3 (an "Automatic Shelf Registration Statement") in accordance with the requirements of the Securities Act and the rules and regulations of the SEC thereunder, which covers the number or class of Registrable Securities which are requested to be registered. If registering any Registrable Securities, the Issuer shall pay the registration fee for all Registrable Securities to be registered pursuant to an Automatic Shelf Registration Statement at the time of filing of the Automatic Shelf Registration Statement and shall not elect to pay any portion of the registration fee on a deferred basis. The Issuer shall use its reasonable best efforts to remain a WKSI (and not to become an ineligible issuer (as defined in Rule 405)) during the period in which any Automatic Shelf Registration Statement is effective. If at any time following the filing of an Automatic Shelf Registration Statement when the Issuer is required to re-evaluate its WKSI status the Issuer determines that it is not a WKSI, the Issuer shall use its reasonable best efforts to post-effectively amend the Automatic Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a new Shelf Registration Statement on Form S-3 or, if such form is not available, Form S-1, have such Shelf Registration Statement declared effective by the SEC and keep such Registration Statement effective during the period in which such Short-Form Registration is required to be kept effective in accordance with Section 3.(f)(ii).

(g)    Shelf Take-Downs. At any time that a Shelf Registration Statement covering Registrable Securities is effective, if any Holder delivers a notice to the Issuer (a "Take-Down Notice") stating that it intends to effect an underwritten offering of all or part of its Registrable Securities included by it on the Shelf Registration Statement (a "Shelf Underwritten Offering"), then the Issuer shall amend or supplement the Shelf Registration Statement as may be necessary in order to enable such Registrable Securities to be distributed pursuant to the Shelf Underwritten Offering (taking into account the inclusion of Registrable Securities by any other Holders pursuant to Section 3.(g)(i)). The Holder delivering such Take-Down Notice shall include in such Take-Down Notice the Estimated Pricing Information with respect to such Shelf Underwritten Offering and shall provide written notice of any updated Estimated Pricing Information as soon as practicable after such updated Estimated Pricing Information is available. Holders shall be entitled to request an unlimited number of shelf take-downs to effect a Shelf Underwritten Offering, if available to the Issuer, with respect to the Registrable Securities held by such requesting Holder and its Affiliates in addition to the other registration rights provided in Section 2 and this Section 3. In connection with any Shelf Underwritten Offering:

(i)    the Issuer shall also promptly deliver the Take-Down Notice to all other Holders with Registrable Securities included on such Shelf Registration Statement and permit each such Holder to include its Registrable Securities included on the Shelf Registration Statement in the Shelf Underwritten Offering if such Holder notifies the proposing Holder and the Issuer within two (2) Business Days after distribution or dissemination (including via email, if available) of the Take-Down Notice to such Holder;

(ii)    in the event that the underwriter advises such requesting Holder and the Issuer in its good faith opinion that the total number or dollar amount of Registrable Securities proposed to be sold in such offering is such as to adversely affect the success of such offering (including, without limitation, adversely affect the per share offering price), then the underwriter may limit the number of shares which would otherwise be included in such take-down offering in the same manner as described in Section 3.(b) with respect to a limitation of shares to be included in a registration; and

(iii)    notwithstanding the foregoing, in the event of a material and adverse change to the Estimated Pricing Information, each Holder proposing to include its Registrable Securities in such Shelf Underwritten Offering shall be provided with a reasonable opportunity (not to exceed two (2) Business Days) to withdraw all or a portion of its Registrable Securities from such Shelf Underwritten Offering.

(h)    Registration Statement Form. If the Issuer becomes eligible to register the Registrable Securities for resale by the Holders on a Short-Form Registration, the Issuer shall be entitled to file such Short-Form Registration in satisfaction of any Demand Registrations pursuant to Section 2 and this Section 3; provided, that if any Demand Registration pursuant to this Section 3 which is proposed by the Issuer to be effected by the filing of a Registration Statement on Form S-3 (or any successor or similar short-form registration statement) shall be in connection with an underwritten public offering, and if the managing underwriter(s) shall advise the Issuer that, in its good faith opinion, the use of another form of Registration Statement is of material importance to the success of such proposed offering or is otherwise required by

12

applicable law, then a Majority-in-Interest of the Demanding Holders may direct the Issuer to file such other form in satisfaction of such Demand Registration. No such registration nor any other Short-Form Registration shall count as a Demand Registration for purposes of calculating how many Demand Registrations Holders have initiated pursuant to the provisions of <u>Section 3</u>.

(i)    <u>Selection of Underwriters</u>. If the Demanding Holders intend that the Registrable Securities requested to be covered by a Demand Registration or a Shelf Underwritten Offering shall be distributed by means of an underwritten offering, such Demanding Holders shall so advise the Issuer as a part of the Demand Notice or Take-Down Notice, and the Issuer shall include such information in the notice sent by the Issuer to the other Holders with respect to such Demand Registration or Shelf Underwritten Offering. In such event, the lead underwriter to administer the offering shall be chosen by a Majority-in-Interest of the Demanding Holders. If the offering is underwritten, the right of any Holder to registration pursuant to this <u>Section 3</u> will be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise agreed by a Majority-in-Interest of the Demanding Holders) and each such Holder will (together with the Issuer and the other Holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting (including, without limitation, pursuant to the terms of any over-allotment or "green shoe" option requested by the managing underwriter(s)), <u>provided</u>, that (i) no Holder shall be required to sell more than the number of Registrable Securities that such Holder has requested the Issuer to include in any registration and (ii) if any Holder disapproves of the terms of the underwriting, such Holder may elect to withdraw therefrom by written notice to the Issuer, the managing underwriter(s) and, in connection with an underwritten registration pursuant to this <u>Section 3</u>, the Demanding Holders, <u>provided</u>, <u>further</u>, that no such Person (other than the Issuer) shall be required to make any representations or warranties other than those related to title and ownership of, and power and authority to transfer, shares and as to the accuracy and completeness of statements made in a Registration Statement, Prospectus or other document in reliance upon, and in conformity with, written information prepared and furnished to the Issuer or the managing underwriter(s) by such Person pertaining exclusively to such Holder. Notwithstanding the foregoing, no Holder shall be required to agree to any indemnification obligations on the part of such Holder that are greater than its obligations pursuant to <u>Section 6</u>.

4.    <u>Registration Procedures</u>. If and whenever the Issuer is required to use its reasonable best efforts to effect the registration of any Registrable Securities under the Securities Act as provided in <u>Section 2</u> and <u>Section 3</u>, the Issuer shall effect such registration to permit the sale of such Registrable Securities in accordance with the intended method or methods of disposition thereof, and pursuant thereto the Issuer shall cooperate in the sale of such Registrable Securities and shall, as soon as practicable:

(a)    prepare and file, in each case as promptly as practicable, with the SEC a Registration Statement or Registration Statements on such form as shall be available for the sale of the Registrable Securities by the Holders thereof or by the Issuer in accordance with the intended method or methods of distribution thereof, make all required filings with FINRA, and, if such Registration Statement is not automatically effective upon filing, use its reasonable best efforts to cause such Registration Statement to be declared effective as soon as practicable and to remain effective as provided herein;

provided, however, that before filing a Registration Statement or Prospectus or any amendments or supplements thereto (including free writing prospectuses under Rule 433 (each a "Free Writing Prospectus")) and, to the extent reasonably practicable, documents that would be incorporated by reference or deemed to be incorporated by reference in a Registration Statement filed pursuant to a Demand Notice (other than a Shelf Registration Statement), the Issuer shall furnish or otherwise make available to the Holders of the Registrable Securities covered by such Registration Statement, their counsel and the managing underwriter(s), if any, copies of all such documents proposed to be filed (including exhibits thereto), which documents will be subject to the reasonable review and comment of such counsel, and such other documents reasonably requested by such counsel, including any comment letter from the SEC, and, if requested by such counsel, provide such counsel reasonable opportunity to participate in the preparation of such Registration Statement and each Prospectus included therein and such other opportunities to conduct a reasonable investigation within the meaning of the Securities Act, including reasonable access to the Issuer's books and records, officers, accountants and other advisors. The Issuer will include comments to any Registration Statement and any amendments or supplements thereto from Holders of a majority of the Registrable Securities covered by such Registration Statement, or their counsel, or the managing underwriters, if any, as reasonably requested on a timely basis. The Issuer shall not file any such Registration Statement or Prospectus, or any amendments or supplements thereto (including such documents that, upon filing, would be incorporated or deemed incorporated by reference therein and including Free Writing Prospectuses) with respect to a Demand Registration to which a Majority-in-Interest of the Demanding Holders (or their counsel) or the managing underwriter(s), if any, shall reasonably object, in writing, on a timely basis, unless, in the opinion of the Issuer, such filing is necessary to comply with applicable law;

(b)      prepare and file with the SEC such amendments, including post-effective amendments, and supplements to such Registration Statement and the Prospectus used in connection therewith and such Free Writing Prospectuses and Exchange Act reports as may be necessary to keep such Registration Statement continuously effective during the period provided herein and comply in all material respects with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement; and cause the related Prospectus to be supplemented by any Prospectus supplement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of the securities covered by such Registration Statement, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) under the Securities Act in each case, until such time as all of such securities have been disposed of in accordance with the intended method or methods of disposition by the seller or sellers thereof set forth in such Registration Statement;

(c)      notify each selling Holder of Registrable Securities, its counsel and the managing underwriter(s), if any, promptly after the Issuer receives notice thereof (i) when a Prospectus or any Prospectus supplement or post-effective amendment or any Free Writing Prospectus has been filed, and, with respect to a Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the

14

SEC or any other federal or state governmental authority for amendments or supplements to a Registration Statement or related Prospectus or for additional information, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceedings for that purpose, (iv) if at any time the Issuer has reason to believe that the representations and warranties of the Issuer contained in any agreement (including any underwriting agreement) contemplated by Section 4.(a)(i)(n) below cease to be true and correct, (v) of the receipt by the Issuer of any notification with respect to the suspension of the qualification or exemption from qualification of such Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any proceeding for such purpose, and (vi) of the happening of any event that makes any statement made in such Registration Statement or related Prospectus, Free Writing Prospectus, amendment or supplement thereto, or any document incorporated or deemed to be incorporated therein by reference, as then in effect, untrue in any material respect or that requires the making of any changes in such Registration Statement, Prospectus or documents so that, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, not misleading, and that in the case of the Prospectus, preliminary Prospectus or any Free Writing Prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (which notice shall notify the selling Holders only of the occurrence of such an event and shall provide no additional information regarding such event to the extent such information would constitute material nonpublic information);

(d)       use its reasonable best efforts to obtain the withdrawal of any order suspending the effectiveness of a Registration Statement, or the lifting of any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction at the earliest date reasonably practical;

(e)       if requested by the managing underwriter(s), if any, or a Majority-in-Interest of the Demanding Holders, promptly include in a Prospectus supplement or post-effective amendment such information as the managing underwriter(s), if any, or such Holder or Holders, as the case may be, may request in order to facilitate the disposition of the Registrable Securities in accordance with the intended method or methods of distribution of such securities set forth in the Registration Statement and make all required filings of such Prospectus supplement or such post-effective amendment as soon as practicable after the Issuer has received such request; provided, however, that the Issuer shall not be required to take any actions under this Section 4.(a)(i)(e) that are not, in the opinion of counsel for the Issuer, in compliance with applicable law;

(f)       deliver to each selling Holder of Registrable Securities, its counsel, and the underwriters, if any, without charge, as many copies of the Prospectus or Prospectuses (including each form of Prospectus) and each amendment or supplement thereto (including any Free Writing Prospectus) as such Persons may reasonably request from time to time in order to facilitate the disposition of the Registrable Securities in accordance with the intended method or methods of disposition thereof; and the Issuer,

subject to the last paragraph of this Section 4, hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders of Registrable Securities and the underwriters, if any, in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any such amendment or supplement thereto;

(g)     prior to any public offering of Registrable Securities, use its reasonable best efforts to register or qualify or cooperate with the selling Holders of Registrable Securities, the underwriters, if any, and their respective counsel in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or blue sky laws of such jurisdictions within the United States as any seller or underwriter reasonably requests in writing and to use its reasonable best efforts to keep each such registration or qualification (or exemption therefrom) effective during the period such Registration Statement is required to be kept effective and to take any other action that may be necessary or advisable to enable such Holders of Registrable Securities to consummate the disposition of such Registrable Securities in such jurisdiction in accordance with the intended method or methods of disposition thereof; provided, however, that the Issuer will not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this Section 4.(a)(i)(g), (ii) subject itself to taxation in any jurisdiction wherein it is not so subject or (iii) take any action that would subject it to general service of process in any such jurisdiction where it is not then so subject (other than service of process in connection with such registration or qualification or any sale of Registrable Securities in connection therewith);

(h)     cooperate with the selling Holders of Registrable Securities and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates (not bearing any legends unless required under applicable law) representing Registrable Securities to be sold and enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriter(s), if any, or Holders may request at least two (2) Business Days prior to any sale of Registrable Securities in a firm commitment public offering, but in any other such sale, within ten (10) Business Days prior to having to issue the securities;

(i)     use its reasonable best efforts to cause the Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental agencies or authorities within the United States as may be necessary in light of the business or operations of the Issuer to enable the seller or sellers thereof or the managing underwriter(s), if any, to consummate the disposition of such Registrable Securities, in accordance with the intended method or methods thereof, except as may be required solely as a consequence of the nature of such selling Holder's business, in which case the Issuer will cooperate in all reasonable respects with the filing of such Registration Statement and the granting of such approvals, as may be necessary to enable the seller or sellers thereof or the underwriters, if any, to consummate the disposition of such Registrable Securities in accordance with the intended method or methods thereof;

(j)      upon the occurrence of any event contemplated by <u>Section 4.(a)(i)(c)(vi)</u> above, promptly prepare a supplement or post-effective amendment to the Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, such Prospectus will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(k)      prior to the effective date of the Registration Statement relating to the Registrable Securities, provide a CUSIP number for the Registrable Securities;

(l)      provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities from and after the effective date of such Registration Statement. In connection therewith, if required by the Issuer's transfer agent, the Issuer will promptly after the effective date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to and maintained with such transfer agent, together with any other authorizations, certificates and directions required by the transfer agent which authorize and direct the transfer agent to issue such Registrable Securities without any such legend upon sale by the Holder or the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if any, of such Registrable Securities under the Registration Statement;

(m)      use its reasonable best efforts to cause all shares of Registrable Securities covered by such Registration Statement to be listed on a national securities exchange if shares of the particular class of Registrable Securities are at that time listed on such exchange, prior to the effectiveness of such Registration Statement;

(n)      enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other customary actions requested by a Majority-in-Interest of the Demanding Holders (including those reasonably requested by the managing underwriter(s), if any) to expedite or facilitate the disposition of such Registrable Securities, and in such connection, whether or not an underwriting agreement is entered into and whether or not the registration is an underwritten registration, (i) make such representations and warranties to the Holders of such Registrable Securities and the underwriters, if any, with respect to the business of the Issuer and its Subsidiaries, and the Registration Statement, Prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in form, substance and scope as are customarily made by issuers to underwriters in underwritten offerings, and, if true, confirm the same if and when reasonably requested, (ii) use its reasonable best efforts to furnish to the selling Holders of such Registrable Securities opinions of outside counsel (and/or internal counsel if acceptable to the managing underwriter(s)) to the Issuer and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriter(s), if any, and counsels to the selling Holders of the Registrable Securities), addressed to each selling Holder of Registrable Securities and

each of the underwriters, if any, covering the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such counsel and underwriters, (iii) use its reasonable best efforts to obtain "cold comfort" letters and updates thereof from an independent registered public accounting firm with respect to the Issuer (and, if necessary, any other independent certified public accountants of any Subsidiary of the Issuer or of any business acquired by the Issuer for which financial statements and financial data are, or are required to be, included in the Registration Statement) who have certified the financial statements included in such Registration Statement, addressed to each selling Holder of Registrable Securities (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and each of the underwriters, if any, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings, (iv) if an underwriting agreement is entered into, the same shall contain indemnification provisions and procedures that are customary for underwriting agreements in connection with underwritten offerings except as otherwise agreed by the parties thereto and (v) deliver such documents and certificates as may be reasonably requested by a Majority-in-Interest of the Demanding Holders or their counsel, as the case may be, or the managing underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to Section 4.(a)(i)(n)(i) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Issuer. The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder;

(o)  upon reasonable notice, make available for inspection by a representative of the selling Holders of Registrable Securities, the underwriters participating in any such disposition of Registrable Securities, if any, and any attorneys or accountants retained by such selling Holders or underwriter (collectively, the "Inspectors") at the offices where normally kept, during reasonable business hours, all financial and other records, pertinent corporate documents and properties of the Issuer and its Subsidiaries (collectively, the "Records"), as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the officers, directors, managers and employees of the Issuer and its Subsidiaries to supply all information in each case reasonably requested by any such representative, underwriter, attorney or accountant in connection with such Registration Statement; provided, however, that any information and Records that are not generally publicly available at the time of delivery of such information shall be kept confidential by the Inspectors unless (i) disclosure of such information or Records is required by court or administrative order, (ii) disclosure of such information or Records, in the opinion of counsel to such Inspector, is required by law or applicable legal process, (iii) such information or Records become generally available to the public other than as a result of a disclosure or failure to safeguard by such Inspector, (iv) such information or Records become available to such Inspector on a nonconfidential basis from a source other than the Company or (v) such information or Records are independently developed by such Inspector. In the case of a proposed disclosure pursuant to (i) or (ii) above, such Inspector shall be required to give the Issuer written notice of the proposed disclosure prior to such disclosure and, if requested by the Issuer, assist the Issuer in seeking to prevent or limit the proposed disclosure;

(p)      cause its officers to use their reasonable best efforts to support the marketing of the Registrable Securities covered by the Registration Statement (including, without limitation, participation in such number of "road shows" as the underwriter(s) reasonably request);

(q)      cooperate with each seller of Registrable Securities and each underwriter or agent participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA;

(r)      otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the SEC (including Regulation M), and make available to its security holders, as soon as reasonably practicable (but no more than eighteen (18) months after the effective date of the Registration Statement or such later date as provided by Section 11(d) of the Securities Act), an earnings statement covering the period of at least twelve (12) months beginning with the first day of the Issuer's first full calendar quarter after the effective date of the Registration Statement (or such later date as provided by Section 11(d) of the Securities Act), which earnings statement will satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder; and

(s)      otherwise use its reasonable best efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

The Issuer may require each Holder of Registrable Securities as to which any registration is being effected to furnish to the Issuer in writing such information required in connection with such registration regarding such seller and the distribution of such Registrable Securities as the Issuer may, from time to time, reasonably request and the Issuer may exclude from such registration the Registrable Securities of any Holder who unreasonably fails to furnish such information within a reasonable time after receiving such request.

The Issuer agrees not to file or make any amendment to any Registration Statement with respect to any Registrable Securities, or any amendment of or supplement to the Prospectus or any Free Writing Prospectus used in connection therewith, that refers to any Holder covered thereby by name, or otherwise identifies such Holder as the holder of any securities of the Issuer, without the consent of such Holder, such consent not to be unreasonably withheld or delayed, unless and to the extent such disclosure is required by law, rule or regulation, in which case the Issuer shall provide prompt written notice to such Holders prior to the filing of such amendment to any Registration Statement or amendment of or supplement to the Prospectus or any Free Writing Prospectus.

If the Issuer files any Shelf Registration Statement for the benefit of the holders of any of its securities other than the Holders, the Issuer agrees that it shall use its reasonable best efforts to include in such Shelf Registration Statement such disclosures as may be required by Rule 430B under the Securities Act (referring to the unnamed selling security holders in a generic manner by identifying the initial offering of the securities to the Holders) in order to ensure that the Holders may be added to such Shelf Registration Statement at a later time through the filing of a Prospectus supplement rather than a post-effective amendment.

Each Holder of Registrable Securities agrees if such Holder has Registrable Securities covered by such Registration Statement that, upon receipt of any notice from the Issuer of the happening of any event of the kind described in <u>Section 4.(a)(i)(c)(ii)-(vi)</u> hereof, such Holder will promptly discontinue disposition of such Registrable Securities covered by such Registration Statement or Prospectus until such Holder's receipt of the copies of the supplemented or amended Prospectus contemplated by <u>Section 4.(a)(i)(j)</u> hereof, or until it is advised in writing by the Issuer that the use of the applicable Prospectus may be resumed, and has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus; <u>provided</u>, <u>however</u>, that the time periods under <u>Section 3</u> with respect to the length of time that the effectiveness of a Registration Statement must be maintained shall automatically be extended by the amount of time the Holder is required to discontinue disposition of such Registrable Securities.

5.     <u>Hedging Transactions.</u>  The Parties agree that the provisions of this Agreement relating to the registration, offer and sale of Registrable Securities apply also to (a) any transaction which Transfers some or all of the economic risk of ownership of Registrable Securities, including any forward contract, equity swap, put or call, put or call equivalent position, collar, margin loan, sale of exchangeable security or similar transaction (including the registration, offer and sale under the Securities Act of Registrable Securities pledged to the counterparty to such transaction or of securities of the same class as the underlying Registrable Securities by the counterparty to such transaction in connection therewith), and that the counterparty to such transaction shall be selected in the sole discretion of the Holders and (b) any derivative transactions in which a broker-dealer, other financial institution or unaffiliated Person may sell Registrable Securities covered by any Prospectus and the applicable prospectus supplement including short sale transactions using Registrable Securities pledged by a Holder or borrowed from the Holder or others and Registrable Securities loaned, pledged or hypothecated to any such party.

The Prospectus shall permit, in connection with derivative transactions, a broker-dealer, other financial institution or third party to sell shares of the Registrable Securities covered by such Prospectus and the applicable prospectus supplement, including in short sale transactions.

6.     <u>Indemnification.</u>

(a)     <u>Indemnification by the Issuer.</u> The Issuer shall, without limitation as to time, indemnify and hold harmless, to the fullest extent permitted by law, each Holder of Registrable Securities whose Registrable Securities are covered by a Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus or other document (including any related notification or the like), or any amendment thereof or supplement thereto or any document incorporated by reference therein, the officers, directors, managers, partners, members, managers, shareholders, accountants, attorneys, agents and employees of each of them, each Person who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) each such Holder and the officers, directors, managers, partners, members, managers, shareholders, accountants, attorneys, agents and employees of each such controlling Person, each underwriter, if any, and each Person who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) such underwriter (each such Person being referred to herein as a "<u>Covered Person</u>"), from and against any and all losses,

claims, damages, liabilities, costs (including, without limitation, costs of preparation and reasonable attorneys' fees and any legal or other fees or expenses incurred by such Covered Person in connection with any investigation or proceeding), expenses, judgments, fines, penalties, charges and amounts paid in settlement (collectively, "Losses"), as incurred, arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus or other document (including any related notification or the like), or any amendment thereof or supplement thereto or any document incorporated by reference therein incident to any such registration, qualification or compliance, or based on any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, preliminary Prospectus or Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, or any violation by the Issuer of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation thereunder applicable to the Issuer and relating to any action or inaction in connection with the related offering of Registrable Securities, and will reimburse each such Covered Person for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such Loss, provided, that the Issuer will not be liable in any such case to the extent that any such Loss arises out of or is based on any untrue statement or omission by such Covered Person relating to such Covered Person or its Affiliates (other than the Issuer or any of its Subsidiaries), but only to the extent that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus, or any amendment thereof or supplement thereto or any document incorporated by reference therein, or other document in reliance upon and in conformity with written information furnished to the Issuer by such Covered Person with respect to such Covered Person expressly for use therein. It is agreed that the indemnity agreement contained in this Section 6.(a) shall not apply to amounts paid in settlement of any such Loss or action if such settlement is effected without the consent of the Issuer (which consent shall not be unreasonably withheld).

(b)       Indemnification by Holder of Registrable Securities. As a condition to including any Registrable Securities in any Registration Statement filed in accordance with Section 4 hereof, the Issuer shall have received an undertaking reasonably satisfactory to it from the prospective seller of such Registrable Securities to indemnify, to the fullest extent permitted by law, severally and not jointly with any other Holders of Registrable Securities, the Issuer, its directors, managers and officers and each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) the Issuer and each underwriter, broker or other Person acting on behalf of the holders of Registrable Securities, from and against all Losses arising out of or based on any untrue or alleged untrue statement of a material fact contained in any such Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus or other document, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, preliminary Prospectus or Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, and will reimburse the Issuer, such directors, managers, officers, controlling Persons, underwriters, brokers and other Persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such Loss, in each case to the extent, but only to the extent, that such untrue statement or omission is made in such Registration Statement, Prospectus, preliminary

Prospectus, offering circular, Free Writing Prospectus or other document in reliance upon and in conformity with written information furnished to the Issuer by such Holder with respect to such Holder expressly for inclusion in such Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus or other document; provided, however, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such Losses (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld); and provided, further, that the liability of such Holder of Registrable Securities under this <u>Section 6.(b)</u> and <u>Section 6.(d)</u> shall be limited, in the aggregate, to the net proceeds after underwriting fees, commissions and discounts (but before any taxes and expenses which may be payable by such Holder) received by such selling Holder from the sale of Registrable Securities covered by such Registration Statement.

(c)     <u>Conduct of Indemnification Proceedings</u>. If any Person shall be entitled to indemnity hereunder (an "<u>Indemnified Party</u>"), such Indemnified Party shall give prompt notice to the Party from which such indemnity is sought (the "<u>Indemnifying Party</u>") of any claim or of the commencement of any proceeding with respect to which such Indemnified Party seeks indemnification or contribution pursuant hereto; <u>provided</u>, <u>however</u>, that the delay or failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any obligation or liability except to the extent that the Indemnifying Party has been materially prejudiced by such delay or failure. The Indemnifying Party shall have the right, exercisable by giving written notice to an Indemnified Party promptly after the receipt of written notice from such Indemnified Party of such claim or proceeding, to, unless in the Indemnified Party's reasonable judgment a conflict of interest between such Indemnified Party and Indemnifying Party may exist in respect of such claim, assume, at the Indemnifying Party's expense, the defense of any such claim or proceeding, with counsel reasonably satisfactory to such Indemnified Party; <u>provided</u>, <u>however</u>, that an Indemnified Party shall have the right to employ separate counsel in any such claim or proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless: (i) the Indemnifying Party agrees to pay such fees and expenses; or (ii) the Indemnifying Party fails promptly to assume, or in the event of a conflict of interest cannot assume, the defense of such claim or proceeding or fails to employ counsel reasonably satisfactory to such Indemnified Party; in which case the Indemnified Party shall have the right to employ counsel and to assume the defense of such claim or proceeding at the Indemnifying Party's expense; <u>provided</u>, <u>further</u>, <u>however</u>, that the Indemnifying Party shall not, in connection with any one such claim or proceeding or separate but substantially similar or related claims or proceedings in the same jurisdiction, arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one firm of attorneys (together with appropriate local counsel) at any time for all of the Indemnified Parties, or for fees and expenses that are not reasonable and documented. Whether or not such defense is assumed by the Indemnifying Party, such Indemnifying Party will not be subject to any liability for any settlement made without its consent (but such consent will not be unreasonably withheld or delayed). The Indemnifying Party shall not consent to entry of any judgment or enter into any settlement that (x) does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release, in form and substance reasonably satisfactory to the Indemnified Party, from all liability in respect of such claim or litigation for which such Indemnified Party would be entitled to indemnification hereunder or (y) involves the imposition of equitable remedies or the imposition of any obligations on the Indemnified Party or adversely

22

affects such Indemnified Party other than as a result of financial obligations for which such Indemnified Party would be entitled to indemnification hereunder.

(d)    Contribution. If the indemnification provided for in this Section 6 is unavailable to an Indemnified Party in respect of any Losses (other than in accordance with its terms), then each applicable Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party, on the one hand, and Indemnified Party, on the other hand, shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made (or omitted) by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, whether any applicable violation of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation thereunder was perpetrated by the Indemnifying Party or the Indemnified Party, and the Parties' relative intent, knowledge, access to information and opportunity to correct or prevent any such action, statement or omission.

The Parties agree that it would not be just and equitable if contribution pursuant to this Section 6.(d) were determined by *pro rata* allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 6.(d), an Indemnifying Party that is a selling Holder of Registrable Securities shall not be required to contribute any amount in excess of the amount that such Indemnifying Party has otherwise been, or would otherwise be, required to pay pursuant to Section 6.(b) by reason of such untrue or alleged untrue statement or omission or alleged omission. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are more favorable to the Holders than the foregoing provisions, the provisions in the underwriting agreement shall control.

(e)    Deemed Underwriter. To the extent that any of the Holders is, or would be expected to be, deemed to be an underwriter of Registrable Securities pursuant to any SEC comments or policies or any court of law or otherwise, the Issuer agrees that (i) the indemnification and contribution provisions contained in this Section 6 shall be applicable to the benefit of such Holder in its role as deemed underwriter in addition to its capacity as a Holder (so long as the amount for which any other Holder is or becomes responsible does not exceed the amount for which such Holder would be responsible if the Holder were not deemed to be an underwriter of Registrable Securities) and (ii) such Holder and its representatives shall be entitled to conduct the due diligence which would normally be conducted in connection with an offering of securities registered under the Securities Act, including receipt of customary opinions and comfort letters.

(f)     Other Indemnification. Indemnification similar to that specified in the preceding provisions of this Section 6 (with appropriate modifications) shall be given by the Issuer and each seller of Registrable Securities with respect to any required registration or other qualification of securities under any federal or state law or regulation or governmental authority other than the Securities Act.

(g)     Non-Exclusivity. The obligations of the Parties under this Section 6 shall be in addition to any liability which any Party may otherwise have to any other Party.

(h)     Primacy of Indemnification. The Issuer hereby acknowledges that certain of the Investors have certain rights to indemnification, advancement of expenses and/or insurance provided by certain of its Affiliates (collectively, the "Indemnitors"). The Issuer hereby agrees that (i) it is the indemnitor of first resort (i.e., its obligations to the Investors are primary and any obligation of the Indemnitors to advance expenses or to provide indemnification for the same Losses incurred by any of the Investors are secondary to any such obligation of the Issuer), (ii) it shall be liable for the full amount of all Losses to the extent legally permitted and as required by the terms of this Agreement and the articles and other organizational documents of the Issuer (or any other agreement between the Issuer and the relevant Investor), without regard to any rights any Investor may have against the Indemnitors, and (iii) it irrevocably waives, relinquishes and releases the Indemnitors from any and all claims (x) against the Indemnitors for contribution, indemnification, subrogation or any other recovery of any kind in respect thereof and (y) that any Investor must seek indemnification from any Indemnitor before the Issuer must perform its indemnification obligations under this Agreement. No advancement or payment by the Indemnitors on behalf of any Investor with respect to any claim for which such Investor has sought indemnification from the Issuer hereunder shall affect the foregoing. The Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery which any Investor would have had against the Issuer if the Indemnitors had not advanced or paid any amount to or on behalf of such Investor. The Issuer and the Investors agree that the Indemnitors are express third party beneficiaries of this Section 6.

7.     Conversion to Corporation.

(a)     In connection with an IPO, all Investors shall, and shall cause their Affiliates to, take all necessary or desirable actions in connection with the consummation of such transaction, (i) to, as the Board may reasonably request, (x) convert the Company to a corporate form in a tax-free transaction (except to the extent of taxable income or gain required to be recognized by a Investor in an amount that does not exceed the amount of cash or any property or rights (other than stock) received by such Investor upon the consummation of such transaction and/or any concurrent transaction), or (y) accomplish the foregoing by effecting a transaction that is treated as the contribution of the Units or Unit Equivalents of the Company into a newly formed "shell" corporation pursuant to Section 351 of the U.S. Internal Revenue Code of 1986, as amended, with the result that each Investor shall hold capital stock of such surviving corporation or business entity (in each case, a "Successor Corporation"), and (ii) to cause the Successor Corporation to assume all of the obligations of the Company under this Agreement,

*mutatis mutandis*.  Upon the occurrence of any such conversion to a corporation, the terms of this Agreement shall thereafter apply to the Stock, *mutatis mutandis*.

(b)     The Company and the Board will use their respective reasonable best efforts to perform any conversion or restructuring contemplated in <u>Section 7(a)</u> in the most tax efficient manner for the Investors, including any Investors that are treated as corporations for U.S. federal income tax purposes. Upon the approval of the Board that such action is necessary to preserve the benefits of "tacking" under Rule 144 of the Securities Act, such conversion or merger may be structured to occur without any action on the part of any Investor, and each Investor hereby consents in advance to any action that the Board shall deem necessary to accomplish such result.

(c)     In connection with an IPO, if so determined by the Board, immediately prior to the consummation of the IPO or at such other time as the Board may determine, all of the outstanding Common Units of the Company shall automatically convert into shares of common stock of the Successor Corporation (the "<u>Stock</u>") and all of the Unit Equivalents convertible into, exchangeable or exercisable for Common Units, shall automatically convert into securities, obligations, options, warrants or other rights that are convertible into, exchangeable, or exercisable for Stock, on the same terms, or terms as similar as possible, as they are then convertible into, exchangeable, or exercisable for Common Units.

8.     <u>Registration Expenses</u>. All fees and expenses incurred in the performance of or compliance with this Agreement by the Issuer or as otherwise identified below shall be borne by the Issuer, whether or not any Registration Statement is filed or becomes effective, including, without limitation, (a) all registration and filing fees (including, without limitation, fees and expenses with respect to (i) filings required to be made with the SEC, all applicable securities exchanges and/or FINRA and (ii) compliance with securities or blue sky laws, including, without limitation, any reasonable fees and disbursements of counsel for the underwriters in connection with blue sky qualifications of the Registrable Securities pursuant to <u>Section 4.(a)(i)(g)</u>), (b) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing Prospectuses if the printing of Prospectuses is requested by the managing underwriter(s), if any, or by a Majority-in-Interest of the Demanding Holders), (c) messenger, telephone and delivery expenses of the Issuer, (d) fees and disbursements of counsel for the Issuer, (e) expenses of the Issuer incurred in connection with any road show, (f) fees and disbursements of all independent registered public accounting firms referred to in <u>Section 4.(a)(i)(n)</u> hereof (including, without limitation, the expenses of any "cold comfort" letters required by this Agreement) and any other Persons, including special experts retained by the Issuer and (g) documented fees and disbursements of one firm of counsel for all of the Holders participating in the offering, which counsel shall be selected by a Majority-in-Interest of the Demanding Holders with respect to an offering in connection with a Demand Registration, and otherwise by Holders holding a majority of the Registrable Securities proposed to be sold in such offering. In addition, the Issuer shall pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit, the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange on which similar securities issued by the Issuer are then listed and rating agency fees and the fees and expenses of any Person, including special experts, retained by the Issuer.

The Issuer shall not be required to pay (i) fees and disbursements of any counsel retained by any Holder of Registrable Securities or by any underwriter (except as set forth in Section 6 and this Section 8), (ii) any underwriter's fees (including discounts, commissions or fees of underwriters, selling brokers, dealer managers or similar securities industry professionals) relating to the distribution of the Registrable Securities (other than with respect to Registrable Securities sold by the Issuer), or (iii) any other expenses of the Holders of Registrable Securities not specifically required to be paid by the Issuer pursuant to Section 6 or the first paragraph of this Section 8.

9.    Rule 144. After an IPO, the Issuer covenants that it will file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder (or, if the Issuer is not required to file such reports, it will, upon the request of any Holder, make publicly available such information so long as necessary to permit sales of Registrable Securities pursuant to Rule 144), and it will take such further action as any Holder of Registrable Securities (or, if the Issuer is not required to file reports as provided above, any Holder) may request, all to the extent required from time to time to enable such Holder to sell shares of Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144. Upon the request of any Holder of Registrable Securities, the Issuer will deliver to such Holder a written statement as to whether it has complied with such requirements and, if not, the specifics thereof.

10.    Certain Additional Agreements. If any Registration Statement or comparable statement under state blue sky laws refers to any Holder by name or otherwise as the Holder of any securities of the Issuer, then such Holder shall have the right to require (a) the insertion therein of language, in form and substance satisfactory to such Holder and the Issuer, to the effect that the holding by such Holder of such securities is not to be construed as a recommendation by such Holder of the investment quality of the Issuer's securities covered thereby and that such holding does not imply that such Holder will assist in meeting any future financial requirements of the Issuer, or (b) in the event that such reference to such Holder by name or otherwise is not in the good faith judgment of the Issuer required by the Securities Act or any similar federal statute or any state blue sky or securities law then in force, the deletion of the reference to such Holder.

11.    Miscellaneous.

(a)    Termination. The provisions of this Agreement shall terminate upon the earliest to occur of (i) its termination by the written agreement of all Parties or their respective successors in interest, (ii) with respect to a Holder, the date on which all Equity Securities held by such Holder or which may be obtained upon the conversion, exchange or exercise of other securities held by such Holder have ceased to be Registrable Securities, (iii) with respect to the Issuer, the date on which all Equity Securities outstanding or which may be obtained upon the conversion, exchange or exercise of other securities outstanding have ceased to be Registrable Securities and (iv) the dissolution, liquidation or winding up of the Issuer. Nothing herein shall relieve any Party from any liability for the breach of any of the agreements set forth in this Agreement. The provisions of Sections 6 and 8 shall survive any termination of this Agreement.

(b)     Holdback Agreement. In consideration for the Issuer agreeing to its obligations under this Agreement, each Holder agrees in connection with any registration of the Issuer's securities (whether or not such Holder is participating in such registration) upon the request of the Issuer and the underwriter(s) managing any underwritten offering of the Issuer's securities, to enter into a customary and reasonable agreement (subject to customary and reasonable exceptions) (each, a "Holdback Agreement") not to effect (other than sales of Registrable Securities to be included in such offering and registration) any public sale or distribution of its Registrable Securities held immediately before the effectiveness of the Registration Statement for such offering, including, but not limited to, any sale pursuant to Rule 144, or make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of, or enter into any swap or other arrangement that transfers to another Person any of the economic consequences of ownership of, any Registrable Securities, any other equity securities of the Issuer or any securities convertible into or exchangeable or exercisable for any equity securities of the Issuer without the prior written consent of the Issuer or such underwriters, as the case may be, during the Holdback Period. The foregoing provisions of this Section 11.(b) shall be applicable to a Holder only if all executive officers, directors and managers of the Issuer and all other Holders, together with their Affiliates, owning more than five (5%) of the Equity Securities then outstanding are subject to restrictions on substantially similar terms.

If any registration pursuant to Section 3 of this Agreement shall be in connection with any underwritten public offering, upon request of the underwriter(s) managing such underwritten offering, the Issuer and each of the executive officers, directors, and managers of the Issuer will not effect any public sale or distribution of any equity securities of the Issuer or any securities convertible into or exchangeable or exercisable for any equity securities of the Issuer (other than a registration statement (i) on Form S-4, Form S-8 or any successor forms promulgated for similar purposes or (ii) filed in connection with an exchange offer or any employee benefit or dividend reinvestment plan) for its own account without the prior written consent of such underwriters, during the Holdback Period.

Each Holdback Agreement entered into by a Holder in connection with any underwritten offering shall be on terms that are no less favorable to such Holder than terms applicable to the Party subject to the corresponding restrictions under (i) the Holdback Agreement entered into by any other Holder in connection with such underwritten offering or (ii) any agreement similar to the Holdback Agreement entered into by the directors, managers or executive officers of the Company.

(c)     Amendments and Waivers. This Agreement may be amended and the Issuer may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if any such amendment, action or omission to act has received the written consent of the Company or the Issuer, as the case may be, and the Holders of a majority of the then outstanding Registrable Securities; provided, that this Agreement may not be amended in a manner that would, by its terms, adversely and disproportionately affect the rights or obligations of any Holder of Registrable Securities without the prior written consent of each such Holder. The failure of any Party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such Party thereafter to enforce each and every provision of this Agreement in accordance with its terms. Any Holder may waive (in writing) the benefit of any provision of this Agreement with respect to itself for

any purpose. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Holder granting such waiver in any other respect or at any other time.

(d)     <u>Issuer Party; Non-U.S. IPO</u>. In the event that the entity ultimately selected to be the Issuer is not a Party, the Parties shall amend this Agreement to include the Issuer as a Party and shall cause the Issuer to enter into such amended Agreement. In the event the Parties elect to consummate an initial public offering of Equity Securities in a jurisdiction other than the United States, the Parties shall amend the terms of this Agreement as necessary to reflect the rules and regulations of the exchange and jurisdiction where such initial public offering is to be performed, it being understood and agreed that the provisions set forth herein (including, without limitation, those set forth in <u>Sections 6</u> and <u>8</u>) shall be applicable to any such non-U.S. initial public offering and any subsequent non-U.S. public offerings of Equity Securities.

(e)     <u>Successors, Assigns and Transferees</u>. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties and their respective successors and assigns who agree in writing to be bound by the provisions of this Agreement. The rights of a Holder hereunder may be assigned (but only with all related obligations set forth below) in connection with a Transfer of Registrable Securities effected in accordance with the terms of this Agreement to a Permitted Transferee of that Holder. Without prejudice to any other or similar conditions imposed hereunder with respect to such Transfer, no assignment permitted under the terms of this <u>Section 11.(e)</u> will be effective unless and until the Permitted Transferee to which the assignment is being made, if not a Holder, has delivered to the Issuer the executed Joinder Agreement in the form attached as <u>Exhibit B</u> hereto agreeing to be bound by, and be party to, this Agreement. A Permitted Transferee to whom rights are transferred pursuant to this <u>Section 11.(e)</u> may not again Transfer those rights to any other Permitted Transferee, other than as provided in this <u>Section 11.(e)</u>. The Issuer may assign this Agreement at any time in connection with a sale or acquisition of the Issuer, whether by merger, consolidation, sale of all or substantially all of the Issuer's assets, or similar transaction, without the consent of the Holders; <u>provided</u>, that the successor or acquiring Person agrees in writing to assume all of the Issuer's rights and obligations under this Agreement.

(f)     <u>Notices</u>. Except as otherwise provided elsewhere in this Agreement regarding notices by electronic mail or other electronic means to the Investors and the Company and regarding all notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall in all cases be delivered by email (with read receipt or other written confirmation received, in which case such notice shall be deemed received on the date such email was sent), but may, as a second method of delivery, also be delivered (i) by personal delivery, (ii) by a nationally recognized overnight courier service or (ii) by deposit in the U.S. Mail, postage prepaid, registered or certified mail, return receipt requested, to the Company at its principal executive office and to any Investor at the address then shown as the current address of such Investor specified on the Investor Registry (as defined in the LLC Agreement) or on such Investor's signature page hereto. All notices delivered by email shall be confirmed by the recipient by a non-automated email response within two (2) Business Days of receipt.

The Holders will keep any notice delivered pursuant to <u>Section 2</u> or <u>3</u> confidential.

(g)     <u>Further Assurances.</u> At any time or from time to time after the date hereof, the Parties agree to cooperate with each other, and at the request of any other Party, to execute and deliver any further instruments or documents and to take all such further action as the other Party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the Parties hereunder.

(h)     <u>Preservation of Rights.</u>. The Issuer will not (i) grant any registration right to third parties which are more favorable than or inconsistent with the rights granted hereunder or (ii) enter into any agreement, take any action or permit any change to occur, with respect to securities that violates or subordinates the rights expressly granted to the Holders.

(i)     <u>Entire Agreement; No Third Party Beneficiaries</u>. This Agreement (i) constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes any prior discussions, correspondence, negotiations, proposed term sheets, understandings or agreements, and there are no agreements, understandings, representations or warranties between the Parties other than those set forth or referred to in this Agreement and (ii) except as provided in <u>Section 6</u> with respect to an Indemnified Party, is not intended to confer in or on behalf of any Person not a Party (and their successors and assigns) any rights, benefits, causes of action or remedies with respect to the subject matter or any provision hereof.

(j)     <u>Governing Law; Jurisdiction and Forum; Waiver of Jury Trial</u>.

(i)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts executed and to be performed wholly within such State and without reference to the choice-of-law principles that would result in the application of the laws of a different jurisdiction.

(ii)     Each Party irrevocably submits to the jurisdiction of the United States District Court for the Southern District of New York or any court of the State of New York located in such district for the purposes of any suit, action or other proceeding arising out of or relating to this Agreement, and hereby irrevocably agrees that all claims in respect of such suit, action or proceeding may be heard and determined in such court. Each Party hereby irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such suit, action or other proceeding. The Parties further agree, to the extent permitted by law, that final and unappealable judgment against any of them in any suit, action or other proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of which shall be conclusive evidence of the fact and amount of such judgment.

(iii)     EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(k)  Severability. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party hereto. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(l)  Enforcement. Each Party hereto acknowledges that money damages would not be an adequate remedy in the event that any of the covenants or agreements in this Agreement are not performed in accordance with its terms, and it is therefore agreed that in addition to and without limiting any other remedy or right it may have, the non-breaching Party will have the right to an injunction, temporary restraining order or other equitable relief in any court of competent jurisdiction enjoining any such breach and enforcing specifically the terms and provisions hereof.

(m)  Titles and Subtitles. The titles of the sections and subsections of this Agreement are for convenience of reference only and will not affect the meaning or interpretation of this Agreement.

(n)  No Recourse. Notwithstanding anything that may be expressed or implied in this Agreement, the Company, the Issuer and each Holder covenant, agree and acknowledge that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any current or future director, manager, officer, employee, member, shareholder, general or limited partner or member of the Investors or of any Affiliate or assignee thereof, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current or future director, manager, officer, employee, member, shareholder, general or limited partner or member of any Investor or of any Affiliate or assignee thereof, as such for any obligation of the Investor under this Agreement or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

(o)  Counterparts; Electronic Signatures. This Agreement may be executed in any number of counterparts (including via electronic transmission), each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by electronic signature(s).

[Remainder of page left intentionally blank]

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement or caused this Agreement to be duly executed on its behalf as of the date first written above.

SMI TOPCO HOLDINGS, LLC

By: _____
Name:
Title:

*Signature Page to Registration Rights Agreement*

[NAME OF INVESTOR]

By: _____
    Name:
    Title:

*Signature Page to Registration Rights Agreement*

<u>Exhibit A</u>

<u>INVESTORS</u>

<u>Exhibit B</u>

<div align="center"><u>JOINDER AGREEMENT</u></div>

Reference is made to the Registration Rights Agreement, dated as of [●], 2023 (as amended from time to time, the "<u>Registration Rights Agreement</u>"), by and among SMI Topco Holdings, LLC, a Delaware limited liability company (the "<u>Company</u>") and the other parties thereto. The undersigned agrees, by execution hereof, to become a party to, and to be subject to the rights and obligations of a Holder under, the Registration Rights Agreement.

[NAME]

By: _____

    Name:

    Title:

Date:

Address:

Acknowledged by:

SMI TOPCO HOLDINGS, LLC

By: _____

    Name:

    Title

**Exhibit B**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

Pursuant to Article V.A of the Plan, on the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be assumed by and assigned to the applicable Reorganized Debtors, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, or any of their respective designated assignees in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Court, other than those Executory Contracts or Unexpired Leases that: (1) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) have been previously rejected or assumed by a Final Order; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; or (5) have previously expired or terminated pursuant to its own terms or by agreement of the parties thereto.

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or herein, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third-party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing its assumption under applicable federal law. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors, with the reasonable consent of the Required First Lien Lender Group, reserve the right to alter, amend, modify, or supplement this Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than three (3) days' notice to the applicable non-Debtor counterparties.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or

**Exhibit B**

Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. Neither the exclusion nor inclusion of any Executory Contract or Unexpired Leases on this Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything else in the Plan, shall constitute an admission by the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that any Debtor or Reorganized Debtor has any liability thereunder.

| Contract | Contract Debtor | Contract Counterparty | Address |
|---|---|---|---|
| None | N/A | N/A | N/A |

**Exhibit B**

**<u>Exhibit C</u>**

**Identities of Members of the New Board and Officers of Reorganized SMI Topco**

- To be supplemented.

**Exhibit C**

**Exhibit D**

**List of Retained Causes of Action**

Article IV.H of the Plan[4] provides that:

In accordance with section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors or the Post-Sale Estates, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the List of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Post-Sale Estates, as applicable.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Confirmation Order, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, will not pursue any and all available Causes of Action against it. The Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order (including the Confirmation Order), including pursuant to Article VIII hereof, the Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor

---

[4]    Capitalized terms used but not otherwise defined herein shall have the meanings given to such term in the Plan.

**Exhibit D**

or Post-Sale Estate, as applicable. The applicable Reorganized Debtors or the Post-Sale Estates, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

In accordance with Article IV.H of the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action not expressly released or waived under the Plan, including, but not limited to, the following:

## A.    Causes of Action Related to Litigation and Possible Litigation

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action, including any claims, defenses, counterclaims, and/or crossclaims against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding involving the Debtors, whether formal or informal, judicial or non-judicial, including, without limitation, proceedings involving dealers, creditors, counterparties, customers, employees, consultants, contractors, subcontractors, utilities, suppliers, vendors, insurers, sureties, lenders, or any other parties whatsoever.

Except to the extent any such claim is specifically satisfied, settled, and released herein, in accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any Cause of Action on the List of Retained Causes of Action shall not be deemed an admission, denial, or waiver of any claims, demands, rights, or causes of action that the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates may hold against any Entity. For the avoidance of doubt, nothing herein shall be read as an admission as to the validity or allowance of any claim against any Debtor, any Reorganized Debtor, and/or the Plan Administrator on behalf of the Post-Sale Estates. Any and all prepetition claims against any Debtor that may be identified herein shall be treated in accordance with the Plan and the Bankruptcy Code.

Without limiting the foregoing, the Debtors expressly reserve any and all Causes of Action, including rights to payment of attorneys' fees costs and expenses in connection with:

1. *Strategic Materials, Inc. v. Jeffries, et al.*, Case No. 2023-CA-000581AX (Mantee Cnty., Fla. Feb. 6, 2023);

2. *Atlas Copco Compressors LLC v. Strategic Materials, Inc.*, Case No. 2023-46735 (Harris Cnty., Tex. July 25, 2023); and

**Exhibit D**

      3.   *Strategic Materials, Inc. v. D&M Truck and Tire Repair, LLC*, Case No. 23-014006-CB (Wayne Cnty., Mich. Oct. 27, 2023).

**B.      Causes of Action Related to Tax Refunds or Credits**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax assets and refunds.

**C.      Causes of Action Related to Insurance Policies and Surety Bonds**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims or Causes of Action against or related to all Entities based in whole or in part upon any and all insurance contracts, insurance policies, and surety bonds to which any of the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estate, as applicable, are a party or pursuant to which any Debtor, Reorganized Debtor, and/or Plan Administrator on behalf of the Post-Sale Estates, as applicable, has any rights whatsoever, regardless of whether such contract, policy, or bond is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, claims or Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, or surety bond issuers related to coverage, indemnity, contribution, reimbursement, overpayment of premiums and/or fees, breach of contract, or any other matters.

**D.      Causes of Action Related to Contracts and Leases**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims or Causes of Action against or related to any and all contracts and/or leases, and similar agreements to which any Debtor, Reorganized Debtor, and/or Plan Administrator on behalf of the Post-Sale Estates has any rights whatsoever.  The claims and Causes of Action reserved include, but are not limited to, Causes of Action against vendors, suppliers of goods and services, or any other parties for: (a) overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) counterclaims and defenses related to any contractual obligations; (f) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (g) unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

<div align="center">**Exhibit D**</div>

**E.      Causes of Action Related to Accounts Receivable and Accounts Payable**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims or Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, regardless of whether such Entity is expressly identified in the Plan, the Plan Supplement, or any amendment thereto.  Furthermore, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, owe money to them.

**F.      Causes of Action Related to Preferential or Fraudulent Transfers**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims and Causes of Action held by the Estate for any state or federal or foreign law fraudulent transfer, preferential transfer, fraudulent conveyance, or similar claim.

**G.      Causes of Action Related to Deposits, Prepayments, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims or Causes of Action based in whole, or in part, upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral paid to, or owed by, any creditor, lessor, utility, supplier, vendor, landlord, sub-lessee, assignee, or any other Entity.

**The Debtors reserve all rights to amend, revise, or supplement this <u>Exhibit D</u> to the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Court.**

**Exhibit D**

**Exhibit E**

**Material Exit Term Loan Facilities Documents**

- To be supplemented.

**Exhibit E**

4890-4691-1632v.7

**Exhibit F**

**Restructuring Transactions Exhibit**

*In the event of an Equitization Transaction,[5] the Reorganized Debtors shall implement the Restructuring as set forth in the Plan. In connection therewith, the following describes the steps to be taken by the Debtors or the Reorganized Debtors, as applicable, to effectuate the conversion of SMI Topco Holdings, Inc. from a Delaware corporation to a Delaware limited liability company (such converted entity, "**SMI Topco LLC**") and the receipt of Reorganized SMI Topco Interests and, if applicable, Second Out Exit Term Loans by Holders of Allowed Claims (other than any Claims held by SMI Topco) in Class 3, Class 4, and Class 5 and Holders of Allowed SMI Topco Interests in Class 10.*

**SMI Topco Conversion**:

- **State Law Conversion:** On the Conversion Date, SMI Topco will convert from a Delaware corporation to a Delaware limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act (the "**State Law Conversion**").

- **Internal Revenue Service ("*IRS*") Filing:** On the Conversion Date, SMI Topco LLC will file an IRS Form 8832 electing to be treated as a corporation for U.S. federal income tax purposes, effective as of the Conversion Date (the "**Check-the-Box Election**").

- **Intended Tax Treatment:** It is intended that (a) the State Law Conversion and the Check-the-Box Election, taken together, be treated as a reorganization within the meaning of Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended (the "**Code**") and (b) the Plan constitute a "plan of reorganization" within the meaning of Treasury Regulations section 1.368-2(g) and 1.368-3(a).

**Distributions to Holders of Allowed Claims in Class 3, Class 4 and Class 5**:

- **Step 1**: **Contributions of Reorganized SMI Topco Interests:** On the Effective Date, SMI Topco LLC will contribute a portion of its Reorganized SMI Topco Interests necessary to satisfy all Allowed Claims (other than any Claims held by SMI Topco) in Class 3, Class 4, and Class 5 to SMI Group Ultimate Holdings, Inc. ("**Ultimate Holdings**"). Ultimate Holdings will contemporaneously contribute such Reorganized SMI Topco Interests to SMI Group Holdings, LLC ("**Group Holdings**"). Group Holdings will contemporaneously contribute such Reorganized SMI Topco Interests to SMI Group Acquisitions, Inc. ("**Acquisitions**"). Acquisitions will contemporaneously contribute such Reorganized SMI Topco Interests to Strategic Materials Holding Corp. ("**SMHC**").

- **Step 2**: **Distributions to Holders of Allowed Claims in Classes 3, 4, and 5:** On the Effective Date, following the contributions effectuated pursuant to Step 1 above, SMHC will make distributions to Holders of Allowed Claims (other than any Claims held by SMI Topco) in Classes 3, 4, and 5 in accordance with the treatment to be provided to such Claims under Article III.B of the Plan.

---

[5]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "***Plan***").

**Exhibit F**

**Distributions to Holders of Allowed SMI Topco Interests in Class 10**:

- **Topco Equity Exchange:** As described in Article III.B of the Plan, on the Effective Date, Holders of Allowed SMI Topco Interests, on account of their Class 10 Claims, will exchange their Allowed SMI Topco Interests for an allocation of the Reorganized SMI Topco Interests and Second Out Exit Term Loans that SMI Topco would have otherwise received on account of its Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, and Allowed Second Lien Credit Facility Claims pursuant to the treatment set forth in Classes 3, 4, and 5.

- **Intended Tax Treatment:** For U.S. federal income and applicable state and local income tax purposes, it is intended that (a) the distribution of Reorganized SMI Topco Interests and Second Out Exit Term Loans to Holders of Allowed SMI Topco Interests on account of their Allowed SMI Topco Interests be treated as a recapitalization within the meaning of section 368(a)(1)(E) with the Second Out Exit Term Loan constituting "boot" described in Section 356 of the Code and (b) the Plan constitute a "plan of reorganization" within the meaning of Treasury Regulations section 1.368-2(g) and 1.368-3(a).

<div align="center">**Exhibit F**</div>

**Exhibit C**

*Solicitation Version*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-[_____]** |
| | § | |
| **STRATEGIC MATERIALS, INC.,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |

## NOTICE OF AMENDED SUPPLEMENT TO THE
## DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION

**PLEASE TAKE NOTICE** that, on November 15, 2023, the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") commenced solicitation of the *Debtors' Joint Prepackaged Plan of Reorganization* (together with all exhibits and amendments thereto, the "***Plan***")[2] by sending copies of the Plan, the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (together with all exhibits and amendments thereto, the "***Disclosure Statement***"), the ballots for voting to accept or reject the Plan (the "***Ballots***"), and the *Notice of Supplement to the Debtors' First Amended Joint Chapter 11 Plan of Reorganization* (together with all exhibits and amendments thereto, the "***Plan Supplement***," and together with the Plan, the Disclosure Statement, and the Ballots, the "***Solicitation Materials***"), to parties entitled to vote to accept or reject the Plan, which includes Holders of Claims in Classes 3, 4, and 5, and Holders of Interests in Class 10.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby amend and supplement the Plan Supplement by including **Exhibits A-1** and **E**, as set forth herein.

**PLEASE TAKE FURTHER NOTICE** that the Debtors anticipate they may commence chapter 11 cases and, if they do, they will subsequently file each of the Solicitation Materials on the docket in such chapter 11 cases.

---

[1]  The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  17220 Katy Freeway, Ste. 150, Houston, TX 77094.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

**PLEASE TAKE FURTHER NOTICE** that this Plan Supplement includes the following documents, as may be modified, amended, or supplemented from time to time in accordance with the Plan and the Restructuring Support Agreement:[3]

- **Exhibit A** — Material New Governance Documents

- **Exhibit B** — Schedule of Rejected Executory Contracts and Unexpired Leases

- **Exhibit C** — Identities of Members of the New Board and Officers of Reorganized SMI Topco

- **Exhibit D** — List of Retained Causes of Action

- **Exhibit E** — Material Exit Term Loan Facilities Documents

- **Exhibit F** — Restructuring Transactions Exhibit

**PLEASE TAKE FURTHER NOTICE** that the Plan Supplement and any exhibits, appendices, supplements, or annexes to the Plan Supplement documents are incorporated into the Plan by reference and are a part of the Plan as if set forth therein. If the Plan is confirmed by the Court, the Plan Supplement will be approved as well. The Debtors reserve the right, subject to any applicable consent rights contained in the Plan and the Restructuring Support Agreement, to alter, amend, modify, or supplement any document or exhibit in the Plan Supplement until the Effective Date or as otherwise provided in the Plan, in each case in accordance with the Plan and the Restructuring Support Agreement, as applicable; *provided*, that if any document in the Plan Supplement is altered, amended, modified, or supplemented in any material respect, the Debtors will file a revised version of such document with the Court.

**PLEASE TAKE FURTHER NOTICE** that the Solicitation Materials, including this Plan Supplement, may be obtained upon request made to the Debtors' counsel at the address specified below, and the Solicitation Materials (excluding the Ballots) are also available for inspection free of charge on the Debtors' solicitation website at https://cases.ra.kroll.com/SMISolicitation. If the Debtors file chapter 11 cases, copies of all pleadings, including the Solicitation Materials, will be on file with the Clerk of the Court, 515 Rusk Street, Houston, Texas 77002 and available for review during the normal operating hours, and they will also be available for inspection on the Court's website at www.txs.uscourts.gov or free of charge on the Debtors' restructuring website at https://cases.ra.kroll.com/SMI.

---

[3]   To the extent a document is identified in the Plan as a document to be included in the Plan Supplement and is not included in this Plan Supplement, the Debtors will provide such document as soon as practicable as part of an amended Plan Supplement and will file such document with the Court if the Debtors commence chapter 11 cases.

Dated:  November 20, 2023
Houston, Texas

**VINSON & ELKINS LLP**
Paul E. Heath (TX 09355050)
Matthew D. Struble (TX 24102544)
Trevor G. Spears (TX 24106681)
845 Texas Avenue, Suite 4700
Houston, TX 77002
Tel: 713.758.2222
Fax: 713.758.2346
Email: pheath@velaw.com
mstruble@velaw.com
tspears@velaw.com

-and-

David S. Meyer (*pro hac vice* pending)
Jessica C. Peet (*pro hac vice* pending)
Steven Zundell (*pro hac vice* pending)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel:  212.237.0000
Fax:  212.237.0100
Email: dmeyer@velaw.com
jpeet@velaw.com
szundell@velaw.com

***Proposed Co-Counsel to the Debtors and
Debtors in Possession***

**WACHTELL, LIPTON, ROSEN & KATZ**
Joshua A. Feltman (*pro hac vice* pending)
Benjamin S. Arfa (*pro hac vice* pending)
Michael A. Chaia (*pro hac vice* pending)
Katherine Mateo (*pro hac vice* pending)
51 West 52nd Street
New York, NY 10019
Tel: 212.403.1000
Fax: 212.403.2000
Email: JAFeltman@wlrk.com
BSArfa@wlrk.com
MAChaia@wlrk.com
KMateo@wlrk.com

***Proposed Co-Counsel to the Debtors and
Debtors in Possession***

## Exhibit A

**Material New Governance Documents**

**<u>Exhibit A-1</u>**

**New Company Agreement**

*Solicitation Version*

# LIMITED LIABILITY COMPANY AGREEMENT

## OF

## SMI TOPCO HOLDINGS, LLC

(a Delaware limited liability company)

**EFFECTIVE AS OF [_____], 202[3]**

# TABLE OF CONTENTS

Page

## ARTICLE I

ORGANIZATION     2

| | | |
|---|---|---|
| Section 1.1. | **Formation** | 2 |
| Section 1.2. | **Company Name** | 2 |
| Section 1.3. | **Effective Date** | 2 |
| Section 1.4. | **Term** | 2 |
| Section 1.5. | **Offices** | 2 |
| Section 1.6. | **Registered Office and Registered Agent** | 3 |
| Section 1.7. | **Filings; Authorized Persons** | 3 |
| Section 1.8. | **Purposes** | 3 |
| Section 1.9. | **No Partnership** | 3 |
| Section 1.10. | **Tax Status** | 3 |

## ARTICLE II

UNITS     3

| | | |
|---|---|---|
| Section 2.1. | **Units Generally** | 3 |
| Section 2.2. | **Common Units** | 3 |
| Section 2.3. | **Members** | 4 |
| Section 2.4. | **Restrictive Legend** | 4 |
| Section 2.5. | **Non-Voting Securities** | 5 |
| Section 2.6. | **No Appraisal Rights** | 5 |

## ARTICLE III

MEMBERS     5

| | | |
|---|---|---|
| Section 3.1. | **Admission on the Effective Date** | 5 |
| Section 3.2. | **Admission of New Members** | 6 |
| Section 3.3. | **Capital Contributions** | 6 |
| Section 3.4. | **Withdrawal** | 6 |
| Section 3.5. | **Voting** | 6 |
| Section 3.6. | **Meetings** | 7 |
| Section 3.7. | **Quorum** | 8 |
| Section 3.8. | **Action by Written Consent** | 8 |
| Section 3.9. | **Power of Members** | 8 |
| Section 3.10. | **No Interest in Company Property** | 8 |

1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

ARTICLE IV

DISTRIBUTIONS                                                                        9

Section 4.1.    **Distributions**. ...................................................................... 9
Section 4.2.    **Non-Cash Distributions** ........................................................ 9

ARTICLE V

MANAGEMENT AND CONTROL OF BUSINESS                                                    9

Section 5.1.    **Board of Managers**.................................................................. 9
Section 5.2.    **Board Meetings; Board Action**. ............................................. 13
Section 5.3.    **Consent Rights**...................................................................... 14
Section 5.4.    **Managers' Non-Exclusive Services** ........................................ 16
Section 5.5.    **Reimbursement of Expenses** .................................................. 16
Section 5.6.    **Manager Compensation** ........................................................ 16
Section 5.7.    **Business Opportunities**. ........................................................ 17
Section 5.8.    **Officers**. ............................................................................... 17
Section 5.9.    **Duties**................................................................................... 19
Section 5.10.   **Exculpation** .......................................................................... 20
Section 5.11.   **Indemnification**. ................................................................... 20
Section 5.12.   **Insurance**.............................................................................. 22

ARTICLE VI

INFORMATION RIGHTS; FINANCIAL AND TAX MATTERS                                        22

Section 6.1.    **Information Rights of Members; Right of Inspection**. ................ 22
Section 6.2.    **Information Rights of the Company** ........................................ 23
Section 6.3.    **Bank and Investment Accounts** .............................................. 24
Section 6.4.    **Fiscal Year** ........................................................................... 24
Section 6.5.    **Tax Information**. ................................................................... 24

ARTICLE VII

TRANSFER                                                                             25

Section 7.1.    **Transfer of Units** .................................................................. 25
Section 7.2.    **General Provisions Regarding Transfers**.................................. 25
Section 7.3.    **Tag-Along Rights**. ................................................................. 26
Section 7.4.    **Drag-Along Rights**. ............................................................... 29
Section 7.5.    **Preemptive Rights** ................................................................. 31
Section 7.6.    **All Other Transfers Void**........................................................ 33
Section 7.7.    **Admission of Substitute Member; Liabilities**. ........................... 33
Section 7.8.    **Transfers Among Members** ..................................................... 33

1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

ARTICLE VIII

REPRESENTATIONS AND WARRANTIES                                              34

Section 8.1.      **Representations and Warranties of Each Party**..........................................34

ARTICLE IX

DISSOLUTION AND LIQUIDATION                                                  35

Section 9.1.      **Events of Dissolution**.............................................................................35
Section 9.2.      **Liquidation; Winding Up** ......................................................................35
Section 9.3.      **Survival of Rights, Duties and Obligations**...........................................36
Section 9.4.      **Claims of the Members**..........................................................................36

ARTICLE X

MISCELLANEOUS                                                                36

Section 10.1.     **Complete Agreement**.............................................................................36
Section 10.2.     **Other Actions**.......................................................................................36
Section 10.3.     **Governing Law**.....................................................................................37
Section 10.4.     **No Assignment**......................................................................................37
Section 10.5.     **Binding Effect**.......................................................................................37
Section 10.6.     **Severability**...........................................................................................37
Section 10.7.     **No Partition**...........................................................................................37
Section 10.8.     **Additional Documents and Acts** ...........................................................37
Section 10.9.     **No Employment Rights**.........................................................................37
Section 10.10.    **Amendments; Termination of Equity Rights** .......................................37
Section 10.11.    **No Waiver**.............................................................................................38
Section 10.12.    **Notices**..................................................................................................38
Section 10.13.    **Consent to Jurisdiction; WAIVER OF JURY TRIAL**..........................38
Section 10.14.    **No Third-Party Beneficiary** .................................................................39
Section 10.15.    **Confidentiality**......................................................................................39
Section 10.16.    **Cumulative Remedies; Specific Performance** .......................................40
Section 10.17.    **Exhibits and Schedules** ........................................................................41
Section 10.18.    **Interpretation**.......................................................................................41
Section 10.19.    **Termination**..........................................................................................41
Section 10.20.    **Counterparts**........................................................................................41

1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

Exhibit A            Definitions
Exhibit B            Member Registry
Exhibit C            Form of Joinder Agreement

Annex I              Form of Confidentiality Agreement

Schedule 1           Officers
[Schedule 2          Monthly KPIs]

1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

# LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") of SMI Topco Holdings, LLC, a Delaware limited liability company (the "**Company**"), effective as of [___], 202[3] (the "**Effective Date**"), is adopted and entered into by and among (a) each of the holders of Common Units (as defined below) as of the Effective Date and (b) any other Person (as defined below) who shall at any time be a party to or bound by this Agreement as a result of the execution and delivery to the Company of a Joinder Agreement (as defined herein), in accordance with the terms hereof (the Persons described in clauses (a) and (b), collectively, the "**Members**"). Capitalized terms used, but not otherwise defined, herein have the meanings set forth in **Exhibit A** attached hereto and made a part hereof by reference.

# RECITALS

A.   WHEREAS, SMI Topco Holdings, Inc., the Company's predecessor entity (the "**Predecessor Entity**"), was incorporated in the State of Delaware on September 19, 2017;

B.   WHEREAS, the Predecessor Entity was converted into the Company by [the filing of a Certificate of Conversion and a Certificate of Formation with the Secretary of State of Delaware on [__], 202[3] (the "**Certificate of Formation**");]

C.   WHEREAS, the Predecessor Entity and certain other parties agreed to implement the transactions contemplated by that certain Restructuring Support Agreement (as amended, restated, modified, supplemented, or replaced from time to time in accordance with its terms, dated as of September 15, 2023 (the "**Restructuring Support Agreement**"));

D.   WHEREAS, the Predecessor Entity and certain of its direct and indirect Subsidiaries commenced voluntary cases under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101– 1532, as amended from time to time in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Bankruptcy Court**") on [__], 2023;

E.   WHEREAS, on [__], 2023, the Predecessor Entity and its affiliated debtors and debtors in possession filed the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (Docket No. [__]) (including the Plan Supplement (as defined in the Plan) and all other exhibits and schedules thereto, in each case, as may be further amended, modified or supplemented from time to time, the "**Plan**") with the Bankruptcy Court;

F.   WHEREAS, the Plan was confirmed by the Bankruptcy Court pursuant to the [*ORDER*] (Docket No. [__]) (the "**Confirmation Order**") entered on [____], 202[3], and became effective on the Effective Date;

G.   WHEREAS, prior to the Effective Date, SMI Topco, LP, a Delaware limited partnership, owned one hundred percent (100%) of the outstanding equity interests of the Company;

H.   WHEREAS, pursuant to the Plan, the Common Units (as defined herein) were issued by the Company on the Effective Date to certain creditors of the Company;

1

I.      WHEREAS, pursuant to the Plan and/or the Confirmation Order, on and as of the Effective Date, all of the holders of Common Units (and their respective successors and assigns), whether such Common Units are to be received on or after the Effective Date under the Plan, shall be deemed to be parties to this Agreement, without the need for execution of this Agreement; and

J.      WHEREAS, the parties hereto desire to enter into this Agreement to establish certain arrangements with respect to the Company's equity interests and other related ownership and governance with respect to the Company.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## ORGANIZATION

Section 1.1.    **Formation**. [The Certificate of Conversion converting the Predecessor Entity into the Company and the Certificate of Formation of the Company were filed with the Secretary of State of the State of Delaware in accordance with the General Corporation Law of the State of Delaware and the Act, respectively, in each case on [_____], 202[3]]. The Members hereby agree that the Company shall be governed by the terms and conditions of this Agreement and, except as otherwise provided herein, the Act. This Agreement shall constitute the "limited liability company agreement" (as that term is used in the Act) of the Company. The rights, powers, duties, obligations and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights, powers, duties, obligations and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Act in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

Section 1.2.    **Company Name**. The name of the Company is "SMI Topco Holdings, LLC". The Board may (without the consent of any Member) change the Company's name at any time and from time to time in accordance with the provisions of the Act.

Section 1.3.    **Effective Date**. This Agreement is entered into, and is effective, as of the Effective Date.

Section 1.4.    **Term**. The Company shall continue until dissolved and its affairs wound up in accordance with the Act and the terms of this Agreement.

Section 1.5.    **Offices**. The principal office of the Company shall be established and maintained at [ADDRESS] or at such other or additional place or places as the Board shall determine from time to time ("Principal Office"). The Company may have other offices at such place or places as the Board may from time to time designate.

Section 1.6.    **Registered Office and Registered Agent**.  The address of the Company's registered office in the State of Delaware and the name and address of the Company's registered agent in the State of Delaware shall be Corporation Service Company, 251 Little Falls Drive, in the City of Wilmington, County of New Castle. The Board may designate another registered agent and/or registered office from time to time in accordance with the provisions of the Act and any other applicable laws.

Section 1.7.    **Filings; Authorized Persons**.  The Members shall execute and deliver such documents and perform such acts consistent with the terms of this Agreement as may be necessary to comply with the requirements of law for the formation, qualification and operation of a limited liability company, the ownership of property and the conduct of business under the laws of the State of Delaware and each other jurisdiction in which the Company shall own property or conduct business.

Section 1.8.    **Purposes**.  The Company is formed for the purposes of engaging in any lawful acts or activities for which limited liability companies may be organized under the Act and to engage in any and all activities necessary or incidental thereto. The Company shall have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Act.

Section 1.9.    **No Partnership**.  The Members intend that the Company shall not be a partnership (including a limited partnership) or joint venture, and that no Member, Manager or officer of the Company shall be a partner or joint venturer of any other Member, Manager or officer of the Company as a result of this Agreement.

Section 1.10.    **Tax Status**.  It is the intention of the Members that the Company be treated as a corporation for U.S. federal and all applicable state and local income tax purposes. All provisions of this Agreement are to be construed so as to ensure and preserve such tax status. The Company shall elect, by timely filing a U.S. Internal Revenue Service Form 8832 (Entity Classification Election) and any other relevant state or local forms or elections, to be treated as a corporation for U.S. federal and all applicable state and local income tax purposes. The Members shall be required to file all such elections necessary to ensure and preserve such tax status, and shall be required to file any necessary tax returns on a basis consistent with such tax status with any relevant tax authorities.

<div align="center">

**ARTICLE II**

**UNITS**

</div>

Section 2.1.    **Units Generally**.  The limited liability company interests of the Members shall be represented by issued and outstanding Units, which may be divided into one or more types, classes, or series. Each type, class, or series of Units shall have the privileges, preference, duties, liabilities, obligations, and rights, including voting rights, if any, set forth in this Agreement with respect to such type, class, or series.

Section 2.2.    **Common Units**.  The Company is hereby authorized to issue a class of Units designated as Common Units. As of the date hereof and after giving effect to the transactions

<div align="center">3</div>

contemplated by the Plan, the Common Units in the amounts set forth on the Member Registry opposite each Member's name are issued and outstanding. The Company shall be authorized to issue, pursuant to an Equity Incentive Plan adopted by the Board on or after the date hereof, Common Units or Unit Equivalents exercisable for Common Units (the "**Incentive Securities**") in an aggregate amount not to exceed [●] percent ([●]%) of the total authorized Units.

Section 2.3.     **Members**.  In addition to the Common Units and Incentive Securities, the Company is hereby authorized, subject to compliance with **Section 5.3(b)** and **Section 7.5**, to authorize and issue or sell to any Person any of the following: (a) any new type, class, or series of Units not otherwise described in this Agreement, which Units may be designated as classes or series of the Common Units but having different rights; and (b) Unit Equivalents. The Board is hereby authorized, subject to **Section 5.3(b)** and **Section 10.10**, to amend this Agreement to reflect such issuance and to fix the relative privileges, preference, duties, liabilities, obligations, and rights of any such new Units or Unit Equivalents, including the number of such new Units or Unit Equivalents to be issued, the preference (with respect to Distributions, in liquidation, or otherwise) over any other Units, and any Capital Contributions required in connection therewith.

Section 2.4.     **Restrictive Legend**.

(a)     The Board in its sole discretion may, but shall not be required to, issue certificates to the Members representing the Units held by such Member.

(b)     In the event that the Board shall issue certificates representing Units in accordance with **Section 2.4(a)**, then in addition to any other legend required by applicable law, each certificate representing the Units shall contain a legend in substantially the following form:

**"THE UNITS REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE PROVISIONS OF A LIMITED LIABILITY COMPANY AGREEMENT MADE AS OF [_____], 2023, INCLUDING RESTRICTIONS ON TRANSFER, TO WHICH THE COMPANY AND ALL MEMBERS ARE PARTY. THE UNITS REPRESENTED BY THIS CERTIFICATE ARE TRANSFERABLE ONLY IN ACCORDANCE WITH THE PROVISIONS OF SUCH AGREEMENT, AND ANY HOLDER OF UNITS OF THE COMPANY (WHETHER ACQUIRED UPON ISSUANCE OR TRANSFER) SHALL BE, AND BE DEEMED TO BE, A PARTY TO AND BOUND BY THAT AGREEMENT, WHICH SHALL CONTINUE TO BE EFFECTIVE NOTWITHSTANDING ANY ISSUE OR TRANSFER OF UNITS OF THE COMPANY. A COPY OF THE LIMITED LIABILITY COMPANY AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.**

**THE UNITS REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITY OR BLUE SKY LAWS AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER SAID ACT OR**

LAWS OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

(c)       Subject to any lock-up or other agreement that may apply to a Member's Units as may be specifically agreed to with an applicable Member, the requirement that the certificates representing the Units contain the second paragraph of the legend set forth in clause (b) above shall cease and terminate when such Units are transferred pursuant to Rule 144 promulgated under the 1933 Act ("**Rule 144**"). Upon the consummation of an event described in the immediately preceding sentence, the Company, upon surrender of certificates containing the second paragraph of such legend (if certificated), shall, at its own expense, and upon delivery, if requested by the Company, of a written opinion of legal counsel in form and substance reasonably satisfactory to the Company's legal counsel to the effect that the proposed Transfer is being made pursuant to Rule 144, deliver to the holder of any such securities as to which the requirement for the second paragraph of such legend shall have terminated, one or more new certificates evidencing such securities not bearing the second paragraph of such legend (if certificated).

(d)       In the event that any Units shall cease to be subject to the restrictions on Transfer set forth in **Article VII**, the requirement that such Units contain the first paragraph of the legend set forth in clause (b) above shall cease and terminate. Upon the consummation of an event described in the immediately preceding sentence, the Company, upon surrender of certificates containing the first paragraph of such legend (if certificated), shall, at its own expense, deliver to the holder of any such Units as to which the requirement for the first paragraph of such legend shall have terminated, one or more new certificates evidencing such securities not bearing the first paragraph of such legend (if certificated).

Section 2.5.       **Non-Voting Securities**.  Notwithstanding anything to the contrary set forth herein, the Company shall not issue any non-voting equity interests as and to the extent prohibited by section 1123(a)(6) of Chapter 11, Title 11 of the United States Code ("**Section 1123(a)(6)**"); provided, however, that the foregoing (a) will not have any further force or effect beyond that required under Section 1123(a)(6), (b) will have such force and effect only for so long as such Section 1123(a)(6) is in effect and applicable to the Company and (c) in all events may be amended or eliminated in accordance with applicable law from time to time in effect.

Section 2.6.       **No Appraisal Rights**.  The Members do not have any appraisal rights, dissenter's rights or other similar rights with respect to the Units or Unit Equivalents, including any such rights in connection with any amendment of this Agreement or the Certificate of Formation, any merger or consolidation in which the Company is a constituent party, any conversion of the Company to another business form, any division of the Company into two or more other entities, any transfer to or domestication in any jurisdiction by the Company, the sale of all or substantially all of the Company's assets or otherwise.

## ARTICLE III

## MEMBERS

Section 3.1.       **Admission on the Effective Date**.  On the Effective Date and pursuant to the Plan, each of the Members has exchanged, or is deemed to have exchanged, directly or

5

indirectly, to or for the benefit of the Company, such Member's Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, and Allowed Second Lien Credit Facility Claims (as each term is defined in the Plan), for newly authorized and issued Common Units, in each case as set forth on the Member Registry opposite such Member's name. Pursuant to the Plan, each Member is automatically deemed to have agreed to be bound by this Agreement (in its capacity as a Member of the Company) and is automatically deemed to be a party hereto as a Member as if, and with the same effect as if, such Member had delivered a duly executed counterpart signature page to this Agreement, in each case, without any further action by any party. Notwithstanding anything to the contrary contained herein, no further approval of the Board, any Member or any other Person shall be required with respect to the foregoing.

Section 3.2.     **Admission of New Members**.

(a)     New Members and Substitute Members may be admitted from time to time (i) in connection with an issuance of Units by the Company, subject to compliance with the provisions of **Section 5.3(b) and Section 7.5**, and (ii) in connection with a Transfer of Units, subject to compliance with the provisions of **Article VII**, and in either case, compliance with the provisions of **Section 3.2(b)**.

(b)     In order for any Person not already a Member of the Company to be admitted as a new Member or Substitute Member pursuant to an issuance or Transfer of Units (including a Permitted Transfer), as applicable, such Person shall have executed and delivered to the Company a written undertaking substantially in the form of the Joinder Agreement. Upon the execution and delivery of such undertaking and the satisfaction of any other applicable conditions as may reasonably be deemed necessary or appropriate by the Board, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Units, such Person shall be admitted as a Member or Substitute Member, as applicable, and deemed listed as such on the books and records of the Company and thereupon shall be issued their Units, and the Board shall update the Member Registry to reflect such issuance or Transfer.

Section 3.3.     **Capital Contributions**.     No Member shall be required to make any Capital Contributions to the Company. Any future Capital Contributions made by any Member shall only be made with the consent of the Board and in connection with an issuance of Units made in compliance with **Section 5.3(b)** and **Section 7.5**.

Section 3.4.     **Withdrawal**.     A Member shall not cease to be a Member as a result of the bankruptcy of such Member or as a result of any other events specified in Section 18-304 of the Act. So long as a Member continues to hold any Units, such Member shall not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company shall be null and void. As soon as any Person who is a Member ceases to hold any Units, such Person shall no longer be a Member.

Section 3.5.     **Voting**.     Except as otherwise provided by this Agreement (including **Section 10.10**) or as otherwise required by the Act or applicable law, each Member shall be entitled to one vote per Common Unit on all matters upon which the Members have the right to vote under this Agreement.

6

Section 3.6.        **Meetings**.

(a)        Calling the Meeting. Meetings of the Members may be called by (i) any two (2) members of the Board or (ii) by a Member or group of Members holding at least forty percent (40%) of the outstanding Common Units (determined without regard to any Incentive Securities, whether or not vested or exercised).

(b)        Notice. Written notice stating the place, date, and time of the meeting and, in the case of a meeting of the Members not regularly scheduled, describing the purpose(s) for which the meeting is called, shall be delivered not fewer than ten (10) days and not more than sixty (60) days before the date of the meeting to each Member, by or at the direction of the Managers or the Member(s) calling the meeting, as the case may be. The Members may hold meetings at the Company's Principal Office or at such other place within or without the State of Delaware as the Managers or the Member(s) calling the meeting may designate in the notice for such meeting. Attendance of a Member at any meeting shall constitute waiver of notice of such meeting. Additionally, a waiver of such notice in writing signed by a Member entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

(c)        Record Date.  Unless otherwise determined by the Board, the date on which notice of a Member meeting is first sent shall be the record date for the determination of Members entitled to notice of or to vote at such meeting (including any adjournment thereof).  The record date for determining Members entitled to express consent to action in writing without a meeting shall be the first date on which a signed written consent setting forth the action taken or proposed to be taken is delivered to the Company.

(d)        Participation. Any or all Members may participate in a meeting of the Members through the use of any means of remote communication by which all Persons participating can hear each other at the same time or by any other means permitted by the Act.  Any Member participating in a meeting by any such means of remote communication or by any such other means permitted by the Act is deemed to be present in person at such meeting.

(e)        Vote by Proxy. On any matter that is to be voted on by Members, a Member may vote in person or by proxy, and such proxy may be granted in writing, by means of electronic transmission, or as otherwise permitted by applicable law. Every proxy shall be revocable in the discretion of the Member executing it unless otherwise provided in such proxy; provided, that such right to revocation shall not invalidate or otherwise affect actions taken under such proxy prior to such revocation.   Except as otherwise limited therein, proxies shall entitle the individuals authorized to vote at a meeting thereby to vote at any adjournment of such meeting.

(f)        Conduct of Meetings. The Chairman of the Board or, if the Chairman is absent or the Chairman position is vacant, the Chief Executive Officer (or, in the Chief Executive Officer's absence, any vice president of the Company) shall call meetings of the Members to order and act as chairperson of such meetings.  In the absence of said officers, any Member entitled to vote at the meeting, or any proxy of any such Member, may call the meeting to order and a chairperson shall be elected by Majority Vote of the Members  present in person or represented by proxy and entitled to vote on any matter to be presented at such meeting.  The secretary or any assistant

7

secretary of the Company or any Person appointed as secretary of a meeting of the Members by the chairperson at any meeting of the Members may act as secretary of such meeting. The chairperson of any Member meeting shall determine the order of business and the procedure at such meeting, including such regulation of the manner of voting and the conduct of discussion.

Section 3.7.    **Quorum**.

(a)    A quorum of any meeting of the Members shall require the presence of the Members holding at least a Majority of the Common Units held by all Members. No action at any meeting may be taken by the Members unless the appropriate quorum is present. No action may be taken by the Members at any meeting at which a quorum is present without (x) the Majority Vote of the Members, or (y) with respect to the matters set forth in **Section 5.3(b)**, the Supermajority Vote of the Members.

(b)    Notwithstanding any other provision of this Agreement, if a quorum is not present at any Member meeting, such meeting may be adjourned by affirmative vote of the holders of a Majority of the Common Units that are present in person or represented by proxy at such meeting. Notice of an adjournment need not be given to the Members if the time and place of the adjourned meeting are announced at the meeting at which the adjournment is taken. At the adjourned meeting, any business may be transacted which might have been transacted at the original meeting. However, if the adjournment is for more than thirty (30) days from the date of the original meeting, or if after the adjournment a new record date is fixed for the adjourned meeting, a new notice of the adjourned meeting shall be given in accordance with **Section 3.6(b)** to each Member of record entitled to vote at such adjourned meeting.

Section 3.8.    **Action by Written Consent**.  Notwithstanding the provisions of **Section 3.7**, any action required or permitted to be taken at a meeting of the Members may be taken without a meeting if the Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting of the Members consent in writing or by electronic transmission to the adoption of a resolution authorizing such action. Each resolution so adopted and the writings or electronic transmissions evidencing such consent by the Members shall be filed with the minutes of the proceedings of the Members.

Section 3.9.    **Power of Members**.  The Members shall have the power to exercise any and all rights or powers granted to Members pursuant to the express terms of this Agreement and the Act. Except as otherwise specifically provided by this Agreement or required by the Act, no Member, in their capacity as a Member, shall have the power to act for or on behalf of, or to bind, the Company.

Section 3.10.    **No Interest in Company Property**.  No real or personal property of the Company shall be deemed to be owned by any Member individually, but shall be owned by, and title shall be vested solely in, the Company.

## ARTICLE IV

## DISTRIBUTIONS

Section 4.1.    **Distributions**.

(a)    Subject to **Section 4.1(b)** and **Section 4.1(c)**, the Board shall have sole discretion regarding the amounts and timing of Distributions to Members, including to decide to forgo payment of Distributions in order to provide for the retention and establishment of reserves of, or payment to third parties of, such funds as it deems necessary with respect to the reasonable business needs of the Company (which needs may include the payment or the making of provision for the payment when due of the Company's obligations, including, but not limited to, present and anticipated debts and obligations, capital needs and expenses, the payment of any management or administrative fees and expenses, and reasonable reserves for contingencies).

(b)    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any Distribution to Members if such Distribution would violate Section 18-607 of the Act or other applicable law.

(c)    Subject to the priority of Distributions pursuant to **Section 9.2(c)**, if applicable, all Distributions determined to be made by the Board pursuant to **Section 4.1(a)** shall be made to the Members holding Common Units pro rata in proportion to their aggregate holdings of Common Units.

Section 4.2.    **Non-Cash Distributions**.   The value of any non-cash assets to be Distributed to the Members in accordance with this Agreement shall be reasonably determined by the Board.  Any such Distribution of non-cash assets shall be *pro rata*, as nearly as practicable, in accordance with the other provisions of this Agreement.

## ARTICLE V

## MANAGEMENT AND CONTROL OF BUSINESS

Section 5.1.    **Board of Managers**.

(a)    <u>Powers of the Board</u>. The business and affairs of the Company shall be managed by or under the direction of a board of managers (the "**Board**" and, each member of the Board, a "**Manager**"). Except as otherwise provided herein, the Board shall have full, exclusive and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company as set forth herein. Without limiting the foregoing, the Company and its Subsidiaries shall not take any of the following actions, or enter into any arrangement, contract, agreement or commitment to do any of the following actions, without prior Board approval:

(i)    (x) approve the annual budget for the Company and its Subsidiaries for any fiscal year, or (y) make any material change to or deviation from such annual budget,

9

including any material increase or decrease in capital expenditures or any unbudgeted investment, during the relevant fiscal year;

(ii)    (x) hire or fire or change the compensation of any of the executive officers of the Company or any of its Subsidiaries;

(iii)    adopt or amend any incentive plan for officers, employees or directors of the Company or its Subsidiaries, including any Equity Incentive Plan;

(iv)    except as in accordance with the Plan, incur, issue, permit to exist, assume or guarantee any indebtedness in excess of $[●] or enter into, amend, restate, supplement, modify or replace any agreement, instrument, note or other arrangement pursuant to which the Company or its Subsidiaries incurs or may incur any indebtedness in excess of $[●] (together with any schedules, exhibits or other documents relating thereto);

(v)    make any loan or advance in excess of $[●], other than advances or prepayments to vendors made in the ordinary course of business consistent with the Company's past practice;

(vi)    declare or pay any dividend or distribution on, or repurchase, any Units, Unit Equivalents or other equity interests of the Company or any Subsidiary that is not wholly-owned by the Company; and

(vii)    except as in accordance with the Plan, issue any Units, Unit Equivalents or Subsidiary Securities or other equity interests of the Company or any of its Subsidiaries, other than issuances of Subsidiary Securities to the Company or to any wholly-owned Subsidiary of the Company.

(b)    Board Composition. The Board shall initially be comprised of five (5) Managers. Each designation or determination pursuant to this **Section 5.1(b)** or **Section 5.1(e)** shall be made by written notice to the Company delivered to the attention of the Chief Executive Officer and secretary of the Company. Each holder of Units hereby agrees, to the extent requested or required, that such Person will vote, or cause to be voted, all Units over which such Person has the power to vote or direct the voting, and will take all other necessary or desirable action within such Person's control, and the Company will take all necessary and desirable actions within its control, to cause the Board (and, if directed by the Board, other specified Subsidiaries of the Company) and their respective committees to be constituted, continue in existence and adjusted in accordance with this **Article V**, including by procuring resignations of its, his or their designees, as required. The Board shall be composed as follows:

(i)    one (1) Manager who shall be the then-current Chief Executive Officer at the time (the "**CEO Manager**");

(ii)    for so long as the ALCM Member, together with its Affiliates and Related Funds, collectively owns (x) at least fifteen percent (15%) but less than thirty percent (30%) of the Common Units outstanding, one (1) individual designated by the ALCM Member

10

and (y) at least thirty percent (30%) of the Common Units outstanding, two (2) individuals designated by the ALCM Member;

(iii)     for so long as the CSAM Member, together with its Affiliates and Related Funds, collectively owns at least fifteen percent (15%) of the Common Units outstanding, one (1) individual designated by the CSAM Member;

(iv)     for so long as the Cerberus Member and the HPS Member collectively own at least fifteen percent (15%) of the Common Units outstanding, one (1) Independent Manager jointly designated by the Cerberus Member and the HPS Member; provided, further, that, if the Cerberus Member and the HPS Member are unable to agree on the designation of the Independent Manager, whichever of the Cerberus Member and the HPS Member owns more Common Units at such time shall be entitled to designate the Independent Manager; and

(v)     if the above clauses (ii) through (iv) do not result in the designation of four (4) Managers, the remaining Manager(s) necessary to fill a Board of five (5) Managers (subject to **Section 5.1(f)(iv)**) shall be designated by plurality vote of the holders of Common Units outstanding.

The ownership thresholds set forth in the foregoing clauses (ii), (iii) and (iv) shall be determined without regard to any Incentive Securities, whether or not vested or exercised.

(c)     <u>Chairman</u>. The Chairman of the Board, if any, shall be a Manager (excluding any Manager that is an employee of the Company or any of its Subsidiaries) appointed, removed and/or replaced from time to time by a vote of a Majority of the Managers then in office.

(d)     <u>No Transfer</u>. None of the Members shall be permitted to Transfer its right to designate a Manager pursuant to **Section 5.1(b)** or an Observer pursuant to **Section 5.1(h)** in connection with a Permitted Transfer of such Member's Units, other than to an Affiliate or Related Fund in connection with an Affiliate Transfer.

(e)     <u>Removal of Managers</u>. Except as otherwise set forth in this **Section 5.1(e)**, once designated, a Manager shall serve on the Board until the earliest of (i) his or her death, disability, disqualification or resignation, (ii) in the case of the CEO Manager, such time as he or she ceases to be the Chief Executive Officer, (iii) in the case of the Managers designated pursuant to **Section 5.1(b)(ii) or (iii)**, the determination by the Member(s) having the right to designate such Manager pursuant to **Section 5.1(b)** to remove such Manager from the Board with or without cause, (iv) the Member(s) having the right to designate such Manager pursuant to **Section 5.1(b)(ii) or (iii)** no longer have that right (it being understood and agreed for purposes of this clause (iv) that if the applicable designating Member(s) continue to have the right to designate any Managers to the Board, they may choose which of their designees will be subject to removal from the Board by written notice to the Company within five (5) Business Days following the loss of the right to designate additional Managers (the "**Manager Removal Notice**") and if the designating Member(s) do not deliver a Manager Removal Notice by the end of such fifth (5th) Business Day, the Managers not designated by such designating Member(s) shall determine which Manager shall

11

be removed) and (v) the vote by Members owning a Majority of the Common Units outstanding to remove such Manager for cause.

(f)      Vacancies. Except as otherwise set forth in this **Section 5.1(f)**, if at any time a vacancy is created on the Board by reason of the death, disability, disqualification, resignation or removal of any Manager, a designee shall be designated to fill such vacancy or vacancies by the Member(s) entitled to designate such Manager pursuant to **Section 5.1(b)**; provided that if a Member fails to exercise its right to designate a Manager within thirty (30) days of the creation of the vacancy and such vacancy would make it impossible for a quorum to be present at a duly called meeting of the Board, the Majority of the remainder of the Board shall be permitted to designate an interim Manager to fill the seat in order to hold a meeting, subject to the right of such Member to remove and/or replace such interim Manager with its own designee.

(i)      Following the loss of the right of one or more Members to designate a Manager pursuant to **Section 5.1(b)(ii) and (iii)**, the applicable Manager shall immediately thereafter automatically be removed (provided, that, if such Member(s) continue to have the right to designate any Managers to the Board, the applicable Manager shall be removed upon receipt by the Company of the Manager Removal Notice, or if no Manager Removal Notice is delivered by the applicable Member(s) within five (5) Business Days following the loss of the right to designate additional Managers, at the end of such fifth (5th) Business Day), and the vacancy created as a result of the removal of such Manager in accordance with **Section 5.1(e)** shall thereafter be filled in accordance with **Section 5.1(b)(v)**.

(ii)      Following the loss of the right of the Cerberus Member and the HPS Member to designate a Manager pursuant to **Section 5.1(b)(iv)**, the Independent Manager that was appointed by such Members shall remain in office until the earliest of (i) his or her death, disability, disqualification or resignation, or (ii) Members holding a Majority of the Common Units outstanding vote to remove such Independent Manager with or without cause. The vacancy created as a result of the removal of such Independent Manager shall thereafter be filled by plurality vote of the holders of Common Units outstanding.

(iii)      If at any time the CEO Manager is no longer serving as Chief Executive Officer, then (A) the CEO Manager shall be deemed to have resigned from the Board immediately and (B) the Board shall cause the vacancy caused by such resignation to be filled by the new Chief Executive Officer of the Company.

(iv)      If at any time there is no Chief Executive Officer, the CEO Manager seat shall be vacant until a Chief Executive Officer is designated whether on an interim or permanent basis.

(g)      Committees. The Board may delegate any of its powers, authorities and discretions, including the power to sub-delegate, to any committee consisting of one or more Managers. Any committee created by the Board shall include at least one (1) Manager appointed by the ALCM Member, for so long as ALCM holds at least thirty percent (30%) of the Common Units outstanding (determined without regard to any Incentive Securities, whether or not vested or exercised).

(h)    Board Observer Rights. Each of the Members that, together with its Affiliates and Related Funds, collectively owns at least ten percent (10%) of the Common Units outstanding as of the date of this Agreement (determined without regard to any Incentive Securities, whether or not vested or exercised) shall have the right, for so long as such Member, together with its Affiliates and Related Funds, collectively owns at least ten percent (10%) of the Common Units (determined without regard to any Incentive Securities, whether or not vested or exercised), to designate one (1) individual representative of such Member to attend all meetings of the Board (including any committees thereof) in a nonvoting observer capacity (each, an "**Observer**"). The Company will provide to each Observer copies of all notices, minutes, consents and other materials that it provides to the Managers at the same time and in the same manner as provided to such Managers; provided, that each such Observer shall (x) maintain the confidentiality of all notices, reports, minutes, consents and other documents and information that such Observer receives in its capacity as an Observer ("**Confidential Board Information**") and not disclose any Confidential Board Information in any manner to any other Person (other than to its employees, agents, Affiliates, Related Funds, advisors, managers, officers, other representatives, in each case, which are informed of its confidential nature) and (y) not use the Confidential Board Information for any purpose other than to permit such Observer to provide input and advice and to have current information with respect to the affairs of the Company and actions taken by the Board.  Each Observer shall enter into a confidentiality agreement in a form reasonably satisfactory to the Board with respect to any information derived from such role as an Observer.  Notwithstanding the foregoing, no Observer will have the right to receive any such materials or attend any such meeting if the Board determines that such disclosure or attendance would be likely to result in a loss of any legal privilege (including attorney-client privilege) or a conflict of interest or a breach or violation of any confidentiality obligation.

IN THE EVENT ANY MEMBER FAILS TO COMPLY WITH ITS OBLIGATIONS UNDER THIS **SECTION 5.1** TO CAUSE THE BOARD (AND, IF DIRECTED BY THE BOARD, OTHER SPECIFIED SUBSIDIARIES OF THE COMPANY) AND THEIR RESPECTIVE COMMITTEES TO BE CONSTITUTED, CONTINUE IN EXISTENCE AND ADJUSTED IN ACCORDANCE WITH THIS **ARTICLE V**, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY AND EACH MEMBER HEREBY GRANTS A PROXY AND POWER OF ATTORNEY TO THE MEMBER(S) ENTITLED TO DESIGNATE MANAGER(S) TO TAKE ALL NECESSARY ACTIONS AND EXECUTE AND DELIVER ALL DOCUMENTS DEEMED NECESSARY AND APPROPRIATE BY SUCH PERSON(S) TO EFFECTUATE THE ELECTION OR REMOVAL OF SUCH MANAGER(S) CONSISTENT WITH THIS **SECTION 5.1**.  SUCH PROXY AND POWER ARE COUPLED WITH AN INTEREST, ARE PERPETUAL AND IRREVOCABLE, AND BESTOW ON THE NOMINEE THE FULL POWER TO VOTE AND ACT FOR SUCH MEMBER WITH RESPECT TO THE ELECTION OF MANAGERS.

Section 5.2.    **Board Meetings; Board Action**.

(a)    Meetings. Meetings of the Board shall be held at least quarterly, and may be held at any other time when called by any Manager, in each case upon not less than three (3) Business Days' advance written notice to the other Managers. Attendance at any meeting of the Board shall constitute waiver of notice of such meeting. Additionally, a waiver of such notice in writing signed

by a Manager entitled to such notice, whether before or after the time stated therein, shall be deemed equivalent to the giving of such notice.

(b)      Participation. One or more, or all, Managers or Observers (subject, in the case of Observers, to **Section 5.1(h)**) may participate in a meeting of the Board or any committee of the Board through the use of any means of remote communication by which all Persons participating can hear each other at the same time or by any other means permitted by the Act.  Any Manager participating in a meeting by any such means of remote communication or by any such other means permitted by the Act is deemed to be present in person at such meeting.

(c)      Voting. Each Manager shall be entitled to one (1) vote. An act of the Board shall require the affirmative vote (at any meeting of the Board at which a quorum is present) of the Majority of the entire Board.

(d)      Quorum. The quorum for a meeting of the Board shall require the presence of a Majority of the entire Board, which shall include at least one (1) Manager designated by the ALCM Member for so long as the ALCM Member has the right to designate two (2) Managers pursuant to **Section 5.1(b)(ii)**.  In the absence of a quorum, a Majority of the votes of the Managers present and entitled to vote may adjourn the meeting from time to time without further notice, other than announcement at the meeting, until a quorum shall be present.  If a meeting of the Board is adjourned on two consecutive occasions as a result of the failure to achieve quorum due to the absence of the Manager(s) appointed by ALCM (with each such Manager having received proper prior written notice of such meeting), then the next meeting shall only require the presence of a Majority of the entire Board to constitute a quorum.

(e)      Action by Written Consent. Any action required or permitted to be taken at a meeting of the Board may be taken without a meeting if all of the Managers then in office consent in writing or by electronic transmission to the adoption of a resolution authorizing such action. Each resolution so adopted and the writings or electronic transmissions evidencing such consent by the Board shall be filed with the minutes of the proceedings of the Board.

(f)      Related Party Transactions. Notwithstanding anything to the contrary in this Agreement, other than (i) the Registration Rights Agreement and amendments thereto, (ii) the Loan Documents and amendments thereto, and (iii) any indemnification agreement entered into on the Effective Date with a Manager, the Company may not, directly or indirectly (and the Company shall cause its Subsidiaries not to), enter into any transaction or series of related transactions involving more than $500,000 with any holder which, together with its Affiliates, holds five percent (5%) or more of the Common Units outstanding on a Fully Diluted Basis or any of their respective executive officers, managers, directors or Affiliates (which, for such purpose, shall not include the Company or any of its Subsidiaries) (a "**Related Party Transaction**") without the affirmative vote of a Majority of the Disinterested Managers and the consent of the Members as required by **Section 5.3(a)(vi)**, unless such transaction is entered into (x) on arm's length terms in the ordinary course of business consistent with the Company's past practice with a portfolio company of such holder or (y) in connection with new or continued employment or service of the managers, directors, officers or employees of the Company or its Subsidiaries.

Section 5.3.      **Consent Rights**.

(a)  <u>Majority Member Consent Rights</u>. In addition to any vote of the Board, and notwithstanding anything to the contrary in this Agreement, the Company and its Subsidiaries shall not, and the Board shall not authorize the Company or any of its Subsidiaries to, take any of the following actions, or enter into any arrangement or contract to do any of the following actions, without the Majority Vote of the Members:

(i)  except as in accordance with the Plan and except for the pledge of equity interests or assets in connection with any secured debt financing of the Company or any of its Subsidiaries or any amendment, modification or restructuring thereof, and the exercise of rights and remedies thereunder, effect any acquisition or divestiture of any equity interests, assets, properties or business, whether in one transaction or a series of related transactions, or enter into any joint venture with, or acquire ownership of any partnership or other interest in, any Person (other than a wholly-owned Subsidiary of the Company), that involves or results in aggregate consideration or capital contributions or investments by the Company or any of its Subsidiaries (in respect of any single transaction or series of related transactions and whether at the effective date of the transaction or on a contingent basis) in an amount in excess of $[●]; <u>provided</u> that, for the purposes hereof, the term "divestitures" shall not include divestitures of assets in the ordinary course of business consistent with past practice;

(ii)  dissolve, liquidate or wind up the Company;

(iii)  increase or decrease the size of the Board;

(iv)  except as in accordance with the Plan, incur, issue, permit to exist, assume or guarantee any indebtedness in excess of $[●] or enter into, amend, restate, supplement, modify or replace any agreement, instrument, note or other arrangement pursuant to which the Company or its Subsidiaries incurs or may incur any indebtedness in excess of $[●] (together with any schedules, exhibits or other documents relating thereto);

(v)  make any change in company structure or domicile that would result in the Company materially modifying its tax status;

(vi)  other than (A) the Registration Rights Agreement and amendments thereto, (B) the Loan Documents and amendments thereto, and (C) any indemnification agreement entered into on the Effective Date with a Manager, enter into a Related Party Transaction unless such transaction is entered into (x) on arm's length terms in the ordinary course of business consistent with the Company's past practice with a portfolio company of a Member or (y) in connection with new or continued employment or service of the managers, directors, officers or employees of the Company or its Subsidiaries; or

(vii)  any agreement or commitment to take any of the foregoing actions.

(b)  <u>Supermajority Member Consent Rights</u>. In addition to any vote of the Board, and notwithstanding anything to the contrary in this Agreement, the Company and its Subsidiaries shall not, and the Board shall not authorize the Company or any of its Subsidiaries to, take the following

actions, or enter into any arrangement or contract to do the following actions, without the Supermajority Vote of the Members:

        (i)      undertake an IPO or a Company Sale;

        (ii)     enter into any new line of business or terminate any existing line of business, in each case which represents more than ten percent (10%) of the Company's total revenues in its consolidated statement of income for the most recent fiscal year;

        (iii)    amend, change, waive, alter or repeal any provision of this Agreement or the Registration Rights Agreement;

        (iv)    hire or fire or change the compensation of the Chief Executive Officer or the chief executive officer of any of its Subsidiaries;

        (v)     issue any Units with designations, preferences, rights or powers that are senior to Common Units; or

        (vi)    any agreement or commitment to take any of the foregoing actions.

Section 5.4.    **Managers' Non-Exclusive Services**.  No Manager shall be required to manage the Company as his sole and exclusive function and any Manager or Member may have other business interests and may engage in other activities in addition to those relating to the Company. Notwithstanding the foregoing, Managers who are employees of the Company or its Subsidiaries shall be required to have such employment as their primary business function.

Section 5.5.    **Reimbursement of Expenses**.  Each Manager and Observer shall be entitled to reimbursement from the Company of all reasonable and documented expenses reasonably incurred and paid by such Manager or Observer in connection with such Manager's services as a Manager or such Observer's attendance of meetings of the Board or any committees of the Board or otherwise incurred for the benefit of, or on behalf of, the Company. Without limiting the foregoing, each of the ALCM Member and CSAM Member, for so long as they are entitled to designate a Manager to the Board, shall also be entitled to reimbursement from the Company of all reasonable and documented expenses incurred and paid by such Member in connection with the attendance by such Member's designated Manager(s) at Board meetings or committee meetings and in connection with other matters related thereto. The Board may establish, from time to time, policies relating to expense reimbursement (including what expenses, such as retained counsel or other advisors, will be reimbursable), which policies shall treat and apply to each Manager and Observer (other than any employee of the Company serving as a Manager) equally.

Section 5.6.    **Manager Compensation**.  Each of the Managers (other than any employee of the Company serving as a Manager) shall be entitled to reasonable managerial fees or other reasonable compensation as determined by the Board from time to time. The Board shall have the discretion to determine if Managers should be provided additional reasonable fees for serving on one or more committees of the Company. Further, nothing contained herein shall preclude any Manager that is an employee of the Company from receiving wages or similar

16

compensation pursuant to any employment agreement with the Company for services rendered thereto. For the avoidance of doubt, no Observer shall be entitled to compensation from the Company in such capacity.

Section 5.7.    **Business Opportunities**.

(a)    The Company acknowledges and affirms that the Managers and the Members (other than officers of any of the Company's Subsidiaries and employees of the Company or any of the Company's Subsidiaries) may have, and may continue to participate in, directly or indirectly, investments in assets and businesses which are, or will be, suitable for the Company or its Subsidiaries or competitive with their business ("**Company Investments**").

(b)    The Company expressly waives any conflicts of interest or potential conflicts of interest that exist or arise as a result of any such Company Investments and agrees that none of the Managers or the Members (other than, in each case, officers of any of the Company's Subsidiaries and employees of the Company or any of the Company's Subsidiaries) that complies with this **Section 5.7** shall have liability to the Company with respect to such conflicts of interest or potential conflicts of interest in respect of such Company Investments.

(c)    Subject to **Section 5.7(d)**, the Company and each Member (other than officers of any of the Company's Subsidiaries and employees of the Company or any of the Company's Subsidiaries) and each of their respective Affiliates, officers, directors, trustees, employees, partners, managers, members, stockholders, beneficiaries and agents (the foregoing Persons in this **Section 5.7(c)**, the "**Exempted Persons**"), have the right to, and shall have no duty (contractual, fiduciary or otherwise) not to, directly or indirectly engage in any business, business activity or line of business, including those that are the same or similar to those of the Company or any of its Subsidiaries or may be deemed to be competing with the Company or any of its Subsidiaries.

(d)    In the event that any Exempted Person acquires knowledge of a potential transaction or matter that may be a business opportunity for any of the Company or one or more of its Subsidiaries, on the one hand, and such Exempted Person or any other Person, on the other hand, such Exempted Person shall have no duty (contractual, fiduciary or otherwise) to communicate or present such business opportunity to the Company or any of its Subsidiaries or Affiliates, as the case may be, and notwithstanding anything herein to the contrary, shall not be liable to the Company or any of its Affiliates or creditors for breach of any duty (contractual, fiduciary or otherwise) by reason of the fact that such Exempted Person, directly or indirectly, pursues or acquires such opportunity for itself, directs such opportunity to another Person, or does not present such opportunity to the Company or any of its Subsidiaries; provided, however, that this **Section 5.7(d)** shall not apply to any business opportunities that come to an Exempted Person's attention solely as a result of such Exempted Person's (or their officers', directors', trustees', employees', partners', managers', members', stockholders', beneficiaries', Affiliates' and agents') rights under this Agreement or position as a Manager.

Section 5.8.    **Officers**.

(a)    Election and Tenure.   The Board may (but shall not be required to) appoint individuals to serve as officers of the Company, which may include a Chief Executive Officer, a

Chief Financial Officer, a Secretary, a Treasurer, a Chief Operating Officer, and such other officers and assistant officers as the Board may deem necessary or advisable. No officer need be a Member or Manager, except that the Chief Executive Officer shall automatically become a Manager pursuant to **Section 5.1(b)(i)**. The Board may expressly delegate to any such officer the power to appoint or remove subordinate officers, agents or employees. Any two or more offices of the Company may be held by the same person. Each officer shall hold office until their successor is designated by the Board, or until their earlier death, resignation, or removal. Each officer shall be a natural person who is eighteen (18) years of age or older.

(b)      _Resignation, Removal and Vacancies._  Any officer may resign at any time upon written notice to the Board. Such resignation shall take effect when such notice is delivered unless the notice specifies a later date, and acceptance of the resignation shall not be necessary to render such resignation effective unless such resignation so states. Any officer may be removed by the Board (acting by Majority vote of all Managers other than the officer being considered for removal, if applicable) at any time with or without cause. If any office becomes vacant for any reason, the vacancy may be filled by the Board. The appointment of an officer shall not itself create contract rights in favor of the officer, and the removal or resignation of an officer shall not affect the officer's contract rights, if any, with the Company or the Company's contract rights, if any, with the officer.

(c)      _Chief Executive Officer._  The chief executive officer of the Company (the "**Chief Executive Officer**") shall (i) have general and active management of the business of the Company, and preside over the day-to-day business operations of the Company, (ii) see that all orders and resolutions of the Board are carried into effect, and (iii) perform all duties as may from time to time be assigned to him or her by the Board or as may be expressly set forth in this Agreement. The Chief Executive Officer shall also be the President of the Company.

(d)      _Chief Financial Officer._  The chief financial officer of the Company (the "**Chief Financial Officer**") shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Financial Officer. In addition, the Chief Financial Officer shall have, along with the Chief Executive Officer, responsibility for the day-to-day business operations of the Company. The Chief Financial Officer shall also be a Vice President of the Company.

(e)      _Chief Operating Officer._  The chief operating officer of the Company (the "**Chief Operating Officer**") shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement, and shall perform such duties and have such powers and responsibilities as are incident to the office of Chief Operating Officer. The Chief Operating Officer shall also be a Vice President of the Company.

(f)      _Vice Presidents._  The vice presidents of the Company (the "**Vice Presidents**"), if any, shall perform such duties and possess such powers as from time to time may be assigned to them by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement. In the absence of the Chief Executive Officer or in the event of the inability or refusal

18

of the Chief Executive Officer to act, the Vice President (or in the event there be more than one Vice President, the Vice Presidents in the order designated by the Board, or in the absence of any designation, then in the order of the election or appointment of the Vice Presidents) shall perform the duties of the Chief Executive Officer and when so performing shall have all the powers of and be subject to all the restrictions upon the Chief Executive Officer.

(g)     Secretary.  The secretary of the Company (the "**Secretary**") shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Secretary shall perform such duties and have such powers as are incident to the office of Secretary, including the duty and power to give notice of all meetings of Members (if any), the Board and any committee of the Board, to prepare and maintain minutes of the meetings of the Members (if any) or the Board (or any committee thereof), to maintain other records and information of the Company, to authenticate records of the Company, to be custodian of the Company seal, if any, and to affix and attest to the Company seal, if any, on documents.

(h)     Treasurer.  The treasurer of the Company (the "**Treasurer**") shall perform such duties and shall have such powers as may from time to time be assigned to him or her by the Board or the Chief Executive Officer or as may be expressly set forth in this Agreement.  In addition, the Treasurer shall perform such duties and have such powers as are incident to the office of Treasurer, including the duty and power to keep and be responsible for all funds and securities of the Company, to deposit funds of the Company in depositories selected in accordance with this Agreement, to disburse such funds as ordered by the Board, making proper accounts thereof, and to render as required by the Board statements of all such transactions and of the financial condition of the Company.

(i)     Assistant Secretaries and Assistant Treasurers.  The assistant secretaries and assistant treasurers of the Company (the "**Assistant Secretaries**" and the "**Assistant Treasurers**"), if any, shall perform such duties as shall be assigned to them by the Secretary or the Treasurer, respectively, or by the Chief Executive Officer or the Board, or as may be expressly set forth in this Agreement.  In the absence, inability or refusal to act of the Secretary or the Treasurer, the Assistant Secretaries or the Assistant Treasurers, respectively, in the order designated by the Board, or in the absence of any designation, then in the order of their election or appointment, shall perform the duties and exercise the powers of the Secretary or Treasurer, as the case may be.

Section 5.9.     **Duties**.

(a)     Except as otherwise expressly required by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member, Observer, officer nor any Manager shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being an officer, Member or acting as a Manager of the Company.

(b)     To the fullest extent permitted by law, including Section 18-1101(c) of the Act, and notwithstanding any other provision of this Agreement or in any agreement contemplated herein or applicable provision of law or equity or otherwise, the parties hereto hereby agree that any duties (including fiduciary duties) of a Member, Manager or Observer owed to the Company, the

19

Members or any other Person (whether bound by this Agreement or otherwise) are hereby waived and eliminated; provided, however, that the foregoing shall not apply to employees or officers of the Company or its Subsidiaries.  Notwithstanding any other provision of this Agreement (but subject to the proviso in the first sentence of this **Section 5.9(b)**) or otherwise applicable provision of law or equity, whenever in this Agreement, any Member or Manager is permitted or required to take any action or make any decision, such Member or Manager shall be entitled to consider only such interests and factors as he, she or it desires, including exclusively his, her or its own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation (fiduciary or otherwise) to give any consideration to any interest of or factors affecting the Company, its Subsidiaries, any Member or any other Person, and shall be entitled to act in a manner adverse to the Company, its Subsidiaries, the Members and any other Person.

(c)     The officers of the Company, in their capacity as such (including, for the avoidance of doubt, the CEO Manager in his or her capacity as Chief Executive Officer), shall have fiduciary duties identical to those of officers of business corporations organized under the General Corporation Law of the State of Delaware.

Section 5.10.     **Exculpation**.  To the fullest extent permitted under the Act and applicable law, none of (a) the Managers, Observers or officers of the Company or its Subsidiaries, (b) the Members (including each Member who has the right to designate a Manager or Observer hereunder, whether in its capacity as such designating Member or otherwise, and each Fund Indemnitor related to such Member, Manager or Observer), or (c) any of the Managers', Observers' or Members' respective Affiliates or any of their respective officers, directors, managers, employees, partners, members, representatives or equityholders or any officers of the Company or its Subsidiaries (each of the Persons described in the foregoing clauses (a), (b) or (c), a "**Protected Person**") will be liable to the Company or any Member for any loss or damage sustained by the Company or any Member except as specifically provided to the contrary in the immediately following sentence. None of the Protected Persons shall be liable to the Company or its Members for any loss or damage resulting from any act or omission taken or suffered by such Protected Person in connection with the conduct of the affairs of the Company or otherwise in connection with this Agreement or the matters contemplated hereby; provided, that (i) if the Protected Person is subject to **Section 5.9(c)**, such Protected Person  acted in good faith and in a manner such Protected Person reasonably believed to be in or not opposed to the best interests of the Company, (ii) if the Protected Person is subject to **Section 5.9(c)**, such Protected Person did not violate any applicable fiduciary duties set forth in **Section 5.9(c)**, (iii) with respect to any criminal action or proceeding, such Protected Person had no reasonable cause to believe its conduct was unlawful, and (iv) the loss or damage did not result from any breach of this Agreement by the Protected Person. For the avoidance of doubt, except in the case of the CEO Manager, clauses (i) and (ii) in the preceding proviso shall not apply to a Protected Person that is a Manager. Any Protected Person or officer may consult with legal counsel, accountants, advisors or other similar Persons with respect to the Company's affairs and shall be fully protected and justified in any action or inaction that is taken or omitted in good faith, in reliance upon and in accord with the opinion or advice of such Persons; provided, however, such legal counsel, accountants, advisors or other similar Persons shall have been selected in good faith. The preceding sentence shall in no way limit any Person's right to rely on information to the extent provided in Section 18-406 of the Act.

Section 5.11.     **Indemnification**.

20

(a)      To the fullest extent permitted under the Act and applicable law, the Company shall indemnify and hold harmless each of the Protected Persons (each, an "**Indemnitee**") from and against any and all claims, liabilities, damages, losses, costs and expenses (including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and reasonable expenses of investigating or defending against any claim or alleged claim) of any nature whatsoever, known or unknown, liquidated or unliquidated (collectively, "**Damages**"), that are incurred by any Indemnitee, and arise out of, are related to, or are in connection with (i) the affairs or operations of the Company or any of its Subsidiaries or the performance by such Indemnitee of any of the Indemnitee's responsibilities hereunder, and (ii) the service at the request of the Company by such Indemnitee as a partner, member, manager, director, officer, trustee, employee or agent of any other Person; provided, however, that (A) if the Indemnitee is subject to **Section 5.9(c)**, the Indemnitee acted in good faith and in a manner such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, (B) if the Indemnitee is subject to **Section 5.9(c)**, the Indemnitee did not violate any applicable fiduciary duties set forth in **Section 5.9(c)**, (C) with respect to any criminal action or proceeding, the Indemnitee had no reasonable cause to believe its conduct was unlawful and (D) the Damages did not result from any breach of this Agreement by the Indemnitee. For the avoidance of doubt, clauses (A) and (B) in the preceding sentence shall not apply to an Indemnitee that is a Manager (other than the CEO Manager). The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of *nolo contendere* or its equivalent, shall not, of itself, create a presumption that the Indemnitee, if the Indemnitee is subject to **Section 5.9(c)**, did not act in good faith and in a manner which such Indemnitee reasonably believed to be in or not opposed to the best interests of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that such Indemnitee's conduct was unlawful. The indemnification obligations of the Company pursuant to this **Section 5.11** shall be satisfied from and limited to the Company's assets, and no Member shall have any personal liability on account thereof.

(b)      The Company shall pay reasonable, documented expenses incurred by any Indemnitee in defending any action, suit or proceeding described in **Section 5.10(a)** in advance of the final disposition of such action, suit or proceeding, as such Damages are incurred; provided, however, that any such advance shall only be made if such Indemnitee provides written affirmation to repay such advance if it shall ultimately be determined by a court of competent jurisdiction that such Indemnitee is not entitled to be indemnified by the Company pursuant to this **Section 5.11**.

(c)      Certain Indemnitees that are directors, officers, employees, stockholders, partners, limited partners, members, equityholders, managers, or advisors of any Member or any of such Member's Affiliates (each such Person, a "**Fund Indemnitee**") may have certain rights to indemnification, advancement of expenses and/or insurance provided by or on behalf of such Member and/or its Affiliates or such Indemnitees personally (collectively, the "**Fund Indemnitors**"). Notwithstanding anything to the contrary in this Agreement or otherwise: (i) the Company is the indemnitor of first resort (i.e., the Company's obligations to each Fund Indemnitee are primary and any obligation of the Fund Indemnitors to advance Damages or to provide indemnification for such Damages incurred by each Fund Indemnitee are secondary), (ii) the Company shall be required to advance the full amount of Damages incurred by each Fund Indemnitee and will be liable for the full amount of all such Damages paid in settlement to the extent legally permitted and as required by this Agreement, without regard to any rights each Fund Indemnitee may have against the Fund Indemnitors, and (iii) the Company irrevocably waives,

relinquishes and releases the Fund Indemnitors from any and all claims against the Fund Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. Notwithstanding anything to the contrary in this Agreement or otherwise, no advancement or payment by the Fund Indemnitors on behalf of a Fund Indemnitee with respect to any claim for which such Fund Indemnitee has sought indemnification or advancement of Damages from the Company shall affect the foregoing and the Fund Indemnitors will have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such Fund Indemnitee against the Company. The Fund Indemnitors are express third-party beneficiaries of the terms of this **Section 5.11**.

(d)     Without limiting **Section 5.11(c)**, the indemnification provided by this **Section 5.11** shall not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement, determination of the Board or otherwise. The rights to indemnification and reimbursement or advancement of expenses provided by, or granted pursuant to, this **Section 5.11** shall continue as to an Indemnitee who has ceased to be a Member, Manager or officer (or other Person indemnified hereunder) and shall inure to the benefit of the successors, executors, administrators, legatees and distributees of such Person.

(e)     The provisions of this **Section 5.11** shall be a contract between the Company, on the one hand, and each Indemnitee who served at any time while this **Section 5.11** is in effect in any capacity entitling such Indemnitee to indemnification hereunder, on the other hand, pursuant to which the Company and each such Indemnitee intend to be legally bound. No repeal or modification of this **Section 5.11** shall affect any rights or obligations with respect to any state of facts then or theretofore existing or thereafter arising or any action, suit or proceeding theretofore or thereafter brought or threatened based in whole or in part upon such state of facts.

(f)     The Company may enter into indemnity contracts with Indemnitees and adopt written procedures pursuant to which arrangements are made for the advancement of expenses and the funding of obligations under this **Section 5.11** hereof and containing such other procedures regarding indemnification as are appropriate. For the avoidance of doubt, each of the Managers shall be entitled to receive indemnity contracts with the Company on terms no less favorable than any other indemnity contract entered into between the Company (or any of its Subsidiaries) and any other Manager.

Section 5.12.     **Insurance**.  The Company shall purchase and maintain insurance, on behalf of such Indemnitees, and may purchase and maintain insurance on behalf of the Company, against any liability that may be asserted against or expenses that may be incurred by any such Person in connection with the activities of the Company or such Indemnitees, and in such amounts, as the Board reasonably determines are customary for similarly-situated businesses such as the Company and its Subsidiaries, regardless of whether the Company would have the power to indemnify such Person against such liability under the provisions of this Agreement.

## ARTICLE VI

## INFORMATION RIGHTS; FINANCIAL AND TAX MATTERS

Section 6.1.     **Information Rights of Members; Right of Inspection**.

(a)        Each Member, other than any Member that is a Competitor, shall have the right to receive the following information (which right the Company may satisfy by providing access to each Member to a confidential website such as Intralinks and timely posting such information on such website (which website shall have a system of email notification of new postings and may require confirmation by viewers of the site of the confidentiality obligations set forth in **Section 10.15**) (a "**Secure Site**")), and each Member may share and discuss such information (along with any other information provided to Members pursuant to this Agreement and otherwise made available to Members via the Secure Site) with its Affiliates, Related Funds, directors, officers, partners, managers, stockholders, employees, investors and advisors as well as any bona fide prospective purchaser of Units that (x) is not a Competitor and (y) has entered into, and delivered to the Company, a confidentiality agreement substantially in the form set forth on **Annex I** attached hereto regarding the treatment of such information (and for the avoidance of doubt, at its election, the Company may share and discuss such information with any prospective purchaser of Units):

(i)        within ninety (90) days of the end of each fiscal year of the Company, copies of (x) all annual financial statements of SMI Group Acquisitions, Inc. and its Subsidiaries on a consolidated basis for and as of the end of such fiscal year, which financial statements shall be audited by a nationally recognized accounting firm approved by the Board, and (y) [a consolidated income statement and balance sheet for the Company and each Subsidiary of the Company above SMI Group Acquisitions, Inc. for and as of the end of such fiscal year];

(ii)        within forty-five (45) days of the end of each of the first three (3) fiscal quarters of each fiscal year of the Company, copies of (x) all unaudited quarterly financial statements of SMI Group Acquisitions, Inc. and its Subsidiaries on a consolidated basis for and as of the end of such fiscal quarter, and (y) [a consolidated income statement and balance sheet for the Company and each Subsidiary of the Company above SMI Group Acquisitions, Inc. for and as of the end of such fiscal quarter]; and

(iii)        within thirty (30) days after the end of each calendar month,  the Company shall provide (including by making available on a subfolder of the Secure Site) a report with respect to such month on certain key performance indicators set forth on **Schedule 2**, in each case, to each Member that has expressly delivered notice to the Company in writing, which may be through a click-through confirmation on the Company's website, the Secure Site or other digital datasite, that such Member desires to receive the monthly information set forth on **Schedule 2**.

(b)        Once each fiscal quarter, at a time mutually agreed between the senior officers of the Company and the Company, and on a date that is promptly after the delivery of the information required pursuant to **Section 6.1(a)(i)** or **(a)(ii)** above, the Company shall arrange a conference call at a reasonable time during its normal business hours with senior officers of the Company to discuss such financial statements.

Section 6.2.        **Information Rights of the Company**.  The Company may from time to time (including in connection with the admission of a new or Substitute Member) reasonably request of any or all Members information (a) needed by the Company to comply with applicable law and/or (b) regarding such Member's "accredited investor" status (within the meaning of

23

Regulation D promulgated under the Securities Act), but a Member may be compelled to answer no more frequently than once per calendar quarter (unless, with respect to clause (a) hereof, required by applicable law).

Section 6.3.     **Bank and Investment Accounts**.  All funds of the Company shall be deposited in its name, or in such name as may be designated by the Board, in such checking, savings or other accounts, or held in its name in the form of such other investments, as shall be designated by the Board. The funds of the Company shall not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company shall be made exclusively upon the signature or signatures of such officer or officers of the Company as the Board may designate.

Section 6.4.     **Fiscal Year**.  The fiscal year of the Company shall be the same as its taxable year. The Board may elect to change the Company's fiscal year.

Section 6.5.     **Tax Information**.

(a)     Without limiting the generality of **Section 6.2**, each Member shall, and shall cause such Member's directors, officers and shareholders to, use reasonable efforts to promptly provide any information that the Company reasonably requests such Member to provide, in relation to the Company (or any Subsidiary's) tax compliance; provided, that such information is in such Member's possession or control and is not subject to any duty of confidentiality to a third-party and further provided that such information is treated confidentially in accordance with **Section 10.15**.

(b)     The Company shall, and shall cause each of its Subsidiaries to, comply with Sections 1471 through 1474 of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**"), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b) of the Code, any intergovernmental agreement entered into in connection with such Sections of the Code, or any U.S. or non-U.S. fiscal or regulatory legislation, rules, practices or guidance notes adopted pursuant to any such intergovernmental agreement, and any tax reporting or filing obligations of a similar nature (the "**Tax Information Reporting Obligations**").

(c)     Each party to this Agreement agrees to waive any provision of applicable law that would, absent a waiver, prevent any other party to this Agreement from complying with or satisfying any reporting or withholding obligations under the Tax Information Reporting Obligations.

(d)     The Company shall, promptly following a request from a Member, furnish to that Member any information and/or documentation that is reasonably requested by that Member in order for that Member to file any tax return, report or other filing, to claim any refund or rebate, to determine its or its direct or indirect owners' tax consequences or to otherwise comply with any tax requirement applicable to it.

24

# ARTICLE VII

## TRANSFER

Section 7.1.    **Transfer of Units**.  Any Member may Transfer, offer to Transfer, or accept an offer from any proposed Transferee for, all or any Units to another Person in accordance with and subject to the terms and conditions set forth in this **Article VII** (including compliance with **Section 7.3**). A Transfer completed in accordance with this **Article VII** is referred to in this Agreement as a "Permitted Transfer".

Section 7.2.    **General Provisions Regarding Transfers**.

(a)    Without limiting any other provisions or restrictions or conditions of this **Article VII**, no Transfer of Units or Unit Equivalents or any other rights or obligations or interests of a Member, as applicable, may be made under any circumstances unless such Transfer is made in accordance with the procedures set forth herein and such Transfer would not result in any of the following:

(i)    Securities Laws. Any violation of the Securities Act, or any regulation issued pursuant thereto, or any state securities laws or regulations, or any other applicable federal or state laws or order of any court having jurisdiction over the Company; or

(ii)    Registration. Until the Company becomes obligated to file reports under Section 13 or 15(d) of the Exchange Act, any requirement that the Company register the Units or any other equity interests of the Company under Section 12(g) of the Exchange Act or any regulation issued pursuant thereto.

Compliance with the restrictions on Transfer set forth in this **Section 7.2(a)** may be administered by the Company or the Company's transfer agent under the direction and control of the Company, and the Company and its transfer agent shall be entitled to take such measures as are reasonably necessary to prevent any Transfers in violation of this **Section 7.2(a)**. In furtherance of the foregoing, it is understood and agreed by all Members and Substitute Members that Transfers may not be permitted if, following such Transfer, the Units and Unit Equivalents would be held by a number of holders or non-accredited investors that would result in a requirement that the Company file a registration statement under the Exchange Act or any regulation issued pursuant thereto, unless the Company has already become required, or the Board has elected (with requisite Member approval), to file such a registration statement in connection with an IPO.

(b)    Mechanics. Any Transfer of Units or Unit Equivalents shall be subject to the restrictions of this **Article VII**. The Person proposing to make any such Transfer shall deliver to the Company (i) the name of the Person or Persons to whom the proposed Transfer is to be made ("**Transferee**") and (ii) if reasonably requested by the Board, a written opinion of legal counsel in form and substance reasonably satisfactory to the Company's legal counsel to the effect that the proposed Transfer may be effected without registration under the Securities Act or any applicable state law.

(c)    <u>Joinder Agreement</u>. Prior to the consummation of an IPO, no direct Transfer of Units or Unit Equivalents by any Member will be permitted unless the Transferee in such Transfer (if not already a party hereto) executes a Joinder Agreement, pursuant to which such Transferee shall become a Member bound by this Agreement. Upon any Transfer by a Member of all of its Units or Unit Equivalents, that Member shall cease to be a Member for all purposes under this Agreement.

(d)    <u>Prohibited Persons</u>. Notwithstanding anything herein to the contrary, unless approved by the Board or pursuant to a Tag-Along Sale or Drag-Along Sale, no Transfer of any Units or Unit Equivalents otherwise permitted by this Agreement shall be permitted or made by any Member if such Transfer, whether directly or indirectly, is to a Prohibited Person.

Section 7.3.    **<u>Tag-Along Rights</u>**.

(a)    Without limiting the other terms and conditions hereof (including **Section 7.1**), if at any time one or more Members (each, a "**Tag-Along Seller**") acting in concert proposes to Transfer, directly or indirectly, for value Common Units (a "**Tag-Along Sale**"), then each other Member that holds Common Units (each, a "**Tag-Along Rightholder**") shall have the right to sell its *pro rata* portion of such Common Units in such Transfer, based on the ratio of the Common Units on a Fully Diluted Basis held by such Member on the Tag-Along Record Date to the number of Common Units on a Fully Diluted Basis held by all the Members on the Tag-Along Record Date; <u>provided</u> that no such tag-along rights shall apply to (i) Transfers of Common Units that represent less than forty percent (40%) of the Common Units (determined without regard to any Incentive Securities, whether or not vested or exercised) (the "**Tag-Along Threshold**"); <u>provided</u>, <u>further</u>, that Transfers to the same party or related parties, whether at one time or in a series (a "**Staggered Transfer**"), shall be aggregated for purposes of determining whether the Tag-Along Threshold is satisfied, (ii) open-market purchases by a purchaser, (iii) Affiliate Transfers, (iv) Transfers as part of an IPO or (v) Transfers that are Drag-Along Sales.

(b)    The Tag-Along Seller shall give written notice to each Tag-Along Rightholder of each proposed Transfer by it that gives rise to the rights of the Tag-Along Rightholders set forth in this **Section 7.3** no less than thirty (30) days prior to the proposed consummation of such Transfer. The close of business on the date on which written notice is given to the Tag-Along Rightholders in accordance with this **Section 7.3(b)** shall be deemed to be the "**Tag-Along Record Date**". The notice provided by the Tag-Along Seller shall set forth in reasonable detail, based on information available to the Tag-Along Seller, the name of such Tag-Along Seller, the number of Common Units that will be held by such Tag-Along Seller as of the Tag-Along Record Date and the number of Common Units proposed to be sold by such Tag-Along Seller (the "**Tag-Along Offered Units**"), the name of and contact information for the proposed purchaser (the "**Tag-Along Purchaser**"), the proposed amount and form of consideration and terms and conditions of payment offered by such Tag-Along Purchaser, the percentage (or a reasonable estimate of the minimum and maximum percentage) of Common Units on a Fully Diluted Basis the Tag-Along Rightholders may sell to such Tag-Along Purchaser (determined in accordance with **Section 7.3(a)**), the purchase price per Common Unit and any other material terms or conditions (the "**Tag-Along Notice**"). The tag-along rights provided by this **Section 7.3** must be exercised by any Tag-Along Rightholder electing to sell Tag-Along Offered Units no later than the tenth (10th) Business Day following the Tag-Along Record Date, which exercise shall be by delivery of a written irrevocable

26

offer (the "**Tag-Along Rightholder's Offer**") to the Tag-Along Seller and the Company indicating such Tag-Along Rightholder's election to have its Common Units included in the Tag-Along Sale and specifying the number of Common Units (up to the maximum number of Common Units as determined in accordance with **Section 7.3(a)**) it elects to sell; provided that any Tag-Along Rightholder may waive its tag-along rights under this **Section 7.3** with respect to such Tag-Along Sale prior to the expiration of such ten (10)-Business Day period by giving written notice thereof to the Tag-Along Seller, with a copy to the Company (and failure to deliver a Tag-Along Rightholder's Offer by the tenth (10th) Business Day following the Tag-Along Record Date will be deemed to be a waiver of such Tag-Along Rightholder's tag‑along rights under this **Section 7.3** with respect to such Tag-Along Sale). Subject to the other terms herein, delivery of the Tag-Along Rightholder's Offer will constitute an irrevocable binding commitment by such Tag-Along Rightholder to sell the number of Common Units specified in the Tag-Along Rightholder's Offer of such Tag-Along Rightholder on the terms set forth in the Tag-Along Notice. For any Staggered Transfer, each Tag-Along Rightholder shall be put in no better or worse economic position than if such Tag-Along Rightholder had participated in each stage of the Staggered Transfer and sold on a *pro rata* basis its Common Units in accordance with their respective terms, and the provisions of this **Section 7.3** shall be construed accordingly. The Tag-Along Seller shall attempt to obtain the inclusion in the proposed Tag-Along Sale of the entire number of Tag-Along Offered Units that the Tag-Along Rightholders timely elect to have included in such Tag-Along Sale. If the Tag-Along Seller is unable to obtain such inclusion of all such securities, then the number of Common Units to be sold in such Tag-Along Sale shall be allocated on a *pro rata* basis among the Tag-Along Seller and each Tag-Along Rightholder who shall have timely elected to participate in such Tag-Along Sale in proportion to the total number of Common Units, determined on a Fully Diluted Basis, offered and eligible to be sold in the Tag-Along Sale by each such Member, and neither the Tag-Along Seller nor any of its Affiliates shall receive any direct or indirect consideration in connection with the Tag-Along Sale (including by way of fees, consulting arrangements or a non-compete payment) other than consideration received in exchange for its Common Units.

(c)       If (i) the Tag-Along Seller has not consummated the Tag-Along Sale within ninety (90) days of the delivery to Members of the related Tag-Along Notice (for any reason other than the failure of a Tag-Along Rightholder to sell its Common Units under this **Section 7.3**); provided that such period may be extended to one hundred twenty (120) days in order to obtain regulatory approvals that are a condition to such Tag-Along Sale or (ii) the amount or form of consideration shall have changed from those in the Tag-Along Notice, then, in either case, the Tag-Along Notice and any Tag-Along Rightholder's Offer shall be null and void, and it shall be necessary for a separate Tag-Along Notice to be furnished, and the terms and provisions of this **Section 7.3** separately complied with, in order to subsequently consummate such proposed Tag-Along Sale pursuant to this **Section 7.3** unless, in the case of clause (i) of this **Section 7.3(c)**, the Tag-Along Seller receives the written consent of each of the Tag-Along Rightholders who delivered a Tag-Along Rightholder's Offer agreeing to an extension or waiver. Notwithstanding any other provision of this **Section 7.3**, there shall be no liability on the part of any Tag-Along Seller to any other Member arising from the failure of any Tag-Along Seller or Tag-Along Purchaser to consummate the Tag-Along Sale for any reason, and the decision to consummate such Tag-Along Sale shall be in the sole discretion of the Tag-Along Seller.

(d)     Each Person selling Common Units in a proposed Tag-Along Sale shall take or cause to be taken all such reasonable actions consistent with the terms of this Agreement as may be reasonably necessary in order expeditiously to consummate such sale and any related transactions, including: executing, acknowledging and delivering consents, assignments, waivers and other documents or instruments; furnishing information and copies of documents reasonably requested of it; and otherwise reasonably cooperating with the selling Members, the Company, and the prospective purchaser. Without limiting the generality of the foregoing, with respect to a proposed Tag-Along Sale, each such participating Member agrees to execute and deliver agreements consistent in form and substance with the agreements being entered into by the Tag-Along Seller, so long as all selling Members party to such agreements will be subject to the same terms; provided that a participating Member that is not the Tag-Along Seller (i) shall not be required to make representations and warranties other than customary representations and warranties with respect to unencumbered title to its Common Units, and the power, authority and legal right of such Member to Transfer its Common Units, (ii) may be liable, but shall only be severally, not jointly, liable with all other sellers (whether by purchase price adjustment, indemnity payments or otherwise) in respect of representations, warranties, covenants and other agreements made in respect of the Company and its Subsidiaries, (iii) shall not be liable for any breach of representations, warranties, covenants or other agreements made by, or fraud or willful misconduct of, any other participating Member or the Tag-Along Seller, (iv) may be required to remain subject to confidentiality restrictions in respect of the business of the Company and its Subsidiaries consistent with those set forth in this Agreement and (v) other than as set forth in the foregoing clause (iv), shall not be required to agree to any restrictive covenant (including any non-competition, non-solicitation or similar restrictive covenant); and provided, further, that with respect to representations, warranties, covenants and other agreements of the type described in clause (ii), the aggregate amount of such liability (x) will not exceed the lesser of (A) such Member's *pro rata* portion of any such liability, to be determined in accordance with such Member's portion of the total consideration to be received in such sale and (B) the net proceeds actually received by such Member in connection with such sale and (y) will be satisfied, at least as to such liability of the participating Members that are not the Tag-Along Seller, first from the proceeds of such sale that are escrowed or otherwise withheld (which escrow or withholding will be of the proceeds payable to all Members participating in such sale, on a *pro rata* basis) (if any), and then from the proceeds of such sale actually received by such participating Members (if any).

(e)     The Effective Date of a Tag-Along Sale will take place at such time and place as the Tag-Along Seller shall reasonably specify by written notice to each participating Member.

(f)     In any Tag-Along Sale, the sale of Common Units by all selling Members shall (i) be made on the same terms (including the price per Unit and the type of consideration to be received), (ii) be subject to the same conditions, except as set forth in the provisos in **Section 7.3(d)** and (iii) be entitled to receive the proceeds from such sale (in such amount calculated as provided herein) at the same time.

(g)     For purposes of determining the amount of Common Units permitted to be included in a Tag-Along Sale pursuant to this **Section 7.3**, Unit Equivalents that are then convertible into or exercisable for Common Units at the time of such Tag-Along Sale shall be deemed to be Common Units for purposes of this **Section 7.3**; provided, that the price payable for such Unit Equivalents in connection with the Tag-Along Sale shall be reduced by the exercise price thereof

28

or other consideration, if any, required to be paid to the Company to acquire the underlying Common Unit.

Section 7.4.      **Drag-Along Rights**.

(a)      Prior to the occurrence of an IPO, at any time one or more Members who collectively hold more than fifty-five percent (55%) of the Common Units outstanding (determined without regard to any Incentive Securities, whether or not vested or exercised) (collectively, the "**Dragging Member**") approve any Company Sale which constitutes a sale solely to one or more Unaffiliated Third-Party Purchaser(s) (an "**Approved Sale**"), specifying in connection with such approval that this **Section 7.4** shall apply to such transaction, then, subject to the conditions set forth in this **Section 7.4**, the Dragging Member shall have the right (the "**Drag-Along Right**"), by providing notice of such Approved Sale to the Company, to require the Company and each Member to comply with this **Section 7.4** with respect to such Approved Sale (such sale, a "**Drag-Along Sale**"). Each Member, together with the Company, is hereby obligated to cooperate with (including, in the case of the Company, by retaining advisors selected by the Dragging Member), consent to and raise no objections against or, without waiving its rights under this Agreement, assert any claims in connection with such Approved Sale, and each Member is hereby obligated to sell the same portion of each class or series of its own Units that is being sold by the Dragging Members of such class of their Units (i) for its *pro rata* share (based on the ratio of the shares of such class or series of Units held by such Member on the Drag-Along Record Date to the number of Units held by all the Members on the Drag-Along Record Date) of the aggregate amount of consideration to be paid in respect of such class of Units set forth in the Company Notice (as defined below), after adjusting for any exercise price payable with respect to any Unit Equivalent and subject to **Section 7.5(c)**, and (ii) subject to the limitations set forth in the next paragraph, otherwise on the same terms and subject to the same conditions to which the Dragging Member is subject with respect to its Units. The Company shall provide each such Member with written notice of any Approved Sale at least thirty (30) days prior to the consummation thereof setting forth in reasonable detail the terms of such Approved Sale, including the identity of the prospective Unaffiliated Third-Party Purchaser(s), the form, type and aggregate amount of consideration to be paid in respect of each class of Units to be Transferred in connection with such Approved Sale (which, for the avoidance of doubt, does not involve any non *pro rata* roll over of equity other than in any *de minimis* respect), and the date on which such Approved Sale is proposed to be consummated (the "**Company Notice**"). The close of business on the date on which the Company Notice is given in accordance with this **Section 7.4(a)** shall be deemed to be the "**Drag-Along Record Date**". The Members shall not be required to comply with, and shall have no rights under, **Section 7.3** in connection with any Approved Sale.

(b)      Each Member required to sell Units pursuant to an Approved Sale (each, a "**Drag-Along Seller**") shall cooperate in consummating such Approved Sale, including by becoming a party to the sales, merger, or other agreement pursuant to which it is proposed such Approved Sale will be consummated and all other reasonably necessary related agreements, delivering, at the consummation of such sale, share certificates (if any) and other instruments for such securities duly endorsed for transfer, free and clear of all liens and encumbrances, and voting or consenting in favor of such transaction (to the extent a vote or consent is required) and taking any other necessary or appropriate action in furtherance thereof, including the execution and delivery of any other reasonably necessary agreements, certificates, instruments and other documents; underlined *provided*

29

that each Drag-Along Seller (i) shall not be required to make representations and warranties other than customary representations and warranties with respect to unencumbered title to its Units, and the power, authority and legal right of such Drag-Along Seller to Transfer its Units, (ii) may be liable, but shall only be severally, not jointly, liable with all other sellers (whether by purchase price adjustment, indemnity payments or otherwise) in respect of representations, warranties, covenants and other agreements made in respect of the Company and its Subsidiaries, (iii) shall not be liable for any breach of representations, warranties, covenants or other agreements made by, or fraud or willful misconduct of, the Dragging Member or any other Drag-Along Seller, (iv) may be required to remain subject to confidentiality restrictions in respect of the business of the Company and its Subsidiaries consistent with those set forth in this Agreement and (v) other than as set forth in the foregoing clause (iv), shall not be required to agree to any restrictive covenant (including any non-competition, non-solicitation or similar restrictive covenant); and provided, further, that with respect to representations, warranties, covenants and other agreements of the type described in clause (ii), the aggregate amount of such liability (x) will not exceed the lesser of (A) such Drag-Along Seller's *pro rata* portion of any such liability, to be determined in accordance with such Drag-Along Seller's portion of the total consideration to be received in such sale and (B) the net proceeds actually received by such Drag-Along Seller in connection with such sale and (y) will be satisfied, at least as to such liability of the Drag-Along Sellers, first from the proceeds of such sale that are escrowed or otherwise withheld (which escrow or withholding will be of the proceeds payable to the Dragging Member and all Drag-Along Sellers, on a *pro rata* basis) (if any), and then from the proceeds of such sale actually received by such Drag-Along Seller.

(c)      Notwithstanding anything to the contrary set forth herein, a Member will not be required to comply with this **Section 7.4** in connection with any Approved Sale unless upon the consummation thereof (i) each holder of each class or series of Units will receive the same form of consideration for their shares of such class or series as is received by other holders in respect of their Units of such same class or series of Units, and if any holders of any Units are given a choice as to the form of consideration to be received as a result of the Approved Sale, all holders of such Units will be given the same option, and (ii) each holder of Common Units will receive the same amount of consideration per Common Unit and at the same time as is received by other holders in respect of their Common Units. Neither the Drag-Along Seller nor any of its Affiliates shall receive any direct or indirect consideration in connection with the Drag-Along Sale (including by way of fees, consulting arrangements or a non-compete payment) other than consideration received in exchange for its Units.  For purposes of this **Section 7.4**, Unit Equivalents shall be deemed to be the same type of Unit for which they are exercisable or into which they are convertible.

(D)      IN THE EVENT ANY MEMBER FAILS TO TIMELY COMPLY WITH ITS OBLIGATIONS UNDER THIS **SECTION 7.4** WITH RESPECT TO AN APPROVED SALE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY AND EACH MEMBER HEREBY GRANTS A PROXY AND POWER OF ATTORNEY TO ANY NOMINEE OF THE DRAGGING MEMBERS TO TAKE ALL NECESSARY ACTIONS AND EXECUTE AND DELIVER ALL DOCUMENTS DEEMED NECESSARY AND APPROPRIATE BY SUCH PERSON TO EFFECTUATE THE CONSUMMATION OF ANY APPROVED SALE. SUCH PROXY AND POWER ARE COUPLED WITH AN INTEREST, ARE PERPETUAL AND IRREVOCABLE, AND BESTOW ON THE NOMINEE THE FULL POWER TO VOTE AND ACT FOR SUCH DRAG-ALONG SELLER WITH RESPECT TO THE CONSUMMATION OF THE APPROVED SALE.

1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

(E)     Notwithstanding anything in this **Article VII** to the contrary, following delivery of a Company Notice, no Member shall thereafter Transfer any Units that would be sold in the Drag-Along Sale unless and until the transaction that is the subject of the Company Notice is terminated.

Section 7.5.     **Preemptive Rights**.  Any issuance of New Securities by the Company or any of its Subsidiaries, other than an issuance of Exempt Securities, shall be subject to the following provisions:

(a)     Right to Purchase New Securities. Except as otherwise provided in this **Section 7.5** (including **Section 7.5(f)** hereof) and until an IPO, the Company hereby grants to each Member holding, together with its Affiliates and Related Funds, at least two percent (2%) of the Common Units outstanding (determined without regard to any Incentive Securities, whether or not vested or exercised) (each such Member, applicable Affiliate or Related Fund, a "**Preemptive Rightholder**"), the right to purchase up to its *pro rata* share (based on the ratio of the shares of Common Units on a Fully Diluted Basis held by such Preemptive Rightholder on the Preemptive Offer Record Date to the number of Common Units on a Fully Diluted Basis held by all the Members on the Preemptive Offer Record Date) of any and all issuances, sales or distributions of New Securities proposed to be made by the Company or any of its Subsidiaries as set forth herein.

(b)     Issuance Notice. The Company shall give each Preemptive Rightholder written notice of the Company's intention to issue or sell New Securities other than Exempt Securities (which notice may be provided by posting the requisite information on a Secure Site and notifying (or causing notification to be delivered to) each of such Preemptive Rightholders of such posting in writing) (the "**Issuance Notice**"), describing the type and terms of the New Securities, the price at which such New Securities will be issued or sold and the other material terms upon which the Company proposes to issue or sell the New Securities, including the anticipated date of such issuance, sale or distribution, the general use of proceeds thereof, a description of both the business purpose of the offering of such New Securities and the dilutive effects, if any, of such offering, and the record date for determining Preemptive Rightholders which, if not otherwise specified in the Issuance Notice, shall be as of the date of the Issuance Notice (the "**Preemptive Offer Record Date**"), and the *pro rata* share of each of them. Each Preemptive Rightholder shall have five (5) Business Days from the date the Issuance Notice is sent (the "**Response Period**") to deliver notice (the "**Response Notice**") of its intention to purchase all or any portion of its *pro rata* share of the New Securities, based on the ratio of Common Units on a Fully Diluted Basis held by such Preemptive Rightholder on the Preemptive Offer Record Date to the number of Common Units on a Fully Diluted Basis held by all the Members on the Preemptive Offer Record Date, and stating therein the quantity of New Securities it intends to purchase (each Preemptive Rightholder who delivers a Response Notice hereunder is a "**Purchaser**" for purposes of this **Section 7.5**). Such Response Notice shall constitute the irrevocable agreement of such Purchaser to purchase the quantity of New Securities indicated in the Response Notice at the price and upon the terms stated in the Issuance Notice; provided, however, that if the Company is proposing to issue, sell or distribute securities for consideration other than all cash, and subject to the limitations on the rights set forth in this **Section 7.5**, the Company shall accept from such Purchaser the cash value of such non-cash consideration as agreed upon in good faith by such Purchaser and the Board (acting in accordance with **Section 5.2**). Any purchase of New Securities by a Purchaser pursuant to this **Section 7.5** shall be consummated concurrently with (and conditioned upon) the issuance of the other offered securities described in the applicable Issuance Notice.

31

(c)     Over-Allotment. In the event not all Preemptive Rightholders exercise their rights under this **Section 7.5** to purchase their full *pro rata* shares of the New Securities (determined in accordance with **Section 7.5(b)**), then no later than five (5) Business Days following the last day of the Response Period, the Company shall notify each Purchaser in writing (each, an "**Over-Allotment Notice**") of the number of New Securities which such Preemptive Rightholders did not exercise their right to purchase (the "**Over-Allotment Securities**"), and that such Purchaser may purchase its *pro rata* share (determined in accordance with **Section 7.5(b)**) of the Over-Allotment Securities by delivering a Response Notice to the Company within five (5) Business Days of its receipt of the Over-Allotment Notice (the "**Over-Allotment Period**"), stating its intention to purchase all or any portion of its *pro rata* share (determined in accordance with **Section 7.5(b)**) of the Over-Allotment Securities, and the quantity of Over-Allotment Securities it intends to purchase. Such Response Notice shall be treated in accordance with **Section 7.5(b)**.

(d)     Sale to Other Persons. The Company shall have sixty (60) days following the later of (x) the last day of the Response Period and (y) if applicable, the last day of the Over-Allotment Period to consummate an issuance, sale or distribution of any New Securities that the Preemptive Rightholders have not elected to purchase pursuant to **Section 7.5(b)** to other Persons at a price and on terms and conditions not less favorable to the Company than those contained in the Issuance Notice, on the condition that any Person purchasing New Securities pursuant to such offer must comply with **Sections 7.2** and **7.7**. In the event that the sale of New Securities is not fully consummated within such sixty (60)-day period, then the Company shall be obligated once again to offer the purchase rights set forth in this **Section 7.5** before it may subsequently sell such New Securities; <u>provided</u> that such period may be extended to one hundred twenty (120) days in order obtain regulatory approvals that would be required for such Person to acquire such New Securities.

(e)     Exempt Securities. Notwithstanding the foregoing provisions of this **Section 7.5**, Preemptive Rightholders shall not have the right to participate in the issuance of any New Securities (i) issued as consideration in any merger, consolidation or combination with or acquisition of securities or assets of another Person in exchange for New Securities, (ii) made upon exchange, conversion or exercise of any rights, convertible securities, options, warrants or other equity or debt securities to purchase Units or other equity interests of the Company, (iii) made by any Subsidiary of the Company to the Company or any of its direct or indirect wholly-owned Subsidiaries, (iv) that are the subject of a registration statement being filed under the Securities Act pursuant to an IPO, (v) to Managers, officers, employees, managers or consultants as compensation pursuant to any Equity Incentive Plans approved in accordance with **Section 5.1** or (vi) in connection with a stock split, *pro rata* stock dividend or other similar *pro rata* distribution of the Company (the New Securities described in the foregoing clauses (i) through (vi), "**Exempt Securities**").

(f)     Accelerated Buyers. Nothing in this **Section 7.5** shall prevent the Company or its Subsidiaries from issuing or selling to any Person (the "**Accelerated Buyer**") any New Securities without first complying with the provisions of this **Section 7.5**; <u>provided</u> that in connection with such issuance or sale (i) the Company gives reasonably prompt notice to the Preemptive Rightholders of such issuance (after such issuance has occurred), which notice shall describe in reasonable detail the New Securities purchased by the Accelerated Buyer and the purchase price thereof and (ii) the Accelerated Buyer and the Company enable the Preemptive Rightholders to effectively exercise their respective rights under this **Section 7.5** with respect to their purchase of

32

their *pro rata* share (determined in accordance with **Section 7.5(b)**) of the total of the New Securities issued to the Accelerated Buyer and to be issued to all Preemptive Rightholders. Such rights must be exercised by Preemptive Rightholders within fifteen (15) Business Days after receipt of the notice by the Preemptive Rightholder of such issuance to the Accelerated Buyer on the terms specified in this **Section 7.5**. The Preemptive Offer Record Date for such issuance shall be the date such New Securities are issued to the Accelerated Buyer.

(g)      Invalid Transfers. Notwithstanding the foregoing, and without limiting any other right or remedy that may be available to the Company, the Board may deny any right contemplated by this **Section 7.5** to any Person that is a Transferee or purported Transferee of any securities of the Company in violation of **Section 7.2**.

(h)      Assignment.  The rights granted to each Preemptive Rightholder pursuant to this **Section 7.5** may be assigned by such Preemptive Rightholder to any of its Affiliates or Related Funds.

Section 7.6.      **All Other Transfers Void**.  Any Transfer or purported Transfer in violation of the provisions of this **Article VII** shall be null and void *ab initio*, shall be of no force or effect and shall constitute a material breach of this Agreement.

Section 7.7.      **Admission of Substitute Member; Liabilities**.

(a)      After the consummation of any Transfer of any Units or Unit Equivalents in compliance with the requirements of this **Article VII**, the assignee of Units or Unit Equivalents so transferred (a "**Substitute Member**") shall be required to comply with all of the terms and provisions of this Agreement. An assignee of Units or Unit Equivalents will be admitted as a Substitute Member only if (i) the Transfer of such Units or Unit Equivalents complies in all respects with this **Article VII** and (ii) the prospective Substitute Member delivers a signed Joinder Agreement pursuant to **Section 3.2(b)**. Unless otherwise agreed to by the Board, the admission of a Substitute Member shall not release the transferring Member from any liability to the Company or to the other Members in respect of its Units or Unit Equivalents that may have existed prior to such admission.

(b)      No Transfer of all or any other quantity of Units or Unit Equivalents shall be effective until the date upon which the applicable requirements of this **Article VII** have been met. Any Substitute Member shall take such Units or Unit Equivalents subject to the restrictions on Transfer imposed by this Agreement.

(c)      The Company shall reflect, or shall cause its transfer agent to reflect, the admission of such Substitute Member in the records of the Company (including the Member Registry pursuant to **Section 3.2(b)**) as soon as possible after satisfaction of the conditions set forth in this Agreement.

Section 7.8.      **Transfers Among Members**.  Each Member acknowledges and agrees, with respect to any Transfer by, with, to or from any Member with a right to designate a Manager pursuant to **Section 5.1(b)** or the right to appoint an Observer pursuant to **Section 5.1(h)** (any such Member, a "**Counterparty**") that (a) no Counterparty has made any representation or warranty,

33

express or implied, regarding the Company or any of its Subsidiaries or the Units or Unit Equivalents, and any such purported representations or warranties are expressly disclaimed and waived and such Member has not relied upon and expressly disclaims reliance upon any such purported representations or warranties; and (b) a Counterparty may have, or may come into possession of, information with respect to the Units or Unit Equivalents, the Company or its Subsidiaries that may constitute material non-public information or information that is not known to other Members and that may be material to a decision to the purchase or sale of Units or Unit Equivalents by or with such Counterparty ("**Counterparty Excluded Information**").   In connection with any such purchase or sale of Units or Unit Equivalents by, with, to or from a Counterparty, such Counterparty may, in its sole discretion, disclose any or all Counterparty Excluded Information in such Counterparty's possession to the applicable Member purchasing or selling Units or Unit Equivalents, including any Tag-Along Seller, which Counterparty Excluded Information shall be subject to the terms of **Section 10.15**.   Within three (3) Business Days of receiving such Counterparty Excluded Information, the applicable Member, including any applicable Tag-Along Seller, may revoke its purchase or sale, including its Tag-Along Rightholder's Offer.

## ARTICLE VIII

## REPRESENTATIONS AND WARRANTIES

Section 8.1.    **Representations and Warranties of Each Party**.  Except as otherwise specified below, each of the parties to this Agreement, severally and not jointly and severally, represents and warrants to each of the other parties to this Agreement as follows:

(a)    Due Organization and Good Standing. If the party is the Company or a Member that is a corporation, limited liability company, partnership or other entity, it is duly incorporated or organized, validly existing and in good standing (to the extent that its jurisdiction of organization recognizes the concept of good standing) under the laws of its jurisdiction of incorporation or organization. If the Member is an individual, the Member is of legal age to execute, deliver and perform this Agreement and is legally competent to do so.

(b)    Authority Relative to This Agreement. It has all necessary power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution and delivery of this Agreement by it has been duly and validly authorized by all requisite action, and no other proceedings on its part are necessary to authorize this Agreement. This Agreement has been duly and validly executed and delivered by it and, assuming the due authorization, execution and delivery by the other parties to this Agreement, constitutes a legal, valid and binding obligation of it, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles. It has not granted nor is it a party to any proxy, voting trust or other agreement that is inconsistent with, conflicts with or violates any provision of this Agreement.

(c)    No Conflict. The execution, delivery and performance by it of this Agreement do not and shall not violate any applicable law or conflict with or constitute a default, breach or violation of (with or without notice or lapse of time, or both) the terms, conditions or provisions

of any contract, agreement or instrument to which it is subject, which would prevent it from performing any of its obligations hereunder or thereunder.

## ARTICLE IX

## DISSOLUTION AND LIQUIDATION

Section 9.1.    **Events of Dissolution**.  The Company shall be dissolved and its affairs wound up only upon the occurrence of any of the following events (each, an "**Event of Dissolution**"):

(a)    the determination of the Board to dissolve the Company;

(b)    an election to dissolve the Company made by the Majority Vote of the Members in accordance with **Section 5.3(a)(iii)**; or

(c)    the entry of a decree of judicial dissolution under Section 18-802 of the Act.

Except as otherwise set forth in this **Section 9.2**, the Company is intended to have perpetual existence.  To the fullest extent permitted by law, any death, retirement, resignation, expulsion, bankruptcy or dissolution of a Member (or the occurrence of any other event that terminates the continued membership of a Member in the Company) shall not, in and of itself, cause a dissolution of the Company and the Company shall continue in existence subject to the terms and conditions of this Agreement.

Section 9.2.    **Liquidation; Winding Up**.    Upon the occurrence of an Event of Dissolution, the Board shall wind up the affairs of the Company in accordance with the Act and shall supervise the liquidation of the assets and property of the Company and, except as hereinafter provided, shall have full, complete and absolute discretion in the mode, method, manner and timing of effecting such liquidation. The Board shall have absolute discretion in determining whether to sell or otherwise dispose of Company assets or to distribute the same in kind. The Board shall liquidate and wind up the affairs of the Company as follows:

(a)    The Board shall prepare (or cause to be prepared) a balance sheet of the Company in accordance with GAAP as of the date of dissolution.

(b)    The assets, properties and business of the Company shall be liquidated by the Board in an orderly and businesslike manner. Notwithstanding the foregoing, if it is determined by the Board not to sell all or any portion of the properties and assets of the Company, such properties and assets shall be distributed in kind in the order of priority set forth in clause (c); provided, however, that the fair market value of such properties and assets (as determined by the Board in good faith, which determination shall be binding and conclusive) shall be used in determining the extent and amount of a distribution in kind of such properties and assets in lieu of actual cash proceeds of any sale or other disposition thereof

(c)    The proceeds of the sale of all or substantially all of the properties and assets of the Company and all other properties and assets of the Company not sold, as provided in clause (b)

above, and valued at the fair market value thereof as provided in such clause (b), shall be Distributed in one or more installments as follows, and in the following order of priority:

> (i)      First, to the payment of all debts and liabilities of the Company and the expenses of liquidation not otherwise adequately provided for and the setting up of any reserves that are reasonably necessary for any contingent, conditional or unmatured liabilities or obligations of the Company or of the Members arising out of, or in connection with, the Company; and

> (ii)     Second, the remaining proceeds shall be distributed in accordance with the Distribution priorities (and subject to the limitations) established in **Section 4.1(c)**.

(d)     A certificate of cancellation, as required by the Act, shall be filed by the Board.

Section 9.3.    **Survival of Rights, Duties and Obligations**.  Termination, dissolution, liquidation or winding up of the Company for any reason shall not release any Person from liability which at the time of such termination, dissolution, liquidation or winding up already had accrued to any other party or which thereafter may accrue with respect to any act or omission prior to such termination, dissolution, liquidation or winding up, or of any indemnity rights of Persons as against the Company.

Section 9.4.    **Claims of the Members**.  Members and former Members shall look solely to the Company's assets for all Distributions with respect to the Company, and if the assets of the Company remaining after payment of or due provision for all debts, liabilities and obligations of the Company are insufficient to make such Distributions, the Members and former Members shall have no recourse against the Company or any other Member.

## ARTICLE X

## MISCELLANEOUS

Section 10.1.    **Complete Agreement**.  This Agreement, the Certificate of Formation and the other agreements expressly referenced in this Agreement constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter hereof. This Agreement supersedes all prior written and oral statements by and among the Members or any of them, and except as otherwise specifically contemplated by this Agreement, no representation, statement, or condition or warranty not contained in this Agreement will be binding on the Members or the Company or have any force or effect whatsoever.

Section 10.2.    **Other Actions**. The Company by its execution hereof acknowledges that it has actual notice of the terms of this Agreement, consents hereto and hereby covenants with each of the Members that it will at all times during the term of this Agreement be governed by the terms and provisions hereof in carrying out its business and affairs and, accordingly, shall give or cause to be given such notices, execute or cause to be executed such documents, and do or cause to be done all such acts, matters and things as may from time to time be necessary or required to carry out the terms and intent hereof.

36

Section 10.3.    **Governing Law**.  This Agreement and the rights of the parties hereunder will be governed by, interpreted and enforced in accordance with the laws of the State of Delaware, without reference to conflicts of law principles.

Section 10.4.    **No Assignment**.  Except as otherwise expressly set forth herein, no party hereto may assign any of its respective rights or delegate any of its respective obligations under this Agreement, and any attempted assignment or delegation in violation of the foregoing shall be null and void. Notwithstanding the foregoing, any Person that acquires Units or Unit Equivalents pursuant to a Transfer made in accordance with **Article VII** shall be entitled to rights under and be bound by this Agreement as if an original party hereto except as otherwise set forth herein.

Section 10.5.    **Binding Effect**.  Subject to the provisions of this Agreement relating to transferability or assignment, this Agreement will be binding upon and inure to the benefit of the Company and each of the Members, and their respective heirs, devisees, spouses, distributees, representatives, successors and permitted assigns.

Section 10.6.    **Severability**.  If any provision of this Agreement is held to be illegal, invalid or unenforceable under any present or future laws applicable to the Company effective during the term of this Agreement, such provision will be fully severable; this Agreement will be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part of this Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement.

Section 10.7.    **No Partition**.  The parties acknowledge that the assets and properties of the Company are not and will not be suitable for partition. Thus, each Member (on behalf of such Member and their successors and assigns) hereby irrevocably waives any and all rights that such Member may have to maintain any action for partition of such assets and properties, if any.

Section 10.8.    **Additional Documents and Acts**.  Each party hereto agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be reasonably necessary or appropriate to effectuate, carry out, and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

Section 10.9.    **No Employment Rights**.  Nothing in this Agreement shall confer upon any Person any right to be employed or to continued employment by the Company or any of its Affiliates, or interfere in any manner with any right of the Company or any of its Affiliates to terminate such employment at any time.

Section 10.10.    **Amendments; Termination of Equity Rights**.  All amendments to this Agreement must be in writing and approved by Supermajority Vote of the Members; <u>provided</u> that (a) any amendments that materially and disproportionately adversely affect the rights or obligations of a Member under this Agreement relative to the rights of another Member under this Agreement must be approved by such adversely affected Member, (b) any amendment to **Section 5.1(b)** or this **Section 10.10** must be approved by all Members adversely affected by such amendment, (c) any amendment to the (x) definition of "Majority Vote" or "Supermajority Vote", (y) the percentage thresholds set forth in **Section 5.1(h)**, or (z) any amendment to **Section 5.2(f)**,

**Section 5.3(a)**, **Section 5.3(b)** or **Article VII**, in each case must be approved by Members holding at least seventy-five percent (75%) of the Common Units outstanding (and, in the case of the foregoing clause (y), any Member directly and adversely affected thereby); and (d) this proviso shall not apply to any amendment that (x) corrects clerical errors or (y) reflects the grant of rights associated with new equity interests otherwise issued in compliance with this Agreement and the Organizational Documents that do not discriminate among the existing Members. The Company shall give each Member prompt notice of any amendment to this Agreement.

Section 10.11.   **No Waiver**.  No delay, failure or waiver by any party to exercise any right or remedy under this Agreement, and no partial or single exercise of any such right or remedy, will operate to limit, preclude, cancel, waive or otherwise affect such right or remedy, nor will any single or partial exercise of such right or remedy limit, preclude, impair or waive any further exercise of such right or remedy or the exercise of any other right or remedy.

Section 10.12.   **Notices**.   Except as otherwise provided elsewhere in this Agreement regarding notices by electronic mail or other electronic means to Members and the Board and regarding proxies, all notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall in all cases be delivered by email (with read receipt or other written confirmation received, in which case such notice shall be deemed received on the date such email was sent), but may, as a second method of delivery, also be delivered (a) by personal delivery, (b) by a nationally recognized overnight courier service or (c) by deposit in the U.S. Mail, postage prepaid, registered or certified mail, return receipt requested, to the Company at its principal executive office and to any Member at the address then shown as the current address of such Member specified on the Member Registry or on such Member's signature page hereto. All notices delivered by email shall be confirmed by the recipient by a non-automated email response within two (2) Business Days of receipt. Any party may, at any time by giving five (5) calendar days' prior written notice to the Company, specify a different address (physical or electronic) for notice purposes by sending notice thereof in the foregoing manner. Any notice required to be given by the Company to Members may be given by posting to a Secure Site and shall be deemed to be delivered on the date such posting is made.

Section 10.13.   **Consent to Jurisdiction; WAIVER OF JURY TRIAL**.

(a)   Consent to Jurisdiction. The Company and each Member (i) irrevocably submits to the exclusive jurisdiction of any state court in the State of Delaware, and the United States District Court for the District of Delaware (and the appropriate appellate courts), for the purposes of any suit, action or other proceeding arising out of this Agreement and (ii) agrees to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in any state court in the State of Delaware. Notwithstanding the foregoing, any party hereto may commence an action, suit or proceeding with any governmental body anywhere in the world for the sole purpose of seeking recognition and enforcement of a judgment of any court referred to in the first sentence of this **Section 10.13(a)**. The Company and each Member further (x) agree that service of any process, summons, notice or document by U.S. registered mail to such party's respective address set forth on the Member Registry (or, in the case of the Company, at the Company's Principal Office) shall be effective service of process for any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction in this **Section**

38

**10.13(a)** and (y) irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement in (A) any state court in the State of Delaware, or (B) the United States District Court for the District of Delaware, and hereby further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(b)　　WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 10.14.　**No Third-Party Beneficiary**. Except as provided in **Section 5.9**, **Section 5.10** and **Section 5.11**, which shall be for the benefit of and enforceable by the Protected Persons, the Indemnitees and the Fund Indemnitors as described therein, this Agreement is made solely and specifically among and for the benefit of the parties hereto (including each Member), and their respective successors and permitted assigns, and no other Person will have any rights, interest or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third-party beneficiary or otherwise.

Section 10.15.　**Confidentiality**.

(a)　　The terms of this Agreement, the identity of any Person with whom the Company may be holding discussions with respect to any investment, acquisition, disposition or other transaction, any information disclosed to or received by any Member pursuant to **Section 6.1** or **Annex I** and all other business, financial or other information relating directly to the conduct of the business and affairs of the Company or its Subsidiaries or the relative or absolute rights or interests of any of the Members (collectively, the "**Confidential Information**") that has not been publicly disclosed pursuant to authorization by the Board is confidential and proprietary information of the Company, the disclosure of which would cause irreparable harm to the Company and the Members. Accordingly, each Member represents that it has not and agrees that it will not, and will direct its shareholders, partners, stockholders, directors, officers, agents, advisors, Affiliates and Related Funds not to, disclose to any Person any Confidential Information or confirm any statement made by third parties regarding Confidential Information until the Company has publicly disclosed the Confidential Information pursuant to authorization by the Board; provided, however, that any Member (or its Affiliates or Related Funds) may disclose such Confidential Information: (i) to the extent required by law (it being specifically understood and agreed that anything required to be set forth in a registration statement or any other document required to be filed pursuant to law will be deemed required by law, so long as the requirement to

39

file such registration statement does not arise primarily in connection with a Transfer of securities of the Company), regulation or the listing standards of any national securities exchange, (ii) to the extent that the Confidential Information is publicly known or subsequently becomes publicly known other than through a breach of this **Section 10.15(a)** by such Member, (iii) to the extent that the Confidential Information is already in possession of, or is subsequently received by, a Member from a third party not known by the Member after due inquiry to be subject to an obligation of confidentiality owed to the Company, (iv) to a prospective Transferee that (x) is not associated with any Competitor and (y) has entered into reasonable confidentiality arrangements enforceable by the Company as described in **Section 6.1(a)**, subject to the terms and conditions of such arrangements, (v) to any Person in connection with a potential Company Sale involving such Person; <u>provided</u>, that such Person has an obligation to the Company to keep such Confidential Information confidential; or (vi) to the extent related to the tax treatment and tax structure of the transactions contemplated by this Agreement (including all materials of any kind, such as opinions or other tax analyses that the Company, its Affiliates or its Representatives have provided to such Member relating to such tax treatment and tax structure); <u>provided</u> that the foregoing does not constitute an authorization to disclose the identity of any existing or future party to the transactions contemplated by this Agreement or their Affiliates or Representatives, or, except to the extent relating to such tax structure or tax treatment, any specific pricing terms or commercial or financial information.

(b)      Each Member hereby consents in advance to any motion for any protective order brought by the Company or any other Member represented as being intended by the movant to implement the purposes of this **Section 10.15**; <u>provided</u> that, if a Member receives a request to disclose any Confidential Information under the terms of a valid and effective order issued by a court or governmental agency and the order was not sought by or on behalf of or consented to by such Member, then such Member may disclose the Confidential Information to the extent required if the Member, as promptly as practicable, (i) notifies the Company of the existence, terms and circumstances of the order, (ii) consults in good faith with the Company on the advisability of taking legally available steps to resist or to narrow the order and cooperates with the reasonable requests of the Company, at the Company's sole cost and expense, in connection with the foregoing, and (iii) if disclosure of the Confidential Information is required, exercises its commercially reasonable efforts to obtain a protective order or other reliable assurance that confidential treatment will be accorded to the portion of the disclosed Confidential Information that the Company designates. The cost (including attorneys' fees and expenses) of obtaining a protective order covering Confidential Information designated by the Company will be borne by the Company.

(c)      The covenants contained in this **Section 10.15** will survive the Transfer of the Units of any Member and the termination of this Agreement.

Section 10.16.    **Cumulative Remedies; Specific Performance**.

(a)      The rights and remedies of any party hereto as set forth in this Agreement are not exclusive and are in addition to any other rights and remedies now or hereafter provided by law or at equity.

(b)     The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that, in addition to any other rights and remedies at law or in equity existing in its favor, any party hereto shall be entitled to specific performance and/or other injunctive relief from any court of law or equity of competent jurisdiction (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement.

Section 10.17.   **Exhibits and Schedules**.  All Exhibits and Schedules attached hereto are hereby incorporated by reference into, and made a part of, this Agreement.

Section 10.18.   **Interpretation**.   The titles and section headings set forth in this Agreement are for convenience only and shall not be considered as part of the agreement of the parties hereto. When the context requires, the plural shall include the singular and the singular the plural, and any gender shall include all other genders or neuter. The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation". No provision of this Agreement shall be interpreted or construed against any party because such party or its counsel was the drafter thereof. Any reference to the Act or other statutes or laws will include all amendments, modifications or replacements of the specific sections and provisions concerned. Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

Section 10.19.   **Termination**.  This Agreement will be automatically effective as of the Effective Date and will continue in effect thereafter until the earlier to occur of (a) its termination by the written agreement of the parties hereto (other than the Company) or their respective successors in interest, (b) its termination by the unanimous written consent of all Members of the Company, and (c) the dissolution, liquidation or winding-up of the Company in accordance with **Article IX**. This **Article X** shall survive any termination of this Agreement.  Notwithstanding anything set forth herein, the provisions of **Sections 5.1, 5.3, and 6.1** and **Article VII** shall automatically terminate and be of no further effect upon the consummation of an IPO.

Section 10.20.   **Counterparts**.  This Agreement may be executed in two (2) or more counterparts (including Joinder Agreements as counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and all signatures need not appear on any one counterpart. Any counterpart or other signature hereupon delivered by email attachment shall be deemed for all purposes as constituting good and valid execution and delivery of this Agreement by such party. The failure of any party to execute this Agreement does not make it invalid against any other party.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the Effective Date.

COMPANY:

**SMI TOPCO HOLDINGS, LLC**

By: _____
    Name:
    Title:

**EXHIBIT A**

**DEFINITIONS**

As used in this Agreement, the following terms will have the following meanings, and all section references shall be to sections in this Agreement unless otherwise provided:

"**Accelerated Buyer**" has the meaning set forth in **Section 7.5(f)**.

"**Act**" means the Delaware Limited Liability Company Act, Title 6 of the Delaware Code, Section 18-101, *et seq*., as amended from time to time.

"**Affiliate(s)**" means any individual, partnership, corporation, trust or other entity or association, directly or indirectly, through one (1) or more intermediaries, controlling, controlled by, or under common control with a Person. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation or limited liability company, the right to exercise, directly or indirectly, twenty percent (20%) or more of the voting rights attributable to the controlled corporation or limited liability company, and, with respect to any individual, partnership, trust, other entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled entity. With respect to any Person who is a general partner of a Person, such general partner is an Affiliate of such Person. With respect to a trust, any Affiliate shall include any Person that is a trustee or lifetime beneficiary of such trust.  For the avoidance of doubt, for so long as GLAS Americas LLC (or any successor or replacement escrow agent) holds any Common Units in escrow for the benefit of SMI Topco, LP (or an Affiliate or Related Fund), such escrow agent shall, solely with respect to such Common Units, be deemed an Affiliate of SMI Topco, LP (or its applicable Affiliate or Related Fund), and such Common Units shall be deemed owned or held by SMI Topco, LP (or its applicable Affiliate or Related Fund).

"**Affiliate Transfer**" means, (i) with respect to a Member that is not a natural person, a Transfer of Units or Unit Equivalents from a Member to its members (if the Member is a limited liability company), to its partners (if the Member is a general or limited partnership), to its shareholders (if the Member is a corporation) or by way of a distribution or to its beneficiaries (if the Member is a trust) or a Transfer of Units or Unit Equivalents to an Affiliate or Related Fund of the transferring Member or (ii) with respect to a Member that is a natural person, Transfers to such Member's legatees or heirs, following the death of such Member, and Transfers to a family member or to a trust primarily for such Member's benefit or the benefit of its family members.

"**Agreement**" has the meaning set forth in the preamble.

"**ALCM Member**" means [ARBOUR], or a Related Fund designated by Arbour Lane Capital Management, L.P.

"**Approved Sale**" has the meaning set forth in **Section 7.4(a)**.

"**Assistant Secretaries**" has the meaning set forth in **Section 5.8(i)**.

"**Assistant Treasurers**" has the meaning set forth in **Section 5.8(i)**.

1" = "1" "US 174882469v8" "" US 174882469v8
4886-0215-6178v.1

"**Bankruptcy**" means, in respect of any Person, (i) the filing by such Person of a voluntary petition seeking liquidation, reorganization or arrangement, in any form, of its debts under Title 11 of the United States Code or under any other Federal, state, or foreign bankruptcy or insolvency law, or such Person's filing an answer consenting to or acquiescing in any such petition; (ii) the making by such Person of any general assignment for the benefit of its creditors; or (iii) the expiration of sixty (60) days after the filing of (a) an involuntary petition under Title 11 of the United States Code against such Person, (b) an application for the appointment of a receiver for such Person or for assets of such Person, or (c) an involuntary petition or other pleading seeking liquidation, reorganization or arrangement, in any form, of such Person's debts under any other Federal, state, or foreign bankruptcy or insolvency law; <u>provided</u> that the same shall not have been vacated, set aside or stayed within such sixty (60)-day period.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Board**" has the meaning set forth in **Section 5.1(a)**.

"**Business Day**" means any day other than a Saturday, Sunday or date on which commercial banks in the State of New York are authorized or required by law to close for business.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents of any property contributed to the Company by such Member.

"**CEO Manager**" has the meaning set forth in **Section 5.1(b)(i)**.

"**Cerberus Member**" means [CERBERUS], or a Related Fund designated by Cerberus Capital Management.

"**Certificate of Formation**" has the meaning set forth in the recitals.

"**Chief Executive Officer**" has the meaning set forth in **Section 5.8(c)**.

"**Chief Financial Officer**" has the meaning set forth in **Section 5.8(d)**.

"**Chief Operating Officer**" has the meaning set forth in **Section 5.8(e)**.

"**Code**" has the meaning set forth in **Section 6.5(b)**.

"**Common Units**" means the Units designated as "Common Units" pursuant to **Section 2.2** and having the privileges, preferences, duties, liabilities, obligations, and rights specified with respect to "Common Units" in this Agreement.

"**Company**" has the meaning set forth in the preamble.

"**Company Investments**" has the meaning set forth in **Section 5.7(a)**.

"**Company Notice**" has the meaning set forth in **Section 7.4(a)**.

A-2

"**Company Sale**" means the occurrence of any of the following: (a) the direct or indirect sale, lease, transfer, conveyance or other disposition, in one or a series of related transactions (including any merger or consolidation, whether by operation of law or otherwise), of all or substantially all of the properties or assets of the Company and its Subsidiaries (as defined herein) taken as a whole to any Person (or "group", within the meaning of the regulations promulgated by the Commission under Section 13(d) of the Exchange Act), (b) the consummation of any transaction (including any merger or consolidation, whether by operation of law or otherwise), the result of which is that any one Person (or a "group", within the meaning of the regulations promulgated by the Commission under Section 13(d) of the Exchange Act), becomes the beneficial owner, directly or indirectly, of all of the then-outstanding Common Units or (c) the consummation of any transaction (including any merger or consolidation, whether by operation of law or otherwise), the result of which is that less than fifty percent (50%) of the combined voting power of the voting securities of the Company or any surviving entity of any such transaction is held by the Members immediately prior to such transaction.

"**Competitor**" means (x) any Person who competes with the Company or any of its Subsidiaries as determined by the Board in good faith (which shall include the approval of a Majority of disinterested Managers) and (y) any Person who is known by the Board to directly or indirectly own (other than as a passive investor) more than ten percent (10%) of the equity securities of a Person described in the foregoing clause (x).

"**Confidential Board Information**" has the meaning set forth in **Section 5.1(h)**.

"**Confidential Information**" has the meaning set forth in **Section 10.15(a)**.

"**Counterparty**" has the meaning set forth in **Section 7.8**.

"**Counterparty Excluded Information**" has the meaning set forth in **Section 7.8**.

"**CSAM Member**" means [CSAM], or a Related Fund designated by Credit Suisse Asset Management, LLC.

"**Damages**" has the meaning set forth in **Section 5.11(a)**.

"**Disinterested Manager**" means, with respect to any Related Party Transaction, each member of the Board then in office, other than any of the following: (a) with respect to any Related Party Transaction in which ALCM has a direct or indirect material financial interest, each Manager designated by ALCM pursuant to **Section 5.1(b)(ii)**, (b) with respect to any Related Party Transaction in which CSAM has a direct or indirect material financial interest, the Manager designated by CSAM pursuant to **Section 5.1(b)(iii)**, and (c) with respect to any Related Party Transaction in which one or more individual Managers has a direct or indirect material financial interest, each such Manager; provided, that no Person shall be deemed to have a direct or indirect material financial interest by reason of such Person or an Affiliate of such Person holding Units or Unit Equivalents or being a lender to the Company or any Subsidiary of the Company.

"**Distribution**" means a distribution made by the Company to a Member, whether in cash, property, or securities of the Company and whether by liquidating distribution or otherwise; provided, that

A-3

none of the following shall be a Distribution: (a) any redemption or repurchase by the Company or any Member of any Units or Unit Equivalents; (b) any recapitalization or exchange of securities of the Company; (c) any subdivision (by a split of Units or otherwise) or any combination (by a reverse split of Units or otherwise) of any outstanding Units; or (d) any fees or remuneration paid to any Member in such Member's capacity as a service provider for the Company or any of its Subsidiaries. "Distribute" when used as a verb shall have a correlative meaning.

"**Drag-Along Record Date**" has the meaning set forth in **Section 7.4(a)**.

"**Drag-Along Right**" has the meaning set forth in **Section 7.4(a)**.

"**Drag-Along Sale**" has the meaning set forth in **Section 7.4(a)**.

"**Drag-Along Seller**" has the meaning set forth in **Section 7.4(b)**.

"**Dragging Member**" has the meaning set forth in **Section 7.4(a)**.

"**Effective Date**" has the meaning set forth in the preamble.

"**Equity Incentive Plan**" means any equity incentive plan for officers, employees, managers or directors of the Company or its Subsidiaries.

"**Event of Dissolution**" has the meaning set forth in **Section 9.1**.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

"**Exempt Securities**" has the meaning set forth in **Section 7.5(e)**.

"**Exempted Persons**" has the meaning set forth in **Section 5.7(c)**.

"**Fully Diluted Basis**" means, with respect to any determination or calculation of ownership of any class of Units of any Member hereunder, such Member's ownership of such Units assuming the full conversion, exchange and/or exercise, as applicable, of all Unit Equivalents of the Company convertible, exchangeable, or exercisable into a Unit of the Company, or class thereof, inclusive of any vested and unrestricted Units or Unit Equivalents under any Equity Incentive Plans, but excluding debt securities convertible into Units or Unit Equivalents.

"**Fund Indemnitee**" has the meaning set forth in **Section 5.11(c)**.

"**Fund Indemnitor**" has the meaning set forth in **Section 5.11(c)**.

"**GAAP**" means the generally accepted accounting principles as in effect from time to time in the U.S.

"**HPS Member**" means [HPS], or a Related Fund designated by HPS Investment Partners, LLC.

"**Incentive Securities**" has the meaning set forth in **Section 2.2**.

"**Indemnitee**" has the meaning set forth in **Section 5.11(a)**.

<div align="center">A-4</div>

"**Independent Manager**" means an individual (a) who is suitably qualified to make a contribution to the deliberative competence of the Board; (b) is independent from any Member that owns greater than one percent (1%) of the outstanding Common Units; (c) is neither (i) an employee or officer of the Company or its Subsidiaries or (ii) a partner, equityholder, officer, director, manager, employee or agent of any Affiliate of the Company or its Subsidiaries; and (d) in the good faith determination of the other members of the Board, otherwise has no relationship that would interfere with the exercise of such individual's exercise of independent judgment in carrying out director responsibilities.

"**IPO**" means the first public underwritten offering of equity securities of the Company (or a direct or indirect parent holding company or Subsidiary) pursuant to an effective registration statement under the Securities Act (other than on Forms S-4, S-8 or successor to such forms) marketed by a nationally recognized investment bank after the Effective Date of which such equity securities are listed on a national securities exchange.

"**Issuance Notice**" has the meaning set forth in **Section 7.5(b)**.

"**Joinder Agreement**" means an agreement substantially in the form attached hereto as **Exhibit C**, permitting a Person to become a party to this Agreement.

"**Loan Documents**" means (a) the Term Loan Agreement, (b) any promissory note payable to a term lender under the Term Loan Agreement evidencing the indebtedness owing to such term lender thereunder, (c) any guaranty executed by any of the guarantors pursuant to the Term Loan Agreement, (d) the collateral documents delivered pursuant to the Term Loan Agreement, (e) any permitted intercreditor agreements under the Term Loan Agreement, (f) any extension amendments entered into pursuant to Section 2.18 of the Term Loan Agreement, (g) any joinder agreement entered into pursuant to Section 2.15 or 2.16 of the Term Loan Agreement, and (h) the fee letter entered into between Strategic Materials Holding Corp., on the one hand, and Acquiom Agency Services LLC and Seaport Loan Products LLC, on the other, in their capacity as co-administrative agents under the Term Loan Agreement, relating to the administrative and collateral agent services to be under the Term Loan Agreement.

"**Majority**" means greater than fifty percent (50%) (subject, in the case of voting, to any applicable adjustments or limitations on voting as set forth in this Agreement).

"**Majority Vote**" of any group of Members means the affirmative vote or written consent of the holders of a Majority of the outstanding Common Units (but not Unit Equivalents) held by such Members.

"**Manager**" has the meaning set forth in **Section 5.1(a)**.

"**Member Registry**" means the register of the Company, as initially set forth in **Exhibit B**, indicating: (a) with respect to each issuance of Units or Unit Equivalents, the date of such issuance, the number of Units or Unit Equivalents issued and the Member to whom such Units or Unit Equivalents were issued and (b) with respect to each Permitted Transfer of Units or Unit Equivalents, the date of such Transfer, the number of Units or Unit Equivalents Transferred and the identity of each transferor of such Units or Unit Equivalents and the Transferee(s) thereof.

"**Members**" has the meaning given in the preamble.

"**New Securities**" means any Common Units, Unit Equivalents, Subsidiary Securities or other equity securities issued by the Company or any of its Subsidiaries subsequent to the Effective Date, whether or not authorized as of the Effective Date.

"**Observer**" has the meaning set forth in **Section 5.1(h)**.

"**Over-Allotment Notice**" has the meaning set forth in **Section 7.5(c)**.

"**Over-Allotment Period**" has the meaning set forth in **Section 7.5(c)**.

"**Permitted Transfer**" has the meaning set forth in **Section 7.1**.

"**Person**" means an individual, partnership, limited liability company, corporation, joint venture, trust, business trust, association, or similar entity, whether domestic or foreign, and the heirs, executors, legal representatives, successors and assigns of such entity where the context requires.

"**Plan**" has the meaning set forth in the recitals.

"**Preemptive Offer Record Date**" has the meaning set forth in **Section 7.5(b)**.

"**Preemptive Rightholder**" has the meaning set forth in **Section 7.5(a)**.

"**Predecessor Entity**" has the meaning set forth in the recitals.

"**Principal Office**" has the meaning set forth in **Section 1.5**.

"**Prohibited Person**" means (a) any Person appearing on the Specially Designated Nationals and Blocked Persons List of the Office of Foreign Assets Control in the United States Department of the Treasury; (b) any other Person with whom a transaction is prohibited by Executive Order 13224, the USA PATRIOT Act, the Trading with the Enemy Act or the foreign asset control regulations of the United States Treasury Department, in each case as amended from time to time; (c) any other Person whom the Board (acting reasonably and in good faith and the determination of which includes a Majority of the disinterested Managers) considers would create a material reputational risk for the Company; or (d) any other Person that is a Competitor.

"**Protected Person**" has the meaning set forth in **Section 5.10**.

"**Purchaser**" has the meaning set forth in **Section 7.5(b)**.

"**Registration Rights Agreement**" means that certain Registration Rights Agreement, dated the date hereof, by and among the Company and the Members party thereto, as may be amended, restated, modified or supplemented from time to time.

"**Related Fund**" means with respect to any Person, any fund, account or investment vehicle that is controlled, managed, sub-managed, advised or sub-advised by (a) such Person, (b) an Affiliate of such Person or (c) the same investment manager, sub-investment manager, advisor or sub-

A-6

advisor as such Person or an Affiliate of such investment manager, sub-investment manager, advisor or sub-advisor.

"**Related Party Transaction**" has the meaning set forth in **Section 5.2(f)**.

"**Response Notice**" has the meaning set forth in **Section 7.5(b)**.

"**Response Period**" has the meaning set forth in **Section 7.5(b)**.

"**Rule 144**" has the meaning set forth in **Section 2.4(c)**.

"**SEC**" means the Securities and Exchange Commission and any governmental body or agency succeeding to the functions thereof.

"**Secretary**" has the meaning set forth in **Section 5.8(g)**.

"**Section 1123(a)(6)**" has the meaning set forth in **Section 2.5**.

"**Secure Site**" has the meaning set forth in **Section 6.1(a)**.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Staggered Transfer**" has the meaning set forth in **Section 7.3(a)**.

"**Subsidiary**" means any Person, the majority of the equity of which, directly, or indirectly through one or more other Persons, (a) the Company has the right to acquire or (b) is owned or controlled by the Company. As used in this definition, "control", including its correlative meanings, "controlled by" and "under common control with", means possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of equity, by contract or otherwise). For the avoidance of doubt, "Subsidiary" shall include any Person that is included in the Company's consolidated group for purposes of preparing the Company's consolidated financial statements in accordance with GAAP.

"**Subsidiary Securities**" means any equity securities of any direct or indirect Subsidiary of the Company, and any direct or indirect options, rights, warrants or equity securities convertible into, or exercisable or exchangeable for, equity securities of any direct or indirect Subsidiary of the Company.

"**Substitute Member**" has the meaning set forth in **Section 7.7(a)**.

"**Supermajority Vote**" of any group of Members means the affirmative vote or written consent of the holders of at least fifty-five percent (55%) of the Common Units held by such Members.

"**Tag-Along Notice**" has the meaning set forth in **Section 7.3(b)**.

"**Tag-Along Offered Units**" has the meaning set forth in **Section 7.3(b)**.

"**Tag-Along Purchaser**" has the meaning set forth in **Section 7.3(b)**.

"**Tag-Along Record Date**" has the meaning set forth in **Section 7.3(b)**.

"**Tag-Along Rightholder**" has the meaning set forth in **Section 7.3(a)**.

"**Tag-Along Rightholder's Offer**" has the meaning set forth in **Section 7.3(b)**.

"**Tag-Along Sale**" has the meaning set forth in **Section 7.3(a)**.

"**Tag-Along Seller**" has the meaning set forth in **Section 7.3(a)**.

"**Tag-Along Threshold**" has the meaning set forth in **Section 7.3(a)**.

"**Tax Information Reporting Obligations**" has the meaning set forth in **Section 6.5(b)**.

"**Term Loan Agreement**" means that certain Term Loan Credit Agreement, dated as of the Effective Date, among Strategic Materials Holding Corp., a Delaware corporation, as borrower, SMI Group Acquisitions, Inc., a Delaware corporation, the lenders from time to time party thereto and Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents.

"**Transfer**" means the sale, sale of any option or contract to purchase, purchase of any option or contract to sell, grant of any option, right or warrant to purchase, assignment, loan, offer, transfer, exchange or other disposition of any Units or Unit Equivalents, whether or not for value, and whether voluntarily, by operation of law or otherwise, and includes foreclosure.

"**Transferee**" has the meaning set forth in **Section 7.2(b)**.

"**Treasurer**" has the meaning set forth in **Section 5.8(h)**.

"**Unaffiliated Third-Party Purchaser**" means a third-party purchaser that is not affiliated with any of the Company or any of the Members holding, together with its Affiliates and Related Funds, five percent (5%) or more of the Common Units outstanding.

"**Unit**" means a unit representing a fractional part of the ownership interest of the Company and shall include all types and classes of Units, including the Common Units; provided, that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations, and rights set forth in this Agreement and the ownership interest represented by such type or class or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations, and rights.

"**Unit Equivalents**" means any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable, or exercisable for Units, and any option, warrant, or other right to subscribe for, purchase, or acquire Units.

"**U.S.**" means the United States of America.

"**Vice Presidents**" has the meaning set forth in **Section 5.8(f)**.

A-8

**EXHIBIT B**

**MEMBER REGISTRY**

[See attached.]

1" = "1" "US 174882469v5" "" US 174882469v5
1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

**EXHIBIT C**

**JOINDER AGREEMENT**

This Joinder Agreement (this "**Joinder**") is executed pursuant to the terms of the Limited Liability Company Agreement, dated as of [_____], 2023, by and among SMI Topco Holdings, LLC, a Delaware limited liability company (the "**Company**"), and the Member parties thereto, a copy of which is attached hereto (as it may be amended from time to time, the "**Agreement**"), by the undersigned executing this Joinder. Capitalized terms used and not defined herein shall have the meaning set forth in the Agreement.

By executing and delivering this Joinder to the Company, the undersigned hereby (a) agrees to become a party to, to be bound by, and to comply with all of the provisions, obligations and responsibilities of the Agreement in the same manner as if the undersigned were an original signatory to the Agreement; (b) agrees that the undersigned shall be a Member of the Company, as such term is defined in the Agreement; (c) represents and warrants to the Company that the undersigned is acquiring the Units solely for its own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof; and (d) acknowledges that the Units are not registered under the Securities Act of 1933, as amended, and that the Units may not be transferred or sold except pursuant to the registration provisions of the Securities Act of 1933, as amended, or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable.

Additionally, the undersigned agrees and acknowledges that the address provided on the signature page hereto shall be included as part of the current Member Registry (as defined in the Agreement) of the Agreement as if originally provided therein.

*[Signature page follows]*

1" = "1" "US 174882469v5" "" US 174882469v5
1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

IN WITNESS WHEREOF, the undersigned have duly executed this Joinder Agreement as of _____ ___, _____.

SMI TOPCO HOLDINGS, LLC

By: _____
Name:
Title:

MEMBER:

_____

MEMBER'S ADDRESS:

_____

_____

_____

_____

C-2

**ANNEX I**

**FORM OF**
**CONFIDENTIALITY AGREEMENT**

SMI Topco Holdings, LLC
[ADDRESS]

[INSERT DATE]

[INSERT NAME OF POTENTIAL TRANSFEREE]

[INSERT ADDRESS OF POTENTIAL TRANSFEREE]

Ladies and Gentlemen:

In connection with the consideration by [INSERT NAME OF POTENTIAL TRANSFEREE] ("**you**" or "**your**") of a potential investment in SMI Topco Holdings, LLC, a Delaware limited liability company (the "**Company**" and together with you, collectively, the "**Parties**" and each individually, a "**Party**"), or other securities of the Company (the "**Transaction**"), certain affiliates or members of the Company, the Company or their respective representatives have furnished or may furnish you and your Representatives (as hereinafter defined) with non-public information regarding the Company, including, without limitation, information concerning the Company's financial and operational performance, properties, prospects, activities and plans. You recognize and acknowledge that such information furnished or to be furnished to you and/or your Representatives in the future (whether oral or written) is proprietary to the Company and may include trade secrets or other highly confidential non-public business information the disclosure of which could harm the Company. In consideration for, and as a condition of, such non-public information being furnished to you (and your agents, representatives, attorneys, advisors, directors, officers, employees and affiliates, collectively, your "**Representatives**"), you agree to treat any and all information concerning the Company or any of its Subsidiaries that has been or is to be furnished to you or your Representatives (regardless of the manner in which it is furnished, including, without limitation, in written or electronic format or orally, gathered by visual inspection or otherwise) by or on behalf of the Company or any of its affiliates or members, together with any documents you create that contain or are based upon any such information, in whole or in part (collectively, "**Company Information**"), in accordance with the provisions of this letter agreement (this "**Agreement**").

The term "**Company Information**" does not include information that you can demonstrate: (i) is obtained by you or your Representatives from a third party, who, after reasonable inquiry, is not known by you to be bound by any duty of confidentiality to or confidential agreement with the Company or any other Person (as defined below) with respect to Company Information or is otherwise prohibited from transmitting the information to you by a contractual, legal, fiduciary or other obligation to the Company or any other Person; (ii) is or becomes part of the public domain (other than through a breach of this Agreement by you or any of your Representatives); (iii) is independently ascertained or developed by or for you or your Representatives or any third party without use of or reference to Company Information; or (iv) is approved for public release by

written authorization of the Company. For purposes of this Agreement, the term "**Person**" shall be broadly interpreted to include, without limitation, any individual, partnership, limited liability company, corporation, joint venture, trust, business trust, association or similar entity, whether domestic or foreign, and the heirs, executors, legal representatives, successors and assigns of such entity where the context requires.

1.      You hereby agree that you and your Representatives will, except to the extent required by applicable law or legal process, (a) keep the Company Information strictly confidential, (b) not disclose any of the Company Information in any manner whatsoever without the prior written consent of the Company and (c) not use the Company Information for any purpose other than considering and negotiating the Transaction; provided, however, that you may disclose any of such information to your Representatives (i) who need to know such information for the sole purpose of advising you with respect to the Transaction and (ii) who are informed by you of the confidential nature of such information; provided, further, that you will (x) be responsible for any violation of this Agreement by any of your Representatives as if they were parties hereto and (y) provide the Company with the names of any of your Representatives who receives Company Information. You agree to promptly notify the Company in writing of any unauthorized use or disclosure of the Company Information and such notice shall include a detailed description of the circumstances of the disclosure and the Persons involved.

2.      In the event that you or any of your Representatives are required by applicable law or legal process to disclose any of the Company Information, you will promptly notify (except where such notice would be legally prohibited) the Company in writing so that the Company may seek a protective order or other appropriate remedy and (except to the extent legally prohibited) will reasonably cooperate with the Company (at the Company's expense) to limit the disclosure to the greatest extent possible consistent with such applicable law or legal process, including, without limitation, in appropriate circumstances, seeking reliable assurances that confidential or "attorneys eyes only" treatment shall be accorded the Company Information. Any such Company Information that is (x) not required to be disclosed or (y) accorded confidential treatment shall continue to be Company Information to which this Agreement shall continue to apply. You acknowledge and agree that, for purposes of this Agreement, there shall be no "applicable law" requiring you to disclose any Company Information solely by virtue of the fact that, absent such disclosure, you would be prohibited from purchasing, selling, or engaging in derivative transactions with respect to, any securities of the Company or otherwise proposing or making an offer to do any of the foregoing.

3.      All Company Information shall remain the property of the Company. Neither you nor any of your Representatives shall by virtue of disclosure to you or any of your Representatives, or your or any of your Representative's use, of any Company Information acquire any rights with respect thereto, all of which rights (including, without limitation, all intellectual property rights) shall remain exclusively with the Company.

4.      If you determine that you do not wish to proceed with a Transaction, you will promptly advise the Company of that decision. As soon as possible upon the Company's written request, you and your Representatives shall destroy (or at the Company's option (in its sole discretion) return to the Company) all Company Information that has been disclosed to you or any of your

<div align="center">Annex I – Page 2</div>

Representatives, except for any such Company Information stored on electronic backup media to the extent that such information cannot be expunged without unreasonable effort. Upon returning or destroying such Company Information, you shall provide written notice to the Company certifying compliance with the foregoing sentence. Notwithstanding the provisions of this paragraph, you acknowledge and agree that this Agreement will continue to apply to any returned, held, retained or destroyed Company Information on the terms set forth herein.

5.     You acknowledge and agree that all Company Information is furnished on an "AS IS" basis, without warranty of any kind. THE COMPANY AND ITS AFFILIATES EXPRESSLY DISCLAIM ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, REGARDING THE COMPANY INFORMATION, INCLUDING, WITHOUT LIMITATION, ANY REPRESENTATION OR WARRANTY OF MERCHANTABILITY, TITLE, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE.

6.     You acknowledge that an award of money damages would be inadequate for any breach of this Agreement by you or any of your Representatives and would cause the Company irreparable harm. Therefore, you hereby agree that, in the event of any breach or threatened breach of this Agreement by you or any of your Representatives, the Company will be entitled to seek equitable relief, including, without limitation, injunctive relief and specific performance, as remedies for any such breach or threatened breach without the requirement of posting a bond or other security. Such remedies will not be the exclusive remedies for any breach of this Agreement, but will be in addition to all other remedies available at law or in equity to the Company.

7.     This Agreement or any provision hereof may not be amended, modified or waived by course of dealing, usage in trade, conduct or any exchanges of communication, including, without limitation, email or any other electronic or digital means, other than by amendment, in writing duly executed with the handwritten signatures of an authorized signatory of each of the Parties. The rights and remedies of the Parties are cumulative, and not alternative. Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement can be discharged by one Party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other Party; (b) no waiver that may be given by a Party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one Party will be deemed to be a waiver of any obligation of such Party or of the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

8.     This Agreement constitutes the complete agreement between the Parties concerning the subject matter hereof and supersedes and cancels any and all prior communications and agreements between the Parties with respect thereto. This Agreement relates only to the subject matter hereof and shall not be construed as an agreement to agree to enter into the Transaction or any transaction by either Party. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect. If any of the covenants or provisions of this Agreement are determined to

Annex I – Page 3

be unenforceable by reason of its extent, duration, scope or otherwise, then the Parties contemplate that the court making such determination shall reduce such extent, duration, scope or other provision and enforce them in their reduced form for all purposes contemplated by this Agreement.

9.      Neither Party may assign any rights or delegate any duties under this Agreement without the prior written consent of the other Party, which consent shall be at the other Party's sole discretion. Any such attempted assignment or delegation without the other Party's prior written consent will be null and void *ab initio*. This Agreement will be binding upon the Parties and their respective authorized successors and assigns.

10.     You acknowledge and agree that no contract or agreement providing for any Transaction shall be deemed to exist between you and the Company or any of its affiliates or members unless and until a final definitive agreement has been executed and delivered, and each Party hereby waives, in advance, any claims (including, without limitation, breach of contract) in connection with any Transaction unless and until a final definitive agreement has been executed and delivered with respect thereto. The Parties also agree that unless and until a final definitive agreement regarding a Transaction has been executed and delivered, neither Party will be under any legal obligation of any kind whatsoever with respect to such a Transaction by virtue of this Agreement, except for the matters specifically agreed to herein. You acknowledge and agree that the Company and its affiliates and members reserve the right, in their sole discretion, to reject any and all proposals made by you or any of your Representatives with regard to the Transaction, and to terminate discussions and negotiations with you at any time.

11.     This Agreement shall be deemed to have been made and executed in the State of Delaware, and any dispute arising hereunder shall be governed by, and construed in accordance with, the laws of the State of Delaware, without regard to its conflict of laws rules. You and the Company (i) irrevocably submit to the exclusive jurisdiction of any state court in the State of Delaware and the United States District Court for the District of Delaware (and the appropriate appellate courts) for the purposes of any suit, action or other proceeding arising out of this Agreement and (ii) agree to commence any such action, suit or proceeding either in the United States District Court for the District of Delaware or if such suit, action or other proceeding may not be brought in such court for jurisdictional reasons, in any state court in the State of Delaware.

12.     EACH OF THE COMPANY AND YOU HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT OR YOU MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, INVOLVING OR OTHERWISE IN RESPECT OF THIS AGREEMENT.

13.     All notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall in all cases be delivered by email (with read receipt or other written confirmation received, in which case such notice shall be deemed received on the date such email was sent), but may, as a second method of delivery, also be delivered (i) by personal delivery, (ii) by a nationally recognized overnight courier service or (iii) by deposit in the U.S. Mail, postage prepaid, registered or certified mail, return receipt requested. All notices delivered by email shall be confirmed by the recipient by a non-automated email response within two (2) Business Days of receipt. Any party may, at any time by giving five (5) calendar days' prior written notice to the

1" = "1" "US 174882469v5" "" US 174882469v5
1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

Company, specify a different address (physical or electronic) for notice purposes by sending notice thereof in the foregoing manner.

*If to the Company*:

SMI Topco Holdings, LLC
[ADDRESS]
Attention: [NAME]
Email: [EMAIL]

*If to you*:

[INSERT ADDRESS OF POTENTIAL TRANSFEREE]

Attention:_____
Facsimile:_____
Telephone:_____
Email:_____

14.     This Agreement shall expire on the earlier of (i) the date of the last to occur of (x) a definitive agreement relating to the Transaction is entered into by you and either the Company or any of its affiliates or members and (y) you have become a party to the Limited Liability Company Agreement, dated as of [_____], 2023, as amended from time to time, by and among the Company and the members of the Company and (ii) the twenty-four (24) month anniversary of the Effective Date.

15.     This Agreement may be executed in two (2) or more counterparts, each of which will be deemed to be an original and all of which taken together will be deemed to constitute this Agreement when a duly authorized representative of each Party has signed a counterpart. The Parties may sign and deliver this Agreement by facsimile or electronic (that is, .PDF) transmission. Each Party agrees that the delivery of this Agreement by facsimile or electronic transmission will have the same force and effect as delivery of original signatures.

1" = "1" "US 174882469v5" "" US 174882469v5
1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

Please confirm your agreement with the foregoing by signing and returning one copy of this Agreement to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

Very truly yours,


SMI TOPCO HOLDINGS, LLC


By: _____
    Name:
    Title:


Accepted and agreed as of the date first written above:

[INSERT NAME OF POTENTIAL TRANSFEREE]


By: _____
    Name:
    Title:

1" = "1" "US 174882469v5" "" US 174882469v5
1" = "1" "US 174882469v8" "" US 174882469v8
4886-0215-6178v.1

**SCHEDULE 1**

**OFFICERS**

1" = "1" "US 174882469v5" "" US 174882469v5
1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

**SCHEDULE 2**

**MONTHLY KPIs**

1" = "1" "US 174882469v5" "" US 174882469v5
1" = "1" "US 174882469v8" "" US 174882469v8

4886-0215-6178v.1

# Exhibit A-2

## Registration Rights Agreement

*Solicitation Version*

**REGISTRATION RIGHTS AGREEMENT**

**BY AND AMONG**

**SMI TOPCO HOLDINGS, LLC**

**AND**

**THE INVESTORS (AS DEFINED HEREIN)**

**DATED AS OF [●], 2023**

1.	Definitions and Interpretations ........................................................................... 1

(a)	Definitions.......................................................................................................... 1

(b)	Interpretations .................................................................................................... 6

2.	Incidental Registrations .................................................................................... 6

   (a)	Right to Include Registrable Securities................................................... 6

   (b)	Priority in Incidental Registrations ........................................................ 7

3.	Registration on Request....................................................................................... 8

   (a)	Request by the Demand Party .................................................................... 8

   (b)	Priority on Demand Registration ............................................................. 9

   (c)	Cancellation of a Demand Registration ................................................... 9

   (d)	Limitations on Demand Registrations ................................................... 10

   (e)	Postponements in Requested Registrations ......................................... 10

   (f)	Short-Form Registrations ........................................................................ 10

   (g)	Shelf Take-Downs ..................................................................................... 12

   (h)	Registration Statement Form ................................................................. 12

   (i)	Selection of Underwriters ....................................................................... 13

4.	Registration Procedures ................................................................................... 13

5.	Hedging Transactions. ...................................................................................... 20

6.	Indemnification. ................................................................................................ 20

   (a)	Indemnification by the Issuer................................................................. 20

   (b)	Indemnification by Holder of Registrable Securities.......................... 21

   (c)	Conduct of Indemnification Proceedings ............................................. 22

   (d)	Contribution .............................................................................................. 23

   (e)	Deemed Underwriter ............................................................................... 23

   (f)	Other Indemnification ............................................................................. 24

  (g)  Non-Exclusivity .................................................................... 24

  (h)  Primacy of Indemnification ................................................... 24

7. Conversion to Corporation ............................................................. 24

8. Registration Expenses .................................................................... 25

9. Rule 144; Other Exemptions .......................................................... 26

10. Certain Additional Agreements ...................................................... 26

11. Miscellaneous ................................................................................ 26

  (a)  Termination .......................................................................... 26

  (b)  Holdback Agreement ............................................................ 27

  (c)  Amendments and Waivers .................................................... 27

  (d)  Issuer Party; Non-U.S. IPO .................................................. 28

  (e)  Successors, Assigns and Transferees .................................... 28

  (f)  Notices .................................................................................. 28

  (g)  Further Assurances ............................................................... 29

  (h)  Preservation of Rights .......................................................... 29

  (i)  Entire Agreement; No Third Party Beneficiaries .................. 29

  (j)  Governing Law; Jurisdiction and Forum; Waiver of Jury Trial ........................... 29

  (k)  Severability .......................................................................... 30

  (l)  Enforcement ......................................................................... 30

  (m)  Titles and Subtitles ............................................................... 30

  (n)  No Recourse ......................................................................... 30

  (o)  Counterparts; Facsimile Signatures ...................................... 30

Exhibit A — Investors
Exhibit B — Joinder Agreement

iii

This REGISTRATION RIGHTS AGREEMENT (this "<u>Agreement</u>") is entered into as of [●], 2023, by and among SMI Topco Holdings, LLC, a Delaware limited liability company (the "<u>Company</u>") and the Persons identified on <u>Exhibit A</u> hereto (collectively, the "<u>Investors</u>" and, each individually, an "<u>Investor</u>").

WHEREAS, the Parties desire to provide the Holders with rights to registration under the Securities Act of Registrable Securities, on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and of the mutual promises hereinafter set forth, the Parties agree as follows:

<div align="center">AGREEMENT</div>

1.    <u>Definitions and Interpretations</u>

(a)    <u>Definitions</u>. As used in this Agreement, the following capitalized terms shall have the following respective meanings:

"<u>Affiliate</u>" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with, such Person as of the date on which, or at any time during the period for which, the determination of affiliation is being made (including any investment fund the primary investment advisor to which is such Person or an Affiliate thereof); <u>provided</u>, that for purposes of this Agreement, no Holder shall be deemed an Affiliate of the Issuer or any of its Subsidiaries.

"<u>Agreement</u>" has the meaning given to such term in the preamble, as the same may be amended, supplemented or restated from time to time.

"<u>Automatic Shelf Registration Statement</u>" has the meaning given to such term in <u>Section 3.(f)(iii)</u>.

"<u>Board</u>" means the Board of Managers or Directors of the Issuer, as applicable.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or date on which commercial banks in the State of New York are authorized or required by law to close for business.

"<u>Common Units</u>" means the Units designated as "Common Units" pursuant to the LLC Agreement.

"<u>Company</u>" has the meaning given to such term in the preamble.

"<u>control</u>" (including the terms "<u>controlling</u>", "<u>controlled by</u>" and "<u>under common control with</u>"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee or executor, by contract or otherwise.

<div align="center">1</div>

"Covered Person" has the meaning given to such term in Section 6.(a).

"Demand Follow-Up Notice" has the meaning given to such term in Section 3.(a).

"Demand Including Holders" has the meaning given to such term in Section 3.(a).

"Demand Notice" has the meaning given to such term in Section 3.(a).

"Demand Registration" has the meaning given to such term in Section 3.(a).

"Demanding Holders" has the meaning given to such term in Section 3.(a).

"Equity Securities" means any and all Common Units or shares of Common Stock, of the Issuer.

"Estimated Pricing Information" means, with respect to any offering of securities in which a Holder is including its Registrable Securities, a good faith estimate (which may take the form of a customary "price range") of the price per share at which the Registrable Securities will be sold. Any Estimated Pricing Information shall be given based on the advice of the lead managing underwriter(s), in the case of an underwritten offering.

"Exchange Act" means the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"FINRA" means the Financial Industry Regulatory Authority.

"Free Writing Prospectus" has the meaning given to such term in Section 4.(a)(i)(a).

"Holdback Agreement" has the meaning given to such term in Section 11.(b).

"Holdback Period" means, (i) with respect to an IPO, one hundred eighty (180) days after, and during the ten (10) days before, the effective date of the related Registration Statement and (ii) with respect to any registered offering other than an IPO covered by this Agreement, ninety (90) days after, and during the ten (10) days before, the effective date of the related Registration Statement or, in the case of a takedown from a Shelf Registration Statement, sixty (60) days after the date of the Prospectus supplement filed with the SEC in connection with such takedown and during such prior period (not to exceed seven (7) days) as the Issuer has given reasonable written notice to the Holder of Registrable Securities, in each case of clauses (i) and (ii), as such periods may be shortened by the agreement of the lead managing underwriter(s) with respect to such offering.

"Holder" means any of (i) the Investors, (ii) any other Person entitled to incidental or piggyback registration rights hereunder upon entering into a Joinder Agreement substantially in the form of Exhibit B hereto and (iii) any direct or indirect transferee of a Holder who has acquired Registrable Securities from a Holder and who has entered into a

Joinder Agreement substantially in the form of Exhibit B hereto, in each case of clauses (i), (ii) and (iii), for so long as such Person holds Registrable Securities.

"Including Holder" has the meaning given to such term in Section 2.(a).

"Indemnified Party" has the meaning given to such term in Section 6.(c).

"Indemnifying Party" has the meaning given to such term in Section 6.(c).

"Indemnitors" has the meaning given to such term in Section 6.(h).

"Inspectors" has the meaning given to such term in Section 4.(a)(i)(o).

"IPO" means the initial public offering of Equity Securities of the Issuer pursuant to an effective Registration Statement under the Securities Act, including a direct listing without conducting a concurrent underwritten Public Offering or any other transaction that results in the listing of Equity Securities of the Issuer on a national securities exchange.

"Issuer" means the Company, any Subsidiary of the Company or any Successor Corporation.

"LLC Agreement" means that certain Limited Liability Company Agreement of the Company, dated as of the date hereof, by and among the Investors party thereto and the Company.

"Losses" has the meaning given to such term in Section 6.(a).

"Majority-in-Interest of the Demanding Holders" means Demanding Holders that requested registration of a majority of the Registrable Securities requested to be registered by all Demanding Holders in a Demand Registration.

"Investor" has the meaning given to such term in the preamble.

"Parties" means the parties to this Agreement.

"Permitted Transferee" means with respect to any Holder, (i) an Affiliate (other than any "portfolio company" described below) of such Holder, (ii) in the case of a Holder that is a partnership, limited liability company or any foreign equivalent thereof, any partner, member or foreign equivalent thereof of such Holder (provided, that such Transfer is made in a *pro rata* distribution in accordance with the applicable partnership agreement, limited liability company agreement or foreign equivalent thereof, as the case may be) and (iii) any transferee of Registrable Securities that is not an Affiliate of such Holder that holds (after giving effect to such Transfer), together with its Affiliates, in excess of five percent (5%) of the then-outstanding Equity Securities; provided, however, that any such transferee shall agree in a writing in substantially the form attached as Exhibit B hereto to be bound by and to comply with all applicable provisions of this Agreement; provided, further, however, that in no event shall (A) the Company or any of

3

its Subsidiaries or (B) any "portfolio company" (as such term is customarily used among institutional investors) of any Holder or any entity controlled by an portfolio company of any Holder constitute a "Permitted Transferee".

"Person" means any individual, partnership, joint venture, corporation, limited liability company, trust, unincorporated organization, government or any department or agency thereof or any other entity.

"Prospectus" means the prospectus included in any Registration Statement (including, without limitation, a prospectus that discloses information previously omitted from a prospectus filed as part of an effective Registration Statement in reliance upon Rule 430A promulgated under the Securities Act), as amended or supplemented by any prospectus supplement, relating to Registrable Securities, and all other amendments and supplements to the Prospectus, including post-effective amendments, and all material incorporated by reference or deemed to be incorporated by reference in such prospectus.

"Public Offering" means a public offering of Equity Securities of the Issuer pursuant to an effective Registration Statement under the Securities Act.

"Records" has the meaning given to such term in Section 4.(a)(i)(o).

"Registrable Securities" means (i) any Equity Securities held by a Holder,  (ii) any Equity Securities which may be obtained upon the conversion, exchange or exercise of other securities held by a Holder and (iii) any other equity securities or equity interests issued or issuable, directly or indirectly, with respect to the securities described in clause (i) or (ii) by way of conversion or exchange thereof or stock dividends, stock splits or in connection with a combination of shares, reclassification, recapitalization, merger, consolidation or other reorganization.  As to any particular Registrable Securities, once issued such securities shall cease to be Registrable Securities on the date when (A) they are disposed of pursuant to an effective Registration Statement under the Securities Act, (B) they are sold to the public pursuant to Rule 144 (or another applicable exemption from registration under the Securities Act), (C) they are able to be sold by their Holder without restriction as to volume or manner of sale pursuant to Rule 144 or (D) they shall have ceased to be outstanding.

"Registration Statement" means any registration statement of the Issuer filed with the SEC under the Securities Act which covers any of the Registrable Securities pursuant to the provisions of this Agreement, including any Prospectus, Free Writing Prospectus, amendments and supplements to such registration statement, including post-effective amendments, all exhibits and all material incorporated by reference or deemed to be incorporated by reference in such registration statement.

"Rule 144" means Rule 144 under the Securities Act.

"Rule 145" means Rule 145 under the Securities Act.

"Rule 405" means Rule 405 under the Securities Act.

4

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933, as amended, and the rules and regulations of the SEC promulgated thereunder.

"Shelf Registration Statement" has the meaning given to such term in Section 3.(f)(i).

"Shelf Underwritten Offering" has the meaning given to such term in Section 3.(g).

"Short-Form Registration" has the meaning given to such term in Section 3.(f)(i)

"Stock" has the meaning given to such term in Section 7.(a).

"Subsidiary" means (i) any corporation of which a majority of the securities entitled to vote generally in the election of directors thereof, at the time as of which any determination is being made, are owned by another entity, either directly or indirectly and (ii) any joint venture, general or limited partnership, limited liability company or other legal entity in which an entity is the record or beneficial owner, directly or indirectly, of a majority of the voting interests or the general partner.

"Successor Corporation" has the meaning given to such term in Section 7.(a).

"Suspension Event" has the meaning given to such term in Section 3.(e).

"Take-Down Notice" has the meaning given to such term in Section 3.(g).

"Transfer" means, directly or indirectly, to sell, transfer, assign, pledge, encumber, hypothecate or similarly dispose of, either voluntarily or involuntarily, or to enter into any contract, option or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation or similar disposition of, any Equity Securities beneficially owned by a Person, or any interest in any Equity Securities (including through ownership of any other securities convertible into or exchangeable or exercisable for Equity Securities) beneficially owned by a Person. In the event that any Holder that is a corporation, partnership, limited liability company or other legal entity (other than an individual, trust or estate) ceases to be, directly or indirectly, controlled by the Person controlling such Holder as of the date hereof or a Permitted Transferee thereof, such event shall be deemed to constitute a "Transfer" subject to the restrictions on Transfer contained or referenced herein; provided, however, that, with respect to any Investor or Affiliate thereof that is an investment fund, a change of control of the direct or indirect general partner or investment advisor of such investment fund shall not constitute a Transfer.

"Unit" means a unit representing a fractional part of the ownership interest of the Company and shall include all types and classes of Units; provided that any type or class of Unit shall have the privileges, preference, duties, liabilities, obligations, and rights set forth in the LLC Agreement and the ownership interest represented by such type or class

5

or series of Unit shall be determined in accordance with such privileges, preference, duties, liabilities, obligations, and rights.

"Unit Equivalents" means any security or obligation that is by its terms, directly or indirectly, convertible into, exchangeable, or exercisable for Units, and any option, warrant, or other right to subscribe for, purchase, or acquire Units.

"WKSI" has the meaning given to such term in Section 3.(f)(iii).

(b)    Interpretations.  For purposes of this Agreement, unless otherwise noted:

(i)    All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor laws, rules, regulations and forms thereto in effect at the time.

(ii)    All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successor thereto.

(iii)    All references to agreements and other contractual instruments shall be deemed to be references to such agreements or other instruments as they may be amended, waived, supplemented or modified from time to time.

(iv)    All references to any amount of securities (including Registrable Securities) shall be deemed to be a reference to such amount measured on an as-converted or as-exercised basis.

2.    Incidental Registrations.

(a)    Right to Include Registrable Securities. If, at any time following the consummation of an IPO, the Issuer determines to register its Equity Securities under the Securities Act (other than pursuant to a Demand Registration in accordance with Section 3.(a) or a Registration Statement filed by the Issuer on Form S-4 or S-8 or any successor forms promulgated for similar purposes, or filed solely in connection with an exchange offer or any employee benefit or dividend reinvestment plan), whether or not for sale for its own account, in a manner which would permit registration of Registrable Securities for sale to the public under the Securities Act, it will, at each such time, give prompt written notice to all Holders of Registrable Securities of its intention to do so and of such Holders' rights under this Section 2. Upon the written request of any such Holder (each, an "Including Holder") made within seven (7) Business Days after the receipt of any such notice (which request shall specify the Registrable Securities intended to be disposed of by such Holder and the intended method or methods of disposition thereof), the Issuer will use its reasonable best efforts to effect the registration under the Securities Act of all Registrable Securities which the Issuer has been so requested to register by the Including Holders, to the extent required to permit the disposition of the Registrable Securities so to be registered; provided, that (i) if, at any time after giving written notice of its intention to register any securities to be sold by it and prior to the effective date of the Registration Statement filed in connection with such registration, the Issuer shall determine for

6

any reason not to proceed with the proposed registration of the securities to be sold by it, the Issuer may, at its election, give written notice of such determination to each Holder of Registrable Securities and, thereupon, shall be relieved of its obligation to register any Registrable Securities in connection with such registration (but not from its obligation to pay the expenses in connection therewith) without prejudice to the rights of the Holders to request that such registration be effected as a registration under Section 3 and (ii) if such registration involves an underwritten offering, all Including Holders must sell their Registrable Securities to the underwriters selected by the Issuer on the same terms and conditions as applied to the Issuer, with such differences, including any with respect to indemnification and liability insurance, as may be customary or appropriate in combined primary and secondary offerings. The Issuer shall provide each Including Holder with written notice of the Estimated Pricing Information as soon as practicable after such Estimated Pricing Information is available and shall provide each Including Holder with written notice of any updated Estimated Pricing Information as soon as practicable after such updated Estimated Pricing Information is available. Other than with respect to a Shelf Registration Statement in accordance with Section 3(f), the Issuer shall not be required to maintain the effectiveness of the Registration Statement for a registration requested pursuant to this Section 2.(a) beyond the earlier to occur of (i) one hundred eighty (180) days after the effective date thereof and (ii) consummation of the distribution by the Holders of the Registrable Securities included in such Registration Statement. Any Including Holder shall be permitted to withdraw from such registration and offering by written notice to the Issuer (x) in the case of an underwritten offering, at least two (2) Business Days prior to the earlier of the anticipated filing date of the "red herring" prospectus, if applicable, and the anticipated pricing date, or (y) in the case of any other offering, at least two (2) Business Days prior to the effective date of the Registration Statement filed in connection with such registration; provided, that, in the case of either (x) or (y), an Including Holder may withdraw from such registration and offering all or a portion of its Registrable Securities at any time prior to two (2) Business Days after the date on which the Estimated Pricing Information is provided by the Issuer with respect to such offering and within two (2) Business Days after the date on which any updated Estimated Pricing Information is provided by the Issuer with respect to such offering.

(b)     Priority in Incidental Registrations. In the event of any registration pursuant to this Section 2, the Issuer shall, and shall cause the managing underwriter(s) of a proposed underwritten offering to, permit Holders of Registrable Securities who have requested to include Registrable Securities in such offering to include in such offering all Registrable Securities so requested to be included on the same terms and conditions as any other shares or units of Equity Securities, if any, of the Issuer included in the offering. Notwithstanding the foregoing, if the managing underwriter(s) of such underwritten offering have informed the Issuer that in its or their good faith opinion the total number or dollar amount of securities that such Holders and the Issuer intend to include in such offering is such as to adversely affect the per share offering price, then there shall be included in such underwritten offering the number or dollar amount of Registrable Securities that in the good faith opinion of such managing underwriter(s) can be sold without such adverse effect, and such number of Registrable Securities shall be allocated as follows: first, all securities of the Issuer requested to be included by the Issuer in such registration for its own account (if any); and second, all securities of the Issuer requested to be included by the Holders of Registrable Securities requesting such registration *pro rata* among such Holders on the basis of the percentage of the Registrable Securities owned by each such Holder.

7

3.      <u>Registration on Request</u>.

(a)      <u>Request by the Demand Party</u>. Subject to <u>Section 3.(d)</u>, following an IPO, Holders of at least fifteen percent (15%) of the then outstanding Registrable Securities (the "<u>Demanding Holders</u>") shall have the right to require the Issuer to register, pursuant to the terms of this Agreement, pursuant to a Registration Statement on an appropriate form and under and in accordance with the provisions of the Securities Act, the number of Registrable Securities of such Holders requested to be so registered pursuant to this Agreement, in each case by delivering written notice to the Issuer (any such written notice, a "<u>Demand Notice</u>" and any such registration, a "<u>Demand Registration</u>"). Subject to <u>Section 3.(d)</u>, following receipt of a Demand Notice for a Demand Registration in accordance with this <u>Section 3.(a)</u>, the Issuer shall use its reasonable best efforts to file a Registration Statement as promptly as practicable, but no later than thirty (30) days following receipt of any Demand Notice, and to cause such Registration Statement to be declared effective under the Securities Act as promptly as practicable after the filing thereof.

No Demand Registration shall be deemed to have occurred for purposes of the first sentence of the preceding paragraph if (i) the Registration Statement relating thereto (x) does not become effective, (y) is not maintained effective for the period required pursuant to this <u>Section 3</u>, or (z) is subject to a stop order, injunction, or similar order or requirement of the SEC during such period, (ii) more than ninety percent (90%) of the Registrable Securities requested by the Demanding Holders to be included in such registration are not so included pursuant to <u>Section 3.(b)</u> or (iii) the conditions to closing specified in any underwriting agreement, purchase agreement or similar agreement entered into in connection with the registration relating to such request are not satisfied (other than as a result of a material default or breach thereunder by a Demanding Holder or its Affiliates) or otherwise waived by a Majority-in-Interest of the Demanding Holders.

Within two (2) Business Days after receipt by the Issuer of a Demand Notice in accordance with this <u>Section 3.(a)</u>, the Issuer shall give written notice (the "<u>Demand Follow-Up Notice</u>") of such Demand Notice to all other Holders of Registrable Securities and shall, subject to the provisions of <u>Section 3.(b)</u> hereof, include in such registration all Registrable Securities with respect to which the Issuer receives written requests for inclusion therein (the Holders making such requests, the "<u>Demand Including Holders</u>") within seven (7) Business Days after such Demand Follow-Up Notice is given by the Issuer to such Holders. For the avoidance of doubt, any such requests for inclusion in such registration of Registrable Securities by Demand Including Holders shall not count as a Demand Registration for the purposes of the limitations set forth in <u>Section 3.(d)</u>. The Issuer shall provide each Demand Including Holder with written notice of the Estimated Pricing Information as soon as practicable after such Estimated Pricing Information is available and shall provide each Demand Including Holder with written notice of any updated Estimated Pricing Information as soon as practicable after such updated Estimated Pricing Information is available.

All requests made pursuant to this <u>Section 3</u> will specify the number of Registrable Securities to be registered and the intended method or methods of disposition thereof.

The Issuer shall be required to maintain the effectiveness of the Registration Statement with respect to any Demand Registration for a period of at least one hundred eighty (180) days after the effective date thereof or such shorter period during which all Registrable Securities included in such Registration Statement have actually been sold; provided, however, that such period shall be extended for a period of time equal to the period the Holder of Registrable Securities refrains from selling any securities included in such Registration Statement at the request of the Issuer or an underwriter of the Issuer pursuant to the provisions of this Agreement.

(b)   <u>Priority on Demand Registration</u>. If any of the Registrable Securities registered pursuant to a Demand Registration are to be sold in an underwritten offering, and the managing underwriter(s) advise the Holders of such securities that in its or their good faith opinion the total number or dollar amount of Registrable Securities proposed to be sold in such offering (including, without limitation, securities proposed to be included by other Holders of securities entitled to include securities in such Registration Statement pursuant to <u>Section 2</u> or <u>Section 3.(a)</u>) is such as to adversely affect the per share offering price, then there shall be included in such underwritten offering the number or dollar amount of Registrable Securities that in the good faith opinion of such managing underwriter(s) can be sold without such adverse effect, and such number of Registrable Securities shall be allocated as follows, unless the underwriters require a different allocation:

(i)   first, to the Holders requesting such registration (whether pursuant to a Demand Notice or pursuant to incidental or piggyback registration rights) *pro rata* on the basis of the percentage of Registrable Securities owned by each such Holder, until with respect to each such Holder, all Registrable Securities requested for registration by such Holder have been included in such registration; and

(ii)   second, the securities for which inclusion in such Demand Registration was requested by the Issuer.

(c)   <u>Cancellation of a Demand Registration</u>. A Majority-in-Interest of the Demanding Holders shall have the right, prior to the effectiveness of the Registration Statement, to notify the Issuer that it or they, as the case may be, have determined that the Registration Statement be abandoned or withdrawn, in which event the Issuer shall abandon or withdraw such Registration Statement. Any Holder of Registrable Securities who has elected to sell Registrable Securities in an underwritten offering pursuant to this <u>Section 3</u> (including any Demanding Holder) shall be permitted to withdraw from such registration and offering by written notice to the Issuer at least two (2) Business Days prior to the effective date of the Registration Statement filed in connection with such registration, or, in the case of an underwritten offering, at least two (2) Business Days prior to the earlier of the anticipated filing of the "red herring" prospectus, if applicable, and the anticipated pricing date; provided, that a Demand Including Holder may withdraw from such registration and offering all or a portion of its Registrable Securities at any time prior to two (2) Business Days after the date on which the Estimated Pricing Information is provided by the Issuer with respect to such offering and within two (2) Business Days after the date on which any updated Estimated Pricing Information is provided by the Issuer with respect to such offering.

(d)      <u>Limitations on Demand Registrations</u>. Following an IPO, the Holders as a group shall be entitled to initiate no more than two (2) Demand Registrations in any twelve (12) month period (other than Short-Form Registrations and shelf take-downs to effect a Shelf Underwritten Offering).

(e)      <u>Postponements in Requested Registrations</u>. If the filing, initial effectiveness or continued use of a Registration Statement, including a Shelf Registration Statement, with respect to a Demand Registration would require the Issuer to make a public disclosure of material nonpublic information that the Issuer has a bona fide business purpose for preserving as confidential, which disclosure in the good faith judgment of the Board (after consultation with external legal counsel) (i) would be required to be made in any Registration Statement so that such Registration Statement would not contain any untrue statement of material fact or omit to state a material fact necessary in order to make the statements made therein not misleading, (ii) would not be required to be made at such time but for the filing, effectiveness or continued use of such Registration Statement and (iii) would reasonably be expected to have a material adverse effect on the Issuer or its business or on the Issuer's ability to effect a bona fide material proposed acquisition, disposition, financing, reorganization, recapitalization or similar transaction involving the Issuer (collectively, a "<u>Suspension Event</u>"), and the Issuer furnishes to the Holders a certificate signed by the Chief Executive Officer or any other senior executive officer of the Issuer stating that such disclosure would in the good faith judgment of the Chief Executive Officer or such other senior executive officer result in any such Suspension Event, then the Issuer may, upon giving prompt written notice of such action to the Holders participating in such registration, delay the filing or initial effectiveness (but not the preparation) of, or suspend the use of, such Registration Statement; <u>provided</u>, that the Issuer shall be permitted to take any such action no more than once in any six (6)-month period for a period not to exceed forty-five (45) days following notice of any such Suspension Event, which period shall end upon the termination of the Suspension Event, if earlier; <u>provided further</u>, that the Issuer may not postpone or suspend for periods exceeding, in the aggregate, sixty (60) days during any twelve (12)-month period. In the event that the Issuer exercises its rights under the preceding sentence, such Holders agree to suspend, promptly upon receipt of the notice referred to above, the use of any Prospectus relating to such registration in connection with any sale or offer to sell Registrable Securities. The Issuer covenants and agrees that it shall not deliver a suspension notice with respect to a Suspension Event unless all of the Issuer's employees, officers, directors and managers who are subject to the Issuer's Insider Trading Compliance Policy, and who are prohibited by the terms thereof from effecting any public sales of securities of the Issuer beneficially owned by them, are so prohibited for the duration of such suspension period. If the Issuer so postpones the filing of a Prospectus or the effectiveness of a Registration Statement, a Majority-in-Interest of the Demanding Holders shall be entitled to withdraw such request and, if such request is withdrawn, such registration request shall not count for the purposes of the limitations set forth in <u>Section 3.(d)</u>. The Issuer shall promptly give the Holders requesting registration thereof pursuant to this <u>Section 3</u> written notice of any postponement made in accordance with this <u>Section 3.(e)</u>.

(f)      <u>Short-Form Registrations</u>.

(i)      Following an IPO, the Issuer shall use its reasonable best efforts to qualify for registration on Form S-3 or any comparable or successor form or forms or any similar

short-form registration (a "Short-Form Registration"). At any time and from time to time following an IPO when the Issuer has qualified for Short-Form Registration, Holders of Registrable Securities shall be entitled to submit a Demand Notice to request an unlimited number of Short-Form Registrations with respect to the Registrable Securities held by such requesting Holder and its Affiliates in addition to the other registration rights provided in Section 2 and this Section 3 and, if requested by the Holders of Registrable Securities and available to the Issuer, such Short-Form Registration shall be a "shelf" registration statement providing for the registration of, and the sale on a continuous or delayed basis of, the Registrable Securities, pursuant to Rule 415 or otherwise (a "Shelf Registration Statement").

(ii)    Upon filing any Short-Form Registration, the Issuer shall use its reasonable best efforts to keep such Short-Form Registration effective with the SEC at all times and to re-file such Short-Form Registration upon its expiration, and to cooperate in any shelf take-down, whether or not underwritten, by amending or supplementing any Prospectus related to such Short-Form Registration as may be reasonably requested by Holders of Registrable Securities or as otherwise required, until such time as all Registrable Securities that could be sold in such Short-Form Registration have been sold or are no longer outstanding. To the extent that the Issuer becomes ineligible to use Form S-3, the Issuer shall file a "shelf" registration statement on Form S-1 not later than thirty (30) days after the date of such ineligibility and use its reasonable best efforts to have such Registration Statement declared effective as promptly as practicable.

(iii)    To the extent the Issuer is a well-known seasoned issuer (as defined in Rule 405) (a "WKSI") at the time any Demand Notice for a Short-Form Registration is submitted to the Issuer and such Demand Notice requests that the Issuer file a Shelf Registration Statement, the Issuer shall file an automatic shelf registration statement (as defined in Rule 405) on Form S-3 (an "Automatic Shelf Registration Statement") in accordance with the requirements of the Securities Act and the rules and regulations of the SEC thereunder, which covers the number or class of Registrable Securities which are requested to be registered. If registering any Registrable Securities, the Issuer shall pay the registration fee for all Registrable Securities to be registered pursuant to an Automatic Shelf Registration Statement at the time of filing of the Automatic Shelf Registration Statement and shall not elect to pay any portion of the registration fee on a deferred basis. The Issuer shall use its reasonable best efforts to remain a WKSI (and not to become an ineligible issuer (as defined in Rule 405)) during the period in which any Automatic Shelf Registration Statement is effective. If at any time following the filing of an Automatic Shelf Registration Statement when the Issuer is required to re-evaluate its WKSI status the Issuer determines that it is not a WKSI, the Issuer shall use its reasonable best efforts to post-effectively amend the Automatic Shelf Registration Statement to a Shelf Registration Statement on Form S-3 or file a new Shelf Registration Statement on Form S-3 or, if such form is not available, Form S-1, have such Shelf Registration Statement declared effective by the SEC and keep such Registration Statement effective during the period in which such Short-Form Registration is required to be kept effective in accordance with Section 3.(f)(ii).

(g)     Shelf Take-Downs. At any time that a Shelf Registration Statement covering Registrable Securities is effective, if any Holder delivers a notice to the Issuer (a "Take-Down Notice") stating that it intends to effect an underwritten offering of all or part of its Registrable Securities included by it on the Shelf Registration Statement (a "Shelf Underwritten Offering"), then the Issuer shall amend or supplement the Shelf Registration Statement as may be necessary in order to enable such Registrable Securities to be distributed pursuant to the Shelf Underwritten Offering (taking into account the inclusion of Registrable Securities by any other Holders pursuant to Section 3.(g)(i)). The Holder delivering such Take-Down Notice shall include in such Take-Down Notice the Estimated Pricing Information with respect to such Shelf Underwritten Offering and shall provide written notice of any updated Estimated Pricing Information as soon as practicable after such updated Estimated Pricing Information is available. Holders shall be entitled to request an unlimited number of shelf take-downs to effect a Shelf Underwritten Offering, if available to the Issuer, with respect to the Registrable Securities held by such requesting Holder and its Affiliates in addition to the other registration rights provided in Section 2 and this Section 3. In connection with any Shelf Underwritten Offering:

(i)     the Issuer shall also promptly deliver the Take-Down Notice to all other Holders with Registrable Securities included on such Shelf Registration Statement and permit each such Holder to include its Registrable Securities included on the Shelf Registration Statement in the Shelf Underwritten Offering if such Holder notifies the proposing Holder and the Issuer within two (2) Business Days after distribution or dissemination (including via email, if available) of the Take-Down Notice to such Holder;

(ii)     in the event that the underwriter advises such requesting Holder and the Issuer in its good faith opinion that the total number or dollar amount of Registrable Securities proposed to be sold in such offering is such as to adversely affect the success of such offering (including, without limitation, adversely affect the per share offering price), then the underwriter may limit the number of shares which would otherwise be included in such take-down offering in the same manner as described in Section 3.(b) with respect to a limitation of shares to be included in a registration; and

(iii)     notwithstanding the foregoing, in the event of a material and adverse change to the Estimated Pricing Information, each Holder proposing to include its Registrable Securities in such Shelf Underwritten Offering shall be provided with a reasonable opportunity (not to exceed two (2) Business Days) to withdraw all or a portion of its Registrable Securities from such Shelf Underwritten Offering.

(h)     Registration Statement Form. If the Issuer becomes eligible to register the Registrable Securities for resale by the Holders on a Short-Form Registration, the Issuer shall be entitled to file such Short-Form Registration in satisfaction of any Demand Registrations pursuant to Section 2 and this Section 3; provided, that if any Demand Registration pursuant to this Section 3 which is proposed by the Issuer to be effected by the filing of a Registration Statement on Form S-3 (or any successor or similar short-form registration statement) shall be in connection with an underwritten public offering, and if the managing underwriter(s) shall advise the Issuer that, in its good faith opinion, the use of another form of Registration Statement is of material importance to the success of such proposed offering or is otherwise required by

12

applicable law, then a Majority-in-Interest of the Demanding Holders may direct the Issuer to file such other form in satisfaction of such Demand Registration. No such registration nor any other Short-Form Registration shall count as a Demand Registration for purposes of calculating how many Demand Registrations Holders have initiated pursuant to the provisions of Section 3.

(i)     Selection of Underwriters. If the Demanding Holders intend that the Registrable Securities requested to be covered by a Demand Registration or a Shelf Underwritten Offering shall be distributed by means of an underwritten offering, such Demanding Holders shall so advise the Issuer as a part of the Demand Notice or Take-Down Notice, and the Issuer shall include such information in the notice sent by the Issuer to the other Holders with respect to such Demand Registration or Shelf Underwritten Offering. In such event, the lead underwriter to administer the offering shall be chosen by a Majority-in-Interest of the Demanding Holders. If the offering is underwritten, the right of any Holder to registration pursuant to this Section 3 will be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise agreed by a Majority-in-Interest of the Demanding Holders) and each such Holder will (together with the Issuer and the other Holders distributing their securities through such underwriting) enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting (including, without limitation, pursuant to the terms of any over-allotment or "green shoe" option requested by the managing underwriter(s)), provided, that (i) no Holder shall be required to sell more than the number of Registrable Securities that such Holder has requested the Issuer to include in any registration and (ii) if any Holder disapproves of the terms of the underwriting, such Holder may elect to withdraw therefrom by written notice to the Issuer, the managing underwriter(s) and, in connection with an underwritten registration pursuant to this Section 3, the Demanding Holders, provided, further, that no such Person (other than the Issuer) shall be required to make any representations or warranties other than those related to title and ownership of, and power and authority to transfer, shares and as to the accuracy and completeness of statements made in a Registration Statement, Prospectus or other document in reliance upon, and in conformity with, written information prepared and furnished to the Issuer or the managing underwriter(s) by such Person pertaining exclusively to such Holder. Notwithstanding the foregoing, no Holder shall be required to agree to any indemnification obligations on the part of such Holder that are greater than its obligations pursuant to Section 6.

4.     Registration Procedures. If and whenever the Issuer is required to use its reasonable best efforts to effect the registration of any Registrable Securities under the Securities Act as provided in Section 2 and Section 3, the Issuer shall effect such registration to permit the sale of such Registrable Securities in accordance with the intended method or methods of disposition thereof, and pursuant thereto the Issuer shall cooperate in the sale of such Registrable Securities and shall, as soon as practicable:

(a)     prepare and file, in each case as promptly as practicable, with the SEC a Registration Statement or Registration Statements on such form as shall be available for the sale of the Registrable Securities by the Holders thereof or by the Issuer in accordance with the intended method or methods of distribution thereof, make all required filings with FINRA, and, if such Registration Statement is not automatically effective upon filing, use its reasonable best efforts to cause such Registration Statement to be declared effective as soon as practicable and to remain effective as provided herein;

provided, however, that before filing a Registration Statement or Prospectus or any amendments or supplements thereto (including free writing prospectuses under Rule 433 (each a "Free Writing Prospectus")) and, to the extent reasonably practicable, documents that would be incorporated by reference or deemed to be incorporated by reference in a Registration Statement filed pursuant to a Demand Notice (other than a Shelf Registration Statement), the Issuer shall furnish or otherwise make available to the Holders of the Registrable Securities covered by such Registration Statement, their counsel and the managing underwriter(s), if any, copies of all such documents proposed to be filed (including exhibits thereto), which documents will be subject to the reasonable review and comment of such counsel, and such other documents reasonably requested by such counsel, including any comment letter from the SEC, and, if requested by such counsel, provide such counsel reasonable opportunity to participate in the preparation of such Registration Statement and each Prospectus included therein and such other opportunities to conduct a reasonable investigation within the meaning of the Securities Act, including reasonable access to the Issuer's books and records, officers, accountants and other advisors. The Issuer will include comments to any Registration Statement and any amendments or supplements thereto from Holders of a majority of the Registrable Securities covered by such Registration Statement, or their counsel, or the managing underwriters, if any, as reasonably requested on a timely basis. The Issuer shall not file any such Registration Statement or Prospectus, or any amendments or supplements thereto (including such documents that, upon filing, would be incorporated or deemed incorporated by reference therein and including Free Writing Prospectuses) with respect to a Demand Registration to which a Majority-in-Interest of the Demanding Holders (or their counsel) or the managing underwriter(s), if any, shall reasonably object, in writing, on a timely basis, unless, in the opinion of the Issuer, such filing is necessary to comply with applicable law;

(b)     prepare and file with the SEC such amendments, including post-effective amendments, and supplements to such Registration Statement and the Prospectus used in connection therewith and such Free Writing Prospectuses and Exchange Act reports as may be necessary to keep such Registration Statement continuously effective during the period provided herein and comply in all material respects with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement; and cause the related Prospectus to be supplemented by any Prospectus supplement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of the securities covered by such Registration Statement, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) under the Securities Act in each case, until such time as all of such securities have been disposed of in accordance with the intended method or methods of disposition by the seller or sellers thereof set forth in such Registration Statement;

(c)     notify each selling Holder of Registrable Securities, its counsel and the managing underwriter(s), if any, promptly after the Issuer receives notice thereof (i) when a Prospectus or any Prospectus supplement or post-effective amendment or any Free Writing Prospectus has been filed, and, with respect to a Registration Statement or any post-effective amendment, when the same has become effective, (ii) of any request by the

SEC or any other federal or state governmental authority for amendments or supplements to a Registration Statement or related Prospectus or for additional information, (iii) of the issuance by the SEC of any stop order suspending the effectiveness of such Registration Statement or the initiation or threatening of any proceedings for that purpose, (iv) if at any time the Issuer has reason to believe that the representations and warranties of the Issuer contained in any agreement (including any underwriting agreement) contemplated by Section 4.(a)(i)(n) below cease to be true and correct, (v) of the receipt by the Issuer of any notification with respect to the suspension of the qualification or exemption from qualification of such Registrable Securities for sale in any jurisdiction, or the initiation or threatening of any proceeding for such purpose, and (vi) of the happening of any event that makes any statement made in such Registration Statement or related Prospectus, Free Writing Prospectus, amendment or supplement thereto, or any document incorporated or deemed to be incorporated therein by reference, as then in effect, untrue in any material respect or that requires the making of any changes in such Registration Statement, Prospectus or documents so that, in the case of the Registration Statement, it will not contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, not misleading, and that in the case of the Prospectus, preliminary Prospectus or any Free Writing Prospectus, it will not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (which notice shall notify the selling Holders only of the occurrence of such an event and shall provide no additional information regarding such event to the extent such information would constitute material nonpublic information);

(d)     use its reasonable best efforts to obtain the withdrawal of any order suspending the effectiveness of a Registration Statement, or the lifting of any suspension of the qualification (or exemption from qualification) of any of the Registrable Securities for sale in any jurisdiction at the earliest date reasonably practical;

(e)     if requested by the managing underwriter(s), if any, or a Majority-in-Interest of the Demanding Holders, promptly include in a Prospectus supplement or post-effective amendment such information as the managing underwriter(s), if any, or such Holder or Holders, as the case may be, may request in order to facilitate the disposition of the Registrable Securities in accordance with the intended method or methods of distribution of such securities set forth in the Registration Statement and make all required filings of such Prospectus supplement or such post-effective amendment as soon as practicable after the Issuer has received such request; provided, however, that the Issuer shall not be required to take any actions under this Section 4.(a)(i)(e) that are not, in the opinion of counsel for the Issuer, in compliance with applicable law;

(f)     deliver to each selling Holder of Registrable Securities, its counsel, and the underwriters, if any, without charge, as many copies of the Prospectus or Prospectuses (including each form of Prospectus) and each amendment or supplement thereto (including any Free Writing Prospectus) as such Persons may reasonably request from time to time in order to facilitate the disposition of the Registrable Securities in accordance with the intended method or methods of disposition thereof; and the Issuer,

subject to the last paragraph of this <u>Section 4</u>, hereby consents to the use of such Prospectus and each amendment or supplement thereto by each of the selling Holders of Registrable Securities and the underwriters, if any, in connection with the offering and sale of the Registrable Securities covered by such Prospectus and any such amendment or supplement thereto;

(g)   prior to any public offering of Registrable Securities, use its reasonable best efforts to register or qualify or cooperate with the selling Holders of Registrable Securities, the underwriters, if any, and their respective counsel in connection with the registration or qualification (or exemption from such registration or qualification) of such Registrable Securities for offer and sale under the securities or blue sky laws of such jurisdictions within the United States as any seller or underwriter reasonably requests in writing and to use its reasonable best efforts to keep each such registration or qualification (or exemption therefrom) effective during the period such Registration Statement is required to be kept effective and to take any other action that may be necessary or advisable to enable such Holders of Registrable Securities to consummate the disposition of such Registrable Securities in such jurisdiction in accordance with the intended method or methods of disposition thereof; <u>provided</u>, <u>however</u>, that the Issuer will not be required to (i) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this <u>Section 4.(a)(i)(g)</u>, (ii) subject itself to taxation in any jurisdiction wherein it is not so subject or (iii) take any action that would subject it to general service of process in any such jurisdiction where it is not then so subject (other than service of process in connection with such registration or qualification or any sale of Registrable Securities in connection therewith);

(h)   cooperate with the selling Holders of Registrable Securities and the managing underwriter(s), if any, to facilitate the timely preparation and delivery of certificates (not bearing any legends unless required under applicable law) representing Registrable Securities to be sold and enable such Registrable Securities to be in such denominations and registered in such names as the managing underwriter(s), if any, or Holders may request at least two (2) Business Days prior to any sale of Registrable Securities in a firm commitment public offering, but in any other such sale, within ten (10) Business Days prior to having to issue the securities;

(i)   use its reasonable best efforts to cause the Registrable Securities covered by the Registration Statement to be registered with or approved by such other governmental agencies or authorities within the United States as may be necessary in light of the business or operations of the Issuer to enable the seller or sellers thereof or the managing underwriter(s), if any, to consummate the disposition of such Registrable Securities, in accordance with the intended method or methods thereof, except as may be required solely as a consequence of the nature of such selling Holder's business, in which case the Issuer will cooperate in all reasonable respects with the filing of such Registration Statement and the granting of such approvals, as may be necessary to enable the seller or sellers thereof or the underwriters, if any, to consummate the disposition of such Registrable Securities in accordance with the intended method or methods thereof;

(j)     upon the occurrence of any event contemplated by <u>Section 4.(a)(i)(c)(vi)</u> above, promptly prepare a supplement or post-effective amendment to the Registration Statement or a supplement to the related Prospectus or any document incorporated or deemed to be incorporated therein by reference, or file any other required document so that, as thereafter delivered to the purchasers of the Registrable Securities being sold thereunder, such Prospectus will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

(k)     prior to the effective date of the Registration Statement relating to the Registrable Securities, provide a CUSIP number for the Registrable Securities;

(l)     provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities from and after the effective date of such Registration Statement. In connection therewith, if required by the Issuer's transfer agent, the Issuer will promptly after the effective date of the Registration Statement, cause an opinion of counsel as to the effectiveness of the Registration Statement to be delivered to and maintained with such transfer agent, together with any other authorizations, certificates and directions required by the transfer agent which authorize and direct the transfer agent to issue such Registrable Securities without any such legend upon sale by the Holder or the underwriter or managing underwriter of an underwritten offering of Registrable Securities, if any, of such Registrable Securities under the Registration Statement;

(m)     use its reasonable best efforts to cause all shares of Registrable Securities covered by such Registration Statement to be listed on a national securities exchange if shares of the particular class of Registrable Securities are at that time listed on such exchange, prior to the effectiveness of such Registration Statement;

(n)     enter into such agreements (including an underwriting agreement in form, scope and substance as is customary in underwritten offerings) and take all such other customary actions requested by a Majority-in-Interest of the Demanding Holders (including those reasonably requested by the managing underwriter(s), if any) to expedite or facilitate the disposition of such Registrable Securities, and in such connection, whether or not an underwriting agreement is entered into and whether or not the registration is an underwritten registration, (i) make such representations and warranties to the Holders of such Registrable Securities and the underwriters, if any, with respect to the business of the Issuer and its Subsidiaries, and the Registration Statement, Prospectus and documents, if any, incorporated or deemed to be incorporated by reference therein, in each case, in form, substance and scope as are customarily made by issuers to underwriters in underwritten offerings, and, if true, confirm the same if and when reasonably requested, (ii) use its reasonable best efforts to furnish to the selling Holders of such Registrable Securities opinions of outside counsel (and/or internal counsel if acceptable to the managing underwriter(s)) to the Issuer and updates thereof (which counsel and opinions (in form, scope and substance) shall be reasonably satisfactory to the managing underwriter(s), if any, and counsels to the selling Holders of the Registrable Securities), addressed to each selling Holder of Registrable Securities and

each of the underwriters, if any, covering the matters customarily covered in opinions requested in underwritten offerings and such other matters as may be reasonably requested by such counsel and underwriters, (iii) use its reasonable best efforts to obtain "cold comfort" letters and updates thereof from an independent registered public accounting firm with respect to the Issuer (and, if necessary, any other independent certified public accountants of any Subsidiary of the Issuer or of any business acquired by the Issuer for which financial statements and financial data are, or are required to be, included in the Registration Statement) who have certified the financial statements included in such Registration Statement, addressed to each selling Holder of Registrable Securities (unless such accountants shall be prohibited from so addressing such letters by applicable standards of the accounting profession) and each of the underwriters, if any, such letters to be in customary form and covering matters of the type customarily covered in "cold comfort" letters in connection with underwritten offerings, (iv) if an underwriting agreement is entered into, the same shall contain indemnification provisions and procedures that are customary for underwriting agreements in connection with underwritten offerings except as otherwise agreed by the parties thereto and (v) deliver such documents and certificates as may be reasonably requested by a Majority-in-Interest of the Demanding Holders or their counsel, as the case may be, or the managing underwriter(s), if any, to evidence the continued validity of the representations and warranties made pursuant to Section 4.(a)(i)(n)(i) above and to evidence compliance with any customary conditions contained in the underwriting agreement or other agreement entered into by the Issuer. The above shall be done at each closing under such underwriting or similar agreement, or as and to the extent required thereunder;

(o)     upon reasonable notice, make available for inspection by a representative of the selling Holders of Registrable Securities, the underwriters participating in any such disposition of Registrable Securities, if any, and any attorneys or accountants retained by such selling Holders or underwriter (collectively, the "Inspectors") at the offices where normally kept, during reasonable business hours, all financial and other records, pertinent corporate documents and properties of the Issuer and its Subsidiaries (collectively, the "Records"), as shall be reasonably necessary to enable them to exercise their due diligence responsibility, and cause the officers, directors, managers and employees of the Issuer and its Subsidiaries to supply all information in each case reasonably requested by any such representative, underwriter, attorney or accountant in connection with such Registration Statement; provided, however, that any information and Records that are not generally publicly available at the time of delivery of such information shall be kept confidential by the Inspectors unless (i) disclosure of such information or Records is required by court or administrative order, (ii) disclosure of such information or Records, in the opinion of counsel to such Inspector, is required by law or applicable legal process, (iii) such information or Records become generally available to the public other than as a result of a disclosure or failure to safeguard by such Inspector, (iv) such information or Records become available to such Inspector on a nonconfidential basis from a source other than the Company or (v) such information or Records are independently developed by such Inspector. In the case of a proposed disclosure pursuant to (i) or (ii) above, such Inspector shall be required to give the Issuer written notice of the proposed disclosure prior to such disclosure and, if requested by the Issuer, assist the Issuer in seeking to prevent or limit the proposed disclosure;

(p)     cause its officers to use their reasonable best efforts to support the marketing of the Registrable Securities covered by the Registration Statement (including, without limitation, participation in such number of "road shows" as the underwriter(s) reasonably request);

(q)     cooperate with each seller of Registrable Securities and each underwriter or agent participating in the disposition of such Registrable Securities and their respective counsel in connection with any filings required to be made with the FINRA;

(r)     otherwise use its reasonable best efforts to comply with all applicable rules and regulations of the SEC (including Regulation M), and make available to its security holders, as soon as reasonably practicable (but no more than eighteen (18) months after the effective date of the Registration Statement or such later date as provided by Section 11(d) of the Securities Act), an earnings statement covering the period of at least twelve (12) months beginning with the first day of the Issuer's first full calendar quarter after the effective date of the Registration Statement (or such later date as provided by Section 11(d) of the Securities Act), which earnings statement will satisfy the provisions of Section 11(a) of the Securities Act and Rule 158 thereunder; and

(s)     otherwise use its reasonable best efforts to take all other steps necessary to effect the registration of such Registrable Securities contemplated hereby.

The Issuer may require each Holder of Registrable Securities as to which any registration is being effected to furnish to the Issuer in writing such information required in connection with such registration regarding such seller and the distribution of such Registrable Securities as the Issuer may, from time to time, reasonably request and the Issuer may exclude from such registration the Registrable Securities of any Holder who unreasonably fails to furnish such information within a reasonable time after receiving such request.

The Issuer agrees not to file or make any amendment to any Registration Statement with respect to any Registrable Securities, or any amendment of or supplement to the Prospectus or any Free Writing Prospectus used in connection therewith, that refers to any Holder covered thereby by name, or otherwise identifies such Holder as the holder of any securities of the Issuer, without the consent of such Holder, such consent not to be unreasonably withheld or delayed, unless and to the extent such disclosure is required by law, rule or regulation, in which case the Issuer shall provide prompt written notice to such Holders prior to the filing of such amendment to any Registration Statement or amendment of or supplement to the Prospectus or any Free Writing Prospectus.

If the Issuer files any Shelf Registration Statement for the benefit of the holders of any of its securities other than the Holders, the Issuer agrees that it shall use its reasonable best efforts to include in such Shelf Registration Statement such disclosures as may be required by Rule 430B under the Securities Act (referring to the unnamed selling security holders in a generic manner by identifying the initial offering of the securities to the Holders) in order to ensure that the Holders may be added to such Shelf Registration Statement at a later time through the filing of a Prospectus supplement rather than a post-effective amendment.

Each Holder of Registrable Securities agrees if such Holder has Registrable Securities covered by such Registration Statement that, upon receipt of any notice from the Issuer of the happening of any event of the kind described in <u>Section 4.(a)(i)(c)(ii)-(vi)</u> hereof, such Holder will promptly discontinue disposition of such Registrable Securities covered by such Registration Statement or Prospectus until such Holder's receipt of the copies of the supplemented or amended Prospectus contemplated by <u>Section 4.(a)(i)(j)</u> hereof, or until it is advised in writing by the Issuer that the use of the applicable Prospectus may be resumed, and has received copies of any additional or supplemental filings that are incorporated or deemed to be incorporated by reference in such Prospectus; <u>provided</u>, <u>however</u>, that the time periods under <u>Section 3</u> with respect to the length of time that the effectiveness of a Registration Statement must be maintained shall automatically be extended by the amount of time the Holder is required to discontinue disposition of such Registrable Securities.

5.     <u>Hedging Transactions.</u>  The Parties agree that the provisions of this Agreement relating to the registration, offer and sale of Registrable Securities apply also to (a) any transaction which Transfers some or all of the economic risk of ownership of Registrable Securities, including any forward contract, equity swap, put or call, put or call equivalent position, collar, margin loan, sale of exchangeable security or similar transaction (including the registration, offer and sale under the Securities Act of Registrable Securities pledged to the counterparty to such transaction or of securities of the same class as the underlying Registrable Securities by the counterparty to such transaction in connection therewith), and that the counterparty to such transaction shall be selected in the sole discretion of the Holders and (b) any derivative transactions in which a broker-dealer, other financial institution or unaffiliated Person may sell Registrable Securities covered by any Prospectus and the applicable prospectus supplement including short sale transactions using Registrable Securities pledged by a Holder or borrowed from the Holder or others and Registrable Securities loaned, pledged or hypothecated to any such party.

The Prospectus shall permit, in connection with derivative transactions, a broker-dealer, other financial institution or third party to sell shares of the Registrable Securities covered by such Prospectus and the applicable prospectus supplement, including in short sale transactions.

6.     <u>Indemnification.</u>

(a)     <u>Indemnification by the Issuer.</u> The Issuer shall, without limitation as to time, indemnify and hold harmless, to the fullest extent permitted by law, each Holder of Registrable Securities whose Registrable Securities are covered by a Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus or other document (including any related notification or the like), or any amendment thereof or supplement thereto or any document incorporated by reference therein, the officers, directors, managers, partners, members, managers, shareholders, accountants, attorneys, agents and employees of each of them, each Person who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) each such Holder and the officers, directors, managers, partners, members, managers, shareholders, accountants, attorneys, agents and employees of each such controlling Person, each underwriter, if any, and each Person who controls (within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act) such underwriter (each such Person being referred to herein as a "<u>Covered Person</u>"), from and against any and all losses,

claims, damages, liabilities, costs (including, without limitation, costs of preparation and reasonable attorneys' fees and any legal or other fees or expenses incurred by such Covered Person in connection with any investigation or proceeding), expenses, judgments, fines, penalties, charges and amounts paid in settlement (collectively, "Losses"), as incurred, arising out of or based upon any untrue or alleged untrue statement of a material fact contained in any Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus or other document (including any related notification or the like), or any amendment thereof or supplement thereto or any document incorporated by reference therein incident to any such registration, qualification or compliance, or based on any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, preliminary Prospectus or Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, or any violation by the Issuer of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation thereunder applicable to the Issuer and relating to any action or inaction in connection with the related offering of Registrable Securities, and will reimburse each such Covered Person for any legal and any other expenses reasonably incurred in connection with investigating and defending or settling any such Loss, provided, that the Issuer will not be liable in any such case to the extent that any such Loss arises out of or is based on any untrue statement or omission by such Covered Person relating to such Covered Person or its Affiliates (other than the Issuer or any of its Subsidiaries), but only to the extent that such untrue statement (or alleged untrue statement) or omission (or alleged omission) is made in such Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus, or any amendment thereof or supplement thereto or any document incorporated by reference therein, or other document in reliance upon and in conformity with written information furnished to the Issuer by such Covered Person with respect to such Covered Person expressly for use therein. It is agreed that the indemnity agreement contained in this Section 6.(a) shall not apply to amounts paid in settlement of any such Loss or action if such settlement is effected without the consent of the Issuer (which consent shall not be unreasonably withheld).

(b)        Indemnification by Holder of Registrable Securities. As a condition to including any Registrable Securities in any Registration Statement filed in accordance with Section 4 hereof, the Issuer shall have received an undertaking reasonably satisfactory to it from the prospective seller of such Registrable Securities to indemnify, to the fullest extent permitted by law, severally and not jointly with any other Holders of Registrable Securities, the Issuer, its directors, managers and officers and each Person who controls (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act) the Issuer and each underwriter, broker or other Person acting on behalf of the holders of Registrable Securities, from and against all Losses arising out of or based on any untrue or alleged untrue statement of a material fact contained in any such Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus or other document, or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein (in the case of a Prospectus, preliminary Prospectus or Free Writing Prospectus, in light of the circumstances under which they were made) not misleading, and will reimburse the Issuer, such directors, managers, officers, controlling Persons, underwriters, brokers and other Persons for any legal or any other expenses reasonably incurred in connection with investigating or defending any such Loss, in each case to the extent, but only to the extent, that such untrue statement or omission is made in such Registration Statement, Prospectus, preliminary

Prospectus, offering circular, Free Writing Prospectus or other document in reliance upon and in conformity with written information furnished to the Issuer by such Holder with respect to such Holder expressly for inclusion in such Registration Statement, Prospectus, preliminary Prospectus, offering circular, Free Writing Prospectus or other document; provided, however, that the obligations of such Holder hereunder shall not apply to amounts paid in settlement of any such Losses (or actions in respect thereof) if such settlement is effected without the consent of such Holder (which consent shall not be unreasonably withheld); and provided, further, that the liability of such Holder of Registrable Securities under this <u>Section 6.(b)</u> and <u>Section 6.(d)</u> shall be limited, in the aggregate, to the net proceeds after underwriting fees, commissions and discounts (but before any taxes and expenses which may be payable by such Holder) received by such selling Holder from the sale of Registrable Securities covered by such Registration Statement.

(c)     <u>Conduct of Indemnification Proceedings</u>. If any Person shall be entitled to indemnity hereunder (an "<u>Indemnified Party</u>"), such Indemnified Party shall give prompt notice to the Party from which such indemnity is sought (the "<u>Indemnifying Party</u>") of any claim or of the commencement of any proceeding with respect to which such Indemnified Party seeks indemnification or contribution pursuant hereto; <u>provided</u>, <u>however</u>, that the delay or failure to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any obligation or liability except to the extent that the Indemnifying Party has been materially prejudiced by such delay or failure. The Indemnifying Party shall have the right, exercisable by giving written notice to an Indemnified Party promptly after the receipt of written notice from such Indemnified Party of such claim or proceeding, to, unless in the Indemnified Party's reasonable judgment a conflict of interest between such Indemnified Party and Indemnifying Party may exist in respect of such claim, assume, at the Indemnifying Party's expense, the defense of any such claim or proceeding, with counsel reasonably satisfactory to such Indemnified Party; <u>provided</u>, <u>however</u>, that an Indemnified Party shall have the right to employ separate counsel in any such claim or proceeding and to participate in the defense thereof, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party unless: (i) the Indemnifying Party agrees to pay such fees and expenses; or (ii) the Indemnifying Party fails promptly to assume, or in the event of a conflict of interest cannot assume, the defense of such claim or proceeding or fails to employ counsel reasonably satisfactory to such Indemnified Party; in which case the Indemnified Party shall have the right to employ counsel and to assume the defense of such claim or proceeding at the Indemnifying Party's expense; <u>provided</u>, <u>further</u>, <u>however</u>, that the Indemnifying Party shall not, in connection with any one such claim or proceeding or separate but substantially similar or related claims or proceedings in the same jurisdiction, arising out of the same general allegations or circumstances, be liable for the fees and expenses of more than one firm of attorneys (together with appropriate local counsel) at any time for all of the Indemnified Parties, or for fees and expenses that are not reasonable and documented. Whether or not such defense is assumed by the Indemnifying Party, such Indemnifying Party will not be subject to any liability for any settlement made without its consent (but such consent will not be unreasonably withheld or delayed). The Indemnifying Party shall not consent to entry of any judgment or enter into any settlement that (x) does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party of a release, in form and substance reasonably satisfactory to the Indemnified Party, from all liability in respect of such claim or litigation for which such Indemnified Party would be entitled to indemnification hereunder or (y) involves the imposition of equitable remedies or the imposition of any obligations on the Indemnified Party or adversely

affects such Indemnified Party other than as a result of financial obligations for which such Indemnified Party would be entitled to indemnification hereunder.

(d)     Contribution. If the indemnification provided for in this Section 6 is unavailable to an Indemnified Party in respect of any Losses (other than in accordance with its terms), then each applicable Indemnifying Party, in lieu of indemnifying such Indemnified Party, shall contribute to the amount paid or payable by such Indemnified Party as a result of such Losses, in such proportion as is appropriate to reflect the relative fault of the Indemnifying Party, on the one hand, and such Indemnified Party, on the other hand, in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of such Indemnifying Party, on the one hand, and Indemnified Party, on the other hand, shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission to state a material fact, has been made (or omitted) by, or relates to information supplied by, such Indemnifying Party or Indemnified Party, whether any applicable violation of the Securities Act, the Exchange Act, any state securities law, or any rule or regulation thereunder was perpetrated by the Indemnifying Party or the Indemnified Party, and the Parties' relative intent, knowledge, access to information and opportunity to correct or prevent any such action, statement or omission.

The Parties agree that it would not be just and equitable if contribution pursuant to this Section 6.(d)were determined by *pro rata* allocation or by any other method of allocation that does not take account of the equitable considerations referred to in the immediately preceding paragraph. Notwithstanding the provisions of this Section 6.(d), an Indemnifying Party that is a selling Holder of Registrable Securities shall not be required to contribute any amount in excess of the amount that such Indemnifying Party has otherwise been, or would otherwise be, required to pay pursuant to Section 6.(b) by reason of such untrue or alleged untrue statement or omission or alleged omission. No Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.

Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are more favorable to the Holders than the foregoing provisions, the provisions in the underwriting agreement shall control.

(e)     Deemed Underwriter. To the extent that any of the Holders is, or would be expected to be, deemed to be an underwriter of Registrable Securities pursuant to any SEC comments or policies or any court of law or otherwise, the Issuer agrees that (i) the indemnification and contribution provisions contained in this Section 6 shall be applicable to the benefit of such Holder in its role as deemed underwriter in addition to its capacity as a Holder (so long as the amount for which any other Holder is or becomes responsible does not exceed the amount for which such Holder would be responsible if the Holder were not deemed to be an underwriter of Registrable Securities) and (ii) such Holder and its representatives shall be entitled to conduct the due diligence which would normally be conducted in connection with an offering of securities registered under the Securities Act, including receipt of customary opinions and comfort letters.

23

(f)      Other Indemnification. Indemnification similar to that specified in the preceding provisions of this Section 6 (with appropriate modifications) shall be given by the Issuer and each seller of Registrable Securities with respect to any required registration or other qualification of securities under any federal or state law or regulation or governmental authority other than the Securities Act.

(g)      Non-Exclusivity. The obligations of the Parties under this Section 6 shall be in addition to any liability which any Party may otherwise have to any other Party.

(h)      Primacy of Indemnification. The Issuer hereby acknowledges that certain of the Investors have certain rights to indemnification, advancement of expenses and/or insurance provided by certain of its Affiliates (collectively, the "Indemnitors"). The Issuer hereby agrees that (i) it is the indemnitor of first resort (i.e., its obligations to the Investors are primary and any obligation of the Indemnitors to advance expenses or to provide indemnification for the same Losses incurred by any of the Investors are secondary to any such obligation of the Issuer), (ii) it shall be liable for the full amount of all Losses to the extent legally permitted and as required by the terms of this Agreement and the articles and other organizational documents of the Issuer (or any other agreement between the Issuer and the relevant Investor), without regard to any rights any Investor may have against the Indemnitors, and (iii) it irrevocably waives, relinquishes and releases the Indemnitors from any and all claims (x) against the Indemnitors for contribution, indemnification, subrogation or any other recovery of any kind in respect thereof and (y) that any Investor must seek indemnification from any Indemnitor before the Issuer must perform its indemnification obligations under this Agreement. No advancement or payment by the Indemnitors on behalf of any Investor with respect to any claim for which such Investor has sought indemnification from the Issuer hereunder shall affect the foregoing. The Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery which any Investor would have had against the Issuer if the Indemnitors had not advanced or paid any amount to or on behalf of such Investor. The Issuer and the Investors agree that the Indemnitors are express third party beneficiaries of this Section 6.

7.      Conversion to Corporation.

(a)      In connection with an IPO, all Investors shall, and shall cause their Affiliates to, take all necessary or desirable actions in connection with the consummation of such transaction, (i) to, as the Board may reasonably request, (x) convert the Company to a corporate form in a tax-free transaction (except to the extent of taxable income or gain required to be recognized by a Investor in an amount that does not exceed the amount of cash or any property or rights (other than stock) received by such Investor upon the consummation of such transaction and/or any concurrent transaction), or (y) accomplish the foregoing by effecting a transaction that is treated as the contribution of the Units or Unit Equivalents of the Company into a newly formed "shell" corporation pursuant to Section 351 of the U.S. Internal Revenue Code of 1986, as amended, with the result that each Investor shall hold capital stock of such surviving corporation or business entity (in each case, a "Successor Corporation"), and (ii) to cause the Successor Corporation to assume all of the obligations of the Company under this Agreement,

*mutatis mutandis.*  Upon the occurrence of any such conversion to a corporation, the terms of this Agreement shall thereafter apply to the Stock, *mutatis mutandis.*

(b)     The Company and the Board will use their respective reasonable best efforts to perform any conversion or restructuring contemplated in <u>Section 7(a)</u> in the most tax efficient manner for the Investors, including any Investors that are treated as corporations for U.S. federal income tax purposes. Upon the approval of the Board that such action is necessary to preserve the benefits of "tacking" under Rule 144 of the Securities Act, such conversion or merger may be structured to occur without any action on the part of any Investor, and each Investor hereby consents in advance to any action that the Board shall deem necessary to accomplish such result.

(c)     In connection with an IPO, if so determined by the Board, immediately prior to the consummation of the IPO or at such other time as the Board may determine, all of the outstanding Common Units of the Company shall automatically convert into shares of common stock of the Successor Corporation (the "<u>Stock</u>") and all of the Unit Equivalents convertible into, exchangeable or exercisable for Common Units, shall automatically convert into securities, obligations, options, warrants or other rights that are convertible into, exchangeable, or exercisable for Stock, on the same terms, or terms as similar as possible, as they are then convertible into, exchangeable, or exercisable for Common Units.

8.     <u>Registration Expenses</u>. All fees and expenses incurred in the performance of or compliance with this Agreement by the Issuer or as otherwise identified below shall be borne by the Issuer, whether or not any Registration Statement is filed or becomes effective, including, without limitation, (a) all registration and filing fees (including, without limitation, fees and expenses with respect to (i) filings required to be made with the SEC, all applicable securities exchanges and/or FINRA and (ii) compliance with securities or blue sky laws, including, without limitation, any reasonable fees and disbursements of counsel for the underwriters in connection with blue sky qualifications of the Registrable Securities pursuant to <u>Section 4.(a)(i)(g)</u>), (b) printing expenses (including, without limitation, expenses of printing certificates for Registrable Securities in a form eligible for deposit with The Depository Trust Company and of printing Prospectuses if the printing of Prospectuses is requested by the managing underwriter(s), if any, or by a Majority-in-Interest of the Demanding Holders), (c) messenger, telephone and delivery expenses of the Issuer, (d) fees and disbursements of counsel for the Issuer, (e) expenses of the Issuer incurred in connection with any road show, (f) fees and disbursements of all independent registered public accounting firms referred to in <u>Section 4.(a)(i)(n)</u> hereof (including, without limitation, the expenses of any "cold comfort" letters required by this Agreement) and any other Persons, including special experts retained by the Issuer and (g) documented fees and disbursements of one firm of counsel for all of the Holders participating in the offering, which counsel shall be selected by a Majority-in-Interest of the Demanding Holders with respect to an offering in connection with a Demand Registration, and otherwise by Holders holding a majority of the Registrable Securities proposed to be sold in such offering. In addition, the Issuer shall pay its internal expenses (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit, the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange on which similar securities issued by the Issuer are then listed and rating agency fees and the fees and expenses of any Person, including special experts, retained by the Issuer.

The Issuer shall not be required to pay (i) fees and disbursements of any counsel retained by any Holder of Registrable Securities or by any underwriter (except as set forth in Section 6 and this Section 8), (ii) any underwriter's fees (including discounts, commissions or fees of underwriters, selling brokers, dealer managers or similar securities industry professionals) relating to the distribution of the Registrable Securities (other than with respect to Registrable Securities sold by the Issuer), or (iii) any other expenses of the Holders of Registrable Securities not specifically required to be paid by the Issuer pursuant to Section 6 or the first paragraph of this Section 8.

9.      Rule 144. After an IPO, the Issuer covenants that it will file the reports required to be filed by it under the Securities Act and the Exchange Act and the rules and regulations adopted by the SEC thereunder (or, if the Issuer is not required to file such reports, it will, upon the request of any Holder, make publicly available such information so long as necessary to permit sales of Registrable Securities pursuant to Rule 144), and it will take such further action as any Holder of Registrable Securities (or, if the Issuer is not required to file reports as provided above, any Holder) may request, all to the extent required from time to time to enable such Holder to sell shares of Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144. Upon the request of any Holder of Registrable Securities, the Issuer will deliver to such Holder a written statement as to whether it has complied with such requirements and, if not, the specifics thereof.

10.      Certain Additional Agreements. If any Registration Statement or comparable statement under state blue sky laws refers to any Holder by name or otherwise as the Holder of any securities of the Issuer, then such Holder shall have the right to require (a) the insertion therein of language, in form and substance satisfactory to such Holder and the Issuer, to the effect that the holding by such Holder of such securities is not to be construed as a recommendation by such Holder of the investment quality of the Issuer's securities covered thereby and that such holding does not imply that such Holder will assist in meeting any future financial requirements of the Issuer, or (b) in the event that such reference to such Holder by name or otherwise is not in the good faith judgment of the Issuer required by the Securities Act or any similar federal statute or any state blue sky or securities law then in force, the deletion of the reference to such Holder.

11.      Miscellaneous.

(a)      Termination. The provisions of this Agreement shall terminate upon the earliest to occur of (i) its termination by the written agreement of all Parties or their respective successors in interest, (ii) with respect to a Holder, the date on which all Equity Securities held by such Holder or which may be obtained upon the conversion, exchange or exercise of other securities held by such Holder have ceased to be Registrable Securities, (iii) with respect to the Issuer, the date on which all Equity Securities outstanding or which may be obtained upon the conversion, exchange or exercise of other securities outstanding have ceased to be Registrable Securities and (iv) the dissolution, liquidation or winding up of the Issuer. Nothing herein shall relieve any Party from any liability for the breach of any of the agreements set forth in this Agreement. The provisions of Sections 6 and 8 shall survive any termination of this Agreement.

(b)    Holdback Agreement. In consideration for the Issuer agreeing to its obligations under this Agreement, each Holder agrees in connection with any registration of the Issuer's securities (whether or not such Holder is participating in such registration) upon the request of the Issuer and the underwriter(s) managing any underwritten offering of the Issuer's securities, to enter into a customary and reasonable agreement (subject to customary and reasonable exceptions) (each, a "Holdback Agreement") not to effect (other than sales of Registrable Securities to be included in such offering and registration) any public sale or distribution of its Registrable Securities held immediately before the effectiveness of the Registration Statement for such offering, including, but not limited to, any sale pursuant to Rule 144, or make any short sale of, loan, grant any option for the purchase of, or otherwise dispose of, or enter into any swap or other arrangement that transfers to another Person any of the economic consequences of ownership of, any Registrable Securities, any other equity securities of the Issuer or any securities convertible into or exchangeable or exercisable for any equity securities of the Issuer without the prior written consent of the Issuer or such underwriters, as the case may be, during the Holdback Period. The foregoing provisions of this Section 11.(b) shall be applicable to a Holder only if all executive officers, directors and managers of the Issuer and all other Holders, together with their Affiliates, owning more than five (5%) of the Equity Securities then outstanding are subject to restrictions on substantially similar terms.

If any registration pursuant to Section 3 of this Agreement shall be in connection with any underwritten public offering, upon request of the underwriter(s) managing such underwritten offering, the Issuer and each of the executive officers, directors, and managers of the Issuer will not effect any public sale or distribution of any equity securities of the Issuer or any securities convertible into or exchangeable or exercisable for any equity securities of the Issuer (other than a registration statement (i) on Form S-4, Form S-8 or any successor forms promulgated for similar purposes or (ii) filed in connection with an exchange offer or any employee benefit or dividend reinvestment plan) for its own account without the prior written consent of such underwriters, during the Holdback Period.

Each Holdback Agreement entered into by a Holder in connection with any underwritten offering shall be on terms that are no less favorable to such Holder than terms applicable to the Party subject to the corresponding restrictions under (i) the Holdback Agreement entered into by any other Holder in connection with such underwritten offering or (ii) any agreement similar to the Holdback Agreement entered into by the directors, managers or executive officers of the Company.

(c)    Amendments and Waivers. This Agreement may be amended and the Issuer may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if any such amendment, action or omission to act has received the written consent of the Company or the Issuer, as the case may be, and the Holders of a majority of the then outstanding Registrable Securities; provided, that this Agreement may not be amended in a manner that would, by its terms, adversely and disproportionately affect the rights or obligations of any Holder of Registrable Securities without the prior written consent of each such Holder. The failure of any Party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such Party thereafter to enforce each and every provision of this Agreement in accordance with its terms. Any Holder may waive (in writing) the benefit of any provision of this Agreement with respect to itself for

any purpose. Any such waiver shall constitute a waiver only with respect to the specific matter described in such writing and shall in no way impair the rights of the Holder granting such waiver in any other respect or at any other time.

(d)      Issuer Party; Non-U.S. IPO. In the event that the entity ultimately selected to be the Issuer is not a Party, the Parties shall amend this Agreement to include the Issuer as a Party and shall cause the Issuer to enter into such amended Agreement. In the event the Parties elect to consummate an initial public offering of Equity Securities in a jurisdiction other than the United States, the Parties shall amend the terms of this Agreement as necessary to reflect the rules and regulations of the exchange and jurisdiction where such initial public offering is to be performed, it being understood and agreed that the provisions set forth herein (including, without limitation, those set forth in Sections 6 and 8) shall be applicable to any such non-U.S. initial public offering and any subsequent non-U.S. public offerings of Equity Securities.

(e)      Successors, Assigns and Transferees. This Agreement shall be binding upon and inure to the benefit of and be enforceable by the Parties and their respective successors and assigns who agree in writing to be bound by the provisions of this Agreement. The rights of a Holder hereunder may be assigned (but only with all related obligations set forth below) in connection with a Transfer of Registrable Securities effected in accordance with the terms of this Agreement to a Permitted Transferee of that Holder. Without prejudice to any other or similar conditions imposed hereunder with respect to such Transfer, no assignment permitted under the terms of this Section 11.(e) will be effective unless and until the Permitted Transferee to which the assignment is being made, if not a Holder, has delivered to the Issuer the executed Joinder Agreement in the form attached as Exhibit B hereto agreeing to be bound by, and be party to, this Agreement. A Permitted Transferee to whom rights are transferred pursuant to this Section 11.(e) may not again Transfer those rights to any other Permitted Transferee, other than as provided in this Section 11.(e). The Issuer may assign this Agreement at any time in connection with a sale or acquisition of the Issuer, whether by merger, consolidation, sale of all or substantially all of the Issuer's assets, or similar transaction, without the consent of the Holders; provided, that the successor or acquiring Person agrees in writing to assume all of the Issuer's rights and obligations under this Agreement.

(f)      Notices. Except as otherwise provided elsewhere in this Agreement regarding notices by electronic mail or other electronic means to the Investors and the Company and regarding all notices, requests, demands and other communications required or permitted to be given hereunder shall be in writing and shall in all cases be delivered by email (with read receipt or other written confirmation received, in which case such notice shall be deemed received on the date such email was sent), but may, as a second method of delivery, also be delivered (i) by personal delivery, (ii) by a nationally recognized overnight courier service or (ii) by deposit in the U.S. Mail, postage prepaid, registered or certified mail, return receipt requested, to the Company at its principal executive office and to any Investor at the address then shown as the current address of such Investor specified on the Investor Registry (as defined in the LLC Agreement) or on such Investor's signature page hereto. All notices delivered by email shall be confirmed by the recipient by a non-automated email response within two (2) Business Days of receipt.

The Holders will keep any notice delivered pursuant to Section 2 or 3 confidential.

(g)    Further Assurances. At any time or from time to time after the date hereof, the Parties agree to cooperate with each other, and at the request of any other Party, to execute and deliver any further instruments or documents and to take all such further action as the other Party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the Parties hereunder.

(h)    Preservation of Rights.. The Issuer will not (i) grant any registration right to third parties which are more favorable than or inconsistent with the rights granted hereunder or (ii) enter into any agreement, take any action or permit any change to occur, with respect to securities that violates or subordinates the rights expressly granted to the Holders.

(i)    Entire Agreement; No Third Party Beneficiaries. This Agreement (i) constitutes the entire agreement among the Parties with respect to the subject matter of this Agreement and supersedes any prior discussions, correspondence, negotiations, proposed term sheets, understandings or agreements, and there are no agreements, understandings, representations or warranties between the Parties other than those set forth or referred to in this Agreement and (ii) except as provided in Section 6 with respect to an Indemnified Party, is not intended to confer in or on behalf of any Person not a Party (and their successors and assigns) any rights, benefits, causes of action or remedies with respect to the subject matter or any provision hereof.

(j)    Governing Law; Jurisdiction and Forum; Waiver of Jury Trial.

(i)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts executed and to be performed wholly within such State and without reference to the choice-of-law principles that would result in the application of the laws of a different jurisdiction.

(ii)    Each Party irrevocably submits to the jurisdiction of the United States District Court for the Southern District of New York or any court of the State of New York located in such district for the purposes of any suit, action or other proceeding arising out of or relating to this Agreement, and hereby irrevocably agrees that all claims in respect of such suit, action or proceeding may be heard and determined in such court. Each Party hereby irrevocably waives, to the fullest extent that it may effectively do so, the defense of an inconvenient forum to the maintenance of such suit, action or other proceeding. The Parties further agree, to the extent permitted by law, that final and unappealable judgment against any of them in any suit, action or other proceeding contemplated above shall be conclusive and may be enforced in any other jurisdiction within or outside the United States by suit on the judgment, a certified copy of which shall be conclusive evidence of the fact and amount of such judgment.

(iii)    EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT SUCH PARTY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(k)  <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party hereto. Upon such a determination, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(l)  <u>Enforcement</u>. Each Party hereto acknowledges that money damages would not be an adequate remedy in the event that any of the covenants or agreements in this Agreement are not performed in accordance with its terms, and it is therefore agreed that in addition to and without limiting any other remedy or right it may have, the non-breaching Party will have the right to an injunction, temporary restraining order or other equitable relief in any court of competent jurisdiction enjoining any such breach and enforcing specifically the terms and provisions hereof.

(m)  <u>Titles and Subtitles</u>. The titles of the sections and subsections of this Agreement are for convenience of reference only and will not affect the meaning or interpretation of this Agreement.

(n)  <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Agreement, the Company, the Issuer and each Holder covenant, agree and acknowledge that no recourse under this Agreement or any documents or instruments delivered in connection with this Agreement shall be had against any current or future director, manager, officer, employee, member, shareholder, general or limited partner or member of the Investors or of any Affiliate or assignee thereof, whether by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any statute, regulation or other applicable law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any current or future director, manager, officer, employee, member, shareholder, general or limited partner or member of any Investor or of any Affiliate or assignee thereof, as such for any obligation of the Investor under this Agreement or any documents or instruments delivered in connection with this Agreement for any claim based on, in respect of or by reason of such obligations or their creation.

(o)  <u>Counterparts; Electronic Signatures</u>. This Agreement may be executed in any number of counterparts (including via electronic transmission), each of which shall be an original, but all of which together shall constitute one instrument. This Agreement may be executed by electronic signature(s).

<div align="center">[Remainder of page left intentionally blank]</div>

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement or caused this Agreement to be duly executed on its behalf as of the date first written above.

SMI TOPCO HOLDINGS, LLC

By: _____
     Name:
     Title:

*Signature Page to Registration Rights Agreement*

[NAME OF INVESTOR]

By: _____
    Name:
    Title:

Exhibit A

INVESTORS

<u>Exhibit B</u>

<div align="center"><u>JOINDER AGREEMENT</u></div>

Reference is made to the Registration Rights Agreement, dated as of [●], 2023 (as amended from time to time, the "<u>Registration Rights Agreement</u>"), by and among SMI Topco Holdings, LLC, a Delaware limited liability company (the "<u>Company</u>") and the other parties thereto. The undersigned agrees, by execution hereof, to become a party to, and to be subject to the rights and obligations of a Holder under, the Registration Rights Agreement.

[NAME]

By: _____
    Name:
    Title:

Date:

Address:

Acknowledged by:

SMI TOPCO HOLDINGS, LLC

By: _____
    Name:
    Title

**Exhibit B**

**Schedule of Rejected Executory Contracts and Unexpired Leases**

Pursuant to Article V.A of the Plan, on the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be assumed by and assigned to the applicable Reorganized Debtors, the Post-Sale Estates, and/or any Third-Party Purchaser, as applicable, or any of their respective designated assignees in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Court, other than those Executory Contracts or Unexpired Leases that: (1) are identified on the Schedule of Rejected Executory Contracts and Unexpired Leases; (2) have been previously rejected or assumed by a Final Order; (3) are the subject of a motion to reject Executory Contracts or Unexpired Leases that is pending on the Effective Date; (4) are subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date; or (5) have previously expired or terminated pursuant to its own terms or by agreement of the parties thereto.

Entry of the Confirmation Order shall constitute the Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan or herein, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to the Plan but not assigned to a third-party before the Effective Date shall re-vest in and be fully enforceable by the applicable Reorganized Debtor or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Court authorizing its assumption under applicable federal law. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Court on or after the Effective Date. Notwithstanding anything to the contrary in the Plan, the Debtors, with the reasonable consent of the Required First Lien Lender Group, reserve the right to alter, amend, modify, or supplement this Schedule of Rejected Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than three (3) days' notice to the applicable non-Debtor counterparties.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or

Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. Neither the exclusion nor inclusion of any Executory Contract or Unexpired Leases on this Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything else in the Plan, shall constitute an admission by the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease, or that any Debtor or Reorganized Debtor has any liability thereunder.

| Contract | Contract Debtor | Contract Counterparty | Address |
|----------|-----------------|-----------------------|---------|
| None | N/A | N/A | N/A |

## **Exhibit C**

**Identities of Members of the New Board and Officers of Reorganized SMI Topco**

- To be supplemented.

**Exhibit C**

4887-5026-1394

**Exhibit D**

**List of Retained Causes of Action**

Article IV.H of the Plan[1] provides that:

In accordance with section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors or the Post-Sale Estates, as applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the List of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors or the Post-Sale Estates, as applicable.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, the Confirmation Order, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors, the Reorganized Debtors, or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, will not pursue any and all available Causes of Action against it. The Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order (including the Confirmation Order), including pursuant to Article VIII hereof, the Debtors, the Reorganized Debtors, and the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or Consummation.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Reorganized Debtor

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings given to such term in the Plan.

or Post-Sale Estate, as applicable.  The applicable Reorganized Debtors or the Post-Sale Estates, as applicable, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Reorganized Debtors or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Court.

In accordance with Article IV.H of the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action not expressly released or waived under the Plan, including, but not limited to, the following:

## A.      Causes of Action Related to Litigation and Possible Litigation

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action, including any claims, defenses, counterclaims, and/or crossclaims against or related to all Entities that are party to or that may in the future become party to litigation, arbitration, or any other type of adversarial proceeding or dispute resolution proceeding involving the Debtors, whether formal or informal, judicial or non-judicial, including, without limitation, proceedings involving dealers, creditors, counterparties, customers, employees, consultants, contractors, subcontractors, utilities, suppliers, vendors, insurers, sureties, lenders, or any other parties whatsoever.

Except to the extent any such claim is specifically satisfied, settled, and released herein, in accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any Cause of Action on the List of Retained Causes of Action shall not be deemed an admission, denial, or waiver of any claims, demands, rights, or causes of action that the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates may hold against any Entity. For the avoidance of doubt, nothing herein shall be read as an admission as to the validity or allowance of any claim against any Debtor, any Reorganized Debtor, and/or the Plan Administrator on behalf of the Post-Sale Estates. Any and all prepetition claims against any Debtor that may be identified herein shall be treated in accordance with the Plan and the Bankruptcy Code.

Without limiting the foregoing, the Debtors expressly reserve any and all Causes of Action, including rights to payment of attorneys' fees costs and expenses in connection with:

1. *Strategic Materials, Inc. v. Jeffries, et al.*, Case No. 2023-CA-000581AX (Mantee Cnty., Fla. Feb. 6, 2023);

2. *Atlas Copco Compressors LLC v. Strategic Materials, Inc.*, Case No. 2023-46735 (Harris Cnty., Tex. July 25, 2023); and

> 3. *Strategic Materials, Inc. v. D&M Truck and Tire Repair, LLC*, Case No. 23-014006-CB (Wayne Cnty., Mich. Oct. 27, 2023).

**B.      Causes of Action Related to Tax Refunds or Credits**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action against or related to all Entities that owe or that may in the future owe money related to tax assets and refunds.

**C.      Causes of Action Related to Insurance Policies and Surety Bonds**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims or Causes of Action against or related to all Entities based in whole or in part upon any and all insurance contracts, insurance policies, and surety bonds to which any of the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estate, as applicable, are a party or pursuant to which any Debtor, Reorganized Debtor, and/or Plan Administrator on behalf of the Post-Sale Estates, as applicable, has any rights whatsoever, regardless of whether such contract, policy, or bond is specifically identified in the Plan, this Plan Supplement, or any amendments thereto, including, without limitation, claims or Causes of Action against insurance carriers, reinsurance carriers, insurance brokers, underwriters, or surety bond issuers related to coverage, indemnity, contribution, reimbursement, overpayment of premiums and/or fees, breach of contract, or any other matters.

**D.      Causes of Action Related to Contracts and Leases**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims or Causes of Action against or related to any and all contracts and/or leases, and similar agreements to which any Debtor, Reorganized Debtor, and/or Plan Administrator on behalf of the Post-Sale Estates has any rights whatsoever.  The claims and Causes of Action reserved include, but are not limited to, Causes of Action against vendors, suppliers of goods and services, or any other parties for: (a) overpayments, back charges, duplicate payments, improper holdbacks, deductions owing or improper deductions taken, deposits, warranties, guarantees, indemnities, recoupment, or setoff; (b) wrongful or improper termination, suspension of services or supply of goods, or failure to meet other contractual or regulatory obligations; (c) failure to fully perform or to condition performance on additional requirements under contracts with any one or more of the Debtors before the assumption or rejection, if applicable, of such contracts; (d) payments, deposits, holdbacks, reserves, or other amounts owed by any creditor, utility, supplier, vendor, insurer, surety, factor, lender, bondholder, lessor, or other party; (e) counterclaims and defenses related to any contractual obligations; (f) any turnover actions arising under section 542 or 543 of the Bankruptcy Code; and (g) unfair competition, interference with contract or potential business advantage, breach of contract, infringement of intellectual property, or any business tort claims.

**E.      Causes of Action Related to Accounts Receivable and Accounts Payable**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims or Causes of Action against or related to all Entities that owe or that may in the future owe money to the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, regardless of whether such Entity is expressly identified in the Plan, the Plan Supplement, or any amendment thereto.  Furthermore, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all Causes of Action against or related to all Entities who assert or may assert that the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, owe money to them.

**F.      Causes of Action Related to Preferential or Fraudulent Transfers**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims and Causes of Action held by the Estate for any state or federal or foreign law fraudulent transfer, preferential transfer, fraudulent conveyance, or similar claim.

**G.      Causes of Action Related to Deposits, Prepayments, Adequate Assurance Postings, and Other Collateral Postings**

Unless otherwise released by the Plan, the Debtors, the Reorganized Debtors, and/or the Plan Administrator on behalf of the Post-Sale Estates, as applicable, expressly reserve all claims or Causes of Action based in whole, or in part, upon any and all postings of a security deposit, adequate assurance payment, or any other type of deposit, prepayment, or collateral paid to, or owed by, any creditor, lessor, utility, supplier, vendor, landlord, sub-lessee, assignee, or any other Entity.

**The Debtors reserve all rights to amend, revise, or supplement this <u>Exhibit D</u> to the Plan Supplement, and any of the documents and designations contained herein, at any time before the Effective Date of the Plan, or any such other date as may be provided for by the Plan or by order of the Court.**

## Exhibit E

**Material Exit Term Loan Facilities Documents**

*Solicitation Version*

TERM LOAN CREDIT AGREEMENT

Dated as of [_____]

among

STRATEGIC MATERIALS HOLDING CORP.,[1]
as the Borrower,

and

SMI GROUP ACQUISITIONS, INC.,
as Holdings,

ACQUIOM AGENCY SERVICES LLC,
as Co-Administrative Agent,

SEAPORT LOAN PRODUCTS LLC,
as Co-Administrative Agent,

and

The Lenders From Time to Time Party Hereto

---

[1] Agreement to be updated to include a separate term loan facility hereunder to be provided by the First Out Lenders on the Closing Date to NexCycle Industries Ltd., the proceeds of which will be used to refinance in full the term loan credit facility provided to NexCycle Industries Ltd. by Piney Lake. The term loan made to NexCycle Industries Ltd. will be guaranteed by all Loan Parties (including the US Loan Parties) and secured by a lien on substantially all assets of the Loan Parties. The loans made (or deemed made) to Strategic Materials Holding Corp. will be guaranteed by the Loan Parties, other than the Canadian Subsidiaries, and will not be secured by assets of the Canadian Subsidiaries or equity interests of the Canadian Subsidiaries, other than a pledge of 65% of the voting and 100% of the non-voting equity of the Canadian Subsidiaries owned by the Loan Parties (other than the Canadian Subsidairies).

# TABLE OF CONTENTS

<div align="right">**Page**</div>

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 2 |
| Section 1.02 | Other Interpretive Provisions | 56 |
| Section 1.03 | Accounting Terms | 56 |
| Section 1.04 | Rounding | 57 |
| Section 1.05 | References to Agreements and Laws | 57 |
| Section 1.06 | Times of Day | 57 |
| Section 1.07 | Timing of Payment or Performance | 57 |
| Section 1.08 | Rates | 57 |
| Section 1.09 | Pro Forma Calculations; Limited Condition Acquisitions | 58 |
| Section 1.10 | Calculation of Baskets | 59 |

## ARTICLE II
## THE TERM COMMITMENTS AND TERM BORROWINGS

| | | |
|---|---|---|
| Section 2.01 | The Loans | 59 |
| Section 2.02 | Term Borrowings, Conversions and Continuations of Loans | 61 |
| Section 2.03 | [Reserved.] | 62 |
| Section 2.04 | [Reserved.] | 62 |
| Section 2.05 | Prepayments | 62 |
| Section 2.06 | Termination or Reduction of Term Commitments | 69 |
| Section 2.07 | Repayment of Loans | 69 |
| Section 2.08 | Interest | 70 |
| Section 2.09 | Fees | 71 |
| Section 2.10 | Computation of Interest and Fees | 71 |
| Section 2.11 | Evidence of Indebtedness | 72 |
| Section 2.12 | Payments Generally; Administrative Agent's Clawback | 72 |
| Section 2.13 | Sharing of Payments | 75 |
| Section 2.14 | [Reserved.] | 75 |
| Section 2.15 | Increase in Term Facility | 75 |
| Section 2.16 | New Incremental Term Facilities | 78 |
| Section 2.17 | [Reserved] | 82 |
| Section 2.18 | Extension of Term Loans | 82 |
| Section 2.19 | [Reserved.] | 85 |
| Section 2.20 | Defaulting Lenders | 85 |

## ARTICLE III
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

| | | |
|---|---|---|
| Section 3.01 | Taxes | 86 |
| Section 3.02 | Illegality | 88 |
| Section 3.03 | Inability to Determine Rates | 89 |
| Section 3.04 | Increased Cost and Reduced Return; Capital Adequacy | 91 |
| Section 3.05 | Funding Losses | 92 |

Section 3.06     Matters Applicable to All Requests for Compensation ...................................93
Section 3.07     Replacement of Lenders under Certain Circumstances ...................................94
Section 3.08     Survival .................................................................................................................95

ARTICLE IV
CONDITIONS PRECEDENT TO TERM BORROWINGS

Section 4.01     Conditions to Closing Date....................................................................................95

ARTICLE V
REPRESENTATIONS AND WARRANTIES

Section 5.01     Existence, Qualification and Power; Compliance with Laws..........................98
Section 5.02     Authorization; No Contravention .....................................................................99
Section 5.03     Governmental Authorization ............................................................................99
Section 5.04     Binding Effect....................................................................................................99
Section 5.05     Financial Statements; No Material Adverse Effect .........................................99
Section 5.06     Litigation..........................................................................................................100
Section 5.07     Ownership of Property; Intellectual Property; Insurance ...........................100
Section 5.08     Environmental Compliance ............................................................................101
Section 5.09     Taxes ................................................................................................................101
Section 5.10     Employee Benefits Plans; Labor Matters ......................................................102
Section 5.11     Subsidiaries; Equity Interests.........................................................................103
Section 5.12     Margin Regulations; Investment Company Act .............................................103
Section 5.13     Disclosure ........................................................................................................103
Section 5.14     Compliance with Laws ....................................................................................104
Section 5.15     Brokerage Fees.................................................................................................104
Section 5.16     [Reserved].........................................................................................................104
Section 5.17     Status of the Term Facilities as Senior Indebtedness.....................................104
Section 5.18     Perfection, Etc..................................................................................................104
Section 5.19     PATRIOT Act, Etc...........................................................................................105
Section 5.20     FCPA; Anti-Corruption ...................................................................................105
Section 5.21     Sanctioned Persons ..........................................................................................105
Section 5.22     Use of Proceeds................................................................................................106

ARTICLE VI
AFFIRMATIVE COVENANTS

Section 6.01     Financial Statements .......................................................................................106
Section 6.02     Certificates; Other Information.......................................................................107
Section 6.03     Notices .............................................................................................................109
Section 6.04     Payment of Taxes............................................................................................110
Section 6.05     Preservation of Existence ...............................................................................110
Section 6.06     Maintenance of Properties ..............................................................................110
Section 6.07     Maintenance of Insurance ...............................................................................110
Section 6.08     Compliance with Law; Anti-Corruption Laws, Anti-Money
                  Laundering and Sanctions...............................................................................111
Section 6.09     Books and Records ..........................................................................................112
Section 6.10     Inspection Rights .............................................................................................112
Section 6.11     Use of Proceeds................................................................................................112

Section 6.12   Covenant to Guarantee Obligations and Give Security .................................112
Section 6.13   Compliance with Environmental Laws.................................................................115
Section 6.14   Further Assurances.................................................................................................115
Section 6.15   [Reserved]...............................................................................................................116
Section 6.16   [Reserved]...............................................................................................................116
Section 6.17   Post-Closing Matters.............................................................................................116

ARTICLE VII
NEGATIVE COVENANTS

Section 7.01   Liens.........................................................................................................................116
Section 7.02   Investments ............................................................................................................121
Section 7.03   Indebtedness...........................................................................................................123
Section 7.04   Fundamental Changes ..........................................................................................126
Section 7.05   Dispositions............................................................................................................128
Section 7.06   Restricted Payments .............................................................................................130
Section 7.07   Change in Nature of Business; Conduct of Business.......................................133
Section 7.08   Transactions with Affiliates .................................................................................133
Section 7.09   Burdensome Agreements .....................................................................................134
Section 7.10   [Reserved.].............................................................................................................136
Section 7.11   Accounting Changes .............................................................................................136
Section 7.12   Prepayments, Etc. of Indebtedness; Amendments .........................................136
Section 7.13   Holding Company .................................................................................................137

ARTICLE VIII
EVENTS OF DEFAULT AND REMEDIES

Section 8.01   Events of Default ...................................................................................................139
Section 8.02   Remedies Upon Event of Default .......................................................................142
Section 8.03   [Reserved.].............................................................................................................142
Section 8.04   Application of Funds.............................................................................................142

ARTICLE IX
ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01   Appointment and Authorization of Agents.....................................................143
Section 9.02   Delegation of Duties .............................................................................................144
Section 9.03   Liability of Agents .................................................................................................144
Section 9.04   Reliance by Agents ...............................................................................................146
Section 9.05   Notice of Default....................................................................................................146
Section 9.06   Credit Decision; Disclosure of Information by Agents ...................................147
Section 9.07   Indemnification of Agents ...................................................................................147
Section 9.08   Agents in their Individual Capacities.................................................................148
Section 9.09   Successor Agents ...................................................................................................148
Section 9.10   Administrative Agent May File Proofs of Claim..............................................149
Section 9.11   Collateral and Guaranty Matters ........................................................................150
Section 9.12   Erroneous Payments..............................................................................................151
Section 9.13   No Fiduciary Relationship ...................................................................................152
Section 9.14   Appointment of Supplemental Administrative Agents..................................152
Section 9.15   Certain ERISA Matters .........................................................................................153

Section 9.16      Credit Bidding ............................................................................................. 156

ARTICLE X

MISCELLANEOUS

Section 10.01     Amendments, Etc. ......................................................................................... 156
Section 10.02     Notices; Electronic Communications ............................................................ 160
Section 10.03     No Waiver; Cumulative Remedies; Enforcement ........................................ 162
Section 10.04     Expenses ...................................................................................................... 162
Section 10.05     Indemnification by the Borrower .................................................................. 162
Section 10.06     Payments Set Aside ..................................................................................... 164
Section 10.07     Successors and Assigns ................................................................................ 164
Section 10.08     Confidentiality ............................................................................................. 170
Section 10.09     Setoff ........................................................................................................... 171
Section 10.10     [Reserved] .................................................................................................... 171
Section 10.11     Interest Rate Limitation ............................................................................... 171
Section 10.12     Counterparts ................................................................................................. 172
Section 10.13     Integration; Effectiveness ............................................................................ 172
Section 10.14     Survival of Representations and Warranties ................................................ 172
Section 10.15     Severability .................................................................................................. 172
Section 10.16     Tax Forms .................................................................................................... 173
Section 10.17     Governing Law; Jurisdiction; Etc. ............................................................... 175
Section 10.18     WAIVER OF RIGHT TO TRIAL BY JURY ............................................... 176
Section 10.19     Binding Effect .............................................................................................. 176
Section 10.20     No Advisory or Fiduciary Responsibility .................................................... 177
Section 10.21     Affiliate Activities ....................................................................................... 177
Section 10.22     Lender Action ............................................................................................... 178
Section 10.23     Electronic Execution of Assignments and Certain Other Documents ........... 178
Section 10.24     PATRIOT Act .............................................................................................. 178
Section 10.25     [Reserved.] ................................................................................................... 178
Section 10.26     Judgment Currency ...................................................................................... 178
Section 10.27     [Reserved.] ................................................................................................... 179
Section 10.28     Intercreditor Agreement ............................................................................... 179
Section 10.29     Acknowledgement and Consent to Bail-In of EEA Financial
                  Institutions ................................................................................................... 180
Section 10.30     [Reserved] .................................................................................................... 180
Section 10.31     Cashless Settlement ..................................................................................... 180

SCHEDULES

1             Guarantors
1.01(d)       Disqualified Lenders (Competitors)
2.01(a)       First Out New Money Term Loan Commitments
2.01(b)       First Out Roll-Up Loan Amounts
2.01(c)       Initial Second Out Term Loan Amounts
5.06          Litigation
5.07(a)       Real Property
5.07(b)       Intellectual Property Matters

4885-4953-0770v.1

5.08        Environmental Matters
5.11        Subsidiaries and Other Equity Investments
6.17        Post-Closing Matters
7.01        Existing Liens
7.02        Existing Investments
7.03        Existing Indebtedness
7.08        Transactions with Affiliates
7.09        Burdensome Agreements
10.02       Certain Addresses for Notices

EXHIBITS

            Form of

A           Committed Loan Notice
B           Prepayment Notice
C           Term Note
D           Compliance Certificate
E           Assignment and Assumption
F           Guaranty
G           U.S. Security Agreement
H           Solvency Certificate
I           Intercompany Subordination Agreement
J           PIK Notice
K           Monthly Financial Statements

4885-4953-0770v.1

This TERM LOAN CREDIT AGREEMENT (this "<u>Agreement</u>") is entered into as of [_____], among STRATEGIC MATERIALS HOLDING CORP., a Delaware corporation (the "<u>Borrower</u>"), SMI GROUP ACQUISITIONS, INC., a Delaware corporation ("<u>Holdings</u>"), the Lenders and ACQUIOM AGENCY SERVICES LLC ("<u>Acquiom</u>") and SEAPORT LOAN PRODUCTS LLC ("<u>Seaport</u>"), as co-administrative agents for the Lenders (in such capacities, together with any successor co-administrative agent appointed pursuant to the provisions of <u>Article IX</u>, each a "<u>Co-Administrative Agent</u>" and collectively, the "<u>Administrative Agent</u>").

## A.  PRELIMINARY STATEMENTS

WHEREAS, the Borrower entered into that certain First Lien Credit Agreement, dated as of November 1, 2017 (as amended prior to the date hereof, the "<u>Prepetition First Lien Credit Agreement</u>"), by and among the Borrower, Holdings, the lenders party thereto (the "<u>Prepetition First Lien Lenders</u>"), the letter of credit issuers party thereto, and Acquiom and Seaport, as co-administrative agents (as successor to Goldman Sachs Bank USA in such capacity), pursuant to which the Prepetition First Lien Lenders agreed, subject to the terms and conditions contained therein, to make available to the Borrower certain credit facilities as provided for therein;

WHEREAS, on [_____], 2023 (the "<u>Petition Date</u>"), Holdings, the Borrower and certain of their direct and indirect Subsidiaries (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") filed voluntary petitions with the Bankruptcy Court (as defined below) for relief under Chapter 11 of the Bankruptcy Code (as defined below) (each case of each Debtor, a "<u>Case</u>" and collectively, the "<u>Cases</u>");

WHEREAS, in connection with the Cases, Holdings and the Borrower, each as a debtor and a debtor-in-possession, entered into that certain Superpriority Secured Debtor-in-Possession Credit Agreement, dated as of [_____], 2023 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the date hereof, the "<u>DIP Credit Agreement</u>"), by and among Holdings, the Borrower, the lenders party thereto (collectively, the "<u>DIP Lenders</u>", and each, a "<u>DIP Lender</u>") and Acquiom and Seaport, as co-administrative agents (collectively, the "<u>DIP Agents</u>"), pursuant to which the DIP Lenders provided to the Borrower a $[__],000,000 senior secured, superpriority debtor-in-possession new money term loan facility (the "<u>DIP New Money Loan Facility</u>") and a $[___],000,000 senior secured, superpriority debtor-in-possession roll-up loan facility (the "<u>DIP Roll-Up Loan Facility</u>", and together with the DIP New Money Loan Facility, the "<u>DIP Term Loan Facilities</u>");

WHEREAS, this Agreement, together with the other Loan Documents, are the "Exit Term Loan Facilities Documents" referred to in the Debtors' *Joint Prepackaged Chapter 11 Plan of Reorganization* (as amended, supplemented, or otherwise modified from time to time, the "<u>Chapter 11 Plan</u>") filed in the Cases of the Debtors;

WHEREAS, pursuant to the Chapter 11 Plan, (i) the Prepetition First Lien Lenders are entitled to receive, among other distributions, the Initial Second Out Term Loans (as defined below), (ii) the DIP Lenders are entitled to receive, among other distributions, the First Out Roll-Up Loans (as defined below) and (iii) the Borrower is authorized to borrow from the Lenders the First Out New Money Term Loans (as defined below), in each case on the terms and conditions set forth in this Agreement and the other Loan Documents; and

WHEREAS, on [_____], the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Chapter 11 Plan, which Confirmation Order, *inter alia*, authorized the Borrower's, Holdings' and the other Debtors' entry into and performance under this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

ARTICLE I
Definitions and Accounting Terms

Section 1.01      Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"ABL Facility" has the meaning specified in the definition of "Permitted Revolving Credit Facility".

"ABL Priority Collateral" means Collateral consisting of accounts receivable, inventory and other collateral for a receivables and inventory-based, asset-based revolving credit facility that would customarily be secured by Liens having priority over the Liens securing a senior secured term loan facility in a split collateral structure.

"Acquiom"  has the meaning specified in the introductory paragraph hereto.

"Additional Lender" means, at any time, any bank, financial institution or other institutional lender or investor that, in any case, is not an existing Lender and that agrees to provide any portion of any (a) Term Facility Increase in accordance with Section 2.15 or (b) Incremental Term Facility in accordance with Section 2.16.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administrative Agent" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"Administrative Agent's Account" means such account of the Administrative Agent as the Administrative Agent may from time to time notify the Borrower and the Lenders.

"Administrative Questionnaire" means an administrative questionnaire provided to the Borrower by the Administrative Agent from time to time in such form approved by the Administrative Agent.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agent-Related Persons</u>" means each Agent, together with its Related Parties.

"<u>Agents</u>" means, collectively, each Co-Administrative Agent and the Supplemental Administrative Agents (if any).

"<u>Aggregate Original First Out New Money Term Loan Principal Amount</u>" has meaning specified in <u>Section 2.01(c)</u>.

"<u>Aggregate Term Commitments</u>" means the Term Commitments of all the Lenders.

"<u>Agreement</u>" means this Term Loan Credit Agreement.

"<u>All-In Yield</u>" means, as to any Indebtedness, the effective yield on such Indebtedness in the reasonable determination of the Required Lenders (in consultation with the Borrower) and consistent with generally accepted financial practices, taking into account the applicable interest rate margins and any amendments to the interest margin on the applicable Indebtedness that became effective subsequent to the Closing Date but prior to the applicable date of determination, any interest rate floors, or similar devices and all fees, including upfront or similar fees (which shall be deemed to constitute like amounts of original issue discount) or original issue discount (with original issue discount being equated to interest based on an assumed four-year life to maturity) payable generally to lenders or other institutions providing such Indebtedness in the primary syndication thereof, but excluding (x) any arrangement, structuring, underwriting, ticking, consent, commitment, unused line, prepayment premiums, end of term or other similar fees (regardless of whether any such fees are paid to or shared in whole or in part with any lenders), (y) any fees not paid to all Lenders providing such Indebtedness and (z) if applicable, consent fees for an amendment paid generally to consenting lenders.

"<u>Anti-Corruption Laws</u>" has the meaning specified in <u>Section 5.20(a)</u>.

"<u>Anti-Money Laundering Laws</u>" means all laws, rules, and regulations of any jurisdiction applicable to Holdings or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"<u>Applicable Discount</u>" has the meaning specified in the definition of "Dutch Auction".

"<u>Applicable Premium</u>" has the meaning specified in <u>Section 2.05(e)</u>.

"<u>Applicable Rate</u>" means (a) with respect to Initial First Out Term Loans, a percentage per annum equal to (i) 6.50% per annum for SOFR Loans and (ii) 5.50% per annum for Base Rate Loans and (b) with respect to Initial Second Out Term Loans, (i) during any PIK Interest Accrual Period, (A) 8.50% per annum for SOFR Loans and (B) 7.50% per annum for Base Rate Loans and (ii) at all other times, (A) 7.50% per annum for SOFR Loans and (B) 6.50% per annum for Base Rate Loans.

"<u>Appropriate Lenders</u>" means, at any time, with respect to Term Loans of any Tranche, the Lenders of such Tranche.

"<u>Approved Domestic Bank</u>" has the meaning specified in clause (b) of the definition of "Cash Equivalents".

"<u>Approved Fund</u>" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"<u>Assignee Group</u>" means two (2) or more Eligible Assignees that are Affiliates of one another or two (2) or more Approved Funds managed by the same investment advisor.

"<u>Assignment and Assumption</u>" means an Assignment and Assumption substantially in the form of <u>Exhibit E</u>, or otherwise in form (including electronic documentation generated by MarkitClear or other electronic platform) and substance reasonably acceptable to the Administrative Agent.

"<u>Auction</u>" has the meaning specified in the definition of "Dutch Auction".

"<u>Auction Agent</u>" means (a) the Administrative Agent or (b) any other financial institution or advisor employed by the Borrower (whether or not an Affiliate of the Administrative Agent) to act as an arranger in connection with any Dutch Auction; *provided* that the Borrower shall not designate the Administrative Agent as the Auction Agent without the written consent of the Administrative Agent (it being understood that the Administrative Agent shall be under no obligation to agree to act as the Auction Agent); *provided*, *further*, that neither the Borrower nor any of its Affiliates may act as the Auction Agent.

"<u>Auction Amount</u>" has the meaning specified in the definition of "Dutch Auction".

"<u>Auction Notice</u>" has the meaning specified in the definition of "Dutch Auction".

"<u>Available Amount</u>" means, at any date, an amount, not less than zero in the aggregate, determined on a cumulative basis equal to:

(a)     the amount of Excess Cash Flow (if any) not required to be applied towards repayment of the Term Facility pursuant to <u>Section 2.05(b)(i)</u> determined for the period (taken as one accounting period) commencing with the fiscal year ending December 31, 2025 to the end of the fiscal year most recently ended in respect of which a Compliance Certificate has been delivered as required hereunder, *plus*

(b)     the Net Cash Proceeds (or, if the proceeds thereof are other than cash, the Fair Market Value of such proceeds) of any Permitted Equity Issuance and 100% of the aggregate amount of cash contributions to the common capital of the Borrower (and 100% of the aggregate Fair Market Value of property other than cash contributed to the common capital of the Borrower), in each case after the Closing Date, *plus*

(c)     any Declined Amounts; *plus*

(d)    in the event that all or a portion of the Available Amount has been applied to make an Investment pursuant to Section 7.02(q), an amount equal to the aggregate amount received by the Borrower or any Subsidiary in cash and Cash Equivalents from:  (i) the sale (other than to Holdings, the Borrower or any Subsidiary) of any such Investment, (ii) any dividend or other distribution received in respect of any such Investment or (iii) interest, returns of principal, repayments and similar payments received in respect of any such Investment, in each case not to exceed the amount of the initial Investment made using the Available Amount.

as such amount may be reduced from time to time to the extent that all or a portion of the Available Amount is applied to make Investments, Restricted Payments or prepayments of Junior Financing to the extent permitted hereunder.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark (or component thereof) is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 3.03(b)(iv).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, or any appellate court having jurisdiction over the Cases from time to time.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate for such day *plus* 1/2 of 1%, (b) the Prime Rate and (c) Adjusted Term SOFR for a one-month Interest Period *plus* 1%.  If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Rate or Adjusted Term SOFR for any reason, the Base Rate shall be determined without regard to clause (a) or (c) above, as applicable, until the circumstances giving rise to such inability no longer exist.  Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR shall be effective from the day of such change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR, respectively.

"Base Rate Loan" means a Term Loan that bears interest based on the Base Rate.

"Base Rate Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event and the related Benchmark Replacement Date, have occurred with respect to the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.03(b).

"Benchmark Replacement" means with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent (acting at the direction of the Required Lenders) in consultation with the Borrower (and that is administratively feasible as determined by the Administrative Agent) giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; *provided* that if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent (acting at the direction of the Required Lenders) in consultation with the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time; provided, that any such Benchmark Replacement Adjustment shall be administratively feasible as determined in good faith by the Administrative Agent.

"Benchmark Replacement Conforming Changes" means, with respect to the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods and other technical, administrative or operational matters) that the Administrative Agent (acting at the direction of the Required Lenders) in consultation with the Borrower decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines in good faith that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent (acting at the direction of the Required Lenders) in consultation with the Borrower determines that no market practice for the administration of any such rate exists, in such

other manner of administration as (x) the Administrative Agent (acting at the direction of the Required Lenders in consultation with the Borrower) decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents and (y) the Administrative Agent determines is administratively feasible).

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a) in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b) in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component)

has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; <u>provided</u> that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"<u>Benchmark Transition Start Date</u>" means, in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day (or such other date selected by the Administrative Agent (acting at the direction of the Required Lenders)) prior to the expected date of such event as of such public statement or publication of information (as such expected date may be delayed pursuant to any subsequent public statement or event) (or if the expected date of such prospective event is fewer than ninety (90) days (or such other date selected by the Administrative Agent (acting at the direction of the Required Lenders)) after such statement or publication, the date of such statement or publication).

"<u>Benchmark Unavailability Period</u>" means, with respect to any then-current Benchmark, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 3.03(b)</u> and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 3.03(b)</u>.

"<u>Borrower</u>" has the meaning specified in the introductory paragraph hereto.

"<u>Borrower Materials</u>" has the meaning specified in <u>Section 6.02</u>.

"<u>Business Day</u>" means (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York City a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, SOFR Loans, any day which is a Business Day described in clause (i) above and which is also a U.S. Government Securities Business Day.

"<u>Canadian Credit Facility</u>" means that certain Term Loan Credit Agreement, dated as of December 31, 2019 (as amended, supplemented or otherwise modified from time to time), by and among NexCycle Canada Ltd., an Ontario corporation, NexCycle Industries Ltd., an Ontario corporation, Piney Lake Opportunities ECI Master Fund LP, as administrative agent and collateral agent, and the lenders party thereto from time to time, and all other Loan Documents (as defined

in the Canadian Credit Facility) (including all exhibits and guarantee, security and other ancillary documentation in respect of the foregoing, in each case as amended, supplemented or otherwise modified from time to time).

"Canadian Guaranty" means the Canadian Guaranty executed by the Canadian Guarantors on the date hereof in favor of the Administrative Agent on behalf of the Secured Parties.

"Canadian Loan Party" means any Loan Party that is organized under the laws of Canada, or any of its provinces or territories.

"Canadian PPSA" means the Personal Property Security Act (Ontario), including the regulations thereto, provided that if perfection or the effect of perfection or non-perfection or the priority of any Lien created hereunder or under any other Loan Document on the Collateral is governed by the personal property security legislation or other applicable legislation with respect to personal property security in effect in a jurisdiction in Canada other than the Province of Ontario, "Canadian PPSA" means the Personal Property Security Act or such other applicable legislation (including the Civil Code (Quebec)) in effect from time to time in such other jurisdiction in Canada for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority, and any successor statutes, together with any regulations thereunder, in each case as in effect from time to time.

"Canadian Security Agreement" means the Canadian Security Agreement, dated as of the Closing Date, executed in favor of the Administrative Agent by each of the Canadian Loan Parties and each other Loan Party party thereto, together with each other security agreement and security agreement supplement executed and delivered pursuant to Section 6.12.

"Capital Expenditures" means, as of any date for the applicable period then ended, all cash capital expenditures of the Borrower and its Subsidiaries on a consolidated basis for such period, as determined in accordance with GAAP (including acquisitions of intellectual property to the extent the cost thereof is treated as a capitalized expense in accordance with GAAP made in cash during such period); provided, however, that Capital Expenditures shall not include any such expenditures which constitute (a) to the extent permitted by this Agreement, (i) a reinvestment of the Net Cash Proceeds of any Disposition or Casualty Event in accordance with Section 2.05(b)(ii) or (ii) the purchase of property, plant or equipment or software to the extent financed with the proceeds of Dispositions or Casualty Events that are not required pursuant to Section 2.05(b)(ii) to be applied to prepay Loans or to be reinvested and (b) expenditures that are accounted for as capital expenditures by the Borrower or any of its Subsidiaries and that actually are paid for or reimbursed by a Person other than the Borrower or any of its Subsidiaries and for which neither the Borrower nor any of its Subsidiaries has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such Person or any other Person (whether before, during or after such period).

"Capitalized Lease Obligations" means, as applied to any Person, all obligations of such Person under leases of property that have been or should be, in accordance with GAAP, recorded as capitalized leases of such Person, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP as in effect on December 15, 2018; provided that any change in GAAP after December 15, 2018 will not cause any obligation that was not or would not have

been a Capitalized Lease Obligation prior to such change to be deemed a Capitalized Lease Obligation following such change.

"Case" and "Cases" has the meaning specified in the Preliminary Statements.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Borrower or any of its Subsidiaries:

(a)    (i) Dollars, (ii) Canadian Dollars (in the case of the Canadian Loan Parties and their respective Subsidiaries), (iii) readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof, in each case having maturities of not more than twelve (12) months from the date of acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof, and (iv) securities issued or directly and fully guaranteed or insured by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or P-1 by Moody's, in each case having maturities of not more than twelve (12) months from the date of acquisition thereof;

(b)    time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated at least P-2 (or the then equivalent grade) by Moody's or at least A-2 (or the then equivalent grade) by S&P and (iii) has combined capital and surplus of at least $250,000,000 (any such bank being an "Approved Domestic Bank"), in each case with maturities of not more than three hundred sixty-five (365) days from the date of acquisition thereof;

(c)    commercial paper and variable or fixed rate notes issued by an Approved Domestic Bank (or by the parent company thereof) or any variable rate note issued by, or guaranteed by, a domestic corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with maturities of not more than three hundred sixty-five (365) from the date of acquisition thereof;

(d)    marketable short-term money market and similar funds (including such funds investing a portion of their assets in municipal securities) having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(e)    repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer having capital and surplus in excess of $250,000,000 for direct obligations issued by or fully guaranteed or insured by the United States government or any agency or instrumentality of the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a Fair Market Value of at least 100% of the amount of the repurchase obligations;

(f)       Investments, classified in accordance with GAAP as Current Assets of the Borrower or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions having capital of at least $250,000,000, and the portfolios of which are limited such that at least 95% of such investments are of the character, quality and maturity described in clauses (a) through (e) of this definition;

(g)       investment funds investing at least 95% of their assets in securities of the types (including as to credit quality and maturity) described in clauses (a) through (f) above; and

(h)       solely with respect to any Subsidiary that is a Foreign Subsidiary, (x) such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business and (y) investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (g) customarily utilized in countries in which such Foreign Subsidiary operates for short term cash management purposes.

"Cash Flow Revolving Credit Facility" has the meaning specified in the definition of Permitted Revolving Credit Facility.

"Casualty Event" means any event that gives rise to the receipt by Holdings, the Borrower or any Subsidiary of any casualty insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace, restore or repair, or compensate for the loss of, such equipment, fixed assets or real property.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the U.S. Environmental Protection Agency.

"Change of Control" means:  (a) at any time, for any reason whatsoever, Holdings shall cease to own, directly or indirectly, 100% of the Equity Interests of the Borrower; (b) at any time, for any reason whatsoever, any "person" or "group" (within the meaning of Rule 13d-5 of the Exchange Act as in effect on the Closing Date) other than the Permitted Holders shall beneficially own a percentage of the then outstanding Voting Equity Interests of Holdings that is more than 35% of the outstanding Voting Equity Interests of Holdings or (c) any "Change of Control" (or any comparable term) in or any document pertaining to any Permitted Revolving Credit Facility.

"Chapter 11 Plan" has the meaning specified in the Preliminary Statements.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with such Section 4.01 and the Initial Term Loans are advanced (or deemed borrowed, as applicable), which date is [_____].

"Closing Date Second Out Lenders" shall have the meaning specified in the definition of "Lenders".

-11-

"Co-Administrative Agent" has the meaning specified in the introductory paragraph hereto.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all of the "Collateral" referred to in the Collateral Documents and all of the other property and assets that are or are required under the terms of the Collateral Documents to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties.

"Collateral Documents" means, collectively, the Security Agreement, [the Mexican Security Agreement], the Canadian Security Agreement, the Intellectual Property Security Agreements, the Mortgages, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent and the Lenders pursuant to Section 6.12, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties securing all or a portion of the Obligations.

"Committed Loan Notice" means a written notice of (a) a Term Borrowing, (b) a conversion of Term Loans from one Type to the other or (c) a continuation of SOFR Loans, pursuant to Section 2.02(a), which shall be substantially in the form of Exhibit A or such other form reasonably acceptable to the Administrative Agent.

"Commitment" means a Term Commitment.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. §1 et seq.) as amended from time to time, and any successor statute.

"Competitor" means any competitor of the Borrower or any Subsidiary that is in the same or a substantially similar line of business as the Borrower or any Subsidiary designated in writing from time to time by the Borrower to the Administrative Agent.

"Compliance Certificate" means a certificate substantially in the form of Exhibit D or such other form as may be agreed between the Borrower and the Administrative Agent (acting at the direction of the Required Lenders).

"Confirmation Order" has the meaning specified in the Preliminary Statements.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Cash Taxes" means, as of any date for the applicable period ending on such date with respect to the Borrower and its Subsidiaries on a consolidated basis, the aggregate of all income, franchise and similar taxes (including penalties and interest), as determined in accordance with GAAP, to the extent the same are payable in cash with respect to such period and tax distributions payable pursuant to Section 7.06(i) with respect to such period.

"Consolidated Current Assets" means, with respect to any Person, the Current Assets of such Person and its Subsidiaries on a consolidated basis, but excluding assets relating to current or deferred taxes based on income or profits.

"Consolidated Current Liabilities" means, with respect to any Person and its Subsidiaries on a consolidated basis, all liabilities in accordance with GAAP that would be classified as current liabilities on the consolidated balance sheet of such Person, but excluding (a) the current portion of Indebtedness (including the Swap Termination Value of any Swap Contracts) to the extent reflected as a liability on the consolidated balance sheet of such Person, (b) the current portion of interest, (c) accruals for current or deferred taxes based on income or profits, (d) accruals of any costs or expenses related to restructuring reserves, (e) deferred revenue, (f) escrow account balances and (g) any revolving loans or letters of credit outstanding under a Permitted Revolving Credit Facility.

"Consolidated EBITDA" means, as of any date for the applicable period ending on such date with respect to any Person and its Subsidiaries on a consolidated basis, an amount equal to the sum of:

        (a)        Consolidated Net Income for such period; plus

        (b)        to the extent deducted in determining Consolidated Net Income for such period, the sum, without duplication of:

        (i)        Consolidated Interest Expense,

        (ii)        any provision for Taxes based on income, profits or capital for such period, including state, foreign and franchise and similar Taxes and any tax distributions made during such period,

        (iii)        depreciation expense, amortization expense (including without limitation amortization of financing leases), any impairment charges, any non-cash charges associated with goodwill and other intangible assets, any write off or write down of any assets, and any write off or write down of debt discount, debt issuance, warrant and other equity issuance discounts, redemption premium and other fees associated with any indebtedness (including agency fees (or similar fees) and commitment fees),

        (iv)        the amount of cost savings, adjustments, operating expense reductions, operating improvements and synergies, in each case on a "run rate" basis and in connection with the Transactions, Permitted Acquisitions, investments, dispositions, cost saving initiatives, restructurings, business optimization projects and other operational changes and initiatives ("Run Rate Amounts") that are identifiable and projected in good faith to result from actions that have been or are expected to be taken within twenty-four (24) months, net of actual benefits received; *provided* that (x) the Administrative Agent shall have received a reasonably detailed statement or schedule of such Run Rate Amounts, (y) such amounts are certified by a Responsible Officer of the Borrower to be reasonably quantifiable, identifiable, factually supportable, expected to have a continuing impact resulting from actions specified and reasonably anticipated to result from such actions and (z) the benefits resulting therefrom are anticipated by the Borrower to be realized within twenty-four (24) months; *provided*, *further*, that, for any Test

4885-4953-0770v.1

Period, the amount added back in calculating Consolidated EBITDA pursuant to this clause (iv), together with the amount added back in calculating Consolidated EBITDA pursuant to clause (v) below, shall not, in the aggregate, exceed 25 % of Consolidated EBITDA for such Test Period (determined prior to giving effect to such add-backs),

(v)      integration and transition charges (including, without limitation, inventory optimization programs, facilities' opening and pre-opening costs and other business optimization expenses, including transaction costs and costs related to the closure or consolidation of facilities, contract termination payments (including future lease payments), consulting fees, signing costs, retention or completion bonuses, relocation expense, severance payment, executive recruiting costs, modification to pension and post-retirement employee benefit plans and systems design); *provided* that for any Test Period, the amount added back in calculating Consolidated EBITDA pursuant to this clause (v) together with the amount added back in calculating Consolidated EBITDA pursuant to clause (iv) above, shall not, in the aggregate, exceed 25 % of Consolidated EBITDA for such Test Period (determined prior to giving effect to such add-backs),

(vi)      expenses, charges and loss associated with and resulting from discontinued operations to the extent the Administrative Agent shall have received a reasonably detailed statement or schedule thereof, vacant facility expenses, and net losses from closed, disposed, abandoned or discontinued operations or product lines determined in conformity with GAAP,

(vii)      net extraordinary, non-recurring or unusual losses or expenses,

(viii)      non-recurring litigation and claim settlement charges and expenses,

(ix)      accruals, costs, fees, payments and expenses (x) in connection with the Transactions, on or after the Closing Date, or (y) relating to (1) permitted Dispositions, Permitted Acquisitions, permitted Investments, permitted offerings of Indebtedness or Equity Interests, permitted incurrences or issuances of Indebtedness (including in connection with any exchange or refinancing, replacement, amendment, renewal or extension), (2) earn-out or bonus obligations incurred in connection with any Permitted Acquisition or Investment and paid or accrued during such period and with respect to similar Permitted Acquisitions and Investments completed prior to the Closing Date or (3) entry into and maintaining of hedging arrangements, in each case whether or not consummated,

(x)      non-cash losses, charges, reserves and expenses reducing Consolidated Net Income for such period,

(xi)      the amount of fees, costs and expenses incurred during such period (x) that are covered by indemnification provisions in any agreement in connection with any Investment or Permitted Acquisition (or similar transactions consummated prior to the Closing Date), in each case whether or not consummated, (y) to the extent that a corresponding amount is received in cash from any Person other than the Borrower, the Guarantors or any Subsidiary under any agreement providing for reimbursement of such expense or (z) constituting expenses with respect to liability or casualty events, or product recalls, in each case, (1) so long as the Borrower or its applicable Subsidiary has submitted in good faith, and reasonably expects to receive payment

-14-

in connection with, a claim for reimbursement of such amounts under its relevant insurance policy (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within the next four (4) fiscal quarters) and such coverage or claim has not been denied by the applicable carrier or indemnifying party in writing within two hundred seventy (270) days of such submission or (2) without duplication of amounts included in prior test period under clause (1) above, to the extent covered by insurance proceeds received in cash during such period (it being understood that if the amount received in cash under any such agreement in any period exceeds the amount of expense paid during such period such excess amounts received may be carried forward and applied against expenses in future periods);

(xii)    proceeds of business interruption insurance policies, if any, received during such period in an amount representing the earnings for the applicable period that such proceeds are intended to replace,

(xiii)   (x) any deductions, charges or expenses incurred pursuant to any management equity plan or stock option plan or any other management or employee benefit plan or agreement, pension plan, any stock subscription or shareholder agreement or any distributor equity plan or agreement or in connection with grants of stock appreciation or similar rights or other rights to directors, officers and/or employees of Holdings, any Parent Entity, the Borrower or its Subsidiaries, (y) any payments, charges, costs, expenses, accruals or reserves in connection with the rollover, acceleration or payout of equity interests held by management or the issuance of any stock options, and (z) any other non-cash compensation expenses,

(xiv)   [reserved],

(xv)    losses or discounts on sales of receivables and related assets in connection with permitted receivables securitizations,

(xvi)   costs relating to non-ordinary course employee bonuses, costs in connection with strategic initiatives, transition costs and non-recurring product and intellectual property development costs and other business optimization and information systems related costs,

(xvii)  losses (gains) on sales of assets outside of the ordinary course of business, *minus*

(c)      to the extent included in arriving at such Consolidated Net Income, the sum, without duplication, of:

(i)      non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDA in any prior period),

(ii)     net extraordinary, non-recurring or unusual gains,

(iii)    any net gain from closed, disposed, abandoned or discontinued operations or product lines, and

(iv)     cash payments during such period on account of accruals on or

-15-

reserves added to Consolidated EBITDA pursuant to clause (b)(x) above;

*provided* that:

(A)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA (1) currency translation gains and losses related to currency re-measurements of indebtedness (including the net loss or gain resulting from hedging transactions for currency exchange risk) and (2) all other foreign currency translation gains or losses to the extent such gains or losses are non-cash items;

(B)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any adjustments resulting from the application of FASB Accounting Standards Codification 815 and International Accounting Standard No. 39 and their respective related pronouncements and interpretations; and

(C)    to the extent included in Consolidated Net Income, there shall be excluded in determining Consolidated EBITDA for any period any income (loss) for such period attributable to the early extinguishment of (1) Indebtedness, (2) obligations under any hedging transactions or (3) other derivative instruments.

"Consolidated Funded Indebtedness" means all third-party indebtedness for borrowed money, unreimbursed obligations in respect of drawn letters of credit, Capitalized Lease Obligations and other purchase money indebtedness and guarantees of any of the foregoing obligations, of the Borrower and its Subsidiaries on a consolidated basis and excluding, in any event, (i) any amounts under Permitted Factoring Arrangements, (ii) any letter of credit or surety bond (except to the extent of unreimbursed obligations in respect of drawn letters of credit) and (iii) obligations under any Swap Contracts.

"Consolidated Funded Senior Secured Indebtedness" means Consolidated Funded Indebtedness that is secured by a Lien on any assets of the Borrower or any Subsidiary; *provided* that such Consolidated Funded Indebtedness is not expressly subordinated in right of payment to the Obligations pursuant to a written agreement.

"Consolidated Interest Expense" means, as of any date for the applicable period ending on such date with respect to any Person and its Subsidiaries on a consolidated basis, total interest expense determined in accordance with GAAP (including, to the extent deducted and not added back in computing Consolidated Net Income, (A) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (B) all commissions, discounts and other fees and charges owed with respect to letters of credit or bankers' acceptances, (C) noncash interest payments, (D) the interest component of Capitalized Lease Obligations, (E) net payments, if any, made (less net payments, if any, received) pursuant to interest rate Swap Contracts with respect to Indebtedness, (F) amortization or write off of deferred financing fees, debt issuance costs, commissions, fees and expenses, including commitment, letter of credit and administrative fees and charges with respect to the Term Facilities and with respect to other Indebtedness permitted to be incurred hereunder and (G) any expensing of bridge, commitment and other financing fees, but excluding total interest expense associated with Synthetic Lease Obligations) and, to the extent not reflected in such total interest expense, any losses on hedging obligations or other derivative

-16-

instruments entered into for the purpose of hedging interest rate risk, net of interest income and gains on such hedging obligations, and costs of surety bonds in connection with financing activities (whether amortized or immediately expensed).

"Consolidated Net Income" means, as of any date for the applicable period ending on such date with respect to the Borrower and its Subsidiaries on a consolidated basis, net income (or loss) as determined in accordance with GAAP; *provided*, *however*, that the following shall be excluded (without duplication): (a) any amounts attributable to Investments in any Joint Venture to the extent that such amounts have not been distributed in cash to such Person and its Subsidiaries during such applicable period; (b) (i) any net unrealized gains and losses resulting from fair value accounting required by FASB ASC 815 and (ii) any net unrealized gains and losses relating to mark-to-market of amounts denominated in foreign currencies resulting from the application of FASB ASC 830, in each case, to the extent included in Consolidated Net Income, (c) the income (or loss) of any Person accrued prior to the date it becomes a Subsidiary of the Borrower or is merged into or consolidated with the Borrower or any Subsidiary (except to the extent required for any calculation of Consolidated EBITDA on a Pro Forma Basis), (d) to the extent not already excluded or deducted as minority interest expense in accordance with GAAP, payments made in respect of minority interests of third parties in any non-wholly owned Subsidiary or Joint Venture in such period, including pursuant to dividends declared or paid on Equity Interests held by third parties in respect of such non-wholly owned Subsidiary or Joint Venture, (e) (i) any net loss attributable to the write-down or write-off of any asset or (ii) any increase in amortization or depreciation or any non-cash charge or loss resulting from any amortization, write-up, write-down or write-off of assets upon the application of recapitalization accounting or purchase accounting (including tangible and intangible assets, goodwill, deferred financing costs and inventory (including any adjustment reflected in the "cost of goods sold" or similar line item of the financial statements)) in connection with Permitted Acquisitions or any acquisition, merger, consolidation or similar transaction not prohibited hereunder, (f) any net after-tax income or loss from discontinued operations (which shall not, unless the Borrower otherwise elects, include assets then held for sale) and any net after-tax gain or loss on disposal of such discontinued operations, (g) any net after-tax income or loss (less all fees and expenses or charged relating thereto) attributable to the early extinguishment of Indebtedness, (h) the cumulative effect of a change in accounting principles during such period, (i) any non-cash impairment charges resulting from the application of FASB ASC 350 and FASB ASC 360 and the amortization of intangibles arising pursuant to FASB ASC 805, (j) the effect of mark-to-market accounting for derivatives contracts under FASB ASC 820 and (k) expenses, charges or losses that are covered by indemnification provisions in connection with investments or Permitted Acquisitions.

"Consolidated Scheduled Funded Debt Payments" means, as of any date for the applicable Excess Cash Flow Period with respect to the Borrower and its Subsidiaries on a consolidated basis, the sum of all scheduled payments of principal during such period on Consolidated Funded Indebtedness that constitutes Funded Debt (including the implied principal component of payments due on Capitalized Lease Obligations during such period), less the reduction in such scheduled payments resulting from voluntary prepayments or mandatory prepayments required pursuant to Section 2.05, in each case as applied pursuant to Section 2.05, as determined in accordance with GAAP.

-17-

"Consolidated Total Assets" means, on any date of determination, the consolidated total assets of Holdings, the Borrower and its Subsidiaries as set forth on the consolidated balance sheet of Holdings as of the last day of the applicable Test Period.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other contractual undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and "Controlling" and "Controlled" have meanings correlative thereto.

"Current Assets" means, with respect to any Person, all assets of such Person that, in accordance with GAAP, would be classified as current assets on the balance sheet of a company conducting a business the same as or similar to that of such Person, after deducting appropriate and adequate reserves therefrom in each case in which a reserve is proper in accordance with GAAP, but excluding (i) cash, (ii) Cash Equivalents, (iii) Swap Contracts to the extent that the mark-to-market Swap Termination Value would be reflected as an asset on the consolidated balance sheet of such Person, (iv) deferred financing fees and (v) payment for deferred taxes (so long as the items described in clauses (iv) and (v) are noncash items).

"Debt Issuance" means the issuance by any Person of any Indebtedness for borrowed money.

"Debtor" and "Debtors" has the meaning specified in the Preliminary Statements.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Declined Amounts" has the meaning specified in Section 2.05(c).

"Declining Lender" has the meaning specified in Section 2.05(c).

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" has the meaning specified in Section 2.08(b).

"Defaulting Lender" means, subject to Section 2.20(b), any Lender that, (a) has refused (which refusal may be given verbally or in writing and has not been retracted) or failed to perform any of its funding obligations hereunder (unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's good faith determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied),

including in respect of its Loans within two (2) Business Days after the date required to be funded by it hereunder, (b) has notified the Borrower or the Administrative Agent that it does not intend to comply with its funding obligations (which notification has not been withdrawn in writing) or has made a public statement to that effect with respect to its funding obligations hereunder (unless such notification or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's good faith determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such notification or public statement) cannot be satisfied), (c) has failed, within three (3) Business Days after reasonable request by the Administrative Agent (which request the Administrative Agent agrees to make at the reasonable request of the Borrower), to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations; *provided* that a Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such confirmation by the Administrative Agent or (d) has, or has a direct or indirect parent company that has, other than via an Undisclosed Administration, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it or any substantial part of its assets, (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment, (iv) become subject to forced liquidation, (v) made a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or bankrupt or (vi) become the subject of a Bail-In Action; *provided* that no Lender shall be a Defaulting Lender solely by virtue of (x) the ownership or acquisition by a Governmental Authority of any equity interest in that Lender or any direct or indirect parent company thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (y) the occurrence of any of the events described in clause (d)(i), (d)(ii), (d)(iii), (d)(iv) or (d)(v) of this definition which in each case has been dismissed or terminated prior to the date of this Agreement. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.20(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"Deposit Account" has the meaning assigned to it in the U.S. Security Agreement [or the Canadian Security Agreement].

"Deposit Account Control Agreement" means an agreement among a Loan Party, a depository institution, and the Administrative Agent, which agreement is in a form reasonably acceptable to the Administrative Agent and the Required Lenders and which provides the Administrative Agent with "control" (as such term is used in Article 9 of the UCC) over the deposit account(s) described therein.

"Designated Pledged Debt" has the meaning specified in the U.S. Security Agreement [or the Canadian Security Agreement].

"Designated Pledged Interests" has the meaning specified in the U.S. Security Agreement [or the Canadian Security Agreement].

"Designation Date" has the meaning specified in Section 2.18(f).

"DIP Credit Agreement" has the meaning specified in the Preliminary Statements.

"DIP Lender" and "DIP Lenders" has the meaning specified in the Preliminary Statements.

"DIP New Money Loan Facility" has the meaning specified in the Preliminary Statements.

"DIP Roll-Up Facility" has the meaning specified in the Preliminary Statements.

"DIP Term Loan Facilities" has the meaning specified in the Preliminary Statements.

"Discount Range" has the meaning specified in the definition of "Dutch Auction".

"Disposition" or "Dispose" means the sale, transfer, license, sublicense, lease or other disposition of any property by any Person (including any Sale Leaseback Transactions and any issuance of Equity Interests by a Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Equity Interests that are not Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Term Loans and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Term Loans and all other Obligations that are accrued and payable), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Latest Term Loan Maturity Date in effect at the time of issuance of such Equity Interests; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of officers, directors or employees of Holdings, any Parent Entity, the Borrower or any Subsidiary or by any such plan to any such Person, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower or a Subsidiary or any other Person in order to satisfy applicable statutory or regulatory obligations or as a result of such Person's termination, death or disability.

"Disqualified Lenders" means (a) any natural person, (b) the Disqualified Lenders (Competitors) and (c) those Persons identified by the Borrower to the Administrative Agent prior to the date hereof and any Affiliate of such Person (except any Affiliate that is a bona fide fixed

income investor or debt fund) to the extent that (i) such Affiliate has been identified in writing by the Borrower to the Administrative Agent as such from time to time or (ii) such Affiliate is clearly identifiable as such on the basis of its name. Following each such identification in writing by or on behalf of the Borrower, Schedule 1.01(d) shall be promptly updated by the Borrower to reflect such written identification, and delivered to the Administrative Agent to make available to the Lenders. Notwithstanding anything herein to the contrary, in no event shall any supplement to the list of Disqualified Lenders apply retroactively to disqualify any Person that has previously acquired an assignment or participation of Term Loans and/or Term Commitments hereunder prior to the date any update to Schedule 1.01(d) is made available to the Lenders.  Notwithstanding the foregoing, each of the parties hereto acknowledges and agrees that the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions relating to Disqualified Lenders.  Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Lender or (y) have any liability with respect to or arising out of any assignment or participation of loans, or disclosure of confidential information to, or the restrictions on any exercise of rights or remedies of, any Lender.

"Disqualified Lenders (Competitors)" means, collectively, any Competitor of the Borrower identified in writing by the Borrower from time to time and set forth on Schedule 1.01(d) (subject, if after the Closing Date, to the Required Lenders' consent, which consent shall not be unreasonably withheld, delayed or conditioned) and any Affiliate of such Competitor (except any Affiliate that is a bona fide fixed income investor or debt fund), that (i) has been identified in writing by the Borrower hereto as such from time to time and set forth on Schedule 1.01(d) or (ii) that is clearly identifiable as such on the basis of such Affiliate's name.  Following each such identification in writing by or on behalf of the Borrower, Schedule 1.01(d) shall be promptly updated by the Borrower to reflect such written identification, and delivered to the Administrative Agent to make available to the Lenders.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary of the Borrower that is not a Foreign Subsidiary.

"Dutch Auction" means an auction (an "Auction") conducted by Holdings, the Borrower or one of its Subsidiaries in order to purchase Term Loans of any Tranche in accordance with the following procedures or such other procedures as may be agreed to between the Auction Agent and the Borrower:

    (a)    *Notice Procedures*.  In connection with any Auction, the Borrower shall provide notification to the Auction Agent (for distribution to the Appropriate Lenders) of the Tranche of Term Loans that will be the subject of the Auction (an "Auction Notice"). Each Auction Notice shall be in a form reasonably acceptable to the Auction Agent and shall specify (i) the total cash value of the bid, in a minimum amount of $5,000,000 with minimum increments of $1,000,000 in excess thereof (the "Auction Amount") and (ii) the discounts to par, which shall be expressed as a range of percentages (the "Discount Range"), representing the range of purchase prices (expressed as discounts to par) that

could be paid in the Auction for such Term Loans at issue.

(b)     *Reply Procedures*.  In connection with any Auction, each applicable Lender may, in its sole discretion, participate in such Auction by providing the Auction Agent with a notice of participation (the "<u>Return Bid</u>") which shall be in a form reasonably acceptable to the Auction Agent and shall specify (i) a discount to par (such discount being the "<u>Reply Discount</u>") that must be expressed as a price, which must be within the Discount Range, and (ii) a principal amount of the applicable Term Loans such Lender is willing to sell, which must be in increments of $1,000,000 or in an amount equal to such Lender's entire remaining amount of the applicable Term Loans (the "<u>Reply Amount</u>").  Lenders may only submit one Return Bid per Auction.  In addition to the Return Bid, each Lender wishing to participate in such Auction must execute and deliver, to be held in escrow by the Auction Agent, an assignment and acceptance agreement in a form reasonably acceptable to the Auction Agent (and shall authorize the Auction Agent to adjust the same to reflect any ratable treatment required by clause (c) below).

(c)     *Acceptance Procedures*.  Based on the Reply Discounts and Reply Amounts received by the Auction Agent, the Auction Agent, in consultation with the Borrower, will determine the applicable discount with respect to all Term Loans (the "<u>Applicable Discount</u>") for the Auction, which shall be the highest Reply Discount for which Holdings, the Borrower or its Subsidiary, as applicable, can complete the Auction at the Auction Amount; <u>provided</u> that, in the event that the Reply Amounts are insufficient to allow Holdings, the Borrower or its Subsidiary, as applicable, to complete a purchase of the entire Auction Amount (any such Auction, a "<u>Failed Auction</u>"), Holdings, the Borrower or such Subsidiary shall either, at its election, (i) withdraw the Auction or (ii) complete the Auction at an Applicable Discount equal to the lowest Reply Discount.  Holdings, the Borrower or its Subsidiary, as applicable, shall purchase the applicable Term Loans (or the respective portions thereof) from each applicable Lender with a Reply Discount that is equal to or greater than the Applicable Discount ("<u>Qualifying Bids</u>") at the Applicable Discount; <u>provided</u> that if the aggregate proceeds required to purchase all applicable Term Loans subject to Qualifying Bids would exceed the Auction Amount for such Auction, Holdings, the Borrower or its Subsidiary, as applicable, shall purchase such Term Loans at the Applicable Discount ratably based on the principal amounts of such Qualifying Bids (subject to adjustment for rounding as specified by the Auction Agent).  Each participating Lender will receive notice of a Qualifying Bid as soon as reasonably practicable but in no case later than five (5) Business Days from the date the Return Bid was due.

(d)     *Additional Procedures*.  Once initiated by an Auction Notice, Holdings, the Borrower or its Subsidiary, as applicable, may not withdraw an Auction other than a Failed Auction.  Furthermore, in connection with any Auction, upon submission by a Lender of a Qualifying Bid, such Lender will be obligated to sell the entirety or its allocable portion of the Reply Amount, as the case may be, at the Applicable Discount.

"<u>ECF Prepayment Due Date</u>" has the meaning specified in <u>Section 2.05(b)(i)</u>.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority,

(b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 10.07(b) (subject to receipt of such consents, if any, as may be required for the assignment of the applicable Term Loan to such Person under Section 10.07(b)(iii)).

"Environment" shall mean any surface or subsurface physical medium or natural resource, including air, land, soil, surface waters, ground waters, stream and river sediments, biota and any indoor area, surface or physical medium.

"Environmental Claim" shall mean any claim, notice, demand, order, action, suit, proceeding, or other communication alleging or asserting liability or obligations under or relating to Environmental Law, including liability or obligation for investigation, assessment, remediation, removal, cleanup, response, corrective action, monitoring, post-remedial or post-closure studies, investigations, operations and maintenance, injury, damage, destruction or loss to natural resources, personal injury, wrongful death, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release of Hazardous Material in, on, into or from the Environment at any location or (ii) any violation of or non-compliance with Environmental Law, and shall include any claim, notice, demand, order, action, suit or proceeding seeking damages (including the costs of remediation), contribution, indemnification, cost recovery, penalties, fines, indemnities, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to human health, safety or the Environment.

"Environmental Laws" means any and all federal, state, local and foreign statutes, laws, including applicable common law, regulations, ordinances, rules, judgments, orders, decrees or governmental restrictions relating to pollution, the protection of the environment, the release of Hazardous Materials into the environment or human exposure to Hazardous Materials, including those related to the treatment, transport, storage and disposal of Hazardous Materials, air emissions and discharges to public wastewater treatment systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, monitoring or oversight by a Governmental Authority, fines, or penalties), of the Borrower, any other Loan Party or their respective Subsidiaries directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) human exposure to any Hazardous Materials,

(d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other binding consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"Equity Issuance" means any issuance for cash by any Person to any other Person of (a) its Equity Interests, (b) any of its Equity Interests pursuant to the exercise of options or warrants, (c) any of its Equity Interests pursuant to the conversion of any debt securities to equity or (d) any options or warrants relating to its Equity Interests; *provided* that any instrument evidencing Indebtedness convertible into or exchangeable for any of the foregoing shall not be deemed Equity Interests unless and until any such instruments are so converted or exchanged.

"ERISA" means the Employee Retirement Income Security Act of 1974, and the rules and regulations thereunder, each as amended or modified from time to time.

"ERISA Affiliate" means any Person who together with any Loan Party is treated as a single employer within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Plan; (b) the withdrawal of any Loan Party or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA); (d) the filing of a notice of intent to terminate or the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, (e) the institution by the PBGC of proceedings to terminate a Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (g) the determination that any Plan is considered an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; (h) the determination that any Multiemployer Plan is considered a plan in endangered or critical status within the meaning of Sections 431 and 432 of the Code or Sections 304 and 305 of ERISA; (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (j) the conditions for the imposition of a lien under Section 430(k) of the Code or Section 303(k) of ERISA shall have been met with respect to any Plan; k) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Plan or the failure to make any required

-24-

contribution to a Multiemployer Plan; (l) the occurrence of a Foreign Plan Event; or (m) any other event or condition with respect to a Plan or Multiemployer Plan that could result in liability of the Borrower or any Subsidiary.

"Erroneous Payment" has the meaning assigned to it in Section 9.12(a).

"Erroneous Payment Notice" has the meaning assigned to it in Section 9.12(a).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

"Excess Cash Flow" means, with respect to any Excess Cash Flow Period, an amount, not less than zero, equal to the excess of:

(a)     the sum, without duplication, of (i) Consolidated Net Income of the Borrower and its Subsidiaries for such Excess Cash Flow Period, *plus* (ii) the amount of all noncash charges (including depreciation, amortization and deferred tax expense) deducted in arriving at such Consolidated Net Income, *plus* (iii) the aggregate net amount of noncash loss on the sale, transfer or other Disposition of assets, business units or property ("asset sales") by the Borrower and the Subsidiaries during such Excess Cash Flow Period (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income, *minus*

(b)     the sum, without duplication (in each case, for the Borrower and the Subsidiaries on a consolidated basis), of:

(i)     Capital Expenditures, solely to the extent made, directly or indirectly, with Internally Generated Cash, that are (A) actually made or expected to be made during such Excess Cash Flow Period or (B) at the option of the Borrower, committed during such Excess Cash Flow Period to be made in the immediately succeeding Excess Cash Flow Period; *provided* that (x) if any Capital Expenditures are deducted from Excess Cash Flow pursuant to clause (B) above, such amount shall be added to the Excess Cash Flow for the immediately succeeding Excess Cash Flow Period if the expenditure is not actually made within such Excess Cash Flow Period and (y) no deduction shall be taken in the immediately succeeding Excess Cash Flow Period when such amounts deducted pursuant to clause (B) above are actually spent;

(ii)     Consolidated Scheduled Funded Debt Payments and, to the extent not otherwise deducted from Consolidated Net Income, Consolidated Cash Taxes;

(iii)     Restricted Payments made by the Borrower and its Subsidiaries to the extent that such Restricted Payments are made in cash under Sections 7.06(d) or 7.06(i), solely to the extent made, directly or indirectly, with Internally Generated Cash;

(iv)     the aggregate amount of voluntary or mandatory permanent principal payments or mandatory repurchases of (A) Indebtedness for borrowed money (including any reimbursement obligations in respect of drawn letters of credit, bankers' acceptances, bank

-25-

guaranties or similar arrangements) and (B) the principal component of payments in respect of Capitalized Lease Obligations of the Borrower and its Subsidiaries (in each case, excluding the Obligations and any Indebtedness secured on a *pari passu* basis with the Obligations), in each case, financed with Internally Generated Cash; *provided* that (w) such prepayments or repurchases are made prior to the ECF Prepayment Due Date, (x) such prepayments or repurchases are otherwise permitted hereunder, (y) if such Indebtedness consists of a revolving line of credit or the reimbursement of obligations under a stand-alone letter of credit, bankers' acceptance, bank guaranty or other similar arrangement, the commitments under such facility are permanently reduced by the amount of such prepayment or repurchase, and (z) such prepayments or repurchases are made with Internally Generated Cash and not made, directly or indirectly, using the Available Amount; *provided*, *further*, that, in the case of any such prepayment or repurchase at less than the par value of the applicable Indebtedness, amounts deducted pursuant to this clause (iv) shall be limited to the actual cash amount paid by the Borrower in respect of such repayment or repurchase;

(v)     (A) the aggregate amount of any premium, make-whole or penalty payments actually paid in cash during such period that are required to be made in connection with any prepayment or satisfaction and discharge of Indebtedness to the extent that the amount so prepaid, satisfied or discharged is not deducted from Consolidated Net Income for purposes of calculating Excess Cash Flow and (B), to the extent included in determining Consolidated Net Income, the aggregate amount of any income (or loss) for such period attributable to the early extinguishment of Indebtedness, Swap Contracts or other derivative instruments (other than commodity Swap Contracts);

(vi)     to the extent not deducted in arriving at Consolidated Net Income, (A) cash fees and expenses incurred in connection with the Transactions and (B) to the extent permitted hereunder, cash fees and expenses incurred in connection with any Investment permitted under Section 7.02, Equity Issuance or Debt Issuance (whether or not consummated), in the case of this clause (B), to the extent financed with Internally Generated Cash;

(vii)     the aggregate amount of expenditures, to the extent financed with Internally Generated Cash, that are actually made in cash during such period (including expenditures for payment of financing fees) to the extent such expenditures are not expensed during such period or expensed but not deducted in arriving at Consolidated Net Income;

(viii)     cash used or, at the option of the Borrower, committed within three months of the end of the applicable Excess Cash Flow Period to be used to consummate, or to pay amounts (including earnouts and purchase price adjustments) owing in connection with, a Permitted Acquisition or any Investment in the immediately succeeding Excess Cash Flow Period, in each case, as permitted under Section 7.02; *provided*, *however*, that if any amount is deducted from Excess Cash Flow pursuant to this clause (viii) with respect to any Excess Cash Flow Period as a result of a Permitted Acquisition or Investment that has been committed to be consummated but not yet actually consummated during such period then (x) such amount shall not be deducted from Excess Cash Flow pursuant to this clause (viii) as a result of such Permitted Acquisition or Investment, as the case may be, being actually consummated in the immediately succeeding Excess Cash Flow Period and (y) such amount shall be added to Excess Cash Flow for the immediately succeeding Excess Cash Flow Period if the Permitted Acquisition or Investment is not actually consummated during such succeeding period;

(ix)     the amount of cash payments made in respect of pensions and other postemployment benefits in such period to the extent not deducted in arriving at such Consolidated Net Income;

(x)     cash expenditures in respect of Swap Contracts during such fiscal year to the extent they exceed the amount of expenditures expensed in determining Consolidated Net Income for such period;

(xi)     the aggregate principal amount of all mandatory prepayments of the Term Facilities made during such Excess Cash Flow Period pursuant to Section 2.05(b)(ii) or, in each case, reinvestments of Net Cash Proceeds in lieu thereof, to the extent that the applicable Net Cash Proceeds resulted in an increase of Consolidated Net Income for such or any prior Excess Cash Flow Period;

(xii)     the amount representing accrued expenses for cash payments (including with respect to deferred compensation or retirement plan obligations) that are not paid in cash during such Excess Cash Flow Period; *provided* that such amounts will be added to Excess Cash Flow for the following Excess Cash Flow Period to the extent not paid in cash within such Excess Cash Flow Period (and no future deduction shall be made for purposes of this definition when such amounts are paid in cash in such following Excess Cash Flow Period); and

(xiii)     all noncash gains and credits to the extent included in arriving at Consolidated Net Income; *minus*

(c)     any increase in Net Working Capital during such Excess Cash Flow Period (measured as the excess, if any, of Net Working Capital at the end of such Excess Cash Flow Period *minus* Net Working Capital at the beginning of such Excess Cash Flow Period); *plus*

(d)     any decrease in Net Working Capital during such Excess Cash Flow Period (measured as the excess, if any, of Net Working Capital at the beginning of such Excess Cash Flow Period *minus* Net Working Capital at the end of such Excess Cash Flow Period).

"Excess Cash Flow Period" means any fiscal year of the Borrower, commencing with the fiscal year ending December 31, 2025.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Accounts" means (i) tax withholding accounts funded in the ordinary course of business or required by applicable law, (ii) deposit accounts used only for payroll obligations in the ordinary course of business and deposit accounts used only for other employee wage, benefit, severance and compensation payments (including salaries, wages, benefits and expense reimbursements, 401(k) and other retirement plans and employee benefits), (iii) zero-balance accounts or accounts that are swept daily or on each Business Day, directly or indirectly, to a Deposit Account subject to a control agreement in favor of the Administrative Agent, (iv) Deposit Accounts the balances of which are comprised solely of cash, cash equivalents or other assets that Holdings or any Subsidiary thereof holds in trust or as an escrow fiduciary for another Person which is not a Loan Party or (v) deposit accounts used only to hold pledges or deposits made to secure payment of workers' compensation, unemployment insurance or other forms of

governmental insurance or benefits or to participate in any fund in connection with workers' compensation, unemployment insurance, pensions or other social security programs.

"Excluded Assets" has the meaning specified in the Security Agreement.

"Excluded Subsidiary" means any Subsidiary that is (a) a Foreign Subsidiary, other than a Material Foreign Subsidiary or (b) not wholly owned directly by Holdings, the Borrower or one or more of their respective wholly owned Subsidiaries; *provided* that it is understood and agreed that, notwithstanding the above, if a Subsidiary executes the Guaranty as a "Guarantor" then it shall not constitute an "Excluded Subsidiary" (unless released from its obligations under the Guaranty as "Guarantor" in accordance with the terms hereof and thereof); *provided*, *further*, that no Subsidiary of the Borrower shall be an Excluded Subsidiary if such Subsidiary guarantees or is a primary obligor of obligations in respect of any Permitted Revolving Credit Facility.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Agent or any Lender, or required to be withheld or deducted from a payment to any Agent or any Lender, as applicable, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Term Loan or Term Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Term Loan or Term Commitment (other than pursuant to an assignment request by the Borrower under Section 3.07) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such recipient's failure to comply with Section 10.16 and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Existing Term Loans" has the meaning specified in Section 2.18(a).

"Existing Tranche" has the meaning specified in Section 2.18(a).

"Extended First Out Term Loans" means Extended Term Loans in respect of which the Existing Tranche constituted First Out Term Loans.

"Extended Second Out Term Loans" means Extended Term Loans in respect of which the Existing Tranche constituted Second Out Term Loans.

"Extended Term Loans" has the meaning specified in Section 2.18(a).

"Extended Term Tranche" has the meaning specified in Section 2.18(a).

"Extended Tranche" has the meaning specified in Section 2.18(a).

"Extending Lender" has the meaning specified in Section 2.18(b).

"Extension" has the meaning specified in Section 2.18(b).

"Extension Amendment" has the meaning specified in Section 2.18(c).

"Extension Date" has the meaning specified in Section 2.18(d).

"Extension Election" has the meaning specified in Section 2.18(b).

"Extension Request" has the meaning specified in Section 2.18(a).

"Extension Request Deadline" has the meaning specified in Section 2.18(b).

"Facility" means the Initial Term Facility and any Incremental Term Facility, as the context may require.

"Failed Auction" has the meaning specified in the definition of "Dutch Auction".

"Fair Market Value" means, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Borrower in good faith (which shall be conclusive if reasonably determined in good faith).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury Regulations promulgated thereunder or official interpretation thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with any of the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) received by the Administrative Agent on such day on such transactions from three commercial banks of recognized standing selected by the Administrative Agent, but in no event less than 0% per annum.

"Fee Letter" means the fee letter, dated as of the date hereof, entered into between the Borrower and the Co-Administrative Agents (in their capacity as such) relating to the administrative  and collateral agent services to be under the Loan Documents.

-29-

"First Out Lender" means, at any time, any Lender that has a First Out New Money Term Loan Commitment or holds a First Out Term Loan at such time.

"First Out New Money Term Loan Commitment" means, as to each Term Lender, its obligation to make First Out New Money Term Loans to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount not to exceed the amount set forth opposite such Term Lender's name on Schedule 2.01 under the caption "First Out New Money Term Commitment" or opposite a comparable caption in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The initial aggregate amount of the First Out New Money Term Commitments is $[__],000,000.

"First Out New Money Term Loans" has the meaning specified in Section 2.01(a).

"First Out Roll-Up Loans" has the meaning specified in Section 2.01(b).

"First Out Roll-Up Schedule" has the meaning specified in Section 2.01(b).

"First Out Term Loan" means an Initial First Out Term Loan, an Incremental First Out Term Loan, or an Extended First Out Term Loan, as the context may require.

"Flood Laws" means the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors of the Federal Reserve System).

"Floor" means a rate of interest equal to 1.00%.

"Foreign Lender" has the meaning specified in Section 10.16(b)(i).

"Foreign Loan Party" means any Loan Party that is not a U.S. Loan Party.

"Foreign Pension Plan" means a registered pension plan which is subject to applicable pension legislation other than ERISA or the Code, which a Loan Party or Subsidiary sponsors or maintains, or to which it makes or is obligated to make contributions.

"Foreign Plan" means each Foreign Pension Plan, deferred compensation or other retirement or superannuation plan, fund, program, agreement, commitment or arrangement whether oral or written, funded or unfunded, sponsored, established, maintained or contributed to, or required to be contributed to, or with respect to which any liability is borne, outside the United States of America, by any Loan Party or Subsidiary, other than any such plan, fund, program, agreement or arrangement sponsored by a Governmental Authority.

"Foreign Plan Event" has the meaning specified in Section 5.10(d).

"Foreign Subsidiary" means any direct or indirect Subsidiary of the Borrower that is organized under the laws of a jurisdiction other than one of the fifty states of the United States or the District of Columbia.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Funded Debt" of any Person means Indebtedness for borrowed money of such Person that by its terms matures more than one year from the date of its creation or matures within one year from such date that is renewable or extendable, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, and shall in any event include Indebtedness in respect of the Term Loans.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, as in effect from time to time.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank, supra national authority or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" has the meaning specified in Section 10.07(g).

"Guarantee" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any such obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary or reasonable indemnity obligations in effect on the Closing Date, or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the

maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, collectively, Holdings and each of its and the Borrower's direct and indirect Subsidiaries of the Borrower listed on Schedule 1, and each other Subsidiary of the Borrower that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 6.12.

"Guaranties" means, collectively, (i) the U.S. Guaranty, (ii) the Canadian Guaranty and (iii) each other guaranty and guaranty supplement delivered pursuant to Section 6.12.

"Hazardous Materials" means all hazardous or toxic substances, materials or wastes, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and radioactive substances, infectious or medical wastes and all other substances or wastes of any nature regulated as "hazardous" or "toxic," pursuant to any Environmental Law.

"Holdings" has the meaning specified in the introductory paragraph to this Agreement.

"Incremental Amount" means, at any date of determination, an amount not in excess of (i) $15,000,000 *minus* (ii) the aggregate principal amount of any Term Facility Increase or any Incremental Term Facility pursuant to Section 2.15 or 2.16 in each case incurred on or prior to such date.

"Incremental First Out Facility" has the meaning specified in Section 2.16(e).

"Incremental First Out Term Loan" has the meaning specified in Section 2.16(e).

"Incremental Second Out Facility" has the meaning specified in Section 2.16(e).

"Incremental Second Out Term Loan" has the meaning specified in Section 2.16(e).

"Incremental Term Commitment Effective Date" has the meaning specified in Section 2.16(c).

"Incremental Term Commitments" has the meaning specified in Section 2.16(a).

"Incremental Term Facility" has the meaning specified in Section 2.16(a).

"Incremental Term Lender" has the meaning specified in Section 2.16(b).

"Incremental Term Loan" has the meaning specified in Section 2.16(a).

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)      the maximum amount (after giving effect to any prior drawings or reductions which have been reimbursed) of (i) all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(c)      net obligations of such Person under any Swap Contract;

(d)      all obligations of such Person to pay the deferred purchase price of property or services (other than (w) trade accounts (including on an intercompany basis) payable in the ordinary course of business and not more than three hundred and sixty-five (365) days overdue, (x) any earn-out obligation until such obligation is not paid after becoming due and payable, (y) expenses accrued in the ordinary course of business and (z) obligations resulting from take-or pay contracts entered into in the ordinary course of business);

(e)      Indebtedness (excluding prepaid interest thereon) of another Person secured by a Lien on property owned or being purchased by such Person (including Indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such Indebtedness shall have been assumed by such Person or is limited in recourse;

(f)      all Capitalized Lease Obligations;

(g)      all obligations of such Person with respect to redemption, repayment or other repurchase (excluding accrued dividends to the extent not increasing liquidation preference) in respect of Disqualified Equity Interests; and

(h)      all Guarantees of such Person in respect of any of the foregoing;

*provided* that Indebtedness shall not include (i) prepaid or deferred revenue arising in the ordinary course of business and (ii) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy warranties or other unperformed obligations of the seller of such asset.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company or the foreign equivalent thereof) in which such Person is a general partner or a joint venturer, except to the extent the holders of such Indebtedness do not have recourse to such Person. The amount of any net obligation owed by such Person under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) above shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Liabilities" has the meaning specified in Section 10.05.

"Indemnified Taxes" means all Taxes other than Excluded Taxes or Other Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Loan Document.

"Indemnitees" has the meaning specified in Section 10.05.

"Information" has the meaning specified in Section 10.08.

"Initial First Out Term Facility" means, at any time, the aggregate Initial First Out Term Loans of all Term Lenders at such time.

"Initial First Out Term Loans" means, collectively, the First Out New Money Term Loans and the First Out Roll-Up Loans.

"Initial Second Out Term Facility" means, at any time, the aggregate Initial Second Out Term Loans of all Term Lenders at such time.  As of the Closing Date, the aggregate principal amount of the Initial Second Out Term Loans is $[__].

"Initial Second Out Term Loans" has the meaning specified in Section 2.01(c).

"Initial Term Facility" means, at any time, the aggregate Initial Term Loans of all Term Lenders at such time.

"Initial Term Loans" means, collectively, the Initial First Out Term Loans and the Initial Second Out Term Loans.

"Intellectual Property Security Agreement" means, collectively, (i) the intellectual property security agreement, substantially in the form of Exhibit B to the U.S. Security Agreement, [(ii) the intellectual property security agreement, substantially in the form of Exhibit B to the Canadian Security Agreement] and (iii) each intellectual property security agreement supplement executed and delivered pursuant to Section 6.12.

"Intercompany Subordination Agreement" means an intercompany subordination agreement in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent.

"Interest Calculation Period" means (a) with respect to any Initial Second Out Term Loan that is a Base Rate Loan, each period commencing on the date of the then most recent Interest Payment Date applicable to such Base Rate Loan (or, if an Interest Payment Date has not yet occurred with respect to such Base Rate Loan, the date such Base Rate Loan is made or the applicable Initial Second Out Term Loan is converted to such Base Rate Loan) to and excluding the then next occurring Interest Payment Date applicable to such Base Rate Loan and (b) with respect to any Initial Second Out Term Loan that is a SOFR Loan, the Interest Period then applicable to such SOFR Loan.

"Interest Payment Date" means, (a) as to any Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date of the Facility under which such Loan was made; *provided*, *however*, that if any Interest Period for a SOFR Loan

-34-

exceeds three (3) months, the respective dates that fall every three (3) months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any Base Rate Loan, the last Business Day of each March, June, September and December and the Maturity Date of the Facility under which such Loan was made.

"Interest Period" means, as to each SOFR Loan, the period commencing on the date such SOFR Loan is disbursed or converted to or continued as a SOFR Loan and ending on the date one (1), three (3) or six (6) months thereafter, as selected by the Borrower in a Committed Loan Notice; *provided* that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the scheduled Maturity Date of the Facility under which such Loan was made.

"Internally Generated Cash" means, with respect to any period, any cash of the Borrower or any Subsidiary generated during such period, excluding Net Cash Proceeds and any cash that is generated from an incurrence of Indebtedness or an issuance of (or contributions in respect of) Equity Interests.

"Investment" means, as to any Person, any direct or indirect investment by such Person, by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of Indebtedness in respect of such Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such other Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment.

"IP Rights" has the meaning specified in Section 5.07.

"IP Security Agreement Supplement" has the meaning specified in the U.S. Security Agreement [or the Canadian Security Agreement].

"IRS" means the United States Internal Revenue Service.

"Joint Venture" means (a) any Person which would constitute an "equity method investee" of the Borrower or any of its Subsidiaries and (b) any Person in whom the Borrower or any of its Subsidiaries beneficially owns any Equity Interest that is not a Subsidiary.

"Judgment Currency" has the meaning specified in Section 10.26(a).

"Judgment Currency Conversion Date" has the meaning specified in Section 10.26(a).

"Junior Financing" means any Indebtedness that is (a) expressly subordinated in right of payment to the Obligations (other than intercompany Indebtedness), (b) secured on a junior priority basis relative to the Term Facilities by some or all of the Collateral (but excluding any Permitted Revolving Credit Facility) or (c) unsecured and has a principal amount outstanding in excess of $10,000,000 (in each case, other than intercompany Indebtedness).

"Junior Financing Documentation" means any documentation governing any Junior Financing.

"Latest Term Loan Maturity Date" means, at any date of determination, the latest maturity date applicable to any Tranche of Term Loans hereunder at such time, including the latest maturity or expiration date of any Initial Term Loan, any Incremental Term Facility (or Term Loan thereunder) or any Extended Tranche, in each case, as extended in accordance with this Agreement from time to time.

"Laws" means, collectively, all applicable international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Legal Requirements" shall mean, as to any Person, the Organization Documents of such Person, and any treaty, law (including the common law), statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, order or determination of an arbitrator or a court or other Governmental Authority, and any interpretation thereof published by the applicable Governmental Authority or administrative procedures relating thereto established by the applicable Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph to this Agreement.  The financial institutions named on Schedule 2.01(c) on the Effective Date are holders of a First Lien Credit Facility Claim (as defined in the Chapter 11 Plan) as of the applicable distribution record date and are referred to herein as the "Closing Date Second Out Lenders"; each Closing Date Second Out Lender is deemed to be a party to this Agreement on the Closing Date.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any leases evidencing Capitalized Lease Obligations having substantially the same economic effect as any of the foregoing).

"Limited Condition Acquisition" means any acquisition or similar investment permitted by Section 7.02 that the Borrower or one or more of its Subsidiaries is contractually committed to consummate, and whose consummation is not conditioned on the availability of, or on obtaining, third party financing (it being understood that such commitment may be subject to other conditions precedent, which conditions precedent may be amended, satisfied or waived in accordance with the terms of the applicable agreement).

"Loan" means a Term Loan.

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Guaranty, (iv) the Collateral Documents, (v) any Permitted ABL Intercreditor Agreement or Permitted Cash Flow Revolver Intercreditor Agreement, (vi) any Extension Amendment, (vii) any joinder agreement entered into pursuant to Section 2.15 or 2.16, and (ix) the Fee Letter.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse effect on the business, assets, liabilities (actual or contingent), financial condition or results of operations of the Borrower and the Subsidiaries, taken as a whole, (b) a material adverse effect on the ability of the Loan Parties (taken as a whole) to perform their respective payment obligations under the Loan Documents or (c) a material adverse effect on the rights and remedies of the Lenders or the Administrative Agent under the Loan Documents.

"Material Foreign Subsidiary" means, on any date of determination, any Foreign Subsidiary of the Borrower that is organized in a Material Jurisdiction.

"Material Jurisdiction" means, as of any date of determination, [(i) Mexico], (ii) Canada or any of its provinces or territories and (iii) any jurisdiction (other than the United States) in which the Borrower and its Subsidiaries have (x) aggregate revenues for the most recent period of four consecutive fiscal quarters ending prior to such date exceeding 5.00% of the total revenues of the Borrower and its Subsidiaries for such period or (y) aggregate assets exceeding 5.00% of the total assets of the Borrower and its Subsidiaries.

"Material Real Property" means any parcel of real property (other than a parcel with a Fair Market Value of less than $1,000,000) owned in fee by a Loan Party; *provided*, *however*, that one or more parcels owned in fee by such Loan Party and located adjacent to, contiguous with, or in close proximity to, and comprising one property with a common street address shall, in the reasonable discretion of the Required Lenders, be deemed to be one parcel for the purposes of this definition. For the avoidance of doubt, the parcels of real property located at 3050 and 3070 Roosevelt Highway, College Park, Georgia 30349 shall be treated as separate parcels of real property for the purposes of this Agreement.

-37-

"Maturity Date" means:  (a) with respect to the Initial First Out Term Facility, the earlier of (i) [_____][2] and (ii) the date that the Initial First Out Term Loans are declared due and payable pursuant to Section 8.02, (b) with respect to the Initial Second Out Term Facility, the earlier of (i) [_____][3] and (ii) the date that the Initial Second Out Term Loans are declared due and payable pursuant to Section 8.02, (c) with respect to any Tranche of Extended Term Loans, the final maturity date as specified in the applicable Extension Amendment and (d) with respect to any Incremental Term Facility, the final maturity date as specified in the applicable amendment to this Agreement in respect of such Term Facility; *provided*, in each case, that if such day is not a Business Day, the applicable Maturity Date shall be the Business Day immediately preceding such day.

"Maximum Rate" has the meaning specified in Section 10.11.

"Mexican Guarantor" means Strategic Materials Mexicana S.A. de C.V.

"Mexican Security Agreement" means, collectively, (i) the Mexican Non-Possessory Pledge Agreement, to be entered into after the Closing Date (and in any event on or prior to the date required by Section 6.17), by and between, the Mexican Guarantor, as pledgor, and Acquiom, acting as collateral agent under the Loan Documents, as pledgee, and the other Persons party thereto and (ii) the Mexican Share Pledge Agreement, to be entered into after the Closing Date (and in any event on or prior to the date required by Section 6.17),  by and between, SMI Materials, Inc. as pledgor, Acquiom, acting as collateral agent under the Loan Documents, as pledgee, the Mexican Guarantor, as the issuer of the pledged shares, and the other Persons party thereto, in each case in form and substance reasonably satisfactory to the Required Lenders.

"Minimum Extension Condition" has the meaning specified in Section 2.18(g).

"MNPI" has the meaning specified in Section 6.02.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means, collectively, the deeds of trust, trust deeds and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"Mortgaged Properties" means any Material Real Property with respect to which a Mortgage is required pursuant to Section 6.12.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, to which any Loan Party, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six years, has made or been obligated to make contributions.

---

[2] Date to be 4 years and 6 months after the Closing Date
[3] Date to be 5 years after the Closing Date

"Net Cash Proceeds" means:

(a)    with respect to the Disposition of any asset by the Borrower or any Subsidiary or any Casualty Event, the excess, if any, of (i) the sum of cash and Cash Equivalents received in connection with such Disposition or Casualty Event and attributable to the assets or business of the Borrower or such Subsidiary that is subject to such Disposition or Casualty Event (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received and, with respect to any Casualty Event, any insurance proceeds or condemnation awards in respect of such Casualty Event received by or paid to or for the account of the Borrower or any Subsidiary over (ii) the sum of (A) the principal amount of any Indebtedness that is secured by the asset subject to such Disposition or Casualty Event and that is required to be repaid in connection with such Disposition or Casualty Event (other than Indebtedness under the Loan Documents and, if such asset constitutes Collateral, any Indebtedness secured by such asset with a Lien ranking junior to the Lien securing the Obligations), (B) the out-of-pocket expenses incurred by the Borrower or such Subsidiary in connection with such Disposition or Casualty Event (including attorneys' fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary or reasonable fees actually incurred in connection therewith), (C) any taxes paid or reasonably estimated to be payable in connection with such Disposition or Casualty Event, any tax distributions payable pursuant to Section 7.06(i) in connection with such Disposition or Casualty Event and any repatriation costs associated with receipt by the applicable taxpayer of such proceeds, (D) any reserve for adjustment in respect of (x) the sale price of the property that is the subject of such Disposition established in accordance with GAAP and (y) any liabilities associated with such property and retained by the Borrower or any Subsidiary after such Disposition, including pension and other post-employment benefit liabilities and Environmental Liabilities or against any indemnification obligations associated with such transaction, (E) any customer deposits required to be returned as a result of such Disposition, (F) the pro rata portion of the net cash proceeds of any Disposition or Casualty Event by any non-wholly owned Subsidiary (calculated without regard to this clause (F)) attributable to minority interests and not available for distribution to or for the account of the Borrower or a wholly owned Subsidiary as a result thereof and (G) the amount of any payments required to be made by the Borrower or any Subsidiary in respect of such Disposition pursuant to equity options, management incentive plans or similar obligations in each case entered into in the ordinary course of business, and it being understood that "Net Cash Proceeds" shall include, without limitation, any cash or Cash Equivalents (i) received upon the Disposition of any noncash consideration (including, without limitation, any Designated Non-Cash Consideration) received by the Borrower or any Subsidiary in any such Disposition and (ii) upon the reversal (without the satisfaction of any applicable liabilities in cash in a corresponding amount, or any offsetting other reserve) of any reserve described in clause (D) above;

(b)    with respect to the issuance of any Equity Interest by the Borrower or any Subsidiary, the excess of (i) the sum of the cash and Cash Equivalents received in connection with such issuance over (ii) the investment banking fees, underwriting

-39-

discounts and commissions, other out-of-pocket expenses and other customary or reasonable fees and expenses, incurred by the Borrower or such Subsidiary in connection with such issuance; and

(c)    with respect to the incurrence or issuance of any Indebtedness by the Borrower or any Subsidiary, the excess, if any, of (i) the sum of the cash received in connection with such incurrence or issuance over (ii) the investment banking fees, underwriting discounts and commissions, taxes paid or reasonably estimated to be payable or issuance and other out-of-pocket fees and expenses and other customary expenses, incurred by the Borrower or such Subsidiary in connection with such incurrence.

"Net Working Capital" means, with respect to the Borrower, Consolidated Current Assets *minus* Consolidated Current Liabilities.

"Non-Consenting Lender" has the meaning specified in Section 3.07(d).

"Non-Extending Lender" has the meaning specified in Section 2.18(e).

"No Undisclosed Information Representation" means a representation made by a Person that such Person is not in possession of any information regarding the Borrower, its subsidiaries or its Affiliates, or the Borrower's assets, its ability to perform its obligations or any other matter that may be material to a decision by any Lender to participate in or enter into such assignment or any of the transactions contemplated thereby and that has not previously been disclosed to the Administrative Agent and the Lenders that are Public Lenders.

"Non-Canadian Foreign Loan Parties" means Foreign Loan Parties, other than Canadian Loan Parties

"NPL" means the National Priorities List under CERCLA.

"Obligation Currency" has the meaning specified in Section 10.26(a).

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include (a) the obligation to pay principal, interest, premiums, if any, charges, expenses, fees, indemnities and other amounts payable by any Loan Party under any Loan Document and (b) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"OFAC" has the meaning specified in Section 5.21(a).

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction) and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, trust or other applicable agreement of formation or organization and, if applicable, any agreement or instrument with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Administrative Agent or any Lender, as applicable, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Incremental Term Facility" means any Incremental Term Facility, other than a Super Senior Incremental Term Facility.

"Other Incremental Term Loan" means any Incremental Term Loan, other than a Super Senior Incremental Term Loan.

"Other Taxes" has the meaning specified in Section 3.01(b).

"Outstanding Amount" means, with respect to any Tranche of Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Loans occurring on such date.

"Parent Entity" means any direct or indirect parent entity of Holdings, having Control of Holdings and which does not own (directly or indirectly) the Equity Interests of any Person other than (a) Holdings or a direct or indirect parent entity of Holdings, (b) any Person or Persons that are created or acquired by such Parent Entity for the purpose of contributing (directly or indirectly) the Equity Interest of such Person to the Borrower (and whose Equity Interests are promptly contributed (directly or indirectly) to the Borrower upon the creation or acquisition thereof) in connection with a Permitted Acquisition or other similar Investment permitted pursuant to Section 7.02 or (c) any other Person, to the extent the Equity Interests of such Person are owned (directly or indirectly) by Holdings.

"Participant" has the meaning specified in Section 10.07(d).

"Participant Register" has the meaning specified in Section 10.07(l).

"PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56. (signed into law October 26, 2001)), as amended or modified from time to time.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation.

"<u>Pension Funding Rules</u>" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Protection Act of 2006, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Protection Act of 2006 and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"<u>Perfection Exceptions</u>" has the meaning specified in the Security Agreement.

"<u>Periodic Term SOFR Determination Day</u>" has the meaning specified in the definition of "Term SOFR".

"<u>Permitted ABL Intercreditor Agreement</u>" has the meaning specified in the definition of "Permitted Revolving Credit Facility".

"<u>Permitted Acquisition</u>" means the purchase or other acquisition, by merger or otherwise, by the Borrower or any Subsidiary of all or a majority of the Equity Interests in, or all or substantially all the assets of (or all or substantially all the assets constituting a business unit, division, product line or line of business of) any Person; *provided* that (a) no Event of Default shall have occurred and be continuing or would result therefrom, (b) any Person or assets or division acquired in connection herewith shall be in the same business or lines of business or reasonably related, ancillary or complementary businesses (including related, complementary, synergistic or ancillary technologies) in which the Borrower and/or its Subsidiaries are then engaged, (c) each applicable Loan Party and any such newly created or acquired Subsidiary shall have complied with the requirements of <u>Section 6.12</u> or made arrangements for compliance therewith after the effectiveness of such Permitted Acquisition in accordance with <u>Section 6.12</u>, (d) in the case of an acquisition of a publicly-held Person, such acquisition shall have been approved by the board of directors of the Person (or similar governing body if such Person is not a corporation) which is the subject of such acquisition and such Person shall not have publicly announced that it will oppose such acquisition or shall not have commenced any action which alleges that such acquisition will violate applicable law (unless such announcement or action shall have been withdrawn, dismissed or terminated), (e) the Total Net Leverage Ratio for the Test Period most recently ended, calculated on a Pro Forma Basis after giving effect to such acquisition and any related transactions, shall not exceed 4.00:1.00, and (f) the total cash and noncash consideration (including earn-outs and other contingent payment obligations (only to the extent of the reserve, if any, required under GAAP (as determined at the time of the consummation of such Permitted Acquisition)) to be established in respect thereof by the Borrower or its Subsidiaries to such sellers and all assumptions of Indebtedness in connection therewith) paid by the Borrower and its Subsidiaries for any such purchase or other acquisition of an entity that does not become a Guarantor (including by way of merger) or of assets that do not become Collateral, when aggregated with the total cash and noncash consideration (calculated on the same basis) paid by or on behalf of the Borrower and the other Subsidiaries for all other purchases and other acquisitions made by the Borrower and the other Subsidiaries of entities that do not become Guarantors (including by way of merger) or of assets that do not become Collateral in entities that do not become Guarantors or of assets that do not become Collateral, shall not exceed $5,000,000.

"<u>Permitted Cash Flow Revolver Intercreditor Agreement</u>" has the meaning specified in the definition of Permitted Revolving Credit Facility.

"<u>Permitted Equity Issuance</u>" means any capital contribution to Holdings (other than with respect to Disqualified Equity Interests) or sale or issuance of any Equity Interests (other than Disqualified Equity Interests) of Holdings, the proceeds of which are contributed to the common equity of the Borrower.

"<u>Permitted Factoring Arrangements</u>" means receivables financing facilities and factoring arrangements existing on the Closing Date and any amendment or modification of any receivables financing facility or factoring arrangement existing on the Closing Date, to the extent such amendment or modification is not materially adverse to the interests of the Lenders (as determined in good faith by the Borrower).

"<u>Permitted Investors</u>" means all First Out Lenders owning Equity Interests in Holdings on the Closing Date, immediately after giving effect to the consummation of the Chapter 11 Plan, and their respective Affiliates, any of their respective investment advisors and funds that are managed or advised by the same investment advisor of another fund that is a First Out Lender owning Equity Interests in Holdings on the Closing Date, immediately after giving effect to the consummation of the Chapter 11 Plan, or by an Affiliate of such investment advisor.

"<u>Permitted Refinancing</u>" means, with respect to any Person, any modification, refinancing, refunding, renewal, replacement, redemption, repurchase, defeasance, exchange and/or extension (collectively to "<u>Refinance</u>" or a "<u>Refinancing</u>" or "<u>Refinanced</u>") of any Indebtedness (any such Indebtedness as so modified, refinanced, refunded, renewed, replaced, redeemed, repurchased, defeased, exchanged and/or extended, "<u>Refinancing Indebtedness</u>") of such Person; *provided* that (a) the principal amount (or, if issued with original issue discount, the aggregate issue price) of such Refinancing Indebtedness does not exceed the principal amount of the Indebtedness so Refinanced except by an amount equal to unpaid accrued interest, fees and premium (including tender premium) and penalties (if any) thereon, *plus* upfront fees and original issue discount thereon, *plus* other reasonable and customary fees and expenses incurred or paid in connection with such Refinancing, *plus* an amount equal to any existing commitment unutilized and letters of credit undrawn thereunder; (b) such Refinancing Indebtedness has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being Refinanced; (c) if the Indebtedness being Refinanced is subordinated in right of payment to the Obligations arising under the Loan Documents, such Refinancing Indebtedness is subordinated in right of payment to the Obligations arising under the Loan Documents on terms, taken as a whole, not materially less favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced; (d) if the Indebtedness being Refinanced is secured by a security interest in the Collateral that is junior in priority to the security interest in the Collateral securing the Obligations and/or subject to any intercreditor arrangements for the benefit of the Lenders, such Refinancing Indebtedness is secured and subject to intercreditor arrangements on terms, taken as a whole, not materially less favorable to the Lenders as those contained in the documentation governing the Indebtedness being Refinanced; (e) the terms and conditions of the Refinancing Indebtedness (excluding, for the avoidance of doubt, interest rates (including through fixed interest rates), interest margins, rate floors, fees, funding discounts, original issue discounts and prepayment or

<div align="center">-43-</div>

redemption premiums) are, when taken as a whole, (x) substantially identical to or (y) not materially more favorable to the lenders or holders providing such Refinancing Indebtedness than those applicable to the Indebtedness being Refinanced, when taken as a whole, (*provided* that a certificate of a Responsible Officer of the Borrower delivered to the Administrative Agent at least five (5) Business Days prior to the incurrence of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the requirement of this clause (e)(y) shall be conclusive evidence that such terms and conditions satisfy such requirement unless the Administrative Agent (at the direction of the Required Lenders) notifies the Borrower within such five (5) Business Day period that the Required Lender disagree with such determination (including a reasonable description of the basis for such disagreement)) or are otherwise acceptable to the Required Lenders; (g) no Liens secure such Refinancing Indebtedness, other than Liens covering the same assets, as those which secured the Indebtedness being Refinanced; and (h) no Person is obligated with respect to such Refinancing Indebtedness (as borrower, guarantor, or otherwise) to any greater extent than such Person is obligated with respect to the Indebtedness being Refinanced.

"Permitted Revolving Credit Facility" means a revolving credit facility which (i) is not secured by any assets or property that is not Collateral, (ii) does not have any obligors that are not Loan Parties, (iii) if an asset-based revolving credit facility (an "ABL Facility"), is at all times subject to an intercreditor agreement which shall be customary for transactions of this type and otherwise on terms and conditions reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) (such intercreditor agreement, a "Permitted ABL Intercreditor Agreement") pursuant to which the lenders party to any such ABL Facility (or an agent on their behalf) shall have a first Lien on the ABL Priority Collateral and, to the extent such ABL Facility is secured by Term Loan Priority Collateral, a second Lien on the Term Loan Priority Collateral and the Administrative Agent, for the benefit of the Secured Parties, shall have a first Lien on the Term Loan Priority Collateral and a second Lien on the ABL Priority Collateral and (iv) if a cash-flow revolving credit facility (a "Cash Flow Revolving Credit Facility"), is at all times subject to an intercreditor agreement which shall be customary for transactions of this type and otherwise on terms and conditions reasonably satisfactory to the Administrative Agent (acting at the direction of the Required Lenders) (such intercreditor agreement, a "Permitted Cash Flow Revolver Intercreditor Agreement") pursuant to which the lenders party to any such Cash Flow Revolving Credit Facility (or an agent on their behalf) shall have a Lien on the Collateral that is *pari passu* with the Lien of the Administrative Agent, for the benefit of the Secured Parties, on the Collateral, but such Cash Flow Revolving Credit Facility shall be senior in right of payment to the Term Facility with respect to any payments or distributions made following an "Event of Default" under and as defined in the documentation governing such Cash Flow Revolving Credit Facility, on terms reasonably satisfactory to the Administrative Agent (at the direction of the Required Lenders).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning specified in the Preliminary Statements.

"PIK Election" has the meaning specified in Section 2.08(c).

"PIK Interest" has the meaning specified in Section 2.08(c).

"PIK Interest Accrual Period" means any Interest Calculation Period for which a PIK Election has been made in accordance with Section 2.08(c).

"PIK Notice" means a written notice from the Borrower to the Administrative Agent notifying the Administrative Agent of a PIK Election and specifying the portion of the applicable interest (expressed as a rate per annum, not to exceed 6.50%) to be paid in-kind.

"Plan" means any "employee benefit plan" (other than a Multiemployer Plan) within the meaning of Section 3(3) of ERISA that is or within the last six years has been maintained, contributed to or required to be contributed to by, a Loan Party, Subsidiary or any ERISA Affiliate and is subject to Title IV of ERISA or the minimum funding standards under Section 412 of the Code or Section 302 of ERISA.

"Platform" has the meaning specified in Section 6.02.

"Prepayment Amount" has the meaning specified in Section 2.05(c).

"Prepayment Date" has the meaning specified in Section 2.05(c).

"Prepetition First Lien Credit Agreement" has the meaning specified in the Preliminary Statements.

"Prepetition First Lien Lenders" has the meaning specified in the Preliminary Statements.

"Prime Rate" means, for any day, the prime rate published in The Wall Street Journal for such day; provided that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates).

"Pro Forma Basis", "Pro Forma Compliance" and "Pro Forma Effect" means, in respect of a Specified Transaction, that such Specified Transaction and the following transactions in connection therewith (to the extent applicable) shall be deemed to have occurred as of the first day of the applicable period of measurement for the applicable covenant or requirement: (a) historical income statement items (whether positive or negative) attributable to the property or Person, if any, subject to such Specified Transaction, (i) in the case of a Dispositions or other disposition of all or substantially all Equity Interests in any Subsidiary of the Borrower or any division, product line, or facility used for operations of the Borrower or any of its Subsidiaries, shall be excluded, and (ii) in the case of a Permitted Acquisition, or any other purchase or other acquisition of all or substantially all of the property and assets or business of any Person, or of assets constituting a business unit, a line of business or division of such Person, or of all or substantially all of the Equity Interests in a Person, shall be included, (b) any repayment, retirement, redemption, satisfaction, and discharge or defeasance of Indebtedness or Disqualified Equity Interests, and (c) if any Indebtedness incurred or assumed by the Borrower or any of its Subsidiaries in connection therewith (including, with respect to each Limited Condition Acquisition, and only during the

-45-

period from and after the related definitive agreement for such acquisition is entered into and until the earlier of the consummation of such acquisition or the termination of such agreement, any Indebtedness contemplated to be incurred in connection with such Limited Condition Acquisition) has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable period for purposes of this definition determined by utilizing the rate which is or would be in effect with respect to such Indebtedness as at the relevant date of determination (taking into account any hedging obligations applicable to such Indebtedness if such hedging obligation has a remaining term in excess of twelve (12) months); *provided* that "Pro Forma Basis," "Pro Forma Compliance" and "Pro Forma Effect" in respect of any Specified Transaction shall be calculated in a reasonable and factually supportable manner and certified by a Responsible Officer of the Borrower; *provided, further,* that such calculations may include adjustments (estimated by the Borrower in good faith) consistent with (and subject to the restrictions and limitations set forth in) clauses (b)(iv) and (b)(v) of the definition of "Consolidated EBITDA".

"Pro Rata Share" means, with respect to each Lender and any Facility or all the Facilities (as the case may be) at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the amount of the Commitments of such Lender under the applicable Facility or the Facilities (and, in the case of any Term Loan Tranche after the applicable borrowing date (or deemed borrowing date) and without duplication, the principal amount of Term Loans of such Tranche of such Lender) at such time and the denominator of which is the amount of the aggregate Commitments of all Lenders (and, in the case of any Term Loan Tranche and without duplication, the principal amount of Term Loans of such Tranche) under the applicable Facility or the Facilities at such time; *provided* that if the commitment of each Lender to make Term Loans has been terminated pursuant to Section 8.02, then the Pro Rata Share of each Lender shall be determined based on the Pro Rata Share of such Lender immediately prior to such termination and after giving effect to any subsequent assignments made pursuant to the terms hereof.

"Public Lender" has the meaning specified in Section 6.02.

"Qualified Cash" means, as of any date of determination, the aggregate amount of Unrestricted Cash and Cash Equivalents of the Loan Parties that are in deposit accounts or securities accounts, or any combination thereof, free and clear of any Liens (other than a Lien in favor of the Administrative Agent and Permitted Liens), which accounts are the subject of Deposit Account Control Agreements or Securities Account Control Agreements, as applicable; *provided* that the calculation of the Qualified Cash as of any date of determination shall not include the receipt of the proceeds of Indebtedness or an issuance of Equity Interests that is incurred or issued on such date; *provided,* further, that until the date that Deposit Account Control Agreements or Securities Account Control Agreements, as applicable, are required to be delivered to the Administrative Agent pursuant to Section 6.17, Qualified Cash shall include Unrestricted Cash and Cash Equivalents of the Borrower and its Subsidiaries in deposits accounts (other than Excluded Accounts) whether or not such deposit accounts or securities accounts are subject to Deposit Account Control Agreements or Securities Account Control Agreements, as applicable.

"Qualifying Bids" has the meaning specified in the definition of "Dutch Auction".

"<u>Real Property</u>" shall mean, collectively, all right, title and interest (including any leasehold, fee, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"<u>Refinance</u>," "<u>Refinancing</u>" and "<u>Refinanced</u>" has the meaning given to such terms in the definition of Permitted Refinancing.

"<u>Register</u>" has the meaning specified in <u>Section 10.07(c)</u>.

"<u>Regulation T</u>" means Regulation T of the FRB as in effect from time to time.

"<u>Regulation U</u>" means Regulation U of the FRB as in effect from time to time.

"<u>Regulation X</u>" means Regulation X of the FRB as in effect from time to time.

"<u>Related Parties</u>" means, with respect to any Person, such Person's Affiliates and the partners, members, directors, officers, employees, agents, attorneys-in-fact, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"<u>Release</u>" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Materials in, into, onto, from or through the Environment or any Real Property (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Materials).

"<u>Relevant Governmental Body</u>" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"<u>Replaceable Lender</u>" has the meaning specified in <u>Section 3.07(a)</u>.

"<u>Reply Amount</u>" has the meaning specified in the definition of "Dutch Auction".

"<u>Reply Discount</u>" has the meaning specified in the definition of "Dutch Auction".

"<u>Reportable Event</u>" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"<u>Required Lenders</u>" means, as of any date of determination, Lenders having more than 50% of the sum of the (a) Total Outstandings and (b) aggregate unused Commitments; *provided*, that at any time there are two or more Lenders that are not Affiliates of one another, "Required Lenders" must include at least two Lenders that are not Affiliates of one another.

"<u>Responsible Officer</u>" means the chief executive officer, director, president, vice president, executive vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party and, as to any document delivered on the Closing Date (except as otherwise expressly set forth in <u>Section 4.01</u>), any secretary or assistant secretary.  Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"<u>Restricted Payment</u>" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent Persons thereof).

"<u>Return Bid</u>" has the meaning specified in the definition of "Dutch Auction".

"<u>S&P</u>" means S&P Global Ratings Inc., and any successor thereto.

"<u>Sale Leaseback Transaction</u>" means any arrangement with any Person providing for the leasing by either of the Borrower or any of the other Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Subsidiary to such Person in contemplation of such leasing.

"<u>Sanctioned Country</u>" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the so - called Donetsk People's Republic, the so- called Luhansk People's Republic, the Crimea, Zaporizhzhia and Kherson Regions of Ukraine, Cuba, Iran, North Korea and Syria).

"<u>Sanctioned Person</u>" means, at any time, any Person that is subject to or the target of any Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. government, including by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or by the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"<u>Sanctions</u>" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or His Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"<u>Seaport</u>"  has the meaning specified in the introductory paragraph hereto.

-48-

"<u>SEC</u>" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"<u>Second Out Lender</u>" means, at any time, any Lender that holds a Second Out Term Loan at such time.

"<u>Second Out Term Loan</u>" means an Initial Second Out Term Loan, an Incremental Second Out Term Loan, or an Extended First Out Term Loan, as the context may require.

"<u>Second Out Term Loan Uptiering Transaction</u>" has the meaning specified in <u>Section 10.01(i)</u>.

"<u>Section 6.01 Financials</u>" means the financial statements delivered, or required to be delivered, pursuant to <u>Section 6.01(a)</u>, <u>6.01(b)</u> or <u>Section 6.01(c)</u>.

"<u>Secured Obligations</u>" shall mean the Obligations.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, the Lenders, any Supplemental Administrative Agent, each co-agent or subagent appointed by the Administrative Agent from time to time pursuant to <u>Article IX</u> and the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document.

"<u>Securities Account Control Agreement</u>" means an agreement, among a Loan Party, a securities intermediary, and the Administrative Agent, which agreement is in a form reasonably acceptable to the Administrative Agent and the Required Lenders and which provides the Administrative Agent with "control" (as such term is used in <u>Articles 8</u> and 9 of the UCC) over the securities account(s) described therein.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Senior Representative</u>" means, with respect to any series of Indebtedness, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"<u>SOFR</u>" means a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"<u>SOFR Loan</u>" means a Loan bearing interest at a rate determined by reference to Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Base Rate".

"<u>Solvent</u>" means, with respect to the Borrower and its Subsidiaries on a consolidated basis on any date of determination, that on such date (it being agreed that any such determination on the Closing Date shall be after giving effect to the Transactions) (a) the fair value of the assets of the Borrower and its Subsidiaries on a consolidated basis, exceeds the debts and liabilities, direct,

4885-4953-0770v.1

subordinated, contingent or otherwise, of the Borrower and its Subsidiaries on a consolidated basis; (b) the present fair saleable value of the property of the Borrower and its Subsidiaries on a consolidated basis will be greater than the amount that will be required to pay the probable liability of the Borrower and its Subsidiaries on a consolidated basis on their debts and other liabilities, direct, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (c) the Borrower and its Subsidiaries on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (d) the Borrower and its Subsidiaries on a consolidated basis will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date.

"SPC" has the meaning specified in Section 10.07(g).

"Specified Event of Default" means any Event of Default pursuant to Section 8.01(a) (with respect to any principal, interest or fees only) or, with respect to the Borrower only, Section 8.01(f) or (g).

"Specified Existing Tranche" has the meaning specified in Section 2.18(a).

"Specified Excluded Disposition" means any Disposition made by Holdings or a Subsidiary thereof in reliance on Section 7.05(a), (b), (c), (d), (e), (f), (g), (h), (i), (k), (m), (n), (q), (r), (t) and (u).

"Specified Representations" means the representations and warranties made in Sections 5.01(a), 5.01(b)(ii) (limited to the execution, delivery and performance of the Loan Documents, incurrence of Indebtedness under the Loan Documents and the granting on the closing date of the guarantees and Liens in respect thereof), 5.02(a), 5.04, 5.12, 5.16, 5.18, 5.19, 5.20 and 5.21, in each case, after giving effect to the applicable transactions.

"Specified Transaction" means any incurrence or repayment, retirement, redemption, satisfaction and discharge or defeasance of Indebtedness (excluding Indebtedness incurred for working capital purposes other than pursuant to this Agreement, and including any contemplated incurrence of Indebtedness in connection with a Limited Condition Acquisition, unless and to the extent such Limited Condition Acquisition has been consummated without any such contemplated Indebtedness or the definitive agreement for such Limited Condition Acquisition has been terminated) or Disqualified Equity Interests, any acquisition or Investment that results in a Person becoming a Subsidiary, or any Disposition or other disposition that results in a Subsidiary ceasing to be a Subsidiary of the Borrower, any investment constituting an acquisition of assets constituting a business unit, line of business or division of another Person, any Disposition or other disposition of a business unit, line of business or division of the Borrower or a Subsidiary, or the cessation of the operations of a business unit, line of business or division of the Borrower or a Subsidiary, in each case (other than in connection with any operating change) whether by merger, consolidation, amalgamation or otherwise or any material restructuring of the Borrower or implementation of any initiative not in the ordinary course of business.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (a) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned or (b) the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person and, in the case of this clause (b), which is treated as a consolidated subsidiary for accounting purposes.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" means, collectively, the Subsidiaries of the Borrower that are Guarantors.

"Super Senior Incremental Amount" means, at any date of determination, an amount not in excess of (i)  $25,000,000 *minus* (ii) the sum of (x) the aggregate principal amount of all Term Facility Increases in respect of Super Senior Incremental Term Loans incurred on or prior to such date pursuant to Section 2.15 and (y) the aggregate principal amount of all Super Senior Incremental Term Facilities incurred pursuant to Section 2.16 on or prior to such date.

"Super Senior Incremental Term Facility" has the meaning specified in Section 2.16(e).

"Super Senior Incremental Term Loan" has the meaning specified in Section 2.16(e).

"Super Senior Lender" means any Lender holding a Term Commitment in respect of a Super Senior Incremental Term Loan or a Super Senior Incremental Term Loan.

"Supplemental Administrative Agent" has the meaning specified in Section 9.14 and "Supplemental Administrative Agents" shall have the corresponding meaning.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, including any obligations or liabilities under any such master agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market

value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer (other than a counterparty to any such Swap Contracts) in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under a so-called synthetic, off-balance sheet or tax retention lease.

"Taxes" means all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges imposed by any Governmental Authority, including any additions to tax, penalties and interest with respect thereto.

"Term Borrowing" means a borrowing (or deemed borrowing) consisting of simultaneous Term Loans of the same Type and, in the case of SOFR Loans, having the same Interest Period made (or deemed made) by each of the Term Lenders pursuant to Section 2.01.

"Term Commitment" means, as to each applicable Term Lender, (i) its First Out New Money Term Commitment, if any, (ii) its Incremental Term Commitment, if any, (iii) its commitment to provide Extended Term Loans, if any, and (iv) without duplication of the foregoing, its commitment to provide Term Loans in connection with a Term Facility Increase, if any, in each case as the context may require.

"Term Facility" means the Initial First Out Term Facility, the Initial Second Out Term Facility, any Incremental Term Facility, and/or any other Tranche of Term Commitments or Term Loans.

"Term Facility Increase" has the meaning specified in Section 2.15(a).

"Term Facility Increase Lender" has the meaning specified in Section 2.15(b).

"Term Increase Effective Date" has the meaning specified in Section 2.15(c).

"Term Lender" means any Lender that holds Term Loans and/or Term Commitments at such time.

"Term Loan" means an Initial First Out Term Loan, an Initial Second Out Term Loan, an Incremental Term Loan, or an Extended Term Loan, as the context may require.

"Term Note" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit C hereto, evidencing the indebtedness of the Borrower to such Term Lender resulting from the Term Loans made or held by such Term Lender.

"Term SOFR" means,

(a)      for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the

first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)      for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

"Term SOFR Adjustment" means a percentage per annum as set forth below for the applicable Type of such Term Loan and (if applicable) Interest Period therefor:

Base Rate Loans:      0.11448%

SOFR Loans:

| Interest Period | Percentage |
| --- | --- |
| One month | 0.11448% |
| Three months | 0.26161% |
| Six months | 0.42826% |

"Term SOFR Administrator" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" shall mean the forward-looking term rate based on SOFR.

"Test Period" means, as of the date of any determination under this Agreement, the four (4) consecutive fiscal quarters of the Borrower then last ended and for which Section 6.01 Financials under Section 6.01(a) or (b) have been delivered (or are required to have been delivered to) to the Administrative Agent.

"Threshold Amount" means $3,500,000.

"Total Net Leverage Ratio" means, with respect to the Borrower on a consolidated basis, as of the end of any Test Period, the ratio of (a) Consolidated Funded Indebtedness (less Qualified Cash as of the date of such determination in an aggregate amount not to exceed $20,000,000) of the Borrower and its Subsidiaries as of the end of such Test Period to (b) Consolidated EBITDA of the Borrower and its Subsidiaries for such Test Period.

"Total Outstandings" means the aggregate Outstanding Amount of all Loans.

"Tranche" with respect to Loans or Commitments, refers to whether such Loans or Commitments are (i) Initial First Out Term Loans or First Out New Money Term Loan Commitments, as applicable, (ii) Initial Second Out Term Loans, (iii) Incremental Term Facilities or Incremental Term Loans with the same terms and conditions made on the same day, or (iv) Extended Term Loans or Extended Tranches (of the same series).

"Transactions" means the entering into of the Loan Documents and borrowing (and, as applicable, deemed borrowing) of the Term Loans hereunder on the Closing Date, the payments of fees, commissions and expenses in connection with each of the foregoing, the consummation of the Chapter 11 Plan and the refinancing of the Canadian Credit Facility.

"Type" means, with respect to a Loan, its character as a Base Rate Loan or a SOFR Loan.

"UCC Filing Collateral" shall have the meaning specified in Section 4.01.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Unfunded Advances/Participations" means, with respect to the Administrative Agent, the aggregate amount, if any (i) made available to the Borrower on the assumption that each Lender has made available to the Administrative Agent such Lender's share of the applicable Term Borrowing available to the Administrative Agent as contemplated by Section 2.12(b) and (ii) with respect to which a corresponding amount shall not in fact have been returned to the Administrative Agent by the Borrower or made available to the Administrative Agent by any such Lender.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"United States" and "U.S." mean the United States of America.

"<u>Unrestricted Cash and Cash Equivalents</u>" means cash and Cash Equivalents of the Borrower and its Subsidiaries, other than cash or Cash Equivalents which are or should be listed as "restricted" on the consolidated balance sheet of the Borrower and the Subsidiaries as of such date.

"<u>U.S. Government Securities Business Day</u>" shall mean any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"<u>U.S. Guaranty</u>" means the Guaranty executed by the Guarantors (other than the Canadian Guarantors) on the date hereof in favor of the Administrative Agent on behalf of the Secured Parties

"<u>U.S. Lender</u>" has the meaning specified in <u>Section 10.16(c)</u>.

"<u>U.S. Loan Party</u>" means Holdings, the Borrower and the Subsidiaries of the Borrower that are not Foreign Subsidiaries.

"<u>U.S. Security Agreement</u>" means, collectively, the Security Agreement dated the date hereof executed by the Loan Parties (other than [the Mexican Guarantor] and the Canadian Loan Parties)], together with each other security agreement and security agreement supplement executed and delivered pursuant to <u>Section 6.12</u>.

"<u>U.S. Security Agreement Supplement</u>" has the meaning specified in the U.S. Security Agreement.

"<u>Voting Equity Interests</u>" means, with respect to any Person, the outstanding Equity Interests of a Person having the power, directly or indirectly, to designate the board of directors (or other similar governing body) of such Person.

"<u>Weighted Average Life to Maturity</u>" means, when applied to any Indebtedness at any date, the number of years (and/or portion thereof) obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"<u>wholly owned</u>" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

-55-

Section 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(i)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(ii)    The term "including" is by way of example and not limitation.

(iii)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(iv)    Any reference herein to any Person shall be construed to include such Person's successors and assigns.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(d)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03    Accounting Terms.    (a) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, as in effect from time to time, applied in a manner consistent with that used in preparing the audited Section 6.01 Financials, except as otherwise specifically prescribed herein.

(b)    If at any time any change in GAAP or the application thereof would affect the computation or interpretation of any financial ratio, basket, requirement or other provision set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Required Lenders and the Borrower shall negotiate in good faith to amend such ratio, basket, requirement or other provision to preserve the original intent thereof in light of such change in GAAP or the application thereof; *provided* that, until so amended, (A) such ratio, basket, requirement or other provision shall continue to be computed or interpreted in accordance with GAAP or the application thereof prior to such change therein and (B) in the case of any relevant calculation, the Borrower shall provide to the Administrative Agent and the Lenders a written reconciliation in form and substance reasonably satisfactory to the Required Lenders, between calculations of such ratio, basket, requirement or other provision made before and after giving

-56-

effect to such change in GAAP or the application thereof.

(c)      Notwithstanding anything to the contrary contained herein, all financial covenants, basket amounts and ratios contained herein or in any other Loan Document shall be calculated (i) without giving effect to any election under FASB ASC 825 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof and (ii) without giving effect to any changes in GAAP after December 15, 2018 that would require lease obligations that were treated as operating leases under GAAP as in effect December 15, 2018 to be classified and accounted for as capital leases or otherwise reflected as Indebtedness on the Borrower's consolidated balance sheet.

Section 1.04      Rounding.   Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05      References to Agreements and Laws.   Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06      Times of Day.   Unless otherwise specified, all references herein to times of day shall be references to Eastern Time (daylight savings or standard, as applicable).

Section 1.07      Timing of Payment or Performance.   When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as specifically provided in Section 2.12 or as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

Section 1.08      Rates.   The Administrative Agent does not warrant or accept any responsibility for, and the Administrative Agent shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Benchmark Replacement Conforming Changes.   The Administrative Agent and its affiliates or other related entities may

-57-

engage in transactions that affect the calculation of the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.09     Pro Forma Calculations; Limited Condition Acquisitions.

(a)     Notwithstanding anything to the contrary herein, for purposes of determining compliance with any test or covenant contained in this Agreement, the Total Net Leverage Ratio shall be calculated (including for purposes of Sections 2.15 and 2.16) on a Pro Forma Basis with respect to each Specified Transaction occurring during the applicable four (4) quarter period to which such calculation relates, and subsequent to the end of such four-quarter period but not later than the date of such calculation (notwithstanding that such ratio may be said to be determined as of the end of a Test Period); *provided* that notwithstanding the foregoing, when calculating the Total Net Leverage Ratio for purposes of determining the applicable percentage of Excess Cash Flow for purposes of Section 2.05(b), any Specified Transaction and any related adjustment contemplated in the definition of Pro Forma Basis (and corresponding provisions of the definition of Consolidated EBITDA) that occurred subsequent to the end of the applicable four (4) quarter period shall not be given Pro Forma Effect.

(b)     Notwithstanding anything to the contrary herein, for purposes of determining (i) compliance on a Pro Forma Basis with any Total Net Leverage Ratio, (ii) the amount of any basket set forth in Article VII hereof which is based on a percentage of Consolidated Total Assets or Consolidated EBITDA or (iii) whether a Default or Event of Default (but not, for the avoidance of doubt, a Specified Event of Default) has occurred and is continuing, in each case, in connection with the consummation of a Limited Condition Acquisition, the date of such determination shall, at the election of the Borrower (with such election to be made on or prior to the date on which the definitive agreements for such Limited Condition Acquisition are executed by the Borrower or its applicable Subsidiary), be the time the definitive agreements for such Limited Condition Acquisition are entered into after giving Pro Forma Effect to such Limited Condition Acquisition and the other transactions to be entered into in connection therewith (including any incurrence of Indebtedness and the use of proceeds thereof), in each case, as if they occurred at the beginning of the applicable Test Period, and, for the avoidance of doubt, if any of such ratios or amounts are exceeded as a result of fluctuations in such ratio or amount including due to fluctuations in Consolidated Total Assets or Consolidated EBITDA, as applicable, of the Borrower or the Person subject to such acquisition or investment, at or prior to the consummation of the relevant transaction or action, such ratios will not be deemed to have been exceeded as a result of such fluctuations solely for purposes of determining whether the relevant transaction or action is permitted to be consummated or taken; *provided* that (i) if the Borrower elects to have

-58-

such determinations occur at the time of entry into the definitive agreement with respect to such Limited Condition Acquisition, the Indebtedness to be incurred (and any associated lien) shall be deemed incurred at the time of such election (until such time as the Indebtedness is actually incurred or the applicable acquisition agreement is terminated without actually consummating the applicable Limited Condition Acquisition (in which case such Limited Condition Acquisition and the incurrence of related Indebtedness will not be treated as having occurred)) and outstanding thereafter for purposes of Pro Forma Compliance with any applicable ratios, tests or other baskets, as the case may, (ii) in connection with any calculation made after such test date and prior to the consummation of the Limited Condition Acquisition, the Consolidated Net Income and Consolidated Total Assets (and any other financial defined term derived therefrom) shall not include any Consolidated Net Income of or attributable to the target company or assets associated with any such Limited Condition Acquisition unless and until the closing of such Limited Condition Acquisition shall have actually occurred and (iii) any borrowings under any revolving credit facilities incurred substantially concurrently with the applicable Limited Condition Acquisition shall be disregarded and excluded from such pro forma calculation.

Section 1.10    Calculation of Baskets.  Except as set forth in Section 1.09 with respect to a Limited Condition Acquisition or as otherwise specified herein, the baskets set forth in Article VII of this Agreement shall be tested solely at the time of consummation of the relevant transaction or action utilizing any of such baskets and, for the avoidance of doubt, if any of such baskets are exceeded solely as a result of fluctuations to Consolidated Total Assets or Consolidated EBITDA, as applicable, after the last time such baskets were calculated for any purpose under Article VII, such baskets will not be deemed to have been exceeded solely as a result of such fluctuations.  If any Indebtedness or Liens securing Indebtedness are incurred to Refinance any existing Indebtedness or Liens securing Indebtedness, in each case, initially incurred in reliance on a basket measured by reference to a percentage of Consolidated Total Assets or Consolidated EBITDA, as applicable, at the time of incurrence, and such Refinancing would cause the percentage of Consolidated Total Assets or Consolidated EBITDA, as applicable, restriction to be exceeded if calculated based on the Consolidated Total Assets at the time of incurrence of such Refinancing, such percentage of Consolidated Total Assets or Consolidated EBITDA, as applicable, restriction shall not be deemed to be exceeded so long as the principal amount of such Indebtedness or such Indebtedness secured by such Liens, as applicable, does not exceed the principal amount of the relevant existing Indebtedness or Indebtedness secured by such Liens, as applicable, being Refinanced, *plus* Indebtedness incurred to pay premiums, defeasance costs and fees and expenses in connection therewith.

## ARTICLE II
## The Term Commitments and Term Borrowings

Section 2.01    The Loans.

(a)    First Out New Money Term Loans.

(i)    Subject to the terms and conditions of this Agreement, each First Out Lender with a First Out New Money Term Loan Commitment severally agrees to make a single loan denominated in Dollars to the Borrower on the Closing Date in an aggregate amount not to exceed such First Out Lender's First Out New Money Term Loan Commitment (the "First

Out New Money Term Loans"). Amounts borrowed under this Section 2.01(a) and subsequently repaid or prepaid may not be reborrowed. The First Out New Money Term Loans may be Base Rate Loans or SOFR Loans as further provided herein.

(ii) The First Out New Money Term Loans will have discount of two percent (2.00%) of the aggregate principal amount of the First Out New Money Term Loans, such that the aggregate amount of Dollars actually funded by the First Out Lenders in respect thereof is $[_____], but the aggregate principal amount of the First Out New Money Term Loans held by the First Out Lenders on the Closing Date (immediately after giving effect to such funding) is $[_____] (such amount being referred to herein as the "Aggregate Original First Out New Money Term Loan Principal Amount"). The aggregate outstanding principal balance of the First Out New Money Term Loans immediately after giving effect to the borrowing of the First Out New Money Term Loans on the Closing Date and the amount of the First Out New Money Term Loans to be repaid hereunder shall be the Aggregate Original First Out New Money Term Loan Principal Amount.

(b) First Out Roll-Up Loans. Subject to the terms and conditions of this Agreement and in accordance with the Chapter 11 Plan, on the Closing Date, the principal amount of all loans (together with accrued and unpaid interest thereon) held by the DIP Lenders under the DIP Credit Agreement, together with the Exit Fee (as defined in the DIP Credit Agreement) payable to the DIP Lenders under the DIP Credit Agreement, shall be automatically substituted and exchanged for (and prepaid or paid, as applicable, by) term loans issued hereunder by the Borrower (the "First Out Roll-Up Loans") on the Closing Date to the First Out Lenders, in the amount, for each First Out Lender, set forth opposite such First Out Lender's name on Schedule 2.01(b) (the "First Out Roll-Up Schedule") under the heading "First Out Roll-Up Loans". The parties hereto hereby agree that set forth on the First Out Roll-Up Schedule is the name of each DIP Lender whose loans (together with accrued and unpaid interest thereon) under the DIP Credit Agreement and portion of the Exit Fee (as defined in the DIP Credit Agreement) will be exchanged for (and prepaid or paid, as applicable, by) First Out Roll-Up Loans hereunder on the Closing Date and the principal amount of First Out Roll-Up Loans to be received by each First Out Lender that is a DIP Lender or an Affiliate of a DIP Lender on the Closing Date (and the parties hereto hereby agree that the Administrative Agent may each conclusively rely on the First Out Roll-Up Schedule). Upon their issuance hereunder on the Closing Date, the First Out Roll-Up Loans shall be deemed Initial First Out Term Loans made hereunder by the First Out Lenders to the Borrower, and the DIP Lender (or Affiliate thereof) identified on the First Out Roll-Up Schedule holding such First Out Roll-up Loans shall be deemed a First Out Lender for all purposes hereunder. Amounts deemed borrowed under this Section 2.01(b) and subsequently repaid or prepaid may not be reborrowed. The First Out Roll-Up Loans may be Base Rate Loans or SOFR Loans as further provided herein. The First Out Roll-Up Loans shall initially be SOFR Loans with an Interest Period of [___] month(s).

(c) Initial Second Out Term Loans. Subject to the terms and conditions of this Agreement and in accordance with the Chapter 11 Plan, on the Closing Date, each Closing Date Second Out Lender (i) is deemed to have made a term loan to the Borrower (each an "Initial Second Out Term Loan") in the amount set forth opposite such Closing Date Second Out Lender's name on Schedule 2.01(c) under the heading "Initial Second Out Term Loans" and (ii) is deemed, pursuant to the Chapter 11 Plan and the Confirmation Order, to have executed and delivered this

Agreement, regardless of whether such Closing Date Second Out Lender has executed and delivered a signature page hereto.  Amounts deemed borrowed under this Section 2.01(c) and subsequently repaid or prepaid may not be reborrowed.  The Initial Second Out Term Loans may be Base Rate Loans or SOFR Loans as further provided herein.  The Initial Second Out Term Loans shall initially be SOFR Loans with an Interest Period of [___] month(s).

Section 2.02    Term Borrowings, Conversions and Continuations of Loans.  (a) Each Term Borrowing (other than pursuant to Section 2.01(b) or (c) on the Closing Date), each conversion of Term Loans from one Type to the other, and each continuation of SOFR Loans shall be made upon the Borrower's irrevocable written notice to the Administrative Agent.  Each such notice must be received by the Administrative Agent not later than (i) 1:00 p.m. (New York City time) three (3) Business Days prior to the requested date of any Term Borrowing of, conversion of Base Rate Loans to, or continuation of, SOFR Loans and (ii) 1:00 p.m. (New York City time) one (1) Business Day prior to the requested date of any Term Borrowing of Base Rate Loans, or of any conversion of SOFR Loans to Base Rate Loans or, in each case, such shorter period as the Administrative Agent and the Required Lenders shall agree.  Each written notice by the Borrower pursuant to this Section 2.02(a) shall be delivered by the Borrower to the Administrative Agent in the form of a Committed Loan Notice.  Each Term Borrowing of, conversion to or continuation of SOFR Loans shall be in a principal amount of $1,000,000 or a whole multiple of $250,000 in excess thereof (or, if the outstanding principal amount of the Term Loans of such Type is not a whole multiple of $250,000, such outstanding principal amount of the Term Loans of such Type). Each Term Borrowing of, or conversion to, Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof (or, if the outstanding principal amount of the Term Loans of such Type is not a whole multiple of $100,000, such outstanding principal amount of the Term Loans of such Type).  Each Committed Loan Notice shall specify (i) whether the Borrower is requesting a Term Borrowing, a conversion of Term Loans from one Type to the other, or a continuation of SOFR Loans, (ii) the requested date of the Term Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Term Loans to be borrowed, converted or continued, (iv) the Type of Term Loans to be borrowed or to which existing Term Loans are to be converted, (v) if applicable, the duration of the Interest Period with respect thereto, and (vi) in the case of a Term Borrowing (other than pursuant to Section 2.01(b) or (c)), the wiring instructions of the account of the Borrower to which the proceeds of such Borrowing are to be disbursed.  If the Borrower fails to specify a Type of Term Loan in a Committed Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Term Loans shall be made as, or converted to, SOFR Loans with an interest period of one month.  If the Borrower requests a Term Borrowing of, conversion to, or continuation of SOFR Loans in any such Committed Loan Notice, but fails to specify an Interest Period, the Borrower will be deemed to have specified an Interest Period of one month.

(b)    Following receipt of a Committed Loan Notice, the Administrative Agent shall promptly notify each applicable Lender of the amount of its ratable share of the applicable Term Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each applicable Lender of the details of any automatic conversion to SOFR Loans described in Section 2.02(a).  In the case of a Term Borrowing, each Appropriate Lender shall make the amount of its Term Loan available to the Administrative Agent in immediately available funds to the Administrative Agent's Account not later than 1:00 p.m. (New York City time) on the

-61-

Business Day specified in the applicable Committed Loan Notice.  Upon satisfaction of the applicable conditions set forth in Section 4.01 and receipt of all requested funds by the Administrative Agent, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent by wire transfer of such funds, in each case in accordance with instructions provided to the Administrative Agent by the Borrower in the applicable Committed Loan Notice.

(c)     Except as otherwise provided herein, a SOFR Loan may be continued or converted only on the last day of an Interest Period for such SOFR Loan unless the Borrower pays the amount due under Section 3.05 in connection therewith. During the existence of a Default, at the election of the Required Lenders, no Term Loans may be requested as, converted to or continued as SOFR Loans.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for SOFR Loans upon determination of such interest rate.  The determination of Adjusted Term SOFR by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)     After giving effect to all Term Borrowings, all conversions of Term Loans from one Type to the other and all continuations of Term Loans as the same Type, there shall not be more than ten (10) Interest Periods in effect.

(f)     The failure of any Lender to make the Term Loan to be made by it as part of any Term Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to make its Term Loan on the date of such Term Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Term Loan to be made by such other Lender on the date of any Term Borrowing.

Section 2.03     [Reserved.].

Section 2.04     [Reserved.].

Section 2.05     Prepayments.  (a) Optional.  (i)  The Borrower may, upon notice to the Administrative Agent in substantially the form of Exhibit B, at any time or from time to time voluntarily prepay Loans in whole or in part without premium or penalty, except as set forth in Sections 2.05(e) below; *provided* that (1) such notice must be received by the Administrative Agent not later than 11:00 a.m. (New York City time) (A) three (3) Business Days (or, with respect to any prepayment of SOFR Loans, three (3) U.S. Government Securities Business Days) prior to any date of prepayment of SOFR Loans and (B) on the Business Day prior to the prepayment of Base Rate Loans; (2) any prepayment of SOFR Loans shall be in a principal amount of $1,000,000 or a whole multiple of $250,000 in excess thereof; and (3) any prepayment of Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment, the Tranche of Loans to be prepaid, the Type(s) of Loans to be prepaid, the Interest Period(s) of such Loans (except that if the Tranche of Loans to be prepaid includes both Base Rate Loans and SOFR Loans, absent direction by the Borrower, the applicable prepayment shall be applied first to Base Rate Loans to the full extent thereof before

application to SOFR Loans, and in the case of SOFR Loans, in direct order of Interest Period maturities), and the Applicable Premium (if any) payable in connection therewith.  The Administrative Agent shall promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's ratable share of the relevant Tranche).  If such notice is given by the Borrower, subject to clause (iii) below, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a SOFR Loan shall be accompanied by all accrued interest thereon, together with any additional amounts required pursuant to <u>Section 2.05(e)</u> and <u>Section 3.05</u>.  Subject to <u>Section 2.20</u> and the immediately following sentence, each prepayment of outstanding Term Loans pursuant to this <u>Section 2.05(a)</u> shall be applied to each Tranche of Term Loans as the Borrower may direct, and shall be applied to the remaining amortization payments of such Tranche of Term Loans as directed by the Borrower (and absent any such direction, pro rata among all Tranches of Term Loans to the remaining amortization payments thereunder in direct order of maturity thereof), and each such prepayment shall be paid to the Appropriate Lenders in the same Tranche on a pro rata basis.  Notwithstanding anything to the contrary contained in this <u>Section 2.05(a)</u> or otherwise, until (x) each Super Senior Incremental Term Loan (if any) has been paid in full in cash and all other Obligations in respect of the Super Senior Incremental Term Loans have been paid in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made), no optional prepayment of outstanding First Out Term Loans or Second Out Term Loans or other application of proceeds in respect of the First Out Term Loans or Second Out Term Loans that would otherwise be permitted under this Section 2.05(a) shall be made (or required to be made) hereunder and (y) each First Out Term Loan has been paid in full in cash and all other Obligations in respect of the First Out Term Loans have been paid in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made), no optional prepayment of outstanding Second Out Term Loans or other application of proceeds in respect of the Second Out Term Loans that would otherwise be permitted under this <u>Section 2.05(a)</u> shall be made (or required to be made) hereunder.

(i)     [Reserved].

(ii)     Notwithstanding anything to the contrary contained in this Agreement, the Borrower may state that any notice of prepayment under <u>Section 2.05(a)(i)</u> is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.

(b)     <u>Mandatory</u>.  (ii)  On or prior to the fifth Business Day following the date on which the financial statements have been delivered (or, if later, required to be delivered) pursuant to <u>Section 6.01(a)</u> and the related Compliance Certificate has been delivered (or, if later, required to be delivered) pursuant to <u>Section 6.02(a)</u> (the "<u>ECF Prepayment Due Date</u>"), the Borrower shall prepay, subject to <u>Section 2.05(c)</u>, an aggregate principal amount of Term Loans in an amount equal to (A) 50% (as may be adjusted pursuant to the proviso below) of the amount of any Excess Cash Flow in excess of $5,000,000, for the fiscal year covered by such financial statements (commencing with the fiscal year ending on December 31, 2025), *minus* (B) the sum of (1) the amount of any cash prepayments of the Term Loans made pursuant to <u>Section 2.05(a)</u> during such

-63-

fiscal year and (2) all voluntary prepayments of loans under a Permitted Revolving Credit Facility during such fiscal year to the extent the commitments under such Permitted Revolving Credit Facility are permanently reduced by the amount of such payments; *provided* that in each case under clause (B) above, (x) no voluntary prepayment funded with the proceeds of an incurrence of Indebtedness may be applied pursuant to clause (B) above to reduce the amount of the prepayment required under this Section 2.05(b)(i) and (y) in the case of any such prepayment that is made at less than the par value of the applicable Indebtedness being so repaid, the amount of any reduction pursuant to this Section 2.05(b)(i) shall be limited to the actual cash amount paid by the Borrower in respect of such repayment; *provided*, *further*, that such percentage in clause (A) above shall be reduced to (x) 25% if the Total Net Leverage Ratio as of the end of such fiscal year was equal to or less than 3.00:1.00 but greater than 2.00:1.00 and (y) 0% if the Total Net Leverage Ratio as of the end of such fiscal year was equal to or less than 2.00:1.00.

(i)     (A)  If the Borrower or any Subsidiary Disposes of any property or assets (other than any Specified Excluded Disposition), and any transaction or series of related transactions described in this clause (A) results in the receipt in any fiscal year by the Borrower or such Subsidiary of Net Cash Proceeds in excess of $1,500,000 in the aggregate for all such transactions or series of related transactions (any such transaction or series of related transactions resulting in Net Cash Proceeds being a "Relevant Transaction"), the Borrower shall (1) give written notice to the Administrative Agent thereof promptly (but in any event not later than five (5) Business Days) after the date of receipt of such Net Cash Proceeds and (2) except to the extent the Borrower elects in such notice to reinvest all or a portion of such Net Cash Proceeds in accordance with Section 2.05(b)(ii)(B) (which election may only be made by the Borrower if no Event of Default has occurred and is continuing), the Borrower shall, subject to Section 2.05(b)(viii) hereof, prepay an aggregate principal amount of Term Loans in an amount equal to the Net Cash Proceeds received from such Relevant Transaction in excess of such annual limit within fifteen (15) Business Days of receipt thereof by the Borrower or such Subsidiary.

(A)     With respect to any Net Cash Proceeds realized or received with respect to any Relevant Transaction at the option of the Borrower and so long as no Event of Default has occurred and is continuing, the Borrower may reinvest all or any portion of such Net Cash Proceeds in assets that are used or useful in the business of the Borrower and its Subsidiaries (or to make a Permitted Acquisition of a Person who has assets that are used or useful in the business of the Borrower and its Subsidiaries) within three hundred sixty five (365) days following receipt of such Net Cash Proceeds (or, if the Borrower or the relevant Subsidiary, as applicable, has contractually committed within three hundred sixty five (365) days following receipt of such Net Cash Proceeds to reinvest such Net Cash Proceeds, then within five hundred forty five (545) days following receipt of such Net Cash Proceeds); *provided*, *however*, that if any of such Net Cash Proceeds are no longer intended to be so reinvested at any time after the occurrence of the Relevant Transaction (or are not reinvested within such three hundred sixty five (365) days or five hundred forty five (545) days, as applicable), an amount equal to any such Net Cash Proceeds shall be promptly applied to the prepayment of the Term Loans as set forth in this Section 2.05.

(ii)     Upon the incurrence or issuance by the Borrower or any Subsidiary of any Indebtedness not expressly permitted to be incurred or issued pursuant to Section 7.03, the Borrower shall prepay the Term Loans in an amount equal to 100% of all Net Cash Proceeds received therefrom immediately upon receipt thereof by the Borrower or such Subsidiary.

4885-4953-0770v.1

(iii)     [Reserved].

(iv)     [Reserved].

(v)     Subject to Sections 2.05(b)(ix), 2.16(e)(v), 2.18 and 2.20, each prepayment of Term Loans pursuant to this Section 2.05(b) shall be applied (x)(A) *first*, to the prepayment of the Super Senior Incremental Term Loans (if any) on a pro rata basis among such Super Senior Incremental Term Loans, (B) *second*, subject to the prior payment in full in cash of all Super Senior Incremental Term Loans (if any) and the satisfaction in full of all other Obligations in respect of the Super Senior Incremental Term Loans (if any) (including accrued and unpaid interest and any premium in respect thereof) (other than contingent indemnification and reimbursement obligations for which no claim has been made), to the prepayment of the First Out Term Loans on a pro rata basis among such First Out Term Loans and (C) *third*, subject to the prior payment in full in cash of the all First Out Term Loans and the satisfaction in full of all other Obligations in respect of the First Out Term Loans (including accrued and unpaid interest and any Applicable Premium) (other than contingent indemnification and reimbursement obligations for which no claim has been made), to the prepayment of the Second Out Term Loans on a pro rata basis among such Second Out Term Loans, (y) pro rata to Term Loans of Term Lenders within each applicable Tranche, based upon the outstanding principal amounts owing to each such Term Lender under each such Tranche of Term Loans and (z) to reduce the next four (4) scheduled installments of principal within each such Tranche and then to the remaining scheduled installments of principal within each such Tranche in inverse order of maturity; *provided* that (x) with respect to the allocation of such prepayments under this clause (A) between an Existing Term Tranche and Extended Term Tranche of the same extension series, the Borrower may allocate such prepayments as the Borrower may specify, subject to the limitation that the Borrower shall not allocate to Extended Term Loans of any extension series any such mandatory prepayment unless such prepayment under this clause (A) is accompanied by at least a pro rata prepayment, based upon the applicable remaining scheduled installments of principal due in respect thereof, of the Term Loans of the Existing Term Tranche, if any, from which such Extended Loans were converted or exchanged (unless such Term Loans of the Existing Term Tranche have otherwise been repaid in full) and (y) the Borrower may allocate less than a pro rata amount of such prepayment to any Incremental Term Loan to the extent so provided in the applicable joinder agreement.

(vi)     All prepayments under this Section 2.05 shall be made together with, in the case of any such prepayment of a SOFR Loan on a date other than the last day of an Interest Period therefor, any amounts owing in respect of such SOFR Loan, as applicable, pursuant to Section 3.05, and, to the extent applicable, any additional amounts required pursuant to Section 2.05(e), *provided*, that so long as no Event of Default shall have occurred and be continuing, in lieu of making any payment pursuant to this Section 2.05(b) in respect of any SOFR Loan prior to the last day of the Interest Period thereof, the Borrower may, in its discretion, deposit an amount sufficient to make any such prepayment otherwise required to be made thereunder together with accrued interest to the last day of such Interest Period into a cash collateral account reasonably acceptable to the Administrative Agent until the last day of such Interest Period, at which time the Administrative Agent shall be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of such Term Loans in accordance with this Section 2.05(b).  Upon the occurrence and during the continuance of any

-65-

Event of Default, the Administrative Agent shall also be authorized (without any further action by or notice to or from the Borrower or any other Loan Party) to apply such amount to the prepayment of the outstanding Term Loans in accordance with the relevant provisions of this Section 2.05. Each prepayment of Term Loans under any Tranche pursuant to this Section 2.05(b) shall be applied on a pro rata basis to the then outstanding Base Rate Loans and SOFR Loans under the Tranche being prepaid; *provided* that if there are no Declining Lenders with respect to such prepayment, then the amount thereof shall be applied first to Base Rate Loans under the Tranche being prepaid to the full extent thereof before application to SOFR Loans under such Tranche, and in the case of SOFR Loans, in direct order of Interest Period maturities.

(vii)    Notwithstanding any other provisions of this Section 2.05, to the extent that any or all of the Net Cash Proceeds of any Disposition by a Foreign Subsidiary or the Net Cash Proceeds of any Casualty Event from a Foreign Subsidiary, in each case giving rise to a prepayment event pursuant to Section 2.05(b)(ii), or Excess Cash Flow giving rise to a prepayment event pursuant to Section 2.05(b)(i), if distributed by such Foreign Subsidiary, (x) would result in material adverse tax consequences for the Borrower, the Parent Entities and their Subsidiaries (taken as a whole) or adverse tax consequences that are material in relation to the amount of such Net Cash Proceeds or (y) would violate, require consents from a Governmental Authority under or otherwise be restricted or delayed by applicable local law (e.g., financial assistance, corporate benefit, thin capitalization, capital maintenance, liquidity maintenance and similar legal principles, restrictions on upstreaming of cash intragroup and the fiduciary and statutory duties of the directors of the relevant subsidiaries) or material organizational document restrictions as a result of minority ownership from being repatriated to the United States, in each case as reasonably determined by the Borrower in good faith, the portion of such Net Cash Proceeds or Excess Cash Flow so affected will not be required to be applied to repay Term Loans; *provided* that the Borrower will use commercially reasonable efforts (which shall not require the incurrence of any costs or losses beyond a *de minimis* amount and shall not require repayment of foreign intercompany notes if such repayment would result in material adverse tax consequences to the Borrower, the Parent Entities and their Subsidiaries (taken as a whole)) to take all actions permitted by applicable law, in order to repatriate or otherwise permit the payment of such amounts (and, in the case of any such prepayment that is delayed by applicable local law, that such prepayment be made when reasonably practicable after such delay); *provided*, *further*, that any such amount not repatriated or paid shall be excluded from the determination of the Available Amount.

(viii)    Notwithstanding anything to the contrary in this Section 2.05(b) or otherwise, (x) until each Super Senior Incremental Term Loan (if any) has been paid in full in cash and all other Obligations in respect of the Super Senior Incremental Term Loans (if any) have been paid in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made), no mandatory prepayment of outstanding First Out Term Loans or other application of proceeds in respect of the First Out Term Loans that would otherwise be permitted under this Section 2.05(b) shall be made (or required to be made) hereunder and (y) until each First Out Term Loan has been paid in full in cash and all other Obligations in respect of the First Out Term Loans have been paid in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made), no mandatory prepayment of outstanding Second Out Term Loans or other application of proceeds in respect of the Second Out Term Loans that would otherwise be permitted under this Section 2.05(b) shall be made (or required to be made) hereunder.

-66-

(c)      Term Lender Opt-Out.  With respect to any prepayment of Term Loans pursuant to Section 2.05(b)(i), (ii) or (iii), the Term Lenders may decline to accept the applicable prepayment.  The Borrower shall notify the Administrative Agent of any event giving rise to a prepayment under Section 2.05(b)(i), (ii) or (iii) at least five (5) Business Days prior to the date of such prepayment.  Each such notice shall specify the date of such prepayment and provide a reasonably detailed calculation of the amount of such prepayment that is required to be made under Section 2.05(b)(i), (ii) or (iii) (the "Prepayment Amount") and the Applicable Premium (if any) applicable thereto.  The Administrative Agent will promptly notify each Appropriate Lender of the contents of any such prepayment notice so received from the Borrower, including the date on which such prepayment is to be made (the "Prepayment Date").  Any Appropriate Lender may decline to accept all (but not less than all) of its share of any such prepayment (other than such prepayment pursuant to Section 2.05(b)(iii)(x)) (any such Lender, a "Declining Lender") by providing written notice to the Administrative Agent no later than two (2) Business Days after the date of such Appropriate Lender's receipt of notice from the Administrative Agent regarding such prepayment.  If any Appropriate Lender does not give a notice to the Administrative Agent on or prior to such second Business Day informing the Administrative Agent that it declines to accept the applicable prepayment, then such Lender will be deemed to have accepted such prepayment.  On any Prepayment Date, an amount equal to the Prepayment Amount minus the portion thereof allocable to Declining Lenders, in each case for such Prepayment Date, shall be paid to the Administrative Agent by the Borrower and applied by the Administrative Agent to prepay Term Loans owing to Appropriate Lenders (other than Declining Lenders) in the manner described in Section 2.05(b) for such prepayment.  Any amounts that would otherwise have been applied to prepay Term Loans under any Term Loan Tranche owing to Declining Lenders may be retained by the Borrower (such remaining amounts, the "Declined Amounts") and used for any purpose not prohibited hereunder.

(d)      All payments or repayments of Loans made pursuant to this Section 2.05 shall be made in Dollars.

(e)      Prepayment Premium.

(i)      If, prior to the third anniversary of the Closing Date, the Borrower makes any voluntary or mandatory prepayment of any Initial First Out Term Loans (other than any mandatory prepayment pursuant to Section 2.05(b)(i) or Section 2.05(b)(ii) (solely as a result of a Casualty Event) or scheduled amortization payment under Section 2.07), in each case except in connection with a transaction resulting in a Change of Control (other than a Change of Control that occurs during or as a part of a proceeding under any Debtor Relief Law), or the Initial First Out Term Loans are accelerated (whether as a result of an Event of Default, by operation of law or otherwise), including as a result of any Event of Default under Sections 8.01(f), or there shall occur any satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any of the Obligations in respect of the Initial First Out Term Loans in any bankruptcy, insolvency proceeding, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind in any bankruptcy or insolvency proceeding to any Agent or any Lender in full or partial satisfaction of the Obligations in respect of Initial First Out Term Loans (each of the foregoing, a "Premium Event"), then, in each case, the Borrower shall pay to the Administrative Agent for the

-67-

ratable account of the First Out Lenders, a prepayment premium (an "<u>Applicable Premium</u>") in an amount equal to (i) in the case of any Premium Event prior to the first anniversary of the Closing Date, the Make-Whole Premium (as defined below) in respect of Initial First Out Term Loans subject to such Premium Event, (ii) in the case of any Premium Event on or after the first anniversary of the Closing Date but prior to the second anniversary of the Closing Date, 2.00% of the principal amount of Initial First Out Term Loans subject to such Premium Event and (iii) in the case of any Premium Event on or after the second anniversary of the Closing Date but prior to the third anniversary of the Closing Date, 1.00% of the principal amount of Initial First Out Term Loans subject to such Premium Event, and (iv) in the case of any Premium Event on or after the third anniversary of the Closing Date, 0.00% of the principal amount of Initial First Out Term Loans subject to such Premium Event.

"<u>Make-Whole Premium</u>" means an amount equal to (I) the present value of all interest payments on the principal amount of Initial First Out Term Loans subject to such Premium Event that would have been payable during the period from and including the date of such Premium Event to, but excluding, the first anniversary of the Closing Date (calculated (x) on the basis of the interest rate with respect to the Initial Term Loans that is in effect on the date of such Premium Event and (y) computed on the basis of actual days elapsed over a year of 360 days and using a discount rate equal to the Treasury Rate as of the earlier of the date on which the applicable notice of prepayment is given and the date of the Premium Event, plus 50 basis points), *plus* (II) 2.00% of the principal amount of Initial First Out Term Loans subject to such Premium Event. For the avoidance of doubt, interest that accrued on the First Out Term Loans prior to the date of the applicable Premium Event shall not be included in the present value calculation in clause (I) of the prior sentence.

"<u>Treasury Rate</u>" means, as of any date, the rate per annum equal to the yield to maturity as of such date of the United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15 (519) that has become publicly available at least two Business Days prior to such date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such date to the first anniversary of the Closing Date; provided, however, that if the period from such date to the first anniversary of the Closing Date is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

(ii)     Notwithstanding anything to the contrary in this Agreement or any other Loan Document, it is understood and agreed that if any Initial First Out Term Loans are accelerated (whether as a result of the occurrence and continuance of any Event of Default, by operation of law or otherwise), any Applicable Premium (including any Make-Whole Premium) applicable thereto pursuant to this <u>Section 2.05(e)</u>, determined as of the date of acceleration, will also be immediately due and payable as though the applicable Initial First Out Term Loans Term Loans were prepaid as of such date and shall constitute part of the Obligations for all purposes herein. The Applicable Premium, if any, shall also be payable in the event the Obligations (and/or this Agreement) are satisfied or released by foreclosure (whether by power of judicial proceeding), by deed in lieu of foreclosure or by

4885-4953-0770v.1

any other similar means. **THE LOAN PARTIES EXPRESSLY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE APPLICABLE PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION.** The parties hereto further acknowledge and agree that the Applicable Premium is not intended to act as a penalty or to punish the Loan Parties for any repayment or prepayment of the Initial First Out Term Loans. The Loan Parties expressly agree that (i) the Applicable Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (ii) the Applicable Premium, if any, shall be payable notwithstanding the then prevailing market rates at the time payment is made, (iii) there has been a course of conduct between the First Out Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Applicable Premium, if any, (iv) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this Section 2.05(e), (v) their agreement to pay the Applicable Premium is a material inducement to the First Out Lenders to make (or be deemed to make) the Initial First Out Term Loans, and (vi) the Applicable Premium represents a good-faith, reasonable estimate and calculation of the lost profits or damages of the First Out Lenders and that it would be impractical and extremely difficult to ascertain the actual amount of damages to the First Out Lenders or profits lost by the First Out Lenders as a result of any Premium Event.

Section 2.06     Termination or Reduction of Term Commitments. (a) Optional. (i) The Borrower may, upon written notice to the Administrative Agent, terminate the unused portions of the Term Commitments or from time to time permanently reduce the unused portions of the Term Commitments; *provided* that (i) any such notice shall be received by the Administrative Agent prior to 11:00 a.m. three (3) Business Days (or such shorter period as the Administrative Agent shall agree) prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $100,000 in excess thereof.

Any such notice of termination or reduction of commitments pursuant to Section 2.06(a)(i) may state that it is conditioned upon the occurrence or non-occurrence of any event specified therein (including the effectiveness of other credit facilities), in which case such notice may be revoked by the Borrower (by written notice to the Administrative Agent on or prior to 10:00 a.m. (New York City time) on the specified effective date) if such condition is not satisfied.

(b)     Mandatory.   The (i) aggregate First Out New Money Term Loan Commitments shall be automatically and permanently reduced to zero (0) on the Closing Date (immediately after giving effect to the Term Borrowing of the First Out New Money Term Loans) and (ii) any subsequently incurred Term Commitments shall be automatically and permanently reduced to zero (0) on the date of the Term Borrowing applicable thereto.

Section 2.07     Repayment of Loans. (a) Initial First Out Term Loans.  Beginning with the fiscal quarter ending [_____], the Borrower shall repay to the Administrative Agent, for the ratable account of the Lenders holding Initial First Out Term Loans, the aggregate principal amount of Initial First Out Term Loans set forth below, on the dates (or if such day is not a Business Day, the immediately preceding Business Day) set forth below (which installments shall, to the

-69-

extent applicable, be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05, or be increased as a result of any increase in the amount of Initial First Out Term Loans pursuant to Section 2.15 (such increased amortization payments to be calculated in the same manner (and on the same basis) as the schedule set forth below for the Initial First Out Term Loans made (or deemed made) as of the Closing Date)):

| Date | Amount |
|---|---|
| Each fiscal quarter ending prior to the Maturity Date for the Initial First Out Term Facility | 0.25% of the aggregate principal amount of Initial First Out Term Loans outstanding on the Closing Date |
| Maturity Date for the Initial First Out Term Facility | the unpaid aggregate principal amounts of all outstanding Initial First Out Term Loans |

(b)     Initial Second Out Term Loans.  Beginning with the fiscal quarter ending [_____], the Borrower shall repay to the Administrative Agent, for the ratable account of the Lenders holding Initial Second Out Term Loans, the aggregate principal amount of Initial Second Out Term Loans set forth below, on the dates (or if such day is not a Business Day, the immediately preceding Business Day) set forth below (which installments shall, to the extent applicable, be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.05, or be increased as a result of any increase in the amount of Initial Second Out Term Loans pursuant to Section 2.15 (such increased amortization payments to be calculated in the same manner (and on the same basis) as the schedule set forth below for the Initial Second Out Term Loans deemed made as of the Closing Date)):

| Date | Amount |
|---|---|
| Each fiscal quarter ending prior to the Maturity Date for the Initial Second Out Term Facility | 0.25% of the aggregate principal amount of Initial Second Out Term Loans outstanding on the Closing Date |
| Maturity Date for the Initial Second Out Term Facility | the unpaid aggregate principal amounts of all outstanding Initial Second Out Term Loans |

(c)     Incremental Term Loans.  The principal amount of Incremental Term Loans of each Term Lender shall be repaid by the Borrower as provided in the amendment to this Agreement in respect of such Incremental Term Loans as contemplated by Section 2.16, subject to the requirements of Section 2.16.  To the extent not previously paid, each Incremental Term Loan shall be due and payable on the Maturity Date applicable to such Incremental Term Loans.

(d)     [Reserved].

(e)     Extended Term Loans.  The principal amount of Extended Term Loans of each Extending Lender shall be repaid as provided in the amendment to this Agreement in respect of such Extended Term Loans as contemplated by Section 2.18.  To the extent not previously paid,

each Extended Term Loan shall be due and payable on the Maturity Date applicable to such Extended Term Loans.

Section 2.08     Interest.  (a) Subject to the provisions of Section 2.08(b), (i) each SOFR Loan under a Term Facility shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the sum of (A) Adjusted Term SOFR for such Interest Period *plus* (B) the Applicable Rate for SOFR Loans under such Term Facility and (ii) each Base Rate Loan under a Term Facility shall bear interest on the outstanding principal amount thereof from the applicable borrowing date (or deemed borrowing date) or conversion date, as the case may be, at a rate per annum equal to the sum of (A) the Base Rate *plus* (B) the Applicable Rate for Base Rate Loans under such Term Facility.

(b)     Notwithstanding the foregoing, automatically upon the occurrence and during the continuance of any Event of Default under Section 8.01(a) or (f), and upon the election of the Required Lenders during the continuation of any other Event of Default, without duplication, (i) all outstanding Loans shall bear interest at a per annum rate equal to (i) 2.0% plus the rate otherwise applicable to such Loan as provided in Sections 2.08(a) and (ii) if any other Obligation (other than principal of the Loans) is not paid when due, 2.0% plus the rate applicable to Base Rate Loans as provided in Section 2.08(a) (in either case, the "Default Rate"). Accrued and unpaid interest pursuant to this Section 2.08(b) shall be payable upon demand.

(c)     Accrued interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein; *provided* that in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment. Notwithstanding the foregoing, the Borrower may, by giving written notice to the Administrative Agent in the form of a PIK Notice no later than 1:00 p.m. (New York City time) three (3) Business Days prior to the commencement of any Interest Calculation Period, elect (such election, a "PIK Election") to pay a portion of the total interest (in an amount not to exceed to 6.50% per annum for such period) on the Initial Second Out Term Loans that will accrue during such Interest Calculation Period in-kind (in lieu of in cash) on the Interest Payment Date ending on the last day of such Interest Calculation Period by capitalizing and adding such portion of such interest to the unpaid principal balance of the Initial Second Out Term Loans outstanding (such interest that is capitalized and added to the outstanding principal balance of the Initial Second Out Term Loans being referred to herein as "PIK Interest"); *provided* that (x) for the avoidance of doubt, the remainder of the accrued interest due and owing on such Interest Payment Date in respect of such Initial Second Out Term Loans that are subject to such PIK Election shall payable in cash on such Interest Payment Date and (y) any PIK Election made by the Borrower for an Interest Calculation Period shall be deemed to apply only to such Interest Calculation Period and not to any subsequent Interest Calculation Period (unless a new PIK Notice is delivered for such subsequent Interest Calculation Period in accordance with the provisions hereof); *provided, further*, that in the event of any repayment or prepayment of any Initial Second Out Term Loan, all accrued interest on the principal amount repaid or prepaid shall be payable in cash on the date of such repayment or prepayment. Amounts representing accrued interest that is paid as PIK Interest shall thereafter constitute principal of the Initial Second Out Term Loans, have the same terms thereof and bear interest in accordance with the terms of this Agreement.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the

commencement of any proceeding under any Debtor Relief Law.

(d)     All interest paid or payable pursuant to this <u>Section 2.08</u> shall be paid in Dollars.

Section 2.09     <u>Fees</u>.

(a)     The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times specified in the Fee Letter.

(b)     The Borrower shall pay directly to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified (if any).

Section 2.10     <u>Computation of Interest and Fees</u>.  All computations of interest for Base Rate Loans (except for Base Rate computations in respect of clauses (a) and (c) of the definition thereof) shall be made on the basis of a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred sixty (360)-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a three hundred sixty-five (365)-day year).  Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to <u>Section 2.12(a)</u>, bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11     <u>Evidence of Indebtedness</u>.  (a) The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting as a non-fiduciary agent for the Borrower.  The Administrative Agent may conclusively rely on any amended or updated Schedule 2.01(a), (b) or (c) delivered to it pursuant to Sections 2.15, 2.16 and 2.18 to update the Register in connection with the transactions contemplated therein.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error.  Any failure to so record or any error in doing so shall not, however, limit the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Term Note payable to such Lender, which shall evidence such Lender's Term Loans in addition to such accounts or records.  Each Lender may attach schedules to its Term Note and endorse thereon the date, Type (if applicable), amount and maturity of its Term Loans and payments with respect thereto.

(d)     [Reserved.]

(e)     Entries made in good faith by the Administrative Agent in the Register pursuant to <u>Sections 2.11(a)</u>, and by each Lender in its accounts or records pursuant to <u>Sections 2.11(a)</u>, shall be prima facie evidence of the amount of principal and interest due and payable or

4885-4953-0770v.1

to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such accounts or records, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such accounts or records shall not limit the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12    Payments Generally; Administrative Agent's Clawback.    (a)  General. All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, to the Administrative Agent's Account in Dollars and in immediately available funds not later than 2:00 p.m.  (New York City time) on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its ratable share in respect of the relevant Facility or Tranche (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m.  (New York City time) may, in Administrative Agent's sole discretion, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  Except as otherwise expressly provided herein, if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided*, *however*, that if such extension would cause payment of interest on or principal of SOFR Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(b)    (i) Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received written notice from a Lender prior to the proposed date of any Term Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Term Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with and at the time required by Section 2.02(b) and may, in its sole discretion and in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if any Lender does not in fact make its share of the applicable Term Borrowing available to the Administrative Agent, then such Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand an amount equal to such applicable share in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower by the Administrative Agent to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any reasonable administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing and (B) in the case of a payment to be made by the Borrower, the highest interest rate applicable to Term Loans that are Base Rate Loans. If both the Borrower and such Lender pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Term Borrowing to the Administrative Agent, then the amount so paid shall constitute

-73-

such Lender's Loan included in such Term Borrowing. Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make its share of any Term Borrowing available to the Administrative Agent.

(ii)     Payments by the Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received written notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Appropriate Lenders the amount due. In such event, if the Borrower did not in fact make such payment, then each of the Appropriate Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed by the Administrative Agent to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any reasonable administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(b) shall be conclusive, absent manifest error.

(c)     Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Term Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender on demand, without interest.

(d)     Obligations of the Lenders Several. The obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to Section 9.07 are several and not joint. The failure of any Lender to make any Term Loan or to make any payment under Section 9.07 on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Term Loan or to make its payment under Section 9.07.

(e)     Funding Source. Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Term Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Term Loan in any particular place or manner.

(f)     Insufficient Funds. If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees (including any prepayment premium) then due hereunder with respect to the Super Senior Incremental Term Loans, ratably among the parties entitled thereto in accordance with the amounts of interest and

-74-

fees (including any prepayment premium) then due to such parties, (ii) <u>second</u>, towards payment of principal then due hereunder in respect of the Super Senior Incremental Term Loans, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, (iii) <u>third</u>, towards payment of interest and fees (including any prepayment premium) then due hereunder with respect to the First Out Term Loans, ratably among the parties entitled thereto in accordance with the amounts of interest and fees (including any prepayment premium) then due to such parties, (iv) <u>fourth</u>, towards payment of principal then due hereunder in respect of the First Out Term Loans, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties, (v) <u>fifth</u>, towards payment of interest and fees (including any prepayment premium) then due hereunder  with respect to the Second Out Term Loans, ratably among the parties entitled thereto in accordance with the amounts of interest and fees (including any prepayment premium) then due to such parties, and (vi) <u>sixth</u>, towards payment of principal then due hereunder with respect to the Second Out  Term Loans, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

> (g)   <u>Unallocated Funds</u>.  If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds first to the payment of any amounts due and owing to the Agents and then to each of the Lenders in accordance with such Lender's ratable share of the Outstanding Amount of all Term Loans outstanding at such time, in repayment or prepayment of such of the outstanding Term Loans (first with respect to interest and any Applicable Premium due and payable on the Loans and second with respect to principal on the Loans) or other Obligations then owing to such Lender.

> Section 2.13   <u>Sharing of Payments</u>.  If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Term Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact and (b) purchase from the other Lenders such participations in the Term Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Term Loans pro rata with each of them; *provided*, *however*, that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in <u>Section 10.06</u> (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by Law, exercise all its rights of payment (including the right of setoff, but subject to <u>Section 10.09</u>) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  Each Lender that purchases a participation pursuant to this <u>Section 2.13</u> shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though

-75-

the purchasing Lender were the original owner of the Obligations purchased.  For the avoidance of doubt, the provisions of this Section 2.13 shall not be construed to apply to (A) [reserved], (B) the assignments and participations (including by means of a Dutch Auction and open market repurchases) described in Section 10.07, (C) any Incremental Term Facility in accordance with Section 2.16, or any Extension in accordance with Section 2.18, (D) any loan modification offer described in Section 10.01, or (E) any applicable circumstances contemplated by Sections 2.15, 2.18 or 3.07.

Section 2.14    [Reserved.]

Section 2.15    Increase in Term Facility.  (a) The Borrower may from time to time, upon written notice by the Borrower to the Administrative Agent specifying the proposed amount thereof, request an increase, from any Lender or any Additional Lender, in any Tranche of Term Loans (each, a "Term Facility Increase") (which shall be on the same terms as, and become part of, the applicable Tranche of Term Loans hereunder (except as otherwise provided in Sections 2.15(c) and 2.15(e))) by an aggregate principal amount not to exceed, at the time the time of incurrence, the Incremental Amount (in the case of an increase in the amount of any Tranche of Term Loans other than Super Senior Incremental Term Loans) or the Super Senior Incremental Amount (in the case of an increase in the amount of any Super Senior Incremental Term Loans); *provided* that (i) any such request for a Term Facility Increase shall be in a minimum amount of the lesser of (x) $500,000 and (y) the entire amount of any Term Facility Increase that may be requested under this Section 2.15 and (ii) any such Term Facility Increase shall be offered to all First Out Lenders in accordance with their respective Pro Rata Shares (based on their outstanding First Out Loans) of such Term Facility Increase.  Each First Out Lender may elect or decline, in its sole discretion, to provide all or a portion of such Term Facility Increase offered to it (which increase may be provided directly by such First Out Lender or through any of its Affiliates or Approved Funds) (and any First Out Lender that has failed to respond to any such request shall be deemed to have declined to participate in such Term Facility Increase) and in the event any First Out Lender declines (or is deemed to decline) to provide all or a portion of such Term Facility Increase offered to it, the accepting First Out Lenders shall be entitled to provide their respective ratable shares (based on their outstanding First Out Loans)  of such declined amounts (which declined amounts may be provided directly by such accepting First Out Lenders or through any of their respective Affiliates or Approved Funds).  In the event the accepting First Out Lenders decline to provide the full amount of such Term Facility Increase (or there are no accepting First Out Lenders), the Borrower may then offer such opportunity to one or more other Lenders or Additional Lenders; provided that the Administrative Agent shall have consented to any such Additional Lender providing any portion of such Term Facility Increase, solely if and to the extent such consent would be required under Section 10.07(b)(iii) for an assignment of Loans or Commitments, as applicable, to such Additional Lender.

(b)    Each such notice shall, subject to the provisions of the proviso to the last sentence of Section 2.15(a), specify the Tranche of Term Loans that is proposed to be increased, the identity of each Lender or other Person that is an Eligible Assignee (each, a "Term Facility Increase Lender") to whom the Borrower proposes any portion of such Term Facility Increase be allocated and the proposed amounts of such allocation.

(c)    If any Tranche of Term Loans is increased in accordance with this Section

2.15, the Borrower, and, with respect to operational or technical requirements, in consultation with the Administrative Agent, shall determine the effective date (the "Term Increase Effective Date") and the Borrower, subject to the rights of the First Out Lenders under Section 2.15(a), shall determine the final allocation of such Term Facility Increase among the applicable Term Facility Increase Lenders which need not be on a ratable basis for all existing Lenders of the applicable Tranche. The Borrower shall provide the Administrative Agent an amended Schedule 2.01(a) or (c), as applicable, reflecting the Term Facility Increase and such amended schedule shall be deemed incorporated herein. The Borrower shall promptly notify the applicable Lenders of the final allocation of such increase and the Term Increase Effective Date. As of the Term Increase Effective Date, the amortization schedule for the Tranche of Term Loans subject to the Term Facility Increase set forth in Section 2.07(a) or (b) (or any other applicable amortization schedule for the relevant Tranche of Term Loans) shall be amended in a writing (which may be executed and delivered solely by the Borrower and the Administrative Agent) to reflect the addition of such Term Facility Increase. In addition, in connection with any Term Facility Increase pursuant to this Section 2.15, the Lenders hereby authorize the Administrative Agent to enter into amendments (which may be executed and delivered solely by the Borrower and the Administrative Agent) to this Agreement and the other Loan Documents with the Borrower as may be necessary in the reasonable opinion of the Administrative Agent and the Borrower in order to reflect any technical changes (including amendments to Schedule 2.01(a) or (c) and any changes required by Section 2.15(d)(iii) and Section 2.15(e)) necessary to give effect to such Term Facility Increase in accordance with its terms as set forth herein.

(d)     Such Term Facility Increase shall become effective, as of the applicable Term Increase Effective Date; *provided* that (i) no Event of Default shall have occurred and be continuing or would result after giving effect to such Term Facility Increase (including the use of proceeds thereof) (*provided* that, if such Term Facility Increase is being incurred in connection with a Limited Condition Acquisition, the Lenders providing such Term Facility Increase may agree to limit the foregoing condition to provide that no Event of Default under Sections 8.01(a), (f) or (g) shall have occurred and be continuing or would result after giving effect to such Term Facility Increase), (ii) after giving effect to the making of any Term Loans or the effectiveness of any Term Facility Increase (including the use of proceeds thereof), the representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality) on and as of the date of such making of such Term Loan or effectiveness of such Term Facility Increase, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality) as of such earlier date (*provided* that, if such Term Facility Increase is being incurred in connection with a Limited Condition Acquisition, the Lenders providing such Term Facility Increase may agree to limit the foregoing condition to relate solely to the accuracy of the Specified Representations and the representations made by or with respect to the target of such Limited Condition Acquisition as are material to the interests of the Lenders (but only to the extent the Borrower or its Affiliate has the right to terminate (or decline to consummate) its obligations under such acquisition agreement as a result of a breach of such representations in such acquisition agreement) and to be subject to customary limitations on collateral-related requirements (in each case, modified as necessary for such Limited Condition Acquisition)); (iii) the Term Facility Increase shall be effected pursuant to one or more joinder

agreements (consistent with the terms of this Section 2.15) executed and delivered by the Borrower and the Term Facility Increase Lenders, and, to the extent applicable, the Administrative Agent, and each of which shall be recorded in the Register, (iv) the Borrower shall have delivered a certificate dated as of the Term Increase Effective Date signed by a Responsible Officer of the Borrower certifying that the conditions precedent to establishment of the Term Facility Increase and any related amendments to the Loan Documents have been satisfied, (v) to the extent reasonably requested by the Lenders providing such Term Facility Increase, the Administrative Agent and such Lenders shall have received legal opinions, board resolutions, officers' certificates and/or reaffirmation agreements, including any supplements or amendments to the Collateral Documents, consistent in all material respects with those delivered on the Closing Date under Section 4.01 with respect to the Borrower and all other applicable Loan Parties (other than changes to such legal opinions resulting from a change in Law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Lenders providing such Term Facility Increase) and evidencing the approval of such increase by the Borrower and each other applicable Loan Party including, without limitation, any amendments and/or supplements to the Mortgages and such other deliverables required by Section 6.12 and datedown endorsements to the title policies, (vi) all fees and expenses owing in respect of such increase to the Administrative Agent and the applicable Lenders shall have been paid or shall be paid concurrently with the Term Increase Effective Date and (vii) except in the case of a Term Facility Increase in respect of Super Senior Incremental Term Loans, the Total Net Leverage Ratio for the Test Period most recently ended, calculated on a Pro Forma Basis after giving effect to such Term Facility Increase, shall not exceed 4.00:1.00.  The additional Term Loans made pursuant to any Term Facility Increase shall be made by the applicable Lenders participating therein pursuant to the procedures set forth in Section 2.02.

(e)     Any Term Facility Increase shall be on the same terms and pursuant to the same documentation as the Tranche or Tranches, as applicable, of Term Loans increased thereby as of the Term Increase Effective Date; *provided* that it is agreed that the Applicable Rate of the applicable existing Tranche of Term Loans may be increased to equal the Applicable Rate of such increased Tranche of Term Loans to satisfy the requirements of this clause (e).

Section 2.16     New Incremental Term Facilities.  (a) The Borrower may from time to time, upon written notice by the Borrower to the Administrative Agent, specifying in reasonable detail the proposed terms thereof, request, from any Lender or any Additional Lender, to add one or more new term loan facilities to the Term Facilities (each, an "Incremental Term Facility"; and any advance made by a Lender thereunder, an "Incremental Term Loan"), in an aggregate principal amount not to exceed, at the time of incurrence, (x) if such Incremental Term Loans being incurred are Super Senior Incremental Term Loans, the Super Senior Incremental Amount or (y) if such Incremental Term Loans being incurred are Other Incremental Term Loans, the Incremental Amount; *provided* that (1) any such request for an Incremental Term Facility shall be in a minimum amount of the lesser of (i) $500,000 and (ii) the entire amount that may be requested under this Section 2.16 and (2) any such Incremental Term Facility shall be offered to all First Out Lenders in accordance with their respective Pro Rata Shares (based on their outstanding First Out Loans) of such Incremental Term Facility.  Each First Out Lender may elect or decline, in its sole discretion, to provide all or a portion of such Incremental Term Facility offered to it (which increase may be provided directly by such First Out Lender or through any of its Affiliates or Approved Funds) (and any First Out Lender that has failed to respond to any such request shall be deemed to have declined to participate in such Incremental Term Facility) and in the event any

-78-

First Out Lender declines (or is deemed to decline) to provide all or a portion of such Incremental Term Facility offered to it, the accepting First Out Lenders shall be entitled to provide their respective ratable shares (based on their outstanding First Out Loans) of such declined amounts (which declined amounts may be provided directly by such accepting First Out Lenders or through any of their respective Affiliates or Approved Funds). In the event the accepting First Out Lenders decline to provide the full amount of such Incremental Term Facility (or there are no accepting First Out Lenders), the Borrower may then offer such opportunity to one or more other Lenders or Additional Lenders; provided that the Administrative Agent shall have consented to any such Additional Lender providing any portion of such Incremental Term Facility, solely if and to the extent such consent would be required under Section 10.07(b)(iii) for an assignment of Loans or Commitments, as applicable, to such Additional Lender.

(c)     Each such notice shall, subject to the provisions of the proviso to the last sentence of Section 2.16(a), specify the identity of each Lender or other Person that is an Eligible Assignee (each, an "Incremental Term Lender", and collectively, the "Incremental Term Lenders") to whom the Borrower proposes any portion of such Incremental Term Facility be allocated and the proposed amounts of such allocations and whether the Incremental Term Facility will be a Super Senior Incremental Term Facility an Other Incremental Term Facility.

(d)     If an Incremental Term Facility is added in accordance with this Section 2.16, the Borrower, and, with respect to operational or technical requirements, in consultation with the Administrative Agent, shall determine the effective date (the "Incremental Term Commitment Effective Date") and the Borrower shall determine the final allocation of such Incremental Term Facility among the Incremental Term Lenders. The Borrower shall promptly notify the applicable Lenders of the final allocation of the Incremental Term Facility and the Incremental Term Facility Effective Date. In connection with any addition of an Incremental Term Facility pursuant to this Section 2.16, the Lenders hereby authorize the Administrative Agent to enter into amendments (which may be executed and delivered solely by the Borrower and the Administrative Agent) to this Agreement and the other Loan Documents with the Borrower as may be necessary or appropriate in the reasonable opinion of the Incremental Term Lenders providing the applicable Incremental Term Facility and the Borrower in order to (i) give effect to such Incremental Term Facility in accordance with its terms as set forth herein (including the addition of such Incremental Term Facility as a "Term Facility" hereunder and treated in a manner consistent with the other applicable Term Facilities, as applicable, including for purposes of prepayments and voting, amendments to Schedule 2.01(a) and any changes required by Section 2.16(d)(iii)) and (ii) so long as such changes are not materially adverse to the interest of the Lenders (as determined by the Borrower and the Required Lenders acting in good faith), make such Incremental Term Loans fungible with one or more then outstanding Tranches of Term Loans.

(e)     Such Incremental Term Facilities shall become effective, as of the applicable Incremental Term Facility Effective Date; provided that (i) no Event of Default shall have occurred and be continuing or would result after giving effect to such Incremental Term Loans (including the use of the proceeds thereof) (provided that, if such Incremental Term Loans are being incurred in connection with a Limited Condition Acquisition, the Lenders providing such Incremental Term Loans may agree to limit the foregoing condition to provide that no Event of Default under Sections 8.01(a), (f) or (g) shall have occurred and be continuing or would result after giving effect to the incurrence of such Incremental Term Loans), (ii) after giving effect to the

-79-

making of any Incremental Term Loans (including the use of the proceeds thereof), the representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality) on and as of the date of such making of such Incremental Term Loans, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality) as of such earlier date (*provided* that, if such Incremental Term Loans are being incurred in connection with a Limited Condition Acquisition, the Lenders providing such Incremental Term Loans may agree to limit the foregoing condition to relate solely to the accuracy of the Specified Representations and the representations made by or with respect to the target of such Limited Condition Acquisition as are material to the interests of the Lenders (but only to the extent the Borrower or its Affiliate has the right to terminate (or decline to consummate) its obligations under such acquisition agreement as a result of a breach of such representations in such acquisition agreement), and to be subject to customary limitations on collateral-related requirements (in each case, modified as necessary for such Limited Condition Acquisition)), (iii) the Incremental Term Facility, as applicable, shall be effected pursuant to one or more joinder agreements (consistent with the terms of this Section 2.16) executed and delivered by the Borrower and Incremental Term Lenders, and to the extent applicable, the Administrative Agent, and each of which shall be recorded in the Register, (iv) the Borrower shall have delivered a certificate dated as of the Incremental Term Facility Effective Date signed by a Responsible Officer of the Borrower certifying that the conditions precedent to the establishment of the Incremental Term Facility (and the terms of the related Incremental Term Loans) and any related amendments to the Loan Documents have been satisfied, (v) to the extent reasonably requested by the Lenders providing such Incremental Term Loans, the Administrative Agent and the Lenders providing such Incremental Term Loans shall have received legal opinions, board resolutions, officers' certificates and/or reaffirmation agreements, including any supplements or amendments to the Collateral Documents, consistent in all material respects with those delivered on the Closing Date under Section 4.01 with respect to the Borrower and all other applicable Loan Parties (other than changes to such legal opinions resulting from a change in Law, change in fact or change to counsel's form of opinion reasonably satisfactory to the Lenders providing such Incremental Term Loans) and evidencing the approval of such increase by the Borrower and each other applicable Loan Party, including, without limitation, any amendments and/or supplements to the Mortgages and such other deliverables required by Section 6.12 and datedown endorsements to the title policies, (vi) all fees and expenses owing in respect of such Incremental Term Commitment to the Administrative Agent and the applicable Lenders shall have been paid or shall be paid concurrently with the Incremental Term Commitment Effective Date and (vii) other than in the case of a Super Senior Incremental Term Facility, the Total Net Leverage Ratio for the Test Period most recently ended, calculated on a Pro Forma Basis after giving effect to such Incremental Term Facility, shall not exceed 4.00:1.00.

(f)     The terms, provisions and documentation of the Incremental Term Loans and Incremental Term Facilities shall be as determined by the Borrower and the lenders providing such Incremental Term Facility and Incremental Term Loans; *provided* that, except as set forth in the proviso below, to the extent such terms, provisions and documentation are not substantially identical with the Initial First Out Term Loans or the Initial Second Out Term Loans, as applicable, they shall not be, as determined in good faith by the Borrower and the lenders providing such

Incremental Term Facility and Incremental Term Loans, materially more favorable (taken a whole) to the lenders providing such Incremental Term Facility and Incremental Term Loans than the corresponding terms applicable the Initial First Out Term Loans or the Initial Second Out Term Loans, as applicable, shall reflect current market terms for such types of Indebtedness or shall be as otherwise reasonably acceptable to the Required Lenders (except for terms applicable only to periods after the Latest Term Loan Maturity Date with respect to the then outstanding Term Loans (determined immediately prior to giving effect to such Incremental Term Loan or Incremental Term Facility)); *provided*, *further*, that:

(i)    such Incremental Term Facility and the Term Loans thereunder shall (x) rank (A) senior in right of payment to (including in respect of voluntary and mandatory prepayments and payments or distributions following an Event of Default, but excluding, for the avoidance of doubt, in respect of scheduled amortization payment, subject to Section 2.12(f)), and be secured on a *pari passu* basis with, the Initial First Out Term Loans (any such Incremental Term Facility or Incremental Term Loans, a "Super Senior Incremental Term Facility" or "Super Senior Incremental Term Loans", respectively), (B) *pari passu* in right of payment with (including in respect of voluntary and mandatory prepayments and payments or distributions following an Event of Default, but excluding, for the avoidance of doubt, in respect of scheduled amortization payment, subject to Section 2.12(f)), and be secured on a *pari passu* basis with, the Initial First Out Term Loans (any such Incremental Term Facility or Incremental Term Loans, an "Incremental First Out Facility" or "Incremental First Out Term Loans", respectively), (C) *pari passu* in right of payment with, and be secured on a *pari passu basis* with, the Initial Second Out Term Loans (any such Incremental Term Facility or Incremental Term Loans, an "Incremental Second Out Facility" or "Incremental Second Out Term Loans", respectively) or (D) junior in right of payment to, and secured on a *pari passu* basis with, the Initial First Out Term Loans or the Initial Second Out Term Loans, (y) be incurred or guaranteed only by the Borrower and the Guarantors obligated under the Initial Term Loans and (z) be secured only by the same Collateral securing the Initial Term Loan or be unsecured;

(ii)    the final maturity of any Tranche of (w) Super Senior Incremental Term Loans may be any date determined by the Borrower and the Incremental Term Lenders providing such Super Senior Incremental Term Loans, (x) Incremental First Out Term Loans shall be no earlier than the Latest Term Loan Maturity Date applicable to the First Out Term Loans in effect at the time of incurrence, (y) Incremental Second Out Term Loans shall be no earlier than the Latest Term Loan Maturity Date applicable to Second Out Term Loans in effect at the time of incurrence or (z) Incremental Term Loans that is secured on a junior basis to the Obligations or is unsecured shall not be earlier than prior to 91 days after the Latest Term Loan Maturity Date;

(iii)    the Weighted Average Life to Maturity of (w) any Super Senior Incremental Term Facility shall be as determined by the Borrower and the Incremental Term Lenders providing such Super Senior Incremental Term Facility, (x) any Incremental First Out Facility shall be no shorter than the then-longest remaining Weighted Average Life to Maturity of the First Out Term Loans outstanding at the time of incurrence, (y) any Incremental Second Out Facility shall be no shorter than the then-longest remaining Weighted Average Life to Maturity of Second Out Loans outstanding at the time of incurrence or (z) any Incremental Term Facility (other than an Incremental First Out Facility or an Incremental Second Out Facility) shall be no shorter than the then-longest remaining Weighted Average Life to Maturity of the Tranches of Term Loans

-81-

outstanding at the time of incurrence;

(iv)  subject to clauses (ii) and (iii) of this proviso, the amortization schedule applicable to any Incremental Term Facility shall be determined by the Borrower and the Incremental Term Lenders providing such Incremental Term Facility;

(v)  any Incremental Term Facility which is secured on a *pari passu* basis with the Obligations may participate on a pro rata basis or less than pro rata basis (but, except in the case of a Super Senior Incremental Term Facility or as otherwise expressly permitted by this Agreement, not on a greater than pro rata basis) in any prepayments of the Initial Term Facility pursuant to Section 2.05(a), as specified in the applicable joinder agreement; provided, that (x) until each Super Senior Incremental Term Loan (to the extent any Super Senior Incremental Term Loans have been borrowed on or prior to such time) has been paid in full in cash and all other Obligations in respect of the Super Senior Incremental Term Loans (if any) have been paid in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made), no prepayment of outstanding Incremental Term Loans (other than Super Senior Incremental Term Loans) shall be made (or required to be made) hereunder and (y) until each First Out Term Loan has been paid in full in cash and all other Obligations in respect of the First Out Term Loans have been paid in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made), no prepayment of outstanding Incremental Term Loans (other than Super Senior Incremental Term Loans and Incremental First Out Term Loans) shall be made (or required to be made) hereunder;

(vi)  the All-In Yield applicable to the Incremental Term Loans of each Tranche shall be determined by the Borrower and the applicable Incremental Term Lenders and shall be set forth in each applicable joinder agreement; *provided* that with respect to (x) Incremental First Out Term Loans, the All-In Yield applicable to such Incremental First Out Term Loans shall not be greater than the applicable All-In Yield payable pursuant to the terms of this Agreement as amended through the date of such calculation with respect to Initial First Out Term Loans *plus* 50 basis points per annum unless the interest rate (together with, as and to the extent provided in the final proviso to this clause (vi) below, the Adjusted Term SOFR or Base Rate floor) with respect to the Initial First Out Term Loans is increased so as to cause the then applicable All-In Yield under this Agreement on the Initial First Out Term Loans to equal the All-In Yield then applicable to the Incremental First Out Term Loans *minus* 50 basis points, and (y) Incremental Second Out Term Loans, the All-In Yield applicable to such Incremental Second Out Term Loans shall not be greater than the applicable All-In Yield payable pursuant to the terms of this Agreement as amended through the date of such calculation with respect to Initial Second Out Term Loans *plus* 50 basis points per annum unless the interest rate (together with, as and to the extent provided in the final proviso to this clause (vi) below, the Adjusted Term SOFR or Base Rate floor) with respect to the Initial Second Out Term Loans is increased so as to cause the then applicable All-In Yield under this Agreement on the Initial Second Out Term Loans to equal the All-In Yield then applicable to the Incremental Second Out Term Loans *minus* 50 basis points; *provided, further* that any increase in All-In Yield to any existing Initial Term Loan due solely (or partially) to the application of a Adjusted SOFR Rate or Base Rate floor on any Incremental Term Loan shall be effected solely (or to such partial extent) through an increase in (or implementation of, as applicable) any Adjusted SOFR Rate or Base Rate floor applicable to such existing Initial Term Loan; and

(vii)    subject to clause (vi) above, any fees payable in connection with any such Incremental Term Facility shall be determined by the Borrower and the lenders providing such Incremental Term Facility.

(g)    The Term Loans and Term Commitments made or established pursuant to this Section 2.16 shall constitute Term Loans and Term Commitments under, and shall be entitled to all the benefits afforded by, this Agreement and the other Loan Documents, and shall, without limiting the foregoing, benefit equally and ratably from the Guarantees and security interests created by the Collateral Documents.  The Loan Parties shall take any actions reasonably required by the Administrative Agent or the Required Lenders to ensure and/or demonstrate that the Lien granted by the Collateral Documents continue to be perfected under the Uniform Commercial Code or otherwise to the extent required under Section 6.12 and the Collateral Documents after giving effect to the extension or establishment of any such Term Loans or any such Term Commitments.

Section 2.17    [Reserved].

Section 2.18    Extension of Term Loans.

(a)    The Borrower may at any time and from time to time request that all or a portion of the Term Loans of one or more Tranches existing at the time of such request (each, an "Existing Tranche", and the Term Loans of such Tranche, the "Existing Term Loans") be converted to extend the scheduled maturity date(s) of any payment of principal with respect to all or a portion of any principal amount of any Existing Tranche (any such Existing Tranche which has been so extended, an "Extended Tranche", and the Term Loans of such Extended Tranche, the "Extended Term Loans") and to provide for other terms consistent with this Section 2.18; provided that (i) any such request shall be made by the Borrower to all Lenders with Term Loans with a like maturity date (whether under one or more Tranches) on a pro rata basis (based on the aggregate outstanding principal amount of the applicable Term Loans) and on the same terms to each such Lender and (ii) any applicable Minimum Extension Condition shall be satisfied unless waived by the Borrower in its sole discretion.  In order to establish any Extended Tranche, the Borrower shall provide a written notice to the Administrative Agent (who shall provide a copy of such notice to each of the Lenders of the applicable Existing Tranche) (an "Extension Request") setting forth the proposed terms of the Extended Tranche to be established, which terms shall be substantially similar to those applicable to the Existing Tranche from which they are to be extended (the "Specified Existing Tranche"), except with respect to the following as determined by the Borrower and set forth in the Extension Request:  (i) interest margins and fees, (ii) other covenants or other provisions applicable only to periods after the Maturity Date of the applicable Existing Tranche, (iii) amortization and (iv) final maturity date, premium, required prepayment dates and participation in prepayments; provided that, (A) the Weighted Average Life to Maturity of such Extended Term Tranche shall be no shorter than the remaining Weighted Average Life to Maturity of the Specified Existing Tranche, (B) the final maturity date of such Extended Term Tranche shall be no earlier than the Maturity Date of the applicable Existing Tranche, (C) any Extended Term Loans may participate on a pro rata basis or on a less than pro rata basis (but not greater than pro rata basis) with the Specified Existing Tranche in any mandatory prepayments of Term Loans under Section 2.05(b)(i), (ii) or (iii); provided that, notwithstanding anything to the contrary in this Section 2.18 or otherwise, (x) assignments and participations of Extended Tranches shall be

-83-

governed by the same or, at the Borrower's discretion, more restrictive assignment and participation provisions applicable to Initial Term Loans set forth in <u>Section 10.07</u> and (y) (1) until each Super Senior Incremental Term Loan (if any) has been paid in full in cash and all other Obligations in respect of the Super Senior Incremental Term Loans (if any) have been paid in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made), no voluntary or mandatory prepayment of outstanding First Out Term Loans or Second Out Term Loans shall be made (or required to be made) and (2) until each First Out Term Loan has been paid in full in cash and all other Obligations in respect of the First Out Term Loans have been paid in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made), no voluntary or mandatory prepayment of outstanding Second Out Term Loans shall be made (or required to be made).  No Lender shall have any obligation to agree to have any of its Existing Term Loans converted into an Extended Tranche pursuant to any Extension Request.  Any Extended Tranche shall constitute a separate Tranche of Term Loans from the Specified Existing Tranches and from any other Existing Tranches (together with any other Extended Tranches so established on such date).

(b)     The Borrower shall provide the applicable Extension Request at least ten (10) Business Days (or such shorter period as the Required Lenders may agree in their reasonable discretion) prior to the date on which Lenders under the applicable Existing Tranche or Existing Tranches are requested to respond.  Any Lender (an "<u>Extending Lender</u>") wishing to have all or a portion of its Specified Existing Tranche converted into an Extended Tranche shall notify the Administrative Agent (each, an "<u>Extension Election</u>") on or prior to the date specified in such Extension Request of the amount of its Specified Existing Tranche that it has elected to convert into an Extended Tranche.  In the event that the aggregate amount of the Specified Existing Tranche subject to Extension Elections exceeds the amount of Extended Tranches requested pursuant to the Extension Request, the Specified Existing Tranches subject to Extension Elections shall be converted to Extended Tranches on a pro rata basis based on the amount of Specified Existing Tranches included in each such Extension Election.  In connection with any extension of Term Loans pursuant to this <u>Section 2.18</u> (each, an "<u>Extension</u>"), the Borrower shall agree to such procedures regarding timing, rounding and other administrative adjustments to ensure reasonable administrative management of the credit facilities hereunder after such Extension, as may be established by, or acceptable to, the Administrative Agent, in each case acting reasonably to accomplish the purposes of this <u>Section 2.18</u>.  The Borrower may amend, revoke or replace an Extension Request pursuant to procedures reasonably acceptable to the Administrative Agent at any time prior to the date (the "<u>Extension Request Deadline</u>") on which Lenders under the applicable Existing Tranche or Existing Tranches are requested to respond to the Extension Request.  Any Lender may revoke an Extension Election at any time prior to 5:00 p.m.  on the date that is two (2) Business Days prior to the Extension Request Deadline, at which point the Extension Request becomes irrevocable (unless otherwise agreed by the Borrower).  The revocation of an Extension Election prior to the Extension Request Deadline shall not prejudice any Lender's right to submit a new Extension Election prior to the Extension Request Deadline.

(c)     Extended Tranches shall be established pursuant to an amendment (an "<u>Extension Amendment</u>") to this Agreement (which may include amendments to provisions as set forth in <u>Section 2.18(a)</u>, and which, in each case, except to the extent expressly contemplated by the last sentence of this <u>Section 2.18(c)</u> and notwithstanding anything to the contrary set forth in <u>Section 10.01</u>, shall not require the consent of any Lender other than the Extending Lenders with

-84-

respect to the Extended Tranches established thereby) executed by the Loan Parties, the Administrative Agent, and the Extending Lenders.  For the avoidance of doubt, the failure of a Lender to respond to a request for an Extension shall be treated as if such non-responding Lender had affirmatively declined to participate in such Extension.  Subject to the requirements of this Section 2.18 and without limiting the generality or applicability of Section 10.01 to any Section 2.18 Additional Amendments, any Extension Amendment may provide for additional terms and/or additional amendments other than those referred to or contemplated above (any such additional amendment, a "Section 2.18 Additional Amendment") to this Agreement and the other Loan Documents; *provided* that such Section 2.18 Additional Amendments do not become effective prior to the time that such Section 2.18 Additional Amendments have been consented to (including, without limitation, pursuant to consents applicable to holders of any Extended Tranches provided for in any Extension Amendment) by such of the Lenders, Loan Parties and other parties (if any) as may be required in order for such Section 2.18 Additional Amendments to become effective in accordance with Section 10.01; *provided*, *further*, that no Extension Amendment may provide for any Extended Tranche to be secured by any Collateral or other assets of any Loan Party that does not also secure the Existing Tranches or be guaranteed by any Person other than the Guarantors. Notwithstanding anything to the contrary in Section 10.01, any such Extension Amendment may, without the consent of any other Lenders, effect such amendments to any Loan Documents as may be necessary, in the reasonable judgment of the Borrower and the Extending Lenders, to effect the provisions of this Section 2.18; *provided* that the foregoing shall not constitute a consent on behalf of any Lender to the terms of any Section 2.18 Additional Amendment.

(d)     Notwithstanding anything to the contrary contained in this Agreement, on any date on which any Existing Tranche is converted to extend the related scheduled maturity date(s) in accordance with clause (a) above (an "Extension Date"), in the case of the Specified Existing Tranche of each Extending Lender, the aggregate principal amount of such Specified Existing Tranche shall be deemed reduced by an amount equal to the aggregate principal amount of Extended Tranche so converted by such Lender on such date, and such Extended Tranches shall be established as a separate Tranche from the Specified Existing Tranche and from any other Existing Tranches (together with any other Extended Tranches so established on such date).

(e)     If, in connection with any proposed Extension Amendment, any Lender declines to consent to the applicable extension on the terms and by the deadline set forth in the applicable Extension Request (each such other Lender, a "Non-Extending Lender") then the Borrower may, on notice to the Administrative Agent and the Non-Extending Lender, replace such Non-Extending Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07 (with the assignment fee and any other costs and expenses to be paid by the Borrower in such instance) all of its rights and obligations under this Agreement to one or more assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender; *provided*, *further*, that the applicable assignee shall have agreed to provide Extended Term Loans on the terms set forth in such Extension Amendment; *provided*, *further*, that all obligations of the Borrower owing to the Non-Extending Lender relating to the Existing Term Loans so assigned shall be paid in full by the assignee Lender to such Non-Extending Lender concurrently with such Assignment and Assumption.  In connection with any such replacement under this Section 2.18, if the Non-Extending Lender does not execute and deliver to the Administrative Agent a duly completed Assignment and Assumption by the later of (A) the date on which the replacement Lender executes and delivers such Assignment and

-85-

Assumption and (B) the date as of which all obligations of the Borrower owing to the Non-Extending Lender relating to the Existing Term Loans so assigned shall be paid in full by the assignee Lender to such Non-Extending Lender, then such Non-Extending Lender shall be deemed to have executed and delivered such Assignment and Assumption as of such date and the Borrower shall be entitled (but not obligated) to execute and deliver such Assignment and Assumption on behalf of such Non-Extending Lender.

(f)        Following any Extension Date, with the written consent of the Borrower, any Non-Extending Lender may elect to have all or a portion of its Existing Term Loans deemed to be an Extended Term Loan under the applicable Extended Tranche on any date (each date a "Designation Date") prior to the maturity date of such Extended Tranche; *provided* that such Lender shall have provided written notice to the Borrower and the Administrative Agent at least ten (10) Business Days prior to such Designation Date (or such shorter period as the Administrative Agent may agree in its reasonable discretion); *provided*, *further*, that no greater amount shall be paid by or on behalf of the Borrower or any of its Affiliates to any such Non-Extending Lender as consideration for its extension into such Extended Tranche than was paid to any Extending Lender as consideration for its Extension into such Extended Tranche and provided further that such Designation Date and the terms of such conversion of the Term Loans of such Non-Extending Lender are agreed to in writing between such Non-Extending Lender and the Borrower and are administratively feasible for the Administrative Agent.  Following a Designation Date, the Existing Term Loans held by such Lender so elected to be extended will be deemed to be Extended Term Loans of the applicable Extended Tranche, and any Existing Term Loans held by such Lender not elected to be extended, if any, shall continue to be "Existing Loans" of the applicable Tranche.

(g)        With respect to all Extensions consummated by the Borrower pursuant to this Section 2.18, (i) such Extensions shall not constitute optional payments or prepayments for purposes of Sections 2.05(a) and (ii) no Extension Request is required to be in any minimum amount or any minimum increment; *provided* that the Borrower may at its election specify as a condition (a "Minimum Extension Condition") to consummating any such Extension that a minimum amount (to be determined and specified in the relevant Extension Request in the Borrower's sole discretion and may be waived by the Borrower) of Existing Term Loans of any or all applicable Tranches be extended.  The Administrative Agent and the Lenders hereby consent to the transactions contemplated by this Section 2.18 (including, for the avoidance of doubt, payment of any interest, fees or premium in respect of any Extended Term Loans on such terms as may be set forth in the relevant Extension Request) and hereby waive the requirements of any provision of this Agreement (including, without limitation, Sections 2.05(a) and 2.07) or any other Loan Document that may otherwise prohibit any such Extension or any other transaction contemplated by this Section 2.18.

Section 2.19        [Reserved.]

Section 2.20        Defaulting Lenders.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(a)        That Defaulting Lender's right to approve or disapprove any amendment,

waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.01.

(b)    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 10.09), shall be applied at such time or times as may be determined by the Administrative Agent as follows:  first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default shall have occurred and be continuing or would result therefrom), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a noninterest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; fourth, to the payment of any amounts then due and owing to the Lenders (to the extent applicable) as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default shall have occurred and be continuing or would result therefrom, to the payment of any amounts then due and owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and sixth, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans in respect of which that Defaulting Lender has not fully funded its appropriate share and (y) such Loans were made at a time when the conditions set forth in Section 4.01 were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Commitments hereunder without giving effect to Section 2.20(a)(iv).  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

## ARTICLE III
### Taxes, Increased Costs Protection and Illegality

Section 3.01    Taxes.  (a) Any and all payments by the Borrower and any other Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, unless otherwise required by applicable Laws.  If any Loan Party shall be required by any Laws (as determined in the good faith discretion of the applicable Loan Party or Administrative Agent, as applicable) to deduct or withhold any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) if such Tax is an Indemnified Tax or Other Tax, the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions and withholdings applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Loan Party shall make such deductions or withholdings, (iii) the Loan Party shall pay the full amount deducted or withheld to the relevant

-87-

Governmental Authority in accordance with applicable Laws and (iv) as soon as practicable after such payment, the Loan Party shall furnish to such Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, a copy of the return reporting such payment or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.

(b)     In addition but without duplication, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any and all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under or otherwise with respect to, any Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.07) (hereinafter referred to as "Other Taxes").

(c)     The Borrower agrees to indemnify each Agent and any Lender, as applicable, for (i) the full amount of any Indemnified Taxes and Other Taxes (including any Indemnified Taxes or Other Taxes imposed or asserted by any Governmental Authority on amounts payable under this Section 3.01) paid by such Agent and such Lender and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; *provided* that such Agent or Lender, as the case may be, provides the Borrower (with a copy to the Administrative Agent) with a certificate or other evidence reasonably acceptable to the Borrower setting forth in reasonable detail the basis and calculation of such amounts.  A certificate as to such amounts prepared in good faith by such Agent or Lender (or by an Agent on behalf of such Lender) shall be conclusive absent manifest error.  Payment under this Section 3.01(c) shall be made within ten (10) days after the date such Lender or such Agent makes a written demand therefor.

(d)     If any Lender or Agent determines in its sole discretion exercised in good faith that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrower pursuant to this Section 3.01, it shall promptly remit such refund (but only to the extent of indemnity payments made under this Section 3.01) to the Borrower, net of all reasonable out-of-pocket expenses (including Taxes) of the Lender or Agent, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided*, *however*, that the Borrower, upon the request of the Lender or Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant Governmental Authority.  Nothing contained in this Section 3.01(d) shall interfere with the right of a Lender or Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or Agent to claim any Tax refund or to disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled.  Notwithstanding anything to the contrary in this clause (d), in no event will the Agent or any Lender be required to pay any amount to the Borrower pursuant to this clause

-88-

(d) the payment of which would place the Agent or any Lender in a less favorable net after-Tax position than the Agent or any Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require the Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(e)     Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a), (b) or (c) with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to avoid or reduce to the greatest extent possible any indemnification or additional amounts being due under this Section 3.01, including to designate another Lending Office for any Term Loan affected by such event; *provided* that such efforts are made on terms that, in the reasonable and good faith judgment of such Lender, (i) would eliminate or reduce amounts payable pursuant to Section 3.01, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender; *provided*, *further*, that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Sections 3.01(a) and (c). The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender as a result of a request by the Borrower under this Section 3.01(e).

(f)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation and information prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation and information reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this Section 3.01(f), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Section 3.02     Illegality. If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Term Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue SOFR Loans or to convert Base Rate Loans to SOFR Loans shall be suspended and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Base Rate, the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate, in each case until such

-89-

Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans of such Lender to Base Rate Loans (the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.  Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 3.03    Inability to Determine Rates; Benchmark Replacement Setting.

(a)    If in connection with any request for a SOFR Loan or a conversion to or continuation thereof, except in the case where the circumstances described in Section 3.03(b) apply, (a) the Administrative Agent reasonably determines that, pursuant to the definition thereof, adequate and reasonable means do not exist for determining Adjusted Term SOFR for any Interest Period with respect to a proposed SOFR Loan or in connection with an existing or proposed Base Rate Loan, or (b) the Required Lenders reasonably determine (provided the Required Lenders shall notify the Administrative Agent following such determination) that for any reason Adjusted Term SOFR for any Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding (or being deemed to fund) such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain SOFR Loans shall be suspended, and (y) the utilization of the Adjusted Term SOFR component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (in the case of a determination pursuant to clause (b) above, upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans or, failing that, will be deemed to have converted such request into a request for a borrowing of Base Rate Loans (determined without reference to the Adjusted Term SOFR component thereof) in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the Interest Period.

(b)    *Benchmark Replacement Setting*

(i)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent (acting at the direction of the Required Lenders) may, without further action or consent of any other party to this Agreement or any other Loan Document, amend this

Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted notice of such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders stating that such Benchmark Replacement does not constitute a replacement index rate that is widely adopted in the leveraged syndicated loan market. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 3.03(b)(i) will occur prior to the applicable Benchmark Transition Start Date.

(ii)     Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent (acting at the direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document (and the Lenders hereby (i) authorize and direct each of the Administrative Agent to make any Benchmark Replacement Conforming Changes (and to enter into any modifications to this Agreement or other Loan Documents implementing such Benchmark Replacement Conforming Changes) in respect of which the Administrative Agent has received a direction from the Required Lenders to implement and (ii) acknowledge and agree that the Administrative Agent shall be entitled to all of the exculpations, protections and indemnifications provided for in this Agreement in favor of the Administrative Agent in implementing any Benchmark Replacement Conforming Changes (or in entering into any modifications to this Agreement or the other Loan Documents implementing the same) in respect of which the Administrative Agent has received a direction from the Required Lenders to implement).

(iii)     Notices; Standards for Decisions and Determinations. The Administrative Agent (acting at the direction of the Required Lenders) will promptly notify the Borrower and the applicable Lenders of (i) the implementation of any Benchmark Replacement, (ii) the effectiveness of any Benchmark Replacement Conforming Changes, (iii) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 3.03(b)(iv) and (iv) the commencement or conclusion of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent (acting at the direction of the Required Lenders) as expressly set forth in this Section 3.03(b) and the defined terms used herein, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.03(b).

(iv)     Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as

selected by the Administrative Agent in its reasonable discretion and in consultation with the Borrower or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may (by providing notice thereof (which may be via email) to the Borrower and the Lenders), modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time (by providing notice thereof (which may be via email) to the Borrower and the Lenders) to reinstate such previously removed tenor.

(v)     Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any request for a borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to Base Rate Loans and (ii) during the continuance of any Benchmark Unavailability Period, any outstanding affected SOFR Loans will be deemed to have been converted to Base Rate Loans at the end of the applicable Interest Period. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

Section 3.04     Increased Cost and Reduced Return; Capital Adequacy. (a) If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the date hereof, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Term Loan, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (including Taxes on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, but excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from Indemnified Taxes and other Taxes indemnified under Section 3.01, Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and Connection Income Taxes), then within 15 days after demand of such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)     If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the date hereof, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration

its policies with respect to capital adequacy or liquidity and such Lender's desired return on capital), then within 15 days after demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within 15 days after receipt of demand therefor.

(c)     The Borrower shall not be required to compensate a Lender pursuant to Section 3.04(a) or (b) for any such increased cost or reduction incurred more than one hundred eighty (180) days prior to the date that such Lender demands, or notifies the Borrower of its intention to demand, compensation therefor; provided that if the circumstance giving rise to such increased cost or reduction is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(d)     If any Lender requests compensation under this Section 3.04, then such Lender will, if requested by the Borrower and at the Borrower's expense, use commercially reasonable efforts to designate another Lending Office for any Term Loan affected by such event; *provided* that such efforts would not, in the good faith judgment of such Lender, be inconsistent with the internal policies of, or otherwise be materially disadvantageous in any legal, economic or regulatory respect to such Lender or its Lending Office.  The provisions of this clause (d) shall not affect or postpone any Obligations of the Borrower or rights of such Lender pursuant to Sections 3.04(a) or (b).

For purposes of this Section 3.04, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have gone into effect after the date hereof, regardless of the date enacted, adopted or issued.

Section 3.05     Funding Losses.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, setting forth in reasonable detail the basis for calculating such compensation, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(a)     any continuation, conversion, payment or prepayment of any Term Loan (other than a Base Rate Loan) on a day other than the last day of the Interest Period for such Term Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)     any failure by the Borrower (for a reason other than the failure of such Lender to make a Term Loan) to prepay, borrow, continue or convert any Term Loan (other than a Base Rate Loan) on the date or in the amount notified by the Borrower; or

(c)     any mandatory assignment of such Lender's Term Loans (other than Base Rate Loans) pursuant to Section 3.07 on a day other than the last day of the Interest Period for such Term Loans; including any loss or expense (excluding loss of anticipated profits and all

administrative processing or similar fees) arising from the liquidation or reemployment of funds obtained by it to maintain such Term Loan or from fees payable to terminate the deposits from which such funds were obtained, but excluding any such loss for which no reasonable means of calculation exist, as set forth in Section 3.03.

Section 3.06    Matters Applicable to All Requests for Compensation.  (a) Any Agent or any Lender claiming compensation under this Article III shall deliver a certificate to the Borrower contemporaneously with the demand for payment, setting forth in reasonable detail a calculation of the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)    With respect to any Lender's claim for compensation under Section 3.02, 3.03 or 3.04, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under Section 3.04, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another SOFR Loans, or to convert Base Rate Loans into SOFR Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of Section 3.06(c) shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

If the obligation of any Lender to make or continue from one Interest Period to another any SOFR Loan, or to convert Base Rate Loans into SOFR Loans shall be suspended pursuant to Section 3.06(b) hereof, such Lender's SOFR Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such SOFR Loans (or, in the case of an immediate conversion required by Section 3.02, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to such conversion no longer exist:

to the extent that such Lender's SOFR Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's SOFR Loans shall be applied instead to its Base Rate Loans; and

all Term Loans that would otherwise be made or continued from one Interest Period to another by such Lender as SOFR Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into SOFR Loans shall remain as Base Rate Loans.

If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in Section 3.02, 3.03 or 3.04 hereof that gave rise to the conversion of such Lender's SOFR Loans pursuant to this Section 3.06 no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when SOFR Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted,

on the first day(s) of the next succeeding Interest Period(s) for such outstanding SOFR Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding SOFR Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods).

Section 3.07    Replacement of Lenders under Certain Circumstances.  (a) If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in Section 3.01 or 3.04 or any Lender ceases to make SOFR Loans as a result of any condition described in Section 3.02 or 3.03, (ii) [reserved] or (iii) any Lender becomes a Non-Consenting Lender (as defined below in this Section 3.07) (collectively, a "Replaceable Lender"), then the Borrower may, on prior written notice to the Administrative Agent and such Lender, either (i) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (with the assignment fee to be paid by the Borrower unless waived by the Administrative Agent in such instance) 100% of its relevant Term Commitments and the principal of its relevant outstanding Term Loans plus any accrued and unpaid interest and any Applicable Premium together with all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person or (ii) terminate the applicable Term Commitment of such Lender and repay all applicable obligations of the Borrower owing to such Lender relating to the Term Loans held by such Lender as of such termination date; *provided* that (A) in the case of any such assignment resulting for a claim for compensation under Section 3.01 or payments to be required under Section 3.04, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such termination of Term Commitments and/or repayment of Term Loans with respect to a Non-Consenting Lender such termination and/or repayment, as applicable, shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents.

(b)    Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's Term Commitment and outstanding Term Loans (*provided* that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register) and (ii) deliver any Term Notes evidencing such Term Loans to the Borrower.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's Term Commitment and outstanding Term Loans, (B) all Obligations relating to the Term Loans so assigned shall be paid in full by the assignee Lender (and, if applicable, the Borrower shall pay the amount payable pursuant to Section 2.05(d)) to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, the assigning Lender shall deliver to the assignee Lender the applicable Term Note or Term Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Term Loans and Term Commitments, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Replaceable Lender (as defined above) does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within one (1) Business Day of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Replaceable Lender, then such Replaceable Lender shall be deemed to have executed and

-95-

delivered such Assignment and Assumption without any action on the part of the Replaceable Lender and the Borrower shall be authorized to execute and deliver such Assignment and Assumption on behalf of such Replaceable Lender.  In connection with the replacement of any Lender pursuant to Section 3.07(a) above, the Borrower shall pay to such Lender such amounts as may be required pursuant to Section 3.05.

(c)     [Reserved.]

(d)     In the event that (i) the Borrower has requested the Lenders to consent to (A) an extension of the Maturity Date as permitted by Section 2.18, (B) a departure or waiver of any provisions of the Loan Documents or (C) any amendment or other modification thereto, (ii) the consent, waiver, amendment or modification in question requires the agreement of all Lenders or all affected Lenders in accordance with the terms of  Section 10.01 or all the Lenders with respect to a certain Tranche of the Term Loans and (iii) solely with respect to clauses (i)(B) and (C) above, the Required Lenders have agreed to such waiver, amendment or modification, then any Lender who does not agree to such extension, waiver, amendment or modification shall be deemed a "Non-Consenting Lender."

Section 3.08     Survival.  All of the Borrower's obligations under this Article III and each Lender's obligations under Section 3.01 shall survive termination of the Aggregate Term Commitments and repayment of all other Obligations hereunder and resignation of the Administrative Agent.

ARTICLE IV
Conditions Precedent to Term Borrowings

Section 4.01     Conditions to Closing Date.  This Agreement shall become effective on the first date on which each of the following conditions precedent is satisfied (or waived by the Required Lenders):

(a)     The Administrative Agent shall have received all of the following, each dated as of the Closing Date (or, in the case of certificates of governmental officials, as of a recent date before the Closing Date), each in form and substance reasonably satisfactory to the Required Lenders, and each accompanied by their respective required schedules and other attachments:

(i)     executed counterparts of (A) this Agreement from the Borrower and Holdings, (B) the U.S. Guaranty from Holdings and each Subsidiary Guarantor (other than the Canadian Loan Parties) and (C) the Canadian Guaranty from the Canadian Loan Parties;

(ii)     the U.S. Security Agreement, duly executed by Holdings, the Borrower, and the Subsidiary Guarantors (other than the Mexican Guarantor and the Canadian Loan Parties), the Canadian Security Agreement, duly executed by the Canadian Loan Parties, and each other Collateral Document (other than Collateral Documents that pursuant to the express terms hereof are not contemplated to be executed and delivered on the Closing Date), together with:

(A)     certificates, if any, representing the Equity Interests in the Borrower and all other Designated Pledged Interests referenced in the U.S. Security Agreement or

the Canadian Security Agreement accompanied by undated stock powers executed in blank,

           (B)    copies of proper financing statements, filed or duly prepared for filing under the Uniform Commercial Code or the Canadian PPSA in all jurisdictions that the Required Lenders may deem reasonably necessary in order to perfect the Liens on assets of each of the Loan Parties created under the Collateral Documents covering the Collateral described in the Collateral Document, and

           (C)    evidence that all other actions, recordings and filings of or with respect to the U.S. Security Agreement or the Canadian Security Agreement that the Required Lenders may deem reasonably necessary in order to perfect the Liens created thereby shall have been taken, completed or otherwise provided for in a manner reasonably satisfactory to the Required Lenders;

           (iii)    an Intellectual Property Security Agreement (in the form of Exhibit B to the U.S. Security Agreement or Exhibit B to the Canadian Security Agreement, as applicable), duly executed by each Loan Party that owns Registered Intellectual Property Collateral (as defined in the U.S. Security Agreement [or the Canadian Security Agreement, as applicable]) that is required to be pledged in accordance with the U.S. Security Agreement or the Canadian Security Agreement;

           (iv)    such customary certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Required Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

           (v)    such documents and certifications (including Organization Documents and, if applicable, good standing certificates in the jurisdiction of organization of the applicable Loan Party) as the Required Lenders may reasonably require to evidence that each Loan Party is duly organized or formed, and that each of them is validly existing and in good standing; and

           (vi)    an opinion of Wachtell, Lipton, Rosen & Katz, counsel to the Loan Parties, addressed to the Administrative Agent and the Lenders on the Closing Date, in form reasonably satisfactory to the Required Lenders.

        (b)    [Reserved].

        (c)    The Administrative Agent shall have received a duly executed payoff letter with respect to the Canadian Credit Facility, together with appropriate termination statements, mortgage releases and such other documentation as shall be necessary to terminate and release all Liens thereunder, in each case, in form reasonably satisfactory to the Required Lenders.

        (d)    Each Loan Party shall have provided the documentation and other information reasonably requested in writing at least ten (10) Business Days prior to the Closing Date by the Lenders in connection with satisfactory compliance clearing, including, without limitation, in respect of applicable "know your customer" and anti-money-laundering rules and

-97-

regulations and the PATRIOT Act, in each case at least three (3) Business Days prior to the Closing Date.

(e)       Except as provided in Section 6.17, all actions necessary to establish that the Administrative Agent will have a perfected -priority security interest (subject to no Liens other than the Liens permitted under Section 7.01) in the Collateral shall have been taken.

(f)       The applicable Lender shall have received a Term Note executed by the Borrower in favor of each Lender requesting a Term Note reasonably in advance of the Closing Date.

(g)       The Administrative Agent shall have received a Committed Loan Notice relating to the initial Term Borrowing (other than pursuant to Section 2.01(b) and (c)).

(h)       The Administrative Agent shall have received a solvency certificate from the chief financial officer or other officer with equivalent duties of the Borrower (after giving effect to the consummation of the Transactions) in a form reasonably satisfactory to the Required Lenders.

(i)       The Bankruptcy Court shall have entered the Confirmation Order, in form and substance consistent with the Restructuring Support Agreement and the Plan; such Confirmation Order and the Chapter 11 Plan shall be in full force and effect, and shall not (in whole or in part) have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal (other than, in the case of an amendment or modification, in a manner consistent with the Restructuring Support Agreement and the Plan); and the "Effective Date" as set forth in the Chapter 11 Plan shall have occurred prior to or simultaneously with the Closing Date.

(j)       The Administrative Agent shall have received evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with the certificates of insurance, naming the Administrative Agent, on behalf of the Lenders, as an additional insured or lender's loss payee, as the case may be, under all insurance policies maintained with respect to the assets and properties of the Loan Parties that constitute Collateral.

(k)       The transactions contemplated to occur on the Effective Date under the Chapter 11 Plan shall have been, or substantially contemporaneously with the effectiveness of this Agreement shall be, consummated.

(l)       All necessary governmental and third-party approvals, consents, licenses, and permits in connection with the Initial Term Facility shall have been obtained and remain in full force and effect.

(m)       As of the Closing Date, there shall not be any litigation pending or known by Loan Parties to be threatened against any Loan Party drawing into question any credit transaction contemplated by Initial Term Loan Facility, or that could reasonably be expected to have a Material Adverse Effect.

(n)       All costs, fees, expenses (including legal fees and expenses) and other

compensation required to be paid hereunder to the Administrative Agent, the Lenders and third party service providers shall have been paid to the extent due (and, in the case of expenses, to the extent invoiced in reasonable detail at least one (1) Business Days prior to the Closing Date (or such later date as the Borrower may reasonably agree)).  The Administrative Agent shall have received a fully executed copy of the Fee Letter.

(o)     The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality) on and as of the Closing Dae, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality) as of such earlier date.

(p)     No Default or Event of Default shall exist, or would result from such proposed Term Borrowing or from the application of the proceeds therefrom.

Without limiting the generality of the provisions of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.01, the Administrative Agent and each Lender as of the Closing Date shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the Closing Date specifying its objection thereto.

ARTICLE V
Representations and Warranties

Each of Holdings and the Borrower represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01     Existence, Qualification and Power; Compliance with Laws.  Each of Holdings, the Borrower and each Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing (to the extent such concept is applicable in the relevant jurisdiction) under the Laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept is applicable in the relevant jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (b) (other than in the case of (b)(ii)), (c), (d) and (e), to the extent that any failure to be so or to have such could not reasonably be expected to have a Material Adverse Effect.

Section 5.02     Authorization; No Contravention.     The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, are within such Loan Party's corporate or other organizational

powers, have been duly authorized by all necessary corporate or other organizational action and do not (a) contravene the terms of any of such Person's Organization Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by Section 7.01), or require any payment (other than for Indebtedness to be repaid on the Closing Date in connection with the Transactions) to be made under (i) any Contractual Obligation to which such Person is a party or the properties of such Person or any of its Subsidiaries or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject or (c) violate any Law; in the case of the foregoing clauses (b) and (c), except to the extent such conflict, breach, violation, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

Section 5.03    Governmental Authorization.    No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) filings and registrations necessary to perfect the Liens on the Collateral granted by the Loan Parties, filings in the United States Patent and Trademark Office and the United States Copyright Office, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings, the failure of which to obtain or make could not reasonably be expected to have a Material Adverse Effect.

Section 5.04    Binding Effect.  This Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  This Agreement and each other Loan Document constitutes, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally of the United States or other applicable jurisdictions from time to time in effect and by general principles of equity.

Section 5.05    Financial Statements; No Material Adverse Effect.  (a) All financial statements relating to any Loan Party which may hereafter be delivered by any Loan Party to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) have been prepared in accordance with GAAP and present fairly, in all material respects, the financial position and results of operations and cash flows of Holdings and its consolidated Subsidiaries as of such dates and for such periods.  The representations in this Section 5.05(a), as applicable, are subject, in the case of unaudited financial statements, to normal year-end audit adjustments and accruals and the absence of notes.

(b)    The consolidated forecasted balance sheets, statements of income and statements of cash flows of Holdings and its Subsidiaries hereafter delivered pursuant to Section 6.01 will be prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed by the management of Holdings to be reasonable as of the date of delivery thereof; it being recognized by the Agents and the Lenders that such projections are as to future events and are not to be viewed as facts, the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of Holdings, the Borrower and the Subsidiaries, that no assurance can be given that any particular projections will be realized

-100-

and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

(c)     After the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.06     Litigation.  Except as specified in Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Subsidiary, that either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

Section 5.07     Ownership of Property; Intellectual Property; Insurance.

(a)     Each of the Borrower and each of the Subsidiaries has good and valid title to, or valid leasehold interests in, all real property necessary in the ordinary conduct of its business. Each parcel of real property owned in fee by a Loan Party is owned free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or utilize such assets for their intended purposes and Liens permitted by Section 7.01, except where the failure to have such title or interests could not reasonably be expected to have a Material Adverse Effect.

(b)     The Borrower and each Subsidiary owns, licenses or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of its respective business, as currently conducted, and to the knowledge of the Borrower the use of such IP Rights in the conduct of its respective business as currently conducted does not infringe upon any IP Rights of any other Person, except to the extent such failure to own, license or possess or such conflicts could not reasonably be expected to have a Material Adverse Effect. The conduct of the business of the Borrower or any Subsidiary as currently conducted or as contemplated to be conducted to the knowledge of the Borrower, does not infringe upon or violate any rights held by any other Person, except for such infringements and violations which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened in writing, which could reasonably be expected to have a Material Adverse Effect.

(c)     The properties of the Borrower and each of the other Subsidiaries are, in the reasonable judgment of the Borrower, insured with financially sound and reputable insurance companies, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning or leasing similar properties in localities where the applicable Person operates.

Section 5.08     Environmental Compliance.  Except as disclosed in Schedule 5.08 hereto:

(a)     None of the Borrower or any of its Subsidiaries are subject to any Environmental Liability that could reasonably be expected to have a Material Adverse Effect.

4885-4953-0770v.1

(b)      Except as could not reasonably be expected to have a Material Adverse Effect, (i) none of the properties currently, or to the knowledge of the Borrower, formerly owned or operated by Holdings, the Borrower or any of its Subsidiaries is listed on the NPL, CERCLIS or any analogous foreign, state or local list or, to the knowledge of the Borrower, is proposed for listing on the NPL or any analogous foreign, state or local list, (ii) there are no underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by the Borrower or, to the knowledge of the Borrower, on any property formerly owned or operated by Holdings, the Borrower or any of its Subsidiaries, in each case for which Holdings, the Borrower or any of its Subsidiaries would be responsible for any associated costs of investigation, abatement, or remediation, (iii) there is no asbestos or asbestos-containing material on any property currently owned or operated by the Borrower requiring investigation, remediation, mitigation, removal, assessment, remedial or corrective action, or other response by the Borrower, pursuant to any Environmental Law and (iv) to the knowledge of the Borrower, Hazardous Materials have not been released, discharged or disposed of by the Borrower on any property currently or, to the knowledge of the Borrower, formerly owned or operated by Holdings, the Borrower or any of its Subsidiaries, except for such releases, discharges and disposals that were in compliance with Environmental Laws.

(c)      None of the Material Real Properties contain any Hazardous Materials in amounts or in concentrations which constitute a violation of, or require remedial action under, any Environmental Law or could otherwise reasonably be expected to give rise to an Environmental Liability, except for any such violations, remedial actions and Environmental Liabilities that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)      None of the Borrower or any of its Subsidiaries is undertaking, and none has completed, either individually or together with other potentially responsible parties, any investigation, assessment, remediation, mitigation, removal, remedial response or corrective action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except for any such investigation, assessment, remediation, mitigation, removal, remedial response or corrective action that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.09      Taxes.  Each of the Borrower and its Subsidiaries have filed all U.S. federal, state, local, non-U.S. and other Tax returns and reports required to be filed, and have paid all U.S. federal, state, local, non-U.S. and other Taxes, levied or imposed upon them or their properties, income or assets that have become due and payable, except those (a) which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. (b) that need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, or (c) with respect to which the failure to make such filing or payment could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.10      Employee Benefits Plans; Labor Matters.  (a) Except as could not reasonably be expected to result in a Material Adverse Effect, (i) each Plan is in compliance with

the applicable provisions of ERISA, the Code and other applicable federal and state laws and (ii) each Plan that is intended to be a qualified plan under Section 401(a) of the Code may rely upon an opinion letter for a prototype plan or has received a favorable determination letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the IRS, and to the knowledge of any Loan Party, nothing has occurred that would prevent, or cause the loss of, such tax-qualified status.

(b)      There are no pending or, to the knowledge of any Loan Party, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect.  There has been no "prohibited transaction" within the meaning of Section 4975 of the Code or Section 406 or 407 of ERISA (and not otherwise exempt under Section 408 of ERISA) with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)      (i) No ERISA Event has occurred and neither any Loan Party nor, to the knowledge of any Loan Party, any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Plan or Multiemployer Plan, (ii) each Loan Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Plan, and no waiver of the minimum funding standards under such Pension Funding Rules has been applied for or obtained, (iii) neither any Loan Party nor, to the knowledge of any Loan Party, any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) for any Plan, if applicable, to drop below 80% as of the most recent valuation date, (iv) neither any Loan Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid, (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA and (vi) no Plan has been terminated by the plan administrator thereof or by the PBGC and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan or Multiemployer Plan, except with respect to each of the foregoing clauses (i) through (vi) of this Section 5.10(c), as could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

(d)      With respect to each Foreign Plan, none of the following events or conditions exists and is continuing that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect:  (i) substantial non-compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders; (ii) failure to be maintained, where required, in good standing with applicable regulatory authorities; (iii) any obligation of a Loan Party or its Subsidiaries in connection with the termination or partial termination of, or withdrawal from, any Foreign Plan; (iv) any Lien on the property of a Loan Party or its Subsidiaries in favor of a Governmental Authority as a result of any action or inaction regarding a Foreign Plan; (v) for each Foreign Plan that is a funded or insured plan, failure to be funded or insured on an ongoing basis to the extent required by applicable non-U.S. law (using actuarial methods and assumptions which are consistent with the valuations last filed with the

-103-

applicable Governmental Authorities); (vi) any facts that, to the best knowledge of the Loan Party or any of its Subsidiaries, exist that would reasonably be expected to give rise to a dispute and any pending or threatened disputes that, to the best knowledge of the Loan Party or any of its Subsidiaries, would reasonably be expected to result in a material liability to the Loan Party or any of its Subsidiaries concerning the assets of any Foreign Plan (other than individual claims for the payment of benefits); and (vii) failure to make all contributions in a timely manner to the extent required by applicable non-U.S. law (each of the events described in clauses (i) through (vii) hereof are hereinafter referred to as a "Foreign Plan Event").

(e)     Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against the Borrower or any of its Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by, and payments made based on hours worked by, employees of the Borrower and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters; and (c) all payments due from Borrower or any of its Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

Section 5.11    Subsidiaries; Equity Interests.  As of the Closing Date, after giving effect to the Transactions, the Borrower has no Subsidiaries other than those specifically disclosed in Schedule 5.11, and all of the outstanding Equity Interests in the Borrower and such Subsidiaries that are owned by a Loan Party are owned free and clear of all Liens except (i) those created under the Collateral Documents and (ii) any non-consensual Lien that is permitted under Section 7.01.

Section 5.12    Margin Regulations; Investment Company Act.  (a) The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock and no proceeds of any Term Borrowings will be used for any purpose that violates Regulation T, Regulation U or Regulation X of the FRB.

(b)     None of the Loan Parties is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.13    Disclosure.  As of the Closing Date, no report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, pro forma financial information and information of a general economic or industry nature) to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished), when taken as a whole, contains, when furnished, any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected and pro forma financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time made; it being understood (A) that such projections and forecasts are as to future events and are not to be viewed as facts, that such projections are subject to significant

-104-

uncertainties and contingencies, many of which are beyond the control of Holdings, the Borrower and its Subsidiaries, that no assurance can be given that any particular projection or forecast will be realized and that actual results during the period or periods covered by any such projections or forecasts may differ significantly from the projected results and such differences may be material and that such projections and forecasts are not a guarantee of future financial performance and (B) that no representation is made with respect to information of a general economic or general industry nature.

Section 5.14    Compliance with Laws.   Each of Holdings, the Borrower and each Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.15    Brokerage Fees.   None of the Borrower or any Subsidiary of the Borrower has utilized the service of any broker or finder in connection with obtaining financing from the Lenders under this Agreement and no brokerage commission or finder's fee is payable by Holdings, the Borrower or its Subsidiaries in connection herewith.

Section 5.16    Solvency.   As of the Closing Date after giving effect to the consummation of the Transactions, including the making of the Term Loans under this Agreement and the incurrence by the Borrower of the other Indebtedness incurred by them on the Closing Date, and after giving effect to the application of the proceeds of such Term Loans and such other Indebtedness, the Borrower and its Subsidiaries, on a consolidated basis, are Solvent.

Section 5.17    Status of the Term Facilities as Senior IndebtednessThe obligations under the Term Facilities constitute "senior debt", "senior indebtedness", "guarantor senior debt", "senior secured financing" and "designated senior indebtedness" (or any comparable term) under the documentation for all Indebtedness that is subordinated in right of payment to the Obligations (if applicable).

Section 5.18    Perfection, Etc.   Each Collateral Document delivered pursuant to this Agreement will, upon execution and delivery thereof, be effective to create (to the extent described therein) in favor of the Administrative Agent for the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, the Collateral described therein to the extent intended to be created thereby and required to be perfected therein (after giving effect to any Perfection Exceptions contained therein), except as to enforcement, as may be limited by applicable domestic or foreign bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar laws relating to or affecting creditors' rights generally, general equitable principles (whether considered in a proceeding in equity or at law) and (a) when financing statements and other filings in appropriate form are filed in the offices of the Secretary of State (or other appropriate filing office) of each Loan Party's jurisdiction of organization or formation and applicable documents are filed and recorded in the United States Copyright Office or the United States Patent and Trademark Office and (b) upon the taking of possession or control by the Administrative Agent of such Collateral with respect to which a security interest may be perfected only by possession or control (which possession or control shall be given to the Administrative Agent to the extent possession or control by the Administrative Agent is required

by the U.S. Security Agreement or the Canadian Security Agreement), the Liens created by the Collateral Documents shall constitute fully perfected Liens so far as possible under relevant Law on, and security interests in (to the extent intended to be created thereby and required to be perfected under the Loan Documents), all right, title and interest of the grantors in such Collateral in each case free and clear of any Liens other than Liens permitted hereunder.

Section 5.19    PATRIOT Act, Etc.

(a)    To the extent applicable, each of Holdings, the Borrower and its Subsidiaries is in compliance, in all material respects, with applicable anti-money laundering or anti-terrorism laws and regulations, including, without limitation, the Bank Secrecy Act, as amended by the PATRIOT Act (collectively, the "Anti-Money Laundering Laws").

(b)    The use of proceeds of the Term Loans will not violate in any material respect the Anti-Money Laundering Laws.

Section 5.20    FCPA; Anti-Corruption.

(a)    None of Holdings, the Borrower or any of its Subsidiaries or any of their respective directors or officers or, to the knowledge of the Borrower, representatives, agents, Affiliates or employees has violated any applicable anti-corruption laws or regulations, including, without limitation, the U.S. Foreign Corrupt Practices Act of 1977, the United Kingdom Bribery Act of 2010, the Corruption of Foreign Public Officials Act of Canada, the Freezing Assets of Corrupt Foreign Public Officials Act (Canada), and laws enacted to implement the OECD Convention on Combating Bribery of Foreign Officials in International Business Transactions (collectively, the "Anti-Corruption Laws").

(b)    The Borrower will not use any part of the proceeds of the Loans directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage in violation of any Anti-Corruption Law.

Section 5.21    Sanctioned Persons.

(a)    None of Holdings, the Borrower or any of its Subsidiaries or any of their respective directors or officers, to the knowledge of the Borrower, representatives, agents, Affiliates or employees is a Person that is, or is owned or controlled by, or acting for or on behalf of, directly or indirectly, Persons that are:  (i) the subject or target of any economic or financial sanctions administered or enforced by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Nations Security Council, the European Union, the United Kingdom (including by His Majesty's Treasury) or any other relevant national or supra-national sanctions authority with jurisdiction over Holdings, the Borrower or the Subsidiaries (collectively, "Sanctions"); or (ii) domiciled, organized or resident in a country or territory that is, or whose government is, the subject of comprehensive Sanctions broadly prohibiting or restricting dealings in, with or involving such country or territory.

(b)    The Borrower will not, directly or indirectly, use any part of the proceeds

of the Term Loans or otherwise make available such proceeds to any Person: (i) to fund or finance any activities or business of, with or involving any Person, that at the time of such funding or financing, is, or whose government is, the subject or target of Sanctions; or (ii) in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

Section 5.22    Use of Proceeds.  The Borrower will use the proceeds of (a) the Initial First Out Term Loans (i) to pay fees, cure costs, and other costs and expenses related to the Transactions, (ii) to repay in full on the Closing Date the Obligations (as defined in the Canadian Credit Facility) and (iii) for working capital and general corporate purposes of Holdings and its Subsidiaries and (b) all other Term Borrowings for working capital and general corporate purposes.

ARTICLE VI
Affirmative Covenants

So long as any Lender shall have any Term Commitment hereunder, any Term Loan or other Obligation (other than contingent indemnification or other contingent obligations as to which no claim has been asserted) hereunder shall remain unpaid or unsatisfied, Holdings and the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02 and 6.03) cause each of the Subsidiaries to:

Section 6.01    Financial Statements.  Deliver to the Administrative Agent for further distribution to each Lender:

(a)    as soon as available, but in any event within one hundred twenty (120) days after the end of each fiscal year of Holdings ending after the date hereof, a consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report and opinion of Grant Thornton LLP or any other independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of such audit (other than any such exception or explanatory paragraph that is expressly solely with respect to, or expressly resulting solely from, an upcoming maturity date under the Term Facilities or a Permitted Revolving Credit Facility that is scheduled to occur within one year from the time such report and opinion are delivered), together with customary "management discussion and analysis" with respect to the financial information delivered pursuant to this Section 6.01(a);

(b)    as soon as available, but in any event within forty-five (45) days after the end of each fiscal quarter of each fiscal year of Holdings (other than the last fiscal quarter of any fiscal year), a consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations and cash flows for such fiscal quarter and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and

-107-

the corresponding portion of the previous fiscal year and the figures for the corresponding fiscal quarter in the budget most recently delivered pursuant to <u>Section 6.01(d)</u>, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of Holdings and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, together with customary "management discussion and analysis" with respect to the financial information delivered pursuant to this <u>Section 6.01(b)</u>;

       (c)     as soon as available but in any event within thirty (30) days after the end of each fiscal month of Holdings, a consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal month, and the related consolidated statements of income or operations and cash flows for such fiscal month and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of Holdings and its Subsidiaries in accordance with GAAP consistently applied, subject only to normal year-end audit adjustments and the absence of footnotes, together with customary "management discussion and analysis" with respect to the financial information delivered pursuant to this Section 6.01(c), all in form and detail substantially consistent with Exhibit K hereto;

       (d)     as soon as available, but within one hundred twenty (120) days after the end of each fiscal year of Holdings, a customary budget, which includes financial information presented on a quarterly basis.

       (e)     quarterly, to the extent requested by the Required Lenders, at a time mutually agreed with the Required Lenders that is promptly after the delivery of the information required pursuant to <u>Section 6.01(a)</u> or <u>(b)</u> above, participate in a conference call for Lenders to discuss the financial condition and results of operations of Holdings, the Borrower and its Subsidiaries for the most recently-ended fiscal quarter or year for which financial statements have been delivered; *provided* that the requirements of this <u>Section 6.01(e)</u> may be satisfied by participation in a quarterly public earnings call.

Notwithstanding the foregoing, (A) in the event that Holdings delivers to the Administrative Agent an Annual Report for the Borrower on Form 10-K for any fiscal year, as filed with the SEC, within one hundred twenty (120) days after the end of such fiscal year, such Form 10-K shall satisfy all requirements of clause (a) of this <u>Section 6.01</u> with respect to such fiscal year to the extent that it contains the information and report and opinion required by such clause (a) and such report and opinion does not contain any "going concern" or like qualification, exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of audit (other than any such exception or explanatory paragraph expressly permitted to be contained therein under clause (a) of this <u>Section 6.01</u>), (B) in the event that the Holdings delivers to the Administrative Agent a Quarterly Report for the Borrower on Form 10-Q for any fiscal quarter, as filed with the SEC, within forty-five (45) days after the end of such fiscal quarter, such Form 10-Q shall satisfy all requirements of clause (b) of this <u>Section 6.01</u> with respect to such fiscal quarter to the extent that it contains the information required by such clause (b); in each case to the extent that information contained in such Form 10-K or Form 10-Q satisfies the requirements of clauses

(a) or (b) of this <u>Section 6.01</u>, as the case may be and (C) the requirements of <u>Section 6.01(e)</u> may be satisfied by participation in a quarterly public earnings call.

Section 6.02    <u>Certificates; Other Information</u>.  Deliver to the Administrative Agent for further distribution to each Lender:

(a)    Concurrently with the delivery of (i) the financial statements referred to in <u>Sections 6.01(a)</u> and <u>(b)</u>, or (ii) an Annual Report on Form 10-K or a Quarterly Report on Form 10-Q (in either case, delivered pursuant to the final paragraph of <u>Section 6.01</u>), beginning with the fiscal period ending [_____], a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower (which delivery may be by electronic communication including fax or email and shall be deemed to be an original authentic counterpart thereof for all purposes);

(b)    promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Holdings or the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act, or with any Governmental Authority that may be substituted therefor, or with any national securities exchange, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)    promptly after the furnishing thereof, copies of any requests or notices received by any Loan Party (other than in the ordinary course of business) and copies of any statement or report furnished to any holder of debt of any Loan Party or of any of its Subsidiaries, in each case pursuant to the terms of any Permitted First Lien Credit Facility or any Junior Financing Documentation in a principal amount greater than the Threshold Amount and not otherwise required to be furnished to the Lenders pursuant to any other clause of this <u>Section 6.02</u>;

(d)    promptly after the assertion or occurrence thereof, notice of any action arising under any Environmental Law against, or of any noncompliance by, any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could reasonably be expected to have a Material Adverse Effect;

(e)    together with the delivery of each Compliance Certificate pursuant to <u>Section 6.02(a)</u>, a report supplementing <u>Schedule 5.11</u> hereto to the extent there are any changes that have occurred with respect to the information contained therein so that the related representation and warranty would be true and correct in all material respects if made as of the date of such Compliance Certificate; and

(f)    promptly, such additional information regarding the business, legal, financial or corporate affairs of the Borrower or any of its Subsidiaries thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to <u>Section 6.01</u> or <u>Section 6.02(b)</u> or <u>(d)</u> (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the

Administrative Agent); *provided* that:  (i) upon written request by a Lender through the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to such Lender until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.

The Administrative Agent shall have no obligation to request the delivery of or to maintain or deliver to Lenders paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive information that is (i) of a type that would be publicly available (or could be derived from publicly available information) if the Borrower were a public reporting company and (ii) material with respect to the Borrower or any of its securities for purposes of United States federal and state securities laws (all such information described in the foregoing, "MNPI").  The Borrower hereby agrees that (w) at the request of any Lender, it will use commercially reasonable efforts to cause all Borrower Materials to be identified as either (A) "PUBLIC" (which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof) or (B) "PRIVATE"; (x) by marking the Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any MNPI (although it may be sensitive and proprietary) (*provided*, *however*, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are marked "PUBLIC" as being suitable for posting on a portion of the Platform designated "Public Side Information" (it being understood that the Borrower and its Subsidiaries shall not otherwise be under any obligation to mark any particular Borrower Materials "PUBLIC"). Notwithstanding anything herein to the contrary, financial statements delivered pursuant to Sections 6.01(a) and (b) and Compliance Certificates delivered pursuant to Section 6.02(a) shall be deemed to be suitable for posting on a portion of the Platform designated for "Public Side Information".  Unless expressly marked "PUBLIC" and subject to the prior sentence, the Administrative Agent agrees not to make any such Borrower Materials available to Public Lenders.

Section 6.03    Notices.  Notify the Administrative Agent:

(a)    promptly, but in any event within five (5) Business Days after a Responsible Officer of the Borrower or any Guarantor has obtained knowledge thereof, of the occurrence of any Default;

(b)        promptly after a Responsible Officer of the Borrower or any Guarantor has obtained knowledge of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)        promptly after a Responsible Officer of the Borrower or any Guarantor has obtained knowledge of the institution of any material, non-frivolous, litigation not previously disclosed by the Borrower to the Administrative Agent, or any material development in any material litigation in each case that is reasonably likely to be adversely determined and could, if adversely determined be reasonably expected to have a Material Adverse Effect, or that seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated herein;

(d)        promptly after a Responsible Officer of the Borrower or any Guarantor has obtained knowledge of the occurrence of any ERISA Event, where there is any potential material liability to any Loan Party as a result thereof; and

(e)        promptly, but in any event within five (5) Business Days after a Responsible Officer of the Borrower or any Guarantor has obtained knowledge thereof, any default or event of default under any Permitted Revolving Credit Facility or any delivery to the Borrower by any agent or lender under any Permitted Revolving Credit Facility, or the receipt by such agent or any such lenders from the Borrower, of any notice of a default or event of default thereunder.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04        Payment of Taxes.  Pay, discharge or otherwise satisfy as the same shall become due and payable, all of its Tax liabilities and assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are being maintained by the Borrower or such Subsidiary; except to the extent the failure to pay, discharge or satisfy the same could not reasonably be expected to have a Material Adverse Effect.

Section 6.05        Preservation of Existence.  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05 and (b) take all reasonable action to maintain all rights, privileges (including its good standing, if such concept is applicable in its jurisdiction of organization), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or as otherwise permitted hereunder.

Section 6.06        Maintenance of Properties.  Except if the failure to do so could not reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in good working order, repair and condition (ordinary wear and tear excepted and casualty or condemnation excepted) and (b) preserve or renew all of its preservable or renewable, as applicable, United States registered patents, trademarks, trade names and service marks to the extent permitted by applicable Laws of

the United States.

Section 6.07    <u>Maintenance of Insurance</u>.  (a) Maintain with financially sound and reputable insurance companies (in the good faith judgment of the management of the Borrower), insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon reasonable written request from the Administrative Agent or Required Lenders, information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance (excluding business interruption insurance) maintained in the United States shall, as appropriate, (i) name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a lender's loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as the loss payee thereunder.

(b)    Notwithstanding anything herein to the contrary, with respect to each Mortgaged Property, if at any time the area in which the buildings and other improvements (as described in the applicable Mortgage) are located is designated a "special flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such reasonable total amount as the Required Lenders may from time to time reasonably require, and otherwise to ensure compliance with the NFIP as set forth in the Flood Laws.  Following the Closing Date, the Borrower shall deliver to the Administrative Agent annual renewals of each flood insurance policy or annual renewals of each force-placed flood insurance policy, as applicable.  In connection with any amendment to this Agreement pursuant to which any increase, extension, or renewal of Term Loans is contemplated, the Borrower shall cause to be delivered to the Administrative Agent for any Mortgaged Property, a Flood Determination Form, Borrower Notice and Evidence of Flood Insurance, as applicable.  If at any time the area in which the premises (as defined in the Mortgages, if any) are located is designated (i) a "flood hazard area" in any Floor Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as the Required Lenders may from time to time reasonably require in respect of compliance with the NFIP as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Subsidiaries.

Section 6.08    <u>Compliance with Law; Anti-Corruption Laws, Anti-Money Laundering and Sanctions</u>.

(a)    Comply in all respects with the requirements of all Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; provided, however, that with respect to Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions, the Borrower shall, and shall cause each of its Subsidiaries to, comply in all material respects.

(b)      Use funds or properties of Holdings, the Borrower or any of its Subsidiaries to repay the Term Loans only to the extent such funds or, to the knowledge of the Borrower, properties do not constitute property of, and are not beneficially owned by, directly or indirectly, any Person that is the subject or target of Sanctions.

Section 6.09      Books and Records.  Maintain proper books of record and account, in a manner to allow financial statements to be prepared in conformity with GAAP consistently applied in respect of all material financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be (it being understood and agreed that Foreign Subsidiaries may maintain individual books and records in a manner to allow financial statements to be prepared in conformity with generally accepted accounting principles that are applicable in their respective jurisdiction of organization).

Section 6.10      Inspection Rights.  Permit representatives of the Administrative Agent and, during the continuance of any Event of Default, of each Lender to visit and inspect any of its properties (to the extent it is within such Person's control to permit such inspection), to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors and officers, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance written notice to the Borrower; *provided* that, in no event shall the Borrower or any of the Subsidiaries be required pursuant to the terms of this Section 6.10 to allow any such Person to inspect or examine, or be required to discuss, any records, documents or other information (x) that constitutes trade secrets or proprietary information, (y) that constitutes attorney work product or (z) to the extent that the provision or discussion thereof would waive or impair attorney-client privilege, or violate any law, rule or regulation, or any obligation of confidentiality binding on the Borrower or any Subsidiary (*provided* that in the event the Borrower or such Subsidiary does not provide information in reliance on the foregoing, such Person shall provide notice to the Administrative Agent that such information is being withheld and shall use commercially reasonable efforts to (a) to the extent such waiver or consent would not result in a loss of privilege, receive a waiver or consent with respect to such restriction and (b) if such waiver or consent cannot be obtained, communicate the applicable information to the Administrative Agent (if reasonably practicable) in a way that would not violate the applicable obligation or risk waiver of such privilege); *provided*, *further*, that excluding any such visits and inspections during the continuation of an Event of Default, (i) only the Administrative Agent on behalf of the Lenders may exercise rights under this Section 6.10, (ii) the Administrative Agent shall not exercise such rights more often than one time during any calendar year and (iii) such exercise shall be at the Borrower's expense; *provided*, *further*, that when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance written notice.  The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's accountants.

Section 6.11      Use of Proceeds.  Use the proceeds of all Term Borrowings in accordance with Section 5.22.

Section 6.12      Covenant to Guarantee Obligations and Give Security.  (a) Upon the

-113-

formation or acquisition of any new wholly owned Subsidiaries by any Loan Party (*provided* that any Excluded Subsidiary ceasing to be an Excluded Subsidiary but remaining a Subsidiary shall be deemed to constitute the acquisition of a Subsidiary for all purposes of this <u>Section 6.12</u>), and upon the acquisition of any property (other than Excluded Assets (as defined in the U.S. Security Agreement [or the Canadian Security Agreement]) and real property that is not Material Real Property) by any Loan Party, which property, in the reasonable judgment of the Required Lenders, is not already subject to a perfected Lien in favor of the Administrative Agent for the benefit of the Secured Parties (and where such a perfected Lien would be required in accordance with the terms of the Collateral Documents), the Borrower shall, in each case at the Borrower's expense:

(i)      in connection with the formation or acquisition of a wholly owned Subsidiary, within sixty (60) days after such formation or acquisition or such longer period as the Required Lenders may agree, (A) cause each such Subsidiary that is not an Excluded Subsidiary to duly execute and deliver to the Administrative Agent a supplement to the U.S. Guaranty or the Canadian Guaranty, as applicable, substantially in the form of Annex B thereto or a guaranty or a guaranty supplement in such other form reasonably satisfactory to the Administrative Agent, guaranteeing the Borrower's obligations under the Loan Documents and (B) (if not already so delivered) deliver certificates representing the Designated Pledged Interests of each such Subsidiary (if any) accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and instruments evidencing the Designated Pledged Debt (if any) of such Subsidiary indorsed in blank to the Administrative Agent, together with, if requested by the Required Lenders, supplements to the U.S. Security Agreement [or the Canadian Security Agreement] substantially in the form of Annex A thereto or a pledge or security agreement in such other form reasonably satisfactory to the Required Lenders,

(ii)      in connection with the formation or acquisition of a Subsidiary, within sixty (60) days after such formation or acquisition (or such longer period, as the Required Lenders may agree), furnish to the Administrative Agent a description of the owned real and personal properties of each such Subsidiary and their respective Subsidiaries (other than Excluded Subsidiaries) in detail reasonably satisfactory to the Required Lenders; *provided* that any such information provided pursuant to this clause (ii) shall consist solely of information of the type that would be set forth on Schedules I-IV of the U.S. Security Agreement [or the Canadian Security Agreement],

(iii)      within sixty (60) (or, in the case of Mortgages and other documentation related thereto, ninety (90) days) after such formation or acquisition of such Subsidiary or acquisition of such Material Real Property or any request therefor by the Required Lenders (or, in each case, such longer period, as the Required Lenders may agree) duly execute and deliver, and cause each such Subsidiary that is not an Excluded Subsidiary to duly execute and deliver, to the Administrative Agent one or more Mortgages (with respect to Material Real Properties only), supplements to the U.S. Security Agreement or Canadian Security Agreement (in the form of Annex A thereto or such other form reasonably satisfactory to the Required Lenders), IP Security Agreement Supplements and other security agreements, as specified by and in form and substance reasonably satisfactory to the Required Lenders (consistent with the U.S. Security Agreement, the Canadian Security Agreement, IP Security Agreement and Mortgages), securing payment of all the Obligations of the applicable Loan Party or such Subsidiary, as the case may be, under the Loan Documents and establishing Liens on all such properties,

(iv)     within sixty (60) (or, in the case of Mortgages and other documentation related thereto, ninety (90) days) after such request, formation or acquisition of such Subsidiary or acquisition of such Material Real Property, or such longer period, as the Required Lenders may agree in its sole discretion, take, and cause such Subsidiary that is not an Excluded Subsidiary to take, whatever action (including the recording of Mortgages (with respect to Material Real Properties only), the filing of Uniform Commercial Code or Canadian PPSA financing statements, the giving of notices and delivery of stock and membership interest certificates) as specified by the Required Lenders as may be necessary or advisable in the reasonable opinion of the Required Lenders to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the Mortgages, supplements to the U.S. Security Agreement and the Canadian Security Agreement, IP Security Agreement Supplements and security agreements delivered pursuant to this Section 6.12, in each case to the extent required under the Loan Documents and subject to the Perfection Exceptions, enforceable against all third parties in accordance with their terms,

(v)     in connection with the formation or acquisition of a Subsidiary which will be a Subsidiary Guarantor, within sixty (60) (or, in the case of any local counsel opinion relating to Mortgages relating to Material Real Property, ninety (90) days) after the formation or acquisition of such Subsidiary or acquisition of such Material Real Property or any request of the Required Lenders, or, in each case, such longer period as the Required Lenders may agree, deliver to the Administrative Agent, a signed copy of one or more opinions, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Required Lenders as to such matters as the Required Lenders may reasonably request,

(vi)     within ninety (90) days after such formation or acquisition of such Subsidiary or acquisition of such Material Real Property or any request therefor by the Required Lenders (or such longer period as the Required Lenders may agree), deliver to the Administrative Agent with respect to each Material Real Property by a Subsidiary that is the subject of such request, title reports, fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in the applicable jurisdiction in form and substance, with endorsements and in an amount reasonably acceptable to the Required Lenders (not to exceed the value of the Material Real Properties covered thereby) and surveys in compliance with the 2016 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys reasonably satisfactory to the Required Lenders and evidence of payment of title insurance premiums and expenses and all recording, mortgage, transfer and stamp taxes and fees payable in connection with recording the Mortgages, any amendments thereto and any fixture filings in appropriate county land office(s),

(vii)     no later than three Business Days prior to the date on which a Mortgage is executed and delivered, in order to comply with the Flood Laws (or such later date as the Required Lenders may agree), the Administrative Agent shall have received the following documents:  (A) a completed standard "life of loan" flood hazard determination form (a "Flood Determination Form"), (B) if the improvement(s) to the applicable improved real property is located in a special flood hazard area, a notification to the Borrower ("Borrower Notice") and (if applicable) notification to the Borrower that flood insurance coverage under the National Flood

-115-

Insurance Program ("NFIP") is not available because the community does not participate in the NFIP, (C) documentation evidencing the Borrower's receipt of the Borrower Notice (e.g., countersigned Borrower Notice, return receipt of certified U.S. Mail, or overnight delivery), and (D) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of one of the following:  the flood insurance policy, the Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance satisfactory to the Required Lenders (any of the foregoing being "Evidence of Flood Insurance"), and

(viii)    at any time and from time to time, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent or the Required Lenders in their reasonable judgment may deem necessary or desirable in obtaining the full benefits of, or in perfecting and preserving the Liens of, such guaranties, Mortgages, supplements to the U.S. Security Agreement and the Canadian Security Agreement, IP Security Agreement Supplements and security agreements.

(b)    The foregoing shall, in each case, be subject to the Perfection Exceptions and in no event shall (A) perfection be required with respect to commercial tort claims with a value of less than $250,000 or promissory notes evidencing indebtedness in a principal amount of less than $250,000 or (B) perfection (except to the extent perfected through the filing of Uniform Commercial Code or Canadian PPSA financing statements) be required with respect to letter of credit rights.

(c)    Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document and without limiting Article VII, no Subsidiary shall be excluded as a "Guarantor" if such Subsidiary enters into, or is required to enter into, a guarantee of (or becomes, or is required to become, a borrower or other obligor under) any obligations of the Borrower or any Subsidiary of the Borrower under any Permitted Revolving Credit Facility.

Section 6.13    Compliance with Environmental Laws.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, (i) comply, and make all reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits and obtain and renew all Environmental Permits necessary for its operations and properties and (ii) to the extent required under Environmental Laws, conduct any investigation, mitigation, study, sampling and testing, and undertake any cleanup or removal, remedial, corrective or other action necessary to respond to and remove all Hazardous Materials from any of its properties, if required by and in accordance with the requirements of applicable Environmental Laws, unless liability for such actions is being contested in good faith.

Section 6.14    Further Assurances.  Promptly upon reasonable request by the Administrative Agent or the Required Lenders, and subject to the limitations described in Section 6.12, (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document or other document or instrument relating to any Collateral and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other

instruments as the Administrative Agent or the Required Lenders may reasonably require from time to time in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Collateral Documents.

Section 6.15    [Reserved].

Section 6.16    [Reserved].

Section 6.17    Post-Closing Matters.  The Borrower will, and will cause each of Loan Parties to, take each of the actions set forth on Schedule 6.17 within the time period prescribed therefor on such schedule (as such time period may be extended by the Administrative Agent (acting at the direction of the Required Lenders)).[2]

ARTICLE VII
Negative Covenants

So long as any Lender shall have any Term Commitment hereunder, any Term Loan or other Obligation (other than contingent indemnification or other contingent obligations), Holdings and the Borrower shall not, nor shall they permit any Subsidiary to, directly or indirectly:

Section 7.01    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens pursuant to any Loan Document;

(b)    Liens existing on the Closing Date which are listed on Schedule 7.01and any modifications, replacements, renewals, refinancings or extensions thereof; *provided* that (i) the Lien does not encumber any property other than (A) property encumbered on such date, (B) after-acquired property that is affixed or incorporated into the property encumbered by such Lien on such date and (C) proceeds and products thereof (it being understood that individual financings otherwise permitted to be secured hereunder provided by one Person may be cross-collateralized to other such financings provided by such Person (or its affiliates)) and (ii) the replacement, renewal, extension or refinancing of the obligations secured or benefited by such Liens, to the extent constituting Indebtedness, is permitted by Section 7.03;

(c)    Liens for Taxes, assessments or governmental charges which are not yet delinquent or are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP (or, for Foreign Subsidiaries, in conformity with generally accepted accounting principles that are applicable in their respective jurisdiction of organization);

(d)    Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other customary Liens (so long as such Liens do not secure Indebtedness) arising in the ordinary course of business, which secure amounts not overdue for a period of more than thirty (30) days or if more than thirty (30) days overdue, are unfiled (or if filed, have been discharged or are stayed) and no other action has been taken to enforce such Lien

---

[2] In any event to include DACAs and Mexican guarantee/collaterals.

or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)     Liens, pledges or deposits in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation, (ii) securing liability for reimbursement or indemnification obligations of (including bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, any Parent Entity (to the extent such insurance is directly attributable to its (direct or indirect) ownership of Holdings), the Borrower or any Subsidiary or (iii) securing obligations in respect of letters of credit that have been posted by the Borrower or any of its Subsidiaries to support the payment of items set forth in clauses (i) and (ii);

(f)     Liens to secure the performance of tenders, statutory obligations, bids, trade contracts, governmental contracts, leases and other contracts (other than Indebtedness for borrowed money), statutory obligations, licenses, surety, stay, customs and appeal bonds, performance and return-of-money bonds, performance and completion guarantees and other obligations of a like nature (including (i) those to secure health, safety and environmental obligations, (ii) those required or requested by any Governmental Authority and (iii) letters of credit issued in lieu of any such bonds or to support issuance thereof) and other Liens in favor of providers of performance or surety bonds pursuant to customary indemnity and other similar arrangements, in each case pursuant to this clause (f) entered into in connection therewith incurred in the ordinary course of business;

(g)     (i) easements (including reciprocal easement arrangements), reservations, rights-of-way, restrictions (including building, zoning and similar restrictions), utility agreements, covenants, reservations, encroachments, protrusions, changes and other similar encumbrances and title defects affecting real property which, in the aggregate, do not in any case materially and adversely interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries on the properties subject thereto, taken as a whole, (ii) mortgages, liens, security interests, restrictions, encumbrances or any other matter of record that have been placed by any developer, landlord or other third party on property over which the Borrower or any of its Subsidiaries has easement rights or a leasehold, and subordination or similar agreements relating thereto, (iii) ground leases (other than with respect to the Mortgaged Properties) in the ordinary course in respect of real property on which facilities owned or leased by the Loan Parties or any of their Subsidiaries are located and (iv) Liens arising on any real property as a result of any eminent domain, condemnation or similar proceeding being commenced with respect to such real property;

(h)     Liens securing judgments, or arising by reason of a judgment, decree or court order, in each case not constituting an Event of Default under Section 8.01(h);

(i)     Liens securing Indebtedness permitted under Section 7.03(g) (including Liens securing Permitted Refinancing of the Indebtedness secured by such Lien); *provided* that (i) such Liens (other than any Liens securing any Permitted Refinancing of the Indebtedness secured by such Liens) attach prior to, concurrently with or within two hundred seventy (270) days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property (except for replacements, additions and accessions to such property) other than the property financed by such

-118-

Indebtedness and the proceeds and the products thereof and accessories thereto and (iii) with respect to leases evidencing Capitalized Lease Obligations, such Liens do not at any time extend to or cover any assets other than the assets subject to such leases and the proceeds and products thereof, additions and accessions thereto, and customary security deposits; *provided* that individual financings otherwise permitted to be secured hereunder provided by one Person (or its affiliates) may be cross collateralized to other similar financings provided by such Person (or its affiliates);

(j)     leases, non-exclusive licenses, subleases or non-exclusive sublicenses granted to others in the ordinary course of business and not interfering in any material respect with the business of the Borrower or any Subsidiary, taken as a whole;

(k)     Liens (i) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods or (ii) on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person, or supporting trade payables, warehouse receipts or similar facilities entered into, to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(l)     Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business; and (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(m)     Liens (i) on cash or Cash Equivalents advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 7.02 to be applied against the purchase price for such Investment, (ii) arising out of conditional sale, title retention, consignment or similar arrangements for the purchase or sale of goods entered into by the Borrower or any Subsidiary in the ordinary course of business, (iii) solely on any cash earnest money deposits made by the Borrower or any Subsidiary in connection with any letter of intent or purchase agreement permitted hereunder or (iv) consisting of an agreement to Dispose of any property in a Disposition permitted under Section 7.05 (or, to dispose of any property in a transaction not constituting a Disposition hereunder);

(n)     Liens on the assets of a Subsidiary that is not a Loan Party; *provided* that, in the case of any such Liens securing Indebtedness, such Indebtedness shall have been permitted to be incurred under Section 7.03;

(o)     Liens in favor of the Borrower or any Subsidiary (other than Liens granted by the Borrower or a Guarantor in favor of a Subsidiary that is not the Borrower or a Guarantor);

(p)     Liens existing on property at the time of its acquisition or existing on the property of any Person that becomes a Subsidiary after the date hereof and any modifications, replacements, renewals or extensions thereof (including Liens securing Permitted Refinancings of Indebtedness secured by such Liens); *provided* that (i) such Lien was not created in contemplation

-119-

of such acquisition or such Person becoming a Subsidiary, and (ii)(A) in the case of any such Liens securing purchase money Indebtedness or Capitalized Lease Obligations or any replacement, renewal, extension or refinancing thereof, such Lien does not extend to or cover any other assets or property (other than the proceeds or products thereof, accessions and additions thereto, and after-acquired property subjected to a Lien pursuant to terms existing at the time of such acquisition or such Person becomes a Subsidiary, it being understood that such requirement shall not apply to any property solely as a result of such acquisition or such Person becoming a Subsidiary); *provided* that individual financings otherwise permitted to be secured hereunder provided by one Person (or its affiliates) may be cross collateralized to other such financings provided by such Person (or its affiliates); and the Indebtedness secured thereby (or, as applicable, any modifications, replacements, renewals or extensions thereof) is permitted under Section 7.03(g) and (B) in the case of any such Liens securing Indebtedness other than purchase money Indebtedness or Capitalized Lease Obligations or Permitted Refinancings thereof, such Liens do not extend to the property of any Person other than such Person, the Person acquired or formed to make such acquisition and the Subsidiaries of such Person; and the Indebtedness secured thereby (or, as applicable, any modifications, replacements, renewals or extensions thereof) is permitted under Section 7.03(o);

(q)      Liens arising from precautionary UCC financing statement (or similar filings under applicable law) filings regarding leases, consignment or bailee arrangements, or other non-Indebtedness arrangements, entered into by the Borrower or any Subsidiary;

(r)      any interest or title of a lessor, sublessor, licensee, sublicensee, licensor or sublicensor under any lease, sublease, license (or other grants of rights to use or exploit) or sublicense agreement or secured by a lessor's, sublessor's, licensee's, sublicensee's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense permitted by this Agreement (including software and other technology licenses), and any Lien deemed to exist in connection with software escrow arrangements entered into by the Borrower or any Subsidiary with third parties in the ordinary course of business;

(s)      deposits of cash or Cash Equivalents made to the issuer or issuers of letters of credit permitted to be incurred by the Borrower or a Subsidiary thereof pursuant to Section 7.03(r) or (u) to backstop or collateralize such letters of credit; provided, that the aggregate amount of any such deposits made to the issuers of such letters of credit shall not exceed 105% of the face amount of such letters of credit;

(t)      Liens that are customary contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any Subsidiary or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Subsidiary in the ordinary course of business;

(u)      (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business of the Borrower and the Subsidiaries complies, and (ii) any zoning or similar Law or right reserved to or vested in any

Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower or any Subsidiary taken as a whole;

(v)    Liens on Equity Interests of Joint Ventures securing obligations of such Joint Venture, and options, put and call arrangements, rights of first refusal and similar rights relating to such Joint Venture;

(w)    (i) deposits made in the ordinary course of business to secure liability to insurance carriers and (ii) Liens on insurance policies and the proceeds thereof securing the financing of insurance premiums with respect thereto;

(x)    receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien;

(y)    Liens on cash deposits in an aggregate amount not to exceed $2,500,000 securing any Swap Contract permitted hereunder;

(z)    [reserved];

(aa)    Liens securing Indebtedness incurred pursuant to Section 7.03(a) under (i) a Permitted Revolving Credit Facility that is an ABL Facility, so long as such Liens cover only assets constituting Collateral and are at all times subject to a Permitted ABL Intercreditor Agreement or (ii) a Permitted Revolving Credit Facility that is a Cash Flow Revolving Credit Facility, so long as such Liens cover only assets constituting Collateral and are at all times subject to a Permitted Cash Flow Revolver Intercreditor Agreement;

(bb)    [reserved];

(cc)    [reserved];

(dd)    [reserved];

(ee)    (i) customary rights of set-off, revocation, refund or chargeback under deposit agreements or under the Uniform Commercial Code or common law of banks or other financial institutions where the Borrower or any of its Subsidiaries maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business and (ii) utility deposits in the ordinary course of business;

(ff)    Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents under clause (e) of the definition thereof arising out of such repurchase transaction;

(gg)    any Permitted Factoring Arrangements; and

(hh)    other Liens securing

obligations outstanding in an aggregate principal amount not to exceed $2,000,000.

-121-

Section 7.02      <u>Investments</u>.  Make or hold any Investments, except:

(a)      Investments held by the Borrower or any Subsidiary in the form of Cash Equivalents when such Investment was made;

(b)      loans or advances to officers, directors, managers, consultants and employees of any Parent Entity (in each case, solely to the extent directly attributable to its (direct or indirect) ownership of Holdings), Holdings, the Borrower or any Subsidiary (i) for travel, entertainment, relocation and analogous ordinary business purposes in the ordinary course of business or constituting advances of payroll payments and expenses, in an aggregate amount not to exceed $1,000,000 at any time outstanding, (ii) relating to indemnification or reimbursement in respect of liability relating to their serving in any such capacity in the ordinary course of business, and (iii) in connection with such Person's purchase of Equity Interests of Holdings, any Parent Entity, the Borrower or any Subsidiary; *provided* that no cash is actually advanced pursuant to this clause (iii) other than to pay Taxes due in connection with such purchase unless such cash is promptly repaid or contributed to a Loan Party;

(c)      Investments (i) by the Borrower or any Subsidiary in any Loan Party (excluding Holdings), (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is also not a Loan Party, (iii) by Loan Parties in any Subsidiary that is not a Loan Party, and (iv) constituting Guarantees of obligations of the Borrower and its Subsidiaries other than Indebtedness, incurred in the ordinary course of business; *provided* that (A) the aggregate amount of any Investments made pursuant to this <u>Section 7.02(c)</u> and Investments made pursuant to <u>Section 7.02(j)</u>, in each case in entities that do not become Guarantors or of assets that do not become Collateral, shall not exceed $500,000 at any time outstanding and (B) the aggregate amount of any Investments made by U.S. Loan Parties and Canadian Loan Parties in Non-Canadian Foreign Loan Parties pursuant to this <u>Section 7.02(c)</u> shall not exceed $2,500,000 at any time outstanding;

(d)      Investments (i) consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business (including advances made to distributors), Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors, Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contacts, and Investments consisting of prepayments to suppliers, licensors and licensees in the ordinary course of business and (ii) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business and upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(e)      to the extent constituting Investments, transactions expressly permitted under <u>Sections 7.01</u>, <u>7.03</u>, <u>7.04</u>, <u>7.05</u> (including the receipt of noncash consideration for the Dispositions of assets permitted thereunder), <u>7.06</u> and <u>7.12</u>, in each case, other than any provision in any of the foregoing Sections generally permitting transactions permitted by this <u>Section 7.02</u>;

(f)      Investments in existence on, or that are made pursuant to legally binding written commitments that are in existence on, the Closing Date which are listed on <u>Schedule 7.02</u>

-122-

and any modification, replacement, renewal or extension thereof; *provided* that no such modification, replacement, renewal or extension shall increase the amount of Investments then permitted under this Section 7.02(f), except as otherwise permitted by this Section 7.02;

(g)     Investments in Swap Contracts permitted under Section 7.03;

(h)     promissory notes and other noncash consideration received in connection with Dispositions permitted by Section 7.05;

(i)     Investments constituting a Permitted Acquisition:

(j)     Investments by Loan Parties in any Subsidiary that is not a Loan Party, in an aggregate amount not to exceed, the sum of, (A) when aggregated with Investments made pursuant to Section 7.02(c), in each case in entities that do not become Guarantors or of assets that do not become Collateral, $500,000 at any time outstanding and (B) an amount equal to any returns of capital or sale proceeds actually received in cash in respect of any such Investments made pursuant to this Section 7.02(j) (*provided* that amounts added pursuant to this clause (B) shall not, in any event, exceed Fair Market Value of the applicable Investment at the time such Investment was initially made);

(k)     Investments in the ordinary course of business or consistent with past practice, consisting of (i) endorsements for collection or deposit, (ii) customary trade arrangements with customers, (iii) loans or advances made to distributors, (iv) advances of payroll payments to employees or other advances of salaries or compensation (including advances against commissions) to employees and sales representatives and (v) Investments maintained in connection with any Loan Party's deferred compensation plan;

(l)     the non-exclusive licensing, sublicensing or contribution of intellectual property rights pursuant to joint marketing arrangements with Persons other than the Borrower and the Subsidiaries in the ordinary course of business;

(m)     loans and advances to Holdings or any Parent Entity in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments made to Holdings and any Parent Entities) Restricted Payments permitted to be made to Holdings or any Parent Entity in accordance with Section 7.06; *provided* that any such loan or advance shall reduce the amount of such applicable Restricted Payment thereafter permitted under Section 7.06 by a corresponding amount while outstanding;

(n)     other bona fide Investments not exceeding $2,500,000 in the aggregate, at any time outstanding;

(o)     Investments to the extent that (x) payment for such Investments is made by the issuance of, or from the proceeds of the issuance of, Equity Interests (other than Disqualified Equity Interests) of Holdings or any Parent Entity or (y) such Investments are contributed by Holdings or any Parent Entity to the common equity capital of the Borrower;

(p)     Investments held by a Person that is acquired and becomes a Subsidiary or held by a company merged or amalgamated or consolidated into any Subsidiary, in each case after

-123-

the Closing Date and in accordance with this Section 7.02 and/or Section 7.04, as applicable, to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation, and were in existence on the date of such acquisition, merger, amalgamation or consolidation;

(q)     Investments made with the portion, if any, of the Available Amount on the date that the Borrower elects to apply all or a portion thereof pursuant to this Section 7.02(q); *provided* that (i) no Event of Default shall have occurred and be continuing or would result therefrom and (ii) immediately after giving effect to any such Investment, the Borrower and the Subsidiaries shall be in Pro Forma Compliance with a Total Net Leverage Ratio as of the end of the Test Period not to exceed 4.00:1.00, such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) as if such Investment had occurred on the first day of such Test Period;

(r)     [reserved];

(s)     the forgiveness or conversion to equity of any Indebtedness owed to a Loan Party and permitted by Section 7.03;

(t)     [reserved];

(u)     to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses (or other grants or rights to use or exploit) or leases of other assets, intellectual property, or other rights, in each case in the ordinary course of business;

(v)     Investments consisting of the contribution of Equity Interests of any Foreign Subsidiary to any Wholly-Owned Subsidiary of the Borrower; and

(w)     Investments consisting of operating deposit accounts maintained in the ordinary course of business.

Notwithstanding the foregoing, no IP Rights that are owned by a Loan Party may be transferred or contributed as an Investment or otherwise, whether directly or indirectly or by one or more transactions, by any Loan Party to any Affiliate of a Loan Party that is not a Loan Party; provided, that a Loan Party may license or sublicense IP Rights to an Affiliate that is not a Loan Party if such license or sublicense is a non-exclusive license granted in the ordinary course of business.

Section 7.03     Indebtedness.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     any Indebtedness of the Loan Parties under a Permitted Revolving Credit Facility and any Permitted Refinancing thereof (or successive Permitted Refinancings thereof); provided that the aggregate amount of Indebtedness incurred pursuant to this clause (a) (inclusive of the unused commitments under any such Permitted Revolving Credit Facility) shall not at any time exceed $35,000,000 at any time outstanding;

-124-

(b)        [reserved];

(c)        Indebtedness of the Loan Parties under the Loan Documents;

(d)        Indebtedness outstanding or committed to be incurred on the Closing Date and listed on Schedule 7.03;

(e)        Guarantees incurred by the Borrower or any Subsidiary in respect of Indebtedness of the Borrower or any other Subsidiary that is permitted to be incurred under this Agreement; *provided*, *however*, that, if (i) the Indebtedness being guaranteed is subordinated to the Obligations, then the Guarantee with respect to such Indebtedness shall be subordinated to the Obligations on terms at least as favorable to the Lenders as those contained in the subordination provisions of such Indebtedness and (ii) any Guarantee incurred by a Loan Party in respect of Indebtedness of a non-Loan Party must be permitted under Section 7.02;

(f)        Indebtedness of (i) any Loan Party (other than Holdings) owing to any other Loan Party; *provided*, that the aggregate amount of Indebtedness under this clause (f)(i) owing by Non-Canadian Foreign Loan Parties to U.S. Loan Parties and Canadian Loan Parties (together with the aggregate amount of any Investments made by U.S. Loan Parties and Canadian Loan Parties in Non-Canadian Foreign Loan Parties pursuant to this Section 7.02(c)) shall not exceed $2,500,000, (ii) any Subsidiary that is not a Loan Party owed to (x) any other Subsidiary that is not a Loan Party or (y) any Loan Party; *provided*, that Indebtedness of Subsidiaries that are not Loan Parties owing to Loan Parties must also be permitted under Section 7.02, and (iii) any Loan Party owed to any Subsidiary which is not a Loan Party; *provided* that any Indebtedness incurred pursuant to this clause (f)(iii) shall constitute an Investment made by the obligee of such Indebtedness and shall be required to be in compliance with Section 7.02; *provided*, *further*, that all such Indebtedness of any Loan Party under this clause (f)(iii) must be expressly subordinated to the Obligations on the terms of the Intercompany Subordination Agreement or subject to subordination terms substantially identical to such Intercompany Subordination Agreement, in each case within sixty (60) days of the incurrence of such Indebtedness or such later date as the Required Lenders shall reasonably agree, in each case, to the extent permitted by applicable Law and not giving rise to materially adverse Tax consequences;

(g)        (i) Capitalized Lease Obligations and purchase money obligations (including obligations in respect of mortgage, industrial revenue bond, industrial development bond and similar financings) to finance the purchase, construction, lease, repair or improvement of fixed or capital assets; *provided*, *however*, that the aggregate principal amount of all such Indebtedness at any one time outstanding, together with the aggregate principal amount of Permitted Refinancings outstanding pursuant to clause (ii) below, shall not exceed $15,000,000 and (ii) any Permitted Refinancing thereof (or successive Permitted Refinancings thereof);

(h)        Indebtedness of Subsidiaries that are not Loan Parties in an aggregate principal amount at any one time outstanding not to exceed $2,500,000;

(i)        Indebtedness in respect of Swap Contracts incurred in the ordinary course of business and not for speculative purposes;

(j)        Indebtedness (other than for borrowed money or constituting Capitalized

-125-

Lease Obligations) secured by Liens permitted under <u>Section 7.01</u>;

(k)     Indebtedness representing (1) deferred compensation or stock-based compensation to directors, officers, managers, employees and other service providers of Holdings, a Parent Entity (to the extent directly attributable to its (direct or indirect) ownership of Holdings), the Borrower and the Subsidiaries or (2) to the extent constituting Indebtedness, unfunded pension fund and other employee benefit plan obligations and liabilities incurred in the ordinary course of business to the extent they do not result in an Event of Default under <u>Section 8.01(i)</u>;

(l)     Indebtedness consisting of promissory notes issued by any Loan Party to current or former officers, directors, managers, consultants and employees, their respective estates, heirs, family members, spouses, domestic partners or former spouses or former domestic partners to finance the purchase or redemption of Equity Interests of any Parent Entity or Loan Party permitted by <u>Section 7.06</u>;

(m)     Indebtedness in respect of indemnification, purchase price adjustments or other similar obligations incurred by the Borrower or any Subsidiary in a Permitted Acquisition or similar Investment or Disposition under agreements which provide for indemnification, the adjustment of the purchase price or for similar adjustments;

(n)     unsecured Indebtedness consisting of obligations of the Borrower or any Subsidiary under deferred consideration (e.g., earn-outs, indemnifications, incentive non-competes and other contingent or deferred obligations) or other similar arrangements incurred by such Person in connection with any Permitted Acquisition or other Investment permitted under <u>Section 7.02</u> in an aggregate principal amount at any one time outstanding not to exceed $5,000,000;

(o)     Indebtedness of a Person or Indebtedness attaching to assets of a Person that, in either case, becomes a Subsidiary (or is merged or consolidated with or into the Borrower or a Subsidiary) or Indebtedness attaching to assets that are acquired by the Borrower or any Subsidiary (including any Indebtedness assumed by the Borrower or any Subsidiary in connection with any acquisition of any assets or Person), in each case after the Closing Date as the result of a Permitted Acquisition or other Investment permitted by <u>Section 7.02</u> (other than <u>Section 7.02(e)</u>) to the extent existing at the time of such Permitted Acquisition or similar Investment and any Permitted Refinancing thereof (or successive Permitted Refinancings thereof); *provided* that such Indebtedness is not incurred in contemplation of such Permitted Acquisition or similar Investment; *provided* further that the aggregate principal amount of any Indebtedness assumed pursuant to this <u>Section 7.03(o)</u> shall not exceed $5,000,000.

(p)     Indebtedness in respect of cash management obligations and netting services, overdraft protections, employee credit card programs, automatic clearinghouse arrangements and similar arrangements in each case in connection with deposit accounts and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(q)     Indebtedness in an aggregate principal amount not to exceed $5,000,000 at any time outstanding;

-126-

(r)     Indebtedness incurred by the Borrower or any Subsidiary in respect of any banker's acceptances, bank guarantees, letters of credit, warehouse receipts or similar instruments entered into in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, or other Indebtedness with respect to reimbursement type obligations regarding workers compensation claims;

(s)     (i) obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any Subsidiary and (ii) Indebtedness consisting of (x) the financing of insurance premiums or (y) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business or consistent with past practice;

(t)     [reserved].

(u)     Indebtedness of the Borrower or any Subsidiary as an account party in respect of commercial letters of credit issued in the ordinary course of business; *provided* that if secured or collateralized, such letters of credit are only secured or collateralized as permitted by Section 7.01(s);

(v)     Guarantees (i) in respect of any travel and other reimbursable business expenses incurred by employees of the Borrower or any of its Subsidiaries in the ordinary course of business and (ii) incurred in the ordinary course of business in respect of obligations of or to suppliers, customers, franchisees, lessors, licensees, sublicensees or distribution partners;

(w)     all premiums (if any), interest (including post-petition interest), fees, expenses, defeasance costs, charges and additional or contingent interest on obligations described in this Section 7.03;

(x)     [reserved]; and

(y)     to the extent constituting Indebtedness, obligations under Permitted Factoring Arrangements.

The accrual of interest, the accretion of accreted value and the payment of interest in the form of additional Indebtedness shall not be deemed to be an incurrence of Indebtedness for purposes of this Section 7.03.

Section 7.04     Fundamental Changes.     Merge, dissolve, liquidate, amalgamate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

(a)     any Subsidiary (or any other Person) may merge, amalgamate or consolidate with (i) the Borrower; *provided* that the Borrower shall be the continuing or surviving Person  or (ii) any one or more other Subsidiaries; *provided*, *further*, that (x) when any Guarantor is merging or amalgamating with another Subsidiary that is not a Loan Party the Guarantor shall be the continuing or surviving Person or (y) when any U.S. Loan Party or Canadian Loan Party is

-127-

merging or amalgamating with Non-Canadian Foreign Loan Party, the U.S. Loan Party or Canadian Loan Party, as applicable, shall be the continuing or surviving Person;

(b)     (i) any Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Subsidiary that is not a Loan Party and (ii) any Subsidiary may liquidate or dissolve, or the Borrower or any Subsidiary may (if the validity, perfection and priority of the Liens securing the Obligations is not adversely affected thereby) change its legal form if the Borrower determines in good faith that such action is in the best interest of the Borrower and its Subsidiaries taken as a whole and is not disadvantageous to the Lenders in any material respect (it being understood that in the case of any liquidation or dissolution of a Subsidiary that is a Guarantor, such Subsidiary shall at or before the time of such liquidation or dissolution transfer its assets to another Subsidiary that is a Loan Party (and if the transferor is a U.S. Loan Party or a Canadian Loan Party, the transferee shall be a U.S. Loan Party or a Canadian Loan Party) unless such Disposition of assets is permitted hereunder; and in the case of any change in legal form, a Subsidiary that is a Loan Party will remain a Loan Party unless such Loan Party is otherwise permitted to cease being a Loan Party hereunder and a Domestic Subsidiary or Canadian Subsidiary shall remain a Domestic Subsidiary or Canadian Subsidiary, as applicable);

(c)     any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to any Subsidiary; *provided* that if the transferor in such transaction is a Guarantor, then (i) the transferee must be a Loan Party and (ii) to the extent constituting an Investment, such Investment must be permitted by Section 7.02 (other than Section 7.02(e));

(d)     any Subsidiary may merge, amalgamate or consolidate with, or dissolve into, any other Person in order to effect an Investment permitted pursuant to Section 7.02 (other than Section 7.02(e)); *provided* that (i) the continuing or surviving Person shall, to the extent subject to the terms hereof, have complied with the requirements of Section 6.12, (ii) to the extent constituting an Investment, such Investment must be a permitted Investment in accordance with Section 7.02 (other than Section 7.02(e)), (iii) to the extent constituting a Disposition, such Disposition must be permitted hereunder and (iv) to the extent such Subsidiary is a Loan Party, it must remain a Loan Party and to the extent such Subsidiary is a Domestic Subsidiary, it must remain a Domestic Subsidiary;

(e)     [reserved];

(f)     so long as no Event of Default exists or would result therefrom, any Subsidiary may merge, dissolve, liquidate, amalgamate, consolidate with or into another Person or Dispose of all or substantially all of its assets in order to effect a Disposition permitted pursuant to Section 7.05; and

(g)     so long as no Event of Default exists or would result therefrom, any Investment permitted by Section 7.02 (other than Section 7.02(e)) may be structured as a merger, consolidation or amalgamation.

Section 7.05     Dispositions.  Make any Disposition, except:

(a)     Dispositions of obsolete, uneconomic, surplus or worn out property,

-128-

whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used, useful or economically practicable to maintain in the conduct of the business of the Borrower and its Subsidiaries (including allowing any registrations or any applications for registration of any intellectual property to lapse or go abandoned);

(b)        Dispositions of inventory and goods held for sale in the ordinary course of business;

(c)        Dispositions of property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) an amount equal to the net proceeds of such Disposition is promptly applied to the purchase price of such replacement property;

(d)        to the extent constituting a Disposition, (i) Investments permitted by Section 7.02 and (ii) Restricted Payments permitted by Section 7.06, in each case excluding any provision of such applicable Section generally permitting transactions permitted by this Section 7.05;

(e)        Dispositions of cash and Cash Equivalents;

(f)        (i) Dispositions of accounts receivable in connection with the collection or compromise thereof and (ii) any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or other litigation claims in the ordinary course of business;

(g)        Non-exclusive licensing or sublicensing (or other grants of rights to use or exploit) of IP Rights in the ordinary course of business;

(h)        Dispositions of property  (A) between Loan Parties; *provided*, that (1) any Dispositions of property by a U.S. Loan Party or Canadian Loan Party to a Non-Canadian Foreign Loan Party for less than Fair Market Value and (2) any noncash consideration received in exchange for any such Disposition, shall in each case constitute an Investment in such Non-Canadian Foreign Loan Party, (B) between Subsidiaries (other than Loan Parties), (C) by Subsidiaries that are not Loan Parties to the Loan Parties or (D) by Loan Parties to any Subsidiary that is not a Loan Party; *provided* that (1) the portion (if any) of any such Disposition made for less than Fair Market Value and (2) any noncash consideration received in exchange for any such Disposition, shall in each case constitute an Investment in such Subsidiary;

(i)        leases, subleases, licenses, sublicenses, occupancy agreements or assignment of property in the ordinary course of business;

(j)        transfers of (i) property subject to Casualty Events, (ii) condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise) and (iii) property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(k)        any Disposition of any asset between or among the Subsidiaries as a substantially concurrent interim Disposition in connection with a Disposition otherwise permitted

pursuant to this <u>Section 7.05</u>;

       (l)      Dispositions of Investments (including Equity Interests) in Joint Ventures to the extent required by, or made pursuant to customary buy/sell arrangements between, the joint venture parties set forth in joint venture arrangements and similar binding arrangements;

       (m)     the transfer for fair value of property to another Person in connection with a joint venture arrangement with respect to the transferred property; *provided* that such transfer is permitted under <u>Section 7.02(n)</u>;

       (n)      the unwinding or termination of Swap Contracts permitted hereunder pursuant to their terms;

       (o)      Dispositions by the Borrower or any Subsidiary not otherwise permitted under this <u>Section 7.05</u>; *provided* that (i) at the time of such Disposition, no Event of Default shall have occurred and be continuing or would result therefrom, (ii) the aggregate consideration received in respect of all Dispositions pursuant to this clause (o) shall not exceed $2,500,000 in any fiscal year, (iii) such Disposition shall be for no less than the Fair Market Value of such property at the time of such Disposition, (iv) at least 75% of the purchase price for such property shall be paid to the Borrower or such Subsidiary, as applicable, in the form of cash or Cash Equivalents;

       (p)      [reserved];

       (q)      any issuance of, or Disposition in connection with, directors' qualifying shares or investments by residents of a particular jurisdiction as, and to the extent, mandated by relevant foreign law;

       (r)      Dispositions of (i) Cash Equivalents in the ordinary course of business and (ii) accounts receivables in the ordinary course of business in connection with the collection or compromise thereof;

       (s)      [reserved];

       (t)      Dispositions pursuant to Permitted Factoring Arrangements; and

       (u)      Sale Leaseback Transactions constituting Liens permitted pursuant to <u>Section 7.01</u> and Indebtedness permitted pursuant to <u>Section 7.03</u>.

To the extent any Collateral is Disposed of as expressly permitted by this <u>Section 7.05</u> to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, and the Administrative Agent is authorized to, and, upon request by the Required Lenders, shall, take any actions reasonably requested by the Borrower in order to effect the foregoing.

Notwithstanding the foregoing, no IP Rights that are owned by a Loan Party may be Disposed of, transferred or contributed as an Investment or otherwise, whether directly or indirectly or by one or more transactions, by any Loan Party to any Affiliate of a Loan Party that is not a Loan Party;

provided, that a Loan Party may license or sublicense IP Rights to an Affiliate that is not a Loan Party if such license or sublicense is a non-exclusive license granted in the ordinary course of business.

Section 7.06     Restricted Payments.    Declare or make, directly or indirectly, any Restricted Payment, except:

(a)     each Subsidiary may make Restricted Payments to the Borrower and to other Subsidiaries that directly or indirectly own Equity Interests of such Subsidiary (and, in the case of a Restricted Payment by a non-wholly owned Subsidiary, to the Borrower and any such other Subsidiary and to each other owner of Equity Interests of such Subsidiary based on their relative ownership interests, it being understood, however, that any such Subsidiary may exclude one or more classes of equity holders from any such Restricted Payment so long as the class or classes of equity interests owned by any Loan Party or any Subsidiary are not excluded from any such Restricted Payment);

(b)     the Borrower and each Subsidiary may declare and make dividend payments or other distributions payable solely in the Equity Interests (other than Disqualified Equity Interests) of such Person;

(c)     to the extent constituting Restricted Payments, the Borrower and the Subsidiaries may take actions expressly permitted by Sections 7.02 (other than Sections 7.02(e) and (m)), 7.04, 7.08 or 7.12;

(d)     Borrower or any Subsidiary may make Restricted Payments to Holdings:

(i)     the proceeds of which shall be used by Holdings or any Parent Entity to pay (a) its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business (and, in the case of any Parent Entity, directly attributable to its (direct or indirect) ownership of Holdings), plus any reasonable and customary indemnification claims made by directors, officers or employees of Holdings or any Parent Entity (and, in the case of any Parent Entity, directly attributable to its (direct or indirect) ownership of Holdings) or (b) the fees and other amounts described in Sections 7.08(d), (e) and (n) to the extent that the Borrower or any Subsidiary would be then permitted under such Section 7.08(d), (e) or (n), as applicable to pay such fees and other amounts directly;

(ii)     the proceeds of which shall be used by Holdings or any Parent Entity to pay its franchise Taxes and other similar Taxes required to maintain its corporate, legal and organizational existence which are imposed on a separate company basis (in the case of any Parent Entity, solely to the extent directly attributable to its (direct or indirect) ownership of Holdings);

(iii)     the proceeds of which will be used to repurchase, retire or otherwise acquire the Equity Interests of Holdings or any Parent Entity from directors, managers, officers, employees, consultants or independent contractors or members of management of Holdings, any Parent Entity, the Borrower or any Subsidiary (or their estate, heirs, beneficiaries under their estates, family members, spouse, former spouse, domestic partner and/or former domestic partner),

-131-

in each case in connection with the resignation, termination, death or disability of any such directors, officers, employees or members of management, consultants or independent contractors, not in excess of $1,000,000 in any fiscal year of the Borrower; *provided*, *further*, that the amounts set forth in this clause (d)(iii) may be further increased by (A) the proceeds of any key-man life insurance received by Holdings, the Borrower or any Subsidiary (solely with respect to the calendar year in which such proceeds are received and without limiting any carry-over thereof permitted above), *plus* (B) the net cash proceeds received by (or contributed to common equity capital of) the Borrower from sales of Equity Interests of any of Holdings or any Parent Entity to directors, officers, employees, members of management or consultants of any of Holdings, any Parent Entity, the Borrower, or their respective Subsidiaries (or their estate, heirs, beneficiaries under their estates, family members, spouse, former spouse, domestic partner and/or former domestic partner) (*provided* that in no event shall any such contributed amounts that are so utilized increase the Available Amount);

(iv)     the proceeds of which are applied to the purchase or other acquisition by Holdings or any Parent Entity of all or substantially all of the property and assets or business of any Person, or of assets constituting a business unit, a line of business or division of such Person, or of all of the Equity Interests in a Person or to finance any Investment permitted to be made pursuant to Section 7.02 as if such Investment were made by the Borrower or any Subsidiary; *provided* that if such purchase, other acquisition or other Investment had been made by the Borrower or any Subsidiary, it would have constituted a Permitted Acquisition or other Investment permitted under Section 7.02; *provided*, *further*, that (A) such Restricted Payment shall be made substantially concurrently with the closing of such purchase, other acquisition or other Investment and (B) Holdings or such Parent Entity shall, immediately following the closing thereof, cause (1) all property acquired (whether assets or Equity Interests) and any liabilities assumed to be contributed to the Borrower or any Subsidiary or (2) the merger (to the extent permitted in Section 7.04) into the Borrower or any Subsidiary of the Person formed or acquired in order to consummate such purchase, other acquisition or other Investment;

(v)     to effectuate the repurchase of Equity Interests of Holdings or any Parent Entity deemed to occur upon the noncash exercise of stock options and warrants or similar equity incentive awards;

(vi)     the proceeds of which shall be used by Holdings or any Parent Entity to pay, other than to Affiliates of Holdings that are not Parent Entities, customary costs, fees and expenses related to any equity offering by Holdings or any Parent Entity, or offering or debt issuance, incurrence or offering, Disposition or acquisition or investment transaction permitted by this Agreement, in each case whether or not successful;

(vii)     the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to directors, managers, officers and employees of Holdings or any Parent Entity, in each case, to the extent such salaries, bonuses and other benefits are attributable to the ownership or operation of the Borrower and its Subsidiaries; and

(viii)     to the extent constituting Restricted Payments, amounts that would be permitted to be paid directly by the Borrower or its Subsidiaries under Section 7.08 (other than Section 7.08(g));

(e)      in addition to the foregoing Restricted Payments, the Borrower may make additional Restricted Payments to Holdings or any Parent Entity in an aggregate amount not to exceed an amount equal to the portion, if any, of the Available Amount on the date of such election that the Borrower elects to apply to this Section 7.06(e), such election to be specified in a written notice of a Responsible Officer of the Borrower calculating in reasonable detail the amount of Available Amount immediately prior to such election and the amount thereof elected to be so applied; *provided* that, in the case of this Section 7.06(e), (A) immediately before and after giving effect to any such Restricted Payment, no Event of Default shall have occurred and be continuing and (B) immediately after giving effect to any such Restricted Payment, the Borrower and the Subsidiaries shall be in Pro Forma Compliance with a Total Net Leverage Ratio as of the end of the Test Period not to exceed 2.50:1.00, such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) as if the Restricted Payment had occurred on the first day of such Test Period;

(f)      [reserved];

(g)      the Borrower and any Subsidiary may (i) pay cash in lieu of fractional shares in connection with any dividend, split or combination of its Equity Interests or any Permitted Acquisition (or similar Investment) and (ii) honor any conversion request by a holder of convertible Indebtedness and make cash payments in lieu of fractional shares in connection with any such conversion;

(h)      [reserved];

(i)      Restricted Payments in amounts sufficient to permit Holdings to pay (or to make Restricted Payments to any Parent Entity in amounts sufficient to permit such Parent Entity to pay) its consolidated, combined or similar tax liability with respect to income, franchise or similar taxes in respect of the Borrower and its Subsidiaries in the event that the Borrower files a consolidated, combined or similar type income tax return with Holdings and/or a Parent Entity; *provided* that the amount of such Restricted Payments shall not be greater than the amount of such taxes that would have been due and payable by the Borrower and the Borrower's Subsidiaries had the Borrower filed a consolidated, combined or similar type income tax return as the parent of a consolidated group that included only the Borrower and the Borrower's Subsidiaries;

(j)      Restricted Payments pursuant to the transactions contemplated by the Chapter 11 Plan or the Confirmation Order;

(k)      the Borrower may redeem in whole or in part any Equity Interests of the Borrower, any Parent Entity or Holdings solely as part of an exchange for another class of Equity Interests (other than Disqualified Equity Interests) or rights to acquire Equity Interests (other than Disqualified Equity Interests) or with proceeds from substantially concurrent equity contributions from, or issuances of new shares of its Equity Interests (other than Disqualified Equity Interests) to, any Person other than Borrower or any of its Subsidiaries; *provided* that any terms and provisions material to the interests of the Lenders, when taken as a whole, contained in such other class of Equity Interests of the Borrower, any Parent Entity or Holdings are no more adverse (taken as a whole) to the Lenders than those contained in the Equity Interests redeemed thereby; and

-133-

(l)      each Subsidiary of the Borrower, or its direct or indirect parent (other than the Borrower), may repurchase its Equity Interests owned by any of its minority owners upon a direct or indirect sale of such Subsidiary or of all or substantially all of such Subsidiary's assets (*provided* that such sale is permitted under this Agreement).

Section 7.07      Change in Nature of Business; Conduct of Business.  Engage in any material line of business substantially different from those lines of business conducted by the Borrower and the Subsidiaries on the date hereof or any business reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

Section 7.08      Transactions with Affiliates.  Enter into any transaction of any kind with any Affiliate of the Borrower (including the purchase, sale, lease or exchange of any property or the rendering of any service), on terms that are less favorable to the Borrower or such Subsidiary, as the case may be, than those that might be obtained at the time in a comparable arm's-length transaction from a Person who is not an Affiliate whether or not in the ordinary course of business, other than (a) transactions among Loan Parties, (b) transactions between one or more Subsidiaries, so long as no such Subsidiary is a Loan Party, (c) on fair and reasonable terms substantially as favorable to the Borrower or such Subsidiary as would be obtainable by the Borrower or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, (d) entering into this Agreement and the other Loan Documents, the Transactions and the payment of fees and expenses in connection with the consummation of the Transactions, (e) customary fees and indemnities may be paid to, and customary indemnification agreements (or similar arrangement) may be made with, any directors, officers, employees or members of management of Holdings, any Parent Entity (to the extent directly attributable to its (direct or indirect) ownership of Holdings), the Borrower and the other Subsidiaries and reasonable out-of-pocket costs of such Persons may be reimbursed, (f) employment, compensation, bonus, incentive, retention and severance arrangements and health, disability and similar insurance or benefit plans or other benefit arrangements between Holdings, any Parent Entity (to the extent directly attributable to its (direct or indirect) ownership of Holdings), the Borrower or any Subsidiary thereof and their respective directors, officers, employees or managers (including management and employee benefit plans or agreements, retirement or savings plans, vacation plans, subscription agreements or similar agreements pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current or former employees, officers, directors, managers, consultants or independent contractors and stock option or incentive plans and other compensation arrangements) in the ordinary course of business or as otherwise approved by the board of directors (or other similar governing body) of Holdings, any Parent Entity, the Borrower or any Subsidiary, (g) Restricted Payments permitted under Section 7.06 (excluding provisions thereof generally permitting transactions permitted by this Section 7.08), (h) Investments permitted under Section 7.02 (excluding provisions thereof generally permitting transactions permitted by this Section 7.08), (i) [reserved], (j) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.08 or any amendment to any such agreement to the extent such an amendment is not materially adverse, taken as a whole, to the Lenders in any material respect, (k) transactions between a Loan Party and any Person that is an Affiliate solely due to the fact that a director of such Person is also a director of any Loan Party; *provided*, *however*, that such director abstains from voting as a director of such Loan Party, as the case may be, on any matter involving such other Person, (l) [reserved], (m) loans, guarantees and other transactions by the Borrower and its Subsidiaries to the extent not prohibited under Article VII (excluding provisions thereof

generally permitting transactions permitted by this <u>Section 7.08</u>), (n) [reserved], (o) any issuance of Equity Interests in Holdings or any Parent Entity, or other payments, awards or grants in cash, securities, Equity Interests in Holdings or any Parent Entity or otherwise pursuant to, or the funding of, employment arrangements, stock options and stock ownership plans in the ordinary course of business approved by the board of directors (or other similar governing body) of Holdings, such Parent Entity or the Borrower, as the case may be, (p) the payment of reasonable out-of-pocket costs and expenses relating to registration rights and indemnities provided to Persons holding Equity Interests of the Loan Parties pursuant to any registration rights agreement entered into after the Closing Date, (q) [reserved], (r) transactions with wholly owned Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business and consistent with past practice, and (s) transactions with joint ventures for the purchase or sale of goods, equipment and services entered into in the ordinary course of business and consistent with past practice.

Section 7.09    <u>Burdensome Agreements</u>.  Enter into or permit to exist any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability (a) of any Subsidiary that is not a Loan Party to make Restricted Payments to Borrower or any Guarantor, except for (i) any agreement in effect on the Closing Date and described on <u>Schedule 7.09</u> (as amended, so long as such restrictions are not expanded in scope), (ii) any agreement in effect at the time any Subsidiary becomes a Subsidiary of the Borrower, or any agreement assumed in connection with the acquisition of assets from any Person, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary of the Borrower or of the acquisition of assets from such Person, (iii) any agreement representing Indebtedness of a Subsidiary of the Borrower which is not a Loan Party and which Indebtedness is permitted by <u>Section 7.03</u>, (iv) any agreement in connection with a Disposition permitted by <u>Section 7.05</u> or, any disposition not constituting a Disposition, (v) customary provisions (1) in joint venture agreements or other similar agreements applicable to joint ventures permitted under <u>Section 7.02</u>, and (2) in partnership agreements, limited liability company agreements and other similar agreements that restrict the transfer of ownership interests in the relevant partnership, limited liability company or other person, (vi) customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (vii) customary net worth provisions contained in real property leases entered into by the Borrower or any Subsidiary in the ordinary course of business, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower and the Subsidiaries to meet their ongoing payment obligations under the Loan Documents, (viii) any customary restrictions of IP rights contained in licenses or sublicenses (or other grants of rights to use or exploit), (ix) customary provisions restricting the subletting or assignment of any lease governing a leasehold interest, (x) customary or reasonable restrictions contained in any agreements or instruments governing (A) a Permitted Revolving Credit Facility, (B) Indebtedness permitted pursuant to <u>Sections 7.03(h)</u> (to the extent applicable only to the Foreign Subsidiaries obligated with respect to such Indebtedness) and <u>7.03(q)</u>, (C) Indebtedness permitted pursuant to <u>Section 7.03</u> (to the extent applicable only to the Foreign Subsidiaries obligated with respect to such Indebtedness), and (D) Swap Contracts permitted under this Agreement, and, in each case, any Permitted Refinancing thereof (or successive Permitted Refinancings thereof), (xi) restrictions contained in agreements and instruments governing Indebtedness permitted pursuant to <u>Section 7.03</u> to the extent not materially more restrictive, taken as a whole, to the Borrower and its Subsidiaries than the covenants contained in this Agreement and the other Loan Documents (as

-135-

reasonably determined by the Borrower, which determination shall be conclusive), (xii) any agreement relating to Indebtedness incurred pursuant to Sections 7.03(g), (xiii) solely to the extent that such restrictions relate to the Subsidiary being acquired or incurring such Indebtedness restrictions contained in Indebtedness permitted pursuant to Section 7.03(o), (xiv) restrictions imposed by reason of applicable Law, and (xv) any amendments, modifications, restatements, renewal, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in the foregoing clauses (i) through (xiv); *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower not materially more restrictive with respect to such Restricted Payment restrictions than those contained in the Restricted Payment restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing; or (b) of the Borrower or any Subsidiary Guarantor to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Lenders with respect to the Term Facilities and the Obligations or under the Loan Documents except for (i) any agreement in effect on the Closing Date and described on Schedule 7.09, (ii) any agreement in effect at the time any Subsidiary becomes a Subsidiary of the Borrower, or any agreement assumed in connection with the acquisition of assets from any Person, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary of the Borrower or of the acquisition of assets from such Person and applies solely to such Subsidiary or to such acquired assets, (iii) customary restrictions that arise in connection with (x) any Lien permitted by Section 7.01 on any asset or property that is not, and is not required to be, Collateral that relates to the property subject to such Lien or (y) any Disposition permitted by Sections 7.04 or 7.05 and relate solely to the assets or Person subject to such Disposition, (iv) negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Sections 7.03(g), but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness and proceeds and products thereof (including property which is cross-collateralized pursuant to the proviso to such clause), (v) restrictions imposed by (1) any agreement relating to secured Indebtedness permitted pursuant to Section 7.03 to the extent that such restrictions apply only to the property or assets securing such Indebtedness and proceeds and products thereof, or (2) any agreements and instruments governing Indebtedness permitted pursuant to Section 7.03 to the extent not materially more restrictive, taken as a whole, to the Borrower and its Subsidiaries than the covenants contained in this Agreement and the other Loan Documents (as reasonably determined by the Borrower, which determination shall be conclusive), (vi) customary restrictions in leases, subleases, licenses, sublicenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto, (vii) customary net worth provisions contained in real property leases entered into by the Borrower or any Subsidiary in the ordinary course of business, so long as the Borrower has determined in good faith that such net worth provisions would not reasonably be expected to impair the ability of the Borrower and the Subsidiaries to meet their ongoing obligations, (viii) [reserved], (ix) restrictions arising (1) in connection with cash or other deposits permitted under Sections 7.01 or 7.02 and limited to such cash or deposit, or (2) in respect of cash collateral so long as the Lien in respect of such cash collateral is permitted hereunder, (x) customary provisions restricting assignment of any agreement entered into in the ordinary course of business, (xi) customary and reasonable provisions restricting the subletting or assignment of any lease governing a leasehold interest, (xii) customary and reasonable provisions (1) in joint venture agreements and other similar agreements applicable to joint ventures, and (2) in partnership agreements, limited liability company

-136-

agreements and other similar agreements that restrict the transfer of ownership interests in the relevant partnership, limited liability company or other person, (xiii) Indebtedness permitted pursuant to Section 7.03 incurred by Foreign Subsidiaries (to the extent applicable only to the Foreign Subsidiaries obligated with respect to such Indebtedness), (xiv) restrictions imposed by applicable Law, (xv) restrictions contained in Swap Contracts and in other Indebtedness permitted pursuant to Section 7.03(i) or (p), provided that such restrictions do not restrict the Liens securing the Obligations as contemplated by the Loan Documents or the senior priority status thereof, (xvi) any Permitted Factoring Arrangements to the extent limited to the assets subject to such Permitted Factoring Arrangements or not materially more restrictive, when taken as a whole (as reasonably determined by the Borrower), than the restrictions contained in the Loan Documents and (xvii) any amendments, modifications, restatements, renewal, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in the foregoing clauses (i) through (xvi); provided that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower not materially more restrictive with respect to such Lien restrictions than those contained in the Lien restrictions prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 7.10     [Reserved.]

Section 7.11     Accounting Changes.  Make any change in the fiscal year of the Borrower; provided, however, that the Borrower may, with the written consent of the Administrative Agent (at the direction of the Required Lenders), change its fiscal year to any other fiscal year reasonably acceptable to the Required Lenders, in which case, the Borrower and the Administrative Agent will, and is hereby authorized by the Lenders to make any amendments to this Agreement that are necessary, in the reasonable judgment of the Borrower, to reflect such change in fiscal year.

Section 7.12     Prepayments, Etc. of Indebtedness; Amendments.  (a) Make, directly or indirectly, any voluntary prepayment or other voluntary distribution (whether in cash, securities or property), prior to the scheduled due date thereof, of or in respect of principal of or interest on Junior Financing, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of such Junior Financing in respect thereof, except (i) payments of regularly scheduled interest and fees and payments of indemnities and expense reimbursement, (ii) a prepayment, redemption, purchase, defeasance or other satisfaction of Junior Financing made using the portion, if any, of the Available Amount on the date of such election that the Borrower elects to apply to this Section 7.12(a)(ii); provided that (A) no Event of Default shall have occurred and be continuing or would result therefrom and (B) immediately after giving effect to any such prepayment, redemption, purchase, defeasance or other satisfaction, the Borrower shall be in Pro Forma Compliance with a Total Net Leverage Ratio as of the end of the Test Period not to exceed 2.50:1.00, such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) as though such prepayment, redemption, purchase, defeasance or other satisfaction had been made on the first day of such Test Period, (iii) the conversion of any Junior Financing to Equity Interests (other than Disqualified Equity Interests), (iv) the prepayment, redemption, purchase, defeasance or other satisfaction of any Junior

Financing with any Permitted Refinancing thereof, and (v) payments of interest in the form of payments in kind, accretion or similar payments; or (b) amend, modify or change any term or condition of any Junior Financing Documentation or any of its Organization Documents in any manner that is (I) taken as a whole, materially adverse to the interests of the Administrative Agent or the Secured Parties (*provided*, that the Borrower shall provide copies of such Organization Documents promptly following such amendment or modification; *provided*, *further*, that, if such Junior Financing, when originally incurred or at the time of such amendment, modification or change, would be permitted to be incurred having terms and conditions that give effect such amendment, modification or change, then such amendment, modification or change shall not be deemed adverse to the interests of the Administrative Agent or the Secured Parties) and (II) in the case of any Junior Financing Documentation in respect of Junior Financing that is subject to an intercreditor agreement to which the Administrative Agent is a party, prohibited by such intercreditor agreement; *provided* that this clause (b) shall not, for the avoidance of doubt, restrict a Refinancing of any Junior Financing otherwise permitted hereunder that complies with the definition of "Permitted Refinancing" and any amendment to any Junior Financing Documentation to reflect such Permitted Refinancing.

Section 7.13    Holding Company.  Conduct, transact or otherwise engage in any material business or operations; *provided* that the following shall be permitted in any event:  (i) its ownership of the Equity Interests the Borrower and activities incidental thereto; (ii) the entry into, and the performance of its obligations with respect to, the Loan Documents, any Permitted Revolving Credit Facility, or any Permitted Refinancing of any of the foregoing (or successive Permitted Refinancings thereof); (iii) the consummation of, and performance of its obligations in connection with, the Transactions; (iv) the payment of dividends and distributions, the issuance, sale and redemption of its Equity Interests, the making of contributions to the capital of its Subsidiaries; (v) the maintenance of its legal existence and activities and contractual rights incidental thereto (including the ability to incur fees, costs and expenses relating to such maintenance and performance of activities relating to its officers, directors, managers and employees and those of its Subsidiaries); (vi) [reserved]; (vii) the participation in tax, accounting and other administrative matters as a member of the consolidated group of any Parent Entity, Holdings and the Borrower, including compliance with applicable Laws and legal, tax and accounting matters related thereto and activities relating to its officers, directors, managers and employees; (viii) the holding of any cash and Cash Equivalents (but not operating any property); (ix) the entry into, and performance of its obligations with respect to, contracts and other arrangements with officers, managers, employees, consultants, independent contractors and directors of any Parent Entity, Holdings or any of its Subsidiaries relating to their employment or directorships (including the providing of indemnification to such Persons); (x) the obtainment of, and the payment of any fees and expenses for, management, consulting, monitoring, investment banking, advisory and other services to the extent otherwise permitted by this Agreement; (xi) any transaction between any Parent Entity, Holdings and the Borrower or any Subsidiary expressly permitted under this Article VII, including (a) holding any cash or property received in connection with Restricted Payments made by the Borrower or any Subsidiary in accordance with Section 7.06 pending application thereof by Holdings in the manner (if specified) contemplated by Section 7.06 (including the redemption in whole or in part of any of its Equity Interests in exchange for another class of Equity Interests or rights to acquire its Equity Interests or with proceeds from substantially concurrent equity contributions or issuances of new shares of its Equity Interests), (b) making any Investment to the extent (1) payment therefor is made solely with the Equity

-138-

Interests of any Parent Entity or Holdings, the proceeds of Restricted Payments received from the Borrower and/or proceeds of the issuance of, or contribution in respect of the, Equity Interests of any Parent Entity or Holdings and (2) any property (including Equity Interests) acquired in connection therewith is contributed to the Borrower or a Subsidiary Guarantor (or, if otherwise permitted by <u>Section 7.06</u>, a Subsidiary) or the Person formed or acquired in connection therewith is merged with the Borrower or a Subsidiary and (c) the (1) provision of guarantees in the ordinary course of business in respect of obligations of the Borrower or any of its Subsidiaries to suppliers, customers, franchisees, lessors, licensees, sublicensees or distribution partners; *provided*, for the avoidance of doubt, that such guarantees shall not be in respect of Indebtedness for borrowed money and (2) incurrence of Indebtedness representing deferred compensation to employees, consultants or independent contractors of any Parent Entity or Holdings and unsecured Indebtedness consisting of promissory notes issued to any future, present or former employee, director, manager, officer, member of management, consultant or distributor (or their respective Affiliates or estates, heirs, family members, spouses, former spouses, domestic partner and/or former domestic partner) of the Borrower or any of its Subsidiaries to finance the retirement, acquisition, repurchase, purchase or redemption of Equity Interests of any Parent Entity or Holdings; (xii) paying taxes and other customary obligations in the ordinary course of business; (xiii) preparing reports to, notices to and filings with Governmental Authorities and to its shareholders; (xiv) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable law and (xv) complying with applicable Law and activities incidental to the foregoing; or (b) if the Person formed by or surviving any such merger, amalgamation or consolidation is not Holdings (any such Person, "<u>Successor Holdings</u>"), (A) Successor Holdings shall be an entity organized or existing under the laws of the United States, any state thereof or the District of Columbia, (B) Successor Holdings shall expressly assume all the obligations of Holdings under this Agreement and the other Loan Documents pursuant to an agreement or agreements in form and substance reasonably satisfactory to the Required Lenders, (C) such merger shall be permitted or not restricted under <u>Section 7.04</u> and (E) to the extent requested by the Administrative Agent, Holdings shall have delivered to Administrative Agent an officer's certificate and an opinion of counsel, each stating that such merger or consolidation and such agreement or agreements referred to above comply with this Agreement; *provided*, *further*, that if the foregoing are satisfied, Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement.  Holdings shall not create, incur, assume or suffer to exist any Lien on any Equity Interests of the Borrower (other than Liens pursuant to any (x) Loan Document, (y) any agreement or documentation governing a Permitted Revolving Credit Facility so long as such Lien is subject to the Permitted ABL Intercreditor Agreement or Permitted Cash Flow Revolver Intercreditor Agreement, as applicable or (z) non-consensual Liens arising solely by operation of Law).

<div align="center">

ARTICLE VIII
Events of Default and Remedies

</div>

Section 8.01    <u>Events of Default</u>.  Any of the following shall constitute an "Event of Default":

(a)    <u>Non-Payment</u>.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Term Loan when due, or (ii)

<div align="center">-139-</div>

within five (5) Business Days after the same becomes due, any interest on any Term Loan or any fee due hereunder, or any other amount payable hereunder or with respect to any other Loan Document; or

(b)      Specific Covenants.  Holdings, the Borrower or any Subsidiary fails to perform or observe any term, covenant or agreement contained in any of Sections  6.01, 6.02, 6.03(a), 6.05(a) (solely with respect to the Borrower), 6.07, 6.10, 6.11, 6.12, 6.14, 6.17 or in any Section of Article VII; or

(c)      Other Defaults.  Holdings, the Borrower or any Subsidiary fails to perform or observe any covenant or agreement (other than those specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after notice thereof by the Administrative Agent or the Required Lenders to the Borrower; or

(d)      Representations and Warranties.  Any representation or warranty made or deemed made by or on behalf of Holdings, the Borrower or any Subsidiary herein, in any other Loan Document, or in any document required to be delivered pursuant hereto or thereto shall be incorrect in any material respect when made or deemed made (or in any respect if any such representation or warranty is already qualified by materiality); materiality).

(e)      Cross-Default.  Any Loan Party or any Subsidiary (i) fails to make any payment of principal, premium or interest beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise), in respect of any Indebtedness (other than Indebtedness hereunder and Indebtedness owed by any Loan Party to any Subsidiary or owed by any Subsidiary to any Loan Party or any other Subsidiary) having an aggregate outstanding principal amount of more than the Threshold Amount or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness (other than Indebtedness hereunder and Indebtedness owed by a Loan Party to another Loan Party) having an aggregate outstanding principal amount of more than the Threshold Amount, or any other event occurs (and such failure or event continues past any applicable grace period), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; *provided* that this clause (e)(ii) shall not apply to (x) secured Indebtedness that becomes due as a result of the voluntary sale or transfer or other Disposition (including any Casualty Event) of the property or assets securing such Indebtedness, if such sale, transfer or Disposition is permitted hereunder and under the documents providing for such Indebtedness and such Indebtedness is repaid when required under the documents providing for such Indebtedness or (y) events of default, termination events or any other similar event under the documents governing Swap Contracts for so long as such event of default, termination event or other similar event does not result in the occurrence of an early termination date or any acceleration or prepayment of any amounts or other Indebtedness payable thereunder; or

(f)      Insolvency Proceedings, Etc.  Any Loan Party or any Subsidiary institutes

-140-

or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or substantially all of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged and unstayed for sixty (60) days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed and unstayed for sixty (60) days, or an order for relief with respect to any material portion of the Collateral is entered in any such proceeding; or

(g)     Inability to Pay Debts; Attachment.  (i) Any Loan Party or any Subsidiary admits in writing its inability or fails generally to pay its debts as they become due or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or substantially all of the property of any such Person, with respect to an assessed obligation in excess of the Threshold Amount and is not released, vacated or fully bonded within sixty (60) days after its issue or levy; or

(h)     Judgments.  There is entered against any Loan Party or any Subsidiary a final judgment or order for the payment of money in an aggregate amount exceeding the Threshold Amount (to the extent not paid, and not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and does not dispute coverage) and there is a period of sixty (60) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)     ERISA.  (i) An ERISA Event or Foreign Plan Event occurs which results in, or would  reasonably be expected to result in, a Material Adverse Effect or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under any Multiemployer Plan which has resulted, or would reasonably be expected to result in, a Material Adverse Effect; or

(j)     Invalidity of Loan Documents.  Any material provision of the Guaranty or any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than (x) as expressly permitted hereunder or thereunder (including such express permission as a result of a transaction permitted under Section 7.04 or 7.05, or satisfaction in full of all the Obligations then due and owing (other than contingent indemnification or other obligations as to which no claim has been asserted and obligations)), or (y) as a result of the acts or omissions of the Administrative Agent or any Lender, ceases to be in full force and effect; or any Loan Party denies in writing that it has any or further liability or obligation under any Guaranty or any Collateral Document (other than as a result of repayment in full of the Obligations then due and owing (other than contingent indemnification or other obligations as to which no claim has been asserted) and termination of the Aggregate Term Commitments, or as a result of a transaction permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05)); or

(k)     Change of Control.  There occurs any Change of Control; or

(l)      Collateral Documents.  Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.12 shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create a valid and perfected lien on and security interest in Collateral (other than an immaterial portion thereof) covered by the Collateral Documents as a whole, subject to Liens permitted under Section 7.01, except (i) to the extent that any such perfection or priority is not required pursuant to Section 6.12 or Section 6.14, or the provisions of the applicable Collateral Document, or results from the failure of the Administrative Agent to maintain possession of possessory collateral actually delivered to it or to file Uniform Commercial Code or Canadian PPSA continuation statements or other applicable documents or statements to the extent solely within its control or (ii) upon satisfaction in full of all the Obligations then due and owing (other than the contingent indemnification or other obligations as to which no claim has been asserted and obligations).

(m)      Intercreditor Agreement.  (A) Any Loan Party shall assert in writing that any Permitted ABL Intercreditor Agreement or Permitted Cash Flow Revolver Intercreditor Agreement (in each case after execution and delivery thereof) or other applicable subordination agreement (after execution and delivery thereof) shall have ceased for any reason to be in full force and effect (other than pursuant to the terms hereof or thereof) or shall knowingly contest, or knowingly support another Person in any action that seeks to contest, the validity or effectiveness of any such intercreditor or subordination agreement (other than pursuant to the terms hereof or thereof) or (B) the lien priority or payment priority provisions of the Permitted ABL Intercreditor Agreement or Permitted Cash Flow Revolver Intercreditor Agreement (in each case after execution and delivery thereof) or the payment or lien subordination provisions of any other applicable subordination agreement (after execution and delivery thereof), in each case, with respect to Indebtedness having an outstanding principal amount in excess of the Threshold Amount, shall terminate, cease to be effective or cease to be legally valid, binding and enforceable against any party thereto except as otherwise permitted hereunder or in accordance with its terms (as in effect when such document is consented to by the Borrower).

Section 8.02      Remedies Upon Event of Default.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of the Required Lenders, take any or all of the following actions:

(a)      declare the Term Commitments (if any) to be terminated, whereupon such Term Commitments shall be terminated;

(b)      declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, all premiums accrued and unpaid thereon, if any, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(c)      [reserved]; and

(d)      exercise on behalf of itself and the Lenders all rights and remedies available to it, and the Lenders under the Loan Documents, under any document evidencing Indebtedness in respect of which the Term Facilities have been designated as "Designated Senior Debt" (or any

-142-

comparable term) and/or under applicable Law;

*provided*, *however*, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under any Debtor Relief Law, the obligation of each Lender to make Term Loans shall automatically terminate, the unpaid principal amount of all outstanding Term Loans and all interest, premiums, if any, and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

Section 8.03      [Reserved.]

Section 8.04      Application of Funds.  After the exercise of remedies provided for in Section 8.02 (or after an actual or deemed entry of an order for relief with respect to the Borrower under any Debtor Relief Law), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order, subject to any contrary provisions expressly set forth in any Permitted ABL Intercreditor Agreement or Permitted Cash Flow Revolver Intercreditor Agreement, as applicable:

(a)      first, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, disbursements and other charges of counsel payable under Section 10.04 and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

(b)      second, to payment in full of Unfunded Advances/Participations;

(c)      third, to payment of that portion of the Obligations constituting fees, indemnities, expenses, any prepayment premium and other amounts (other than principal and interest) payable to the Super Senior Lenders (in their capacities as such) (including fees, disbursements and other charges of counsel payable under Section 10.05) arising under the Loan Documents and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this clause (c) held by them;

(d)      fourth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Super Senior Incremental Term Loans, ratably among the Super Senior Lenders in proportion to the respective amounts described in this clause (d) held by them;

(e)      fifth, to payment of that portion of the Obligations constituting unpaid principal of the Super Senior Incremental Term Loans, ratably among the Super Senior Lenders in proportion to the respective amounts described in this clause (e) held by them;

(f)      sixth, to payment of that portion of the Obligations constituting fees, indemnities, expenses, any Applicable Premium and other amounts (other than principal and interest) payable to the First Out Lenders (in their capacities as such) (including fees, disbursements and other charges of counsel payable under Section 10.05) arising under the Loan Documents and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this clause (f) held by them;

(g)      seventh, to payment of that portion of the Obligations constituting accrued

and unpaid interest on the First Out Term Loans, ratably among the First Out Lenders in proportion to the respective amounts described in this clause (g) held by them;

(h)     eighth, to payment of that portion of the Obligations constituting unpaid principal of the First Out Term Loans, ratably among the First Out Lenders in proportion to the respective amounts described in this clause (h) held by them;

(i)     ninth, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) payable to the Second Out Lenders (in their capacities as such) (including fees, disbursements and other charges of counsel payable under Section 10.05) arising under the Loan Documents and amounts payable under Article III, ratably among them in proportion to the respective amounts described in this clause (i) held by them;

(j)     tenth, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Second Out Term Loans, ratably among the Second Out Lenders in proportion to the respective amounts described in this clause (j) held by them;

(k)     eleventh, to payment of that portion of the Obligations constituting unpaid principal of the Second Out Term Loans, ratably among the Second Out Lenders in proportion to the respective amounts described in this clause (k) held by them;

(l)     twelfth, to the payment of all other Obligations of the Loan Parties owing under or in respect of the Loan Documents that are then due and payable to the Administrative Agent and the other Secured Parties, ratably based upon the respective aggregate amounts of all such Obligations then owing to the Administrative Agent and the other Secured Parties; and

(m)     last, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Law.

<div align="center">

ARTICLE IX
Administrative Agent and Other Agents

</div>

Section 9.01     Appointment and Authorization of Agents.   (a) Each Lender hereby irrevocably (i) appoints and designates (A) Acquiom to act on its behalf as a Co-Administrative Agent hereunder and under the other Loan Documents, (B) Seaport to act on its behalf as a Co-Administrative Agent hereunder and under the other Loan Documents, and (ii)  authorizes each Co-Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto; *provided*, that notwithstanding anything to the contrary in this Agreement or any other Loan Document (but without limiting any rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent under this Agreement and the other Loan Documents), the appointment of Seaport as a Co-Administrative Agent is solely with respect to its capacity in processing assignments of the Loans under this Agreement (and Seaport shall not be required to, or have any duty to or responsibility for, acting in any other capacities, without its prior written consent).   Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, no Agent

<div align="center">-144-</div>

shall have any duties or responsibilities, except those expressly set forth herein, nor shall any Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.  Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)     [Reserved.]

(c)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers as are reasonably incidental thereto.  In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder or under any intercreditor agreement at the direction of the Administrative Agent or the Required Lenders), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02     Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents or of exercising any rights and remedies thereunder or under any intercreditor agreement) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct.

Section 9.03     Liability of Agents.  No Agent-Related Person shall (a) be liable to any Secured Party in its capacity as such for any action taken or omitted to be taken by any of them (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as any Co-Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 8.02 or Section 10.01) or (ii) in the absence of its own gross negligence or willful misconduct (the absence of which shall be presumed unless otherwise   determined in a final, non-appealable judgment by a court of competent jurisdiction) or (b) be responsible in any manner to any Secured Party for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness,

-145-

enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof. In no event shall the Administrative Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit), even if the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.  Notwithstanding anything contained in this Agreement to the contrary, the Administrative Agent shall be under no obligation (i) to monitor, determine or verify the unavailability or cessation of Term SOFR or Adjusted Term SOFR (or other applicable benchmark interest rate), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any date on which such rate may be required to be transitions or replaced in accordance with the terms of the Loan Documents, applicable law or otherwise, (ii) to select, determine or designate any replacement to such rate, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied, (iii) to select, determine or designate any modifier to any replacement or successor index, or (iv) to determine whether or what amendments to this Agreement or the other Loan Documents are necessary or advisable, if any, in connection with any of the foregoing.

No provision of this Agreement or any other Loan Document shall require the Administrative Agent to expend or risk its own funds or (unless indemnified by the Loan Parties to the reasonable satisfaction of the Administrative Agent pursuant to the Loan Documents or otherwise) incur any financial liability in the performance of any of its duties hereunder or thereunder or in the exercise of any of its rights or powers, if it shall have grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

In no event shall the Administrative Agent be liable for any failure or delay in the performance of its obligations under this Agreement or any other Loan Document because of circumstances beyond the Administrative Agent's control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Administrative Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

Section 9.04     Reliance by Agents.  (a) Each Agent shall be entitled to conclusively rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent.  Each Agent shall be fully justified in failing

or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action. Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance, as reasonably determined by the Administrative Agent) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders. Without limiting any rights, protections, immunities or indemnities afforded to the Administrative Agent hereunder (including without limitation this Article VIII), phrases such as "satisfactory to the Administrative Agent," "approved by the Administrative Agent," "acceptable to the Administrative Agent," "as determined by the Administrative Agent," "in the Administrative Agent's discretion," "selected by the Administrative Agent," "elected by the Administrative Agent," "requested by the Administrative Agent," and phrases of similar import that authorize or permit the Administrative Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent receiving written direction from the Required Lenders to take such action or to exercise such rights. Nothing contained in this Agreement shall require any Agent to exercise any discretionary acts.

(b)     For purposes of determining compliance with the conditions specified in Sections 4.01 and 4.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 9.05     Notice of Default. The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to defaults in the payment of principal and interest required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Administrative Agent shall notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; *provided*, *however*, that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable.

Section 9.06     Credit Decision; Disclosure of Information by Agents. Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance

-147-

upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder.  Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07     Indemnification of Agents.  Whether or not the transactions contemplated hereby are consummated, each Lender shall, on a ratable basis based on such Lender's Pro Rata Share of all the Term Facilities, indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), and hold harmless each Agent-Related Person in each case from and against any and all Indemnified Liabilities incurred by such Agent-Related Person; *provided*, *however*, that no Lender shall be liable for any Indemnified Liabilities incurred by an Agent-Related Person to the extent such Indemnified Liabilities are determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Agent-Related Person's own gross negligence or willful misconduct; *provided*, *however*, that no action taken in accordance with the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07.  In the case of any investigation, litigation or proceeding giving rise to any Indemnified Liabilities, this Section 9.07 shall apply whether or not any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limiting the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its pro rata share of any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any source against any amount due to the Administrative Agent under this Section 9.07. The undertaking in this Section 9.07 shall survive termination of the Aggregate Term Commitments, the payment of all other Obligations and the resignation or removal of the Administrative Agent.

Section 9.08     Agents in their Individual Capacities.  Any Agent and its Affiliates may

make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though it were not an Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, an Agent or its Affiliates may receive information regarding any Loan Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that such Agent shall be under no obligation to provide such information to them.  With respect to its Term Loans, such Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not an Agent, and the terms "Lender" and "Lenders" include such Agent in its individual capacity.

Section 9.09    <u>Successor Agents</u>.  Each Co-Administrative Agent may resign as a Co-Administrative Agent upon thirty (30) days' written notice to the Lenders and the Borrower (*provided* that no such notice to the Borrower shall be required if an Event of Default under <u>Section 8.01(f)</u> or <u>(g)</u> shall have occurred and be continuing).  If a Co-Administrative Agent resigns under this Agreement, the Required Lenders shall appoint a successor agent for the Lenders, which successor agent shall be consented to by the Borrower at all times other than during the existence of an Event of Default under <u>Section 8.01(a)</u>, <u>(f)</u> or <u>(g)</u> (which consent of the Borrower shall not be unreasonably withheld or delayed).  If no successor agent is appointed prior to the effective date of the resignation of a Co-Administrative Agent, such Co-Administrative Agent may appoint, after consulting with the Lenders and the Borrower, a successor agent from among the Lenders.  Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Co-Administrative Agent and the term "Co-Administrative Agent" or "Administrative Agent" shall mean such successor co-administrative agent, and the retiring Co-Administrative Agent's appointment, powers and duties as a Co-Administrative Agent and Administrative Agent shall be terminated.  After the retiring Co-Administrative Agent's resignation hereunder as a Co-Administrative Agent, the provisions of this <u>Article IX</u> and <u>Sections 10.04</u> and <u>10.05</u> shall continue in effect for its benefit as to any actions taken or omitted to be taken by it while it was a Co-Administrative Agent under this Agreement.  If no successor agent has been appointed and accepted such appointment as a Co-Administrative Agent by the date which is thirty (30) days following the retiring Co-Administrative Agent's notice of resignation, the retiring Co-Administrative Agent's resignation shall nevertheless thereupon become effective and the Lenders (or, in the case of a resignation of Seaport Loan Products LLC, the other Co-Administrative Agent) shall perform all of the duties of such Co-Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  Upon the acceptance of any appointment as a Co-Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, the entering Co-Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Co-Administrative Agent.   Upon the acceptance of any appointment as a Co-Administrative Agent hereunder by a successor or upon the expiration of the 30-day period following the retiring Co-Administrative Agent's notice of resignation without a successor agent having been appointed, the retiring Co-Administrative Agent shall be discharged from its duties

and obligations under the Loan Documents.  If a Co-Administrative Agent becomes a Defaulting Agent, such Co-Administrative Agent may be removed as a Co-Administrative Agent hereunder by the Borrower or the Required Lenders.

Upon the expiration of the 30-day period following the retiring Co-Administrative Agent's notice of registration without a successor agent having been appointed, notwithstanding such absence of a successor agent, the Borrower shall not be prohibited from the borrowing of Term Loans under the Loan Documents due to any purported inability to make representations and warranties regarding Liens or perfection of such Liens.

Section 9.10    Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Secured Parties and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.11    Collateral and Guaranty Matters.  Each of the Lenders irrevocably authorizes and directs the Administrative Agent to, and the Administrative Agent shall, upon the request of the Borrower,

-150-

(a)      release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate Term Commitments and payment in full of all Obligations then due and owing (other than contingent indemnification or other contingent obligations as to which no claim has been asserted, (ii) that is sold, disposed of or distributed or to be sold, disposed of or distributed as part of or in connection with any sale permitted hereunder or under any other Loan Document to a Person that is not a Loan Party, (iii) subject to Section 10.01, if approved, authorized or ratified in writing by the Required Lenders, (iv) owned by a Subsidiary Guarantor upon release of such Subsidiary Guarantor from its obligations under its Guaranty pursuant to clause (c) below, (v) upon property constituting Excluded Assets or (vi) to the extent required pursuant to the terms of any Permitted ABL Intercreditor Agreement or Permitted Cash Flow Revolver Intercreditor Agreement;

(b)      release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i);

(c)      release any Subsidiary Guarantor from its obligations under the Guaranty (i) if such Person ceases to be a Subsidiary or (ii) to the extent required pursuant to the terms of any Permitted ABL Intercreditor Agreement or Permitted Cash Flow Revolver Intercreditor Agreement; and

(d)      establish intercreditor arrangements as contemplated by this Agreement.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11. In each case as specified in this Section 9.11, the Administrative Agent shall (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents prepared by a Loan Party (and in form and substance reasonably satisfactory to the Administrative Agent) as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to subordinate any Lien thereon granted to or held by the Administrative Agent, or to release (or evidence the release of) such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11; *provided* that, the Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer of the Borrower certifying that any such transaction has been consummated in compliance with this Agreement and the other Loan Documents, which the Administrative Agent shall be entitled to conclusively rely upon and upon receipt the Administrative Agent shall be authorized to execute and deliver any and all documents evidencing the release of such items of Collateral or Guarantor or the subordination of such Liens without incurring any liability therefor. Each of the Lenders hereby direct and authorize the Administrative Agent to execute and deliver any releases presented to the Administrative Agent for execution in accordance with the terms of any Permitted ABL Intercreditor Agreement or Permitted Cash Flow Revolver Intercreditor Agreement, and the Administrative Agent shall have no obligations to investigate or determine whether any such release is permitted by the Loan Documents or any other related document and shall incur no liability for executing and delivering any such release.

-151-

Section 9.12        Erroneous Payments.

(a)        Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender)  (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "Erroneous Payment") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine.  A notice of the Administrative Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

(b)        Without limiting immediately preceding clause (a), each Lender hereby further agrees that if it receives a payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Lender is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine.  Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)        The Borrower and each other Loan Party hereby agrees that (x) in the event

-152-

an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Administrative Agent's rights and remedies under this Section 9.12), the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(d)     In addition to any rights and remedies of the Administrative Agent provided by law, Administrative Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 9.12 and which has not been returned to the Administrative Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Administrative Agent or any of its Affiliate, branch or agency thereof to or for the credit or the account of such Lender. Administrative Agent agrees promptly to notify the Lender after any such setoff and application made by Administrative Agent; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

(e)     Each party's obligations under this Section 9.12 shall survive the resignation or replacement of the Administrative Agent, the termination of the Term Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

Section 9.13     No Fiduciary Relationship.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any other Lender.  Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

Section 9.14     Appointment of Supplemental Administrative Agents.  (a) It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent, administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "Supplemental Administrative Agent" and collectively as "Supplemental Administrative Agents").

-153-

(b)     In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this <u>Article IX</u> and of <u>Sections 10.04</u> and <u>10.05</u> (obligating the Borrower to pay the Administrative Agent's expenses and to indemnify the Administrative Agent) that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)     Should any instrument in writing from the Borrower, Holdings or any other Loan Party be reasonably required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower or Holdings, as applicable, shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon reasonable request by the Administrative Agent or the Required Lenders.   In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

Section 9.15     <u>Certain ERISA Matters</u>.  (a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto to, and (y) covenants, from the date such Person became a Lender party hereto until the date such Person ceases to be a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Term Loans or Term Commitments,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the

-154-

Term Commitments and this Agreement,

        (iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Term Loans, the Term Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Term Loans, the Term Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the Term Commitments and this Agreement, or

        (iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

        (b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

        (i)    none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

        (ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Term Loans, the Term Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E), (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Term Loans, the Term Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Term Loans, the Term Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the Term Commitments and this Agreement, or

        (iii)    the Person making the investment decision on behalf of such Lender

with respect to the entrance into, participation in, administration of and performance of the Term Loans, the Term Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)      the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Term Loans, the Term Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Term Loans, the Term Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)      no fee or other compensation is being paid directly to the Administrative Agent or any of its Affiliates for investment advice (as opposed to other services) in connection with the Term Loans, the Term Commitments or this Agreement.

(c)      The Administrative Agent hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person may have a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Term Loans, the Term Commitments and this Agreement, (ii) may recognize a gain if it extended the Term Loans or the Term Commitments for an amount less than the amount being paid for an interest in the Term Loans or the Term Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

For purposes of this Section 9.15, the following definitions apply to each of the capitalized terms below:

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

Section 9.16      Credit Bidding.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States,

including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject and/or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.01 of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle *pro rata* by the Lenders, as a result of which each of the Lenders shall be deemed to have received a *pro rata* portion of any Equity Interests or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders *pro rata* and the Equity Interests or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be canceled, without the need for any Secured Party or any acquisition vehicle to take any further action).

<div align="center">ARTICLE X<br>Miscellaneous</div>

Section 10.01    Amendments, Etc.    Except as otherwise expressly set forth in this Agreement, no amendment, waiver or consent of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower (or the applicable Loan Party), and delivered to the Administrative Agent (other than with respect to any other amendment or waiver contemplated in clauses (a) through (i) below, which shall only require the consent of the Lenders expressly described below rather than the Required Lenders), and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that no such amendment, waiver or consent shall:

(a)    extend or increase the Term Commitment of any Lender, or reinstate the Term Commitment of any Lender after the termination of such Term Commitment pursuant to Section 8.02, in each case without the written consent of each Lender directly and adversely

<div align="center">-157-</div>

affected thereby (it being understood that a waiver of (or the amendments to the terms of) any condition precedent set forth in <u>Section 4.02</u> or the waiver of (or the amendments to the terms of) any Default, mandatory prepayment or mandatory reduction of the Term Commitments shall not constitute an extension or increase of any Term Commitment of any Lender);

(b)        postpone any date scheduled for any payment of principal of, or interest on, any Term Loan, or any fees or other premium payable hereunder, without the written consent of each Lender directly and adversely affected thereby, it being understood that the waiver of any obligation to pay interest at the Default Rate, and the amendment or waiver of any mandatory prepayment of Term Loans under any Term Facility (or any component in calculation of the amount of such prepayment) shall not constitute a postponement of any date scheduled for the payment of principal, interest or fees;

(c)        reduce the principal of, or the rate of interest specified herein on, any Term Loan, or increase the portion of the total interest on the Second Out Term Loans that is payable in-kind, or (subject to clause (iii) of the proviso following clause (h) below) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby; *provided*, *however*, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation to pay interest at the Default Rate;

(d)        modify (i) <u>Section 2.06(c)</u>, <u>2.13</u> or <u>8.04</u>  without the written consent of each Lender directly and adversely affected thereby or (ii) clause (y) of the proviso to <u>Section 10.07(j)</u> without the written consent of each Second Out Term Lender;

(e)        change any provision of this <u>Section 10.01</u>, or the definition of Required Lenders, or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or to make any determination or grant any consent hereunder without the written consent of each Lender;

(f)        other than in a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(g)        other than in a transaction permitted under Section 7.04 or 7.05, release all or substantially all of the value of the aggregate Guaranty, without the written consent of each Lender;

(h)        other than in connection with any debtor-in-possession financing (or similar financing under applicable law), subordinate (x) the Liens securing any of the First Out Term Loans on all or substantially all of the Collateral to the Liens on the Collateral securing any other Indebtedness or (y) any First Out Term Loans or Obligations in respect thereof in contractual right of payment to any other Indebtedness, in either the case of subclause (x) or (y), without the written consent of each First Out Lender adversely affected thereby unless such affected First Out Lender has been offered a bona fide opportunity to fund or otherwise provide its pro rata share (based on the amount of First Out Term Loans that are adversely affected thereby held by such First Out Lender) of such other Indebtedness on the same terms as offered to all other providers (or their

-158-

Affiliates) of such other Indebtedness pursuant to a written offer made to such First Out Lenders describing the material terms of the arrangements pursuant to which such other Indebtedness is to be provided, which offer shall remain open to such First Out Lenders for a period of not less than five (5) Business Days; or

(i)     other than in connection with a repayment in full in cash of the Second Out Term Loans, amend, modify or waive any provision of any Loan Document to allow for any Second Out Term Loans to be exchanged for or converted into (including pursuant to a buyback or similar transaction) Indebtedness (A) secured by Liens on Collateral that are senior to the Liens securing the Second Out Term Loans, (B) senior in right of payment to the Second Out Term Loans and/or (C) structurally senior to the Second Out Term Loans (each, a "Second Out Term Loan Uptiering Transaction"), unless each Second Out Lender has been offered a bona fide opportunity to participate ratably (based on its outstanding Second Out Term Loans) in such Second Out Term Loan Uptiering Transaction on the same terms as offered to all other Second Out Lenders pursuant to a written offer made to such Second Out Lenders describing the material terms of such Second Out Term Loan Uptiering Transaction, which offer shall remain open to such Second Out Lenders for a period of not less than five (5) Business Days;

provided, further, that (i) [reserved]; (ii) [reserved]; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent, in its capacity as such, in addition to the Borrower and the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (iv) Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Term Loans are being funded by an SPC at the time of such amendment, waiver or other modification and (v) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

Notwithstanding anything herein to the contrary, no Lender consent is required to effect any amendment or supplement to any Permitted ABL Intercreditor Agreement, Permitted Cash Flow Revolver Intercreditor Agreement or intercreditor arrangement permitted under this Agreement (i) that is for the purpose of, in connection with the incurrence by any Loan Party of any Indebtedness of such Loan Party that is permitted to be secured by the Collateral pursuant to Sections 7.01 and 7.03 of this Agreement, (x) adding the holders thereof (or a Senior Representative with respect thereto) as parties thereto, as expressly contemplated by the terms of any such intercreditor agreement or other arrangement permitted under this Agreement, as applicable, and/or (y) causing such Indebtedness to be secured by a valid, perfected Lien (with such priority as may be designated by such Loan Party, to the extent such priority is permitted by the Loan Documents) (it being understood that any such amendment or supplement may make such other changes to the applicable intercreditor agreement or other arrangement as, in the good faith determination of the Administrative Agent (acting at the direction of the Required Lenders), are required to effectuate the foregoing; provided that such other changes are not adverse, in any material respect, to the interests of the Lenders) or (ii) that is expressly contemplated by any such intercreditor agreement or other intercreditor arrangement permitted under this Agreement; provided, further, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder or under any other Loan Document without the prior written consent of the Administrative Agent.

This Section 10.01 shall be subject to any contrary provision of Sections 1.03, 2.15, 2.16, 2.18 and 7.11 and the Lenders hereby authorize the Administrative Agent (acting at the direction of the Required Lenders) to enter into amendments to this Agreement and the other Loan Documents with the Borrower as may be necessary in the reasonable opinion of the Required Lenders and the Borrower in order to give effect to, and the reflect the existence of, any Term Facility Increase pursuant to Section 2.15, any Incremental Term Facility pursuant to Section 2.16, and any Extension pursuant to Section 2.18, in each case in accordance with the terms set forth therein (including the addition thereof as a "Tranche" and/or "Term Facility" hereunder, if applicable).  In addition, notwithstanding anything else to the contrary contained in this Section 10.01, if the Required Lenders and the Borrower shall have jointly identified an obvious error or any error, omission or defect of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower shall be permitted to amend such provision.

Section 10.02    Notices; Electronic Communications.  (a) General.  Unless otherwise expressly provided herein, all notices and other communications provided for herein shall be in writing (including by facsimile transmission or electronic mail) and shall be mailed, faxed, emailed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone or electronic mail shall be made to the applicable telephone number or electronic mail address, as the case may be, as follows:

(i)      if to the Borrower, the Administrative Agent, to the address, fax number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, fax number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties hereto, as provided in Section 10.02(d); and

(ii)     if to any other Lender, to the address, fax number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).   Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)      Electronic Communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving, or is unwilling to receive, notices under such Article II by electronic communication.   The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved

by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes (with the Borrower's consent), (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT-RELATED PERSONS DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT-RELATED PERSON IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall any Agent-Related Person have any liability to Holdings, the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent-Related Person; *provided*, *however*, that in no event shall any Agent-Related Person have any liability to Holdings, the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.  Each of Holdings, the Borrower and the Administrative Agent may change its address, fax, telephone number or electronic mail address for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, fax, telephone number or electronic mail address for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities

-161-

Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States federal or state securities laws.

(e)     Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower to the extent required by Section 10.05.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 10.03     No Waiver; Cumulative Remedies; Enforcement.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided hereunder and under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04     Expenses.  The Borrower agrees to pay (i) all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and the Required Lenders incurred by the Administrative Agent or the Required Lenders and any of their respective Affiliates, in connection with the structuring, documentation, negotiation, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing, extending or replacing, in whole or in part, the credit facilities provided herein, including the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or any other document or matter requested by the Borrower or any other Loan Party, (ii) all reasonable and documented out-of-pocket costs and expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the Administrative Agent for the benefit of the Secured Parties, including filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and other charges of counsel to the Administrative Agent and of counsel providing any opinions that the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) may reasonably request in respect of the Collateral or the Liens created pursuant to the Collateral Documents and (iii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel or other advisor for the Administrative Agent or any Lender) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under

this Section 10.04, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that the Loan Parties shall not be required to reimburse the legal fees and expenses of more than (x) one outside counsel (in addition to one local counsel in each relevant material jurisdiction) for the Agents and their Related Parties, taken as a whole and (y) one outside counsel (in addition to one local counsel in each relevant material jurisdiction) for the Lenders and their Related Parties, taken as a whole, or, in the case of an actual or potential conflict of interest, of one additional counsel to the affected Lenders to the extent such Lenders are similarly situated.

Section 10.05    Indemnification by the Borrower.  The Borrower agrees to indemnify the Agents, each Lender and each of their respective Related Parties (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, all reasonable out-of-pocket costs and any and all losses, claims, damages, liabilities, fees, fines, penalties, actions, judgments, suits and related expenses, including reasonable and documented fees, charges and disbursements, incurred by, imposed on or asserted against any Indemnitee, directly or indirectly, arising out of, in any way connected with, or as a result of (i) the execution, delivery, performance, administration or enforcement of the Loan Documents or any agreement or instrument contemplated thereby or the performance by the parties thereto of their respective obligations thereunder, (ii) any actual or proposed use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, (iv) any actual or alleged presence or Release or threatened Release of Hazardous Materials, on, at, under or from any property owned, leased or operated by any Loan Party at any time, or any Environmental Claim or threatened Environmental Claim related in any way to any Loan Party, (v) any past, present or future non-compliance with, or violation of, Environmental Laws or Environmental Permits applicable to any Loan Party, or any Loan Party's business, or any property presently or formerly owned, leased, or operated by any Loan Party or their predecessors in interest, (vi) the environmental condition of any property owned, leased, or operated by any Loan Party at any time, or the applicability of any Legal Requirements relating to such property, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of any Loan Party, (vii) the imposition of any environmental Lien encumbering any Real Property, (viii) the consummation of the transactions contemplated hereby or (ix) any actual or prospective action, claim, suit, litigation, investigation, inquiry or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party or otherwise, and regardless of whether any Indemnitee is a party thereto (all of the foregoing, collectively, the "Indemnified Liabilities") in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee and regardless of whether such Indemnitee is a party thereto, and whether or not such proceedings are brought by the Borrower, its equity holders, its Affiliates, creditors or any other third person; provided that (A) such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from (1) the gross negligence or willful misconduct of such Indemnitee, (2) any dispute among Indemnitees (other than a claim against the Administrative Agent or its affiliates solely in its capacity as the Administrative Agen) or (3) Taxes, except for Taxes necessary to hold an Indemnitee harmless from and against any and all Indemnified Liabilities with respect to any non-Tax claim and (B) legal fees and expenses of counsel constituting Indemnified Liabilities shall be limited to one outside counsel (in addition to one local counsel in each relevant material jurisdiction) for the Agents and their Related Parties, taken as a whole and (y) one outside

counsel (in addition to one local counsel in each relevant material jurisdiction) for all other Indemnitees, taken as a whole, or, in the case of an actual or potential conflict of interest, of one additional counsel to the affected Indemnitees to the extent such Indemnitees are similarly situated.

The provisions of Sections 10.04 and 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of the Loans, and any other Secured Obligations, the release of any Guarantor or of all or any portion of the Collateral, the expiration of the Term Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agents, the or any Lender. All amounts due under this Sections 10.04 and 10.05 shall be accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

To the fullest extent permitted by applicable Legal Requirements, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, exemplary, consequential, or punitive damages (including any loss of profits, business or anticipated savings) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with the Loan Documents or the transactions contemplated hereby or thereby.

All amounts due under Sections 10.04 or 10.05 shall be payable not later than 10 days after demand therefor.

The agreements in this Sections 10.04 and 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the Term Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 10.06    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the applicable Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.07    Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and

-164-

assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (other than as a result of a transaction consummated in accordance with Section 7.04) and no Lender may sell, assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.07(b), (ii) by way of participation in accordance with the provisions of Section 10.07(d), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(f) or (iv) to an SPC in accordance with the provisions of Section 10.07(g).   Any attempted or purported sale, assignment or other transfer by any party hereto of its rights and obligations in contravention of this Section 10.07 shall be null and void.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(d) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)        Subject to the limitations specified in clause (a) above and in this clause (b), any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Term Commitment(s) and the Term Loans at the time owing to it); *provided* that:

(i)        (A) in the case of an assignment of the entire remaining amount of the assigning Lender's Term Commitment under any Term Facility and the Term Loans at the time owing to it under such Facility, no minimum amount shall need be assigned, and (B) in any case not described in clause (b)(i)(A) of this Section 10.07, the aggregate amount of the Term Commitment (which for this purpose includes Term Loans outstanding thereunder) or, if the applicable Term Commitment is not then in effect, the outstanding principal balance of the Term Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent shall not be less than $500,000 unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld, delayed or conditioned) except such consent by the Borrower shall not be required if such assignment is to an Approved Fund; *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)        each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Term Loans or the Term Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among separate Term Facilities on a non-pro rata basis;

(iii)        no consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section 10.07 and, in addition (A) the consent of the Borrower (such consent not to be unreasonably withheld, delayed or conditioned; it being agreed that a withholding of consent to an assignment to a Disqualified Lender shall in all events be

-165-

deemed reasonable) shall be required for any assignment unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; and (B) the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned) shall be required for any assignment unless such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(iv)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), together with a processing and recordation fee of $3,500 (except, (x) in the case of contemporaneous assignments by any Lender to one or more Approved Funds, only a single processing and recording fee shall be payable for such assignments and (y) the Administrative Agent, in its sole discretion, may elect to waive such processing and recording fee in the case of any assignment) and all "know your customer" documentation reasonably requested by the Administrative Agent;

(v)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and applicable tax forms;

(vi)     no such assignment shall be made (A) to any Defaulting Agent or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (A), (B) to any natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person) or (C) to any Disqualified Lender (solely to the extent the list of Disqualified Lenders has been made available to all Lenders);

(vii)     [reserved];

(viii)     the assigning Lender shall deliver any Term Notes or, in lieu thereof, a lost note affidavit and indemnity reasonably acceptable to the Borrower evidencing such Term Loans to the Borrower or the Administrative Agent; and

(ix)     [reserved].

Notwithstanding anything in this Section 10.07 to the contrary, if the Borrower has not provided the Administrative Agent written notice of its objection to an assignment of Term Loans within ten (10) Business Days after receipt of written notice of such assignment, the Borrower shall be deemed to have consented to such assignment.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(c), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits (and subject to the obligations) of a Lender under Sections 3.01, 3.04,

-166-

3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date of such assignment, and to be subject to the obligations set forth in Section 10.08 and 10.16).  Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (b) or Section 3.07(b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(d).

(c)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Term Commitments of, and principal amounts (and related interest amounts) and currencies of the Term Loans, owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower, any Agent and any Lender (solely with respect to such Lender's own interests only), at any reasonable time and from time to time upon reasonable prior written notice.

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person), a Person that the Administrative Agent has identified in a notice to the Lenders as a Disqualified Lender (Competitor) (solely to the extent the list of Disqualified Lenders has been made available to all Lenders)) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Term Commitment and/or the Term Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) for the avoidance of doubt, the Administrative Agent shall have no oversight or responsibility of any kind for ensuring that the Lenders do not sell participations in violation of the foregoing provisions of this Section 10.07(d).  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a), (b), (c), (f) or (g) of the first proviso to Section 10.01 that directly affects such Participant.  Subject to Section 10.07(e), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and Section 10.16) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(b).

(e)     A Participant shall not be entitled to receive (and no Loan Party shall be required to make) any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender

-167-

would have been entitled to receive with respect to the participation sold to such Participant, except to the extent that such entitlement to receive a greater payment results from a change in or in the interpretation of any Law that occurs after the Participant acquired the applicable participation.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Term Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment, and no foreclosure or other enforcement action in respect thereof, shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Term Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Term Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Term Loan, the Granting Lender shall be obligated to make such Term Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Administrative Agent as is required under Section 2.12(b)(ii). Each party hereto hereby agrees that an SPC shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and the obligations to provide the forms and certifications pursuant to Section 10.16 as if it were a Lender); *provided* that neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including under Section 3.01, 3.04 or 3.05). Each party hereto further agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (ii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender of record hereunder. Other than as expressly provided in this Section 10.07(g), (A) such Granting Lender's obligations under this Agreement shall remain unchanged, (B) such Granting Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Granting Lender in connection with such Granting Lender's rights and obligations under this Agreement. The making of a Term Loan by an SPC hereunder shall utilize the Term Commitment of the Granting Lender to the same extent, and as if, such Term Loan were made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not, other than in respect of matters unrelated to this Agreement or the transactions contemplated hereby, institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its rights hereunder with respect to any Term Loan to the Granting Lender

and (ii) subject to <u>Section 10.08</u>, disclose on a confidential basis any non-public information relating to its funding of Term Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)     Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Term Loans owing to it and the Term Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this <u>Section 10.07</u>, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents, and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(i)     [Reserved].

(j)     Notwithstanding anything to the contrary herein, any Lender may assign all or any portion of its Term Loans hereunder to Holdings or the Borrower, but only if:

(i)     (A) such assignment is made pursuant to a Dutch Auction open to all Lenders holding Term Loans of the specified Tranche on a pro rata basis or (B) such assignment is made as an open market purchase on a non-pro rata basis;

(ii)     no Event of Default shall have occurred and be continuing or would result therefrom;

(iii)     if the Borrower is the assignee, upon the effectiveness of such assignment, such Term Loans will be deemed to be automatically and permanently cancelled;

(iv)     if Holdings is the assignee, upon the effectiveness of such assignment, Holdings will be deemed to have contributed the principal amount of such Term Loans, plus all accrued and unpaid interest thereon, to the Borrower as common equity and such Term Loans will be deemed to have been automatically and permanently cancelled;

(v)     the Borrower and its Subsidiaries do not use the proceeds of any Permitted Revolving Credit Facility to acquire such Term Loans; and

(vi)     Holdings or the Borrower, as applicable, shall, at the time of such assignment, affirm the No Undisclosed Information Representation;

*provided*, that (x) notwithstanding anything to the contrary contained in this <u>Section 10.07(j)</u> or otherwise, until each First Out Term Loan has been paid in full in cash and all other Obligations in respect of the First Out Term Loans have been paid in full in cash (other than contingent indemnification and reimbursement obligations for which no claim has been made), no Dutch Auction or open market purchase in respect of outstanding Second Out Term Loans shall be made (or permitted to be made) hereunder and (y) any open market purchase transaction effected pursuant to this <u>Section 10.07(j)</u> or other buyback or acquisition of Second Out Term Loans by a Loan Party or Subsidiary thereof (other than pursuant to a Dutch Auction or similar transaction

open all Lenders holding Second Out Term Loans on a pro rata basis), in each case that would result in a Second Out Term Loan Uptiering Transaction shall be subject to the requirements of <u>Section 10.01(i)</u> to the same extent as if the Credit Agreement were being amended to provide for such Second Out Term Loan Uptiering Transaction

(k)      [Reserved.]

(l)      The applicable Lender, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a register on which it enters the name and address of (i) each SPC (other than any SPC that is treated as a disregarded entity of the Granting Lender for U.S. federal income tax purposes) that has exercised its option pursuant to <u>Section 10.07(g)</u> and (ii) each Participant, and the amount of each such SPC's and Participant's interest in such Lender's rights and/or obligations under this Agreement (the "<u>Participant Register</u>"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of the applicable rights and/or obligations of such Lender under this Agreement.    For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

Section 10.08    <u>Confidentiality</u>.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' and Approved Funds' directors, officers, employees, investors and potential investors, agents, advisors and other representatives, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof and the Administrative Agent or such Lender will be responsible for their compliance herewith), (b) to the extent requested by any regulatory authority or any quasi-regulatory authority (such as the National Association of Insurance Commissioners) (in which case such Agents or Lender, as applicable, agrees (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, to inform the Borrower promptly thereof prior to disclosure), (c) to the extent required by applicable Legal Requirements or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under the Loan Documents or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder (in which case, the Borrower is notified in advance of such disclosure, to the extent permitted by law), (f) subject to an agreement containing provisions substantially the same as those of this Section 10.08, to (i) any assignee of or Participant in, or any prospective permitted assignee of or permitted Participant in, any of its loans and commitments under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower and its obligations, (iii) any actual or prospective investor in an SPC or (iv) any rating agency for the

-170-

purpose of obtaining a credit rating applicable to any Loan or Loan Party, (g) with the written consent of Borrower, (h) to any assignee or pledgee under Section 10.07(f) or to any other party to this Agreement, or (i) to the extent such Information (i) is publicly available at the time of disclosure or becomes publicly available other than as a result of a breach of this Section 10.08 or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source that is not, to the Administrative Agent's or such Lender's knowledge, subject to contractual or fiduciary contractual obligations owing to any Loan Party, other than Borrower or any Subsidiary.  In addition, the Agents and the Lenders may disclose the existence of the Loan Documents and information about the Loan Documents to market data collectors, similar service providers to the financing community, and service providers to the Agents and the Lenders.  For the purposes of this Section 10.08, "Information" shall mean all information received from or on behalf of any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Borrower from a source that is not, to the Administrative Agent's or such Lender's knowledge, subject to contractual or fiduciary contractual obligations owing to any Loan Party.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.08 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Assumption, the provisions of this Section 10.08 shall survive with respect to the Administrative Agent and each Lender until the second anniversary of such Administrative Agent or Lender ceasing to be an Administrative Agent or Lender, respectively.

Section 10.09    Setoff.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Secured Party is authorized at any time and from time to time without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party) to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final), other than deposits in fiduciary accounts as to which a Loan Party is acting as fiduciary for another Person who is not a Loan Party, at any time held by, and other Indebtedness at any time owing by, such Lender to or for the credit or the account of the respective Loan Parties against any and all Obligations owing to such Secured Party hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness.  Each Secured Party agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Secured Party; *provided*, *however*, that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of the Administrative Agent and each Secured Party under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Secured Party may have. Notwithstanding the foregoing, no Participant shall have any rights of setoff under this Section 10.09 or otherwise.

Section 10.10    [Reserved].

Section 10.11    <u>Interest Rate Limitation</u>.    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.12    <u>Counterparts</u>.    This Agreement and each other Loan Document may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery by fax or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document.  The Agents may also require that any such documents and signatures delivered by fax or other electronic transmission be confirmed by a manually-signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by fax or other electronic transmission.

Section 10.13    <u>Integration; Effectiveness</u>.    This Agreement and the other Loan Documents, and those provisions of the Fee Letter that, by their terms, survive the termination or expiration of the Fee Letter, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  It is expressly agreed and confirmed by the parties hereto that the provisions of the Fee Letter shall survive the execution and delivery of this Agreement, the occurrence of the Closing Date, and shall continue in effect thereafter in accordance with their terms.  In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan Document shall not be deemed a conflict with this Agreement.  Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.  Without limiting <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.

Section 10.14    <u>Survival of Representations and Warranties</u>.    All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Term Borrowing, and shall continue in full force and effect as

long as any Term Loan or any other Obligation (other than contingent indemnification or other obligations as to which no claim has been asserted) hereunder shall remain unpaid or unsatisfied.

Section 10.15     Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.15, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Agents shall be limited by Debtor Relief Laws, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.16     Tax Forms.  (a) Each Lender and Agent shall deliver to the Borrower and the Administrative Agent, when reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation and information as will permit payments hereunder to be made without withholding, and/or as will permit the Borrower and the Administrative Agent to determine the applicable rate of withholding and whether such Lender or Agent is subject to information reporting.  Notwithstanding the foregoing, the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.16(b) and (c) below) shall not be required to be delivered by the Lender if in such Lender's reasonable and good faith judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(b)     (i) Without limiting the generality of the foregoing, subject to Section 10.16(b)(ii), each Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "Foreign Lender") shall deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent whichever of the following is applicable, (x) two (2) duly signed, properly completed copies of either IRS Form W-8BEN or Form W-8BEN-E, as applicable, or any successor thereto (relating to such Foreign Lender and entitling it to an exemption from, or reduction of, United States withholding tax on all payments to be made to such Foreign Lender by the Borrower or any other Loan Party pursuant to this Agreement or any other Loan Document), (y) IRS Form W-8ECI or any successor thereto (relating to all payments to be made to such Foreign Lender by the Borrower or any other Loan Party pursuant to this Agreement or any other Loan Document) or (z) two (2) duly signed, properly completed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or any successor thereto and a certificate that establishes in writing to the Borrower and the Administrative Agent that such Foreign Lender is not (i) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (ii) a "10 percent shareholder" of any Borrower within the meaning of Section 871(h)(3)(B) of the Code and or (iii) a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.  Thereafter and from time to time, each such Foreign Lender shall promptly submit to the Borrower and the Administrative Agent such additional duly completed and signed copies of one or more of such forms and/or certificates (or such successor forms or certificates as shall be adopted from time to time by the relevant Governmental Authority or such other evidence as is satisfactory to the Borrower and the Administrative Agent (in either case, in its sole discretion)) as may then be

-173-

presented by then current United States laws and regulations to avoid or reduce, United States withholding taxes in respect of all payments to be made to such Foreign Lender by the Borrower or other Loan Party pursuant to this Agreement, or any other Loan Document, in each case, (1) on or before the date that any such form, certificate or other evidence expires or becomes obsolete, (2) after the occurrence of any event requiring a change in the most recent form, certificate or other evidence previously delivered by it to the Borrower and the Administrative Agent (including, for the avoidance of doubt, due to a designation of a new Lending Office) and (3) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

(ii)    Each Foreign Lender, to the extent it does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Foreign Lender under any of the Loan Documents, shall deliver to the Borrower and the Administrative Agent on the date when such Foreign Lender ceases to act for its own account with respect to any portion, if any, of any such sums paid or payable, and at such other times as prescribed by the last sentence of <u>Section 10.16(a)</u> or as may be necessary in the determination of the Borrower or the Administrative Agent (in either case, in the reasonable exercise of its discretion), two (2) duly signed, properly completed, copies of IRS Form W-8IMY (or any successor thereto), together with all required supporting documentation, and any other certificate or statement of exemption or reduction required under the Law, to establish that such Foreign Lender is not acting for its own account with respect to a portion of any such sums payable to such Foreign Lender.

(iii)    The Administrative Agent may deduct and withhold any Taxes required by any Laws to be deducted and withheld from any payment under any of the Loan Documents.

(c)    Each Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "<u>U.S. Lender</u>") shall deliver to the Administrative Agent and the Borrower (or in the case of a Participant or SPC, to the relevant Lender) two (2) duly signed, properly completed, copies of IRS Form W-9 (or any successor form) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement, including, for the avoidance of doubt, by means of an assignment on the date it becomes a Participant) and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent, certifying that such U.S. Lender is entitled to an exemption from United States backup withholding.  If such U.S. Lender fails to deliver such forms, then the Administrative Agent and/or the Borrower may withhold from any payment to such U.S. Lender an amount equivalent to the applicable backup withholding imposed by the Code.

(d)    Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes and Other Taxes attributable to such Lender (but only to the extent any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 10.07(l)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability

delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)    Each Agent shall deliver to the Borrower two duly signed, properly completed, copies of IRS Form W-9 (or any successor form) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement) and from time to time thereafter upon the reasonable request of the Borrower, certifying that such Agent is entitled to an exemption from United States backup withholding. Thereafter and from time to time, each such Agent shall promptly submit to the Borrower an updated IRS Form W-9 (or successor form), in each case, (1) on or before the date that any such previously delivered form expires or becomes obsolete, (2) after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower and (3) from time to time thereafter if reasonably requested by the Borrower.

The obligation of the Foreign Lenders or U.S. Lenders, severally, under this <u>Section 10.16</u> shall survive the termination of the Aggregate Term Commitments, repayments of all other Obligations hereunder and the resignation of the Administrative Agent.

Notwithstanding any other provision of this <u>Section 10.16</u>, a Lender shall not be required to deliver any form that such Lender is not legally able to deliver.

Section 10.17    <u>Governing Law; Jurisdiction; Etc.</u>    (a) <u>GOVERNING LAW</u>.    THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

(b)    <u>SUBMISSION TO JURISDICTION</u>.    EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY TO THE EXCLUSIVE GENERAL JURISDICTION OF THE SUPREME COURT OF THE STATE OF NEW YORK FOR THE COUNTY OF NEW YORK (THE "<u>NEW YORK SUPREME COURT</u>"), AND THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (THE "<u>FEDERAL DISTRICT COURT</u>," AND TOGETHER WITH THE NEW YORK SUPREME COURT, THE "<u>NEW YORK COURTS</u>") AND APPELLATE COURTS FROM EITHER OF THEM; *PROVIDED* THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE (I) ANY AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS (IN WHICH CASE ANY PARTY SHALL BE ENTITLED TO ASSERT ANY CLAIM OR DEFENSE, INCLUDING ANY CLAIM OR DEFENSE THAT THIS <u>SECTION 10.17</u> WOULD OTHERWISE REQUIRE TO BE ASSERTED IN A LEGAL ACTION OR PROCEEDING IN A NEW YORK COURT), OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE ADMINISTRATIVE AGENT OR ANY OTHER AGENT, (II) ANY PARTY FROM BRINGING ANY LEGAL ACTION OR PROCEEDING IN ANY JURISDICTION FOR THE RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT, (III) IF ALL SUCH NEW

YORK COURTS DECLINE JURISDICTION OVER ANY PERSON, OR DECLINE (OR, IN THE CASE OF THE FEDERAL DISTRICT COURT, LACK) JURISDICTION OVER ANY SUBJECT MATTER OF SUCH ACTION OR PROCEEDING, A LEGAL ACTION OR PROCEEDING MAY BE BROUGHT WITH RESPECT THERETO IN ANOTHER COURT HAVING JURISDICTION AND (IV) IN THE EVENT A LEGAL ACTION OR PROCEEDING IS BROUGHT AGAINST ANY PARTY HERETO OR INVOLVING ANY OF ITS ASSETS OR PROPERTY IN ANOTHER COURT (WITHOUT ANY COLLUSIVE ASSISTANCE BY SUCH PARTY OR ANY OF ITS SUBSIDIARIES OR AFFILIATES), SUCH PARTY FROM ASSERTING A CLAIM OR DEFENSE (INCLUDING ANY CLAIM OR DEFENSE THAT THIS SECTION 10.17 WOULD OTHERWISE REQUIRE TO BE ASSERTED IN A LEGAL ACTION OR PROCEEDING IN A NEW YORK COURT) IN ANY SUCH ACTION OR PROCEEDING.

(c)  WAIVER OF VENUE.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SECTION 10.17(B).  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)  SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.18  WAIVER OF RIGHT TO TRIAL BY JURY.  **EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 10.18 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

Section 10.19  Binding Effect.  When this Agreement shall have become effective in accordance with Section 10.13, it shall thereafter be binding upon and inure to the benefit of the Borrower, each Agent and each Lender and their respective successors and permitted assigns;

*provided* that, except as a result of a transaction consummated in accordance with Section 7.04, the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Administrative Agent and each Lender.

Section 10.20    No Advisory or Fiduciary Responsibility.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower and Holdings acknowledge and agree, and each of them acknowledges and agrees that it has informed its other Affiliates, that:  (i) (A) no fiduciary, advisory or agency relationship between any of Holdings, the Borrower and its Subsidiaries and any Agent is intended to be or has been created in respect of any of the transactions contemplated hereby and by the other Loan Documents, irrespective of whether any Agent has advised or is advising Holdings, the Borrower and its Subsidiaries on other matters, (B) the arranging and other services regarding this Agreement provided by the Agents are arm's-length commercial transactions between Holdings, the Borrower and its Subsidiaries, on the one hand, and the Agents, on the other hand, (C) each of Holdings and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (D) each of Holdings and the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent is and has been acting solely as a principal and, except as may otherwise be expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Holdings or any of its Affiliates, or any other Person and (B) no Agent has any obligation to Holdings or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Holdings and its Affiliates, and no Agent has any obligation to disclose any of such interests and transactions to Holdings or any of its Affiliates.  To the fullest extent permitted by law, each of Holdings and the Borrower hereby waives and releases any claims that it may have against the Agents with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.21    Affiliate Activities.  Each of the Borrower and Holdings acknowledges that each Agent and each Lender (and their respective Affiliates) is a full service securities firm engaged, either directly or through affiliates, in various activities, including securities trading, investment banking and financial advisory, investment management, principal investment, hedging, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals.  In the ordinary course of these activities, any of them may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including bank loans) for their own account and for the accounts of customers and may at any time hold long and short positions in such securities and/or instruments.  Such investment and other activities may involve securities and instruments of Holdings and its Affiliates, as well as of other entities and persons and their Affiliates which may (i) be involved in transactions arising from or relating to the transactions contemplated hereby and by the other Loan Documents, (ii) be customers or competitors of Holdings and its Affiliates or (iii) have other relationships with Holdings and its Affiliates.  In addition, it may provide investment banking, underwriting and financial advisory services to such other entities and persons.  It may also co-invest with, make direct investments in, and invest or co-invest client

-177-

monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of Holdings and its Affiliates or such other entities. The transactions contemplated hereby and by the other Loan Documents may have a direct or indirect impact on the investments, securities or instruments referred to in this Section 10.21.

Section 10.22    Lender Action. Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent (which shall not be withheld in contravention of Section 9.04). The provision of this Section 10.22 is for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.23    Electronic Execution of Assignments and Certain Other Documents. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.24    PATRIOT Act. Each Lender that is subject to the PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act. The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

Section 10.25    [Reserved.].

Section 10.26    Judgment Currency.

(a)    The Borrower's obligations hereunder and under the other Loan Documents to make payments Dollars (pursuant to such obligation, the "Obligation Currency") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by the Administrative Agent or the respective Lender of the full amount of the Obligation Currency expressed to be payable to the Administrative

-178-

Agent or such Lender under this Agreement or the other Loan Documents.  If, for the purpose of obtaining or enforcing judgment against Borrower in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "Judgment Currency") an amount due in the Obligation Currency, and in the case of other currencies, the rate of exchange (as quoted by a financial institution or known dealer in such currency designated by the Required Lenders) determined, in each case, as of the Business Day immediately preceding the day on which the judgment is given (such Business Day being hereinafter referred to as the "Judgment Currency Conversion Date").

(b)	If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due, the Borrower shall pay, or cause to be paid, the amount necessary such that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce not less than the amount of the Obligation Currency which could have been purchased with the amount of the Judgment Currency stipulated on the judgment or judicial award as the rate of exchanged prevailing on the Judgment Currency Conversion Date.

(c)	For purposes of determining any other rate of exchange for this Section 10.26, such amounts shall include any premium and costs payable in connection with the purchase of the Obligation Currency.

Section 10.27	[Reserved.]

Section 10.28	Intercreditor Agreement.  Each of the Lenders and the other Secured Parties (a) authorizes and instructs the Administrative Agent to enter into any Permitted ABL Intercreditor Agreement, Permitted Cash Flow Revolver Intercreditor Agreement and/or other intercreditor agreements (and any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to, such agreements in connection with the incurrence by any Loan Party of any Indebtedness of such Loan Party that is permitted to be secured by the Collateral pursuant to Sections 7.01 and 7.03 of this Agreement, in order to permit such Indebtedness to be secured by a valid, perfected Lien (with such priority as may be designated by such Loan Party, to the extent such priority is permitted by the Loan Documents)) as collateral agent and on behalf of such Person, and by its acceptance of the benefits of the Collateral Documents, hereby acknowledges that any such Permitted ABL Intercreditor Agreement, Permitted Cash Flow Revolver Intercreditor Agreement and/or other intercreditor agreement will be binding upon it and (b) agrees that it will be bound by and will take no actions contrary to the provisions of any Permitted ABL Intercreditor Agreement, Permitted Cash Flow Revolver Intercreditor Agreement or such other intercreditor agreements (and any amendments, amendments and restatements, restatements or waivers of or supplements to or other modifications to, such agreements in connection with the incurrence by any Loan Party of any Indebtedness of such Loan Party that is permitted to be secured by the Collateral pursuant to Sections 7.01 and 7.03 of this Agreement, in order to permit such Indebtedness to be secured by a valid, perfected Lien (with such priority as may be designated by such Loan Party, to the extent such priority is permitted by the Loan Documents)), and to subject the Liens on the Collateral securing the Obligations to the provisions thereof.

Section 10.29    Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties with respect to the subject matter hereof, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

In the event that a Lender has been notified by an EEA Resolution Authority that it has or may be subject to a Bail-In Action, it shall immediately notify the Administrative Agent who shall in turn promptly notify the Borrower.

Section 10.30    [Reserved].

Section 10.31    Cashless Settlement. Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any extension or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Borrower and such Lender (and that is administratively feasible for the Administrative Agent).

**[REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**STRATEGIC MATERIALS HOLDING CORP.**, as the Borrower

By: _____
Name: Paul Garris
Title:  Senior Vice President and Chief Financial Officer

**SMI GROUP ACQUISITIONS, INC.**, as Holdings

By: _____
Name: Paul Garris
Title:  Senior Vice President and Chief Financial Officer

4885-4953-0770v.1

**ACQUIOM AGENCY SERVICES LLC**,
as Co-Administrative Agent


By: _____
Name:
Title:


**SEAPORT LOAN PRODUCTS LLC**,
as Co-Administrative Agent


By: _____
Name:
Title:

[Signature Page to Term Loan Credit Agreement]

4885-4953-0770v.1

## EXHIBIT F

### Restructuring Transactions Exhibit

*In the event of an Equitization Transaction,[1] the Reorganized Debtors shall implement the Restructuring as set forth in the Plan. In connection therewith, the following describes the steps to be taken by the Debtors or the Reorganized Debtors, as applicable, to effectuate the conversion of SMI Topco Holdings, Inc. from a Delaware corporation to a Delaware limited liability company (such converted entity, "**SMI Topco LLC**") and the receipt of Reorganized SMI Topco Interests and, if applicable, Second Out Exit Term Loans by Holders of Allowed Claims (other than any Claims held by SMI Topco) in Class 3, Class 4, and Class 5 and Holders of Allowed SMI Topco Interests in Class 10.*

**SMI Topco Conversion**:

- **State Law Conversion:** On the Conversion Date, SMI Topco will convert from a Delaware corporation to a Delaware limited liability company pursuant to Section 18-214 of the Delaware Limited Liability Company Act (the "***State Law Conversion***").

- **Internal Revenue Service ("*IRS*") Filing:** On the Conversion Date, SMI Topco LLC will file an IRS Form 8832 electing to be treated as a corporation for U.S. federal income tax purposes, effective as of the Conversion Date (the "***Check-the-Box Election***").

- **Intended Tax Treatment:** It is intended that (a) the State Law Conversion and the Check-the-Box Election, taken together, be treated as a reorganization within the meaning of Section 368(a)(1)(F) of the Internal Revenue Code of 1986, as amended (the "***Code***") and (b) the Plan constitute a "plan of reorganization" within the meaning of Treasury Regulations section 1.368-2(g) and 1.368-3(a).

**Distributions to Holders of Allowed Claims in Class 3, Class 4 and Class 5**:

- **Step 1**: **Contributions of Reorganized SMI Topco Interests:** On the Effective Date, SMI Topco LLC will contribute a portion of its Reorganized SMI Topco Interests necessary to satisfy all Allowed Claims (other than any Claims held by SMI Topco) in Class 3, Class 4, and Class 5 to SMI Group Ultimate Holdings, Inc. ("***Ultimate Holdings***"). Ultimate Holdings will contemporaneously contribute such Reorganized SMI Topco Interests to SMI Group Holdings, LLC ("***Group Holdings***"). Group Holdings will contemporaneously contribute such Reorganized SMI Topco Interests to SMI Group Acquisitions, Inc. ("***Acquisitions***"). Acquisitions will contemporaneously contribute such Reorganized SMI Topco Interests to Strategic Materials Holding Corp. ("***SMHC***").

- **Step 2**: **Distributions to Holders of Allowed Claims in Classes 3, 4, and 5:** On the Effective Date, following the contributions effectuated pursuant to Step 1 above, SMHC will make distributions to Holders of Allowed Claims (other than any Claims held by SMI Topco) in Classes 3, 4, and 5 in accordance with the treatment to be provided to such Claims under Article III.B of the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (including all exhibits and schedules attached thereto, and as may be amended, altered, modified or supplemented from time to time, the "***Plan***").

**Distributions to Holders of Allowed SMI Topco Interests in Class 10**:

- **Topco Equity Exchange:** As described in Article III.B of the Plan, on the Effective Date, Holders of Allowed SMI Topco Interests, on account of their Class 10 Claims, will exchange their Allowed SMI Topco Interests for an allocation of the Reorganized SMI Topco Interests and Second Out Exit Term Loans that SMI Topco would have otherwise received on account of its Allowed First Lien Credit Facility Claims, Allowed 1.5 Lien Credit Facility Claims, and Allowed Second Lien Credit Facility Claims pursuant to the treatment set forth in Classes 3, 4, and 5.

- **Intended Tax Treatment:** For U.S. federal income and applicable state and local income tax purposes, it is intended that (a) the distribution of Reorganized SMI Topco Interests and Second Out Exit Term Loans to Holders of Allowed SMI Topco Interests on account of their Allowed SMI Topco Interests be treated as a recapitalization within the meaning of section 368(a)(1)(E) with the Second Out Exit Term Loan constituting "boot" described in Section 356 of the Code and (b) the Plan constitute a "plan of reorganization" within the meaning of Treasury Regulations section 1.368-2(g) and 1.368-3(a).

**Exhibit D**

74481

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.**

**IMPORTANT: NO CHAPTER 11 CASES HAVE BEEN COMMENCED AS OF THE DATE OF THE DISTRIBUTION OF THIS BALLOT.   IF VOLUNTARY REORGANIZATION CASES ARE FILED, THE COMPANY INTENDS TO PROMPTLY SEEK CONFIRMATION OF THE PREPACKAGED CHAPTER 11 PLAN BY THE COURT.**

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-[_____]** |
| | § | |
| **STRATEGIC MATERIALS, INC.,** *et al.,* | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |

**BALLOT FOR VOTING TO ACCEPT OR REJECT THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

*CLASS 3 – FIRST LIEN CREDIT FACILITY CLAIMS*

---

**THE VOTING DEADLINE BY WHICH YOUR BALLOT MUST BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT IS 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023 (THE "*VOTING DEADLINE*").**

**IF YOUR BALLOT IS NOT RECEIVED ON OR PRIOR TO THE VOTING DEADLINE, THE VOTE REPRESENTED BY YOUR BALLOT WILL NOT BE COUNTED, EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST LIEN LENDER GROUP.**

---

       Strategic Materials, Inc. and its affiliated debtors listed in footnote 1 (collectively, the "***Debtors***") have provided you with this ballot (the "***Ballot***") to solicit your vote to accept or reject

---

[1]    The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  17220 Katy Freeway, Ste. 150, Houston, TX 77094.

the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be modified, amended, or supplemented, the "***Plan***"), which is being proposed by the Debtors.[2]

If you are, **on November 13, 2023** (the "***Voting Record Date***"), a Holder of a Class 3 First Lien Credit Facility Claim against any of the Debtors arising under that certain First Lien Credit Agreement, dated as of November 1, 2017, among Strategic Materials Holding Corp., as borrower, SMI Group Acquisitions, Inc., as holdings, the lenders from time to time party thereto, and Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (as successor to Goldman Sachs Bank USA in such capacity) (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "***First Lien Credit Agreement***"), please use this Ballot to cast your vote to accept or reject the Plan.  The Plan is attached as **Exhibit A** to the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, dated November 15, 2023 (as may be amended, restated, modified, supplemented, or replaced from time to time and including all exhibits or supplements thereto, the "***Disclosure Statement***"), which accompanies this Ballot and also provides for a summary description of the terms and conditions of the Plan.

The Debtors have not yet commenced cases under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").  The Debtors expect to file the Chapter 11 Cases after they complete the solicitation of votes from Holders of Claims and Interests entitled to vote on the Plan.  The Disclosure Statement has not yet been approved by any court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code.  The Debtors intend to seek approval of the Disclosure Statement and confirmation of the Plan at a combined hearing before the Court (the "***Combined Hearing***"), on a date and time to be announced.

The Plan and Disclosure Statement are accessible now for review and download, free of charge, on the Debtors' restructuring website maintained by the Solicitation Agent (as defined below) at https://cases.ra.kroll.com/SMISolicitation.  Printed copies of the Plan and Disclosure Statement may be obtained free of charge by contacting the Solicitation Agent via (i) telephone at (844) 307-7493  (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll) or (ii) email at SMIInfo@ra.kroll.com (with "SMI Solicitation" in the subject line).

Upon the commencement of the Chapter 11 Cases, the Debtors will file the Plan and Disclosure Statement on the docket with the Court.  Thereafter, the Plan and Disclosure Statement, as well as all other documents filed on the docket, will be available for review and download free of charge on the Debtors' restructuring website maintained by the Solicitation Agent at https://cases.ra.kroll.com/SMI, and they will also be available for review for a fee on the Court's website at www.txs.uscourts.gov and will be on file with the Clerk of the Court, 4th Floor, 515 Rusk Street, Houston, Texas 77002, where they will be available for review during normal operating hours.

Before you transmit your vote, please review the Plan, the Disclosure Statement, and all related documents enclosed herewith carefully.  The Plan can be confirmed by the Court and

---

[2]    Capitalized terms used in this Ballot and the attached instructions that are not otherwise defined herein have the meanings given to them in the Plan.

thereby made binding upon you if it is accepted by the Holders of (i) at least two-thirds in dollar amount and more than one-half in number of Claims in each Class of Claims entitled to vote and that actually vote on the Plan and (ii) at least two-thirds in number of Interests in each Class of Interests entitled to vote and that actually vote on the Plan, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained (or if a Class of Claims or Interests is deemed to reject the Plan), the Court may nonetheless confirm the Plan if it finds that the Plan provides fair and equitable treatment to, and does not discriminate unfairly against, the Class or Classes rejecting it, and otherwise satisfies the applicable requirements of section 1129(b) of the Bankruptcy Code.

Please note that the Plan contemplates separate Classes of Claims and Interests for voting and distribution purposes.  Depending on the nature of the Claims or Interests that are held in or against the Debtors, a creditor may have Claims and/or Interests in multiple Classes.  The Disclosure Statement sets forth a description of the Classes in the Plan.

Your receipt of this Ballot does not signify that your Claim has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of or distribution on account of Class 3 First Lien Credit Facility Claims.  You must provide all of the information requested by this Ballot.  Failure to do so may result in the disqualification of your vote.

**Please also note that the Plan may be modified as described in Article X of the Plan. If the Plan is so modified, the Debtors may not be required to and, accordingly, may not resolicit votes on the Plan.  In such case , a vote to accept the Plan submitted prior to the Voting Deadline will be considered a vote to accept the Plan as so modified.**

If you have any questions on how to properly complete this Ballot, please call Kroll Restructuring Administration, LLC, the Debtors' proposed claims, noticing, and solicitation agent (the "***Solicitation Agent***" or "***Kroll***") at (844) 307-7493  (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll) and request to speak with a member of the solicitation team or email—with a reference to "Strategic Materials, Inc. Solicitation" in the subject line—to SMIBallots@ra.kroll.com. **THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**PLEASE READ AND FOLLOW THE BELOW INSTRUCTIONS CAREFULLY. COMPLETE, SIGN (ELECTRONIC SIGNATURE IS ACCEPTABLE) AND DATE YOUR CUSTOMIZED BALLOT (PURSUANT TO THE INSTRUCTIONS BELOW), AND RETURN IT SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE OF <u>5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023</u> IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED HEREIN.  IF THIS BALLOT IS NOT COMPLETED, SIGNED, AND <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT PRIOR TO THE EXPIRATION OF THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED, EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST LIEN LENDER GROUP.**

---

**IMPORTANT**

You should carefully review the Disclosure Statement and Plan before you vote. You may wish to seek legal or other professional advice concerning the Plan and your First Lien Credit Facility Claim. Your First Lien Credit Facility Claim against the Debtors has been placed in Class 3 under the Plan.

**VOTING DEADLINE: 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023.**

If your Ballot is not received by the Solicitation Agent on or before the Voting Deadline and such deadline is not extended, your vote will not count except in the Debtors' discretion, in consultation with the First Lien Lender Group.

If the Plan is confirmed by the Court, it will be binding on you whether or not you vote.

---

**SPECIAL NOTE REGARDING ELIGIBLE HOLDERS:**

Only Holders of First Lien Credit Facility Claims that are Eligible Holders are permitted to vote prior to the Petition Date. An "*Eligible Holder*" is a Holder of Claims that certifies to the reasonable satisfaction of the Debtors that it is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933 (the "*Securities Act*")) or an "accredited investor" (as defined in Rule 501 of Regulation D under the Securities Act). If you are not an Eligible Holder, you may not vote to accept or reject the Plan prior to the Petition Date.

---

IF YOU (I) HAVE ANY QUESTIONS REGARDING THE BALLOT, (II) DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR (III) NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE SOLICITATION AGENT BY CALLING (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM OR EMAIL—WITH A REFERENCE TO "STRATEGIC MATERIALS, INC." IN THE SUBJECT LINE—SMIBALLOTS@RA.KROLL.COM . PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

4881-4554-7408

**VOTING DEADLINE: NOVEMBER 22, 2023 5:00 P.M. (CENTRAL TIME)**

For your vote to be counted, this Ballot must be properly completed, signed, and returned so that it is **actually received** by the Solicitation Agent by no later than November 22, 2023 at 5:00 p.m. (Central Time), unless such time is extended in writing by the Debtors, in consultation with the First Lien Lender Group. Please submit a Ballot with your vote in the envelope provided or by **one** of the following methods:

**If Submitting Your Vote through the E-Balloting Portal**

Kroll will accept Ballots if properly completed through the E-Balloting Portal. To submit your Ballot via the E-Balloting Portal, visit **https://cases.ra.kroll.com/SMISolicitation**, click on the "Submit E-Ballot" section of Kroll's website for the Debtors and follow the instructions to submit your Ballot.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

Unique E-Ballot ID#:_____

Kroll's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot. Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

If your Ballot is not received by Kroll on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.

**If by First Class Mail, Overnight Courier, or Hand Delivery to:**
**Strategic Materials, Inc. Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue, Suite 412**
**Brooklyn, NY 11232**

**To arrange hand delivery of your Ballot, please contact the Solicitation Agent via email at SMIBallots@ra.kroll.com (with "SMI Solicitation Ballot Submission" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.**

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

**Item 1.** *Amount of Class 3 First Lien Credit Facility Claim.* The undersigned hereby certifies that on November 13, 2023, the Voting Record Date, the undersigned was the record Holder (or authorized signatory of such a Holder) of a First Lien Credit Facility Claim in Class 3 under the Plan, in the aggregate unpaid principal amount of:

**Claim Amount:   $ _____**

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHOM YOU HAVE A FIRST LIEN CREDIT FACILITY CLAIM.**

**Item 2.** *Vote on Plan.* The undersigned Holder of First Lien Credit Facility Claims in Class 3 under the Plan, as described in Item 1 above, votes all such Claims to (check <u>one</u> box):

☐ **Accept** the Plan

OR

☐ **Reject** the Plan

**Item 3**. *Optional Opt-Out of Releases*.

Following Confirmation, subject to Article IX of the Plan, the Plan will be substantially consummated on the Effective Date. Among other things, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective. In determining how to cast your vote on the Plan, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how confirmation and substantial consummation of the Plan—which effectuates such provisions—will affect you and any Claim(s) you may hold against the Debtors and/or certain other Released Parties specified in the Plan.[3]

---

[3] "*Released Party*" means each of the following solely in its capacity as such: (a) each of the Debtors; (b) each of the Reorganized Debtors or the Post-Sale Estates (as applicable); (c) each Consenting Party; (d) the Third-Party Purchaser (if applicable), (e) each Holder of a Claim or Interest who votes in favor of the Plan; (f) each Related Party of each Entity in clause (a) through this clause (f); provided, that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases set forth in Article VIII.F of the Plan; or (y) timely objects to the releases set forth in Article VIII.F of the Plan and such objection is not resolved before Confirmation.

4881-4554-7408

Article VIII.F of the Plan contains the following provision:

*F.   Releases by Holders of Claims and Interests*

**As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, whether known or unknown, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Definitive Documents, the Plan, or any Restructuring (including any transaction in connection therewith), contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the Debtors' Restructuring efforts (including those contemplated by the Restructuring Support Agreement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, any Restructuring transaction, any assumed contract, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Obligations as set forth in the Plan.**

74481

**Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.**

Check the box below if you elect not to grant the releases contained in Article VIII.F of the Plan. Election to withhold consent is at your option.  If you submit a Ballot accepting or rejecting the Plan, or if you abstain from submitting a Ballot, and in either case, you do not check the box below, you will be deemed to consent to the releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law.  Please be advised that your decision to opt out does not affect the amount of distribution you will receive under the Plan.  Specifically, your recovery under the Plan will be the same whether or not you opt out of the releases contained in Article VIII.F of the Plan.

<u>**The Holder of a Class 3 First Lien Credit Facility Claim set forth in Item 1 elects to:**</u>

☐ **OPT OUT** of the Releases Contained in Article VIII.F of the Plan

---

**IF YOU VOTE TO ACCEPT OR REJECT
THE PLAN AND YOU DO NOT CHECK
THE "OPT-OUT" BOX IN ITEM 3 AND TIMELY SUBMIT YOUR
BALLOT, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES
OF THE RELEASED PARTIES SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

**IF YOU ABSTAIN FROM VOTING
ON THE PLAN AND YOU DO NOT TIMELY
SUBMIT YOUR BALLOT WITH THE "OPT-OUT" BOX IN ITEM 3
CHECKED, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES
OF THE RELEASED PARTIES SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

---

4881-4554-7408

**Item 4:** *Acknowledgement of Eligible Holder Status.* The undersigned Holder of First Lien Credit Facility Claims in Class 3 under the Plan, as described in Item 1 above, acknowledges that (a) it is an Eligible Holder because it is (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) and/or (ii) an "accredited investor" as that term is defined by Rule 501 of Regulation D, 17 C.F.R. § 230.501(a), promulgated under the Securities Act, 15 U.S.C. §§ 77a-77aa (as amended), and (b) the securities being distributed pursuant to the Plan are not being distributed pursuant to a registration statement filed with the U.S. Securities and Exchange Commission, and that such securities will be acquired for the Holder's own account and not with a view to any distribution of such securities in violation of the Securities Act.

## ☐ **Acknowledgement of Eligible Holder Status**

**Item 5:** *Certifications.* By returning this Ballot, the undersigned Holder of First Lien Credit Facility Claims in Class 3 under the Plan, as described in Item 1 above, certifies that (a)(i) it was the record Holder of the Claims described in Item 1 on November 13, 2023, and/or (ii) it has full power and authority to vote to accept or reject the Plan; (b) it has received a copy of the Plan and Disclosure Statement (and all attachments and supplements thereto); (c) the Holder has cast the same vote with respect to all of its Class 3 Claims described in Item 1; and (d) no other Class 3 Ballots with respect to the amount of the Claims described in Item 1 have been cast or, if any other Class 3 Ballots have been cast with respect to such Claims, then any such earlier Class 3 Ballots are hereby revoked. The undersigned understands that an otherwise properly completed, executed and timely-returned Ballot that does not indicate either acceptance or rejection of the Plan or indicates both acceptance and rejection of the Plan will not be counted. By signing this Ballot you also are acknowledging that your vote is subject to all terms or conditions set forth in the Disclosure Statement and Plan.

Name of Holder: _____

Signature: _____

Print Name: _____

Title: _____

Street Address: _____

City, State and Zip Code: _____

Telephone Number: _____

Email Address: _____

Date Completed: _____

**PLEASE PROMPTLY RETURN YOUR COMPLETED BALLOT.**

**BALLOTS MAY BE SUBMITTED VIA THE E-BALLOT PORTAL, IN THE RETURN ENVELOPE PROVIDED, OR AS DIRECTED IN THE VOTING INSTRUCTIONS.**

74481

IN ORDER TO COUNT, YOUR COMPLETED BALLOT MUST
BE <u>RECEIVED</u> NO LATER THAN 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22,
2023 OR THE VOTES TRANSMITTED THEREBY WILL NOT BE COUNTED,
EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST
LIEN LENDER GROUP.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
PROCEDURES, OR IF YOU NEED ADDITIONAL COPIES OF THIS BALLOT, THE
DISCLOSURE STATEMENT, THE PLAN, OR OTHER RELATED MATERIALS OR
DOCUMENTS, PLEASE CALL THE SOLICITATION AGENT AT (844) 307-7493
(U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND
REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM OR EMAIL
AT SMIBALLOTS@RA.KROLL.COM WITH A REFERENCE TO "STRATEGIC
MATERIALS, INC." IN THE SUBJECT LINE.

4881-4554-7408

## INSTRUCTIONS FOR COMPLETING THE BALLOT

1.    In order for your vote to count, you must:

   a)    In the box provided in Item 1, indicate the amount of your Claim;

   b)    In Item 2, indicate either acceptance or rejection of the Plan by checking the appropriate box;

   c)    Make sure to read the information regarding releases in Item 3 and check the box **if you elect to opt out** of the releases;

   d)    In Item 4, indicate your acknowledgement that you are an Eligible Holder;

   e)    Review the certification in Item 5 of the Ballot; and either

      i.    electronically complete, sign, and return your customized electronic Ballot by utilizing the "E-Ballot" platform on Kroll's website so that is it **actually received** by Kroll no later than the Voting Deadline of 5:00 P.M. Central Time on November 22, 2023 (unless such time is extended by the Debtors, in consultation with the First Lien Lender Group); **OR**

      ii.    complete, sign, and return your Ballot by first class mail, overnight courier or hand delivery per mailing instructions provided above so that is it **actually received** by Kroll no later than the Voting Deadline of 5:00 P.M. Central Time on November 22, 2023 (unless such time is extended by the Debtors, in consultation with the First Lien Lender Group).  A pre-addressed, postage pre-paid return envelope is enclosed for your convenience.  Any unsigned or non-original Ballot will not be counted.

2.    **The method of delivery of your Ballot is at your election and at your own risk.  YOU ARE STRONGLY ENCOURAGED TO SUBMIT YOUR BALLOT VIA THE E-BALLOT PLATFORM.  Kroll's "E-Ballot" platform is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.  If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the E-Ballot platform on Kroll's website.  Your Ballot must be received by Kroll no later than the Voting Deadline, unless such time is extended by the Debtors, in consultation with the First Lien Lender Group.**

**Creditors who cast a Ballot using Kroll's "E-Ballot" platform should NOT also submit a paper Ballot.**

If you are unable to use the E-Ballot platform or need assistance from Kroll in completing and submitting your Ballot, please contact Kroll by email—with a reference to "Strategic Materials, Inc." in the subject line—to: SMIBallots@ra.kroll.com or by telephone at (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) and request to speak with a member of the solicitation team.

3.    A properly completed, executed, and timely-returned Ballot that either (a) indicates both an acceptance and rejection of the Plan or (b) fails to indicate either an acceptance or rejection of the Plan will not be counted.

74481

4.      You must vote all your Claims within a single Class under the Plan either to accept or reject the Plan.  Accordingly, a Ballot (or multiple Ballots with respect to Claims within a single Class) that partially rejects and partially accepts the Plan will not be counted.

5.      If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot timely received shall be deemed to reflect the voter's intent and shall supersede and revoke any earlier received Ballot.  If you simultaneously cast inconsistent duplicate Ballots with respect to the same Claim, such Ballots shall not be counted.

6.      Any Ballot cast by a person or entity that did not hold a Claim in Class 3  (First Lien Credit Facility Claims) as of the Voting Record Date will not be counted.

7.      Any Ballot that is illegible or that contains insufficient information to permit the identification of the claimant will not be counted.

8.      The Ballot does not constitute, and shall not be deemed to be, a proof of claim or equity interest or an assertion or admission of a Claim or an Interest.

9.      It is important that you vote.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of (i) at least two-thirds in dollar amount and more than one-half in number of Claims in each Class entitled to vote and that actually vote on the Plan and (ii) at least two-thirds in number of Interests in each Class entitled to vote and that actually vote on the Plan, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.  The votes of Claims actually voted in your Class will bind both those who vote and those who do not vote.  If the requisite acceptances are not obtained, the Court nonetheless may confirm the Plan if it finds that the Plan:  (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes voting to reject the Plan; and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

10.     Each Ballot you receive is for voting only your Claim described in that Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 3 First Lien Credit Facility Claims.

11.     The Ballot is not a letter of transmittal and may not be used for any purposes other than to cast a vote to accept or reject the Plan.  Holders should not surrender, at this time, certificates (if any) representing their securities.  No party will accept delivery of any such certificates surrendered together with this Ballot.

12.     NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER SOLICITATION MATERIALS APPROVED BY THE COURT, INCLUDING, WITHOUT LIMITATION, THE DISCLOSURE STATEMENT.

13.     PLEASE RETURN YOUR BALLOT PROMPTLY.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE PROCEDURES GENERALLY, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT KROLL BY EMAIL—WITH A REFERENCE TO "STRATEGIC MATERIALS, INC." IN THE SUBJECT LINE—TO: SMIBALLOTS@RA.KROLL.COM OR BY TELEPHONE AT (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.  THE SOLICITATION AGENT IS NOT AUTHORIZED TO PROVIDE LEGAL ADVICE.

4881-4554-7408

**<u>Exhibit E</u>**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.**

**IMPORTANT: NO CHAPTER 11 CASES HAVE BEEN COMMENCED AS OF THE DATE OF THE DISTRIBUTION OF THIS BALLOT.  IF VOLUNTARY REORGANIZATION CASES ARE FILED, THE COMPANY INTENDS TO PROMPTLY SEEK CONFIRMATION OF THE PREPACKAGED CHAPTER 11 PLAN BY THE COURT.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-[_____]** |
| | § | |
| **STRATEGIC MATERIALS, INC.,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |

**BALLOT FOR VOTING TO ACCEPT OR REJECT THE
DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

*CLASS 4 – 1.5 LIEN CREDIT FACILITY CLAIMS*

---

**THE VOTING DEADLINE BY WHICH YOUR BALLOT MUST BE
ACTUALLY RECEIVED BY THE SOLICITATION  AGENT IS 5:00 P.M. (CENTRAL
TIME) ON NOVEMBER 22, 2023 (THE "*VOTING DEADLINE*").**

**IF YOUR BALLOT IS NOT RECEIVED ON OR PRIOR
TO THE VOTING DEADLINE, THE VOTE REPRESENTED BY YOUR BALLOT
WILL NOT BE COUNTED, EXCEPT IN THE DEBTORS' DISCRETION, IN
CONSULTATION WITH THE FIRST LIEN LENDER GROUP.**

---

Strategic Materials, Inc. and its affiliated debtors listed in footnote 1 (collectively, the "***Debtors***") have provided you with this ballot (the "***Ballot***") to solicit your vote to accept or reject

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  17220 Katy Freeway, Ste. 150, Houston, TX 77094.

the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be modified, amended, or supplemented, the "***Plan***"), which is being proposed by the Debtors.[2]

If you are, **on November 13, 2023** (the "***Voting Record Date***"), a Holder of a Class 4 1.5 Lien Credit Facility Claim against any of the Debtors arising under that certain 1.5 Lien Credit Agreement, dated as of September 22, 2022, among Strategic Materials Holding Corp., as borrower, SMI Group Acquisitions, Inc., as holdings, the lenders from time to time party thereto, and Alter Domus (US) LLC, as administrative agent (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "***1.5 Lien Credit Agreement***"), please use this Ballot to cast your vote to accept or reject the Plan.  The Plan is attached as **Exhibit A** to the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, dated November 15, 2023 (as may be amended, restated, modified, supplemented, or replaced from time to time and including all exhibits or supplements thereto, the "***Disclosure Statement***"), which accompanies this Ballot and also provides for a summary description of the terms and conditions of the Plan.

The Debtors have not yet commenced cases under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").  The Debtors expect to file the Chapter 11 Cases after they complete the solicitation of votes from Holders of Claims and Interests entitled to vote on the Plan.  The Disclosure Statement has not yet been approved by any court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code.  The Debtors intend to seek approval of the Disclosure Statement and confirmation of the Plan at a combined hearing before the Court (the "***Combined Hearing***"), on a date and time to be announced.

The Plan and Disclosure Statement are accessible now for review and download, free of charge, on the Debtors' restructuring website maintained by the Solicitation Agent (as defined below) at https://cases.ra.kroll.com/SMISolicitation.  Printed copies of the Plan and Disclosure Statement may be obtained free of charge by contacting the Solicitation Agent via (i) telephone at (844) 307-7493  (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll) or (ii) email at SMIInfo@ra.kroll.com (with "SMI Solicitation" in the subject line).

Upon the commencement of the Chapter 11 Cases, the Debtors will file the Plan and Disclosure Statement on the docket with the Court.  Thereafter, the Plan and Disclosure Statement, as well as all other documents filed on the docket, will be available for review and download free of charge on the Debtors' restructuring website maintained by the Solicitation Agent at https://cases.ra.kroll.com/SMI, and they will also be available for review for a fee on the Court's website at www.txs.uscourts.gov and will be on file with the Clerk of the Court, 4th Floor, 515 Rusk Street, Houston, Texas 77002, where they will be available for review during normal operating hours.

Before you transmit your vote, please review the Plan, the Disclosure Statement, and all related documents enclosed herewith carefully.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of (i) at least two-thirds in dollar

---

[2]   Capitalized terms used in this Ballot and the attached instructions that are not otherwise defined herein have the meanings given to them in the Plan.

74481

amount and more than one-half in number of Claims in each Class of Claims entitled to vote and that actually vote on the Plan and (ii) at least two-thirds in number of Interests in each Class of Interests entitled to vote and that actually vote on the Plan, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained (or if a Class of Claims or Interests is deemed to reject the Plan), the Court may nonetheless confirm the Plan if it finds that the Plan provides fair and equitable treatment to, and does not discriminate unfairly against, the Class or Classes rejecting it, and otherwise satisfies the applicable requirements of section 1129(b) of the Bankruptcy Code.

Please note that the Plan contemplates separate Classes of creditors and interest holders for voting and distribution purposes.  Depending on the nature of the debt or interest that is held in or against the Debtors, a creditor may have Claims and/or Interests in multiple Classes.  The Disclosure Statement sets forth a description of the Classes in the Plan.

Your receipt of this Ballot does not signify that your Claim has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of or distribution on account of Class 4 1.5 Lien Credit Facility Claims. You must provide all of the information requested by this Ballot.  Failure to do so may result in the disqualification of your vote.

**Please also note that the Plan may be modified as described in Article X of the Plan.  If the Plan is so modified, the Debtors may not be required to and, accordingly, may not resolicit votes on the Plan.  In such case , a vote to accept the Plan submitted prior to the Voting Deadline will be considered a vote to accept the Plan as so modified.**

If you have any questions on how to properly complete this Ballot, please call Kroll Restructuring Administration, LLC, the Debtors' proposed claims, noticing, and solicitation agent (the "*Solicitation Agent*" or "*Kroll*") at (844) 307-7493  (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll) and request to speak with a member of the solicitation team or email—with a reference to "Strategic Materials, Inc. Solicitation" in the subject line—to SMIBallots@ra.kroll.com.  **THE SOLICITATION  AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**PLEASE READ AND FOLLOW THE BELOW INSTRUCTIONS CAREFULLY. COMPLETE, SIGN (ELECTRONIC SIGNATURE IS ACCEPTABLE) AND DATE YOUR CUSTOMIZED BALLOT (PURSUANT TO THE INSTRUCTIONS BELOW), AND RETURN IT SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE OF <u>5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023</u> IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED HEREIN.  IF THIS BALLOT IS NOT COMPLETED, SIGNED, AND <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT PRIOR TO THE EXPIRATION OF THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED, EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST LIEN LENDER GROUP.**

74481

---

**IMPORTANT**

You should carefully review the Disclosure Statement and Plan before you vote.  You may wish to seek legal or other professional advice concerning the Plan and your 1.5 Lien Credit Facility Claim.  Your 1.5 Lien Credit Facility Claim against the Debtors has been placed in Class 4 under the Plan.

**VOTING DEADLINE:  5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023.**

If your Ballot is not received by the Solicitation Agent on or before the Voting Deadline and such deadline is not extended, your vote will not count except in the Debtors' discretion, in consultation with the First Lien Lender Group.

If the Plan is confirmed by the Court, it will be binding on you whether or not you vote.

---

**SPECIAL NOTE REGARDING ELIGIBLE HOLDERS:**

Only Holders of 1.5 Lien Credit Facility Claims that are Eligible Holders are permitted to vote prior to the Petition Date.  An "*Eligible Holder*" is a Holder of Claims that certifies to the reasonable satisfaction of the Debtors that it is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933 (the "*Securities Act*")) or an "accredited investor" (as defined in Rule 501 of Regulation D under the Securities Act).  If you are not an Eligible Holder, you may not vote to accept or reject the Plan prior to the Petition Date.

---

IF YOU (I) HAVE ANY QUESTIONS REGARDING THE BALLOT, (II) DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR (III) NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE SOLICITATION AGENT BY CALLING (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM OR EMAIL—WITH A REFERENCE TO "STRATEGIC MATERIALS, INC." IN THE SUBJECT LINE—SMIBALLOTS@RA.KROLL.COM . PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.  THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

4881-4554-7408

<u>**VOTING DEADLINE:  NOVEMBER 22, 2023 5:00 P.M. (CENTRAL TIME)**</u>

**For your vote to be counted, this Ballot must be properly completed, signed, and returned so that it is <u>actually received</u> by the Solicitation Agent by no later than November 22, 2023 at 5:00 p.m. (Central Time), unless such time is extended in writing by the Debtors, in consultation with the First Lien Lender Group.  Please submit a Ballot with your vote in the envelope provided or by <u>*one*</u> of the following methods:**

<u>**If Submitting Your Vote through the E-Balloting Portal**</u>

**Kroll will accept Ballots if properly completed through the E-Balloting Portal.  To submit your Ballot via the E-Balloting Portal, visit https://cases.ra.kroll.com/SMISolicitation, click on the "Submit E-Ballot" section of Kroll's website for the Debtors and follow the instructions to submit your Ballot.**

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

**Unique E-Ballot ID#:_____**

**Kroll's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.**

**Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.**

**If your Ballot is not received by Kroll on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.**

<u>**If by First Class Mail, Overnight Courier, or Hand Delivery to:**</u>
**Strategic Materials, Inc. Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue, Suite 412**
**Brooklyn, NY 11232**

<u>**To arrange hand delivery of your Ballot, please contact the Solicitation Agent via email at SMIBallots@ra.kroll.com (with "SMI Solicitation Ballot Submission" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.**</u>

4881-4554-7408

**PLEASE READ THE ATTACHED VOTING INFORMATION**
**<u>AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT</u>**

**Item 1.** ***Amount of Class 4 1.5 Lien Credit Facility Claim.*** The undersigned hereby certifies that on November 13, 2023, the Voting Record Date, the undersigned was the record Holder (or authorized signatory of such a Holder) of a 1.5 Lien Credit Facility Claim in Class 4 under the Plan, in the aggregate unpaid principal amount of:

> **Claim Amount:   $ _____**

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHOM YOU HAVE A 1.5 LIEN CREDIT FACILITY CLAIM.**

**Item 2.** ***Vote on Plan.*** The undersigned Holder of 1.5 Lien Credit Facility Claims in Class 4 under the Plan, as described in Item 1 above, votes all such Claims to (check <u>one</u> box):

☐ **Accept** the Plan

OR

☐ **Reject** the Plan

**Item 3**. ***Optional Opt-Out of Releases.***

Following Confirmation, subject to Article IX of the Plan, the Plan will be substantially consummated on the Effective Date. Among other things, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective. In determining how to cast your vote on the Plan, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how confirmation and substantial consummation of the Plan—which effectuates such provisions—will affect you and any Claim(s) you may hold against the Debtors and/or certain other Released Parties specified in the Plan.[3]

---

[3]   "***Released Party***" means each of the following solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors or the Post-Sale Estates (as applicable); (c) each Consenting Party; (d) the Third-Party Purchaser (if applicable), (e) each Holder of a Claim or Interest who votes in favor of the Plan; (f) each Related Party of each Entity in clause (a) through this clause (f); provided, that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases set forth in Article VIII.F of the Plan; or (y) timely objects to the releases set forth in Article VIII.F of the Plan and such objection is not resolved before Confirmation.

Article VIII.F of the Plan contains the following provision:

*F.   Releases by Holders of Claims and Interests*

**As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, whether known or unknown, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Definitive Documents, the Plan, or any Restructuring (including any transaction in connection therewith), contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the Debtors' Restructuring efforts (including those contemplated by the Restructuring Support Agreement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, any Restructuring transaction, any assumed contract, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Obligations as set forth in the Plan.**

74481

**Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.**

Check the box below if you elect not to grant the releases contained in Article VIII.F of the Plan. Election to withhold consent is at your option.  If you submit a Ballot accepting or rejecting the Plan, or if you abstain from submitting a Ballot, and in either case, you do not check the box below, you will be deemed to consent to the releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law.  Please be advised that your decision to opt out does not affect the amount of distribution you will receive under the Plan.  Specifically, your recovery under the Plan will be the same whether or not you opt out of the releases contained in Article VIII.F of the Plan.

<u>**The Holder of a Class 4 1.5 Lien Credit Facility Claim set forth in Item 1 elects to:**</u>

☐ **OPT OUT** of the Releases Contained in Article VIII.F of the Plan

---

**IF YOU VOTE TO ACCEPT OR REJECT
THE PLAN AND YOU DO NOT CHECK
THE "OPT-OUT" BOX IN ITEM 3 AND TIMELY SUBMIT YOUR
BALLOT, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES
OF THE RELEASED PARTIES SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

**IF YOU ABSTAIN FROM VOTING
ON THE PLAN AND YOU DO NOT TIMELY
SUBMIT YOUR BALLOT WITH THE "OPT-OUT" BOX IN ITEM 3
CHECKED, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES
OF THE RELEASED PARTIES SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

---

**Item 4:** ***Acknowledgement of Eligible Holder Status.***  The undersigned Holder of 1.5 Lien Credit Facility Claims in Class 4 under the Plan, as described in Item 1 above, acknowledges that (a) it is an Eligible Holder because it is (i)  a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) and/or (ii)  an "accredited investor" as that term is defined by Rule 501 of Regulation D, 17 C.F.R. § 230.501(a), promulgated under the Securities Act, 15 U.S.C. §§ 77a-77aa (as amended), and (b) the securities being distributed pursuant to the Plan are not being distributed pursuant to a registration statement filed with the U.S. Securities and Exchange Commission, and that such securities will be acquired for the Holder's own account and not with a view to any distribution of such securities in violation of the Securities Act.

☐ **Acknowledgement of Eligible Holder Status**

**Item 5:** ***Certifications.***  By returning this Ballot, the undersigned Holder of 1.5 Lien Credit Facility Claims in Class 4 under the Plan, as described in Item 1 above, certifies that (a)(i) it was the record Holder of the Claims described in Item 1 on November 13, 2023, and/or (ii) it has full power and authority to vote to accept or reject the Plan; (b) it has received a copy of the Plan and Disclosure Statement (and all attachments and supplements thereto); (c) the Holder has cast the same vote with respect to all of its Class 4 Claims described in Item 1; and (d) no other Class 4 Ballots with respect to the amount of the Claims described in Item 1 have been cast or, if any other Class 4 Ballots have been cast with respect to such Claims, then any such earlier Class 4 Ballots are hereby revoked.  The undersigned understands that an otherwise properly completed, executed and timely-returned Ballot that does not indicate either acceptance or rejection of the Plan or indicates both acceptance and rejection of the Plan will not be counted. By signing this Ballot you also are acknowledging that your vote is subject to all terms or conditions set forth in the Disclosure Statement and Plan.

Name of Holder: _____

Signature: _____

Print Name: _____

Title: _____

Street Address: _____

City, State and Zip Code: _____

Telephone Number: _____

Email Address: _____

Date Completed: _____

**PLEASE PROMPTLY RETURN YOUR COMPLETED BALLOT.**

**BALLOTS MAY BE SUBMITTED VIA THE E-BALLOT PORTAL, IN THE RETURN ENVELOPE PROVIDED, OR AS DIRECTED IN THE VOTING INSTRUCTIONS.**

74481

**IN ORDER TO COUNT, YOUR COMPLETED BALLOT MUST
BE <u>RECEIVED</u> NO LATER THAN 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22,
2023 OR THE VOTES TRANSMITTED THEREBY WILL NOT BE COUNTED,
EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST
LIEN LENDER GROUP.**

---

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
PROCEDURES, OR IF YOU NEED ADDITIONAL COPIES OF THIS BALLOT, THE
DISCLOSURE STATEMENT, THE PLAN, OR OTHER RELATED MATERIALS OR
DOCUMENTS, PLEASE CALL THE SOLICITATION AGENT AT (844) 307-7493
(U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND
REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM OR EMAIL
AT SMIBALLOTS@RA.KROLL.COM WITH A REFERENCE TO "STRATEGIC
MATERIALS, INC." IN THE SUBJECT LINE.**

4881-4554-7408

## <u>INSTRUCTIONS FOR COMPLETING THE BALLOT</u>

1.      In order for your vote to count, you must:

      a)      In the box provided in Item 1, indicate the amount of your Claim;

      b)      In Item 2, indicate either acceptance or rejection of the Plan by checking the appropriate box;

      c)      Make sure to read the information regarding releases in Item 3 and check the box **<u>if you elect to opt out</u>** of the releases;

      d)      In Item 4, indicate your acknowledgement that you are an Eligible Holder;

      e)      Review the certification in Item 5 of the Ballot; and either

            i.      electronically complete, sign, and return your customized electronic Ballot by utilizing the "E-Ballot" platform on Kroll's website so that is it **<u>actually received</u>** by Kroll no later than the Voting Deadline of 5:00 P.M. Central Time on November 22, 2023 (unless such time is extended by the Debtors, in consultation with the First Lien Lender Group); **<u>OR</u>**

            ii.      complete, sign, and return your Ballot by first class mail, overnight courier or hand delivery per mailing instructions provided above so that is it **<u>actually received</u>** by Kroll no later than the Voting Deadline of 5:00 P.M. Central Time on November 22, 2023 (unless such time is extended by the Debtors, in consultation with the First Lien Lender Group).  A pre-addressed, postage pre-paid return envelope is enclosed for your convenience.  Any unsigned or non-original Ballot will not be counted.

2.      **The method of delivery of your Ballot is at your election and at your own risk.  YOU ARE STRONGLY ENCOURAGED TO SUBMIT YOUR BALLOT VIA THE E-BALLOT PLATFORM.  Kroll's "E-Ballot" platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.  If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the E-Ballot platform on Kroll's website.  Your Ballot must be received by Kroll no later than the Voting Deadline, unless such time is extended by the Debtors, in consultation with the First Lien Lender Group.**

**<u>Creditors who cast a Ballot using Kroll's "E-Ballot" platform should NOT also submit a paper Ballot.</u>**

If you are unable to use the E-Ballot platform or need assistance from Kroll in completing and submitting your Ballot, please contact Kroll by email—with a reference to "Strategic Materials, Inc." in the subject line—to: SMIBallots@ra.kroll.com or by telephone at (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) and request to speak with a member of the solicitation team.

3.      A properly completed, executed, and timely-returned Ballot that either (a) indicates both an acceptance and rejection of the Plan or (b) fails to indicate either an acceptance or rejection of the Plan will not be counted.

4.      You must vote all your Claims within a single Class under the Plan either to accept or reject the Plan.  Accordingly, a Ballot (or multiple Ballots with respect to Claims within a single Class) that partially rejects and partially accepts the Plan will not be counted.

5.      If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot timely received shall be deemed to reflect the voter's intent and shall supersede and revoke any earlier received Ballot.  If you simultaneously cast inconsistent duplicate Ballots with respect to the same Claim, such Ballots shall not be counted.

6.      Any Ballot cast by a person or entity that did not hold a Claim in Class 4 (1.5 Lien Credit Facility Claims) as of the Voting Record Date will not be counted.

7.      Any Ballot that is illegible or that contains insufficient information to permit the identification of the claimant will not be counted.

8.      The Ballot does not constitute, and shall not be deemed to be, a proof of claim or equity interest or an assertion or admission of a Claim or an Interest.

9.      It is important that you vote.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of (i) at least two-thirds in dollar amount and more than one-half in number of Claims in each Class entitled to vote and that actually vote on the Plan and (ii) at least two-thirds in number of Interests in each Class entitled to vote and that actually vote on the Plan, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.  The votes of Claims actually voted in your Class will bind both those who vote and those who do not vote.  If the requisite acceptances are not obtained, the Court nonetheless may confirm the Plan if it finds that the Plan:  (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes voting to reject the Plan; and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

10.     Each Ballot you receive is for voting only your Claim described in that Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 4 1.5 Lien Credit Facility Claims.

11.     The Ballot is not a letter of transmittal and may not be used for any purposes other than to cast a vote to accept or reject the Plan.  Holders should not surrender, at this time, certificates (if any) representing their securities.  No party will accept delivery of any such certificates surrendered together with this Ballot.

12.     NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER SOLICITATION MATERIALS APPROVED BY THE COURT, INCLUDING, WITHOUT LIMITATION, THE DISCLOSURE STATEMENT.

13.     PLEASE RETURN YOUR BALLOT PROMPTLY.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE PROCEDURES GENERALLY, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT KROLL BY EMAIL—WITH A REFERENCE TO "STRATEGIC MATERIALS, INC." IN THE SUBJECT LINE—TO:

74481

SMIBALLOTS@RA.KROLL.COM OR BY TELEPHONE AT (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.  THE SOLICITATION AGENT IS NOT AUTHORIZED TO PROVIDE LEGAL ADVICE.

4881-4554-7408

**Exhibit F**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.**

**IMPORTANT: NO CHAPTER 11 CASES HAVE BEEN COMMENCED AS OF THE DATE OF THE DISTRIBUTION OF THIS BALLOT. IF VOLUNTARY REORGANIZATION CASES ARE FILED, THE COMPANY INTENDS TO PROMPTLY SEEK CONFIRMATION OF THE PREPACKAGED CHAPTER 11 PLAN BY THE COURT.**

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

</div>

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-[_____]** |
| | § | |
| **STRATEGIC MATERIALS, INC.,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| **Debtors.[1]** | § | **(Joint Administration Requested)** |

<div align="center">

**BALLOT FOR VOTING TO ACCEPT OR REJECT THE
DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

*CLASS 5 – SECOND LIEN CREDIT FACILITY CLAIMS*

</div>

---

<div align="center">

**THE VOTING DEADLINE BY WHICH YOUR BALLOT MUST BE
ACTUALLY RECEIVED BY THE SOLICITATION AGENT IS 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023 (THE "*VOTING DEADLINE*").**

**IF YOUR BALLOT IS NOT RECEIVED ON OR PRIOR
TO THE VOTING DEADLINE, THE VOTE REPRESENTED BY YOUR BALLOT
WILL NOT BE COUNTED, EXCEPT IN THE DEBTORS' DISCRETION, IN
CONSULTATION WITH THE FIRST LIEN LENDER GROUP.**

</div>

---

Strategic Materials, Inc. and its affiliated debtors listed in footnote 1 (collectively, the "***Debtors***") have provided you with this ballot (the "***Ballot***") to solicit your vote to accept or reject

---

[1]   The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  17220 Katy Freeway, Ste. 150, Houston, TX 77094.

4881-4554-7408

the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be modified, amended, or supplemented, the "***Plan***"), which is being proposed by the Debtors.[2]

If you are, **on November 13, 2023** (the "***Voting Record Date***"), a Holder of a Class 5 Second Lien Credit Facility Claim against any of the Debtors arising under that certain Second Lien Credit Agreement, dated as of November 1, 2017, among Strategic Materials Holding Corp., as borrower, SMI Group Acquisitions, Inc., as holdings, the lenders from time to time party thereto, and Acquiom Agency Services LLC and Seaport Loan Products, LLC as co-administrative agents (as successor to Goldman Sachs Bank USA in such capacity) (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date (the "***Second Lien Credit Agreement***"), please use this Ballot to cast your vote to accept or reject the Plan. The Plan is attached as **Exhibit A** to the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, dated November 15, 2023 (as may be amended, restated, modified, supplemented, or replaced from time to time and including all exhibits or supplements thereto, the "***Disclosure Statement***"), which accompanies this Ballot and also provides for a summary description of the terms and conditions of the Plan.

The Debtors have not yet commenced cases under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***"). The Debtors expect to file the Chapter 11 Cases after they complete the solicitation of votes from Holders of Claims and Interests entitled to vote on the Plan. The Disclosure Statement has not yet been approved by any court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code. The Debtors intend to seek approval of the Disclosure Statement and confirmation of the Plan at a combined hearing before the Court (the "***Combined Hearing***"), on a date and time to be announced.

The Plan and Disclosure Statement are accessible now for review and download, free of charge, on the Debtors' restructuring website maintained by the Solicitation Agent (as defined below) at https://cases.ra.kroll.com/SMISolicitation. Printed copies of the Plan and Disclosure Statement may be obtained free of charge by contacting the Solicitation Agent via (i) telephone at (844) 307-7493 (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll) or (ii) email at SMIInfo@ra.kroll.com (with "SMI Solicitation" in the subject line).

Upon the commencement of the Chapter 11 Cases, the Debtors will file the Plan and Disclosure Statement on the docket with the Court. Thereafter, the Plan and Disclosure Statement, as well as all other documents filed on the docket, will be available for review and download free of charge on the Debtors' restructuring website maintained by the Solicitation Agent at https://cases.ra.kroll.com/SMI, and they will also be available for review for a fee on the Court's website at www.txs.uscourts.gov and will be on file with the Clerk of the Court, 4th Floor, 515 Rusk Street, Houston, Texas 77002, where they will be available for review during normal operating hours.

Before you transmit your vote, please review the Plan, the Disclosure Statement, and all related documents enclosed herewith carefully. The Plan can be confirmed by the Court and thereby made

---

[2]    Capitalized terms used in this Ballot and the attached instructions that are not otherwise defined herein have the meanings given to them in the Plan.

binding upon you if it is accepted by the Holders of (i) at least two-thirds in dollar amount and more than one-half in number of Claims in each Class of Claims entitled to vote and that actually vote on the Plan and (ii) at least two-thirds in number of Interests in each Class of Interests entitled to vote and that actually vote on the Plan, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained (or if a Class of Claims or Interests is deemed to reject the Plan), the Court may nonetheless confirm the Plan if it finds that the Plan provides fair and equitable treatment to, and does not discriminate unfairly against, the Class or Classes rejecting it, and otherwise satisfies the applicable requirements of section 1129(b) of the Bankruptcy Code.

Please note that the Plan contemplates separate Classes of Claims and Interests for voting and distribution purposes.  Depending on the nature of the Claims or Interests that are held in or against the Debtors, a creditor may have Claims and/or Interests in multiple Classes.  The Disclosure Statement sets forth a description of the Classes in the Plan.

Your receipt of this Ballot does not signify that your Claim has been or will be Allowed.  This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of or distribution on account of Class 5 Second Lien Credit Facility Claims.  You must provide all of the information requested by this Ballot.  Failure to do so may result in the disqualification of your vote.

**Please also note that the Plan may be modified as described in Article X of the Plan.  If the Plan is so modified, the Debtors may not be required to and, accordingly, may not resolicit votes on the Plan.  In such case , a vote to accept the Plan submitted prior to the Voting Deadline will be considered a vote to accept the Plan as so modified.**

If you have any questions on how to properly complete this Ballot, please call Kroll Restructuring Administration, LLC, the Debtors' proposed claims, noticing, and solicitation agent (the "***Solicitation Agent***" or "***Kroll***") at (844) 307-7493  (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll) and request to speak with a member of the solicitation team or email— with a reference to "Strategic Materials, Inc. Solicitation" in the subject line—to SMIBallots@ra.kroll.com.  **THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**PLEASE READ AND FOLLOW THE BELOW INSTRUCTIONS CAREFULLY. COMPLETE, SIGN (ELECTRONIC SIGNATURE IS ACCEPTABLE) AND DATE YOUR CUSTOMIZED BALLOT (PURSUANT TO THE INSTRUCTIONS BELOW), AND RETURN IT SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE OF <u>5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023</u> IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED HEREIN.  IF THIS BALLOT IS NOT COMPLETED, SIGNED, AND <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT PRIOR TO THE EXPIRATION OF THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED, EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST LIEN LENDER GROUP.**

74481

---

**IMPORTANT**

You should carefully review the Disclosure Statement and Plan before you vote. You may wish to seek legal or other professional advice concerning the Plan and your First Lien Credit Facility Claim. Your Second Lien Credit Facility Claim against the Debtors has been placed in Class 5 under the Plan.

**VOTING DEADLINE: 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023.**

If your Ballot is not received by the Solicitation Agent on or before the Voting Deadline and such deadline is not extended, your vote will not count except in the Debtors' discretion, in consultation with the First Lien Lender Group.

If the Plan is confirmed by the Court, it will be binding on you whether or not you vote.

---

**SPECIAL NOTE REGARDING ELIGIBLE HOLDERS:**

Only Holders of Second Lien Credit Facility Claims that are Eligible Holders are permitted to vote prior to the Petition Date. An "*Eligible Holder*" is a Holder of Claims that certifies to the reasonable satisfaction of the Debtors that it is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933 (the "*Securities Act*")) or an "accredited investor" (as defined in Rule 501 of Regulation D under the Securities Act). If you are not an Eligible Holder, you may not vote to accept or reject the Plan prior to the Petition Date.

---

IF YOU (I) HAVE ANY QUESTIONS REGARDING THE BALLOT, (II) DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR (III) NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE SOLICITATION AGENT BY CALLING (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM OR EMAIL—WITH A REFERENCE TO "STRATEGIC MATERIALS, INC." IN THE SUBJECT LINE—SMIBALLOTS@RA.KROLL.COM. PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT. THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**VOTING DEADLINE:  NOVEMBER 22, 2023 5:00 P.M. (CENTRAL TIME)**

For your vote to be counted, this Ballot must be properly completed, signed, and returned so that it is <u>actually received</u> by the Solicitation Agent by no later than November 22, 2023 at 5:00 p.m. (Central Time), unless such time is extended in writing by the Debtors, in consultation with the First Lien Lender Group.  Please submit a Ballot with your vote in the envelope provided or by <u>*one*</u> of the following methods:

**If Submitting Your Vote through the E-Balloting Portal**

Kroll will accept Ballots if properly completed through the E-Balloting Portal.  To submit your Ballot via the E-Balloting Portal, visit **https://cases.ra.kroll.com/SMISolicitation**, click on the "Submit E-Ballot" section of Kroll's website for the Debtors and follow the instructions to submit your Ballot.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

Unique E-Ballot ID#:_____

Kroll's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

If your Ballot is not received by Kroll on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.

**If by First Class Mail, Overnight Courier, or Hand Delivery to:**
**Strategic Materials, Inc. Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue, Suite 412**
**Brooklyn, NY 11232**

**<u>To arrange hand delivery of your Ballot, please contact the Solicitation Agent via email at SMIBallots@ra.kroll.com (with "SMI Solicitation Ballot Submission" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.</u>**

4881-4554-7408

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

**Item 1.** ***Amount of Class 5 Second Lien Credit Facility Claim.***  The undersigned hereby certifies that on November 13, 2023, the Voting Record Date, the undersigned was the record Holder (or authorized signatory of such a Holder) of a Second Lien Credit Facility Claim in Class 5 under the Plan, in the aggregate unpaid principal amount of:

**Claim Amount:   $ _____**

**YOUR VOTE ON THIS BALLOT WILL BE APPLIED TO EACH DEBTOR AGAINST WHOM YOU HAVE A SECOND LIEN CREDIT FACILITY CLAIM.**

**Item 2.** ***Vote on Plan.***  The undersigned Holder of Second Lien Credit Facility Claims in Class 5 under the Plan, as described in Item 1 above, votes all such Claims to (check <u>one</u> box):

☐ **Accept** the Plan

OR

☐ **Reject** the Plan

**Item 3**.  ***Optional Opt-Out of Releases.***

Following Confirmation, subject to Article IX of the Plan, the Plan will be substantially consummated on the Effective Date.  Among other things, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective.  In determining how to cast your vote on the Plan, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how confirmation and substantial consummation of the Plan—which effectuates such provisions—will affect you and any Claim(s) you may hold against the Debtors and/or certain other Released Parties specified in the Plan.[3]

---

[3]   "***Released Party***" means each of the following solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors or the Post-Sale Estates (as applicable); (c) each Consenting Party; (d) the Third-Party Purchaser (if applicable), (e) each Holder of a Claim or Interest who votes in favor of the Plan; (f) each Related Party of each Entity in clause (a) through this clause (f); provided, that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases set forth in Article VIII.F of the Plan; or (y) timely objects to the releases set forth in Article VIII.F of the Plan and such objection is not resolved before Confirmation.

Article VIII.F of the Plan contains the following provision:

*F.   Releases by Holders of Claims and Interests*

**As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, whether known or unknown, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Definitive Documents, the Plan, or any Restructuring (including any transaction in connection therewith), contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the Debtors' Restructuring efforts (including those contemplated by the Restructuring Support Agreement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, any Restructuring transaction, any assumed contract, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Obligations as set forth in the Plan.**

**Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.**

Check the box below if you elect not to grant the releases contained in Article VIII.F of the Plan. Election to withhold consent is at your option. If you submit a Ballot accepting or rejecting the Plan, or if you abstain from submitting a Ballot, and in either case, you do not check the box below, you will be deemed to consent to the releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law. Please be advised that your decision to opt out does not affect the amount of distribution you will receive under the Plan. Specifically, your recovery under the Plan will be the same whether or not you opt out of the releases contained in Article VIII.F of the Plan.

**<u>The Holder of a Class 5 Second Lien Credit Facility Claim set forth in Item 1 elects to</u>:**

☐ **OPT OUT** of the Releases Contained in Article VIII.F of the Plan

---

**IF YOU VOTE TO ACCEPT OR REJECT
THE PLAN AND YOU DO NOT CHECK
THE "OPT-OUT" BOX IN ITEM 3 AND TIMELY SUBMIT YOUR
BALLOT, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES
OF THE RELEASED PARTIES SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

**IF YOU ABSTAIN FROM VOTING
ON THE PLAN AND YOU DO NOT TIMELY
SUBMIT YOUR BALLOT WITH THE "OPT-OUT" BOX IN ITEM 3
CHECKED, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES
OF THE RELEASED PARTIES SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

---

**Item 4:** *Acknowledgement of Eligible Holder Status.* The undersigned Holder of Second Lien Credit Facility Claims in Class 5 under the Plan, as described in Item 1 above, acknowledges that (a) it is an Eligible Holder because it is (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) and/or (ii) an "accredited investor" as that term is defined by Rule 501 of Regulation D, 17 C.F.R. § 230.501(a), promulgated under the Securities Act, 15 U.S.C. §§ 77a-77aa (as amended), and (b) the securities being distributed pursuant to the Plan are not being distributed pursuant to a registration statement filed with the U.S. Securities and Exchange Commission, and that such securities will be acquired for the Holder's own account and not with a view to any distribution of such securities in violation of the Securities Act.

☐ **Acknowledgement of Eligible Holder Status**

**Item 5:** *Certifications.* By returning this Ballot, the undersigned Holder of Second Lien Credit Facility Claims in Class 5 under the Plan, as described in Item 1 above, certifies that (a)(i) it was the record Holder of the Claims described in Item 1 on November 13, 2023, and/or (ii) it has full power and authority to vote to accept or reject the Plan; (b) it has received a copy of the Plan and Disclosure Statement (and all attachments and supplements thereto); (c) the Holder has cast the same vote with respect to all of its Class 5 Claims described in Item 1; and (d) no other Class 5 Ballots with respect to the amount of the Claims described in Item 1 have been cast or, if any other Class 5 Ballots have been cast with respect to such Claims, then any such earlier Class 5 Ballots are hereby revoked. The undersigned understands that an otherwise properly completed, executed and timely-returned Ballot that does not indicate either acceptance or rejection of the Plan or indicates both acceptance and rejection of the Plan will not be counted. By signing this Ballot you also are acknowledging that your vote is subject to all terms or conditions set forth in the Disclosure Statement and Plan.

Name of Holder: _____

Signature: _____

Print Name: _____

Title: _____

Street Address: _____

City, State and Zip Code: _____

Telephone Number: _____

Email Address: _____

Date Completed: _____

**PLEASE PROMPTLY RETURN YOUR COMPLETED BALLOT.**

**BALLOTS MAY BE SUBMITTED VIA THE E-BALLOT PORTAL, IN THE RETURN ENVELOPE PROVIDED, OR AS DIRECTED IN THE VOTING INSTRUCTIONS.**

**IN ORDER TO COUNT, YOUR COMPLETED BALLOT MUST
BE <u>RECEIVED</u> NO LATER THAN 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22,
2023 OR THE VOTES TRANSMITTED THEREBY WILL NOT BE COUNTED,
EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST
LIEN LENDER GROUP.**

---

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING
PROCEDURES, OR IF YOU NEED ADDITIONAL COPIES OF THIS BALLOT, THE
DISCLOSURE STATEMENT, THE PLAN, OR OTHER RELATED MATERIALS OR
DOCUMENTS, PLEASE CALL THE SOLICITATION AGENT AT (844) 307-7493
(U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND
REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM OR EMAIL
AT SMIBALLOTS@RA.KROLL.COM WITH A REFERENCE TO "STRATEGIC
MATERIALS, INC." IN THE SUBJECT LINE.**

4881-4554-7408

<u>**INSTRUCTIONS FOR COMPLETING THE BALLOT**</u>

1.      In order for your vote to count, you must:

   a)   In the box provided in Item 1, indicate the amount of your Claim;

   b)   In Item 2, indicate either acceptance or rejection of the Plan by checking the appropriate box;

   c)   Make sure to read the information regarding releases in Item 3 and check the box **<u>if you elect to opt out</u>** of the releases;

   d)   In Item 4, indicate your acknowledgement that you are an Eligible Holder;

   e)   Review the certification in Item 5 of the Ballot; and either

      i.   electronically complete, sign, and return your customized electronic Ballot by utilizing the "E-Ballot" platform on Kroll's website so that is it **<u>actually received</u>** by Kroll no later than the Voting Deadline of 5:00 P.M. Central Time on November 22, 2023 (unless such time is extended by the Debtors, in consultation with the First Lien Lender Group); **<u>OR</u>**

      ii.   complete, sign, and return your Ballot by first class mail, overnight courier or hand delivery per mailing instructions provided above so that is it **<u>actually received</u>** by Kroll no later than the Voting Deadline of 5:00 P.M. Central Time on November 22, 2023 (unless such time is extended by the Debtors, in consultation with the First Lien Lender Group). A pre-addressed, postage pre-paid return envelope is enclosed for your convenience. Any unsigned or non-original Ballot will not be counted.

2.      **The method of delivery of your Ballot is at your election and at your own risk. YOU ARE STRONGLY ENCOURAGED TO SUBMIT YOUR BALLOT VIA THE E-BALLOT PLATFORM. Kroll's "E-Ballot" platform is the sole manner in which Ballots will be accepted via electronic or online transmission. Ballots submitted by facsimile, email or other means of electronic transmission will not be counted. If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the E-Ballot platform on Kroll's website. Your Ballot must be received by Kroll no later than the Voting Deadline, unless such time is extended by the Debtors, in consultation with the First Lien Lender Group.**

**<u>Creditors who cast a Ballot using Kroll's "E-Ballot" platform should NOT also submit a paper Ballot.</u>**

If you are unable to use the E-Ballot platform or need assistance from Kroll in completing and submitting your Ballot, please contact Kroll by email—with a reference to "Strategic Materials, Inc." in the subject line—to: SMIBallots@ra.kroll.com or by telephone at (844) 307-7493 (U.S./CANADA, toll-free) OR +1 (646) 651-1183 (International, toll) and request to speak with a member of the solicitation team.

3.      A properly completed, executed, and timely-returned Ballot that either (a) indicates both an acceptance and rejection of the Plan or (b) fails to indicate either an acceptance or rejection of the Plan will not be counted.

4.      You must vote all your Claims within a single Class under the Plan either to accept or reject the Plan.  Accordingly, a Ballot (or multiple Ballots with respect to Claims within a single Class) that partially rejects and partially accepts the Plan will not be counted.

5.      If you cast more than one Ballot voting the same Claim prior to the Voting Deadline, the last valid Ballot timely received shall be deemed to reflect the voter's intent and shall supersede and revoke any earlier received Ballot.  If you simultaneously cast inconsistent duplicate Ballots with respect to the same Claim, such Ballots shall not be counted.

6.      Any Ballot cast by a person or entity that did not hold a Claim in Class 5  (Second Lien Credit Facility Claims) as of the Voting Record Date will not be counted.

7.      Any Ballot that is illegible or that contains insufficient information to permit the identification of the claimant will not be counted.

8.      The Ballot does not constitute, and shall not be deemed to be, a proof of claim or equity interest or an assertion or admission of a Claim or an Interest.

9.      It is important that you vote.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of (i) at least two-thirds in dollar amount and more than one-half in number of Claims in each Class entitled to vote and that actually vote on the Plan and (ii) at least two-thirds in number of Interests in each Class entitled to vote and that actually vote on the Plan, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.  The votes of Claims actually voted in your Class will bind both those who vote and those who do not vote.  If the requisite acceptances are not obtained, the Court nonetheless may confirm the Plan if it finds that the Plan:  (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes voting to reject the Plan; and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

10.     Each Ballot you receive is for voting only your Claim described in that Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 5 Second Lien Credit Facility Claims.

11.     The Ballot is not a letter of transmittal and may not be used for any purposes other than to cast a vote to accept or reject the Plan.  Holders should not surrender, at this time, certificates (if any) representing their securities.   No party will accept delivery of any such certificates surrendered together with this Ballot.

12.     NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER SOLICITATION MATERIALS APPROVED BY THE COURT, INCLUDING, WITHOUT LIMITATION, THE DISCLOSURE STATEMENT.

13.     PLEASE RETURN YOUR BALLOT PROMPTLY.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE PROCEDURES GENERALLY, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT KROLL BY EMAIL—WITH A REFERENCE TO "STRATEGIC MATERIALS, INC." IN THE SUBJECT LINE—TO: SMIBALLOTS@RA.KROLL.COM OR BY TELEPHONE AT (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.  THE SOLICITATION AGENT IS NOT AUTHORIZED TO PROVIDE LEGAL ADVICE.

**Exhibit G**

**NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS INCLUDED IN THE MATERIALS MAILED WITH THIS BALLOT.**

**IMPORTANT: NO CHAPTER 11 CASES HAVE BEEN COMMENCED AS OF THE DATE OF THE DISTRIBUTION OF THIS BALLOT.   IF VOLUNTARY REORGANIZATION CASES ARE FILED, THE COMPANY INTENDS TO PROMPTLY SEEK CONFIRMATION OF THE PREPACKAGED CHAPTER 11 PLAN BY THE COURT.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-[_____]** |
| | § | |
| **STRATEGIC MATERIALS, INC.,** *et al.*, | § | **(Chapter 11)** |
| | § | |
| **Debtors.**[1] | § | **(Joint Administration Requested)** |

**BALLOT FOR VOTING TO ACCEPT OR REJECT THE**
**DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN OF REORGANIZATION**

*CLASS 10 – SMI TOPCO INTERESTS*

---

**THE VOTING DEADLINE BY WHICH YOUR BALLOT MUST BE**
**ACTUALLY RECEIVED BY THE SOLICITATION AGENT IS 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023 (THE "*VOTING DEADLINE*").**

**IF YOUR BALLOT IS NOT RECEIVED ON OR PRIOR**
**TO THE VOTING DEADLINE, THE VOTE REPRESENTED BY YOUR BALLOT WILL NOT BE COUNTED, EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST LIEN LENDER GROUP.**

---

Strategic Materials, Inc. and its affiliated debtors listed in footnote 1 (collectively, the "***Debtors***") have provided you with this ballot (the "***Ballot***") to solicit your vote to accept or reject

---

[1]   The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  17220 Katy Freeway, Ste. 150, Houston, TX 77094.

the *Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization* (as may be modified, amended, or supplemented, the "***Plan***"), which is being proposed by the Debtors.[2]

If you are, **on November 13, 2023** (the "***Voting Record Date***"), a Holder of Class 10 SMI Topco Interests, please use this Ballot to cast your vote to accept or reject the Plan.  The Plan is attached as <u>**Exhibit A**</u> to the *Disclosure Statement for the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization*, dated November 15, 2023 (as may be amended, restated, modified, supplemented, or replaced from time to time and including all exhibits or supplements thereto, the "***Disclosure Statement***"), which accompanies this Ballot and also provides for a summary description of the terms and conditions of the Plan.

The Debtors have not yet commenced cases under chapter 11 of the Bankruptcy Code (the "***Chapter 11 Cases***").  The Debtors expect to file the Chapter 11 Cases after they complete the solicitation of votes from Holders of Claims and Interests entitled to vote on the Plan.  The Disclosure Statement has not yet been approved by any court with respect to whether it contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code.  The Debtors intend to seek approval of the Disclosure Statement and confirmation of the Plan at a combined hearing before the Court (the "***Combined Hearing***"), on a date and time to be announced.

The Plan and Disclosure Statement are accessible now for review and download, free of charge, on the Debtors' restructuring website maintained by the Solicitation Agent (as defined below) at https://cases.ra.kroll.com/SMISolicitation.  Printed copies of the Plan and Disclosure Statement may be obtained free of charge by contacting the Solicitation Agent via (i) telephone at (844) 307-7493  (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll) or (ii) email at SMIInfo@ra.kroll.com (with "SMI Solicitation" in the subject line).

Upon the commencement of the Chapter 11 Cases, the Debtors will file the Plan and Disclosure Statement on the docket with the Court.  Thereafter, the Plan and Disclosure Statement, as well as all other documents filed on the docket, will be available for review and download free of charge on the Debtors' restructuring website maintained by the Solicitation Agent at https://cases.ra.kroll.com/SMI, and they will also be available for review for a fee on the Court's website at www.txs.uscourts.gov and will be on file with the Clerk of the Court, 4th Floor, 515 Rusk Street, Houston, Texas 77002, where they will be available for review during normal operating hours.

Before you transmit your vote, please review the Plan, the Disclosure Statement, and all related documents enclosed herewith carefully.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of (i) at least two-thirds in dollar amount and more than one-half in number of Claims in each Class of Claims entitled to vote and that actually vote on the Plan and (ii) at least two-thirds in number of Interests in each Class of Interests entitled to vote and that actually vote on the Plan, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.  If the requisite acceptances are not obtained (or if a Class of Claims or Interests is deemed to reject the Plan), the Court may nonetheless confirm the Plan if it

---

[2]   Capitalized terms used in this Ballot and the attached instructions that are not otherwise defined herein have the meanings given to them in the Plan.

finds that the Plan provides fair and equitable treatment to, and does not discriminate unfairly against, the Class or Classes rejecting it, and otherwise satisfies the applicable requirements of section 1129(b) of the Bankruptcy Code.

Please note that the Plan contemplates separate Classes of Claims and Interests for voting and distribution purposes.  Depending on the nature of the Claims or Interests that are held in or against the Debtors, a creditor may have Claims and/or Interests in multiple Classes.  The Disclosure Statement sets forth a description of the Classes in the Plan.

Your receipt of this Ballot does not signify that your Interest has been or will be Allowed. This Ballot is solely for purposes of voting to accept or reject the Plan and not for the purpose of allowance or disallowance of or distribution on account of Class 10 SMI Topco Interests.  You must provide all of the information requested by this Ballot.  Failure to do so may result in the disqualification of your vote.

**Please also note that the Plan may be modified as described in Article X of the Plan. If the Plan is so modified, the Debtors may not be required to and, accordingly, may not resolicit votes on the Plan.  In such case , a vote to accept the Plan submitted prior to the Voting Deadline will be considered a vote to accept the Plan as so modified.**

If you have any questions on how to properly complete this Ballot, please call Kroll Restructuring Administration, LLC, the Debtors' proposed claims, noticing, and solicitation agent (the "***Solicitation Agent***" or "***Kroll***") at (844) 307-7493  (U.S./Canada, toll-free) or +1 (646) 651-1183 (International, toll) and request to speak with a member of the solicitation team or email— with a reference to "Strategic Materials, Inc. Solicitation" in the subject line—to SMIBallots@ra.kroll.com.  **THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**PLEASE READ AND FOLLOW THE BELOW INSTRUCTIONS CAREFULLY. COMPLETE, SIGN (ELECTRONIC SIGNATURE IS ACCEPTABLE) AND DATE YOUR CUSTOMIZED BALLOT (PURSUANT TO THE INSTRUCTIONS BELOW), AND RETURN IT SO THAT IT IS <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE OF <u>5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023</u> IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED HEREIN.  IF THIS BALLOT IS NOT COMPLETED, SIGNED, AND <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT PRIOR TO THE EXPIRATION OF THE VOTING DEADLINE, THEN THE VOTES TRANSMITTED BY THIS BALLOT WILL NOT BE COUNTED, EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST LIEN LENDER GROUP.**

---

**IMPORTANT**

You should carefully review the Disclosure Statement and Plan before you vote.  You may wish to seek legal or other professional advice concerning the Plan and your SMI Topco Interests.  Your SMI Topco Interests against the Debtors has been placed in Class 10 under the Plan.

VOTING DEADLINE:  5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22, 2023.

If your Ballot is not received by the Solicitation Agent on or before the Voting Deadline and such deadline is not extended, your vote will not count except in the Debtors' discretion, in consultation with the First Lien Lender Group.

If the Plan is confirmed by the Court, it will be binding on you whether or not you vote.

---

**SPECIAL NOTE REGARDING ELIGIBLE HOLDERS:**

Only Holders of SMI Topco Interests that are Eligible Holders are permitted to vote prior to the Petition Date.  An "*Eligible Holder*" is a Holder of Claims that certifies to the reasonable satisfaction of the Debtors that it is a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act of 1933 (the "*Securities Act*")) or an "accredited investor" (as defined in Rule 501 of Regulation D under the Securities Act).  If you are not an Eligible Holder, you may not vote to accept or reject the Plan prior to the Petition Date.

---

IF YOU (I) HAVE ANY QUESTIONS REGARDING THE BALLOT, (II) DID NOT RECEIVE A COPY OF THE DISCLOSURE STATEMENT OR PLAN, OR (III) NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT THE SOLICITATION AGENT BY CALLING (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM OR EMAIL—WITH A REFERENCE TO "STRATEGIC MATERIALS, INC." IN THE SUBJECT LINE—SMIBALLOTS@RA.KROLL.COM.  PLEASE DO NOT DIRECT ANY INQUIRIES TO THE COURT.  THE SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.

**VOTING DEADLINE:  NOVEMBER 22, 2023 5:00 P.M. (CENTRAL TIME)**

For your vote to be counted, this Ballot must be properly completed, signed, and returned so that it is <u>actually received</u> by the Solicitation Agent by no later than November 22, 2023 at 5:00 p.m. (Central Time), unless such time is extended in writing by the Debtors, in consultation with the First Lien Lender Group.  Please submit a Ballot with your vote in the envelope provided or by <u>*one*</u> of the following methods:

**If Submitting Your Vote through the E-Balloting Portal**

Kroll will accept Ballots if properly completed through the E-Balloting Portal.  To submit your Ballot via the E-Balloting Portal, visit **https://cases.ra.kroll.com/SMISolicitation**, click on the "Submit E-Ballot" section of Kroll's website for the Debtors and follow the instructions to submit your Ballot.

**IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:**

Unique E-Ballot ID#:_____

Kroll's E-Balloting Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot.  Please complete and submit an electronic Ballot for each E-Ballot ID# you receive, as applicable.

If your Ballot is not received by Kroll on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.

**If by First Class Mail, Overnight Courier, or Hand Delivery to:**
**Strategic Materials, Inc. Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue, Suite 412**
**Brooklyn, NY 11232**

<u>**To arrange hand delivery of your Ballot, please contact the Solicitation Agent via email at SMIBallots@ra.kroll.com (with "SMI Solicitation Ballot Submission" in the subject line) at least 24 hours prior to your arrival at the Kroll address above and provide the anticipated date and time of delivery.**</u>

**PLEASE READ THE ATTACHED VOTING INFORMATION
AND INSTRUCTIONS BEFORE COMPLETING THIS BALLOT**

**Item 1.** *Certification of SMI Topco Interests.*  The undersigned hereby certifies that on November 13, 2023, the Voting Record Date, the undersigned was the record Holder (or authorized signatory of such a Holder) of SMI Topco Interests in Class 10 under the Plan.  The undersigned owns the following aggregate amount of SMI Topco Interests:

> **Number of SMI Topco Interests:**  _____

**Item 2.** *Vote on Plan.*  The record Holder of the SMI Topco Interests in Class 10 under the Plan, as described in Item 1 above, votes all such Interests to (check <u>one</u> box):

☐ **Accept** the Plan

OR

☐ **Reject** the Plan

**Item 3**. *Optional Opt-Out of Releases.*

Following Confirmation, subject to Article IX of the Plan, the Plan will be substantially consummated on the Effective Date.  Among other things, effective as of the Confirmation Date but subject to the occurrence of the Effective Date, certain release, injunction, exculpation, and discharge provisions set forth in Article VIII of the Plan will become effective.  In determining how to cast your vote on the Plan, it is important to read the provisions contained in Article VIII of the Plan very carefully so that you understand how confirmation and substantial consummation of the Plan—which effectuates such provisions—will affect you and any Interests you may hold against the Debtors and/or certain other Released Parties specified in the Plan.[3]

---

[3]    "*Released Party*" means each of the following solely in its capacity as such:  (a) each of the Debtors; (b) each of the Reorganized Debtors or the Post-Sale Estates (as applicable); (c) each Consenting Party; (d) the Third-Party Purchaser (if applicable), (e) each Holder of a Claim or Interest who votes in favor of the Plan; (f) each Related Party of each Entity in clause (a) through this clause (f); provided, that in each case, an Entity shall not be a Released Party if it: (x) elects to opt out of the releases set forth in Article VIII.F of the Plan; or (y) timely objects to the releases set forth in Article VIII.F of the Plan and such objection is not resolved before Confirmation.

Article VIII.F of the Plan contains the following provision:

*F. Releases by Holders of Claims and Interests*

**As of the Effective Date, in exchange for good and valuable consideration, including the obligations of the Debtors under the Plan, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each of the Releasing Parties, in each case on behalf of itself and its respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged each Debtor, Reorganized Debtor, and other Released Party from any and all Causes of Action, whether known or unknown, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the governance, management, ownership or operation thereof), the Debtors' capital structure, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among the Debtors and/or their Affiliates, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors, the Reorganized Debtors, or the Post-Sale Estates, as applicable, and the ownership thereof, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the DIP Facility, the Exit Term Loan Facilities, the Prepetition Credit Agreements, the Chapter 11 Cases and any related adversary proceedings and related prepetition activities, the formulation, preparation, dissemination, negotiation, filing, or consummation of the Restructuring Support Agreement, the Definitive Documents, the Plan, or any Restructuring (including any transaction in connection therewith), contract, instrument, release, or other agreement or document created or entered into in connection with the Restructuring Support Agreement, the DIP Facility, the Exit Term Loan Facilities, the Definitive Documents, or the Plan, the Debtors' Restructuring efforts (including those contemplated by the Restructuring Support Agreement), the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion, any action or actions taken in furtherance or consistent with administration of the Plan, the issuance or distribution of any debt and/or securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release any obligations of any Entity arising on or after the Effective Date under the Plan, the Confirmation Order, any Restructuring transaction, any assumed contract, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the assumption of the Indemnification Obligations as set forth in the Plan.**

**Entry of the Confirmation Order shall constitute the Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.**

Check the box below if you elect not to grant the releases contained in Article VIII.F of the Plan. Election to withhold consent is at your option.  If you submit a Ballot accepting or rejecting the Plan, or if you abstain from submitting a Ballot, and in either case, you do not check the box below, you will be deemed to consent to the releases contained in Article VIII.F of the Plan to the fullest extent permitted by applicable law.  Please be advised that your decision to opt out does not affect the amount of distribution you will receive under the Plan.  Specifically, your recovery under the Plan will be the same whether or not you opt out of the releases contained in Article VIII.F of the Plan.

<u>**The Holder of the Class 10 SMI Topco Interests set forth in Item 1 elects to:**</u>

☐ **OPT OUT** of the Releases Contained in Article VIII.F of the Plan

---

**IF YOU VOTE TO ACCEPT OR REJECT
THE PLAN AND YOU DO NOT CHECK
THE "OPT-OUT" BOX IN ITEM 3 AND TIMELY SUBMIT YOUR
BALLOT, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES
OF THE RELEASED PARTIES SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

**IF YOU ABSTAIN FROM VOTING
ON THE PLAN AND YOU DO NOT TIMELY
SUBMIT YOUR BALLOT WITH THE "OPT-OUT" BOX IN ITEM 3
CHECKED, YOU WILL BE DEEMED TO CONSENT TO THE RELEASES
OF THE RELEASED PARTIES SET FORTH IN ARTICLE VIII.F OF THE PLAN.**

---

**Item 4:** *Acknowledgement of Eligible Holder Status.* The undersigned Holder of SMI Topco Interests in Class 10 under the Plan, as described in Item 1 above, acknowledges that (a) it is an Eligible Holder because it is (i) a "qualified institutional buyer" (as defined in Rule 144A under the Securities Act) and/or (ii) an "accredited investor" as that term is defined by Rule 501 of Regulation D, 17 C.F.R. § 230.501(a), promulgated under the Securities Act, 15 U.S.C. §§ 77a-77aa (as amended), and (b) the securities being distributed pursuant to the Plan are not being distributed pursuant to a registration statement filed with the U.S. Securities and Exchange Commission, and that such securities will be acquired for the Holder's own account and not with a view to any distribution of such securities in violation of the Securities Act.

## ☐ Acknowledgement of Eligible Holder Status

**Item 5:** *Certifications.* By returning this Ballot, the undersigned Holder of SMI Topco Interests in Class 10 under the Plan, as described in Item 1 above, certifies that (a)(i) it was the record Holder of the Interests described in Item 1 on November 13, 2023, and/or (ii) it has full power and authority to vote to accept or reject the Plan; (b) it has received a copy of the Plan and Disclosure Statement (and all attachments and supplements thereto); (c) the Holder has cast the same vote with respect to all of its Class 10 Interests described in Item 1; and (d) no other Class 10 Ballots with respect to the amount of the Interests described in Item 1 have been cast or, if any other Class 10 Ballots have been cast with respect to such Interests, then any such earlier Class 10 Ballots are hereby revoked. The undersigned understands that an otherwise properly completed, executed and timely-returned Ballot that does not indicate either acceptance or rejection of the Plan or indicates both acceptance and rejection of the Plan will not be counted. By signing this Ballot you also are acknowledging that your vote is subject to all terms or conditions set forth in the Disclosure Statement and Plan.

Name of Holder: _____

Signature: _____

Print Name: _____

Title: _____

Street Address: _____

City, State and Zip Code: _____

Telephone Number: _____

Email Address: _____

Date Completed: _____

**PLEASE PROMPTLY RETURN YOUR COMPLETED BALLOT.**

**BALLOTS MAY BE SUBMITTED VIA THE E-BALLOT PORTAL, IN THE RETURN ENVELOPE PROVIDED, OR AS DIRECTED IN THE VOTING INSTRUCTIONS.**

74481

**IN ORDER TO COUNT, YOUR COMPLETED BALLOT MUST
BE <u>RECEIVED</u> NO LATER THAN 5:00 P.M. (CENTRAL TIME) ON NOVEMBER 22,
2023 OR THE VOTES TRANSMITTED THEREBY WILL NOT BE COUNTED,
EXCEPT IN THE DEBTORS' DISCRETION, IN CONSULTATION WITH THE FIRST
LIEN LENDER GROUP.**

---

**IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE VOTING PROCEDURES, OR IF YOU NEED ADDITIONAL COPIES OF THIS BALLOT, THE DISCLOSURE STATEMENT, THE PLAN, OR OTHER RELATED MATERIALS OR DOCUMENTS, PLEASE CALL THE SOLICITATION AGENT AT (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM OR EMAIL AT SMIBALLOTS@RA.KROLL.COM WITH A REFERENCE TO "STRATEGIC MATERIALS, INC." IN THE SUBJECT LINE.**

4881-4554-7408

74481

## INSTRUCTIONS FOR COMPLETING THE BALLOT

1.      In order for your vote to count, you must:

      a)      In the box provided in Item 1, indicate the number of Interests held;

      b)      In Item 2, indicate either acceptance or rejection of the Plan by checking the appropriate box;

      c)      Make sure to read the information regarding releases in Item 3 and check the box **if you elect to opt out** of the releases;

      d)      In Item 4, indicate your acknowledgement that you are an Eligible Holder;

      e)      Review the certification in Item 5 of the Ballot; and either

            i.      electronically complete, sign, and return your customized electronic Ballot by utilizing the "E-Ballot" platform on Kroll's website so that is it **actually received** by Kroll no later than the Voting Deadline of 5:00 P.M. Central Time on November 22, 2023 (unless such time is extended by the Debtors, in consultation with the First Lien Lender Group); **OR**

            ii.      complete, sign, and return your Ballot by first class mail, overnight courier or hand delivery per mailing instructions provided above so that is it **actually received** by Kroll no later than the Voting Deadline of 5:00 P.M. Central Time on November 22, 2023 (unless such time is extended by the Debtors, in consultation with the First Lien Lender Group). A pre-addressed, postage pre-paid return envelope is enclosed for your convenience.  Any unsigned or non-original Ballot will not be counted.

2.      **The method of delivery of your Ballot is at your election and at your own risk.  YOU ARE STRONGLY ENCOURAGED TO SUBMIT YOUR BALLOT VIA THE E-BALLOT PLATFORM.  Kroll's "E-Ballot" platform is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email or other means of electronic transmission will not be counted.  If voting online, to have your vote counted, you must electronically complete, sign, and submit the electronic Ballot by utilizing the E-Ballot platform on Kroll's website.  Your Ballot must be received by Kroll no later than the Voting Deadline, unless such time is extended by the Debtors, in consultation with the First Lien Lender Group.**

**Creditors who cast a Ballot using Kroll's "E-Ballot" platform should NOT also submit a paper Ballot.**

If you are unable to use the E-Ballot platform or need assistance from Kroll in completing and submitting your Ballot, please contact Kroll by email—with a reference to "Strategic Materials, Inc." in the subject line—to: SMIBallots@ra.kroll.com or by telephone at (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, toll) and request to speak with a member of the solicitation team.

3.      A properly completed, executed, and timely-returned Ballot that either (a) indicates both an acceptance and rejection of the Plan or (b) fails to indicate either an acceptance or rejection of the Plan will not be counted.

4881-4554-7408

4.     You must vote all your Interests within a single Class under the Plan either to accept or reject the Plan.  Accordingly, a Ballot (or multiple Ballots with respect to Interests within a single Class) that partially rejects and partially accepts the Plan will not be counted.

5.     If you cast more than one Ballot voting the same Interest prior to the Voting Deadline, the last valid Ballot timely received shall be deemed to reflect the voter's intent and shall supersede and revoke any earlier received Ballot.  If you simultaneously cast inconsistent duplicate Ballots with respect to the same Interest, such Ballots shall not be counted.

6.     Any Ballot cast by a person or entity that did not hold an SMI Topco Interest in Class 10 (SMI Topco Interests) as of the Voting Record Date will not be counted.

7.     Any Ballot that is illegible or that contains insufficient information to permit the identification of the claimant will not be counted.

8.     The Ballot does not constitute, and shall not be deemed to be, a proof of claim or equity interest or an assertion or admission of a Claim or an Interest.

9.     It is important that you vote.  The Plan can be confirmed by the Court and thereby made binding upon you if it is accepted by the Holders of (i) at least two-thirds in dollar amount and more than one-half in number of Claims in each Class entitled to vote and that actually vote on the Plan and (ii) at least two-thirds in number of Interests in each Class entitled to vote and that actually vote on the Plan, and if it otherwise satisfies the requirements of section 1129(a) of the Bankruptcy Code.  The votes of Claims actually voted in your Class will bind both those who vote and those who do not vote.  If the requisite acceptances are not obtained, the Court nonetheless may confirm the Plan if it finds that the Plan:  (a) provides fair and equitable treatment to, and does not unfairly discriminate against, the Class or Classes voting to reject the Plan; and (b) otherwise satisfies the requirements of section 1129(b) of the Bankruptcy Code.

10.     Each Ballot you receive is for voting only your Claim described in that Ballot.  Please complete and return each Ballot you receive.  The attached Ballot is designated only for voting Class 10 SMI Topco Interests.

11.     The Ballot is not a letter of transmittal and may not be used for any purposes other than to cast a vote to accept or reject the Plan.  Holders should not surrender, at this time, certificates (if any) representing their securities.  No party will accept delivery of any such certificates surrendered together with this Ballot.

12.     NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, OTHER THAN WHAT IS CONTAINED IN THE MATERIALS MAILED WITH THIS BALLOT OR OTHER SOLICITATION MATERIALS APPROVED BY THE COURT, INCLUDING, WITHOUT LIMITATION, THE DISCLOSURE STATEMENT.

13.     PLEASE RETURN YOUR BALLOT PROMPTLY.

IF YOU HAVE ANY QUESTIONS REGARDING THIS BALLOT OR THE PROCEDURES GENERALLY, OR IF YOU NEED ADDITIONAL COPIES OF THE BALLOT OR OTHER ENCLOSED MATERIALS, PLEASE CONTACT KROLL BY EMAIL—WITH A REFERENCE TO "STRATEGIC MATERIALS, INC." IN THE SUBJECT LINE—TO: SMIBALLOTS@RA.KROLL.COM OR BY TELEPHONE AT (844) 307-7493 (U.S./CANADA, TOLL-FREE) OR +1 (646) 651-1183 (INTERNATIONAL, TOLL) AND REQUEST TO SPEAK WITH A MEMBER OF THE SOLICITATION TEAM.  THE SOLICITATION AGENT IS NOT AUTHORIZED TO PROVIDE LEGAL ADVICE.

**<u>Exhibit H</u>**

Exhibit H

Class 3 Service List

Served via Email

| Name | Email |
|------|-------|
| ALCOF II NUBT, L.P. | Email address on file |
| ALCOF II NUBT, L.P. | Email address on file |
| ALCOF III NUBT LP | Email address on file |
| ALCOF III NUBT LP | Email address on file |
| CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM | Email address on file |
| CERBERUS CORPORATE CREDIT FUND, L.P. | Email address on file |
| CERBERUS CORPORATE CREDIT FUND, L.P. | Email address on file |
| COPPERHILL LOAN FUND I, LLC | Email address on file |
| CREDIT SUISSE FLOATING RATE HIGH INCOME FUND | Email address on file |
| CREDIT SUISSE STRATEGIC INCOME FUND | Email address on file |
| CREDIT VALUE MASTER FUND IV-B, LP | Email address on file |
| DAVINCI REINSURANCE LTD. | Email address on file |
| DOLLAR SEN LN MSTR FD II LTD | Email address on file |
| DOLLAR SENIOR LOAN FUND, LTD. | Email address on file |
| ERIE INDEMNITY COMPANY | Email address on file |
| ERIE INSURANCE EXCHANGE | Email address on file |
| FIDANTE PARTNERS SERVICES LIMITED AS RESPONSIBLE ENTITY FOR BENTHAM SYNDICATE | Email address on file |
| GENERATE CLO 2 LTD. | Email address on file |
| GENERATE CLO 3 LTD. | Email address on file |
| GREAT GRAY COLLECTIVE INVESTMENT TRUST - CREDIT SUISSE FLOATING RATE TRUST | Email address on file |
| HPS SPEC SITUATIONS OPPOR FD II LP | Email address on file |
| HPS SPECIAL SIT OPP FUND L.P | Email address on file |
| IVY HILL M MKT CRD FD IX, LTD. | Email address on file |
| IVY HILL MIDDLE MARKET CREDIT FUND IV, LTD | Email address on file |
| IVY HILL MIDDLE MARKET CREDIT FUND V, LTD | Email address on file |
| IVY HILL MIDDLE MARKET CREDIT FUND VIII, LTD | Email address on file |
| LAPETUS CAPITAL III LLC | Email address on file |
| LITTLEJOHN FUND V, L.P. | Email address on file |
| LITTLEJOHN FUND V, L.P. | Email address on file |
| LITTLEJOHN FUND V-A, L.P. | Email address on file |
| LITTLEJOHN FUND V-A, L.P. | Email address on file |
| LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION | Email address on file |
| MADISON FLINTHOLM SR LOAN FUND I DAC | Email address on file |
| MADISON PARK FUNDING XI, LTD. | Email address on file |
| MADISON PARK FUNDING XL, LTD. | Email address on file |
| MADISON PARK FUNDING XLI, LTD | Email address on file |
| MADISON PARK FUNDING XLII, LTD. | Email address on file |
| MADISON PARK FUNDING XLIII, LTD. | Email address on file |
| MADISON PARK FUNDING XLIV, LTD. | Email address on file |
| MADISON PARK FUNDING XVII, LTD | Email address on file |
| MADISON PARK FUNDING XVIII, LTD. | Email address on file |
| MADISON PARK FUNDING XXIII LTD | Email address on file |
| MADISON PARK FUNDING XXIV, LTD | Email address on file |
| MADISON PARK FUNDING XXV, LTD. | Email address on file |
| MADISON PARK FUNDING XXVI, LTD. | Email address on file |
| MADISON PARK FUNDING XXVII, LTD. | Email address on file |
| MADISON PARK FUNDING XXX LTD | Email address on file |
| MADISON PARK FUNDING XXXI, LTD. | Email address on file |
| MARYLAND STATE RETIREMENT AND PENSION SYSTEM | Email address on file |
| MONROE CAP MML CLO 2017-1 LTD | Email address on file |
| ONE ELEVEN FUNDING III, LTD. | Email address on file |
| PHILLIPS 66 RETIREMENT PLAN TRUST | Email address on file |

Exhibit H
Class 3 Service List
Served via Email

| Name | Email |
|------|-------|
| RENAISSANCE INVESTMENT HOLDINGS LTD | Email address on file |
| SMI TOPCO HOLDINGS, INC. | Email address on file |
| SMI TOPCO HOLDINGS, INC. | Email address on file |
| SMI TOPCO HOLDINGS, INC. | Email address on file |
| SSOF II OFFSHORE HLDG LP | Email address on file |
| SSOF OFFSHORE HLDG LP | Email address on file |
| SUMUS CREDIT OPPORTUNITIES MASTER FUND, L.P. | Email address on file |
| WELLFLEET CLO 2016-1, LTD. | Email address on file |
| WELLFLEET CLO 2016-2, LTD | Email address on file |
| WELLFLEET CLO 2017-1, LTD. | Email address on file |
| WELLFLEET CLO 2017-2, LTD | Email address on file |
| WELLFLEET CLO 2017-3, LTD. | Email address on file |
| WESPATH FUNDS TRUST | Email address on file |
| WY (STATE OF) | Email address on file |

In re: Strategic Materials, Inc., et al.
Case No. 23-90907 (CML)

Page 2 of 2

**Exhibit I**

Exhibit I

Class 4 Service List

Served via Email

| Name | Email |
|------|-------|
| Littlejohn Fund V, L.P. | Email address on file |
| Littlejohn Fund V-A, L.P | Email address on file |
| SMI Topco Holdings, Inc | Email address on file |

**Exhibit J**

Exhibit J

Class 5 Service List

Served via Email

| Name | Email |
|------|-------|
| ALCOF II NUBT, L.P. | Email address on file |
| ALCOF II UBT, L.P. | Email address on file |
| ALCOF III NUBT LP | Email address on file |
| ALCOF III UBT, L.P. | Email address on file |
| AUSTRALIANSUPER, AUSTRALIANSUPER PTY LTD, TTEE | Email address on file |
| Bentham Syndicated Loan Fund | Email address on file |
| BLACKSTONE LONG-SHORT CREDIT INCOME FUND | Email address on file |
| BLACKSTONE STRATEGIC CREDIT FUND | Email address on file |
| Blackstone/GSO SENIOR FLOATING RATE TERM FUND | Email address on file |
| California State Teachers' Retirement System | Email address on file |
| CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM | Email address on file |
| Cerberus Corporate Credit Fund, L.P. | Email address on file |
| CLCP II-B ISSUER ENTITY 1 LLC | Email address on file |
| Copperhill Loan Fund I, LLC | Email address on file |
| COPPERHILL LOAN FUND I, LLC | Email address on file |
| CREDIT SUISSE ASSET MANAGEMENT INCOME FUND INC | Email address on file |
| Credit Suisse Floating Rate High Income Fund | Email address on file |
| CREDIT SUISSE FLOATING RATE HIGH INCOME FUND | Email address on file |
| CREDIT SUISSE HIGH YIELD BOND FUND | Email address on file |
| CREDIT SUISSE NOVA (LUX) - GLOBAL SENIOR LOAN FUND | Email address on file |
| Credit Suisse Strategic Income Fund | Email address on file |
| CREDIT SUISSE STRATEGIC INCOME FUND | Email address on file |
| DaVinci Reinsurance Ltd. | Email address on file |
| DAVINCI REINSURANCE LTD. | Email address on file |
| DOLLAR SEN LN MSTR FD II LTD | Email address on file |
| Dollar Senior Loan Fund, Ltd. | Email address on file |
| Dollar Senior Loan Master Fund II, Ltd. | Email address on file |
| EATON CORPORATION MASTER RETIREMENT TRUST | Email address on file |
| ELEVATION CLO 2014-2, LTD. | Email address on file |
| ELEVATION CLO 2017-6, LTD. | Email address on file |
| FIDANTE PARTNERS SERVICES LIMITED AS RESPONSIBLE ENTITY FOR BENTHAM HIGH YIELD FUND | Email address on file |
| Goldman Sachs Lending Partners | Email address on file |
| HPS Special Situations Opportunity Fund II, L.P. | Email address on file |
| HPS Special Situations Opportunity Fund, L.P. | Email address on file |
| Madison Flintholm Senior Loan Fund I Designated Activity Company | Email address on file |
| MADISON FLINTHOLM SR LOAN FUND I DAC | Email address on file |
| MADISON PARK FD XXXII, LTD. | Email address on file |
| MADISON PARK FUNDING XI, LTD | Email address on file |
| MADISON PARK FUNDING XIII LTD | Email address on file |
| MADISON PARK FUNDING XIV, LTD. | Email address on file |
| MADISON PARK FUNDING XL, LTD. | Email address on file |
| MADISON PARK FUNDING XLI, LTD | Email address on file |
| MADISON PARK FUNDING XLII, LTD. | Email address on file |
| MADISON PARK FUNDING XLIII, LTD. | Email address on file |
| MADISON PARK FUNDING XV, LTD 1 MADISON AVENUE, 10TH FL | Email address on file |
| MADISON PARK FUNDING XVII, LTD | Email address on file |
| MADISON PARK FUNDING XVIII, LTD. | Email address on file |
| MADISON PARK FUNDING XX LTD | Email address on file |

Exhibit J

Class 5 Service List

Served via Email

| Name | Email |
|------|-------|
| MADISON PARK FUNDING XXIII LTD | Email address on file |
| MADISON PARK FUNDING XXIV, LTD | Email address on file |
| MADISON PARK FUNDING XXIX, LTD | Email address on file |
| MADISON PARK FUNDING XXV, LTD. | Email address on file |
| MADISON PARK FUNDING XXVI, LTD. | Email address on file |
| MADISON PARK FUNDING XXVII, LTD. | Email address on file |
| MADISON PARK FUNDING XXX LTD | Email address on file |
| MADISON PARK FUNDNG XXVIII LTD | Email address on file |
| MARYLAND STATE RETIREMENT AND PENSION SYSTEM | Email address on file |
| NEW YORK LIFE INSURANCE COMPANY | Email address on file |
| ONE ELEVEN FUNDING III, LTD. | Email address on file |
| One Eleven Funding III, Ltd. | Email address on file |
| PHILLIPS 66 RETIREMENT PLAN TRUST | Email address on file |
| PROSPECT CAPITAL CORPORATION | Email address on file |
| RENAISSANCE INVESTMENT HOLDINGS LTD | Email address on file |
| Renaissance Investments Holdings Ltd. | Email address on file |
| SMI TOPCO HOLDINGS, INC. | Email address on file |
| SSOF II Offshore Holdings, L.P. | Email address on file |
| SSOF Offshore Holdings, L.P. | Email address on file |
| Sumus Credit Opportunities Master Fund, L.P. | Email address on file |
| WELLFLEET CLO 2015-1, LTD. | Email address on file |
| WELLFLEET CLO 2016-1, LTD. | Email address on file |
| WELLFLEET CLO 2016-2, LTD | Email address on file |
| WELLFLEET CLO 2017-1, LTD. | Email address on file |
| WELLFLEET CLO 2017-2, LTD | Email address on file |
| WELLFLEET CLO 2017-3, LTD. | Email address on file |

**<u>Exhibit K</u>**

Exhibit K
Amended Plan Supplement Service List
Served via Email

| Name | Email |
|---|---|
| ALCOF II NUBT, L.P. | Email address on file |
| ALCOF II NUBT, L.P. | Email address on file |
| ALCOF II NUBT, L.P. | Email address on file |
| ALCOF II UBT, L.P. | Email address on file |
| ALCOF III NUBT LP | Email address on file |
| ALCOF III NUBT LP | Email address on file |
| ALCOF III NUBT LP | Email address on file |
| ALCOF III UBT, L.P. | Email address on file |
| AUSTRALIANSUPER, AUSTRALIANSUPER PTY LTD, TTEE | Email address on file |
| Bentham Syndicated Loan Fund | Email address on file |
| BLACKSTONE LONG-SHORT CREDIT INCOME FUND | Email address on file |
| BLACKSTONE STRATEGIC CREDIT FUND | Email address on file |
| Blackstone/GSO SENIOR FLOATING RATE TERM FUND | Email address on file |
| CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM | Email address on file |
| California State Teachers' Retirement System | Email address on file |
| CALIFORNIA STATE TEACHERS' RETIREMENT SYSTEM | Email address on file |
| CERBERUS CORPORATE CREDIT FUND, L.P. | Email address on file |
| CERBERUS CORPORATE CREDIT FUND, L.P. | Email address on file |
| Cerberus Corporate Credit Fund, L.P. | Email address on file |
| CLCP II-B ISSUER ENTITY 1 LLC | Email address on file |
| COPPERHILL LOAN FUND I, LLC | Email address on file |
| Copperhill Loan Fund I, LLC | Email address on file |
| COPPERHILL LOAN FUND I, LLC | Email address on file |
| CREDIT SUISSE ASSET MANAGEMENT INCOME FUND INC | Email address on file |
| CREDIT SUISSE FLOATING RATE HIGH INCOME FUND | Email address on file |
| Credit Suisse Floating Rate High Income Fund | Email address on file |
| CREDIT SUISSE FLOATING RATE HIGH INCOME FUND | Email address on file |
| CREDIT SUISSE HIGH YIELD BOND FUND | Email address on file |
| CREDIT SUISSE NOVA (LUX) - GLOBAL SENIOR LOAN FUND | Email address on file |
| CREDIT SUISSE STRATEGIC INCOME FUND | Email address on file |
| Credit Suisse Strategic Income Fund | Email address on file |
| CREDIT SUISSE STRATEGIC INCOME FUND | Email address on file |
| CREDIT VALUE MASTER FUND IV-B, LP | Email address on file |
| DAVINCI REINSURANCE LTD. | Email address on file |
| DaVinci Reinsurance Ltd. | Email address on file |
| DAVINCI REINSURANCE LTD. | Email address on file |
| DOLLAR SEN LN MSTR FD II LTD | Email address on file |
| DOLLAR SEN LN MSTR FD II LTD | Email address on file |
| DOLLAR SENIOR LOAN FUND, LTD. | Email address on file |
| Dollar Senior Loan Fund, Ltd. | Email address on file |
| Dollar Senior Loan Master Fund II, Ltd. | Email address on file |
| EATON CORPORATION MASTER RETIREMENT TRUST | Email address on file |
| ELEVATION CLO 2014-2, LTD. | Email address on file |
| ELEVATION CLO 2017-6, LTD. | Email address on file |
| ERIE INDEMNITY COMPANY | Email address on file |
| ERIE INSURANCE EXCHANGE | Email address on file |
| FIDANTE PARTNERS SERVICES LIMITED AS RESPONSIBLE ENTITY FOR BENTHAM HIGH YIELD FUND | Email address on file |
| FIDANTE PARTNERS SERVICES LIMITED AS RESPONSIBLE ENTITY FOR BENTHAM SYNDICATED LOAN FUND | Email address on file |
| GENERATE CLO 2 LTD. | Email address on file |
| GENERATE CLO 3 LTD. | Email address on file |

Exhibit K
Amended Plan Supplement Service List
Served via Email

| Name | Email |
|---|---|
| Goldman Sachs Lending Partners | Email address on file |
| GREAT GRAY COLLECTIVE INVESTMENT TRUST - CREDIT SUISSE FLOATING RATE TRUST | Email address on file |
| HPS SPEC SITUATIONS OPPOR FD II LP | Email address on file |
| HPS SPECIAL SIT OPP FUND L.P | Email address on file |
| HPS Special Situations Opportunity Fund II, L.P. | Email address on file |
| HPS Special Situations Opportunity Fund, L.P. | Email address on file |
| IVY HILL M MKT CRD FD IX, LTD. | Email address on file |
| IVY HILL MIDDLE MARKET CREDIT FUND IV, LTD | Email address on file |
| IVY HILL MIDDLE MARKET CREDIT FUND V, LTD | Email address on file |
| IVY HILL MIDDLE MARKET CREDIT FUND VIII, LTD | Email address on file |
| LAPETUS CAPITAL III LLC | Email address on file |
| LITTLEJOHN FUND V, L.P. | Email address on file |
| LITTLEJOHN FUND V, L.P. | Email address on file |
| Littlejohn Fund V, L.P. | Email address on file |
| Littlejohn Fund V-A, L.P | Email address on file |
| LITTLEJOHN FUND V-A, L.P. | Email address on file |
| LITTLEJOHN FUND V-A, L.P. | Email address on file |
| LOS ANGELES COUNTY EMPLOYEES RETIREMENT ASSOCIATION | Email address on file |
| Madison Flintholm Senior Loan Fund I Designated Activity Company | Email address on file |
| MADISON FLINTHOLM SR LOAN FUND I DAC | Email address on file |
| MADISON FLINTHOLM SR LOAN FUND I DAC | Email address on file |
| MADISON PARK FD XXXII, LTD. | Email address on file |
| MADISON PARK FUNDING XI, LTD | Email address on file |
| MADISON PARK FUNDING XI, LTD. | Email address on file |
| MADISON PARK FUNDING XIII LTD | Email address on file |
| MADISON PARK FUNDING XIV, LTD. | Email address on file |
| MADISON PARK FUNDING XL, LTD. | Email address on file |
| MADISON PARK FUNDING XL, LTD. | Email address on file |
| MADISON PARK FUNDING XLI, LTD | Email address on file |
| MADISON PARK FUNDING XLI, LTD | Email address on file |
| MADISON PARK FUNDING XLII, LTD. | Email address on file |
| MADISON PARK FUNDING XLII, LTD. | Email address on file |
| MADISON PARK FUNDING XLIII, LTD. | Email address on file |
| MADISON PARK FUNDING XLIII, LTD. | Email address on file |
| MADISON PARK FUNDING XLIV, LTD. | Email address on file |
| MADISON PARK FUNDING XV, LTD 1 MADISON AVENUE, 10TH FL | Email address on file |
| MADISON PARK FUNDING XVII, LTD | Email address on file |
| MADISON PARK FUNDING XVII, LTD | Email address on file |
| MADISON PARK FUNDING XVIII, LTD. | Email address on file |
| MADISON PARK FUNDING XVIII, LTD. | Email address on file |
| MADISON PARK FUNDING XX LTD | Email address on file |
| MADISON PARK FUNDING XXIII LTD | Email address on file |
| MADISON PARK FUNDING XXIII LTD | Email address on file |
| MADISON PARK FUNDING XXIV, LTD | Email address on file |
| MADISON PARK FUNDING XXIV, LTD | Email address on file |
| MADISON PARK FUNDING XXIX, LTD | Email address on file |
| MADISON PARK FUNDING XXV, LTD. | Email address on file |
| MADISON PARK FUNDING XXV, LTD. | Email address on file |
| MADISON PARK FUNDING XXVI, LTD. | Email address on file |
| MADISON PARK FUNDING XXVI, LTD. | Email address on file |
| MADISON PARK FUNDING XXVII, LTD. | Email address on file |

Exhibit K
Amended Plan Supplement Service List
Served via Email

| Name | Email |
|------|-------|
| MADISON PARK FUNDING XXVII, LTD. | Email address on file |
| MADISON PARK FUNDING XXX LTD | Email address on file |
| MADISON PARK FUNDING XXX LTD | Email address on file |
| MADISON PARK FUNDING XXXI, LTD. | Email address on file |
| MADISON PARK FUNDNG XXVIII LTD | Email address on file |
| MARYLAND STATE RETIREMENT AND PENSION SYSTEM | Email address on file |
| MARYLAND STATE RETIREMENT AND PENSION SYSTEM | Email address on file |
| MONROE CAP MML CLO 2017-1 LTD | Email address on file |
| NEW YORK LIFE INSURANCE COMPANY | Email address on file |
| ONE ELEVEN FUNDING III, LTD. | Email address on file |
| ONE ELEVEN FUNDING III, LTD. | Email address on file |
| One Eleven Funding III, Ltd. | Email address on file |
| PHILLIPS 66 RETIREMENT PLAN TRUST | Email address on file |
| PHILLIPS 66 RETIREMENT PLAN TRUST | Email address on file |
| PROSPECT CAPITAL CORPORATION | Email address on file |
| RENAISSANCE INVESTMENT HOLDINGS LTD | Email address on file |
| RENAISSANCE INVESTMENT HOLDINGS LTD | Email address on file |
| Renaissance Investments Holdings Ltd. | Email address on file |
| SMI Topco Holdings, Inc | Email address on file |
| SMI TOPCO HOLDINGS, INC. | Email address on file |
| SMI TOPCO HOLDINGS, INC. | Email address on file |
| SMI TOPCO HOLDINGS, INC. | Email address on file |
| SMI TOPCO HOLDINGS, INC. | Email address on file |
| SMI Topco L.P. | Email address on file |
| SSOF II OFFSHORE HLDG LP | Email address on file |
| SSOF II Offshore Holdings, L.P. | Email address on file |
| SSOF OFFSHORE HLDG LP | Email address on file |
| SSOF Offshore Holdings, L.P. | Email address on file |
| SUMUS CREDIT OPPORTUNITIES MASTER FUND, L.P. | Email address on file |
| Sumus Credit Opportunities Master Fund, L.P. | Email address on file |
| WELLFLEET CLO 2015-1, LTD. | Email address on file |
| WELLFLEET CLO 2016-1, LTD. | Email address on file |
| WELLFLEET CLO 2016-1, LTD. | Email address on file |
| WELLFLEET CLO 2016-2, LTD | Email address on file |
| WELLFLEET CLO 2016-2, LTD | Email address on file |
| WELLFLEET CLO 2017-1, LTD. | Email address on file |
| WELLFLEET CLO 2017-1, LTD. | Email address on file |
| WELLFLEET CLO 2017-2, LTD | Email address on file |
| WELLFLEET CLO 2017-2, LTD | Email address on file |
| WELLFLEET CLO 2017-3, LTD. | Email address on file |
| WELLFLEET CLO 2017-3, LTD. | Email address on file |
| WESPATH FUNDS TRUST | Email address on file |
| WY (STATE OF) | Email address on file |