**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Case No. 23-90907 (CML)** |
| | § | |
| **STRATEGIC MATERIALS, INC.,** *et al.,* | § | **(Chapter 11)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.[1]** | § | **(Emergency Hearing Requested)** |

### EMERGENCY MOTION FOR
### ENTRY OF INTERIM AND FINAL
### ORDERS (I) AUTHORIZING THE DEBTORS TO
### (A) OBTAIN POSTPETITION FINANCING, (B) GRANT
### SENIOR LIENS AND SUPERPRIORITY ADMINISTRATIVE
### EXPENSE STATUS, AND (C) UTILIZE CASH COLLATERAL,
### (II) GRANTING ADEQUATE PROTECTION TO PREPETITION
### SECURED LENDERS, (III) MODIFYING THE AUTOMATIC STAY, (IV)
### SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

**E Emergency relief has been requested. Relief is requested not later than 5:30 p.m. on December 5, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on December 5, 2023 at 5:30 p.m. in Courtroom 401, floor 4, 515 Rusk Avenue, Houston, TX 77002.**

**Participation at the hearing will only be permitted by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at 832-917-1510. Once connected, you will be asked to enter**

---

[1] The Debtors in these Chapter 11 Cases and the last four digits of their respective federal tax identification numbers are: Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109). The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is: 17220 Katy Freeway, Ste. 150, Houston, TX 77094.

> **the conference room number. Judge Lopez's conference room number is 590153. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Lopez's home page. The meeting code is "Judge Lopez". Click the settings icon in the upper right corner and enter your name under the personal information setting.**
>
> **Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Lopez's home page. Select the case name, complete the required fields and click "Submit" to complete your appearance.**

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

The above-captioned debtors and debtors in possession (collectively, the "***Debtors***") file this motion (the "***Motion***") for entry of interim and final orders (respectively, the "***Interim Order***," substantially in the form attached hereto, and the "***Final Order***," together, the "***DIP Orders***") pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 507, and 552(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "***Bankruptcy Code***"), Rules 2002, 4001, 6003, 6004, and 9104 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***"), Rules 2002-1, 4001-1(b), and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "***Local Rules***"), and the Procedures for Complex Chapter 11 Bankruptcy Cases in the Southern District of Texas (the "***Complex Case Procedures***"): The facts and circumstances supporting the relief requested in this Motion are set forth in the: (1) the *Declaration of Robert Flachs, Managing Director of Moelis & Company LLC in Support of the Debtors' Motion to Obtain Postpetition Debtor-in-Possession Financing*, filed substantially contemporaneously herewith (the "***Flachs Declaration***"); (2) the *Declaration of Ryan Omohundro, Managing Director of Alvarez and Marsal North America, LLC in Support of the Debtors' Motion to Obtain Postpetition Debtor-in-Possession Financing*, filed substantially contemporaneously herewith (the "***Omohundro Declaration***"); and (3) the *Declaration of Paul Garris in Support of Chapter 11*

*Petitions and First Day Pleadings* (the "***First Day Declaration***").[2] In support of this Motion, the Debtors state as follows:

## PRELIMINARY STATEMENT[3]

1.      As discussed in greater detail in the Flachs Declaration, the Omohundro Declaration, the First Day Declaration, and the other pleadings filed in connection with the commencement of these Chapter 11 Cases, certain of the Debtors entered into a Restructuring Support Agreement (the "***RSA***") with, among other parties, certain of their Prepetition Secured Lenders on September 15, 2023, which sets forth, among other things, (i) the terms whereby the Debtors would run a prepetition out of court sale process for all or substantially all assets; (ii)  the framework for restructuring transactions to be consummated through either (a) a plan of reorganization (the "***Plan***") (i) whereby the Prepetition Secured Lenders (other than the Prepetition Superpriority Lenders) will exchange their claims under the Prepetition Loan Documents (other than the Superpriority Loan Documents) for one hundred percent (100.00%) of the equity in the reorganized Debtor (subject to dilution on account of any management incentive program), or (ii) whereby the Debtors will sell all or substantially all of their assets, or (b) an alternative sale transaction consummated under section 363 of the Bankruptcy Code, and (iii) the Prepetition Secured Lenders' agreement to consent to the DIP Loan Parties' (as defined below) use of Cash Collateral during these Chapter 11 Cases and the DIP Lenders' (as defined herein) commitment to provide the DIP Facility, the terms of which were agreed to in that certain DIP term sheet attached to the RSA (the "***DIP Term Sheet***").

---

[2]   Capitalized terms used but not otherwise defined in this Motion shall have the meaning set forth in the First Day Declaration or Interim Order, as applicable.

[3]   Capitalized terms used in this Preliminary Statement but not otherwise defined have the meanings ascribed to such terms elsewhere in the Motion.

2.      In connection with the RSA, on September 15, 2023, the DIP Loan Parties entered into a superpriority term loan with certain of the Prepetition First Lien Lenders for an aggregate amount of up to $27,500,000 (the "***Prepetition Superpriority Facility***").  The DIP Loan Parties, in their business judgment and with the assistance of their advisors, determined the Prepetition Superpriority Facility amount was necessary to support the Debtors' sale and restructuring efforts and, if necessary, would allow for an orderly entry into chapter 11.  The Prepetition Superpriority Facility is secured by a superpriority lien on substantially all of the DIP Loan Parties' assets.

3.      Though the Prepetition Superpriority Facility provided the DIP Loan Parties with necessary capital to fund the Debtors' prepetition sale and restructuring efforts, the DIP Loan Parties require additional liquidity to enable the Debtors to execute the value-maximizing transactions contemplated under the RSA, fund the administration of these Chapter 11 Cases, and satisfy their working capital needs.  Accordingly, leading up to the Petition Date (as defined herein) and as detailed in the Flachs Declaration and the Omohundro Declaration, the Debtors, along with their investment banker Moelis and Company ("***Moelis***"), and their other advisors, conducted a thorough marketing process for potential third-party postpetition financing and no actionable financing proposals materialized from that prepetition marketing process.

4.      As a significant amount of the Debtors' property is encumbered by the liens of the Prepetition Secured Lenders and the value of the unencumbered property is limited, the prepetition marketing process for third-party postpetition financing was insufficient to entice any third parties to offer financing in an amount the Debtors submit is necessary for these Chapter 11 Cases. Accordingly, the Debtors pursued debtor-in-possession financing offered by the Prepetition Superpriority Lenders and the Prepetition First Lien Lenders in the ad hoc group of Prepetition First Lien Lenders and Prepetition Superpriority Lenders represented by Arnold & Porter Kaye

Scholer LLP and Ankura Consulting Group, LLC (the "***First Lien Lender Group***") who are party to the RSA on the terms outlined in the DIP Term Sheet.  The Debtors respectfully request the Court approve the proposed DIP Facility, which will provide the Debtor DIP Loan Parties with (i) $23,000,000 in new money financing and (ii) loans representing a "roll up" of the full amount of the  Prepetition Superpriority Loans (including accrued and unpaid interest thereon), and upon approval, will enable the Debtors to, among other things, honor employee benefits and wages, procure goods and services, and fund general and corporate operating needs and the administration of these Chapter 11 Cases.

5.      As set forth in greater detail below and in the Flachs Declaration and the Omohundro Declaration, the proposed use of Cash Collateral and the DIP Facility are the product of arm's-length negotiations, constitute the best postpetition financing available to the Debtors under the circumstances, and are in the best interests of the Debtors and their Estates.  The terms of the DIP Facility comply with section 364 of the Bankruptcy Code, and entry into the DIP Facility is reasonable and appropriate and a sound exercise of the Debtor DIP Loan Parties' business judgment under the circumstances.  Because, as detailed in the Flachs Declaration, the Omohundro Declaration, and above, a significant amount of the Debtors' property is encumbered by valid and perfected first-priority liens of the Prepetition Secured Lenders, the Debtors would be unable to obtain postpetition financing without granting priming liens. The Prepetition Secured Lenders have consented to such priming liens in connection with the proposed DIP Facility, and they will receive adequate protection as described more fully herein and in the Interim Order.

6.      As discussed in greater detail below and in the Flachs Declaration and the Omohundro Declaration, the Debtors submit that entry into the DIP Facility and performance of all of the DIP Loan Parties' obligations thereunder is a sound exercise of the Debtor DIP Loan

Parties' business judgment and will maximize value for the Debtors' Estates.  Accordingly, the Debtors respectfully request that the Court authorize the DIP Loan Parties to use Cash Collateral, obtain the DIP Facility, and grant all other relief requested in this Motion.

## JURISDICTION AND VENUE

7.      The United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "*Court*") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  The Debtors confirm their consent, pursuant to rule 7008 of the Bankruptcy Rules, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

9.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, and 6004, Local Rules 2002-1, 4001-1, and 9013-1, and the Complex Case Procedures.

## EMERGENCY CONSIDERATION

10.      In accordance with Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion. The Debtors submit that an immediate and orderly transition into chapter 11 is critical to the viability of their operations and the success of these Chapter 11 Cases. As discussed in detail below, in the First Day Declaration, the Flachs Declaration, and the Omohundro Declaration any delay in granting the relief requested could hinder the Debtors' operations and cause immediate and irreparable harm. As such, the Debtors believe that emergency consideration is necessary and respectfully request that this Motion be heard at the Debtors' first day hearings.

## BACKGROUND

11.     Strategic Materials, Inc. and its Debtor and non-Debtor affiliates are a privately held glass recycling company that is the industry leader in recovering and processing post-consumer and post-industrial glass in North America.  The Debtors and their non-Debtor affiliates operate a network of forty-three (43) facilities in nineteen (19) states across the United States, Canada, and Mexico.  Through this network of facilities, the Debtors and their non-Debtor affiliates recycle over two million tons of glass per year and serve large and stable end markets, including those related to glass packaging, fiberglass insulation, flat glass, highway safety beads, air-blast abrasives, specialty glass, recycled plastic resin, and glass fillers.

12.     On the date hereof (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no request for the appointment of a trustee or examiner has been made and no official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

13.     Additional information regarding the Debtors and these Chapter 11 Cases, including the Debtors' business operations, capital structure, financial condition, and the reasons for and objectives of these Chapter 11 Cases, is set forth in the First Day Declaration, filed contemporaneously herewith and incorporated herein by reference.

## RELIEF REQUESTED

14.     By this Motion, the Debtors seek entry of the Interim Order substantially in the form attached hereto as **Exhibit A**, and the Final Order:

(i)     authorizing the Debtor DIP Loan Parties (as defined below) to incur senior secured postpetition obligations on a superpriority basis in respect of a superpriority senior secured priming debtor-in-possession term loan facility (the "***DIP Facility***")

consisting of (i) new money term loans in an aggregate principal amount of $23,000,000 to be made in a single borrowing on the Closing Date (the commitments to provide such new money term loans under the DIP Facility, the "***New Money DIP Commitments***," and such new money term loans under the DIP Facility, the "***New Money DIP Loans***") which shall be provided by the Prepetition First Lien Lenders (as defined below) and Prepetition Superpriority Lenders (as defined below) in the First Lien Lender Group; and (ii) loans representing a "roll up" of the Prepetition Superpriority Loans (as defined below) (and accrued and unpaid interest thereon) (such loans, the "***DIP Roll-Up Loans***" and, together with the New Money DIP Loans, the "***DIP Loans***") on the terms and conditions substantially in the form annexed hereto as **Exhibit B** (as the same may be amended, restated, amended and restated, supplemented, waived, extended or otherwise modified from time to time, the "***DIP Credit Agreement***"), by and among (w) Strategic Materials Holding Corp., a Delaware corporation, as borrower (the "***Borrower***"); (x) SMI Group Acquisitions, Inc., a Delaware corporation ("***Holdings***"); (y) Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents and collateral agent (collectively, the "***DIP Agent***"); and (z) each member of the First Lien Lender Group (or affiliated designee thereof) that provides a portion of the New Money DIP Commitments (and/or holds DIP Roll-Up Loans), in its capacity as a lender under the DIP Facility, together with its successors and permitted assigns in such capacity (a "***DIP Lender***," and collectively, the "***DIP Lenders***" and, together with the DIP Agent, the "***DIP Secured Parties***"), and such DIP Facility shall be fully and unconditionally guaranteed by (i) Holdings, (ii) each of the Borrower's domestic subsidiaries, including its subsidiaries that are Debtors, each as a debtor and debtor-in-possession (collectively with Holdings and the Borrower, the "***Debtor DIP Loan Parties***")[4], and (iii) the Borrower's subsidiary organized under the laws of Mexico (the "***Foreign Subsidiary Guarantor***," and collectively with Holdings and the subsidiaries of the Borrower referred to in clause (ii), the "***Guarantors***," and together with the Borrower, the "***DIP Loan Parties***")[5];

(ii)    authorizing the Debtor DIP Loan Parties to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) (as amended, restated, supplemented,

---

[4]    Debtors SMI Topco Holdings, Inc., SMI Group Ultimate Holdings, Inc., and SMI Group Holdings, LLC are not parties to the DIP Facility, but the DIP Loan Parties will distribute funds to those Debtors solely to the extent permitted by, and in accordance with the terms of the DIP Documents.

[5]    For the avoidance of doubt and notwithstanding any provision to the contrary herein or in any DIP Document or any definitive document related to the Exit Term Loan Facilities (as defined in the RSA), in no event shall NexCycle Canada, Ltd., an Ontario corporation, or any of its subsidiaries be required to become a DIP Loan Party or a guarantor or to grant a security interest over any of their respective assets in connection with the DIP Facility or under any DIP Document or the Exit Term Loan Facilities, in each case, until all Obligations (as defined under the Canadian Credit Facility) have been paid in full (other than contingent reimbursement or indemnification obligations for which no claim has been made in writing). A structure chart identifying the parties is attached hereto as **Exhibit C**.

waived, and/or modified from time to time, collectively with the DIP Credit Agreement, the "***DIP Documents***") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    authorizing the Debtor DIP Loan Parties to borrow the New Money DIP Loans under the New Money DIP Commitments in a single borrowing on the Closing Date and to use such proceeds as expressly provided in the DIP Documents and solely in accordance with the DIP Orders and the applicable Approved Budget (as defined in the DIP Credit Agreement) (subject to permitted variances and other exclusions set forth in the DIP Documents and the Interim Order) a summary of which is attached hereto as **Exhibit D**, which New Money DIP Loans shall be funded into and credited to the Funding Account (as defined below) to finance: (a) interest, fees, and expenses owed to the DIP Lenders and the DIP Agent; (b) working capital of the Debtors during the Chapter 11 Cases; (c) administrative costs of the Chapter 11 Cases; and (d) payment of certain adequate protection amounts to the Prepetition Secured Parties, and for the avoidance of doubt the New Money DIP Loans may be withdrawn from the Funding Account in accordance with the terms set forth in the DIP Credit Agreement; *provided*, that, notwithstanding the foregoing, a portion of the New Money DIP Loans may be disbursed to account(s) other than the Funding Account directly to one or more payees in the manner to be agreed in the DIP Documents and as between the Debtor DIP Loan Parties and the DIP Secured Parties;

(iv)    authorizing the Debtor DIP Loan Parties to make (a) payment of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after the Petition Date) the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to be due, now existing or hereafter arising, fixed or otherwise, of the DIP Loan Parties to the DIP Agent and the DIP Lenders under the DIP Documents and the DIP Orders (including the costs and expenses of the advisors to the DIP Agent and the DIP Lenders payable pursuant to the terms of the DIP Documents), as and when due, and (b) payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtor DIP Loan Parties to the DIP Agent and the DIP Lenders under or pursuant to the DIP Documents and the DIP Orders (collectively, the "***DIP Obligations***");

(v)    subject to the Carve-Out, granting, to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claim status in each of the Debtor DIP Loan Parties' Chapter 11 Cases and any of their Successor Cases pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses, including those of the kind specified in, or ordered pursuant to, sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 503(a), 503(b), 506(c) (subject to the terms of the Interim Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114 or any other provisions of the Bankruptcy Code and

having full recourse against all assets of the DIP Loan Parties in accordance with the terms of the DIP Orders;

(vi)    subject to the Carve-Out, granting to the DIP Agent, for the benefit of the DIP Secured Parties, valid, enforceable, nonavoidable, automatically, and fully perfected security interests in and liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, including all property constituting Cash Collateral;

(vii)   authorizing the Debtor DIP Loan Parties to use the Prepetition Collateral (as defined below), including the Cash Collateral under the Prepetition Loan Documents (as defined below), and providing adequate protection to certain of the Prepetition Secured Parties (as defined below) for any diminution in value of their interests in the applicable Prepetition Collateral (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law ("***Diminution in Value***") to the extent such Diminution in Value occurs on account of the Debtors' sale, lease, or use of the Prepetition Collateral (including Cash Collateral), the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, and the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral;

(viii)  subject to and effective upon entry of the Final Order with respect to the Prepetition Collateral and the DIP Collateral, in each case except to the extent of the Carve-Out, determining that the Debtors have waived any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and determining that (a) the equitable doctrine of marshaling and other similar doctrines, and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply;

(ix)    vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the DIP Orders; and

(x)     scheduling a final hearing (the "***Final Hearing***") to consider entry of the Final Order.

## SUMMARY OF TERMS OF DIP FACILITY AND USE OF CASH COLLATERAL

15.     In accordance with Bankruptcy Rules 4001(b)-(d), the below chart summarizes the material provisions of the proposed Interim Order and the DIP Credit Agreement:[6]

---

[6]    The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced, To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

| Bankruptcy Rule | Summary of Material Term |
|---|---|
| **Borrower**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Strategic Materials Holdings Corp.<br><br>*See* DIP Credit Agreement, Recitals. |
| **Guarantors**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Holdings and each of its and the Borrower's direct and indirect Subsidiaries listed on Schedule 1 to the DIP Credit Agreement (such Subsidiaries of the Borrower not to include any Excluded Subsidiary), and each other Subsidiary of the Borrower that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 6.12 of the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Article I. |
| **DIP Lenders**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Each member of the First Lien Lender Group (or affiliated designee thereof) that provides a portion of the New Money DIP Commitments (and/or holds DIP Roll-Up Loans), in its capacity as a lender under the DIP Facility, together with its successors and permitted assigns in such capacity.<br><br>*See* Interim Order, Recital (i). |
| **DIP Agent**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents and collateral agent.<br><br>*See* Interim Order, Recital (i). |
| **DIP Commitment**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The DIP Facility consists of a superpriority senior secured priming debtor-in-possession term loan facility consisting of (i) new money  term loans in an aggregate principal amount of $23,000,000 to be made in a single borrowing on the Closing Date (the commitments to provide such new money term loans under the DIP Facility, the "***New Money DIP Commitments***," and such new money term loans under the DIP Facility, the "***New Money DIP Loans***"); and (ii) loans representing a "roll up" of the full principal amount of the Prepetition Superpriority Loans and any accrued and unpaid interest thereon.<br><br>*See* Interim Order, Recital (i). |
| **Interest Rate**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | Each SOFR Loan  shall bear interest at a rate per annum equal to the sum of (A) Adjusted Term SOFR for such Interest Period plus (B) 10.00% per annum; and  (ii) each Base Rate Loan shall bear interest at a rate per annum equal to the sum of (A) the Base Rate plus (B) 9.00% per annum.<br><br>*See* DIP Credit Agreement, Section 2.08. |
| **Maturity Date; Duration for Use of DIP Collateral**<br><br>*Fed. R. Bankr. P. 4001(c)(1)(B)* | The Maturity Date shall be the earliest of (a) thirty-five (35) days following the Petition Date (subject to the availability of the Court) (or such later date as may be agreed to by the Required Lenders) if the Final Order shall not have been entered on or prior to such date, (b) the Approved Plan Effective Date or the effective date of any other plan of reorganization or liquidation in any of the Chapter 11 Cases, (c) the date on which all or substantially all of the assets of the Debtors are sold in a sale under a chapter 11 plan or pursuant to Section 363 of the Bankruptcy Code, (d) forty (40) days following the Petition Date (or such later date, not to exceed seventy (70) days following the Petition Date, as may be agreed to in writing by the Required Lenders) and (e) the date that all Term Loans shall become due and payable in full in accordance with the terms of the DIP Term |

| | |
|---|---|
| | Facility, including due to acceleration. |
| | *See* DIP Credit Agreement, Article I. |
| **Events of Default**<br><br>*FED. R. BANKR. P.<br>4001(c)(1)(B)* | Events of Default shall include, without limitation: |
| | (a) <u>Non-Payment</u>.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid under the DIP Credit Agreement, any amount of principal of any Term Loan when due, or (ii) within three (3) Business Days after the same becomes due, any interest on any Term Loan or any fee due under the DIP Credit Agreement or any other amount payable thereunder, or with respect to any other Loan Document; or |
| | (b) <u>Specific Covenants</u>.  Holdings, the Borrower or any Restricted Subsidiary fails to perform or observe any term, covenant or agreement contained in any of Sections 6.01, 6.02, 6.03(a), 6.05(a) (solely with respect to the Borrower), 6.07, 6.10, 6.11, 6.12, 6.14, 6.15. 6.16, 6.17, 6.18, 6.20, 6.21,  or 6.23 or in any Section of Article VII of the DIP Credit Agreement; or |
| | (c) <u>Other Defaults</u>.  Holdings, the Borrower or any Restricted Subsidiary fails to perform or observe any covenant or agreement (other than those specified in Section 8.01(a) or (b) of the DIP Credit Agreement) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the occurrence thereof; or |
| | (d) <u>Representations and Warranties</u>.  Any representation or warranty made or deemed made by or on behalf of Holdings, the Borrower or any Restricted Subsidiary in the DIP Credit Agreement, in any other Loan Document, or in any document required to be delivered pursuant hereto or thereto shall be incorrect in any material respect when made or deemed made (or in any respect if any such representation or warranty is already qualified by materiality); or |
| | (e) <u>Cross-Default.</u>  Any Loan Party or any Restricted Subsidiary that (i) fails to make any payment of principal, premium or interest beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise), in respect of any Indebtedness (other than Indebtedness under the DIP Credit Agreement, Indebtedness owed by any Loan Party to any Restricted Subsidiary or, in the case of the Debtors, Indebtedness that is created or incurred prior to the Petition Date) having an aggregate outstanding principal amount of more than the Threshold Amount or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness (other than Indebtedness under the DIP Credit Agreement and Indebtedness owed by a Loan Party to another Loan Party, or in the case of the Debtors, Indebtedness that is created or incurred prior to Petition Date) having an aggregate outstanding principal amount of more than the Threshold Amount, or any other event occurs (and such failure or event continues past any applicable grace period), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; |
| | (f) <u>Insolvency Proceedings, Etc</u>.  Any Loan Party or any Restricted Subsidiary (in each case that is not a Debtor) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it |

or for all or substantially all of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged and unstayed for sixty (60) days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed and unstayed for sixty (60) days, or an order for relief with respect to any material portion of the Collateral is entered in any such proceeding; or

(g)  Inability to Pay Debts; Attachment.  (i) Any Loan Party or any Restricted Subsidiary (in each case that is not a Debtor) admits in writing its inability or fails generally to pay its debts as they become due or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or substantially all of the property of any such Person, with respect to an assessed obligation in excess of the Threshold Amount and is not released, vacated or fully bonded within sixty (60) days after its issue or levy; or

(h)  Judgments.  There is entered against any Loan Party or any Restricted Subsidiary a final judgment or order for the payment of money arising following the Petition Date in an aggregate amount exceeding the Threshold Amount (to the extent not paid, and not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and does not dispute coverage) and there is a period of sixty (60) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)  ERISA.  (i) An ERISA Event or Foreign Plan Event occurs which results in, or would reasonably be expected to result in, liability of any Loan Party in an aggregate amount (determined as of the date of occurrence of such ERISA Event) which would reasonably be expected to result in a Material Adverse Effect or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under any Multiemployer Plan which has resulted, or would reasonably be expected to result in, liability of any Loan Party in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(j)  Invalidity of Loan Documents.  Any material provision of the Guaranty or any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than (x) as expressly permitted under the DIP Credit Agreement or thereunder (including such express permission as a result of a transaction permitted under Section 7.04 or 7.05, or satisfaction in full of all the Obligations then due and owing (other than contingent indemnification or other obligations as to which no claim has been asserted and obligations)), or (y) as a result of the acts or omissions of the Administrative Agent or any Lender, ceases to be in full force and effect; or any Loan Party denies in writing that it has any or further liability or obligation under the Guaranty or any Collateral Document (other than as a result of repayment in full of the Obligations then due and owing (other than contingent indemnification or other obligations as to which no claim has been asserted) and termination of the Aggregate New Money DIP Commitments, or as a result of a transaction permitted under the DIP Credit Agreement or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05)); or

(k)  Change of Control.  There occurs any Change of Control; or

(l)  Collateral Documents.  Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.12 (or otherwise) shall for any reason (other than pursuant to the terms of the DIP Credit Agreement or thereof including as a result of a

transaction permitted under Section 7.04 or 7.05) cease to create a valid and perfected lien on and security interest in any of Collateral covered by the Collateral Documents, or the DIP Orders, subject to Liens permitted under Section 7.01, except (i) to the extent that any such perfection or priority is not required pursuant to the DIP Orders and the applicable Collateral Document, or results from the failure of the Administrative Agent to maintain possession of possessory collateral actually delivered to it or (ii) upon satisfaction in full of all the Obligations then due and owing (other than the contingent indemnification or other obligations as to which no claim has been asserted and obligations); or

(m) any of the Chapter 11 Cases of the Debtors shall be converted to a case under Chapter 7 of the Bankruptcy Code; or

(n) a trustee, responsible officer or an examiner (other than a fee examiner) with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors is appointed or elected in the any of the Chapter 11 Cases, or the Court shall have entered an order providing for such appointment; or

(o) an order of the Court shall be entered denying or terminating use of Cash Collateral by the Debtors and the Debtors shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance acceptable to, the Required Lenders; or

(p) any Loan Party or any of its Subsidiaries, or any person claiming by or through any Loan Party or any of its Subsidiaries, with any Loan Party's or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the Administrative Agent or any of the Lenders relating to the DIP Term Facility (in their capacities as such) or (B) the administrative agent, the collateral agent or any lender relating to the Prepetition First Lien Credit Agreement (in their capacities as such), in each case other than in connection with enforcement of the Loan Documents or the Restructuring Support Agreement; or

(q) the existence of any claims or charges, or the entry of any order of the Court authorizing (i) any claims or charges, other than in respect of the DIP Term Facility and the Carve-Out or as otherwise permitted under the applicable Loan Documents or the DIP Orders, entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code that are pari passu with or senior to the claims of the Agents and the Lenders under the DIP Term Facility, or there shall arise or be granted by the Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or *pari passu* with the Liens and security interests provided for under the DIP Credit Agreement securing the Obligations thereunder, except, in each case, as expressly provided in the Loan Documents or in the DIP Order then in effect (but only in the event specifically consented to by the Required Lenders (or the Administrative Agent with the consent of the Required Lenders)); or

(r) the Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse

Effect on the Loan Parties or their Estates (taken as a whole); or

(s) an order of the Court shall be entered reversing, staying, or vacating the Interim Order or the Final Order or amending, supplementing or modifying the Interim Order or the Final Order (other than, in the case of an amendment, supplement or modification, as reasonably acceptable to the Required Lenders), or a Loan Party shall apply for the authority to do so; or

(t) the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral; or

(u) an order shall have been entered by the Court avoiding or requiring disgorgement by any Agent or any of the Lenders of any amounts received in respect of the Obligations; or

(v) an order shall have been entered by the Court providing for a change in venue with respect to the Chapter 11 Cases; or

(w) any of the Loan Parties shall fail to comply in all material respects with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date); or

(x) other than with respect to the Carve-Out, an order in the Chapter 11 Cases shall be entered charging any of the Collateral (as defined in the DIP Credit Agreement and in the Prepetition First Lien Credit Agreement) under Section 506(c) of the Bankruptcy Code against the Lenders or the lenders under the Prepetition First Lien Credit Agreement, or the commencement of other actions that is materially adverse to Administrative Agent or the Lenders (in their capacities as such), or their respective rights and remedies under the DIP Term Facility in any of the Chapter 11 Cases or inconsistent with any of the Loan Documents; or

(y) any order shall be entered which dismisses any of the Chapter 11 Cases of the Debtors and which order does not provide for termination of the New Money DIP Commitments and indefeasible payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable) and continuation of the Liens with respect thereto until the effectiveness thereof, or any of the Loan Parties and their Subsidiaries shall seek, support or fail to contest in good faith the entry of any such order; or

(z) any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in Section 8.01 of the DIP Credit Agreement or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(aa) any Loan Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or any other rights granted to the Administrative Agent and the Lenders in the DIP Orders or the DIP Credit Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral; or

(bb) any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or the administrative agent, the collateral agent or any lender under

the Prepetition First Lien Credit Agreement with respect to the obligations thereunder, other than to challenge the occurrence of a Default or Event of Default; or

(cc)   without the consent of the Administrative Agent and the Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Court approving) adequate protection to any pre-petition agent, trustee or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date); or

(dd)   without the Required Lenders' consent, the entry of any order by the Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Court (in each case, other than the DIP Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's and the Required Lenders' consent or to obtain any financing under section 364 of the Bankruptcy Code other than the facility under the DIP Credit Agreement unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby; or

(ee)   the filing by any of the Loan Parties of a plan of reorganization under Chapter 11 of the Bankruptcy Code other than the Approved Plan; or

(ff)   entry of an order by the Court (A) terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders or (B) confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases other than the Approved Plan; or

(gg)   if any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; provided, that the Loan Parties shall have five (5) Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Court or another court to address any such court order; or

(hh)   any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments authorized by one or more "first day" orders, "second day" orders, the Interim Order or the Final Order and consistent with the Approved Budget; or

(ii)   the occurrence of (i) the material amendment, modification or supplementing of the Plan Documentation in any manner not in compliance with the Restructuring Support Agreement or (ii) the waiver of any condition precedent to confirmation of the Approved Plan or effective date of the Approved Plan without the consent of the Required Consenting First Lien Creditors and the Required Lenders; or

(jj)   the Confirmation Order is entered in form and substance which is not reasonably acceptable to the Required Lenders in respect of the treatment of the claims of the Administrative Agent and the Lenders; or

(kk)   Restructuring Support Agreement. The Restructuring Support Agreement shall have been validly terminated as to any of the Consenting First Lien Creditors (as defined in the RSA) and after giving effect to such termination (i) the Consenting First Lien Creditors remaining party thereto, taken together, hold

| | |
|---|---|
| | less than two-thirds of the aggregate principal amount of First Lien Term Loans (or no Consenting First Lien Creditors remain party thereto), (ii) the Consenting Second Lien Creditors (as defined in the Restructuring Support Agreement) remaining party thereto, taken together, hold less than two-thirds of the aggregate principal amount of the Second Lien Term Loans, or (iii) any Company Party, Consenting 1.5 Lien Creditor or Consenting Sponsor (as such terms are defined in the RSA) is no longer a party thereto. |
| | *See* DIP Credit Agreement § 8.01. |
| **Liens and Priority**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | Effective upon entry of the Interim Order, as security for the DIP Obligations (and subject and subordinate in all respects to the Carve-Out and Permitted Third Party Liens), pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the other DIP Secured Parties will be granted perfected, first priority, senior priming liens (collectively, the "***DIP Liens***") on and security interests in all prepetition and postpetition property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, (such property collectively, the "***DIP Collateral***").<br><br>The DIP Liens on the DIP Collateral shall, in all cases, subject and subordinate to the Carve-Out, have the priority set forth as follows:<br><br>(a)  pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense status (the "***DIP Superpriority Claims***"), with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code;<br><br>(b)  pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in all DIP Collateral that is not subject to a valid, enforceable, non-avoidable and perfected lien existing on the Petition Date;<br><br>(c)  pursuant to section 364(c)(3) of the Bankruptcy Code, a lien on and security interest in all DIP Collateral that is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the liens of the Prepetition Secured Lenders and Prepetition Agents, which prepetition liens will be primed by the liens described in the following clause (d)) (the "***Permitted Third Party Liens***") with such lien of the DIP Secured Parties being subject and junior to Permitted Third Party Liens; and<br><br>(d)  pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior priming lien on and security interest in all Collateral, subject and junior to Permitted Third Party Liens.<br><br>Other than as set forth in the Interim Order or permitted under the DIP Documents, the DIP Liens and the DIP Superpriority Claims: (i) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552(b) of the Bankruptcy Code; (ii) shall not be subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of the Debtor DIP Loan Parties and their Estates under section 551 of the Bankruptcy Code or otherwise or (B) any Liens or claims of any DIP Loan Party or any direct or indirect subsidiary thereof against any DIP Loan Party or any of such DIP Loan Party's property; (iii) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in a Successor Case, and/or upon the dismissal of any of the Chapter 11 Cases; and (iv) notwithstanding anything to the contrary in any "first day" order of |

| | |
|---|---|
| | this Court in any of the Chapter 11 Cases, shall be senior to any administrative claims arising under any such "first day" order.<br><br>*See* Interim Order ¶¶ 7–9. |
| **Carve-Out**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(i)* | The DIP Orders provide a "Carve-Out," as defined therein, of certain statutory fees and allowed professional fees of the Debtors as detailed in the Interim Order.<br><br>*See* Interim Order ¶ 27. |
| **Parties with an Interest in Cash Collateral**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(i)* | The Prepetition Secured Parties.<br><br>*See* Interim Order ¶¶ 12—14. |
| **Duration/Use of Cash Collateral**<br><br>*FED. R. BANKR. P. 4001(b)(1)(B)(iii)* | The proceeds of the DIP Facility may be used only for the purposes specifically set forth in the Interim Order and the DIP Documents, including, subject to the Carve-Out, to (i) pay fees, interest, and expenses associated with the DIP Facility; (ii) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases; (iii) make payments in respect of the adequate protection provided to the Prepetition Secured Parties; and (iv) fund the costs of the administration of the Chapter 11 Cases, in each case subject to the Approved Budget and Variance Limit and the terms and conditions in the Interim Order and the DIP Documents. Except as otherwise specified in the DIP Documents, the proceeds of the DIP Loans when made shall be funded or credited to a non-interest bearing account in the name of the DIP Agent and subject to the sole control of the DIP Agent (the "***Funding Account***") and for the avoidance of doubt may be withdrawn from the Funding Account consistent with the terms set forth in the DIP Credit Agreement.<br><br>*See* Interim Order ¶ 11. |

| | |
|---|---|
| **Liens, Cash Payments, or Adequate Protection Provided for Use of Cash Collateral**<br><br>*FED. R. BANKR. P.*<br><br>*4001(b)(1)(B)(iv)*<br>*4001(c)(1)(B)(ii)* | <u>Adequate Protection for the Prepetition First Lien Secured Parties</u>.  The Prepetition First Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value.  As adequate protection, the Prepetition First Lien Secured Parties are granted pursuant to the Interim Order the following (the "***First Lien Adequate Protection Obligations***"): |

(a) <u>First Lien Adequate Protection Liens</u>.  Subject to the Carve-Out, to the extent of any Diminution in Value, the Prepetition First Lien Secured Parties are granted pursuant to the Interim Order, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, a senior perfected replacement lien on all Prepetition Collateral, including any such assets of the Debtor DIP Loan Parties' or their Estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof (the "***First Lien Adequate Protection Liens***"), which First Lien Adequate Protection Liens shall be junior and subordinate only to the Carve-Out, the DIP Liens, and the Permitted Third Party Liens on such Prepetition Collateral that are (and are permitted under the Prepetition First Lien Credit Agreement to be) senior to the liens on such Prepetition Collateral securing the Prepetition First Lien Obligations.  The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition Collateral, and continue to be subject to the applicable Prepetition Intercreditor Agreements.  The First Lien Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition First Lien Secured Parties and not in substitution therefor.

(b) <u>First Lien Adequate Protection Superpriority Claims</u>.  To the extent of Diminution in Value, the Prepetition First Lien Secured Parties are further granted an allowed superpriority administrative claim (the "***First Lien Adequate Protection Superpriority Claim***") in the amount of any First Lien Adequate Protection Obligations, pursuant to section 507(b) of the Bankruptcy Code, with priority over all other superpriority and administrative expense claims against the Debtor DIP Loan Parties or their Estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in paragraph 34 of the Interim Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, junior and subordinate only to the Carve-Out, the DIP Superpriority Claims, and the DIP Obligations to the extent provided in the Interim Order and in the DIP Documents, and having full recourse against all assets of the DIP Loan Parties in accordance with the terms of the Interim Order.

(c) <u>First Lien Adequate Protection Payments</u>.  As additional adequate protection, the Borrower shall pay in cash (i) on, before, or within one (1) Business Day of the Closing Date, all accrued and unpaid reasonable prepetition fees and expenses of the Prepetition First Lien Secured Parties (including all reasonable fees and expenses of Arnold & Porter Kaye Scholer LLP ("***Arnold & Porter***"), Ankura Consulting Group, LLC ("***Ankura***"), and one local counsel in each applicable jurisdiction retained by any of the Prepetition Secured Parties; and (ii) after entry of the Interim Order, monthly payments of the reasonable and documented costs, fees and expenses of the Prepetition First Lien Secured Parties, including fees and expenses of (x) one primary counsel (which shall be Arnold & Porter) and one local counsel in each applicable jurisdiction to the Prepetition First Lien Lenders, (y) one primary counsel and one local counsel in each applicable jurisdiction to the Prepetition First Lien Agent, and (z) any other

advisor retained by the Prepetition First Lien Secured Parties (including Ankura) (such payments collectively, the "***First Lien Adequate Protection Payments***").

(d) <u>First Lien Postpetition Interest Payments</u>. As additional adequate protection, all interest on the loans under the Prepetition First Lien Credit Agreement, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall accrue interest at the Default Rate (as defined in the Prepetition First Lien Credit Agreement) and be paid in kind by adding such accrued interest to the unpaid principal amount of the loans under the Prepetition First Lien Credit Agreement on the date such interest is due until full discharge of all Prepetition First Lien Obligations, and which shall be deemed part of the Prepetition First Lien Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

(e) <u>Information</u>. The DIP Loan Parties shall substantially concurrently deliver to the Prepetition First Lien Secured Parties all information, reports, documents, and other materials that the DIP Loan Parties provide to the DIP Agent and the DIP Lenders pursuant to the DIP Documents, the Interim Order, and the Final Order.

(f) <u>Adequate Protection Reservation</u>. Subject to the Carve-Out, nothing in the Interim Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties under the Interim Order is insufficient to compensate for any Diminution in Value during the Chapter 11 Cases or any Successor Cases. The receipt by the Prepetition First Lien Secured Parties of the adequate protection provided in the Interim Order shall not be deemed an admission that the interests of the Prepetition First Lien Secured Parties are adequately protected. Further, the Interim Order shall not prejudice or limit the rights of the Prepetition First Lien Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection. Nothing in the Interim Order or the other DIP Documents shall be construed as the affirmative consent by any of the Prepetition First Lien Secured Parties to the use of Cash Collateral other than on the terms set forth in the Interim Order and solely in the context of the DIP Financing authorized by the Interim Order, (ii) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by the Interim Order, or (iii) prejudice, limit, or otherwise impair the rights of any of the Prepetition First Lien Secured Parties, upon a change in circumstances to seek new, different, or additional adequate protection or assert the interests of any of the Prepetition First Lien Secured Parties, and the rights of any other party in interest, including the DIP Loan Parties and the DIP Secured Parties, to object to such relief are hereby preserved.

<u>Adequate Protection for the Prepetition 1.5 Lien Secured Parties</u>. The Prepetition 1.5 Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral. As adequate protection, the Prepetition 1.5 Lien Secured Parties are granted pursuant to the Interim Order the following (the "***1.5 Lien Adequate Protection Obligations***"):

(a) <u>1.5 Lien Adequate Protection Liens</u>. Subject to the Carve-Out, to the extent of any Diminution in Value (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law, the Prepetition 1.5 Lien Secured Parties, are granted pursuant to the Interim Order, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, a perfected replacement lien on

all the Prepetition Collateral, including, including any such assets of the Debtor DIP Loan Parties' or their Estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof (the "*1.5 Lien Adequate Protection Liens*"), which 1.5 Lien Adequate Protection Liens on such Prepetition Collateral shall be junior and subordinate only to the Carve-Out, the DIP Liens, the Prepetition First Lien Liens, the First Lien Adequate Protection Liens, and the Permitted Third Party Liens on such Prepetition Collateral that are (and are permitted under the Prepetition 1.5 Lien Credit Agreement to be) senior to the liens of the Prepetition 1.5 Lien Secured Parties on such Prepetition Collateral. The 1.5 Lien Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition Collateral, and continue to be subject to the applicable Prepetition Intercreditor Agreements. The 1.5 Lien Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition 1.5 Lien Secured Parties and not in substitution therefor.

(b)  1.5 Lien Adequate Protection Superpriority Claims.  To the extent of Diminution in Value, the Prepetition 1.5 Lien Secured Parties are further granted an allowed superpriority administrative claim (the "*1.5 Lien Adequate Protection Superpriority Claim*"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all other superpriority and administrative expense claims against the Debtor DIP Loan Parties or their Estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in paragraph 34 of the Interim Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior and subordinate only to the Carve-Out, the DIP Superpriority Claims, the DIP Obligations, the First Lien Adequate Protection Obligations, and the Prepetition First Lien Obligations to the extent provided in the Interim Order and in the DIP Documents and having full recourse against all assets of the DIP Loan Parties in accordance with the terms of the Interim Order.

(c)  1.5 Lien Postpetition Interest Payments.  As additional adequate protection, all interest on the loans under the Prepetition 1.5 Lien Credit Agreement, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall accrue interest at the Default Rate (as defined in the Prepetition 1.5 Lien Credit Agreement) and be paid in kind by adding such accrued interest to the unpaid principal amount of the loans under the Prepetition 1.5 Lien Credit Agreement on the date such interest is due until full discharge of all Prepetition 1.5 Lien Obligations, and which shall be deemed part of the Prepetition 1.5 Lien Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

Adequate Protection for the Prepetition Second Lien Secured Parties.  The Prepetition Second Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral.  As adequate protection, the Prepetition Second Lien Secured Parties are granted pursuant to the Interim Order the following (the "*Second Lien Adequate Protection Obligations*"):

(a)  Second Lien Adequate Protection Liens.  Subject to the Carve-Out, to the extent of any Diminution in Value (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law, the Prepetition Second Lien Secured Parties, are granted pursuant to the Interim Order subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, valid,

Case 23-90907   Document 20   Filed in TXSB on 12/04/23   Page 22 of 305

binding, enforceable and perfected replacement liens on and security interests in the Prepetition Collateral, including, including any such assets of the Debtor DIP Loan Parties' Estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof (the "***Second Lien Adequate Protection Liens***," and, together with the First Lien Adequate Protection Liens and the 1.5 Lien Adequate Protection Liens, the "***Adequate Protection Liens***"), which Second Lien Adequate Protection Liens on such Prepetition Collateral shall be junior and subordinate only to the Carve-Out, the DIP Liens, the Prepetition First Lien Liens, the Prepetition 1.5 Lien Liens, the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Permitted Third Party Liens on Prepetition Collateral that are (and are permitted under the Prepetition Second Lien Credit Agreement to be) senior to the liens of the Prepetition Second Lien Secured Parties on such Prepetition Collateral. The Second Lien Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition Collateral, and continue to be subject to the applicable Prepetition Intercreditor Agreements. The Second Lien Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Second Lien Secured Parties and not in substitution therefor.

(a) <u>Second Lien Adequate Protection Superpriority Claims</u>. To the extent of Diminution in Value, the Prepetition Second Lien Secured Parties are further granted an allowed superpriority administrative claim (the "***Second Lien Adequate Protection Superpriority Claim***" and together with the First Lien Adequate Protection Superpriority Claim and the 1.5 Lien Adequate Protection Superpriority Claim, the "***Adequate Protection Superpriority Claims***"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all other superpriority and administrative expense claims against the Debtor DIP Loan Parties or their Estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in paragraph 34 of the Interim Order), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior and subordinate only to the Carve-Out, the DIP Superpriority Claims, the DIP Obligations, the First Lien Adequate Protection Obligations, the 1.5 Lien Adequate Protection Obligations, the Prepetition First Lien Obligations, and the Prepetition 1.5 Lien Obligations, to the extent provided in the Interim Order and in the DIP Documents and having full recourse against all assets of the DIP Loan Parties in accordance with the terms of the Interim Order.

(b) <u>Second Lien Postpetition Interest Payments</u>. As additional adequate protection, all interest on the loans under the Prepetition Second Lien Credit Agreement, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall accrue interest at the Default Rate (as defined in the Prepetition Second Lien Credit Agreement) and be paid in kind by adding such accrued interest to the unpaid principal amount of the loans under the Prepetition Second Lien Credit Agreement on the date such interest is due until full discharge of all Prepetition Second Lien Obligations, and which shall be deemed part of the Prepetition Second Lien Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

*See* Interim Order ¶¶12–14.

| | |
|---|---|
| **Budget**<br><br>*Fed. R. Bankr. P.* | The DIP Loan Parties may use the proceeds of all borrowings under the DIP Facility and Cash Collateral in a manner in accordance with the Approved Budget (subject to the |

22

| | |
|---|---|
| *4001(c)(1)(B)* | Variance Limit), the DIP Documents, and the Interim Order.  The Budget annexed to the DIP Credit Agreement shall constitute the initial Budget ("***Initial Budget***") that reflects on a line-item basis the DIP Loan Parties' (i) weekly projected cash receipts (including from non-ordinary course assets sales) ("***Receipts***"), (ii) weekly projected disbursements, including ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Cases (including the estimated fees and expenses of the advisors to any parties to the Chapter 11 Cases paid by the Debtors), capital expenditures, issuances of any letter of credit, including the fees relating thereto, and any other fees and expenses relating to the DIP Facility ("***Disbursements***"), and (iii) all other information reasonably requested by the DIP Agent and/or the DIP Lenders holding, managing or controlling in the aggregate, DIP Loans and unused New Money DIP Commitments comprising at least 50.1% of the principal amount of all DIP Loans and unused New Money DIP Commitments, (such DIP Lenders, the "***Required DIP Lenders***"), or Ankura, on their behalf, in each case.

Starting with the first full Variance Testing Period, any variance that is unfavorable to the financial condition and the interests of the DIP Loan Parties or the interests of the DIP Lenders shall not exceed (i) in the case of the first three Variance Testing Dates after the Closing Date (x) with respect to Disbursements (determined on an aggregate basis and excluding professional fees ), twenty percent (20.00%) tested on each such Variance Testing Date for the applicable Variance Testing Period and (y) with respect to the line item "Customer Receipts" in the Approved Budget (determined on an aggregate basis), twenty percent (20.00%) tested on each such Variance Testing Date for the applicable Variance Testing Period; and (ii) in the case of the fourth Variance Testing Date after the Closing Date and each Variance Testing Date thereafter (x) with respect to Disbursements (determined on an aggregate basis and excluding professional fees), fifteen percent (15.00%) tested on each such Variance Testing Date for the applicable Variance Testing Period and (y) with respect to the line item "Customer Receipts" in the Approved Budget (determined on an aggregate basis), fifteen percent (15.00%) tested on each such Variance Testing Date for the applicable Variance Testing Period, and, in each case, based upon the most recent Approved Budget (or, with respect to the portion of any Variance Testing Period that is covered in a preceding Approved Budget and not in the then most current Approved Budget, in such preceding Approved Budget as in effect at the beginning of the applicable week) (the preceding collectively, the "***Variance Limit***").

Until the DIP Obligations are paid in full, the DIP Loan Parties shall not (i) allow any variances to exist from the Approved Budget, except for Permitted Variances, (as defined in the DIP Credit Agreement), and (ii) permit Liquidity (as defined in the DIP Credit Agreement) as of the close of business on the last Business Day of each week following the Closing Date to be less than $3,000,000. Notwithstanding anything to the contrary in the Interim Order, the professional fees, costs, and expenses of the DIP Agent's advisors, the DIP Lender's advisors, the Prepetition First Lien Agent's advisors, and the Prepetition First Lien Lenders' advisors shall be due, payable, and paid in accordance with the terms of the Interim Order notwithstanding any budgeted amounts for such fees, costs, and expenses set forth in the Approved Budget, and the DIP Loan Parties shall not be deemed to have breached the terms of the Approved Budget to the extent the actual amount of such fees, costs, and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.

*See* Interim Order ¶ 15. |
| **Reporting Information**

*FED. R. BANKR. P. 4001(c)(1)(B)* | By no later than 5:00 p.m. (prevailing New York City Time) on each Wednesday (or, if such Wednesday is not a Business Day, the immediately succeeding Business Day) after the Closing Date, commencing on the first Wednesday after the first complete week following the Closing Date (each, a "***Reporting Date***"), the DIP Loan Parties will provide to the DIP Secured Parties and Ankura, a thirteen (13)-week cash flow forecast covering the thirteen (13)-week period beginning on the Monday of the week in which |

it is (or is required to be) delivered, containing line items of sufficient detail to reflect the DIP Loan Parties' (i) Receipts; (ii) Disbursements; and (iii) all other information reasonably requested by the DIP Agent and/or the Required DIP Lenders, or Ankura, on their behalf, in each case, in the form attached as **Exhibit H** to the DIP Credit Agreement or otherwise in form and substance reasonably satisfactory to the Required DIP Lenders (the "***Budget***"); *provided*, that, the Budget shall become the Approved Budget upon a notification in writing from the Required DIP Lenders to the Borrower and the DIP Agent (which may be in the form of an email from counsel to the Required DIP Lenders, on the behalf of the Required DIP Lenders) that such Budget will become the Approved Budget.

*See* Interim Order ¶ 15(b).

By no later than 5:00 p.m. (prevailing New York City Time) on each Wednesday (or, if such Wednesday is not a Business Day, the immediately succeeding Business Day) after the Closing Date, commencing on the first Wednesday after the first complete week following the Closing Date (each, a "***Variance Testing Date***"), the DIP Loan Parties will provide to the DIP Secured Parties and Ankura a variance report for the applicable Variance Testing Period[7] (such report, a "***Budget Variance Report***"), substantially in the form attached as **Exhibit I** to the DIP Credit Agreement which shall include (i) in each case, by line item, the actual Receipts and Disbursements for the immediately preceding week (ended on the immediately preceding Sunday), noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the Approved Budget, and explanation for all material variances; (ii) in each case, by line item, the actual Receipts and Disbursements for the then most recently ended Variance Testing Period, noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the Approved Budget (or, if a portion of such Variance Testing Period is covered in a preceding Approved Budget and not in the then most recent Approved Budget, from the amounts set forth in (x) such preceding Approved Budget (for the portion of such Variance Testing Period covered in such preceding Approved Budget and not in the then most recent Approved Budget) and (y) in the then current Approved Budget (for the portion of such Variance Testing Period covered in such current Approved Budget)), and explanation for all material variances; and (iii) a certification by the chief financial officer of the Borrower that such Budget Variance Report was prepared in good faith and fairly presents in all material respects the information set forth therein.

*See* Interim Order ¶ 15(c).

---

[7]    "***Variance Testing Period***" shall mean as of (i) the first Variance Testing Date after the Closing Date, the one-week period ending on the immediately preceding Sunday, (ii) the second Variance Testing Date after the Closing Date, the two-week period ending on the immediately preceding Sunday, (iii) the third Variance Testing Date after the Closing Date, the three-week period ending on the immediately preceding Sunday and (iv) each Variance Testing Date thereafter, the four-week period ending on the immediately preceding Sunday.

| | |
|---|---|
| | By no later than 5:00 p.m. (prevailing New York City Time) on the first Wednesday (or, if such Wednesday is not a Business Day, the immediately succeeding Business Day) after the Closing Date, and thereafter by not later than 5:00 p.m. (prevailing New York City Time) on the Wednesday (or, if such Wednesday is not a Business Day, the immediately succeeding Business Day) of every week thereafter, the DIP Loan Parties will provide to the DIP Secured Parties and Ankura (i) a revenue report for the calendar month in which such report is delivered substantially in the form attached as **Exhibit G** to the DIP Credit Agreement and (ii) a certificate of a Responsible Officer of the Borrower certifying as to the Liquidity of the DIP Loan Parties as of the end of the last Business Day of the immediately preceding week.  *See* Interim Order ¶ 15(d). <br><br> By no later than 5:00 p.m. (prevailing New York City Time) on the first Wednesday after the Closing Date, the DIP Loan Parties will provide to the DIP Secured Parties and Ankura a report showing actual cash receipts and disbursements for the immediately preceding one-week period (ending on the immediately preceding Sunday), in detail similar to that which would be included in a Budget Variance Report. <br><br> *See* Interim Order ¶ 15(e). |
| **Conditions to Closing** <br><br> *FED. R. BANKR. P. 4001(c)(1)(B)* | Usual and customary for financings of this type, including, among other things: <br><br>   (a)  The DIP Agent and the DIP Lenders shall have received certain, specified documents; <br>   (b)  The Petition Date shall have occurred, and the Borrower and each Guarantor (other than the Mexican Guarantor) shall be a debtor and debtor-in-possession in the Chapter 11 Cases; <br>   (c)  All "first day" orders and all related pleadings intended to be entered on or prior to the Interim Order Entry Date shall have been entered by the Court and shall be reasonably acceptable in form and substance to the Required Lenders and the DIP Agent; <br>   (d)  The Interim Order shall have been entered within three (3) Business Days of the Petition Date; <br>   (e)  The Plan Documentation shall be in form and substance as required pursuant to the Restructuring Support Agreement and reasonably acceptable to the Required Lenders; and <br>   (f)  The Restructuring Support Agreement shall be in full force and effect and no notice of termination or breach shall have been delivered thereunder. <br><br> *See* DIP Credit Agreement, § 4.01. |
| **Covenants** <br><br> *FED. R. BANKR. P. 4001(c)(1)(B)* | Usual and customary affirmative covenants for financings of this type including stipulations to, among other things: <br><br>   (a)  Deliver certain financial statements to the DIP Agent; <br>   (b)  Deliver cash flow forecasts and variance reports to the DIP Agent; <br>   (c)  Preserve and keep in full force the legal existence of the DIP Loan Parties; <br>   (d)  Keep adequate books of record and account with respect to its business activities; <br>   (e)  Maintain and preserve the DIP Loan Parties' properties and adequate insurance on properties; and <br>   (f)  Continue paying obligations and taxes and comply with applicable law in all material respects. <br><br> Usual and customary negative covenants for financings of this type including stipulations to not, among other things, other than in accordance with the DIP Credit Agreement: <br><br>   (a)  Incur, create, assume, or permit Indebtedness generally; <br>   (b)  Pay or make any Restricted Payment; |

| | |
|---|---|
| | (c)  Make or own any Investment;<br>(d)  Make any Disposition; and<br>(e)  Incur, create, assume or suffer to exist any Lien.<br><br>*See* DIP Credit Agreement, Articles VI–VII. |
| **Fees, Expenses, and Additional Payments**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | Upfront Fee. A fee in the amount equal to the sum of (i) 4.00% of such Lender's New Money DIP Commitments on the Closing Date (the "***New Money Upfront Fee***") and (ii) 2.00% of such Lender's Roll-Up Loans on the Closing Date.<br><br>Exit Fee. A fee in the amount equal to 4.00% of the amount of the Term Loans repaid, prepaid, accelerated, or assigned in the event of the repayment, prepayment, acceleration, or mandatory assignment of the Term Loans prior to the Maturity Date.<br><br>*See* DIP Credit Agreement, § 2.09. |
| **Prepayments**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | Optional Prepayments. The Term Loans may be prepaid in whole or in part without premium or penalty. Any prepayment shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, the entire principal amount thereof then outstanding. Any prepayment shall be accompanied by all accrued interest thereon.<br><br>Mandatory Prepayments. Not later than three (3) Business Days following (i) the receipt of any Net Cash Proceeds of any Disposition of any property or assets; (ii) the receipt of any Net Cash Proceeds of any Debt Issuance; or (iii) the receipt of any Net Cash Proceeds from a Casualty Event, the DIP Loan Parties shall make prepayments in an aggregate principal amount equal to 100.00% of the applicable Net Cash Proceeds.<br><br>*See* DIP Credit Agreement, § 2.05. |
| **Determination Regarding Prepetition Claims**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(iii)* | The Interim Order contains stipulations of fact by the Debtors, including related to the validity and enforceability of the DIP Loan Parties' prepetition secured obligations.<br><br>*See* Interim Order ¶ F. |
| **Effect of Debtors' Stipulations on Third Parties**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(iii), (viii)* | The stipulations, admissions, agreements, and releases contained in the Interim Order (collectively as the "***Debtors' Stipulations and Releases***) including, without limitation paragraphs **Error! Reference source not found.**, **Error! Reference source not found.**, and **Error! Reference source not found.** thereof, shall be binding on the Debtors in all circumstances and for all purposes Subject to the Challenge Period, and the Debtors' Stipulation and Releases shall be binding upon each party in interest (other than the Debtors), including the Creditors' Committee (if any) and any chapter 11 trustee (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period, the chapter 7 trustee in such Successor Case), except to the extent and only to the extent such party in interest with standing *first*, commences, in the case of such adversary proceeding or other contested matter filed by a party in interest with required standing (including the Creditors' Committee (if any)), by the date that shall be (i) except as to any official committee appointed in these Chapter 11 Cases, sixty (60) days after entry of the Interim Order, and (ii) in the case of any official committee appointed in these Chapter 11 Cases, sixty (60) days after such appointment; and (iii) the date of confirmation of the Approved Plan (such time period established by the earlier of clauses (i), (ii), and (iii) as applicable, the "***Challenge Period***," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (x) no Challenge (defined below) is raised during the Challenge Period or (y) with respect only to those parties who file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "***Challenge Period*** |

| | |
|---|---|
| | *Termination Date*") , a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations and Releases (collectively, the "**Challenges**" and, each individually, a "**Challenge**"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "**Successful Challenge**"); *provided*, that, any pleadings filed in any Challenge proceeding shall (x) set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Period Termination Date shall be deemed forever, waived, released, and barred) and (y) identify on the face of the pleading that it is a Challenge. Failure to comply with clauses (x) and (y) shall conclusively deem such pleading to not be a Challenge.  Upon a Successful Challenge as against any party, including that an obligation to such party is unsecured or undersecured, the Court may fashion an appropriate remedy. <br><br> *See* Interim Order ¶ 32(a). |
| **Waiver or Modification of the Automatic Stay** <br><br> *FED. R. BANKR. P. 4001(c)(1)(B)(iv)* | The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is modified as necessary to effectuate all of the terms and provisions of the Interim Order, including, without limitation and as applicable, to: (i) permit the Debtor DIP Loan Parties to grant the DIP Liens, First Lien Adequate Protection Liens, 1.5 Lien Adequate Protection Liens, Second Lien Adequate Protection Liens, DIP Superpriority Claims, First Lien Adequate Protection Superpriority Claims, 1.5 Lien Adequate Protection Superpriority Claims, and Second Lien Adequate Protection Superpriority Claims; (ii) permit the Debtor DIP Loan Parties to perform such acts as the DIP Secured Parties or the Prepetition Secured Parties each may reasonably request to assure the perfection and priority of the liens granted in the Interim Order; (iii) permit the Debtor DIP Loan Parties to incur all liabilities and obligations to the DIP Secured Parties or the Prepetition Secured Parties under the DIP Documents, the DIP Facility, and the Interim Order, as applicable; (iv) authorize the Debtor DIP Loan Parties to pay, and the DIP Secured Parties or the Prepetition Secured Parties to retain, disburse and/or apply, payments made in accordance with the terms of the Interim Order; and (v) otherwise to the extent necessary to implement and effectuate the provisions of the Interim Order and the DIP Documents. <br><br> Each of the DIP Agent (with respect to the DIP Liens) and Prepetition Agents (with respect to the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens, as applicable) may, each in their sole discretion, enter into and file, as applicable, financing statements, mortgages, security agreements, notices of Liens, and other similar documents, and is granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed, or recorded as of the Petition Date. <br><br> *See* Interim Order ¶¶ 16; 18(b). |
| **Waiver or Modification of Authority to File a Plan, Extend Time to File Plan, Request Use of Cash Collateral, or Request Authority to Obtain Credit** | The Interim Order does not provide for a waiver of any entity's authority or right to file a plan, request the use of cash collateral, or request authority to obtain credit, provided that there are limitations imposed on the DIP Loan Parties' rights to do any of the foregoing.  If any such actions are taken, it may cause an Event of Default under the DIP Facility. |

| | |
|---|---|
| *FED. R. BANKR. P. 4001(c)(1)(B)(v)* | |
| **Milestones**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(vi)* | The DIP Credit Agreement contains the following Milestones:<br><br>(a) no later than November 15, 2023, the Borrower shall have commenced solicitation of the Approved Plan;<br><br>(b) no later than the Petition Date, the Borrower shall have filed the Approved Plan, the Disclosure Statement, the Disclosure Statement Motion, the Plan Supplement, and the DIP Motion with the Court;<br><br>(c) no later than three (3) Business Days after the Petition Date the Borrower shall have delivered a notice of hearing to the Consenting Creditor Representatives at which the Court will consider confirmation of the Approved Plan and final approval of the Disclosure Statement;<br><br>(d) no later than three (3) Business Days following the Petition Date (subject to the availability of the Court), the Court shall have entered the Interim Order;<br><br>(e) no later than thirty-five (35) days following the Petition Date (subject to the availability of the Court), the Court shall have entered the Final Order and the Confirmation Order; and<br><br>(f) no later than forty (40) days following the Petition Date, the Restructuring Transactions shall have been consummated and the Restructuring Effective Date shall have occurred.<br><br>*See* DIP Credit Agreement, § 6.16. |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(vii)* | The Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens, the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens without the necessity of (i) filing, execution, or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document that may otherwise be required under the law of any jurisdiction, obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral, and the DIP Agent, shall be deemed, without any further action, to have control over all of the DIP Loan Parties' deposit accounts, securities accounts, and commodities accounts (within the meaning of the Uniform Commercial Code and other law); (ii) taking any other action to validate or perfect the DIP Liens, the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens or to entitle the DIP Liens, the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens to the priorities granted in the Interim Order; or (iii) the filing or recording of any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document with respect to security interests in any jurisdiction outside of the United States in assets located in, titled or arising or protected under the laws of a jurisdiction outside of the United States.<br><br>*See* Interim Order ¶ 18(a). |
| **Releases, Waivers, or Limitation on any Claim or Cause of Action**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(viii)* | Effective as of entry of the Interim Order, the Debtors waive and release each of the Prepetition Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives (all of the foregoing, collectively, the "***Prepetition Secured Party Releasees***") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of |

| | |
|---|---|
| | disgorgement or recovery against any and all of the Prepetition Secured Party Releasees, whether arising at law or in equity, but solely to the extent relating to and/or otherwise in connection with, among other things, the Prepetition Loan Documents, the Prepetition Obligations, and the Prepetition Liens.<br><br>*See* Interim Order ¶ G. |
| **Indemnification**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(ix)* | The DIP Credit Agreement contains indemnification provisions ordinary and customary for financings of this type.<br><br>*See* DIP Credit Agreement, §§ 9.07, 10.05. |
| **Section 506(c) Waiver**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)(x)* | Subject to and upon entry of the Final Order, except to the extent of the Carve-Out, the Debtors irrevocably waive and are prohibited from asserting any claim under section 506(c) of the Bankruptcy Code, and no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code shall be charged against or recovered from the DIP Collateral, the DIP Agent, or the DIP Lenders, and the Prepetition Collateral, the Prepetition Agents, or the Prepetition Secured Lenders pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders) or the applicable Prepetition Agents, as may be applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.<br><br>*See* Interim Order ¶ 34. |
| **Section 552(b) Waiver**<br><br>*FED. R. BANKR. P. 4001(c)(1)(B)* | Subject to and upon entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply to the DIP Secured Parties, the DIP Obligations, the Prepetition Secured Parties, or the Prepetition Obligations.<br><br>*See* Interim Order ¶ 36. |

## STATEMENT REGARDING SIGNIFICANT PROVISIONS

16.     The Interim Order contains certain of the provisions (the "***Significant Provisions***")[8]

listed in section C, paragraph 8 of the Complex Case Procedures, as set forth below:

---

[8]     Significant Provisions refer to those provisions that contain: (a) sale or plan confirmation milestones; (b) cross-collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies that are self-executing or preclude court oversight, including (i) provisions terminating the automatic stay without further order, (ii) provisions waiving rights to challenge lenders' ability to exercise post-default remedies, and (iii) provisions limiting required proof or altering the burden of proof at post-default hearings; (f) releases of claims; (g) limitations on the use of cash collateral or DIP proceeds (other than general "carve-outs") to pay approved fees and expenses of advisors to official committees or future trustees; (h) non-consensual priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

| Term | Relief Requested |
|---|---|
| **Sale or Plan Confirmation Milestones**<br><br>*Complex Case Procedures, ¶ 8(a)* | The Interim Order provides for the following milestones.<br><br>*See* Interim Order ¶ 24; DIP Credit Agreement § 6.16.<br><br>    (i)   no later than November 15, 2023, the Borrower shall have commenced solicitation of the Approved Plan;<br><br>    (ii)  no later than the Petition Date, the Borrower shall have filed the Approved Plan, the Disclosure Statement, the Disclosure Statement Motion, the Plan Supplement, and the DIP Motion with the Court;<br><br>    (iii) no later than three (3) Business Days after the Petition Date the Borrower shall have delivered a notice of hearing to the Consenting Creditor Representatives at which the Court will consider confirmation of the Approved Plan and final approval of the Disclosure Statement;<br><br>    (iv) no later than three (3) Business Days following the Petition Date (subject to the availability of the Court), the Court shall have entered the Interim Order;<br><br>    (v)  no later than thirty-five (35) days following the Petition Date (subject to the availability of the Court), the Court shall have entered the Final Order and the Confirmation Order; and<br><br>    (vi) no later than forty (40) days following the Petition Date, the Restructuring Transactions shall have been consummated and the Restructuring Effective Date shall have occurred.<br><br>**Justification.**  These milestones were extensively negotiated and agreed upon between the Debtors and the DIP Lenders, and they are appropriately tailored to the circumstances of these Chapter 11 Cases. |
| **Cross-Collateralization**<br><br>*Complex Case Procedures, ¶ 8(b)* | The Interim Order does not provide for cross-collateralization, other than replacement liens as adequate protection. |
| **Roll-Ups**<br><br>*Complex Case Procedures, ¶ 8(c)* | The Interim Order provides for the roll-up of the full amount of the  Prepetition Superpriority Loans, (including accrued and unpaid interest thereon), subject to Challenge during the Challenge Period.  The DIP Roll-Up Loans shall be approved upon entry of the Interim Order and deemed to have been advanced on the Closing Date concurrently with the borrowing of the New Money DIP Loans.<br><br>*See* Interim Order ¶ I(v)<br><br>**Justification.**  The DIP Roll-Up Loans are an integral component of the DIP Facility. The DIP Roll-Up Loans, which include loans to refund and replace the Prepetition Superpriority Loans in the principal amount of $27.5 million and all accrued and unpaid interest under the Prepetition Superpriority Facility, which bridged the Debtors to these Chapter 11 Cases and provided the liquidity necessary to allow the Debtors' to run a robust out-of-court sale process and prepare for these Chapter 11 Cases in an orderly fashion.  The Prepetition Secured Parties indicated that they would not have consented to the use of Cash Collateral or provision of the DIP Facility without an agreement regarding debtor-in-possession financing, including the interim DIP Roll-Up Loans.  Further, the DIP Lenders required the DIP Roll-Up Loans as a condition for funding the DIP Facility, and the DIP Roll-Up Loans played an important role in the negotiation of the RSA and the restructuring transactions contemplated in these Chapter 11 Cases. |

| | |
|---|---|
| **Liens on Avoidance Actions or Proceeds of Avoidance Actions**<br><br>*Complex Case Procedures, ¶ 8(d)* | The Interim Order does not provide for granting any liens on Avoidance Actions; however, the Interim Order provides that the DIP Liens shall attach to the proceeds of Avoidance Actions subject to entry of the Final Order.<br><br>*See* Interim Order ¶ 7.<br><br>**Justification.** The Debtors respectfully submit that granting liens on proceeds of Avoidance Action is appropriate under the circumstances to secure repayment of the DIP Obligations. The Interim Order is tailored to grant liens on proceeds of Avoidance Actions only upon entry of the Final Order and does not grant liens on the Avoidance Actions. |
| **Default Provisions and Remedies**<br><br>*Complex Case Procedures, ¶ 8(e)* | Notwithstanding the automatic stay, the Interim Order will allow for the exercise of remedies by the DIP Agent at the direction of the Required DIP Lenders, upon the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement or any of the DIP Documents or any other breach, default, or other violation by the DIP Loan Parties of the terms and provisions of the Interim Order, which breach, default, or violation (other than any payment default to which no grace period shall apply) is not cured within three (3) Business Days of the DIP Loan Parties having notice of the occurrence thereof, and upon receipt of notice thereof, the DIP Loan Parties shall provide prompt written notice to the DIP Secured Parties Agent detailing such breach, default, or violation.<br><br>*See* Interim Order ¶¶ 25-26.<br><br>**Justification.** The Debtors respectfully submit that the Events of Default appropriately balance the DIP Lenders' need for protection and the DIP Loan Parties' need to ensure continued access to Cash Collateral and access to the DIP Facility. In addition, the remedies provision in paragraph 26(b) of the Interim Order provides for a hearing on five (5) Business Days' written notice prior to enforcing any right or remedy. |
| **Releases of Claim Against Lender or Others**<br><br>*Complex Case Procedures, ¶ 8(f)* | Subject to entry of the Interim Order, and subject to a customary "challenge" period for all parties other than the Debtors, the Debtors will provide customary stipulations and releases for any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, or obligations related to or arising out of the DIP Obligations, the DIP Liens, or the debtor-creditor relationship between any of the DIP Secured Parties, on the one hand, and any of the Debtors, on the other hand, arising prior to the date of entry of the Interim Order.<br><br>*See* Interim Order ¶¶ G, 32, 37–39.<br><br>**Justification.** The Releases and Stipulations are an integral component of the DIP Facility and the Prepetition Secured Parties indicated that they would not have consented to the Interim Order without the Debtors providing such Releases and Stipulations. |
| **Limitations on Fees for Advisors to Official Committees**<br><br>*Complex Case Procedures, ¶ 8(g)* | Allowed Professional Fees of Professional Persons in an aggregate amount, with respect to Committee Professionals incurred after the first Business Day following delivery by the DIP Agent (acting at the direction of Required DIP Lenders) of the Carve-Out Trigger Notice (such date, the "***Termination Declaration Date***") are limited to $250,000.<br><br>Further, up to $25,000 shall be made available to the Creditors' Committee (if any) solely for investigation costs to pursue any investigation rights during the Challenge Period.<br><br>*See* Interim Order ¶¶ 27(a), 28.<br><br>**Justification.** The Debtors respectfully submit that this limitation is reasonable given the facts and circumstances of these Chapter 11 Cases. |

| Priming Liens<br><br>*Complex Case Procedures, ¶ 8(h)* | Subject and subordinate only to the Carve-Out and Permitted Third Party Liens, the DIP Lenders are provided first priority, senior priming lien on, and security interest in, all DIP Collateral<br><br>**Justification.**  The DIP Liens granted pursuant to the DIP Orders to the DIP Lenders are appropriate under section 364(d) of the Bankruptcy Code because, among other things: (a) the applicable Prepetition Secured Parties have consented, are deemed to have consented, or do not otherwise object to such priming DIP Liens granted pursuant to the DIP Orders to the DIP Lenders; and (b) the grant of the DIP Liens is otherwise in compliance with section 364(d) of the Bankruptcy Code. |

17.     The DIP Facility is the best postpetition financing alternative available to the Debtors, and the DIP Lenders would not have agreed to provide such financing without the inclusion of the Significant Provisions summarized above.  In light of the foregoing, the Debtors respectfully submit that the Significant Provisions are appropriate under the facts and circumstances of these Chapter 11 Cases.

## DEBTORS' PREPETITION CAPITAL STRUCTURE

18.     As of the Petition Date, the principal amount of the Debtors' funded debt liabilities total approximately $433 million, including approximately (i) $406 million of outstanding principal and letters or credit and (ii) $26 million in accrued and unpaid interest.

**A.     Prepetition Superpriority Facility.**

19.     Pursuant to that certain Superpriority Secured Credit Agreement, dated as of September 15, 2023 (as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition Superpriority Credit Agreement***," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition Superpriority Loan Documents***"), providing a term loan facility (the "***Prepetition Superpriority Facility***") in the aggregate principal amount of $27,500,000 in U.S. dollar-denominated term loans (the "***Prepetition Superpriority Loans***"), entered into by and among (a) Holdings, (b) the Borrower, (c) the lenders from time to time party thereto (the

"*Prepetition Superpriority Lenders*"), and (d) Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (in such capacities, collectively, the "*Prepetition Superpriority Agent*" and, together with the Prepetition Superpriority Lenders, the "*Prepetition Superpriority Secured Parties*"), the Prepetition Superpriority Lenders agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition Superpriority Loan Documents.  All obligations of the applicable DIP Loan Parties arising under the Prepetition Superpriority Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition Superpriority Loan Documents) or the other Prepetition Superpriority Loan Documents shall collectively be referred to herein as the "*Prepetition Superpriority Obligations*."

20.     **Amounts Owed under Prepetition Superpriority Loan Documents**.  As of the Petition Date, the applicable DIP Loan Parties owed the Prepetition Superpriority Secured Parties, pursuant to the Prepetition Superpriority Loan Documents, without defense, counterclaim, reduction, or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Superpriority Secured Parties, an aggregate principal amount of approximately $27,500,000, plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Superpriority Loan Documents), and other amounts now or hereafter due under the Prepetition Superpriority Loan Documents.

**B.     Prepetition First Lien Facility.**

21.     Pursuant to that certain First Lien Credit Agreement, dated as of November 1, 2017 (as amended by the First Amendment to First Lien Credit Agreement dated as of June 1, 2020, the Second Amendment to First Lien Credit Agreement, dated as of June 19, 2020, the Third

Amendment to First Lien Credit Agreement, dated as of September 22, 2021, the Fourth Amendment to First Lien Credit Agreement, dated as of September 22, 2022, the Fifth Amendment to First Lien Credit Agreement, dated as of February 1, 2023, and as may be further amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition First Lien Credit Agreement***," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition First Lien Loan Documents***"), providing for (A) term loans in the initial aggregate principal amount of $256,100,000 and (B) revolving credit commitments in the amount of $40,000,000, entered into by and among (a) Holdings, (b) the Borrower, (c) the lenders from time to time party thereto (the "***Prepetition First Lien Lenders***"), and (d) Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (collectively, in such capacities, the "***Prepetition First Lien Agent***" and, together with the Prepetition First Lien Lenders, the "***Prepetition First Lien Secured Parties***") (as successors to Goldman Sachs Bank USA, as administrative agent and collateral agent in accordance with that certain Successor First Lien Agent Agreement, dated as of September 15, 2023), the Prepetition First Lien Lenders agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition First Lien Loan Documents.  All obligations of the applicable DIP Loan Parties arising under the Prepetition First Lien Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition First Lien Loan Documents) or the other Prepetition First Lien Loan Documents shall collectively be referred to herein as the "***Prepetition First Lien Obligations***."

22.    **Amounts Owed under Prepetition First Lien Loan Documents**. As of the Petition Date, the applicable DIP Loan Parties owed the Prepetition First Lien Secured Parties,

pursuant to the Prepetition First Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition First Lien Secured Parties, an aggregate principal amount of approximately $285,000,000, plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition First Lien Loan Documents), and other amounts now or hereafter due under the Prepetition First Lien Loan Documents.

**C.      Prepetition 1.5 Lien Facility.**

23.      Pursuant to that certain 1.5 Lien Credit Agreement, dated as of September 22, 2022 (as amended by that First Amendment to 1.5 Lien Credit Agreement, dated as of February 1, 2023, and as may be further amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition 1.5 Lien Credit Agreement***," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition 1.5 Lien Loan Documents***"), providing a term loan facility in the initial aggregate principal amount of $10,000,000, entered into by and among (a) Holdings, (b) the Borrower, (c) the lenders from time to time party thereto (the "***Prepetition 1.5 Lien Lenders***"), and (d) Alter Domus (US) LLC, as administrative agent (in such capacity, the "***Prepetition 1.5 Lien Agent***" and the Prepetition 1.5 Lien Agent together with the Prepetition 1.5 Lien Lenders, the "***Prepetition 1.5 Lien Secured Parties***"), the Prepetition 1.5 Lien Lenders agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition 1.5 Lien Loan Documents.  All obligations of the applicable DIP Loan Parties arising under the Prepetition 1.5 Lien Credit Agreement (including the "Obligations" as defined therein, whether or not arising

under the Prepetition 1.5 Lien Loan Documents) or the other Prepetition 1.5 Lien Loan Documents shall collectively be referred to herein as the "***Prepetition 1.5 Lien Obligations***."

24.     **Amounts Owed under Prepetition 1.5 Lien Loan Documents**.  As of the Petition Date, the applicable DIP Loan Parties owed the Prepetition 1.5 Lien Secured Parties, pursuant to the Prepetition 1.5 Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition 1.5 Lien Secured Parties, an aggregate principal amount of approximately $11,000,000, plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition 1.5 Lien Loan Documents), and other amounts now or hereafter due under the Prepetition 1.5 Lien Loan Documents.

**D.     Prepetition Second Lien Facility.**

25.     Pursuant to that certain Second Lien Credit Agreement, dated as of November 1, 2017 (as amended by that certain First Amendment to Second Lien Credit Agreement, dated as of September 22, 2022, that certain Second Amendment to Second Lien Credit Agreement, dated as of February 1, 2023, and as may be further amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition Second Lien Credit Agreement***," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition Second Lien Loan Documents***," and, together with the Prepetition Superpriority Loan Documents, the Prepetition First Lien Loan Documents, and the Prepetition 1.5 Lien Loan Documents, the "***Prepetition Loan Documents***") providing for a term loan facility in the aggregate principal amount of $80,000,000, entered into by and among (a) Holdings, (b) the Borrower, (c) the lenders from time to time party thereto (the "***Prepetition***

*Second Lien Lenders*" and, together with the Prepetition Superpriority Lenders, the Prepetition First Lien Lenders, and the Prepetition 1.5 Lien Lenders, are referred to collectively herein as the "*Prepetition Secured Lenders*"), and (d) Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (collectively, in such capacities, the "*Prepetition Second Lien Agent*" (as successors to Goldman Sachs Bank USA, as administrative agent and collateral agent in accordance with that certain Successor Second Lien Agent Agreement, dated as of September 15, 2023) and, together with the Prepetition Superpriority Agent, the Prepetition First Lien Agent and the Prepetition 1.5 Lien Agent, are referred to collectively herein as the "*Prepetition Agents*;" the Prepetition Second Lien Agent together with the Prepetition Second Lien Lenders are referred to collectively herein as, the "*Prepetition Second Lien Secured Parties*," and the Prepetition Second Lien Secured Parties together with the Prepetition Superpriority Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition 1.5 Lien Secured Parties, are referred to collectively herein as the "*Prepetition Secured Parties*") the Prepetition Second Lien Lenders agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition Second Lien Loan Documents.  All obligations of the applicable DIP Loan Parties arising under the Prepetition Second Lien Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition Second Lien Loan Documents) or the other Prepetition Second Lien Loan Documents shall collectively be referred to herein as the "*Prepetition Second Lien Obligations*," and, together with the Prepetition Superpriority Obligations, the Prepetition First Lien Obligations, and the Prepetition 1.5 Lien Obligations, the "*Prepetition Obligations*."

26.     **Amounts Owed under Prepetition Second Lien Loan Documents**.  As of the Petition Date, the applicable DIP Loan Parties owed the Prepetition Second Lien Secured Parties,

pursuant to the Prepetition Second Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Second Lien Secured Parties, an aggregate principal amount of approximately $80,000,000, plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Second Lien Loan Documents), and other amounts now or hereafter due under the Prepetition Second Lien Loan Documents.

**E.      Prepetition Collateral**

27.      Pursuant to the Prepetition Loan Documents, the obligations arising under the Prepetition Superpriority Credit Agreement, the Prepetition First Lien Credit Agreement, the Prepetition 1.5 Lien Credit Agreement, and the Prepetition Second Lien Credit Agreement are secured by security interests and continuing Liens on all "Collateral" as such term is defined in each applicable Prepetition Loan Document (collectively, the "***Prepetition Collateral***" and the liens securing the Prepetition Collateral, the "***Prepetition Liens***").

**F.      Prepetition Intercreditor Agreements**

28.      Several intercreditor agreements govern certain relative priorities, rights, and remedies of certain Prepetition Secured Parties including (i) that certain Super Senior/First Lien Intercreditor Agreement, dated as of September 15, 2023 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "***Super Senior/First Lien Intercreditor Agreement***") by and among the Prepetition Superpriority Agent and the Prepetition First Lien Agent, and acknowledged and agreed to by the DIP Loan Parties; (ii) that certain First Lien/1.5 Lien Intercreditor Agreement, dated as of September 22, 2022 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from

time to time, the "*First Lien/1.5 Lien Intercreditor Agreement*") by and among the Prepetition

Superpriority Agent, the Prepetition First Lien Agent, and the Prepetition 1.5 Lien Agent, and

acknowledged and agreed to by the DIP Loan Parties; (iii) that certain 1.5 Lien/Second Lien

Intercreditor Agreement, dated as of September 22, 2022 (as amended, restated, amended and

restated, supplemented, waived and/or otherwise modified from time to time, the "*1.5 Lien/Second*

*Lien Intercreditor Agreement*") by and among the Prepetition 1.5 Lien Agent and the Prepetition

Second Lien Agent, and acknowledged and agreed to by the DIP Loan Parties; and (iv) that certain

Second Lien Intercreditor Agreement, dated as of November 1, 2017 (as amended, restated,

amended and restated, supplemented, waived and/or otherwise modified from time to time, the

"*Second Lien Intercreditor Agreement*" and, together with the Super Senior/First Lien

Intercreditor Agreement, the First Lien/1.5 Lien Intercreditor Agreement, and the 1.5 Lien/Second

Lien Intercreditor Agreement, the "*Prepetition Intercreditor Agreements*") by and among the

Prepetition Superpriority Agent, the Prepetition First Lien Agent, and the Prepetition Second Lien

Agent, and acknowledged and agreed to by the DIP Loan Parties.

## DEBTORS' LIQUIDITY NEEDS
## AND THE PROPOSED DIP FACILITY

29.     As detailed in the Flachs Declaration and the Omohundro Declaration, the Debtors

require access to liquidity to ensure that they are able to continue their normal business operations

during these Chapter 11 Cases and preserve the value of their Estates.  All of the DIP Loan Parties'

cash on hand as of the Petition Date and any proceeds of the Prepetition Collateral is subject to the

liens of the Prepetition Secured Lenders.  Pursuant to the RSA, the requisite Prepetition Secured

Lenders have agreed to consent to the DIP Loan Parties' use of Cash Collateral and the DIP

Lenders have agreed to provide the DIP Facility on the terms set forth in the Interim Order and in

accordance with the Approved Budget.

30.     The proceeds from the proposed DIP Facility will be used for, among other things, making payments integral to the Debtors' business operations, paying administrative expenses associated with these Chapter 11 Cases, and satisfying working capital needs in the ordinary course of business.  Moreover, the liquidity to be provided under the DIP Facility, combined with access to existing Cash Collateral, will enable the Debtors to (i) fund their operations during the course of these Chapter 11 Cases including chapter 11 administrative costs, (ii) ensure that value is preserved during the course of the Debtors' Chapter 11 Cases, and (iii) effectively carry out the restructuring transactions contemplated by the DIP Loan Parties under the RSA to maximize value for the Debtors' Estates.

31.     Given that substantially all of the DIP Loan Parties' unrestricted cash is Cash Collateral, the DIP Loan Parties need access to such Cash Collateral and the proceeds of the DIP Facility to operate their business in the ordinary course during these Chapter 11 Cases.  Authority to use Cash Collateral and enter into the DIP Facility will provide the Debtors with necessary funds to operate their business and continue paying their postpetition obligations as they come due during these Chapter 11 Cases.

### DEBTORS' PREPETITION
### DIP FINANCING MARKETING EFFORTS

32.     As further detailed in the Flachs Declaration, Moelis undertook a process to identify potential alternative DIP financing to fund these Chapter 11 Cases (the "***DIP Marketing Process***"). During the DIP Marketing Process, Moelis sought new money financing from twelve (12) potential debt investors.   The third-party financial institutions involved in the DIP Marketing Process included well-known commercial banks and specialty institutions that routinely provide asset-based and cash flow-based financing.  Moelis identified these parties based on a number of factors, including, among other things, their ability to complete diligence in a timely manner, their

experience and interest in providing distressed financing, and their familiarity with the Debtors' industry.  As part of this process, Moelis reached out to the potential new money counterparties in order to introduce them to the situation.  The Debtors submit that this DIP Marketing Process provided a reasonable survey of potential new money alternatives to the DIP Facility .

33.     None of the parties contacted submitted binding financing proposals, or even entered into customary non-disclosure agreements, due to a number of factors, including the Debtors' financial position, the difficulty in structuring a new financing within the Debtors' prepetition capital structure, and their unwillingness to fund on a junior basis.  The Debtors also submit that a non-consensual priming financing process would have been value destructive to the Debtors and their Estates.  Ultimately, no actionable financing proposals materialized from the prepetition DIP Marketing Process.

<div style="text-align:center"><b>THE ROLL-UP OF A PORTION OF THE<br>PREPETITION SUPERPRIORITY  FACILITY IS REASONABLE</b></div>

34.     The DIP Facility will "roll up" $27,500,000 of the total amount outstanding under the Prepetition Superpriority Facility and all accrued and unpaid interest under the Prepetition Superpriority Facility.  The DIP Roll-Up Loans are a material component of the structure of the DIP Facility and are required by the DIP Lenders as a condition to their commitment to provide postpetition financing and their consent to the DIP Loan Parties' use of Cash Collateral.  Under the terms of the DIP Facility, on the Closing Date concurrent with the DIP Loan Parties' borrowing of the New Money DIP Loans, for every dollar of new money that the DIP Lenders provide (or have already provided), a corresponding amount of DIP Roll-Up Loans will be advanced (or deemed advanced) to refund and replace outstanding Prepetition Superpriority Loans that will be simultaneously satisfied (or deemed satisfied) and reduce the amounts due and owing under the Prepetition Superpriority Facility on a dollar-for-dollar basis.  The DIP Loan Parties and the DIP

Lenders engaged in arm's-length negotiations and ultimately agreed to the DIP Roll-Up Loans as consideration for, among other things, the DIP Loan Parties' continued use of Cash Collateral and the benefits associated with the extension of $23,000,000 of New Money DIP Loans through the Chapter 11 Cases.

35.     Roll-ups and repayments of prepetition debt, such as the proposed DIP Roll-Up Loans in the DIP Orders, have been approved in a variety of cases in this district as set forth below:

| Recent Roll-Ups in the Southern District of Texas | | | |
|---|---|---|---|
| **Case Name** | **New Money Amount** | **Roll Up Amount** | **Approximate Roll Up Ratio** |
| *In re Air Methods Corporation, et al.*, No. 23-90886 (MI) (S.D. Tex. Oct. 24, 2023) | $80.0 million | $75.0 million | 0.94:1 |
| *In re Anagram Holdings, LLC, et al.*, No. 23-90901 (MI) (S.D. Tex. Nov. 8, 2023) | $22.0 million | $10.0 million | 0.46:1 |
| *In re Venator Materials PLC, et al.*, No. 23-90301 (DRJ) (S.D. Tex. May 14, 2023) | $275.0 million | $190.0 million | 0.69:1 |
| *In re Noble House Home Furnishings, LLC, et al.*, No. 23-90773 (CML) (S.D. Tex. Sept. 11, 2023) | $12.2 million | $70.4 million | 5.75:1 |
| *In re Genesis Care Pty Limited, et al., No. 23-90614 (MI) (S.D. Tex. June 1, 2023)* | $200.0 million | $600.0 million | 3:1 |
| *In re Diebold Holding Company, LLC, et al.*, No. 23-90602 (DRJ) (S.D. Tex. June 1, 2023) | $760.0 million | $490.0 million | 0.65:1 |
| *In re Soft Surroundings Holdings, LLC, et al.*, No. 23-90769 (CML) (S.D. Tex. | $17.0 million | $14.7 million | 0.87:1 |
| *In re Lilis Energy, Inc.*, No. 20- 33274 (MI) (Bankr. S.D. Tex. June 29, 2020) | $15.0 million | $15.0 million | 1:1 |
| *In re Unit Corp.*, No. 20-32740 (DRJ) (Bankr. S.D. Tex. May 26, 2020) | $36.0 million | $88.0 million | 2.45:1 |

## THE DIP FACILITY WAS NEGOTIATED
## IN GOOD FAITH AND AT ARM'S-LENGTH

36.     As further described in the Flachs Declaration and the Omohundro Declaration, the terms of the DIP Facility are the product of extensive good faith, arm's-length negotiations between the DIP Loan Parties and the DIP Lenders, each of which was represented by qualified counsel and financial advisors.  Beginning in July 2023, the DIP Loan Parties, with the assistance of Moelis and the Debtors' other advisors, actively negotiated the terms and provisions of the RSA and the DIP Facility on behalf of the DIP Loan Parties.  These negotiations resulted in the RSA and the proposed DIP Facility.  Based on the DIP financing marketing process conducted by the Debtors and Moelis and the extensive arm's-length negotiations between the DIP Loan Parties and the DIP Lenders, the DIP Facility represents the best financing option available to the Debtors. The terms of the DIP Facility are reasonable under the circumstances and are consistent with market terms for such financings provided to companies in circumstances similar to the DIP Loan Parties.

## BASIS FOR RELIEF REQUESTED

**A.     Obtaining the DIP Facility, Including Rolling Up Certain Prepetition Obligations, Is a Sound Exercise of Business Judgment.**

37.     After thorough marketing and analysis, the Debtors have concluded that the DIP Facility is the best option for financing available under the circumstances of these Chapter 11 Cases.  The Court should authorize the Debtor DIP Loan Parties, as an exercise of the Debtor DIP Loan Parties' sound business judgment, to (i) enter into the DIP Documents, (ii) obtain access to the DIP Facility, and (iii) use advances of credit under the DIP Facility and Cash Collateral in accordance with the DIP Orders and the Approved Budget.

38.     If an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts give debtors considerable deference in acting in

accordance with their sound business judgment in obtaining such credit.  *See, e.g.*, *In re N. Bay Gen. Hosp., Inc.*, No. 08-20368 (Bankr. S.D. Tex. July 11, 2008) (approving postpetition financing on an interim basis as an exercise of debtors' business judgment); *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Debtors correctly posit that courts will almost always defer to the business judgment of a debtor in the selection of a lender."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

39.     Bankruptcy courts generally will not second guess a debtor's business decisions when those decisions involve a minimum level of care in arriving at the decision on an informed basis, in good faith, and in the honest belief that the action was taken in the best interests of the debtor.  *See In re Los Angeles Dodgers LLC*, 457 B.R. at 313.  To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007) (citations omitted); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (noting that courts require only that the debtors "show that a sound business purpose justifies such actions") (citations omitted).

40.     Under the circumstances, the Debtor DIP Loan Parties' determination to obtain the debtor-in-possession financing under the terms of the DIP Facility is a sound exercise of their business judgment following a careful evaluation of the alternatives.  ***First***, without access to the DIP Facility, the DIP Loan Parties will be unable to pay ongoing operating expenses necessary to sustain their operations, which would irreparably impair the value of the Debtors' Estates during the proposed restructuring process.  ***Second***, the DIP Loan Parties negotiated the DIP Credit Agreement and the other DIP Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of their advisors, and the Debtors submit that the terms of the DIP Facility represent the most favorable terms on which such financing can be obtained.  ***Third***, the Debtor DIP Loan Parties submit that the terms of the DIP Facility are reflective of market terms for financings of this type.  Accordingly, the Court should authorize the Debtor DIP Loan Parties' entry into the DIP Documents as a reasonable exercise of the Debtor DIP Loan Parties' business judgment.

**B.      The Court Should Authorize the Granting of Liens and Superpriority Claims Under Sections 364(c) and 364(d) of the Bankruptcy Code.**

41.     The Debtor DIP Loan Parties propose to obtain financing under the DIP Facility by providing the DIP Lenders security interests and liens as set forth in the DIP Documents pursuant to sections 364(c) and 364(d) of the Bankruptcy Code.  Specifically, the Debtor DIP Loan Parties propose to provide the DIP Lenders (i) first priority liens on all of the DIP Loan Parties' unencumbered assets pursuant to section 364(c) of the Bankruptcy Code and (ii) first priority, senior priming liens ("***Priming Liens***") on all of the DIP Loan Parties' encumbered assets with priority over all other claims (subject and subordinate in each case only to the Permitted Third Party Liens (as defined in the Interim Order) and the Carve-Out).

*i.    The Court Should Authorize the Granting of Superpriority Administrative Claims and Liens on Unencumbered Property.*

42.     The Debtor DIP Loan Parties meet the requirements for relief under section 364(c) of the Bankruptcy Code, which provides:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt:
>
> > (1)     with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
> >
> > (2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or
> >
> > (3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

43.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, courts consider whether (i) the debtor made a reasonable effort, but failed, to obtain unsecured credit under sections 364(a) and 364(b) of the Bankruptcy Code; (ii) the credit transaction benefits the debtor as necessary to preserve estate assets; and (iii) the terms of the credit transaction are fair, reasonable, and adequate, given the circumstances of the debtor and proposed lender.  *See In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11*;  In re Los Angeles Dodgers LLC*, 457 B.R. at 312–13;  *In re Ames Dep't Stores, Inc.*, 115 B.R. at 40;  *In re Aqua Assoc.*, 123 B.R. 192, 195–99 (Bankr. E.D. Pa. 1991).  However, section 364 of the Bankruptcy Code "imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code.  *Id.*; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show

that it made reasonable efforts to seek other sources of financing under section 364(a) and (b) of the Bankruptcy Code).

44.      The Debtor DIP Loan Parties submit they have satisfied the requirements of section 364(c) of the Bankruptcy Code and should thus be authorized to grant liens on unencumbered property and superpriority claims to the DIP Lenders on account of the DIP Facility.

45.      *First*, as detailed above, prior to the Petition Date, the Debtors and their advisors contacted multiple parties to seek proposals for third-party postpetition financing.  No potential lenders were willing to provide financing on an unsecured or junior lien basis.  Accordingly, the Debtors submit that the requirement of section 364 of the Bankruptcy Code is satisfied because alternative credit on more favorable terms is unavailable to the Debtors.

46.      *Second*, the DIP Facility is necessary to preserve the Debtors' Estates.  The DIP Loan Parties require immediate access to the DIP Facility and to Cash Collateral to continue operations and preserve the going-concern value of the Debtors and their Estates.  As the Debtors experience fluctuations in their cash flows, which affects their ability to pay trade creditors and satisfy other obligations that arise in the ordinary course of business, the nonpayment of which would have adverse effects on their operations, the DIP Loan Parties' access to the DIP Facility and Cash Collateral will provide certainty that the Debtors will have sufficient liquidity to continue their operations in the ordinary course.

47.      *Third*, the terms of the DIP Facility are justified under the circumstances.  The DIP Facility represents the most favorable source of postpetition financing available to the Debtors and is designed to provide the Debtors with sufficient liquidity to administer these Chapter 11 Cases and facilitate the restructuring process.  Absent the DIP Facility, which will allow the Debtors to meet their working capital needs during these Chapter 11 Cases, the value of the Debtors' Estates

would be significantly impaired.  Given the Debtors' circumstances, the Debtors submit that the terms of the DIP Facility, as set forth in the DIP Credit Agreement, are fair, reasonable, and adequate.  For all of the foregoing reasons, the Debtors submit that they have satisfied the requirements of section 364(c) of the Bankruptcy Code and that the Court should, therefore, authorize the Debtor DIP Loan Parties to provide the DIP Lenders with (i) superpriority administrative expense status for the DIP Obligations as provided for in section 364(c)(1) of the Bankruptcy Code and (ii) liens on the Debtor DIP Loan Parties' unencumbered property pursuant to section 364(c)(2) of the Bankruptcy Code.

    *ii.*        *The Court Should Authorize the DIP Loan Parties to Grant Priming Liens.*

    48.       In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts may also authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on encumbered property if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1).  Specifically, section 364(d)(1) of the Bankruptcy Code provides:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if:
>
> > (A) the trustee is unable to obtain such credit otherwise; and
> >
> > (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

    49.       "Section 364(d) 'does not require that debtors seek alternative financing from every possible lender.  However, the debtor must make an effort to obtain credit without priming a senior lien.'"  *In re Republic Airways Holdings Inc.*, 2016 WL 2616717, at *11.  Consent by secured creditors to priming obviates the need to show adequate protection.  *See Anchor Savs. Bank FSB*

*v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").  What constitutes adequate protection is decided on a case-by-case basis. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case by case basis."); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006) ("The term 'adequate protection' is intended to be a flexible concept."); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what constitutes adequate protection must be decided on a case-by-case basis").  Accordingly, the Debtor DIP Loan Parties may incur "priming" liens under the DIP Facility if they are unable to obtain unsecured or junior secured credit and either (i) the existing secured creditors have consented or (ii) such existing secured creditors are adequately protected.

50.     The DIP Loan Parties seek authority to grant liens to the DIP Lenders on a priming basis (subject and subordinate to the Carve-Out and any Permitted Third Party Liens).  The DIP Loan Parties submit that the grant of Priming Liens contemplated by the DIP Facility is appropriate because the proposed priming is consensual and the DIP Loan Parties are providing adequate protection to those secured creditors whose liens are being primed.  The DIP Lenders include certain of the Prepetition Secured Lenders—the primary prepetition secured creditors of the DIP Loan Parties —and the requisite Prepetition Secured Lenders have consented to the priming features of the DIP Facility.  Indeed, the Prepetition Secured Lenders have actively participated in negotiating the terms of the proposed financing and/or Cash Collateral usage, and they have agreed

to the form of the Interim Order.  Furthermore, the Debtor DIP Loan Parties propose to provide adequate protection to the Prepetition Secured Lenders in the form of superpriority claims and replacement liens as set forth in the Interim Order.  Finally, the DIP Loan Parties do not seek to prime any Permitted Third Party Liens.  Accordingly, the DIP Loan Parties submit that they have satisfied the requirements for granting Priming Liens to the DIP Lenders pursuant to section 364(d)(1) of the Bankruptcy Code, and they request that the Court authorize them to do so.

**C.    The Court Should Approve the Proposed Adequate Protection.**

51.    In addition to advances under the DIP Facility, the DIP Loan Parties require use of Cash Collateral for working capital to preserve their business operations and to administer these Chapter 11 Cases.  Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's cash collateral.  Section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

52.    Section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (en banc).  Courts determine what constitutes sufficient adequate protection on a case-by-case basis.  *Swedeland Dev. Grp.*, 16 F.3d at 564.

50

53.     As highlighted above, the Debtor DIP Loan Parties propose to provide the Prepetition Secured Lenders with adequate protection in various forms, including the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, the Second Lien Adequate Protection Liens, the First Lien Adequate Protection Superpriority Claims, the 1.5 Lien Adequate Protection Superpriority Claims, and the Second Lien Adequate Protection Superpriority Claims, to protect their interests in the Debtor DIP Loan Parties' property from any diminution in value of the Prepetition Collateral (including Cash Collateral) resulting from the use of the Cash Collateral by the Debtor DIP Loan Parties and the imposition of the automatic stay.  Access to the Prepetition Secured Parties' Cash Collateral will provide liquidity vital to the Debtors' operations and these Chapter 11 Cases.  Accordingly, the Debtor DIP Loan Parties' provision of adequate protection is not only necessary to protect against any diminution in value, but is fair, reasonable, and appropriate under the circumstances of these Chapter 11 Cases to ensure that the DIP Loan Parties are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order and the DIP Documents, for the benefit of all parties in interest and their Estates.

**D.      The Roll-Up of the Prepetition Superpriority Facility is Appropriate**

54.     An integral component of the DIP Facility is the DIP Roll-Up Loans, which include up to an aggregate principal amount of $27,500,000.00 and the amount of all accrued and unpaid interest under the Prepetition Superpriority Facility of DIP Roll-Up Loans, which, subject to Challenge during the Challenge Period, shall be approved upon entry of the Interim Order and advanced (or deemed advanced) on the Closing Date concurrent with the DIP Loan Parties' borrowing of the New Money DIP Loans to refund and replace the full principal amount of the Prepetition Superpriority Loans and any accrued and unpaid interest thereon, that will be automatically and simultaneously satisfied (or deemed satisfied) and which shall reduce the amounts due and owing under the Prepetition Superpriority Facility on a dollar-for-dollar basis.

The negotiation of the DIP Roll-Up Loans was a critical component of the overall DIP Facility and was necessary to achieve a consensual restructuring rather than a freefall bankruptcy.

55.     The liquidity runway from the Prepetition Superpriority Loans funded the Debtors' liquidity needs in the period immediately prior to the filing of these Chapter 11 Cases and allowed the Debtors to run a prepetition marketing and sale process in an effort to effectuate value-maximizing out-of-court transactions.  The financing provided under the Prepetition Superpriority Loans has contributed to a consensual restructuring and orderly entry into these Chapter 11 Cases that will maximize the value of the Debtors' Estates.  Without the Prepetition Superpriority Loans, the Debtors would have faced a freefall bankruptcy, jeopardizing the livelihood of the Debtors' employees and the continuity of business operations, and resulting in a reduced recovery for all parties.

56.     The DIP Lenders required the DIP Roll-Up Loans and approval of the DIP Roll-Up Loans upon entry of the Interim Order as a condition for funding the DIP Facility, and the contemplated DIP Roll-Up Loans played an important role in the overall negotiation of the RSA. Importantly, the terms of the DIP Facility—including the DIP Roll-Up Loans—were negotiated as part of the global RSA to ensure a clear path to maximize value in these Chapter 11 Cases. Accordingly, the terms of the roll-up component of the DIP Facility are reasonable and necessary components of the DIP Facility. The DIP Facility— including the DIP Roll-Up Loans and all fees payable in connection therewith—represents the best financing option available to address the Debtors' liquidity needs under these circumstances.  The DIP Roll-Up Loans are reasonable, appropriate, and reflective of the current market for debtor-in-possession financings under these circumstances.

57.     Finally, "roll-ups" and repayments of prepetition debt, such as the proposed DIP Roll-Up Loans in the DIP Orders have been approved in a variety of cases in this and other districts. *See, e.g., In re IEH Auto Parts Holding LLC*, No. 23-90054 (CML) (Bankr. S.D. Tex. Feb. 10, 2023) (authorizing refinancing of approximately $211.2 million of prepetition debt); *In re Monitronics Int'l, Inc.*, No. 23-90332 (CML) (Bankr. S.D. Tex. May 16, 2023) (authorizing refinancing of approximately $294 million of prepetition debt); *In re Venator Materials PLC*, No. 23-90301 (DRJ) (Bankr. S.D. Tex. May 16, 2023) (authorizing refinancing of approximately $190 million of prepetition debt); *In re Unit Corp.*, No. 20-32740 (DRJ) (Bankr. S.D. Tex. June 19, 2020) (authorizing refinancing of approximately $88 million of prepetition debt); *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 1, 2009) (authorizing approximately $6.5 billion in DIP financing that included repayment of approximately $3.25 billion in prepetition debt); *In re Mervyn's Holdings LLC*, No. 08-11586 (KG) (Bankr. D. Del. Aug. 26, 2008) (authorizing approximately $465 million in DIP financing that included repayment of $329.4 million in prepetition debt).

**E.     The Court Should Authorize the DIP Loan Parties to Use Cash Collateral.**

58.     The DIP Loan Parties should further be authorized to use Cash Collateral pursuant to section 363(c)(2) of the Bankruptcy Code, which provides, in relevant part, that a debtor:

> [M]ay not use, sell, or lease cash collateral . . . unless:
>
> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

59.     Section 363(e) of the Bankruptcy Code further provides that "on request of an entity that has an interest in property . . . to be used, sold, or leased by the trustee, the court . . . shall

prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest." 11 U.S.C. § 362(e).

60.    The requisite Prepetition Secured Lenders have consented to the DIP Loan Parties' use of Cash Collateral in exchange for the provision of adequate protection described above and provided for in the Interim Order.  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes adequate protection on a case-by-case basis.  *See Swedeland Dev. Grp.*, 16 F.3d at 564 ("[A] determination of whether there is adequate protection is made on a case by case basis.").

61.    As described herein and in the Flachs Declaration and the Omohundro Declaration, access to Cash Collateral on an interim basis is essential to the continued operation of the Debtors' business and orderly entry into the Chapter 11 Cases, and the adequate protection offered here in exchange for the use of Cash Collateral is customary and appropriate under the circumstances. Use of Cash Collateral is in the best interest of the Debtors' Estates and, accordingly, the Court should authorize the DIP Loan Parties to use Cash Collateral pursuant to section 363(c) of the Bankruptcy Code.

**F.    The Court Should Authorize the DIP Loan Parties to Pay the Fees Under the DIP Documents.**

62.    The DIP Lenders have committed substantial capital to ensure successful execution of the DIP Facility and these Chapter 11 Cases.  The DIP Loan Parties have further agreed to pay certain fees of the DIP Lenders in exchange for their agreement to provide the financing under the DIP Facility.  The terms of the financing, which includes the fees payable in connection therewith, is the only financing available to the Debtors under the circumstances of these cases.  The consideration being provided to the DIP Lenders in exchange for such commitment appropriately

compensates the DIP Lenders for their costs and commitment, was the subject of arm's-length negotiation between the DIP Loan Parties and the DIP Lenders, and is necessary to obtain the DIP Facility, which will enable the Debtors' continued operations for the benefit of all parties in interest and the Estates.  The DIP Loan Parties submit that under these circumstances, authorization to pay such fees is warranted.

**G.    The DIP Lenders Should Be Deemed Good Faith Lenders Under Section 364(e) of the Bankruptcy Code.**

63.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

64.    The terms of the DIP Documents are the result of good faith, arm's-length negotiation and the DIP Loan Parties' reasonable and informed determination that the DIP Lenders have offered the most favorable postpetition financing terms under the circumstances, which are the only available terms pursuant to which the Debtors could obtain necessary postpetition financing.  The terms of the DIP Documents are reasonable under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code and in accordance with the DIP Orders and the DIP Documents (including the Approved Budget).  Accordingly, the Court should find that the DIP Lenders are "good faith"

lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all the protections afforded by that section.

## H.   The Automatic Stay Should Be Modified on a Limited Basis.

65.   The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order including to (i) permit the DIP Loan Parties to grant the security interests, liens, and superpriority claims described herein and to perform such acts as may be required to assure the perfection and priority of such security interests and liens, and (ii) permit the DIP Secured Parties to exercise rights and remedies under certain circumstances.

66.   The proposed Interim Order provides that, upon the occurrence and during the continuance of an Event of Default under the DIP Credit Agreement or any of the DIP Documents; any other breach, default, or other violation by the DIP Loan Parties of the terms and provisions of the Interim Order (other than any payment default to which no grace period shall apply) which breach, default, or violation is not cured within three (3) Business Days of the DIP Loan Parties having notice of the occurrence thereof (and upon receipt of notice thereof, the DIP Loan Parties shall provide prompt written notice to the DIP Agent detailing such breach, default, or violation); or any other Termination Event (as defined herein) as specifically set out in the Interim Order (each, a "*Termination Event*"), the automatic stay shall terminate solely to the extent necessary for the DIP Agent (acting at the direction of the Required DIP Lenders) to exercise all rights and remedies in accordance with the Interim Order without requiring further order from the Court and without the need for filing any motion (except as expressly required by the Interim Order) for relief from the automatic stay or any other pleading, immediately upon the date of delivery of a written notice (with a copy filed with the Court) (a "*Default Notice*," and the date of delivery of such Default Notice,

the "***DIP Termination Date***") by the DIP Agent (acting at the direction of the Required DIP Lenders) to the Debtors, counsel to the Debtors, counsel to the Prepetition First Lien Secured Parties, counsel to the Creditors' Committee (if any), and the U.S. Trustee on the occurrence of a Termination Event (the "***Event of Default Occurrence***"). Notably, the Interim Order provides that the DIP Agent (acting at the direction of the Required DIP Lenders) must wait for a period of five (5) Business Days after the date a Default Notice is delivered before exercising remedies (the "***Remedies Notice Period***"). Upon an Event of Default Occurrence, the DIP Agent (acting at the direction of the Required DIP Lenders) may file a motion seeking an emergency hearing before the Court (a "***Stay Relief Hearing***") and, at such Stay Relief Hearing the DIP Agent (acting at the direction of the Required DIP Lenders) may seek Court approval to enforce any other right or remedy with respect to the DIP Collateral, the DIP Liens permitted under the DIP Documents, the Prepetition Collateral, or the Prepetition First Lien Liens under the Prepetition First Lien Loan Documents, and until such time as such motion has been adjudicated by the Court, the DIP Loan Parties may use Cash Collateral only in accordance with the DIP Documents to make payroll and fund critical expenses necessary to preserve the Prepetition Collateral.  Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements and, in the Debtor DIP Loan Parties' business judgment, are reasonable and fair under the circumstances of these Chapter 11 Cases and should be approved.  *See, e.g.*, *In re Cineworld Grp. Plc*, No. 22-90618 (MI) (Bankr. S.D. Tex. Sept. 9, 2022) (Docket No. 173) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Sheridan Holding Company II, LLC*, No. 19-35198 (MI) (Bankr. S.D. Tex. Oct. 21, 2019) (Docket No. 178) (same); *In re Vanguard Natural Resources, Inc.*, No. 19-31786 (DRJ) (Bankr. S.D. Tex. Apr. 3, 2019) (Docket No. 118) (same); *In re Southcross Holdings LP*, No. 16-20111 (MI) (Bankr. S.D. Tex. Apr. 11, 2016) (Docket No. 183) (same).

I.      **Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.**

67.      Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.  Section 363(c)(3) of the Bankruptcy Code authorizes the court to conduct a preliminary hearing and to authorize the use of cash collateral "if there is a reasonable likelihood that the [debtor] will prevail at the final hearing under [section 363(e) of the Bankruptcy Code]." 11 U.S.C. § 363(c)(3).  Furthermore, the Complex Case Procedures provide that "on motion by the debtors, a hearing will routinely be conducted as a first day hearing to consider either cash collateral and/or interim debtor-in-possession financing."  Complex Case Procedures, ¶ 23.

68.      The Debtors respectfully request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtor DIP Loan Parties, from entry of the Interim Order until the Final Hearing, to withdraw and borrow funds under the DIP Facility and use Cash Collateral.  The Debtors will suffer immediate and irreparable harm if the Interim Order approving the DIP Facility is not entered sooner than fourteen (14) days after service of the Motion, if the DIP Loan Parties are not permitted to access the New Money DIP Loans in the aggregate principal amount of  $23,000,000 during the Interim Period (as defined in the Interim Order), and if the DIP Roll-Up Loans are not approved upon entry of this Interim Order and deemed to have been advanced concurrent with the DIP Loan Parties' borrowing of the New Money DIP Loans on the Closing Date.  The Debtor DIP Loan Parties require access to the DIP Facility prior to the final hearing on the Motion and entry of the Final Order approving the DIP Facility in order to continue

operating, to pay their administrative expenses, and to implement the relief requested in the Debtors' other "first-day" motions.  This relief is necessary for the Debtors to preserve and maximize value and, therefore, to avoid immediate and irreparable harm and prejudice to the Debtors' Estates and all parties in interest.

## REQUEST FOR FINAL HEARING

69.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors respectfully request that the Court set a date for the Final Hearing that is as soon as practicable and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## REQUEST FOR IMMEDIATE RELIEF

70.     Bankruptcy Rule 6003 empowers a court to grant relief within the first twenty-one (21) days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." FED. R. BANKR. P. 6003. For the reasons discussed herein, in the First Day Declaration, the Flachs Declaration, and the Omohundro Declaration, authorizing the Debtor DIP Loan Parties to enter into the DIP Documents, obtain the DIP Loans, and grant the protections to the DIP Secured Parties and the Prepetition Secured Parties as set forth in the Interim Order, as well as granting the other relief requested herein, is critical to enabling the Debtors to effectively transition to operating as chapter 11 debtors and to preserve their business operations. Failure to receive such authorization and other relief during the first twenty-one (21) days of these Chapter 11 Cases would severely disrupt the Debtors' operations and significantly impact the Debtors' ability to reorganize swiftly and efficiently. As such, the relief requested is necessary in order for the Debtors to operate their businesses in the ordinary course and preserve the ongoing value of the Debtors' operations while maximizing the value of their Estates. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## WAIVER OF BANKRUPTCY RULES 6004(a) AND 6004(h)

71.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## RESERVATION OF RIGHTS

72.     Nothing contained in this Motion shall constitute, nor is it intended to constitute, (a) an implication or admission as to the validity, priority, enforceability, or perfection of any claim, lien, security interest in, or other encumbrance against the Debtors and the property of their Estates, (b) an impairment or waiver of the Debtors' or any other party in interest's rights to contest or dispute any such claim or lien, (c) a promise or requirement to pay any prepetition claim, (d) an implication or admission that any particular claim is of a type specified or defined in this Motion or any proposed order, (e) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable law, (f) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code, or (g) a concession by the Debtors that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this Motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection or seek avoidance of all such liens.

## NOTICE

73.     Notice of this Motion has been provided by delivery to:  (a) the Office of the United States Trustee for the Southern District of Texas; (b) the holders of the thirty (30) largest unsecured claims against the Debtors (on a consolidated basis); (c) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002; (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) all other applicable

government agencies to the extent required by the Bankruptcy Rules or the Local Rules; (g) the First Lien Lender Group; (h) counsel to the First Lien Lender Group; (h) counsel to the DIP Lenders; (i) the DIP Lenders; (j) each of the Prepetition Secured Parties, and counsel thereto; (k) the agent under the DIP Facility, and counsel thereto; and (l) financial institutions where the Debtors hold bank accounts.  In light of the nature of the relief requested in this Motion, the Debtors submit that no further notice is necessary.

## <u>NO PRIOR REQUEST</u>

74.     No prior motion for the relief requested herein has been made to this Court or any other court.

## **PRAYER**

The Debtors respectfully request that the Court enter the Interim Order, substantially in the form attached hereto as **Exhibit A**, and subsequently the Final Order, and grant them such other and further relief to which the Debtors may be justly entitled.

Dated: December 4, 2023
Houston, Texas

/s/ Paul E. Heath
**VINSON & ELKINS LLP**
Paul E. Heath (TX 09355050)
Matthew D. Struble (TX 24102544)
Trevor G. Spears (TX 24106681)
845 Texas Avenue, Suite 4700
Houston, TX 77002
Tel: 713.758.2222
Fax: 713.758.2346
Email: pheath@velaw.com
            mstruble@velaw.com
            tspears@velaw.com

-and-

David S. Meyer (*pro hac vice* pending)
Jessica C. Peet (*pro hac vice* pending)
Steven Zundell (*pro hac vice* pending)
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel:  212.237.0000
Fax:  212.237.0100
Email: dmeyer@velaw.com
            jpeet@velaw.com
            szundell@velaw.com

***Proposed Co-Counsel to the Debtors and Debtors in Possession***

**WACHTELL, LIPTON, ROSEN & KATZ**
Joshua A. Feltman (*pro hac vice* pending)
Benjamin S. Arfa (*pro hac vice* pending)
Michael A. Chaia (*pro hac vice* pending)
Katherine Mateo (*pro hac vice* pending)
51 West 52nd Street
New York, NY 10019
Tel: 212.403.1000
Fax: 212.403.2000
Email: JAFeltman@wlrk.com
            BSArfa@wlrk.com
            KMateo@wlrk.com

***Proposed Co-Counsel to the Debtors and Debtors in Possession***

## CERTIFICATE OF ACCURACY

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made in accordance with Bankruptcy Local Rule 9013-1(i).

*/s/ Trevor G. Spears*
One of Counsel


## CERTIFICATE OF SERVICE

I certify that on December 4, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Struble*
One of Counsel

# **EXHIBIT A**

## **Proposed Interim Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| STRATEGIC MATERIALS, INC., *et al.*,[1] | ) | Case No. 23-90907 (CML) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | **Re: Docket No. [•]** |
| | ) | |

## INTERIM ORDER
## (I) AUTHORIZING THE DEBTORS
## TO (A) OBTAIN POSTPETITION FINANCING
## AND (B) USE CASH COLLATERAL, (II) GRANTING
## LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE
## EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION TO
## PREPETITION SECURED PARTIES, (IV) MODIFYING THE AUTOMATIC STAY,
## (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

Upon the motion (the "***Motion***"),[2] of Strategic Materials, Inc. and its affiliated

debtors in the above-captioned chapter 11 cases (collectively, the "***Chapter 11 Cases***"), as debtors

and debtors in possession (collectively, the "***Debtors***") seeking entry of an interim order (this

"***Interim Order***") and a final order (the "***Final Order***," together with this Interim Order, the "***DIP***

***Orders***") pursuant to sections 105, 361, 362, 363, 364(c), 364(d), 364(e), 503, 507, and 552(b) of

title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***"), Rules 2002,

4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy***

---

[1]     The Debtors in these chapter 11 cases and the last four digits of their respective federal tax identification numbers are:  Strategic Materials, Inc. (7116); SMI Group Ultimate Holdings, Inc. (5043); SMI Topco Holdings, Inc. (6850); SMI Group Holdings, LLC (9607); SMI Group Acquisitions, Inc. (9072); Strategic Materials Holding Corp. (4439); American Specialty Glass, Inc. (0993); Container Recycling Alliance, LLC (7719); SMI Reflective Recycling NE HoldCo, LLC (3065); SMI Reflective Recycling HoldCo, LLC (3541); SMI Reflective Industries HoldCo, LLC (3374); SMI Equipment, Inc. (2735); SMI Nutmeg HoldCo, LLC (4526); SMI BevCon HoldCo, LLC (6158); Ripple Glass, LLC (1936); and NexCycle, Inc. (9109).  The location of the Debtors' U.S. corporate headquarters and the Debtors' service address is:  17220 Katy Freeway, Ste. 150, Houston, TX 77094.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion, the DIP Credit Agreement, or the Plan, as applicable.

*Rules*"), Rules 2002-1, 4001-1(b), 4002-1, and 9013-1 of the Local Rules of the United States

Bankruptcy Court for the Southern District of Texas (the "*Local Rules*"), and the Procedures for

Complex Chapter 11 Bankruptcy Cases in the Southern District of Texas (the "*Complex Case*

*Procedures*"), seeking, among other things, entry of an order:

(i)     authorizing the Debtor DIP Loan Parties (as defined below) to incur senior secured
postpetition obligations on a superpriority basis in respect of a superpriority senior
secured priming debtor-in-possession term loan facility (the "*DIP Facility*")
consisting of (i) new money term loans in an aggregate principal amount of
$23,000,000 to be made in a single borrowing on the Closing Date (the
commitments to provide such new money term loans under the DIP Facility, the
"*New Money DIP Commitments*," and such new money term loans under the DIP
Facility, the "*New Money DIP Loans*") which shall be provided by the Prepetition
First Lien Lenders (as defined below) and Prepetition Superpriority Lenders (as
defined below) in the ad hoc group of Prepetition First Lien Lenders and Prepetition
Superpriority Lenders represented by Arnold & Porter Kaye Scholer LLP (the
"*First Lien Lender Group*"); and (ii) loans representing a "roll up" of the
Prepetition Superpriority Loans (as defined below) (and accrued and unpaid interest
thereon) (such loans, the "*DIP Roll-Up Loans*" and, together with the New Money
DIP Loans, the "*DIP Loans*") on the terms and conditions substantially in the form
annexed to the Motion as **Exhibit B** (as the same may be amended, restated,
amended and restated, supplemented, waived, extended or otherwise modified from
time to time, the "*DIP Credit Agreement*"), by and among (w) Strategic Materials
Holding Corp., a Delaware corporation, as borrower (the "*Borrower*"); (x) SMI
Group Acquisitions, Inc., a Delaware corporation ("*Holdings*"); (y) Acquiom
Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents
and collateral agent (collectively,  the "*DIP Agent*"); and (z) each member of the
First Lien Lender Group (or affiliated designee thereof) that provides a portion of
the New Money DIP Commitments (and/or holds DIP Roll-Up Loans), in its
capacity as a lender under the DIP Facility, together with its successors and
permitted assigns in such capacity (a "*DIP Lender*," and collectively, the "*DIP
Lenders*" and, together with the DIP Agent, the "*DIP Secured Parties*"), and such
DIP Facility shall be fully and unconditionally guaranteed by (i) Holdings, (ii) each
of the Borrower's domestic subsidiaries, including its subsidiaries that are Debtors,
each as a debtor and debtor-in-possession (collectively with Holdings and the
Borrower, the "*Debtor DIP Loan Parties*"), and (iii) the Borrower's subsidiary
organized under the laws of Mexico (the "*Foreign Subsidiary Guarantor*," and
collectively with Holdings and the subsidiaries of the Borrower referred to in clause
(ii), the "*Guarantors*," and together with the Borrower, the "*DIP Loan Parties*")[3];

---

[3]     For the avoidance of doubt and notwithstanding any provision to the contrary herein or in any DIP Document or
any definitive document related to the Exit Term Loan Facilities (as defined in the RSA), in no event shall
NexCycle Canada, Ltd., an Ontario corporation, or any of its subsidiaries be required to become a DIP Loan

(ii)    authorizing the Debtor DIP Loan Parties to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, intercreditor agreements, guarantees, fee letters, control agreements, and other ancillary documents related thereto (including any security agreements, intellectual property security agreements, or notes) (as amended, restated, supplemented, waived, and/or modified from time to time, collectively with the DIP Credit Agreement, the "***DIP Documents***") and to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    authorizing the Debtor DIP Loan Parties to borrow the New Money DIP Loans under the New Money DIP Commitments in a single borrowing on the Closing Date and to use such proceeds as expressly provided in the DIP Documents and solely in accordance with this Interim Order and the applicable Approved Budget (as defined in the DIP Credit Agreement) (subject to permitted variances and other exclusions set forth in the DIP Documents and this Interim Order) which New Money DIP Loans shall be funded into and credited to the Funding Account (as defined below) to finance: (a)  interest, fees, and expenses owed to the DIP Lenders and the DIP Agent; (b) working capital of the Debtors during the Chapter 11 Cases; (c) administrative costs of the Chapter 11 Cases; and (d) payment of certain adequate protection amounts to the Prepetition Secured Parties, and for the avoidance of doubt, the New Money DIP Loans may be withdrawn from the Funding Account in accordance with the terms set forth in the DIP Credit Agreement; *provided*, that, notwithstanding the foregoing, a portion of the New Money DIP Loans may be disbursed to account(s) other than the Funding Account directly to one or more payees in the manner to be agreed in the DIP Documents and as between the Debtor DIP Loan Parties and the DIP Secured Parties;

(iv)    authorizing the Debtor DIP Loan Parties to make (a) payment of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after the Petition Date) the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses, and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to be due, now existing or hereafter arising, fixed or otherwise, of the DIP Loan Parties to the DIP Agent and the DIP Lenders under the DIP Documents and the DIP Orders (including the costs and expenses of the advisors to the DIP Agent and the DIP Lenders payable pursuant to the terms of the DIP Documents), as and when due, and (b) payment and performance of all covenants, duties, agreements, obligations, and liabilities of the Debtor DIP Loan Parties to the DIP Agent and the DIP Lenders under or pursuant to the DIP Documents and the DIP Orders (collectively, the "***DIP Obligations***");

---

Party or a guarantor or to grant a security interest over any of their respective assets in connection with the DIP Facility or under any DIP Document or the Exit Term Loan Facilities, in each case until all Obligations (as defined under the Canadian Credit Facility) have been paid in full (other than contingent reimbursement or indemnification obligations for which no claim has been made in writing).

(v)     subject to the Carve-Out (as defined below), granting, to the DIP Agent, for the benefit of the DIP Secured Parties, allowed superpriority administrative expense claim status in each of the Debtor DIP Loan Parties' Chapter 11 Cases and any of their Successor Cases (as defined below) pursuant to section 364(c)(1) of the Bankruptcy Code, having priority over all administrative expenses, including those of the kind specified in, or ordered pursuant to, sections 105, 326, 327, 328, 330, 331, 361, 362, 363, 364, 503(a), 503(b), 506(c) (subject to the terms of this Interim Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114 or any other provisions of the Bankruptcy Code, and having full recourse against all assets of the DIP Loan Parties in accordance with the terms of this Interim DIP Order;

(vi)     subject to the Carve-Out, granting to the DIP Agent, for the benefit of the DIP Secured Parties, valid, enforceable, nonavoidable, automatically, and fully perfected security interests in and liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, including all property constituting Cash Collateral (as defined below);

(vii)     authorizing the Debtor DIP Loan Parties to use the Prepetition Collateral (as defined below), including the Cash Collateral under the Prepetition Loan Documents (as defined below), and providing adequate protection to certain of the Prepetition Secured Parties (as defined below) for any diminution in value of their interests in the applicable Prepetition Collateral (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law ("***Diminution in Value***") to the extent such Diminution in Value occurs on account of the Debtors' sale, lease, or use of the Prepetition Collateral (including Cash Collateral), the imposition and enforcement of the automatic stay pursuant to section 362 of the Bankruptcy Code, and the priming of the Prepetition Secured Parties' respective interests in the Prepetition Collateral;

(viii)     subject to and effective upon entry of the Final Order with respect to the Prepetition Collateral and the DIP Collateral, in each case except to the extent of the Carve-Out, determining that the Debtors have waived any right to surcharge any collateral pursuant to sections 105(a) and 506(c) of the Bankruptcy Code or otherwise, and determining that (a) the equitable doctrine of marshaling and other similar doctrines, and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply;

(ix)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(x)     scheduling a final hearing (the "***Final Hearing***") to consider the relief requested in the Motion.

     The Bankruptcy Court for the Southern District of Texas (the "***Court***") having considered the Motion, the exhibits attached thereto, the *Declaration of Robert Flachs, Managing*

4

*Director of Moelis & Company LLC in Support of the Debtors' Motion to Obtain Postpetition Debtor-in-Possession Financing* (the "**Flachs Declaration**"), the *Declaration of Ryan Omohundro, Managing Director of Alvarez and Marsal North America, LLC in Support of the Debtors' Motion to Obtain Postpetition Debtor-in-Possession Financing* (the "**Omohundro Declaration**"), the *Declaration of Paul Garris in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**") and the evidence submitted and arguments made at the interim hearing held on December 5, 2023 (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates (as defined under section 541 of the Bankruptcy Code, the "**Estates**") pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors and their Estates and is essential for the continued operation of the Debtors' businesses and the preservation of the value of the Debtors' assets; and it appearing that the Debtor DIP Loan Parties' entry into the DIP Credit Agreement and the other DIP Documents is a sound and prudent exercise of the Debtor DIP Loan Parties' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[4]**

---

[4]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To

A.    **Petition Date**.  On December 4, 2023 (the "***Petition Date***"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.

B.    **Debtors in Possession**.  The Debtors have continued in the management and operation of their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

C.    **Jurisdiction and Venue**.  This Court has subject matter jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334.  Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue for the Chapter 11 Cases and proceedings with respect to the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    **Committee Formation**.  As of the date hereof, the United States Trustee for the Southern District of Texas (the "***U.S. Trustee***") has not appointed an official committee of unsecured creditors in the Chapter 11 Cases (a "***Creditors' Committee***") pursuant to section 1102 of the Bankruptcy Code.

E.    **Notice**.  Notice of the Motion and the Interim Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Complex Case Procedures, and no other or further notice of the Motion with respect to the relief requested at the Interim Hearing or the entry of this Interim Order shall be required.

F.    **Debtors' Stipulations**.  After consultation with their attorneys and financial advisors, and without prejudice to the rights of other parties in interest (other than the Debtors), including the Creditors' Committee (if any), set forth in paragraph 32 herein, the Debtors admit,

---

the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

stipulate, acknowledge, and agree (paragraphs F, G, and H shall be referred to herein collectively as the "***Debtors' Stipulations and Releases***") as follows:

        (i)        ***Prepetition Superpriority Facility***

        (a)        Pursuant to that certain Superpriority Secured Credit Agreement, dated as of September 15, 2023 (as amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition Superpriority Credit Agreement***," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition Superpriority Loan Documents***"), providing a term loan facility (the "***Prepetition Superpriority Facility***") in the aggregate principal amount of $27,500,000 in U.S. dollar-denominated term loans (the "***Prepetition Superpriority Loans***"), entered into by and among (a) Holdings, (b) the Borrower, (c) the lenders from time to time party thereto (the "***Prepetition Superpriority Lenders***"), and (d) Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (in such capacities, collectively, the "***Prepetition Superpriority Agent***" and, together with the Prepetition Superpriority Lenders, the "***Prepetition Superpriority Secured Parties***"), the Prepetition Superpriority Lenders agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition Superpriority Loan Documents.  All obligations of the applicable DIP Loan Parties arising under the Prepetition Superpriority Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition Superpriority Loan Documents) or the other

Prepetition Superpriority Loan Documents shall collectively be referred to herein as the "***Prepetition Superpriority Obligations***."

        (b)    **Prepetition Superpriority Collateral**.  Pursuant to the Collateral Documents (as defined in the Prepetition Superpriority Credit Agreement, and as such documents are amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition Superpriority Collateral Documents***"), by and among the Grantors (as defined in the applicable Prepetition Superpriority Collateral Documents) (collectively, the "***Prepetition Superpriority Grantors***," and each, a "***Prepetition Superpriority Grantor***") and the Prepetition Superpriority Agent, each Prepetition Superpriority Grantor granted to the Prepetition Superpriority Agent, for the benefit of the Prepetition Superpriority Secured Parties, to secure the Prepetition Superpriority Obligations, security interests in and continuing Liens (the "***Prepetition Superpriority Liens***") on "Collateral" as such term is defined in the Prepetition Superpriority Loan Documents.

        (c)    **Validity, Perfection, and Priority of Prepetition Superpriority Liens and Prepetition Superpriority Obligations**. As of the Petition Date, (a) the Prepetition Superpriority Liens (I) are legal, valid, binding, enforceable, unavoidable, and perfected superpriority Liens, (II) were granted to the Prepetition Superpriority Agent for the benefit of the Prepetition Superpriority Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens (as defined below) (after giving effect to this Interim Order), (B) the Carve-Out (after giving effect to this Interim Order), and (C) valid, perfected, and unavoidable liens permitted under the Prepetition Superpriority Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the Prepetition Superpriority

Liens; and (b)(I) the Prepetition Superpriority Obligations constitute legal, valid, and binding obligations of the applicable DIP Loan Parties, enforceable in accordance with the terms of the applicable Prepetition Superpriority Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Superpriority Obligations exist, (III) no portion of the Prepetition Superpriority Obligations or any payments made to any or all of the Prepetition Superpriority Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of the Guarantors (as defined in the Prepetition Superpriority Credit Agreement)  under the Prepetition Superpriority Collateral Documents and the other Prepetition Superpriority Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition Superpriority Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the DIP Loan Parties pursuant to the terms of this Interim Order or the DIP Documents.

(d)      **Amounts Owed under Prepetition Superpriority Loan Documents**.  As of the Petition Date, the applicable DIP Loan Parties owed the Prepetition Superpriority Secured Parties, pursuant to the Prepetition Superpriority Loan Documents, without defense, counterclaim, reduction, or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Superpriority Secured Parties, an aggregate principal amount of approximately $27,500,000, plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants',

appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Superpriority Loan Documents), and other amounts now or hereafter due under the Prepetition Superpriority Loan Documents.

(ii)     ***Prepetition First Lien Facility.***

(a)     Pursuant to that certain First Lien Credit Agreement, dated as of November 1, 2017 (as amended by the First Amendment to First Lien Credit Agreement, dated as of June 1, 2020, the Second Amendment to First Lien Credit Agreement, dated as of June 19, 2020, the Third Amendment to First Lien Credit Agreement, dated as of September 22, 2021, the Fourth Amendment to First Lien Credit Agreement, dated as of September 22, 2022, the Fifth Amendment to First Lien Credit Agreement, dated as of February 1, 2023, and as may be further amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition First Lien Credit Agreement***," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition First Lien Loan Documents***"), providing for (A) term loans in the initial aggregate principal amount of $256,100,000 and (B) revolving credit commitments in the amount of $40,000,000, entered into by and among (a) Holdings, (b) the Borrower, (c) the lenders from time to time party thereto (the "***Prepetition First Lien Lenders***"), and (d) Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (collectively, in such capacities, the "***Prepetition First Lien Agent***" and, together with the Prepetition First Lien Lenders, the "***Prepetition First Lien Secured Parties***") (as successors to Goldman Sachs Bank USA, as administrative agent and collateral agent in accordance with that certain Successor First Lien Agent Agreement, dated as of September 15, 2023), the Prepetition First Lien Lenders agreed to extend loans and other financial

accommodations to the Borrower pursuant to the Prepetition First Lien Loan Documents.  All obligations of the applicable DIP Loan Parties arising under the Prepetition First Lien Credit Agreement (including the "Obligations" as defined therein, whether or not arising under the Prepetition First Lien Loan Documents) or the other Prepetition First Lien Loan Documents shall collectively be referred to herein as the "***Prepetition First Lien Obligations***."

(b)      **Prepetition First Lien Collateral**.  Pursuant to the Collateral Documents (as defined in the Prepetition First Lien Credit Agreement, and as such documents are amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition First Lien Collateral Documents***"), by and among the Grantors (as defined in the applicable Prepetition First Lien Collateral Document) (collectively, the "***Prepetition First Lien Grantors***" and each, a "***Prepetition First Lien Grantor***") and the Prepetition First Lien Agent, each Prepetition First Lien Grantor granted to the Prepetition First Lien Agent, for the benefit of the Prepetition First Lien Secured Parties, to secure the Prepetition First Lien Obligations, security interests in and continuing Liens (the "***Prepetition First Lien Liens***") on "Collateral" as such term is defined in the Prepetition First Lien Loan Documents.

(c)      **Validity, Perfection, and Priority of Prepetition First Lien Liens and Prepetition First Lien Obligations**. As of the Petition Date, (a) the Prepetition First Lien Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to the Prepetition First Lien Agent for the benefit of the Prepetition First Lien Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens (after giving effect to this Interim Order), (B) the Carve-Out (after giving

11

effect to this Interim Order), (C) the Prepetition Superpriority Liens on the Prepetition Collateral, and (D) valid, perfected, and unavoidable liens permitted under the Prepetition First Lien Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the Prepetition First Lien Liens; and (b)(I) the Prepetition First Lien Obligations constitute legal, valid, and binding obligations of the applicable DIP Loan Parties, enforceable in accordance with the terms of the applicable Prepetition First Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition First Lien Obligations exist, (III) no portion of the Prepetition First Lien Obligations or any payments made to any or all of the Prepetition First Lien Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of the Guarantors (as defined in the Prepetition First Lien Credit Agreement) under the Prepetition First Lien Collateral Documents and the other Prepetition First Lien Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition First Lien Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the DIP Loan Parties pursuant to the terms of this Interim Order or the DIP Documents.

(d)      **Amounts Owed under Prepetition First Lien Loan Documents**. As of the Petition Date, the applicable  DIP Loan Parties owed the Prepetition First Lien Secured Parties, pursuant to the Prepetition First Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made

by the Prepetition First Lien Secured Parties, an aggregate principal amount of approximately $285,000,000, plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition First Lien Loan Documents), and other amounts now or hereafter due under the Prepetition First Lien Loan Documents.

   (iii)  ***Prepetition 1.5 Lien Facility***

    (a)  Pursuant to that certain 1.5 Lien Credit Agreement, dated as of September 22, 2022 (as amended by that First Amendment to 1.5 Lien Credit Agreement, dated as of February 1, 2023, and as may be further amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition 1.5 Lien Credit Agreement***," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition 1.5 Lien Loan Documents***"), providing a term loan facility in the initial aggregate principal amount of $10,000,000, entered into by and among (a) Holdings, (b) the Borrower, (c) the lenders from time to time party thereto (the "***Prepetition 1.5 Lien Lenders***"), and (d) Alter Domus (US) LLC, as administrative agent (in such capacity, the "***Prepetition 1.5 Lien Agent***" and the Prepetition 1.5 Lien Agent together with the Prepetition 1.5 Lien Lenders, the "***Prepetition 1.5 Lien Secured Parties***"), the Prepetition 1.5 Lien Lenders agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition 1.5 Lien Loan Documents.  All obligations of the applicable DIP Loan Parties arising under the Prepetition 1.5 Lien Credit Agreement (including the "Obligations" as defined therein, whether or

not arising under the Prepetition 1.5 Lien Loan Documents) or the other Prepetition 1.5 Lien Loan Documents shall collectively be referred to herein as the "***Prepetition 1.5 Lien Obligations***."

(b)      **Prepetition 1.5 Lien Collateral**.    Pursuant to the Collateral Documents (as defined in the Prepetition 1.5 Lien Credit Agreement, and as such documents are amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition 1.5 Lien Collateral Documents***"), by and among the Grantors (as defined in the Prepetition 1.5 Lien Loan Documents) (collectively, the "***Prepetition 1.5 Lien Grantors***" and each, a "***Prepetition 1.5 Lien Grantor***") and the Prepetition 1.5 Lien Agent, each Prepetition 1.5 Lien Grantor granted to the Prepetition 1.5 Lien Agent, for the benefit of the Prepetition 1.5 Lien Secured Parties, to secure the Prepetition 1.5 Lien Obligations, security interests in and continuing Liens (the "***Prepetition 1.5 Lien Liens***") on "Collateral" as such term is defined in the Prepetition 1.5 Lien Loan Documents.

(c)      **Validity, Perfection, and Priority of Prepetition 1.5 Lien Liens and Prepetition 1.5 Lien Obligations**. As of the Petition Date, (a) the Prepetition 1.5 Lien Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to the Prepetition 1.5 Lien Agent for the benefit of the Prepetition 1.5 Lien Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens (after giving effect to this Interim Order), (B) the Carve-Out (after giving effect to this Interim Order), (C) the Prepetition Superpriority Liens, (D) the Prepetition First Lien Liens on the Prepetition Collateral, and (E) valid, perfected, and unavoidable liens permitted under the Prepetition 1.5 Lien Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the Prepetition

1.5 Lien Liens; and (b)(I) the Prepetition 1.5 Lien Obligations constitute legal, valid, and binding obligations of the applicable DIP Loan Parties, enforceable in accordance with the terms of the applicable Prepetition 1.5 Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition 1.5 Lien Obligations exist, (III) no portion of the Prepetition 1.5 Lien Obligations or any payments made to any or all of the Prepetition 1.5 Secured Parties are subject to avoidance, disallowance, disgorgement, recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of the Guarantors (as defined in the Prepetition 1.5 Lien Credit Agreement) under the Prepetition 1.5 Lien Collateral Documents and the other Prepetition 1.5 Lien Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition 1.5 Lien Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the DIP Loan Parties pursuant to the terms of this Interim Order or the DIP Documents.

(d)      **Amounts Owed under Prepetition 1.5 Lien Loan Documents**.  As of the Petition Date, the applicable DIP Loan Parties owed the Prepetition 1.5 Lien Secured Parties, pursuant to the Prepetition 1.5 Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition 1.5 Lien Secured Parties, an aggregate principal amount of approximately $11,000,000, plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and

expenses that are chargeable or reimbursable under the Prepetition 1.5 Lien Loan Documents), and other amounts now or hereafter due under the Prepetition 1.5 Lien Loan Documents.

(iv) ***Prepetition Second Lien Facility***

(a) Pursuant to that certain Second Lien Credit Agreement, dated as of November 1, 2017 (as amended by that certain First Amendment to Second Lien Credit Agreement, dated as of September 22, 2022, that certain Second Amendment to Second Lien Credit Agreement, dated as of February 1, 2023, and as may be further amended, supplemented or otherwise modified prior to the date hereof, the "***Prepetition Second Lien Credit Agreement***," and collectively with any other agreements and documents executed or delivered in connection therewith, including the "Loan Documents" as defined therein, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition Second Lien Loan Documents***," and, together with the Prepetition Superpriority Loan Documents, the Prepetition First Lien Loan Documents, and the Prepetition 1.5 Lien Loan Documents, the "***Prepetition Loan Documents***"), providing for a term loan facility in the aggregate principal amount of $80,000,000.00, entered into by and among (a) Holdings, (b) the Borrower, (c) the lenders from time to time party thereto (the "***Prepetition Second Lien Lenders***" and, together with the Prepetition Superpriority Lenders, the Prepetition First Lien Lenders, and the Prepetition 1.5 Lien Lenders, are referred to collectively herein as the "***Prepetition Secured Lenders***"), and (d) Acquiom Agency Services LLC and Seaport Loan Products LLC, as co-administrative agents (collectively, in such capacities, the "***Prepetition Second Lien Agent***" (as successors to Goldman Sachs Bank USA, as administrative agent and collateral agent in accordance with that certain Successor Second Lien Agent Agreement, dated as of September 15, 2023) and, together with the Prepetition Superpriority Agent, the Prepetition First Lien Agent and the Prepetition 1.5 Lien

16

Case 23-90907   Document 20   Filed in TXSB on 12/04/23   Page 81 of 305


Agent, are referred to collectively herein as the "***Prepetition Agents***;" the Prepetition Second Lien Agent together with the Prepetition Second Lien Lenders are referred to collectively herein as, the "***Prepetition Second Lien Secured Parties***," and the Prepetition Second Lien Secured Parties together with the Prepetition Superpriority Secured Parties, the Prepetition First Lien Secured Parties, and the Prepetition 1.5 Lien Secured Parties, are referred to collectively herein as the "***Prepetition Secured Parties***") the Prepetition Second Lien Lenders agreed to extend loans and other financial accommodations to the Borrower pursuant to the Prepetition Second Lien Loan Documents. All obligations of the applicable DIP Loan Parties arising under the Prepetition Second Lien Credit Agreement (including the "Obligations" as defined therein whether or not arising under the Prepetition Second Lien Loan Documents) or the other Prepetition Second Lien Loan Documents shall collectively be referred to herein as the "***Prepetition Second Lien Obligations***," and, together with the Prepetition Superpriority Obligations, the Prepetition First Lien Obligations, and the Prepetition 1.5 Lien Obligations, the "***Prepetition Obligations***."

(b)      **Prepetition Second Lien Collateral**. Pursuant to the Collateral Documents (as defined in the Prepetition Second Lien Credit Agreement, and as such documents were amended, restated, supplemented, or otherwise modified from time to time, the "***Prepetition Second Lien Collateral Documents***"), by and among the Grantors (as defined in the Prepetition Second Lien Credit Agreement) (collectively, the "***Prepetition Second Lien Grantors***" and each, a "***Prepetition Second Lien Grantor***") and the Prepetition Second Lien Agent, each Prepetition Second Lien Grantor granted to the Prepetition Second Lien Agent, for the benefit of the Prepetition Second Lien Secured Parties, to secure the Prepetition Second Lien Obligations, security interests in and continuing Liens (the "***Prepetition Second Lien Liens***," and, together with the Prepetition Superpriority Liens, the Prepetition First Lien Liens, and the Prepetition 1.5 Lien

17

Liens, the "***Prepetition Liens***") on "Collateral" as such term is defined in the Prepetition Second Lien Loan Documents, and together with all "Collateral" as such term is defined in the Prepetition Superpriority Loan Documents, the Prepetition First Lien Loan Documents, and the Prepetition 1.5 Lien Loan Documents, collectively, the "***Prepetition Collateral***."

(c) **Validity, Perfection, and Priority of Prepetition Second Lien Liens and Prepetition Second Lien Obligations**. As of the Petition Date, (a) the Prepetition Second Lien Liens (I) are legal, valid, binding, enforceable, and perfected Liens, (II) were granted to the Prepetition Second Lien Agent for the benefit of, the Prepetition Second Lien Secured Parties for fair consideration and reasonably equivalent value, (III) are not subject to avoidance, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law (except for the priming contemplated herein), and (IV) are subject and subordinate only to (A) the DIP Liens (after giving effect to this Interim Order), (B) the Carve-Out (after giving effect to this Interim Order), (C) the Prepetition Superpriority Liens, (D) the Prepetition First Lien Liens on the Prepetition Collateral, (E) the Prepetition 1.5 Lien Liens on the Prepetition Collateral, and (F) valid, perfected, and unavoidable liens permitted under the Prepetition Second Lien Credit Agreement to the extent that such permitted liens are senior to or *pari passu* with the Prepetition Second Lien Liens; and (b)(I) the Prepetition Second Lien Obligations constitute legal, valid, and binding obligations of the applicable DIP Loan Parties, enforceable in accordance with the terms of the applicable Prepetition Second Lien Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), (II) no setoffs, recoupments, offsets, defenses, or counterclaims to any of the Prepetition Second Lien Obligations exist, (III) no portion of the Prepetition Second Lien Obligations or any payments made to any or all of the Prepetition Second Lien Secured Parties are subject to avoidance, disallowance, disgorgement,

recharacterization, recovery, subordination, attack, offset, counterclaim, defense, or "claim" (as defined in section 101(5) of the Bankruptcy Code) of any kind pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (IV) the obligations of the Guarantors (as defined in the Prepetition Second Lien Credit Agreement) under the Prepetition Second Lien Collateral Documents and the other Prepetition Second Lien Loan Documents shall continue in full force and effect to unconditionally guaranty the Prepetition Second Lien Obligations notwithstanding any use of Cash Collateral permitted hereunder or any financing and financial accommodations extended by the DIP Secured Parties to the DIP Loan Parties pursuant to the terms of this Interim Order or the DIP Documents.

(d) **Amounts Owed under Prepetition Second Lien Loan Documents**. As of the Petition Date, the applicable DIP Loan Parties owed the Prepetition Second Lien Secured Parties, pursuant to the Prepetition Second Lien Loan Documents, without defense, counterclaim, reduction or offset of any kind, in respect of loans made and other financial accommodations made by the Prepetition Second Lien Secured Parties, an aggregate principal amount of approximately $80,000,000, plus all accrued and unpaid interest thereon and any additional fees, expenses (including any reasonable and documented attorneys', accountants', appraisers', and financial advisors' fees and expenses that are chargeable or reimbursable under the Prepetition Second Lien Loan Documents), and other amounts now or hereafter due under the Prepetition Second Lien Loan Documents.

G. **Release**. Subject to paragraph 32 hereof, and in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Debtor shall be deemed to have forever waived, discharged, and released each of the Prepetition Secured Parties and their respective affiliates, assigns, or successors and the respective members, managers, equity holders,

19

affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives (all of the foregoing, collectively, the "***Prepetition Secured Party Releasees***") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the Prepetition Secured Party Releasees, whether arising at law or in equity, but solely to the extent relating to and/or otherwise in connection with the Prepetition Loan Documents, the Prepetition Obligations, or the Prepetition Liens or the debtor-creditor relationship between any of the Prepetition Secured Parties, on the one hand, and any of the Debtors, on the other hand, arising prior to the date of entry of this Interim Order, including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the Prepetition Obligations or any payments or other transfers made on account of the Prepetition Obligations, or the validity, enforceability, priority, or non-avoidability of the Prepetition Liens securing the applicable Prepetition Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the Prepetition Secured Party Releasees.

H.     **Cash Collateral**.  All of the DIP Loan Parties' cash, including cash and other amounts in deposit accounts, whether as original collateral or proceeds of the Prepetition Collateral, whether existing on the Petition Date or thereafter, constitutes the cash collateral

(within the meaning of section 363(a) of the Bankruptcy Code) of the DIP Secured Parties (after giving effect to this Interim Order) or the Prepetition Secured Parties (the "***Cash Collateral***").

I.      <u>**Findings Regarding Postpetition Financing and Use of Cash Collateral**</u>.

(i)      **Request for Postpetition Financing**.  The DIP Loan Parties have requested from each of the DIP Lenders, and the DIP Lenders are willing, subject to the terms of this Interim Order, the other DIP Documents, and satisfaction of the conditions set forth in the DIP Credit Agreement, to extend the DIP Loans on the terms and conditions set forth in this Interim Order and the other DIP Documents.

(ii)      **Need for Postpetition Financing and Use of Cash Collateral**.  The DIP Loan Parties have a need to use Cash Collateral on an interim basis and obtain credit in an amount equal to the New Money DIP Loans pursuant to the DIP Facility in order to, among other things, enable the orderly continuation of their operations and to administer and avoid immediate and irreparable harm to the value of their Estates, as applicable.  The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers, to pay their employees, and otherwise finance their operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which, on an interim basis as contemplated hereunder, would immediately and irreparably harm the Debtors and their Estates.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses, maintain their properties in the ordinary course of business, and fund the Chapter 11 Cases without the authorization for the Debtor DIP Loan Parties to use Cash Collateral and to borrow the New Money DIP Loans.  Accordingly, the DIP Loan Parties have an immediate need to obtain the postpetition financing and to use Cash Collateral as set forth in this Interim Order to, among other things, permit the orderly continuation of the operation and maintenance of their

businesses, roll-up the Prepetition Superpriority Loans (and all accrued and unpaid interest thereon) pursuant to the DIP Roll-Up Loans, minimize the disruption of their business operations and other efforts and activities, and preserve and maximize the value of the assets of the Debtors' Estates.

         (iii)    **No Credit Available on More Favorable Terms**.  The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Documents and this Interim Order.  The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or secured credit allowable only under sections 364(c)(1), 364(c)(2), or 364(c)(3) of the Bankruptcy Code. As the Debtors assert in the Motion, as set forth in the Flachs Declaration and the Omohundro Declaration, and as the Debtors have demonstrated at the Interim Hearing, the Debtors are unable to obtain the necessary postpetition financing, let alone on terms more favorable, taken as a whole, than the financing offered by each of the DIP Secured Parties pursuant to the DIP Documents, which include the DIP Roll-Up Loans.  In light of the foregoing, the Debtor DIP Loan Parties have reasonably and properly concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to the Debtors at this time, and is in the best interests of the Debtors and their Estates.

         (iv)    **Priming of the Prepetition Liens**.  The priming of the Prepetition Liens under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as provided herein, is necessary and required by the DIP Secured Parties for the DIP Loan Parties to obtain the working capital provided by the DIP Facility and use Cash Collateral necessary to continue to operate their business as a going concern during the pendency of the Chapter 11 Cases in order to preserve and maximize the value of their Estates.  The ability of the Debtors to finance

their operations, maintain business relationships with their vendors and suppliers, and pay their employees requires the availability of working capital from the DIP Facility and the use of Cash Collateral.  The DIP Loan Parties' inability to access the financing under the DIP Facility and use Cash Collateral will harm the Debtors and their Estates.  The Prepetition Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent of any Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral) as a result of the priming of the Prepetition Liens.

(v)     **DIP Roll-Up Loans.**    Approved upon entry of this Interim Order and concurrent with the DIP Loan Parties' borrowing of the New Money DIP Loans on the Closing Date, without any further action by the DIP Loan Parties or any other party, the outstanding amount of Prepetition Superpriority Loans (and all accrued and unpaid interest thereon) shall be converted into DIP Loans in accordance with this Interim Order and the DIP Credit Agreement (the "***DIP Roll-Up***"); *provided*, that, notwithstanding anything to the contrary herein, the DIP Roll-Up shall be subject to Challenge during the Challenge Period in accordance with paragraph 32 hereof.  The roll-up of the Prepetition Superpriority Obligations into the DIP Roll-Up Loans is necessary as the Prepetition Superpriority Secured Parties would not have otherwise consented to the use of their Cash Collateral, the subordination of their liens, or the extension of credit to fund critical working capital needs in the form of the DIP Facility without the DIP Roll-Up.  Upon consummation of the DIP Roll-up in accordance with the DIP Credit Agreement, without any further action by the DIP Loan Parties or any other party, all Prepetition Superpriority Obligations (other than expense reimbursement and contingent indemnification obligations which survive termination of the Prepetition Superpriority Loan Documents) and all related liens are discharged.

23

(vi)     **Use of Cash Collateral and Proceeds of the DIP Facility**.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility, and the authorization to use the Prepetition Collateral (including Cash Collateral), the DIP Agent, the other DIP Secured Parties, the Prepetition Agents, and the other Prepetition Secured Parties require, and the DIP Loan Parties have agreed, that proceeds of the DIP Facility and the Prepetition Secured Parties' Cash Collateral shall be used solely and exclusively for the purposes set forth in, and in a manner in accordance with, the terms and conditions of this Interim Order, the DIP Documents, and the Approved Budget (as the same may be modified from time to time in accordance with the terms of the DIP Documents and subject to such exclusions as permitted in the DIP Documents, and as set forth in paragraph 11 hereof (subject to the Variance Limit (as defined below)), this Interim Order, and subject to the Carve-Out, solely for the purposes set forth in the DIP Documents and this Interim Order, and subject to the Carve-Out, including (a) ongoing working capital and other general corporate purposes; (b) interest, fees, and expenses owed to the DIP Lenders and the DIP Agent; (c) administrative costs of the Chapter 11 Cases; and (d) payment of certain adequate protection amounts to the Prepetition Secured Parties.

(vii)     **No Obligation to Monitor**.  No DIP Lender or the DIP Agent shall have any obligation or responsibility to monitor any DIP Loan Party's use of the DIP Facility and each DIP Lender and the DIP Agent may rely upon each DIP Loan Party's representations that the extension of credit under the DIP Facility requested at any time and the use thereof are in accordance with the requirements of this Interim Order, the DIP Documents, and Bankruptcy Rule 4001(c)(2).

(viii)     **Application of Proceeds of DIP Collateral**.  As a condition to entry into the DIP Credit Agreement, the extension of credit under the DIP Facility, and authorization to use

24

Cash Collateral, the DIP Loan Parties, the DIP Agent, the other DIP Secured Parties, and the Prepetition Secured Parties have agreed that the DIP Loan Parties may utilize the proceeds of the DIP Collateral solely in accordance with this Interim Order, the DIP Documents, and the Approved Budget.

J.      **Intercreditor Agreements**. Pursuant to section 510 of the Bankruptcy Code, (i) that certain Super Senior/First Lien Intercreditor Agreement, dated as of September 15, 2023 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "***Super Senior/First Lien Intercreditor Agreement***") by and among the Prepetition Superpriority Agent and the Prepetition First Lien Agent, and acknowledged and agreed to by the DIP Loan Parties; (ii) that certain First Lien/1.5 Lien Intercreditor Agreement, dated as of September 22, 2022 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "***First Lien/1.5 Lien Intercreditor Agreement***") by and among the Prepetition Superpriority Agent, the Prepetition First Lien Agent, and the Prepetition 1.5 Lien Agent, and acknowledged and agreed to by the DIP Loan Parties; (iii) that certain 1.5 Lien/Second Lien Intercreditor Agreement, dated as of September 22, 2022 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "***1.5 Lien/Second Lien Intercreditor Agreement***") by and among the Prepetition 1.5 Lien Agent and the Prepetition Second Lien Agent, and acknowledged and agreed to by the DIP Loan Parties; and (iv) that certain Second Lien Intercreditor Agreement, dated as of November 1, 2017 (as amended, restated, amended and restated, supplemented, waived and/or otherwise modified from time to time, the "***Second Lien Intercreditor Agreement***" and, together with the Super Senior/First Lien Intercreditor Agreement, the First Lien/1.5 Lien Intercreditor Agreement, and the 1.5 Lien/Second Lien Intercreditor Agreement, the "***Prepetition Intercreditor***

*Agreements*") by and among the Prepetition Superpriority Agent, the Prepetition First Lien Agent, and the Prepetition Second Lien Agent, and acknowledged and agreed to by the DIP Loan Parties, and any other applicable intercreditor or subordination provisions contained in any of the other Prepetition Documents, (x) shall remain in full force and effect, (y) shall continue to govern the relative priorities, rights, and remedies of the Prepetition Secured Parties (including the relative priorities, rights, and remedies of such parties with respect to the replacement liens, administrative expense claims, and superpriority administrative expense claims granted or the amounts payable by the DIP Loan Parties under this Interim Order or otherwise), and (z) shall not be deemed to be amended, altered, or modified by the terms of this Interim Order or the DIP Documents, unless expressly set forth herein or therein.

K.     **Adequate Protection**.  The Prepetition Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, solely to the extent there is a Diminution in Value of their respective interests in the Prepetition Collateral (including Cash Collateral) as a result of the Debtor DIP Loan Parties' use of the Prepetition Collateral, including Cash Collateral, subject and subordinate in all respects to the Carve-Out and subject to paragraph 32 of this Interim Order.

L.     **Sections 506(c), 552(b) and Marshaling**.  In consideration of (i) the DIP Secured Parties' willingness to provide the DIP Facility to the extent set forth herein, (ii) the DIP Secured Parties' and the Prepetition Secured Parties' agreement to subordinate their liens and claims to the Carve-Out, and (iii) the application and use of Cash Collateral as set forth in this Interim Order, the terms of the DIP Credit Agreement, and the terms of this Interim Order, each of the DIP Secured Parties and the Prepetition Secured Parties are, subject to entry of the Final Order, entitled to receive (x) a waiver of any equities of the case exceptions or claims under section

26

552(b) of the Bankruptcy Code and a waiver of unjust enrichment, the equitable doctrine of marshaling and other similar doctrines, and (y) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

M.    **No Control**.  None of the DIP Secured Parties or Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any of the Debtors' operations are conducted, or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Documents, and/or the Prepetition Loan Documents (including by permitting the DIP Loan Parties to use the Prepetition Collateral (including the Cash Collateral) or in taking any other actions permitted by this Interim Order).

N.    **Good Faith of the DIP Agent, the DIP Secured Parties, and the Prepetition Secured Parties**.

(i)    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (a) the extensions of credit under the DIP Facility are fair and reasonable, are appropriate for secured financing to debtors in possession, are the best available to the Debtors under the circumstances, reflect the Debtor DIP Loan Parties' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration; (b) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's-length among the DIP Loan Parties, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors; (c) the use of Cash Collateral, including, without limitation, pursuant to this Interim Order, has been allowed in "good faith" within the meaning of section 364(e) of the Bankruptcy Code; (d) any credit to be extended, loans to be made, and other financial

accommodations to be extended to the DIP Loan Parties by the DIP Secured Parties or the Prepetition Secured Parties, including, without limitation, pursuant to this Interim Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Secured Parties and the Prepetition Secured Parties in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code; and (e) the DIP Facility, the DIP Liens, and the DIP Superpriority Claims (as defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(ii)      Absent an order of this Court, the consent of the Prepetition Secured Parties is required for the DIP Loan Parties' use of Cash Collateral and other Prepetition Collateral.  The Prepetition Secured Parties have consented, or are deemed pursuant to the Prepetition Loan Documents to have consented, or have not objected, to the DIP Loan Parties' use of Cash Collateral and other Prepetition Collateral or to the DIP Loan Parties' entry into the DIP Documents in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

O.      **Immediate Entry**.  The Debtors have requested entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), (c) and (d) and the Local Rules.  Absent granting the interim relief sought by this Interim Order, the Debtors' Estates could be immediately and irreparably harmed.  Thus, sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2), (c) and (d).

P.      **Interim Hearing**.  Notice of the Interim Hearing and the relief requested in the Motion has been provided by the Debtors to certain parties in interest, including the Notice

Parties (as defined in the Motion).  The Debtors have made reasonable efforts to afford the best notice possible under the circumstances, and no other notice is required in connection with the relief set forth in this Interim Order.

Based upon the foregoing findings and conclusions, the Motion, and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor, **IT IS HEREBY ORDERED THAT**:

1.      <u>DIP Facility Approved on Interim Basis</u>.  The DIP Facility and the DIP Loans are authorized and approved on an interim basis, to the extent set forth herein, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Documents and this Interim Order.  All objections to this Interim Order, to the extent not withdrawn, waived, settled, or resolved, are hereby denied and overruled.  This Interim Order shall become effective immediately upon its entry.

2.      <u>Authorization Regarding the DIP Documents and the DIP Facility</u>.  The Debtor DIP Loan Parties are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform all of their obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to deliver all instruments, certificates, agreements, and documents that may be required or necessary for the performance by the Debtor DIP Loan Parties under the DIP Facility and the creation and perfection of the DIP Liens.  The Debtor DIP Loan Parties are authorized to pay, in accordance with this Interim Order, the principal, interest, fees, payments, expenses, and other amounts described in the DIP Documents as such amounts become due and without need to obtain further Court approval, including, without limitation,  the Commitment Fee, the Exit Fee, all other fees and other amounts owed to the DIP Secured Parties, and the reasonable fees and disbursements of the DIP Secured

Parties, including the reasonable and documented fees and disbursements of counsel and other professionals, in each case whether or not such fees or other amounts arose before, on, and after the Petition Date, and whether or not the transactions contemplated hereby are consummated, and to take any other actions that may be necessary or appropriate, all as provided in this Interim Order or the DIP Documents and in accordance with this Interim Order or the DIP Documents; *provided*, that, the payment of legal and other professionals' fees and expenses of the DIP Agent and the other DIP Secured Parties (other than legal and other professionals' fees and expenses incurred prior to the Closing Date) shall be subject to the requirements of paragraph 11 hereof.  All collections and proceeds, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnations, or otherwise, shall be deposited and applied as required by this Interim Order and the DIP Documents.  Upon execution and delivery, the DIP Documents shall represent valid and binding obligations of the Debtor DIP Loan Parties, enforceable against each of the Debtor DIP Loan Parties and their Estates in accordance with their terms.  Upon the Closing Date, (a) the Commitment Fee shall be fully earned and non-refundable and shall be paid as specified in the DIP Documents, (b) the Exit Fee shall be fully earned and non-refundable and shall be paid as specified in the DIP Documents; and (c) the DIP Roll-Up Loans shall have been deemed to have been advanced on the Closing Date concurrent with the DIP Loan Parties' borrowing of the New Money DIP Loans.

3.     <u>Direction of the Prepetition Agents</u>.  Pursuant to the terms of this Interim Order, each of the Prepetition Agents are authorized and instructed (i) to file, execute, deliver, and perform under any documents in any jurisdiction (including in any foreign jurisdiction), including, without limitation, any intercreditor agreements, lien subordination agreements, security agreements, pledge agreements, amendments, waivers, consents, powers of attorney (solely with

respect to foreign jurisdictions), or release agreements, in each case, which may be reasonably necessary to give effect to this Interim Order, the transactions contemplated herein, and the DIP Credit Agreement; (ii) under local law, to give effect to the priming DIP Liens in favor of the DIP Secured Parties under the DIP Facility, execute, file, amend, amend and restate, release or replace guarantee or collateral agreements or any other similar documents so that the DIP Agent can act as the collateral agent thereunder and permit the DIP Agent to hold collateral on behalf of the DIP Secured Parties and/or the Prepetition Secured Parties, in each case, solely to the extent required to reflect the lien priority expressly set forth in this Interim Order; and (iii) subject to this Interim Order, to consent and take all reasonably necessary actions to give effect to the priming liens and security interests, use of Cash Collateral, adequate protection arrangements, intercreditor agreements and other documents, instruments and arrangements to give effect to this Interim Order (clauses (i) – (iii) above, collectively, the "***Direction***"), in each case, subject to the payment of all fees, costs and other expenses (including attorneys', accountants', appraisers', and financial advisors' fees), amounts, charges, costs, indemnities and other obligations in connection therewith. For purposes of the foregoing, no further consent, approval or direction of the Prepetition Secured Parties or this Court shall be required prior to the performance under or execution of such documents as contemplated in clauses (i) – (iii) above and any such documents necessary to effectuate the actions in clauses (i) – (iii) above shall be in a form acceptable to each of the Prepetition Agents.  Each of the Prepetition Agents is fully protected in conclusively relying upon this Interim Order in connection with the Direction and carrying out any of the foregoing.

4.     <u>Authorization to Borrow and Use Cash Collateral</u>.  To prevent immediate and irreparable harm to the Debtors and their Estates and to enable the Debtors to continue to operate their business and preserve and maximize the value of their Estates, from the entry of this

Interim Order through and including the earliest to occur of (i) entry of the Final Order or (ii) the DIP Termination Date (as defined below), and subject to the terms, conditions, and limitations on availability set forth in the DIP Documents and this Interim Order, the Debtor DIP Loan Parties are hereby authorized to (i) use the Cash Collateral for the purposes described in this Interim Order; and (ii) borrow under the DIP Facility; *provided*, that, the use of the proceeds of the DIP Loans or use of Cash Collateral shall be in accordance with the terms and conditions of this Interim Order and the DIP Documents, including the Approved Budget solely to the extent set forth in the Variance Limit.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors, their Estates, or the Foreign Subsidiary Guarantor outside the ordinary course of business, or any Debtor's or the Foreign Subsidiary Guarantor's use of any Cash Collateral or other proceeds resulting therefrom, in each case, except as permitted in this Interim Order (including with respect to the Carve-Out), the DIP Facility, or the DIP Documents.

5. <u>Amendment of the DIP Documents</u>.  No waiver, modification, or amendment of any of the provisions of the DIP Documents shall be effective unless set forth in writing, signed by or on behalf of the DIP Borrower and the DIP Agent (acting at the direction of the DIP Lenders holding, managing or controlling in the aggregate, DIP Loans and unused New Money DIP Commitments comprising at least 50.1% of the principal amount of all DIP Loans and unused New Money DIP Commitments, such DIP Lenders, the "***Required DIP Lenders***") except in the case of amendments, modifications, or waivers requiring consent from all DIP Lenders (or all affected DIP Lenders, as specified in the DIP Documents).  The DIP Documents and the Approved Budget may from time to time be amended, modified, waived, or supplemented by the parties thereto (in the case of the DIP Lenders, by the DIP Agent at the direction of the Required DIP Lenders) in accordance with the terms thereof (and this Interim Order) without further order

of the Court if the amendment, modification, waiver, or supplement is non-material and in accordance with the DIP Documents or the Approved Budget, is necessary to conform the terms of the DIP Documents or the Approved Budget to this Interim Order, or is necessary to conform the terms of the DIP Documents or the Approved Budget to agreements reflected on the record at a hearing before the Court.   In the case of a material amendment, modification, waiver, or supplement to the DIP Documents, the Debtors shall provide notice on the docket, and parties in interest shall have two (2) Business Days from the date of such notice within which to object, in writing to the DIP Loan Parties and the DIP Secured Parties, to such amendment, modification, waiver, or supplement.  If any such party timely objects to such material amendment, modification, waiver, or supplement to the DIP Documents, such material amendment, modification, waiver, or supplement shall only be permitted pursuant to an order of the Court.  The foregoing shall be without prejudice to the Debtors' right to seek approval from the Court of a material amendment, modification, waiver, or supplement on an expedited basis.  For the avoidance of doubt, the extension of a Milestone (as defined in the DIP Credit Agreement) or waiver of the Variance Limit shall not constitute a material amendment, modification, waiver, or supplement to the DIP Documents.

6.      DIP Obligations.   The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the DIP Obligations, which shall be enforceable against each of the Debtor DIP Loan Parties, their Estates, and any successors thereto, including, without limitation, against any trustee or any other estate representative elected or appointed in the Cases, upon the conversion of any of the Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (collectively, the "*Successor Cases*" and each a "*Successor Case*").  Upon entry of this Interim Order, the DIP

Obligations will include all loans and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the DIP Loan Parties to the DIP Agent or any of the other DIP Secured Parties, in each case, under the DIP Documents or this Interim Order or secured by the DIP Liens, including, without limitation, all principal, accrued and unpaid interest, costs, fees, expenses, indemnities, and other amounts (including any reasonable and documented attorneys', accountants', financial advisors', and other fees, costs, and expenses that are chargeable or reimbursable under the DIP Documents and/or this Interim Order) owing under the DIP Documents.  Subject to the exceptions specified in the DIP Documents, the DIP Loan Parties shall be jointly and severally liable for the DIP Obligations.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligations or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under chapter 5 of the Bankruptcy Code, section 724(a) of the Bankruptcy Code, or any other provision with respect to avoidance actions under the Bankruptcy Code or applicable federal, state or foreign law equivalents) or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise, but other than to the Carve-Out), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

7. <u>DIP Liens</u>.  Effective upon entry of this Interim Order, as security for the DIP Obligations (and subject and subordinate in all respects to the Carve-Out and Permitted Third Party Liens (as defined below), pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent, for the benefit of itself and the other DIP Secured Parties is hereby granted perfected, first priority, senior priming liens (collectively, the "***DIP Liens***") on and

security interests in all prepetition and postpetition property of the DIP Loan Parties, whether existing on the Petition Date or thereafter acquired, including, without limitation, all inventory, equipment, accounts, cash and cash equivalents, general intangibles, intercompany receivables, contract rights, supporting obligations and letter-of-credit rights, instruments (including, but not limited to, intercompany notes), deposit accounts, investment property, intellectual property, books and records, investments, proceeds of causes of action (including those arising under sections 544, 547, 548 and 549 of the Bankruptcy Code and any related action under section 550 of the Bankruptcy Code) (subject to entry of the Final Order), and to the extent not otherwise included, all proceeds, products, offspring, and profits of any and all of the foregoing (all such assets, collectively, the "***DIP Collateral***").  For the avoidance of doubt and subject to entry of the Final Order, the DIP Collateral shall include the proceeds of any claim or cause of action arising under or pursuant to chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state, federal, or foreign law (including any other avoidance actions under the Bankruptcy Code).  All liens authorized and granted pursuant to the DIP Orders on DIP Collateral of the DIP Loan Parties shall be deemed valid, binding, enforceable, effective and automatically perfected and non-avoidable as of the Petition Date, and no further filing, notice, or act under applicable law or otherwise will be required to effect such perfection.  The DIP Lenders, or the DIP Agent on behalf of the DIP Lenders, shall be permitted, but not required, to make any filings, deliver any notices, make recordations, perform any searches or take any other acts as may be necessary under state law or other applicable law in order to enforce the security, perfection or priority of the DIP Lenders' claims described herein.  The Foreign Subsidiary Guarantor will be required to take all actions reasonably requested by the DIP Agent or the Required DIP Lenders

to grant, create, and maintain the perfection of the liens and security interests granted on the DIP Collateral of the Foreign Subsidiary Guarantor.

       8.     <u>DIP Lien Status and Priority</u>.  The DIP Liens on the DIP Collateral shall, in all cases, subject and subordinate to the Carve-Out, have the priority set forth as follows:

       (a)     pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority administrative expense status (the "***DIP Superpriority Claims***"), with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code;

       (b)     pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority lien on and security interest in all DIP Collateral that is not subject to a valid, enforceable, non-avoidable and perfected lien existing on the Petition Date;

       (c)     pursuant to section 364(c)(3) of the Bankruptcy Code, a lien on and security interest in all DIP Collateral that is subject to valid, perfected and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than the liens of the Prepetition Secured Lenders and Prepetition Agents, which prepetition liens will be primed by the liens described in the following clause (d)) (the "***Permitted Third Party Liens***"), with such lien of the DIP Secured Parties being subject and junior to Permitted Third Party Liens; and

(d)      pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior priming lien on and security interest in all DIP Collateral, subject and junior to Permitted Third Party Liens.

9.      **Priority of DIP Liens and DIP Superpriority Claims.** Other than as set forth herein or permitted under the DIP Documents, the DIP Liens and the DIP Superpriority Claims: (i) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552(b) of the Bankruptcy Code; (ii) shall not be subordinate to, or *pari passu* with, (A) any Lien that is avoided and preserved for the benefit of the Debtor DIP Loan Parties and their Estates under section 551 of the Bankruptcy Code or otherwise or (B) any Liens or claims of any DIP Loan Party or any direct or indirect subsidiary thereof against any DIP Loan Party or any of such DIP Loan Party's property; (iii) shall be valid and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in a Successor Case, and/or upon the dismissal of any of the Chapter 11 Cases; and (iv) notwithstanding anything to the contrary in any "first day" order of this Court in any of the Chapter 11 Cases, shall be senior to any administrative claims arising under any such "first day" order.

10.      **No Obligation to Extend Credit.** The DIP Lenders shall have no obligation to make any loan under the DIP Documents unless (and subject to the occurrence of the Closing Date) all of the conditions precedent to the making of such extension of credit under the DIP Documents, this Interim Order and/or the Final Order, as applicable, have been satisfied in full or waived by the DIP Agent (at the direction of the Required DIP Lenders) in accordance with the terms of the DIP Credit Agreement.

11. <u>Use of Proceeds of the DIP Facility</u>. From and after the Petition Date, the DIP Loan Parties may use proceeds of borrowings under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, including, subject to the Carve Out, to: (i) pay fees, interest, and expenses associated with the DIP Facility; (ii) provide for the ongoing working capital and capital expenditure needs of the Debtors during the pendency of the Chapter 11 Cases; (iii) make payments in respect of the adequate protection provided to the Prepetition Secured Parties; and (iv) fund the costs of the administration of the Chapter 11 Cases, in each case subject to the Approved Budget and Variance Limit and the terms and conditions in this Interim Order and the DIP Documents. Except as otherwise specified in the DIP Documents, the proceeds of the DIP Loans when made shall be funded or credited to a non-interest bearing account in the name of the DIP Agent and subject to the sole control of the DIP Agent (the "***Funding Account***") and for the avoidance of doubt may be withdrawn from the Funding Account in accordance with the terms set forth in the DIP Credit Agreement.

12. <u>Adequate Protection for the Prepetition First Lien Secured Parties</u>. The Prepetition First Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value. As adequate protection, the Prepetition First Lien Secured Parties are hereby granted the following (the "***First Lien Adequate Protection Obligations***"):

(a) <u>First Lien Adequate Protection Liens</u>. To the extent of any Diminution in Value, the Prepetition First Lien Secured Parties are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, a senior perfected replacement lien on all Prepetition Collateral, including any such assets

38

of the Debtor DIP Loan Parties' or their Estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof (the "***First Lien Adequate Protection Liens***"), which First Lien Adequate Protection Liens shall be junior and subordinate only to the Carve-Out, the DIP Liens, and the Permitted Third Party Liens on such Prepetition Collateral that are (and are permitted under the Prepetition First Lien Credit Agreement to be) senior to the liens on such Prepetition Collateral securing the Prepetition First Lien Obligations. The First Lien Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition Collateral, and continue to be subject to the applicable Prepetition Intercreditor Agreements. The First Lien Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition First Lien Secured Parties and not in substitution therefor.

(b)    First Lien Adequate Protection Superpriority Claims. To the extent of Diminution in Value, the Prepetition First Lien Secured Parties are hereby further granted an allowed superpriority administrative claim (the "***First Lien Adequate Protection Superpriority Claim***") in the amount of any First Lien Adequate Protection Obligations, pursuant to section 507(b) of the Bankruptcy Code, with priority over all other superpriority and administrative expense claims against the Debtor DIP Loan Parties or their Estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in paragraph 34 hereof), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, junior and subordinate only to the Carve-Out, the DIP Superpriority Claims, and the DIP Obligations to the extent provided herein and in the DIP Documents, and

having full recourse against all assets of the DIP Loan Parties in accordance with the terms of this Interim Order.

(c)     First Lien Adequate Protection Payments.  As additional adequate protection, the Borrower shall pay in cash (i) on, before, or within one (1) Business Day of the Closing Date, all accrued and unpaid reasonable prepetition fees and expenses of the Prepetition First Lien Secured Parties (including all reasonable fees and expenses of Arnold & Porter Kaye Scholer LLP ("**Arnold & Porter**"), Ankura Consulting Group, LLC ("**Ankura**"), and one local counsel in each applicable jurisdiction retained by any of the Prepetition Secured Parties); and (ii) after entry of this Interim Order, monthly payments of the reasonable and documented costs, fees and expenses of the Prepetition First Lien Secured Parties, including fees and expenses of (x) one primary counsel (which shall be Arnold & Porter) and one local counsel in each applicable jurisdiction to the Prepetition First Lien Lenders, (y) one primary counsel and one local counsel in each applicable jurisdiction to the Prepetition First Lien Agent, and (z) any other advisor retained by the Prepetition First Lien Secured Parties (including Ankura) (such payments collectively, the "**First Lien Adequate Protection Payments**").

(d)     First Lien Postpetition Interest Payments.  As additional adequate protection, all interest on the loans under the Prepetition First Lien Credit Agreement, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall accrue interest at the Default Rate (as defined in the Prepetition First Lien Credit Agreement) and be paid in kind by adding such accrued interest to the unpaid principal amount of the loans under the Prepetition First Lien Credit Agreement on the date such interest is due until full discharge of all Prepetition First Lien Obligations, and which shall be deemed part of the Prepetition First Lien

Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

(e)     <u>Information</u>.  The DIP Loan Parties shall substantially concurrently deliver to the Prepetition First Lien Secured Parties all information, reports, documents, and other materials that the DIP Loan Parties provide to the DIP Agent and the DIP Lenders pursuant to the DIP Documents, this Interim Order, and the Final Order.

(f)     <u>Adequate Protection Reservation</u>.  Subject to the Carve-Out, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition First Lien Secured Parties hereunder is insufficient to compensate for any Diminution in Value during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition First Lien Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition First Lien Secured Parties are adequately protected.  Further, this Interim Order shall not prejudice or limit the rights of the Prepetition First Lien Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.  Nothing in this Interim Order or the other DIP Documents shall (i) be construed as the affirmative consent by any of the Prepetition First Lien Secured Parties to the use of Cash Collateral other than on the terms set forth in this Interim Order and solely in the context of the DIP Financing authorized by this Interim Order, (ii) be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) other than as contemplated by this Interim Order, or (iii) prejudice, limit, or otherwise impair the rights of any of the Prepetition First Lien Secured Parties, upon a change in circumstances to seek new, different, or additional adequate protection or assert the interests of any of the Prepetition First Lien Secured

Parties, and the rights of any other party in interest, including the DIP Loan Parties and the DIP Secured Parties, to object to such relief are hereby preserved.

13.      Adequate Protection for the Prepetition 1.5 Lien Secured Parties.   The Prepetition 1.5 Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral.  As adequate protection, the Prepetition 1.5 Lien Secured Parties are hereby granted the following (the "*1.5 Lien Adequate Protection Obligations*"):

(a)      1.5 Lien Adequate Protection Liens.   To the extent of any Diminution in Value (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law, the Prepetition 1.5 Lien Secured Parties, are hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, a perfected replacement lien on all the Prepetition Collateral, including any such assets of the Debtor DIP Loan Parties' or their Estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof (the "*1.5 Lien Adequate Protection Liens*"), which 1.5 Lien Adequate Protection Liens on such Prepetition Collateral shall be junior and subordinate only to the Carve-Out, the DIP Liens, the Prepetition First Lien Liens, the First Lien Adequate Protection Liens, and  the Permitted Third Party Liens on such Prepetition Collateral that are (and are permitted under the Prepetition 1.5 Lien Credit Agreement to be) senior to the liens of the Prepetition 1.5 Lien Secured Parties on such Prepetition Collateral.  The 1.5 Lien Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition Collateral, and continue to be subject to the applicable Prepetition

Intercreditor Agreements.  The 1.5 Lien Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition 1.5 Lien Secured Parties and not in substitution therefor.

           (b)        <u>1.5 Lien Adequate Protection Superpriority Claims</u>.  To the extent of Diminution in Value, the Prepetition 1.5 Lien Secured Parties are hereby further granted an allowed superpriority administrative claim (the "***1.5 Lien Adequate Protection Superpriority Claim***"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all other superpriority and administrative expense claims against the Debtor DIP Loan Parties or their Estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in paragraph 34 hereof), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior and subordinate only to the Carve-Out, the DIP Superpriority Claims, the DIP Obligations, the First Lien Adequate Protection Obligations, and the Prepetition First Lien Obligations to the extent provided herein and in the DIP Documents, and having full recourse against all assets of the DIP Loan Parties in accordance with the terms of this Interim Order.

           (c)        <u>1.5 Lien Postpetition Interest Payments</u>.  As additional adequate protection, all interest on the loans under the Prepetition 1.5 Lien Credit Agreement, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall accrue interest at the Default Rate (as defined in the Prepetition 1.5 Lien Credit Agreement) and be paid in kind by adding such accrued interest to the unpaid principal amount of the loans under the Prepetition 1.5 Lien Credit Agreement on the date such interest is due until full discharge of all

Prepetition 1.5 Lien Obligations, and which shall be deemed part of the Prepetition 1.5 Lien Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

14.     <u>Adequate Protection for the Prepetition Second Lien Secured Parties</u>.  The Prepetition Second Lien Secured Parties are entitled, pursuant to sections 361, 362, 363(c)(2), 363(e), and 507 of the Bankruptcy Code, to adequate protection of their respective interests in the applicable Prepetition Collateral, including Cash Collateral, solely to the extent of any Diminution in Value of their interests in the Prepetition Collateral.  As adequate protection, the Prepetition Second Lien Secured Parties are hereby granted the following (the "***Second Lien Adequate Protection Obligations***"):

(a)     <u>Second Lien Adequate Protection Liens</u>.  To the extent of any Diminution in Value (including Cash Collateral) from and after the Petition Date to the fullest extent set forth in the Bankruptcy Code and other applicable law, the Prepetition Second Lien Secured Parties, are hereby granted subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens on and security interests in the Prepetition Collateral, including any such assets of the Debtor DIP Loan Parties' or their Estates existing as of the Petition Date or thereafter acquired, and all proceeds thereof (the "***Second Lien Adequate Protection Liens***," and, together with the First Lien Adequate Protection Liens and the 1.5 Lien Adequate Protection Liens, the "***Adequate Protection Liens***"), which Second Lien Adequate Protection Liens on such Prepetition Collateral shall be junior and subordinate only to the Carve-Out, the DIP Liens, the Prepetition First Lien Liens, the Prepetition 1.5 Lien Liens, the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Permitted Third Party Liens on Prepetition Collateral that

44

are (and are permitted under the Prepetition Second Lien Credit Agreement to be) senior to the liens of the Prepetition Second Lien Secured Parties on such Prepetition Collateral.  The Second Lien Adequate Protection Liens shall otherwise be senior to all other security interests in or liens on any of the Prepetition Collateral, and continue to be subject to the applicable Prepetition Intercreditor Agreements.  The Second Lien Adequate Protection Liens shall be in addition to all valid and enforceable liens and security interests now existing in favor of the Prepetition Second Lien Secured Parties and not in substitution therefor.

(b)      Second Lien Adequate Protection Superpriority Claims.  To the extent of Diminution in Value, the Prepetition Second Lien Secured Parties are hereby further granted an allowed superpriority administrative claim (the "*Second Lien Adequate Protection Superpriority Claim*" and together with the First Lien Adequate Protection Superpriority Claim and the 1.5 Lien Adequate Protection Superpriority Claim, the "*Adequate Protection Superpriority Claims*"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all other superpriority and administrative expense claims against the Debtor DIP Loan Parties or their Estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in paragraph 34 hereof), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114, or any other provision of the Bankruptcy Code or otherwise, junior and subordinate only to the Carve-Out, the DIP Superpriority Claims, the DIP Obligations, the First Lien Adequate Protection Obligations, the 1.5 Lien Adequate Protection Obligations, the Prepetition First Lien Obligations, and the Prepetition 1.5 Lien Obligations, to the extent provided herein and in the DIP Documents, and having full recourse against all assets of the DIP Loan Parties in accordance with the terms of this DIP Order.

45

(c)     Second Lien Postpetition Interest Payments.  As additional adequate protection, all interest on the loans under the Prepetition Second Lien Credit Agreement, including accrued and unpaid interest as of the Petition Date and interest accruing thereafter, shall accrue interest at the Default Rate (as defined in the Prepetition Second Lien Credit Agreement) and be paid in kind by adding such accrued interest to the unpaid principal amount of the loans under the Prepetition Second Lien Credit Agreement on the date such interest is due until full discharge of all Prepetition Second Lien Obligations, and which shall be deemed part of the Prepetition Second Lien Secured Parties' secured claim for all purposes, including for purposes of any credit bid under section 363(k) of the Bankruptcy Code.

15.     Budget.

(a)     The DIP Loan Parties may use the proceeds of all borrowings under the DIP Facility and Cash Collateral in a manner in accordance with the Approved Budget (subject to the Variance Limit), the DIP Documents, and this Interim Order.  The Budget annexed to the DIP Credit Agreement shall constitute the initial Budget ("***Initial Budget***") that reflects on a line-item basis the DIP Loan Parties' (i) weekly projected cash receipts (including from non-ordinary course assets sales) ("***Receipts***"), (ii) weekly projected disbursements, including ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Cases (including the estimated fees and expenses of the advisors to any parties to the Chapter 11 Cases paid by the Debtors), capital expenditures, issuances of any letter of credit, including the fees relating thereto, and any other fees and expenses relating to the DIP Facility ("***Disbursements***"), and (iii) all other information reasonably requested by the DIP Agent and/or the Required DIP Lenders or Ankura, on their behalf, in each case.

46

(b)     By no later than 5:00 p.m. (prevailing New York City Time) on each Wednesday (or, if such Wednesday is not a Business Day, the immediately succeeding Business Day) after the Closing Date, commencing on the first Wednesday after the first complete week following the Closing Date (each, a "***Reporting Date***"), the DIP Loan Parties will provide to the DIP Secured Parties and Ankura, a thirteen (13)-week cash flow forecast covering the thirteen (13)-week period beginning on the Monday of the week in which it is (or is required to be) delivered, containing line items of sufficient detail to reflect the DIP Loan Parties' (i) Receipts; (ii) Disbursements; and (iii) all other information reasonably requested by the DIP Agent and/or the Required DIP Lenders, or Ankura, on their behalf, in each case, in the form attached as **Exhibit H** to the DIP Credit Agreement or otherwise in form and substance reasonably satisfactory to the Required DIP Lenders (the "***Budget***"); *provided*, that, the Budget shall become the Approved Budget upon a notification in writing from the Required DIP Lenders to the Borrower and the DIP Agent (which may be in the form of an email from counsel to the Required DIP Lenders, on the behalf of the Required DIP Lenders) that such Budget will become the Approved Budget.

(c)     By no later than 5:00 p.m. (prevailing New York City Time) on each Wednesday (or, if such Wednesday is not a Business Day, the immediately succeeding Business Day) after the Closing Date, commencing on the first Wednesday after the first complete week following the Closing Date (each, a "***Variance Testing Date***"), the DIP Loan Parties will provide to the DIP Secured Parties and Ankura a variance report for the applicable Variance Testing Period[5] (such report, a "***Budget Variance Report***"), substantially in the form attached as **Exhibit**

---

[5]     "***Variance Testing Period***" shall mean as of (i) the first Variance Testing Date after the Closing Date, the one-week period ending on the immediately preceding Sunday, (ii) the second Variance Testing Date after the Closing Date, the two-week period ending on the immediately preceding Sunday, (iii) the third Variance Testing Date after the Closing Date, the three-week period ending on the immediately preceding Sunday and (iv) each Variance Testing Date thereafter, the four-week period ending on the immediately preceding Sunday.

**I**  to the DIP Credit Agreement which shall include (i)  in each case, by line item, the actual Receipts and Disbursements for the immediately preceding week (ended on the immediately preceding Sunday), noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the Approved Budget, and explanation for all material variances; (ii) in each case, by line item, the actual Receipts and Disbursements for the then most recently ended Variance Testing Period, noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the Approved Budget (or, if a portion of such Variance Testing Period is covered in a preceding Approved Budget and not in the then most recent Approved Budget, from the amounts set forth in (x) such preceding Approved Budget (for the portion of such Variance Testing Period covered in such preceding Approved Budget and not in the then most recent Approved Budget) and (y) in the then current Approved Budget (for the portion of such Variance Testing Period covered in such current Approved Budget)), and explanation for all material variances; and (iii) a certification by the chief financial officer of the Borrower that such Budget Variance Report was prepared in good faith and fairly presents in all material respects the information set forth therein.

(d)     By no later than 5:00 p.m. (prevailing New York City Time) on the first Wednesday (or, if such Wednesday is not a Business Day, the immediately succeeding Business Day) after the Closing Date, and thereafter by not later than 5:00 p.m. (prevailing New York City Time) on the Wednesday (or, if such Wednesday is not a Business Day, the immediately succeeding Business Day) of every week thereafter, the DIP Loan Parties will provide to the DIP Secured Parties and Ankura (i) a revenue report for the calendar month in which such report is delivered substantially in the form attached as **Exhibit G** to the DIP Credit Agreement and (ii) a

48

certificate of a Responsible Officer of the Borrower certifying as to the Liquidity of the DIP Loan Parties as of the end of the last Business Day of the immediately preceding week.

(e)     By no later than 5:00 p.m. (prevailing New York City Time) on the first Wednesday after the Closing Date, the DIP Loan Parties will provide to the DIP Secured Parties and Ankura a report showing actual cash receipts and disbursements for the immediately preceding one-week period (ending on the immediately preceding Sunday), in detail similar to that which would be included in a Budget Variance Report.

(f)     Starting with the first full Variance Testing Period, any variance that is unfavorable to the financial condition and the interests of the DIP Loan Parties or the interests of the DIP Lenders shall not exceed (i) in the case of the first three Variance Testing Dates after the Closing Date (x) with respect to Disbursements (determined on an aggregate basis and excluding professional fees), twenty percent (20.0%) tested on each such Variance Testing Date for the applicable Variance Testing Period and (y) with respect to the line item "Customer Receipts" in the Approved Budget (determined on an aggregate basis), twenty percent (20.0%) tested on each such Variance Testing Date for the applicable Variance Testing Period; and (ii) in the case of the fourth Variance Testing Date after the Closing Date and each Variance Testing Date thereafter (x) with respect to Disbursements (determined on an aggregate basis and excluding professional fees), fifteen percent (15.0%) tested on each such Variance Testing Date for the applicable Variance Testing Period and (y) with respect to the line item "Customer Receipts" in the Approved Budget (determined on an aggregate basis), fifteen percent (15.0%) tested on each such Variance Testing Date for the applicable Variance Testing Period, and, in each case, based upon the most recent Approved Budget (or, with respect to the portion of any Variance Testing Period that is covered in a preceding Approved Budget and not in the then most current Approved

49

Budget, in such preceding Approved Budget as in effect at the beginning of the applicable week) (the preceding collectively, the "***Variance Limit***").

(g)  Until the DIP Obligations are paid in full, the DIP Loan Parties shall not (i) allow any variances to exist from the Approved Budget, except for Permitted Variances (as defined in the DIP Credit Agreement), and (ii) permit Liquidity (as defined in the DIP Credit Agreement) as of the close of business on the last Business Day of each week following the Closing Date to be less than $3,000,000.  Notwithstanding anything to the contrary in this Interim Order, the professional fees, costs, and expenses of the DIP Agent's advisors, the DIP Lender's advisors, the Prepetition First Lien Agent's advisors, and the Prepetition First Lien Lenders' advisors shall be due, payable, and paid in accordance with the terms of this Interim Order notwithstanding any budgeted amounts for such fees, costs, and expenses set forth in the Approved Budget, and the DIP Loan Parties shall not be deemed to have breached the terms of the Approved Budget to the extent the actual amount of such fees, costs, and expenses exceed the applicable budgeted amounts as set forth in the Approved Budget.

16.  <u>Modification of Automatic Stay</u>.  The automatic stay imposed under section 362(a)(2) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation and as applicable, to: (i) permit the Debtor DIP Loan Parties to grant the DIP Liens, First Lien Adequate Protection Liens, 1.5 Lien Adequate Protection Liens, Second Lien Adequate Protection Liens, DIP Superpriority Claims, First Lien Adequate Protection Superpriority Claims, 1.5 Lien Adequate Protection Superpriority Claims, and Second Lien Adequate Protection Superpriority Claims; (ii) permit the Debtor DIP Loan Parties to perform such acts as the DIP Secured Parties or the Prepetition Secured Parties each may reasonably request to assure the perfection and priority of the liens granted herein; (iii)

permit the Debtor DIP Loan Parties to incur all liabilities and obligations to the DIP Secured Parties or the Prepetition Secured Parties under the DIP Documents, the DIP Facility, and this Interim Order, as applicable; (iv) authorize the Debtor DIP Loan Parties to pay, and the DIP Secured Parties or the Prepetition Secured Parties to retain, disburse and/or apply, payments made in accordance with the terms of this Interim Order; and (v) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order and the DIP Documents.

17.     <u>Cash Management</u>.  No pledged bank account will be closed during the Chapter 11 Cases without the prior consent of the applicable secured parties and nothing in this Interim Order or the Final Order alters or impairs any security interest or perfection thereof that existed as of the Petition Date or that arises after the Petition Date.  The Debtors' cash management system, as approved by an interim or final order of this Court (such interim or final order, as applicable, the "***Cash Management Orders***") shall at all times be maintained (i) in accordance with the terms of the DIP Documents and the Cash Management Orders, and (ii) in a manner which in any event shall be reasonably satisfactory to the DIP Agent and the Required DIP Lenders.  The Debtors shall not transfer any funds (including, without limitation, any proceeds of the DIP Facility, the DIP Collateral, or any Cash Collateral) to any of the Debtors' non-Debtor affiliates or the non-DIP Loan Party Debtors during the Chapter 11 Cases, except as permitted under the DIP Credit Agreement and the terms of the Cash Management Orders.  The DIP Loan Parties shall only transfer funds to the Debtors in accordance with the terms of the DIP Documents and this Interim Order and to the extent expressly set forth in the Approved Budget.  The DIP Agent shall be deemed to have "control" over all cash management accounts for all purposes of perfection under the Uniform Commercial Code.

18.     <u>Automatic Perfection of DIP Liens and Adequate Protection Liens</u>.

(a)     This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection, and priority of the DIP Liens, the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens without the necessity of (i) filing, execution, or recording any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document that may otherwise be required under the law of any jurisdiction, obtaining "control" (as defined in any applicable Uniform Commercial Code or other law) over any DIP Collateral, and the DIP Agent, shall be deemed, without any further action, to have control over all of the DIP Loan Parties' deposit accounts, securities accounts, and commodities accounts (within the meaning of the Uniform Commercial Code and other law); (ii) taking any other action to validate or perfect the DIP Liens, the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens or to entitle the DIP Liens, the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens to the priorities granted herein; or (iii) the filing or recording of any financing statement, deed of trust, mortgage, security agreement, pledge agreement, control agreement, or other instrument or document with respect to security interests in any jurisdiction outside of the United States in assets located in, titled or arising or protected under the laws of a jurisdiction outside of the United States.

(b)     Notwithstanding the foregoing, each of the DIP Agent (with respect to the DIP Liens) and Prepetition Agents (with respect to the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens, as applicable) may, each in their sole discretion, enter into and file, as applicable, financing

statements, mortgages, security agreements, notices of Liens, and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices, and other agreements or documents shall be deemed to have been entered into, filed, or recorded as of the Petition Date.  The DIP Loan Parties shall execute and deliver to the DIP Agent and/or the Prepetition Agents, as applicable, all such financing statements, mortgages, notices, and other documents as such parties may reasonably request to evidence and confirm the contemplated validity, perfection, and priority of the DIP Liens, the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, each of the DIP Agent (with respect to the DIP Liens) and Prepetition Agents (with respect to the First Lien Adequate Protection Liens, the 1.5 Lien Adequate Protection Liens, and the Second Lien Adequate Protection Liens, as applicable) may, in its discretion, file a photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction (whether or not located in the United States) in which any DIP Loan Party has real or personal property.  Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or other monetary obligations to any governmental entity or non-governmental entity in order for the DIP Loan Parties to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof

by any DIP Loan Party, in favor of the DIP Secured Parties in accordance with the terms of the DIP Documents and this Interim Order or in favor of the Prepetition Secured Parties in accordance with this Interim Order.  To the extent that any of the Prepetition Agents or any other Prepetition Secured Party is the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, financing statement, or account control agreements, listed as loss payee or additional insured under any of the DIP Loan Parties' insurance policies, or is the secured party under any of the Prepetition Loan Documents, the DIP Agent shall also be deemed to be the secured party under such account control agreements, loss payee or additional insured under the DIP Loan Parties' insurance policies, and the secured party under each Prepetition Loan Document, and shall have all rights and powers attendant to that position (including rights of enforcement); *provided*, however, that the relative rights, obligations, claims and liens of the DIP Secured Parties and the Prepetition Secured Parties with respect to the DIP Collateral and proceeds thereof shall be as set forth in the DIP Documents and this Interim Order and such parties shall act in accordance therewith.  The applicable Prepetition Agents shall serve as agent for the DIP Agent for purposes of perfecting the DIP Agent's Liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

(c)     Subject to the terms of the DIP Documents, the DIP Agent or the DIP Lenders may require the DIP Loan Parties to enter into non-U.S. security documentation with respect to such DIP Collateral owned by non-U.S. DIP Loan Parties or located in non-U.S. jurisdictions, and each DIP Loan Party and its respective officers are authorized and directed to execute, file and record any documents or instruments as the DIP Agent or the DIP Lenders may

54

reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order.

19. <u>Protections of Rights of DIP Agent and DIP Secured Parties</u>.

(a) Unless the DIP Agent, at the direction of the Required DIP Lenders, shall have provided its prior written consent, or all DIP Obligations have been paid in full, it shall be a Termination Event (as defined below) if there shall be entered in any of these Chapter 11 Cases or any Successor Cases any order (including any order confirming any plan of reorganization or liquidation), or the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases seek entry of any order, that authorizes any of the following (unless such order provides for the DIP Obligations to simultaneously be paid in full): (i) the obtaining of credit or the incurring of indebtedness pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each such case that is superior to or *pari passu* with the DIP Liens and/or the DIP Superpriority Claims, except as expressly set forth in this Interim Order or the DIP Documents, (ii) the use of Cash Collateral for any purpose other than to fund the Carve-Out or in a manner in accordance with the Approved Budget (subject to the Variance Limit), the DIP Documents, and this Interim Order, or (iii) except as provided for herein, any modification of the DIP Agent's or any DIP Secured Party's rights under this Interim Order or the DIP Documents with respect any DIP Obligations. In the event that credit is obtained or debt is incurred in accordance with the foregoing clause (i) and in violation of the DIP Documents or this Interim Order, unless otherwise ordered by the Court, all the cash proceeds derived from

55

such credit or debt shall immediately be applied to repay outstanding DIP Obligations, and all outstanding New Money DIP Commitments, if any, shall automatically terminate.

(b)       The DIP Loan Parties shall, whether or not the DIP Obligations have been paid in full, (i) maintain books, records, and accounts to the extent and as required by the DIP Documents and the Prepetition Loan Documents; (ii) reasonably cooperate with, consult with, and provide to the DIP Agent and/or the DIP Lenders or Ankura, on their behalf, in each case all such information and documents that any or all of the DIP Loan Parties are obligated (including upon reasonable request by any of the DIP Agent or Ankura, on behalf of the DIP Lenders) to provide under the DIP Documents, the Prepetition Loan Documents, or the provisions of this Interim Order; (iii) upon reasonable request, authorize their independent certified public accountants, financial advisors, investment bankers, and consultants, to cooperate and consult with the DIP Agent and/or the DIP Lenders or Ankura, on behalf of the DIP Lenders; (iv) upon reasonable advance notice permit consultants, advisors, and other representatives (including third party representatives) of the DIP Agent or Ankura, on behalf of the DIP Lenders, reasonable access to any of the DIP Loan Parties' respective properties, to examine and make abstracts or copies from any of their respective books and records, to tour the DIP Loan Parties' business premises and other properties, and to discuss, and provide advice with respect to, their respective affairs, finances, properties, business operations, and accounts with their respective officers, employees, independent public accountants, and other professional advisors; and (v) upon reasonable advance notice and during normal business hours, permit the DIP Agent or Ankura on behalf of the DIP Lenders to consult with the DIP Loan Parties' management and advisors on matters concerning the DIP Loan Parties' businesses, financial condition, operations, and assets.  Notwithstanding anything to the contrary contained herein, the DIP Loan Parties do not, and shall not be required

to, waive any right to attorney-client, work product, or similar privilege, or breach any contractual non-disclosure agreement.   In the event the DIP Loan Parties are prohibited from sharing information with the DIP Agent and/or the  DIP Lenders or Ankura, on their behalf, due to a contractual non-disclosure agreement, the DIP Loan Parties shall use commercially reasonable efforts to obtain relief from such restriction as promptly as practicable.  The DIP Loan Parties shall not be required to provide the DIP Agent or any other DIP Secured Parties or their respective counsel and financial advisors with any information subject to, or over which any DIP Loan Party in good faith asserts, attorney-client privilege or legal professional privilege or consisting of attorney work product.

20.    Credit Bidding.  In connection with any sale of the DIP Collateral (or any portion thereof) constituting property or assets of the DIP Loan Parties and subject to the terms of the RSA, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code subject to and upon entry of this Interim Order, the DIP Agent (at the direction of the Required DIP Lenders) for the benefit of the DIP Secured Parties, shall have the right to credit bid up to the full amount of the DIP Obligations.  In connection with any sale of the Prepetition Collateral (or any portion thereof) constituting property or assets of the DIP Loan Parties and subject to the terms of the RSA, whether effectuated through sections 363, 725, or 1123 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the Bankruptcy Code subject to and upon entry of this Interim Order and payment in full of the DIP Obligations, the Prepetition First Lien Agent (at the direction of the Required Lenders (as defined in the Prepetition First Lien Credit Agreement)), for

57

the benefit of the Prepetition First Lien Secured Parties, shall have the right to credit bid up to the full amount of the Prepetition First Lien Obligations.

21.    <u>Proceeds of Subsequent Financing</u>.    If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in the Chapter 11 Cases or any Successor Cases shall obtain credit or incur debt pursuant to sections 364(b), 364(c), or 364(d) of the Bankruptcy Code at any time before the indefeasible repayment in full of all DIP Obligations and the termination of the DIP Agent's and DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors (if applicable), then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied in accordance with this Interim Order and the DIP Documents.

22.    <u>Maintenance of DIP Collateral</u>. Until the DIP Obligations are paid in full, the DIP Loan Parties shall (i) insure the DIP Collateral as required under the DIP Documents and the applicable Prepetition Loan Documents; (ii) maintain the cash management system in effect as of the Petition Date, as modified by the Cash Management Orders; and (iii)(a) maintain accurate records of all transfers (including intercompany transactions) within the cash management system so that all postpetition transfers and transactions shall be adequately and promptly documented in, and readily ascertainable from, their books and records, to the same extent maintained by the DIP Loan Parties before the Petition Date, and (b) provide reasonable access to such records to the DIP Agent, the other DIP Secured Parties, and their advisors.

23.    <u>Disposition of DIP Collateral</u>.  Except as otherwise provided for in the DIP Documents, the Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral other than in the ordinary course of business without the prior written

consent of the DIP Agent (at the direction of the Required DIP Lenders) and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent or any other DIP Secured Parties.

24. <u>Milestones</u>. The milestones contained in section 6.16 of the DIP Credit Agreement (the "***Milestones***") are hereby approved.

25. <u>Termination Events</u>. The following shall constitute a termination event under this Interim Order and the DIP Documents unless waived in writing (at the direction of the Required DIP Lenders) (each, a "***Termination Event***"):

(a) The occurrence of an Event of Default under the DIP Credit Agreement or any of the DIP Documents, as set forth therein, including, for the avoidance of doubt, but not limited to, the failure to comply with the Milestones;

(b) Any other breach, default, or other violation by the DIP Loan Parties of the terms and provisions of this Interim Order, which breach, default, or violation (other than any payment default to which no grace period shall apply) is not cured within three (3) Business Days of the DIP Loan Parties having notice of the occurrence thereof, and upon receipt of notice thereof, the DIP Loan Parties shall provide prompt written notice to the DIP Agent detailing such breach, default, or violation ; and

(c) Any other Termination Event as specifically set out in this Interim Order.

26. <u>Rights and Remedies Upon a Termination Event</u>.

(a) Without requiring further order from the Court and without the need for filing any motion (except as expressly required by this paragraph 26(a)) for relief from the automatic stay or any other pleading, immediately upon the date of delivery of a written notice

(with a copy filed with the Court) (a "**Default Notice**," and the date of delivery of such Default Notice, the "**DIP Termination Date**") by the DIP Agent (acting at the direction of the Required DIP Lenders) to the Debtors, counsel to the Debtors, counsel to the Prepetition First Lien Secured Parties, counsel to the Creditors' Committee (if any), and the U.S. Trustee on the occurrence of a Termination Event (the "**Event of Default Occurrence**"), the automatic stay shall terminate solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the DIP Agent (acting at the direction of the Required DIP Lenders): (i) any and all obligations of the DIP Lenders in connection with the DIP Facility and Prepetition Secured Parties with respect to Cash Collateral under this Interim Order and the Loan Documents (as defined in the DIP Credit Agreement), as applicable, shall immediately terminate, subject to the DIP Loan Parties' authority to use Cash Collateral to make payroll and fund critical expenses necessary to preserve the Prepetition Collateral, in each case in accordance with the terms of the Approved Budget and this Interim Order (and subject to the Carve-Out); (ii) the DIP Obligations shall (subject only to the Carve-Out) be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the DIP Lenders; (iii) the New Money DIP Commitments shall be terminated or reduced to the extent any New Money DIP Commitments remain outstanding, and any further New Money DIP Commitments shall be restricted; (iv) the DIP Facility shall be terminated with respect to any future liability or obligation of the DIP Lenders, but, for the avoidance of doubt, without affecting any of the DIP Liens, the DIP Superpriority Claims, or the DIP Obligations; and (v) the Carve-Out shall apply through the delivery of the Carve-Out Trigger Notice (as defined below); *provided*, that, the Debtors may seek an emergency hearing before the Court, and must provide prompt notice of such hearing to counsel to the DIP Secured Parties, to

contest whether a Termination Event or Event of Default Occurrence has occurred and/or to seek non-consensual use of Cash Collateral.

(b)        Upon an Event of Default Occurrence, the DIP Agent (acting at the direction of the Required DIP Lenders), may file a motion with the Court seeking emergency relief to exercise such remedies and an emergency hearing before the Court (a "***Stay Relief Hearing***") on at least five (5) Business Days' written notice (the "***Remedies Notice Period***") to the Debtors and the U.S. Trustee, and the Debtors agree not to object to the shortening of notice of such Stay Relief Hearing.  At such Stay Relief Hearing, the DIP Agent (acting at the direction of the Required DIP Lenders) may seek Court approval to enforce any other right or remedy (in addition to those set forth in paragraph 26(a) above) with respect to the DIP Collateral, the DIP Liens permitted under the DIP Documents, the Prepetition Collateral, or the Prepetition First Lien Liens under the Prepetition First Lien Loan Documents, including but not limited to (i) termination of the use of Cash Collateral, or (ii) the enforcement of DIP Liens securing the DIP Obligations or the Prepetition First Lien Liens securing the Prepetition First Lien Obligations under the Prepetition First Lien Loan Documents or other remedies with respect to the DIP Collateral or the Collateral (as defined in the Prepetition First Lien Credit Agreement).  In the event that an Event of Default Occurrence is cured during the Remedies Notice Period, the DIP Agent (acting at the direction of the Required DIP Lenders) shall withdraw any motion seeking emergency relief to exercise remedies with respect to such Event of Default Occurrence.

(c)        Notwithstanding the occurrence of a Termination Event and/or termination of the New Money DIP Commitments, all of the rights, remedies, benefits, and protections provided to the DIP Secured Parties and the Prepetition Secured Parties, as applicable, under the DIP Documents and this Interim Order shall survive.  For the avoidance of doubt,

irrespective of any Remedies Notice Period, the DIP Lenders shall not be obligated to provide any DIP Loans or advances at any time a Termination Event has occurred and is continuing.

27.     Carve-Out.  Subject to the terms and conditions contained in this paragraph, each of the DIP Liens, DIP Obligations, DIP Superpriority Claims, Prepetition Liens, Prepetition Obligations, Adequate Protection Liens, Adequate Protection Superpriority Claims, and any other forms of adequate protection granted hereunder and all other obligations of the DIP Loan Parties, including any postpetition intercompany claims among the Debtors, shall be subject and subordinate to the Carve-Out as follows:

(a)     Definition.  As used in this Interim Order, the "*Carve-Out*" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate, if any, pursuant to 31 U.S.C. § 3717 (without regard to the notice set forth in (iii) below); (ii) all reasonable and documented fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise, all unpaid fees and expenses (in each case, other than any restructuring, sale, success or other transaction fee of any investment bankers or financial advisors) (the "*Allowed Professional Fees*") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "*Debtor Professionals*") or retained by the Creditors' Committee (if any) pursuant to section 328 or 1103 of the Bankruptcy Code (the "*Committee Professionals*" and, together with the Debtor Professionals, the "*Professional Persons*") at any time before or on the first Business Day following delivery by the DIP Agent (acting at the direction of Required DIP Lenders) of a Carve-Out Trigger Notice, and without

62

regard to whether such fees and expenses are provided for in any Approved Budget or were invoiced after the Termination Declaration Date (as defined below), whether allowed by the Court prior to or after delivery of a Carve-Out Trigger Notice (the amounts set forth in this clause (iii), the "***Pre-Carve-Out Trigger Notice Cap***"); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount, with respect to the Debtor Professionals not to exceed $2,500,000, and with respect to the Committee Professionals not to exceed $250,000, incurred after the first Business Day following delivery by the DIP Agent (acting at the direction of Required DIP Lenders) of the Carve-Out Trigger Notice (such date, the "***Termination Declaration Date***"), to the extent allowed at any time, whether by interim order, procedural order, final order, or otherwise (the amounts set forth in this clause (iv), the "***Post-Carve-Out Trigger Notice Cap***" and, together with the Pre-Carve-Out Trigger Notice Cap, and the amounts set forth in clauses (i) through (ii), the "***Carve-Out Cap***"); *provided*, that, nothing herein shall be construed to impair the ability of any party to object to the amount of fees, expenses, reimbursement or compensation described in this paragraph 27(a) on any grounds.  The Carve-Out shall be subject to the applicable restrictions on the use of proceeds of the DIP Loans and Cash Collateral, including the limitations described in paragraph 28.

(b)     <u>Carve-Out Account</u>.  Immediately upon the delivery of a Carve-Out Trigger Notice, and prior to the payment of any DIP Obligations, the DIP Loan Parties shall be required to deposit into a separate account not subject to the control of the DIP Agent (the "***Carve-Out Account***") cash in an amount equal to the Carve-Out Cap.  Notwithstanding anything to the contrary herein or in the other DIP Documents, following delivery of a Carve-Out Trigger Notice, the DIP Agent and the Prepetition First Lien Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the DIP Loan Parties until

the Carve-Out Account has been fully funded as permitted above in an amount equal to all obligations benefitting from the Carve-Out.  The amounts in the Carve-Out Account shall be available only to satisfy amounts included in the Carve-Out until such amounts are paid in full. The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for amounts included in the Carve-Out that are paid after the delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall not be replenished for such amounts so paid.  The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out.  For the avoidance of doubt, (i) to the extent the Carve-Out is funded from borrowings under the DIP Facility, such borrowed amounts shall constitute DIP Obligations, and (ii) the incurrence or payment of any Carve-Out shall not be restricted by the Approved Budget. In no way shall the Carve-Out, the Carve-Out Account, or any Approved Budget be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).

(c)     Carve-Out Trigger Notice.  For purposes of the foregoing, "*Carve-Out Trigger Notice*" shall mean a written notice delivered by email by the DIP Agent (at the direction of the Required DIP Lenders) or the Prepetition Fist Lien Agent (at the direction of the Required Lenders (as defined in the Prepetition First Lien Credit Agreement)) to the Debtors, counsel to the Debtors, counsel to the Creditors' Committee (if any),  and the U.S. Trustee, which notice may be delivered following the occurrence and during the continuation of a Termination Event and acceleration of the DIP Obligations under the DIP Facility stating that the Post-Carve-Out Trigger Notice Cap has been invoked.  The Carve-Out Notice shall constitute a demand to the DIP Loan Parties to utilize all cash on hand to transfer the Carve-Out Account cash in an amount

equal to the Carve-Out Cap less any amounts then held in the Carve-Out Account pursuant to this paragraph.

(d)     <u>Timing of Allowance of Allowed Professional Fees</u>.   For the avoidance of doubt, to the extent that professional fees and expenses of the Professional Persons have been incurred at any time before or on the first Business Day after delivery of a Carve-Out Trigger Notice but have not yet been allowed by the Court, such professional fees and expenses of the Professionals Persons shall, subject to the limitations set forth in paragraph 27(a), constitute Allowed Professional Fees benefiting from the Carve-Out upon their allowance by the Court, whether by interim or final compensation order and whether before or after delivery of the Carve-Out Trigger Notice, and the Carve-Out Account shall include all such estimated professional fees and expenses.

(e)     <u>Payment of Allowed Professional Fees Prior to the Termination Declaration Date</u>.  Any payment or reimbursement made prior to the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall not reduce the Carve-Out.

(f)     <u>No Direct Obligation To Pay Allowed Professional Fees</u>.  Nothing in this DIP Order shall obligate the DIP Secured Parties or the Prepetition Secured Parties for the payment or reimbursement of any fees or expenses of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Case under any chapter of the Bankruptcy Code regardless of whether such fee or expense has been allowed by the Court.  Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Secured Parties or the Prepetition Secured Parties, in any way, to pay compensation to, or to reimburse expenses of, any Professional Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

(g)      <u>Payment of Carve-Out On or After the Termination Declaration Date</u>.  Any payment or reimbursement made on or after the occurrence of the Termination Declaration Date in respect of any Allowed Professional Fees shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  Any funding of the Carve-Out shall be added to, and made a part of, the DIP Obligations secured by the DIP Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the DIP Documents, the Bankruptcy Code, and applicable law.

(h)      <u>Professional Fee Account</u>. Within one (1) Business Day of the initial funding of the DIP Loans, the Debtor DIP Loan Parties shall fund into the Carve-Out Account an amount equal to the total budgeted Professional Persons' fees for the first two (2) weeks set forth in the Approved Budget and, thereafter on a weekly basis, the Debtor DIP Loan Parties shall transfer into the Carve-Out Account cash in an amount equal to the estimated Professional Persons' fees for the next unfunded week set forth in the Approved Budget into the Carve-Out Account. Thereafter, the Debtor DIP Loan Parties shall first use such funds held in the Carve-Out Account to pay Professional Persons' fees as they become allowed and payable pursuant to interim or final orders from the Court before using funds from cash on hand; *provided,* that, any funds remaining in the Professional Fee Account after all Allowed Professional Fees have been irrevocably paid in full shall revert to the Reorganized Debtors or Post-Sale Estates as applicable.  For the avoidance of doubt, nothing in this paragraph 27(h) is or shall be construed as a cap or limitation on Allowed Professional Fees.

28.      <u>Limitations on Use of DIP Proceeds, Cash Collateral, and Carve-Out</u>.  No proceeds of the DIP Facility, the Carve-Out, or any Cash Collateral may be used by the DIP Loan Parties or any other party in interest, or their representatives, to (or support any other party to)

(i) finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the DIP Secured Parties or the Prepetition Secured Parties, or their respective rights and remedies under or in respect of the DIP Facility, the credit facilities provided under the Prepetition Loan Documents, or any interim or final order with respect to the DIP Facility and the adequate protection granted to the Prepetition Secured Parties, except as otherwise provided in the DIP Documents, (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests, and adequate protection of the DIP Secured Parties or the Prepetition Secured Parties, including for the avoidance of doubt, (a) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations under the DIP Facility or the DIP Liens, or (b) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the obligations and liens under credit facilities provided under the Prepetition Loan Documents, (iii) for any purpose that is prohibited under the Bankruptcy Code, this Interim Order, the Final Order, or the DIP Documents, and (iv) to make any payment, in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body, or to pay any costs or expenses incurred in connection with any such claim, action or proceeding, in each case which payment is not provided for in the Approved Budget, without the prior written consent of the Required DIP Lenders; *provided*, however that up to $25,000 shall be made available to the Creditors' Committee (if any) solely for investigation costs to pursue any investigation rights during the Challenge Period (as defined below).

29.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  Based on the findings set forth in this Interim Order and the record

made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, waived, or vacated by a subsequent order of this Court or any other court of competent jurisdiction, each of the DIP Secured Parties and the Prepetition Secured Parties are entitled to the full protections provided in section 364(e) of the Bankruptcy Code.   Any such modification, amendment, waiver, or vacatur shall not affect the validity and enforceability of any advances previously made, including advances made hereunder, or any lien, claim, or priority authorized or created hereby, unless such authorization and the incurring of such debt, or the granting of such priority lien, is stayed pending appeal and the DIP Secured Parties had actual knowledge of such stay.   Notwithstanding any such modification, amendment, or vacatur, any claim granted to the DIP Secured Parties or the Prepetition Secured Parties hereunder arising prior to the effective date of such modification, amendment or vacatur of any of the DIP Liens, First Lien Adequate Protection Liens, 1.5 Lien Adequate Protection Liens, Second Lien Adequate Protection Liens, DIP Superpriority Claims, First Lien Adequate Protection Superpriority Claims, 1.5 Lien Adequate Protection Superpriority Claims, or Second Lien Adequate Protection Superpriority Claims granted to or for the benefit of the DIP Secured Parties or the applicable Prepetition Secured Parties shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Liens, First Lien Adequate Protection Liens, 1.5 Lien Adequate Protection Liens, Second Lien Adequate Protection Liens, DIP Superpriority Claims, First Lien Adequate Protection Superpriority Claims, 1.5 Lien Adequate Protection Superpriority Claims, and Second Lien Adequate Protection Superpriority Claims granted herein, with respect to any such claim.   Because the DIP Loans are made in reliance on this Interim Order,

the DIP Obligations incurred by the DIP Loan Parties or owed to the DIP Secured Parties prior to the effective date of any stay, modification, or vacatur of this Interim Order shall not, as a result of any subsequent order in the Chapter 11 Cases or in any Successor Case, be disallowed or subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Secured Parties or the Prepetition Secured Parties under this Interim Order.

30.     <u>Payment of Fees and Expenses</u>.    The DIP Loan Parties shall pay all reasonable and documented fees and out-of-pocket expenses of each of the DIP Agent and the other DIP Secured Parties, whether incurred before or after the Petition Date or in connection with the Chapter 11 Cases (in any capacity) and the DIP Facility, including the reasonable and documented out-of-pocket expenses of the DIP Agent and the other DIP Secured Parties associated with the DIP Facility, the Debtors, these Chapter 11 Cases, and the transactions contemplated thereby and therein.  Other than in connection with fees and expenses payable as a condition to the occurrence of the Closing Date, any time that professionals of any of the DIP Agent or the other DIP Secured Parties seek payment of fees and expenses from the DIP Loan Parties, such professional shall provide summary copies of its fee and expense statements or invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work- product doctrine) by electronic mail to the U.S. Trustee and counsel to the Creditors' Committee (if any) contemporaneously with the delivery of such fee and expense statements to the Debtors.  The Debtors, the Creditors' Committee (if any), or the U.S. Trustee

may dispute the payment of any portion of such invoiced fees and expenses (the "***Disputed Invoiced Fees***") if a Debtor, the Creditors' Committee (if any), or the U.S. Trustee notifies the submitting party in writing within five (5) Business Days of the receipt of such fee and expense statement or invoice, setting forth the specific objections to the Disputed Invoiced Fees (to be followed by the filing with the Court, if necessary, of a motion or other pleading, with at least twenty-one (21) days prior written notice to the submitting party of any hearing on such motion or other pleading).  The DIP Loan Parties shall promptly pay in full all such invoiced fees and expenses other than the Disputed Invoiced Fees.  Notwithstanding the foregoing, the DIP Loan Parties shall pay on or about the Closing Date all reasonable and documented fees, costs, and out-of-pocket expenses of each of the DIP Agent and the other DIP Secured Parties incurred on or prior to such date without the need for any professional engaged by any of the DIP Agent or the other DIP Secured Parties to first deliver a copy of its invoice as provided for herein (other than to the Debtors).  No attorney or advisor to any of the DIP Agent or the other DIP Secured Parties shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.  Any and all fees, costs and expenses paid prior to the Petition Date by any of the Debtors to the DIP Agent or the other DIP Secured Parties in connection with the DIP Facility are hereby approved in full.

31.    <u>Proofs of Claim</u>.  The DIP Agent, the other DIP Secured Parties, and the Prepetition Secured Parties will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim allowed herein, including any claims arising under the Prepetition Documents.  The Debtors' Stipulations and Releases shall be deemed to constitute a timely filed proof of claim for the DIP Secured Parties and each of the Prepetition Secured Parties upon approval of this Interim Order, and the DIP Secured Parties and each of the Prepetition

Secured Parties shall be treated under section 502(a) of the Bankruptcy Code as if they filed a proof of claim.  However, in order to facilitate the processing of claims, to ease the burden upon the Court and to reduce any unnecessary expense to the Debtors' Estates, each of the Prepetition Agents are each authorized (but not directed), in their sole discretions, to file in the Debtors' lead Chapter 11 Case *In re Strategic Materials, Inc.*, Case No. 23-90907 (CML), a master proof of claim on behalf of their respective Prepetition Secured Parties on account of any and all of their respective claims arising under their applicable Prepetition Loan Documents and hereunder (as applicable) (each, a "***Master Proof of Claim***") against each of the applicable Debtors.  Upon the filing of any such Master Proof of Claim, the applicable Prepetition Agent (and Prepetition Secured Party, as applicable) shall be deemed to have filed a proof of claim in each of the Chapter 11 Cases of the applicable Debtors.  The Master Proof of Claim shall not be required to attach any instruments, agreements, or other documents evidencing the obligations owing to the applicable Prepetition Secured Parties.  Any proof of claim filed by a Prepetition Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties.  Any order entered by the Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to (i) the DIP Secured Parties, or (ii) the Prepetition Secured Parties with respect to any claims arising under the Prepetition Loan Documents.

32.     <u>Effect of Stipulations on Third Parties</u>.

(a)     *Generally*.  The Debtors' Stipulations and Releases, admissions, agreements, and releases contained in this Interim Order, including, without limitation paragraphs F, G, and H hereof, shall be binding on the Debtors in all circumstances and for all purposes.  The

Debtors' Stipulations and Releases shall be binding upon the Debtors' Estates and each party in interest (other than the Debtors), including the Creditors' Committee (if any), and any chapter 11 trustee (or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period, the chapter 7 trustee in such Successor Case), except to the extent and only to the extent such party in interest with standing *first*, commences, in the case of such adversary proceeding or other contested matter filed by a party in interest with required standing (including the Creditors' Committee (if any)), by the date that shall be (i)(a) except as to any official committee appointed in these Chapter 11 Cases, sixty (60) days after entry of this Interim Order, and (b) in the case of any official committee appointed in these chapter 11 cases, sixty (60) days after such appointment; and (ii) the date of confirmation of the Approved Plan (such time period established by the earlier of clauses (i) and (ii) as applicable, the "***Challenge Period***," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (x) no Challenge (defined below) is raised during the Challenge Period or (y) with respect only to those parties who file a Challenge, such Challenge is fully and finally adjudicated, shall be referred to as the "***Challenge Period Termination Date***") , a contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations and Releases (collectively, the "***Challenges***" and, each individually, a "***Challenge***"), and *second*, obtains a final, non-appealable order in favor of such party in interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "***Successful Challenge***"); *provided*, that, any pleadings filed in any Challenge proceeding shall (x) set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the Challenge Period Termination Date shall be deemed forever, waived,

72

released, and barred) and (y) identify on the face of the pleading that it is a Challenge.  Failure to

comply with clauses (x) and (y) shall conclusively deem such pleading to not be a Challenge.

Upon a Successful Challenge as against any party, including that an obligation to such party is

unsecured or undersecured, the Court may fashion an appropriate remedy.

(b)     Except as otherwise expressly provided herein, from and after the

Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any

Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), (i) the

Debtors' Stipulations and Releases shall be binding on all parties in interest, including, without

limitation, the Creditors' Committee (if any), (ii) the Prepetition Liens and any other prepetition

claims and liens granted under or in connection with the Prepetition Loan Documents, shall be

deemed, without further order of the Court, to the extent not theretofore indefeasibly repaid,

satisfied, or discharged, as applicable, to be finally allowed for all purposes in the Chapter 11

Cases and any Successor Cases and shall not be subject to challenge or objection by any party in

interest as to validity, extent, amount, perfection, priority, or non-avoidability; (iii) the Prepetition

Liens on the respective Prepetition Collateral shall be deemed to have been, as of the Petition Date,

legal, valid, binding, perfected, security interests and liens, not subject to recharacterization,

subordination, avoidance, or other defense, but subject to the Carve-Out and the other priorities

described herein; and (iv) the Prepetition Obligations and the Prepetition Liens on the respective

Prepetition Collateral shall not be subject to any other or further claim or challenge by the

Creditors' Committee (if any), any statutory or non-statutory committees appointed or formed in

the Chapter 11 Cases or any other party in interest acting or seeking to act on behalf of the Debtors'

Estates, including, without limitation, any successor thereto (including, without limitation, any

chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors) and

any defenses, claims, causes of action, counterclaims and offsets, whether arising under the Bankruptcy Code or otherwise, against any of the Prepetition Secured Parties and their representatives arising out of or relating to any of the Prepetition Loan Documents or this Interim Order shall be deemed forever waived, released and barred.

(c)       Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and Releases, and the other provisions in clauses (i) through (iv) in paragraph 32(b) hereof shall nonetheless remain binding and preclusive on the Creditors' Committee (if any) and on any other party in interest from and after the Challenge Period Termination Date, except, solely as to the plaintiff party that timely filed such Challenge and not, for the avoidance of doubt, as to any other party in interest, to the extent that such Debtors' Stipulations and Releases or the other provisions in clauses (i) through (iv) of paragraph 32(b) hereof were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.

(d)       Nothing in this Interim Order vests or confers on any Person (as defined in the Bankruptcy Code), including the Creditors' Committee (if any) or any statutory or non-statutory committees appointed or formed in these Chapter 11 Cases, standing or authority to pursue any claim or cause of action belonging to the Debtors or their Estates, including, without limitation, Challenges with respect to the Debtors' Stipulations and Releases.

(e)       For the avoidance of doubt, as to the Debtors, upon entry of this Interim Order, all Challenges, and any right to assert any Challenge, are hereby irrevocably waived and relinquished as of the Petition Date, and the Debtors' Stipulations and Releases shall be binding in all respects on the Debtors irrespective of the filing of any Challenge.  Any successor to the Debtors (including, without limitation, any chapter 7 or chapter 11 trustee appointed or

74

elected for any of the Debtors or any other estate representative appointed in the Chapter 11 Cases or any Successor Cases) shall be, subject to the expiration of any applicable challenge period, bound by the terms of this Interim Order and the Final Order to the same extent as the Debtors.

33.     No Third-Party Rights.   Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary.

34.     Section 506(c) Claims.  Subject to and upon entry of the Final Order, except to the extent of the Carve-Out, the Debtors irrevocably waive and are prohibited from asserting any claim under section 506(c) of the Bankruptcy Code, and no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code shall be charged against or recovered from the DIP Collateral, the DIP Agent, or the DIP Lenders, and the Prepetition Collateral, the Prepetition Agents, or the Prepetition Secured Lenders pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders) or the applicable Prepetition Agents, as may be applicable, and no such consent shall be implied from any action, inaction, or acquiescence by any party.

35.     No Marshaling/Applications of Proceeds.  Subject to and upon entry of the Final Order, except to the extent of the Carve-Out, in no event shall the DIP Secured Parties or the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

36.     Section 552(b).  Subject to and upon entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall be entitled to all of the rights and benefits

of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception thereunder shall not apply to the DIP Secured Parties, the DIP Obligations, the Prepetition Secured Parties, or the Prepetition Obligations.

37.     <u>Releases and Stipulations</u>.  Each of the Debtors' Stipulations and Releases set forth in Paragraphs F, G, and H of this Interim Order are authorized and approved to the extent set forth herein.

38.     <u>Limits on Lender Liability</u>.  Nothing in this Interim Order, any of the DIP Documents, any of the Prepetition Loan  Documents, or any other documents related thereto, shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from any activities by the Debtors in the operation of their businesses or in connection with the administration of these Chapter 11 Cases or any Successor Cases.  The DIP Secured Parties and the Prepetition Secured Parties shall not, solely by reason of having made loans under the DIP Facility or authorizing the use of Cash Collateral, be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).  Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors.

39.     <u>Release of DIP Secured Party Claims</u>. Each Debtor shall forever waive, discharge, and release each of the DIP Secured Parties and their respective affiliates, assigns, or

successors and the respective members, managers, equity holders, affiliates, agents, attorneys, financial advisors, consultants, officers, directors, employees, and other representatives of the foregoing (all of the foregoing, collectively, the "***DIP Secured Party Releasees***") from any and all obligations and liabilities to the Debtors (and their permitted successors and assigns) and from any and all "claims" (as defined in section 101(5) of the Bankruptcy Code), counterclaims, causes of action (including causes of action in the nature of "lender liability"), defenses, setoff, recoupment, other offset rights, and other rights of disgorgement or recovery against any and all of the DIP Secured Party Releasees, whether arising at law or in equity, relating to and/or otherwise in connection with the DIP Obligations, the DIP Liens, or the debtor-creditor relationship between any of the DIP Secured Parties, on the one hand, and any of the Debtors, on the other hand, arising prior to the date of entry of this Interim Order including (a) any recharacterization, subordination, avoidance, disallowance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state law, federal law, municipal law, or foreign law; and (b) any right or basis to challenge or object to the amount, validity, or enforceability of the DIP Obligations or any payments or other transfers made on account of the DIP Obligations, or the validity, enforceability, priority, or non-avoidability of the DIP Liens securing the DIP Obligations, including any right or basis to seek any disgorgement or recovery of payments of cash or any other distributions or transfers previously received by any of the DIP Secured Party Releasees.  For the avoidance of doubt, the foregoing releases in this paragraph 39 are only given by each Debtor to the DIP Secured Party Releasees and are not given by any other party.

40.     <u>Insurance Proceeds and Policies</u>.  Upon entry of this Interim Order, subject to the terms of the DIP Loan Parties' leases for non-residential real property and otherwise to the

fullest extent provided by applicable law, the DIP Agent (on behalf of itself and the other DIP Secured Parties) and each of the Prepetition Agents (on behalf of itself and for the benefit of the applicable Prepetition Secured Parties, as applicable), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the DIP Loan Parties that in any way relates to the DIP Collateral or any Prepetition Collateral.

41.     <u>Joint and Several Liability</u>.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' Estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for the obligations hereunder and all DIP Obligations in accordance with the terms hereof and the DIP Documents.

42.     <u>Rights Preserved</u>.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (i) any of the DIP Secured Parties' or the Prepetition Secured Parties' rights to seek any other or supplemental relief; (ii) any of the rights of any of the DIP Secured Parties or the Prepetition Secured Parties under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (a) request modification of the automatic stay imposed by section 362 of the Bankruptcy Code, (b) request dismissal of any of the Chapter 11 Cases or Successor Cases, conversion of any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or appointment of a chapter 11 trustee or examiner with expanded powers, or (c) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (iii) any other rights, claims, or privileges (whether legal, equitable, or otherwise) of any of the DIP Secured Parties or the Prepetition Secured Parties.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a

waiver of, expressly or implicitly, the Debtors', a Creditors' Committee's (if any), or any party in interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence except as expressly set forth in this Interim Order.

43.    <u>No Waiver by Failure to Seek Relief</u>.  The failure of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of any of the DIP Secured Parties or the Prepetition Secured Parties.

44.    <u>Binding Effect of Interim Order</u>.  The provisions of this Interim Order shall be binding upon and inure to the benefit of the Debtors, each of the DIP Secured Parties, each of the Prepetition Secured Parties, the Creditors' Committee (if any), all other creditors of any of the Debtors and all other parties in interest and, in each case, their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors).  To the extent permitted by applicable law, this Interim Order shall bind any trustee, administrator, (whether under U.S. law or the laws of any other jurisdiction), or equivalent entity or person hereafter appointed for the Estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of the conversion of any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case, to a liquidation under chapter 7 of the Bankruptcy Code.  Such binding effect is an integral part of this Interim Order.

45.     <u>No Modification of Interim Order</u>.  Until the DIP Obligations have been paid in full, the Debtors shall be prohibited from seeking or consenting to, directly or indirectly, any modification, stay, vacatur, waiver, or amendment to this Interim Order or any provision hereof without the prior written consent of the DIP Agent (at the direction of the Required DIP Lenders) and no such consent shall be implied by any action or inaction of the DIP Agent.

46.     <u>Interim Order Controls</u>.  In the event of any inconsistency between the terms and conditions of the DIP Documents and this Interim Order, the provisions of this Interim Order shall control.

47.     <u>Discharge</u>.  Subject to the terms and conditions of the DIP Credit Agreement, the DIP Obligations shall not be discharged by the entry of an order confirming any plan of reorganization in the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless the DIP Obligations have been paid in full on or before the effective date of such plan of reorganization or the DIP Agent (at the direction of the Required DIP Lenders) has otherwise agreed in writing.

48.     <u>Survival</u>.  The provisions of this Interim Order and the DIP Documents, any actions taken pursuant hereto or thereto, and all of the protections, rights, remedies, liens, priorities, privileges, and benefits granted to any or all of the DIP Secured Parties and Prepetition Secured Parties respectively, shall survive, and shall not be modified, impaired, or discharged by, the entry of any order confirming any plan of reorganization or liquidation in any of the Chapter 11 Cases, converting any of the Chapter 11 Cases to a chapter 7 case, dismissing any of the Chapter 11 Cases or any Successor Cases, withdrawing of the reference of any of these Chapter 11 Cases, any Successor Cases, or providing for abstention from handling or retaining of jurisdiction of any of these Chapter 11 Cases in this Court, or terminating the joint administration of these Chapter

11 Cases or by any other act or omission.  The terms and provisions of this Interim Order shall

continue in the Chapter 11 Cases, in any Successor Cases, or following the dismissal of the Chapter

11 Cases or any Successor Cases, notwithstanding the entry of any such order, and such

protections, rights, remedies, liens, priorities, privileges, and benefits shall continue in full force

and effect in these proceedings and after dismissal of any thereof, and shall maintain their

respective priorities as provided by this Interim Order and the DIP Documents, and to the

maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full in

cash and discharged.

49.     Replacement Agent.  Notwithstanding the resignation or replacement of any

collateral agent or administrative agent, including the DIP Agent and any Prepetition Agent, the

DIP Liens on the DIP Collateral, the Prepetition Liens on the Prepetition Collateral, and the

Adequate Protection Liens shall remain continuously and properly perfected, notwithstanding the

transfer of control, possession, or title of any Prepetition Collateral or DIP Collateral to a new

collateral or administrative agent.

50.     Payments Free and Clear.  Any and all payments or proceeds remitted to the

DIP Agent on behalf of the DIP Secured Parties or any Prepetition Agent on behalf of any

Prepetition Secured Party, pursuant to the provisions of this Interim Order, any subsequent order

of this Court or the DIP Documents, shall, subject to the terms of this paragraph, be irrevocable,

received free and clear of any claims, charges, assessments, or other liabilities, including, without

limitation, subject to entry of the Final Order granting such relief, any such claims or charges

arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code or section

552(b) of the Bankruptcy Code, whether asserted or assessed by, through or on behalf of the

Debtors, and in the case of payments made or proceeds remitted after the delivery of the Carve-Out Trigger Notice, subject to the Carve-Out in all respects.

51.    <u>Governing Law</u>.  The DIP Documents shall be governed by, and construed in accordance with, the laws of the State of New York and applicable United States federal law, without regard to the conflict of law principles.

52.    <u>Headings</u>.  Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

53.    <u>Final Hearing</u>.  The Final Hearing shall be held on [•], 2024, at [•]. (Central Time), and any objections to the final relief sought in the Motion shall be filed with the Court no later than [•], 2024,  at 5:00 p.m. (Central Time).

54.    <u>Retention of Jurisdiction</u>.  This Court retains exclusive jurisdiction to resolve any dispute arising from or related to the interpretation or enforcement of this Interim Order.

Signed: December [•], 2023

_____
**THE HONORABLE CHRISTOPHER M. LOPEZ**
**UNITED STATES BANKRUPTCY JUDGE**

# <u>EXHIBIT B</u>

**Form of DIP Credit Agreement**

*Execution Version*

SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of December 6, 2023

among

**STRATEGIC MATERIALS HOLDING CORP.,**
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code
as the Borrower,

and

**SMI GROUP ACQUISITIONS, INC.,**
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code
as Holdings,

and

ACQUIOM AGENCY SERVICES LLC,
as Co-Administrative Agent,

SEAPORT LOAN PRODUCTS LLC,
as Co-Administrative Agent,

and

The Lenders From Time to Time Party Hereto

# TABLE OF CONTENTS

**Page**

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

| | | |
|---|---|---|
| Section 1.01 | Defined Terms | 1 |
| Section 1.02 | Other Interpretive Provisions | 38 |
| Section 1.03 | Accounting Terms | 39 |
| Section 1.04 | Rounding | 39 |
| Section 1.05 | References to Agreements and Laws | 40 |
| Section 1.06 | Times of Day | 40 |
| Section 1.07 | Timing of Payment or Performance | 40 |
| Section 1.08 | Rates | 40 |

## ARTICLE II
## THE NEW MONEY DIP COMMITMENTS AND TERM BORROWINGS

| | | |
|---|---|---|
| Section 2.01 | The Loans | 41 |
| Section 2.02 | Term Borrowings, Conversions and Continuations of Loans | 41 |
| Section 2.03 | [Reserved.] | 43 |
| Section 2.04 | [Reserved.] | 43 |
| Section 2.05 | Prepayments | 43 |
| Section 2.06 | Termination or Reduction of New Money DIP Commitments | 44 |
| Section 2.07 | Repayment of Loans | 44 |
| Section 2.08 | Interest | 45 |
| Section 2.09 | Fees | 45 |
| Section 2.10 | Computation of Interest and Fees | 47 |
| Section 2.11 | Evidence of Indebtedness | 47 |
| Section 2.12 | Payments Generally; Administrative Agent's Clawback | 48 |
| Section 2.13 | Sharing of Payments | 50 |
| Section 2.14 | Withdrawal of Funds from the Funding Account | 50 |
| Section 2.15 | Exit Facility Refinancing; Refinancing Date Transactions | 52 |

## ARTICLE III
## TAXES, INCREASED COSTS PROTECTION AND ILLEGALITY

| | | |
|---|---|---|
| Section 3.01 | Taxes | 53 |
| Section 3.02 | Illegality | 55 |
| Section 3.03 | Inability to Determine Rates | 56 |
| Section 3.04 | Increased Cost and Reduced Return; Capital Adequacy | 58 |
| Section 3.05 | Funding Losses | 59 |
| Section 3.06 | Matters Applicable to All Requests for Compensation | 59 |
| Section 3.07 | Replacement of Lenders under Certain Circumstances | 60 |
| Section 3.08 | Survival | 62 |

174499819

## ARTICLE IV
## CONDITIONS PRECEDENT TO TERM BORROWINGS

Section 4.01    Conditions to Closing Date ..................................................................62
Section 4.02    Conditions to All Term Borrowings and Withdrawals ......................65

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Section 5.01    Existence, Qualification and Power; Compliance with Laws...........66
Section 5.02    Authorization; No Contravention ......................................................66
Section 5.03    Governmental Authorization ............................................................66
Section 5.04    Binding Effect...................................................................................67
Section 5.05    Financial Condition; No Material Adverse Effect ...........................67
Section 5.06    Litigation...........................................................................................67
Section 5.07    Ownership of Property; Intellectual Property; Insurance ...............68
Section 5.08    Environmental Compliance ..............................................................68
Section 5.09    Taxes ..................................................................................................69
Section 5.10    Employee Benefits Plans; Labor Matters .........................................69
Section 5.11    Subsidiaries; Equity Interests...........................................................71
Section 5.12    Margin Regulations; Investment Company Act ...............................71
Section 5.13    Disclosure .........................................................................................71
Section 5.14    Compliance with Laws .....................................................................72
Section 5.15    Brokerage Fees..................................................................................72
Section 5.16    [Reserved].........................................................................................72
Section 5.17    Collateral Documents........................................................................72
Section 5.18    PATRIOT Act, Etc............................................................................72
Section 5.19    FCPA; Anti-Corruption ....................................................................73
Section 5.20    Sanctioned Persons ..........................................................................73
Section 5.21    Use of Proceeds.................................................................................73
Section 5.22    Cases; DIP Orders; Secured Super-Priority Obligations ................73

## ARTICLE VI
## AFFIRMATIVE COVENANTS

Section 6.01    Financial Statements .........................................................................75
Section 6.02    Certificates; Other Information.........................................................77
Section 6.03    Notices ...............................................................................................79
Section 6.04    Payment of Taxes...............................................................................79
Section 6.05    Preservation of Existence..................................................................80
Section 6.06    Maintenance of Properties ................................................................80
Section 6.07    Maintenance of Insurance.................................................................80
Section 6.08    Compliance with Law; Anti-Corruption Laws, Anti-Money
                Laundering and Sanctions.................................................................81
Section 6.09    Books and Records ............................................................................81
Section 6.10    Inspection Rights ..............................................................................81
Section 6.11    Use of Proceeds.................................................................................82

Section 6.12    Covenant to Guarantee Obligations and Give Security ...................................82
Section 6.13    Compliance with Environmental Laws...................................................85
Section 6.14    Further Assurances...................................................................85
Section 6.15    Priority of Liens....................................................................86
Section 6.16    Milestones...........................................................................87
Section 6.17    Bankruptcy Related Matters ..........................................................87
Section 6.18    Independent Director.................................................................89
Section 6.19    [Reserved]...........................................................................89
Section 6.20    Budget Compliance....................................................................89
Section 6.21    Lender Calls.........................................................................89
Section 6.22    [Reserved]...........................................................................89
Section 6.23    Post-Closing Matters.................................................................89

## ARTICLE VII
## NEGATIVE COVENANTS

Section 7.01    Liens................................................................................89
Section 7.02    Investments..........................................................................93
Section 7.03    Indebtedness.........................................................................95
Section 7.04    Fundamental Changes..................................................................96
Section 7.05    Dispositions.........................................................................97
Section 7.06    Restricted Payments..................................................................98
Section 7.07    Change in Nature of Business; Conduct of Business....................................99
Section 7.08    Transactions with Affiliates.........................................................99
Section 7.09    Burdensome Agreements................................................................100
Section 7.10    Certain Restrictions on Subsidiaries.................................................100
Section 7.11    Accounting Changes...................................................................101
Section 7.12    Prepayments, Etc. of Indebtedness; Amendments........................................101
Section 7.13    Holding Company......................................................................101
Section 7.14    Subsidiaries.........................................................................103
Section 7.15    Budget Variance......................................................................103
Section 7.16    Minimum Liquidity....................................................................103
Section 7.17    Additional Bankruptcy Matters........................................................103

## ARTICLE VIII
## EVENTS OF DEFAULT AND REMEDIES

Section 8.01    Events of Default ...................................................................104
Section 8.02    Remedies Upon Event of Default ......................................................109
Section 8.03    [Reserved.]..........................................................................110
Section 8.04    Application of Funds.................................................................110

## ARTICLE IX
## ADMINISTRATIVE AGENT AND OTHER AGENTS

Section 9.01    Appointment and Authorization of Agents..............................................111
Section 9.02    Delegation of Duties ................................................................111

174499819

Section 9.03      Liability of Agents ...................................................................112
Section 9.04      Reliance by Agents ...................................................................113
Section 9.05      Notice of Default.......................................................................113
Section 9.06      Credit Decision; Disclosure of Information by Agents .................114
Section 9.07      Indemnification of Agents .........................................................114
Section 9.08      Agents in their Individual Capacities...........................................115
Section 9.09      Successor Agents ......................................................................115
Section 9.10      Administrative Agent May File Proofs of Claim...........................116
Section 9.11      Collateral and Guaranty Matters ................................................117
Section 9.12      Erroneous Payments..................................................................118
Section 9.13      No Fiduciary Relationship ..........................................................119
Section 9.14      Appointment of Supplemental Administrative Agents...................119
Section 9.15      Certain ERISA Matters ..............................................................120
Section 9.16      Credit Bidding...........................................................................122

ARTICLE X
MISCELLANEOUS

Section 10.01      Amendments, Etc. .....................................................................123
Section 10.02      Notices; Electronic Communications ..........................................125
Section 10.03      No Waiver; Cumulative Remedies; Enforcement...........................127
Section 10.04      Expenses ..................................................................................127
Section 10.05      Indemnification by the Borrower..................................................128
Section 10.06      Payments Set Aside...................................................................129
Section 10.07      Successors and Assigns..............................................................130
Section 10.08      Confidentiality ..........................................................................134
Section 10.09      Setoff........................................................................................135
Section 10.10      [Reserved] .................................................................................136
Section 10.11      Interest Rate Limitation ..............................................................136
Section 10.12      Counterparts ..............................................................................136
Section 10.13      Integration; Effectiveness ............................................................136
Section 10.14      Survival of Representations and Warranties...................................137
Section 10.15      Severability ................................................................................137
Section 10.16      Tax Forms ..................................................................................137
Section 10.17      Governing Law; Jurisdiction; Etc. ................................................139
Section 10.18      WAIVER OF RIGHT TO TRIAL BY JURY..................................140
Section 10.19      Binding Effect .............................................................................141
Section 10.20      No Advisory or Fiduciary Responsibility ......................................141
Section 10.21      Affiliate Activities ......................................................................141
Section 10.22      Lender Action .............................................................................142
Section 10.23      Electronic Execution of Assignments and Certain Other Documents ...........142
Section 10.24      PATRIOT Act.............................................................................142
Section 10.25      [Reserved.].................................................................................142
Section 10.26      Judgment Currency .....................................................................143
Section 10.27      [Reserved.] .................................................................................143
Section 10.28      DIP Orders .................................................................................143

-iv-

Section 10.29    Acknowledgement and Consent to Bail-In of EEA Financial Institutions...................................................................................................143

SCHEDULES

| | |
|---|---|
| 1 | Guarantors |
| 1.01(d) | Disqualified Lenders (Competitors) |
| 2.01(a) | New Money DIP Commitments and Pro Rata Shares |
| 2.01(b) | Roll-Up Schedule |
| 5.06 | Litigation |
| 5.08 | Environmental Matters |
| 5.11 | Subsidiaries and Other Equity Investments |
| 6.23 | Post-Closing |
| 7.01 | Existing Liens |
| 7.02 | Existing Investments |
| 7.03 | Existing Indebtedness |
| 7.08 | Existing Transactions with Affiliates |
| 10.02 | Administrative Agent's Office, Certain Addresses for Notices |

EXHIBITS

Form of

| | |
|---|---|
| A | Committed Term Loan Notice |
| B | Interim Order |
| C | Term Note |
| D | Compliance Certificate |
| E | Assignment and Assumption |
| F | Funding Account Withdrawal Notice |
| G | Revenue Report |
| H | Budget |
| I | Budget Variance Report |
| J | Monthly Financial Statements |
| K | Regional and Plant Financials |
| L | [Reserved] |
| M | Exit Term Sheet |

174499819

This SUPERPRIORITY SECURED DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") is entered into as of December 6, 2023, among STRATEGIC MATERIALS HOLDING CORP., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "Borrower"), SMI GROUP ACQUISITIONS, INC., a Delaware corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("Holdings"), the Lenders and ACQUIOM AGENCY SERVICES LLC ("Acquiom") and SEAPORT LOAN PRODUCTS LLC ("Seaport"), as co-administrative agents for the Lenders (in such capacities, together with any successor co-administrative agent appointed pursuant to the provisions of Article IX, each a "Co-Administrative Agent" and collectively, the "Administrative Agent").

## PRELIMINARY STATEMENTS

WHEREAS, on December 4, 2023 (the "Petition Date"), Borrower and certain of the Guarantors (each a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of Borrower and each other Debtor, a "Case" and collectively, the "Cases") and have continued in the possession of their assets and management of their business pursuant to Section 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Lenders extend credit to the Borrower in the form of new money term loans in an aggregate principal amount of up to $23,000,000.00 and in the form of roll-up loans in respect of the loans outstanding under the Prepetition Superpriority Credit Agreement (as defined below) (together with accrued and unpaid interest thereon) in an aggregate principal amount equal to $28,439,583.33 (collectively, the "DIP Term Facility"), with all of the Borrower's obligations under the DIP Term Facility to be guaranteed by each Guarantor;

WHEREAS, the priority of the Liens on the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court; and

WHEREAS, the Lenders are willing to extend such credit to the Borrower on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
### Definitions and Accounting Terms

Section 1.01    Defined Terms.  As used in this Agreement, the following terms shall have the meanings set forth below:

"Acquiom"  has the meaning set forth in the introductory paragraph hereto.

"Adequate Protection" has the meaning set forth in the Interim Order or Final Order, as applicable.

174499819

"<u>Adjusted Term SOFR</u>" shall mean, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"<u>Administrative Agent</u>" has the meaning assigned to such term in the introductory paragraph of this Agreement.

"<u>Administrative Questionnaire</u>" means an administrative questionnaire provided to the Borrower by the Administrative Agent from time to time in such form approved by the Administrative Agent.

"<u>Affiliate</u>" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Agent-Related Persons</u>" means each Agent, together with its Related Parties.

"<u>Agents</u>" means, collectively, each Co-Administrative Agent and the Supplemental Administrative Agents (if any).

"<u>Aggregate New Money DIP Commitments</u>" means the New Money DIP Commitments of all the Lenders.

"<u>Agreement</u>" means this Superpriority Secured Debtor-in-Possession Credit Agreement.

"<u>Ankura</u>" shall mean Ankura Consulting Group, LLC.

"<u>Anti-Corruption Laws</u>" has the meaning specified in <u>Section 5.20(a)</u>.

"<u>Anti-Money Laundering Laws</u>" means all laws, rules, and regulations of any jurisdiction applicable to Holdings or any of its Affiliates from time to time concerning or relating to bribery or corruption.

"<u>Applicable Rate</u>" means a percentage per annum equal to (i) 10.00% per annum for SOFR Loans and (ii) 9.00% per annum for Base Rate Loans.

"<u>Approved Budget</u>" means (a) the Initial Budget, unless and until there is a Replacement Approved Budget and (b) thereafter, the then most recent Replacement Approved Budget.

"<u>Approved Domestic Bank</u>" has the meaning specified in clause (b) of the definition of "Cash Equivalents".

"<u>Approved Fund</u>" means any Fund that is administered, advised or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers, advises or manages a Lender.

"Approved Plan" means the Debtors' Joint Prepackaged Chapter 11 Plan of Reorganization administered under Case Number 23-90907, as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms thereof and the Restructuring Support Agreement.

"Approved Plan Effective Date" has the meaning ascribed to the term "Effective Date" in the Approved Plan.

"Assignee Group" means two (2) or more Eligible Assignees that are Affiliates of one another or two (2) or more Approved Funds managed by the same investment advisor.

"Assignment and Assumption" means an Assignment and Assumption substantially in the form of Exhibit E, or otherwise in form and substance reasonably acceptable to the Administrative Agent.

 "Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if the then-current Benchmark (or component thereof) is a term rate, any tenor for such Benchmark that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 3.03(b)(iv).

"Avoidance Action" means the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code.

"Avoidance Proceeds" means any proceeds or property recovered, unencumbered or otherwise in connection with successful Avoidance Actions, whether by judgment, settlement or otherwise.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means the United States Bankruptcy Code, 11 U.S.C. § 101, *et seq.*, as amended, and any rules and regulations promogulated thereunder.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, or any appellate court having jurisdiction over the Cases from time to time.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases, including any local rules of the Bankruptcy Court.

"<u>Base Rate</u>" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate for such day *plus* 1/2 of 1%, (b) the Prime Rate and (c) Adjusted Term SOFR for a one-month Interest Period *plus* 1%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Rate or Adjusted Term SOFR for any reason, the Base Rate shall be determined without regard to clause (a) or (c) above, as applicable, until the circumstances giving rise to such inability no longer exist. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR shall be effective from the day of such change in the Prime Rate, the Federal Funds Rate or Adjusted Term SOFR, respectively.

"<u>Base Rate Loan</u>" means a Term Loan that bears interest based on the Base Rate.

"<u>Base Rate Term SOFR Determination Day</u>" shall have the meaning specified in the definition of "Term SOFR".

"<u>Benchmark</u>" means, initially, the Term SOFR Reference Rate; <u>provided</u> that if a Benchmark Transition Event and the related Benchmark Replacement Date, have occurred with respect to the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 3.03(b)</u>.

"<u>Benchmark Replacement</u>" means with respect to any Benchmark Transition Event, the first alternative set forth in the order below that (x) can be determined by the Administrative Agent (acting at the direction of the Required Lenders) for the applicable Benchmark Replacement Date and (y) is administratively feasible as determined in good faith by the Administrative Agent:

(a) the sum of (i) Daily Simple SOFR and (ii) 0.11448% (11.448 basis points);

(b) for any Available Tenor, the sum of (i) the alternate benchmark rate that has been selected by the Administrative Agent (acting at the direction of the Required Lenders) in consultation with the Borrower (and that is administratively feasible as determined by the Administrative Agent) giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (ii) the related Benchmark Replacement Adjustment;

*provided* that if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"<u>Benchmark Replacement Adjustment</u>" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or

-4-

negative value or zero) that has been selected by the Administrative Agent (acting at the direction of the Required Lenders) in consultation with the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time; provided, that any such Benchmark Replacement Adjustment shall be administratively feasible as determined in good faith by the Administrative Agent.

"Benchmark Replacement Conforming Changes" means, with respect to the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods and other technical, administrative or operational matters) that the Administrative Agent (acting at the direction of the Required Lenders) in consultation with the Borrower decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent determines in good faith that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent (acting at the direction of the Required Lenders) in consultation with the Borrower determines that no market practice for the administration of any such rate exists, in such other manner of administration as (x) the Administrative Agent (acting at the direction of the Required Lenders and in consultation with the Borrower) decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents and (y) the Administrative Agent determines is administratively feasible).

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available

Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a) a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c) a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the ninetieth (90th) day (or such other date selected by the Administrative Agent (acting at the direction of the Required Lenders)) prior to the expected date of such event as of such public statement or

-6-

publication of information (as such expected date may be delayed pursuant to any subsequent public statement or event) (or if the expected date of such prospective event is fewer than ninety (90) days (or such other date selected by the Administrative Agent (acting at the direction of the Required Lenders)) after such statement or publication, the date of such statement or publication).

"<u>Benchmark Unavailability Period</u>" means, with respect to any then-current Benchmark, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 3.03(b)</u> and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with <u>Section 3.03(b)</u>.

"<u>Borrower</u>" means Strategic Materials Holding Corp., a Delaware corporation.

"<u>Borrower Materials</u>" has the meaning specified in <u>Section 6.02</u>.

"<u>Budget</u>" means a rolling 13-week cash flow forecast delivered on or prior to the Closing Date and thereafter at such time set forth in <u>Section 6.01(d)</u>, setting forth all forecasted receipts and disbursements of Holdings and its Subsidiaries on a weekly basis during such 13-week period which forecast shall be substantially in the form of <u>Exhibit H</u> attached hereto, (i) initially, covering the period commencing on the Monday occurring on or immediately preceding the Closing Date and (ii) thereafter, covering the period commencing on the Monday immediately preceding the date on which the Budget is (or is required to be) delivered pursuant to <u>Section 6.01(d)</u>.

"<u>Budget Variance Report</u>" means a weekly variance report provided by the Borrower to the Administrative Agent (i) showing, in each case, by line item the actual cash receipts and disbursements for the immediately preceding one-week period (ended on the immediately preceding Sunday), noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the Approved Budget, and shall include explanations for all material variances, (ii) showing, in each case, by line item the actual cash receipts and disbursements for the then most recently ended Variance Testing Period, noting therein all variances, on a line-item and aggregate basis, from the amounts set forth for such period in the Approved Budget (or, if a portion of such Variance Testing Period is covered in a preceding Approved Budget and not in the then most recent Approved Budget, from the amounts set forth in (x) such preceding Approved Budget (for the portion of such Variance Testing Period covered in such preceding Approved Budget and not in the then most recent Approved Budget) and (y) in the then current Approved Budget (for the portion of such Variance Testing Period covered in such current Approved Budget)), and shall include explanations for all material variances and (iii) certified by the chief financial officer of the Borrower.  The Budget Variance Report shall be substantially in the form of <u>Exhibit I</u> hereto.

"<u>Business Day</u>" means (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York City a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, SOFR Loans, any day which is a Business Day described in clause (i) above and which is also a U.S. Government Securities Business Day.

"Canadian Credit Facility" means that certain Term Loan Credit Agreement, dated as of December 31, 2019 (as amended, supplemented or otherwise modified from time to time), by and among NexCycle Canada Ltd., an Ontario corporation, NexCycle Industries Ltd., an Ontario corporation, Piney Lake Opportunities ECI Master Fund LP, as administrative agent and collateral agent, and the lenders party thereto from time to time, and all other Loan Documents (as defined in the Canadian Credit Facility) (including all exhibits and guarantee, security and other ancillary documentation in respect of the foregoing, in each case as amended, supplemented or otherwise modified from time to time).

"Canadian Subsidiaries" means NexCycle Canada Ltd. and its Subsidiaries organized under the laws of Canada.

"Capitalized Lease Obligations" means, as applied to any Person, all obligations of such Person under leases of property that have been or should be, in accordance with GAAP, recorded as capitalized leases of such Person, in each case taken at the amount thereof accounted for as liabilities in accordance with GAAP as in effect on December 15, 2018; *provided* that any change in GAAP after December 15, 2018 will not cause any obligation that was not or would not have been a Capitalized Lease Obligation prior to such change to be deemed a Capitalized Lease Obligation following such change.

"Carve-Out" as defined in the Interim Order or the Final Order, as applicable.

"Carve-Out Trigger Notice" as defined in the Interim Order or the Final Order, as applicable.

"Case" and "Cases" has the meaning specified in the Preliminary Statements.

"Cash Collateral" has the meaning specified in the Interim Order or the Final Order, as applicable.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Borrower or any of its Restricted Subsidiaries:

(a)     (i) Dollars, (ii) Canadian Dollars, (iii) readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof, in each case having maturities of not more than twelve (12) months from the date of acquisition thereof; *provided* that the full faith and credit of the United States is pledged in support thereof, and (iv) securities issued or directly and fully guaranteed or insured by any State, commonwealth or territory of the United States of America, or by any political subdivision or taxing authority thereof, and rated at least A by S&P or P-1 by Moody's, in each case having maturities of not more than twelve (12) months from the date of acquisition thereof;

(b)     time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated at least P-2 (or the then equivalent grade) by Moody's or at least

A-2 (or the then equivalent grade) by S&P and (iii) has combined capital and surplus of at least $250,000,000 (any such bank being an "Approved Domestic Bank"), in each case with maturities of not more than three hundred sixty-five (365) days from the date of acquisition thereof;

(c)     commercial paper and variable or fixed rate notes issued by an Approved Domestic Bank (or by the parent company thereof) or any variable rate note issued by, or guaranteed by, a domestic corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with maturities of not more than three hundred sixty-five (365) from the date of acquisition thereof;

(d)     marketable short-term money market and similar funds (including such funds investing a portion of their assets in municipal securities) having a rating of at least P-2 or A-2 from either Moody's or S&P, respectively (or, if at any time neither Moody's nor S&P shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency selected by the Borrower);

(e)     repurchase agreements entered into by any Person with a bank or trust company (including any of the Lenders) or recognized securities dealer having capital and surplus in excess of $250,000,000 for direct obligations issued by or fully guaranteed or insured by the United States government or any agency or instrumentality of the United States in which such Person shall have a perfected first priority security interest (subject to no other Liens) and having, on the date of purchase thereof, a Fair Market Value of at least 100% of the amount of the repurchase obligations;

(f)     Investments, classified in accordance with GAAP as Current Assets of the Borrower or any of its Restricted Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions having capital of at least $250,000,000, and the portfolios of which are limited such that at least 95% of such investments are of the character, quality and maturity described in clauses (a) through (e) of this definition;

(g)     investment funds investing at least 95% of their assets in securities of the types (including as to credit quality and maturity) described in clauses (a) through (f) above; and

(h)     solely with respect to any Restricted Subsidiary that is a Foreign Subsidiary, (x) such local currencies in those countries in which such Foreign Subsidiary transacts business from time to time in the ordinary course of business and (y) investments of comparable tenor and credit quality to those described in the foregoing clauses (a) through (g) customarily utilized in countries in which such Foreign Subsidiary operates for short term cash management purposes.

"Casualty Event" means any event that gives rise to the receipt by Holdings, the Borrower or any Restricted Subsidiary of any casualty insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace, restore or repair, or compensate for the loss of, such equipment, fixed assets or real property.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980.

"CERCLIS" means the Comprehensive Environmental Response, Compensation, and Liability Information System maintained by the U.S. Environmental Protection Agency.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"Change of Control" means:  (a) for any reason whatsoever Holdings shall cease to own, directly 100% of the Equity Interests of the Borrower; (b) the Permitted Investors shall cease to own, directly or indirectly, at least 50.1% of the Voting Equity Interests of Holdings; or (c) any "Change of Control" (or any comparable term) in the Prepetition First Lien Credit Agreement, the Prepetition 1.5 Lien Credit Agreement or the Prepetition Second Lien Credit Agreement.

"Claim" means all claims, demands, rights, actions, causes of action, liabilities, duties, damages, losses, obligations, diminution in value, judgments, decrees, suits, liens, undertakings, rights to property or information, and controversies of any kind or nature whatsoever, whether absolute or contingent, due or to become due, accrued or unaccrued, disclosed or undisclosed, foreseen or unforeseen, apparent or not apparent, disputed or undisputed, liquidated or unliquidated, at law or in equity, or known or unknown, and whether existing, accrued or arising on, before or after the Petition Date, including all claims arising under state, federal or foreign laws, common law, statutes, rules, regulations or agreements.  Without limiting the generality of the foregoing, the term "Claim" shall include the items described in the definition of "Claim" in 11 U.S.C. § 101(5), all claims or causes of action under Chapter 5 of the Bankruptcy Code (including Sections 542, 544, 545, 546, 547, 548, 549 and 550 of the Bankruptcy Code), all claims or causes of action under Sections 105 or 362 of the Bankruptcy Code, all claims or causes of action under any other Bankruptcy Law, all claims or causes of action arising under the Uniform Fraudulent Conveyance Act, Uniform Fraudulent Transfer Act, or Uniform Voidable Transactions Act as in effect in any state, and all rights of contribution, subrogation, exoneration or indemnity.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with such Section 4.01 and the Term Loans are advanced, which date is December 6, 2023.

"Co-Administrative Agent"  has the meaning set forth in the introductory paragraph hereto.

"Code" means the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all the "Collateral" (or equivalent term) as defined in the Interim Order (and, when entered, the Final Order) or in any Collateral Document.

"Collateral Documents" means, collectively, the Security Agreement, the Mexican Security Agreement, the Intellectual Property Security Agreements, the Mortgages, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent and the Lenders pursuant to Section 6.12, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties securing all or a portion of the Obligations.

"Committed Term Loan Notice" means a written notice of (a) a Term Borrowing, (b) a conversion of Term Loans from one Type to the other or (c) a continuation of SOFR Loans,

pursuant to <u>Section 2.02(a)</u>, which shall be substantially in the form of <u>Exhibit A</u> or such other form reasonably acceptable to the Administrative Agent.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. §1 et seq.) as amended from time to time, and any successor statute.

"<u>Competitor</u>" means any competitor of the Borrower or any Restricted Subsidiary that is in the same or a substantially similar line of business as the Borrower or any Restricted Subsidiary designated from time to time by the Borrower to the Administrative Agent.

"<u>Compliance Certificate</u>" means a certificate substantially in the form of <u>Exhibit D</u> or such other form as may be agreed between the Borrower and the Administrative Agent.

"<u>Confirmation Order</u>" means an order of the Bankruptcy Court confirming the Approved Plan in accordance with the terms of the Restructuring Support Agreement.

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>Consenting Creditor Representatives</u>" has the meaning specified in the Restructuring Support Agreement.

"<u>Contractual Obligation</u>" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other contractual undertaking to which such Person is a party or by which it or any of its property is bound.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, and "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Control Investment Affiliate</u>" means, as to any Person, any other Person that (a) directly or indirectly, is in Control of, is Controlled by, or is under common Control with, such Person and (b) is organized by such Person primarily for the purpose of making equity investments in one or more companies.

"<u>Credit Extension</u>" shall mean the making (or deemed making) of a Term Loan by a Lender.

"<u>Daily Simple SOFR</u>" means, for any day, an interest rate per annum equal to SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent (acting at the direction of the Required Lenders) in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "Daily Simple SOFR" for syndicated business loans; *provided*, that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent (acting at the direction of the Required

174499819

Lenders), may establish another convention in its reasonable discretion that is administratively feasible for the Administrative Agent.

"Debt Issuance" means the issuance by any Person of any Indebtedness for borrowed money.

"Debtor" and "Debtors" has the meaning specified in the Preliminary Statements.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" has the meaning specified in Section 2.08(b).

"Defaulting Agent" means any Agent that has, or has a direct or indirect parent company that has, other than via an Undisclosed Administration, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it or any substantial part of its assets, (iii) taken any action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment, (iv) become subject to forced liquidation, (v) made a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Person or its assets to be, insolvent or bankrupt or (vi) become the subject of a Bail-In Action; *provided* that no Agent shall be a Defaulting Agent solely by virtue of (x) the ownership or acquisition by a Governmental Authority of any equity interest in that Lender or any direct or indirect parent company thereof so long as such ownership interest does not result in or provide such Agent with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Agent (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Agent or (y) the occurrence of any of the events described in clause (i), (ii), (iii), (iv) or (v) of this definition which in each case has been dismissed or terminated prior to the date of this Agreement.

"Deposit Account" has the meaning assigned to it in the Security Agreement.

"Designated Pledged Debt" has the meaning specified in the Security Agreement.

"Designated Pledged Interests" has the meaning specified in the Security Agreement.

"DIP Motion" has the meaning specified in the Restructuring Term Sheet.

"DIP Orders" means the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

-12-

174499819

"DIP Term Facility" has the meaning specified in the Preliminary Statements.

"Disclosure Statement" has the meaning specified in the Restructuring Support Agreement.

"Disclosure Statement Motion" has the meaning specified in the Restructuring Support Agreement.

"Disposition" or "Dispose" means the sale, transfer, license, sublicense, lease or other disposition of any property by any Person (including any Sale Leaseback Transactions and any issuance of Equity Interests by a Restricted Subsidiary of such Person), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Disqualified Equity Interests" means any Equity Interest which, by its terms (or by the terms of any security or other Equity Interests into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition (a) matures or is mandatorily redeemable (other than solely for Equity Interests that are not Disqualified Equity Interests), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Term Loans and all other Obligations that are accrued and payable), (b) is redeemable at the option of the holder thereof (except as a result of a change of control or asset sale so long as any rights of the holders thereof upon the occurrence of a change of control or asset sale event shall be subject to the prior repayment in full of the Term Loans and all other Obligations that are accrued and payable), in whole or in part, (c) provides for the scheduled payments of dividends in cash or (d) is or becomes convertible into or exchangeable for Indebtedness or any other Equity Interests that would constitute Disqualified Equity Interests, in each case, prior to the date that is ninety-one (91) days after the Maturity Date; *provided* that if such Equity Interests are issued pursuant to a plan for the benefit of officers, directors or employees of Holdings, any Parent Entity, the Borrower or any Restricted Subsidiary or by any such plan to any such Person, such Equity Interests shall not constitute Disqualified Equity Interests solely because they may be required to be repurchased by the Borrower or a Restricted Subsidiary or any other Person in order to satisfy applicable statutory or regulatory obligations or as a result of such Person's termination, death or disability.

"Disqualified Lenders" means (a) any natural person and (b) the Disqualified Lenders (Competitors). Notwithstanding anything herein to the contrary, in no event shall any supplement to the list of Disqualified Lenders apply retroactively to disqualify any Person that has previously acquired an assignment or participation of Term Loans and/or New Money DIP Commitments hereunder prior to the date any update to Schedule 1.01(d) is made available to the Lenders. Notwithstanding the foregoing, each of the parties hereto acknowledges and agrees that the Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions relating to Disqualified Lenders. Without limiting the generality of the foregoing, the Administrative Agent shall not (x) be obligated to ascertain, monitor or inquire as to whether any Lender or Participant or prospective Lender or Participant is a Disqualified Lender or (y) have any liability with respect to or arising out of any assignment or participation of loans, or disclosure of confidential information to, or the restrictions on any exercise of rights or remedies of, any Lender.

-13-

"<u>Disqualified Lenders (Competitors)</u>" means, collectively, any Competitor of the Borrower identified in writing by the Borrower (or the Sponsor on the Borrower's behalf) from time to time and set forth on <u>Schedule 1.01(d)</u> (subject, if after the Closing Date, to the Required Lenders' consent, which consent shall not be unreasonably withheld, delayed or conditioned) and any Affiliate of such Competitor (except any Affiliate that is a bona fide fixed income investor or debt fund), that (i) has been identified in writing by the Borrower (or the Sponsor on the Borrower's behalf) hereto as such from time to time and set forth on <u>Schedule 1.01(d)</u> or (ii) that is clearly identifiable as such on the basis of such Affiliate's name.  Following each such identification in writing by or on behalf of the Borrower, <u>Schedule 1.01(d)</u> shall be promptly updated by the Borrower to reflect such written identification, and delivered to the Administrative Agent to make available to the Lenders.

"<u>Dollar</u>" and "<u>$</u>" mean lawful money of the United States.

"<u>Domestic Subsidiary</u>" means any Subsidiary of the Borrower that is not a Foreign Subsidiary.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eligible Assignee</u>" means any Person that meets the requirements to be an assignee under <u>Section 10.07(b)</u> (subject to receipt of such consents, if any, as may be required for the assignment of the applicable Term Loan to such Person under <u>Section 10.07(b)(iii)</u>).

"<u>Environment</u>" shall mean any surface or subsurface physical medium or natural resource, including air, land, soil, surface waters, ground waters, stream and river sediments, biota and any indoor area, surface or physical medium.

"<u>Environmental Claim</u>" shall mean any claim, notice, demand, order, action, suit, proceeding, or other communication alleging or asserting liability or obligations under or relating to Environmental Law, including liability or obligation for investigation, assessment, remediation, removal, cleanup, response, corrective action, monitoring, post-remedial or post-closure studies, investigations, operations and maintenance, injury, damage, destruction or loss to natural resources, personal injury, wrongful death, property damage, fines, penalties or other costs resulting from, related to or arising out of (i) the presence, Release or threatened Release of Hazardous Material in, on, into or from the Environment at any location or (ii) any violation of or non-compliance with Environmental Law, and shall include any claim, notice, demand, order,

action, suit or proceeding seeking damages (including the costs of remediation), contribution, indemnification, cost recovery, penalties, fines, indemnities, compensation or injunctive relief resulting from, related to or arising out of the presence, Release or threatened Release of Hazardous Material or alleged injury or threat of injury to human health, safety or the Environment.

"Environmental Laws" means any and all federal, state, local and foreign statutes, laws, including applicable common law, regulations, ordinances, rules, judgments, orders, decrees or governmental restrictions relating to pollution, the protection of the environment, the release of Hazardous Materials into the environment or human exposure to Hazardous Materials, including those related to the treatment, transport, storage and disposal of Hazardous Materials, air emissions and discharges to public wastewater treatment systems.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, monitoring or oversight by a Governmental Authority, fines, or penalties), of the Borrower, any other Loan Party or their respective Restricted Subsidiaries directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) human exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other binding consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Law.

"Equity Interests" means, with respect to any Person, all of the shares, interests, rights, participations or other equivalents (however designated) of capital stock of (or other ownership or profit interests or units in) such Person and all of the warrants, options or other rights for the purchase, acquisition or exchange from such Person of any of the foregoing (including through convertible securities).

"ERISA" means the Employee Retirement Income Security Act of 1974, and the rules and regulations thereunder, each as amended or modified from time to time.

"ERISA Affiliate" means any Person who together with any Loan Party is treated as a single employer within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Plan; (b) the withdrawal of any Loan Party or any ERISA Affiliate from a Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization (within the meaning of Section 4241 of ERISA) or insolvent (within the meaning of Section 4245 of ERISA); (d) the filing of a notice of intent to terminate or the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, respectively, (e) the institution by the PBGC of

-15-

proceedings to terminate a Plan or Multiemployer Plan; (f) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan or Multiemployer Plan; (g) the determination that any Plan is considered an at-risk plan within the meaning of Section 430 of the Code or Section 303 of ERISA; (h) the determination that any Multiemployer Plan is considered a plan in endangered or critical status within the meaning of Sections 431 and 432 of the Code or Sections 304 and 305 of ERISA; (i) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate; (j) the conditions for the imposition of a lien under Section 430(k) of the Code or Section 303(k) of ERISA shall have been met with respect to any Plan; k) the failure to meet the minimum funding standard of Section 412 of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (l) the occurrence of a Foreign Plan Event; or (m) any other event or condition with respect to a Plan or Multiemployer Plan that could result in liability of the Borrower or any Subsidiary, other than in the usual course.

"Erroneous Payment" has the meaning assigned to it in Section 9.12(a).

"Erroneous Payment Notice" has the meaning assigned to it in Section 9.12(a).

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning specified in Section 8.01.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Actions" has the meaning specified in the Security Agreement.

"Excluded Assets" has the meaning specified in the Security Agreement.

"Excluded Subsidiary" means the Canadian Subsidiaries, but only so long as such Canadian Subsidiaries are parties in any capacity to, or the assets of such Canadian Subsidiaries secure, the Canadian Credit Facility pursuant to the requirements of the Canadian Credit Facility as in effect on the date hereof.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Agent or any Lender, or required to be withheld or deducted from a payment to any Agent or any Lender, as applicable, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Term Loan or New Money DIP Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Term Loan or New Money DIP Commitment (other than pursuant to an assignment request by the Borrower under Section 3.07) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 3.01, amounts with respect to such Taxes were payable either to such Lender's

-16-

assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such recipient's failure to comply with Section 10.16 and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Facility" has the meaning ascribed to the term "Exit Term Loan Facilities" in the Approved Plan.

"Exit Facility Agent" has the meaning ascribed to the term "Exit Term Loan Facilities Agent" in the Approved Plan.

"Exit Facility Credit Agreement" means the credit agreement evidencing the Exit Facility, which shall be substantially on the terms set forth in the Exit Term Sheet, and otherwise in form and substance reasonably acceptable to the Borrower, the Required Lenders and the Exit Facility Agent.

"Exit Fee" has the meaning specified in Section 2.09(c).

"Exit First Out New Money Term Loans" has the meaning ascribed to the term "First Out New Money Exit Term Loans" in the Approved Plan.

"Exit First Out Roll-Up Loans" has the meaning ascribed to the term "First Out Roll-Up Loans" in the Approved Plan.

"Exit First Out Term Loans" means, collectively, the Exit First Out New Money Term Loans and Exit First Out Roll-Up Loans.

"Exit Term Sheet" means the term sheet attached as Exhibit M.

"Fair Market Value" means, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a sale of such asset at such date of determination assuming a sale by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as reasonably determined by the Borrower in good faith (which shall be conclusive if reasonably determined in good faith).

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future Treasury Regulations promulgated thereunder or official interpretation thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with any of the foregoing and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided* that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next

-17-

preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) received by the Administrative Agent on such day on such transactions from three commercial banks of recognized standing selected by the Administrative Agent, but in no event less than 0% per annum.

"<u>Fee Letter</u>" means the fee letter dated as of the date hereof entered into between the Borrower and the Co-Administrative Agents (in their capacity as such) relating to the administrative and collateral agent services to be under the Loan Documents.

"<u>Final Order</u>" means an order of the Bankruptcy Court authorizing and approving on a final basis, among other things, the DIP Term Facility and the transactions contemplated by this Agreement in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are reasonably satisfactory to the Required Lenders).

"<u>Final Order Entry Date</u>" means the date on which the Final Order is entered by the Bankruptcy Court.

"<u>Flood Laws</u>" means the National Flood Insurance Reform Act of 1994 and related legislation (including the regulations of the Board of Governors of the Federal Reserve System).

"<u>Floor</u>" means a rate of interest equal to 1.00%.

"<u>Foreign Lender</u>" has the meaning specified in <u>Section 10.16(b)(i)</u>.

"<u>Foreign Pension Plan</u>" means a registered pension plan which is subject to applicable pension legislation other than ERISA or the Code, which a Loan Party or Restricted Subsidiary sponsors or maintains, or to which it makes or is obligated to make contributions.

"<u>Foreign Plan</u>" means each Foreign Pension Plan, deferred compensation or other retirement or superannuation plan, fund, program, agreement, commitment or arrangement whether oral or written, funded or unfunded, sponsored, established, maintained or contributed to, or required to be contributed to, or with respect to which any liability is borne, outside the United States of America, by any Loan Party or Restricted Subsidiary, other than any such plan, fund, program, agreement or arrangement sponsored by a Governmental Authority.

"<u>Foreign Plan Event</u>" has the meaning specified in <u>Section 5.10(d)</u>.

"<u>Foreign Subsidiary</u>" means (i) any direct or indirect Subsidiary of the Borrower that is organized under the laws of a jurisdiction other than one of the fifty states of the United States or the District of Columbia, (ii) any FSHCO, or (iii) any Subsidiary of a Person described in clause (i) or (ii).

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the United States.

174499819

"FSHCO" means any Subsidiary (i) that is organized under the laws of the United States, any state thereof or the District of Columbia and (ii) substantially all of the assets of which consist of equity or Indebtedness (treated as equity for U.S. federal income tax purposes) of one or more CFCs.

"Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Funding Account" means a blocked, non-interest bearing trust account maintained by the Administrative Agent in which the proceeds of the Term Loans shall be deposited and held as provided in this Agreement.  None of the Borrower or the other Loan Parties shall have any property interest of any kind in the Funding Account or the funds held therein; provided that, for the avoidance of doubt, an amount equal to the proceeds of the Loans deposited in the Funding Account in accordance with the Funding Authorization Letter (as reduced from time to time by the amount of Withdrawals) shall be held for the benefit of the Secured Parties and the Borrower in accordance with, and released from the Funding Account solely in accordance with and subject to the terms and conditions set forth in, this Agreement (including Sections 2.14, 2.15 and 8.04).

"Funding Account Withdrawal Notice" has the meaning specified in Section 2.14.

"Funding Authorization Letter" means that certain letter agreement, dated as of the Closing Date, made by the Borrower in favor of the Administrative Agent, pursuant to which, among other things, the Borrower has authorized and directed the Administrative Agent to disburse or otherwise apply the proceeds of the Term Loans on the Closing Date in accordance with a funds flow memorandum attached to such letter.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, as in effect from time to time.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank, supra national authority or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Granting Lender" has the meaning specified in Section 10.07(g).

"Guarantee" means, as to any Person, without duplication, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any such obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance of such Indebtedness or other monetary

-19-

obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other monetary obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or other monetary obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien); *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business, or customary or reasonable indemnity obligations in effect on the Closing Date, or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, collectively, Holdings and each of its and the Borrower's direct and indirect Subsidiaries of the Borrower listed on Schedule 1 (such Subsidiaries of the Borrower not to include any Excluded Subsidiary), and each other Subsidiary of the Borrower that shall be required to execute and deliver a guaranty or guaranty supplement pursuant to Section 6.12.

"Guaranty" means the Debtor-in-Possession Guaranty executed by the Guarantors on the date hereof in favor of the Administrative Agent on behalf of the Secured Parties, together with each other guaranty and guaranty supplement delivered pursuant to Section 6.12.

"Hazardous Materials" means all hazardous or toxic substances, materials or wastes, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas and radioactive substances, infectious or medical wastes and all other substances or wastes of any nature regulated as "hazardous" or "toxic," pursuant to any Environmental Law.

"Holdings" has the meaning specified in the introductory paragraph to this Agreement.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(i)     all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(j)     the maximum amount (after giving effect to any prior drawings or reductions which have been reimbursed) of (i) all letters of credit (including standby and commercial), bankers' acceptances, bank guaranties and (ii) surety bonds, performance bonds and similar instruments issued or created by or for the account of such Person;

(k)     net obligations of such Person under any Swap Contract;

-20-

(l)      all obligations of such Person to pay the deferred purchase price of property (other than (w) trade accounts payable in the ordinary course of business and not more than three hundred and sixty-five (365) days overdue, (x) any earn-out obligation until such obligation is not paid after becoming due and payable, (y) expenses accrued in the ordinary course of business and (z) obligations resulting from take-or pay contracts entered into in the ordinary course of business);

(m)      Indebtedness (excluding prepaid interest thereon) of another Person secured by a Lien on property owned or being purchased by such Person (including Indebtedness arising under conditional sales or other title retention agreements and mortgage, industrial revenue bond, industrial development bond and similar financings), whether or not such Indebtedness shall have been assumed by such Person or is limited in recourse;

(n)      all Capitalized Lease Obligations;

(o)      all obligations of such Person with respect to redemption, repayment or other repurchase (excluding accrued dividends to the extent not increasing liquidation preference) in respect of Disqualified Equity Interests; and

(p)      all Guarantees of such Person in respect of any of the foregoing;

*provided* that Indebtedness shall not include (i) prepaid or deferred revenue arising in the ordinary course of business and (ii) purchase price holdbacks arising in the ordinary course of business in respect of a portion of the purchase price of an asset to satisfy warranties or other unperformed obligations of the seller of such asset.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company or the foreign equivalent thereof) in which such Person is a general partner or a joint venturer, except to the extent the holders of such Indebtedness do not have recourse to such Person. The amount of any net obligation owed by such Person under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.  The amount of Indebtedness of any Person for purposes of clause (e) above shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Liabilities" has the meaning specified in Section 10.05.

"Indemnified Taxes" means all Taxes other than Excluded Taxes or Other Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Loan Document.

"Indemnitees" has the meaning specified in Section 10.05.

"Information" has the meaning specified in Section 10.08.

"Initial Budget" means the Budget delivered on or prior to the Closing Date.

174499819

"Interest Payment Date" means, (a) as to any Term Loan other than a Base Rate Loan, the last day of each Interest Period applicable to such Term Loan and the Maturity Date; and (b) as to any Base Rate Loan, the last Business Day of each calendar month and the Maturity Date.

"Interest Period" means, as to each SOFR Loan, the period commencing on the date such SOFR Loan is disbursed or converted to or continued as a SOFR Loan and ending on the date one (1) month thereafter; *provided* that:

(q)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day;

(r)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(s)     no Interest Period shall extend beyond the scheduled Maturity Date.

"Interim Order" means an order of the Bankruptcy Court, in the form set forth in Exhibit B, authorizing on an interim basis, among other things, the DIP Term Facility and the transactions contemplated by this Agreement, with only such modifications as are reasonably satisfactory to the Borrower and the Required Lenders.

"Interim Order Entry Date" means the date on which the Interim Order is entered by the Bankruptcy Court.

"Intellectual Property Security Agreement" means, collectively, the intellectual property security agreement, substantially in the form of Exhibit B to the Security Agreement, together with each intellectual property security agreement supplement executed and delivered pursuant to Section 6.12.

"Investment" means, as to any Person, any direct or indirect investment by such Person, by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of Indebtedness in respect of such Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such other Person.  For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested (measured at the time made), without adjustment for subsequent increases or decreases in the value of such Investment.

"IP Rights" has the meaning specified in Section 5.07.

"IRS" means the United States Internal Revenue Service.

"Judgment Currency" has the meaning specified in Section 10.26(a).

"Judgment Currency Conversion Date" has the meaning specified in Section 10.26(a).

"Laws" means, collectively, all applicable international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority.

"Legal Requirements" shall mean, as to any Person, the Organization Documents of such Person, and any treaty, law (including the common law), statute, ordinance, code, rule, regulation, guidelines, license, permit requirement, order or determination of an arbitrator or a court or other Governmental Authority, and any interpretation thereof published by the applicable Governmental Authority or administrative procedures relating thereto established by the applicable Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, in each case whether or not having the force of law.

"Lender" means (a) the financial institutions and other Persons party hereto as "Lenders" on the date hereof, and (b) each financial institution or other Person that becomes a party hereto pursuant to an Assignment and Assumption, other than, in each case, any such financial institution or Person that has ceased to be a party hereto pursuant to an Assignment and Assumption.

"Lender Advisors" means Arnold & Porter Kaye Scholer LLP and Ankura as advisors to the Lender Group or certain members thereof.

"Lender Group" means the ad hoc group of Lenders represented by Arnold & Porter Kaye Scholer LLP.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any leases evidencing Capitalized Lease Obligations having substantially the same economic effect as any of the foregoing).

"Liquidity" means, as of any date of determination, the sum of (x) Qualified Cash on such date plus (y) the aggregate amount of cash on deposit in the Funding Account on such date.

"Loan Documents" means, collectively, (i) this Agreement, (ii) the Notes, (iii) the Guaranty, (iv) the Collateral Documents and (v) the Fee Letter.

"Loan" means a Term Loan.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Material Adverse Effect" means (a) a material adverse effect on the business, assets, liabilities (actual or contingent), financial condition or results of operations of the Borrower and the Restricted Subsidiaries, taken as a whole, (b) a material adverse effect on the ability of the Loan Parties (taken as a whole) to perform their respective payment obligations under the Loan Documents or (c) a material adverse effect on the rights and remedies of the Lenders or the Administrative Agent under the Loan Documents.

"Material Real Property" means any parcel of real property (other than a parcel with a Fair Market Value of less than $5,000,000) owned in fee by a Loan Party; *provided*, *however*, that one or more parcels owned in fee by such Loan Party and located adjacent to, contiguous with, or in close proximity to, and comprising one property with a common street address shall, in the reasonable discretion of the Required Lenders, be deemed to be one parcel for the purposes of this definition.  For the avoidance of doubt, the parcels of real property located at 3050 and 3070 Roosevelt Highway, College Park, Georgia 30349 shall be treated as separate parcels of real property for the purposes of this Agreement.

"Maturity Date" means the earliest of (a) thirty-five (35) days following the Petition Date (subject to the availability of the Bankruptcy Court) (or such later date as may be agreed to by the Required Lenders) if the Final Order shall not have been entered on or prior to such date, (b) the Approved Plan Effective Date or the effective date of any other plan of reorganization or liquidation in any of the Cases, (c) the date on which all or substantially all of the assets of the Debtors are sold in a sale under a chapter 11 plan or pursuant to Section 363 of the Bankruptcy Code, (d) forty (40) days following the Petition Date (or such later date, not to exceed seventy (70) days following the Petition Date, as may be agreed to in writing by the Required Lenders) and (e) the date that all Term Loans shall become due and payable in full in accordance with the terms of the DIP Term Facility, including due to acceleration.

"Maximum Rate" has the meaning specified in Section 10.11.

"Milestone" has the meaning specified in Section 6.16.

"Mexican Guarantor" means Strategic Materials Mexicana S.A. de C.V.

"Mexican Security Agreement" means, collectively, (i) the Mexican Non-Possessory Pledge Agreement dated March 28, 2023, as amended and restated on October 12, 2023, entered into by and between, the Mexican Guarantor, as pledgor, and Acquiom, acting as collateral agent under the Loan Documents, as pledgee, and the other Persons party thereto and (ii) the Mexican Share Pledge Agreement dated March 28, 2023, as amended and restated on October 12, 2023, entered into by and between, SMI Materials, Inc. as pledgor, Acquiom, acting as collateral agent under the Loan Documents, as pledgee, the Mexican Guarantor, as the issuer of the pledged shares, and the other Persons party thereto.

"MNPI" has the meaning specified in Section 6.02.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means, collectively, the deeds of trust, trust deeds and mortgages made by the Loan Parties in favor or for the benefit of the Administrative Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"Mortgaged Properties" means any Material Real Property with respect to which a Mortgage is required pursuant to Section 6.12.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA, to which any Loan Party, any Restricted Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding six years, has made or been obligated to make contributions.

"Net Cash Proceeds" means:

(t)     with respect to any Disposition (other than any issuance or sale of Equity Interests), the proceeds thereof in the form of cash, cash equivalents and marketable securities (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable, or by the sale, transfer or other disposition of any non-cash consideration received in connection therewith or otherwise, but only as and when received) received by any Loan Party (including cash proceeds subsequently received (as and when received by any Loan Party) in respect of non-cash consideration initially received) net of (i) reasonable and customary selling expenses (including reasonable brokers' fees or commissions, legal, accounting and other professional and transactional fees, transfer and similar taxes (but excluding any such amounts payable to any Affiliate of Borrower) and Borrower's good faith estimate of income taxes paid or payable in connection with such sale (after taking into account any available tax credits or deductions and any tax sharing arrangements)), (ii) amounts provided as a reserve, in accordance with GAAP, against (x) any liabilities under any indemnification obligations associated with such Disposition or (y) any other liabilities retained by any Loan Party associated with the properties sold in such Disposition (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), and (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money that is secured by a Lien on the properties sold in such Disposition (so long as such Lien was permitted to encumber such properties under the Loan Documents at the time of such sale) and which is repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such properties);

(u)     with respect to any Debt Issuance, the cash proceeds thereof received by any Loan Party, net of reasonable and customary fees (including legal, accounting and other professional and transaction fees and brokers' fees), commissions, costs and other expenses incurred in connection therewith; and

(v)     with respect to any Casualty Event, the cash insurance proceeds, condemnation awards and other compensation received by any Company in respect thereof, net of

all reasonable costs and expenses (including legal, accounting and other professional and transaction fees and brokers' fees) incurred in connection with the collection of such proceeds, awards or other compensation in respect of such Casualty Event (including legal, accounting and other professional and transaction fees and brokers' fees).

"New Money DIP Commitment" means, as to each Term Lender, its obligation to make New Money Term Loans to the Borrower pursuant to Section 2.01(a) in an aggregate principal amount not to exceed the amount set forth opposite such Term Lender's name on Schedule 2.01(a) under the caption "New Money DIP Commitment" or opposite a comparable caption in the Assignment and Assumption pursuant to which such Term Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement. The initial aggregate amount of the New Money DIP Commitments is $23,000,000.00.

"New Money Term Loans" has the meaning specified in Section 2.01(a).

"New Money Upfront Fee" has the meaning specified in Section 2.09(b).

"Non-Consenting Lender" has the meaning specified in Section 3.07(d).

"NPL" means the National Priorities List under CERCLA.

"Obligation Currency" has the meaning specified in Section 10.26(a).

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Term Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising.  Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include (a) the obligation to pay principal, interest, premiums, if any, charges, expenses, fees (including the Upfront Fee and the Exit Fee), indemnities and other amounts payable by any Loan Party under any Loan Document and (b) the obligation of any Loan Party to reimburse any amount in respect of any of the foregoing that any Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.

"OFAC" has the meaning specified in Section 5.21(a).

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction) and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, trust or other applicable agreement of formation or organization and, if applicable, any agreement or instrument with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

-26-

"Other Connection Taxes" means, with respect to any Administrative Agent or any Lender, as applicable, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Term Loan or Loan Document).

"Other Taxes" has the meaning specified in Section 3.01(b).

"Outstanding Amount" means:  with respect to the Term Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Term Loans occurring on such date.

"Parent Entity" means any direct or indirect parent entity of Holdings, having Control of Holdings and which does not own (directly or indirectly) the Equity Interests of any Person other than (a) Holdings or a direct or indirect parent entity of Holdings or (b) any other Person, to the extent the Equity Interests of such Person are owned (directly or indirectly) by Holdings.

"Participant" has the meaning specified in Section 10.07(d).

"Participant Register" has the meaning specified in Section 10.07(l).

"PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56. (signed into law October 26, 2001)), as amended or modified from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Protection Act of 2006, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Protection Act of 2006 and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Periodic Term SOFR Determination Day" has the meaning specified in the definition of "Term SOFR".

"Permitted Factoring Arrangements" means customer-sponsored receivables financing facilities and receivables factoring arrangements entered into in the ordinary course and existing (and in effect) on the Closing Date.

"Permitted Investors" means (a) the Sponsor, (b) each of its Affiliates (other than portfolio companies) and investment managers, (c) any fund or account managed by any of the persons described in clause (a) or (b) of this definition, (d) any employee benefit plan of Holdings or any of its Restricted Subsidiaries and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan and (e) investment vehicles of members of

-27-

management of Holdings or the Borrower that invest in, acquire or trade commercial loans but excluding natural persons; *provided* that a failure of the Sponsor to own or control, directly or indirectly, 50.1% of the aggregate voting equity interests of Holdings held by the Permitted Investors shall constitute a Change of Control for purposes of the Events of Default.

"Permitted Variances" shall mean (i) all variances that are favorable to the financial condition and the interests of the Loan Parties and the interests of the Lenders, and (ii) any variance that is unfavorable to the financial condition and the interests of the Loan Parties or the interests of the Lenders and in the case of this clause (ii) does not exceed (A) in the case of the first three Variance Testing Dates after the Closing Date (x) with respect to disbursements (determined on an aggregate basis and excluding professional fees), 20%, tested on each such Variance Testing Date for the applicable Variance Testing Period and (y) with respect to the line item "Customer Receipts" in the Approved Budget (determined on an aggregate basis), 20%, tested on each such Variance Testing Date for the applicable Variance Testing Period and (B) in the case of the fourth Variance Testing Date after the Closing Date and each Variance Testing Date thereafter (x) with respect to disbursements (determined on an aggregate basis and excluding professional fees), 15%, tested on each such Variance Testing Date for the applicable Variance Testing Period and (y) with respect to the line item "Customer Receipts" in the Approved Budget (determined on an aggregate basis), 15%, tested on each such Variance Testing Date for the applicable Variance Testing Period, and, in each case, based upon the most recent Approved Budget (or, with respect to the portion of any Variance Testing Period that is covered in a preceding Approved Budget and not in the then most current Approved Budget, in such preceding Approved Budget as in effect at the beginning of the applicable week).

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" shall have the meaning specified in the Preliminary Statements.

"Plan" means any "employee benefit plan" (other than a Multiemployer Plan) within the meaning of Section 3(3) of ERISA that is or within the last six years has been maintained, contributed to or required to be contributed to by, a Loan Party, Restricted Subsidiary or any ERISA Affiliate and is subject to Title IV of ERISA or the minimum funding standards under Section 412 of the Code or Section 302 of ERISA.

"Plan Documentation" means the Approved Plan and any and all documentation, including without limitation any amendments, the Definitive Documents (as defined in the Approved Plan or such other similar term used in the Approved Plan), the Plan Supplement (as defined in the Approved Plan) and/or the Confirmation Order.

"Plan Supplement" has the meaning specified in the Restructuring Support Agreement.

"Platform" has the meaning specified in Section 6.02.

"Post-Petition" means the time period commencing immediately upon the filing of the Cases.

-28-

"Prepetition 1.5 Lien Agent" means Alter Domus (US) LLC, as administrative agent under the Prepetition 1.5 Lien Credit Agreement (together with its successors and assigns).

"Prepetition 1.5 Lien Credit Agreement" means the 1.5 Lien Credit Agreement, dated as of September 22, 2022, by and among the Borrower, Holdings, the lenders party thereto and the Prepetition 1.5 Lien Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Prepetition 1.5 Lien Loan Documents" means the Prepetition 1.5 Lien Credit Agreement and all security and other collateral or other documents related thereto or entered into in connection therewith that are deemed to be "Loan Documents" under the Prepetition 1.5 Lien Credit Agreement.

"Prepetition 1.5 Lien Obligations" means "Obligations" as defined and under the Prepetition 1.5 Lien Credit Agreement.

"Prepetition 1.5 Lien Term Facility" means the "Term Facility" as defined in the Prepetition 1.5 Lien Credit Agreement.

"Prepetition 1.5 Lien Term Loans" means the "Term Loans" under and as defined in the Prepetition 1.5 Lien Credit Agreement.

"Prepetition First Lien Agent" means Acquiom and Seaport, as co-administrative agents under the Prepetition First Lien Credit Agreement (as successor to Goldman Sachs Bank USA in such capacity) (together with their successors and assigns).

"Prepetition First Lien Credit Agreement" means the First Lien Credit Agreement, dated as of November 1, 2017, by and among the Borrower, Holdings, the lenders party thereto, the letter of credit issuers party thereto, and the Prepetition First Lien Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Prepetition First Lien Loan Documents" means the Prepetition First Lien Credit Agreement and all security and other collateral or other documents related thereto or entered into in connection therewith that are deemed to be "Loan Documents" under the Prepetition First Lien Credit Agreement.

"Prepetition First Lien Obligations" means "Obligations" as defined and under the Prepetition First Lien Credit Agreement.

"Prepetition First Lien Term Facility" means the "Term Facility" as defined in the Prepetition First Lien Credit Agreement.

"Prepetition First Lien Term Loans" means the "Term Loans" under and as defined in the Prepetition First Lien Credit Agreement.

"Prepetition Second Lien Agent" means Acquiom and Seaport, as co-administrative agents under the Prepetition Second Lien Credit Agreement (as successor to Goldman Sachs Bank USA in such capacity) (together with their successors and assigns).

"Prepetition Second Lien Credit Agreement" means the Second Lien Credit Agreement, dated as of November 1, 2017, by and among the Borrower, Holdings, the lenders party thereto and the Prepetition Second Lien Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Second Lien Loan Documents" means the Prepetition Second Lien Credit Agreement and all security and other collateral or other documents related thereto or entered into in connection therewith that are deemed to be "Loan Documents" under the Prepetition Second Lien Credit Agreement.

"Prepetition Second Lien Obligations" means "Obligations" as defined and under the Prepetition Second Lien Credit Agreement.

"Prepetition Second Lien Term Facility" means the "Term Facility" as defined in the Prepetition Second Lien Credit Agreement.

"Prepetition Second Lien Term Loans" means the "Term Loans" under and as defined in the Prepetition Second Lien Credit Agreement.

"Prepetition Superpriority Agent" means Acquiom and Seaport, as co-administrative agents under the Prepetition Superpriority Credit Agreement (together with their successors and assigns).

"Prepetition Superpriority Credit Agreement" means the Superpriority Secured Credit Agreement, dated as of September 15, 2023, by and among the Borrower, Holdings, the lenders party thereto and the Prepetition Superpriority Agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Prepetition Superpriority Loan Documents" means the Prepetition Superpriority Credit Agreement and all security and other collateral or other documents related thereto or entered into in connection therewith that are deemed to be "Loan Documents" under the Prepetition Superpriority Credit Agreement.

"Prepetition Superpriority Obligations" means "Obligations" as defined and under the Prepetition Superpriority Credit Agreement.

"Prepetition Superpriority Term Facility" means the "Term Facility" as defined in the Prepetition Superpriority Credit Agreement.

"Prepetition Superpriority Term Loans" means the "Term Loans" under and as defined in the Prepetition Superpriority Credit Agreement.

"Prime Rate" means, for any day, the prime rate published in The Wall Street Journal for such day; provided that if The Wall Street Journal ceases to publish for any reason such rate of interest, "Prime Rate" shall mean the prime lending rate as set forth on the Bloomberg page PRIMBB Index (or successor page) for such day (or such other service as determined by the Administrative Agent from time to time for purposes of providing quotations of prime lending interest rates).

174499819

"Pro Rata Share" means, with respect to each Lender at any time, a fraction (expressed as a percentage, carried out to the ninth decimal place), the numerator of which is the sum of (x) the amount of the unused New Money DIP Commitments of such Lender at such time  and (y) the outstanding principal amount of Term Loans of such Lender at such time and the denominator of which is the sum of (x) amount of the aggregate unused New Money DIP Commitments of all Lenders at such time and (y) the aggregate outstanding principal amount of  all Term Loans at such time.

"Public Lender" has the meaning specified in Section 6.02.

"Qualified Cash" shall mean, as of any date of determination, the amount of unrestricted (other than restrictions imposed pursuant to the Loan Documents, Prepetition First Lien Loan Documents, Prepetition 1.5 Lien Loan Documents (as in effect on the Closing Date) and Prepetition Second Lien Loan Documents (as in effect on the Closing Date)) cash and Cash Equivalents of Borrower  and the other Loan Parties (other than Foreign Subsidiaries) that is in a deposit account or in a securities account, or any combination thereof.  For the avoidance of doubt, cash in the Funding Account shall not constitute Qualified Cash.

"Real Property" shall mean, collectively, all right, title and interest (including any leasehold, fee, mineral or other estate) in and to any and all parcels of or interests in real property owned, leased or operated by any Person, whether by lease, license or other means, together with, in each case, all easements, hereditaments and appurtenances relating thereto, all improvements and appurtenant fixtures and equipment, all general intangibles and contract rights and other property and rights incidental to the ownership, lease or operation thereof.

"Register" has the meaning specified in Section 10.07(c).

"Regulation T" means Regulation T of the FRB as in effect from time to time.

"Regulation U" means Regulation U of the FRB as in effect from time to time.

"Regulation X" means Regulation X of the FRB as in effect from time to time.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, members, directors, officers, employees, agents, attorneys-in-fact, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Release" shall mean any spilling, leaking, seepage, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Materials in, into, onto, from or through the Environment or any Real Property (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Materials).

"Relevant Governmental Body" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"Remedies Notice Period" as defined in Section 8.02.

"Replaceable Lender" has the meaning specified in Section 3.07(a).

"Replacement Approved Budget" means any Budget prepared by the Borrower and delivered to the Administrative Agent after the Closing Date pursuant to Section 6.01(d), but solely to the extent that the Required Lenders notify the Borrower and the Administrative Agent in writing (which may be in the form of an email from counsel to the Required Lenders, on the behalf of the Required Lenders) that such Budget will become the "Approved Budget".

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Required Consenting First Lien Creditors" has the meaning specified in the Restructuring Support Agreement.

"Required Lenders" means, as of any date of determination, Lenders having more than 50% of the sum of the (a) Total Outstandings and (b) aggregate unused New Money DIP Commitments; *provided*, *further*, that at any time there are two or more Lenders, "Required Lenders" must include at least two Lenders.

"Responsible Officer" means the chief executive officer, director, president, vice president, executive vice president, chief financial officer, treasurer or assistant treasurer or other similar officer of a Loan Party and, as to any document delivered on the Closing Date (except as otherwise expressly set forth in Section 4.01), any secretary or assistant secretary. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, limited liability company, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interest of any Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such Equity Interest, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent Persons thereof).

"Restricted Subsidiary" means any Subsidiary of the Borrower.

"Restructuring Effective Date" has the meaning specified in the Restructuring Support Agreement.

"Restructuring Term Sheet" has the meaning specified in the Restructuring Support Agreement.

"Restructuring Transactions" has the meaning specified in the Restructuring Support Agreement.

-32-

"<u>Restructuring Support Agreement</u>" means the Restructuring Support Agreement, dated as of September 15, 2023, among the Loan Parties, the Lenders under the Prepetition Superpriority Credit Agreement party thereto (or nominees, investment advisors, sub-advisors or fund managers on their behalf), the lenders under the Prepetition First Lien Credit Agreement party thereto (or nominees, investment advisors, sub-advisors or fund managers on their behalf), the lenders under the Prepetition 1.5 Lien Credit Agreement party thereto (or nominees, investment advisors, sub-advisors or fund managers on their behalf), the lenders under the Prepetition Second Lien Credit Agreement party thereto (or nominees, investment advisors, sub-advisors or fund managers on their behalf) and the direct and indirect holders of Equity Interests in Holdings party thereto (or nominees, investment advisors, sub-advisors or fund managers on their behalf).

"<u>Roll-Up Loans</u>" has the meaning specified in <u>Section 2.01(b)</u>.

"<u>Roll-Up Schedule</u>" has the meaning specified in <u>Section 2.01(b)</u>.

"<u>S&P</u>" means S&P Global Ratings Inc., and any successor thereto.

"<u>Sale Leaseback Transaction</u>" means any arrangement with any Person providing for the leasing by either of the Borrower or any of the other Restricted Subsidiaries of any real or tangible personal property, which property has been or is to be sold or transferred by the Borrower or such Restricted Subsidiary to such Person in contemplation of such leasing.

"<u>Sale Transaction</u>" has the meaning ascribed thereto in the Approved Plan.

"<u>Sanctioned Country</u>" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, the so - called Donetsk People's Republic, the so- called Luhansk People's Republic, the Crimea, Zaporizhzhia and Kherson Regions of Ukraine, Cuba, Iran, North Korea and Syria).

"<u>Sanctioned Person</u>" means, at any time, any Person that is subject to or the target of any Sanctions, including (a) any Person listed in any Sanctions-related list of designated Persons maintained by the U.S. government, including by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or by the United Nations Security Council, the European Union, any European Union member state, His Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b), or (d) any Person otherwise the subject of any Sanctions.

"<u>Sanctions</u>" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or His Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"<u>Seaport</u>"  has the meaning set forth in the introductory paragraph hereto.

"<u>SEC</u>" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

-33-

174499819

"<u>Section 6.01 Financials</u>" means the financial statements delivered, or required to be delivered, pursuant to <u>Section 6.01(a)</u> <u>6.01(b)</u>, or <u>6.01(c)</u> together with the accompanying officer's certificate delivered, or required to be delivered, pursuant to <u>Section 6.02(a)</u>.

"<u>Secured Obligations</u>" shall mean the Obligations.

"<u>Secured Parties</u>" means, collectively, the Administrative Agent, the Lenders, any Supplemental Administrative Agent, each co-agent or subagent appointed by the Administrative Agent from time to time pursuant to <u>Article IX</u> and the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document.

"<u>Securities Act</u>" means the Securities Act of 1933, as amended.

"<u>Security Agreement</u>" means, collectively, the Debtor-in-Possession Security Agreement dated the date hereof executed by the Loan Parties (other than the Mexican Guarantor), together with each other security agreement and security agreement supplement executed and delivered pursuant to <u>Section 6.12</u>.

"<u>Security Agreement Supplement</u>" has the meaning specified in the Security Agreement.

"<u>Senior Representative</u>" means, with respect to any series of Indebtedness, the trustee, administrative agent, collateral agent, security agent or similar agent under the indenture or agreement pursuant to which such Indebtedness is issued, incurred or otherwise obtained, as the case may be, and each of their successors in such capacities.

"<u>SMI Group Holdings</u>" means SMI Group Holdings, LLC, a Delaware limited liability company.

"<u>SMI Group Ultimate Holdings</u>" means SMI Group Ultimate Holdings, Inc., a Delaware corporation.

"<u>SMI Topco Holdings</u>" means SMI Topco Holdings, Inc., a Delaware corporation.

"<u>SMI Upper Tier Entities</u>" means SMI Group Ultimate Holdings, SMI Topco Holdings and SMI Group Holdings.

"<u>SOFR</u>" means a rate per annum equal to the secured overnight financing rate as administered by the SOFR Administrator.

"<u>SOFR Administrator</u>" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"<u>SOFR Loan</u>" means a Loan bearing interest at a rate determined by reference to Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Base Rate".

"<u>SPC</u>" has the meaning specified in <u>Section 10.07(g)</u>.

"Sponsor" means Littlejohn Fund V, L.P. and Control Investment Affiliates (but excluding any operating portfolio companies of the foregoing).

"Stock Certificates" shall have the meaning specified in Section 4.01.

"Subordinated Indebtedness" shall mean Indebtedness that is by its terms subordinated in right of payment to all or any portion of the Secured Obligations.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity (a) of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned or (b) the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person and, in the case of this clause (b), which is treated as a consolidated subsidiary for accounting purposes. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Subsidiary Guarantor" means, collectively, the Restricted Subsidiaries of the Borrower that are Guarantors.

"Superpriority Claim" means any administrative expense claim in the case of any Loan Party having priority over any and all administrative expenses, diminution claims and all other priority claims against the Debtors, subject only to the Carve-Out, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

"Supplemental Administrative Agent" has the meaning specified in Section 9.14 and "Supplemental Administrative Agents" shall have the corresponding meaning.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement, including any obligations or liabilities under any such master agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer (other than a counterparty to any such Swap Contracts) in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Lease Obligation" means the monetary obligation of a Person under a so-called synthetic, off-balance sheet or tax retention lease.

"Taxes" means all present or future taxes, duties, levies, imposts, deductions, assessments, fees, withholdings or similar charges imposed by any Governmental Authority, including any additions to tax, penalties and interest with respect thereto.

"Term Borrowing" means a borrowing (or deemed borrowing) consisting of simultaneous Term Loans of the same Type made (or deemed made) by each of the Term Lenders pursuant to Section 2.01.

"Term Facility" has the meaning specified in the Preliminary Statements.

"Term Lender" means a Lender.

"Term Loans" means a loan made or deemed made by a Lender to Borrower under Article II, including any New Money Term Loan and any Roll-Up Loan.

"Term Note" means a promissory note of the Borrower payable to any Term Lender or its registered assigns, in substantially the form of Exhibit C hereto, evidencing the indebtedness of the Borrower to such Term Lender resulting from the Term Loans made or held by such Term Lender.

"Term SOFR" means,

(a)      for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

-36-

(b)      for any calculation with respect to a Base Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Base Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Base Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Base Rate Term SOFR Determination Day.

"Term SOFR Adjustment" shall mean a percentage equal to 0.11448% per annum.

"Term SOFR Administrator" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" shall mean the forward-looking term rate based on SOFR.

"Threshold Amount" means $500,000.

"Total Outstandings" means the aggregate Outstanding Amount of all Term Loans.

"Type" means, with respect to a Term Loan, its character as a Base Rate Loan or a SOFR Loan.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Uniform Commercial Code" or "UCC" means the Uniform Commercial Code as the same may from time to time be in effect in the State of New York or the Uniform Commercial Code (or similar code or statute) of another jurisdiction, to the extent it may be required to apply to any item or items of Collateral.

"United States" and "U.S." mean the United States of America.

"U.S. Government Securities Business Day" shall mean any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Lender" has the meaning specified in Section 10.16(c).

174499819

"Variance Testing Date" shall mean each Wednesday after the Closing Date, commencing on the first Wednesday after the first complete week following the Closing Date (or, to the extent any such Wednesday is not a Business Day, the next Business Day thereafter).

"Variance Testing Period" shall mean as of (i) the first Variance Testing Date after the Closing Date, the one-week period ending on the immediately preceding Sunday, (ii) the second Variance Testing Date after the Closing Date, the two-week period ending on the immediately preceding Sunday, (iii) the third Variance Testing Date after the Closing Date, the three-week period ending on the immediately preceding Sunday and (iv) each Variance Testing Date thereafter, the four-week period ending on the immediately preceding Sunday.

"Voting Equity Interests" means, with respect to any Person, the outstanding Equity Interests of a Person having the power, directly or indirectly, to designate the board of directors (or other similar governing body) of such Person.

"wholly owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable Law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.

"Withdrawal" shall mean a disbursement of funds from the Funding Account. "Withdraw" and "Withdrawn" shall have correlative meanings thereto.

"Withdrawal Date" has the meaning specified in Section 2.14.

"Withdrawal Termination Instruction" has the meaning specified in Section 2.14.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "herein," "hereto," "hereof" and "hereunder" and words of similar import when used in any Loan Document shall refer to such Loan Document as a whole and not to any particular provision thereof.

(i)    Article, Section, Exhibit and Schedule references are to the Loan Document in which such reference appears.

(ii)    The term "including" is by way of example and not limitation.

174499819

(iii)    The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(iv)    Any reference herein to any Person shall be construed to include such Person's successors and assigns.

(c)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(d)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

Section 1.03    Accounting Terms.    (a) All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, as in effect from time to time, applied in a manner consistent with that used in preparing the audited Section 6.01 Financials, except as otherwise specifically prescribed herein.

(b)    If at any time any change in GAAP or the application thereof would affect the computation or interpretation of any financial ratio, basket, requirement or other provision set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Required Lenders and the Borrower shall negotiate in good faith to amend such ratio, basket, requirement or other provision to preserve the original intent thereof in light of such change in GAAP or the application thereof; *provided* that, until so amended, (A) such ratio, basket, requirement or other provision shall continue to be computed or interpreted in accordance with GAAP or the application thereof prior to such change therein and (B) in the case of any relevant calculation, the Borrower shall provide to the Administrative Agent and the Lenders a written reconciliation in form and substance reasonably satisfactory to the Required Lenders, between calculations of such ratio, basket, requirement or other provision made before and after giving effect to such change in GAAP or the application thereof.

(c)    Notwithstanding anything to the contrary contained herein, all financial covenants, basket amounts and ratios contained herein or in any other Loan Document shall be calculated (i) without giving effect to any election under FASB ASC 825 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof and (ii) without giving effect to any changes in GAAP after December 15, 2018 that would require lease obligations that were treated as operating leases under GAAP as in effect December 15, 2018 to be classified and accounted for as capital leases or otherwise reflected as Indebtedness on the Borrower's consolidated balance sheet.

Section 1.04    Rounding.    Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which

-39-

174499819

such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

Section 1.05    References to Agreements and Laws.   Unless otherwise expressly provided herein, (a) references to Organization Documents, agreements (including the Loan Documents) and other contractual instruments shall be deemed to include all subsequent amendments, restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, extensions, supplements and other modifications are permitted by any Loan Document and (b) references to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Law.

Section 1.06    Times of Day.   Unless otherwise specified, all references herein to times of day shall be references to Eastern Time (daylight savings or standard, as applicable).

Section 1.07    Timing of Payment or Performance.   When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as specifically provided in Section 2.12 or as described in the definition of Interest Period) or performance shall extend to the immediately succeeding Business Day.

Section 1.08    Rates.   The Administrative Agent does not warrant or accept any responsibility for, and the Administrative Agent shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Base Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Benchmark Replacement Conforming Changes.   The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to Borrower.   The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Base Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, or any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

174499819

ARTICLE II
The New Money DIP Commitments and Term Borrowings

Section 2.01      The Loans.

(a)      Subject to the terms and conditions hereof and in the DIP Orders, each Lender agrees, following entry of the Interim Order and the satisfaction (or waiver) of the conditions set forth in Sections 4.01 and 4.02, to make a single term loan (the "New Money Term Loans") to the Borrower on the Closing Date, in an aggregate principal amount in Dollars not to exceed such Lender's New Money DIP Commitment; provided that the total outstanding New Money Term Loans of all Lenders shall not exceed the aggregate amount of the New Money DIP Commitments in effect on the Closing Date (immediately prior to any funding thereof).  Amounts borrowed under this Section 2.01(a) and subsequently repaid or prepaid may not be reborrowed.

(b)      Subject to the terms and conditions hereof and in the DIP Orders, on the Closing Date, the full amount of all loans (together with accrued and unpaid interest thereon) held by lenders under the Prepetition Superpriority Credit Agreement, as set forth on Schedule 2.01(b) (the "Roll-Up Schedule"), which lenders are also Lenders or Affiliates of Lenders hereunder, shall be automatically substituted and exchanged for (and prepaid by) Term Loans hereunder (the "Roll-Up Loans").  Set forth on the Roll-Up Schedule will be the name of each Lender or Affiliate of a Lender whose loans under the Prepetition Superpriority Credit Agreement will be exchanged for (and prepaid by) Roll-Up Loans on the Closing Date, and the amount of Roll-Up Loans to be received by each such Lender or Affiliate of such Lender on the Closing Date (and the parties hereto hereby agree that the Administrative Agent (and the Prepetition Superpriority Agent) may each conclusively rely on the Roll-Up Schedule in adjusting the Register (and the equivalent document under the Prepetition Superpriority Credit Agreement) to reflect the cancellation of loans under the Prepetition Superpriority Credit Agreement and the Roll-Up Loans to be received by the Lenders on the Closing Date).   The Roll-Up Loans shall initially be SOFR Loans with an Interest Period of one month.

(c)      Following the making of the New Money Term Loan by a Lender, the New Money DIP Commitment of such Lender shall be automatically and permanently reduced to $0. Once funded (or deemed funded), each Term Loan shall be a "Loan" and "Term Loan" for all purposes under this Agreement and the other Loan Documents. Term Loans may be Base Rate Loans or SOFR Loans as further provided herein.

Section 2.02      Term Borrowings, Conversions and Continuations of Loans.  (a) Each Term Borrowing, each conversion of Term Loans from one Type to the other, and each continuation of SOFR Loans shall be made upon the Borrower's irrevocable written notice to the Administrative Agent.  Each such notice must be received by the Administrative Agent not later than (i) 1:00 p.m.  (New York City time) three (3) Business Days prior to the requested date of any Term Borrowing of, conversion of Base Rate Loans to, or continuation of, SOFR Loans (or one (1) Business Day in the case of any Term Borrowing on the Closing Date) and (ii) 1:00 p.m.  (New York City time) one (1) Business Day prior to the requested date of any Term Borrowing of Base Rate Loans, or of any conversion of SOFR Loans to Base Rate Loans or, in each case, such shorter period as the Administrative Agent and the Required Lenders shall agree.  Each written notice by the Borrower pursuant to this Section 2.02(a) shall be delivered by the Borrower to the

-41-

174499819

Administrative Agent in the form of a Committed Term Loan Notice.  Each Term Borrowing of, conversion to or continuation of SOFR Loans shall be in a principal amount of $1,000,000 or a whole multiple of $250,000 in excess thereof.  Each Term Borrowing of, or conversion to, Base Rate Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof.  Each Committed Term Loan Notice shall specify (i) whether the Borrower is requesting a Term Borrowing, a conversion of Term Loans from one Type to the other, or a continuation of SOFR Loans, (ii) the requested date of the Term Borrowing, conversion or continuation, as the case may be (which shall be a Business Day), (iii) the principal amount of Term Loans to be borrowed, converted or continued, (iv) the Type of Term Loans to be borrowed or to which existing Term Loans are to be converted and (v) in the case of a Term Borrowing, that the applicable conditions set forth in Sections 4.02 (a), (b), (d) and (e) will be satisfied as of the requested date of the Term Borrowing.  If the Borrower fails to specify a Type of Term Loan in a Committed Term Loan Notice or if the Borrower fails to give a timely notice requesting a conversion or continuation, then the applicable Term Loans shall be made as, or converted to, Base Rate Loans.

(b)     Following receipt of a Committed Term Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its ratable share of the applicable Term Loans, and if no timely notice of a conversion or continuation is provided by the Borrower, the Administrative Agent shall notify each Lender of the details of any automatic conversion to Base Rate Loans described in Section 2.02(a).  Each Lender shall make the amount of its New Money Term Loan available to the Administrative Agent in immediately available funds (at its account most recently designated by it for such purpose by notice to the Lenders) not later than 1:00 p.m. (New York City time) on the Business Day specified in the applicable Committed Term Loan Notice.  Upon satisfaction (or waiver) of the applicable conditions set forth in Section 4.02 (or, if such Term Borrowing is the initial Term Borrowing of New Money Term Loans, Section 4.01 and Section 4.02) and receipt of all requested funds by the Administrative Agent, the Administrative Agent shall remit the amounts so received, in like funds, to the Funding Account except as provided in the Funding Authorization Letter (which, for the avoidance of doubt, shall provide that a portion of such funds be remitted to the Funding Account).

(c)     Except as otherwise provided herein, a SOFR Loan may be continued or converted only on the last day of an Interest Period for such SOFR Loan unless the Borrower pays the amount due under Section 3.05 in connection therewith.  During the existence of a Default, at the election of the Required Lenders, no Term Loans may be requested as, converted to or continued as SOFR Loans.

(d)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for SOFR Loans upon determination of such interest rate.  The determination of Adjusted Term SOFR by the Administrative Agent shall be conclusive in the absence of manifest error.

(e)     After giving effect to all Term Borrowings, all conversions of Term Loans from one Type to the other and all continuations of Term Loans as the same Type, there shall not be more than five (5) Interest Periods in effect.

(f)     The failure of any Lender to make the Term Loan to be made by it as part of any Term Borrowing shall not relieve any other Lender of its obligation, if any, hereunder to

make its Term Loan on the date of such Term Borrowing, but no Lender shall be responsible for the failure of any other Lender to make the Term Loan to be made by such other Lender on the date of any Term Borrowing.

Section 2.03       [Reserved.].

Section 2.04       [Reserved.].

Section 2.05       Prepayments.  (a) Optional.  Subject to the last sentence of this Section 2.05(a), Borrower may, upon written notice (as set forth in clause (c) below) to the Administrative Agent, at any time or from time to time voluntarily prepay Term Loans in whole or in part without premium or penalty; *provided* that, except as otherwise agreed by the Required Lenders, any prepayment of Term Loans shall be in a principal amount of $500,000 or a whole multiple of $100,000 in excess thereof or, in each case, the entire principal amount thereof then outstanding. If such notice is given by the Borrower, subject to the last sentence of this Section 2.05(a) and clause (c)(iii) of this Section 2.05 below, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of Loans shall be accompanied by all accrued interest thereon.

(b)       Mandatory.

(i)       Not later than three Business Days following the receipt of any Net Cash Proceeds of any Disposition of any property or assets (other than (A) a Casualty Event or (B) any Disposition permitted under Section 7.05) by any Loan Party or Subsidiary thereof, Borrower shall apply 100% of such Net Cash Proceeds to make prepayments in accordance with Section 2.05(c).

(ii)       Not later than three Business Days following the receipt of any Net Cash Proceeds of any Debt Issuance (other than as permitted under Section 7.03) by any Loan Party or Subsidiary thereof, Borrower shall make prepayments in accordance with Section 2.05(c) in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(iii)       Not later than three Business Days following the receipt of any Net Cash Proceeds from a Casualty Event by any Loan Party, Borrower shall apply 100% of such Net Cash Proceeds to make prepayments in accordance with Section 2.05(c) provided that the Borrower may, at least one Business Day prior to the date of the required prepayment, deliver to the Administrative Agent a certificate of a Responsible Officer of the Borrower to the effect that the Borrower intends to cause an amount equal to such Net Cash Proceeds (or a portion thereof specified in such certificate) to be reinvested in Collateral consisting of replacement assets (including through the repair, restoration or replacement of the damaged, destroyed or condemned assets) or other non-current assets useful in the business of the Borrower and its Subsidiaries, in each case, within 365 days after the receipt of such Net Cash Proceeds, and certifying that, as of the date thereof, no Event of Default has occurred and is continuing, in which case during such period the Borrower shall not be required to make such prepayment to the extent of the amount set forth in such certificate; provided further that any such amount of Net Cash Proceeds that are not so reinvested by the end of such period shall be applied to prepay the Term Loans immediately upon the expiration of such period.

-43-

(c)     Application of Prepayments.

(i)     Any prepayments required pursuant to <u>Section 2.05</u> shall be applied ratably to the Loans then outstanding; and each such prepayment shall be paid to the Administrative Agent for the benefit of the Lenders in accordance with their respective pro rata shares of such prepayment.

(ii)     Amounts to be applied pursuant to this <u>Section 2.05</u> to the prepayment of Loans shall be applied, as applicable, first to reduce outstanding Base Rate Loans. Any amounts remaining after each such application shall be applied to prepay SOFR Loans in direct order of Interest Period maturities.

(iii)     Borrower shall notify the Administrative Agent by written notice of any prepayment hereunder not later than 11:00 a.m., New York City time, three Business Days before the date of prepayment; provided that a notice of optional prepayment delivered by Borrower in accordance with this <u>Section 2.05(c)(iii)</u> and <u>Section 2.05(a)</u> that contemplates payment in full of the Loans may, if the Administrative Agent (in its reasonable discretion) has previously agreed to a customary pay-off letter with Borrower, expressly state that such notice is conditioned upon the effectiveness of new credit facilities or similar new Indebtedness and which effectiveness will result in the immediate payment in full of all Obligations, in which case such notice may be revoked by Borrower (by notice to the Administrative Agent on or prior to 2:00 p.m., New York City time, one Business Day prior to the specified notice effective date) if such condition is not satisfied (or is then unlikely to be satisfied). Each such notice shall be irrevocable. Each such notice shall specify the prepayment date, the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment. Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof. Such notice to the Lenders may be by electronic communication. Each partial prepayment of any Term Borrowing shall be in an amount that would be permitted in the case of a Term Borrowing of the same Type as provided in <u>Section 2.02</u>, except as necessary to apply fully the required amount of a mandatory prepayment. Each prepayment of a Term Borrowing shall be applied ratably to the Loans and otherwise in accordance with this <u>Section 2.05</u>.

(d)     Each prepayment of a Term Loan shall be accompanied by all accrued interest thereon and all Exit Fees with respect thereto, together with any additional amounts required pursuant to <u>Section 3.05</u>.

(e)     All payments or repayments of Term Loans made pursuant to this <u>Section 2.05</u> shall be made in Dollars.

Section 2.06     <u>Termination or Reduction of New Money DIP Commitments</u>. The New Money DIP Commitments of each Lender shall be automatically and permanently reduced to zero (0) on the date of (and after giving effect to) the Term Borrowing of the New Money Term Loans (which, for the avoidance of doubt, shall be the Closing Date).

Section 2.07     <u>Repayment of Loans</u>. Subject to Section 2.15, (a) the Borrower shall repay to the Administrative Agent for the ratable account of the Lenders on the Maturity Date the

-44-

aggregate principal amount of all Term Loans outstanding on such date, together with all accrued and unpaid interest thereon and (b) on the Maturity Date, all funds in the Funding Account shall be applied by the Administrative Agent on behalf of the Borrower to the repayment of Obligations in accordance with the priorities of payment set forth in Section 8.04.

Section 2.08    Interest.  (a) Subject to the provisions of Section 2.08(b), (i) each SOFR Loan (including, for the avoidance of doubt, any SOFR Loans the proceeds of which are on deposit in the Funding Account, irrespective of whether such amounts are then unavailable or otherwise restricted for withdrawal or other utilization by the Loan Parties in accordance with the Loan Documents) shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to the sum of (A) Adjusted Term SOFR for such Interest Period *plus* (B) the Applicable Rate for SOFR Loans; and  (ii) each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date (or deemed borrowing date) or conversion date, as the case may be, at a rate per annum equal to the sum of (A) the Base Rate *plus* (B) the Applicable Rate for Base Rate Loans.

(b)    Notwithstanding the foregoing, during the continuation of an Event of Default, without duplication, (i) all outstanding Loans shall bear interest at a per annum rate equal to (i) 2.0% plus the rate otherwise applicable to such Loan as provided in Sections 2.08(a) and (ii) if any other Obligation (other than principal of the Loans) is not paid when due, 2.0% plus the rate applicable to Base Rate Loans as provided in Section 2.08(a) (in either case, the "Default Rate"). Accrued and unpaid interest pursuant to this Section 2.08(b) shall be payable upon demand.

(c)    Subject to Section 2.08(b), interest on the Loans will accrue and be payable in arrears in cash on the on each applicable Interest Payment Date.

(d)    All interest paid or payable pursuant to this Section 2.08 shall be paid in Dollars.

Section 2.09    Fees.

(a)    The Borrower shall pay to the Administrative Agent for its own account fees in the amounts and at the times specified in the Fee Letter.

(b)    On the Closing Date, the Borrower shall pay to each Lender party to this Agreement on the Closing Date, an upfront fee (the "Upfront Fee") in an amount equal to the sum of (i) 4.00% of such Lender's New Money DIP Commitments on the Closing Date (the "New Money Upfront Fee") and (ii) 2.00% of such Lender's Roll-Up Loans on the Closing Date.  The Upfront Fee shall be fully and irrevocably due and payable in cash on the Closing Date and, solely with respect to the New Money Upfront Fee, shall be paid as discount as indicated below in this clause (b). The Upfront Fee shall be earned by the Lenders on the Closing Date as a fee in consideration of the New Money DIP Commitments and the making (and deemed making) of the Term Loans and for the time and costs expended in extending the New Money DIP Commitments and the making (and deemed making) of the Term Loans. The Upfront Fee shall be fully earned when paid and shall not be refundable for any reason whatsoever.   THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE UPFRONT FEE.

The Borrower expressly agrees that: (A) the Upfront Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Upfront Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay the Upfront Fee; and (D) the Borrower shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Borrower expressly acknowledges that its agreement to pay the Upfront Fee to the Lenders as herein described is a material inducement for the Lenders to provide the New Money DIP Commitments and provide the Term Loans.  The New Money Upfront Fee shall, to the extent permitted by applicable law, be paid as discount such that the advance of the New Money Term Loans on the Closing Date shall be made with a discount of 4.00% of the aggregate principal amount of the New Money Term Loans so advanced on the Closing Date resulting in proceeds of such New Money Term Loans being advanced net of such discount (which discount will be retained by the applicable Lenders according to their respective shares thereof).  The aggregate outstanding principal balance of the New Money Term Loans immediately after giving effect to the borrowing of the New Money Term Loans on the Closing Date and the amount of the New Money Term Loans to be repaid hereunder shall be the aggregate amount borrowed under Section 2.1(a).

(c)     With respect to each repayment or prepayment of Term Loans under Section 2.05, any other repayment or prepayment of Term Loans including upon maturity (scheduled or otherwise), any acceleration of the Term Loans and/or the other Obligations with respect thereto (regardless of whether before or after the occurrence of an Event of Default) and/or any mandatory assignment of Loans of a non-consenting Lender pursuant to Section 3.07, in each case whether in full or in part, Borrower shall pay (and shall be required to pay) to the Administrative Agent, for the ratable benefit of each Lender whose Term Loans are so repaid, prepaid, accelerated or assigned, an amount equal to 4.00% of the amount of the Term Loans so repaid, prepaid, accelerated or assigned (the "Exit Fee"), in each case, in cash, concurrently with such repayment, prepayment, acceleration or assignment. For the avoidance of doubt, it is understood and agreed that, if the Term Loans are accelerated or otherwise become due prior to the Maturity Date, in each case whether in full or in part (regardless of whether before or after the occurrence of an Event of Default), the Exit Fee will also automatically be due and payable as though the Term Loans were being repaid, prepaid or assigned and shall constitute part of the Obligations with respect to the Term Loans. The Exit Fee shall be earned by the Lenders on the Closing Date as a fee in consideration of the New Money DIP Commitments and the making (or deemed making) of the Term Loans and for the time and costs expended in extending the New Money DIP Commitments and the making (or deemed making) of the Term Loans. Such Exit Fee shall be fully earned on the Closing Date and shall not be refundable for any reason whatsoever.  THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE EXIT FEE. The Borrower expressly agrees that: (A) the Exit Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Exit Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay the Exit Fee; and (D) the Borrower shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Borrower expressly acknowledges that its agreement to pay the Exit Fee to the Lenders as herein

-46-

described is a material inducement for the Lenders to provide the New Money DIP Commitments and provide the Term Loans. Notwithstanding anything to the contrary in this Section 2.09(c), or any other provision herein to the contrary, if such repayment or prepayment (or acceleration or replacement) of the Term Loans is made (or deemed made) upon consummation of the Approved Plan on the Approved Plan Effective Date (in each case except in connection with the consummation of a Sale Transaction), then rather than being payable in cash, such fee shall be payable in the form of Exit First Out Roll-Up Loans, all as further provided in Section 2.15.

Section 2.10    Computation of Interest and Fees.  All computations of interest for Base Rate Loans (except for Base Rate computations in respect of clauses (a) and (c) of the definition thereof) shall be made on the basis of a year of three hundred sixty-five (365) or three hundred sixty-six (366) days, as the case may be, and actual days elapsed.  All other computations of fees and interest shall be made on the basis of a three hundred sixty (360)-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a three hundred sixty-five (365)-day year).  Interest shall accrue on each Term Loan for the day on which the Term Loan is made (including, for the avoidance of doubt, any Term Loans the proceeds of which are on deposit in the Funding Account, irrespective of whether such amounts are then unavailable or otherwise restricted for withdrawal or other utilization by the Loan Parties in accordance with the Loan Documents), and shall not accrue on a Term Loan, or any portion thereof, for the day on which the Term Loan or such portion is paid; *provided* that any Term Loan that is repaid on the same day on which it is made shall, subject to Section 2.12(a), bear interest for one day.  Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.11    Evidence of Indebtedness.  (a) The Term Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and evidenced by one or more entries in the Register maintained by the Administrative Agent, acting as a non-fiduciary agent for the Borrower.  The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error.  Any failure to so record or any error in doing so shall not, however, limit the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.  In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.  Upon the request of any Lender, the Borrower shall execute and deliver to such Lender a Term Note payable to such Lender, which shall evidence such Lender's Term Loans in addition to such accounts or records.  Each Lender may attach schedules to its Term Note and endorse thereon the date, Type (if applicable), amount and maturity of its Term Loans and payments with respect thereto.

(b)    [Reserved.]

(c)    Entries made in good faith by the Administrative Agent in the Register pursuant to Sections 2.11(a), and by each Lender in its accounts or records pursuant to Sections 2.11(a), shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from the Borrower to, in the case of the Register, each Lender and, in the case of such accounts or records, such Lender, under this Agreement and the other Loan Documents, absent manifest error; *provided* that the failure of the Administrative Agent

-47-

or such Lender to make an entry, or any finding that an entry is incorrect, in the Register or such accounts or records shall not limit the obligations of the Borrower under this Agreement and the other Loan Documents.

Section 2.12     Payments Generally; Administrative Agent's Clawback.  (a)  General. All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at its account most recently designated by it for such purpose by notice to the Borrower and Lenders in Dollars and in immediately available funds not later than 2:00 p.m.  (New York City time) on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its ratable share of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m.  (New York City time) may, in Administrative Agent's sole discretion, be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  Except as otherwise expressly provided herein, if any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be; *provided*, *however*, that if such extension would cause payment of interest on or principal of SOFR Loans to be made in the next succeeding calendar month, such payment shall be made on the immediately preceding Business Day.

(b)     (i) Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received written notice from a Lender prior to the proposed date of any Term Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Term Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with and at the time required by Section 2.02(b) and may, in its sole discretion and in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if any Lender does not in fact make its share of the applicable Term Borrowing available to the Administrative Agent, then such Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand an amount equal to such applicable share in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower by the Administrative Agent to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any reasonable administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing and (B) in the case of a payment to be made by the Borrower, the highest interest rate applicable to Term Loans that are Base Rate Loans. If both the Borrower and such Lender pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Term Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Term Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make its share of any Term Borrowing available to the Administrative Agent.

-48-

(ii)      Payments by the Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received written notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lenders the amount due.  In such event, if the Borrower did not in fact make such payment, then each of the applicable Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed by the Administrative Agent to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate reasonably determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any reasonable administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing.

A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this Section 2.12(b) shall be conclusive, absent manifest error.

(c)      [reserved].

(d)      Obligations of the Lenders Several.   The obligations of the Lenders hereunder to make Term Loans and to make payments pursuant to Section 9.07 are several and not joint.   The failure of any Lender to make any Term Loan or to make any payment under Section 9.07 on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Term Loan or to make its payment under Section 9.07.

(e)      Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Term Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Term Loan in any particular place or manner.

(f)      Insufficient Funds.  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal and interest then due in accordance with this Article II, such funds shall be applied (x) first, toward payment of interest then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest then due to such parties, and (y) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(g)      Unallocated Funds.   If the Administrative Agent receives funds for application to the Obligations of the Loan Parties under or in respect of the Loan Documents under circumstances for which the Loan Documents do not specify the manner in which such funds are to be applied, the Administrative Agent may, but shall not be obligated to, elect to distribute such funds first to the payment of any amounts due and owing to the Agents and then to each of the Lenders in accordance with such Lender's ratable share of the Outstanding Amount of all Term Loans outstanding at such time, in repayment or prepayment of such of the outstanding Term

-49-

Loans (first with respect to interest due and payable on the Loans and second with respect to principal on the Loans) or other Obligations then owing to such Lender.

Section 2.13     Sharing of Payments.  If, other than as expressly provided elsewhere herein, any Lender shall obtain on account of the Term Loans made by it, any payment (whether voluntary, involuntary, through the exercise of any right of setoff, or otherwise) in excess of its ratable share (or other share contemplated hereunder) thereof, such Lender shall immediately (a) notify the Administrative Agent of such fact and (b) purchase from the other Lenders such participations in the Term Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment in respect of such Term Loans pro rata with each of them; *provided*, *however*, that if all or any portion of such excess payment is thereafter recovered from the purchasing Lender under any of the circumstances described in Section 10.06 (including pursuant to any settlement entered into by the purchasing Lender in its discretion), such purchase shall to that extent be rescinded and each other Lender shall repay to the purchasing Lender the purchase price paid therefor, together with an amount equal to such paying Lender's ratable share (according to the proportion of (i) the amount of such paying Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid or payable by the purchasing Lender in respect of the total amount so recovered, without further interest thereon.  The Borrower agrees that any Lender so purchasing a participation from another Lender may, to the fullest extent permitted by Law, exercise all its rights of payment (including the right of setoff, but subject to Section 10.09) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.  Each Lender that purchases a participation pursuant to this Section 2.13 shall from and after such purchase have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.  For the avoidance of doubt, the provisions of this Section 2.13 shall not be construed to apply to (A) the assignments and participations described in Section 10.07, or (B) any applicable circumstances contemplated by Section 3.07.

Section 2.14     Withdrawal of Funds from the Funding Account  The Borrower shall have the right, no more than one (1) time each calendar week (or no more than two (2) times per week in each of the first three (3) calendar weeks following the Closing Date), to withdraw the funds on deposit in the Funding Account by delivering written notice to the Administrative Agent substantially in the form attached as Exhibit F hereto (each such notice, a "Funding Account Withdrawal Notice") not later than 12:00 (noon), New York City time, two (2) Business Days before the proposed Withdrawal Date; *provided* that (i) the Borrower shall concurrently provide a forecast of its Qualified Cash immediately after giving effect to the disbursements to be made with such requested withdrawal and all other cash disbursements and all cash receipts expected to be made or received, as applicable, during the one week period following the applicable Withdrawal Date, in a form substantially consistent with the Approved Budget (but limited to such one-week period), certified by the chief financial officer of the Borrower, demonstrating, to the reasonable satisfaction of the Required Lenders or their advisors, that the aggregate amount of Qualified Cash, excluding the balance in the Carve-Out Account (as defined in the Interim Order), at the end of such one-week period will not exceed $5,000,000 and (ii) all conditions set forth in this Section 2.14 and Section 4.02 shall be satisfied prior to and after giving effect to such withdrawal. Each Funding Account Withdrawal Notice shall specify the following information:

-50-

(a)      the amount of such withdrawal;

(b)      the date of such proposed withdrawal (which shall be on the second Business Day following the delivery of a Funding Account Withdrawal Notice) (the "Withdrawal Date"; provided, if any Withdrawal Termination Instruction is validly delivered, the "Withdrawal Date" shall be the first Business Day following the withdrawal, if any, of such Withdrawal Termination Instruction by the Required Lenders in accordance with the last sentence of the fourth paragraph of this Section 2.14);

(c)      specifying, in reasonable detail with reference to applicable lines items in the Approved Budget, the use of proceeds of all amounts to be Withdrawn on the applicable Withdrawal Date;

(d)      that as of the date of such withdrawal, the conditions set forth in Section 4.02 and this Section 2.14 are satisfied; and

(e)      the wiring instructions of the account of the Borrower to which the proceeds of such withdrawal are to be disbursed.

On the Withdrawal Date, the Administrative Agent shall disburse funds from the Funding Account in an aggregate amount equal to the amount specified in such Funding Account Withdrawal Notice to the account of Borrower specified in such Funding Account Withdrawal Notice, unless the Administrative Agent has received a Withdrawal Termination Instruction from the Required Lenders prior to 10:00 a.m., New York City time, on such Withdrawal Date (and such Withdrawal Termination Instruction has not been withdrawn by the Required Lenders in writing prior to 10:00 a.m., New York City time on such Withdrawal Date).  All proceeds of the Term Loans (except to the extent otherwise applied on the Closing Date in accordance with the Funding Authorization Letter) shall be held in the Funding Account at all times until such proceeds are disbursed or otherwise applied in accordance with this Section 2.14 or Section 2.15.

For the avoidance of doubt, funds withdrawn or applied from the Funding Account shall be used solely in accordance with Section 6.11.

On and after the date of receipt by the Administrative Agent of a written direction from the Required Lenders instructing the Administrative Agent that it may no longer honor instructions from Borrower with respect to the Funding Account due to any of the conditions set forth in this Section 2.14 or in Section 4.02 being unsatisfied or incapable of satisfaction as of the applicable Withdrawal Date (a "Withdrawal Termination Instruction"), Borrower shall have no right to such requested Withdrawal from the Funding Account and the Administrative Agent shall not honor any such request; provided, however, that the Administrative Agent shall not be liable for (i) any disbursements pursuant to instructions from Borrower or (ii) irrevocable electronic funds transfers or wire transfers that are subject to cut-off times, in each case, that were processed or initiated prior to receipt of such Withdrawal Termination Instruction.  Any Withdrawal Termination Instruction received by the Administrative Agent from the Required Lenders shall remain in effect until such time, if any, as the Administrative Agent shall have received a written termination of such Withdrawal Termination Instruction from the Required Lenders.  The Required Lenders shall terminate or withdraw such Withdrawal Termination Instruction (and deliver evidence of the same

to the Administrative Agent) upon their reasonable determination that the conditions set forth in this <u>Section 2.14</u> or in <u>Section 4.02</u> are satisfied or will be satisfied as of the applicable Withdrawal Date.

Each submission by Borrower to the Administrative Agent of a Funding Account Withdrawal Notice shall be deemed to constitute a representation and warranty by Borrower that the conditions set forth in <u>Section 4.02</u> and this <u>Section 2.14</u> will be satisfied as of the applicable Withdrawal Date (both before and after giving effect to the proposed withdrawal). With respect to any disbursement, withdrawal, transfer, or application of funds from the Funding Account hereunder, the Administrative Agent shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, (i) any Funding Account Withdrawal Notice submitted by Borrower as evidence that all conditions precedent to a withdrawal and disbursement from the Funding Account to Borrower have been satisfied (including, without limitation, those set forth in this <u>Section 2.14</u> and <u>Section 4.02</u>), unless the Administrative Agent has received a Withdrawal Termination Instruction from the Required Lenders prior to 10:00 a.m., New York City time, on the applicable Withdrawal Date (and such Withdrawal Termination Instruction has not been subsequently withdrawn by the Required Lenders in writing prior to 10:00 a.m., New York City time, on such Withdrawal Date), and (ii) any Withdrawal Termination Instruction received by it. Notwithstanding anything herein to the contrary, the Administrative Agent shall have no obligation to disburse any amount from the Funding Account in excess of the amounts then held in the Funding Account. The Administrative Agent shall have no duty to inquire or investigate whether any condition precedent to a withdrawal from the Funding Account has been satisfied, and shall not be deemed to have any knowledge that a condition is not satisfied unless it has received a Withdrawal Termination Instruction.

For the avoidance of doubt, all proceeds of Term Loans held in the Funding Account shall be Term Loans for all purposes hereunder and, notwithstanding that the proceeds of such Term Loans are held in the Funding Account, shall bear interest in accordance with this Agreement and shall be subject to all other terms and provisions of this Agreement and the other Loan Documents to the same extent as all other Term Loans.

Notwithstanding anything to the contrary contained herein, the Administrative Agent shall be entitled to apply funds held in the Funding Account to the payment of the fees owing under the Fee Letter and all expenses and indemnities payable to the Administrative Agent or the Lenders hereunder or under any other Loan Document, in each case to the extent not paid when due, regardless of whether any condition precedent in <u>Article IV</u> has been satisfied and regardless of whether a Withdrawal Termination Instruction has been delivered to the Administrative Agent; *provided* that notice of such application is provided to Borrower and the Lenders.

Section 2.15     <u>Exit Facility Refinancing; Refinancing Date Transactions</u>.

Subject to the last paragraph of this <u>Section 2.15</u>, upon the satisfaction or waiver by the lenders under the Exit Facility Credit Agreement of each of the conditions precedent to effectiveness set forth in the Exit Facility Credit Agreement (the "<u>Exit Facility Effective Date</u>"), automatically and without any further consent or action required by the Administrative Agent, any Lender, any other Secured Party or any Loan Party, this Agreement shall terminate and be superseded and replaced in their entirety by the Exit Facility Credit Agreement, and all Term Loans

-52-

(and all accrued and unpaid interest thereon) and the Exit Fee shall be exchanged for (and converted into) Exit First Out Roll-Up Loans under the Exit Facility on a dollar-for-dollar basis. Notwithstanding anything to the contrary in any Loan Document, upon the occurrence of the Exit Facility Effective Date, the Administrative Agent shall release all funds then on deposit in the Funding Account to the Borrower (pursuant to wire instructions for an account of the Borrower provided by the Borrower to the Administrative Agent on or prior to the Exit Facility Effective Date).

Notwithstanding the foregoing, all obligations of the Borrower and the other Loan Parties to the Administrative Agent and the Lenders under this Agreement and any other Loan Document, which are expressly stated in this Agreement or such other Loan Document as surviving such agreement's termination shall, as so specified, survive without prejudice and remain in full force and effect. For the avoidance of doubt, all other Obligations under the Loan Documents (other than as provided in the immediately preceding sentence) shall be deemed satisfied and discharged in full upon the occurrence of the Exit Facility Effective Date.

## ARTICLE III
### Taxes, Increased Costs Protection and Illegality

Section 3.01    Taxes.  (a) Any and all payments by the Borrower and any other Loan Party to or for the account of any Agent or any Lender under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, unless otherwise required by applicable Laws.  If any Loan Party shall be required by any Laws (as determined in the good faith discretion of the applicable Loan Party or Administrative Agent, as applicable) to deduct or withhold any Taxes from or in respect of any sum payable under any Loan Document to any Agent or any Lender, (i) if such Tax is an Indemnified Tax or Other Tax, the sum payable shall be increased as necessary so that after making all required deductions or withholdings (including deductions and withholdings applicable to additional sums payable under this Section 3.01), each of such Agent and such Lender receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the Loan Party shall make such deductions or withholdings, (iii) the Loan Party shall pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Laws and (iv) as soon as practicable after such payment, the Loan Party shall furnish to such Agent or Lender (as the case may be) the original or a certified copy of a receipt evidencing payment thereof to the extent such a receipt is issued therefor, a copy of the return reporting such payment or other written proof of payment thereof that is reasonably satisfactory to the Administrative Agent.

(b)    In addition but without duplication, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any and all present or future stamp, court, documentary, intangible, recording, filing or similar Taxes which arise from any payment made under any Loan Document or from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under or otherwise with respect to, any Loan Document except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.07) (hereinafter referred to as "Other Taxes").

-53-

(c)     The Borrower agrees to indemnify each Agent and any Lender, as applicable, for (i) the full amount of any Indemnified Taxes and Other Taxes (including any Indemnified Taxes or Other Taxes imposed or asserted by any Governmental Authority on amounts payable under this Section 3.01) paid by such Agent and such Lender and (ii) any reasonable expenses arising therefrom or with respect thereto, in each case whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority; *provided* that such Agent or Lender, as the case may be, provides the Borrower (with a copy to the Administrative Agent) with a certificate or other evidence reasonably acceptable to the Borrower setting forth in reasonable detail the basis and calculation of such amounts. A certificate as to such amounts prepared in good faith by such Agent or Lender (or by an Agent on behalf of such Lender) shall be conclusive absent manifest error. Payment under this Section 3.01(c) shall be made within ten (10) days after the date such Lender or such Agent makes a written demand therefor.

(d)     If any Lender or Agent determines in its sole discretion exercised in good faith that it has received a refund in respect of any Indemnified Taxes or Other Taxes as to which indemnification or additional amounts have been paid to it by the Borrower pursuant to this Section 3.01, it shall promptly remit such refund (but only to the extent of indemnity payments made under this Section 3.01) to the Borrower, net of all reasonable out-of-pocket expenses (including Taxes) of the Lender or Agent, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); *provided*, *however*, that the Borrower, upon the request of the Lender or Agent, as the case may be, agree promptly to return such refund (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to such party in the event such party is required to repay such refund to the relevant Governmental Authority. Nothing contained in this Section 3.01(d) shall interfere with the right of a Lender or Agent to arrange its tax affairs in whatever manner it thinks fit nor oblige any Lender or Agent to claim any Tax refund or to disclose any information relating to its tax affairs or any computations in respect thereof or require any Lender or Agent to do anything that would prejudice its ability to benefit from any other refunds, credits, reliefs, remissions or repayments to which it may be entitled. Notwithstanding anything to the contrary in this clause (d), in no event will the Agent or any Lender be required to pay any amount to the Borrower pursuant to this clause (d) the payment of which would place the Agent or any Lender in a less favorable net after-Tax position than the Agent or any Lender would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require the Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the Borrower or any other Person.

(e)     Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 3.01(a), (b) or (c) with respect to such Lender it will, if requested by the Borrower, use commercially reasonable efforts (subject to legal and regulatory restrictions) to avoid or reduce to the greatest extent possible any indemnification or additional amounts being due under this Section 3.01, including to designate another Lending Office for any Term Loan affected by such event; *provided* that such efforts are made on terms that, in the reasonable and good faith judgment of such Lender, (i) would eliminate or reduce amounts payable pursuant to Section 3.01, in the future, and (ii) would not subject such Lender to any unreimbursed cost or

expense and would not otherwise be disadvantageous to such Lender; *provided*, *further*, that nothing in this Section 3.01(e) shall affect or postpone any of the Obligations of the Borrower or the rights of such Lender pursuant to Sections 3.01(a) and (c). The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender as a result of a request by the Borrower under this Section 3.01(e).

(f)     If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation and information prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation and information reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 3.01(f), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Section 3.02     Illegality.  If any Lender reasonably determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable Lending Office to make, maintain or fund Term Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Borrower through the Administrative Agent, (i) any obligation of such Lender to make or continue SOFR Loans or to convert Base Rate Loans to SOFR Loans shall be suspended and (ii) if such notice asserts the illegality of such Lender making or maintaining Base Rate Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Base Rate, the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate, in each case until such Lender notifies the Administrative Agent and the Borrower that the circumstances giving rise to such determination no longer exist.  Upon receipt of such notice, (x) the Borrower shall, upon demand from such Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans of such Lender to Base Rate Loans (the interest rate on Base Rate Loans of such Lender shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Base Rate), either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such SOFR Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such SOFR Loans and (y) if such notice asserts the illegality of such Lender determining or charging interest rates based upon Adjusted Term SOFR, the Administrative Agent shall during the period of such suspension compute the Base Rate applicable to such Lender without reference to the Adjusted Term SOFR component thereof until the Administrative Agent is advised in writing by such Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon Adjusted Term SOFR.  Upon any such prepayment or conversion, the Borrower shall also pay accrued interest on the amount so prepaid or converted.  Each Lender agrees to designate a different Lending Office if such designation will avoid the need for such notice and

will not, in the good faith judgment of such Lender, otherwise be materially disadvantageous to such Lender.

Section 3.03    <u>Inability to Determine Rates; Benchmark Replacement Setting</u>.

(a)    If in connection with any request for a SOFR Loan or a conversion to or continuation thereof, except in the case where the circumstances described in <u>Section 3.03(b)</u> apply, (a) the Administrative Agent reasonably determines that, pursuant to the definition thereof, adequate and reasonable means do not exist for determining Adjusted Term SOFR for any Interest Period with respect to a proposed SOFR Loan or in connection with an existing or proposed Base Rate Loan, or (b) the Required Lenders reasonably determine (provided the Required Lenders shall notify the Administrative Agent following such determination) that for any reason Adjusted Term SOFR for any Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of funding (or being deemed to fund) such Loan, the Administrative Agent will promptly so notify the Borrower and each Lender.  Thereafter, (x) the obligation of the Lenders to make or maintain SOFR Loans shall be suspended, and (y) the utilization of the Adjusted Term SOFR component in determining the Base Rate shall be suspended, in each case until the Administrative Agent (in the case of a determination pursuant to clause (b) above, upon the instruction of the Required Lenders) revokes such notice.  Upon receipt of such notice, (i) Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans or, failing that, will be deemed to have converted such request into a request for a borrowing of Base Rate Loans (determined without reference to the Adjusted Term SOFR component thereof) in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into Base Rate Loans at the end of the Interest Period.

(b)    *Benchmark Replacement Setting*

(i)    <u>Benchmark Replacement</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent (acting at the direction of the Required Lenders) may, without further action or consent of any other party to this Agreement or any other Loan Document, amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted notice of such proposed amendment to all affected Lenders and the Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders stating that such Benchmark Replacement does not constitute a replacement index rate that is widely adopted in the leveraged syndicated loan market.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this <u>Section 3.03(b)(i)</u> will occur prior to the applicable Benchmark Transition Start Date.

(ii)    <u>Benchmark Replacement Conforming Changes</u>. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent (acting at the direction of the Required Lenders) will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action

-56-

or consent of any other party to this Agreement or any other Loan Document (and the Lenders hereby (i) authorize and direct each of the Administrative Agent to make any Benchmark Replacement Conforming Changes (and to enter into any modifications to this Agreement or other Loan Documents implementing such Benchmark Replacement Conforming Changes) in respect of which the Administrative Agent has received a direction from the Required Lenders to implement and (ii) acknowledge and agree that the Administrative Agent shall be entitled to all of the exculpations, protections and indemnifications provided for in this Agreement in favor of the Administrative Agent in implementing any Benchmark Replacement Conforming Changes (or in entering into any modifications to this Agreement or the other Loan Documents implementing the same) in respect of which the Administrative Agent has received a direction from the Required Lenders to implement).

(iii)    Notices; Standards for Decisions and Determinations.  The Administrative Agent (acting at the direction of the Required Lenders) will promptly notify the Borrower and the applicable Lenders of (i) the implementation of any Benchmark Replacement, (ii) the effectiveness of any Benchmark Replacement Conforming Changes, (iii) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 3.03(b)(iv) and (iv) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent (acting at the direction of the Required Lenders) as expressly set forth in this Section 3.03(b) and the defined terms used herein, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 3.03(b).

(iv)    Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion and in consultation with the Borrower or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent (acting at the direction of the Required Lenders) may (by providing notice thereof (which may be via email) to the Borrower and the Lenders), modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent (acting at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time (by providing notice thereof (which may be via email) to the Borrower and the Lenders) to reinstate such previously removed tenor.

(v)       Benchmark Unavailability Period. Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any request for a borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to Base Rate Loans and (ii) during the continuance of any Benchmark Unavailability Period, any outstanding affected SOFR Loans will be deemed to have been converted to Base Rate Loans at the end of the applicable Interest Period.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of the Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Base Rate.

Section 3.04       Increased Cost and Reduced Return; Capital Adequacy.  (a) If any Lender reasonably determines that as a result of the introduction of or any change in or in the interpretation of any Law, in each case after the date hereof, or such Lender's compliance therewith, there shall be any increase in the cost to such Lender of agreeing to make or making, funding or maintaining any Term Loan, or a reduction in the amount received or receivable by such Lender in connection with any of the foregoing (including Taxes on its loans, loan principal, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto, but excluding for purposes of this Section 3.04(a) any such increased costs or reduction in amount resulting from Indemnified Taxes and other Taxes indemnified under Section 3.01, Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and Connection Income Taxes), then within 15 days after demand of such Lender setting forth in reasonable detail such increased costs (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such increased cost or reduction.

(b)       If any Lender determines that the introduction of any Law regarding capital adequacy or liquidity requirements or any change therein or in the interpretation thereof, in each case after the date hereof, or compliance by such Lender (or its Lending Office) therewith, has the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of such Lender's obligations hereunder (taking into consideration its policies with respect to capital adequacy or liquidity and such Lender's desired return on capital), then within 15 days after demand of such Lender setting forth in reasonable detail the charge and the calculation of such reduced rate of return (with a copy of such demand to the Administrative Agent given in accordance with Section 3.06), the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such reduction within 15 days after receipt of demand therefor.

(c)       The Borrower shall not be required to compensate a Lender pursuant to Section 3.04(a) or (b) for any such increased cost or reduction incurred more than one hundred eighty (180) days prior to the date that such Lender demands, or notifies the Borrower of its intention to demand, compensation therefor; provided that if the circumstance giving rise to such increased cost or reduction is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

(d)      If any Lender requests compensation under this <u>Section 3.04</u>, then such Lender will, if requested by the Borrower and at the Borrower's expense, use commercially reasonable efforts to designate another Lending Office for any Term Loan affected by such event; *provided* that such efforts would not, in the good faith judgment of such Lender, be inconsistent with the internal policies of, or otherwise be materially disadvantageous in any legal, economic or regulatory respect to such Lender or its Lending Office.  The provisions of this clause (d) shall not affect or postpone any Obligations of the Borrower or rights of such Lender pursuant to <u>Sections 3.04(a)</u> or <u>(b)</u>.

For purposes of this <u>Section 3.04</u>, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, regulations, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines, requirements and directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall, in each case, be deemed to have gone into effect after the date hereof, regardless of the date enacted, adopted or issued.

Section 3.05      <u>Funding Losses</u>.  Upon written demand of any Lender (with a copy to the Administrative Agent) from time to time, setting forth in reasonable detail the basis for calculating such compensation, the Borrower shall promptly compensate such Lender for and hold such Lender harmless from any loss, cost or expense actually incurred by it as a result of:

(a)      any continuation, conversion, payment or prepayment of any Term Loan (other than a Base Rate Loan) on a day other than the last day of the Interest Period for such Term Loan (whether voluntary, mandatory, automatic, by reason of acceleration, or otherwise);

(b)      any failure by the Borrower (for a reason other than the failure of such Lender to make a Term Loan) to prepay, borrow, continue or convert any Term Loan (other than a Base Rate Loan) on the date or in the amount notified by the Borrower; or

(c)      any mandatory assignment of such Lender's Term Loans (other than Base Rate Loans) pursuant to <u>Section 3.07</u> on a day other than the last day of the Interest Period for such Term Loans;

including any loss or expense (excluding loss of anticipated profits and all administrative processing or similar fees) arising from the liquidation or reemployment of funds obtained by it to maintain such Term Loan or from fees payable to terminate the deposits from which such funds were obtained, but excluding any such loss for which no reasonable means of calculation exist, as set forth in <u>Section 3.03</u>.

Section 3.06      <u>Matters Applicable to All Requests for Compensation</u>.  (a) Any Agent or any Lender claiming compensation under this <u>Article III</u> shall deliver a certificate to the Borrower contemporaneously with the demand for payment, setting forth in reasonable detail a calculation of the additional amount or amounts to be paid to it hereunder which shall be conclusive in the absence of manifest error.  In determining such amount, such Agent or such Lender may use any reasonable averaging and attribution methods.

(b)      With respect to any Lender's claim for compensation under <u>Section 3.02</u>, <u>3.03</u> or <u>3.04</u>, the Borrower shall not be required to compensate such Lender for any amount incurred more than one hundred eighty (180) days prior to the date that such Lender notifies the Borrower of the event that gives rise to such claim; *provided* that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.  If any Lender requests compensation by the Borrower under <u>Section 3.04</u>, the Borrower may, by notice to such Lender (with a copy to the Administrative Agent), suspend the obligation of such Lender to make or continue from one Interest Period to another SOFR Loans, or to convert Base Rate Loans into SOFR Loans, until the event or condition giving rise to such request ceases to be in effect (in which case the provisions of <u>Section 3.06(c)</u> shall be applicable); *provided* that such suspension shall not affect the right of such Lender to receive the compensation so requested.

(c)      If the obligation of any Lender to make or continue from one Interest Period to another any SOFR Loan, or to convert Base Rate Loans into SOFR Loans shall be suspended pursuant to <u>Section 3.06(b)</u> hereof, such Lender's SOFR Loans shall be automatically converted into Base Rate Loans on the last day(s) of the then current Interest Period(s) for such SOFR Loans (or, in the case of an immediate conversion required by <u>Section 3.02</u>, on such earlier date as required by Law) and, unless and until such Lender gives notice as provided below that the circumstances specified in <u>Section 3.02</u>, <u>3.03</u> or <u>3.04</u> hereof that gave rise to such conversion no longer exist:

(i)      to the extent that such Lender's SOFR Loans have been so converted, all payments and prepayments of principal that would otherwise be applied to such Lender's SOFR Loans shall be applied instead to its Base Rate Loans; and

(ii)      all Term Loans that would otherwise be made or continued from one Interest Period to another by such Lender as SOFR Loans shall be made or continued instead as Base Rate Loans, and all Base Rate Loans of such Lender that would otherwise be converted into SOFR Loans shall remain as Base Rate Loans.

(d)      If any Lender gives notice to the Borrower (with a copy to the Administrative Agent) that the circumstances specified in <u>Section 3.02</u>, <u>3.03</u> or <u>3.04</u> hereof that gave rise to the conversion of such Lender's SOFR Loans pursuant to this <u>Section 3.06</u> no longer exist (which such Lender agrees to do promptly upon such circumstances ceasing to exist) at a time when SOFR Loans made by other Lenders are outstanding, such Lender's Base Rate Loans shall be automatically converted, on the first day(s) of the next succeeding Interest Period(s) for such outstanding SOFR Loans, to the extent necessary so that, after giving effect thereto, all Loans held by the Lenders holding SOFR Loans and by such Lender are held pro rata (as to principal amounts, interest rate basis, and Interest Periods).

Section 3.07      <u>Replacement of Lenders under Certain Circumstances</u>.  (a) If at any time (i) the Borrower becomes obligated to pay additional amounts or indemnity payments described in <u>Section 3.01</u> or <u>3.04</u> or any Lender ceases to make SOFR Loans as a result of any condition described in <u>Section 3.02</u> or <u>3.03</u> (ii) [reserved] or (iii) any Lender becomes a Non-Consenting Lender (as defined below in this <u>Section 3.07</u>) (collectively, a "<u>Replaceable Lender</u>"), then the

Borrower may, on prior written notice to the Administrative Agent and such Lender, either (i) replace such Lender by causing such Lender to (and such Lender shall be obligated to) assign pursuant to Section 10.07(b) (with the assignment fee to be paid by the Borrower unless waived by the Administrative Agent in such instance) 100% of its relevant New Money DIP Commitments and the principal of its relevant outstanding Term Loans plus any accrued and unpaid interest together with all of its rights and obligations under this Agreement to one or more Eligible Assignees; *provided* that neither the Administrative Agent nor any Lender shall have any obligation to the Borrower to find a replacement Lender or other such Person or (ii) terminate the applicable New Money DIP Commitment of such Lender and repay all applicable obligations of the Borrower owing to such Lender relating to the Term Loans held by such Lender as of such termination date; *provided* that (A) in the case of any such assignment resulting for a claim for compensation under Section 3.01 or payments under Section 3.04, such assignment will result in a reduction in such compensation or payments and (B) in the case of any such termination of New Money DIP Commitments and/or repayment of Term Loans with respect to a Non-Consenting Lender such termination and/or repayment, as applicable, shall be sufficient (together with all other consenting Lenders) to cause the adoption of the applicable departure, waiver or amendment of the Loan Documents.

(b)     Any Lender being replaced pursuant to Section 3.07(a) above shall (i) execute and deliver an Assignment and Assumption with respect to such Lender's New Money DIP Commitment and outstanding Term Loans (*provided* that the failure of any such Lender to execute an Assignment and Assumption shall not render such assignment invalid and such assignment shall be recorded in the Register) and (ii) deliver any Term Notes evidencing such Term Loans to the Borrower.  Pursuant to such Assignment and Assumption, (A) the assignee Lender shall acquire all or a portion, as the case may be, of the assigning Lender's New Money DIP Commitment and outstanding Term Loans, (B) all Obligations relating to the Term Loans so assigned shall be paid in full by the assignee Lender (and, if applicable, the Borrower shall pay the amount payable pursuant to Section 2.05(d)) to such assigning Lender concurrently with such Assignment and Assumption and (C) upon such payment and, if so requested by the assignee Lender, the assigning Lender shall deliver to the assignee Lender the applicable Term Note or Term Notes executed by the Borrower, the assignee Lender shall become a Lender hereunder and the assigning Lender shall cease to constitute a Lender hereunder with respect to such assigned Term Loans and New Money DIP Commitments, except with respect to indemnification provisions under this Agreement, which shall survive as to such assigning Lender.  In connection with any such replacement, if any such Replaceable Lender (as defined above) does not execute and deliver to the Administrative Agent a duly executed Assignment and Assumption reflecting such replacement within one (1) Business Day of the date on which the assignee Lender executes and delivers such Assignment and Assumption to such Replaceable Lender, then such Replaceable Lender shall be deemed to have executed and delivered such Assignment and Assumption without any action on the part of the Replaceable Lender and the Borrower shall be authorized to execute and deliver such Assignment and Assumption on behalf of such Replaceable Lender.   In connection with the replacement of any Lender pursuant to Section 3.07(a) above, the Borrower shall pay to such Lender such amounts as may be required pursuant to Section 2.09(c) and Section 3.05.

(c)     [Reserved.]

(d)     In the event that (i) the Borrower has requested the Lenders to consent to (A) a departure or waiver of any provisions of the Loan Documents or (B) agree to any amendment or other modification thereto, (ii) the consent, waiver, amendment or modification in question requires the agreement of all Lenders or all affected Lenders in accordance with the terms of Section 10.01 and (iii) the Required Lenders have agreed to such waiver, amendment or modification, then any Lender who does not agree to such waiver, amendment or modification shall be deemed a "Non-Consenting Lender."

Section 3.08     Survival.  All of the Borrower's obligations under this Article III and each Lender's obligations under Section 3.01 shall survive termination of the Aggregate New Money DIP Commitments and repayment of all other Obligations hereunder and resignation of the Administrative Agent.

ARTICLE IV
Conditions Precedent to Term Borrowings

Section 4.01     Conditions to Closing Date.  Each Lender's respective New Money DIP Commitments hereunder shall become effective, on the terms and subject to the other conditions set forth herein, upon the satisfaction or waiver (in accordance with Section 10.01) of the following conditions precedent:

(a)     The Administrative Agent and the Lenders shall have received all of the following, each dated as of the Closing Date (or, in the case of certificates of governmental officials, as of a recent date before the Closing Date), each in form and substance reasonably satisfactory to the Required Lenders, and each accompanied by their respective required schedules and other attachments:

(i)     executed counterparts of (A) this Agreement from the Borrower and Holdings, and (B) the Guaranty from Holdings and each Subsidiary Guarantor;

(ii)     the Security Agreement, duly executed by Holdings, the Borrower, and the Subsidiary Guarantors (other than the Mexican Guarantor), together with:

(A)     certificates, if any, representing the Equity Interests in the Borrower and all other Designated Pledged Interests referenced in the Security Agreement accompanied by undated stock powers executed in blank, in each case to the extent not held by the Prepetition Superpriority Agent immediately prior to the Closing Date,

(B)     Uniform Commercial Code financing statements, requested by the Administrative Agent or Required Lenders to be filed, registered or recorded to create or perfect the Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded or prepared in forms ready to be filed, registered or recorded.  The Interim Order shall be effective to create in favor of the Administrative Agent a legal, valid, perfected and enforceable security interest and Lien upon the Collateral of the Loan Parties (other than the Mexican Guarantor), with the priority set forth in the DIP Order and the terms thereof.

(iii)     [Reserved]

-62-

(iv)     such customary certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Required Lenders may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

(v)     such documents and certifications (including Organization Documents and, if applicable, good standing certificates in the jurisdiction of organization of the applicable Loan Party) as the Required Lenders may reasonably require to evidence that each Loan Party is duly organized or formed, and that each of them is validly existing and in good standing; and

(vi)     an opinion of Wachtell, Lipton, Rosen & Katz, counsel to the Loan Parties,  addressed to the Administrative Agent and the Lenders on the Closing Date, in form reasonably satisfactory to the Required Lenders.

(b)     Each Loan Party shall have provided the documentation and other information reasonably requested in writing at least two (2) Business Days prior to the Closing Date by the Lenders in connection with satisfactory compliance clearing, including, without limitation, in respect of applicable "know your customer" and anti-money-laundering rules and regulations and the PATRIOT Act.

(c)     The applicable Lender shall have received a Note executed by the Borrower in favor of each Lender requesting a Note;

(d)     [Reserved];

(e)     [Reserved];

(f)     The Administrative Agent shall have received a certificate, dated the Closing Date and signed by the chief executive officer or the chief financial officer of Borrower, confirming compliance with the conditions precedent set forth in Section 4.01(k) and Sections 4.02(a) and (b).

(g)     The Petition Date shall have occurred, and the Borrower and each Guarantor (other than the Mexican Guarantor) shall be a debtor and debtor-in-possession in the Cases.

(h)     The Administrative Agent shall have received a copy of, or a certificate as to coverage under, the insurance policies required hereunder and the applicable provisions of the Collateral Documents, each of which shall be endorsed or otherwise amended to include a "**standard**" or "**New York**" lender's loss payable or mortgagee endorsement (as applicable) and shall name the Administrative Agent, on behalf of the Secured Parties, as additional insured, in form and substance satisfactory to the Required Lenders.

(i)     The Administrative Agent shall have received the Initial Budget, in form and substance satisfactory to the Required Lenders.

-63-

(j)     All costs, fees, expenses (including legal fees and expenses) and other compensation required to be paid hereunder to the Administrative Agent, the Lenders and third party service providers shall have been paid to the extent due (and, in the case of expenses, to the extent invoiced in reasonable detail at least one (1) Business Day prior to the Closing Date (or such later date as the Borrower may reasonably agree)). The Administrative Agent shall have received a fully executed copy of the Fee Letter.

(k)     There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or (to the knowledge of the Loan Parties) threatened in writing in any court or before any arbitrator or governmental instrumentality that would reasonably be expected to have a Material Adverse Effect.

(l)     The Cases of any of the Debtors shall have not been dismissed or converted to cases under Chapter 7 of the Bankruptcy Code.

(m)     A motion, in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent, seeking approval of the DIP Term Facility, shall have been filed in each of the Cases within one (1) day of the Petition Date (it being understood that the draft thereof approved by counsel to the Lenders and the Administrative Agent on or prior to the Petition Date are satisfactory to the Lenders and the Administrative Agent).

(n)     All "first day" orders and all related pleadings intended to be entered on or prior to the Interim Order Entry Date shall have been entered by the Bankruptcy Court and shall be reasonably acceptable in form and substance to the Required Lenders and the Administrative Agent (it being understood that the drafts approved by counsel to the Lenders and the Administrative Agent on or prior to the Petition Date are acceptable to the Lenders and the Administrative Agent).

(o)     The Borrower shall have made no payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date (other than repayment of the Prepetition Superpriority Obligations in connection with the Transactions) unless such payment is made (i) with the consent of the Required Lenders or (ii) pursuant to "first day" orders reasonably acceptable to the Required Lenders.

(p)     No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code or examiner (other than a fee examiner) shall have been appointed in any of the Cases.

(q)     The Interim Order Entry Date shall have occurred not later than three (3) Business Days following the Petition Date, and the Interim Order shall be in full force and effect, and shall not (in whole or in part) have been modified or amended (other than as reasonably acceptable to the Required Lenders), or reversed, stayed, vacated, appealed or subject to a stay pending appeal.

(r)     The Plan Documentation shall be in form and substance as required pursuant to the Restructuring Support Agreement and reasonably acceptable to the Required Lenders. Prior to the Closing Date, the Borrower shall have commenced solicitation of acceptances of the Approved Plan from the lenders under the Prepetition First Lien Credit Agreement, the Prepetition 1.5L Credit Agreement and the Prepetition Second Lien Credit Agreement  to accept

-64-

the Approved Plan. By the Petition Date, the Borrower shall have received the requisite number of votes accepting the Approved Plan under Section 1126 of the Bankruptcy Code from the lenders under the Prepetition First Lien Credit Agreement, the Prepetition 1.5L Credit Agreement and the Prepetition Second Lien Credit Agreement.

(s)   The Restructuring Support Agreement shall be in full force and effect.

Each Lender, by delivering its signature page to this Agreement, and funding its New Money Term Loans on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved or accepted or to be satisfied with, each Loan Document and each other document required to be approved by, acceptable or satisfactory to the Administrative Agent, the Required Lenders or any other Lenders, as applicable, on the Closing Date.

Section 4.02   Conditions to All Term Borrowings and Withdrawals.  The obligation of each Lender to make its Credit Extension on the Closing Date and the Borrower's right to make a Withdrawal from the Funding Account on each Withdrawal Date are subject to the following conditions precedent:

(a)   The representations and warranties of the Borrower and each other Loan Party contained in Article V or any other Loan Document shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality) on and as of the date of such Term Borrowing or Withdrawal, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (and in all respects if any such representation or warranty is already qualified by materiality) as of such earlier date.

(b)   No Default or Event of Default shall exist, or would result from such proposed Term Borrowing or Withdrawal from the application of the proceeds therefrom.

(c)   The Administrative Agent shall have received a Committed Term Loan Notice in accordance with the requirements hereof if a Term Borrowing is being requested or a Funding Account Withdrawal Notice (and all other required deliveries under Section 2.14) if a Withdrawal from the Funding Account is being requested.

(d)   The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not (in whole or in part) have been modified or amended (other than as reasonably acceptable to the Required Lenders) or reversed, stayed, vacated, appealed or subject to a stay pending appeal.

(e)   [Reserved].

(f)   With respect to any Withdrawal Date that is on or after the date which is 35 days following the Petition Date (subject to the availability of the Bankruptcy Court) (or such later date as may be agreed to by the Required Lenders), the Final Order shall have been signed and entered by the Bankruptcy Court, and such order shall not have been modified or amended (other than as reasonably acceptable to the Required Lenders) or reversed, stayed, vacated, appealed or subject to a stay pending appeal.

-65-

Each Committed Term Loan Notice or Funding Account Withdrawal Notice submitted by the Borrower after the Closing Date shall be deemed to be a representation and warranty that the conditions specified in <u>Section 4.02(a)</u>, <u>(b)</u>, <u>(d)</u> and <u>(f)</u> will have been satisfied on and as of the date of the applicable Credit Extension or Withdrawal.

<div align="center">ARTICLE V<br><u>Representations and Warranties</u></div>

Each of Holdings (with respect to <u>Sections 5.01</u>, <u>5.02</u>, <u>5.04</u> (as it relates to execution, delivery and enforceability of the Guaranty and its pledge of the equity of the Borrower) and <u>5.14</u> only) and the Borrower represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01    <u>Existence, Qualification and Power; Compliance with Laws</u>.  Each of Holdings, the Borrower and each Restricted Subsidiary (a) is a Person duly organized or formed, validly existing and in good standing (to the extent such concept is applicable in the relevant jurisdiction) under the Laws of the jurisdiction of its incorporation or organization, (b) subject to the entry of the DIP Orders, has all requisite power and authority to (i) own or lease its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and in good standing (to the extent such concept is applicable in the relevant jurisdiction) under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, (d) is in compliance with all Laws and (e) has all requisite governmental licenses, authorizations, consents and approvals to operate its business as currently conducted; except in each case referred to in clause (a) (other than with respect to the Borrower), (b) (other than in the case of (b)(ii) with respect to the Borrower), (c), (d) and (e), to the extent that any failure to be so or to have such could not reasonably be expected to have a Material Adverse Effect.

Section 5.02    <u>Authorization; No Contravention</u>.  Subject to the entry of the DIP Orders and the terms thereof, the execution, delivery and performance by each Loan Party of each Loan Document to which such Person is a party, and the consummation of the Transactions, are within such Loan Party's corporate or other organizational powers, have been duly authorized by all necessary corporate or other organizational action and do not (a) contravene the terms of any of such Person's Organization Documents, (b) conflict with or result in any breach or contravention of, or the creation of any Lien under (other than as permitted by <u>Section 7.01</u>), or require any payment (other than for Indebtedness to be repaid on the Closing Date in connection with the Transactions) to be made under (i) any post-petition Contractual Obligation to which such Person is a party or the properties of such Person or any of its Restricted Subsidiaries or (ii) any material order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject or (c) violate any Law (other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Code); in the case of the foregoing clauses (b) and (c), except to the extent such conflict, breach, violation, contravention or payment could not reasonably be expected to have a Material Adverse Effect.

Section 5.03    <u>Governmental Authorization</u>.  Subject to the entry of the DIP Orders and the terms thereof, no approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in

<div align="center">-66-</div>

connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document, except for (i) filings and registrations necessary to perfect the Liens on the Collateral granted by the Mexican Guarantor, (ii) the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect and (iii) those approvals, consents, exemptions, authorizations or other actions, notices or filings the failure of which to obtain or make would not reasonably be expected to be material to the interests of the Lenders.

Section 5.04    Binding Effect.  Subject to the entry of the DIP Orders and the terms thereof, this Agreement and each other Loan Document has been duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the DIP Orders and the terms thereof, this Agreement and each other Loan Document constitutes, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, receivership, moratorium or other Laws affecting creditors' rights generally of the United States or other applicable jurisdictions from time to time in effect and by general principles of equity.

Section 5.05    Financial Condition; No Material Adverse Effect.  (a) All financial statements relating to any Loan Party which have been or may hereafter be delivered by any Loan Party to the Administrative Agent and the Lenders pursuant to Section 6.01(a), (b) or (c) have been prepared in accordance with GAAP and present fairly, in all material respects, the financial position and results of operations and cash flows of Holdings and its consolidated Subsidiaries as of such dates and for such periods.  The representations in this Section 5.05(a), as applicable, are subject, in the case of unaudited financial statements, to normal year-end audit adjustments and accruals and the absence of notes.

(b)    The consolidated forecasted balance sheets, statements of income and statements of cash flows of Holdings and its Subsidiaries delivered pursuant to Section 6.01 were (or will be) prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed by the management of Holdings to be reasonable as of the date of delivery thereof; it being recognized by the Agents and the Lenders that such projections are as to future events and are not to be viewed as facts, the projections are subject to significant uncertainties and contingencies, many of which are beyond the control of Holdings, the Borrower and the Restricted Subsidiaries, that no assurance can be given that any particular projections will be realized and that actual results during the period or periods covered by any such projections may differ from the projected results and such differences may be material.

(c)    After the Closing Date, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have, a Material Adverse Effect.

Section 5.06    Litigation.  Except for the Cases and as specified in Schedule 5.06, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower, threatened in writing at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Restricted Subsidiary, that either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

-67-

174499819

Section 5.07    Ownership of Property; Intellectual Property; Insurance.

(a)    Each of the Borrower and each of the Restricted Subsidiaries has good and valid title to, or valid leasehold interests in, all real property necessary in the ordinary conduct of its business.  Each parcel of real property owned in fee by a Loan Party is owned free and clear of all Liens except for minor defects in title that do not materially interfere with its ability to conduct its business or utilize such assets for their intended purposes and Liens permitted by Section 7.01, except where the failure to have such title or interests could not reasonably be expected to have a Material Adverse Effect.

(b)    The Borrower and each Restricted Subsidiary owns, licenses or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of its respective business, as currently conducted, and to the knowledge of the Borrower the use of such IP Rights in the conduct of its respective business as currently conducted does not infringe upon any IP Rights of any other Person, except to the extent such failure to own, license or possess or such conflicts could not reasonably be expected to have a Material Adverse Effect.  The conduct of the business of the Borrower or any Restricted Subsidiary as currently conducted or as contemplated to be conducted to the knowledge of the Borrower, does not infringe upon or violate any rights held by any other Person, except for such infringements and violations which could not reasonably be expected to have a Material Adverse Effect.  No claim or litigation regarding any of the foregoing is pending or, to the knowledge of the Borrower, threatened in writing, which could reasonably be expected to have a Material Adverse Effect.

(c)    The properties of the Borrower and each of the other Restricted Subsidiaries are, in the reasonable judgment of the Borrower, insured with financially sound and reputable insurance companies, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning or leasing similar properties in localities where the applicable Person operates.

Section 5.08    Environmental Compliance.  Except as disclosed in Schedule 5.08 hereto:

(a)    None of the Borrower or any of its Restricted Subsidiaries are subject to any Environmental Liability that could reasonably be expected to have a Material Adverse Effect.

(b)    Except as could not reasonably be expected to have a Material Adverse Effect, (i) none of the properties currently, or to the knowledge of the Borrower, formerly owned or operated by Holdings, the Borrower or any of its Restricted Subsidiaries is listed on the NPL, CERCLIS or any analogous foreign, state or local list or, to the knowledge of the Borrower, is proposed for listing on the NPL or any analogous foreign, state or local list, (ii) there are no underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any property currently owned or operated by the Borrower or, to the knowledge of the Borrower, on any property formerly owned or operated by Holdings, the Borrower or any of its Restricted Subsidiaries, in each case for which Holdings, the Borrower or any of its Restricted Subsidiaries would be responsible for any associated costs of investigation, abatement, or remediation, (iii) there is no asbestos or asbestos-containing material on any property currently owned or

-68-

operated by the Borrower requiring investigation, remediation, mitigation, removal, assessment, remedial or corrective action, or other response by the Borrower, pursuant to any Environmental Law and (iv) to the knowledge of the Borrower, Hazardous Materials have not been released, discharged or disposed of by the Borrower on any property currently or, to the knowledge of the Borrower, formerly owned or operated by Holdings, the Borrower or any of its Restricted Subsidiaries, except for such releases, discharges and disposals that were in compliance with Environmental Laws.

(c)     None of the Material Real Properties contain any Hazardous Materials in amounts or in concentrations which constitute a violation of, or require remedial action under, any Environmental Law or could otherwise reasonably be expected to give rise to an Environmental Liability, except for any such violations, remedial actions and Environmental Liabilities that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(d)     None of the Borrower or any of its Restricted Subsidiaries is undertaking, and none has completed, either individually or together with other potentially responsible parties, any investigation, assessment, remediation, mitigation, removal, remedial response or corrective action relating to any actual or threatened release, discharge or disposal of Hazardous Materials at any site, location or operation, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law, except for any such investigation, assessment, remediation, mitigation, removal, remedial response or corrective action that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

Section 5.09     Taxes.  Each of the Borrower and its Restricted Subsidiaries have filed all U.S. federal, state, local, non-U.S. and other Tax returns and reports required to be filed, and have paid all U.S. federal, state, local, non-U.S. and other Taxes, levied or imposed upon them or their properties, income or assets that have become due and payable, except those (a) which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP, (b) that need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code, or (c) with respect to which the failure to make such filing or payment would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 5.10     Employee Benefits Plans; Labor Matters.  (a) Except as could not reasonably be expected to result in a Material Adverse Effect, (i) each Plan is in compliance with the applicable provisions of ERISA, the Code and other applicable federal and state laws and (ii) each Plan that is intended to be a qualified plan under Section 401(a) of the Code may rely upon an opinion letter for a prototype plan or has received a favorable determination letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the IRS, and to the knowledge of any Loan Party, nothing has occurred that would prevent, or cause the loss of, such tax-qualified status.

(b)     There are no pending or, to the knowledge of any Loan Party, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that

-69-

could reasonably be expected to have a Material Adverse Effect.  There has been no "prohibited transaction" within the meaning of Section 4975 of the Code or Section 406 or 407 of ERISA (and not otherwise exempt under Section 408 of ERISA) with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)      (i) No ERISA Event has occurred and neither any Loan Party nor, to the knowledge of any Loan Party, any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Plan or Multiemployer Plan, (ii) each Loan Party and each ERISA Affiliate has met all applicable requirements under the Pension Funding Rules in respect of each Plan, and no waiver of the minimum funding standards under such Pension Funding Rules has been applied for or obtained, (iii) neither any Loan Party nor, to the knowledge of any Loan Party, any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) for any Plan, if applicable, to drop below 80% as of the most recent valuation date, (iv) neither any Loan Party nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid, (v) neither any Loan Party nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA and (vi) no Plan has been terminated by the plan administrator thereof or by the PBGC and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Plan or Multiemployer Plan, except with respect to each of the foregoing clauses (i) through (vi) of this Section 5.10(c), as could not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

(d)      With respect to each Foreign Plan, none of the following events or conditions exists and is continuing that, either individually or in the aggregate, would reasonably be expected to have a Material Adverse Effect:  (i) substantial non-compliance with its terms and with the requirements of any and all applicable laws, statutes, rules, regulations and orders; (ii) failure to be maintained, where required, in good standing with applicable regulatory authorities; (iii) any obligation of a Loan Party or its Restricted Subsidiaries in connection with the termination or partial termination of, or withdrawal from, any Foreign Plan; (iv) any Lien on the property of a Loan Party or its Restricted Subsidiaries in favor of a Governmental Authority as a result of any action or inaction regarding a Foreign Plan; (v) for each Foreign Plan that is a funded or insured plan, failure to be funded or insured on an ongoing basis to the extent required by applicable non-U.S. law (using actuarial methods and assumptions which are consistent with the valuations last filed with the applicable Governmental Authorities); (vi) any facts that, to the best knowledge of the Loan Party or any of its Restricted Subsidiaries, exist that would reasonably be expected to give rise to a dispute and any pending or threatened disputes that, to the best knowledge of the Loan Party or any of its Restricted Subsidiaries, would reasonably be expected to result in a material liability to the Loan Party or any of its Restricted Subsidiaries concerning the assets of any Foreign Plan (other than individual claims for the payment of benefits); and (vii) failure to make all contributions in a timely manner to the extent required by applicable non-U.S. law (each of the events described in clauses (i) through (vii) hereof are hereinafter referred to as a "Foreign Plan Event").

174499819

(e)        Except as, in the aggregate, would not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against the Borrower or any of its Restricted Subsidiaries pending or, to the knowledge of the Borrower, threatened; (b) hours worked by, and payments made based on hours worked by, employees of the Borrower and its Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Laws dealing with wage and hour matters; and (c) all payments due from Borrower or any of its Restricted Subsidiaries on account of employee health and welfare insurance have been paid or accrued as a liability on the books of the relevant party.

Section 5.11        Subsidiaries; Equity Interests.  As of the Closing Date, after giving effect to the transactions contemplated hereby on the Closing Date, the Borrower has no Restricted Subsidiaries other than those specifically disclosed in Schedule 5.11, and all of the outstanding Equity Interests in the Borrower and such Restricted Subsidiaries that are owned by a Loan Party are owned free and clear of all Liens except (i) those created under the Collateral Documents, (ii) those created under the Prepetition First Lien Loan Documents, (iii) those created under the Prepetition 1.5 Lien Loan Documents (iv) those created under the Prepetition Second Lien Loan Documents and (v) any non-consensual Lien that is permitted under Section 7.01.

Section 5.12        Margin Regulations; Investment Company Act.  (a) The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock and no proceeds of any Term Borrowings will be used for any purpose that violates Regulation T, Regulation U or Regulation X of the FRB.

(b)        None of the Loan Parties is required to be registered as an "investment company" under the Investment Company Act of 1940.

Section 5.13        Disclosure.  As of the Closing Date, no report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party (other than projected financial information, pro forma financial information and information of a general economic or industry nature) to any Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (as modified or supplemented by other information so furnished), when taken as a whole, contains, when furnished, any material misstatement of fact or omits to state any material fact necessary to make the statements therein (when taken as a whole), in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected and pro forma financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed by the Borrower to be reasonable at the time made; it being understood (A) that such projections and forecasts are as to future events and are not to be viewed as facts, that such projections are subject to significant uncertainties and contingencies, many of which are beyond the control of Holdings, the Borrower and its Subsidiaries, that no assurance can be given that any particular projection or forecast will be realized and that actual results during the period or periods covered by any such projections or forecasts may differ significantly from the projected results and such differences may be material and that such projections and forecasts are not a guarantee of future financial performance and

(B) that no representation is made with respect to information of a general economic or general industry nature.

Section 5.14    Compliance with Laws.  Each of Holdings, the Borrower and each Restricted Subsidiary is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

Section 5.15    Brokerage Fees.  None of the Borrower or any Subsidiary of the Borrower has utilized the service of any broker or finder in connection with obtaining financing from the Lenders under this Agreement and no brokerage commission or finder's fee is payable by Holdings, the Borrower or its Subsidiaries in connection herewith.

Section 5.16    [Reserved].

Section 5.17    Collateral Documents.  Subject to the entry of the DIP Orders and the terms thereof, each Collateral Document will, upon execution and delivery thereof, be effective to create in favor of the Administrative Agent, for its benefit and the benefit of the Secured Parties, legal, valid and enforceable Liens on, and security interests in, all of the Loan Parties' right, title and interest in and to the Collateral thereunder under applicable law, except as such enforceability may be limited by any Law relating to bankruptcy, insolvency or reorganization or relief of debtors and by general principles of equity (whether enforcement is sought by proceedings in equity or law) and capital maintenance rules and (i) with respect to Collateral of the Mexican Guarantor, (A) when appropriate filings or recordings are properly recorded and indexed in the appropriate offices as may be required under applicable Law (to the extent required hereunder and thereunder), together with the payment of appropriate filing or recording fees and applicable taxes, if any, and (B) upon the taking of possession, control or other action (which possession, control or other action may be given to the Administrative agent or taken by the Administrative Agent only to the extent required by any Collateral Document) and (ii) with respect to Collateral of the Debtors, upon entry of the DIP Orders, in each case the Liens in favor of Administrative Agent will constitute fully perfected Liens on, and security interests in, all right, title and interest of such Loan Parties in such Collateral, having priority over all other Liens on the Collateral of the Debtors to the extent provided in the DIP Orders.

Section 5.18    PATRIOT Act, Etc..

(a)    To the extent applicable, each of Holdings, the Borrower and its Subsidiaries is in compliance, in all material respects, with applicable anti-money laundering or anti-terrorism laws and regulations, including, without limitation, the Bank Secrecy Act, as amended by the PATRIOT Act (collectively, the "Anti-Money Laundering Laws").

(b)    The use of proceeds of the Term Loans will not violate in any material respect the Anti-Money Laundering Laws.

Section 5.19     FCPA; Anti-Corruption.

(a)     Each Loan Party and its Subsidiaries and, to their knowledge, their respective officers and directors, employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all material respects and are not knowingly engaged in any activity that could reasonably be expected to result in any Loan Party being designated as a Sanctioned Person.   None of (a) any Loan Party or any Subsidiary or (b) to the knowledge of any such Loan Party or Subsidiary, any their respective directors, officers or employees or agents that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person.  No making of a Loan, use of proceeds or other transaction contemplated by this Agreement or the other Loan Documents will violate Anti-Corruption Laws or applicable Sanctions.

(b)     The Borrower will not use any part of the proceeds of the Term Loans directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage in violation of any Anti-Corruption Law.

Section 5.20     Sanctioned Persons.

(a)     None of Holdings, the Borrower or any of its Subsidiaries or any of their respective directors or officers, to the knowledge of the Borrower, representatives, agents, Affiliates or employees is a Person that is, or is owned or controlled by, or acting for or on behalf of, directly or indirectly, Persons that are:  (i) the subject or target of any economic or financial sanctions administered or enforced by the United States (including by the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Nations Security Council, the European Union, the United Kingdom (including by His Majesty's Treasury) or any other relevant national or supra-national sanctions authority with jurisdiction over Holdings, the Borrower or the Restricted Subsidiaries (collectively, "Sanctions"); or (ii) domiciled, organized or resident in a country or territory that is, or whose government is, the subject of comprehensive Sanctions broadly prohibiting or restricting dealings in, with or involving such country or territory.

(b)     The Borrower will not, directly or indirectly, use any part of the proceeds of the Term Loans or otherwise make available such proceeds to any Person:  (i) to fund or finance any activities or business of, with or involving any Person, that at the time of such funding or financing, is, or whose government is, the subject or target of Sanctions; or (ii) in any other manner that would constitute or give rise to a violation of Sanctions by any Person, including any Lender.

Section 5.21     Use of Proceeds.  The Borrower will use the proceeds of all Term Borrowings solely in accordance with Section 6.11.

Section 5.22     Cases; DIP Orders; Secured Super-Priority Obligations.

(a)     [Reserved].

(b)     The provisions of the Loan Documents and the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, legal, valid and perfected Liens on and security interests in all right, title and interest in the Collateral of the Debtors, having the priority provided for herein and in the Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, and enforceable against such Loan Parties.

(c)     After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Cases having priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to payment of the Carve-Out in accordance with the DIP Orders, and any Claims secured by valid, enforceable, and non-avoidable Liens that (A) are in existence on the Petition Date and (B) are either perfected as of the Petition Date or perfected subsequent to the Petition Date solely to the extent permitted by section 546(b) of the Bankruptcy Code.

(d)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order and the Final Order, the Secured Obligations will be secured by a valid and perfected Lien on all of the Collateral of the Debtors having the priority set forth in the DIP Orders.

(e)     The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, other than as reasonably acceptable to the Required Lenders, modified or amended.  The Loan Parties are in compliance in all material respects with the Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order).

(f)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order and Section 2.15, as the case may be, upon the Maturity Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent and Lenders shall be entitled to immediate payment of such Obligations and to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

(g)     To the best of the Loan Parties' knowledge, the stipulations of the Loan Parties in each of the DIP Orders are true, accurate and correct in all material respects.

(h)     Subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, neither the Obligations nor the Obligations (as defined in the Prepetition First Lien Credit Agreement, the Prepetition 1.5 Lien Credit Agreement or the Prepetition Second Lien

174499819

Credit Agreement) shall be subject to setoff or recoupment or any such rights under Bankruptcy Code section 553 or otherwise with respect to any claim the Loan Parties may have against the Lenders arising on or before the Petition Date.

(i)       [Reserved].

(j)       Pursuant to Section 364(c)(2) of the Bankruptcy Code and the DIP Orders and subject only to the Carve-Out, all Obligations are secured by a first priority perfected Lien on all assets of the Debtors (now existing or hereafter acquired) and all proceeds thereof that were not subject to (x) a valid, perfected, non-avoidable Lien as of the Petition Date or (y) valid Liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code.

(k)       Pursuant to Section 364(c)(3) of the Bankruptcy Code and the DIP Orders and subject only to the Carve-Out, all Obligations are secured by a valid, binding, continuing, enforceable, fully-perfected junior Lien on all assets of the Debtors (now existing or hereafter acquired) and all proceeds thereof that were subject to valid, perfected and unavoidable Liens in favor of third parties that were in existence immediately prior to the Petition Date, or to valid and unavoidable Liens in favor of third parties that were in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (in each case, other than Liens securing the Prepetition Superpriority Obligations, the Prepetition First Lien Obligations, the Prepetition 1.5 Lien Obligations or the Prepetition Second Lien Obligations).

(l)       Pursuant to Section 364(d)(1) of the Bankruptcy Code and the DIP Orders, all Obligations are secured by a valid, binding, continuing, enforceable, perfected first priority senior priming Lien on all assets of the Debtors (now existing or hereafter acquired), subject and junior to (i) the Carve-Out and (ii) any valid, perfected and unavoidable Liens in existence on the Closing Date on such assets of the Debtors that pursuant to the terms of the DIP Orders are senior in priority to the Liens securing the Secured Obligations.

ARTICLE VI
Affirmative Covenants

So long as any Lender shall have any New Money DIP Commitment hereunder, any Term Loan or other Obligation (other than contingent indemnification or other contingent obligations as to which no claim has been asserted) hereunder shall remain unpaid or unsatisfied), the Borrower shall, and shall cause each of its Restricted Subsidiaries to (and Holdings shall):

Section 6.01       Financial Statements.  Deliver to the Administrative Agent for further distribution to each Lender:

(a)       as soon as available, but in any event within one hundred twenty (120) days after the end of each fiscal year of Holdings ending after the date hereof, a consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, audited and accompanied by a report

-75-

and opinion of Grant Thornton LLP or any other independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification, exception or explanatory paragraph or any qualification, exception or explanatory paragraph as to the scope of such audit (other than any such exception or explanatory paragraph that is expressly solely with respect to, or expressly resulting solely from, an upcoming maturity date under the Term Facility or Indebtedness under the Prepetition First Lien Loan Documents, the Prepetition 1.5 Lien Loan Documents, the Prepetition Second Lien Loan Documents or the Canadian Credit Facility, as applicable, that is scheduled to occur within one year from the time such report and opinion are delivered), together with customary "management discussion and analysis" with respect to the financial information delivered pursuant to this Section 6.01(a);

(b)     as soon as available, but in any event within forty-five (45) days after the end of each fiscal quarter of each fiscal year of Holdings (other than the last fiscal quarter of any fiscal year), a consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations and cash flows for such fiscal quarter and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of Holdings and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes, together with customary "management discussion and analysis" with respect to the financial information delivered pursuant to this Section 6.01(b);

(c)     as soon as available but in any event within thirty (30) days after the end of each fiscal month of Holdings, (x) a consolidated balance sheet of Holdings and its Subsidiaries as at the end of such fiscal month, and the related consolidated statements of income or operations and cash flows for such fiscal month and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and certified by a Responsible Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations and cash flows of Holdings and its Subsidiaries in accordance with GAAP consistently applied, subject only to normal year-end audit adjustments and the absence of footnotes, together with customary "management discussion and analysis" with respect to the financial information delivered pursuant to this Section 6.01(c), all in form and detail substantially consistent with Exhibit J hereto and (y) regional and plant level financial statements for Holdings and its Subsidiaries as at the end of, or for, as applicable, such fiscal month, with selected operating metrics, including without limitation, facility shipments and per ton metrics, all in form and detail substantially consistent with Exhibit K hereto;

(d)     no later than by 5:00 p.m. (New York City time) on each Wednesday after the Closing Date (or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter), commencing on the first Wednesday after the first complete week following the Closing Date, a Budget covering the 13-week period beginning on the Monday of the week in which it is (or is required to be) delivered. Each Budget delivered after the Closing Date shall be substantially in the form of Exhibit H hereto and otherwise be reasonably satisfactory to the

-76-

Required Lenders.  For the avoidance of doubt, a Budget delivered by the Borrower pursuant to this clause (d) shall not constitute the Approved Budget unless it becomes the Approved Budget in accordance with the definitions of Replacement Approved Budget and Approved Budget; and

(e)     no later than 5:00 p.m. (New York City time) on the first Wednesday after the Closing Date and each Wednesday thereafter (or, to the extent any such Wednesday is not a Business Day, the next Business Day thereafter), (i) a revenue report for the calendar month in which such report is delivered substantially in the form of Exhibit G hereto and (ii) a certificate of a Responsible Officer of the Borrower certifying as to the Liquidity of the Loan Parties as of the end of the last Business Day of the immediately preceding week;

(f)     no later than 5:00 p.m. (New York City time) on the first Wednesday after the Closing Date, a report prepared by the Borrower showing actual cash receipts and disbursements for the immediately preceding one-week period (ending on the immediately preceding Sunday), in detail similar to that which would be included in a Budget Variance Report;

(g)     no later than by 5:00 p.m. (New York City time) on each Variance Testing Date, a Budget Variance Report. Each such report shall be certified by the chief financial officer of the Borrower as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

Section 6.02     Certificates; Other Information.  Deliver to the Administrative Agent for further distribution to each Lender:

(a)     Concurrently with the delivery of the financial statements referred to in Sections 6.01(a) (b) or (c), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower (which delivery may be by electronic communication including fax or email and shall be deemed to be an original authentic counterpart thereof for all purposes);

(b)     promptly after the same are publicly available, copies of all annual, regular, periodic and special reports and registration statements which Holdings or the Borrower may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act, or with any Governmental Authority that may be substituted therefor, or with any national securities exchange, and in any case not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(c)     promptly after the furnishing thereof, copies of any requests or notices received by any Loan Party (other than in the ordinary course of business) and copies of any statement or report furnished to any holder of debt of any Loan Party or of any of its Subsidiaries, in each case pursuant to the terms of the Prepetition First Lien Credit Agreement, the Prepetition 1.5 Lien Credit Agreement or the Prepetition Second Lien Credit Agreement and not otherwise required to be furnished to the Lenders pursuant to any other clause of this Section 6.02;

(d)     promptly after the assertion or occurrence thereof, notice of any action arising under any Environmental Law against, or of any noncompliance by, any Loan Party or any of its Subsidiaries with any Environmental Law or Environmental Permit that could reasonably be expected to have a Material Adverse Effect;

(e)      together with the delivery of each Compliance Certificate pursuant to Section 6.02(a), a report supplementing Schedule 5.11 hereto to the extent there are any changes that have occurred with respect to the information contained therein so that the related representation and warranty would be true and correct in all material respects if made as of the date of such Compliance Certificate; and

(f)      promptly, such additional information regarding the business, legal, financial or corporate affairs of the Borrower or any of its Restricted Subsidiaries thereof, including supporting information in respect of any Budget Variance Report or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); *provided* that:  (i) upon written request by a Lender through the Administrative Agent, the Borrower shall deliver paper copies of such documents to the Administrative Agent for further distribution to such Lender until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents.

The Administrative Agent shall have no obligation to request the delivery of or to maintain or deliver to Lenders paper copies of the documents referred to above, and in any event shall have no responsibility to monitor compliance by the Borrower with any such request for delivery, and each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders (each, a "Public Lender") may have personnel who do not wish to receive information that is (i) of a type that would be publicly available (or could be derived from publicly available information) if the Borrower were a public reporting company and (ii) material with respect to the Borrower or any of its securities for purposes of United States federal and state securities laws (all such information described in the foregoing, "MNPI").  The Borrower hereby agrees that (w) at the request of any Lender, it will use commercially reasonable efforts to cause all Borrower Materials to be identified as either (A) "PUBLIC" (which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof) or (B) "PRIVATE"; (x) by marking the Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any MNPI (although it may be sensitive and proprietary) (*provided*, *however*, that to the extent such Borrower Materials constitute Information,

they shall be treated as set forth in Section 10.08); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are marked "PUBLIC" as being suitable for posting on a portion of the Platform designated "Public Side Information" (it being understood that the Borrower and its Restricted Subsidiaries shall not otherwise be under any obligation to mark any particular Borrower Materials "PUBLIC"). Notwithstanding anything herein to the contrary, financial statements delivered pursuant to Sections 6.01(a), (b) and (c) and Compliance Certificates delivered pursuant to Section 6.02(a) shall be deemed to be suitable for posting on a portion of the Platform designated for "Public Side Information".   Unless expressly marked "PUBLIC" and subject to the prior sentence, the Administrative Agent agrees not to make any such Borrower Materials available to Public Lenders.

Section 6.03     Notices.  Notify the Administrative Agent:

(a)     promptly, but in any event within five (5) Business Days after a Responsible Officer of the Borrower or any Guarantor has obtained knowledge thereof, of the occurrence of any Default;

(b)     promptly after a Responsible Officer of the Borrower or any Guarantor has obtained knowledge of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)     promptly after a Responsible Officer of the Borrower or any Guarantor has obtained knowledge of the institution of any material, non-frivolous, litigation (other than before the Bankruptcy Court) not previously disclosed by the Borrower to the Administrative Agent, or any material development in any material litigation (other than before the Bankruptcy Court) in each case that is reasonably likely to be adversely determined and could, if adversely determined be reasonably expected to have a Material Adverse Effect, or that seeks to enjoin or otherwise prevent the consummation of, or to recover any damages or obtain relief as a result of, the transactions contemplated herein; and

(d)     promptly after a Responsible Officer of the Borrower or any Guarantor has obtained knowledge of the occurrence of any ERISA Event, where there is any potential material liability to any Loan Party as a result thereof.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04     Payment of Taxes.  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court (it being understood that no Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payments), pay, discharge or otherwise satisfy as the same shall become due and payable, all of its Tax liabilities and assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with GAAP are

being maintained by the Borrower or such Restricted Subsidiary; except to the extent the failure to pay, discharge or satisfy the same could not reasonably be expected to have a Material Adverse Effect.

Section 6.05    Preservation of Existence.  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its organization and (b) take all reasonable action to maintain all rights, privileges (including its good standing, if such concept is applicable in its jurisdiction of organization), permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect or as otherwise permitted hereunder.

Section 6.06    Maintenance of Properties.  Except if the failure to do so could not reasonably be expected to have a Material Adverse Effect, (a) maintain, preserve and protect all of its properties and equipment necessary in the operation of its business in good working order, repair and condition (ordinary wear and tear excepted and casualty or condemnation excepted) and (b) preserve or renew all of its preservable or renewable, as applicable, United States registered patents, trademarks, trade names and service marks to the extent permitted by applicable Laws of the United States.

Section 6.07    Maintenance of Insurance.  (a) Maintain with financially sound and reputable insurance companies (in the good faith judgment of the management of the Borrower), insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts (after giving effect to any self-insurance reasonable and customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and its Restricted Subsidiaries) as are customarily carried under similar circumstances by such other Persons, and will furnish to the Lenders, upon reasonable written request from the Required Lenders, information presented in reasonable detail as to the insurance so carried.  Each such policy of insurance (excluding business interruption insurance) maintained in the United States shall, as appropriate, (i) name the Administrative Agent, on behalf of the Secured Parties, as an additional insured thereunder as its interests may appear and/or (ii) in the case of each casualty insurance policy, contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties, as the loss payee thereunder.

(b)    Notwithstanding anything herein to the contrary, with respect to each Mortgaged Property, if at any time the area in which the buildings and other improvements (as described in the applicable Mortgage) are located is designated a "special flood hazard area" in any Flood Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such reasonable total amount as the Required Lenders may from time to time reasonably require, and otherwise to ensure compliance with the NFIP as set forth in the Flood Laws.  Following the Closing Date, the Borrower shall deliver to the Administrative Agent annual renewals of each such flood insurance policy or annual renewals of each such force-placed flood insurance policy, as applicable.  In connection with any amendment to this Agreement pursuant to which any increase, extension, or renewal of Term Loans is contemplated, the Borrower shall, if reasonably requested by the Administrative Agent, cause to be delivered to the Administrative Agent for any Mortgaged Property, a Flood Determination Form, Borrower Notice and Evidence of Flood Insurance, as applicable.  If at any time the area in

-80-

which the premises (as defined in the Mortgages, if any) are located is designated (i) a "flood hazard area" in any Floor Insurance Rate Map published by the Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as the Required Lenders may from time to time reasonably require in respect of compliance with the NFIP as set forth in the Flood Disaster Protection Act of 1973, as it may be amended from time to time, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as customary for similarly situated Persons engaged in the same or similar businesses as the Borrower and the Restricted Subsidiaries.

Section 6.08    Compliance with Law; Anti-Corruption Laws, Anti-Money Laundering and Sanctions.

(a)    Comply in all respects with the requirements of all Laws and all orders, writs, injunctions, decrees and judgments applicable to it or to its business or property, except if the failure to comply therewith could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; provided, however, that with respect to Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions, the Borrower shall, and shall cause each of its Restricted Subsidiaries to, comply in all material respects.

(b)    Use funds or properties of Holdings, the Borrower or any of its Restricted Subsidiaries to repay the Term Loans only to the extent such funds or, to the knowledge of the Borrower, properties do not constitute property of, and are not beneficially owned by, directly or indirectly, any Person that is the subject or target of Sanctions.

Section 6.09    Books and Records.  Maintain proper books of record and account, in a manner to allow financial statements to be prepared in conformity with GAAP consistently applied in respect of all material financial transactions and matters involving the assets and business of the Borrower or such Restricted Subsidiary, as the case may be (it being understood and agreed that Foreign Subsidiaries may maintain individual books and records in a manner to allow financial statements to be prepared in conformity with generally accepted accounting principles that are applicable in their respective jurisdiction of organization).

Section 6.10    Inspection Rights.  Permit representatives of the Administrative Agent and, during the continuance of any Event of Default, of each Lender to visit and inspect any of its properties (to the extent it is within such Person's control to permit such inspection), to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors and officers, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance written notice to the Borrower; *provided* that, in no event shall the Borrower or any of the Restricted Subsidiaries be required pursuant to the terms of this Section 6.10 to allow any such Person to inspect or examine, or be required to discuss, any records, documents or other information (x) that constitutes trade secrets or proprietary information, (y) that constitutes attorney work product or (z) to the extent that the provision or discussion thereof would waive or impair attorney-client privilege, or violate any law, rule or regulation, or any obligation of confidentiality binding on the Borrower or any Restricted Subsidiary (*provided* that in the event the Borrower or such Restricted Subsidiary does not provide information in reliance on the foregoing, such Person shall provide notice to the Administrative

-81-

Agent that such information is being withheld and shall use commercially reasonable efforts to (a) to the extent such waiver or consent would not result in a loss of privilege, receive a waiver or consent with respect to such restriction and (b) if such waiver or consent cannot be obtained, communicate the applicable information to the Administrative Agent (if reasonably practicable) in a way that would not violate the applicable obligation or risk waiver of such privilege); *provided, further*, that excluding any such visits and inspections during the continuation of an Event of Default, (i) only the Administrative Agent on behalf of the Lenders may exercise rights under this Section 6.10, (ii) the Administrative Agent shall not exercise such rights more often than one time during any calendar year and (iii) such exercise shall be at the Borrower's expense; *provided, further*, that when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance written notice. The Administrative Agent and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's accountants.

Section 6.11   Use of Proceeds.   Use the proceeds of all Term Borrowings solely in accordance with the DIP Orders and the Approved Budget, (a) to pay interest, fees and expenses in connection with the Loan Documents, (b) for working capital of the Debtors following the commencement of the Cases, (c) to pay administrative costs of the Cases and (d) to pay payments in respect of Adequate Protection provided to the agents and lenders under the Prepetition First Lien Loan Documents as authorized by the Bankruptcy Court in the applicable DIP Order.

Except to the extent set forth in the DIP Orders, no proceeds of the DIP Term Facility, any Collateral or any Cash Collateral may be used (i) to finance any investigation (including discovery proceedings), initiation or prosecution of any adversary action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the Agents or Lenders, the agents and lenders under the Prepetition First Lien Loan Documents, or their respective rights and remedies under or in respect of the Loan Documents, the Prepetition First Lien Loan Documents, any DIP Order, or any Adequate Protection provided to the agents and lenders under the Prepetition First Lien Loan Documents, (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the liens, claims, interests and Adequate Protection of the Agents and the Lenders or the agents and lenders under the Prepetition First Lien Credit Agreement, including for the avoidance of doubt, (A) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the Obligations or the Liens securing the Obligations, or (B) objecting to or contesting the validity, extent, amount, perfection, priority, or enforceability of the Obligations (as defined in the Prepetition First Lien Credit Agreement) or the Liens securing the  Obligations (as defined in the Prepetition First Lien Credit Agreement), (iii) for any purpose that is prohibited under the Bankruptcy Code or the DIP Orders, and (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body, or to pay any costs or expenses incurred in connection with any such claim, action or proceeding, in each case which payment is not provided for in the Approved Budget, without the prior written consent of the Required Lenders.

Section 6.12   Covenant to Guarantee Obligations and Give Security.   (a) Upon the formation or acquisition of any new wholly owned Subsidiaries by any Loan Party (*provided* that any Excluded Subsidiary ceasing to be an Excluded Subsidiary as a result of such Canadian

Subsidiary no longer satisfying the requirements thereof set forth in the definition of Excluded Subsidiary shall be deemed to constitute the acquisition of a Restricted Subsidiary for all purposes of this Section 6.12), and upon the acquisition of any property (other than Excluded Assets (as defined in the Security Agreement) and real property that is not Material Real Property) by any Loan Party, which property, in the reasonable judgment of the Required Lenders, is not already subject to a perfected Lien in favor of the Administrative Agent for the benefit of the Secured Parties (including pursuant to the DIP Orders), the Borrower shall, in each case at the Borrower's expense:

(i)     in connection with the formation or acquisition of a wholly owned Subsidiary, within sixty (60) days after such formation or acquisition or such longer period as the Required Lenders may agree, (A) cause each such Subsidiary that is not an Excluded Subsidiary to duly execute and deliver to the Administrative Agent a supplement to the Guaranty, substantially in the form of Annex B thereto or a guaranty or a guaranty supplement in such other form reasonably satisfactory to the Administrative Agent, guaranteeing the Borrower's obligations under the Loan Documents and (B) (if not already so delivered) deliver certificates representing the Designated Pledged Interests of each such Subsidiary (if any) accompanied by undated stock powers or other appropriate instruments of transfer executed in blank and instruments evidencing the Designated Pledged Debt (if any) of such Subsidiary indorsed in blank to the Administrative Agent, together with, if requested by the Required Lenders, supplements to the Security Agreement substantially in the form of Annex A thereto or pledge or security agreement in such other form reasonably satisfactory to the Required Lenders,

(ii)     in connection with the formation or acquisition of a Subsidiary, within sixty (60) days after such formation or acquisition (or such longer period, as the Required Lenders may agree), furnish to the Administrative Agent a description of the owned real and personal properties of each such Subsidiary and their respective Subsidiaries (other than Excluded Subsidiaries) in detail reasonably satisfactory to the Required Lenders; *provided* that any such information provided pursuant to this clause (ii) shall consist solely of information of the type that would be set forth on Schedules I-IV of the Security Agreement,

(iii)     within sixty (60) (or, in the case of Mortgages and other documentation related thereto, ninety (90) days) after such formation or acquisition of such Subsidiary or acquisition of such Material Real Property or any request therefor by the Required Lenders (or, in each case, such longer period, as the Required Lenders may agree) duly execute and deliver, and cause each such Subsidiary that is not an Excluded Subsidiary to duly execute and deliver, to the Administrative Agent one or more Mortgages (with respect to Material Real Properties only and solely to the extent requested by the Administrative Agent or the Required Lenders), supplements to the Security Agreement (in the form of Annex A thereto or such other form reasonably satisfactory to the Required Lenders), IP Security Agreement Supplements and other security agreements, as specified by and in form and substance reasonably satisfactory to the Required Lenders (consistent with the Security Agreement, IP Security Agreement and Mortgages), securing payment of all the Obligations of the applicable Loan Party or such Subsidiary, as the case may be, under the Loan Documents and establishing Liens on all such properties,

(iv)    within sixty (60) (or, in the case of Mortgages and other documentation related thereto, ninety (90) days) after such request, formation or acquisition of such Subsidiary or acquisition of such Material Real Property, or such longer period, as the Required Lenders may agree in its sole discretion, take, and cause such Subsidiary that is not an Excluded Subsidiary to take, whatever action (including the recording of Mortgages (with respect to Material Real Properties only and solely to the extent requested by the Administrative Agent or the Required Lenders), the filing of Uniform Commercial Code financing statements, the giving of notices and delivery of stock and membership interest certificates) as specified by the Required Lenders as may be necessary or advisable in the reasonable opinion of the Required Lenders to vest in the Administrative Agent (or in any representative of the Administrative Agent designated by it) valid and subsisting Liens on the properties purported to be subject to the Mortgages, supplements to the Security Agreement, IP Security Agreement Supplements and security agreements delivered pursuant to this Section 6.12, in each case to the extent required under the Loan Documents and subject to the Excluded Actions, enforceable against all third parties in accordance with their terms,

(v)    in connection with the formation or acquisition of a Subsidiary which will be a Subsidiary Guarantor, within sixty (60) (or, in the case of any local counsel opinion relating to Mortgages relating to Material Real Property, ninety (90) days) after the formation or acquisition of such Subsidiary or acquisition of such Material Real Property or any request of the Required Lenders, or, in each case, such longer period as the Required Lenders may agree, deliver to the Administrative Agent, a signed copy of one or more opinions, addressed to the Administrative Agent and the other Secured Parties, of counsel for the Loan Parties reasonably acceptable to the Required Lenders as to such matters as the Required Lenders may reasonably request (limited, in the case of any opinions of local counsel to the Loan Parties in states in which any Mortgaged Property is located, to opinions with respect to the enforceability and perfection of the Mortgages relating to Material Real Property with a Fair Market Value of $5,000,000 or greater (and any other Mortgaged Properties located in the same state as any such Material Real Property)),

(vi)    within ninety (90) days) after such formation or acquisition of such Subsidiary or acquisition of such Material Real Property or any request therefor by the Required Lenders (or such longer period as the Required Lenders may agree), solely to extent requested by the Administrative Agent or the Required Lenders, deliver to the Administrative Agent with respect to each Material Real Property by a Subsidiary that is the subject of such request, title reports, fully paid American Land Title Association Lender's Extended Coverage title insurance policies or the equivalent or other form available in the applicable jurisdiction in form and substance, with endorsements and in an amount reasonably acceptable to the Required Lenders (not to exceed the value of the Material Real Properties covered thereby) and surveys in compliance with the 2016 Minimum Standard Detail Requirements for ALTA/NSPS Land Title Surveys reasonably satisfactory to the Required Lenders and evidence of payment of title insurance premiums and expenses and all recording, mortgage, transfer and stamp taxes and fees payable in connection with recording the Mortgages, any amendments thereto and any fixture filings in appropriate county land office(s),

(vii)    no later than three Business Days prior to the date on which a Mortgage is executed and delivered, in order to comply with the Flood Laws (or such later date as the Required Lenders may agree), the Administrative Agent shall have received the following

-84-

documents:  (A) a completed standard "life of loan" flood hazard determination form (a "<u>Flood Determination Form</u>"), (B) if the improvement(s) to the applicable improved real property is located in a special flood hazard area, a notification to the Borrower ("<u>Borrower Notice</u>") and (if applicable) notification to the Borrower that flood insurance coverage under the National Flood Insurance Program ("<u>NFIP</u>") is not available because the community does not participate in the NFIP, (C) documentation evidencing the Borrower's receipt of the Borrower Notice (e.g., countersigned Borrower Notice, return receipt of certified U.S. Mail, or overnight delivery), and (D) if the Borrower Notice is required to be given and flood insurance is available in the community in which the property is located, a copy of one of the following:  the flood insurance policy, the Borrower's application for a flood insurance policy plus proof of premium payment, a declaration page confirming that flood insurance has been issued, or such other evidence of flood insurance satisfactory to the Required Lenders (any of the foregoing being "<u>Evidence of Flood Insurance</u>"), and

(viii)   at any time and from time to time, promptly execute and deliver any and all further instruments and documents and take all such other action as the Administrative Agent or the Required Lenders in their reasonable judgment may deem necessary or desirable in obtaining the full benefits of, or in perfecting and preserving the Liens of, such guaranties, Mortgages, supplements to the Security Agreement, IP Security Agreement Supplements and security agreements.

(b)   The foregoing clause (iii) and (viii) of this Section 6.12 shall, in each case, be subject to the Excluded Actions. For the avoidance of doubt, solely upon the Canadian Subsidiaries ceasing to constitute Excluded Subsidiaries in accordance with the definition thereof, the Loan Parties shall take such actions in or under the laws of Canada reasonably requested by the Required Lenders to obtain or perfect security interests in the assets of the Canadian Subsidiaries.

(c)   [Reserved]

(d)   [Reserved]

Section 6.13   <u>Compliance with Environmental Laws</u>.  Except, in each case, to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect, (i) comply, and make all reasonable efforts to cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits and obtain and renew all Environmental Permits necessary for its operations and properties and (ii) to the extent required under Environmental Laws, conduct any investigation, mitigation, study, sampling and testing, and undertake any cleanup or removal, remedial, corrective or other action necessary to respond to and remove all Hazardous Materials from any of its properties, if required by and in accordance with the requirements of applicable Environmental Laws, unless liability for such actions is being contested in good faith.

Section 6.14   <u>Further Assurances</u>.   Promptly upon reasonable request by the Administrative Agent or the Required Lenders, and subject to the limitations described in <u>Section 6.12</u>, (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Loan Document or other document or instrument

relating to any Collateral and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent or the Required Lenders may reasonably require from time to time in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the Collateral Documents.

Section 6.15    Priority of Liens. Each Debtor hereby covenants, represents and warrants that, upon entry of the Interim Order (and when applicable, the Final Order) and to the extent provided for in such DIP Order, its Obligations hereunder and under the other Loan Documents:

(a)    pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, Avoidance Proceeds), having the priority of the Liens in respect of the DIP Term Facility as set forth in the DIP Order;

(b)    pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code and subject to the Carve-Out to the extent provided in the DIP Orders, shall be secured by a Lien on all Collateral of the Debtors, which Lien shall have the priority of the Liens in respect of the DIP Term Facility as set forth in the DIP Orders;

(c)    shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the Loan Documents, any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; and

(d)    for the avoidance of doubt, the Collateral shall include, subject to the entry of the Final Order, Avoidance Proceeds.

Subject to and effective only upon entry of the Final Order and to the extent provided therein, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under Chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of law, without the prior written consent of the Administrative Agent and the Required Lenders, with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by the Administrative Agent or the Lenders. In no event shall the Administrative Agent or the Lenders be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code (subject only to and effective upon entry of the Final Order), or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral.

Except for the Carve-Out, subject to the entry of the DIP Orders and to the extent provided therein, the Superpriority Claims shall at all times be senior to the rights of the

Borrower, any Chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any Chapter 7 trustee, or any other creditor (including, without limitation, post-petition counterparties and other post-petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 cases (if any of the Cases are converted to cases under Chapter 7 of the Bankruptcy Code).

Each Loan Party hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens on the Collateral of the Debtors in favor of the Administrative Agent on behalf of and for the benefit of the Secured Parties in all of the assets of the Debtors shall be created and (to the extent the Interim Order (and, when entered, the Final Order) is effective to perfect under local law) perfected, without the necessity of the execution, recordation of filings by any Loan Party of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, or the possession or control by the Administrative Agent of, or over, any Collateral of the Debtors, as set forth in the Interim Order and the Final Order, as applicable.

Section 6.16    <u>Milestones</u>.  The Loan Parties shall ensure the satisfaction of the following milestones (collectively, the "<u>Milestones</u>" and each a "<u>Milestone</u>"), unless waived or extended with the consent of the Required Lenders or the Administrative Agent (with the written consent of the Required Lenders) (which consents may be by email):

(a)    no later than November 15, 2023, the Borrower shall have commenced solicitation of the Approved Plan;

(b)    no later than the Petition Date, the Borrower shall have filed the Approved Plan, the Disclosure Statement, the Disclosure Statement Motion, the Plan Supplement, and the DIP Motion with the Bankruptcy Court;

(c)    no later than three (3) Business Days after the Petition Date the Borrower shall have delivered a notice of hearing to the Consenting Creditor Representatives at which the Bankruptcy Court will consider confirmation of the Approved Plan and final approval of the Disclosure Statement;

(d)    no later than three (3) Business Days following the Petition Date (subject to the availability of the Bankruptcy Court), the Bankruptcy Court shall have entered the Interim Order;

(e)    no later than thirty-five (35) days following the Petition Date (subject to the availability of the Bankruptcy Court), the Bankruptcy Court shall have entered the Final Order and the Confirmation Order; and

(f)    no later than forty (40) days following the Petition Date, the Restructuring Transactions shall have been consummated and the Restructuring Effective Date shall have occurred.

Section 6.17    <u>Bankruptcy Related Matters</u>. The Borrower will and will cause each of the Guarantors and Subsidiaries to:

174499819

(a)      cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Obligations, the Obligations (as defined in the Prepetition First Lien Credit Agreement), the Loan Documents and the Prepetition First Lien Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto, (iv) orders concerning the financial condition of the Borrower or any of its Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, and (v) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors to be in accordance with and permitted by the terms of this Agreement and reasonably acceptable to the Required Lenders in all respects, it being understood and agreed that the forms of orders approved by the Required Lenders prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are reasonably acceptable in all respects;

(b)      comply in all material respects with each order entered by the Bankruptcy Court in connection with the Cases;

(c)      comply in all material respects and in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order and the Final Order, as applicable, and any other order of the Bankruptcy Court;

(d)      provide the Administrative Agent and the Lenders upon reasonable request with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, and operational and restructuring activities, in each case subject to customary confidentiality restrictions;

(e)      (i) deliver to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent promptly as soon as available but not later than two (2) Business Days prior to filing, copies of pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases or any other party in interest related to a plan, a disclosure statement, plan exclusivity, assumption or rejection of executory contracts and unexpired leases, key employee incentive or retention plans, and each such pleading motion and (ii) use reasonable best efforts to deliver any other pleading, motion, application, order, financial information or other document as set forth in, and with the timing set forth in, preceding clause (i) to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent and Lenders, in each case to the extent required by and in accordance with the Restructuring Support Agreement; and

(f)      if not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent (for distribution to the Lenders) and to counsel to the Administrative Agent, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases.

Section 6.18    Independent Director. The Borrower shall cause the board of directors of Holdings and the Borrower to include at all times Timothy Pohl as an independent director (or another independent director acceptable to the Required Lenders).

Section 6.19    [Reserved].

Section 6.20    Budget Compliance. The Loan Parties shall comply with, and the proceeds of the Loans and all Withdrawals shall be used by the Loan Parties in accordance with, the Approved Budget, subject to Permitted Variances.

Section 6.21    Lender Calls. Upon advance written request of the Lender Advisors, the Borrower shall, at its own expense, facilitate and hold calls between the Lender Advisors, on the one hand, and members of the Borrower's executive management team and, to the extent appropriate, their advisors, on the other hand, once every week, which calls may also be attended by any Lenders who are not Public Lenders.

Section 6.22    [Reserved].

Section 6.23    Post-Closing Matters. The Borrower will, and will cause each of the Loan Parties to, take each of the actions set forth on Schedule 6.23 within the time period prescribed therefor on such schedule (as such time period may be extended by the Administrative Agent (acting at the direction of the Required Lenders)).

ARTICLE VII
Negative Covenants

So long as any Lender shall have any New Money DIP Commitment hereunder, any Term Loan or other Obligation (other than contingent indemnification or other contingent obligations), each of Holdings and the Borrower shall not, nor shall they permit any Restricted Subsidiary to, directly or indirectly:

Section 7.01    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than the following:

(a)    Liens pursuant to the Loan Documents;

(b)    Liens existing on the Closing Date which are listed on Schedule 7.01;

(c)    Liens for Taxes, assessments or governmental charges, which are not yet delinquent or are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP (or, for Foreign Subsidiaries, in conformity with generally accepted accounting principles that are applicable in their respective jurisdiction of organization);

(d)    Liens of landlords, carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors or other customary Liens (so long as such Liens do not secure Indebtedness) arising in the ordinary course of business, which secure amounts not overdue for a period of more than ninety (90) days or if more than ninety (90) days overdue, are unfiled (or if

-89-

filed, have been discharged or are stayed) and no other action has been taken to enforce such Lien or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(e)     Liens, pledges or deposits in the ordinary course of business and subject to the DIP Orders and the terms thereof (i) in connection with workers' compensation, unemployment insurance and other social security legislation, (ii) securing liability for reimbursement or indemnification obligations of (including bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to Holdings, any Parent Entity (to the extent such insurance is directly attributable to its (direct or indirect) ownership of Holdings), the Borrower or any Restricted Subsidiary or (iii) securing obligations in respect of letters of credit, subject to the DIP Orders and the terms thereof, that have been posted by the Borrower or any of its Restricted Subsidiaries to support the payment of items set forth in clauses (i) and (ii);

(f)     Liens to secure the performance of tenders, statutory obligations, bids, trade contracts, governmental contracts, leases and other contracts (other than Indebtedness for borrowed money), statutory obligations, licenses, surety, stay, customs and appeal bonds, performance and return-of-money bonds, performance and completion guarantees and other obligations of a like nature (including (i) those to secure health, safety and environmental obligations, (ii) those required or requested by any Governmental Authority and (iii) letters of credit issued in lieu of any such bonds or to support issuance thereof) and other Liens in favor of providers of performance or surety bonds pursuant to customary indemnity and other similar arrangements, in each case pursuant to this clause (f) entered into in connection therewith incurred in the ordinary course of business;

(g)     (i) easements (including reciprocal easement arrangements), reservations, rights-of-way, restrictions (including building, zoning and similar restrictions), utility agreements, covenants, reservations, encroachments, protrusions, changes and other similar encumbrances and title defects affecting real property which, in the aggregate, do not in any case materially and adversely interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries on the properties subject thereto, taken as a whole, (ii) mortgages, liens, security interests, restrictions, encumbrances or any other matter of record that have been placed by any developer, landlord or other third party on property over which the Borrower or any of its Restricted Subsidiaries has easement rights or a leasehold, and subordination or similar agreements relating thereto, (iii) ground leases (other than with respect to the Mortgaged Properties) in the ordinary course in respect of real property on which facilities owned or leased by the Loan Parties or any of their Restricted Subsidiaries are located and (iv) Liens arising on any real property as a result of any eminent domain, condemnation or similar proceeding being commenced with respect to such real property;

(h)     Liens securing judgments, or arising by reason of a judgment, decree or court order, in each case not constituting an Event of Default under Section 8.01(h);

(i)     Liens securing Indebtedness permitted under Section 7.03(g); *provided* that (i) such Liens attach prior to, concurrently with or within two hundred seventy (270) days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property (except for

-90-

replacements, additions and accessions to such property) other than the property financed by such Indebtedness and the proceeds and the products thereof and accessories thereto and (iii) with respect to leases evidencing Capitalized Lease Obligations, such Liens do not at any time extend to or cover any assets other than the assets subject to such leases and the proceeds and products thereof, additions and accessions thereto, and customary security deposits *provided* that individual financings otherwise permitted to be secured hereunder provided by one Person (or its affiliates) may be cross collateralized to other similar financings provided by such Person (or its affiliates);

(j)      leases, licenses, subleases or sublicenses granted to others in the ordinary course of business and not interfering in any material respect with the business of the Borrower or any Restricted Subsidiary, taken as a whole;

(k)      Liens (i) in favor of customs and revenue authorities arising as a matter of Law to secure payment of customs duties in connection with the importation of goods or (ii) on specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances or letters of credit issued or created for the account of such Person, or supporting trade payables, warehouse receipts or similar facilities entered into, to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business;

(l)      Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodities brokerage accounts incurred in the ordinary course of business; and (iii) in favor of a banking or other financial institution arising as a matter of Law or under customary general terms and conditions encumbering deposits (including the right of set-off) and which are within the general parameters customary in the banking industry;

(m)      Liens arising out of conditional sale, title retention, consignment or similar arrangements for the purchase or sale of goods entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business;

(n)      [reserved];

(o)      [reserved];

(p)      [reserved];

(q)      Liens arising from precautionary UCC financing statement (or similar filings under applicable law) filings regarding leases, consignment or bailee arrangements, or other non-Indebtedness arrangements, entered into by the Borrower or any Restricted Subsidiary;

(r)      any interest or title of a lessor, sublessor, licensee, sublicensee, licensor or sublicensor under any lease, sublease, license (or other grants of rights to use or exploit) or sublicense agreement or secured by a lessor's, sublessor's, licensee's, sublicensee's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense permitted by this Agreement (including software and other technology licenses), and any Lien deemed to exist in connection with software escrow arrangements entered into by the Borrower or any Restricted Subsidiary with third parties in the ordinary course of business;

-91-

(s)      [reserved];

(t)      Liens that are customary contractual rights of setoff (i) relating to the establishment of depository relations with banks or other financial institutions not given in connection with the incurrence of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower or any Restricted Subsidiary or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(u)      (i) zoning, building, entitlement and other land use regulations by Governmental Authorities with which the normal operation of the business of the Borrower and the Restricted Subsidiaries complies, and (ii) any zoning or similar Law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower or any Restricted Subsidiary taken as a whole;

(v)      [reserved];

(w)      (i) deposits made in the ordinary course of business to secure liability to insurance carriers and (ii) Liens on insurance policies and the proceeds thereof securing the financing of insurance premiums with respect thereto;

(x)      receipt of progress payments and advances from customers in the ordinary course of business to the extent the same creates a Lien;

(y)      [reserved];

(z)      [reserved];

(aa)      [reserved];

(bb)      [reserved];

(cc)      [reserved];

(dd)      other Liens not securing Indebtedness for borrowed money that do not, individually or in the aggregate, secure obligations in excess of $500,000 at any one time;

(ee)      (i) customary rights of set-off, revocation, refund or chargeback under deposit agreements or under the Uniform Commercial Code or common law of banks or other financial institutions where the Borrower or any of its Subsidiaries maintains deposits (other than deposits intended as cash collateral) in the ordinary course of business and (ii) utility deposits in the ordinary course of business;

(ff)      Liens on securities that are the subject of repurchase agreements constituting Cash Equivalents under clause (e) of the definition thereof arising out of such repurchase transaction;

(gg)     any Permitted Factoring Arrangements; and

(hh)     Liens created under (i) the Prepetition First Lien Loan Documents securing the Obligations (as defined in the Prepetition First Lien Credit Agreement), (ii) the Prepetition 1.5 Lien Loan Documents securing the Obligations (as defined in the Prepetition 1.5 Lien Credit Agreement), (iii) the Prepetition Second Lien Loan Documents securing the Obligations (as defined in the Prepetition Second Lien Credit Agreement) and (iv) the Canadian Credit Facility as in effect on the date hereof and to the extent such Liens only encumber assets of Canadian Subsidiaries that are obligors thereunder on the Closing Date.

Section 7.02     Investments.  Make or hold any Investments, except:

(a)     Investments held by the Borrower or any Restricted Subsidiary in the form of Cash Equivalents when such Investment was made;

(b)     [reserved];

(c)     Investments (i) by the Borrower or any Restricted Subsidiary in any Loan Party (excluding Holdings) and (ii) by any Restricted Subsidiary that is not a Loan Party in any other Restricted Subsidiary that is also not a Loan Party;

(d)     Investments (i) consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business (including advances made to distributors), Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors, Investments made in the ordinary course of business in connection with obtaining, maintaining or renewing client contacts, and Investments consisting of prepayments to suppliers, licensors and licensees in the ordinary course of business and (ii) received in connection with the bankruptcy or reorganization of suppliers and customers and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business and upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(e)     to the extent constituting Investments, transactions expressly permitted under Sections 7.01, 7.03, 7.04, 7.05 (including the receipt of noncash consideration for the Dispositions of assets permitted thereunder), 7.06 and 7.12, in each case, other than any provision in any of the foregoing Sections generally permitting transactions permitted by this Section 7.02;

(f)     Investments in existence on the Closing Date which are listed on Schedule 7.02;

(g)     [reserved];

(h)     [reserved];

(i)     [reserved];

(j)     [reserved];

-93-

(k)     Investments in the ordinary course of business or consistent with past practice, consisting of (i) endorsements for collection or deposit, (ii) customary trade arrangements with customers, (iii) loans or advances made to distributors, (iv) advances of payroll payments to employees or other advances of salaries or compensation (including advances against commissions) to employees and sales representatives and (v) Investments maintained in connection with any Loan Party's deferred compensation plan;

(l)     the licensing, sublicensing or contribution of intellectual property rights pursuant to joint marketing arrangements with Persons other than the Borrower and the Restricted Subsidiaries in the ordinary course of business;

(m)     loans and advances to Holdings or any Parent Entity in lieu of, and not in excess of the amount of (after giving effect to any other loans, advances or Restricted Payments made to Holdings and any Parent Entities) Restricted Payments permitted to be made to Holdings or any Parent Entity in accordance with Section 7.06; *provided* that any such loan or advance shall reduce the amount of such applicable Restricted Payment thereafter permitted under Section 7.06 by a corresponding amount while outstanding;

(n)     [reserved];

(o)     [reserved];

(p)     [reserved];

(q)     [reserved];

(r)     [reserved];

(s)     [reserved];

(t)     [reserved];

(u)     to the extent that they constitute Investments, purchases and acquisitions of inventory, supplies, materials or equipment or purchases, acquisitions, licenses (or other grants or rights to use or exploit) or leases of other assets, intellectual property, or other rights, in each case in the ordinary course of business;

(v)     [reserved];

(w)     Investments consisting of operating deposit accounts maintained in the ordinary course of business;

(x)     [reserved]; and

(y)     [reserved].

-94-

Section 7.03    <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)    [reserved];

(b)    (A) any (i) Indebtedness of the Loan Parties under the Prepetition First Lien Loan Documents in an aggregate principal amount not to exceed the aggregate principal amount thereunder as of the Petition Date, (ii) Indebtedness of the Loan Parties under the Prepetition 1.5 Lien Loan Documents in an aggregate principal amount not to exceed the aggregate principal amount thereunder as of the Petition Date and (iii) Indebtedness of the Loan Parties under the Prepetition Second Lien Loan Documents in an aggregate principal amount not to exceed the aggregate principal amount thereunder as of the Petition Date; and (B) any Indebtedness of the Canadian Subsidiaries under the Canadian Credit Facility in an aggregate principal amount not to exceed the aggregate principal amount thereunder as of the Closing Date;

(c)    Indebtedness of the Loan Parties under the Loan Documents;

(d)    Indebtedness outstanding on the Closing Date and listed on <u>Schedule 7.03</u>;

(e)    Guarantees incurred by the Borrower or any Restricted Subsidiary in respect of Indebtedness of the Borrower or any other Restricted Subsidiary that is permitted to be incurred under this Agreement; <u>provided</u>, that in the event that such Indebtedness in respect of which such Guarantees relates is subordinated, then the related Guarantees shall be subordinated to the Obligations on the same terms;

(f)    Indebtedness of (i) any Loan Party owing to any other Loan Party or (ii) any Restricted Subsidiary that is not a Loan Party owed to  any other Restricted Subsidiary that is not a Loan Party;

(g)    (i) Capitalized Lease Obligations and purchase money obligations (including obligations in respect of mortgage, industrial revenue bond, industrial development bond and similar financings) to finance the purchase, construction, lease, repair or improvement of fixed or capital assets; *provided*, *however*, that the aggregate principal amount of all such Indebtedness at any one time outstanding shall not exceed $5,000,000 and any such Indebtedness pursuant to this clause (g) shall be consistent with the Approved Budget at the time of incurrence;

(h)    [reserved];

(i)    [reserved];

(j)    [reserved];

(k)    [reserved];

(l)    [reserved];

(m)    [reserved];

-95-

(n)    [reserved];

(o)    [reserved];

(p)    Indebtedness in respect of cash management obligations and netting services, overdraft protections, employee credit card programs, automatic clearinghouse arrangements and similar arrangements in each case in connection with deposit accounts and Indebtedness arising from the honoring of a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business;

(q)    [reserved];

(r)    Indebtedness incurred by the Borrower or any Restricted Subsidiary in respect of any banker's acceptances, bank guarantees, letters of credit, warehouse receipts or similar instruments entered into in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance, or other Indebtedness with respect to reimbursement type obligations regarding workers compensation claims;

(s)    (i) obligations in respect of performance, bid, appeal and surety bonds and performance and completion guarantees and similar obligations provided by the Borrower or any Restricted Subsidiary and (ii) Indebtedness consisting of (x) the financing of insurance premiums or (y) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business or consistent with past practice;

(t)    [reserved].

(u)    Indebtedness of the Borrower or any Restricted Subsidiary as an account party in respect of commercial letters of credit issued in the ordinary course of business;

(v)    Guarantees (i) in respect of any travel and other reimbursable business expenses incurred by employees of the Borrower or any of its Restricted Subsidiaries in the ordinary course of business and (ii) incurred in the ordinary course of business in respect of obligations of or to suppliers, customers, franchisees, lessors, licensees, sublicensees or distribution partners;

(w)    [reserved];

(x)    [reserved]; and

(y)    to the extent constituting Indebtedness, obligations under Permitted Factoring Arrangements.

Section 7.04   <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, amalgamate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that:

-96-

174499819

(a)        any Restricted Subsidiary (or any other Person) may merge, amalgamate or consolidate with (i) the Borrower; *provided* that the Borrower shall be the continuing or surviving Person or (ii) any one or more other Restricted Subsidiaries; *provided*, *further*, that when any Guarantor is merging or amalgamating with another Restricted Subsidiary that is not a Loan Party the Guarantor shall be the continuing or surviving Person;

(b)        any Restricted Subsidiary that is not a Loan Party may merge, amalgamate or consolidate with or into any other Restricted Subsidiary that is not a Loan Party; and

(c)        any Restricted Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to any Restricted Subsidiary; *provided* that if the transferor in such transaction is a Guarantor, then (i) the transferee must be a Loan Party and (ii) to the extent constituting an Investment, such Investment must be permitted by Section 7.02.

Section 7.05        Dispositions.  Make any Disposition, except:

(a)        Dispositions of obsolete, uneconomic, surplus or worn out property, whether now owned or hereafter acquired, in the ordinary course of business and Dispositions of property no longer used, useful or economically practicable to maintain in the conduct of the business of the Borrower and its Restricted Subsidiaries (including allowing any registrations or any applications for registration of any intellectual property to lapse or go abandoned);

(b)        Dispositions of inventory and goods held for sale, in each case in the ordinary course of business;

(c)        [reserved];

(d)        to the extent constituting a Disposition, (i) Investments permitted by Section 7.02 and (ii) Restricted Payments permitted by Section 7.06, in each case excluding any provision of such applicable Section generally permitting transactions permitted by this Section 7.05;

(e)        Dispositions of cash and Cash Equivalents;

(f)        (i) Dispositions of accounts receivable in connection with the collection or compromise thereof and (ii) any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or other litigation claims in the ordinary course of business;

(g)        non-exclusive licensing or sublicensing (or other grants of rights to use or exploit) of IP Rights in the ordinary course of business;

(h)        sales, Dispositions or contributions of property (including IP Rights) (A) between Loan Parties, (B) between Restricted Subsidiaries (other than Loan Parties) or (C) by Restricted Subsidiaries that are not Loan Parties to the Loan Parties;

(i)        leases, subleases, non-exclusive licenses, sublicenses, occupancy agreements or assignment of property in the ordinary course of business;

-97-

(j)      transfers of (i) property subject to Casualty Events, (ii) condemned property as a result of the exercise of "eminent domain" or other similar powers to the respective Governmental Authority or agency that has condemned the same (whether by deed in lieu of condemnation or otherwise) and (iii) property arising from foreclosure or similar action or that have been subject to a casualty to the respective insurer of such real property as part of an insurance settlement;

(k)      [reserved];

(l)      [reserved];

(m)      [reserved];

(n)      [reserved];

(o)      [reserved];

(p)      [reserved];

(q)      Dispositions of (i) Cash Equivalents in the ordinary course of business and (ii) accounts receivables in the ordinary course of business in connection with the collection or compromise thereof; and

(r)      Dispositions of accounts receivable pursuant to Permitted Factoring Arrangements.

Section 7.06      Restricted Payments.   Declare or make, directly or indirectly, any Restricted Payment, except:

(a)      each Restricted Subsidiary may make Restricted Payments to the Borrower and to other Restricted Subsidiaries that directly or indirectly own Equity Interests of such Restricted Subsidiary;

(b)      [reserved];

(c)      to the extent constituting Restricted Payments, the Borrower and the Restricted Subsidiaries may take actions expressly permitted by Sections 7.02 (other than Sections 7.02(e) and (m)), 7.04, 7.08 or 7.12;

(d)      Borrower or any Restricted Subsidiary may make Restricted Payments to Holdings:

(i)      the proceeds of which shall be used by Holdings to pay its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and similar expenses provided by third parties), which are reasonable and customary and incurred in the ordinary course of business and consistent with the Approved Budget, plus any reasonable and customary indemnification claims made by directors, officers or employees of Holdings;

(ii)      the proceeds of which, in each case consistent with the Approved Budget, shall be used by Holdings or any Parent Entity to pay its franchise Taxes and other similar Taxes required to maintain its corporate, legal and organizational existence which are imposed on a separate company basis (in the case of any Parent Entity, solely to the extent directly attributable to its (direct or indirect) ownership of Holdings); and

(iii)      the proceeds of which shall be used to pay customary salary, bonus and other benefits payable to directors, managers, officers and employees of Holdings, in each case, to the extent such salaries, bonuses and other benefits (x) are attributable to the ownership or operation of the Borrower and its Restricted Subsidiaries, (y) are consistent with the Approved Budget and (z) are pursuant to contractual obligations existing prior to the Closing Date; and

(e)      Restricted Payments in amounts sufficient to permit Holdings to pay its consolidated, combined or similar tax liability with respect to income, franchise or similar taxes in respect of the Borrower and its Restricted Subsidiaries in the event that the Borrower files a consolidated, combined or similar type income tax return with Holdings; *provided* that the amount of such Restricted Payments shall not be greater than the amount of such taxes that would have been due and payable by the Borrower and the Borrower's Subsidiaries had the Borrower filed a consolidated, combined or similar type income tax return as the parent of a consolidated group that included only the Borrower and the Borrower's Subsidiaries.

Section 7.07      Change in Nature of Business; Conduct of Business. Engage in any material line of business substantially different from those lines of business conducted by the Borrower and the Restricted Subsidiaries on the date hereof or any business reasonably related, complementary, synergistic or ancillary thereto or reasonable extensions thereof.

Section 7.08      Transactions with Affiliates. Enter into any transaction of any kind with any Affiliate of the Borrower (including the purchase, sale, lease or exchange of any property or the rendering of any service) on terms that are less favorable to the Borrower or such Restricted Subsidiary, as the case may be, than those that might be obtained at the time in a comparable arm's-length transaction from a Person who is not an Affiliate whether or not in the ordinary course of business, other than (a) transactions among Loan Parties, (b) transactions between one or more Restricted Subsidiaries, so long as no such Restricted Subsidiary is a Loan Party, (c) on fair and reasonable terms substantially as favorable to the Borrower or such Restricted Subsidiary as would be obtainable by the Borrower or such Restricted Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate, (d) entering into this Agreement and the other Loan Documents, (e) customary fees and indemnities may be paid to, and customary indemnification agreements (or similar arrangement) may be made with, any directors, officers, employees or members of management of Holdings, any Parent Entity (to the extent directly attributable to its (direct or indirect) ownership of Holdings), the Borrower and the other Restricted Subsidiaries and reasonable out-of-pocket costs of such Persons may be reimbursed, in each case pursuant to agreements in existence prior to the Closing Date and consistent with the Approved Budget (or, in the case of reimbursements and indemnity payments not included in the Approved Budget, in an aggregate amount not to exceed $75,000 unless consented to by the Required Lenders), (f) employment, compensation, bonus, incentive, retention and severance arrangements and health, disability and similar insurance or benefit plans or other benefit arrangements between Holdings, any Parent Entity (to the extent directly attributable to its (direct or indirect) ownership

of Holdings), the Borrower or any Subsidiary thereof and their respective directors, officers, employees or managers (including management and employee benefit plans or agreements, retirement or savings plans, vacation plans, subscription agreements or similar agreements pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current or former employees, officers, directors, managers, consultants or independent contractors and stock option or incentive plans and other compensation arrangements) in the ordinary course of business or as otherwise approved by the board of directors (or other similar governing body) of Holdings, any Parent Entity, the Borrower or any Restricted Subsidiary and in each case in existence prior to the Closing Date and consistent with the Approved Budget, (g) Restricted Payments permitted under Section 7.06 (excluding provisions thereof generally permitting transactions permitted by this Section 7.08), (h) Investments permitted under Section 7.02 (excluding provisions thereof generally permitting transactions permitted by this Section 7.08), (i) payment of management fees from any Canadian Subsidiary to any Loan Party, (j) transactions pursuant to agreements in existence on the Closing Date and set forth on Schedule 7.08, (k) [reserved], (l) [reserved], (m) [reserved], (n) [reserved], (o) [reserved], (p) [reserved], (q) [reserved], and (r) transactions with wholly owned Restricted Subsidiaries for the purchase or sale of goods, products, parts and services entered into in the ordinary course of business and consistent with past practice.

Section 7.09    Burdensome Agreements.  Enter into any agreement, instrument, deed or lease which prohibits or limits the ability of Holdings, the Borrower or any Restricted Subsidiary to create, incur, assume or suffer to exist any Lien upon any of its properties or assets in favor of the Administrative Agent, whether now owned or hereafter acquired, or which requires the grant of any security for an obligation if security is granted for another obligation, except the following: (a) this Agreement and the other Loan Documents and the Prepetition First Lien Loan Documents, the Prepetition 1.5 Lien Loan Documents, the Prepetition Second Lien Loan Documents and the Canadian Credit Facility; (b) covenants in documents creating Liens permitted by Section 6.02 prohibiting further Liens on the properties encumbered thereby; (c) any prohibition or limitation that (i) exists pursuant to applicable Law, or (ii) consists of customary restrictions and conditions contained in any agreement relating to the sale of any property pending the consummation of such sale; *provided* that (1) such restrictions apply only to the property to be sold and such sale is permitted hereunder, and (2) such sale is permitted hereunder, or (iii) restricts subletting or assignment of any lease governing a leasehold interest of Borrower or one of its Subsidiaries; (d) prohibitions and limitations contained in any agreement to which a Subsidiary is a party that was in effect at the time such Subsidiary became a Subsidiary of a Borrower, so long as such agreement was not entered into in anticipation or contemplation of such Person becoming a Subsidiary and such prohibitions and limitations only relate to such Subsidiary; (e) customary non-assignment provisions in customer contracts and licenses of (or any other grants of rights to use) Intellectual Property, in each case entered into in the ordinary course of business; and (f) is imposed by any amendments that are otherwise permitted by the Loan Documents of the contracts, instruments or obligations referred to in this Section 7.09; provided that such amendments are no more restrictive with respect to the prohibitions and limitations in such contracts, instruments or obligations as in effect prior to any such amendment.

Section 7.10    Certain Restrictions on Subsidiaries. Directly or indirectly, create or otherwise cause or suffer to exist or become effective any encumbrance, restriction or condition on the ability of any Loan Party or Subsidiary thereof to (i) pay dividends or make any other

distributions on its Equity Interests or any other interest or participation in its profits owned by any Loan Party or Subsidiary thereof, or pay any Indebtedness owed to any Loan Party or Subsidiary thereof, (ii) make loans or advances to any Loan Party or Subsidiary thereof or (iii) transfer any of its properties to any Loan Party or Subsidiary thereof, except for such encumbrances, restrictions or conditions existing under or by reason of:

(a)      applicable Legal Requirements;

(b)      this Agreement, the other Loan Documents, the Prepetition First Lien Loan Documents, the Prepetition 1.5 Lien Loan Documents, the Prepetition Second Lien Loan Documents and the Canadian Credit Facility;

(c)      customary provisions restricting subletting or assignment of any lease governing a leasehold interest of a Subsidiary;

(d)      customary provisions restricting assignment of any agreement entered into by a Subsidiary in the ordinary course of business; or

(e)      customary restrictions and conditions contained in any agreement relating to the sale or other disposition of any property pending the consummation of such sale; *provided* that (i) such restrictions and conditions apply only to the property to be sold, and (ii) such sale or other disposition is permitted hereunder.

Section 7.11      <u>Accounting Changes</u>.      Make any change in the fiscal year of the Borrower.

Section 7.12      <u>Prepayments, Etc. of Indebtedness; Amendments</u>.

(a)      Directly or indirectly make or offer to make (or give any notice in respect thereof) any voluntary or optional payment or prepayment on or redemption, retirement, defeasance, or acquisition for value of, or any prepayment or redemption as a result of any asset sale, change of control or similar event of, any Subordinated Indebtedness or any Indebtedness incurred prior to the Petition Date (other than Indebtedness under the Canadian Credit Facility); or

(b)      terminate, amend, modify or change any of its Organizational Documents (including by the filing or modification of any certificate of designation) in a manner adverse to the Lenders (in their capacity as such) in any respect.

Section 7.13      <u>Holding Company</u>.

(a)      Conduct, transact or otherwise engage in any material business or operations; *provided* that the following shall be permitted in any event:  (i) its ownership of the Equity Interests the Borrower and activities incidental thereto; (ii) the entry into, and the performance of its obligations with respect to, the Loan Documents, the Prepetition First Lien Loan Documents, the Prepetition 1.5 Lien Loan Documents and the Prepetition Second Lien Loan Documents; (iii) the Cases, the implementation of the Restructuring Transactions and actions reasonably related thereto; (iv) in each case to the extent expressly permitted hereunder and consistent with the Approved Budget, the payment of dividends and distributions the making of

-101-

contributions to the capital of its Subsidiaries, the Guarantee of Indebtedness permitted to be incurred hereunder by the Borrower or any Restricted Subsidiary and other transactions permitted or expressly contemplated under this Agreement; (v) the maintenance of its legal existence and activities and contractual rights incidental thereto (including the ability to incur fees, costs and expenses relating to such maintenance and performance of activities relating to its officers, directors, managers and employees and those of its Subsidiaries), in each case consistent with the Approved Budget; (vi) [reserved]; (vii) in each case to the extent not prohibited hereunder and consistent with the Approved Budget, the participation in tax, accounting and other administrative matters as a member of the consolidated group of any Parent Entity, Holdings and the Borrower, including compliance with applicable Laws and legal, tax and accounting matters related thereto and activities relating to its officers, directors, managers and employees; (viii) [reserved]; (ix) in each case to the extent not prohibited hereunder and consistent with the Approved Budget, the entry into, and performance of its obligations with respect to, contracts and other arrangements with officers, managers, employees, consultants, independent contractors and directors of any Parent Entity, Holdings or any of its Subsidiaries relating to their employment or directorships (including the providing of indemnification to such Persons); (x) [reserved]; (xi) any transaction between any Parent Entity, Holdings and the Borrower or any Restricted Subsidiary expressly permitted under this Article VII; (xii) maintaining deposit accounts in connection with the conduct of its business, and paying taxes and other customary obligations in the ordinary course of business; (xiii) preparing reports to, notices to and filings with Governmental Authorities and to its shareholders; (xiv) holding director and shareholder meetings, preparing organizational records and other organizational activities required to maintain its separate organizational structure or to comply with applicable law and (xv) complying with applicable Law and activities incidental to the foregoing.

(b)    Permit any SMI Upper Tier Entity to conduct, transact or otherwise engage in any material business or operations or otherwise hold any material assets or have any material liabilities; *provided* that the following shall be permitted in any event:  (i) ownership of the Equity Interests in any other SMI Upper Tier Entity or Holdings, as applicable, and/or of Indebtedness of the Borrower under the Prepetition First Lien Credit Agreement, the Prepetition 1.5 Lien Credit Agreement or the Prepetition Second Lien Credit Agreement, in each case under this clause (i) owned by such SMI Upper Tier Entity on the Closing Date and activities incidental thereto; (ii) the Cases, the implementation of the Restructuring Transactions and actions reasonably related thereto; (iii) in each case to the extent consistent with the Approved Budget, the payment of dividends and distributions and the making of contributions to the capital of its Subsidiaries; (iv) the maintenance of its legal existence and activities and contractual rights incidental thereto (including the ability to incur fees, costs and expenses relating to such maintenance and performance of activities); (v) in each case to the extent consistent with the Approved Budget, the participation in tax, accounting and other administrative matters as a member of the consolidated group of any Parent Entity, Holdings and the Borrower, including compliance with applicable Laws and legal, tax and accounting matters related thereto and activities relating to its officers, directors, managers and employees; (vi) in each case to the extent consistent with the Approved Budget, the entry into, and performance of its obligations with respect to, contracts and other arrangements with its officers, managers, employees and directors relating to their employment or directorships (including the providing of indemnification to such Persons); (vii) preparing reports to, notices to and filings with Governmental Authorities and to its shareholders; (viii) holding director and shareholder meetings, preparing organizational records and other organizational

activities required to maintain its separate organizational structure or to comply with applicable law and (ix) complying with applicable Law and activities incidental to the foregoing.

Section 7.14    Subsidiaries.  Create, acquire or otherwise permit to exist any Subsidiary that is not in existence as of the Closing Date.

Section 7.15    Budget Variance.  As of any Variance Testing Date, for the immediately preceding Variance Testing Period, the Borrower shall not allow any variances to exist from the Approved Budget, except for Permitted Variances.

Section 7.16    Minimum Liquidity.  Permit Liquidity of the Loan Parties as of the close of business on the last Business Day of each week following the Closing Date to be less than $3,000,000.

Section 7.17    Additional Bankruptcy Matters.  To the extent not inconsistent with or otherwise contemplated by the DIP Orders, without the Required Lenders' prior written consent, neither Holdings, the Borrower, nor any Subsidiary will, directly or indirectly:

(a)    enter into any agreement to return any of its inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or allow any creditor to take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $100,000;

(b)    incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claim of the Administrative Agent or the Lenders against the Debtors (other than in respect of the Carve-Out);

(c)    assert or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents or the Restructuring Support Agreement against the Administrative Agent or the Lenders;

(d)    subject to the terms of the Interim Order or the Final Order, as applicable, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Administrative Agent or the Lenders with respect to the Collateral following the occurrence of an Event of Default (provided that any Loan Party may contest or dispute whether an Event of Default has occurred); or

(e)    seek, consent to, or permit to exist, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Interim Order, the Final Order or the other Loan Documents.

ARTICLE VIII
Events of Default and Remedies

Section 8.01    Events of Default.  Any of the following shall constitute an "Event of Default":

(a)    Non-Payment.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of any Term Loan when due, or (ii) within three (3) Business Days after the same becomes due, any interest on any Term Loan or any fee due hereunder, or any other amount payable hereunder or with respect to any other Loan Document; or

(b)    Specific Covenants.  Holdings, the Borrower or any Restricted Subsidiary fails to perform or observe any term, covenant or agreement contained in any of Sections 6.01, 6.02, 6.03(a), 6.05(a) (solely with respect to the Borrower), 6.07, 6.10, 6.11, 6.12, 6.14, 6.15. 6.16, 6.17, 6.18, 6.20, 6.21 or 6.23 or in any Section of Article VII; or

(c)    Other Defaults.  Holdings, the Borrower or any Restricted Subsidiary fails to perform or observe any covenant or agreement (other than those specified in Section 8.01(a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the occurrence thereof; or

(d)    Representations and Warranties.  Any representation or warranty made or deemed made by or on behalf of Holdings, the Borrower or any Restricted Subsidiary herein, in any other Loan Document, or in any document required to be delivered pursuant hereto or thereto shall be incorrect in any material respect when made or deemed made (or in any respect if any such representation or warranty is already qualified by materiality); or

(e)    Cross-Default.  Any Loan Party or any Restricted Subsidiary (i) fails to make any payment of principal, premium or interest beyond the applicable grace period with respect thereto, if any (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise), in respect of any Indebtedness (other than Indebtedness hereunder, Indebtedness owed by any Loan Party to any Restricted Subsidiary or, in the case of the Debtors, Indebtedness that is created or incurred prior to the Petition Date) having an aggregate outstanding principal amount of more than the Threshold Amount or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness (other than Indebtedness hereunder, Indebtedness owed by a Loan Party to another Loan Party or, in the case of the Debtors, Indebtedness that is created or incurred prior to the Petition Date) having an aggregate outstanding principal amount of more than the Threshold Amount, or any other event occurs (and such failure or event continues past any applicable grace period), the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity; or

174499819

(f)     Insolvency Proceedings, Etc.  Any Loan Party or any Restricted Subsidiary (in each case that is not a Debtor) institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes a general assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or substantially all of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged and unstayed for sixty (60) days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or substantially all of its property is instituted without the consent of such Person and continues undismissed and unstayed for sixty (60) days, or an order for relief with respect to any material portion of the Collateral is entered in any such proceeding; or

(g)     Inability to Pay Debts; Attachment.  (i) Any Loan Party or any Restricted Subsidiary (in each case that is not a Debtor) admits in writing its inability or fails generally to pay its debts as they become due or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or substantially all of the property of any such Person, with respect to an assessed obligation in excess of the Threshold Amount and is not released, vacated or fully bonded within sixty (60) days after its issue or levy; or

(h)     Judgments.   There is entered against any Loan Party or any Restricted Subsidiary a final judgment or order for the payment of money arising following the Petition Date in an aggregate amount exceeding the Threshold Amount (to the extent not paid, and not covered by independent third-party insurance as to which the insurer has been notified of such judgment or order and does not dispute coverage) and there is a period of sixty (60) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)     ERISA.  (i) An ERISA Event or Foreign Plan Event occurs which results in, or would reasonably be expected to result in, liability of any Loan Party in an aggregate amount (determined as of the date of occurrence of such ERISA Event) which would reasonably be expected to result in a Material Adverse Effect or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under any Multiemployer Plan which has resulted, or would reasonably be expected to result in, liability of any Loan Party in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(j)     Invalidity of Loan Documents.  Any material provision of the Guaranty or any material provision of any Collateral Document, at any time after its execution and delivery and for any reason other than (x) as expressly permitted hereunder or thereunder (including such express permission as a result of a transaction permitted under Section 7.04 or 7.05, or satisfaction in full of all the Obligations then due and owing (other than contingent indemnification or other obligations as to which no claim has been asserted and obligations)), or (y) as a result of the acts or omissions of the Administrative Agent or any Lender, ceases to be in full force and effect; or any Loan Party denies in writing that it has any or further liability or obligation under the Guaranty or any Collateral Document (other than as a result of repayment in full of the Obligations then due and owing (other than contingent indemnification or other obligations as to which no claim has been asserted) and termination of the Aggregate New Money DIP Commitments, or as a result of

-105-

a transaction permitted hereunder or thereunder (including as a result of a transaction permitted under Section 7.04 or 7.05)); or

        (k)      Change of Control.  There occurs any Change of Control; or

        (l)      Collateral Documents.  Any Collateral Document after delivery thereof pursuant to Section 4.01 or 6.12 (or otherwise) shall for any reason (other than pursuant to the terms hereof or thereof including as a result of a transaction permitted under Section 7.04 or 7.05) cease to create a valid and perfected lien on and security interest in any of Collateral covered by the Collateral Documents or the DIP Orders, subject to Liens permitted under Section 7.01, except (i) to the extent that any such perfection or priority is not required pursuant to the DIP Orders and the applicable Collateral Document, or results from the failure of the Administrative Agent to maintain possession of possessory collateral actually delivered to it or (ii) upon satisfaction in full of all the Obligations then due and owing (other than the contingent indemnification or other obligations as to which no claim has been asserted and obligations); or

        (m)     any of the Cases of the Debtors shall be converted to a case under Chapter 7 of the Bankruptcy Code; or

        (n)      a trustee, responsible officer or an examiner (other than a fee examiner) with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Debtors is appointed or elected in the any of the Cases, or the Bankruptcy Court shall have entered an order providing for such appointment; or

        (o)      an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Debtors and the Debtors shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance acceptable to, the Required Lenders; or

        (p)      any Loan Party or any of its Subsidiaries, or any person claiming by or through any Loan Party or any of its Subsidiaries, with any Loan Party's or any Subsidiary's consent, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the Administrative Agent or any of the Lenders relating to the DIP Term Facility (in their capacities as such) or (B) the administrative agent, the collateral agent or any lender relating to the Prepetition First Lien Credit Agreement (in their capacities as such), in each case other than in connection with enforcement of the Loan Documents or the Restructuring Support Agreement; or

        (q)      the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing (i) any claims or charges, other than in respect of the DIP Term Facility and the Carve-Out or as otherwise permitted under the applicable Loan Documents or the DIP Orders, entitled to superpriority administrative expense claim status in any Case pursuant to Section 364(c)(1) of the Bankruptcy Code that are pari passu with or senior to the claims of the Agents and the Lenders under the DIP Term Facility, or there shall arise or be granted by the Bankruptcy Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of Section 503 or clause (b) of Section 507 of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or pari passu with

the Liens and security interests provided for herein securing the Obligations hereunder, except, in each case, as expressly provided in the Loan Documents or in the DIP Order then in effect (but only in the event specifically consented to by the Required Lenders (or the Administrative Agent with the consent of the Required Lenders)); or

(r)     the Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole); or

(s)     an order of the Bankruptcy Court shall be entered reversing, staying, or vacating the Interim Order or the Final Order or amending, supplementing or modifying the Interim Order or the Final Order (other than, in the case of an amendment, supplement or modification, as reasonably acceptable to the Required Lenders), or a Loan Party shall apply for the authority to do so; or

(t)     the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral; or

(u)     an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by any Agent or any of the Lenders of any amounts received in respect of the Obligations; or

(v)     an order shall have been entered by the Bankruptcy Court providing for a change in venue with respect to the Cases; or

(w)     any of the Loan Parties shall fail to comply in all material respects with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date); or

(x)     other than with respect to the Carve-Out, an order in the Cases shall be entered charging any of the Collateral (as defined herein and in the Prepetition First Lien Credit Agreement) under Section 506(c) of the Bankruptcy Code against the Lenders or the lenders under the Prepetition First Lien Credit Agreement, or the commencement of other actions that is materially adverse to Administrative Agent or the Lenders (in their capacities as such) or their respective rights and remedies under the DIP Term Facility in any of the Cases or inconsistent with any of the Loan Documents; or

(y)     any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for termination of the New Money DIP Commitments and indefeasible payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable) and continuation of the Liens with respect thereto until the effectiveness thereof, or any of the Loan Parties and their Subsidiaries shall seek, support or fail to contest in good faith the entry of any such order; or

-107-

(z)     any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 8.01 or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal; or

(aa)     any Loan Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or any other rights granted to the Administrative Agent and the Lenders in the DIP Orders or this Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral; or

(bb)     any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or the administrative agent, the collateral agent or any lender under the Prepetition First Lien Credit Agreement with respect to the obligations thereunder, other than to challenge the occurrence of a Default or Event of Default; or

(cc)     without the consent of the Administrative Agent and the Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent, trustee or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date); or

(dd)     without the Required Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the DIP Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's and the Required Lenders' consent or to obtain any financing under section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby; or

(ee)     the filing by any of the Loan Parties of a plan of reorganization under Chapter 11 of the Bankruptcy Code other than the Approved Plan; or

(ff)     entry of an order by the Bankruptcy Court (A) terminating or modifying the exclusive right of any Debtor to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required Lenders or (B) confirming a plan of reorganization or liquidation in any of the Chapter 11 Cases other than the Approved Plan; or

(gg)     if any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; provided, that the Loan Parties shall have five (5) Business Days

after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order; or

(hh)    any Loan Party shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments authorized by one or more "first day" orders, "second day" orders, the Interim Order or the Final Order and consistent with the Approved Budget; or

(ii)    the occurrence of (i) the material amendment, modification or supplementing of the Plan Documentation in any manner not in compliance with the Restructuring Support Agreement or (ii) the waiver of any condition precedent to confirmation of the Approved Plan or effective date of the Approved Plan without the consent of the Required Consenting First Lien Creditors and the Required Lenders; or

(jj)    the Confirmation Order is entered in form and substance which is not reasonably acceptable to the Required Lenders in respect of the treatment of the claims of the Administrative Agent and the Lenders; or

(kk)    Restructuring Support Agreement.    The        Restructuring        Support Agreement shall have been validly terminated as to any of the Consenting First Lien Creditors (as defined therein) and after giving effect to such termination (i) the Consenting First Lien Creditors remaining party thereto, taken together, hold less than two-thirds of the aggregate principal amount of Prepetition First Lien Term Loans (or no Consenting First Lien Creditors remain party thereto), (ii) the Consenting Second Lien Creditors (as defined in the Restructuring Support Agreement) remaining party thereto, taken together, hold less than two-thirds of the aggregate principal amount of the Prepetition Second Lien Term Loans, or (iii) any Company Party, Consenting 1.5 Lien Creditor or Consenting Sponsor (as such terms are defined in the Restructuring Support Agreement) is no longer a party thereto.

Section 8.02    Remedies Upon Event of Default.  Upon the occurrence of an Event of Default, and delivery of a written notice (with a copy filed with the Bankruptcy Court) (the date of delivery of such notice, the "Termination Date") by the Administrative Agent (acting at the direction of the Required Lenders) to the Debtors and the U.S. Trustee of the occurrence of an Event of Default (the "Event of Default Occurrence"), subject to the DIP Orders, the automatic stay shall terminate solely to the extent necessary for one or more (without limitation) of the following to occur to the extent elected by the Administrative Agent (acting at the direction of the Required Lenders): (a) the Debtors' authority to use Cash Collateral shall immediately terminate (subject only to the Carve-Out); (b) the Obligations shall (subject only to the Carve-Out) be immediately accelerated and due and payable for all purposes, rights, and remedies, without presentment, demand, protest or other notice of any kind, all of which are expressly waived by the Lenders; (c) the New Money DIP Commitments shall be terminated, (d) the Term Facility shall be terminated with respect to any future liability or obligation of the Lenders, but, for the avoidance of doubt, without affecting any of the Liens, the Superpriority Claims or the Obligations, (e) any and all obligations of the Lenders in connection with the Term Facility and the "Secured Parties" (as defined in the Prepetition First Lien Credit Agreement) with respect to Cash Collateral under the Interim Order and the Loan Documents, as applicable, shall immediately terminate, (f) the

Carve-Out shall apply through the delivery of the Carve-Out Trigger Notice (as defined in the Interim Order or the Final Order, as applicable); and (g) any other right or remedy may be exercised with respect to the Collateral or the Liens permitted under the Loan Documents or under the Prepetition First Lien Loan Documents; *provided*, *however* that (i) in the case of the termination of the use of Cash Collateral pursuant to *clause (a)* above, unless, in the case of an Event of Default Occurrence, such Event of Default Occurrence is cured by the Debtors, as determined by the Required Lenders, prior to the expiration of five (5) Business Days following the Termination Date, and (ii) in the case of the enforcement of Liens securing the Obligations or the Liens securing the "Obligations" under the Prepetition First Lien Loan Documents or other remedies with respect to the Collateral or the Collateral (as defined in the Prepetition First Lien Credit Agreement) pursuant to *clause (g)* above, the Administrative Agent (acting at the direction of the Required Lenders), shall first file a motion with the Bankruptcy Court seeking emergency relief to exercise such remedies on at least five (5) Business Days' written notice seeking an emergency hearing before the Bankruptcy Court (a "Stay Relief Hearing") and the Loan Parties agree not to object the shortening of notice of such Stay Relief Hearing.

Section 8.03     [Reserved.]

Section 8.04     Application of Funds.  After the exercise of remedies provided for in this Article VIII (or after the Loans have automatically become immediately due and payable), any amounts received under any Loan Documents, and all funds credited to the Funding Account, shall be applied by the Administrative Agent as follows:

(a)     *First*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agents) then due and payable to the Agents in their respective capacities as such, until payment in full of all such fees shall have been made;

(b)     *Second*, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest) then due and payable to the Lenders, ratably among them in proportion to the amounts described in this clause *second* payable to them;

(c)     *Third*, to pay ratably all accrued and unpaid interest on the Loans, until payment in full of all such interest shall have been made;

(d)     *Fourth*, to pay the unpaid principal amount of the Loans ratably, until payment in full of the principal of all Loans shall have been made;

(e)     *Fifth*, to pay all other Obligations ratably, until payment in full of all such other Obligations shall have been made; and

(f)     *Sixth*, the balance, if any, to the Person lawfully entitled thereto (including the applicable Loan Party or its successors or assigns) or as a court of competent jurisdiction may direct.

In the event that any such proceeds are insufficient to pay in full the items described in clauses (a) through (f) above, the Loan Parties shall remain liable, jointly and severally, for any deficiency.

174499819

ARTICLE IX
Administrative Agent and Other Agents

Section 9.01     Appointment and Authorization of Agents.   (a) Each Lender hereby irrevocably (i) appoints and designates (A) Acquiom to act on its behalf as a Co-Administrative Agent hereunder and under the other Loan Documents, (B) Seaport to act on its behalf as a Co-Administrative Agent hereunder and under the other Loan Documents, and (ii)  authorizes each Co-Administrative Agent to take such action on its behalf under the provisions of this Agreement and each other Loan Document and to exercise such powers and perform such duties as are expressly delegated to it by the terms of this Agreement or any other Loan Document, together with such powers as are reasonably incidental thereto; *provided*, that notwithstanding anything to the contrary in this Agreement or any other Loan Document (but without limiting any rights, privileges, protections, immunities, and indemnities granted to the Administrative Agent under this Agreement and the other Loan Documents), the appointment of Seaport as a Co-Administrative Agent is solely with respect to its capacity in processing assignments of the Loans under this Agreement (and Seaport shall not be required to, or have any duty to or responsibility for, acting in any other capacities, without its prior written consent).   Notwithstanding any provision to the contrary contained elsewhere herein or in any other Loan Document, no Agent shall have any duties or responsibilities, except those expressly set forth herein, nor shall any Agent have or be deemed to have any fiduciary relationship with any Lender or participant, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against any Agent.   Without limiting the generality of the foregoing sentence, the use of the term "agent" herein and in the other Loan Documents with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.   Instead, such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties.

(b)     [Reserved.]

(c)     The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers as are reasonably incidental thereto.   In this connection, the Administrative Agent, as "collateral agent" (and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.02 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder or under any intercreditor agreement at the direction of the Administrative Agent or the Required Lenders), shall be entitled to the benefits of all provisions of this Article IX (including Section 9.07, as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

Section 9.02     Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement or any other Loan Document (including for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral

-111-

Documents or of exercising any rights and remedies thereunder or under any intercreditor agreement) by or through agents, employees or attorneys-in-fact and shall be entitled to advice of counsel and other consultants or experts concerning all matters pertaining to such duties. The Administrative Agent shall not be responsible for the negligence or misconduct of any agent or attorney-in-fact that it selects in the absence of gross negligence or willful misconduct.

Section 9.03      Liability of Agents.  No Agent-Related Person shall (a) be liable to any Secured Party in its capacity as such for any action taken or omitted to be taken by any of them (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as any Co-Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 8.02 or Section 10.01) or (ii) in the absence of its own gross negligence or willful misconduct (the absence of which shall be presumed unless otherwise  determined in a final, non-appealable judgment by a court of competent jurisdiction) or (b) be responsible in any manner to any Secured Party for any recital, statement, representation or warranty made by any Loan Party or any officer thereof, contained herein or in any other Loan Document, or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document, or the validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document, or the perfection or priority of any Lien or security interest created or purported to be created under the Collateral Documents, or for any failure of any Loan Party or any other party to any Loan Document to perform its obligations hereunder or thereunder.  No Agent-Related Person shall be under any obligation to any Lender or participant to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party or any Affiliate thereof. In no event shall the Administrative Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit), even if the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. Notwithstanding anything contained in this Agreement to the contrary, the Administrative Agent shall be under no obligation (i) to monitor, determine or verify the unavailability or cessation of Term SOFR or Adjusted Term SOFR (or other applicable benchmark interest rate), or whether or when there has occurred, or to give notice to any other transaction party of the occurrence of, any date on which such rate may be required to be transitions or replaced in accordance with the terms of the Loan Documents, applicable law or otherwise, (ii) to select, determine or designate any replacement to such rate, or other successor or replacement benchmark index, or whether any conditions to the designation of such a rate have been satisfied, (iii) to select, determine or designate any modifier to any replacement or successor index, or (iv) to determine whether or what amendments to this Agreement or the other Loan Documents are necessary or advisable, if any, in connection with any of the foregoing.

No provision of this Agreement or any other Loan Document shall require the Administrative Agent to expend or risk its own funds or (unless indemnified by the Loan Parties to the reasonable satisfaction of the Administrative Agent pursuant to the Loan Documents or otherwise) incur any financial liability in the performance of any of its duties hereunder or thereunder or in the exercise of any of its rights or powers, if it shall have grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

In no event shall the Administrative Agent be liable for any failure or delay in the performance of its obligations under this Agreement or any other Loan Document because of circumstances beyond the Administrative Agent's control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services; it being understood that the Administrative Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

Section 9.04    Reliance by Agents.  (a) Each Agent shall be entitled to conclusively rely, and shall be fully protected in relying, upon any writing, communication, signature, resolution, representation, notice, consent, certificate, affidavit, letter, telegram, facsimile, telex or telephone message, electronic mail message, statement or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons, and upon advice and statements of legal counsel (including counsel to any Loan Party), independent accountants and other experts selected by such Agent.  Each Agent shall be fully justified in failing or refusing to take any action under any Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance) as it deems appropriate and, if it so requests, it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any such action.  Each Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Loan Document in accordance with a request or consent of the Required Lenders (or such greater number of Lenders as may be expressly required hereby in any instance, as reasonably determined by the Administrative Agent) and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders.  Without limiting any rights, protections, immunities or indemnities afforded to the Administrative Agent hereunder (including without limitation this Article VIII), phrases such as "satisfactory to the Administrative Agent," "approved by the Administrative Agent," "acceptable to the Administrative Agent," "as determined by the Administrative Agent," "in the Administrative Agent's discretion," "selected by the Administrative Agent," "elected by the Administrative Agent," "requested by the Administrative Agent," and phrases of similar import that authorize or permit the Administrative Agent to approve, disapprove, determine, act or decline to act in its discretion shall be subject to the Administrative Agent receiving written direction from the Required Lenders to take such action or to exercise such rights. Nothing contained in this Agreement shall require any Agent to exercise any discretionary acts.

(b)    For purposes of determining compliance with the conditions specified in Sections 4.01 and 4.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

Section 9.05    Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to

-113-

defaults in the payment of principal and interest required to be paid to the Administrative Agent for the account of the Lenders, unless the Administrative Agent shall have received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default." The Administrative Agent shall notify the Lenders of its receipt of any such notice. The Administrative Agent shall take such action with respect to any Event of Default as may be directed by the Required Lenders in accordance with Article VIII; *provided*, *however*, that unless and until the Administrative Agent has received any such direction, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Event of Default as it shall deem advisable.

Section 9.06    Credit Decision; Disclosure of Information by Agents.  Each Lender acknowledges that no Agent-Related Person has made any representation or warranty to it, and that no act by any Agent hereafter taken, including any consent to and acceptance of any assignment or review of the affairs of any Loan Party or any Affiliate thereof, shall be deemed to constitute any representation or warranty by any Agent-Related Person to any Lender as to any matter, including whether Agent-Related Persons have disclosed material information in their possession. Each Lender represents to each Agent that it has, independently and without reliance upon any Agent-Related Person and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, prospects, operations, property, financial and other condition and creditworthiness of the Loan Parties and their respective Subsidiaries, and all applicable bank or other regulatory Laws relating to the transactions contemplated hereby, and made its own decision to enter into this Agreement and to extend credit to the Borrower and the other Loan Parties hereunder. Each Lender also represents that it will, independently and without reliance upon any Agent-Related Person and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigations as it deems necessary to inform itself as to the business, prospects, operations, property, financial and other condition and creditworthiness of the Borrower and the other Loan Parties. Except for notices, reports and other documents expressly required to be furnished to the Lenders by any Agent herein, such Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of any Agent-Related Person.

Section 9.07    Indemnification of Agents.  Whether or not the transactions contemplated hereby are consummated, each Lender shall, on a ratable basis based on such Lender's Pro Rata Share, indemnify upon demand each Agent-Related Person (to the extent not reimbursed by or on behalf of any Loan Party and without limiting the obligation of any Loan Party to do so), and hold harmless each Agent-Related Person in each case from and against any and all Indemnified Liabilities incurred by such Agent-Related Person; *provided*, *however*, that no Lender shall be liable for any Indemnified Liabilities incurred by an Agent-Related Person to the extent such Indemnified Liabilities are determined in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Agent-Related Person's own gross negligence or willful misconduct; *provided*, *however*, that no action taken in accordance with the directions of the Required Lenders shall be deemed to constitute gross negligence or willful misconduct for purposes of this Section 9.07. In the case of any investigation, litigation or proceeding giving rise

-114-

to any Indemnified Liabilities, this <u>Section 9.07</u> shall apply whether or not any such investigation, litigation or proceeding is brought by any Lender or any other Person. Without limiting the foregoing, each Lender shall reimburse the Administrative Agent upon demand for its pro rata share of any costs or out-of-pocket expenses (including the fees, disbursements and other charges of counsel) incurred by the Administrative Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice in respect of rights or responsibilities under, this Agreement, any other Loan Document, or any document contemplated by or referred to herein, to the extent that the Administrative Agent is not reimbursed for such expenses by or on behalf of the Borrower. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to such Lender from any source against any amount due to the Administrative Agent under this <u>Section 9.07</u>. The undertaking in this <u>Section 9.07</u> shall survive termination of the Aggregate New Money DIP Commitments, the payment of all other Obligations and the resignation or removal of the Administrative Agent.

Section 9.08    <u>Agents in their Individual Capacities</u>.  Any Agent and its Affiliates may make loans to, issue letters of credit for the account of, accept deposits from, acquire Equity Interests in and generally engage in any kind of banking, trust, financial advisory, underwriting or other business with each of the Loan Parties and their respective Affiliates as though it were not an Agent hereunder and without notice to or consent of the Lenders.  The Lenders acknowledge that, pursuant to such activities, an Agent or its Affiliates may receive information regarding any Loan Party or its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that such Agent shall be under no obligation to provide such information to them.  With respect to its Term Loans, such Agent shall have the same rights and powers under this Agreement as any other Lender and may exercise such rights and powers as though it were not an Agent, and the terms "Lender" and "Lenders" include such Agent in its individual capacity.

Section 9.09    <u>Successor Agents</u>.  Each Co-Administrative Agent may resign as a Co-Administrative Agent upon thirty (30) days' written notice to the Lenders and the Borrower (*provided* that no such notice to the Borrower shall be required if an Event of Default under <u>Section 8.01(f)</u> or <u>(g)</u> shall have occurred and be continuing).  If a Co-Administrative Agent resigns under this Agreement, the Required Lenders shall appoint a successor agent for the Lenders.  If no successor agent is appointed prior to the effective date of the resignation of a Co-Administrative Agent, such Co-Administrative Agent may appoint, after consulting with the Lenders and the Borrower, a successor agent from among the Lenders.  Upon the acceptance of its appointment as successor agent hereunder, the Person acting as such successor agent shall succeed to all the rights, powers and duties of the retiring Co-Administrative Agent and the term "Co-Administrative Agent" or "Administrative Agent" shall mean such successor co-administrative agent, and the retiring Co-Administrative Agent's appointment, powers and duties as a Co-Administrative Agent and Administrative Agent shall be terminated.  After the retiring Co-Administrative Agent's resignation hereunder as a Co-Administrative Agent, the provisions of this <u>Article IX</u> and <u>Sections 10.04</u> and <u>10.05</u> shall continue in effect for its benefit as to any actions taken or omitted to be taken by it while it was a Co-Administrative Agent under this Agreement. If no successor agent has been appointed and accepted such appointment as a Co-Administrative Agent by the date which is thirty (30) days following the retiring Co-Administrative Agent's notice

-115-

of resignation, the retiring Co-Administrative Agent's resignation shall nevertheless thereupon become effective and the Required Lenders (or, in the case of a resignation of Seaport Loan Products LLC, the other Co-Administrative Agent) shall perform all of the duties of such Co-Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  Upon the acceptance of any appointment as a Co-Administrative Agent hereunder by a successor and upon the execution and filing or recording of such financing statements, or amendments thereto, and such amendments or supplements to the Mortgages, and such other instruments or notices, as may be necessary or desirable, or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Collateral Documents, the entering Co-Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, discretion, privileges, and duties of the retiring Co-Administrative Agent.  Upon the acceptance of any appointment as a Co-Administrative Agent hereunder by a successor or upon the expiration of the 30-day period following the retiring Co-Administrative Agent's notice of resignation without a successor agent having been appointed, the retiring Co-Administrative Agent shall be discharged from its duties and obligations under the Loan Documents.  If a Co-Administrative Agent becomes a Defaulting Agent, such Co-Administrative Agent may be removed as a Co-Administrative Agent hereunder by the Borrower or the Required Lenders.

Upon the expiration of the 30-day period following the retiring Co-Administrative Agent's notice of registration without a successor agent having been appointed, notwithstanding such absence of a successor agent, the Borrower shall not be prohibited from the borrowing of Term Loans under the Loan Documents due to any purported inability to make representations and warranties regarding Liens or perfection of such Liens.

Section 9.10      Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Term Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Term Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Secured Parties and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.09 and 10.04) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the

Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Agents and their respective agents and counsel, and any other amounts due the Administrative Agent under Sections 2.09 and 10.04.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

Section 9.11    Collateral and Guaranty Matters.   Each of the Lenders irrevocably authorizes and directs the Administrative Agent to, and the Administrative Agent shall, upon the request of the Borrower, in each case subject to, and to the extent required by, the Bankruptcy Court,

(a)     release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon termination of the Aggregate New Money DIP Commitments and payment in full of all Obligations then due and owing (other than contingent indemnification or other contingent obligations as to which no claim has been asserted), including pursuant to Section 2.15, (ii) that is sold, disposed of or distributed or to be sold, disposed of or distributed as part of or in connection with any sale permitted hereunder or under any other Loan Document, or (iii) subject to Section 10.01, if approved, authorized or ratified in writing by the Required Lenders; and

(b)     release or subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.01(i).

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations under the Guaranty pursuant to this Section 9.11. In each case as specified in this Section 9.11, the Administrative Agent shall (and each Lender irrevocably authorizes the Administrative Agent to), at the Borrower's expense, execute and deliver to the applicable Loan Party such documents prepared by a Loan Party (and in form and substance reasonably satisfactory to the Administrative Agent) as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents, or to subordinate any Lien thereon granted to or held by the Administrative Agent, or to release (or evidence the release of) such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Loan Documents and this Section 9.11; *provided* that, the Borrower shall have delivered to the Administrative Agent a certificate of a Responsible Officer of the Borrower certifying that any such transaction has been consummated in compliance with this Agreement and the other Loan Documents, which the Administrative Agent shall be entitled to conclusively rely upon and upon receipt the Administrative Agent shall be authorized to execute and deliver any and all documents

-117-

evidencing the release of such items of Collateral or Guarantor or the subordination of such Liens without incurring any liability therefor.

        Section 9.12       <u>Erroneous Payments</u>.

        (a)       Each Lender hereby agrees that (i) if the Administrative Agent notifies such Lender that the Administrative Agent has determined in its sole discretion that any funds received by such Lender from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Lender (whether or not known to such Lender)  (whether as a payment, prepayment or repayment of principal, interest, fees or otherwise; individually and collectively, an "<u>Erroneous Payment</u>") and demands the return of such Erroneous Payment (or a portion thereof), such Lender shall promptly, but in no event later than two Business Days thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect and (ii) to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including, without limitation, waiver of any defense based on "discharge for value" or any similar theory or doctrine.  A notice of the Administrative Agent to any Lender under this clause (a) shall be conclusive, absent manifest error.

        (b)       Without limiting immediately preceding clause (a), each Lender hereby further agrees that if it receives a payment from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment sent by the Administrative Agent, (y) that was not preceded or accompanied by notice of payment, or (z) that such Lender otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each case, if an error has been made each such Lender is deemed to have knowledge of such error at the time of receipt of such Erroneous Payment, and to the extent permitted by applicable law, such Lender shall not assert any right or claim to the Erroneous Payment, and hereby waives, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payments received, including without limitation waiver of any defense based on "discharge for value" or any similar theory or doctrine.  Each Lender agrees that, in each such case, it shall promptly (and, in all events, within one Business Day of its knowledge (or deemed knowledge) of such error) notify the Administrative Agent of such occurrence and, upon demand from the Administrative Agent, it shall promptly, but in all events no later than one Business Day thereafter, return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds (in the currency so received), together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Lender to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds

Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(c)     The Borrower and each other Loan Party hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Lender that has received such Erroneous Payment (or portion thereof) for any reason (and without limiting the Administrative Agent's rights and remedies under this Section 9.12), the Administrative Agent shall be subrogated to all the rights of such Lender with respect to such amount and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Borrower or any other Loan Party.

(d)     In addition to any rights and remedies of the Administrative Agent provided by law, Administrative Agent shall have the right, without prior notice to any Lender, any such notice being expressly waived by such Lender to the extent permitted by applicable law, with respect to any Erroneous Payment for which a demand has been made in accordance with this Section 9.12 and which has not been returned to the Administrative Agent, to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but excluding trust accounts), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Administrative Agent or any of its Affiliate, branch or agency thereof to or for the credit or the account of such Lender. Administrative Agent agrees promptly to notify the Lender after any such setoff and application made by Administrative Agent; provided, that the failure to give such notice shall not affect the validity of such setoff and application.

(e)     Each party's obligations under this Section 9.12 shall survive the resignation or replacement of the Administrative Agent, the termination of the New Money DIP Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

Section 9.13     No Fiduciary Relationship.  Without limiting the foregoing, none of the Lenders or other Persons so identified shall have or be deemed to have any fiduciary relationship with any other Lender.  Each Lender acknowledges that it has not relied, and will not rely, on any of the Lenders or other Persons so identified in deciding to enter into this Agreement or in taking or not taking action hereunder.

Section 9.14     Appointment of Supplemental Administrative Agents.  (a) It is the purpose of this Agreement and the other Loan Documents that there shall be no violation of any Law of any jurisdiction denying or restricting the right of banking corporations or associations to transact business as agent or trustee in such jurisdiction.  It is recognized that in case of litigation under this Agreement or any of the other Loan Documents, and in particular in case of the enforcement of any of the Loan Documents, or in case the Administrative Agent deems that by reason of any present or future Law of any jurisdiction it may not exercise any of the rights, powers or remedies granted herein or in any of the other Loan Documents or take any other action which may be desirable or necessary in connection therewith, the Administrative Agent is hereby authorized to appoint an additional individual or institution selected by the Administrative Agent in its sole discretion as a separate trustee, co-trustee, administrative agent, collateral agent,

-119-

administrative sub-agent or administrative co-agent (any such additional individual or institution being referred to herein individually as a "Supplemental Administrative Agent" and collectively as "Supplemental Administrative Agents").

(b)     In the event that the Administrative Agent appoints a Supplemental Administrative Agent with respect to any Collateral, (i) each and every right, power, privilege or duty expressed or intended by this Agreement or any of the other Loan Documents to be exercised by or vested in or conveyed to the Administrative Agent with respect to such Collateral shall be exercisable by and vest in such Supplemental Administrative Agent to the extent, and only to the extent, necessary to enable such Supplemental Administrative Agent to exercise such rights, powers and privileges with respect to such Collateral and to perform such duties with respect to such Collateral, and every covenant and obligation contained in the Loan Documents and necessary to the exercise or performance thereof by such Supplemental Administrative Agent shall run to and be enforceable by either the Administrative Agent or such Supplemental Administrative Agent, and (ii) the provisions of this Article IX and of Sections 10.04 and 10.05 (obligating the Borrower to pay the Administrative Agent's expenses and to indemnify the Administrative Agent) that refer to the Administrative Agent shall inure to the benefit of such Supplemental Administrative Agent and all references therein to the Administrative Agent shall be deemed to be references to the Administrative Agent and/or such Supplemental Administrative Agent, as the context may require.

(c)     Should any instrument in writing from the Borrower, Holdings or any other Loan Party be reasonably required by any Supplemental Administrative Agent so appointed by the Administrative Agent for more fully and certainly vesting in and confirming to him or it such rights, powers, privileges and duties, the Borrower or Holdings, as applicable, shall, or shall cause such Loan Party to, execute, acknowledge and deliver any and all such instruments promptly upon reasonable request by the Administrative Agent or the Required Lenders.   In case any Supplemental Administrative Agent, or a successor thereto, shall die, become incapable of acting, resign or be removed, all the rights, powers, privileges and duties of such Supplemental Administrative Agent, to the extent permitted by Law, shall vest in and be exercised by the Administrative Agent until the appointment of a new Supplemental Administrative Agent.

Section 9.15     Certain ERISA Matters.  (a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto to, and (y) covenants, from the date such Person became a Lender party hereto until the date such Person ceases to be a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Term Loans or New Money DIP Commitments,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions

-120-

involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the New Money DIP Commitments and this Agreement,

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate and perform the Term Loans, the New Money DIP Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Term Loans, the New Money DIP Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the New Money DIP Commitments and this Agreement, or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)    none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related to hereto or thereto),

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Term Loans, the New Money DIP Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E), (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Term Loans, the New Money DIP Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Term Loans, the New Money DIP Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied

-121-

with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the New Money DIP Commitments and this Agreement, or

(iii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Term Loans, the New Money DIP Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the Obligations),

(iv)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Term Loans, the New Money DIP Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Term Loans, the New Money DIP Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)     no fee or other compensation is being paid directly to the Administrative Agent or any of its Affiliates for investment advice (as opposed to other services) in connection with the Term Loans, the New Money DIP Commitments or this Agreement.

(c)     The Administrative Agent hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person may have a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Term Loans, the New Money DIP Commitments and this Agreement, (ii) may recognize a gain if it extended the Term Loans or the New Money DIP Commitments for an amount less than the amount being paid for an interest in the Term Loans or the New Money DIP Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

For purposes of this Section 9.15, the following definitions apply to each of the capitalized terms below:

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

Section 9.16     Credit Bidding.  The Secured Parties hereby irrevocably authorize the Administrative Agent, at the direction of the Required Lenders, to credit bid all or any portion of

-122-

the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including under Sections 363, 1123 or 1129 of the Bankruptcy Code of the United States, or any similar Laws in any other jurisdictions to which a Loan Party is subject and/or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Administrative Agent (whether by judicial action or otherwise) in accordance with any applicable Law. In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase). In connection with any such bid (i) the Administrative Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 10.01 of this Agreement), (iii) the Administrative Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle *pro rata* by the Lenders, as a result of which each of the Lenders shall be deemed to have received a *pro rata* portion of any Equity Interests or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any Secured Party or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders *pro rata* and the Equity Interests or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be canceled, without the need for any Secured Party or any acquisition vehicle to take any further action.)

# ARTICLE X
## Miscellaneous

Section 10.01    Amendments, Etc.    Except as otherwise expressly set forth in this Agreement, no amendment, waiver or consent of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower (or the applicable Loan Party), and delivered to the Administrative Agent (other than with respect to any other amendment or waiver contemplated in clauses (a) through (g) below, which shall only require the consent of the Lenders expressly described below rather than the Required Lenders),

-123-

and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *however*, that no such amendment, waiver or consent shall:

(a)     extend or increase the New Money DIP Commitment of any Lender, or reinstate the New Money DIP Commitment of any Lender after the termination of such New Money DIP Commitment pursuant to Section 8.02, in each case without the written consent of each Lender directly and adversely affected thereby (it being understood that a waiver of (or the amendments to the terms of) any condition precedent set forth in Section 4.02 or the waiver of (or the amendments to the terms of) any Default, mandatory prepayment or mandatory reduction of the New Money DIP Commitments shall not constitute an extension or increase of any New Money DIP Commitment of any Lender);

(b)     postpone any date scheduled for any payment of principal of, or interest on, any Term Loan, or any fees or other premium payable hereunder, without the written consent of each Lender directly and adversely affected thereby, it being understood that the waiver of any obligation to pay interest at the Default Rate, and the amendment or waiver of any mandatory prepayment of Term Loans under any Term Facility (or any component in calculation of the amount of such prepayment) shall not constitute a postponement of any date scheduled for the payment of principal, interest or fees;

(c)     reduce the principal of, or the rate of interest specified herein on, any Term Loan, or (subject to clause (iii) of the proviso following clause (h) below) any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly and adversely affected thereby; *provided*, *however*, that only the consent of the Required Lenders shall be necessary to amend the definition of "Default Rate" or to waive any obligation to pay interest at the Default Rate;

(d)     modify Section 2.06(c), 2.13 or 8.04 without the written consent of each Lender directly and adversely affected thereby;

(e)     change any provision of this Section 10.01, or the definition of Required Lenders, or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or to make any determination or grant any consent hereunder without the written consent of each Lender;

(f)     other than in a transaction permitted under Section 7.04 or 7.05 (and except in connection with a "credit bid" undertaken by the Administrative Agent at the direction of the Required Lenders pursuant to section 363(k), section 1129(b)(2)(a)(ii) or any other section of the Bankruptcy Code or any other sale or other disposition of assets in connection with other Debtor Relief Laws or an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents), release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender;

(g)     other than in a transaction permitted under Section 7.04 or 7.05 (and except in connection with a "credit bid" undertaken by the Administrative Agent at the direction of the Required Lenders pursuant to section 363(k), section 1129(b)(2)(a)(ii) or any other section of the Bankruptcy Code or any other sale or other disposition of assets in connection with other Debtor

-124-

Relief Laws or an enforcement action with respect to the Collateral permitted pursuant to the Loan Documents), release all or substantially all of the value of the aggregate Guaranty, without the written consent of each Lender; or

(h)        except as provided by operation of law and otherwise permitted hereunder, amend or modify the Superpriority Claims status of the Obligations under the DIP Orders or under any Loan Document, without the written consent of each Lender;

*provided*, *further*, that (i) [reserved]; (ii) [reserved]; (iii) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent, in its capacity as such, in addition to the Borrower and the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent under this Agreement or any other Loan Document; (iv) Section 10.07(g) may not be amended, waived or otherwise modified without the consent of each Granting Lender all or any part of whose Term Loans are being funded by an SPC at the time of such amendment, waiver or other modification and (v) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto.

Notwithstanding anything else to the contrary contained in this Section 10.01, if the Required Lenders and the Borrower shall have jointly identified an obvious error or any error, omission or defect of a technical nature, in each case, in any provision of the Loan Documents, then the Administrative Agent (acting at the direction of the Required Lenders) and the Borrower shall be permitted to amend such provision.

Section 10.02    Notices; Electronic Communications.  (a) General.  Unless otherwise expressly provided herein, all notices and other communications provided for herein shall be in writing (including by facsimile transmission or electronic mail) and shall be mailed, faxed, emailed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone or electronic mail shall be made to the applicable telephone number or electronic mail address, as the case may be, as follows:

(i)        if to the Borrower, the Administrative Agent, to the address, fax number, electronic mail address or telephone number specified for such Person on Schedule 10.02 or to such other address, fax number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties hereto, as provided in Section 10.02(d); and

(ii)        if to any other Lender, to the address, fax number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by fax shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).   Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

-125-

(b)     Electronic Communications.   Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender, as applicable, has notified the Administrative Agent that it is incapable of receiving, or is unwilling to receive, notices under such Article II by electronic communication.   The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes (with the Borrower's consent), (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Platform.   THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT-RELATED PERSONS DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS.   NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT-RELATED PERSON IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.   In no event shall any Agent-Related Person have any liability to Holdings, the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of such Agent-Related Person; *provided*, *however*, that in no event shall any Agent-Related Person have any liability to Holdings, the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)     Change of Address, Etc.   Each of Holdings, the Borrower and the Administrative Agent may change its address, fax, telephone number or electronic mail address for notices and other communications hereunder by notice to the other parties hereto.   Each other Lender may change its address, fax, telephone number or electronic mail address for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.   In

-126-

addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrower or its securities for purposes of United States federal or state securities laws.

(e)    Reliance by Administrative Agent and Lenders.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic notices) purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower to the extent required by Section 10.05.    All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 10.03    No Waiver; Cumulative Remedies; Enforcement.  No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges provided hereunder and under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

Section 10.04    Expenses.  The Borrower agrees to pay (i) all reasonable and documented out-of-pocket costs and expenses for the Administrative Agent or any Lender or the Lender Advisors incurred by any Agent, the Lenders and any of their respective Affiliates, in connection with the structuring, documentation, negotiation, arrangement and syndication of the credit facilities provided for herein and any credit or similar facility refinancing, extending or replacing, in whole or in part, the credit facilities provided herein, including the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) or any other document or matter requested by the Borrower or any other Loan Party (in the case of Ankura, in accordance with the Loan Parties' engagement letter therewith), (ii) all reasonable and documented out-of-pocket costs and expenses of creating, perfecting, recording, maintaining and preserving Liens in favor of the Administrative Agent for the benefit of the Secured Parties, including filing and

-127-

recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and other charges of counsel to the Administrative Agent and of counsel providing any opinions that the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) may reasonably request in respect of the Collateral or the Liens created pursuant to the Collateral Documents and (iii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel or other advisor for the Administrative Agent or any Lender, including the Lender Advisors) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 10.04, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans; provided that the Loan Parties shall not be required to (I) reimburse the legal fees and expenses of more than (x) one outside counsel (in addition to one local counsel in each relevant material jurisdiction) for the Agents and their Related Parties, taken as a whole and (y) one outside counsel (in addition to one local counsel in each relevant material jurisdiction) for the Lenders and their Related Parties, taken as a whole, or, in the case of an actual or potential conflict of interest, of one additional counsel to the affected Lenders to the extent such Lenders are similarly situated or (II) pay fees or expenses of any financial advisor to the Agents or Lenders, other than those of Ankura or any other financial advisor retained by the Required Lenders (or any Co-Administrative Agent at the direction of the Required Lenders).

Section 10.05     Indemnification by the Borrower.  The Borrower agrees to indemnify the Agents, each Lender and each of their respective Related Parties (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, all reasonable out-of-pocket costs and any and all losses, claims, damages, liabilities, fees, fines, penalties, actions, judgments, suits and related expenses, including reasonable and documented fees, charges and disbursements, incurred by, imposed on or asserted against any Indemnitee, directly or indirectly, arising out of, in any way connected with, or as a result of (i) the execution, delivery, performance, administration or enforcement of the Loan Documents or any agreement or instrument contemplated thereby or the performance by the parties thereto of their respective obligations thereunder, (ii) any actual or proposed use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto, (iv) any actual or alleged presence or Release or threatened Release of Hazardous Materials, on, at, under or from any property owned, leased or operated by any Loan Party at any time, or any Environmental Claim or threatened Environmental Claim related in any way to any Loan Party, (v) any past, present or future non-compliance with, or violation of, Environmental Laws or Environmental Permits applicable to any Loan Party, or any Loan Party's business, or any property presently or formerly owned, leased, or operated by any Loan Party or their predecessors in interest, (vi) the environmental condition of any property owned, leased, or operated by any Loan Party at any time, or the applicability of any Legal Requirements relating to such property, whether or not occasioned wholly or in part by any condition, accident or event caused by any act or omission of any Loan Party, (vii) the imposition of any environmental Lien encumbering any Real Property, (viii) the consummation of the transactions contemplated hereby or (ix) any actual or prospective action, claim, suit, litigation, investigation, inquiry or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party or otherwise, and regardless of whether any Indemnitee is a party thereto (all of the foregoing, collectively, the "Indemnified Liabilities"); provided that (A) such indemnity shall not, as to any

-128-

Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee and (B) legal fees and expenses of counsel constituting Indemnified Liabilities shall be limited to one outside counsel (in addition to one local counsel in each relevant material jurisdiction) for the Agents and their Related Parties, taken as a whole and (y) one outside counsel (in addition to one local counsel in each relevant material jurisdiction) for all other Indemnitees, taken as a whole, or, in the case of an actual or potential conflict of interest, of one additional counsel to the affected Indemnitees to the extent such Indemnitees are similarly situated.

The provisions of Sections 10.04 and 10.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of the Loans, and any other Secured Obligations, the release of any Guarantor or of all or any portion of the Collateral, the expiration of the New Money DIP Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Agents, the or any Lender.  All amounts due under this Sections 10.04 and 10.05 shall be accompanied by reasonable documentation with respect to any reimbursement, indemnification or other amount requested.

To the fullest extent permitted by applicable Legal Requirements, no Loan Party shall assert, and each Loan Party hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, exemplary, consequential, or punitive damages (including any loss of profits, business or anticipated savings) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, or the use of the proceeds thereof.  No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with the Loan Documents or the transactions contemplated hereby or thereby.

All amounts due under Sections 10.04 or 10.05 shall be payable not later than 10 days after demand therefor.

The agreements in this Sections 10.04 and 10.05 shall survive the resignation of the Administrative Agent, the replacement of any Lender, the termination of the New Money DIP Commitments and the repayment, satisfaction or discharge of all the other Obligations.

Section 10.06    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the applicable Agent upon demand its applicable share (without duplication) of any amount so

recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

Section 10.07    Successors and Assigns.  (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may sell, assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of Section 10.07(b), (ii) by way of participation in accordance with the provisions of Section 10.07(d), (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 10.07(f) or (iv) to an SPC in accordance with the provisions of Section 10.07(g).  Any attempted or purported sale, assignment or other transfer by any party hereto of its rights and obligations in contravention of this Section 10.07 shall be null and void.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 10.07(d) and, to the extent expressly contemplated hereby, the Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Subject to the limitations specified in clause (a) above and in this clause (b), any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its New Money DIP Commitment(s) and the Term Loans at the time owing to it); *provided* that:

(i)    (A) in the case of an assignment of the entire remaining amount of the assigning Lender's New Money DIP Commitment and the Term Loans at the time owing to it, no minimum amount shall need be assigned, and (B) in any case not described in clause (b)(i)(A) of this Section 10.07, the aggregate amount of the New Money DIP Commitment (which for this purpose includes Term Loans outstanding thereunder) or, if the applicable New Money DIP Commitment is not then in effect, the outstanding principal balance of the Term Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent shall not be less than $500,000 unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld, delayed or conditioned); *provided*, *however*, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single Eligible Assignee (or to an Eligible Assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met;

(ii)    each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Term Loans or the New Money DIP Commitment assigned;

(iii)    no consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section 10.07 and, in addition (A) the consent of the

-130-

Borrower (such consent not to be unreasonably withheld, delayed or conditioned) shall be required for any assignment unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender, an Approved Fund or a Person who is party to the Restructuring Support Agreement; and (B) the consent of the Administrative Agent (such consent not to be unreasonably withheld, delayed or conditioned) shall be required for any assignment unless such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund;

(iv)    the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), together with a processing and recordation fee of $3,500 (except, (x) in the case of contemporaneous assignments by any Lender to one or more Approved Funds, only a single processing and recording fee shall be payable for such assignments and (y) the Administrative Agent, in its sole discretion, may elect to waive such processing and recording fee in the case of any assignment) and all "know your customer" documentation reasonably requested by the Administrative Agent;

(v)    the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in a form approved by the Administrative Agent and applicable tax forms;

(vi)    no such assignment shall be made (A) to any Defaulting Agent or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (A), (B) to any natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person), (C) to any Loan Party or any Affiliate thereof or (D) to any Disqualified Lender (solely to the extent the list of Disqualified Lenders has been made available to all Lenders);

(vii)    [reserved];

(viii)    the assigning Lender shall deliver any Term Notes or, in lieu thereof, a lost note affidavit and indemnity reasonably acceptable to the Borrower evidencing such Term Loans to the Borrower or the Administrative Agent; and

(ix)    [reserved].

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 10.07(c), from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits (and subject to the obligations) of a Lender under Sections 3.01, 3.04, 3.05, 10.04 and 10.05 with respect to facts and circumstances occurring prior to the effective date

-131-

of such assignment, and to be subject to the obligations set forth in Section 10.08 and 10.16). Upon request, and the surrender by the assigning Lender of its Note, the Borrower (at its expense) shall execute and deliver a Term Note to the assignee Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this clause (b) or Section 3.07(b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 10.07(d).

(c)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the New Money DIP Commitments of, and principal amounts (and related interest amounts) and currencies of the Term Loans, owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrower, the Agents and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, any Agent and any Lender (solely with respect to such Lender's own interests only), at any reasonable time and from time to time upon reasonable prior written notice.

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural person), any Loan Party or any Affiliate thereof or any Person that the Administrative Agent has identified in a notice to the Lenders as a Disqualified Lender (Competitor) (solely to the extent the list of Disqualified Lenders has been made available to all Lenders)) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its New Money DIP Commitment and/or the Term Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) for the avoidance of doubt, the Administrative Agent shall have no oversight or responsibility of any kind for ensuring that the Lenders do not sell participations in violation of the foregoing provisions of this Section 10.07(d). Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and the other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in clauses (a), (b), (c), (f) or (g) of the first proviso to Section 10.01 that directly affects such Participant. Subject to Section 10.07(e), the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and Section 10.16) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 10.07(b).

(e)     A Participant shall not be entitled to receive (and no Loan Party shall be required to make) any greater payment under Section 3.01, 3.04 or 3.05 than the applicable Lender

-132-

would have been entitled to receive with respect to the participation sold to such Participant, except to the extent that such entitlement to receive a greater payment results from a change in or in the interpretation of any Law that occurs after the Participant acquired the applicable participation.

(f)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Term Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender; *provided* that no such pledge or assignment, and no foreclosure or other enforcement action in respect thereof, shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower (an "SPC") the option to provide all or any part of any Term Loan that such Granting Lender would otherwise be obligated to make pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPC to fund any Term Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to make all or any part of such Term Loan, the Granting Lender shall be obligated to make such Term Loan pursuant to the terms hereof or, if it fails to do so, to make such payment to the Administrative Agent as is required under Section 2.12(b)(ii). Each party hereto hereby agrees that an SPC shall be entitled to the benefits of Sections 3.01, 3.04 and 3.05 (subject to the requirements and the limitations of such Sections and the obligations to provide the forms and certifications pursuant to Section 10.16 as if it were a Lender); *provided* that neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of the Borrower under this Agreement (including under Section 3.01, 3.04 or 3.05). Each party hereto further agrees that (i) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement for which a Lender would be liable, and (ii) the Granting Lender shall for all purposes, including the approval of any amendment, waiver or other modification of any provision of any Loan Document, remain the Lender of record hereunder. Other than as expressly provided in this Section 10.07(g), (A) such Granting Lender's obligations under this Agreement shall remain unchanged, (B) such Granting Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Agents and the other Lenders shall continue to deal solely and directly with such Granting Lender in connection with such Granting Lender's rights and obligations under this Agreement. The making of a Term Loan by an SPC hereunder shall utilize the New Money DIP Commitment of the Granting Lender to the same extent, and as if, such Term Loan were made by such Granting Lender. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior debt of any SPC, it will not, other than in respect of matters unrelated to this Agreement or the transactions contemplated hereby, institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency, or liquidation proceeding under the laws of the United States or any State thereof. Notwithstanding anything to the contrary contained herein, any SPC may (i) with notice to, but without prior consent of the Borrower and the Administrative Agent and with the payment of a processing fee of $3,500, assign all or any portion of its rights hereunder with respect to any

-133-

Term Loan to the Granting Lender and (ii) subject to <u>Section 10.08</u>, disclose on a confidential basis any non-public information relating to its funding of Term Loans to any rating agency, commercial paper dealer or provider of any surety or Guarantee or credit or liquidity enhancement to such SPC.

(h)     Notwithstanding anything to the contrary contained herein, any Lender that is a Fund may create a security interest in all or any portion of the Term Loans owing to it and the Term Note, if any, held by it to the trustee for holders of obligations owed, or securities issued, by such Fund as security for such obligations or securities; *provided* that unless and until such trustee actually becomes a Lender in compliance with the other provisions of this <u>Section 10.07</u>, (i) no such pledge shall release the pledging Lender from any of its obligations under the Loan Documents, and (ii) such trustee shall not be entitled to exercise any of the rights of a Lender under the Loan Documents even though such trustee may have acquired ownership rights with respect to the pledged interest through foreclosure or otherwise.

(i)     [Reserved].

(j)     [Reserved].

(k)     [Reserved].

(l)     The applicable Lender, acting solely for this purpose as a non-fiduciary agent of the Borrower, shall maintain a register on which it enters the name and address of (i) each SPC (other than any SPC that is treated as a disregarded entity of the Granting Lender for U.S. federal income tax purposes) that has exercised its option pursuant to <u>Section 10.07(g)</u> and (ii) each Participant, and the amount of each such SPC's and Participant's interest in such Lender's rights and/or obligations under this Agreement (the "<u>Participant Register</u>"); *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of the applicable rights and/or obligations of such Lender under this Agreement.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

Section 10.08     <u>Confidentiality</u>.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' and Approved Funds' directors, officers, employees, investors and potential investors, agents, advisors and other representatives, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof and the Administrative Agent or such Lender will be responsible for their compliance herewith), (b) to the extent requested by any regulatory authority or any quasi-regulatory authority (such as the National Association of

Insurance Commissioners) (in which case such Agents or Lender, as applicable, agrees (except with respect to any audit or examination conducted by bank accountants or any governmental bank regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law, to inform the Borrower promptly thereof prior to disclosure), (c) to the extent required by applicable Legal Requirements or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies under the Loan Documents or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder (in which case, the Borrower is notified in advance of such disclosure, to the extent permitted by law), (f) subject to an agreement containing provisions substantially the same as those of this Section 10.08, to (i) any assignee of or Participant in, or any prospective permitted assignee of or permitted Participant in, any of its loans and commitments under this Agreement, (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to Borrower and its obligations, (iii) any actual or prospective investor in an SPC or (iv) any rating agency for the purpose of obtaining a credit rating applicable to any Loan or Loan Party, (g) with the written consent of Borrower, (h) to any assignee or pledgee under Section 10.07(f) or to any other party to this Agreement, or (i) to the extent such Information (i) is publicly available at the time of disclosure or becomes publicly available other than as a result of a breach of this Section 10.08 or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source that is not, to the Administrative Agent's or such Lender's knowledge, subject to contractual or fiduciary contractual obligations owing to any Loan Party, other than Borrower or any Subsidiary.  In addition, the Agents and the Lenders may disclose the existence of the Loan Documents and information about the Loan Documents to market data collectors, similar service providers to the financing community, and service providers to the Agents and the Lenders.  For the purposes of this Section 10.08, "Information" shall mean all information received from or on behalf of any Loan Party or any Subsidiary thereof relating to any Loan Party or any Subsidiary thereof, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Borrower from a source that is not, to the Administrative Agent's or such Lender's knowledge, subject to contractual or fiduciary contractual obligations owing to any Loan Party.  Any Person required to maintain the confidentiality of Information as provided in this Section 10.08 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.  Notwithstanding any other provision of this Agreement, any other Loan Document or any Assignment and Assumption, the provisions of this Section 10.08 shall survive with respect to the Administrative Agent and each Lender until the second anniversary of such Administrative Agent or Lender ceasing to be an Administrative Agent or Lender, respectively.

Section 10.09    Setoff.  In addition to any rights and remedies of the Lenders provided by Law, upon the occurrence and during the continuance of any Event of Default, each Secured Party is authorized at any time and from time to time without prior notice to the Borrower or any other Loan Party, any such notice being waived by the Borrower (on its own behalf and on behalf of each Loan Party) to the fullest extent permitted by Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final), other than deposits in fiduciary accounts as to which a Loan Party is acting as fiduciary for another Person who is not a Loan Party, at any time held by, and other Indebtedness at any time owing by, such Lender to or for the credit or the account of the respective Loan Parties against any and all Obligations owing to such Secured Party

hereunder or under any other Loan Document, now or hereafter existing, irrespective of whether or not such Agent or such Lender shall have made demand under this Agreement or any other Loan Document and although such Obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit or Indebtedness. Each Secured Party agrees promptly to notify the Borrower and the Administrative Agent after any such set-off and application made by such Secured Party; *provided*, *however*, that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Administrative Agent and each Secured Party under this Section 10.09 are in addition to other rights and remedies (including other rights of setoff) that the Administrative Agent and such Secured Party may have. Notwithstanding the foregoing, no Participant shall have any rights of setoff under this Section 10.09 or otherwise.

Section 10.10    [Reserved].

Section 10.11    Interest Rate Limitation.    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If any Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Term Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged, or received by an Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

Section 10.12    Counterparts.    This Agreement and each other Loan Document may be executed in one or more counterparts (and by different parties hereto in different counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Delivery by fax or other electronic transmission of an executed counterpart of a signature page to this Agreement and each other Loan Document shall be effective as delivery of an original executed counterpart of this Agreement and such other Loan Document. The Agents may also require that any such documents and signatures delivered by fax or other electronic transmission be confirmed by a manually-signed original thereof; *provided* that the failure to request or deliver the same shall not limit the effectiveness of any document or signature delivered by fax or other electronic transmission.

Section 10.13    Integration; Effectiveness.    This Agreement and the other Loan Documents, and those provisions of the Fee Letter that, by their terms, survive the termination or expiration of the Fee Letter, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. It is expressly agreed and confirmed by the parties hereto that the provisions of the Fee Letter shall survive the execution and delivery of this Agreement, the occurrence of the Closing Date, and shall continue in effect thereafter in accordance with their terms. In the event of any conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control; *provided* that the inclusion of supplemental rights or remedies in favor of the Agents or the Lenders in any other Loan

-136-

Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof. Without limiting Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.

Section 10.14    Survival of Representations and Warranties.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by each Agent and each Lender, regardless of any investigation made by any Agent or any Lender or on their behalf and notwithstanding that any Agent or any Lender may have had notice or knowledge of any Default at the time of any Term Borrowing or Withdrawal from the Funding Account, and shall continue in full force and effect as long as any Term Loan or any other Obligation (other than contingent indemnification or other obligations as to which no claim has been asserted) hereunder shall remain unpaid or unsatisfied.

Section 10.15    Severability.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.15, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Agents shall be limited by Debtor Relief Laws, then such provisions shall be deemed to be in effect only to the extent not so limited.

Section 10.16    Tax Forms.  (a) Each Lender and Agent shall deliver to the Borrower and the Administrative Agent, when reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation and information as will permit payments hereunder to be made without withholding, and/or as will permit the Borrower and the Administrative Agent to determine the applicable rate of withholding and whether such Lender or Agent is subject to information reporting.  Notwithstanding the foregoing, the completion, execution and submission of such documentation (other than such documentation set forth in Section 10.16(b) and (c) below) shall not be required to be delivered by the Lender if in such Lender's reasonable and good faith judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(b)    (i) Without limiting the generality of the foregoing, subject to Section 10.16(b)(ii), each Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "Foreign Lender") shall deliver to the Borrower and the Administrative Agent, on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent whichever of the following is applicable, (x) two (2) duly signed, properly completed copies of either IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or any successor thereto (relating to such Foreign Lender and entitling it to an exemption from, or

-137-

reduction of, United States withholding tax on all payments to be made to such Foreign Lender by the Borrower or any other Loan Party pursuant to this Agreement or any other Loan Document), (y) IRS Form W-8ECI or any successor thereto (relating to all payments to be made to such Foreign Lender by the Borrower or any other Loan Party pursuant to this Agreement or any other Loan Document) or (z) two (2) duly signed, properly completed copies of IRS Form W-8BEN or Form W-8BEN-E, as applicable, or any successor thereto and a certificate that establishes in writing to the Borrower and the Administrative Agent that such Foreign Lender is not (i) a "bank" within the meaning of Section 881(c)(3)(A) of the Code, (ii) a "10 percent shareholder" of any Borrower within the meaning of Section 871(h)(3)(B) of the Code or (iii) a CFC related to any Borrower as described in Section 881(c)(3)(C) of the Code.  Thereafter and from time to time, each such Foreign Lender shall promptly submit to the Borrower and the Administrative Agent such additional duly completed and signed copies of one or more of such forms and/or certificates (or such successor forms or certificates as shall be adopted from time to time by the relevant Governmental Authority or such other evidence as is satisfactory to the Borrower and the Administrative Agent (in either case, in its sole discretion)) as may then be presented by then current United States laws and regulations to avoid or reduce, United States withholding taxes in respect of all payments to be made to such Foreign Lender by the Borrower or other Loan Party pursuant to this Agreement, or any other Loan Document, in each case, (1) on or before the date that any such form, certificate or other evidence expires or becomes obsolete, (2) after the occurrence of any event requiring a change in the most recent form, certificate or other evidence previously delivered by it to the Borrower and the Administrative Agent (including, for the avoidance of doubt, due to a designation of a new Lending Office) and (3) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

          (ii)      Each Foreign Lender, to the extent it does not act or ceases to act for its own account with respect to any portion of any sums paid or payable to such Foreign Lender under any of the Loan Documents, shall deliver to the Borrower and the Administrative Agent on the date when such Foreign Lender ceases to act for its own account with respect to any portion, if any, of any such sums paid or payable, and at such other times as prescribed by the last sentence of Section 10.16(a) or as may be necessary in the determination of the Borrower or the Administrative Agent (in either case, in the reasonable exercise of its discretion), two (2) duly signed, properly completed, copies of IRS Form W-8IMY (or any successor thereto), together with all required supporting documentation, and any other certificate or statement of exemption or reduction required under the Law, to establish that such Foreign Lender is not acting for its own account with respect to a portion of any such sums payable to such Foreign Lender.

          (iii)     The Administrative Agent may deduct and withhold any Taxes required by any Laws to be deducted and withheld from any payment under any of the Loan Documents.

          (c)      Each Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code (each, a "U.S. Lender") shall deliver to the Administrative Agent and the Borrower (or in the case of a Participant or SPC, to the relevant Lender) two (2) duly signed, properly completed, copies of IRS Form W-9 (or any successor form) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement, including, for the avoidance of doubt, by means of an assignment on the date it becomes a Participant) and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent, certifying that

such U.S. Lender is entitled to an exemption from United States backup withholding. If such U.S. Lender fails to deliver such forms, then the Administrative Agent and/or the Borrower may withhold from any payment to such U.S. Lender an amount equivalent to the applicable backup withholding imposed by the Code.

(d)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes and Other Taxes attributable to such Lender (but only to the extent any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes or Other Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.07(l) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)     Each Agent shall deliver to the Borrower two duly signed, properly completed, copies of IRS Form W-9 (or any successor form) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement) and from time to time thereafter upon the reasonable request of the Borrower, certifying that such Agent is entitled to an exemption from United States backup withholding. Thereafter and from time to time, each such Agent shall promptly submit to the Borrower an updated IRS Form W-9 (or successor form), in each case, (1) on or before the date that any such previously delivered form expires or becomes obsolete, (2) after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower and (3) from time to time thereafter if reasonably requested by the Borrower.

The obligation of the Foreign Lenders or U.S. Lenders, severally, under this Section 10.16 shall survive the termination of the Aggregate New Money DIP Commitments, repayments of all other Obligations hereunder and the resignation of the Administrative Agent.

Notwithstanding any other provision of this Section 10.16, a Lender shall not be required to deliver any form that such Lender is not legally able to deliver.

Section 10.17     Governing Law; Jurisdiction; Etc.   (a) GOVERNING LAW.   THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)     SUBMISSION TO JURISDICTION. SUBMISSION TO JURISDICTION. EACH LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR

ABSTAINS FROM JURISDICTION, THE SUPREME COURT OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM JURISDICTION, SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, IN SUCH FEDERAL COURT. EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE LEGAL REQUIREMENTS.   NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR OTHERWISE SHALL AFFECT ANY RIGHT THAT THE ADMINISTRATIVE AGENT, ANY OTHER AGENT OR ANY LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AGAINST ANY LOAN PARTY OR ITS PROPERTIES IN THE COURTS OF ANY JURISDICTION, AND HEREBY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT.

(c)     WAIVER OF VENUE.  EACH PARTY HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN SECTION 10.17(B).  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)     SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

Section 10.18     WAIVER OF RIGHT TO TRIAL BY JURY.  **EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION ARISING UNDER ANY LOAN DOCUMENT OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO ANY LOAN DOCUMENT, OR THE TRANSACTIONS RELATED THERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER FOUNDED IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND,**

-140-

**ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS <u>SECTION 10.18</u> WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE SIGNATORIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

Section 10.19    <u>Binding Effect</u>.  When this Agreement shall have become effective in accordance with <u>Section 10.13</u>, it shall thereafter be binding upon and inure to the benefit of the Borrower, each Agent and each Lender and their respective successors and permitted assigns; *provided* that, the Borrower shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of the Administrative Agent and each Lender.

Section 10.20    <u>No Advisory or Fiduciary Responsibility</u>.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), the Borrower and Holdings acknowledge and agree, and each of them acknowledges and agrees that it has informed its other Affiliates, that: (i) (A) no fiduciary, advisory or agency relationship between any of Holdings, the Borrower and its Subsidiaries and any Agent is intended to be or has been created in respect of any of the transactions contemplated hereby and by the other Loan Documents, irrespective of whether any Agent has advised or is advising Holdings, the Borrower and its Subsidiaries on other matters, (B) the arranging and other services regarding this Agreement provided by the Agents are arm's-length commercial transactions between Holdings, the Borrower and its Subsidiaries, on the one hand, and the Agents, on the other hand, (C) each of Holdings and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (D) each of Holdings and the Borrower is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each Agent is and has been acting solely as a principal and, except as may otherwise be expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for Holdings or any of its Affiliates, or any other Person and (B) no Agent has any obligation to Holdings or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Agents and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Holdings and its Affiliates, and no Agent has any obligation to disclose any of such interests and transactions to Holdings or any of its Affiliates.  To the fullest extent permitted by law, each of Holdings and the Borrower hereby waives and releases any claims that it may have against the Agents with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

Section 10.21    <u>Affiliate Activities</u>.  Each of the Borrower and Holdings acknowledges that each Agent and each Lender (and their respective Affiliates) is a full service securities firm engaged, either directly or through affiliates, in various activities, including securities trading, investment banking and financial advisory, investment management, principal investment, hedging, financing and brokerage activities and financial planning and benefits counseling for both companies and individuals.  In the ordinary course of these activities, any of them may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and/or financial instruments (including bank loans) for their own account and for the

-141-

accounts of customers and may at any time hold long and short positions in such securities and/or instruments.  Such investment and other activities may involve securities and instruments of Holdings and its Affiliates, as well as of other entities and persons and their Affiliates which may (i) be involved in transactions arising from or relating to the transactions contemplated hereby and by the other Loan Documents, (ii) be customers or competitors of Holdings and its Affiliates or (iii) have other relationships with Holdings and its Affiliates.  In addition, it may provide investment banking, underwriting and financial advisory services to such other entities and persons.  It may also co-invest with, make direct investments in, and invest or co-invest client monies in or with funds or other investment vehicles managed by other parties, and such funds or other investment vehicles may trade or make investments in securities of Holdings and its Affiliates or such other entities.  The transactions contemplated hereby and by the other Loan Documents may have a direct or indirect impact on the investments, securities or instruments referred to in this Section 10.21.

Section 10.22    Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Loan Party, without the prior written consent of the Administrative Agent (which shall not be withheld in contravention of Section 9.04).  The provision of this Section 10.22 is for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party.

Section 10.23    Electronic Execution of Assignments and Certain Other Documents.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.24    PATRIOT Act.  Each Lender that is subject to the PATRIOT Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act.  The Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

Section 10.25    [Reserved.].

Section 10.26    <u>Judgment Currency</u>.

(a)    The Borrower's obligations hereunder and under the other Loan Documents to make payments Dollars (pursuant to such obligation, the "<u>Obligation Currency</u>") shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any currency other than the Obligation Currency, except to the extent that such tender or recovery results in the effective receipt by the Administrative Agent or the respective Lender of the full amount of the Obligation Currency expressed to be payable to the Administrative Agent or such Lender under this Agreement or the other Loan Documents.  If, for the purpose of obtaining or enforcing judgment against Borrower in any court or in any jurisdiction, it becomes necessary to convert into or from any currency other than the Obligation Currency (such other currency being hereinafter referred to as the "<u>Judgment Currency</u>") an amount due in the Obligation Currency, and in the case of other currencies, the rate of exchange (as quoted by a financial institution or known dealer in such currency designated by the Required Lenders) determined, in each case, as of the Business Day immediately preceding the day on which the judgment is given (such Business Day being hereinafter referred to as the "<u>Judgment Currency Conversion Date</u>").

(b)    If there is a change in the rate of exchange prevailing between the Judgment Currency Conversion Date and the date of actual payment of the amount due, the Borrower shall pay, or cause to be paid, the amount necessary such that the amount paid in the Judgment Currency, when converted at the rate of exchange prevailing on the date of payment, will produce not less than the amount of the Obligation Currency which could have been purchased with the amount of the Judgment Currency stipulated on the judgment or judicial award as the rate of exchanged prevailing on the Judgment Currency Conversion Date.

(c)    For purposes of determining any other rate of exchange for this <u>Section 10.26</u>, such amounts shall include any premium and costs payable in connection with the purchase of the Obligation Currency.

Section 10.27    [Reserved.]

Section 10.28    <u>DIP Orders</u>.  In the event of any conflict between the terms of the DIP Orders and the terms of this Agreement or any other Loan Document, the terms of the DIP Orders shall govern and control.

Section 10.29    <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties with respect to the subject matter hereof, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

-143-

(b)      the effects of any Bail-In Action on any such liability, including, if applicable:

(i)      a reduction in full or in part or cancellation of any such liability;

(ii)      a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)      the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

In the event that a Lender has been notified by an EEA Resolution Authority that it has or may be subject to a Bail-In Action, it shall immediately notify the Administrative Agent who shall in turn promptly notify the Borrower.

**[REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first written above.

**STRATEGIC MATERIALS HOLDING CORP.**,
as the Borrower

By: _____
Name: Paul Garris
Title:   Senior Vice President and Chief Financial
         Officer

**SMI GROUP ACQUISITIONS, INC.**,
as Holdings

By: _____
Name: Paul Garris
Title:   Senior Vice President and Chief Financial
         Officer

[Signature Page to Superpriority Secured Credit Agreement]

**ACQUIOM AGENCY SERVICES LLC**,
as a Co-Administrative Agent


By: _____
Name:
Title:


**SEAPORT LOAN PRODUCTS LLC**,
as a Co-Administrative Agent


By: _____
Name:
Title:

[Signature Page to Superpriority Secured Credit Agreement]

[_],
as a Lender


By: _____
Name:
Title:

[Signature Page to Superpriority Secured Credit Agreement]

Exhibits to DIP Credit Agreement

Intentionally Omitted

**<u>EXHIBIT C</u>**

**Strategic Materials, Inc. Affiliate Structure Chart**



SMI Topco Holdings, Inc. (DE)
SMI Group Ultimate Holdings, Inc. (DE)
SMI Group Holdings, LLC (DE)
SMI Group Acquisitions, Inc. (DE)
Strategic Materials Holding Corp. (DE)
NexCycle, Inc. (DE)
NexCycle Canada, Ltd and its subsidiaries
Strategic Materials, Inc. (DE)
American Specialty Glass, Inc. (DE)
SMI Reflective Industries HoldCo, LLC (DE)
SMI Reflective Recycling NE HoldCo, LLC (DE)
SMI Reflective Recycling HoldCo, LLC (DE)
Ripple Glass, LLC (DE)
SMI Equipment, Inc. (DE)
Container Recycling Alliance, LLC (DE)
SMI BevCon HoldCo, LLC (DE)
SMI Nutmeg HoldCo, LLC (DE)
Strategic Materials Mexicana S.A. de C.V. (MX)
Key
Debtor Entities
Non-Debtor Entities*
DIP Loan Parties

# EXHIBIT D

## Summary of Approved Budget

**Strategic Materials, Inc.**

*Initial DIP Budget (Condensed)*
*($ in 000s)*

| Forecast Week # ><br>Period Ending Date > | 1<br>12/8/23 | 2<br>12/15/23 | 3<br>12/22/23 | 4<br>12/29/23 | 5<br>1/5/24 | 6<br>1/12/24 | Total |
|---|---|---|---|---|---|---|---|
| **Total Receipts** | **$3,257** | **$5,120** | **$5,123** | **$5,308** | **$4,994** | **$5,133** | **$28,935** |
| Trade Payable | (5,491) | (5,491) | (5,491) | (5,491) | (5,491) | (6,024) | (33,479) |
| Personnel Costs | – | (1,129) | (482) | (1,129) | (482) | (1,129) | (4,350) |
| Corporate Card Payment | – | (350) | – | (350) | – | (350) | (1,050) |
| Property Leases, Utilities, Insurance | (213) | (213) | (213) | (315) | (1,255) | (266) | (2,474) |
| Taxes | (17) | – | (202) | – | (136) | – | (355) |
| **Total Operating Disbursements** | **($5,721)** | **($7,182)** | **($6,388)** | **($7,285)** | **($7,364)** | **($7,768)** | **($41,708)** |
| Chapter 11 Case Costs | (3,198) | – | – | – | (632) | (2,200) | (6,031) |
| **Total Cash Flow** | **($5,662)** | **($2,062)** | **($1,265)** | **($1,977)** | **($3,002)** | **($4,835)** | **($18,804)** |
| Beginning Book Cash | 3,851 | 5,864 | 6,561 | 7,225 | 8,180 | 9,009 | 3,851 |
| Cash Flow | (5,662) | (2,062) | (1,265) | (1,977) | (3,002) | (4,835) | (18,804) |
| DIP Draw | 7,675 | 2,759 | 1,929 | 2,932 | 3,830 | 2,385 | 21,511 |
| **Ending Book Cash[1]** | **$5,864** | **$6,561** | **$7,225** | **$8,180** | **$9,009** | **$6,558** | **$6,558** |
| Unused DIP Balance | 13,836 | 11,077 | 9,148 | 6,215 | 2,385 | – | – |
| Minimum Liquidity | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) | (3,000) |
| **Liquidity** | **$16,699** | **$14,638** | **$13,373** | **$11,396** | **$8,394** | **$3,558** | **$3,558** |

**Notes:**

*Debtors SMI Topco Holdings, Inc., SMI Group Ultimate Holdings, Inc., and SMI Group Holdings, LLC are not parties to the DIP Facility but the DIP Loan Parties will distribute funds to those Debtors in order to pay their fees and expenses in administering their chapter 11 cases.*

*[1] Ending Book Cash balance does not include the Corporate Card escrow account balance (approximately $0.8m of restricted cash).*